1

```
1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
2                       ATLANTA DIVISION


3


4   BELCALIS MARLENIS ALMÁNZAR,      )
                                     )
5                   Plaintiff,       )
             v.                      )   CIVIL ACTION
6                                    )   FILE NO. 1:19-CV-01301-WMR
    LATASHA TRANSRINA KEBE a/k/a     )
7   LATASHA TRANSRINA HOWARD and     )
    STARMARIE EBONY JONES,           )
8                                    )   MOTION HEARING
                    Defendants.      )
9   _____ )


10


11

    ---------------------------------------------------------------
12


13        BEFORE THE HONORABLE WILLIAM M. RAY, II


14             TRANSCRIPT OF PROCEEDINGS


15                  OCTOBER 7, 2019


16

    ---------------------------------------------------------------
17


18
         Proceedings recorded by mechanical stenography
19         and computer-aided transcript produced by


20
                WYNETTE C. BLATHERS, RMR, CRR
21                  Official Court Reporter
                    1714 U.S. Courthouse
22                 75 Ted Turner Drive, SW
                   Atlanta, Georgia  30303
23                     (404) 215-1547


24


25
```

```
 1   APPEARANCES:

 2   For the Plaintiff:          SARAH M. MATZ
                                 Attorney at Law
 3                               Adelman Matz, P.C.
                                 1173A Second Avenue
 4                               Suite 153
                                 New York, New York  10065
 5
                                 WILLIAM A. PEQUIGNOT
 6                               Attorney at Law
                                 Moore Pequignot, LLC
 7                               887 West Marietta Street
                                 Suite M-102
 8                               Atlanta, Georgia  30318

 9   For the Defendants:         OLGA IZMAYLOVA
                                 SADEER SABBAK
10                               Attorneys at Law
                                 Sabbak & Izmaylova, LLP
11                               1875 Old Alabama Road
                                 Suite 760
12                               Roswell, Georgia  30076

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    Monday Afternoon Session

 2                       October 7, 2019

 3                         1:40 p.m.

 4                          -  -  -

 5               P R O C E E D I N G S

 6          COURTROOM SECURITY OFFICER:  All rise.  United States

 7  District Court for the Northern District of Georgia, Atlanta

 8  Division, is now in session, the Honorable Judge William M.

 9  Ray, II, presiding.

10          THE COURT:  Thank you, ma'am.  Y'all can be seated.

11  All right.  So we're here on the motion to dismiss

12  counterclaim filed by the defendants.  The motion itself was

13  filed by the plaintiff.  So ready to proceed?

14          MS. MATZ:  Yes, your Honor.  Absolutely.  Would it be

15  okay if I stand up here, your Honor?

16          THE COURT:  Yes.

17          MS. MATZ:  Thank you.  I am from New York, so I just

18  want to make sure I'm following local rules.

19          Good afternoon, your Honor, and may it please the

20  Court.  The essence of our motion is that the defendant, Kebe,

21  has failed to state each of the causes of action that she has

22  alleged against my client.  The first cause of action she's

23  alleged against my client is slander per se.  The main issues

24  with her pleading are that she has not sufficiently pled any

25  words that are actually slander per se or that would be
```

1  actionable period.

2          As an initial matter, the pleading does not actually

3  satisfy the Rule 8 standard.  Ms. Kebe has failed to allege

4  the exact words that my client used and oftentimes is

5  paraphrasing in a very conclusory manner, which fails to meet

6  the standard set out in *Twombly*.  But more importantly than

7  that, even --

8          THE COURT:  What about the comment, what about the

9  statement that she called the defendants -- I guess the

10  defendant.  Is Latasha a woman?

11          MS. IZMAYLOVA:  Yes, she is, your Honor.

12          THE COURT:  What did she call Latasha Kebe?  A liar?

13  What about that?  That seems pretty specific.

14          MS. MATZ:  Well, I don't think that -- so in the

15  context of those, those statements were clearly opinion.  So I

16  think that that would go to the point of slander per se that's

17  to professional reputation or at least that's what the

18  defendant has argued.  But the law is very clear that it can't

19  be slander per se or a statement about somebody's reputation

20  that's actionable if it's about a specific incident as opposed

21  to generally.

22          In all the statements they've actually alleged, if

23  you look at what they pled in their complaint, which is

24  actually a little different than what they argued in their

25  motion, well, what they alleged in their complaint is that my

1  client made statements about a particular instance, that the

2  sources that she had about my client were illegitimate and

3  that she made up stories about my client.  And the law says

4  that when a person is commenting on a particular instance,

5  that is not enough to be actionable to impugn someone's

6  character generally and that it can't be actionable slander

7  per se.

8          One of the cases that we cited on this particular

9  subject is the *Lucas v. Cranshaw*, talks about the single

10  instance versus not single instance.  And the law says that

11  when you charge plaintiff with a single instance of being

12  negligent or not doing something right, that that doesn't

13  actually imply that the person is generally unfit in their

14  profession so that that can't actually be actionable.  And

15  that's really the only ground that they have argued is slander

16  per se.  In their opposition they essentially conceded that

17  there weren't any statements that qualified under either of

18  the other two exceptions.

19          And, you know, part of the issue here is that because

20  they didn't allege the specific statements that were made,

21  they in the opposition have tried to twist the facts.  For

22  example, in the opposition they argued that those statements

23  were general by saying that she made up stories generally, but

24  the pleading actually says she made up stories about

25  plaintiff.

```
 1              The other issue, though, however, is that the -- she
 2      also hasn't -- even if the Court believed that that could fit
 3      into the slander per se exception, there's other reasons why
 4      that should be dismissed.  First and foremost, Ms. Kebe has
 5      not actually alleged any facts to support actual malice, which
 6      is required here.  I don't think that there's any dispute that
 7      she is at the very least --
 8              THE COURT:  Well, that seems a little farfetched to
 9      argue that, if we assume that calling someone a liar is libel
10      per se, that there's not malice involved in that?  I mean --
11              MS. MATZ:  Well --
12              THE COURT:  It seems to be inherent in the use of the
13      term.  I mean, when you call someone a liar, I mean, that's
14      one of the -- lawyers generally in court follow the rule, at
15      least here, that we don't call people -- we don't call other
16      lawyers liars, even when they're lying.  I mean, we dance
17      around it.  We say they're not being, you know, completely
18      accurate about the facts.
19              But, generally speaking, when you call someone a
20      liar -- and the reason why we dance around it here is because
21      it's not polite.  It's generally thought to be unprofessional
22      to use that term.  Sometimes it's unavoidable, I suppose, and
23      you see it more often used by a lawyer in a closing statement
24      as opposed to earlier in a trial.  But it just seems like
25      that's inherent when you call someone a liar, that that is so
```

1  offensive, though it could be true clearly, but that it's

2  malicious.  And here the defendants' claim is that it's not

3  true, that the plaintiff knows it's not true, and so if that's

4  true, if it's not true and the plaintiff knows it's not true,

5  how could it not be malicious?

6         MS. MATZ:  Well, I don't think that they've actually

7  alleged facts to support what your Honor just said and I will

8  say --

9         THE COURT:  You are aware that the Eleventh Circuit

10  pleading standard generally gives parties, when an allegation

11  is made that a pleading is not specific, usually give them an

12  opportunity to reframe that argument.

13         MS. MATZ:  Yes, absolutely.  However, here in the

14  opposition the -- yes, the defendant hasn't actually stated

15  any ability to do so or argue that there are additional facts

16  that they would plead to cure this error.  Their opposition

17  actually didn't talk about it at all, and the pleading

18  standard set forth in *Twombly*, which governs all federal

19  pleading standards, is that there have to be facts alleged to

20  support the legal conclusion element.  And here with respect

21  to actual malice, that's all they did.

22         And with respect, your Honor, I do think that, you

23  know, the statements that they have pled they didn't actually

24  plead that she called her a liar using that term.  They said

25  that she, Kebe, makes up stories about plaintiff and that she

1  doesn't have legitimate sources giving her information.  And,

2  you know, many of those statements and many of the cases we've

3  cited in our brief show that statements akin to that have

4  actually been held to be nonactionable opinion in Georgia.

5       One of the cases we cited was -- the statement was

6  that they were a crook, which I would say is akin to calling

7  someone a liar.  It's essentially saying they're dishonest or

8  disreputable.  That was held to be nonactionable opinion.  I

9  believe that statement, that was *Swanson Towing v. Recovery*

10  (sic), which is a Georgia state case.  There's also the

11  *Cottrell* case which, I think, shares a lot of similarities

12  here because the plaintiff was suing someone who made certain

13  statements on the internet and had been blogging.  And some of

14  the statements were akin to that as well.  They said, the

15  blogger, at that point said -- they criticized and said, his

16  runs weren't even real saying --

17       THE COURT:  I'm sorry.  His what wasn't?

18       MS. MATZ:  His runs weren't even real.  He had talked

19  about his jogging and statements he made about that and he was

20  a -- the plaintiff in that case was an evangelical, I guess,

21  moral leader you could call him.  And so part of his claim was

22  that some of the statements that were made about him, you

23  know, affected his reputation within the industry.  They also

24  called him not trustworthy.  The Court held that was an

25  opinion statement.  They said he seems like a scam artist.

1  Then the Court held that to be --

2      THE COURT:  Well, so I guess my point -- I mean, one

3  is we're at a motion to dismiss phase and not at a summary

4  judgment phase, but those things are things that are not terms

5  of art.  What does -- what is the definition of crook?  I

6  don't know.  You may ask ten different people and get ten

7  different explanations.  And granted you clarified that you

8  don't believe that the term "liar" was used, but that's not a

9  term of art as much.  I mean, that is, you either tell the

10  truth or you don't.  But scam artist, crook, I don't know what

11  those terms necessarily mean.  It really depends on the

12  context.

13      MS. MATZ:  Well, I do think that there's ample

14  authority given the statements that she actually made.  I

15  think the only place I saw in the pleading that used the word

16  "lie" was where she said the allegation, Kebe's allegation, is

17  that my client told, my client told many other lies, actually

18  calling my client a liar.  That's the only place I saw the

19  word "lie."

20      You know, the other statements about saying that

21  she's making up stories about her or that her claims were

22  illegitimate, you know, or that her sources about plaintiff

23  are illegitimate, again, that gets back to, one, those are

24  also terms that are akin to the types of things that are

25  opinion or rhetorical hyperbole.  You know, saying a source is

1   not legitimate, you know, it's kind of like calling someone a

2   crook or calling them not trustworthy.  You don't know exactly

3   what that means, which does render an opinion because for a

4   statement to be defamatory, the speaker has to be saying I am

5   saying a fact about this other person and not describing what

6   they believe their opinion is, not using types of rhetorical

7   hyperbole because the law doesn't want to limit speech like

8   that.

9          And, you know, I would say that I also think that the

10  statements they're actually pleading, again, get back to this

11  idea of if you are trying to allege slander per se, you have

12  to show that the statements that were made affected the

13  reputation generally; right?  They're saying in all instances

14  you don't have legitimate sources.  In all instances you're

15  making up false stories.  That's not what my client said at

16  all or allegedly said.  The exact statements aren't pled in

17  here, and we're not conceding that any of them were made.

18  But, you know, to the extent that my client is alleged to have

19  made certain statements, the statements she is alleged to have

20  made were only about this one instance, and that doesn't

21  affect the character in the way that slander per se wants to

22  protect.

23          THE COURT:  I'm going to jump -- I want to jump past

24  the original argument you made that this is only directed to

25  this incidence and not generally making up, for example,

1  making up stories.  But I think you would probably agree that

2  if someone accused a lawyer of lying, that affects the

3  lawyer's general reputation.

4          MS. MATZ:  Well, that --

5          THE COURT:  If a judge finds that a lawyer is in

6  contempt because they lied to the Court, my guess is that's

7  going to affect a lawyer's general reputation in the industry.

8  You know, Judge X in the Southern District of New York found

9  this lawyer committed contempt by lying to the Court.  So, I

10  mean, maybe that can't be used against a lawyer in another

11  court proceeding, but it certainly could be used against a

12  lawyer from a marketing perspective.

13          So, I mean, that's the problem I have and we're

14  also -- you know, again I'm looking past your argument, and

15  we'll deal with that in due course related to whether or not

16  the allegations that were made were general or specific as it

17  relates to when she made up her stories.  I do think when you

18  call somebody a liar who's in the information business, which

19  this blogger is in, I guess, that they can affect their

20  overall reputation.

21          MS. MATZ:  So that's actually a very interesting

22  example, and one of the cases we've cited actually kind of

23  touched on this.  I believe it was the -- and it actually was

24  a lawyer, so that's a very fortuitous metaphor you brought up.

25  And I'm looking for the name of it, and I will find it.  But

1   the facts of the case were essentially that the statement that

2   was made about the lawyer was that he hadn't shown up.  Okay.

3   And one of the issues the Court was actually dealing with was

4   -- and the Court construed that statement to mean the lawyer,

5   you know, essentially didn't do his job, and the communication

6   itself, though, because it was talking about a specific

7   appearance versus that the lawyer hadn't shown up in general

8   to do his job period, so hadn't shown up at one appearance

9   versus hadn't shown up to do his job.

10          The Court looked at that and said, well, even if they

11  were wrong, right, the statement itself was about one

12  instance, not that the lawyer was generally incompetent and

13  drew that distinction.  So, you know, I'm not going to say

14  that, you know, I would ever be wont to be in the position

15  that your Honor just gave, and certainly I could imagine

16  situations where that could have some effects.  However, the

17  law for slander per se draws a very clear distinction between

18  statements about a specific situation where someone is either

19  criticizing or giving their opinion or even making factual

20  statements about a specific situation versus their character

21  and reputation generally.  So I think --

22          THE COURT:  The argument you're making is there's a

23  distinction between the plaintiff saying she's lying about me

24  here versus saying everybody knows that this blogger lies all

25  the time.

1           MS. IZMAYLOVA:  Yes.  And I do think there's a

2    distinction, and a lot of the cases that we have cited to talk

3    about that distinction because the way at least the cases in

4    Georgia have interpreted that is that one statement even

5    though, yes, of course the person is going to say, well, you

6    know, me being called a liar in this one instance, other

7    people could believe I might be lying in other instances,

8    that's absolutely something that that person would claim.

9           What the law is saying and what a lot of the cases

10   are saying is but that's not slander per se because that

11   person isn't saying that in all instances you're going to lie.

12   That person isn't saying that, you know, because you lied in

13   this one instance that you are lying everywhere else in their

14   life.  They're just saying you didn't tell the truth in this

15   one instance.  That's what the cases say.

16           And I think that the allegations they've made are

17   even more specific than -- well, they're more specific than

18   just saying she's a liar; right?  And they were specific to

19   the story that was told about my client.  Any of the alleged

20   statements were talking about that, and that's how they have

21   alleged it.  So I don't think that it can qualify for slander

22   per se.

23           And, you know, just getting back to the actual malice

24   case, you know, if someone knows they're not telling a truth,

25   I can see where your Honor is saying that that should be just

1    kind of implied.  But when you are a limited purpose public

2    figure, the standard is higher.  The standard of proof is

3    higher, and the standard of pleading is higher.  And, you

4    know, Courts don't typically, at least in the federal cases

5    that we cited in our brief, don't typically presume actual

6    malice.  They want to see that -- because actual malice isn't

7    just, you know, that you either had to have known you were

8    lying in that moment and there has to be proof of that or you

9    have to show proof that the person who uttered the statement

10   was entertaining serious doubts as to the veracity of the

11   statement itself.

12          THE COURT:  And how do you do that, Ms. Matz?

13          MS. MATZ:  Well, I think that there are -- sometimes

14   I think you can show evidence that the person maybe made

15   statements to someone else that they weren't sure it was true,

16   which is actually how we've pled it in the reverse.

17          THE COURT:  Statements to someone else about a

18   totally different incident?

19          MS. MATZ:  No, maybe like -- I'll give you part of

20   the example for --

21          THE COURT:  Well, you could do it with direct

22   evidence.  Direct evidence is that the plaintiff told someone

23   else, hey, I'm going to say this was not true, but she could

24   also do it with circumstantial evidence.

25          MS. MATZ:  Right, exactly.

1      THE COURT:  And circumstantial evidence can be that

2  it's -- that the plaintiff knows that what the blogger said is

3  true.  If the plaintiff knows what the blogger says is true

4  but then goes out and says it's not true and she made it all

5  up, you could presume -- you could infer actual malice by the

6  plaintiff denying and saying that the defendant is lying about

7  her just from that point, I would think.

8      I mean, that's what circumstantial evidence -- I

9  mean, that would be pretty -- that would probably be the

10  strongest circumstantial evidence.  But if it's true that the

11  plaintiff is lying about her, I mean, let me -- because we've

12  got multiple lies here.  We've got the plaintiff lying, the

13  defendant lying --

14      MS. MATZ:  Yes, your Honor.

15      THE COURT:  If it's true what the defendant said

16  about the plaintiff, the plaintiff going out and denying it

17  and saying she made it all up, I mean, jumping past the first

18  argument about individual incident versus general, but, I

19  mean, I would think that would show the malice right there,

20  you know, you could argue, I suppose.  But it doesn't really

21  mean she has malice towards the defendant.  She was just

22  protecting herself even if she was lying about protecting

23  herself.  But, you know, I mean --

24      MS. MATZ:  Right.

25      THE COURT:  -- your argument about how you would

1    prove malice, how you would have to plead malice eliminates

2    the circumstantial evidence in that regard.  If it's true what

3    the blogger said about the plaintiff, then the plaintiff going

4    out and saying the blogger made it up and lied when she did,

5    sounds like to me that that would allow the jury to reasonably

6    infer that there was malice there.  And the malice standard is

7    the malice standard.  The difference between public figure and

8    non-public figure is that you have malice; right?  Because if

9    it's not a public figure, you don't have malice.

10        MS. MATZ:  All you have to prove is falsity, correct.

11        THE COURT:  So I think your best argument is the

12   first one that you were latching onto.  I'm not sure I can

13   agree with you on that one, at least not at this stage, maybe

14   later.  But I think your best argument is probably that all

15   she did was make comments about this particular incident.

16        MS. MATZ:  So the other issue here is that to the

17   extent that, you know, our position is that this doesn't fall

18   into slander per se so if she wants it to be other actionable

19   types of slander, there have to be special damages pled and

20   here that has not actually been pled.  Rule FRCP 9(g) requires

21   that called out specifically that it must be pled with

22   particularity.  Here there's --

23        THE COURT:  -- just advertising because you said I

24   was a liar and that kind of thing?

25        MS. MATZ:  I think there's probably issues of proof

1  with that later, but that's not the issue here today.  But,

2  yeah, no, things like that aren't even enough.  And, actually,

3  the cases on this talk about how, A, you have to plead facts

4  that show causation; right?  Not just generally you did it and

5  therefore I was harmed.  There's a lot of reasons why people

6  may or may not advertise or may or may not choose to watch the

7  content that Kebe is putting out into the world.

8          THE COURT:  But as soon as you made the allegation, I

9  had three subscribers who canceled.  We see that all the time

10 in the press when something negative comes out about a

11 celebrity, you know, everybody jumps on board to cancel their

12 endorsement contracts.  I don't think it's -- I don't know

13 what the facts are here, so it may be nothing like that.  But,

14 I mean, that would be an example to me of special damages if

15 Ford Motor Company and General Foods and others who may have

16 been advertising on their site had canceled immediately after

17 a celebrity said whatever she said.

18         MS. MATZ:  And if that -- if facts had been alleged

19 along that line, I would probably be saying, at least for the

20 purposes of a motion to dismiss, that the pleading standard --

21 whether they can prove it is a different issue; right?  But

22 had they actually alleged, yes, but that's not what they did

23 here.  What the defendant did here is just say I suffered

24 damages, and some of that is advertisers generally.  No names

25 of who, no talking about a timing.  We don't even actually

1  know when the statements she's claiming my client made were

2  made or when any of the alleged damage happened.  If you look

3  at paragraphs 220 and 226 of the counterclaim, you know, it's

4  just mimicking language.  As a direct result of Cardi B's

5  defamatory statements, Ms. Kebe's Instagram account was

6  deleted several times.  She lost thousands of subscribers,

7  lost several third party advertisers.  There's no facts that

8  said statement was made on X date, a third party advertiser

9  canceled on X date or they said to me I'm canceling because of

10  this or any of that.  That's what's required here for this to

11  be plausible.

12          The other issue is the actual damages themselves.  If

13  you look at the way she's pled her damages, she's just asking

14  for $3 million, and the Courts have been very clear that,

15  first of all, you know, for something to be a special damage,

16  it must be something of material value and you have to plead

17  what that is.  You have to say I lost $10,000 in advertising

18  revenue or, you know, this is what my monthly income was and

19  then, you know, they canceled and I know it was because of

20  this and this is the amount of revenue I lost.  The

21  specificity requirement of pleading special damages does not

22  allow you to go into court and just say these things happened,

23  and I want $3 million.  So that just hasn't been pled with

24  specificity.

25          THE COURT:  Yeah, well, I mean, I'm just -- the

1   nomenclature normally doesn't control, but in this case she

2   titles her claim as slander per se from the very beginning

3   under Count One.  I agree that there doesn't appear to be any

4   intent to try to show that there is special damages.  If there

5   is a valid slander per se claim, the presumed damages that

6   Georgia law allows for slander per se, the $3 million would

7   sort of fit because you could -- I mean, I'm not saying that's

8   a legitimate reasonable thing to ask for, but it is an

9   enlightened conscience standard at that point, right, when

10  you -- or is it?  When you plead libel per se, what does --

11  how does the jury determine what the damages would be?

12         MS. MATZ:  Well, so that depends also on whether or

13  not you get punitive and --

14         THE COURT:  Forget about punitives for a minute, but

15  just the general damages themselves.

16         MS. MATZ:  Yeah.  So, I mean, I think it depends on

17  some of the egregiousness of the conduct.  But you also have

18  to keep in mind, your Honor, and, if I may, that the damages

19  are only presumed for Categories 1 through 3 of slander per

20  se, not for the fourth.  So when you say --

21         THE COURT:  Tell me the difference in those.

22         MS. MATZ:  Yeah, so Categories 1 through 3 of

23  defamation are statements about -- the first one is statements

24  about that somebody has a loathsome disease.  The second one

25  is about their professional reputation, and that's the one

1  that they could potentially be claiming.  I am not recalling

2  the third one off the top of my head, although I'll find it in

3  a second.  But the fourth one is the other one that they could

4  be potentially trying to fit in, and that is other types of

5  slanderous conduct plus special damages.

6        That's why it matters, because to the extent your

7  Honor agrees with us on our motion that this doesn't fit into

8  slander per se for harm to someone's professional reputation

9  because the statement was about a specific incident and not

10  about reputation generally, that for them to still get into

11  slander per se, they would have to show the other slanderous

12  statements plus special damages.  That's the other way to get

13  into the slander per se we'll call it.

14        THE COURT:  And if we're not under that section,

15  we're under No. 2, then what do you tell the jury that is

16  their guide for how much damages to award if they decide that

17  they should award damages?

18        MS. MATZ:  Well, some of it could be based on actual

19  damages, and then, you know, the other piece of it, I guess,

20  is you have the general damages that you've suffered.  Then

21  you have punitive --

22        THE COURT:  The general damages standard would be

23  enlightened conscience?

24        MS. MATZ:  I believe so, but I'm not going to say

25  that --

1          THE COURT:  I'm just not aware of in Georgia any

2   other standard for general damages but that.  There may be

3   another one but you've -- I mean, I'm just thinking about the

4   jury instructions I've given, and generally enlightened

5   conscience is really the only thing it comes to.

6          MS. MATZ:  Yeah.

7          THE COURT:  So can we talk a little bit about the

8   assault and the intentional infliction claim?

9          MS. MATZ:  Yes.

10          THE COURT:  Okay.  You have a multitude of issues

11   with those.  I'm a little unclear.  Is it Mr. Skeemo?  Is that

12   his name, the --

13          MS. MATZ:  There's someone in the complaint called

14   Skeemo.

15          THE COURT:  Okay.  So Skeemo alleged, I think, that

16   he -- it's alleged that he posted violent messages making

17   threats against plaintiff.  So is your argument about the

18   assault part that the plaintiff didn't make the threats or

19   that Mr. Skeemo's threats wouldn't be enough to constitute an

20   assault even if the plaintiff had made the threats or both?

21          MS. MATZ:  Both.

22          THE COURT:  Okay.  So let's talk about the second

23   part that's not enough.  What is it that's alleged that

24   Mr. Skeemo said or did?

25          MS. MATZ:  It's not.  The only thing that's alleged

1   is that he posted violent messages.  There is no allegations

2   about what the content of those messages were, when they were

3   posted, how the plaintiff or -- I'm sorry -- how the defendant

4   became aware of them.  She says there were violent messages

5   posted and that she was told about them by various other

6   sources, so I think that presents a multitude of problems.

7   One is -- sorry.  Were you going to --

8       THE COURT:  Let's say that there are more facts she

9   can add about that, that he, Skeemo, posted statements like --

10  I'm just making stuff up because I don't know what they are

11  either -- watch your back.  Maybe that was one that I was told

12  was in here somewhere.  You know, you're going to get it,

13  things like that, would that be enough for -- we're talking

14  about Skeemo here -- for there to be an assault claim against

15  him?  I know he's not sued here but --

16      MS. MATZ:  Right.  I actually don't think that that

17  even would be enough if you look at some of the cases we cited

18  about this issue of what's a reasonable apprehension of an

19  immediate injury.  So one of the cases on *Johnson v. State*,

20  this was actually -- first of all, there was physical presence

21  in this case that I'm talking about, Johnson v. State, which

22  there is not here; right?  These are allegedly posted on the

23  internet.  And in that there was a crowd of people, and this

24  gentleman walked kind of towards the car.  I think it was a

25  picket line or something.  He kind of walked towards this car

1   that people were in, and he was a few feet from the car.  He

2   didn't have a weapon, but he pointed at them and said, we're

3   going get you.  Okay.  And the Court said there was no

4   physical weapon.  He didn't come any closer to the car.  He

5   was several feet away, and, you know.

6         At worst that -- at worst that would have -- it was

7   not a fear of an immediate injury or that his act or, you

8   know, his actual words would cause a reasonable person to fear

9   immediate injury.  Maybe it would cause them to apprehend some

10  fear in the future, but that wasn't enough to constitute

11  assault.  So, no, I don't think, to answer your question, I

12  don't think that even if that was the allegation that this

13  Skeemo person allegedly said, I don't think that that would be

14  enough.

15        I think that most of the cases where assault -- where

16  there is words only will find assault are coupled with facts

17  that show that the person could actually accomplish those

18  words right then; right?  There's the -- actually, you know,

19  this kind of distinguishes some of the cases they've cited.

20  One of the cases was *Wallace v. Stringer*.  The person -- it

21  was a shoplifter, and the person said, I'm going to drag you

22  back to the store.  But they were physically right there;

23  right?  They could have accomplished that threat at that

24  moment, so either a physical presence or something else that

25  would allow you as the judge who's deciding this claim to

1  believe that someone could reasonably infer an immediate

2  injury.

3            So I don't think mere words are enough.  I think it

4  has to be either coupled with some other physical threat or

5  some other thing that allows you to believe that they could

6  accomplish that.  And here, again, none of those facts are

7  pled.  Not only do we not know the content of the messages --

8  that's Problem No. 1 -- and Problem No. 2 is there's no facts

9  alleged that my client had any responsibility for these

10 messages or, you know, posted them, that my client actually

11 did any of this.  This is essentially saying someone told --

12 all this is tantamount to is saying someone told me that

13 someone named Skeemo posted a violent message on the internet,

14 and now somehow the plaintiff should be responsible for that.

15           THE COURT:  Wasn't there some allegation, though,

16 also that -- and this may have been just under information and

17 belief, but that Skeemo and the plaintiff schemed or

18 strategized about how to get back at the defendant for the

19 statements that she had made?

20           MS. MATZ:  I think that there's an allegation that

21 says that my client -- the allegation, I believe, is that my

22 client published a conversation that they were gathering

23 information on her, which, again, gathering information on

24 somebody isn't a threat to someone's physical harm whatsoever

25 and, you know -- so that's my recollection of what the

1   allegation was.

2           THE COURT:  Does the complaint allege that Skeemo is

3   a gang member?

4           MS. MATZ:  Well, it's a little unclear because

5   there's an allegation that says as a direct result of Cardi B

6   and her fellow gang member's threats.  But, again, there's not

7   specific reference to --

8           THE COURT:  Skeemo?

9           MS. MATZ:  Yeah.  And there's also no specific

10  reference to my client making a threat.  So I'm not sure

11  what --

12          THE COURT:  So your client making a threat?

13          MS. MATZ:  Except for they made an allegation that my

14  client said I'm going to sue you, which my client did sue her,

15  but that's not, you know, that's not the threat they're

16  talking about with reference to the assault claim.  But, you

17  know, that's the threat that's alleged that my client made.

18          THE COURT:  So there's no question there's problems

19  in the way that this assault claim and particularly the

20  intentional infliction claim pled as far as what the plaintiff

21  did, what Skeemo did or alleged.  But, generally speaking,

22  would you agree with the proposition that if a person induced

23  another person to make a threat that could be reasonably

24  interpreted to be a physical threat, that that would

25  constitute facts sufficient to support a claim for intentional

1  infliction of emotional stress under Georgia law?

2          I mean, I know I'm asking you to jump over a lot of

3  hoops here, and I'm also asking you to take that out of

4  context for this specific case.  Georgia follows what's called

5  party to the crime theory, which is like aiding and abetting,

6  and you don't have to actually do the act to be guilty of the

7  crime.  You just have to play a part in it.  And if you

8  encourage another person to commit a crime, then you're just

9  as guilty under Georgia criminal law as the person who commits

10  the crime for the full extent.

11          So, you know, under that framework it seems that if

12  you were to induce someone to make a threat that reasonably

13  could be interpreted to be a physical threat against someone,

14  that that could support a claim of intentional infliction of

15  emotional distress.

16          MS. MATZ:  So the only reason I'm going to say I'm

17  not sure I agree with you is this:  That I think that, you

18  know, there could be other torts that that might fall under

19  also.  But part of the thing here is the degree of, you

20  know -- that it has to be either intentional or reckless.  It

21  has to be extreme or outrageous, and there has to be a causal

22  connection.  So I guess that just assumes a lot of things

23  about what --

24          THE COURT:  Well, it does away with the causal

25  connection.  It does away with the intentional thing.  The

1  question is -- the extreme part, it seems to me that if the

2  physical threat is one of death -- you know, again we're

3  making some assumptions here.  But, I mean, look, I'm very

4  familiar with intentional infliction of emotional distress.

5  I've been a lawyer in Georgia a long time.  I was a trial

6  judge in the state system, and there are not a lot of cases

7  that succeed under this tort, very rare.

8       But it would seem like the perfect place for the case

9  to succeed is if you induce someone to threaten to kill

10  somebody.  That's sort of what's alleged here, kind of.  I

11  mean, that's the way that the defendant argues it at least,

12  and I don't think it's specific enough.  I agree with you on

13  that point.  But if there were facts that the plaintiff

14  induced someone to threaten someone that reasonably could be

15  interpreted to be a threat against that person's life, seems

16  like that would establish an intentional infliction.

17       MS. MATZ:  So the thing I was going to say -- you

18  said something interesting.  You said I think that does away

19  with the causation.  The thing I was going to say is I'm not

20  sure that it does, and the reason I'm not sure is this, your

21  Honor:  I think it depends on, you know, what that

22  conversation was; right?  If I say to you, hey, tell her that

23  we're going to expose the reason she's lying, right -- this is

24  purely hypothetical -- and then you go out and do something

25  that threatens to kill someone, right, then that is -- then

1   I'm not sure there is a causal connection, right, between what

2   Person A thought that they were inducing and what Person B

3   actually did.

4          So I'm not sure that that would establish it exactly.

5   I think that there are facts missing there that you would need

6   to know before I could agree with the hypothetical you've

7   given me, and that's the point I'm trying to make.

8          THE COURT:  But if the hypothetical is I want you to

9   go threaten to kill her and make her back off and then the

10  person goes out and does threaten to kill someone or uses

11  language that is reasonably interpreted to convey a threat to

12  your safety, then it sounds like that would be an intentional

13  infliction claim.

14         In fact, Georgia law does support intentional

15  infliction claims if you promise to -- if you threaten to

16  disclose private facts about someone.

17         MS. MATZ:  Yeah.

18         THE COURT:  Someone's sexuality or things like that

19  that's not generally known, you know, that can support a claim

20  as well.

21         MS. MATZ:  Yeah, as is the tort of the false light

22  would also -- those two areas of torts intersect, I'll say,

23  that could be actionable under one or both of them depending

24  on whether it was actually threatened.

25         But here the issue is that I didn't get from their

1  argument that they were saying anyone was threatening to kill

2  her.  I have no idea what they're saying was said because all

3  that the messages are described as is violent.  And I don't

4  know what that means, and I don't know what the specific words

5  are.  And all of these cases hinge so much on the specific

6  facts of what's happened, both in the context of, you know,

7  could the statement reasonably be interpreted that way and

8  also, you know, what did the person actually do.  And this is

9  getting back to an assault.  What did they say plus what did

10 they do plus what situation were you in to decide whether or

11 not --

12         THE COURT:  Who the person was that said it matters

13 too, you know, if it's a boy scout who says it, meaning

14 there's something different than if it really is a gang

15 member, for example.  Skeemo was known to the defendant to be

16 a gang member, and he made some kind of threat that could be

17 interpreted multiple ways.

18         MS. MATZ:  Again, I don't think that the defendant

19 has -- to the extent she's made any allegations about Skeemo,

20 I believe they're upon information and belief.  I don't think

21 she's saying that she knew him to be one way or the other, at

22 least that's not my reading of the pleadings.  And, again,

23 there's just -- there is so little facts that get into what

24 was said, you know.  It's this third party saying it.  My

25 client's role is not at all alleged.  My client isn't

1   responsible for what this other person said.

2          THE COURT:  Maybe.  I mean, that's her position.

3          MS. MATZ:  Yes, it is.

4          THE COURT:  That may not be true.  I mean, it depends

5   on whether or not this person is real, whether or not this

6   person was in a gang, whether this person really said

7   something that was threatening, whether the person really

8   collaborated with her.  I mean, I don't think for the purposes

9   of the complaint to be made you've got to know all of it.

10  You've just got to know a little bit more than what's alleged

11  here.

12         MS. MATZ:  You have to know enough for it to be

13  plausible, and the argument we have made is that this pleading

14  has fallen short on every aspect with respect to both

15  intentional infliction and emotional distress and the assault

16  claim in that regard.  The allegations are truly just

17  conclusory.  They're asking you as a judge to just assume that

18  because they use the word "violent", that that's a reasonable

19  apprehension of immediate fear.

20         And the pleading standard in *Twombly* very clearly

21  says just using conclusory language, just mimicking the

22  language of a statute, that's not enough.  You have to, to

23  unlock the doors of discovery, you just have to come with

24  facts that make those allegations plausible.  And here that's

25  not plausible.  It's not plausible for us to even talk about

1   it without both of us saying we're going to have to assume

2   that it was X, Y and Z, and would this qualify.

3        And then I don't know if you have any other -- that's

4   the majority of our argument on both intentional infliction of

5   emotional distress and the assault claim, and I do think that

6   these things could be dealt with on a motion to dismiss.  A

7   lot of the cases that we've cited show that and, you know,

8   given the pleading standard generally.

9        And the other thing is, you know, in our position

10  typically if you have more facts, if you say I want to

11  amend -- well, first of all, they had a -- they could have,

12  you know -- they've already amended once.  So to the extent

13  that they wanted to add additional facts, they have already

14  amended -- well, they had a chance to respond to -- I'm sorry.

15  We amended, and they had a chance to respond to our amended

16  pleading.  They very easily could have added those facts in.

17  But in their opposition they did not come forth with

18  affidavits, copies of the messages, anything else that you

19  typically would see if someone is going to say no, no, no,

20  this violent message is actually violent and it does qualify

21  and I'm going to show the Court the facts that I have so that

22  this claim won't be dismissed.  They essentially just said we

23  think what we alleged is enough, isn't it obvious.  And it's

24  not obvious.

25        So, you know, while I think that in some instances a

1  Court might say you should be -- you know, we're going to let

2  you have leave to amend, I don't think the Courts typically do

3  that when interposing a motion and that's someone's

4  opportunity to either say we can amend or show additional

5  facts that the Court can take on its own to cure the defects

6  in the pleading where they haven't even made an effort to do

7  that.

8          THE COURT:  So you agree that if the claims are

9  dismissed on this basis, they're dismissed without prejudice

10  since there's no merit decision made at this point?

11          MS. MATZ:  I think the Court -- I mean, I think you

12  would have the authority to dismiss with prejudice, but I

13  understand that that might not be what --

14          THE COURT:  Isn't that generally, though, generally

15  if a motion to dismiss is granted based on what wasn't pled,

16  then it's not a decision on the merits?

17          MS. MATZ:  Yes.  Generally that is the case, although

18  sometimes when there's been multiple opportunities, it can be

19  with prejudice.

20          And then the last thing I will just say is that

21  Ms. Kebe has asserted a separate claim for punitive damages

22  here.

23          THE COURT:  There's no such claim.  I mean, it's got

24  to be derivative of an intentional tort.

25          MS. MATZ:  Absolutely, your Honor, and here -- and I

1    just would like to make three specific points, and then I'll

2    stop unless your Honor has any other questions.  But the first

3    point I'd like to make is that she has not pled that she sent

4    a demand for retraction and removal of any statements, which

5    is absolutely required under Georgia law before you can obtain

6    punitive damages for a slander claim.  You have to have sent a

7    demand for a retraction and then waited the statutory period.

8         THE COURT:  And that does relate to paragraph 238 of

9    her counterclaim to the points of slander and defamation, but

10   there would be no demand for a retraction needed for assault

11   and intentional infliction if those were valid torts that have

12   been alleged.  I mean, if you commit the tort, you can be

13   responsible for punitive damages because they're both

14   intentional torts; right?

15        MS. MATZ:  Well, you can be, although you are

16   supposed to, in order to get punitive in those instances, show

17   willfulness conduct, you know, malice, fraud.  And one of the

18   points we made in our motion was that, again, there's been no

19   facts.  All they did here was kind of mimic a statute.

20   There's been no facts alleged.  And, you know, their response

21   to this in the motion was, well, that's a matter for proof.

22   But it also should be pled.  Okay.

23        And, you know, one of the issues here is that, you

24   know, the -- I think that the assault and the intentional

25   infliction of emotional distress claims are pretty problematic

1  and I don't think that -- you know, I think also the slander

2  per se claim should be dismissed for the reasons we talked

3  about.  But even if you were to decide that it survives, the

4  punitive damages claim absolutely should not, and we shouldn't

5  be going through discovery with the defendant having some

6  expectation of punitive damages when she cannot get that under

7  the law because she did not send the statutorily required

8  notice before bringing this claim.

9          THE COURT:  All right.  Thank you, ma'am.

10          MS. MATZ:  Thank you very much, your Honor.  I

11  appreciate the opportunity to explain our positions.

12          THE COURT:  All right.  I'm sorry.  What is -- I'm

13  assuming that you are Ms. Matz?  Are you Sarah Matz?

14          MS. MATZ:  Yes, I am, your Honor.

15          THE COURT:  I'm sorry.  And what is your name, ma'am?

16          MS. IZMAYLOVA:  Olga Izmaylova.

17          THE COURT:  Okay.  Thank you.  Go ahead.

18          MS. IZMAYLOVA:  So I'm going to address the standard

19  of review first because I think it determines the lens with

20  which we look at plaintiff's arguments.  And while I agree

21  that *Twombly* and *Ashcroft* do set the standard federally, the

22  *DaVita, Inc. v. Nephrology Associates* states that while some

23  Courts have adopted a stringent approach and required

24  defamatory remarks to be stated verbatim in the complaint, in

25  the Eleventh Circuit the test remains whether the allegations

1 give the defendant fair notice of the plaintiff's claim and

2 the ground upon which it rests.  It said -- further in that

3 case, the Eleventh Circuit explained that Rule 8(a)(2) does

4 not require that a plaintiff specifically plead every element

5 of a cause of action.

6        And going off of that, to make a claim for slander

7 per se, we are alleging that she referenced the trade,

8 profession, business of our client, and that the allegations

9 were to my client's general character or ability to do the

10 work in her trade --

11        THE COURT:  I've got your complaint, your

12 counterclaim here.  Go to the -- do you have a copy?

13        MS. IZMAYLOVA:  I do.

14        THE COURT:  Go to the paragraphs in the complaint

15 that you think support your argument that the allegations

16 against the plaintiff are not specific as to your defendant

17 but are in general.

18        MS. IZMAYLOVA:  Yes, sir.  I would like to start with

19 paragraph 211.

20        THE COURT:  All right.  Let me catch up with you.

21        MS. IZMAYLOVA:  It's on page 26 -- before I start

22 with that, actually, the beginning of the counterclaim, the

23 beginning paragraphs lay out my client's profession, what she

24 does, you know, all of her social media, how she makes her

25 money.

1          THE COURT:  I've seen all that.

2          MS. IZMAYLOVA:  In paragraph 211 we allege that in

3   the -- in multiple videos, in her Instagram Live videos,

4   multiple, not just one, the plaintiff began to publicly defame

5   my client by referring to her as, you know, "this blogger

6   lady."  She's specifically talking about her.  She stated that

7   my client makes up fake stories period.

8          THE COURT:  Well, let's back up a little bit.  Why do

9   you include in the complaint "this blogger lady"?  I mean,

10  what's defaming about that?

11         MS. IZMAYLOVA:  Because my client puts herself out

12  there as a, you know, celebrity blogger.

13         THE COURT:  Okay.  So she's a lady; right?

14         MS. IZMAYLOVA:  Yes, your Honor.

15         THE COURT:  And she blogs?

16         MS. IZMAYLOVA:  Yes, sir.

17         THE COURT:  This blogger lady.  So, I mean, what

18  inherently is -- I mean that might be akin, I suppose, to

19  referring to someone as little, like little this or little

20  that, but as far as the defaming, I mean, I don't get it.

21         MS. IZMAYLOVA:  It was in the context of after -- on

22  paragraph 207, if you go back to that, it says on

23  September 19th, 2018, my client published this video interview

24  with this other person, Ms. Jones, and then right around --

25  right after that was published, first the plaintiff reached

1   out to my client privately, in a private message on their

2   social media accounts that was not published to the public.

3   But then after they were not able to -- you know, after they

4   stopped communication privately, that's when -- the allegation

5   is that that's when the plaintiff began to post videos on her

6   social media accounts which have millions and millions of

7   followers.  You know, the reason why it's important, this

8   particular matter, is because it happened so close to the

9   actual posting of the interview.

10          THE COURT:  What you're giving me is a temporal

11  connection, but I'm talking about the words themselves.  I

12  mean, is it your contention, is it the defendant's contention

13  that calling the defendant "this blogger lady" is inherently

14  defaming?

15          MS. IZMAYLOVA:  Just that one statement, if it was

16  just by itself, no, that would not be my contention.  But

17  taking all of the things that the plaintiff has said, you

18  know, in the multiple videos that she has posted, it's clear

19  that she's talking about my client.  She --

20          THE COURT:  Well, okay.  I mean, I'm assuming that

21  she's talking about your client but the -- like if the

22  plaintiff goes on an interview and calls your client a

23  "blogger lady", those words themselves don't defame your

24  client in any way, do they?

25          MS. IZMAYLOVA:  No, just those words alone that's not

1    what we're --

2          THE COURT:  In fact, I would say they don't defame

3    her at all.

4          MS. IZMAYLOVA:  No.

5          THE COURT:  So that's not a source of defamation.  So

6    let's skip over the make up fake stories part and go to harass

7    Cardi B's friends.  If she, the plaintiff, says that your

8    client harasses her friends, would that constitute libel per

9    se given she's talking about -- the plaintiff is talking about

10   her friends and not that the defendant harasses people all

11   over or in general?

12         MS. IZMAYLOVA:  And I probably could have put more

13   facts in here but it all -- it's on a video which we do have.

14   Basically she's stating that in an attempt to get information

15   about this, you know, more information about the plaintiff and

16   about this whole situation, the plaintiff began to harass --

17   I'm sorry -- my client began to harass the plaintiff's

18   friends, begin talk stalking plaintiff.  And making up the

19   fake stories, that was a general statement that she said I'd

20   never do qualify that as far as being in regards to plaintiff

21   only, which is an issue which is a point that the plaintiff

22   did address.  As far as it being a specific instance, that's

23   not what we're alleging.  That's not --

24         THE COURT:  Well, is that the only -- the only two

25   things that I can see in this paragraph that might be general

1  would be make up fake stories, which doesn't seem to be

2  qualified, and many other lies, which I don't know what that

3  means.  But all the rest of it deals with Cardi B; right?

4          MS. IZMAYLOVA:  It does -- those -- yes, those things

5  do.

6          THE COURT:  And so following Ms. Matz's argument, can

7  that be a source of libel per se if it's -- if the plaintiff

8  is talking about what the defendant allegedly did relative to

9  the plaintiff, can that be libel per se?

10          MS. IZMAYLOVA:  I believe that it can, and the case

11  law -- well, first off, I would like to point out that the

12  cases that the plaintiff cited, most of them are not in the

13  same procedural posture as this case.  I believe that she

14  cited the case of *Lucas v. Cranshaw*, and that was actually on

15  appeal for a motion for summary judgment.  So the standard of

16  review in a lot of these discussions is different than the

17  standard of review we have currently in this case.

18          And so there does need to be more additional facts.

19  And, you know, the discovery, I guess, period is over by the

20  time that these discussions are being had by the Court.

21  However, in *Milkovich v. Lorain Journal*, the U.S. Supreme

22  Court did state that you cannot just, you know, say that

23  something is just your opinion or hide behind those words to

24  still go on and defame someone in regards to their profession.

25          THE COURT:  Well, look, I agree with you on this.  I

1   agree with you that if it can be proven that the plaintiff was

2   saying that the defendant makes up stuff all the time in a

3   general context, then that would establish libel per se if

4   proven.  But Ms. Matz's argument is that your allegations go

5   to the plaintiff specifically, not in general.  So I guess my

6   point -- and I understand what you said about the different

7   procedural locations that these cases may have found

8   themselves in, but do you agree that the allegations to

9   support a libel per se have to be general as to the

10  defendant's general character as opposed to any dispute or the

11  transaction between the defendant and the plaintiff?

12          MS. IZMAYLOVA:  I agree that typically --

13          THE COURT:  Okay.  Let me ask it more specifically.

14  Do you agree with this, that if the plaintiff says she's lying

15  about me and she lies about me all the time, that that's not

16  actionable versus if she said the defendant lies in all her

17  stories, she lies about everything she writes?  Do you see

18  those as two different kinds of cases?

19          MS. IZMAYLOVA:  Yes.  The first one being more

20  specific and more arguable that it's about one specific

21  instance.  However, I believe that, you know, based on some of

22  the law that I've read, there could be a way to have a slander

23  per se claim even if it's in regards to specific instances if

24  it directly attacks and, you know, specifically affects the

25  person's trade or business.  And specifically for my client,

1   her veracity is one of the most important things that she has

2   as far as being a, you know, reporter or blogger.  So if

3   someone states that, especially someone of plaintiff's stature

4   with who has millions and millions of followers -- she's an

5   internationally known celebrity -- her statements about my

6   client will affect my client detrimentally more than like if I

7   were to say that about my client.

8          THE COURT:  Is the defendant asking for special

9   damages here?

10          MS. IZMAYLOVA:  No.

11          THE COURT:  So the only damages she's asking for are

12   general damages?

13          MS. IZMAYLOVA:  General --

14          THE COURT:  General and punitive?

15          MS. IZMAYLOVA:  And punitive, yes, your Honor.

16          THE COURT:  Okay.  So it is purely a libel per se

17   claim under -- Ms. Matz has talked about paragraph 2 of the

18   liable statute; right?  Talking more just about the course of

19   defamation claims and not the other claims, but she's only --

20   the only standard of awarding damages to her, if the jury were

21   to find that she had been defamed, are going to be enlightened

22   conscience damages.  Do you agree with that?

23          MS. IZMAYLOVA:  I do agree with that.  And O.C.G.A.

24   51-5-4(a)(3) is the, I guess, subsection that we are

25   proceeding under, which is they're making charges against

1   another in reference to trade, office or profession.  If

2   that's the claim that you're putting forward, Georgia law does

3   not require, you know, damages inferred, and malice is also

4   inferred pursuant to O.C.G.A. 51-5-5.

5           In regards to the punitive damages section -- I did

6   want to address that -- O.C.G.A. 51-12-5.1(f), which is the

7   punitive damages section under Georgia law, does state that

8   whoever must plead with specificity or plead in each count of

9   the complaint for any action that they believe they would be

10  entitled to punitive damages and then also plead punitive

11  damages separately, as a separate account.  So that's the

12  reason why our counterclaim has a separate punitive damages

13  section.

14          THE COURT:  So looking back at your complaint, look,

15  if you would, to paragraph 213.  What in paragraph 213 is

16  actionable for defamation in your opinion?

17          MS. IZMAYLOVA:  Paragraph 213 more relates to be

18  assault claims.

19          THE COURT:  Okay.  So you would agree that none of

20  the allegations in there support a claim related to

21  defamation?  None of the names that the plaintiff allegedly

22  called the defendant could support a defamation claim?

23          MS. IZMAYLOVA:  Not in regards to her profession.

24          THE COURT:  All right.  So what in paragraph 213

25  supports the assault claim?

1          MS. IZMAYLOVA:  So she starts that video with, you

2    know, calling our client all sorts of names, and then she

3    threatens to, you know, sue her, make an example out of her.

4    Then she starts talking about, in the same video, that she had

5    been initiated into a gang at age 16.  She said that she's

6    going to make an example out of my client specifically, and so

7    it all kind of builds on itself because then she publishes a

8    private conversation that she, the plaintiff, had with Skeemo,

9    you know, privately.  But she takes that, like a screenshot of

10   it, and publishes it to her public social media profile.

11          THE COURT:  And what was in that?

12          MS. IZMAYLOVA:  It was like going back and forth.  I

13   can't, you know, I can't believe she would say that, you know,

14   calling her all these sorts of names like, oh, yeah, I'm

15   already gathering, you know, info on her and using all kind of

16   derogatory names, calling my client all sorts of different

17   things.  And then --

18          THE COURT:  So here's where I'm going:  Upon

19   information and belief where is that from?  I mean, where does

20   the defendant say she got this information?  What information

21   did she get about Skeemo and what threats he allegedly made?

22   You're not really giving me anything.  I mean, you're not

23   telling me that he made these threats.  You're saying you

24   think he may have made some threats.  But if you don't have

25   any information, where are you going to get the information?

1          MS. IZMAYLOVA:  Well, no, we do have the -- I have

2     the copies of the screenshots and copies of the videos of

3     plaintiff --

4          THE COURT:  So what was the threat that Skeemo made?

5          MS. IZMAYLOVA:  There were several posts.  Some of

6     them had where he posted, like, pictures of guns and, you

7     know, basically alluded to the fact that he was going to, you

8     know, come and handle my client if she keeps talking.  And

9     those posts --

10         THE COURT:  So did he -- so let's be specific.  Is

11    there a picture of a gun saying I'm going to handle this or

12    something like that?  I mean --

13         MS. IZMAYLOVA:  More or less.

14         THE COURT:  Let's do the more part.  What

15    specifically is in those posts?

16         MS. IZMAYLOVA:  It's a picture of a gun, and I don't

17    remember verbatim off the top of my head.  I mean, like I

18    said, we have the copies of them, but it's something like, you

19    know, I'm going to, you know, basically like, you know, if you

20    keep talking about me, I'm going to get you, something to that

21    effect.  But when he posted it, he didn't tag my client in the

22    post.  But it was so apparent to strangers on social media

23    that he was referring to her, that they began tagging her on

24    Instagram to alert her to the fact that this was being said.

25         THE COURT:  So what made it apparent to other people

1  that he was talking about the defendant?

2        MS. IZMAYLOVA:  Because all of this happened within

3  days apart where the plaintiff kept going -- kept posting

4  videos on her Instagram account.  They're called like "live,"

5  so you basically just, you know, turn your phone on, and as

6  she's talking in realtime, all of her fans can hear what she's

7  saying.  And so it's like she's talking about my client and,

8  you know, this potential litigation.  He's then posting --

9        THE COURT:  So he's posting in relation to what she

10  is saying?

11        MS. IZMAYLOVA:  Basically.  And so it's kind of

12  happening simultaneously almost, and so that's really what --

13  that's really what makes it apparent that they are talking

14  about my client.  Then, obviously, a little bit later on the

15  plaintiff does specifically say that -- you know, she talks

16  about my client's age.  She's a little bit older, but she was

17  pregnant at that time.  At the time all of this was going

18  on --

19        THE COURT:  Who is she?  Your client?

20        MS. IZMAYLOVA:  My client was --

21        THE COURT:  Be careful with pronouns, all right, so

22  we know who you're talking about.

23        MS. IZMAYLOVA:  My apologies.  Let's see.  In

24  paragraph 219 of our counterclaim, I do state that she was in

25  her first trimester of a high-risk pregnancy because she was,

1  like, a little bit older and that's -- you know, during the
2  whole time that this was all going on, this whole back and
3  forth with the plaintiff and affiliates of plaintiff, my
4  client was pregnant during that entire time, and the plaintiff
5  knew that because she said -- you know, she talked about it in
6  her videos.
7          So as she's, you know, posting these private
8  conversations about, you know, veiled threats to, you know,
9  come get my client and, you know, basically retaliate for
10 whatever, you know, for forcing this interview, she's been
11 placed on bedrest, you know.  She can't work.  I mean, it was
12 a lot of things going on.  It got to the point where she had
13 to break her lease and move to a different location because
14 she was that concerned that -- you know, because the plaintiff
15 has -- she lives in New York but she also -- her husband
16 resides in Atlanta, so she's back and forth a lot.
17         THE COURT:  All right.  So let's talk about the
18 assault claim specifically.  What does the defendant have to
19 prove?  What are the elements that she's got to prove under
20 assault?
21         MS. IZMAYLOVA:  Oh.  And that's the other thing I
22 wanted to mention.  The case -- the elements of the case that
23 the plaintiff cited was actually a criminal case.  It was the
24 *Johnson v. State*.  So that was a criminal standard for simple
25 assault under the -- you know, which is different than the

1   tort of assault.  So in *Johnson v. State* it was a -- the

2   standard was that the person --

3          THE COURT:  Let's don't talk about the case that you

4   say doesn't apply.  Let's --

5          MS. IZMAYLOVA:  Well, they -- that's the standard

6   that the plaintiff cited to -- for like -- for the elements

7   of the tort of assault.

8          THE COURT:  Yeah, but you say that doesn't -- you

9   were going down the road that that doesn't control here.  So

10  what do you contend are the elements that you have to prove on

11  behalf of your client?

12         MS. IZMAYLOVA:  I believe that those elements are

13  stated in *Everett v. Goodloe*, and basically the definition is,

14  an assault occurs when all the apparent circumstances

15  reasonably viewed are subject to lead a person to reasonably

16  apprehend a violent injury from the unlawful act of another.

17         So it doesn't have to be an immediate violent injury,

18  but it's got to be the apprehension is what makes the cause of

19  action for a tort of assault.  So it's the apprehension of the

20  person who's receiving the, you know, potential violent

21  threats.  And I do list in the counterclaims all the ways in

22  which my client, you know, was apprehensive for her safety,

23  for her wellbeing.

24         And paragraph 218 talks about, you know, her

25  contacting the FBI even to report the situation and asking --

1  you know, seeking advice as to what they believe is, you know,

2  the best, the safest route for her.  And their advice was to,

3  you know, move -- change her home address, move from where you

4  live currently to a different location, which is what she did

5  immediately after that because she, like I said, was pregnant.

6  She's also married.  She has another child.  She was worried

7  about the safety and wellbeing of her family and herself.

8         And so I believe that that is -- those actions fall

9  directly in the definition of -- with the tort of assault

10 under Georgia law, which is different than the definition of

11 the crime of simple assault, which adds that extra element of

12 imminent violent injury.

13        And regarding the elements of -- the other elements

14 of the assault, in paragraph 202 specifically we do state that

15 the plaintiff is part of the Bloods, which is a notorious

16 violent street gang.  She was initiated by her friend Skeemo,

17 who's a fellow gang member.

18        THE COURT:  So where does that information and belief

19 come from?

20        MS. IZMAYLOVA:  Numerous videos the plaintiff has

21 posted.  She has given exclusive interviews to numerous

22 newspapers and magazines, so it's a well-known fact it's

23 not --

24        THE COURT:  What about Skeemo?  Where does the

25 information come from that --

1          MS. IZMAYLOVA:  From the plaintiff.

2          THE COURT:  She says she was initiated by him?

3          MS. IZMAYLOVA:  Yes, your Honor.

4          THE COURT:  And she says that he's a gang member?

5          MS. IZMAYLOVA:  Yes, and she even has a video where

6  she basically drives to the alleged place of her initiation,

7  and she's driving in the video.  She's, like, doing, you know,

8  like a narrative, you know, of when I was 16, like, this was

9  where we were, you know, like that sort of thing.  So

10 it's all -- from her own mouth all the time she admits to

11 being a gang member, and she's always talking about Skeemo.  I

12 would say in at least 75 percent of her videos somehow, you

13 know, he gets mentioned one way or, you know, one way or

14 another.  And, apparently, they've been friends since she was,

15 like, 16 or 14, so for over ten years at this point.

16         THE COURT:  Let's jump back, if we can, to the

17 paragraph 211.  Now, your claim is that where it talks about

18 stating that Ms. Kebe makes up fake stories was general.  What

19 specifically is the evidence that you have to support that

20 part of the allegation?

21         MS. IZMAYLOVA:  As far as that the plaintiff has said

22 that?

23         THE COURT:  Yeah.  What did the plaintiff say that

24 was general as opposed to about what the defendant had said

25 about her, her being the plaintiff?

1          MS. IZMAYLOVA:  I mean, there's been -- the plaintiff

2     posts these videos, and they're like 45 minutes long, an hour

3     long.  So she just goes on and rants all the time, and she

4     just, you know, just talks.  She'll go in and out of talking

5     about my client, then talking about, you know, her career,

6     whatever the case may be.  But she just says that, you know,

7     like, my client doesn't have any credible sources, she's

8     always lying, you know, she's just trying to -- you know, why

9     can't people leave her, you know, leave her alone, why is

10    everyone, you know, always trying to, you know, write stories

11    that are fake, you know, all this stuff.

12         THE COURT:  How about the plaintiff?

13         MS. IZMAYLOVA:  She sometimes says about herself.

14    Sometimes it's almost like she's posing, you know, rhetorical

15    questions through the video.

16         THE COURT:  Now, earlier you agreed with me that --

17    you essentially agreed with Ms. Matz that the statements have

18    got to be general as opposed to Cardi B -- about Cardi B.  So

19    you're telling me that -- and you're not going to be able to

20    handle it before a jury just by generally characterizing it.

21    I mean, you've got to -- if that's the standard, as Ms. Matz

22    has argued, then you've got to specifically be able to show

23    that it would be one reasonable interpretation of what the

24    plaintiff is saying, is that the defendant generally is a

25    liar, the defendant generally makes up her stories, generally

1   has no sources to any of the things that she writes as opposed

2   to about Cardi B.  And your statement today is that's what

3   could be interpreted from these videos?

4           MS. IZMAYLOVA:  Yes, your Honor.  I mean, it might

5   sound unbelievable to you, but she has posted so many videos

6   about my client and so many, like, tweets and other -- it's --

7           THE COURT:  But you also are going to have to -- I

8   mean, you're a lawyer arguing it right now, but let's say

9   we're at the motion for summary judgment stage.  You're going

10  to have to show that to me.

11          MS. IZMAYLOVA:  Yes, sir.

12          THE COURT:  You're going to be able to show that to

13  me?

14          MS. IZMAYLOVA:  We've preserved as many of the videos

15  as we're able to preserve that -- she gets on all the time so

16  it's -- but, I mean, yes, we have --

17          THE COURT:  And these videos are still posted?

18          MS. IZMAYLOVA:  No.  What happens is for -- the way

19  that Instagram Live works is you can post a live video.  It is

20  up for 24 hours, and then it gets deleted automatically or the

21  person could choose to delete it, you know, earlier than the

22  24-hour expiration.

23          THE COURT:  So you have been able to capture some of

24  these?

25          MS. IZMAYLOVA:  Any time we're able to capture it, we

1  have preserved that evidence.  And, also, sometimes other, you

2  know, bloggers or people on YouTube that are able to capture

3  it and then they, you know, post it on their YouTube channels,

4  or whatever, and people preserve those posts.

5          THE COURT:  But those are just copies that they made

6  from YouTube from the original posting?

7          MS. IZMAYLOVA:  From the original.  But if we were

8  not able to, you know, make -- if we were not able to catch

9  that particular post and someone else was, we've preserved

10 that particular -- you know, those videos as well.

11         THE COURT:  All right.  Anything you want to argue

12 that you haven't had a chance to?

13         MS. IZMAYLOVA:  May I have a moment?

14         THE COURT:  Yes, ma'am.

15         (Brief Pause.)

16         MS. IZMAYLOVA:  Just briefly in closing, our

17 position, you know, we believe that we have met the standard

18 set for our motion to dismiss based on, you know, the federal

19 rules and Georgia substantive law.  But we would ask the

20 Court, if the Court does not agree with us, we would ask for

21 leave to amend the counterclaims to make them abide by the

22 standard because I will be able to make them more specific if

23 the Court wants me to do that.

24         THE COURT:  Thank you, ma'am.

25         All right.  Ms. Matz, do you have anything else you

1   want to say?

2         MS. MATZ:  Yes, if your Honor would just give me a

3   moment.

4         (Brief Pause.)

5         MS. MATZ:  So I do just want to go back to this idea

6   about the general versus specific statement and address a

7   couple of the points that counsel for defendant just made, and

8   that is that they made much of their allegations leading up to

9   these videos, to talk about how this is how they knew that

10  they were talking -- that my client -- I won't use pronouns --

11  this is how Ms. Kebe knew my client was talking about her or

12  allegedly talking about her.  I think that those same

13  statements give the context, as with the rest of the alleged

14  statements she's made, to show that those statements were

15  clearly, to the extent my client made them, they were clearly

16  about her interaction with my client, the specific instance as

17  opposed to the general.

18        And I just want to point your Honor to the --

19  opposing counsel is correct in one thing, that some of the

20  cases we've cited were summary judgment, that some of the case

21  law out there is at that procedural posture.  But in those

22  cases the Courts were making legal determinations, which are

23  the same determinations you're allowed to make on a motion to

24  dismiss because there were no disputed facts.  Here it's just

25  making them on what's been alleged.

1      And I will say we have cited cases also that

2  dismissed defamation and slander claims where the Court

3  interpreted the context on a motion to dismiss in addressing

4  these same types of questions.  So, for example, the *Long v.*

5  *Madison* case they decided the context of allegedly defamatory

6  statements on a motion to dismiss dismissing the case.

7      And, you know, the only other thing that I will just

8  add is that I, you know, I am unsure why there was not -- some

9  of these facts were not offered in opposition because I do

10  believe that to the extent that they believe that they can

11  amend their complaint, given the fact that they are past the

12  time to do so, I mean, I know that the standard is liberal and

13  does say we let people amend their complaints liberally.  But

14  they still need to request leave to do so, and they would need

15  to show good cause why these things couldn't have been alleged

16  in the first place, which it's a little unclear to me if they

17  believe that they, you know, have all these standards and

18  they're so specific they're unable to name even one of them

19  sitting here today.

20      And then the only other thing I'll add is that I do

21  think, also in terms of the context, that, you know, the Court

22  shouldn't accept them clearly paraphrasing, not quoting, and

23  then them saying, well, we should be allowed to just

24  paraphrase.  But then they want to try to characterize those

25  statements in a specific way to say, well, that was what was

1  said when it's not clear at all that that's what was said.

2  There's no quoted statement in here whatsoever, and I think

3  that the context of the statements they've alleged together

4  clearly shows that any statement my client was making about an

5  opinion about -- an opinion about Ms. Kebe was with reference

6  to the specific incident in this video that had been aired

7  about my client and not her broader reputation generally.

8          THE COURT:  All right.  Thank you.

9          MS. MATZ:  Thank you, your Honor.

10         THE COURT:  All right.  So of course I come from -- I

11 come to this job from having been a state trial judge

12 before -- not immediately before I came here but for a good

13 bit of time.  And so I understand the *Twombly* standard, but

14 sometimes the *Twombly* standard is difficult to apply on the

15 ground.  But you go with the case which *Twombly* was decided by

16 the Supreme Court in -- you know, oftentimes just like in the

17 *Daubert* cases, things like that, these are very

18 scientifically, usually very scientific cases where we're

19 dealing with concrete issues.  And in a case like this, you

20 know, there's really no science involved at all where we're

21 talking about, you know, general society and statements and,

22 you know, we're applying state law, for example, in an area

23 that is kind of like defining virtue.  You know, slander is

24 kind of like that, you know.  It's hard to define.

25         I mean, there is a definition for it, but it's the

1   kind of thing that you know when you see, like whether someone

2   is virtuous or not virtuous.  If this was the defendant suing

3   the plaintiff and that's all we had, I would probably dismiss

4   the case today.  It would be without prejudice.  But given

5   that the plaintiff has brought this lawsuit and that these

6   issues that will be involved in discovery are almost exactly

7   the same issues that are brought up and the defendant in

8   counterclaim I'm not going to dismiss at this point in time,

9   but I will tell the defendant this, that if this is the best I

10  get on a motion for summary judgment, the defense is going to

11  lose.  There's got to be specificity.

12          And, you know, even if I dismiss the defendant's

13  claims today, I would let the defendant do discovery about it

14  in the course of this case because it is all congruent with

15  the allegations that are made by the plaintiff.  The plaintiff

16  says, that blogger lied about me.  Well, you know, then the

17  plaintiff coming back and saying that could very well be

18  libelist if it's not true and plaintiff knows it's not true.

19  So there's really no extra there.

20          If the plaintiff did scheme with Skeemo to cause a

21  threat to be made directly or indirectly against the defendant

22  in order to induce the defendant to retract or to stop what

23  she was doing, that may be actionable.  It might not be

24  assault.  I'm not sure.  I'm more familiar not with the tort

25  of assault, but with the crime of assault, and then the crime

1  of assault does require the immediacy to the act.

2          I will say this:  You know, if a defendant in a jail

3  posted something online -- and defendants do have access to

4  phones in jail sometimes -- that made some of the same

5  generalized threats towards me, I'd be concerned about it, and

6  I would have the U.S. Marshals and the FBI all over it.  So I

7  can understand that if there were such threats that were made

8  as have been outlined in argument, not necessarily in

9  pleadings, that it could cause the defendant some harm.

10 Whether it be assault or not, I'm not sure.  I think probably

11 intentional infliction of emotional distress is probably a

12 better claim for that if it's true that it happened, if the

13 plaintiff did induce the defendant to do those types of

14 things.

15         If defendant induced the defendant to do those types

16 of things -- excuse me.  If the plaintiff induced Skeemo to do

17 those types of things towards the defendant, plaintiff might

18 be a party to a crime in this state, and if she is a party to

19 a crime to this state, then that raises the specter of a

20 potential tort all the more.  But I'm not saying any of that

21 happened.  I really don't know.  Honestly, you know, the --

22 well, let me just say I understand why the defendant wants the

23 cases to go away.  I understand why the defendant has brought

24 the cases -- the case that she brought.  A lot of this is just

25 litigation leverage, you know.  The defendant perhaps brought

1  all these claims for litigation leverage.  The plaintiff wants

2  them to go away and even though they're arguing in the

3  discovery about them all, for litigation leverage.  I don't

4  think that's necessary at this point in time for me to rule on

5  that.

6          All of this could go away if y'all wanted it to go

7  away.  This would be a very interesting trial for a jury.  You

8  know, I tried a two-and-a-half to three-week jury trial about

9  a month ago on SEC insider trading.  That was not very

10 interesting for the jury.  You know, you bring Cardi B in

11 here, the allegations that are made, the jury would have a

12 ball, you know.  But I do believe that the parties could

13 settle this case if they want to.  If they don't want to,

14 that's fine.

15         Trying cases is the most fun thing I do because I

16 don't have to work at night, you know.  I get to walk in on

17 Monday morning and get started, and I leave at 5:30 6:00

18 o'clock.  I drive home and watch sports and the news while

19 y'all get to go to work.

20         When I interviewed to be a judge the first time with

21 the governor of Georgia, he asked me why I wanted to be a

22 judge, and I told him, you know, all the right Sunday school

23 answers about public service and all that kind of stuff, which

24 was all true.  But I also said I was tired of working on

25 weekends and nights getting ready for court the next day.  So

1   I understand how hard is to try a case from the standpoint of

2   being a lawyer because you have so much to -- so many balls up

3   in the air.  But, you know, if this case were to go to trial,

4   I think we'd all have a little bit of fun with it, but I'd

5   prefer if you could settle it, if you could, but if not, then

6   we'll deal with it.

7            The defendant has got to do much better job with her

8   counterclaims and the motion for summary judgment or she's

9   probably going to lose them all, but given the way that the

10  case is styled, given that we're not talking about independent

11  claims, those are all really derivative of the same things,

12  I'm going to leave them in for now.

13           Now, y'all need to go ahead and confer.  I doubt you

14  have already on a scheduling order; right?  No scheduling

15  order has been entered?  Or have you?

16           MS. IZMAYLOVA:  It has, your Honor.

17           THE COURT:  How many months discovery did you

18  request?

19           MS. MATZ:  I believe that we asked for eight, your

20  Honor, and some of that was because we do think the

21  discovery -- the counterclaims you're saying, as your Honor is

22  saying, I do think the discovery on this has the potential to

23  kind of spider out.  There's a lot of third party stuff going

24  on.  We have people in different states traveling, and, also,

25  you know, we've -- I realize it's a little longer than

1  probably we normally ask for, but our client does have a more

2  complicated schedule than some people.  And, also, you know, I

3  think we did have a 26(f) conference.  We tried to talk about

4  some informal discovery.  Thus far that has not been

5  forthcoming, so I would like to leave enough time to deal with

6  those things if they continue to be problematic.

7       THE COURT:  Well, you're not necessarily longer than

8  I thought.  I don't have a problem with -- the only time I

9  start getting itchy is when we start approaching the latter

10 half of the second year of an aging case.  We have a rule that

11 y'all may be familiar with in federal courts where we get

12 basically reported when we have a case that's more than three

13 years old and we have motions that are more than six months

14 old.  So other than that, I don't really care.

15      But here's where I do get aggravated generally, is

16 when you don't work diligently along the way, and then you ask

17 me for extension after extension after extension.  Got a case

18 right now on my desk where an old law school friend has put me

19 in a situation where I've granted four or five extensions, and

20 now they want more.  And I'm not going to give them another

21 one.

22      So you've got to be diligent.  I understand the

23 plaintiff's scheduling is not typical, so I think y'all

24 probably just need to go ahead and agree soon in this process

25 when her deposition is going to be, assuming there's going to

1   be one.  And I suppose that you may fight about where it

2   should be, probably ought to be here in Atlanta.  I mean, she

3   filed her lawsuit here in Atlanta.  She's got connections to

4   Atlanta.  I think that's -- you know, if y'all start fighting

5   about that, that's probably where I'm going to come down on

6   that, is that given that she's come to this forum, she's going

7   to have to come to this forum for purposes of deposition as

8   well.

9         MS. MATZ:  We haven't even discussed it.  As for

10   plaintiff, we have propounded our initial discovery demands.

11   We actually did that late last week because we wanted to start

12   getting the ball rolling, but we will pursue discovery

13   diligently.  I appreciate you saying that.  And, you know, we

14   can talk about deposition location.  I'm sure that we can work

15   something out.

16         THE COURT:  Okay.  All right.  Good luck to you.

17   Thank you.

18         MS. MATZ:  Thank you, your Honor.

19         MS. IZMAYLOVA:  Thank you.

20         COURTROOM SECURITY OFFICER:  All rise.

21         (Whereupon, the proceedings were adjourned at 3:10

22   p.m.)

23                  -  -  -

24

25

1                    REPORTERS CERTIFICATE

2

3

4          I, Wynette C. Blathers, Official Court Reporter for

5   the United States District Court for the Northern District of

6   Georgia, with offices at Atlanta, do hereby certify:

7          That I reported on the Stenograph machine the

8   proceedings held in open court on October 7, 2019, in the

9   matter of BELCALIS MARLENIS ALMÁNZAR v. LATASHA TRANSRINA KEBE

10  et al., Case No. 1:19-CV-01301-WMR; that said proceedings in

11  connection with the hearing were reduced to typewritten form

12  by me; and that the foregoing transcript (Pages 1 through 61)

13  is a true and accurate record of the proceedings.

14          This the 9th day of December, 2019.

15

16

17

18                         _____
                           /s/ Wynette C. Blathers, RMR, CRR
19                             Official Court Reporter

20

21

22

23

24

25