```
 1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF GEORGIA
 2                         ATLANTA DIVISION

 3

 4  BELCALIS MARLENIS ALMANZAR,      ) DOCKET NO.
                                     ) 1:19-CV-1301-WMR
 5           PLAINTIFF,              )
                                     ) ATLANTA, GEORGIA
 6                                   ) FEBRUARY 3, 2021
            V.                       )
 7                                   )
    LATASHA TRANSRINA KEBE           )
 8  A/K/A LATASHA TRANSRINA HOWARD   )
    STARMARIE EBONY JONES,           )
 9                                   )
             DEFENDANTS.             )
10

11                    TRANSCRIPT OF MOTION HEARING
12           BEFORE THE HONORABLE WILLIAM M. RAY, II
                      UNITED STATES DISTRICT JUDGE
13

14

15  APPEARANCES OF COUNSEL:

16  FOR THE PLAINTIFF:          SARAH M. MATZ
                                LISA F. MOORE
17                              WILLIAM A. PEQUIGNOT

18  FOR THE DEFENDANTS:         OLGA IZMAYLOVA
                                SADEER SABBAK
19

20

21  COURT REPORTER:            ANDY ASHLEY
                               1949 U. S. COURTHOUSE
22                             75 TED TURNER DRIVE
                               ATLANTA, GEORGIA  30303-3361
23                             (404) 215-1478

24  PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
    PRODUCED BY COMPUTER.
25
```

2

                          P R O C E E D I N G S
1
2    (ATLANTA, FULTON COUNTY, GEORGIA; FEBRUARY 3, 2021
3    IN OPEN COURT.)
4            THE COURT:  ALL RIGHT.  SO WE'RE HERE FOR A ZOOM
5    HEARING IN THE CASE OF ALMANZAR VERSUS KEBE, CASE NUMBER
6    19-CV-1301.  WHO'S GOING TO BE SPEAKING ON BEHALF OF THE
7    PLAINTIFF TODAY?
8            MS. MATZ:  GOOD AFTERNOON, YOUR HONOR, THIS IS SARAH
9    MATZ.  WE REPRESENT THE PLAINTIFF.  WE HAVE SPLIT UP THE ORAL
10   ARGUMENTS TODAY BASED ON MOTION, SO I WILL BE DEALING WITH THE
11   NOTION TO COMPEL, AND MR. PEQUIGNOT, MY COCOUNSEL, LOCAL
12   COUNSEL, WILL BE DEALING WITH THE MOTION TO DISMISS AND
13   OPPOSING THE MOTION TO COMPEL THAT KEBE MADE, YOUR HONOR.
14           THE COURT:  AND THAT'S WILLIAM THAT'S GOING TO DO
15   THAT?
16           MR. PEQUIGNOT:  YES, SIR.
17           THE COURT:  WILLIAM, CAN YOU PRONOUNCE YOUR LAST NAME
18   FOR ME.
19           MR. PEQUIGNOT:  PEQUIGNOT.
20           THE COURT:  PEQUIGNOT.
21           MR. PEQUIGNOT:  AND I HAVE MY MIDDLE NAME ANDREW.
22           THE COURT:  YOU GO BY ANDREW.  OKAY.
23           WHO'S GOING TO BE SPEAKING ON BEHALF OF THE DEFENDANT
24   MS. KEBE?
25           MS. IZMAYLOVA:  GOOD AFTERNOON, YOUR HONOR, OLGA

1   IZMAYLOVA.  I REPRESENT MS. KEBE.  I'LL BE MAKING THE

2   ARGUMENTS, AND MY COCOUNSEL MR. SABBAK WILL BE PRESENTING ANY

3   EXHIBITS, IF NECESSARY.

4            THE COURT:  ALL RIGHT.  THANK YOU.  SO AS WE BEGIN,

5   LET ME JUST STATE THE GENERAL PROPOSITION THAT THE DISCOVERY

6   DISPUTES THAT THE PARTIES HAVE IS VERY UNUSUAL IN FEDERAL COURT

7   THAT LAWYERS COME INTO COURT WITH THESE KINDS OF DISCOVERY

8   DISPUTES.

9            I SERVED A LONG TIME AS A SUPERIOR COURT OR GENERAL

10  TRIAL JUDGE IN GEORGIA, AND, HONESTLY, YOU REALLY DON'T HAVE

11  THEM THAT OFTEN THERE EITHER.  I MEAN YOU TEND TO HAVE THEM IN

12  DIVORCE CASES MORE THAN ANYWHERE ELSE, AND IF YOU HAVE THEM AT

13  ALL IN CIVIL CASES, THEY TEND TO BE CASES INVOLVING COMPANIES

14  AND TRADE SECRETS AND THINGS LIKE THAT.

15           SO I'M JUST GOING TO TELL YOU FROM THE BEGINNING THAT

16  I'M VERY FRUSTRATED THAT I'M HAVING TO GET INVOLVED IN THIS,

17  AND, YOU KNOW, PART OF MY FRUSTRATION IS I MEAN I'VE NOT ONLY

18  GOT LAWYERS THAT ARE I'M SURE ARE WELL QUALIFIED IN A LOT OF

19  DIFFERENT AREAS, FIGHTING ABOUT VERY IN SOME CASES SILLY

20  THINGS, BUT, YOU KNOW, IT JUST BECOMES -- WHENEVER YOU'RE

21  DEALING WITH DISCOVERY DISPUTES, IT'S SO TIME-CONSUMING.

22  THERE'S REALLY NO WAY TO AVOID STUFF LIKE THIS GETTING DOWN AND

23  DIRTY IN THE WEEDS OF IT ALL.

24           SO I'M GOING TO DO THE BEST I CAN, BUT I'M TELLING

25  YOU IN ADVANCE I'M FRUSTRATED ABOUT IT, AND I'M NOT GOING TO BE

1  REAL TOLERANT FOR WHAT I WOULD SAY IS PROTRACTED UNNECESSARY

2  LAWYERING.  I'M GOING TO BE PRACTICAL ABOUT WHAT WE'RE TALKING

3  ABOUT, AND I'M GOING TO ASK A LOT OF QUESTIONS AND HOLD

4  EVERYONE TO A VERY, I HOPE A VERY EXACTING STANDARD ABOUT WHAT

5  YOU NEED AND WHY YOU NEED IT.

6          AND LET ME JUST SAY, I THINK IT'S CLEAR FROM THE

7  RECORD THAT BEARS THIS OUT, I MEAN YOU ALL KNOW THIS, BUT ANY

8  APPELLATE COURT THAT READS THIS TRANSCRIPT MAY NOT KNOW IT AT

9  FIRST, I MEAN THIS IS A DISCOVERY DISPUTE THAT ARISES AT THE

10 END OF A DISCOVERY PERIOD THAT HAS BEEN EXTENDED AT LEAST TWO

11 TIMES.  IT MAY HAVE BEEN EXTENDED MORE THAN TWO TIMES.  I

12 DIDN'T GO BACK AND SPECIFICALLY COUNT, AND, YET, IT IS RAISED

13 AT THE VERY LAST MINUTE.

14         MY OFFICE WAS NOTIFIED AT ABOUT 9:45 ON NOVEMBER 28TH

15 ON A 2019 CASE THAT WAS FILED FAIRLY EARLY IN THAT YEAR THAT

16 THERE WAS A DISCOVERY DISPUTE, AND I WAS NOTIFIED BY I BELIEVE

17 IT WAS BY MS. KEBE'S COUNSEL BECAUSE THEY FILED THE FIRST

18 MOTION TO COMPEL, AND IT WAS NOT -- I DON'T THINK -- I'M NOT

19 SURE THAT I WAS NOTIFIED AT ALL BY PLAINTIFF'S COUNSEL.  SO LET

20 ME ASK THE PLAINTIFF'S COUNSEL THIS QUESTION, WHEN DID YOU ALL

21 NOTIFY ME THAT YOU HAD A DISCOVERY DISPUTE ABOUT WHAT THE

22 DEFENDANT WAS PRODUCING.

23         MS. MATZ:  YOUR HONOR, WE SENT A LETTER I BELIEVE IT

24 WAS THE NEXT DAY, AND I CAN FIND THE LETTER IF YOU CAN GIVE ME

25 ONE MOMENT.  WE DID SEND A LETTER AROUND THE SAME TIME AS MS.

 1   KEBE, AND WE WERE INSTRUCTED BY MS. LUNDY IN THAT SAME EMAIL

 2   THAT SHE SENT RESPONSES TO.

 3           THE COURT:  YEAH, I MEAN I'M SURE I WAS CONTACTED.  I

 4   JUST DIDN'T KNOW WHEN, AND I DID HAVE MS. LUNDY CHECK HER EMAIL

 5   TODAY AND VERIFIED THAT IT WAS NOVEMBER 28TH AT NINE O'CLOCK AT

 6   NIGHT OR SOMETIME AFTER NINE O'CLOCK BEFORE SHE WAS EVER

 7   NOTIFIED.  I MEAN EFFECTIVELY THAT'S REALLY NOVEMBER 29TH AS

 8   WELL IF YOU THINK ABOUT IT.  OBVIOUSLY SOMEBODY WAS WORKING ON

 9   THIS CASE AT THAT TIME, BUT IT WASN'T MY OFFICE.

10           SO ON A DISCOVERY PERIOD THAT WAS EXTENDED AT LEAST

11   TWICE AND LASTED FOR WAY OVER A YEAR, THEN ON THE VERY LAST DAY

12   AT THE VERY LAST PERIOD THAT ALLOWED UNDER THE LOCAL RULES, I'M

13   NOTIFIED THAT THERE'S THIS MAJOR DISCOVERY FIGHT.

14           SO EXCUSE ME IF I DON'T REALLY BELIEVE THE PARTIES

15   WHEN THEY SAY THAT WHAT THEY NEED THEY REALLY NEED.  BECAUSE IF

16   THEY REALLY NEEDED IT, THEN PROBABLY THEY WOULD HAVE ASKED FOR

17   IT FROM ME MUCH SOONER THAN THE VERY END OF DISCOVERY.  FOR

18   EXAMPLE, THERE'S NO RIGHT TO TAKE A DEPOSITION AFTER THE END OF

19   THE DISCOVERY PERIOD.  IF YOU WAIT UNTIL THE VERY LAST MOMENT

20   TO FILE A REQUEST FOR DOCUMENTS OR FOR INFORMATION ABOUT THE

21   IDENTITY OF PEOPLE, YOU'RE NOT ALLOWED TO TAKE DISCOVERY

22   THEREAFTER.

23           YOU HAVE AN OBLIGATION IF YOU DON'T THINK THE OTHER

24   SIDE IS TELLING YOU WHAT YOU NEED TO KNOW THAT YOU'RE ENTITLED

25   TO KNOW TO FIND THAT OUT SOONER THAN THE EXPIRATION OF

1    DISCOVERY SO YOU CAN GO OUT AND TAKE IT, TAKE THE DEPOSITION OR

2    SEEK YOUR THIRD-PARTY PRODUCTION OF DOCUMENTS OR SEND SUBPOENAS

3    FOR THAT MATTER.  I MEAN YOU DON'T REALLY HAVE AN ABSOLUTE

4    RIGHT TO SEND SUBPOENAS AFTER THE DISCOVERY PERIOD FOR THIRD

5    PARTIES, AND ONLY UNDER LIMITED CIRCUMSTANCES DO YOU HAVE THAT

6    RIGHT.

7            SO IT IS THROUGH THAT PRISM THAT I AM LOOKING AT THIS

8    DISCOVERY DISPUTE THAT EXISTS WITH A LARGE MEASURE OF

9    SCEPTICISM ABOUT WHETHER EITHER SIDE REALLY CARES, AND WHETHER

10   OR NOT THIS IS MERELY A STRATEGIC MANEUVER THAT IS BEING USED

11   IN PROTRACTION OF THIS LITIGATION.

12           SO, YOU KNOW, I WILL DO MY BEST NOT TO BE SHORT WITH

13   ANYBODY TODAY, BUT, YOU KNOW, I JUST WANT YOU TO KNOW THE WAY I

14   FEEL GOING INTO IT.  I'M GOING TO BE REAL WEARY ABOUT WHAT YOU

15   SAY, AND SO TO THE EXTENT THAT YOU INTEND TO ADD SOME PUFFERY

16   TO YOUR ARGUMENTS, I WOULD SUGGEST THAT YOU NOT, AND THAT YOU

17   REALLY KIND OF DRILL DOWN ABOUT WHAT YOU ABSOLUTELY NEED.  I

18   MEAN I CERTAINLY KNOW WHAT THE CASE IS ABOUT.  I KNOW WHO THE

19   PLAINTIFF IS.  I DON'T REALLY KNOW THE DEFENDANT.

20           I THINK IT'S ALSO FAIR THAT I WOULD SAY AT THE OUTSET

21   THAT I'VE GOT A LOT OF SCEPTICISM ABOUT THE PLAINTIFF'S CLAIMS

22   IN THIS CASE BECAUSE I KNOW WHAT SHE'S COMPLAINING ABOUT, AND I

23   MEAN I HAVE NOT SEEN ANY OF THE YOUTUBE BLOGS OR OTHERWISE THAT

24   MS. KEBE THROUGH HER COMPANIES PUBLISHED ON THE PLAINTIFF, BUT,

25   YOU KNOW, I CERTAINLY HAVE READ YOUR REPRESENTATIONS ABOUT WHAT

1   THOSE THINGS SAY, YOU KNOW, AND THE FACT OF THE MATTER IS A LOT

2   OF THE THINGS THAT ARE SAID IN THOSE BLOGS WHILE POSSIBLY

3   UNTRUTHFUL IS CONSISTENT WITH THE IMAGE THAT THE PLAINTIFF

4   SEEKS TO PORTRAY IN THE MUSIC AND THE VIDEOS THAT SHE HERSELF

5   PUBLISHES ABOUT HERSELF.

6          AND, YOU KNOW, I HAD THIS DISCUSSION WITH MY WIFE.  I

7   RECOGNIZE THAT THE PLAINTIFF IS AN ARTIST, AND SO A LOT OF THAT

8   IS NO DIFFERENT THAN THE KINDS OF THINGS THAT MADONNA OR LADY

9   GAGA OR SOMEONE LIKE THAT MAY CULTIVATE ABOUT THEMSELVES, BUT

10  IN SOME WAYS IT'S POSSIBLY HARD TO UNDERSTAND THAT THE CLAIMS

11  COULD SUCCEED ON THE MERITS IF PRESENTED TO A JURY SELECTED IN

12  THIS CASE WHEN AND IF THE STATEMENTS THAT HAVE BEEN SAID OR MAY

13  BE CONTINUED TO BE SAID BY THE DEFENDANT SIMPLY EMBRACE THAT

14  IMAGE THAT THE PLAINTIFF HAS HERSELF CULTIVATED FOR PURPOSES OF

15  HER COMMERCIAL BUSINESS, BUT THAT'S SORT OF THE BACKGROUND OF

16  ALL OF THIS.

17          SO LET'S FIRST TALK ABOUT THE DEFENDANT'S MOTION TO

18  DISMISS KEBE STUDIOS LLC, AND PLEASE NOTE THAT I HAVE READ WHAT

19  THE PARTIES HAVE WRITTEN, AND I'M NOT SAYING YOU CAN'T TALK

20  ABOUT WHAT YOU'VE WRITTEN, BUT I HAVE READ IT SO I'M JUST

21  LETTING YOU KNOW THAT.  I GUESS MS. -- I'M SORRY, OLGA COULD

22  YOU PRONOUNCE YOUR NAME ONE MORE TIME FOR ME.

23          MS. IZMAYLOVA:  IT'S IZMAYLOVA.

24          THE COURT:  IZMAYLOVA SO VERY PHONETICALLY.  OKAY.

25  MS. IZMAYLOVA, IF YOU COULD GO FIRST PLEASE.

```
 1          MS. IZMAYLOVA:  WELL GIVEN THE FACT THAT YOUR HONOR
 2  DID READ THE MOTION, THE GIST OF OUR CLAIM IS THAT WHILE WE DID
 3  CONSENT TO THE PLAINTIFF AMENDING THEIR COMPLAINT TO ADD
 4  ADDITIONAL CLAIMS, ADDITIONAL FACTS ABOUT DEFAMATION AND TO ADD
 5  SPECIAL VIDEOS, THERE WAS SPECIFIC LANGUAGE THAT WE HAD AGREED
 6  UPON AS TO WHAT THEIR AMENDMENTS WOULD ACTUALLY BE.  WHEN THEY,
 7  IN FACT, DID FILE THE SECOND AMENDED COMPLAINT, THERE WAS AN
 8  ADDITIONAL -- THERE WAS A NEW CODEFENDANT THAT WAS ADDED AT
 9  THAT TIME WHICH WAS THE LAST DAY OF THE DISCOVERY PERIOD AS
10  YOUR HONOR IS AWARE.
11          SO PURSUANT TO RULE 15 THE TIME FOR THEM TO FILE AN
12  AMENDMENT HAD ALREADY PAST.  SO THE ONLY TWO WAYS THAT THEY
13  COULD HAVE ACHIEVED THIS AMENDMENT WOULD HAVE BEEN TO EITHER
14  ASK FOR OUR CONSENT, WHICH THEY DID NOT DO, OR TO FILE, YOU
15  KNOW, SEEK PERMISSION FROM THE COURT TO AMEND WHICH THEY ALSO
16  DID NOT DO, AND SO BASED ON THE FACT THAT THEY FAILED TO FOLLOW
17  RULE 15, WE BELIEVE THAT THE NEW PARTY THAT THEY ADDED SHOULD
18  BE DISMISSED.  BECAUSE IF WE NOW ARE ADDING A COMPLETELY NEW
19  DEFENDANT TO THE CASE WHERE WE'RE AT THE END OF DISCOVERY,
20  SUMMARY JUDGMENT MOTIONS HAVE BEEN FILED, YOU KNOW, MOTIONS TO
21  COMPEL HAVE BEEN FILED, THIS IS JUST GOING TO PROLONG THE CASE
22  UNNECESSARILY.
23          THERE IS ABSOLUTELY NO ALLEGATIONS IN THE ACTUAL
24  AMENDED COMPLAINT OTHER THAN THEM, YOU KNOW, PUTTING THE KEBE
25  LLC IN THE TITLE, THERE'S NOTHING IN THE ACTUAL COMPLAINT
```

```
 1   ITSELF THAT ALLEGES WHAT, YOU KNOW, ANY ACTIONS OF KEBE LLC OR
 2   ANY CAUSATION BETWEEN THEIR ACTIONS AND THE PLAINTIFF'S
 3   DAMAGES.  SO BASED ON ALL OF THOSE FACTS WE BELIEVE THAT THE
 4   CODEFENDANT SHOULD BE DISMISSED.  WE'RE NOT ARGUING THAT THEY
 5   SHOULDN'T HAVE BEEN ALLOWED TO AMEND IT PER OUR INITIAL
 6   AGREEMENT, THAT'S STILL FINE WITH US, BUT JUST IN REGARDS TO
 7   ADDING THIS NEW CODEFENDANT.
 8            THE COURT:  SO I MEAN IT SOUNDS LIKE WHAT YOUR
 9   POSITION IS IS THAT THERE ARE TWO THINGS HERE.  ONE, YOU ALLEGE
10   THAT THERE'S BEEN A TECHNICAL VIOLATION OF THE PRIVILEGE THAT
11   THE PLAINTIFF WOULD HAVE HAD TO AMEND, SO WE'LL PUT THAT ON ONE
12   SIDE, AND I THINK PROBABLY THAT'S A FAIR POINT TO MAKE.
13            THE OTHER ARGUMENT YOU MAKE IS ESSENTIALLY I'M GOING
14   TO DISTILL IT DOWN FOR YOU WHEN YOU SAY IT WOULD BE UNFAIR.
15   SO, YOU KNOW, THIS IS NOT A NEW CLAIM IN THE SENSE THAT ALL OF
16   A SUDDEN WE HAD A CONTRACT CASE AND THE PLAINTIFF SAYS OH, BY
17   THE WAY, THERE WAS A TORT COMMITTED HERE THAT'S SOMEWHAT
18   RELATED, AND I WANT TO BRING THAT TORT, AND SO THERE'S ANOTHER
19   NEW ROUND OF DISCOVERY THAT THE DEFENDANTS WOULD NEED TO TAKE
20   SO THEY COULD UNDERSTAND THE NATURE OF THE PLAINTIFF'S CLAIMS.
21            THE CLAIMS HERE ARE THE SAME, BUT IT IS AN ADDITIONAL
22   DEFENDANT THAT IS ALLEGED THAT COULD BE RESPONSIBLE IF THERE IS
23   LIABILITY FOR SLANDER OR LIBEL.  I THINK THE OTHER CLAIM IS
24   INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.  THERE MAY HAVE
25   BEEN A FOURTH ONE OR SO.  THOSE ARE THE MAIN ONES, AND SO THE
```

1    FACTS THAT SUPPORT THOSE CLAIMS HAVEN'T CHANGED, AND, OF

2    COURSE, THE DEFENDANT IS APPARENTLY A DEFENDANT -- THE NEW

3    DEFENDANT IS APPARENTLY SIMPLY AN ENTITY THAT IS CONTROLLED BY

4    THE DEFENDANT AND/OR HER HUSBAND.

5            AND THEN THE PLAINTIFF ALSO ADDS THAT THEY WEREN'T

6    EVEN AWARE WHO OF THAT ENTITY WAS OR THAT IT EXISTED UNTIL VERY

7    LATE IN THE GAME.  SO I DON'T WANT TO SAY LATE IN THE GAME, I

8    MEAN LATE DURING THE DISCOVERY PROCESS I THINK AFTER HER

9    DEPOSITION WAS TAKEN THERE WAS SOME COMMUNICATION DURING THAT

10   MEETING.

11           SO I GUESS MY POINT IS OR MY QUESTION REALLY IS IS

12   HOW IS IT UNFAIR TO THE DEFENDANT?  IN OTHER WORDS, IF THE

13   DEFENDANT KNOWS EVERYTHING ABOUT THE CLAIM THAT THEY KNEW

14   BEFORE, AND THAT THOSE SAME THINGS THAT ARE SUPPORTING THIS

15   CASE, THEN WHERE IS THE DEFENDANT PUT AT A DISADVANTAGE OR

16   UNFAIR PREJUDICE IF THE PLAINTIFF IS ALLOWED TO AMEND?

17           MS. IZMAYLOVA:  YOUR HONOR, I MEAN BECAUSE IT IS A

18   SEPARATE ENTITY, YOU KNOW, KEBE STUDIOS LLC, OUR CONTENTION IS

19   THAT THEY, YOU KNOW, THEY'RE NOT -- THEY'RE IRRELEVANT FOR

20   PURPOSES OF THIS, AND ALSO WE DO BELIEVE THAT THE PLAINTIFF DID

21   KNOW ABOUT THEIR EXISTENCE PRIOR TO THE DEPOSITION --

22           THE COURT:  SO CAN YOU ANSWER MY QUESTION THEN?  MY

23   QUESTION IS HOW IS IT UNFAIR.  I MEAN YOU'RE NOT SAYING THAT

24   SHE HAS NOTHING TO DO WITH THAT COMPANY.  IN FACT THE

25   INFORMATION ABOUT THAT COMPANY WAS COMMUNICATED TO THE

1  PLAINTIFFS BY MS. KEBE, AND SHE STATED IN HER DISCOVERY AT HER

2  DEPOSITION, YOU KNOW, IT WAS THROUGH THIS ENTITY I THINK THESE

3  WEBSITES WERE OWNED BY THE COMPANY, AND IF THERE WAS SLANDER

4  THAT OCCURRED, THEN POSSIBLY THE COMPANY IS THE ONE THAT HAS

5  RESPONSIBILITY, AND OF COURSE SHE COULD TOO I MEAN BECAUSE A

6  COMPANY CAN ONLY ACT THROUGH INDIVIDUALS, AND ENTITIES CAN HAVE

7  LIABILITY, BUT THE FUNDAMENTAL QUESTION IS WHY IS IT UNFAIR.

8          MS. IZMAYLOVA:  WELL BECAUSE WE DO STILL BELIEVE THAT

9  IT WILL CAUSE US AT LEAST SOME SORT OF A DELAY AS WE DON'T

10 REPRESENT KEBE STUDIOS LLC SO THEY WOULD HAVE TO, YOU KNOW,

11 RETAIN COUNSEL BECAUSE THEY'RE A SEPARATE DEFENDANT.  I DON'T

12 KNOW -- I MEAN WE DON'T EVEN KNOW WHAT THE ALLEGATIONS ARE OF

13 WHAT THEIR LIABILITIES ARE OR WHAT ACTIONS THEY HAVE

14 COMMITTED.  SO I MEAN --

15          THE COURT:  YOU DO KNOW THAT BECAUSE THAT'S IN THE

16 COMPLAINT, RIGHT, THAT'S IN THE AMENDED COMPLAINT THAT WAS

17 FILED.  YOU KNOW WHAT THE PLAINTIFF SAYS HAPPENED.  I THINK ALL

18 THE PLAINTIFF ALLEGES IS IS THAT ALL THE THINGS THAT MS. KEBE

19 ALLEGEDLY DID WAS DONE THROUGH THAT COMPANY.

20          MS. IZMAYLOVA:  WELL, MS. KEBE'S HUSBAND WHO'S HER,

21 YOU KNOW, BUSINESS MANAGER ALSO DID DO A DEPOSITION TESTIFIED

22 THAT, YOU KNOW, MS. KEBE HAD HER YOUTUBE CHANNEL AND HER BRAND

23 PRIOR TO THEM EVER ESTABLISHING THIS KEBE STUDIOS LLC.  IT WAS

24 A SPECIFIC PURPOSE FOR THEM TO ESTABLISH THAT PARTICULAR

25 COMPANY, AND IT WAS NOT TO -- IT WAS NOT FOR PURPOSES OF

1   RUNNING THE YOUTUBE CHANNEL THAT'S AT ISSUE IN THIS CASE.

2           IN ADDITION TO THAT, WHEN THEY DID ESTABLISH THE LLC

3   NONE OF THE DOCUMENTS, NONE OF THE ASSETS, NOTHING MERGED FROM

4   MS. KEBE'S YOUTUBE CHANNEL AND THAT BRAND WITH THIS NEW

5   COMPANY.

6           THE COURT:  SO WHO RAN, WHO RAN -- WHAT DOES THE

7   RECORD SHOW THROUGH DISCOVERY WHO OWNED AND RAN THE YOUTUBE

8   CHANNEL IF THAT'S WHAT WE'RE TALKING ABOUT?  ARE THERE OTHER

9   THINGS THAT YOU CAN TELL ME -- BUT AFTER THE COMPANY WAS FORMED

10  DID MS. KEBE RUN HER BLOGGING AND YOUTUBE VIDEOS THROUGH THE

11  COMPANY'S PLATFORM THAT IT HAD ESTABLISHED WITH YOUTUBE AT

12  ALL?

13          MS. IZMAYLOVA:  BASED ON MY UNDERSTANDING, NO.  BASED

14  ON MY UNDERSTANDING OF WHAT MS. KEBE AND HER HUSBAND HAD

15  EXPLAINED, NO, SHE DID NOT.  THERE'S NOTHING ON THE YOUTUBE

16  CHANNEL.  NOTHING CHANGED.  THERE'S NO MENTION OF KEBE STUDIOS

17  LLC ANYWHERE ON THERE.  SHE IS THE PERSON THAT RUNS THAT

18  CHANNEL, YOU KNOW.

19          THE COURT:  WHAT DID MS. KEBE SAY IN HER DEPOSITION

20  ABOUT THE CHANNEL THEN?

21          MS. IZMAYLOVA:  SHE SAID --

22          THE COURT:  I'M SORRY, LET ME REPHRASE THAT.  WHAT

23  DID SHE SAY IN HER DEPOSITION ABOUT THE COMPANY'S RELATIONSHIP

24  TO THE CHANNEL, HER YOUTUBE CHANNEL?

25          MS. IZMAYLOVA:  SHE -- I MEAN TO MY RECOLLECTION WHEN

1  SHE WAS ASKED ABOUT THE DIFFERENT BUSINESS VENTURES THAT HER

2  AND HER HUSBAND HAVE ENGAGED IN, SHE GAVE THREE SEPARATE, YOU

3  KNOW, SPECIFIC THINGS THAT THEY DO.  I MEAN THERE DEFINITELY

4  WAS SOME TESTIMONY I BELIEVE IT WAS MAYBE BECAUSE THAT SHE WAS

5  NOT UNDERSTANDING WHAT THE QUESTIONS WERE, BUT SHE DID SAY AT

6  SOME POINT NO, I'M SOLELY RESPONSIBLE FOR EVERYTHING ON MY

7  YOUTUBE CHANNEL.  THEN SHE SAID WELL, MY HUSBAND AND I HAVE

8  THIS COMPANY, AND I AM, YOU KNOW, HE AND I ARE THE COMPANY, AND

9  THEN IN THE NEXT DEPOSITION WHICH WAS HER HUSBAND'S, HE STATED

10 THAT THAT COMPANY WAS, YOU KNOW, CREATED FOR THE SOLE PURPOSE

11 OF GETTING INVOLVED IN LIKE PRODUCTION OF MOVIES AND SUCH, AND

12 NOT WHAT MS. KEBE DOES ON THE YOUTUBE CHANNEL, THAT THEIR

13 ASSETS ARE, YOU KNOW, FROM WHAT MS. KEBE HAD GOING ON IN

14 YOUTUBE WHEN THEY ESTABLISHED THE NEW COMPANY DID NOT MERGE.

15 THERE WAS NOT AGREEMENTS THAT ANYTHING MERGED TOGETHER, SO

16 THAT'S WHERE MY UNDERSTANDING IS, YOU KNOW, MS. KEBE DID STATE

17 IN HER DEPOSITION THAT HER HUSBAND WAS THE BUSINESS MANAGER,

18 BUT HE WOULD KNOW BETTER ABOUT THIS PARTICULAR LINE OF

19 QUESTIONING THAT WAS PUT ALSO AS PART OF, YOU KNOW, HER ANSWERS

20 DURING HER DEPOSITION AT THAT TIME.

21        THE COURT:  AND SO ARE YOU REPRESENTING THEN BASED ON

22 WHAT YOU UNDERSTAND IS THAT THERE IS NO REGISTRATION WITH

23 YOUTUBE OR ANYTHING LIKE THAT RELATIVE TO THE COMPANY AND HOW

24 MS. KEBE PUBLISHED THE VIDEOS THAT THE PLAINTIFF SAYS WAS THE

25 PROBLEM HERE?

```
 1           MS. IZMAYLOVA:  NOT THROUGH YOUTUBE.  I MEAN
 2  OBVIOUSLY THE COMPANY IS REGISTERED WITH THE STATE, YOU KNOW,
 3  THE SECRETARY OF STATE OF GEORGIA, BUT IT IS MY UNDERSTANDING
 4  THAT THE NAME ONLINE WITH TASHA K WHICH IS HER BRAND, IF YOU
 5  WOULD, HAS BEEN AND WAS BEFORE THIS COMPANY.  IT STILL
 6  CONTINUES TO REMAIN THAT.  THERE WAS NO EDITS MADE TO THE
 7  YOUTUBE CHANNEL OR ANYTHING LIKE THAT EVEN AFTER THE COMPANY
 8  WAS ESTABLISHED.
 9           THE COURT:  OKAY.  BEFORE I TALK TO THE PLAINTIFF,
10  ANYTHING ELSE YOU WANT TO SAY ABOUT THIS?
11           MS. IZMAYLOVA:  NO, YOUR HONOR.
12           THE COURT:  ALL RIGHT.  THANK YOU.  IS IT MR.
13  PEQUIGNOT?
14           MR. PEQUIGNOT:  PEQUIGNOT.
15           THE COURT:  OKAY.  YES, SIR, WHAT DO YOU HAVE TO SAY
16  ABOUT IT?
17           MR. PEQUIGNOT:  WELL, I GUESS ON THE FACTUAL RECORD,
18  I WASN'T THERE AT THE DEPOSITION, SO I BELIEVE WHAT MS.
19  IZMAYLOVA JUST STATED ON THE RECORD IS INCONSISTENT WITH SOME
20  OF THE DEPOSITION TESTIMONY.
21           MS. MATZ, CAN YOU CLARIFY THAT?
22           MS. MATZ:  SURE.  IF YOUR HONOR IS WILLING TO HEAR ME
23  ON THIS.  SO WE PUT -- I THINK THAT THAT FACTUAL, THE
24  PRESENTATION OF THE FACTUAL RECORD IS NOT AT ALL CONSISTENT
25  WITH THE DEPOSITION TESTIMONY.
```

1          MS. KEBE SPECIFICALLY TESTIFIED THAT THERE WAS NO

2   DIFFERENCE BETWEEN HER AND THE COMPANY WHEN WE ASKED SPECIFIC

3   QUESTIONS TO UNDERSTAND WHO WAS RESPONSIBLE FOR WHAT.  HER

4   HUSBAND MIRRORED THAT TESTIMONY.  HER HUSBAND ALSO TESTIFIED

5   THAT THE COMPANY RECEIVED THE ADVERTISING REVENUES INTO

6   BUSINESS BANK ACCOUNTS THAT WERE EARNED THROUGH THE

7   EXPLOITATION OF THE CHANNEL.

8          AND, YOUR HONOR, I DON'T WANT TO REPEAT THINGS THAT

9   ARE IN OUR BRIEF SINCE YOU READ THEM, BUT I WILL POINT YOU TO

10  PAGE 11 OF OUR BRIEF.  WE HAVE SET OUT THE PAGE AND LINE

11  NUMBERS OF THE DEPOSITION TESTIMONY, AND THOSE HAVE ALSO BEEN

12  ATTACHED.  SO, YOU KNOW, OUR UNDERSTANDING OF THE TESTIMONY IS

13  ESSENTIALLY THAT THIS IS NOTHING MORE THAN AN ALTER EGO.

14          AND I DON'T BELIEVE THERE WOULD BE ANY PREJUDICE HERE

15  GIVEN THAT MS. KEBE TESTIFIED THAT SHE MAKES ALL THE DECISIONS

16  ABOUT WHAT'S POSTED, AND IT'S HER COMPANY.  THERE'S NO

17  DIFFERENCE BETWEEN THE TWO.  HER HUSBAND ALSO MIRRORED THAT

18  TESTIMONY.  HE SAID HE HAS NO ROLE IN IT.

19          SO IT'S NOT AS IF WE'RE DEPOSING AN ENTITY WHERE

20  THERE WAS SOME DIFFERENT MANAGEMENT OR DECISIONMAKING STRUCTURE

21  IN PLACE, BUT THE CONCEPT THAT MS. IZMAYLOVA HAS PRESENTED THAT

22  THIS COMPANY WAS FORMED FOR A DIFFERENT PURPOSE IS NOT

23  CONSISTENT WITH THE DEPOSITION TESTIMONY WHICH TRULY SPEAKS FOR

24  ITSELF.

25          WHAT THE DEPOSITION TESTIMONY SAID WAS ESSENTIALLY

1   THAT THE TWO OF THEM, MR. AND MRS. KEBE, RUN ALL THREE OF THOSE

2   TYPES OF BUSINESSES THROUGH THE COMPANY, THAT THERE ARE

3   MULTIPLE ACTIVITIES, NOT THAT ONE OR THE OTHER WAS EXCLUDED

4   FROM THE COMPANY'S BUSINESS ACTIVITIES, AND THAT PART OF THE

5   PURPOSE OF THE BUSINESS ACTIVITY OF FORMING THE COMPANY WAS TO

6   HAVE IT, YOU KNOW, LEGALLY SET UP IN SOME WAY, SHAPE OR FORM.

7          AND, YOU KNOW, IF I CAN ADD, YOUR HONOR, I DON'T

8   THINK THAT THERE'S ANY PREJUDICE HERE.  WE'RE NOT ASKING FOR

9   ANY NEW DISCOVERY.  MS. KEBE AND THE COMPANY, THE ONLY TWO

10  PEOPLE WHO COULD POSSIBLY HAVE ANY DOCUMENTS WITH RESPECT TO

11  THIS ENTITY HAVE ALREADY BEEN DEPOSED.  MS. IZMAYLOVA AT LEAST

12  TOLD US THAT SHE'S NOT AWARE OF ANY SEPARATE PLACE WHERE THE

13  CORPORATE BOOKS AND RECORDS WERE KEPT, AND, YOU KNOW, WE ASKED

14  FOR CONFIRMATION THAT THEY HAD BEEN SEARCHED, AND WE'RE STILL

15  WAITING ON THAT, BUT THERE IS NOT ANYTHING ELSE THAT NEEDS TO

16  HAPPEN HERE.  THIS IS A SIMPLE ALTER EGO CLAIM.  WE'RE JUST

17  SAYING THAT THE COMPANY MAY ALSO BE LIABLE FOR THE CONDUCT

18  THAT'S ALREADY BEEN ALLEGED IN THE COMPLAINT.

19          THE COURT:  SO, OF COURSE, I MEAN THERE CAN BE A

20  DIFFERENCE BETWEEN THE TWO, YOU KNOW, YOU CAN HAVE THIS COMPANY

21  ON THE SIDE THAT YOU CONTROL, AND THEN YOU CAN DO CERTAIN

22  THINGS.  SO JUST BECAUSE YOU CONTROL THE COMPANY, I'M SURE

23  EVERYBODY KNOWS THAT, DOESN'T MEAN THAT THERE'S A MERGER HERE

24  FOR PURPOSES OF LIABILITY.

25          THE QUESTION OR, YOU KNOW, THE QUESTION IS WHAT WAS

1  THE PURPOSE OF THE COMPANY, AND WAS THE PURPOSE OF THE COMPANY

2  TO BE INVOLVED IN THIS OVERALL TRANSACTION.  I MEAN IT WOULD BE

3  VERY STRONG EVIDENCE OF A MERGER IF MS. KEBE ENGAGED IN

4  ACTIVITIES ON THE INTERNET, AND THEN HER PAID FOR THOSE

5  ACTIVITIES WAS ADVERTISING REVENUE THAT WAS MADE PAYABLE TO AND

6  RUN THROUGH THE BOOKS OF THE COMPANY.  I MEAN THAT WOULD SHOW

7  THAT THE COMPANY HAS A CONNECTION THAT LIKELY WOULD BRING IT

8  WITHIN THE AMBIT OF LIABILITY IF THERE IS LIABILITY.  SO I GET

9  YOUR POINT IN THAT REGARD.

10         MS. IZMAYLOVA, WAS THERE TESTIMONY, DO YOU RECALL,

11  AND I REMEMBER READING IT IN THE MATERIALS THAT THE PLAINTIFFS

12  SUBMITTED THAT THE ADVERTISING REVENUE FROM THE YOUTUBE CHANNEL

13  WHERE THESE ALLEGED DEFAMATORY STATEMENTS WERE MADE ACTUALLY

14  WAS PAID INTO THIS COMPANY?

15         MS. IZMAYLOVA:  YOUR HONOR, I SAT IN ON ONLY MS.

16  KEBE'S FIRST DAY OF DEPOSITION, AND THE SECOND DAY I WAS NOT

17  THERE, SO I DON'T -- THAT MAY HAVE BEEN DISCUSSED ON THAT DAY.

18  I DO NOT RECALL THAT BEING DISCUSSED WHEN I SAT WITH HER, BUT

19  IF I MAY QUICKLY JUST POINT YOUR HONOR TO MR. KEBE'S DEPOSITION

20  TRANSCRIPT PAGE 43 STARTING WITH LINE 22, HE WAS ASKED WHY, SO

21  WHY THE DECISION TO START AN ENTITY.  HIS ANSWER BECAUSE WE

22  WANT TO GROW AND EXPAND.  NEXT QUESTION WHAT DO YOU WANT TO

23  GROW AND EXPAND INTO.  HIS ANSWER INTO MEDIA PRODUCTION.  THEN

24  I THINK MS. MATZ ASKED WHEN THE BUSINESS WAS FORMED WERE ALL OF

25  THE ASSETS OF THE, QUOTE, ONLINE WITH TASHA K BRAND ASSIGNED

1   INTO THE COMPANY.  THEN MR. KEBE HAD ASKED MS. MATZ TO CLARIFY

2   THE QUESTION SEVERAL TIME, SO I'M MOVING DOWN TO WHERE HE

3   FINALLY I THINK UNDERSTOOD WHAT SHE WAS ASKING.  PAGE 45 OF THE

4   TRANSCRIPT STARTING ON LINE 17, QUESTION:  WAS THERE AN

5   ASSIGNMENT AGREEMENT TO THE COMPANY.  NO.  OR PERHAPS A

6   CONTRIBUTION AGREEMENT.  NO.  THEY'RE TALKING ABOUT AFTER THE

7   COMPANY WAS FORMED --

8           THE COURT:  WHAT WOULD THERE BE TO ASSIGN IN A

9   BUSINESS THAT PRODUCES VIDEOS FOR THE INTERNET?  I MEAN A

10  COMPUTER, A VIDEO CAMERA I MEAN --

11          MS. IZMAYLOVA:  BASED ON THE QUESTIONING OF OPPOSING

12  COUNSEL, THEY SAID THAT THEIR ASSETS RELATED TO THE ONGOING

13  BUSINESS SUCH AS THE BRAND, THE VIDEOS AND THINGS LIKE THAT.

14          THE COURT:  THE BRAND, THE ASSETS RELATED TO THE

15  BRAND, WHAT WOULD THAT BE?  WE'RE TALKING ABOUT A WOMAN WHO

16  GOES ONLINE, AND POSTS THINGS THAT SHE'S HEARD ABOUT PEOPLE

17  THAT ARE FAMOUS.  SO WHAT KIND OF ASSETS MIGHT THERE BE?  I

18  MEAN SHE WOULD MAKE MONEY, I GUESS, FROM THAT IF SHE'S

19  SUCCESSFUL AT IT, BUT AS FAR AS THE -- I'LL PUT IT THIS WAY.

20  THE BARRIERS TO ENTER THE MARKET ARE NOT VERY HIGH IF YOU WANT

21  TO GET ON THE INTERNET.  I MEAN I COULD DO IT TODAY.  NOBODY

22  WOULD WANT TO SEE IT, BUT I COULD DO IT.

23          I'VE GOT A COLLEGE STUDENT WHO AT ONE TIME THOUGHT

24  THAT HE WAS GOING TO MAKE MONEY ON THE INTERNET BY PLAYING

25  VIDEO GAMES.  OF COURSE SOME PEOPLE DO DO THAT, BUT THEY'RE

1   VERY GOOD, YOU KNOW, SO HE'S GOOD IN HIS MIND BUT NOT

2   NECESSARILY COMPARED TO WHAT THE WORLD IS, BUT I MEAN HE DID

3   ALL THAT FROM HIS BEDROOM, YOU KNOW, HE HAD A COMPUTER AND THAT

4   WAS ABOUT IT.

5        LET ME ASK YOU THIS.  WE'LL ASSUME THAT THERE WAS

6   SOME KIND OF ASSETS THAT WERE NOT TRANSFERRED OVER FROM HER

7   PERSONAL OWNERSHIP OR MR. KEBE.  IS IT KEBES?  I WAS SAYING

8   KEBE EARLIER.

9        MS. IZMAYLOVA:  I BELIEVE IT'S KE BEE.

10       THE COURT:  SO THEY MAY HAVE SOME THINGS THAT THEY

11  WERE USING TO MAKE THE PRODUCTION AND UPLOAD AND ALL THAT, THAT

12  WOULD BE ONE EVIDENCE.  NOT ONE BIT OF EVIDENCE ABOUT WHETHER

13  OR NOT THE COMPANY IS RELATED, WHETHER OR NOT THEY TRANSFERRED

14  ASSETS, BUT WOULD YOU NOT AGREE THAT IF THERE WAS REVENUE

15  DERIVED FROM THE VERY SAME ACTIVITIES, PUBLISHING STUFF ONLINE

16  AND THAT REVENUE WAS RUN THROUGH THE COMPANY THAT THAT WOULD

17  TEND TO SHOW THAT MAYBE THE COMPANY IS RELATED TO THE

18  PRODUCTION AND PUBLICATION OF THESE VIDEOS?

19       MS. IZMAYLOVA:  IF THE REVENUE WAS RUN THROUGH THE

20  COMPANY, THEN I WOULD HAVE TO AGREE WITH YOU.

21       THE COURT:  YEAH, I THINK SO.  WERE YOU STARTING TO

22  SAY SOMETHING, OR WAS MS. MATZ STARTING TO SAY SOMETHING ELSE.

23       MS. MATZ:  I WAS, YOUR HONOR, BUT I DID NOT WANT TO

24  INTERRUPT.  I THOUGHT THERE WAS A NATURAL BREAK.  IF I JUST MAY

25  BE HEARD ON THIS, I JUST WANT TO CLARIFY BECAUSE I THINK THAT

1  THE PRESENTATION OF THE FACTUAL STATEMENTS IS GETTING A LITTLE

2  CONFUSED HERE.

3           JUST SO WE'RE CLEAR, MR. KEBE IN HIS DEPOSITION

4  TESTIMONY WHEN THERE WERE QUESTIONS ASKED ABOUT ASSET

5  TRANSFERS, AND JUST SO YOU'RE CLEAR, YOUR HONOR, PART OF THE

6  REASON THESE QUESTIONS WERE ASKED IS BECAUSE A FAILURE TO

7  FOLLOW CORPORATE FORMALITIES WOULD ALSO BE EVIDENCE OF AN ALTER

8  EGO, AND IT'S CLEAR THAT THE ASSETS WERE BEING USED FOR THE

9  PURPOSES OF THE COMPANY'S BUSINESS.

10          BUT WHEN HE WAS ASKED IF THINGS WERE TRANSFERRED BY

11  ANY TYPE OF A WRITTEN AGREEMENT HE SAID NO, AND THEN I SAID WHO

12  OWNS THE ASSETS NOW, AND HE SAID THERE IS NO AGREEMENT IN

13  PLACE, SO IT'S THE BOTH OF US EVEN THOUGH WE'RE MARRIED.  I

14  SAID SO YOU'RE SAYING THE TWO OF YOU INDIVIDUALLY OWN THE

15  ASSETS, NOT THE COMPANY, AND HE SAID IT'S THE SAME, AND I SAID

16  WHAT DO YOU MEAN IT'S THE SAME.  ANSWER, IT'S THE SAME.  WHAT'S

17  THE SAME?  THE COMPANY AND US ARE THE SAME.  QUESTION, OKAY.

18  SO THERE'S NO DIFFERENCE BETWEEN THE TWO OF YOU AND THE

19  COMPANY, IS THAT WHAT YOU'RE SAYING TO ME.  YES.  THAT LINE OF

20  QUESTIONING IS ON PAGE 46 OF THE DEPOSITION.

21          AND JUST SO YOUR HONOR IS ALSO CLEAR ABOUT THE

22  FACTUAL RECORD HERE BECAUSE I DO THINK THAT THIS IS INCREDIBLY

23  IMPORTANT THAT REVENUE BEING DERIVED FROM THESE BUSINESS

24  ACTIVITIES BEING RUN THROUGH THE COMPANY WOULD BE INDICATIVE OF

25  THE COMPANY PARTICIPATING IN THOSE ACTIVITIES, ON PAGE 61 OF

1  THE DEPOSITION WHEN I WAS ASKING ABOUT WHERE VARIOUS SOURCES OF

2  ADVERTISING REVENUE CAME IN BECAUSE WE ONLY HAD CERTAIN

3  ADVERTISING REVENUES HAD BEEN PRODUCED, AND I WAS TRYING TO

4  UNDERSTAND IF THERE WAS ADDITIONAL EVIDENCE OF REVENUE THAT HAD

5  NOT BEEN PRODUCED WHICH IT WAS CLEAR THAT THERE WAS, I ASKED

6  HIM SPECIFICALLY WHERE IT WENT IN, AND I SAID OKAY.  WHAT ABOUT

7  STRIPE, STRIPE IS A PAYMENT PROCESSING PLATFORM, YOUR HONOR, I

8  KNOW THERE'S A LOT OF THEM, AND I SAID OKAY.  WHAT ABOUT

9  STRIPE.  STRIPE, WE USED TO HAVE A YOUTUBE CONSULTATION SERVICE

10  ON OUR WEBSITE.  THEY WERE BUILT INTO A WEBSITE WITH THEIR

11  CONSULTATIONS, YES.  SO DID YOU RECEIVE -- BUT THEN IT WOULD

12  GO, IT WOULD GO DIRECTLY INTO THE BUSINESS ACCOUNT, AND I SAID

13  YOU'RE MEANING THE MONIES WENT DIRECTLY INTO THE BUSINESS BANK

14  ACCOUNT.  YEAH, YES.

15      SO, YOU KNOW, THERE'S CLEAR EVIDENCE THAT THE REVENUE

16  FROM THE ACTIVITIES THAT WE WERE DISCUSSING WHICH IS

17  ADVERTISING REVENUES THAT COME IN FROM THE EXPLOITATION OF THE

18  ONLINE WITH TASHA K PLATFORM WHICH INCLUDES THIS YOUTUBE

19  CHANNEL WENT DIRECTLY INTO THE COMPANY BUSINESS BANK ACCOUNTS.

20      SO I DON'T KNOW, YOU KNOW, FROM OUR PERSPECTIVE

21  THERE'S CLEAR EVIDENCE OF A NUMBER OF THINGS HERE.  ONE IS THE

22  COMPANY'S PARTICIPATION, BUT TWO IS THE ALTER EGO ACTIVITIES

23  BECAUSE IT'S PRETTY CLEAR BECAUSE NEITHER MR. KEBE OR MS. KEBE

24  VIEW ANY DIFFERENCE BETWEEN THEMSELVES AND THE COMPANY.

25      THE COURT:  MS. MATZ, HAS THE COMPLAINT ON THE

1  COMPANY OR HAS THE AMENDED COMPLAINT NAMED THE COMPANY AMONG

2  OTHER THINGS; HAS THAT BEEN SERVED ON THE COMPANY AT THIS

3  POINT?

4           MS. MATZ:  YES, YOUR HONOR, IT HAS, AND I BELIEVE THE

5  RESPONSE WAS DUE ON I WANT TO SAY JANUARY 22ND, AND I BELIEVE I

6  SAW AN ORDER FROM YOUR HONOR EXTENDING ITS TIME TO RESPOND TO

7  THE COMPLAINT UNTIL AFTER THIS HEARING.

8           THE COURT:  I REMEMBER THAT NOW SINCE YOU MENTION

9  THAT.  I THINK I EXTENDED IT BY A MATTER OF JUST A FEW DAYS

10 BECAUSE IT WAS -- I DIDN'T GIVE THEM LIKE A THREE-WEEK PERIOD,

11 I DON'T THINK, BUT IN ANY EVENT, SO I'LL LET THE DEFENDANT HAVE

12 THE LAST WORD SINCE IT'S YOUR MOTION.

13          MS. IZMAYLOVA, DO YOU HAVE ANYTHING ELSE YOU WANT TO

14 SAY?

15          MS. IZMAYLOVA:  NO, YOUR HONOR, I JUST SUBMIT ON THE

16 ARGUMENT THAT WE'VE MADE IN OUR BRIEF.

17          THE COURT:  OKAY.  SO I'M GOING TO ALLOW THE

18 AMENDMENT TO STAND.  THE COURT IN THE MINUTE ORDER THAT WILL BE

19 ISSUED IN CONJUNCTION WITH OUR HEARING TODAY WILL REFLECT THAT

20 HAD I BEEN ASKED PRIOR TO THE FILING OF THE AMENDMENT THAT I

21 WOULD HAVE CONSENTED TO IT BASED ON THE EVIDENCE THAT I HAVE

22 BEFORE ME, AND SO I'M GOING TO ALLOW THE AMENDMENT NAMING THE

23 LLC TO BE RATIFIED BY MY ORDER TODAY RETROACTIVELY, AND THE

24 MEMO WILL STAND, AND THE COMPANY WILL NEED TO FILE AN ANSWER

25 PURSUANT TO THE ORDER THAT I ISSUED SOME WEEKS AGO.

```
 1          AS IT RELATES TO DISCOVERY IN THAT REGARD, YOU KNOW,
 2   IF THERE IS REALLY DISCOVERY THAT IS NEEDED, I WILL CONSIDER A
 3   REASONABLE EXTENSION OF DISCOVERY FOR THAT LIMITED PURPOSE.  I
 4   REALLY DON'T EXPECT TO HEAR THAT YOU WANT TO DO ANYTHING ELSE,
 5   BUT IF YOU DO WANT TO DO SOMETHING ELSE, YOU SHOULD LET ME
 6   KNOW.
 7          AS FAR AS I KNOW WE'VE NOT BEEN NOTIFIED THAT ANY
 8   OTHER COUNSEL IS INVOLVED, AND YOU HAD MENTIONED, THE DEFENDANT
 9   HAD MENTIONED THAT THERE MAY BE SEPARATE LAWYERS AND THAT YOU
10   DON'T REPRESENT THEM.  WHO FILED THE MOTION AND REQUEST THAT
11   THE TIME TO FILE THE ANSWER BE DELAYED?
12          MS. IZMAYLOVA:  I DID FILE THAT ON THEIR BEHALF.  I
13   MEAN WE DIDN'T REPRESENT -- WE WERE WAITING TO SEE WHAT THE
14   OUTCOME OF THIS PARTICULAR MOTION WOULD BE.
15          THE COURT:  YEAH, I'M GOING TO PROBABLY EXPECT THAT
16   YOU'RE GOING TO REPRESENT ALL OF THEM, THAT MAY NOT TURN OUT TO
17   BE THE CASE, BUT ASSUMING THAT IS THE CASE, THEN IT WILL
18   CERTAINLY BE THE NEW DEFENDANT'S KNOWLEDGE OF THE UNDERLYING
19   PROCEEDINGS COULD BE FAIRLY SEAMLESS, AND IF THEY DO HAVE NEW
20   COUNSEL AS OPPOSED TO EXISTING COUNSEL, I FEEL CERTAIN THAT
21   THERE WILL BE TREMENDOUS COOPERATION BECAUSE THE SAME
22   INDIVIDUALS WILL BE DIRECTING BOTH SETS OF LAWYERS EVEN IF ONE
23   IS A COMPANY THROUGH THE SAME INDIVIDUALS THAT ARE DEFENDANTS.
24   SO I WILL NOT --
25          MS. IZMAYLOVA:  YOUR HONOR, I HAVE TO CONFER --
```

```
 1              THE COURT:  GO AHEAD.

 2              MS. IZMAYLOVA:  I WAS GOING TO SAY I WILL HAVE TO

 3  CONFER WITH MY CLIENT, BUT IT'S MORE LIKELY THAN NOT THAT WE

 4  WOULD BE REPRESENTING THE COMPANY AS WELL.

 5              THE COURT:  SO THE MOTION TO DISMISS IN THE MINUTE

 6  ORDER WILL REFLECT THAT IT IS DENIED, AND IT WILL BE TERMINATED

 7  BASED ON THE NEW ORDER THAT WE WILL ENTER.

 8              SO LET'S NEXT MOVE TO THE DEFENDANT'S MOTION TO

 9  COMPEL.  SO HERE'S HOW I WANT TO HANDLE THIS.  I WANT TO GO

10  ITEM BY ITEM AND HEAR FROM THE DEFENDANT ABOUT WHAT IT IS THAT

11  YOU HAVEN'T RECEIVED THAT YOU NEED TO RECEIVE, AND THEN I WILL

12  HEAR THE PLAINTIFF'S RESPONSE TO THAT, AND THEN I'LL MAKE MY

13  MIND UP, AND THEN WE'LL MOVE ON TO THE NEXT ISSUE.  IF THERE'S

14  SOMETHING THAT YOU NEED TO RESPOND TO THAT THE PLAINTIFF BRINGS

15  UP, THEN YOU GET MY ATTENTION BEFORE I MAKE AN ANNOUNCEMENT.

16              SO I HAVE UP ON -- I'VE GOT THIS COMPUTER OBVIOUSLY

17  THAT YOU SEE ME ON AND HEAR ME ON, AND I'VE ALSO GOT MY IPAD UP

18  WHERE I'VE HAVE GOT DOCUMENT 82 WHICH IS DEFENDANT KEBE'S

19  MOTION TO COMPEL, AND SO YOU DIRECT ME IN THERE WHERE YOU NEED

20  ME TO GO, AND THEN WE'LL TAKE ALL OF YOUR ITEMS ONE BY ONE.

21              AND LET ME JUST SAY I'M LESS FAMILIAR WITH THE MOTION

22  TO COMPEL THAN I WAS THE OTHER MOTION AGAIN BECAUSE THIS IS A

23  LITTLE BIT MORE INTRICATE, AND I THINK IT'S EASIER FOR ME TO DO

24  THIS IN PERSON.  SO MAYBE WE HAVE TO GO -- THIS IS THE MOTION.

25  IS THERE A SEPARATE GROUP.  I GUESS I NEED TO GO TO THE BRIEF
```

 1  WHICH IS ACTUALLY DOCUMENT 83 THAT WAS SEALED, SO THAT'S WHERE

 2  YOU NEED TO DIRECT ME TO.

 3          MS. IZMAYLOVA:  YES, SIR.

 4          THE COURT:  AND LET ME JUST SAY, MANDI, YOU'RE THERE,

 5  TAKE GOOD NOTES.  MANDI IS MY STAFF LAWYER WORKING ON THIS

 6  CASE.

 7          MS. IZMAYLOVA:  IF I UNDERSTAND YOUR HONOR CORRECTLY

 8  YOU WANT ME TO GO THROUGH EACH POINT OF OUR ARGUMENT?

 9          THE COURT:  YEAH, I WANT YOU TO TELL ME EACH ITEM OF

10  YOUR DISCOVERY WHETHER IT'S A REQUEST FOR DOCUMENTS OR YOUR

11  INTERROGATORIES THAT YOU THINK THAT THE ANSWERS AND RESPONSES

12  AND PRODUCTIONS YOU GOT WAS INADEQUATE.  SO LET'S JUST TAKE

13  THEM ONE BY ONE.  I DON'T WANT TO HEAR ALL YOUR COMPLAINTS AND

14  THEN HEAR ALL THEIR RESPONSES.  I WANT TO TAKE IT ITEMIZED.

15          THE COURTROOM DEPUTY:  AND ALSO, JUDGE, MANDI IS ON

16  THE CALL.  SHE'S JUST MUTED.

17          THE COURT:  YEAH, I WAS SURE SHE WAS.  IS THE FIRST

18  ONE ON PAGE 8 DEFENDANT'S --

19          MS. IZMAYLOVA:  YES, JUDGE, I STARTED OFF ON PAGE 6

20  WITH THE ARGUMENT JUST A GENERAL, I GUESS, COMPLAINT IN REGARDS

21  TO THE RESPONSES NUMBERED, INTERROGATORY RESPONSES NUMBERED 1,

22  2, 6, 8, 10 AND 11, THE FACT THAT THERE WERE -- THE PLAINTIFF

23  HAS FAILED TO RAISE SPECIFIC OBJECTIONS AND JUST USED

24  GENERALIZED BOILERPLATE OBJECTIONS, AND SO THAT WAS LIKE THE

25  FIRST PORTION OF MY ARGUMENT IS THAT THOSE ARE NOT ALLOWED, YOU

1  KNOW, UNDER THE FEDERAL RULES THAT YOU MUST OBJECT WITH

2  SPECIFICITY, AND SO THAT WAS KIND OF AN OVERALL ARGUMENT THAT

3  APPLIES TO MORE THAN JUST ONE INTERROGATORY.

4        THE COURT:  I UNDERSTAND YOUR POINT ON THAT.  LET ME

5  HEAR FROM MS. MATZ ABOUT THAT.  MS. MATZ, THAT'S NOT ONLY A

6  PART OF THE FEDERAL RULE, THAT'S A PART OF MY STANDING ORDER

7  THAT GENERAL OBJECTIONS ARE NOT ALLOWED.  SO WHY ARE YOU ALL

8  MAKING THOSE?

9        MS. MATZ:  YOUR HONOR, I APOLOGIZE, I ACTUALLY

10 BELIEVE MR. PEQUIGNOT IS FIELDING THIS ONE SO IF I CAN LET HIM

11 RESPOND TO THIS.  THANK YOU.

12       THE COURT:  OKAY.

13       MR. PEQUIGNOT:  YOUR HONOR, WE DON'T BELIEVE WHAT

14 WE'VE ASSERTED ARE GENERAL OBJECTIONS.  WE DIDN'T, YOU KNOW, IN

15 THE SENSE THAT MOST PEOPLE THINK OF GENERAL OBJECTIONS AS

16 HAVING SOME GENERAL OBJECTION SECTION AT THE BEGINNING OF THE

17 RESPONSES, THAT'S NOT WHAT WE DID.  EACH OF THESE OBJECTIONS

18 WERE MADE SPECIFIC TO A PARTICULAR REQUEST.

19       NOW TO THE EXTENT THAT THEY TAKE ISSUE WITH SOME OF

20 THE OBJECTIONS NOT BEING SPECIFIC ENOUGH FOR PURPOSES OF A

21 PARTICULAR RESPONSE, I BELIEVE THAT THAT'S AN ISSUE THAT SHOULD

22 BE ADDRESSED IN CONNECTION WITH EACH REQUEST, BUT WE DID NOT

23 HAVE A GENERAL OBJECTION SECTION IN THE WAY THAT, YOU KNOW,

24 THAT OBVIOUSLY COURTS HAVE DISAPPROVED OF.

25       THE COURT:  SO BACK TO THE DEFENDANT, CAN YOU GIVE ME

1   AN EXAMPLE OF WHAT IT IS THAT THE PLAINTIFFS DID THAT YOU THINK

2   IS WRONG?

3           MS. IZMAYLOVA:  YES, YOUR HONOR, AND WE NEVER DID

4   ALLEGE THAT THEY HAD, YOU KNOW, LIKE A PREAMBLE GENERAL

5   OBJECTION SECTION, BUT STILL USING THOSE SAME BOILERPLATE

6   OBJECTIONS EVEN IF YOU'RE APPLYING IT TO EACH INTERROGATORY IS

7   STILL NOT SUFFICIENT UNDER THE LAW IS OUR POSITION.

8           THE COURT:  GIVE ME AN EXAMPLE, IF YOU WOULD.

9           MS. IZMAYLOVA:  I MEAN IT'S JUST PLAINTIFF OBJECTS TO

10  THESE INTERROGATORIES AS SEEKING PERSONAL INFORMATION THAT'S

11  IRRELEVANT TO THE CLAIMED DEFENSES WITHOUT ACTUALLY, YOU KNOW,

12  STATING WITH SPECIFICITY, YOU KNOW, WHY IT'S IRRELEVANT OR, YOU

13  KNOW, BECAUSE THEY THEN DID PROVIDE ANSWERS TO THE

14  INTERROGATORIES AS WELL, BUT LIKE THEN DID NOT SPECIFY LIKE

15  WHICH PORTION OF THE INTERROGATORY THEY WERE ANSWERING, IF

16  THERE WAS ANYTHING BEING WITHHELD, YOU KNOW, IT WAS JUST

17  BASICALLY EACH OF THEIR INTERROGATORIES WAS PROCEEDED BY AN

18  OBJECTION, BUT THEN ALSO THERE WAS AN ANSWER, AND SO IT WAS NOT

19  EVER VERY CLEAR, YOU KNOW, WHAT PORTION OF THE QUESTION WAS

20  BEING ANSWERED, YOU KNOW, WHETHER ANY INFORMATION WAS BEING

21  WITHHELD, YOU KNOW, IT WAS JUST VERY --

22          THE COURT:  SO LET'S PARSE THAT IF WE CAN, OKAY.  SO

23  IF SOMEONE SAYS I OBJECT TO YOUR QUESTION BECAUSE IT SEEKS

24  IRRELEVANT INFORMATION, WHAT MORE DO THEY NEED TO SAY ABOUT

25  IT?  I MEAN I GUESS, YOU KNOW, YOU TALK ABOUT IN YOUR MOTION

1   THAT WELL WE'RE SUPPOSED TO BE GIVEN SOME INDICATION ABOUT IF

2   SOMETHING IS BEING WITHHELD AND WHAT IS BEING WITHHELD, BUT

3   BEFORE WE GET TO THAT POINT, IF SOMEONE SAYS IT IS IRRELEVANT,

4   THAT'S A CONCLUSION.  IT MAY VERY WELL BE IRRELEVANT.  IF IT IS

5   IRRELEVANT, THEN WHAT ELSE ARE THEY SUPPOSED TO DO.  YOU MAY

6   SAY IT'S NOT IRRELEVANT.

7          SO DO YOU HAVE SPECIFIC INTERROGATORIES THAT YOU WANT

8   ME TO CONSIDER WHERE THEY, THEY BEING THE PLAINTIFF, HAS

9   OBJECTED THAT YOU ARE SEEKING IRRELEVANT INFORMATION, AND IF

10  SO, THEN TELL ME WHY THE INTERROGATORY INFORMATION THAT YOU

11  SEEK IS NOT IRRELEVANT AND IS IN FACT RELEVANT TO YOUR CLAIM.

12         MS. IZMAYLOVA:  YES, YOUR HONOR.  FOR EXAMPLE,

13  INTERROGATORY NUMBER 1 WHERE WE REQUESTED CONTACT INFORMATION

14  FOR THE PLAINTIFF SUCH AS HER ADDRESSES, TELEPHONE NUMBERS,

15  EMAIL ADDRESSES, SOCIAL MEDIA HANDLES BECAUSE, YOU KNOW, THE

16  BULK OF THE COMMUNICATIONS IN THIS CASE OCCURRED ELECTRONICALLY

17  AND SO --

18         THE COURT:  I'M NOT FOLLOWING YOU.  YOU SUED, YOU

19  COUNTERED -- WELL, YOU WERE SUED, WHEN I SAY YOU OF COURSE I'M

20  REFERRING TO YOUR CLIENT, YOUR CLIENT WAS SUED BECAUSE SHE

21  PUBLISHED MATERIALS THAT THE PLAINTIFF SAYS IS UNTRUE AND

22  UNFAIR AND SLANDERED HER OR LIBELED HER.  YOUR COUNTERSUIT IS

23  SIMILAR.  YOU SAY THAT THERE ARE THINGS THAT SHE HAS DONE THAT

24  HAS LIBELED YOUR CLIENT.

25         I THINK YOU ALSO SAY THAT SHE COMMITTED ASSAULT, AND

1   THEN THERE'S INTIMATION THAT MAYBE SHE HAD ENCOURAGED SOME

2   UNSAVORY PERSON TO MAKE A COMMENT, I DON'T REMEMBER HOW IT WAS

3   COMMUNICATED, SOME COMMENT TO YOUR CLIENT ABOUT THAT, YOU KNOW,

4   WOULD SEEM TO INDICATE THEY MIGHT BE IN DANGER.  SO OTHER THAN

5   SLANDER AND LIBEL AND ASSAULT, INTENTIONAL INFLICTION OF

6   EMOTIONAL DISTRESS, WHAT WERE YOUR OTHER CLAIMS THAT YOUR

7   CLIENT ASSERTED?

8           MS. IZMAYLOVA:  YOUR HONOR, WE INITIALLY ASSERTED

9   SLANDER, BUT THEN WE DID ASK FOR PERMISSION TO DISMISS THAT

10  CLAIM, SO THAT HAS BEEN DISMISSED.  SO WE ONLY HAVE ASSAULT AND

11  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

12          THE COURT:  OKAY.  AND SO WHEN YOU ASKED ABOUT HER

13  EMAIL ADDRESSES AND THINGS LIKE, THAT WAS FOR WHAT PURPOSE

14  THEN, TO SEE WHAT, HOW, THE MEANS OF HER FROM WHERE SHE

15  COMMUNICATED TO OTHER PEOPLE?

16          MS. IZMAYLOVA:  THAT'S CORRECT, YOUR HONOR, BECAUSE

17  WE DO -- THERE ARE, YOU KNOW, THROUGH THE DISCOVERY PROCESS

18  WE'VE GATHERED SOME BITS AND PIECES OF INFORMATION THAT PROVE

19  THAT, YOU KNOW, THE PLAINTIFF DOES REACH OUT TO OTHER PEOPLE TO

20  DO THINGS ON HER BEHALF, THINGS, YOU KNOW, LIKE, FOR EXAMPLE,

21  TO, YOU KNOW, MESSAGE MY CLIENT OR OUR CLIENT'S SOCIAL MEDIA

22  PAGES.  THE FACT THAT SHE IS SELF ADMITTEDLY IN A GANG WHICH WE

23  HAVE PLENTY OF EVIDENCE OF THAT.  THE FACT THAT SHE USES HER

24  SOCIAL MEDIA ACCOUNTS TO HARASS AND THREATEN OTHER, YOU KNOW,

25  BLOGGERS IN SIMILAR SITUATIONS THAT SHE'S DONE THAT FOR SOME

1   TIME.  SO IT'S A PATTERN OF BEHAVIOR --

2           THE COURT:  WELL, HER SOCIAL MEDIA ACCOUNTS ARE

3   PUBLIC, RIGHT.  I MEAN ARE THERE SOME THAT ARE NOT PUBLIC THAT

4   YOU ARE TRYING TO FIND OUT ABOUT?

5           MS. IZMAYLOVA:  IT WAS JUST LIKE, YOU KNOW, FOR

6   EXAMPLE, IF YOU'RE ON INSTAGRAM YOU HAVE A HANDLE THAT'S

7   ASSIGNED TO YOUR SPECIFIC ACCOUNT, BUT I WAS TRYING TO FIGURE

8   OUT HOW MANY -- DOES SHE HAVE MORE THAN ONE ACCOUNT OR WAS IT

9   JUST THE ONE HANDLE THAT SHE USES TO COMMUNICATE WITH EVERYONE

10  FOR BASICALLY FOR THE VARIOUS SOCIAL MEDIA PLATFORMS, AND

11  THAT'S THE KIND OF CONTACT INFORMATION THAT WE'RE SEEKING.

12          THE COURT:  OKAY.  LET'S ASSUME THAT SHE'S GOT SOME

13  THAT YOU DON'T KNOW ABOUT, THEN HOW DOES THAT HELP YOU?

14          MS. IZMAYLOVA:  BECAUSE LIKE I SAID THERE'S, YOU

15  KNOW, RANDOM PEOPLE WOULD SEND MY CLIENT LIKE SCREENSHOTS OF

16  MESSAGES FROM, YOU KNOW, PEOPLE THAT SHE MAY NOT BE AWARE OF

17  BUT, YOU KNOW, BASICALLY STRANGERS ON SOCIAL MEDIA SAYING OH,

18  THIS SOUNDS LIKE THEY'RE TALKING ABOUT YOU, AND IT WOULD BE

19  LIKE, YOU KNOW, SOME KIND OF A THREATENING CONVERSATION.  SO IT

20  WAS MORE TO IDENTIFY OTHER PEOPLE THAT THE PLAINTIFF WAS

21  COMMUNICATING WITH REGARDS TO MY CLIENT, AND THIS, YOU KNOW,

22  THEIR WHOLE SITUATION.

23          THE COURT:  OKAY.  SO SITTING HERE TODAY AFTER

24  DISCOVERY HAS ENDED, IF SHE IS REQUIRED TO TELL YOU ALL OF HER

25  SOCIAL MEDIA OUTLETS, NAMES THAT WOULD ALLOW HER TO COMMUNICATE

1  THROUGH SOCIAL MEDIA, IT DOESN'T SOUND LIKE THAT THAT'S REALLY

2  ANYTHING THAT THAT WOULD ACTUALLY HELP YOU DO WHEN DISCOVERY IS

3  CLOSED.

4          YOU WOULD HAVE TO TAKE THAT INFORMATION, AND THEN YOU

5  WOULD HAVE TO RUN THAT INFORMATION DOWN THROUGH OTHER SOURCES.

6  WE'RE TALKING ABOUT THIRD-PARTY REQUESTS THAT NEED TO BE THEN

7  PURSUED WITH PEOPLE THAT SHE MAY HAVE COMMUNICATED TO THAT YOU

8  NEED TO THEN CONTACT AND FIND OUT INFORMATION FROM THEM,

9  WHETHER SHE COMMUNICATED WITH THEM.

10         I MEAN AM I MISSING SOMETHING?  IT DOESN'T SEEM LIKE

11 JUST THE IDENTITY OF HER ACCOUNT NAMES OR HANDLES WILL HELP YOU

12 UNLESS YOU HAVE SOME THREATENING MESSAGES THAT WERE POSTED ON

13 SOCIAL MEDIA THAT MIGHT HAVE BEEN DIRECTED TO YOUR CLIENT THAT

14 OTHERS TOLD YOUR CLIENT ABOUT, AND THEN IF YOU HAD THE

15 PLAINTIFF'S HANDLES YOU COULD THEN TRACE THEM, THOSE POSTS TO

16 HER.  ARE THERE SUCH THINGS THAT YOU HAVE?

17         MS. IZMAYLOVA:  WELL, WHAT WE DO HAVE IS I DO HAVE

18 SEVERAL SCREENSHOTS OF DIRECT MESSAGES THAT WERE SENT DIRECTLY

19 TO MY CLIENT'S INBOX FROM, YOU KNOW, ACCOUNTS THAT APPEAR TO BE

20 THE SAME ACCOUNTS OF THE PLAINTIFF THAT ARE, YOU KNOW,

21 THREATENING IN NATURE DIRECTLY TO MY CLIENT.  SO THOSE ARE THE

22 TYPES OF THINGS BECAUSE I DON'T KNOW -- WE DON'T KNOW WHO THE

23 ACTUAL PERSON IS BEHIND THOSE PARTICULAR HANDLES --

24         THE COURT:  SO HOW DOES THE PLAINTIFF'S IDENTITY OF

25 HER HANDLES HELP YOU FIGURE OUT IF SHE HAD ANYTHING TO DO WITH

1  THOSE MESSAGES BEING SENT TO YOU BY OTHER ACCOUNT HOLDERS?

2          MR. PEQUIGNOT:  YOUR HONOR, CAN I INTERJECT QUICKLY?

3          THE COURT:  WELL, YOU'RE NOT GOING TO ANSWER FOR HER,

4  ARE YOU?

5          MR. PEQUIGNOT:  I'M JUST GOING TO POINT OUT THAT WE

6  PROVIDED THE ANSWERS --

7          THE COURT:  WAIT A MINUTE, WAIT A MINUTE, I DIDN'T

8  SAY YOU COULD INTERRUPT.

9          MR. PEQUIGNOT:  I'M SORRY.

10         THE COURT:  YEAH, I MEAN I SAID YOU'RE NOT GOING TO

11 ANSWER FOR HER SO LET HER ANSWER, AND THEN YOU'LL GET YOUR

12 CHANCE, OKAY.

13         MS. IZMAYLOVA:  WHAT I WAS SAYING IS THERE WOULD NOT

14 BE A THIRD PERSON LIKE SO IF I CREATE MORE THAT ONE ACCOUNT AND

15 THEN I USE A SECONDARY ACCOUNT THAT NO ONE KNOWS ABOUT TO

16 THREATEN DIRECTLY, YOU KNOW, MY CLIENT, THEN IF I'M FORCED TO

17 IDENTIFY THAT SECONDARY ACCOUNT AS BELONGING TO ME, THEN I'M,

18 YOU KNOW, AUTOMATICALLY IMPLICATED IN SENDING THE THREATS.

19         THE COURT:  OKAY.  SO IF THE THREATS REALLY CAME FROM

20 ACCOUNTS THAT SHE CONTROLS, I UNDERSTAND YOUR POINT.

21         MS. IZMAYLOVA:  COULD BE.  I'M NOT SAYING THAT THEY

22 DO, BUT I'M SAYING WE DON'T KNOW.

23         THE COURT:  OKAY.  AND LET'S SAY SHE ANSWERS YOUR

24 QUESTION AND NONE OF THE ACCOUNTS THAT HAD MESSAGES DIRECTED TO

25 YOUR CLIENT CAME FROM HER DIRECTLY, THEN YOU REALLY DON'T HAVE

1  MUCH YET, DO YOU?  I MEAN YOU HAVE TO THEN GO OUT AND DO OTHER

2  DISCOVERY TO FIGURE OUT WHO THE IDENTITY OF THOSE ACCOUNTS ARE

3  FROM; AM I RIGHT?

4          MS. IZMAYLOVA:  THAT WOULD BE CORRECT, YES, SIR.

5          THE COURT:  AND THAT MIGHT ENTAIL ACTUALLY SENDING

6  SUBPOENAS TO THE MEDIA COMPANIES TO TRY TO TRACE THAT

7  INFORMATION, AND IT SEEMS LIKE THAT'S ALWAYS A LOSING CAUSE.

8          MS. IZMAYLOVA:  WE'VE TRIED THAT.  THEY'VE DECLINED.

9          THE COURT:  YEAH, AND YOU DIDN'T FILE ANY MOTIONS

10 WITH ME THAT FORCE ME TO MAKE THEM REVEAL THAT INFORMATION?

11         MS. IZMAYLOVA:  BASED ON THE LETTER WE RECEIVED, IT

12 WAS MY UNDERSTANDING THAT IT WAS NOT -- THEY WEREN'T GOING TO

13 PROVIDE THE INFORMATION.

14         THE COURT:  THEY MAY HAVE PROVIDED IT IF THEY WERE

15 ORDERED TO DO SO UNLESS THEY HAVE A LEGAL EXCUSE NOT TO, AND I

16 DON'T KNOW THAT THERE'S A CARTE BLANCHE ABSOLUTE PRIVILEGE FOR

17 THEM NOT TO.  I MEAN THEY'RE NOT JOURNALISTS IN THE SENSE THAT

18 THEY'RE ABLE TO PROTECT SOURCES UNDER THE FIRST AMENDMENT.  SO

19 YOU MAY HAVE BEEN ABLE TO OBTAIN THAT INFORMATION IF IT WAS

20 DIRECTLY FROM THEM.  SO TO THE EXTENT THAT MS. -- I'M TRYING TO

21 REMEMBER THE PLAINTIFF'S NAME.

22         MS. IZMAYLOVA:  KEBE.

23         THE COURT:  NO, PLAINTIFF.

24         MS. IZMAYLOVA:  ALMANZAR.

25         THE COURT:  ALMANZAR.  TO THE EXTENT THAT SHE HAS NOT

1   IDENTIFIED WHETHER OR NOT THESE NAMES, HANDLES FROM WHICH

2   THREATS CAME WAS CONTROLLED BY HER OR WAS HER, THEN YOU WOULD

3   ASK THAT SHE ANSWER THAT QUESTION.

4           MS. IZMAYLOVA:  YES, YOUR HONOR.

5           THE COURT:  ALL RIGHT.  GO AHEAD FOR THE PLAINTIFF.

6           MR. PEQUIGNOT:  THANK YOU, YOUR HONOR.  SORRY FOR

7   INTERRUPTING.  I THOUGHT I COULD ADD THAT THE SOCIAL MEDIA

8   HANDLES HAVE BEEN DISCLOSED IN THE RESPONSE ON PAGE 10.  SO THE

9   DISCUSSION THAT JUST OCCURRED WITH MS. IZMAYLOVA ASKING FOR THE

10  SOCIAL MEDIA HANDLES, I DON'T, I DON'T KNOW WHAT THE BASIS FOR

11  THAT IS BECAUSE IT'S IN THE RESPONSE.

12          WHAT OUR OBJECTION RELATED TO WAS PERSONAL

13  INFORMATION SUCH AS HER PHONE NUMBER AND HER PHYSICAL ADDRESS

14  WHICH THEY APPEAR NOW NOT TO BE TAKING ISSUE WITH.

15          THE COURT:  IS THERE ANYTHING ELSE ABOUT THE GENERAL

16  OBJECTIONS, SO-CALLED, THAT THE PLAINTIFF -- EXCUSE ME, THAT

17  THE DEFENDANT HAS RAISED HERE THAT YOU WISH TO DISCUSS WITH ME

18  TODAY?  ANY OTHER INFORMATION THAT YOU DON'T THINK YOU GOT THAT

19  YOU SHOULD HAVE GOTTEN?

20          MS. IZMAYLOVA:  WELL, THE OTHER OBJECTION THAT THE

21  PLAINTIFF HAD WAS TO A DEFINITION THAT STARTS AT THE BEGINNING

22  OF THE INTERROGATORIES THAT WE SERVED ON THEM, SPECIFICALLY

23  DEFINITION NUMBER 4 WHICH WE DEFINE THE TERMS PLAINTIFF YOU AND

24  YOUR TO REFER TO THE PLAINTIFF HERSELF AND HER PRESENT AND

25  FORMER EMPLOYEES, AGENTS, ATTORNEYS, YOU KNOW, BASICALLY ANYONE

1  WHO IS ACTING ON HER BEHALF.

2          THE PLAINTIFF RAISED AN OBJECTION THAT THE

3  DEFINITION -- THEY RAISE THE OBJECTION THAT THE DEFINITION

4  IS -- THAT THEY CONSTRUE THE TERMS PLAINTIFF YOU AND YOUR ONLY

5  TO REFER TO THE PLAINTIFF HERSELF, AND THAT'S HOW THEY

6  RESPONDED TO ALL OF OUR INTERROGATORIES.  SO WE DO TAKE ISSUE

7  WITH THAT BECAUSE, AGAIN, YOU KNOW, THERE IS EVIDENCE TO

8  INDICATE THAT PLAINTIFF HAS OTHER PEOPLE COMMUNICATING ON HER

9  BEHALF AND REACH OUT, YOU KNOW, SPECIFICALLY ON HER BEHALF, SO

10  WE DON'T BELIEVE THAT'S AN APPROPRIATE CONSTRUCTION OF THAT

11  DEFINITION.

12          THE COURT:  OKAY.  WHAT SAYS THE PLAINTIFF ABOUT

13  THAT?

14          MR. PEQUIGNOT:  YOUR HONOR, I MEAN RULE 33 ONLY

15  REQUIRES A PERSON BEING ASKED INTERROGATORIES TO RESPOND, AND

16  OBVIOUSLY IF OUR CLIENT'S PERSONAL KNOWLEDGE OF INFORMATION,

17  WHETHER THAT INFORMATION IS MAINTAINED BY SOMEONE ON HER STAFF

18  OR NOT, YOU KNOW, WE'VE OBVIOUSLY PROVIDED THAT, BUT THE WAY

19  THAT THEY'VE DEFINED THIS IS, A, BEYOND THE SCOPE OF RULE 33,

20  BUT, B, IT MAKES EVERY INTERROGATORY HOPELESSLY OVERBROAD

21  BECAUSE THERE'S NO WAY WE CAN ANSWER WITH RESPECT TO EACH OF

22  THESE UNNAMED INDIVIDUALS IN EACH OF THESE INTERROGATORIES.

23          SO JUST TO GIVE YOU AN EXAMPLE, YOUR HONOR, IF WE'RE

24  TALKING ABOUT CONTACT INFORMATION, DO WE HAVE TO PROVIDE SOCIAL

25  MEDIA HANDLES FOR EVERY PERSON THAT'S DEFINED HERE AS OUR

1 CLIENT, DO WE HAVE TO PROVIDE THEIR PHONE NUMBER AND ADDRESS OF

2 EVERY SINGLE PERSON THAT COULD BE DEFINED AS AN INVESTIGATOR OR

3 REPRESENTATIVE.  IT'S JUST I DON'T BELIEVE RULE 33 REQUIRES

4 THAT.

5          THE COURT:  WELL, I WOULD SAY THAT I THINK BOTH OF

6 YOU PROBABLY HAVE TAKEN UNREASONABLE POSITIONS AS IT RELATES TO

7 IT BECAUSE OBVIOUSLY I THINK THE EXAMPLE YOU USED, YOU'RE RIGHT

8 ABOUT, BUT IF A QUESTION ASKS, FOR EXAMPLE, TELL ME ALL

9 COMMUNICATIONS YOU HAD WITH, YOU KNOW, MR. X, AND YOU TAKE THE

10 POSITION THAT IT'S ONLY IF THE PLAINTIFF HAD THAT CONVERSATION

11 WITH MR. X, BUT IF THE PLAINTIFF -- IF SHE HAS DISCLOSE THAT, I

12 MIGHT AGREE, BUT IF SHE TELLS SOME OTHER PERSON TO COMMUNICATE

13 WITH MR. X, THAT'S NOT HER, BUT SHE TOLD THE OTHER PERSON TO DO

14 IT, SHE CONTROLLED THAT PERSON, SO THAT COMMUNICATION WOULD BE

15 SUBJECT TO BEING DISCOVERED, AND THERE'S REALLY NO REASONABLE

16 INTERPRETATION OF RULE 33 AT LEAST FEDERAL PROCEDURE THAT WOULD

17 SAY THAT THEY COULDN'T REQUIRE THAT THAT KIND OF INFORMATION BE

18 PRODUCED.

19          SO HERE'S WHAT I WANT TO HAPPEN AS IT RELATES TO THIS

20 DEFINITION IS I WANT THE PLAINTIFF TO GO BACK OVER THE

21 DEFINITION -- I MEAN GO BACK OVER THE INTERROGATORIES, AND TO

22 THE EXTENT IT APPLIES TO THE REQUEST FOR PRODUCTION OF

23 DOCUMENTS TOO, AND IF THERE'S CERTAIN INFORMATION THAT IS IN

24 THE -- REGARDING COMMUNICATIONS, THINGS THAT WOULD BE WITHIN

25 THE PLAINTIFF'S KNOWLEDGE THAT THE PLAINTIFF MAY HAVE DONE OR

1  CAUSED TO HAPPEN DIRECTLY OR INDIRECTLY OR SAID TO SOMEONE ELSE

2  THAT SHE CAUSED TO HAPPEN DIRECTLY OR INDIRECTLY THAT SHE

3  SUPPLEMENT HER DISCOVERY RESPONSES TO SAY SO.

4         I'M GOING TO GUESS THERE'S MAYBE NOT MUCH THERE, BUT

5  THERE CERTAINLY POSSIBLY COULD BE THERE, SOMETHING THERE.  SO,

6  YEAH, I UNDERSTAND THE PLAINTIFF'S BASIC OBJECTION, BUT THE

7  OBJECTION ITSELF MY POINT IS IT'S OVERLY BROAD, AND IT IS USED

8  TO TRY TO ELIMINATE ANY NEED FOR THE PLAINTIFF TO HAVE TO

9  RESPOND TO THINGS THAT SHE KNOWS ABOUT.

10         SO, SURE, IF WE'RE TALKING ABOUT ADDRESSES AND

11  SOMEONE'S OWN PERSONAL HANDLES, BUT IF, FOR EXAMPLE, THERE'S

12  ANOTHER PERSON THAT WORKS FOR HER THAT IS INFLUENCED BY HER

13  THAT MAKES SOME COMMUNICATION TO THE DEFENDANT AT HER REQUEST

14  OR BEHEST, THEN THAT'S THE KIND OF INFORMATION THAT NEEDS TO BE

15  PRODUCED.  SO I WANT THE PLAINTIFF TO TAKE ANOTHER STAB AT ALL

16  OF THE QUESTIONS TO WHERE THE DEFINITION WOULD APPLY.  IF

17  THERE'S INFORMATION WITHHELD THAT WOULD BE WITHIN HER

18  KNOWLEDGE, CUSTODY AND CONTROL AS I HAVE CLARIFIED, I WANT THAT

19  INFORMATION TO BE SUPPLEMENTED.

20         DOES THE PLAINTIFF HAVE ANY QUESTIONS ABOUT WHAT I

21  WANT YOU TO DO?

22         MR. PEQUIGNOT:  I THINK I UNDERSTAND YOUR HONOR'S

23  DIRECTION.  I MEAN OBVIOUSLY AS WE GO THROUGH EACH OF THESE

24  INTERROGATORIES, I'M NOT SURE IF THERE ARE ADDITIONAL ISSUES

25  THAT, YOU KNOW, MIGHT RISE IN CONNECTION WITH TRYING TO RESPOND

1    TO THAT, BUT OBVIOUSLY WE'RE NOT TRYING TO WITHHOLD INFORMATION

2    WITHIN OUR CLIENT'S PERSONAL KNOWLEDGE.

3              THE IDEA HERE IS THAT, YOU KNOW, THE WAY THAT THEY'VE

4    ASKED THE QUESTION, THE WAY THEY'VE DEFINED IT, WE DON'T WANT

5    TO GO DOWN A BUNCH OF RABBIT HOLES THAT ARE OUTSIDE THE SCOPE

6    OF RULE 33.

7              THE COURT:  WELL, IT MIGHT, BUT IT ALSO DOESN'T GIVE

8    YOU A CARTE BLANCHE REASON THAT WE'RE ONLY GOING TO ANSWER IT

9    WITH REGARDS TO HER INDIVIDUALLY, YOU KNOW, AN AGENT THAT SHE

10   CONTROLS IS HER FOR ALL PRACTICAL PURPOSES.  IN FACT, THAT'S

11   THE LAW, RIGHT, THAT'S THE LAW IN EVERY STATE IS THAT YOUR

12   AGENT IS YOU, YOU'RE LIABLE FOR WHAT THEY DO, AND SO YOU CAN'T

13   INTERPRET YOU TO ONLY BE YOU IF YOU HAVE AGENTS THAT DO THINGS

14   OR SAY THINGS FOR YOU, AND SO THE QUESTIONS HAVE TO BE ANSWERED

15   IN THAT RESPECT, AND I MEAN HONESTLY THIS IS THE KIND OF STUFF

16   THAT A GOOD FAITH CONFERENCE THAT THE RULES REQUIRE SHOULD HAVE

17   BEEN ABLE TO ELIMINATE THEM.  I MEAN I SHOULDN'T BE THE FIRST

18   ONE KIND OF HAVING THIS DISCUSSION.  YOU ALL SHOULD HAVE HAD IT

19   DIRECTLY.

20             MS. IZMAYLOVA:  YOUR HONOR, IF I MAY, THE DEFINITION

21   DOES STATE ANY PERSON ACTING OR PURPORTING TO ACT ON HER

22   BEHALF.  IT LISTS THE PEOPLE, AND THEN IT SAYS IF THEY'RE

23   ACTING OR PURPORTING TO ACT ON HER BEHALF.  WE DID RECEIVE THE

24   EXACT DEFINITION IN THE PLAINTIFF'S REQUESTS TO US, SO I DID

25   NOT BELIEVE THAT THERE WAS ANY OTHER WAY TO INTERPRET IT OTHER

1 THAN OBVIOUSLY IF SHE GETS SOMEONE SPECIFICALLY TO ACT, YOU

2 KNOW, SOME OF THESE PEOPLE ARE EMPLOYEES, WHOEVER IT IS,

3 AGENTS, THAT'S WHAT WE'RE ASKING FOR.

4          THE COURT:  ALL RIGHT.  I THINK I HAVE RESOLVED THIS

5 IN YOUR FAVOR, SO LET'S MOVE ON TO OUR NEXT INTERROGATORY OR

6 THE NEXT MATTER YOU WANT TO TALK TO ME ABOUT WORKING AGAIN FROM

7 YOUR MEMORANDUM.

8          MS. IZMAYLOVA:  YES, YOUR HONOR.  INTERROGATORY

9 NUMBER 2 --

10          THE COURT:  WAIT, WHAT PAGE ARE YOU ON IN YOUR

11 MEMORANDUM?

12          MS. IZMAYLOVA:  MY APOLOGIES.  PAGE 11.

13          THE COURT:  OKAY.

14          MS. IZMAYLOVA:  BASICALLY WE HAVE ASKED FOR CERTAIN

15 SOCIAL MEDIA ANALYTICS FOR SPECIFIC DATES, AND I GUESS THEIR

16 OBJECTION WAS THAT PLAINTIFF DOES NOT HAVE THE KNOWLEDGE OF THE

17 INFORMATION REQUESTED.  HER STAFF DOES NOT MAINTAIN THIS

18 INFORMATION.  BASICALLY I MEAN THEY JUST DID NOT RESPOND TO

19 THIS INTERROGATORY, AND THE REASON WHY IT'S -- THE REASON WHY

20 WE ASKED FOR THIS IS BECAUSE ONE OF THE PLAINTIFF'S CLAIMS IS

21 THAT SHE -- HER REPUTATION WAS DAMAGED AS A RESULT OF MY

22 CLIENT'S ACTIONS, AND SO SPECIFICALLY, YOU KNOW, WITHIN HER FAN

23 BASE THAT'S ONE OF THE CLAIMS THAT'S MADE, AND SO I ASKED ABOUT

24 THE NUMBER OF FOLLOWERS SHE HAD ON CERTAIN SOCIAL MEDIA

25 PLATFORMS ON SPECIFIC DATES BOTH BEFORE AND AFTER THE ALLEGED

1  DEFAMATORY VIDEOS WERE PUBLISHED --

2          THE COURT:  SORRY, AND WHAT INFORMATION DOES THAT

3  GIVE YOU THEN?

4          MS. IZMAYLOVA:  WELL, IF THE NUMBER OF FOLLOWERS THE

5  PLAINTIFF HAD PRIOR TO THE ALLEGED DEFAMATORY VIDEO WAS, YOU

6  KNOW, LET'S SAY A THOUSAND, I'M JUST USING A NUMBER, AND THEN

7  AFTERWARDS IT WENT DOWN TO 500, WELL THEN THERE'S MORE OF A

8  CORRELATION BETWEEN THE FACT THAT, YOU KNOW, SHE COULD MAKE AN

9  ARGUMENT THAT BECAUSE OF THIS VIDEO SHE HAS LOST FOLLOWERS, BUT

10  IF THE FOLLOWERS, YOU KNOW, CONTINUED TO RISE REGARDLESS, YOU

11  KNOW, EVEN AFTER THESE ALLEGED VIDEOS ARE PUBLISHED, THEN I

12  FEEL LIKE IT DETRACTS FROM THAT CLAIM, THE PLAINTIFF'S CLAIM.

13          THE COURT:  SO THEIR RESPONSE TO THAT IS YOU CAN GET

14  THAT YOURSELF.

15          MS. IZMAYLOVA:  I'M NOT SURE HOW BECAUSE THESE DATES

16  ARE IN THE PAST.  THAT'S SOMETHING THAT WE HAD TO, YOU KNOW,

17  YOU HAVE TO GO IN AND LOGIN TO THE ACTUAL ACCOUNT AND LOOK AT

18  THE ANALYTICS.  SO THAT'S SOMETHING THAT'S NOT PUBLICLY

19  AVAILABLE TO PEOPLE WHO DON'T POSSESS LOGIN INFORMATION FOR

20  THOSE PARTICULAR ACCOUNTS.

21          THE COURT:  WELL, HOW WOULD THAT BE -- OTHER THAN

22  JUST TALKING POINTS THAT MIGHT BE USED AT TRIAL GIVEN THAT

23  THERE IS NO EXPERT WITNESS TESTIMONY THAT I'M AWARE OF, MAYBE

24  THERE IS, AND YOU ALL JUST NEED TO TALK ABOUT IT, THEN HOW IS

25  IT REALLY GOING TO BE USEFUL BECAUSE -- I MEAN YOU SAY

1  SOMETHING BAD ABOUT SOMEBODY ELSE -- LET ME PUT IT THIS WAY.

2  YOU SAY SOMETHING BAD ABOUT A PERSON, WELL THAT PERSON WHO HAD

3  SOMETHING BAD SAID ABOUT THEM, THEIR FOLLOWERS MIGHT ACTUALLY

4  GO UP, NOT DOWN, RIGHT.

5       I MEAN IT WOULD SEEM TO ME IT CAN GO EITHER WAY, AND

6  YOU DON'T HAVE ANY EXPERTS THAT ARE GOING TO TESTIFY.  THIS IS

7  JUST ARGUMENT THAT YOU WOULD MAKE TO A JURY.  IN OTHER WORDS,

8  YOU SAID LOOK, IF MY CLIENT SAID STUFF THAT WOULD HURT HER

9  REPUTATION, THEN YOU WOULD HAVE EXPECTED HER FOLLOWERS WOULD

10  HAVE GONE DOWN, AND THEY DIDN'T, THEY ACTUALLY HAD GONE UP OR

11  STAYED STEADY OR SOMETHING LIKE THAT, THAT'S AN ARGUMENT YOU

12  MAKE, BUT YOU DON'T HAVE EXPERT WITNESSES TO COME IN AND SAY

13  THAT SAME STUFF.

14       MS. IZMAYLOVA:  THAT'S CORRECT, BUT THE REASON WHY I

15  EVEN BROUGHT IT UP IS BECAUSE SHE SPECIFICALLY CLAIMED THAT HER

16  REPUTATION WAS DAMAGED, YOU KNOW, INCLUDING BUT NOT LIMITED TO

17  AMONG HER FANS, AND SO THAT'S WHERE I FELT LIKE THAT WOULD BE

18  RELEVANT EVIDENCE TO BRING OUT TO SHOW THAT WELL, IF SHE'S

19  GAINING FANS THEN HER REPUTATION IS NOT DAMAGED BASED ON THESE

20  VIDEOS THAT MY CLIENT HAS PUT OUT.

21       THE COURT:  I MEAN I THINK THAT'S AN ARGUMENT YOU CAN

22  MAKE.  I'M NOT SURE -- I WOULD HAVE TO THINK ABOUT THAT WHETHER

23  I WOULD AGREE OR DISAGREE WITH THAT PERSONALLY, BUT LET ME ASK

24  THE PLAINTIFF WHY -- IS IT POSSIBLE YOU FOR YOU TO TELL THE

25  DEFENDANT THE NUMBER OF FOLLOWERS SHE HAD ON THE TWO CERTAIN

 1  DATES THAT SHE REQUESTED, AND THE NUMBERS OF FOLLOWERS THAT

 2  THERE WERE?

 3          MR. PEQUIGNOT:  NO, YOUR HONOR, WE DON'T HAVE THAT

 4  INFORMATION, AND THAT'S WHAT WE COMMUNICATED TO THEM ON A

 5  NUMBER OF OCCASIONS.  WE CAN'T PROVIDE INFORMATION WE DON'T

 6  HAVE.  AS YOU CAN SEE HERE, YOUR HONOR, WE JUST HAD THIS

 7  DISCUSSION ABOUT PLAINTIFF.  WE'RE NOT TRYING TO WITHHOLD

 8  INFORMATION.  WE'RE MAKING IT CLEAR THAT IT'S NOT JUST, YOU

 9  KNOW, OUR CLIENT WE'RE TALKING ABOUT, YOU KNOW, SHE'S GONE TO

10  HER TEAM AND TALKED TO THE PEOPLE THAT HELPS WITH HER SOCIAL

11  MEDIA ACCOUNT, AND THEY DO NOT HAVE THIS INFORMATION.

12          THE COURT:  IS THAT INFORMATION AVAILABLE ANYWHERE?

13          MR. PEQUIGNOT:  IF IT'S AVAILABLE SOMEWHERE, IT'S

14  AVAILABLE ON SOME THIRD-PARTY SITE THAT TRACKS HISTORICAL WEB

15  INFORMATION THAT, YOU KNOW, IS NOT IN OUR POSSESSION, CUSTODY

16  OR CONTROL.

17          THE COURT:  SO THEN IT WOULD BE CLEAR THAT THE

18  PLAINTIFF CAN'T COME INTO COURT THEN AND TESTIFY THAT I KNOW MY

19  REPUTATION WAS HURT BECAUSE MY FOLLOWERS WENT DOWN EVERY TIME

20  SHE, THE DEFENDANT, PUBLISHED AN ARTICLE OR PUBLISHED A VIDEO.

21  SHE CAN'T POINT TO THAT AS A BASES FOR WHY SHE'S BEEN HURT

22  HERE, RIGHT?

23          MR. PEQUIGNOT:  OR THAT SHE'S GOING TO COME IN AND

24  CLAIM, YOU KNOW, ON X DATE WE HAD THIS NUMBER OF FOLLOWERS, AND

25  SEVEN DAYS LATER WE HAD, YOU KNOW, Y NUMBER OF FOLLOWERS, NO,

1  WE DON'T HAVE THAT INFORMATION.  I MEAN GENERALLY SPEAKING I'M

2  SURE THAT INFORMATION IS GENERALLY OUT THERE, THE MAGNITUDE OF

3  HER FOLLOWERS, BUT NOT, YOU KNOW, ON A PARTICULARIZED BASIS.

4          THE COURT:  YOU MEAN ON A DATE, BY A SPECIFIC DATE?

5          MR. PEQUIGNOT:  AN EXACT NUMBER ON A SPECIFIC DAY.

6          THE COURT:  AND SO AS WE SIT HERE TODAY HER BASIC

7  CLAIM ABOUT HAVING BEEN DAMAGED BY WHAT THE DEFENDANT DID HERE

8  IS SORT OF SELF-EXPLANATORY THAT THIS IS BAD STUFF SHE SAID

9  ABOUT ME, AND THIS WOULD HURT ANYBODY PARTICULARLY SOMEONE LIKE

10 ME BEING A CELEBRITY, SOMETHING LIKE THAT?

11         MR. PEQUIGNOT:  YES, YOUR HONOR.

12         THE COURT:  OKAY.  YOU GET TO --

13         MS. MATZ:  YOUR HONOR.

14         THE COURT:  YES, MA'AM.

15         MS. MATZ:  I WAS GOING TO JUMP IN I JUST WANTED TO

16 SAY ONE THING.  YOU ARE CORRECT WE HAVE NOT MADE AN ARGUMENT

17 THAT THERE IS LIKE A GENERAL FOLLOWER LOSS OR ANYTHING LIKE

18 THAT BECAUSE AGAIN THAT INFORMATION ISN'T AVAILABLE, BUT JUST

19 TO CLARIFY THE RECORD, WE HAVE PROVIDED EVIDENCE AND COMMENTS

20 AND THINGS LIKE THAT WHERE PEOPLE HAVE SAID I'M NOT GOING TO

21 BUY HER MUSIC ANYMORE, I THINK SHE'S DISGUSTING, YOU KNOW,

22 THINGS LIKE THAT.  NUMEROUS COMMENTS AFTER PEOPLE HEARD THESE

23 STATEMENTS ABOUT OUR CLIENT HAVING STD'S AND REALLY TERRIBLE

24 THINGS.  PEOPLE HAVE SAID THINGS THAT I DO THINK ARE INDICATIVE

25 OF A REPUTATION LOSS.  THOSE HAVE BEEN PROVIDED TO THE EXTENT

1   THEY ARE AVAILABLE TO OUR CLIENT, BUT, NO, THERE'S NOT AN

2   ARGUMENT ABOUT LIKE NUMBER OF FANS OR ANYTHING LIKE THAT.

3           THE COURT:  AS FAR AS THE PLAINTIFF UNDERSTANDS THAT

4   IF THEY HAVEN'T PROVIDED THAT EVIDENCE TO THE DEFENDANT, THEN

5   YOU'RE NOT GOING TO BE ABLE TO USE THAT EVIDENCE AT TRIAL,

6   RIGHT?

7           MS. MATZ:  OF COURSE, YOUR HONOR.

8           MS. IZMAYLOVA:  YOUR HONOR, IF I MAY, WE HAVE

9   PROVIDED THAT EXACT SAME TYPE OF EVIDENCE FOR FACEBOOK, FOR

10  YOUTUBE AND FOR TWITTER FOR SPECIFIC DATES NUMBER OF FOLLOWERS

11  THAT OUR CLIENT HAD, AND ALL WE DID WAS ASK LIKE I SAID LOGIN

12  AND ASK FOR HER ACCOUNT, YOU KNOW, WITH THE LOGIN AND PASSWORD

13  THAT SHE HAS.  SO AS FAR AS LIKE IT BEING IMPOSSIBLE TO GET

14  THAT INFORMATION, I JUST DON'T UNDERSTAND HOW THAT COULD BE A

15  CLAIM THAT'S BEING MADE RIGHT NOW BECAUSE WE DID, IN FACT,

16  PROVIDE THAT EXACT SAME INFORMATION TO THE PLAINTIFF IN OUR

17  INTERROGATORY RESPONSES.

18          THE COURT:  ALL RIGHT.  SO HERE'S WHAT I'M GOING TO

19  SAY ABOUT THAT, I'M GOING TO ORDER THAT THE PLAINTIFF EITHER

20  PROVIDE THE INFORMATION THAT'S BEEN REQUESTED OR CERTIFY IN

21  WRITING TO THE DEFENDANTS THAT THEY HAVE ATTEMPTED TO DO SO,

22  AND THERE'S BEEN NO WAY FOR THEM TO DO SO, AND I THINK IF IT'S

23  TRUE THAT WHAT THE DEFENDANT HAS SAID ABOUT THE INFORMATION

24  THAT THEY HAVE PROVIDED, THE JURY IS GOING TO KNOW ABOUT THAT,

25  AND THE DEFENDANT IS GOING TO REQUEST AT TRIAL THE NUMBER FROM

1 THE PLAINTIFF, AND WHEN THE PLAINTIFF DOESN'T PROVIDE THAT

2 INFORMATION THAT THE DEFENDANT HAS PROVIDED THAT INFORMATION,

3 THEN IT'S PROBABLY NOT GOING TO BE A GOOD LOOK TO THE

4 PLAINTIFF.

5         NOW, I'M TAKING THE DEFENDANT'S STATEMENTS AS BEING

6 TRUE THAT THEY HAVE PROVIDED THAT INFORMATION.  I DON'T HAVE

7 ANY INDEPENDENT KNOWLEDGE OF THAT, AND SO AGAIN THE PLAINTIFF

8 NEEDS TO EITHER PROVIDE THE INFORMATION ABOUT THE FOLLOWERS

9 THAT SHE HAD ON THE TWO SPECIFIC DATES OR THREE SPECIFIC DATES

10 THAT ARE REQUESTED IN INTERROGATORY NUMBER 2, OR CERTIFY THAT

11 THEY HAVE ATTEMPTED IN GOOD FAITH TO RETRIEVE THAT INFORMATION

12 FROM THE SOCIAL MEDIA PLATFORMS, AND HAVE BEEN TOLD OR THE

13 INFORMATION HAS BEEN COMMUNICATED TO THEM THAT IT'S

14 UNAVAILABLE, RIGHT.

15         SO WHAT'S YOUR NEXT ISSUE TALKING AGAIN TO THE

16 DEFENDANT?

17         MS. IZMAYLOVA:  YES, YOUR HONOR.  INTERROGATORY

18 NUMBER 4, WHICH BEGINS ON PAGE 12 OF THE BRIEF, IS BASICALLY

19 ASKING FOR ANY EVIDENCE OF EITHER LOST EARNINGS OR, YOU KNOW,

20 LOST BUSINESS THAT THE PLAINTIFF HAS MADE ALLEGATION AND CLAIMS

21 EVEN IN THE MOST RECENT AMENDED COMPLAINT THAT SHE HAS LOST

22 BUSINESS OPPORTUNITIES AND SUCH AS A RESULT OF THE DEFAMATION,

23 BUT WE HAVE NOT RECEIVED ANY EVIDENCE TO SUBSTANTIATE THAT

24 CLAIM.

25         THE COURT:  WHAT IS IT THAT THE PLAINTIFF DIDN'T DO?

1  THEY DIDN'T PROVIDE YOU EVIDENCE OF LOST EARNINGS; IS THAT WHAT

2  YOU'RE SAYING?

3          MS. IZMAYLOVA:  WELL, BASICALLY THE PLAINTIFF IS

4  ALLEGING IN THE COMPLAINT THAT SHE HAS SUFFERED DAMAGE TO HER

5  REPUTATION AND CHARACTER WITHIN HER PROFESSION, INCLUDING BUT

6  NOT LIMITED TO WITH PROSPECTIVE BUSINESS RELATIONS.

7          THE COURT:  HAS SHE PROVIDED YOU EVIDENCE OF ANY

8  RECORD DEALS OR VIDEO DEALS OR ANYTHING LIKE THAT THAT SHE'S

9  LOST?

10         MS. IZMAYLOVA:  NO, YOUR HONOR.

11         THE COURT:  WELL THEN I SUSPECT THAT SHE'LL BE BARRED

12  FROM COMING INTO COURT AND SAYING THAT I LOST SPECIFIC BUSINESS

13  DEALS OR HAD SPECIFIC LOST EARNINGS, THAT TYPE OF THING.  I

14  MEAN OF COURSE WITH LIBEL AND SLANDER, I'M TRYING TO REMEMBER

15  GEORGIA LAW ON IT, THAT DAMAGE CAN BE PRESUMED WHEN YOU TALK

16  ABOUT SOMEBODY IN THEIR PROFESSIONAL CAPACITY, RIGHT?

17         MS. IZMAYLOVA:  YEAH, IF IT'S CONSIDERED PER SE

18  SLANDER OR LIBEL, THEN YES --

19         THE COURT:  WHAT'S THE DEFINITION OF THAT PER SE?

20         MS. IZMAYLOVA:  THERE'S LIKE FOUR CATEGORIES IF

21  YOU --

22         THE COURT:  YEAH, SOMETHING LIKE THE DEFENDANT SAID

23  ABOUT THE PLAINTIFF, RIGHT, I MEAN --

24         MS. IZMAYLOVA:  IF IT WAS A FALSE STATEMENT, YES.

25         THE COURT:  RIGHT, SO YOU DON'T EVEN HAVE TO PROVE

1  DAMAGES, THE STANDARD CAN BE ALMOST THE ENLIGHTENED CONSCIOUS,

2  I MEAN THAT MAY NOT BE THE TECHNICAL TERM OF IT, BUT IT'S WHAT

3  THE JURY WANTS TO DO.  IT'S NOT LIKE THEY HAVE TO DO MATH FOR

4  IT.

5           MS. IZMAYLOVA:  YES, YOUR HONOR, BUT THE PLAINTIFF

6  HAS PLED BOTH PER SE AND THEN THE OTHER, THE 5TH CATEGORY WHERE

7  YOU WOULD HAVE TO PUT UP --

8           THE COURT:  AND IF SHE CAN'T PRODUCE ANY EVIDENCE OF

9  THAT OTHER THAN GENERALIZED STATEMENTS THAT I THINK I LOST THIS

10  DEAL OR I THINK I DIDN'T GET ANOTHER RECORD, MAYBE SO AND SO

11  HAD A REALLY GOOD RECORD I WOULD HAVE LIKED BUT I DIDN'T GET

12  IT.  I MEAN IF SHE CAN'T PRODUCE SPECIFIC EVIDENCE, THEN IT

13  SOUNDS LIKE YOU WOULD BE MAKING A MOTION FOR A DIRECTED VERDICT

14  ON THAT POINT AFTER THE PLAINTIFF'S CASE.

15           MS. IZMAYLOVA:  YES, SIR.

16           THE COURT:  OKAY.  SO SPEAKING TO THE PLAINTIFF, WHAT

17  IS THE PLAINTIFF'S POSITION RIGHT NOW ABOUT THE DAMAGES?

18           MR. PEQUIGNOT:  YOUR HONOR, WE'VE SPECIFICALLY

19  DISCLAIMED LOST EARNINGS AS A CATEGORY OF SPECIAL DAMAGES.  SO

20  THIS INTERROGATORY SPECIFICALLY ASKS FOR INFORMATION IF YOU ARE

21  CLAIMING LOST EARNINGS AS A CATEGORY OF DAMAGES, AND WE'RE NOT

22  CLAIMING THAT AS SPECIAL DAMAGES.

23           THE COURT:  ARE THERE ANY OTHER KINDS OF SPECIAL

24  DAMAGES SHE'S ALLEGING?

25           MR. PEQUIGNOT:  OTHER THAN -- THE ONLY SPECIAL

1    DAMAGES WE'RE ALLEGING ARE SOME EXPENSES THAT SHE'S INCURRED IN

2    CONNECTION WITH SOME PSYCHOLOGICAL THERAPY THAT SHE RECEIVED AS

3    WELL AS JUST ATTORNEY'S FEES AND EXPENSES, BUT THOSE ARE THE

4    ONLY CATEGORIES OF SPECIAL DAMAGES THAT WE'RE SEEKING.

5            THE COURT:  ATTORNEY'S FEES AND LITIGATION COSTS

6    WOULD NOT BE -- I DON'T EVEN KNOW IF WE REALLY CALL THEM

7    SPECIAL DAMAGES.  I MEAN THEY FOLLOW WHEN YOU'VE BEEN INJURED

8    BY TORT, AN INTENTIONAL TORT UNDER O.C.G.A. 13-6-11 STATUTE

9    ABOUT BAD FAITH, BUT AS FAR AS WHAT KIND OF DAMAGES ARE WE

10   TALKING ABOUT AS FAR AS ANY PSYCHOLOGICAL EXPENSES, LIKE DOLLAR

11   VALUE, WHAT IS THAT?

12           MR. PEQUIGNOT:  WHAT IS THE --

13           THE COURT:  YEAH, WHAT'S THE APPROXIMATE AMOUNT THAT

14   SHE'S SEEKING THERE?

15           MR. PEQUIGNOT:  I BELIEVE IT'S ONLY A COUPLE

16   THOUSAND.  I DON'T HAVE THAT EXACT AMOUNT RIGHT IN FRONT OF ME,

17   YOUR HONOR, I THINK IT'S ONLY A COUPLE OF THOUSAND DOLLARS.

18   IT'S JUST SOME TRAVEL EXPENSES FOR A THERAPIST THAT TRAVELED TO

19   SEE OUR CLIENT.

20           THE COURT:  AND THOSE EXPENSES WOULD HAVE TO BE

21   REASONABLE, RIGHT?

22           MR. PEQUIGNOT:  YES, YOUR HONOR.

23           THE COURT:  YEAH, SO YOU THINK A JURY IS GOING TO

24   AWARD TRAVEL EXPENSES FOR A THERAPIST TO COME TRAVEL TO THE

25   CLIENT?  I MEAN PROBABLY NOT, YOU KNOW, I MEAN MAYBE THE HOURLY

1  RATE AT A REASONABLE HOURLY RATE FOR THAT KIND OF THERAPIST.

2  IT COULD BE -- MY WIFE IS A THERAPIST.  MY WIFE IS A

3  PSYCHOLOGIST, SO I'M FAMILIAR WITH WHAT THE RATES ARE.  I'M

4  SURE THAT THE RATES THAT FAMOUS PEOPLE PAY ARE HIGHER THAN WHAT

5  THE AVERAGE PEOPLE PAY.

6          IT REMINDS ME OF A DIVORCE CASE I WAS DOING ONCE AS A

7  JUDGE WHERE THE LADY THAT WAS GETTING DIVORCED WAS A

8  HAIRSTYLIST, AND THESE ARE MUCH LOWER FIGURES THAN, YOU KNOW,

9  FAMOUS PEOPLE WOULD PAY, BUT SHE WAS WORKING AT A HAIR SALON

10  AND WAS CHARGING ABOUT A HUNDRED DOLLARS FOR THIS PARTICULAR

11  THING, AND SHE MOVED TO THIS COMPANY'S MORE EXCLUSIVE HAIR

12  SALON IN A, YOU KNOW, NICER AREA OF ATLANTA, AND SUDDENLY HER

13  CHARGE WAS 400 DOLLARS FOR THAT SAME HAIRCUT, AND WHEN SHE WAS

14  ON THE STAND THE LAWYER FOR HER HUSBAND WAS QUESTIONING HER

15  ABOUT THAT BECAUSE THE ALIMONY WAS AN ISSUE, AND SHE MADE

16  PRETTY GOOD MONEY, AND HE ASKED HER WELL, WHAT'S THE DIFFERENCE

17  IN THE HUNDRED DOLLAR HAIRCUT THAT YOU GAVE IN LAWRENCEVILLE,

18  GEORGIA AND THE FOUR HUNDRED DOLLAR HAIRCUT THAT YOU PROVIDE IN

19  ALPHARETTA, GEORGIA, AND SHE LOOKED AT HIM LIKE HE WAS AN IDIOT

20  AND SAID THREE HUNDRED DOLLARS, YOU KNOW, IT WAS THE SAME

21  HAIRCUT.

22          THE PSYCHOLOGY SERVICES MAY BE THE SAME, BUT THE

23  PLAINTIFF MAY WANT TO BE CAREFUL ABOUT TRAVEL EXPENSES AND

24  THINGS LIKE THAT.  I MEAN WE'RE GOING TO HAVE AVERAGE PEOPLE ON

25  THE JURY, AND I'M NOT SURE WHAT THEY WILL THINK ABOUT THAT, BUT

1    WHO KNOWS.

2           I DON'T SEE ANYTHING TO RULE IN FAVOR OF THE

3    DEFENDANT IN REGARD TO THIS PARTICULAR INTERROGATORY BASED ON

4    WHAT PLAINTIFF HAS SAID HERE TODAY.  ANYTHING ELSE?

5           MS. IZMAYLOVA:  NO, NOT FOR THAT, NOT IN REGARDS TO

6    DAMAGES AFTER THE CLARIFICATION.

7           THE COURT:  YEAH.  GO THROUGH YOUR DOCUMENT AND TELL

8    ME ANYTHING ELSE YOU WANT TO TALK ABOUT.

9           MS. IZMAYLOVA:  YES, YOUR HONOR, INTERROGATORY NUMBER

10   7, WHICH IS FOUND ON PAGE 17, BASICALLY WE'RE ASKING FOR THE

11   PLAINTIFF TO IDENTIFY, YOU KNOW, EACH PERSON WITH PERSONAL

12   KNOWLEDGE CONCERNING THE CLAIMS, DEFENSES, COUNTERCLAIMS, ANY

13   INFORMATION ABOUT THIS ACTION, AND SO WHAT HAS HAPPENED IS

14   THERE HAS BEEN SOME DOCUMENT PRODUCTION THAT WE RECEIVED EITHER

15   I THINK IT WAS ON THE LAST DAY OF DISCOVERY, AND THEN GOING

16   FORWARD THAT ACTUALLY CONTAINED A LOT OF COMMUNICATION BETWEEN

17   ALL THESE PEOPLE THAT WE LEARNED OF FOR THE VERY FIRST TIME

18   BECAUSE PLAINTIFF DID NOT, YOU KNOW, FAILED TO ANSWER

19   INTERROGATORY NUMBER 7 IN FULL.

20          LIKE, FOR EXAMPLE, ON NOVEMBER 30TH OF 2020, THIS

21   YEAR, WAS THE FIRST TIME THAT WE HAD -- WE WERE GIVEN ANY

22   EVIDENCE ABOUT THIS THERAPIST EVEN THOUGH SHE SAW THE THERAPIST

23   IN 2018.  SO WE COULD HAVE HAD THAT INFORMATION AT THE VERY

24   BEGINNING, AND WE MAY HAVE BEEN ABLE TO EITHER DEPOSE THAT

25   THERAPIST OR, YOU KNOW, GET ADDITIONAL INFORMATION, BUT NOW

1  SINCE WE LEARNED OF IT ON THE LAST DAY OF DISCOVERY, YOU KNOW,

2  WE ARE VERY LIMITED IN WHAT WE CAN DO WITH THIS INFORMATION,

3  BUT AT THE VERY LEAST, YOU KNOW, WE WOULD LIKE FOR THEM TO

4  ANSWER INTERROGATORY NUMBER 7 FULLY SO THAT WE KNOW WHAT

5  PEOPLE, YOU KNOW, MAY BE WITNESSES IN THE TRIAL.

6         THE COURT:  DID YOUR REQUEST SAY WHO -- YOU OBVIOUSLY

7  CAN'T ASK PEOPLE, YOU CAN'T ASK THEM TO IDENTIFY WHO THEY'RE

8  GOING TO CALL FOR TRIAL, BUT YOU CAN ASK THEM WHO KNOWS ABOUT

9  YOUR ALLEGATIONS --

10        MS. IZMAYLOVA:  RIGHT.

11        THE COURT:  -- AND WHAT DO THEY KNOW.  DID YOU ASK

12  THEM THE "WHAT DO THEY KNOW" PART?

13        MS. IZMAYLOVA:  YES, I SAID IDENTIFY EACH PERSON WITH

14  PERSONAL KNOWLEDGE CONCERNING THE ALLEGATIONS, AFFIRMATIVE

15  DEFENSES AND COUNTERCLAIMS IN THIS ACTION AND THE SUBJECT OF

16  EACH PERSON'S KNOWLEDGE.

17        THE COURT:  OKAY.  YOU'RE COMPLAINING THAT IT WAS

18  REALLY LATE IN COMING FORWARD, BUT DID THEY -- HAVE THEY NOW

19  GIVEN YOU THAT INFORMATION?

20        MS. IZMAYLOVA:  NO, WHAT I'M SAYING IS THAT THIS

21  INTERROGATORY, THE RESPONSES TO INTERROGATORIES HAVE NOT BEEN

22  SUPPLEMENTED, BUT I KNOW THAT THERE ARE PEOPLE THAT DO EXIST

23  BASED ON SOME OF THE DOCUMENT PRODUCTION.

24        THE COURT:  WELL, HAVE YOU PROVIDED THEM WITH A LIST

25  OF THESE ARE THE NAMES THAT I FOUND IN THE DOCUMENTS AND WHAT

1  INFORMATION DO THEY POSSESS TO YOUR KNOWLEDGE RELEVANT TO THESE

2  CLAIMS?

3          MS. IZMAYLOVA:  I DON'T KNOW --

4          THE COURT:  IN OTHER WORDS, WHAT DO YOU WANT ME TO

5  MAKE THEM DO, YOU KNOW, THAT'S WHAT I'M SAYING?  WHAT IS IT

6  THAT I NEED TO ASK THEM TO DO TODAY.

7          MS. IZMAYLOVA:  I WOULD LIKE FOR INTERROGATORY 7 TO

8  BE ANSWERED, YOU KNOW, IN FULL WITH THE NAMES OF EACH PERSON

9  THAT HAS PERSONAL KNOWLEDGE ABOUT THIS CASE, AND WHAT IS THE

10 GENERAL SUBJECT OF THAT PERSON'S KNOWLEDGE.

11         MS. MATZ:  YOUR HONOR --

12         THE COURT:  YES, MA'AM, GO AHEAD.

13         MS. MATZ:  MAY I SAY SOMETHING, AND I SAY THIS FOR

14 EVERYONE'S BENEFIT INCLUDING YOURS BECAUSE I ACTUALLY TAKE WHAT

15 YOU SAID AT THE BEGINNING OF THIS CONFERENCE VERY SERIOUSLY,

16 AND I WANT YOU TO KNOW THAT I GREATLY RESPECT YOUR TIME AND

17 PATIENCE IN GOING THROUGH ALL THIS.

18         I THINK PART OF THE ISSUE HERE IS THAT THE

19 DEFENDANT'S COUNSEL -- FIRST OF ALL, THE INFORMATION ABOUT THE

20 THERAPIST, THERE WERE DOCUMENTS PRODUCED LONG BEFORE THIS

21 SUPPLEMENTAL INTERROGATORY RESPONSE THAT HAD ALL OF HER CONTACT

22 INFORMATION ON IT, AND SO THEY WERE AWARE OF IT, AND, YES, WE

23 DID SUPPLEMENT THIS INTERROGATORY TO IDENTIFY HER EVEN THOUGH

24 SHE HAD ALREADY BEEN IDENTIFIED THROUGH DOCUMENTS.

25         BUT PART OF THE PROBLEM HERE IS THAT, YOU KNOW, THESE

1  ISSUES WE HAVE NOT BEEN PROVIDED WITH ANY TYPE OF INFORMATION

2  ABOUT WHY THEY THINK THIS IS INCOMPLETE, WHO THEY THINK IS

3  MISSING, YOU KNOW, THE ONLY EXAMPLE THEY GAVE IN THEIR MOTION

4  IS THAT A PERSON NAMED RASHARD HOUGHTON WHO OUR CLIENT HAS

5  NEVER HEARD OF, YOU KNOW, WASN'T IDENTIFIED AND BECAUSE WE SENT

6  HIM A SUBPOENA WHICH WAS OUR CLIENT DIDN'T HAVE ANY PERSONAL

7  KNOWLEDGE OF WHO THIS PERSON IS SO PART OF THE ISSUE --

8          THE COURT:  I'M SORRY, WHAT DID I MISS HERE, YOU SENT

9  THEM A SUBPOENA?

10         MS. MATZ:  YES, WE DID SEND HIM A SUBPOENA, BUT PART

11 OF THE PROBLEM HERE IS THERE WAS NEVER A MEET AND CONFER ON

12 THESE ISSUES.  A LOT OF THESE ISSUES WERE RAISED FOR THE FIRST

13 TIME AT THE VERY END OF DISCOVERY, AND JUST TO REFRESH YOUR

14 HONOR'S RECOLLECTION, WHEN THE DEFENDANT'S COUNSEL FIRST SENT

15 IN THEIR LETTER TO THE COURT WHICH DID NOT HAVE MUCH

16 SPECIFICITY IN IT, WE SAID THAT WE DIDN'T KNOW WHAT ALL THE

17 ISSUES WERE, THAT WE WOULD LIKE THEM TO SPECIFICALLY IDENTIFY

18 THEM AND HAVE SOME ADDITIONAL TIME TO MEET AND CONFER ABOUT IT

19 WHICH THAT WAS THE PLAN TO DO, AND THEN THEY SENT US A LIST AND

20 THEN REFUSED TO TALK ABOUT IT.

21         SO, YOU KNOW, I'M ONLY MENTIONING THIS BECAUSE I AM

22 COGNIZANT OF THE VALUE OF THE COURT'S TIME AND EVERYONE'S TIME

23 ON THIS CALL GOING THROUGH ISSUES WHERE IF THERE ARE NAMES THAT

24 THEY FEEL LIKE SHOULD BE ON HERE, AND THERE IS SOME EXPLANATION

25 THAT WE CAN GIVE THEM, YOU KNOW, PERHAPS YOU DON'T NEED TO BE

1  INVOLVED IN THAT.  I DON'T KNOW.  I'M NOT TRYING TO TELL YOU

2  WHAT TO DO.  I WANTED YOU TO BE AWARE THAT THERE HASN'T BEEN A

3  MEET AND CONFER ON A LOT OF THESE ISSUES, AND I AM ALSO

4  CONCERNED WITH THE WAY MS. IZMAYLOVA IS SAYING THAT SHE JUST

5  WANTS US TO SUPPLEMENT IT.  I STILL DON'T UNDERSTAND WHAT THE

6  PROBLEM IS BECAUSE FROM OUR PERSPECTIVE WE HAVE IDENTIFIED THE

7  PEOPLE THAT OUR CLIENT IS AWARE OF.

8          THE COURT:  WELL, SO --

9          MR. SABBAK:  IF I MAY?

10          THE COURT:  SURE.

11          MR. SABBAK:  THANK YOU, SIR.  REGARDING INTERROGATORY

12  NUMBER 6, IT'S VERY SIMPLE.  THERE ARE 12 NAMES THAT ARE

13  LISTED.  ALL OF THEM ARE RELEVANT TO THIS CASE.  THEY'RE ALL

14  FAMILIAR WITH ALL OF THEM.  MS. STARMARIE JONES IS THE OTHER

15  CODEFENDANT.  STEVE MAHONES WAS A FELLOW GANG MEMBER SHE

16  PUBLISHED THE INITIAL THREATS WITH, YOU KNOW, THE OTHER PEOPLE

17  ON HERE ARE INVOLVED WITH -- THEY HAVE PUBLIC COMMUNICATIONS

18  THAT HAVE BEEN PUBLISHED TO INSTAGRAM REGARDING THE DEFENDANT

19  MS. KEBE.  THEY ARE ALL RELEVANT PARTIES, AND THE INTERROGATORY

20  SIMPLY ASKED THEM TO IDENTIFY EACH PERSON, SAY HOW LONG YOU'VE

21  KNOWN THIS PERSON, DESCRIBE THEIR RELATIONSHIP TO YOU, AND THEN

22  THEIR COMMUNICATIONS WITH YOU REGARDING THE STATEMENTS.  IT'S

23  VERY STRAIGHTFORWARD.  WE'RE NOT ASKING THEM TO IDENTIFY

24  PEOPLE.

25          THE COURT:  HOLD ON A SECOND.  OKAY.  YES, IT IS

1  STRAIGHTFORWARD, BUT IT DOESN'T ASK ABOUT ALL THE THINGS YOU

2  JUST SAID.  I DON'T SEE ANYTHING IN THERE THAT SAYS LIKE HOW

3  LONG HAVE YOU KNOWN THIS PERSON, NOT IN INTERROGATORY NUMBER 7.

4         MS. IZMAYLOVA:  YOUR HONOR, IF I MAY, I BELIEVE MY

5  COCOUNSEL IS TALKING ABOUT A DIFFERENT INTERROGATORY, BUT WE'RE

6  ON NUMBER 7, BUT WHAT I WANTED TO JUST POINT OUT WAS THAT THE

7  BULK OF THE EVIDENCE PRODUCTION THAT OCCURRED FROM PLAINTIFF TO

8  US HAPPENED ON NOVEMBER 30TH AND THEREAFTER.

9         SO WHEN MS. MATZ SAID THAT WE KNEW THE IDENTITY OF

10  THE DOCTOR, THAT'S SIMPLY JUST NOT A FACT.  I MEAN I KNOW EACH,

11  YOU KNOW, THE VOLUME AND THE, YOU KNOW, BATES STAMP NUMBER OF

12  ALL THE EVIDENCE THEY HAVE PRODUCED.  THE FIRST TIME I EVER SAW

13  ANYTHING ABOUT PLAINTIFF GOING TO THERAPY OR ANYTHING LIKE THAT

14  WAS ON NOVEMBER 30TH, 2020.  SO, YOU KNOW, THAT'S THE REASON

15  WHY SOME OF THESE ISSUES HAVE BEEN BROUGHT UP, YOU KNOW, WE

16  SENT THEM A DETAILED CHART OF ALL THE THINGS THAT WE WERE STILL

17  MISSING, THAT'S BECAUSE WE HAD JUST RECEIVED THE BULK OF THEIR

18  DISCOVERY, AND THEIR SECOND BULK CAME ON DECEMBER 7TH.

19         SO THEY CAN'T COMPLAIN ABOUT THE FACT THAT WE HAVEN'T

20  HAD AS MUCH DISCUSSIONS ABOUT SOME OF THESE ISSUES WHEN THEY'RE

21  PRODUCING DISCOVERY PAST, YOU KNOW, THE DISCOVERY END DATE.

22         MS. MATZ:  YOUR HONOR, MAY I RESPOND TO THAT BECAUSE

23  I'M SORRY AGAIN THIS IS A REAL DISTORTION OF THE RECORD.  FIRST

24  OF ALL WE PRODUCED MANY, MANY DOCUMENTS PRIOR TO THE END OF THE

25  DISCOVERY DATE, AND I AM POSITIVE THAT THE INITIAL MEETING

1  RECORDS OF THE MEETING WITH THE PSYCHOLOGIST WERE PRODUCED WELL

2  IN ADVANCE OF THAT.

3           WE'VE PRODUCED OVER 20 VOLUMES OF DISCOVERY, AND

4  THERE WAS SOME SUPPLEMENTATION TOWARDS THE END THAT WAS

5  REQUESTED, AND THEN THERE WAS SOME ADDITIONAL SUPPLEMENTATION

6  ON DECEMBER 7TH, YES, BECAUSE THEY SENT US A DEFICIENCY LIST

7  THAT THEY REFUSED TO SPEAK TO US ABOUT EVEN THOUGH THE COURT

8  GRANTED THE PARTIES ADDITIONAL TIME AT OUR REQUEST.  WE ASKED

9  TO HAVE SOME ADDITIONAL TIME TO TALK ABOUT WHAT THE ISSUES WERE

10  TO TRY TO RESOLVE AS MANY AS POSSIBLE.

11           THEY SENT US A LIST.  THEY REFUSED TO TALK ABOUT IT.

12  WE WENT THROUGH IT AND DID THE BEST WE COULD AND TRIED TO

13  SUPPLEMENT ANYWAYS TO THE EXTENT WE UNDERSTOOD WHAT THE ISSUES

14  WERE AND PRODUCED THAT IN ADVANCE, AND THEN THEY WAITED WEEKS

15  TO MAKE A MOTION.  I DON'T KNOW WHY THERE WASN'T A MEET AND

16  CONFER IN THOSE WEEKS BECAUSE WE ASKED FOR IT IN EMAILS.  I

17  CALLED MR. SABBAK PERSONALLY.  I KNOW MS. MOORE DID, AS WELL.

18           THERE WERE MORE EMAILS AFTER THAT ASKING TO MEET AND

19  CONFER BECAUSE THESE ARE NOT THE TYPES OF ISSUES FRANKLY THAT

20  SHOULD BE IN FRONT OF THE COURT, AND THEY SHOULD BE WORKED OUT

21  AMONGST COUNSEL, YOU KNOW, ESPECIALLY WHEN THE ISSUE IS US

22  UNDERSTANDING WHAT THE SUPPLEMENTATION REQUEST EVEN IS, AND THE

23  COURT NOT BEING BURDENED WITH HAVING TO HEAR THE PARTIES GO

24  BACK AND FORTH WITH OH, WE DID PROVIDE THIS INFORMATION, YOU

25  KNOW, THEY'RE SAYING WE WANT THE INFORMATION, AND WE'RE SAYING

1    IT'S RIGHT THERE IN THE INTERROGATORY, WHAT'S WRONG WITH IT.

2            THE COURT:  WELL, YOU KNOW, HERE WE ARE WE'RE ON PAGE

3    17 OF THIS ORDER.  I WISH I WASN'T INVOLVED IN IT AT ALL, BUT I

4    AM, AND SO WE'RE JUST GOING TO CONTINUE ON AND FINISH WITH IT.

5            MS. MATZ: SURE.

6            THE COURT:  WE'VE GOT LIKE SIX PAGES LEFT, SIX OR

7    SEVEN.  AS IT RELATES TO INTERROGATORY NUMBER 7 THE DEFENDANT

8    HAS SEVEN DAYS TO SEND TO THE PLAINTIFF THE NAMES OF THE PEOPLE

9    THAT IT CONTENDS HAS INFORMATION RELATIVE TO INTERROGATORY

10   NUMBER 7 THAT HAS NOT BEEN PROVIDED.  YOU'RE NOT GOING TO BE

11   ABLE TO EXPOUND BEYOND WHAT YOU REQUESTED IN INTERROGATORY

12   NUMBER 7.  YOU SEND THE NAMES THAT YOU DON'T THINK YOU HAVE THE

13   INFORMATION TO, AND THE PLAINTIFF WILL BE REQUIRED TO DETAIL AS

14   BEST THEY CAN WHAT SUCH PERSON'S KNOWLEDGE RELATIVE TO YOUR

15   CLAIMS OR COUNTERCLAIMS IN THIS CASE IS.

16           ALL RIGHT.  LET'S GO ON TO YOUR NEXT WITNESS, MS.

17   IZMAYLOVA.  ARE YOU JUST LOOKING --

18           MS. IZMAYLOVA:  I WAS TRYING TO FIGURE OUT

19   WHAT THE --

20           THE COURT:  WHAT ABOUT THE ONE THAT YOUR COLLEAGUE

21   WAS TALKING ABOUT?  HE WAS TALKING ABOUT SOMETHING DIFFERENT I

22   TAKE IT.  IT MAY BE SIMILAR BUT DIFFERENT.

23           MS. IZMAYLOVA:  THAT WAS THE SPECIFIC PEOPLE THAT WE

24   DID ALREADY KNOW THE IDENTITY OF, AND WE HAD ASKED THE

25   PLAINTIFF TO PROVIDE FURTHER INFORMATION ABOUT THESE SPECIFIC

1  PEOPLE THAT WE FIGURED WOULD HAVE SOME PERSONAL KNOWLEDGE OR

2  HAS SOME INVOLVEMENT IN THE CLAIMS.  SO THEY DID PROVIDE

3  ANSWERS TO THAT INTERROGATORY WHETHER OR NOT, YOU KNOW, I THINK

4  THE ANSWER IS A LITTLE PROBLEMATIC, BUT THAT'S NOT FOR THIS

5  PARTICULAR HEARING.  I THINK THAT'S ONE FOR IMPEACHMENT AT

6  TRIAL.

7           THE COURT:  OKAY.  ANYTHING ELSE THEN?

8           MS. IZMAYLOVA:  YES.

9           THE COURT:  IS THERE STILL AN OBJECTION WITH

10  INTERROGATORY 8 ABOUT LAWSUITS, AND IF YOU DO, HOW IS THE FACT

11  THAT THE PLAINTIFF MAY HAVE BEEN INVOLVED IN OTHER LAWSUITS

12  RELEVANT TO WHETHER OR NOT YOUR CLIENT SLANDERED HER, LIBELED

13  HER, OR WHETHER OR NOT SHE DID THE SAME TO YOUR CLIENT.

14           MS. IZMAYLOVA:  WELL PART OF OUR POSITION IS THAT WE

15  BELIEVE THAT THE PLAINTIFF BROUGHT THIS LAWSUIT NOT BECAUSE SHE

16  WAS DEFAMED, BUT BECAUSE MY CLIENT REFUSED TO TAKE DOWN THE

17  VIDEOS AFTER THE PLAINTIFF HAD REACHED OUT TO MY CLIENT

18  DIRECTLY TO ASK HER TO TAKE THEM DOWN.  SHE DOES HAVE KIND OF

19  LIKE A PATTERN OF DOING THAT WITH OTHER BLOGGERS LIKE I SAID

20  FROM BEFORE.

21           THE COURT:  WOULD THAT BE ADMISSIBLE?  LET'S ASSUME

22  THAT SHE HAS FILED OTHER LAWSUITS OR THREATENED TO THE FILE

23  OTHER LAWSUITS, WE'LL MAKE IT BROAD, DOES THAT EVEN COME INTO

24  EVIDENCE HERE BECAUSE HER MOTIVE -- SHE'S GOT TO PROVE THAT,

25  SHE'S GOT TO PROVE THAT WHAT YOUR CLIENT SAID ABOUT HER WASN'T

1  TRUE, AND AS A RESULT OF THAT SHE WAS DAMAGED, AND TO THE

2  EXTENT THAT IT'S SPECIFIC, WHAT THE DAMAGES ARE, AND THE FACT

3  THAT SHE MAY HAVE CLAIMED THAT OTHER PEOPLE WOULD HAVE DONE

4  SIMILAR THINGS TO HER, IF SHE HAD, WOULD THAT BE RELEVANT TO

5  WHETHER OR NOT YOUR CLIENT DID AND WHETHER IT HURT HER.

6          MS. IZMAYLOVA:  RELEVANT ONLY IN THE SENSE OF

7  PROCEDURAL HISTORY OF THOSE OTHER CASES LIKE, YOU KNOW, DID

8  SHE -- BECAUSE WHAT I THINK HAPPENED IS SHE JUST GOT UPSET AND

9  FILED THIS LAWSUIT BECAUSE THAT'S WHAT SHE SAID ON HER SOCIAL

10  MEDIA PLATFORM.  IF SHE HAD DONE THAT PREVIOUSLY --

11          THE COURT:  THAT MAY BE TRUE.  OKAY.  THAT MAY BE

12  TRUE, BUT I'M JUST THINKING ABOUT THE RULES OF EVIDENCE, AND

13  I'M TRYING TO THINK HOW THAT COMES INTO THE EVIDENCE, AND IF IT

14  DOESN'T COME INTO EVIDENCE, THEN HOW IT WILL HELP YOU FIND

15  INFORMATION IN DISCOVERY THAT WOULD COME INTO EVIDENCE.

16          MS. IZMAYLOVA:  I BELIEVE THAT IF THERE -- I MEAN

17  OBVIOUSLY I DON'T KNOW IF THERE ARE ANY, BUT IF THERE WERE

18  SIMILAR SITUATIONS WHERE SHE DID FILE DEFAMATION CLAIMS AND

19  THEN, YOU KNOW, SETTLED THE, YOU KNOW, DISMISSED THE CLAIMS

20  THEREAFTER WITHOUT ACTUALLY, YOU KNOW, REACHING RESOLUTION OR

21  GOING FORWARD TO ASK, YOU KNOW, A SPECIFIC POINT IN THE

22  LITIGATION, I BELIEVE THAT THAT COULD GO TO PROVE HER MOTIVE IF

23  THERE WERE ENOUGH CASES.  I MEAN I'M NOT SAYING THERE ARE WHICH

24  IS WHY WE ASKED THE QUESTION.

25          THE COURT:  SO WHERE IS HER MOTIVE RELEVANT, I MEAN

1  HER MOTIVE, SHE COULD BE ANGRY AS HECK ABOUT WHAT YOUR CLIENT

2  SAID ABOUT HER, BUT THAT'S NOT AN ELEMENT OF WHETHER SHE WINS

3  OR SHE LOSES, AND SHE COULD BE AS LITIGIOUS AS SOME PEOPLE THAT

4  HAVE RECENTLY LEFT PUBLIC OFFICE, BUT THAT WOULDN'T REALLY BE

5  RELEVANT TO WHETHER OR NOT WHAT YOUR CLIENT DID WAS WRONG, AND

6  WHETHER OR NOT SHE WAS HARMED BY IT.  I MEAN I UNDERSTAND --

7          MS. IZMAYLOVA:  I GUESS I'M COMING FROM THE FACT LIKE

8  PLAINTIFF KNOWING THAT THE STATEMENTS ARE NOT FALSE, STILL

9  FILED THIS SUIT SIMPLY BECAUSE SHE WAS ANGRY OR UPSET THAT'S I

10 GUESS WHERE I AM --

11         THE COURT:  BUT IF YOU WENT TO, IF WE'RE AT THE

12 HEARING, AND CAN YOU EVEN ASK HER HOW MANY OTHER LAWSUITS HAVE

13 YOU FILED BEFORE IN YOUR LIFE, OR LET'S JUST MAKE IT A

14 DIFFERENT KIND OF CASE.  LET'S MAKE IT A PERSONAL INJURY CASE.

15 SOMEONE GOT HIT BY A CAR, AND THEY SUED, BUT YET THEY'VE BEEN

16 HIT -- THEY FILED TEN OTHER KINDS OF PERSONAL INJURY CLAIMS,

17 NOT INVOLVING THE SAME PART OF THE BODY, OKAY, SO WE'RE NOT

18 TALKING ABOUT WHETHER IT WAS A PREEXISTING CONDITION OR

19 SOMETHING LIKE THAT.  DOES THE FACT THAT THEY HAVE ALWAYS SUED

20 PEOPLE WHEN THEY THINK SOMETHING HAS OCCURRED THAT WAS WRONGFUL

21 TO THEM, WOULD THAT AFFECT THEIR ABILITY TO SUE SOMEONE ELSE,

22 AND I RECOGNIZE THAT IT COULD IF THE QUESTION IS WHETHER THEY

23 WERE ALIKE.

24         IN THIS PARTICULAR CASE, YOU KNOW, WHAT WE HAVE IS

25 WHAT YOUR CLIENT SAID WAS IT TRUE, AND DID IT HURT HER, AND THE

 1  DAMAGES ARE REALLY SORT OF UNDEFINED.  I GUESS MAYBE THE ONLY

 2  SMALL ELEMENT THERE IS HER CLAIM THAT SHE HAD SOME MENTAL

 3  DISTRESS FOR IT, BUT THAT DOESN'T SOUND LIKE TO ME LIKE A BIG

 4  PART OF THE CASE IF ALL SHE HAD WAS A COUPLE OF THOUSAND

 5  DOLLARS IN THERAPY FEES AND A GOOD BIT OF THAT WAS TRAVEL.

 6          SO I JUST DON'T THINK THAT'S RELEVANT, AND I DON'T

 7  THINK IT'S DESIGNED TO LEAD TO THE DISCOVERY OF ADMISSIBLE

 8  EVIDENCE WHICH IS THE STANDARD IN GEORGIA STATE COURT.  I'M NOT

 9  EXACTLY SURE HOW WE -- I HAVEN'T BEEN A FEDERAL JUDGE LONG

10  ENOUGH TO KNOW IF THAT'S EXACTLY THE WAY WE LOOK AT IT IN

11  FEDERAL COURT, BUT I THINK IT IS.

12          MS. MATZ:  IT IS, YOUR HONOR.

13          THE COURT:  AND SO I THINK ON INTERROGATORY NUMBER 8

14  I'M NOT GOING TO MAKE ANY ORDERS WITH REGARD TO THAT AS SET

15  FORTH IN YOUR MOTION.  INTERROGATORY NUMBER 10, WHAT DIDN'T

16  THEY DO THERE THAT WAS RIGHT.

17          MS. IZMAYLOVA:  WELL SPECIFICALLY IN THE ANSWERS WE

18  WERE SEEKING PLAINTIFF'S COMMUNICATIONS WITH OTHER BLOGGERS

19  BECAUSE SHE HAS HAD -- SHE DOES COMMUNICATE WITH NUMEROUS

20  BLOGGERS, OKAY, AND IN THEIR RESPONSE THEY SPECIFICALLY

21  RESPONDED WITH REGARDS TO ALL THE OTHER USERS AND LEFT OUT

22  BLOGGERS COMPLETELY FROM THAT RESPONSE AND SO --

23          THE COURT:  DID THEY ADDRESS ANYTHING ABOUT BLOGGERS

24  AT ALL, DID THEY OBJECT TO PROVIDING THE INFORMATION ABOUT

25  BLOGGERS?

1          MS. IZMAYLOVA:  I'M SORRY, YOUR HONOR, I COULDN'T

2     HEAR YOU.

3          THE COURT:  DID THE PLAINTIFF OBJECT TO PROVIDING YOU

4     INFORMATION ABOUT BLOGGERS THAT SHE HAD COMMUNICATED WITH?

5          MS. IZMAYLOVA:  I MEAN THEY MADE AN OBJECTION TO THIS

6     INTERROGATORY SAYING THAT IT'S VAGUE.

7          THE COURT:  I'VE GOT IT BEFORE ME, AND HAVE YOU

8     DISCUSSED THIS MATTER WITH THE PLAINTIFF AT ALL?

9          MS. IZMAYLOVA:  YES, YOUR HONOR.  I MEAN WE SENT

10    THESE INTERROGATORIES AT THE BEGINNING --

11         THE COURT:  YEAH, I MEAN HAVE YOU HAD A CONVERSATION

12    WITH EITHER OF THE COUNSEL TODAY, THAT ARE ON THE PHONE TODAY

13    MS. MATZ.

14         MS. IZMAYLOVA:  NUMEROUS TIMES, YOUR HONOR.

15         THE COURT:  WELL, LET ME ASK MS. MATZ OR ANDREW, SO

16    WHAT'S THE DEAL HERE, IS YOUR CLIENT REFUSING TO TELL THE

17    DEFENDANT IF SHE HAD COMMUNICATIONS WITH BLOGGERS ABOUT MS.

18    KEBE?

19         MS. MATZ:  SO THERE'S TWO THINGS HERE, YOUR HONOR,

20    THE FIRST IS THAT THERE WAS A MEET AND CONFER ABOUT THIS

21    SPECIFIC ISSUE ABOUT, YOU KNOW, THE DEFINITIONS, AND THE --

22    WELL, IT WAS ACTUALLY IDENTIFIED IN A LETTER, AND THE PLAINTIFF

23    WHEN THEY OFFERED TO NARROW THIS REQUEST, THEY ACTUALLY TOOK

24    OUT THE WORD BLOGGERS, OKAY.

25         MS. IZMAYLOVA:  NO, WE DID NOT.

1           THE COURT:  WOULD THERE BE A WRITTEN RECORD OF THAT.

2           MS. MATZ:  I'M PRETTY POSITIVE IT WAS IN THE

3   DISCOVERY LETTER THAT WAS IN THE COURT, BUT EITHER WAY, IF

4   THERE IS, YOU KNOW, THERE IS SOME WHO IS A BLOGGER AND WHO IS

5   NOT A BLOGGER I THINK IS A VERY VAGUE QUESTION, AND THAT'S PART

6   OF WHAT WE PUT IN THIS MOTION HERE IS THAT, YOU KNOW, A BLOGGER

7   THE WAY IT'S DEFINED IS SOMEONE WHO WRITES IN AN ONLINE

8   JOURNAL, AND THE WAY IT'S BEING USED IN THIS CASE REFERS TO

9   ANYBODY -- IT COULD POTENTIALLY REFER TO ANYBODY WITH AN

10  INSTAGRAM ACCOUNT.

11          I MEAN I DON'T KNOW HOW TO DEFINE THE SCOPE OF THAT.

12  WE HAVE PRODUCED COMMUNICATIONS WITH CERTAIN PEOPLE THAT THEY

13  HAVE IDENTIFIED AS, YOU KNOW, BLOGGERS, AND I THINK THAT THERE

14  COULD BE A DISCUSSION ABOUT WHAT THIS MEANS, AND WHAT THEY'RE

15  REALLY LOOKING FOR, BUT THE TERM BLOGGER IS VERY, VERY VAGUE,

16  AND THAT'S PART OF THE ISSUE HERE BECAUSE --

17          THE COURT:  HOW ABOUT THIS, HOW ABOUT WE REFORM THIS

18  WHOLE THING TO SAY IF THE PLAINTIFF HAS HAD COMMUNICATIONS WITH

19  ANYONE, OTHER THAN PRIVILEGED COMMUNICATIONS WITH COUNSEL OR

20  PERHAPS HER MEDICAL PROVIDERS, THAT SHE IDENTIFY TO WHOM SHE

21  HAS SPOKEN WITH ABOUT MS. KEBE, AND WHAT SHE HAS TOLD THEM, AND

22  WHEN SHE TOLD THEM THIS.  HOW ABOUT THAT?

23          MS. MATZ:  WELL SO PART OF THE ISSUE IS THAT GETS

24  INTO THIS, YOUR HONOR, THERE'S A PROPORTIONALITY ISSUE HERE

25  BECAUSE PART OF THESE DEMANDS, THERE WERE OTHER DEMANDS THAT

1  ASKED FOR COMMUNICATIONS ABOUT MS. KEBE, AND THE PARTIES MET

2  AND CONFERRED AND NARROWED IT DOWN TO A TIMEFRAME THAT WAS

3  RATIONALLY RELATED TO THE INFORMATION THAT THE DEFENDANT WAS

4  TRYING TO GET AFTER, AND SPECIFICALLY THIS WAS GEARED TOWARDS

5  THEIR CLAIMS OF HARASSMENT AND THEIR CLAIM -- I'M SORRY NOT

6  HARASSMENT, ASSAULT AND IIED, AND THERE'S A TIMEFRAME --

7          THE COURT:  I'M SORRY I DIDN'T UNDERSTAND THAT LAST

8  ACRONYM.  WHAT WAS YOUR ACRONYM?

9          MS. MATZ:  IIED, I APOLOGIZE, INTENTIONAL INFLICTION

10 OF EMOTIONAL DISTRESS.  THERE'S A TIMEFRAME WHEN THEY HAVE SAID

11 THAT, YOU KNOW, OUR CLIENT, THEY'RE ALLEGING THAT OUR CLIENT

12 UNDERTOOK CERTAIN ACTIONS THAT CAUSED THIS, AND THE DEMANDS

13 BECAUSE THIS IS NOT THE ONLY DEMAND THAT TOUCHES ON THIS,

14 RIGHT, THERE WERE OTHER DEMANDS THAT REFERENCE SPECIFIC PEOPLE

15 AND OTHER COMMUNICATIONS, AND THE DEMANDS WERE LIMITED TO A

16 CERTAIN TIMEFRAME, AND WE DID PRODUCE DOCUMENTS THAT WERE

17 RESPONSIVE IN THAT TIMEFRAME.

18         SO, YOU KNOW, TO SAY PRODUCE, YOU KNOW, IDENTIFY ANY

19 PERSON SHE'S EVER HAD A CONVERSATION WITH ABOUT KEBE EVER, I

20 THINK THAT THERE IS A REAL PROPORTIONALITY PROBLEM THERE, AND

21 AS YOUR HONOR IS AWARE --

22         THE COURT:  WAIT A MINUTE, WE'RE TALKING TWO AND A

23 HALF YEARS.  IT'S LIMITED IT ON AUGUST 1ST, 2018 -- NO, THAT'S

24 YOUR OBJECTION, I'M SORRY.  SO, YEAH, IT WASN'T LIMITED IN THE

25 QUESTION ITSELF.

1            DID THE DEFENDANT AGREE TO LIMIT IT TO A CERTAIN

2 DATE?

3            MS. MATZ:  THEY AGREED TO LIMIT OTHER DEMANDS THAT I

4 THINK ARE SOMEWHAT DUPLICATIVE TO TIMEFRAMES, AND THAT WAS

5 AUGUST 1, 2018 TO THE FILING OF THE LAWSUIT, AND ALL THE

6 ALLEGED HARASSMENT TOOK PLACE PRIOR TO FILING OF THE LAWSUIT,

7 AND WE'VE RESPONDED TO THAT.

8            MS. IZMAYLOVA:  THE LIMITING TO INTERROGATORY NUMBER

9 10 WAS THAT ANY COMMUNICATION BEGINNING ON AUGUST 1ST, 2018

10 UNTIL THE PRESENT TIME, THAT'S WHAT WE'RE ASKING FOR, AND --

11           THE COURT:  HOLD ON.  LET ME GO BACK TO MS. MATZ.

12 MS. MATZ, YOU THROW OUT THE WORD PROPORTIONALITY.  OF COURSE I

13 MEAN IT'S NOT LOST ON ME, BUT WE'RE TALKING ABOUT SLANDER AND

14 LIBEL HERE, AND WHEN YOU START CLAIMING THAT IT'S NOT

15 PROPORTIONAL, IT MAKES ME WONDER WELL HOW MUCH STUFF HAS SHE

16 SAID ABOUT THE DEFENDANT, BUT IN ANY EVENT IF WE LIMIT IT TO

17 AUGUST 1 TO THE DATES FORWARD, HOW WOULD THAT NOT BE

18 PROPORTIONAL?

19           MS. MATZ:  SORRY, I DIDN'T HEAR THE SECOND DATE,

20 AUGUST 1 UNTIL WHAT?

21           THE COURT:  AUGUST 1, 2018 FORWARD TO TODAY.  HOW IS

22 THAT, HOW IS THAT NOT PROPORTIONAL GIVEN THAT THAT'S WHAT THE

23 LAWSUIT IS ABOUT?

24           MS. MATZ:  WELL SO MS. KEBE ACTUALLY WITHDREW HER

25 CLAIMS OF SLANDER AGAINST MY CLIENT.  THOSE ARE NO LONGER AT

1  ISSUE IN THIS CASE.

2          THE COURT:  OKAY.  WELL, THEN IF WE'RE TALKING ABOUT

3  INTENTIONAL INFLICTION OR IF WE'RE TALKING ABOUT ASSAULT, IN

4  OTHER WORDS THE THEORY IS IS THAT SHE DIRECTLY OR INDIRECTLY

5  ENCOURAGED OTHERS TO ASSAULT MS. KEBE BY MAKING THREATS.  AGAIN

6  HOW WOULD THAT BE DISPROPORTIONAL?

7          MS. MATZ:  YEAH, SURE.

8          THE COURT:  IT'S A VERY SMALL PERIOD OF TIME THAT

9  WE'RE TALKING ABOUT, AND I'M ALSO ASSUMING THAT THE PLAINTIFF'S

10  RESPONSE IS I DIDN'T THREATEN ANYBODY OR ASK ANYBODY TO

11  THREATEN HER.

12          MS. MATZ:  YES, I AGREE WITH YOU THERE, BUT, SORRY,

13  YOUR HONOR, WE'RE MIXING A COUPLE OF DIFFERENT CONCEPTS SO

14  LET'S PARSE IT OUT, RIGHT.  THE FIRST THING IS THE PERIOD IN

15  WHICH THEY HAVE ALLEGED THE ASSAULT WAS AT THE END OF 20 I

16  BELIEVE IT WAS 19 -- NO, IT WAS AT THE END OF 2018, OKAY.  SO

17  THAT'S THE PERIOD WHEN THEY'RE ALLEGING THAT CONDUCT HAPPENED,

18  AND, YES, YOU'RE CORRECT.  I BELIEVE THAT IS MY CLIENT'S

19  POSITION.

20          BUT THIS INTERROGATORY IS NOT LIMITED TO

21  COMMUNICATIONS WHERE THERE WAS SOME ALLEGED THREAT OR

22  ENCOURAGING SOMEONE ELSE TO THREATEN.  IF IT WAS LIMITED TO

23  THAT, I THINK THAT THERE WOULD NOT BE A PROPORTIONALITY PROBLEM

24  BECAUSE I DON'T BELIEVE THAT THAT EXISTS, BUT IF YOU THEN

25  EXPAND IT TO SAY ANYTHING WHERE THE NAME HAS BEEN MENTIONED AND

1  WE'RE TALKING ABOUT A LAWSUIT, I DO THINK THREE YEARS IS NOT A

2  DISCRETE PERIOD OF TIME WHEN YOU TALK ABOUT A LAWSUIT THAT'S

3  GOING ON WHERE MS. KEBE HAS PUBLISHED, I MEAN IT'S OVER 30 SOME

4  VIDEOS SAYING HONESTLY SOME OF THE WORST THINGS I'VE HEARD

5  ABOUT MY CLIENT, YOU KNOW, CLAIMING THAT SHE ENGAGED IN SEXUAL

6  ACTS WITH BEER BOTTLES, THAT SHE'S BEEN DISLOYAL TO HER

7  HUSBAND, THAT SHE, YOU KNOW, HAS STD'S, SHE'S ACCUSED MY CLIENT

8  OF HAVING HERPES REPEATEDLY.  SHE'S ACCUSED HER OF HAVING HPV.

9          SO CLEARLY THIS IS, YOU KNOW, IT'S BEEN AN ONGOING

10 SITUATION, AND SO TO SAY ANY TIME MY CLIENT SAID, YOU KNOW, I'M

11 REALLY UPSET ABOUT THIS BLOGGER WHO'S TALKING ABOUT ME

12 REPEATEDLY FOR THREE YEARS, YEAH, I DO THINK THAT THERE'S A

13 PROPORTIONALITY PROBLEM THERE BECAUSE, YOU KNOW, THERE'S A

14 DIMINISHING RATE OF RELEVANCE THERE.

15          IF YOU ARE ASKING THE QUESTION NARROWED TO

16 COMMUNICATIONS WHERE MY CLIENT ALLEGEDLY, YOU KNOW, LOOKED FOR

17 COMMUNICATIONS WHERE MY CLIENT ALLEGEDLY TOLD SOMEONE ELSE TO

18 GO DO SOMETHING OR ENCOURAGED SOMEONE TO DO SOMETHING, THEN I

19 DON'T BELIEVE THAT THAT'S A PROPORTIONALITY ISSUE, BUT I DON'T

20 THINK THAT ANY OF THOSE EXIST, BUT THOSE ARE TWO DIFFERENT

21 QUESTIONS REALLY.

22          MS. IZMAYLOVA:  WELL, I MEAN --

23          THE COURT:  HOLD ON A SECOND.  BUT YOUR CLIENT IS

24 SUING FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, AS

25 WELL, AND SHE'S CLAIMING THAT -- I'M SORRY ARE YOU IN ATLANTA

1  OR ARE YOU IN NEW YORK, WHERE ARE YOU FROM?

2         MS. MATZ:  ORIGINALLY, YOUR HONOR, I'M ACTUALLY FROM

3  OHIO, BUT I LIVE IN NEW YORK NOW.

4         THE COURT:  OKAY.  SO THE INTENTIONAL INFLICTION OF

5  EMOTIONAL DISTRESS TORT IN GEORGIA IS EXTREMELY RARE.  IN FACT,

6  IT'S HARD TO FIND CASES WHERE THE APPELLATE COURTS HAVE ALLOWED

7  CLAIMS TO STAND, AND IF YOUR CLIENT ENGAGES IN ANY

8  COMMUNICATIONS RELATIVE TO MS. KEBE THAT IS HOSTILE TOWARDS

9  HER, NOT STUFF WHERE YOU CLIENT IS UPSET AND CRYING AND IN

10 DESPAIR AND DEPRESSED, BUT CLAIMS THAT SHOW HOSTILITY, THAT

11 SHOW AGGRESSION, THAT SHOW WHAT MAY BE EVEN JUSTIFIABLE

12 OUTRAGE, IT'S POSSIBLE THAT A JURY CAN INTERPRET THOSE TYPES OF

13 ACTIONS AND THOSE TYPES OF COMMENTS AS NEGATING HER CLAIM FOR

14 INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.  BECAUSE, YOU

15 KNOW, IF YOU THINK ABOUT THIS PARTICULAR TORT, IT'S ALMOST LIKE

16 THE KIND OF PERSON WHO'S CURLED UP IN A FETAL STATE SOMEWHERE

17 AND CAN'T FUNCTION BECAUSE OF WHAT HAPPENED TO THEM.

18        SO I MEAN THIS TORT IT PROBABLY OUGHT TO BE

19 ELIMINATED IN GEORGIA BECAUSE THE APPELLATE COURTS HAVE MADE IT

20 SO HARD TO RECOVER UNDER IT, UNLESS THERE'S A PHYSICAL CONTACT,

21 YOU KNOW, THEN YOU CAN GET INTO THE NEGLIGENT INFLICTION OF

22 EMOTIONAL DISTRESS, AND THE STANDARDS ARE SOMEWHAT RELAXED

23 THERE.

24        SO IF SHE'S OUT THERE TALKING AND TRASHING MS. KEBE

25 THAT'S PROBABLY GOING TO BE RELEVANT, AND, YOU KNOW, IF IT'S A

1  LOT OF STUFF THAT'S JUST THE WAY IT IS.  I THINK THE

2  PROPORTIONALITY -- I MEAN THIS ISN'T A LAWSUIT THAT MS. KEBE

3  BROUGHT.  THIS IS A LAWSUIT THAT SHE'S BEEN SUBJECTED TO, AND,

4  YES, SHE'S BROUGHT COUNTERCLAIMS, BUT THE INFORMATION GOES TO

5  MORE THAN JUST THE COUNTERCLAIMS.  IT CAN ALSO GO TO NEGATE THE

6  PLAINTIFF'S CLAIMS THEMSELVES.

7          SO I THINK SHE NEEDS TO RESPOND TO THE EXTENT SHE

8  KNOWS WHO SHE'S TALKED TO.  MAYBE SHE'S TALKING ABOUT THE

9  DEFENDANT SO OFTEN THAT SHE CAN'T REMEMBER THEM, BUT SHE WILL

10  REMEMBER SOME OF THEM.  SHE WILL REMEMBER GENERALLY WHAT SHE

11  SAID, MAYBE NOT SPECIFICALLY.  I THINK SHE'S GOT A DUTY TO

12  DISCLOSE THAT INFORMATION.  I DO.

13          SO I'M GOING TO RULE IN FAVOR OF THE PLAINTIFF ON

14  THAT ONE THAT THE DEFENDANT NEEDS -- I'M GOING TO RULE IN FAVOR

15  OF THE DEFENDANT.  THE PLAINTIFF NEEDS TO SUPPLEMENT HER

16  RESPONSE AS IT RELATES TO COMMUNICATIONS THAT SHE HAS HAD WITH

17  ANYONE, AND I'M REFORMING IT TO BE ANYONE NOT PRIVILEGED WHERE

18  SHE HAS DISCUSSED MS. KEBE, AND THE GENERAL SUBJECT MATTER OF

19  WHAT SHE HAS DISCUSSED.

20          NOW IS THAT GOING TO BE USEFUL TO THE DEFENDANT, YOU

21  KNOW, I HAVE MY DOUBTS, BUT IF THE PLAINTIFF IS GOING TO

22  MAINTAIN THIS LAWSUIT, THEN SHE NEEDS TO ANSWER THAT QUESTION.

23          SO LET'S MOVE ON INTERROGATORY THAT WAS 10 I BELIEVE,

24  WAS THAT 10?

25          MS. IZMAYLOVA:  IT WAS, IT WAS 10.

```
 1              THE COURT:  I'M TRYING TO SEE IF THERE WAS ANOTHER

 2  ONE.  NUMBER 11.

 3              MS. IZMAYLOVA:  I BELIEVE THAT NUMBER 11 THE

 4  PLAINTIFF HAS RESPONDED THAT THERE IS NO SUCH EVIDENCE, AND

 5  CORRECT ME IF I'M WRONG.

 6              THE COURT:  I WILL ACCEPT THAT.  I THINK THAT

 7  CONCLUDES YOUR MOTION, RIGHT?  LET'S GO TO THE -- LET'S DO

 8  THIS, LET'S TAKE A FIVE-MINUTE RECESS SINCE WE'VE BEEN GOING

 9  AWHILE, AND EVERYONE CAN GO TO THE RESTROOM.

10              (RECESS).

11              THE COURT:  MR. SABBAK, ARE YOU GOING TO HANDLE THE

12  RESPONSE TO THE PLAINTIFF'S MOTION?

13              MS. IZMAYLOVA:  NO, YOUR HONOR, I'LL BE HANDLING

14  THAT.

15              THE COURT:  OH, YOU ARE.  OKAY.

16              I'VE NOW GOT DOCUMENT NUMBER 96 OPEN ON MY IPAD, AND

17  THIS IS PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS

18  FROM THE DEFENDANT.  I'M JUST KIND OF SCROLLING THROUGH IT.

19  IT'S REFERENCING NUMBERS 39, 40, 41 AND 42, AND THEN ALSO 19

20  AND 20.  IT'S GOT A COUPLE OF THINGS IT DISCUSSES.

21              MS. MATZ, ARE YOU HANDLING THE MOTION TO COMPEL FOR

22  THE PLAINTIFF HERE?

23              MS. MATZ:  I AM, YOUR HONOR.  I'LL BE HAPPY TO WALK

24  YOU THROUGH IT WHENEVER YOU'RE READY.

25              THE COURT:  OKAY.  I'M READY.
```

1          MS. MATZ:  OKAY.  GREAT.  THESE ARE BROKEN DOWN

2 INTO -- SO THE FIRST ONE I'D LIKE TO TALK ABOUT IS THE MEDICAL

3 RECORDS WHICH IS SPECIFICALLY REQUESTS 39, 40, 41, 42, AND SO

4 WHAT WE'RE LOOKING FOR HERE IS PRODUCTION OF MS. KEBE'S MEDICAL

5 RECORDS AND MEDICAL BILLS.

6          SHE HAS SPECIFICALLY PUT AT ISSUE WITH REFERENCE TO

7 HER BOTH INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AND HER

8 ASSAULT CLAIMS THAT SHE HAD SUFFERED SEVERE STRESS AND

9 ANXIETY.  SPECIFICALLY THAT SHE WAS PLACED ON MANDATORY BEDREST

10 BY HER PHYSICIAN, THAT SHE HAS SUFFERED OTHER TYPES OF

11 EMOTIONAL HARMS.  SHE'S CONTINUING TO EXPERIENCE SEVERE

12 EMOTIONAL DISTRESS, ANXIETY, PANIC, STRESS, HIGH BLOOD

13 PRESSURE, YOU KNOW, I'M READING FROM VARIOUS QUOTES IN THE

14 ANSWER, BUT THESE ARE ALL IN THE COUNTERCLAIMS.  THESE ARE

15 PARAGRAPHS 226, 232, 237, AND THESE DEMANDS HAVE BEEN

16 PROPOUNDED TO SEEK THE MEDICAL RECORDS RELATED TO THOSE.

17          WHAT THE RESPONSE FROM THE DEFENDANTS HAVE BEEN IS

18 THAT THEY DID NOT AGREE TO PROVIDE AUTHORIZATIONS, AND BACK IN

19 NOVEMBER OF 2019 WHEN THEY SERVED WRITTEN RESPONSES, THEY SAID

20 WE'RE NOT PROVIDING AUTHORIZATIONS BECAUSE WE ARE GOING TO

21 PRODUCE THE MEDICAL RECORDS, AND THEN AT MEET AND CONFERS THERE

22 WERE CONTINUOUS REPRESENTATIONS THAT THOSE MEDICAL RECORDS

23 WOULD BE PROVIDED, THAT THEY HAD BEEN REQUESTED.

24          WE DID NOT FIND OUT UNTIL SOMETIME IN NOVEMBER THAT

25 THEY ACTUALLY HAD NOT EVEN REQUESTED THE MEDICAL RECORDS UNTIL

1  OCTOBER OF 2020, AND THEY NEED TO BE PROVIDED.  THE MEDICAL

2  RECORDS ARE OBVIOUSLY MS. KEBE HAS PUT INTO ISSUE THESE VARIOUS

3  CONDITIONS.  SHE TESTIFIED AT HER DEPOSITION THAT SHE HAS BEEN

4  DIAGNOSED WITH VARIOUS MENTAL DISORDERS IN THE PAST, AND THAT,

5  YOU KNOW, PART OF THE CLAIM IS THAT THEY'VE BEEN EXACERBATED,

6  SO OBVIOUSLY WE'RE ENTITLED TO SEE THE RECORDS RELATED TO THE

7  DIAGNOSES, WHETHER THEY HAVE BEEN EXACERBATED AS WELL AS THE

8  BILLS BECAUSE THEY'RE PART OF THE DAMAGES FOR SAME.

9          THE COURT:  SO CORRECT ME IF I'M WRONG AS IT RELATES

10 TO PSYCHIATRY, PSYCHOLOGICAL RECORDS EVEN WHEN SOMEONE'S MENTAL

11 HEALTH IS PUT AT ISSUE, THE RECORDS OF THE COMMUNICATIONS

12 THEMSELVES ARE STILL PRIVILEGED, RIGHT?  WHAT I TELL MY

13 THERAPIST AND WHAT MY THERAPIST TELLS ME UNDER O.C.G.A.

14 24-9-21(5) ARE STILL GOING TO BE PRIVILEGED, RIGHT?

15         MS. MATZ:  THERE MIGHT BE SPECIFIC COMMUNICATIONS

16 THAT ARE PRIVILEGED, BUT I WILL POINT OUT THAT THERE HAS NOT

17 BEEN A PRIVILEGE OBJECTION ASSERTED HERE FIRST OF ALL, AND

18 REGARDLESS EVIDENCE OF THE -- THE DEFENDANTS HAVE NOT ASSERTED

19 THAT NOR SAID THAT THEY ARE NOT GOING TO PRODUCE ON THOSE

20 GROUNDS.  THAT ACTUALLY ISN'T EVEN SOMETHING THEY SAID IN THEIR

21 MOTION.  THEY REPEATEDLY REPRESENTED THAT THEY HAD REQUESTED

22 THE RECORDS AND WOULD BE PRODUCED.

23         I WOULD SAY, YOUR HONOR, EVEN IF THERE WERE SOME

24 PRIVILEGE ISSUE THAT WOULD NOT MEAN THE ENTIRE RECORD CAN'T BE

25 PRODUCED BECAUSE THERE WOULD STILL BE NONPRIVILEGED INFORMATION

1   IN THERE RELEVANT TO THE DETERMINATION OF THE CLAIMS.

2          THE COURT:  WELL, YEAH, I WAS JUST REALLY, YOU KNOW,

3   THERE WAS A TIME IN GEORGIA WHEN I THINK WE THOUGHT THAT WHEN

4   YOU PUT YOUR PSYCHOLOGICAL HEALTH AT ISSUE THAT YOU LOSE THE

5   PRIVILEGE AS IT RELATES JUST BETWEEN THE PATIENT BECAUSE IT

6   CERTAINLY IS THE CASE WITH MEDICAL RECORDS, BUT I THINK WITH

7   PSYCHOLOGY AND PSYCHIATRY RECORDS, YOU KNOW, WHAT THE PATIENT

8   TELLS THE DOCTOR AND WHAT THE DOCTOR TELLS THE PATIENT REMAINS

9   PRIVILEGED, YOU KNOW, WHAT DO YOU DO WITH THE DIAGNOSIS BECAUSE

10  THE DOCTOR DOES TELL THE PATIENT THE DIAGNOSIS YOU WOULD THINK,

11  BUT INDEPENDENTLY OF TELLING THE PATIENT THE DIAGNOSIS, THE

12  DOCTOR ALSO WRITES THE DIAGNOSIS IN THE RECORDS SO THERE IS

13  SOME DIFFERENCE THERE.

14          I AM A LITTLE SURPRISED THAT YOU WOULD AGREE TO JUST

15  LET THEM PRODUCE THE RECORDS FOR YOU.  I MEAN HOW CAN YOU BE

16  SURE THAT WHAT YOU GET IS REAL UNLESS YOU GET THEM FROM THE

17  SOURCE YOURSELF.

18          MS. IZMAYLOVA:  WELL, YOUR HONOR, I MEAN BOTH MS.

19  IZMAYLOVA AND MR. SABBAK ARE OFFICERS OF THE COURT.  THEY

20  REPRESENTED THAT THEY REQUESTED THE MEDICAL RECORDS THEMSELVES

21  MEANING THE RELEASES THEY PRODUCED WERE IN THEIR NAME SO I

22  GUESS I DON'T HAVE A REASON TO BELIEVE THAT THEY WOULD NOT

23  PRODUCE THE COMPLETE FILE, NOR WOULD I ASSUME THAT THAT WOULD

24  BE THE CASE.

25          IT'S NOT AS IF MS. KEBE IS GETTING THEM, BUT EITHER

1  WAY IN AN EFFORT, YOU KNOW, WHEN SOMEONE OFFERS WHAT I PERCEIVE

2  IS A REASONABLE SOLUTION IN DISCOVERY, I DON'T WHY I WOULD RUSH

3  INTO TO COURT AND MAKE A MOTION ABOUT IT, AND THE REASONABLE

4  SOLUTION HERE THAT WAS OFFERED IS THEIR COUNSEL IS GETTING THE

5  RECORDS, AND THEY WERE GOING TO BE PRODUCED.

6         THE COURT:  BUT EVEN NOW THAT THEY'VE GOTTEN THE

7  RECORDS, THEY'RE STILL REFUSING TO GIVE THEM TO YOU?

8         MS. MATZ:  WELL, SO THERE'S TWO DIFFERENT BUCKETS

9  HERE.  WE HAVE RECEIVED NO EVIDENCE OF PSYCHOLOGICAL RECORDS

10  WHATSOEVER, NOT BILLS THAT WOULD SHOW FREQUENCY WHICH IS AN

11  ISSUE BECAUSE THERE'S CONFLICTING CLAIMS ABOUT WHETHER OR NOT

12  THE THINGS MS. KEBE IS ALLEGING CAUSED HER TO GO MORE OFTEN.

13  SHE'S ALLEGED ONE THING IN HER ANSWER AND TESTIFIED TO THE

14  CONTRARY, SO THAT'S NUMBER 1.

15         WE'VE ALSO NOT RECEIVED ANY PSYCHOLOGICAL RECORDS

16  WHATSOEVER WITH THE DIAGNOSES.  WHAT WE HAVE RECEIVED IS

17  HEAVILY REDACTED COPIES OF HEALTH RECORDS WHICH IS PART OF THE

18  ISSUE, WE DON'T BELIEVE THAT THEY SHOULD BE REDACTED AND

19  RELATED TO HER PREGNANCY.  THOSE RECORDS DO NOT CONTAIN, YOU

20  KNOW, ANY DIAGNOSES BY THE DOCTOR OF THE CONDITIONS SHE'S

21  DESCRIBING.  THERE'S SOME PATIENT COMPLAINTS NOTED IN THERE,

22  BUT THERE ARE ONLY THE MEDICAL RECORDS.  SO THERE'S KIND OF TWO

23  BUCKETS OF INFORMATION THERE.

24         THE COURT:  ALL RIGHT.  MS. IZMAYLOVA, WHAT CAN YOU

25  TELL ME ABOUT THIS ISSUE IN DISPUTE.

```
 1        MS. IZMAYLOVA:  YES, YOUR HONOR.  NUMBER 1, I JUST
 2  WANTED TO POINT OUT THAT WE HAVE NOT CLAIMED ANY MEDICAL BILLS
 3  AS FAR AS DAMAGES ARE CONCERNED.  THAT IS NOT PART OF OUR
 4  DAMAGES CALCULATION, SO I'M REALLY NOT SURE WHY THAT'S EVEN AT
 5  ISSUE.
 6        THE COURT:  LET ME RECITE WHAT I HEARD IS THAT IF
 7  YOU'RE NOT BEING BILLED YOU'RE NOT GOING, AND IF YOU'RE NOT
 8  GOING TO THERAPY THEN YOU DON'T REALLY HAVE A PSYCHOLOGICAL
 9  PROBLEM.  I MEAN THAT'S THE ARGUMENT THAT I THINK WOULD BE
10  MADE.  THAT SOUNDS LIKE A LEGITIMATE ARGUMENT TO MAKE JUST LIKE
11  WHEN PERSONAL INJURY OR PHYSICALLY DAMAGED PEOPLE DON'T FOLLOW
12  THE ADVICE OF THEIR DOCTORS ABOUT FOLLOW-UP TREATMENTS AND
13  OFTENTIMES DEFENSE LAWYERS MAKE A BIG DEAL ABOUT WHETHER THEY
14  WERE REALLY INJURED TO START WITH PARTICULARLY WHEN IT'S A
15  SUBJECTIVE SOFT TISSUE KIND OF THING AS OPPOSED TO SOMETHING
16  SKELETAL THAT'S IMMEDIATELY ASCERTAINABLE.
17        IN ANY EVENT WHY WOULD YOU CARE, I MEAN WHY WOULD YOU
18  CARE IF THE MEDICAL BILLS ARE PRODUCED.  MEDICAL BILLS REALLY
19  AREN'T GOING TO SHOW ANYTHING OTHER THAN DATES OF SERVICE AND
20  MAYBE CODES.  I SUPPOSE THEY MAY HAVE EOB'S WITH CODES ON THEM.
21        MS. IZMAYLOVA:  I MEAN I GUESS I WAS JUST SAYING THAT
22  I BELIEVE THAT SHE STATED THAT WE SPECIFICALLY PLED THOSE IN
23  DAMAGES, BUT WE DID NOT, AND THE REST OF THE MEDICAL RECORDS
24  THOSE HAVE BEEN PRODUCED.  THEY ARE MS. KEBE'S RECORD FOR
25  BASICALLY HER OB-GYN, AND THEN THE REFERRAL THAT SHE RECEIVED
```

1  FROM THEM THAT THE RECORDS DO STATE THAT SHE WAS DIAGNOSED WITH

2  A HIGH-RISK PREGNANCY, AND SHE HAD TO THEN GO TO A SPECIALIST

3  WHICH IS INCLUDED IN THE RECORDS THAT WE DID PRODUCE.

4          THE COURT:  IS THAT RELATED TO THE LAWSUIT?

5          MS. IZMAYLOVA:  IT IS BECAUSE THAT'S ONE OF THE I

6  GUESS EXACERBATING FACTORS THAT WE'RE SAYING THAT PLAINTIFF

7  KNEW THAT MY CLIENT WAS PREGNANT.  SHE WAS AT A HIGH-RISK

8  PREGNANCY AND THEN YET STILL CONTINUED TO HARASS AND THREATEN

9  AND, YOU KNOW, GET OTHER PEOPLE TO DO AS WELL TO MY CLIENT.

10         THE COURT:  HOW DID THE PLAINTIFF KNOW THAT?

11         MS. IZMAYLOVA:  SHE SAID IT, SHE STATED IT ON HER --

12         THE COURT:  YOUR CLIENT STATED IT?

13         MS. IZMAYLOVA:  NO, NO, THE PLAINTIFF SAID IT.

14         THE COURT:  AND IF IT TURNS OUT THE RECORDS DON'T

15 REFLECT THAT THERE WAS ANY STRESS-INDUCED CONDITION RELATED TO

16 HER PREGNANCY THAT IT'S LIKE ALL PHYSIOLOGICALLY BASED LIKE

17 HEREDITY OR SOMETHING LIKE THAT THAT WOULD BE RELEVANT, RIGHT.

18         MS. IZMAYLOVA:  YES, YOUR HONOR, BUT THEY DON'T

19 INDICATE THAT.  THAT'S WHAT I'M SAYING.  THEY INDICATE THAT SHE

20 DID HAVE A HIGH-RISK PREGNANCY, THAT SHE WAS, YOU KNOW,

21 PROHIBITED FROM LIKE TRAVELING AFTER LIKE THE FOURTH MONTH OR

22 SOMETHING LIKE THAT OR FIFTH MONTH OF HER PREGNANCY AND THAT

23 KIND OF THING.

24         THE THINGS THAT WERE REDACTED -- MY CLIENT IS -- I

25 KNOW THAT WE HAVE A PROTECTIVE ORDER IN PLACE IN THE CASE, BUT

1 MY CLIENT STILL DOES HAVE CONCERNS REGARDING PLAINTIFF

2 POTENTIALLY GETTING AHOLD OF THE RECORDS AND RELEASING THEM TO

3 THE PUBLIC BECAUSE IT'S, YOU KNOW, HER HOME ADDRESS HAS BEEN

4 RELEASED BEFORE, HER PERSONAL PHONE NUMBERS HAVE BEEN RELEASED

5 BEFORE.  SHE DOES HAVE CONCERNS ABOUT THAT, AND SO THE PARTS

6 THAT ARE REDACTED ARE PARTS THAT DON'T HAVE ANYTHING TO DO WITH

7 THE DIAGNOSIS OR THE TREATMENT SHE WAS RECEIVING FOR THOSE

8 SPECIFIC DIAGNOSES THAT WE ARE, YOU KNOW, ALLEGING IN OUR

9 COUNTERCLAIM.

10          THE COURT:  IS THERE AN ATTORNEY'S EYE ONLY CONCEPT

11 IN THE PROTECTIVE ORDER?

12          MS. IZMAYLOVA:  THERE IS.

13          MS. MATZ:  AND THAT'S HOW ALL THE MEDICAL RECORDS

14 HAVE BEEN PRODUCED, YOUR HONOR, JUST SO YOU'RE AWARE, AND ALSO

15 WHAT MS. IZMAYLOVA IS NOT TELLING YOU IS THAT THEY HAVE MADE NO

16 ALLEGATION THAT MY CLIENT HAD ANYTHING TO DO WITH RELEASING HER

17 PHONE NUMBER OR ADDRESS.  SO THE IMPLICATION THAT THERE HAS

18 BEEN ANY MISHANDLING OF CONFIDENTIAL INFORMATION I THINK IS

19 REALLY, REALLY DISINGENUOUS.

20          MS. IZMAYLOVA:  THAT'S NOT WHAT I WAS MEANING.  ALL

21 I'M SAYING IS BECAUSE MY CLIENT HAS HAD THESE PREVIOUS

22 EXPERIENCES WITH HER PERSONAL INFORMATION BEING RELEASED

23 PERIOD.  SHE IS VERY MUCH CONCERNED ABOUT THAT JUST IN

24 GENERAL.  I MEAN SHE KNOWS THERE'S A PROTECTIVE ORDER, YOU

25 KNOW, THIS IS STILL HER --

```
 1          THE COURT:  BUT SHE'S NOT THE BOSS HERE.  I MEAN IT'S
 2  RELEVANT.  THERE'S A PROTECTIVE ORDER IN PLACE THAT THE LAWYERS
 3  HAVE TO HONOR.  IF THEY DON'T THERE'S CONSEQUENCES FOR THAT,
 4  YOU KNOW, SHE'S GOT TO PRODUCE THE MEDICAL RECORDS UNREDACTED,
 5  AND THE PSYCHOLOGICAL RECORDS HAVE TO BE PRODUCED WITH THE ONLY
 6  REDACTIONS BEING THE COMMUNICATIONS BETWEEN DOCTOR/PATIENT OR
 7  THERAPIST/PATIENT, EITHER DIRECTION, BUT OTHER THAN THAT, IT'S
 8  ALL DISCOVERABLE BECAUSE IT'S ALL RELEVANT TO THE CLAIMS IN THE
 9  LAWSUIT.
10          SO THE COURT RULES IN FAVOR OF THE PLAINTIFF'S
11  REQUEST THAT THE DEFENDANT MUST IMMEDIATELY WITHIN 7 DAYS
12  SUPPLEMENT THEIR RESPONSES TO PRODUCE UNREDACTED MEDICAL
13  RECORDS AND PSYCHOLOGICAL RECORDS REDACTED ONLY AS TO
14  COMMUNICATIONS BETWEEN DOCTOR AND PATIENT, THERAPIST AND
15  PATIENT, COUNSELOR AND PATIENT WHICH I THINK HAS BEEN
16  INTERPRETED TO ENCOMPASS ALL OF THOSE THINGS, AND LIKEWISE THE
17  MEDICAL BILLS UNREDACTED NEED TO BE PRODUCED.
18          ALL RIGHT.  WHAT'S THE NEXT ITEM FOR THE PLAINTIFF.
19          MS. MATZ:  THANK YOU, YOUR HONOR, I APPRECIATE THAT.
20  THE NEXT ITEM ARE DOCUMENTS CONCERNING ADVERTISING REVENUES
21  FROM THE WEBSITES AND SOCIAL MEDIA ACCOUNTS.  JUST SO YOUR
22  HONOR KNOWS SOME OF THIS HAS BEEN PRODUCED, AND WE'RE NOT
23  SEEKING A REPRODUCTION OF WHAT HAS ALREADY BEEN PRODUCED, BUT
24  THERE ARE I WILL SAY THREE MAIN BUCKETS OF ADVERTISING REVENUES
25  HERE.
```

1          THERE'S WHAT COMES IN FROM YOUTUBE.  WHAT COMES IN

2    FROM PATREON, AND I BELIEVE SUBJECT TO DEFENSE COUNSEL

3    CONFIRMING BECAUSE THIS WAS ONE OF THE ITEMS WE ASKED TO BE

4    CONFIRMED, BUT WE BELIEVE THOSE HAVE BEEN PRODUCED, SO UNLESS,

5    YOU KNOW, WE WOULD ASK FOR CONFIRMATION OF THAT, BUT THE REAL

6    ISSUE HERE IS THAT DURING THE DEPOSITION TESTIMONY IT WAS

7    DISCLOSED THAT THERE WERE OTHER SOURCES OF ADVERTISING REVENUE

8    MEANING THERE WERE INSTEAD OF ADVERTISING REVENUE COMING INTO

9    THESE PLATFORMS LIKE YOUTUBE AND THEN FLOWING TO THE

10   DEFENDANT'S ACCOUNTS, THERE WERE ALSO LIKE THIRD PARTIES THAT

11   ADVERTISED DIRECTLY WITH DEFENDANTS.

12          SO MAYBE A COMPANY WOULD, YOU KNOW, FOR EXAMPLE, SAY

13   WE WANT TO DO A PAID SPONSORSHIP, AND, YOU KNOW, WE WANT YOU TO

14   MENTION OUR PRODUCT ON, YOU KNOW, IN ONE OF YOUR VIDEOS.  SO WE

15   HAVE SPECIFICALLY ASKED FOR THE DOCUMENTS SHOWING THE REVENUE

16   EARNED FROM THAT, AND THIS IS RELEVANT FOR TWO REASONS.

17          THE FIRST REASON WHY THIS IS RELEVANT IS THAT THERE

18   IS A FINANCIAL MOTIVE ASPECT TO THIS.  MS. KEBE TESTIFIED ABOUT

19   WANTING TO DO CERTAIN THINGS, HASHTAGGING OUR CLIENT IN CERTAIN

20   WAYS USING HASHTAGS LIKE HERPES B REFERRING TO OUR CLIENT TO

21   DRIVE ENGAGEMENT TO HER PLATFORMS, AND OBVIOUSLY THERE IS A

22   CORRELATION BETWEEN ENGAGEMENT AND MONEY THAT'S EARNED FROM

23   ADVERTISING REVENUE BECAUSE THAT'S WHAT ADVERTISERS TYPICALLY

24   CARE ABOUT.  SO TO THE EXTENT THAT WE WANT TO PRESENT A WHOLE

25   FINANCIAL PICTURE TO THE JURY ABOUT THE MONEY THAT MS. KEBE WAS

1   MAKING OFF OF THIS AS IT GOES TO HER MOTIVATION TO CONTINUE TO

2   ENGAGE IN THIS COURSE OF CONDUCT AS WELL AS ACTUAL MALICE WHICH

3   IS THAT SHE HAD A REASON TO CONTINUE TO MAKE THESE FALSE AND

4   DEFAMATORY STATEMENTS EVEN AFTER SHE WAS AWARE, AND AS YOUR

5   HONOR KNOWS EVEN UNDER GEORGIA LAW ACTUAL MALICE IS OFTENTIMES

6   PROVEN THROUGH VARIOUS CIRCUMSTANTIAL POINTS OF EVIDENCE,

7   ALTHOUGH WE DO BELIEVE THAT THERE IS TESTIMONY THAT BEARS

8   DIRECTLY ON THE ISSUE ALSO.  SO THAT'S THE FIRST PLACE IT IS

9   RELATED TO.

10          AND THE SECOND AREA THAT THIS IS RELATED TO IS OUR

11  REQUEST FOR PUNITIVE DAMAGES, AND, THAT IS, I THINK ALONE THAT

12  WOULDN'T BE SUCH A BIG DEAL, BUT ONE OF THE THINGS THAT A JURY

13  CAN CONSIDER WHEN THEY'RE GIVING A PUNITIVE DAMAGE AWARD, AND

14  WE CITED A CASE ON THIS IN OUR BRIEF, IS THE PROFIT THAT WAS

15  OBTAINED BY THE TORTFEASOR IN ENGAGING IN THE CONDUCT, BECAUSE

16  ONE OF LEGITIMATE GOALS OF A PUNITIVE AWARD CAN BE TO DISGORGE

17  THAT PROFIT FROM THE PERSON.  SO THIS IS RELATED TO BOTH OF

18  THOSE CONTEXTS.

19          THIS DID COME UP IN DISCOVERY BECAUSE WE KNEW THAT WE

20  WANTED ALL THE ADVERTISING REVENUE, AND WE STARTED GETTING THE

21  YOUTUBE REVENUES.  THEN WE ASKED FOR THE PATREON, AND THEN

22  DURING A MEET AND CONFER I BELIEVE IT WAS IN EARLY NOVEMBER IT

23  CAME UP, YOU KNOW, WE ASKED IF THERE WERE OTHER ADVERTISERS,

24  AND COUNSEL ADMITTED THAT THERE WAS, AND WE SAID WELL THIS

25  DEMAND ENCOMPASSES ALL ADVERTISERS, AND THEY REPRESENTED THAT

1 THEY WOULD GET US THAT INFORMATION. IT CAME UP AGAIN AT THE

2 DEPOSITIONS, AND THE RESPONSE HAS BEEN THAT IT WILL BE

3 PRODUCED, BUT THUS FAR IT HAS NOT BEEN.

4 THE COURT: ALL RIGHT. MS. IZMAYLOVA, WHAT DO YOU

5 SAY ABOUT THAT?

6 MS. IZMAYLOVA: YES, YOUR HONOR. WE HAVE PRODUCED

7 THE ADVERTISING REVENUES THAT PERTAIN TO ANY POTENTIAL MONEY

8 THAT MY CLIENT WOULD HAVE MADE ON ANY VIDEOS THAT SHE PUBLISHED

9 REGARDING PLAINTIFF.

10 THE THIRD-PARTY ADVERTISING CONTRACTS THAT MS. MATZ

11 IS REFERRING TO I BELIEVE EITHER MY CLIENT OR HER HUSBAND

12 DURING ONE OF THE DEPOSITIONS EXPLAINED THAT THEY DO THREE

13 DIFFERENT TYPES OF ADVERTISEMENTS.

14 ONE TYPE IS, YOU KNOW, SOMEONE CAN ADVERTISE DURING

15 THE VIDEOS WHERE SHE TALKS ABOUT THE CELEBRITIES. THAT'S

16 THROUGH YOUTUBE ANALYTICS THAT'S HOW YOU CAN SHOW THOSE

17 REVENUES.

18 ANOTHER TYPE OF ADVERTISING THEY DO IS THEY WILL

19 SHOOT A COMMERCIAL FOR JUST LIKE A THIRD PARTY, YOU KNOW,

20 BECAUSE THEY WANT TO PROMOTE THEIR BRAND. THAT COMMERCIAL IS

21 THEN GIVEN TO THE THIRD PARTY, AND THEY CAN USE IT ON ANY

22 PLATFORM THEY WANT TO. IT DOESN'T NECESSARILY STAY ON THE

23 KEBE'S PLATFORMS BUT --

24 THE COURT: SO THEN IT FEATURES MS. KEBE, AND SO

25 HER --

1            MS. IZMAYLOVA:  PROMOTING A PRODUCT.

2            THE COURT:  YEAH, HER GENERAL THEME THEN IS WHAT THE

3  ADVERTISER IS BUYING, RIGHT?

4            MS. IZMAYLOVA:  YEAH, WHATEVER THE PRODUCT IS OF THE

5  ADVERTISER, SHE'S, YOU KNOW, BASICALLY DOING A COMMERCIAL FOR

6  THAT ADVERTISER PROMOTING THAT PRODUCT.  HOWEVER, AND THIS HAS

7  BEEN MADE CLEAR, THAT THOSE TYPES OF ADVERTISING THEY ARE

8  ONLY -- THE THIRD-PARTY ADVERTISERS THAT ARE REQUESTING TIME

9  THEY ONLY GET AIRED DURING SPECIFIC LIKE SEGMENTS THAT MS. KEBE

10 HAS ON HER YOUTUBE CHANNEL WHICH HAS NOTHING TO DO WITH

11 CELEBRITY NEWS BECAUSE SHE HAS A SUNDAY I THINK IT'S CALLED

12 HAPPY HOUR WHERE IT'S LIKE MORE OF AN UPLIFTING TYPE, YOU KNOW,

13 WHERE SHE ANSWERS LIKE QUESTIONS OR BASICALLY JUST COMPLETELY

14 IRRELEVANT FROM HER CELEBRITY NEWS LOG AND THEN --

15           THE COURT:  BUT PEOPLE WATCH IT BECAUSE THEY --

16 BECAUSE SHE IS A CELEBRITY INDEPENDENT OF THE PLAINTIFF OR

17 ANYONE ELSE, RIGHT, I MEAN LIKE I THINK IF I STARTED THAT AND

18 NOBODY'S WATCHING, YOU KNOW WHAT I'M SAYING?  IF I'M DOING NEWS

19 ON SUNDAY OR UPLIFTING THINGS I MIGHT GET A LOT OF PEOPLE THAT

20 WANT TO WATCH, BUT IT HAS TO DO WITH WHO SHE IS, RIGHT?

21           MS. IZMAYLOVA:  I MEAN, YEAH, I GUESS IT HAS TO DO

22 WITH HER PLATFORM, BUT THE POINT IS THOSE ADVERTISERS CANNOT

23 ADVERTISE DURING THE SEGMENT, THE SEGMENTS, THE FINITE SEGMENTS

24 THAT SHE PUTS OUT WHERE SHE DISCUSSES CELEBRITIES.  SO THERE IS

25 NOT ANY CROSS BETWEEN THIRD-PARTY ADVERTISERS AND THE REVENUE

1   THAT MY CLIENT WOULD HAVE MADE FROM ANY POTENTIAL STORY THAT

2   SHE WOULD PRODUCE ON HER YOUTUBE CHANNEL WITH REGARD TO

3   PLAINTIFF.

4          MS. MATZ:  YOUR HONOR, IF I CAN --

5          THE COURT:  NO, NO, LET'S MAKE SURE SHE'S FINISHED.

6   ANYTHING ELSE ABOUT THAT, MS. IZMAYLOVA?

7          MS. IZMAYLOVA:  NO, THAT'S BASICALLY OUR -- FOR ANY

8   ADVERTISING AND REVENUE THAT MY CLIENT POTENTIALLY, YOU KNOW,

9   COULD HAVE MADE OFF OF THE VIDEOS THAT SHE HAS POSTED ABOUT

10  PLAINTIFF WE HAVE ALREADY PRODUCED THAT INFORMATION.

11         THE COURT:  OKAY.  BUT HOW DO YOU DEAL WITH THE ISSUE

12  OF -- I MEAN OBVIOUSLY IF SHE IS FOUND GUILTY OF ANY TYPE OF

13  DEFAMATION, THE JURY WILL BE AUTHORIZED TO CHECK THE BOX ON THE

14  VERDICT FORM TO AWARD PUNITIVES, AND THEN WE WILL PROBABLY HAVE

15  A SECOND PHASE OF THE TRIAL WHERE THE JURY CAN CONSIDER

16  PUNITIVE DAMAGES, AND THERE MAY BE MORE EVIDENCE INTRODUCED, OR

17  IT MAY JUST BE ARGUMENT.

18         WOULDN'T ALL THE REVENUE SHE MAKES FROM ANY SOURCE BE

19  RELEVANT FOR PURPOSES OF PUNITIVE DAMAGES?  BECAUSE DOESN'T A

20  JURY HAVE TO KNOW HOW MUCH MONEY SOMEONE MAKES TO KNOW HOW MUCH

21  IT WOULD TAKE TO PUNISH THEM TO AWARD PUNITIVE DAMAGES, YOU

22  KNOW, A GOOD EXAMPLE IS I LIVE IN ATLANTA.  IF I DO SOMETHING

23  WRONG THE AMOUNT OF MONEY IT TAKES TO PUNISH ME IS NOT GOING TO

24  BE THE SAME THAT IT WOULD TAKE TO PUNISH DELTA OR COCA-COLA,

25  THE BIG COMPANIES, OR OTHER FAMOUS PEOPLE THAT LIVE IN ATLANTA,

1   SO THAT'S WHY NORMALLY, FOR EXAMPLE, TAX RETURNS ARE

2   ADMISSIBLE.

3          MS. IZMAYLOVA:  I WAS JUST ABOUT TO SAY TO GET AN

4   ACTUAL FULL PICTURE OF THAT ASSESSMENT FOR A JURY THAT WOULD BE

5   AN ALTERNATE DOCUMENT THAT WOULD BE MORE APPROPRIATE.  BECAUSE

6   THE TAX RETURNS ALL OF HER, YOU KNOW, WHATEVER SHE'S MADE

7   THROUGHOUT THE YEARS WOULD BE OBVIOUSLY REFLECTED IN THAT, BUT

8   THESE SPECIFIC THIRD-PARTY ADVERTISERS BECAUSE THEY HAVE, YOU

9   KNOW, BECAUSE THOSE VIDEOS HAVE NOTHING TO DO WITH PLAINTIFF, I

10  JUST DON'T SEE HOW THAT'S RELEVANT FOR WHAT THEY'RE TRYING TO

11  USE IT, YOU KNOW, TO PROVE, BUT IF THEY WANT US TO PRODUCE HER

12  TAX RETURNS THAT'S A DIFFERENT QUESTION, YOU KNOW, SO WE COULD

13  PUT THOSE TOGETHER AND SEND THOSE OVER FOR X AMOUNT OF YEARS.

14         THE COURT:  SO I THINK IT'S ALL RELEVANT PERSONALLY.

15  I MEAN I THINK THE FACT THAT YOUR CLIENT HAS NOTORIETY THAT

16  ALLOWS HER TO ATTRACT ADVERTISERS IN OTHER VENUES OTHER THAN

17  WHEN SHE IS SAYING THINGS ABOUT THE PLAINTIFF OR SAYING SOME OF

18  THE THINGS ABOUT OTHER PEOPLE IS NOT THE POINT.

19         THE POINT IS IS THAT WHEN YOU TALK ABOUT SOMEBODY WHO

20  IS FAMOUS, AND IF IT'S BELIEVED THAT YOU HAVE CREDIBILITY, THEN

21  PEOPLE MIGHT RETURN TO HEAR WHAT YOU SAY ABOUT OTHER PEOPLE OR

22  WHAT YOU SAY ABOUT LIFE, HEY, YOU KNOW, FAMOUS ACTORS THAT

23  ADVERTISE AND SOME DO AND I KNOW SOME CHOOSE NOT TO, THEY

24  ADVERTISE ABOUT A LOT OF DIFFERENT THINGS, AND IF THEIR

25  NOTORIETY THAT THEY HAVE FROM THEIR ACTING LIFE CARRIES OVER TO

1  THE COMMERCIALS THAT I SEE ON TV THAT AREN'T RELATED TO THAT

2  ACTOR'S MOVIES OR TV SHOWS.

3        SO I THINK IT'S ALL RELEVANT, AND I THINK IT ALL

4  NEEDS TO BE PRODUCED.  IT IS SUBJECT TO A CONFIDENTIALITY

5  ORDER.  IT IS SUBJECT TO AN ATTORNEY'S EYES ONLY DESIGNATION,

6  AND SO UNFORTUNATELY THE DEFENDANT IS GOING TO HAVE TO GIVE IT

7  UP.  IF THE JURY DOESN'T FIND THAT SHE'S NEGLIGENT OR IS

8  ENGAGING IN AN INTENTIONAL TORT, THEN IT'S NOT GOING TO BE ABLE

9  TO BE USED AGAINST HER IN THE LAWSUIT, BUT IT'S RELEVANT

10 UNFORTUNATELY.

11       MR. SABBAK:  YOUR HONOR, I HAVE A CLARIFICATION --

12       MS. IZMAYLOVA:  SO FOR PURPOSES OF ARGUING THAT SHE,

13 YOU KNOW, REPORTS ON THE PLAINTIFF WITH MALICE THAT'S WHAT MS.

14 MATZ SAID THAT SHE WAS REQUESTING THESE THIRD-PARTY ADVERTISING

15 CONTRACTS FOR.  THAT'S WHAT --

16       THE COURT:  IT'S LIKE I SAID, THE FACT THAT SHE MIGHT

17 BECOME FAMOUS BECAUSE SHE GOES OUT AND SHE SAYS THINGS ABOUT

18 ONE CELEBRITY CAN DRIVE REVENUE TO HER OTHER ENDEAVORS BECAUSE

19 SHE BECOMES FAMOUS WHEN SHE DOES, AND SO THE MORE REVENUE

20 YOU'VE EARNED THE MORE FAMOUS YOU'VE BECOME AS WELL BECAUSE

21 THAT'S AT LEAST IN THE EYES OF THE ADVERTISERS.  THEY WOULDN'T

22 GIVE YOU MONEY IF THEY DIDN'T THINK YOU HAD A LOT OF INFLUENCE.

23       I ASSUME THAT, YOU KNOW, I MEAN IT'S BEYOND MY

24 UNDERSTANDING ABOUT HOW SOMEONE LIKE THE KARDASHIAN FAMILY

25 COULD BE WEALTHY AND FAMOUS FOR DOING WHAT THEY DO, BUT THEY

 1  ARE, RIGHT, AND IT'S NOT JUST, IT'S NOT -- I GUESS PEOPLE

 2  DON'T, IF THAT SHOW IS STILL ON, PEOPLE DON'T LIKE TO SEE THE

 3  KARDASHIANS BECAUSE OF WHAT THEY DO ON THAT SHOW, IT'S BECAUSE

 4  OF EVERYTHING.  IT'S ABOUT ALL THE STUFF THAT'S ON THE INTERNET

 5  LIKE THE MOTHER WAS MARRIED TO, YOU KNOW, THE WORLD'S GREATEST

 6  ATHLETE WHO HAPPENED TO GO THROUGH SOME INCREDIBLE LIFE CHANGES

 7  HIMSELF OR HERSELF NOW, YOU KNOW, IT'S ALL PART OF THE SAME

 8  PACKAGE.

 9          I THINK THE INFORMATION IS DISCOVERABLE.  SO, YES, I

10  AM ORDERING THAT IT BE PRODUCED AS REQUESTED.

11          MS. MATZ:  THANK YOU, YOUR HONOR.

12          THE COURT:  ANYTHING ELSE.

13          MS. MATZ:  I BELIEVE THERE IS ONE MORE CATEGORY, AND

14  THAT IS -- I'M SORRY, THERE'S TWO MORE.  I APOLOGIZE, YOUR

15  HONOR.  THE NEXT IS COPIES OF PUBLISHED AND UNPUBLISHED CONTENT

16  JUST ABOUT OUR CLIENT, AND JUST YOUR HONOR IS CLEAR, THE DEFINE

17  TERMS IN HERE LIMIT THIS TO STATEMENTS ABOUT OUR CLIENT.

18          OBVIOUSLY THE CLAIM HERE IS -- WELL, THERE'S TWO

19  PRIMARY CLAIMS, AND THERE'S DEFAMATION AND INTENTIONAL

20  INFLICTION OF EMOTIONAL DISTRESS.  MS. KEBE HAS MADE REPEATED

21  STATEMENTS ABOUT OUR CLIENT ON MULTIPLE PLATFORMS, CONTINUES TO

22  DO SO.  WE PROPOUNDED THESE DEMANDS ASKING FOR COPIES OF

23  EVERYTHING, ALL THE STATEMENTS THAT WERE MADE ABOUT OUR CLIENT

24  THAT WERE PUBLISHED AND, YOU KNOW, TO THE EXTENT THAT THERE

25  WERE UNPUBLISHED ONES AS WELL, THOSE SHOULD BE PRODUCED.

```
 1            OUR UNDERSTANDING IS THERE WAS AN AGREEMENT TO

 2   PRODUCE THEM, AND THERE WAS SOME PRODUCTION OF THESE OF COURSE,

 3   BUT THERE HAVE BEEN ADDITIONAL VIDEOS THAT WE HAVE DISCOVERED

 4   THAT WEREN'T INITIALLY SOMETHING THAT WE WERE AWARE OF, AND

 5   THEN MS. KEBE ALSO STARTED PUBLISHING VIDEOS ON ANOTHER

 6   PLATFORM CALLED PATREON WHICH IS MORE PRIVATE AND IT HIDES

 7   BEHIND A PAY WALL, AND, YOU KNOW, I DON'T ACTUALLY KNOW ALL THE

 8   PLACES SHE COULD BE PUBLISHING THESE VIDEOS.  SO WE ASKED

 9   REPEATEDLY TO CONFIRM THAT ALL THAT HAS BEEN PRODUCED.

10            THERE WAS SOME SUPPLEMENTATION, AND MR. SABBAK SAID

11   THAT HE STILL NEEDED TO CONFIRM THAT IT ALL HAD BEEN PRODUCED.

12   WE DID ASK REPEATEDLY FOR CONFIRMATION AND TRY TO MEET AND

13   CONFER ABOUT THIS, BUT THIS IS WHEN DEFENSE COUNSEL REFUSED TO

14   THE SPEAK TO US ABOUT IT, AND THEY DIDN'T RESPOND TO OUR EMAILS

15   EITHER THAT ASKED FOR THE CONFIRMATION ON THE ITEMS.

16            SO WE WOULD LIKE TO KNOW THAT IT HAS ALL BEEN

17   PRODUCED, AND WE'D LIKE PRODUCTION OF ANYTHING THAT HASN'T, BUT

18   I DO BELIEVE WE KNOW THAT THERE'S CONTENT THAT HAS NOT BEEN

19   PRODUCED BECAUSE THERE HAVE BEEN ADDITIONAL VIDEOS THAT MS.

20   KEBE HAS PUBLISHED EVEN AS RECENTLY AS I BELIEVE JANUARY 29TH,

21   AND THEN THERE WAS ANOTHER ONE A FEW WEEKS AGO MAKING

22   STATEMENTS ABOUT OUR CLIENT HAVING STD'S AGAIN.  SO I THINK

23   THAT THIS IS PRETTY HIGHLY RELEVANT, AND CLEARLY RELEVANT.

24            MY UNDERSTANDING OF THE DEFENSE'S OPPOSITION, EVEN

25   THOUGH THEY AGREED TO PRODUCE IT ALL, BUT NOW ARE SAYING -- I
```

1  DON'T REALLY KNOW WHAT THE OPPOSITION IS, BUT ONE OF THE POINTS

2  THEY MADE IS OH, WE SHOULDN'T HAVE TO PRODUCE THE UNPUBLISHED

3  COMMUNICATIONS BECAUSE A STATEMENT HAS TO BE PUBLISHED IN ORDER

4  FOR IT TO BE DEFAMATORY, AND WHILE I'M AWARE OF THE PUBLICATION

5  REQUIREMENTS FOR A STATEMENT TO ACTUALLY CONSTITUTE DEFAMATION,

6  THE CONTENT IS IRRELEVANT.  IT'S FAR BROADER THAN THAT AND --

7          THE COURT:  I DON'T UNDERSTAND WHAT YOU MEAN BY

8  UNPUBLISHED.  YOU MEAN SOMETHING THAT SHE PREPARED THAT WAS

9  NEVER DISTRIBUTED OR --

10          MS. MATZ:  YEAH, EXACTLY, MAYBE SHE RECORDED, MAYBE

11  THERE'S AN UNCUT VERSION OF SOMETHING WHERE SHE RECORDED A

12  LONGER VERSION BUT ONLY PUBLISHED A SHORTER ONE.  MS. KEBE HAS

13  MADE REPEATED STATEMENTS AGAINST INTEREST IN VIDEOS THAT WE

14  KNOW ABOUT MEANING THAT SHE PUBLISHED VIDEOS SAYING THAT SHE

15  KNEW THAT SOME OF THE STORIES ABOUT OUR CLIENT WERE LIES BEFORE

16  SHE PUBLISHED THEM.  SO WE BELIEVE THERE COULD BE OTHER VIDEOS

17  OUT THERE WITH SIMILAR STATEMENTS AGAINST INTEREST THAT MAY OR

18  MAY NOT BE PUBLISHED, SO THE REQUEST IS WE JUST WANT COPIES OF

19  ALL THE VIDEOS PUBLISHED OR UNPUBLISHED THAT ARE ABOUT OUR

20  CLIENT.

21          THE COURT:  ALL RIGHT.  MS. IZMAYLOVA.

22          MS. IZMAYLOVA:  YOUR HONOR, WE PRODUCED EVERYTHING

23  THAT PERTAINS TO THIS REQUEST IN A SUPPLEMENTAL PRODUCTION ON

24  NOVEMBER 23RD, 2020.  SO I MEAN I DON'T KNOW HOW MANY TIMES WE

25  CAN TELL THEM THAT WE'VE PRODUCED --

1            THE COURT:  I'M SORRY, WHEN DID YOU PRODUCE IT?

2            MS. IZMAYLOVA:  NOVEMBER 23RD, 2020.

3            THE COURT:  SO DID SHE HAVE SOME RECENT VIDEO IN

4  JANUARY AS STATED?

5            MS. IZMAYLOVA:  I MEAN I'M NOT SURE.  I GUESS I COULD

6  LOOK INTO THAT, BUT, YOU KNOW, AT THAT TIME WE WERE PRODUCING

7  THINGS, YOU KNOW, WITH THE IDEA THAT THE DISCOVERY WAS CLOSING

8  ON THE 30TH.  WE PRODUCED ALL PUBLISHED AND UNPUBLISHED THAT

9  THEY ASKED FROM ALL THE PLATFORMS PATREON INCLUDED, SO YEAH.

10            THE COURT:  IT DOESN'T SOUND LIKE WE THEN HAVE A

11  DISPUTE THEN THAT YOU'VE HAVE PRODUCED IT.

12            MS. IZMAYLOVA:  CORRECT.

13            THE COURT:  THEN YOU WILL HAVE TO CONTINUE TO

14  SUPPLEMENT YOUR PRODUCTION UP TO THE DATE OF TRIAL FOR ANYTHING

15  ELSE.  SO WHAT I'M GOING TO LOOK FOR IS SOME CERTIFICATION

16  GIVEN TO THE PLAINTIFF, YOU KNOW, A REASONABLE TIME, A WEEK OR

17  SO BEFORE TRIAL THAT EVERYTHING HAS BEEN PRODUCED, AND, YOU

18  KNOW, MAYBE THERE WILL BE NOTHING ELSE THAT OCCURS.

19            THERE MAY BE -- IF, IN FACT, THE DEFENDANT DID NOT

20  PRODUCE STATEMENTS ABOUT THE VIDEOS THAT THE PLAINTIFF SAYS

21  THEY'RE AWARE OF IN JANUARY, I GUESS I'M LOOKING FOR A

22  CERTIFICATION THAT THERE IS NOTHING ELSE, AND THEN IF THE

23  PLAINTIFF -- LET'S GO AHEAD AND DO AN INTERIM CERTIFICATION

24  THAT EVERYTHING HAS BEEN PRODUCED, AND WHO KNOWS WHEN THIS CASE

25  WILL GO TO TRIAL, WE'LL SAY EVERY 60 DAYS THERE NEEDS TO BE A

1  RECERTIFICATION THAT EVERYTHING HAS BEEN PRODUCED, AND IF THE

2  PLAINTIFF IS AWARE THAT THERE'S SOMETHING THAT WAS NOT

3  PRODUCED, THEN THE PLAINTIFF CAN FOLLOW UP WITH INTERROGATORIES

4  ABOUT THAT SPECIFIC ITEM IF THEY WANT TO, OR THEY MAY JUST

5  CHOOSE TO WAIT AND USE IT FOR IMPEACHMENT PURPOSES AT TRIAL.  I

6  WOULD SAY -- ALL RIGHT.  YOU HAD ONE OTHER ITEM I THINK.

7           MS. MATZ:  YES, YOUR HONOR, AND IT'S RELATED.  WE'VE

8  ASKED FOR COMMUNICATIONS RELATED TO THE VIDEOS ABOUT OUR

9  CLIENT, AND, YOU KNOW, DURING -- MS. KEBE HAS, YOU KNOW,

10  THERE'S THREE EMAIL ACCOUNTS AT ISSUE, AND DURING THE

11  DEPOSITION THERE WAS TESTIMONY GIVEN ESSENTIALLY THAT MS. KEBE

12  DIDN'T EVEN SEARCH THEM, AND IT'S PRETTY CLEAR AT THIS POINT

13  THAT THERE IS RESPONSIVE COMMUNICATION THAT HASN'T BEEN

14  PRODUCED.

15           I MEAN I CAN GIVE YOU A COUPLE OF BARE MINIMUM

16  EXAMPLES.  FOR EXAMPLE, BOTH MY LAW FIRM AND A PREDECESSOR

17  COUNSEL HAD SENT CEASE AND DESIST LETTERS TO MS. KEBE THAT SHE

18  AND HER HUSBAND TESTIFIED MIGHT HAVE BEEN FORWARDED, NOBODY

19  REMEMBERED SEEING THEM, EVEN THOUGH JUST SO YOUR HONOR IS AWARE

20  THERE WAS ACTUALLY A RESPONSE TO BOTH LETTERS BY EMAIL.  NONE

21  OF THOSE WERE PRODUCED BY THE DEFENDANTS EVEN THOUGH WE

22  PRODUCED COPIES OF THE ONES WE HAD, BUT OBVIOUSLY IT'S

23  INCUMBENT ON BOTH SIDES TO PRODUCE ALL COMMUNICATIONS.

24           BUT THAT'S NOT MY BIGGER CONCERN, MY BIGGER CONCERN

25  IS THAT THERE'S A LOT OF OTHER COMMUNICATIONS OUT THERE THAT WE

 1  DON'T HAVE, YOU KNOW, EVEN THE COMMUNICATIONS THAT WOULD HAVE

 2  OBVIOUSLY BEEN RELEVANT, FOR EXAMPLE, WITH MS. STARMARIE JONES

 3  WHO WAS, WHO USED TO BE A CODEFENDANT IN THIS ACTION, BUT WAS

 4  NEVER SERVED AND HAS BEEN DISMISSED, BUT MS. JONES DID AN

 5  INTERVIEW THAT WAS ONE OF THE PRIMARY EXAMPLES OF DEFAMATION

 6  THAT MS. KEBE PUBLISHED ACCUSING MY CLIENT OF HAVING AN STD AND

 7  CONTAINED A LOT OF DEFAMATORY STATEMENTS, AND WE DIDN'T GET

 8  COPIES OF THE TEXT MESSAGES BETWEEN MS. KEBE AND MS. JONES.

 9  SOME OF THEM WE LITERALLY GOT DURING THE DEPOSITION ON NOVEMBER

10  30TH, AND IT'S NOT CLEAR TO ME THERE HAS BEEN ANY TYPE OF A

11  SEARCH.

12          THERE'S ALSO AT LEAST TWO OTHER INDIVIDUALS WE'RE

13  AWARE OF, SHAWNA LEEKS AND ANOTHER INDIVIDUAL NAMED KYLE.  MS.

14  LEEKS IS THE PERSON WHO APPARENTLY MS. KEBE CLAIMS WAS THE

15  SOURCE OF A STORY THAT MS. KEBE DID CLAIMING THAT MY CLIENT HAD

16  HPV WHICH IS ONE OF THE DEFAMATORY STATEMENTS, AND KYLE IS

17  ANOTHER INTERNET PERSONALTY WHO MS. KEBE ADMITTED TO

18  COMMUNICATING WITH TALKING ABOUT THE FACT THAT SHE KNEW THE

19  STORY WAS FALSE.

20          SO, YOU KNOW, IN TERMS OF EMAILS AND TEXT MESSAGES

21  AND DM'S WITH THESE PEOPLE THAT ARE ABOUT THESE VIDEOS

22  CONTAINING THE DEFAMATORY STATEMENTS ABOUT MY CLIENT, THEY ARE

23  CLEARLY RELEVANT.  WE KNOW THAT THERE ARE COMMUNICATIONS OUT

24  THERE THAT SHOW MS. KEBE'S ACTUAL MALICE AND INTENT IN

25  CONTINUING TO DEFAME MY CLIENT, BUT THESE HAVEN'T BEEN

1   PRODUCED.

2          THE COURT:  WHAT ABOUT THAT, MS. IZMAYLOVA?

3          MS. IZMAYLOVA:  YOUR HONOR, THE FIRST DAY OF MY

4   CLIENT'S DEPOSITION WAS ON THE 19TH OF NOVEMBER, AND AT THE END

5   OF THAT DEPOSITION, BOTH PARTIES AGREED THAT, YOU KNOW, WE

6   WOULD CONTINUE THE DEPOSITION UNTIL THE FOLLOWING WEEK SO THAT

7   MYSELF AND MR. SABBAK COULD SEARCH ALL THE EMAIL ACCOUNTS AND

8   ALL OF THOSE THINGS THAT MS. MATZ JUST TALKED ABOUT, AND WE DID

9   DO THAT.  WE PERSONALLY HAD HER LOGIN INFORMATION TO ALL OF HER

10  EMAILS, SOCIAL MEDIA, ALL OF THAT, AND SUPPLEMENTED OUR

11  PRODUCTION ON I BELIEVE IT WAS ON NOVEMBER 23RD, BUT IT WAS

12  SEVERAL DAYS BEFORE THE CONTINUATION OF HER DEPOSITION WHICH

13  WAS ON NOVEMBER 30TH.  SO ALL OF THE COMMUNICATIONS THAT THEY

14  HAD REQUESTED WERE PRODUCED.  WE SEARCHED THE EMAIL ACCOUNTS

15  OURSELVES BECAUSE MS. KEBE HAD SAID THAT SHE'S NOT REALLY AWARE

16  OF HOW TO SEARCH IT PROPERLY, SO WE WENT AHEAD AND DID IT

17  OURSELVES.

18         THE COURT:  HOW MANY COMPUTERS DID SHE HAVE FOR YOU

19  TO SEARCH.

20         MS. IZMAYLOVA:  NO, SHE JUST GAVE US HER LOGIN

21  INFORMATION, AND WE SEARCHED THROUGH HER EMAIL ACCOUNT.

22         THE COURT:  JUST ONE EMAIL ACCOUNT?

23         MS. IZMAYLOVA:  I BELIEVE IT WAS LIKE EITHER TWO OR

24  THREE.

25         THE COURT:  SO HOW MUCH -- MS. MATZ, IF SHE'S SAYING

1  THEY PRODUCED EVERYTHING THEY'VE GOT, YOU DON'T THINK THEY

2  HAVE, SO WHAT DO I DO WITH THAT?

3       MS. MATZ:  SO FIRST OF ALL I KNOW THEY HAVE IT.  IF

4  THEY SEARCHED THE EMAILS WHERE WERE THE COMMUNICATIONS WITH MY

5  LAW FIRM.  I'M SORRY THAT'S JUST A BLATANT MISSTATEMENT.  IT'S

6  NOT POSSIBLE.  WE KNOW THAT THINGS EXIST THAT WERE NOT

7  PRODUCED, AND THE TESTIMONY ABOUT KYLE, THE GENTLEMAN THAT SHE

8  TESTIFIED SHE HAD COMMUNICATIONS WITH ABOUT THE FACT THAT SHE

9  KNEW THAT STORY WAS FALSE WERE ON THE 30TH, IN THE DEPOSITION

10  ON THE 30TH.

11       THE COURT:  OKAY.  SO WHAT DO YOU WANT ME TO DO; WHAT

12  ARE YOU ASKING ME TO DO?

13       MS. MATZ:  I MEAN IS THERE A REASON THAT THEY CAN'T

14  BE PUT INTO SOME SORT OF A THIRD-PARTY PLATFORM AND A SEARCH

15  RUN, AND WE EITHER GET A KEYWORD HIT RESULTS OR SOMETHING LIKE

16  THAT BECAUSE, YOU KNOW, I RARELY SAY THIS, BUT I FRANKLY JUST

17  DON'T BELIEVE THAT.  I DON'T BELIEVE THAT THERE HAS BEEN A

18  SEARCH RUN.

19       MS. IZMAYLOVA:  I MEAN MS. MATZ IS LIKE LYING TO THE

20  COURT BECAUSE SHE KNOWS THAT WE TOOK THE WHOLE WEEKEND, WE

21  STAYED HERE ALL WEEKEND AND DID ALL THE SEARCHES THAT THEY

22  ASKED US TO DO AND PRODUCE ALL THE COMMUNICATIONS MY CLIENT

23  HAD.  IF SHE WANTS US TO REPRODUCE THE CEASE AND DESIST LETTER

24  THAT MY CLIENT GOT IN 2018, WE CAN DO THAT BUT --

25       THE COURT:  BUT WAIT A MINUTE, ARE YOU TELLING ME YOU

1  DIDN'T PRODUCE THAT INTENTIONALLY?

2          MS. IZMAYLOVA:  NO, I MEAN I DIDN'T EVEN KNOW HOW

3  THAT WAS RELEVANT AT ALL.

4          THE COURT:  SO YOU'RE TELLING ME YOU DIDN'T PRODUCE

5  IT BECAUSE YOU DIDN'T THINK IT WAS RELEVANT, OR YOU DIDN'T FIND

6  IT?  IT'S ONE THING IF YOU'RE TELLING ME, JUDGE, I SAW IT BUT

7  WE DIDN'T THINK WE NEEDED TO PRODUCE THAT.  IT'S ANOTHER --

8          MS. IZMAYLOVA:  I THINK THAT WE JUST DIDN'T THINK WE

9  NEEDED TO PRODUCE IT BECAUSE THEY HAD SENT IT TO US SO IT

10  WASN'T LIKE WE WERE DISPUTING, YOU KNOW, THAT SHE RECEIVED THAT

11  LETTER.

12          MS. MATZ:  YOUR HONOR, A DEMAND FOR RETRACTION IS

13  CLEARLY RELEVANT UNDER THE STATUTE.  IT'S ONE OF THE

14  PREREQUISITES TO FILING A CLAIM.  SO MY QUESTION IS IF THEY

15  DIDN'T THINK THAT WAS RELEVANT, WHAT ELSE IS BEING WITHHELD ON

16  RELEVANCE GROUNDS.

17          THE COURT:  SO HERE'S WHAT WE'RE GOING TO DO, I'M

18  GOING TO -- THIS IS NOT DRACONIAN IN THE SINCE THAT IT'S

19  DOABLE, IT'S DONE EVERY DAY, BUT IT COSTS SOME MONEY.  I'M

20  GOING TO LET THE PLAINTIFF DECIDE IF THEY WANT TO HIRE A

21  FORENSIC PERSON TO GET ACCESS TO HER EMAIL ACCOUNTS AND

22  DOWNLOAD ALL THE INFORMATION THAT'S IN THOSE EMAIL ACCOUNTS AND

23  TO THEN PRODUCE THAT INFORMATION TO ALSO INCLUDE A FORENSIC

24  ANALYSIS OF ANY COMPUTER THAT THE DEFENDANT MAY HAVE USED OR

25  DEVICE THAT THE DEFENDANT MAY HAVE USED TO UPLOAD ANY MATERIAL

1  OR SEND ANY EMAILS WITH AN AGREED UPON SEARCH TO FIND THAT

2  INFORMATION.

3          IF YOU ALL CANNOT AGREE ON WHAT THE SEARCH QUERY

4  SHOULD BE, THEN I'LL DECIDE THAT ISSUE, AND YOU CAN BOTH

5  PRESENT TO ME YOUR SIDE ABOUT WHAT IT SHOULD BE.  THE PLAINTIFF

6  IS GOING TO HAVE TO PAY THE COST OF THAT, AND IF IT'S

7  DETERMINED THAT THERE ARE DOCUMENTS THAT HAVE NOT BEEN PRODUCED

8  THAT SHOULD BE PRODUCED, THEN I WOULD RESERVE THE RIGHT TO

9  REALLOCATE THOSE COSTS OF THE EXPERTS WHO WOULD REVIEW AND

10  DOWNLOAD AND REVIEW AND DO THE SEARCH TO PRODUCE THOSE COSTS.

11  I MEAN TO SHIFT THOSE COSTS TO THE DEFENDANT.

12          NOW, SO THE WAY YOU WOULD DO IT IS YOU WOULD HIRE

13  YOUR EXPERT.  YOUR EXPERT WOULD -- THE NECESSARY DOCUMENTATION

14  AND AUTHORIZATION RELEASES THAT HAVE TO BE SIGNED BY THE

15  DEFENDANT TO ALLOW THE EXPERT TO HAVE ACCESS TO HER ACCOUNT TO

16  GAIN ACCESS TO THE INFORMATION TO DO THE SEARCHES, AND TO ALSO

17  DO IT ON THE MACHINES THEMSELVES, THE PHONES, THE COMPUTERS,

18  TABLETS, ALL OF THAT.  YOU WOULD AGREE ON WHAT THE SEARCH TERMS

19  ARE GOING TO BE.  THE DOCUMENTS WOULD THEN BE PRODUCED PURSUANT

20  TO THOSE SEARCH TERMS.

21          BEFORE THE PLAINTIFF WOULD SEE ANY OF THE

22  DOCUMENTATION, THE DEFENDANT WOULD HAVE AN OPPORTUNITY TO

23  REVIEW THOSE DOCUMENTS TO SEE IF THERE'S ANYTHING IN THERE THAT

24  IS PRIVILEGED AND SHOULD NOT BE PRODUCED FOR SOME REASON, AND

25  IF THE DEFENDANT BELIEVES THAT THERE ARE DOCUMENTS THAT SHOULD

1   NOT BE PRODUCED TO THE PLAINTIFF, THEN THEY WOULD NEED TO

2   PROVIDE A PRIVILEGE LOG MUCH LIKE THE DEFENDANTS DESCRIBED IN

3   THEIR OWN MOTION HERE THAT WE DISCOVERED TODAY, AND TO PROVIDE

4   THAT TO THE PLAINTIFF, AND IF THE PLAINTIFF DOES NOT AGREE,

5   THEN THE PLAINTIFF CAN FILE A MOTION WITH ME TO OBTAIN SOME OR

6   ALL OF THE DOCUMENTS THAT ARE NOT PRODUCED, OR THAT WERE

7   PRODUCED IN REDACTED FORM.  ANY DOCUMENTS FOR WHICH THERE ARE

8   NO OBJECTIONS MADE BY THE DEFENDANT AFTER THE SEARCH OCCURS

9   SHOULD BE PRODUCED IMMEDIATELY.

10          ALL OF THIS NEEDS TO BE DONE WITHIN THE NEXT 60

11  DAYS.  IT'S GOING TO TAKE THE PLAINTIFF IF THEY DECIDE THEY

12  WANT TO TAKE THIS STEP, THE PLAINTIFF HAS GOT TO FIND AN EXPERT

13  AND WHATNOT.  SO I MEAN THAT'S OBVIOUSLY VERY DOABLE.  AGAIN

14  THE DEFENDANT HAS GOT TO COOPERATE AND MAKE ALL OF HER

15  COMPUTERS, ANY COMPUTER THAT SHE HAD ACCESS TO OR THAT SHE USED

16  TO COMMUNICATE WITH TO ANY SOCIAL MEDIA PLATFORM OR ANY THIRD

17  PARTY WHERE SHE MAY HAVE MADE A STATEMENT ABOUT THE PLAINTIFF

18  IN ANY REGARD.  NOW THAT MAY INCLUDE HER PHONE, HER TABLET, HER

19  COMPUTER, HER HUSBAND'S PHONE, TABLET AND COMPUTER, THE

20  CORPORATION'S PHONE, TABLETS AND COMPUTERS.

21          I DON'T SEE IT AS A BURDEN AS IT RELATES TO THE

22  DEFENDANT BECAUSE THE DEFENDANT IS NOT GOING TO BEAR THE COST

23  OF THIS OTHER THAN MAKING THEIR PASSWORDS INFORMATION AVAILABLE

24  AND SIGNING ANY NECESSARY RELEASES TO GET THE PLATFORMS TO

25  ALLOW THEM TO HAVE ACCESS TO THEIR ACCOUNTS.  AS I STATED AT

1  THE OUTSET, THE PLAINTIFF WILL PAY THE COST SUBJECT TO A

2  REALLOCATION OF THOSE COSTS IF IT TURNS OUT THAT A -- I'M NOT

3  ASSUMING ANYBODY HAS DONE ANYTHING WRONG HERE.  I RECOGNIZE

4  THAT MISTAKES CAN BE MADE.  MAYBE NO MISTAKES WERE MADE AND

5  MAYBE NOTHING WAS WITHHELD, BUT I DON'T NEED TO DECIDE THAT

6  TODAY.

7          I THINK THERE'S ENOUGH REASON HERE TO BELIEVE THAT

8  THERE COULD BE SOMETHING ELSE TO ALLOW THE PLAINTIFF TO HAVE

9  THIS ACCESS, BUT NOT SUCH THAT I'D DECIDE THAT THERE'S BEEN BAD

10  FAITH ON THE DEFENDANT'S BEHALF AND TO ADJUST THE COST FOR THAT

11  SEARCH AT THIS POINT IN TIME.  IF THE PLAINTIFF DECIDES THAT

12  THEY DON'T WANT TO GO FORWARD WITH THIS, THEN THAT'S THEIR

13  OPTION.

14          ALL RIGHT.  WHAT ELSE, MS. MATZ, ANYTHING ELSE?

15          MS. MATZ:  NO, I BELIEVE THAT THAT'S IT, YOUR HONOR.

16  WE HAD MADE A REQUEST FOR COSTS AND EXPENSES, BUT, YOU KNOW, I

17  WILL LEAVE THAT TO THE COURT'S DISCRETION.  OBVIOUSLY YOU JUST

18  RULED ON HOW YOU WANT TO DEAL WITH THAT LAST CATEGORY.

19          THE COURT:  AS IT RELATES TO THE ATTORNEY'S FEES AS

20  PLED IN THESE MOTIONS, THE MINUTE ORDER WILL REFLECT THE COURT

21  IS NOT AT THIS TIME GRANTING ANY ATTORNEY'S FEES TO ANYONE, ANY

22  COSTS TO ANYONE.  I THINK ALL THIS COULD HAVE BEEN HANDLED

23  BETTER.  I'M NOT SAYING ANYTHING.  EACH SIDES ARE EQUALLY

24  CULPABLE.  I'M JUST NOT GOING TO GET INTO THAT.  I DON'T SEE

25  THE NEED TO DO SO, BUT I THINK THE RECORD IS GOING TO REFLECT

1  TODAY OUR DISCUSSIONS, AND IF EITHER PARTY THINKS THAT NOT

2  AWARDING ATTORNEY'S FEES IS A MISTAKE, THAT'S NOT CONSISTENT

3  WITH THE LAW, THEN I GUESS YOU WOULD HAVE THAT PRESERVED FOR

4  APPEAL.

5          I DID LOOK AT RULE 37 TODAY BECAUSE IT WAS QUOTED IN

6  ONE OF THE MOTIONS.  I THINK IT WAS THE DEFENDANT'S MOTION THAT

7  THE COURT MUST GRANT FEES, BUT THAT'S NOT REALLY WHAT RULE 37

8  SAYS.  IT MUST DO SO UNLESS IT FINDS, AND I FIND THAT THERE'S

9  BEEN ENOUGH GENUINE DISPUTES INVOLVED ON BOTH SIDES TO NOT

10 JUSTIFY OR TO JUSTIFY NOT GRANTING FEES IN THIS CASE UP TO THIS

11 POINT.

12          I DO WANT TO TALK JUST ABOUT ONE MORE THING AND THEN

13 WE'LL BE DONE.  SO I'M SURE THERE'S GOING TO BE SOME MOTIONS

14 FOR SUMMARY JUDGMENT FILED BY EITHER SIDE.

15          MS. MATZ:  YOUR HONOR, WE FILED OUR MOTION, AND THE

16 DEADLINE HAS PAST.  THE DEADLINE TO FILE THE MOTIONS FOR

17 SUMMARY JUDGMENT I BELIEVE WAS DECEMBER 29TH OR 30TH.

18          THE COURT:  OKAY.  DID THE DEFENDANT FILE ONE?

19          MS. MATZ:  NO, YOUR HONOR.

20          THE COURT:  SO WHAT I WAS GETTING TO IS THERE WILL BE

21 SOME FILED, AND I WILL HEAR THOSE IN DUE COURSE.  PROBABLY

22 SOMETIME THIS SPRING, I WILL HAVE A HEARING ON THAT.  WE'LL DO

23 IT BY ZOOM UNTIL PROBABLY, YOU KNOW, THERE'S JUST ONE POSITIVE

24 THING GENERALLY THAT'S GOING TO COME OUT OF COVID IS THAT WE'RE

25 PROBABLY GOING TO CONTINUE TO HAVE ZOOM HEARINGS PARTICULARLY

1  WHEN LAWYERS ARE NOT IN ATLANTA LIKE THE PLAINTIFFS HERE.  SO

2  WE'LL PROBABLY DO THAT HEARING ON ZOOM.  OBVIOUSLY I THINK BY

3  THE TIME THIS CASE GOES TO TRIAL, WE'LL BE BACK IN THE

4  COURTROOM.

5          I THINK BOTH SIDES REALLY NEED TO THINK -- I MEAN

6  WASN'T THERE A MEDIATION?  DIDN'T I READ SOMETHING ABOUT

7  MEDICATION AT SOME POINT?

8          MS. MATZ:  THERE WAS NOT A MEDIATION, YOUR HONOR.

9  THERE HAVE BEEN VARIOUS ATTEMPTS BETWEEN COUNSEL TO TRY TO

10  SETTLE THIS.  UNFORTUNATELY I DON'T WANT TO TALK ABOUT THE

11  EXACT SUBSTANCE OF THE COMMUNICATIONS TO THE COURT, BUT, YOU

12  KNOW, THERE HAVE BEEN SOME DEMANDS MADE BY THE OTHER SIDE THAT

13  WE FEEL LIKE ARE PRETTY UNREASONABLE, AND IT SEEMS LIKE

14  EVERYBODY IS PRETTY FAR APART.

15          THE COURT:  SO IF YOU DECIDE YOU WANTED TO MEDIATE, I

16  WOULD -- TO THE EXTENT THAT YOU THOUGHT IT WOULD BE USEFUL, I

17  WOULD APPOINT A MAGISTRATE JUDGE WHO WOULD CONDUCT A MEDIATION,

18  OR YOU COULD HIRE YOUR OWN MEDIATOR.  I MEAN OBVIOUSLY THERE'S

19  LOTS OF GOOD MEDIATORS OUT THERE.  THERE'S SEVERAL SERVICES IN

20  ATLANTA AND ELSEWHERE THAT COULD DO THE MEDIATION.

21          IF YOU DON'T MEDIATE OR YOU JUST DON'T SETTLE, WHAT

22  WE NEED TO DO ON THIS TRIAL I THINK YOU ALSO HAVE TO GIVE SOME

23  THOUGHT TO, YOU KNOW, WHAT'S THE TRIAL GOING TO LOOK LIKE IN

24  THIS CASE, YOU KNOW, ARE WE GOING TO HAVE A TRIAL IN THE

25  COURTROOM, WHETHER IT BE A BENCH TRIAL OR A JURY TRIAL,

1  OBVIOUSLY THAT'S ALL OPEN TO THE PUBLIC.  I CAN'T EXCLUDE

2  ANYONE FROM COMING TO THAT TRIAL.

3         IF THE PARTIES WANT TO DO THIS AND DO THIS PRIVATELY,

4  THEN THEY WOULD HAVE TO AGREE TO ARBITRATION BECAUSE AN

5  ARBITRATION IS NOT PUBLIC SO NOBODY WOULD HAVE A RIGHT TO

6  ATTEND THAT.  OF COURSE, YOU GIVE UP SOME OF YOUR RIGHTS IN AN

7  ARBITRATION.  THE RIGHT TO APPEAL IS SEVERELY LIMITED TO A

8  MANIFEST ABUSE OF THE LAW WHICH IS I GUESS A JUDGE OR AN

9  ARBITRATOR WHO SAYS I KNOW THE LAW BUT I'M NOT FOLLOWING IT,

10  AND HOW YOU EVER REALLY FIGURE THAT OUT.  THEY CAN BE WRONG.

11  THEY JUST CAN'T SAY I'M NOT GOING TO FOLLOW THE LAW.  FRAUD.

12  AND HOPEFULLY WE'D PICK AN ARBITRATOR WHO WOULD NOT BE IN A

13  CONSPIRACY WITH ANYBODY, AND I CAN'T THINK OF THE OTHER COUPLE

14  OF GROUNDS FOR APPEAL UNDER THE FEDERAL RULES, BUT IT DOES GIVE

15  THE ADVANTAGE OF PRIVACY.

16         OBVIOUSLY THE PLAINTIFF HAS SOME PRIVACY ISSUES.  THE

17  DEFENDANT MAY SHARE THOSE, TOO, I DON'T KNOW, BUT OBVIOUSLY YOU

18  CAN AGREE TO ARBITRATION IF YOU WANT TO, AND I'LL TRY IT IN A

19  BENCH TRIAL OR A JURY TRIAL, IT DOESN'T REALLY MATTER TO ME.

20  IF WE DO HAVE A TRIAL THOUGH, THE PARTIES ARE BOTH GOING TO BE

21  REQUIRED TO THERE.  I MEAN WE'RE NOT GOING TO HAVE TRIALS IN

22  ABSENTIA.  SO BOTH OF THEM WILL NEED TO BE THERE AND NEED TO BE

23  THERE THE WHOLE TIME.

24         IN ANY EVENT, I'M NOT GOING TO ENTER A WRITTEN RULING

25  FOR MY HEARING TODAY.

1              MS. IZMAYLOVA:  YOUR HONOR.

2              THE COURT:  YES.

3              MS. IZMAYLOVA:  I'M SORRY, I HATE TO INTERRUPT YOU,

4  BUT I HAVE TWO REQUESTS FOR PRODUCTION THAT WE HAVE FILED

5  MOTIONS TO COMPEL ON THAT WE DID NOT --

6              THE COURT:  OKAY.  I'M SORRY.

7              MS. IZMAYLOVA:  I'M SORRY ABOUT THAT.  WE HAD TWO

8  SEPARATE MOTIONS.

9              THE COURT:  I'M SORRY, I THOUGHT WE WERE DONE.

10             MS. IZMAYLOVA:  GIVEN EVERYTHING THAT WE'VE ALREADY

11 DISCUSSED, I JUST HAVE TWO REQUESTS THAT I WANT TO GO OVER.

12             THE COURT:  ALL RIGHT.

13             MS. IZMAYLOVA:  THE FIRST ONE IS REQUEST NUMBER 20 ON

14 PAGE 17.  THIS IS DOCKET NUMBER 85.

15             THE COURT:  GIVE ME A SECOND TO GET BACK TO THAT

16 DOCUMENT.  I'M SORRY WHAT PAGE IS IT ON?

17             MS. IZMAYLOVA:  17.

18             THE COURT:  WHAT'S THE DOCUMENT AGAIN?

19             MS. IZMAYLOVA:  IT IS DOCUMENT NUMBER 85 WHICH IS THE

20 BRIEF IN SUPPORT OF THE MOTION TO COMPEL PRODUCTION.

21             THE COURT:  IS THAT ON OUR CALENDAR FOR TODAY?  I'M

22 NOT SEEING --

23             MS. IZMAYLOVA:  I BELIEVE IT WAS.  I CAN

24 DOUBLE-CHECK.

25             THE COURT:  HERE IT IS.  IT'S JUST OUT OF ORDER I

1  THINK IN MY GOOGLE DRIVE, OR IT DIDN'T MAKE IT INTO MY GOOGLE

2  DRIVE.  SO, JENNIFER, IT IS REFERENCED IN OUR COVERSHEET FOR

3  TODAY'S HEARING, BUT I DON'T BELIEVE THE DOCUMENT -- IT'S

4  DOCUMENT NUMBER 9 IN OUR GOOGLE DRIVE, AND WE SKIPPED IT.

5           SO I CAN'T READ IT RIGHT THIS SECOND, I CAN'T LOOK AT

6  IT IN THE COMPUTER AS LONG AS WE'RE DOING ZOOM, SO WHY DON'T

7  YOU TELL ME ABOUT IT.

8           THE COURTROOM DEPUTY:  I'LL ADD IT IN.

9           THE COURT:  DUMP IT IN THERE AS SOON AS YOU CAN.

10          GO AHEAD AND TELL ME ABOUT, MS. IZMAYLOVA.

11          MS. IZMAYLOVA:  OKAY.  REQUEST NUMBER 20 BASICALLY IS

12  WHAT WE'RE REQUESTING IS FOR THE PLAINTIFF TO PRODUCE WHAT'S

13  CALLED AN INSTAGRAM DATA DOWNLOAD FOR HER INSTAGRAM ACCOUNT,

14  AND THE REASON BEING IS THAT WE HAVE, YOU KNOW, SNIPPETS OR

15  LITTLE BITS AND PIECES OF CONVERSATION THAT PLAINTIFF HAS WITH

16  ALL THESE, YOU KNOW, THESE OTHER PEOPLE THAT WE ALLEGE BELIEVE

17  TO HAVE BEEN INVOLVED WITH HER AS SHE WAS THREATENING AND

18  HARASSING MY CLIENT, AND WE JUST DO NOT HAVE THE FULL

19  CONVERSATIONS, YOU KNOW, AND WE HAVE OBVIOUSLY REQUESTED THIS.

20  THE PLAINTIFF HAS REFUSED TO PROVIDE IT PERIOD.

21          BUT IT'S THE KIND OF THE SAME CONCERN THAT MS. MATZ

22  HAD IS THAT WE JUST -- THERE'S BEEN SUCH A SPOTTY PRODUCTION OF

23  ALL DOCUMENTS DURING THIS PERIOD, BUT THIS IS LIKE THE MOST

24  IMPORTANT I THINK PIECE OF EVIDENCE THAT WE COULD HAVE IN THIS

25  CASE BECAUSE IT LITERALLY -- WHETHER SHE DELETES, YOU KNOW, A

1  POST OR VIDEO OR ANYTHING FROM HER INSTAGRAM ACCOUNT A DATA

2  DOWNLOAD WILL HAVE THAT INFORMATION ON IT.

3          IT DOESN'T COST ANYTHING.  IT IS FREE TO REQUEST, BUT

4  ONLY THE PERSON, THE USER OF THE ACCOUNT CAN REQUEST IT THROUGH

5  THEIR ACCOUNT, YOU KNOW, OBVIOUSLY WE WOULD BE REQUESTING FOR

6  ALL OF TIME, BUT FROM I GUESS SEPTEMBER 1ST, 2018 UNTIL THE

7  PRESENT BECAUSE MY CLIENT IS STILL GETTING THREATS IN HER

8  EMAIL.

9          THERE WAS, YOU KNOW, AT THE BEGINNING OF THE YEAR,

10  NOT THIS YEAR BUT LAST YEAR, SHE ORDERED TAKEOUT FOOD FROM A

11  LOCAL RESTAURANT HERE, AND TOLD THEM THAT SHE WAS ALLERGIC TO

12  ONIONS.  ONE OF THE PLAINTIFF'S FANS PUT ALL THESE ONIONS AND

13  GOT FIRED, AND THEN I FIND OUT THAT PLAINTIFF FOLLOWS HIM ON

14  INSTAGRAM.  HE'S A RANDOM 18 YEAR OLD OR 20 YEAR OLD KID THAT

15  LIVES IN ATLANTA, AND SHE'S AN INTERNATIONAL CELEBRITY.

16  THERE'S ABSOLUTELY NO REASON FOR HER TO BE FOLLOWING HIS

17  ACCOUNT.

18          BUT I CAN'T OBVIOUSLY GET THE INFORMATION THAT'S

19  INSIDE OF HER ACCOUNT.  ALL I CAN DO IS SEE THE THINGS THAT ARE

20  AVAILABLE PUBLICLY, AND, YOU KNOW, HAVING ACCESS TO THE DATA

21  DOWNLOAD WE'LL BE ABLE TO, YOU KNOW, FILL IN A LOT OF THE GAPS

22  AND A LOT OF THE HOLES WITH REGARDS TO WHO PLAINTIFF HAS OR HAS

23  NOT COMMUNICATED WITH, YOU KNOW, BECAUSE SHE IS ALLEGING THAT

24  SHE HAS NOT COMMUNICATED WITH ANYBODY ELSE AND HAS NOT GOTTEN

25  ANYONE INVOLVED OR, YOU KNOW, ASKED FOR ANYONE'S HELP TO DO

1  ANYTHING TO MY CLIENT WHICH WE JUST DON'T BELIEVE, AND THIS IS

2  CIRCUMSTANTIAL EVIDENCE TO PROVE THAT SHE DOES COMMUNICATE WITH

3  ALL THESE THIRD PARTIES, BUT THAT'S ALL IT IS IS CIRCUMSTANTIAL

4  EVIDENCE AT THIS POINT IN TIME BECAUSE ALL I CAN SEE IS WHAT'S

5  AVAILABLE TO THE PUBLIC'S VIEW, AND SO THAT IS THE REASON --

6           THE COURT:  SO ARE YOU SUGGESTING -- I MEAN DOES THIS

7  ALLOW PUBLIC MESSAGING?

8           MS. IZMAYLOVA:  YES, SIR.

9           THE COURT:  SO ARE YOU SUGGESTING THERE COULD PRIVATE

10  MESSAGES FROM HER AND OTHERS THROUGH INSTAGRAM ABOUT YOUR

11  CLIENT?

12           MS. IZMAYLOVA:  I KNOW THERE ARE BECAUSE WE HAVE

13  RECEIVED BITS AND PIECES OF CONVERSATIONS, BUT, YOU KNOW, JUST

14  BY LOOKING AT THE ACCOUNT THAT SHE FOLLOWS AND WHO FOLLOWS HER

15  THERE'S NO OTHER LEGITIMATE CORRELATION OR CONNECTION BETWEEN,

16  YOU KNOW, SOME OF THESE PEOPLE OTHER THAN THE FACT THAT THEY

17  ALSO HAVE DONE SOMETHING TO HARASS MY CLIENT OR DO SOMETHING TO

18  MY CLIENT, BUT EVEN --

19           THE COURT:  SO I MEAN YOU'RE ASKING FOR A GLOBAL

20  THING HERE, WHAT ABOUT ASKING ABOUT THAT RELATIVE TO THE

21  SPECIFIC INDIVIDUALS THAT YOU SAY HAVE DONE THINGS TO YOUR

22  CLIENT, AND YOU WANT TO SEE IF THEY DID THAT AT THE BEHEST OF

23  THE PLAINTIFF.

24           MS. IZMAYLOVA:  I MEAN --

25           THE COURT:  AS OPPOSED TO EVERYBODY, YOU KNOW, YOU

1  ASK EVERYBODY ABOUT EVERYTHING IN THE WORLD.

2          MS. IZMAYLOVA:  I MEAN MY ISSUE IS THAT THEN THE

3  PLAINTIFF GETS TO DECIDE WHAT TO TURN OVER, AND THAT HAS NOT

4  LED TO, YOU KNOW, WE STILL HAVE SO MANY HOLES IN THE EVIDENCE

5  THAT HASN'T BEEN TURNED OVER, AND SO I'M NOT SAYING GIVE ME A

6  DATA DOWNLOAD FOR THE ENTIRE TIME THAT SHE'S HAD THIS ACCOUNT,

7  BUT FROM SEPTEMBER 1ST, 2018 UNTIL NOW.  I MEAN SHE CONTINUES

8  TO USE, YOU KNOW, SPECIFICALLY HER INSTAGRAM ACCOUNT TO

9  COMMUNICATE WITH NUMEROUS PEOPLE.

10          SHE HAS HIRED PEOPLE TO INVESTIGATE, QUOTE, UNQUOTE,

11  PEOPLE TO HARASS MY CLIENT.  WE HAVE A COUPLE OF INVOICES THAT

12  SHE PAID THIS ONE MAN WHO MY CLIENT THOUGHT WAS LIKE LITERALLY

13  HER STALKER, AND SHE EVEN TOOK A TPO AGAINST HIM, AND COME TO

14  FIND OUT THE PLAINTIFF HIRED HIM TO, QUOTE, UNQUOTE,

15  INVESTIGATE MY CLIENT.

16          SO IT'S THINGS LIKE THAT WHERE ALL I HAVE IS FOUR

17  INVOICES, BUT I DON'T HAVE ANY OF THEIR COMMUNICATIONS OF WHAT

18  DID THEY DISCUSS OR WHAT DID THEY AGREE UPON, AND WHY IS HE

19  FOLLOWING MY CLIENT AND THAT KIND OF THING.  SO WE'VE REQUESTED

20  IT SO MANY TIMES, AT THIS POINT I JUST, YOU KNOW, WE BELIEVE

21  IT'S NECESSARY FOR US TO BE ABLE TO OBTAIN THIS EVIDENCE

22  AND --

23          THE COURT:  SO ARE YOU WILLING TO DO THE SAME THING

24  THAT I'M REQUIRING THE PLAINTIFF TO DO WHICH IS TO HIRE

25  SOMEBODY TO DO THE SEARCHING USING SEARCH TERMS TO DETERMINE IF

1  IT'S RELEVANT TO THIS CASE AND TO YOUR CLIENT, AND THEN TO PAY

2  FOR THAT SUBJECT TO THE ABILITY TO HAVE THOSE CALLS REASSESSED

3  IF IT TURNS OUT THERE'S STUFF THAT THEY HAVEN'T PRODUCED TO YOU

4  BEFORE THIS SEARCH IS DONE?

5        MS. IZMAYLOVA:  THE DOWNLOAD ITSELF IS FOR FREE --

6        THE COURT:  THAT'S NOT MY POINT, BUT THE SEARCH

7  ISN'T, AND SO LIKE IN YOUR SITUATION, THE ONE THAT WE TALKED

8  ABOUT EARLIER, THE PLAINTIFF IS NOT GOING TO GET TO DO THAT

9  SEARCH.  IT'S GOING TO BE AN INDEPENDENT ENTITY THAT DOES THAT

10  SEARCH, AND YOU'LL GET TO SEE WHAT THEY COME UP WITH PRIOR TO

11  IT BEING PRODUCED AND OBJECT, AND THEY'VE GOT TO PAY FOR ALL OF

12  THAT, AND IT SEEMS THAT THIS IS A VERY SIMILAR SCENARIO.

13        YOU DON'T THINK THAT THEY -- JUST LIKE THEY SAID THEY

14  DON'T THINK THAT YOU HAVE DONE A SEARCH THAT'S SUFFICIENT, YOU

15  DON'T THINK THEY HAVE EITHER AS IT RELATES TO THE INSTAGRAM

16  STUFF, AND SO IT SEEMS KIND OF THE SAME THING WHERE THE

17  SEARCH -- THE INFORMATION IS DOWNLOADED, AND THAT'S FOR FREE,

18  BUT THE SEARCH IS DONE BY SOMEONE INDEPENDENTLY, IF THE

19  INFORMATION THAT THAT SEARCH TURNS UP IS RELEVANT TO YOUR

20  CLIENT BASED ON SEARCH TERMS THAT YOU ALL CAN AGREE UPON.  IF

21  YOU CAN'T AGREE OR OTHERWISE I WILL DECIDE TO UTILIZE DOCUMENTS

22  OR IN THIS CASE IF DIGITAL COMMUNICATIONS ARE FOUND, YOU

23  WOULD -- THEY WOULD HAVE AN OPPORTUNITY TO OBJECT IF THEY THINK

24  IT'S IRRELEVANT TO THE ISSUES IN THIS LAWSUIT AND WOULD HAVE TO

25  PROVIDE YOU WITH A PRIVILEGE LOG IF THEY DO OBJECT, AND

1  ANYTHING THEY DON'T OBJECT TO THAT WAS FOUND IN THE SEARCH

2  WOULD BE PROVIDED TO YOUR CLIENT, AND THE THINGS THAT THEY

3  WITHHOLD BASED ON AN OBJECTION, THEY WOULD HAVE TO PROVIDE THE

4  PRIVILEGE LOG, AND YOU WOULD HAVE AN OPPORTUNITY TO FILE A

5  BRIEF WITH ME TO HAVE ME REVIEW IT AND DETERMINE IF IT'S

6  SOMETHING THAT SHOULD BE PRODUCED OR NOT.

7          MS. MATZ:  YOUR HONOR, I AM SORRY, I WOULD LIKE TO

8  RESPOND TO SOME OF THIS BEFORE WE GET TOO FAR INTO THIS BECAUSE

9  I DON'T THINK THE SITUATIONS ARE SIMILAR AT ALL, BUT I WILL DO

10 THAT WHENEVER YOU'RE READY.

11         THE COURT:  SO WHAT ABOUT THAT, COULD YOU LIVE WITH

12 THAT, MS. IZMAYLOVA?

13         MS. IZMAYLOVA:  I MEAN AS LONG AS THE PLAINTIFF IS

14 WILLING TO DO THE INITIAL DOWNLOAD, THEN PASS IT ON TO A THIRD

15 PARTY.

16         THE COURT:  WELL, I MEAN IT'S NOT REALLY UP TO THEM.

17 I MEAN IF I ORDER IT, THEY HAVE TO DO IT JUST LIKE YOU HAVE TO

18 DO IT BECAUSE I ORDERED IT, AND I'LL HEAR FROM MS. MATZ IN A

19 MOMENT, BUT IT SEEMS LIKE A SIMILAR PROCEDURE THAT THEY'RE

20 GOING TO UTILIZE, I MEAN IT IS THE SAME PROCEDURE REALLY.

21 MAYBE THEIRS IS A LITTLE MORE INVOLVED BECAUSE IT INVOLVES

22 DEVICES AND ACCOUNTS, BUT YOURS DOESN'T REALLY INVOLVE -- THE

23 INFORMATION YOU WOULD GIVE TO THEM DOESN'T INVOLVE DEVICES, IT

24 INVOLVES ACCOUNTS ONLY.

25         LET ME HEAR FROM --

```
 1              MS. IZMAYLOVA:  I MEAN I THINK IF MY CLIENT IS
 2   WILLING TO PAY FOR IT, THEN YES.  I WOULD JUST HAVE TO
 3   DOUBLE-CHECK WITH HER.  THIS IS A VERY IMPORTANT PIECE OF
 4   EVIDENCE THAT WE DO NEED.  SO IF THAT'S THE ONLY WAY TO GET IT,
 5   THEN I GUESS, YEAH, THAT'S WHAT WE'LL HAVE TO DO.
 6              THE COURT:  ALL RIGHT.  MS. MATZ.
 7              MS. MATZ:  SO, YOUR HONOR, FIRST OF ALL, I THINK THAT
 8   THE PIECE OF THIS THAT IS VERY DIFFERENT IS ALL THE THINGS THAT
 9   MS. IZMAYLOVA JUST TOLD YOU WERE PRODUCED, THAT THEY FOUND WERE
10   PRODUCED BY MY CLIENT.  SO THEY ASKED FOR COMMUNICATIONS AND WE
11   PRODUCED THEM, OKAY.  AND WE HAVE SAID FROM THE VERY BEGINNING
12   THAT WE THINK THAT THIS REQUEST NUMBER 20 IS EXTREMELY OVERLY
13   BROAD.  IT PRESENTS PROPORTIONALITY PROBLEMS, BUT THE BIGGER
14   ISSUE HERE IS ALSO THAT, YOU KNOW, MY CLIENT HAS A LOT OF
15   PERSONAL INFORMATION IN THAT ACCOUNT, AND SHE'S A HIGH, YOU
16   KNOW, GETS A LOT OF MEDIA ATTENTION, AND THIS COULD POTENTIALLY
17   SUBJECT HER TO HARASSMENT AND EMBARRASSMENT AND ALL THESE OTHER
18   THINGS, AND THERE'S ABSOLUTELY NO ATTEMPT BY THE DEFENDANTS TO
19   HELP US NARROW, OKAY.
20              AN INSTAGRAM DOWNLOAD CONTAINS TONS OF INFORMATION.
21   IT CONTAINS IP ADDRESSES.  IT CONTAINS INFORMATION ABOUT PHONES
22   THAT HAVE BEEN LOGGED INTO IT.  IT CONTAINS INFORMATION ABOUT
23   THE HISTORY OF THE ACCOUNT AND BIO CHANGES.  I'M ACTUALLY NOT
24   EVEN SURE THAT THEY ALL CONTAIN DM'S JUST TO BE CLEAR.  BECAUSE
25   I HAVE ACTUALLY DONE INSTAGRAM DOWNLOADS IN A NUMBER OF CASES,
```

```
 1   AND EVEN THOUGH SOMETIMES THE INFORMATION YOU THINK YOU'RE
 2   GOING TO GET IS NOT ACTUALLY WHAT YOU DO GET, AND, YOU KNOW, IN
 3   THIS PARTICULAR CIRCUMSTANCE AS WELL, YOU KNOW, AT LEAST WHAT
 4   WE WERE ABLE TO OBTAIN THEY WERE NOT PHOTOS AND VIDEOS THAT
 5   CAME, AND I CAN'T CONTROL WHAT INSTAGRAM GIVES US.
 6          BUT EITHER WAY IF THERE ARE SPECIFIC THINGS THEY ARE
 7   LOOKING FOR, YOU KNOW, MS. IZMAYLOVA IS SAYING OH, THERE'S NO
 8   EARTHLY REASON WHY MY PLAINTIFF COULD FOLLOW THIS PERSON IN
 9   ATLANTA.  I DON'T KNOW THAT THAT'S THE CASE, AND FRANKLY I
10   THINK THAT THAT'S A PRETTY GROSS OVER GENERALIZATION.  SO IF
11   THERE'S SPECIAL PEOPLE SHE WANTS US TO GO INTO THE ACCOUNT AND
12   LOOK AT THE HISTORY OF THE COMMUNICATIONS, IF THERE ARE ANY,
13   AND PRODUCE ANYTHING RELATED TO MS. KEBE, THAT IS --
14          THE COURT:  THAT WAS SOMETHING I TALKED ABOUT EARLIER
15   AS TO THE SPECIFIC PEOPLE THAT SHE SAYS HARASSED HER TO DO AN
16   INSTAGRAM DOWNLOAD, AND THEN YOU WOULD CREATE A SEARCH TO SEE
17   IF THERE ARE THINGS RELEVANT TO THE DEFENDANT AND/OR THESE
18   PEOPLE THAT SHE SAY HAS HARASSED HER.  I MEAN WHY WOULD THAT
19   NOT BE RELEVANT?
20          I MEAN IF SHE SAYS THAT THINGS HAVE OCCURRED TO HER,
21   AND IT TURNS OUT THAT YOUR CLIENT HAS A RELATIONSHIP WITH THE
22   PEOPLE THAT DID THESE THINGS TO HER, THAT SEEMS RELEVANT.
23          MS. MATZ:  I'M NOT SAYING IT'S NOT RELEVANT.  I'M
24   SAYING THAT THE ONLY PEOPLE SHE DID THAT FOR WE PRODUCED.  SO
25   MY POINT, YOUR HONOR, IS WHY DON'T THEY TELL US WHO ELSE
```

1  THEY'RE TALKING ABOUT HERE BECAUSE I DON'T THINK THE ANSWER OF

2  WE ASKED YOU FOR SOME SPECIFIC THINGS AND YOU GAVE THEM TO US

3  MEANS THAT MY CLIENT SHOULD TURN OVER HER INSTAGRAM ACCOUNT.  I

4  MEAN IT'S A HUGE AMOUNT OF INFORMATION.

5          THE COURT:  THAT'S NOT WHAT ANYBODY HAS PROPOSED,

6  MAYBE WHAT SHE PROPOSED, BUT IT'S NOT WHAT I HAVE PROPOSED, AND

7  PROPORTIONALITY IS A RED HERRING BECAUSE WE'RE TALKING ABOUT

8  THEY'RE PAYING THE COSTS, THE DEFENDANT IS PAYING THE COSTS.

9  THE DEFENDANT IS NOT THE ONE DOING THE DOWNLOAD OR SEARCHING.

10 IT'S A THIRD PARTY THAT DOES THAT.  IT'S LIMITED TO THE

11 DEFENDANT, AND THE PEOPLE WHO SHE CONTENDS HAS SOMEHOW HARMED

12 HER, HARASSED HER LOOKING FOR A RELATIONSHIP BETWEEN THE

13 PLAINTIFF AND THOSE PEOPLE.  SO THAT BECOMES A VERY SMALL

14 SUBSET PARTICULARLY IF THE PLAINTIFF DOESN'T HAVE A

15 RELATIONSHIP WITH THOSE PEOPLE, AND IF SHE DOES, IT'S PROBABLY

16 FAIR GAME TO KNOW ABOUT IT.  IT MAY BE INNOCENT.  IT MAY NOT BE

17 INNOCENT, BUT WE DON'T KNOW UNTIL WE LOOK.  THE DEFENDANT IS

18 NOT REQUIRED TO ACCEPT THE PLAINTIFF'S REPRESENTATION ON THAT,

19 RIGHT.

20          MS. MATZ:  WELL, I'M NOT SURE I DISAGREE WITH THAT

21 GIVEN THAT WE HAVE TURNED OVER THE OTHER THINGS THEY'VE ASKED

22 FOR.  SO I GUESS WHAT I WOULD SAY IS IF THERE'S SPECIFIC

23 PEOPLE, YOU KNOW, MY UNDERSTANDING AND MS. MOORE IS ON THE

24 PHONE, SO I'LL LET HER SPEAK TO THE SPECIFICS IF THERE'S ANY

25 QUESTIONS.

1          MY UNDERSTANDING IS THAT MS. MOORE WITH THE CLIENT

2    WENT THROUGH THE CLIENT'S DM'S LOOKING FOR THE PEOPLE THAT WE

3    HAVE FOUND AND ARE AWARE OF AND WE HAVE PRODUCED THAT THOSE

4    CONVERSATIONS WITHIN HOW THE PARTIES HAVE AGREED TO DO IT.

5          SO IF THERE'S OTHER PEOPLE I GUESS WHAT I'M SAYING,

6    YOUR HONOR, I THOUGHT THE INITIAL IDEA YOU HAD WAS NOT A BAD

7    ONE, RIGHT.  IF THERE'S SOME OTHER QUESTIONS, WHY DON'T THEY

8    TELL US WHO THESE OTHER PEOPLE ARE, AND, YOU KNOW, WE CAN GO

9    AHEAD AND GET THAT, BUT DIGGING IT OUT OF AN INSTAGRAM DOWNLOAD

10   IS REALLY A LOT I THINK MAKING THIS POTENTIALLY A LOT MORE

11   COMPLICATED THAN IT NEEDS TO BE.

12          MS. IZMAYLOVA:  YOUR HONOR, I DON'T SEE ANY

13   DIFFERENCE BETWEEN THIS AND DOING A FORENSIC SEARCH OF

14   LITERALLY ALL OF MY CLIENT'S COMPUTERS, TABLETS, PHONES, EMAIL

15   ADDRESSES, YOU KNOW, SHE ALSO HAS PRIVATE INFORMATION ON THERE,

16   AND JUST LIKE I HAVE STATED TO THIS COURT AND TO OPPOSING

17   COUNSEL THAT WE HAVE PRODUCED EVERYTHING THEY'RE LOOKING FOR,

18   THEY DON'T BELIEVE ME, AND SO THEY WANT TO DO A FORENSIC

19   SEARCH, SO I MEAN WE'RE LITERALLY ASKING FOR THE SAME THING.  I

20   DON'T KNOW HOW THEY CAN CLAIM THAT HER CLIENT'S INFORMATION IS

21   PRIVATE, AND IT WILL BE SO OVERLY BURDENSOME BUT NOT MINE.

22          THE COURT:  WELL, IT IS A LITTLE DIFFERENT IN THE

23   SENSE THAT MS. MATZ HAS ARGUED THAT THEY WERE NOT PRODUCED, AND

24   YOU'VE AGREED THAT THERE WERE DOCUMENTS THAT WERE NOT PRODUCED

25   ALTHOUGH, YOU KNOW, YOU ARTICULATE A REASON FOR WHY THOSE

1   DOCUMENTS WERE NOT PRODUCED, SO THAT LEAVES THE PLAINTIFF TO

2   BELIEVE THAT MAYBE EITHER A COMPLETE SEARCH WASN'T DONE, OR IT

3   JUST WASN'T DONE PROPERLY.

4           I TAKE YOU AT YOUR WORD THAT IT WAS DONE.  SO IS

5   THERE AS IT RELATES TO THESE PEOPLE, THE PEOPLE THAT YOU SAY

6   HAVE DONE THINGS TO THE DEFENDANT HAVE YOU ASKED ABOUT THOSE

7   SPECIFIC PEOPLE FOR INFORMATION ABOUT COMMUNICATIONS BETWEEN

8   THE PLAINTIFF AND THOSE SPECIFIC PEOPLE?

9           MS. IZMAYLOVA:  WE HAVE ASKED FOR COMMUNICATION

10  BETWEEN PLAINTIFF AND ANY THIRD PARTY, OF COURSE, YES.

11          THE COURT:  AND I THINK I'VE RULED TODAY EARLIER IN

12  YOUR FAVOR THAT IF SHE'S COMMUNICATED ABOUT YOUR CLIENT TO

13  THIRD PARTIES FOR THAT PERIOD OF TIME AUGUST 4 THAT THEY'VE GOT

14  TO PRODUCE THAT.  SO I'VE TAKEN CARE OF THAT AT LEAST AS IT

15  RELATES TO THE COMMUNICATIONS, BUT AS FAR AS PEOPLE THAT THEY

16  HAVE PRODUCED THINGS FOR COMMUNICATIONS BETWEEN THE PLAINTIFF

17  AND THESE PEOPLE HAVE THERE BEEN DOCUMENTS OR COMMUNICATIONS

18  THAT YOU ARE AWARE OF THAT THE PLAINTIFF DIDN'T HERSELF PRODUCE

19  TO YOU?

20          MS. IZMAYLOVA:  I MEAN I DON'T HAVE -- LIKE THERE ARE

21  BITS AND PIECES OF CONVERSATIONS THAT THE PLAINTIFF HAD WITH

22  CERTAIN PEOPLE THAT ARE, YOU KNOW, WELL SOME OF THEM ARE PART

23  OF HER GANG, YOU KNOW, GANG MEMBERS TALKING TO EACH OTHER ABOUT

24  THREATENING MY CLIENT, STUFF LIKE THAT.

25          THEN THIS PERSON WHO I JUST REFERRED TO DENNIS BYRON,

1  YOU KNOW, THEY HAD TO HAVE SOME KIND OF AN AGREEMENT.  THERE

2  HAD TO HAVE BEEN SOME KIND OF COMMUNICATION PAYING INVOICES FOR

3  HIM TO GO STALK MY CLIENT, BUT NO COMMUNICATIONS WERE PRODUCED

4  AT ALL OR ANY AGREEMENT ABOUT WHAT EXACTLY WAS HE HIRED TO DO,

5  AND WHAT WERE THE TERMS OF THAT, YOU KNOW, OF HIS, YOU KNOW,

6  EMPLOYMENT IF YOU WOULD.  I MEAN THERE'S BEEN COMMUNICATIONS

7  BETWEEN PLAINTIFF AND, YOU KNOW, WHO SHE SAYS IS HER BEST

8  FRIEND WHERE, YOU KNOW, WE HAVE SCREENSHOTS OF THEM AND IT HAS,

9  YOU KNOW, HIS INSTAGRAM ACCOUNT IN ONE NAME AND WHAT THEY

10  PRODUCED IS A COMPLETELY DIFFERENT NAME.  IT LOOKS FABRICATED.

11         I MEAN I'M JUST SAYING LIKE I KNOW THAT THERE ARE SO

12  MANY MORE COMMUNICATIONS THAT EXIST THAT THEY HAVE NOT

13  PRODUCED, AND THE REASON WHY THEY DON'T WANT TO PRODUCE, THAT'S

14  WHY THEY'RE FREAKING OUT RIGHT BECAUSE THEY KNOW THEY DID NOT

15  PRODUCE --

16         MS. MOORE:  YOUR HONOR, IF I MAY.

17         THE COURT:  YEAH, GO AHEAD, MS. MOORE.

18         MS. MOORE:  THANK YOU VERY MUCH.  I WENT TO

19  PLAINTIFF'S HOUSE AND SPENT HOURS WITH HER ALONG WITH MY

20  PARALEGAL, AND WE DID EXHAUSTIVE SEARCHES ON HER PHONE FOR EACH

21  AND EVERY INDIVIDUAL IDENTIFIED IN THEIR REQUEST, AND WE

22  PROVIDED THAT, AND WE HAVE NOT HIDDEN OR NOT PRODUCED

23  ANYTHING.  WE DID EXHAUSTING SEARCHES BOTH IN THE INSTAGRAM

24  DM'S AND TEXT MESSAGES FOR EACH AND EVERY PERSON IDENTIFIED,

25  AND WE PROVIDED THAT.

1          MS. MATZ:  YOUR HONOR, THE OTHER THING I THINK IT'S

2    IMPORTANT TO RECOGNIZE HERE IS MS. IZMAYLOVA IS SAYING THERE'S

3    SNIPPETS, AND TO THE EXTENT YOUR HONOR ISN'T FAMILIAR WITH

4    INSTAGRAM, THE WAY IT WORKS, AND DM'S, IT WORKS MUCH LIKE TEXTS

5    MEANING IT'S A CHAIN, RIGHT.  SO, OF COURSE, I DON'T THINK

6    SNIPPETS IS THE RIGHT WORD, BUT I THINK THAT WHAT MR. MOORE IS

7    TRYING TO SAY IS LIKE IT'S NOT AS IF THERE IS A TEXT CHAIN WITH

8    A PERSON, OKAY, LIKE, FOR EXAMPLE, THERE WERE A COUPLE OF

9    OTHERS THEY WERE CALLING THEM BLOGGERS, I'M NOT SURE I WOULD

10   CALL THEM BLOGGERS, BUT THEY ARE PEOPLE WHO OUR CLIENT HAD SOME

11   CONVERSATIONS WITH ABOUT TASHA K.  WE PRODUCED THE PORTIONS OF

12   THOSE THAT RELATED TO HER AS THEY WERE REQUESTED, RIGHT.

13          SO LIKE WHY WOULD OUR CLIENT -- WE WOULDN'T BE UNDER

14   ANY CIRCUMSTANCE COMPELLED TO TURN OVER COMMUNICATIONS THAT HAD

15   NOTHING TO DO WITH THIS OR TASHA K, YOU KNOW, AND A TEXT CHAIN

16   ISN'T LIKE AN EMAIL WHERE YOU START A NEW CHAIN MAYBE AS, YOU

17   KNOW, THE TOPIC HAS CHANGED OR SOMETHING THAT.  SO I THINK THAT

18   THE WAY THAT THIS IS BEING PRESENTED SAYING THERE ARE SNIPPETS

19   OF CONVERSATIONS I THINK IT IS VERY DIFFERENT THAN THE OTHER

20   SITUATION.  I DO.

21          THE COURT:  SO YOU ALL HOLD ON JUST A MINUTE, IF YOU

22   WOULD, AND I'M GOING PUT MYSELF ON MUTE, AND, MANDI, I'M

23   ASSUMING YOU CAN HEAR ME.  GIVE ME A CALL RIGHT NOW.  I'M GOING

24   TO PUT MYSELF ON MUTE.

25          (PAUSE IN THE PROCEEDINGS)

1          THE COURT:  I CAN'T REMEMBER, THIS WAS YOU SAID 20

2     AND 21.  I'VE HEARD ENOUGH ARGUMENT ON THIS ONE.  LET'S TALK

3     ABOUT 21, WHAT WAS THE OTHER ITEM, AND I'LL COME BACK AND

4     ADDRESS THAT AT THE SAME TIME.

5          MS. IZMAYLOVA:  THE OTHER ITEM FOR THE REQUESTS FOR

6     PRODUCTION?

7          THE COURT:  YES, MA'AM.

8          MS. IZMAYLOVA:  I'M SORRY, YOUR HONOR, THAT WAS

9     REQUEST NUMBER 25 BECAUSE MS. KEBE IS ALSO CLAIMING PUNITIVE

10    DAMAGES OR GOING TO TRY TO GET PUNITIVE DAMAGES, SO WE HAVE

11    REQUESTED PLAINTIFF'S TAX RETURNS BECAUSE THAT IS -- THOSE ARE

12    -- THAT IS A DOCUMENT THAT THE JURY CAN REVIEW TO DETERMINE

13    THE AMOUNT OF PUNITIVE DAMAGES IF THEY WERE TO AWARD THOSE, AND

14    SO WE ARE JUST ASKING FOR THE PLAINTIFF TO PROVIDE THAT.

15         THE COURT:  IS THAT THE ONLY BASIS IS FOR THE

16    PUNITIVES?

17         MS. IZMAYLOVA:  WELL, INITIALLY THE REQUEST SAID, YOU

18    KNOW, I THOUGHT THEY WERE ALSO CLAIMING LOST WAGES, BUT TODAY

19    THAT'S BEEN MADE CLEAR THAT THAT'S NOT, YOU KNOW, WHAT THEY'RE

20    GOING FORWARD ON.

21         THE COURT:  SO WHAT PERIOD OF YEARS ARE YOU ASKING

22    FOR TAX RETURNS?

23         MS. IZMAYLOVA:  IN THE REQUEST WE ASKED FOR 2015 TO

24    2019.

25         THE COURT:  ALL RIGHT.  SO, MS. MATZ, MY INCLINATION

1   ABOUT TAX RETURNS WOULD BE TO SAY YOUR CLIENT NEEDS TO BRING

2   HER TAX RETURNS WITH HER TO TRIAL, AND PRODUCE THOSE TAX

3   RETURNS IF THE JURY RETURNS A VERDICT AGAINST HER AND CHECKS

4   THE PUNITIVE DAMAGES BOX BECAUSE I DON'T SEE THE NEED --

5   THERE'S NOT ANOTHER PURPOSE LIKE PROVING THE ALLEGATIONS

6   THEMSELVES HERE.  HOW DOES THAT STRIKE YOU?

7           MS. MATZ:  I THINK THAT -- WELL, I'LL SAY TWO

8   THINGS.  ONE IS YES THAT'S ONE OF THE ARGUMENTS WE MADE THAT

9   THERE'S NOT ANOTHER PURPOSE, AND WE DON'T THINK WITHOUT A

10  SHOWING THAT PUNITIVE DAMAGES ARE GOING TO BE RELEVANT THAT

11  THIS COULD BE ADDRESSED.

12          WHAT I WOULD ACTUALLY SAY, YOUR HONOR, IS I WOULD SAY

13  CAN WE MAKE THIS DETERMINATION AT THE TIME BECAUSE THERE IS NOT

14  A DISPUTE THAT OUR CLIENT IS A HIGH NETWORTH INDIVIDUAL, AND

15  WHAT WE SAID TO THE OTHER SIDE WAS, YOU KNOW, WE'RE GOING TO BE

16  WILLING TO ENTERTAIN SOME TYPE OF A STIPULATION ON THIS ISSUE

17  OR SOME TYPE OF OTHER REASONABLE PROOF, SO I DO NOT THINK IT

18  SHOULD BE PRODUCED NOW.

19          I THINK IF THE JURY DOES AWARD -- IF THE JURY FINDS

20  PUNITIVE DAMAGES AND THERE NEEDS TO BE A CONSIDERATION OF THAT,

21  I THINK THAT THAT'S A DIFFERENT QUESTION, AND PART OF THE

22  QUESTION THEN WOULD BE IS THERE SOMETHING ELSE THAT SHE COULD

23  PROVIDE LIKE A STIPULATION.

24          THE COURT:  YEAH, PROBABLY NOT, SHE PROBABLY WOULD

25  HAVE TO PRODUCE HER TAX RETURNS IN THAT REGARD BECAUSE I MEAN

1  PEOPLE DON'T ALWAYS PAY THE RIGHT AMOUNT OF TAXES THAT YOU

2  PAY.  NORMALLY IT'S A LITTLE LESS, YOU KNOW, AND I'M SAYING

3  THAT GENERALLY, BUT IT WOULD NOT BE -- THE AMOUNT OF THE INCOME

4  REPORTED ON A TAX RETURN WOULD NOT BE MORE THAN THEY ACTUALLY

5  EARNED.  IT WOULD BE LESS.  THERE'S NOT A LOT OF GRATUITOUS

6  FOLKS OUT THERE THAT WANT TO JUST HELP THE GOVERNMENT FUND, YOU

7  KNOW, WHAT IT NEEDS TO PAY FOR, AND THE BEST EVIDENCE FOR THEM

8  IS GOING TO BE THE RETURNS THEMSELVES, BUT WHAT I'M GOING TO

9  ORDER ABOUT THAT IS THAT SHE NEEDS TO HAVE THE TAX RETURNS WITH

10  HER FOR THE PERIOD OF 2018 TO THE DATE OF TRIAL, AND I'M USING

11  THAT DATE BECAUSE THAT'S REALLY KIND OF THE OPERATIVE DATE WITH

12  RESPECT TO THE FACTS OF THIS CASE, RIGHT, 2018, AND SHE NEEDS

13  TO HAVE THEM WITH HER, AND THEN WE WILL ADDRESS WHAT TO DO WITH

14  THEM IF WE GET TO THAT POINT.

15         AS IT RELATES TO THE INSTAGRAM ISSUE WHICH WAS ITEM

16  NUMBER 20, I'M GOING TO ALLOW THE DEFENDANT TO SEARCH TO HAVE

17  AN INSTAGRAM DOWNLOAD RELATED TO THE SPECIFIC INDIVIDUALS THAT

18  SHE SAYS HAS HARASSED HER, YOU KNOW, THAT FORM THE BASIS OF HER

19  CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AND

20  ASSAULT.  THE PARTIES WILL HAVE TO AGREE ON THE SEARCH TERMS.

21  IF YOU CAN'T AGREE AND THAT APPLIES TO THIS ITEM AS WELL AS THE

22  ITEM THAT THE PLAINTIFF CAN DO A SEARCH AS TO THE DEFENDANTS

23  ON.

24         WHAT I'M GOING TO HAVE YOU DO IS SUBMIT, IF YOU CAN'T

25  AGREE ON WHAT THE TERMS OUGHT TO BE, THEN YOU SUBMIT THE

1  QUERIES -- QUERY MAY BE AN OLD WORD.  I WAS TAUGHT IN LAW

2  SCHOOL ON THE TWO WEEKS OF TRAINING I GOT ON WESTLAW OF SEARCH

3  TERMS BECAUSE WE DIDN'T USE NATURAL LANGUAGE THE WAY THEY DO

4  TODAY AND JUST PUT IN YOUR WORDS AND HAVE IT SPIT OUT CASES,

5  BUT IF YOU CAN'T AGREE, THEN I WILL TAKE BOTH OF YOUR SEARCH

6  TERMS AS YOU SUGGEST, AND I WILL PICK ONE OF THEM PROBABLY.  I

7  PROBABLY WON'T TRY TO EDIT THEM, AND I WILL LET YOU ARGUE TO ME

8  IN WRITING WHAT THE TERMS OUGHT TO BE, AND I WILL PICK ONE SIDE

9  OR THE OTHER, AND I DO IT THAT WAY TO ENCOURAGE YOU TO BE AS

10 REASONABLE AS POSSIBLE BECAUSE YOU DON'T KNOW WHICH ONE I'M

11 GOING TO PICK, YOU KNOW, ONE OR THE OTHER.

12         IT'S KIND OF LIKE OTHERWISE REFERRED TO AS BASEBALL

13 ARBITRATION SO, YOU KNOW, THAT YOU'RE FAMILIAR WITH IF YOU'RE A

14 MAJOR LEAGUE BASEBALL FAN, AND I THINK THAT ENCOURAGES THE

15 PARTIES TO SETTLE ON THE ISSUE AND BE AS REASONABLE AS POSSIBLE

16 BECAUSE THERE'S NO GUARANTEE THAT THEIR TERMS WILL BE

17 SELECTED.

18         THE INSTAGRAM DOWNLOAD BY AN EXPERT TO BE HIRED --

19 AND BY THE WAY, BOTH OF THESE EXPERTS ARE GOING TO HAVE TO

20 AGREE TO CONFIDENTIALITY PROVISIONS THAT THE INFORMATION THEY

21 HAVE ACCESS TO WILL NOT BE PROVIDED TO THE OTHER PARTY; IN

22 OTHER WORDS, THE OTHER SIDE OF THE CASE FROM WHERE THE EVIDENCE

23 IS DERIVED.  THAT WILL ONLY OCCUR BY COURT ORDER AND OTHERWISE

24 INCLUDE THE NORMAL AND ORDINARY PROTECTIVE LANGUAGE THAT WAS

25 INCLUDED IN YOUR AGREEMENTS AND IN ALL COMMERCIAL AGREEMENTS IN

1   CASE -- JUST TO ENSURE THAT THE INFORMATION IS PROTECTED AND

2   NOT LEAKED.

3           THE SEARCH WOULD BE AS TO THE INDIVIDUALS THAT THE

4   DEFENDANT INDICATES SHE'S BEEN HARASSED BY AND ONLY THOSE

5   INDIVIDUALS ON THE SEARCH TERMS AGREED TO, AND THE PLAINTIFF

6   WOULD HAVE AN OPPORTUNITY TO REVIEW ALL OF THAT INFORMATION

7   THAT IT GETS PRIOR TO IT BEING PRODUCED.  IT MUST PRODUCE

8   ANYTHING THAT IT DOES NOT OBJECT TO, AND THE STUFF THAT IT DOES

9   OBJECT TO THEY MUST PROVIDE A PRIVILEGE LOG TO THE DEFENDANT AS

10  TO WHAT IT'S NOT PRODUCING WITH AN ADEQUATE DESCRIPTION OF WHAT

11  THAT IS AND WHY, AND IF THE DEFENDANT IS UNHAPPY THAT THOSE

12  DOCUMENTS WERE NOT PRODUCED, THEY'RE WITHHELD AS INDICATED ON

13  THE PRIVILEGE LOG, THEN THE PARTIES CAN FILE A MOTION, AND AT

14  THAT POINT IN TIME I WILL REVIEW THE MATERIALS THAT WERE

15  WITHHELD AND NOT PRODUCED BY THE APPROPRIATE PARTY BASED ON THE

16  PRIVILEGE DETERMINED IF I AGREE WITH IT.

17          I DON'T KNOW THAT THE PARTIES ARE SIMILARLY SITUATED,

18  BUT I CAN'T IN MY MIND JUSTIFY TREATING THE DEFENDANT'S REQUEST

19  DIFFERENTLY AT THIS TIME, AND I DON'T BELIEVE THIS

20  PROPORTIONALITY ISSUE BECAUSE YOU DON'T HAVE ANY EXPENSE.  YOU

21  DON'T EVEN HAVE ATTORNEY EXPENSE TO REVIEW STUFF UNLESS THERE'S

22  A HIT.  THE ONLY I GUESS REAL EXPENSE YOU HAVE IS DOING THE

23  WITH THE CONFIDENTIALITY ORDER AND/OR THE CONSTRUCTION OF THE

24  SEARCH TERMS TO BE UTILIZED BY THAT EXPERT.

25          MS. MATZ:  YOUR HONOR, MAY I ASK A QUESTION?

1          THE COURT:  YES, MA'AM.

2          MS. MATZ:  I JUST WANT TO MAKE SURE I'M CLEAR ON

3  THIS.  SO WE'RE GOING TO BE GETTING A LIST OF THE SPECIFIC

4  INDIVIDUALS THAT SHE'S CLAIMING HAVE HARASSED HER, AND THEN THE

5  DOWNLOADS WOULD BE SEARCHED FOR THE COMMUNICATIONS WITH THOSE

6  INDIVIDUALS, AND WE'D AGREE ON THE SEARCH TERMS.

7          THE COURT:  RIGHT, AND AS I SAID AT THE DEFENDANT'S

8  EXPENSE WITH THE -- AS FAR AS THE EXPERT IS CONCERNED IS THE

9  ABILITY TO REALLOCATE THAT IF IT TURNS OUT THERE'S A BUNCH OF

10 STUFF THAT HAVE BEEN PRODUCED, AND I CERTAINLY HAVE NO DOUBT

11 THAT MS. MOORE HAS DONE WHAT SHE SAID SHE DID, AND I DON'T --

12 I'M NOT QUESTIONING LIKEWISE THAT THE DEFENDANT'S LAWYERS DID

13 IT AS WELL, BUT SOMETIMES THE BEST WAY TO PROVE THAT YOU'VE

14 BEEN HONEST IS TO SORT OF SHOW IT.

15         I WILL JUST TELL YOU THAT OFTEN IN CRIMINAL CASES I'M

16 OFTEN ASKED NOT TO PUT PEOPLE ON PROBATION AFTER THEIR PRISON

17 SENTENCE BECAUSE THEY SAY THEY'VE LEARNED THEIR LESSON, AND I

18 DON'T REALLY GO FOR THAT BECAUSE IN MY VIEW PROBATION AFTER

19 PRISON IF YOU'RE NOT GOING TO DO ANYTHING WRONG, THEN YOU'LL

20 HAVE NOTHING TO FEAR ABOUT BECAUSE YOU'RE NOT GOING TO GET IN

21 TROUBLE.

22         SO SAME THING HERE, YOU KNOW, IT'S NOT AN ISSUE FOR

23 EITHER SIDE TO HAVE TO MAKE THEIR STUFF AVAILABLE IF THEY

24 PRODUCED EVERYTHING THAT THEY SAID THEY WERE GOING TO PRODUCE.

25 AND, OF COURSE, THERE'S AN EXPENSE ASSOCIATED WITH THE SEARCH,

1  TOO, SO YOU HAVE TO BE SURE THAT IT'S SOMETHING YOU REALLY WANT

2  TO DO BECAUSE IT MAY YIELD NOTHING.

3          ALL RIGHT.  IS THERE ANYTHING ELSE WE NEED TO TALK

4  ABOUT TODAY THEN.

5          MS. IZMAYLOVA:  YOUR HONOR, THE REMAINING DOCUMENTS

6  REGARDING DENNIS BYRON.

7          THE COURT:  TELL ME ABOUT THAT.

8          MS. IZMAYLOVA:  THE PERSON THAT WAS HIRED BY THE

9  PLAINTIFF TO QUOTE, UNQUOTE, INVESTIGATE MY CLIENT.  WHAT I

10  KNOW IS THAT THERE ARE FOUR INVOICES FROM APRIL, I GUESS APRIL,

11  MAY, JUNE AND JULY, ALL OF THEM STATE THAT, YOU KNOW, IT'S

12  REGARDING INVESTIGATION OF, YOU KNOW, TV SLASH STARMARIE JONES

13  CASE.

14          THE INVOICES ARE SENT TO PLAINTIFF OR AT LEAST THEY

15  LIST HER NAME.  I DON'T KNOW WHO THEY WERE SENT TO, BUT WE

16  REQUESTED COPIES OF ANY DOCUMENTS, RECORDS, COMMUNICATIONS,

17  STATEMENTS BETWEEN THE PLAINTIFF AND SPECIFICALLY A NAME DENNIS

18  BYRON, BUT THE ONLY THING THAT WE RECEIVED ARE THE FOUR

19  INVOICES, BUT, YOU KNOW, BEFORE -- I MEAN THERE HAD TO HAVE

20  BEEN SOME KIND OF COMMUNICATION AND SOME KIND OF AN AGREEMENT.

21  WE EVEN REQUESTED COPIES OF CONTRACTS OR AGREEMENTS AGAIN

22  NAMING SPECIFICALLY DENNIS BYRON AS ONE OF THE PEOPLE THAT

23  WE'RE REQUESTING IT ABOUT, YOU KNOW, WE DO NOT HAVE THAT, AND I

24  JUST -- THERE'S SOMETHING, I MEAN THEY HAVE TO HAVE SOME KIND

25  OF CONVERSATIONS BEFORE THEY AGREED, THE PLAINTIFF AGREED TO

1  HIRE MR. BYRON OR HOW MUCH SHE WOULD PAY HIM --

2          THE COURT:  ISN'T THAT INCLUDED IN THE THING THAT I

3  ORDERED EARLIER WHEN I SAID THAT THEY HAD TO PRODUCE ALL

4  RECORDS OF COMMUNICATIONS ABOUT MS. KEBE?

5          MS. IZMAYLOVA:  I BELIEVE THAT SPECIFICALLY RELATED

6  TO BLOGGERS.

7          THE COURT:  OKAY.

8          MS. IZMAYLOVA:  BUT THAT'S THE ONLY OTHER ONE BECAUSE

9  I KNOW WE DO HAVE THOSE.

10          THE COURT:  OKAY.

11          MS. IZMAYLOVA:  I MAY HAVE MISUNDERSTOOD IT.

12          THE COURT:  MS. MATZ, IS THERE ANYTHING ELSE THAT

13  YOUR CLIENT HAS RELATED TO THIS GENTLEMAN AND COMMUNICATION

14  WITH THE PLAINTIFF TO HIM?

15          MS. MATZ:  SO, YOUR HONOR, THIS IS ONE OF THE ISSUES

16  WE RAISED.  THIS AGAIN GETS BACK TO THE PARTIES WHEN THERE WERE

17  THESE BROAD REQUESTS FOR COMMUNICATIONS, THE PARTIES MET AND

18  CONFERRED.  THERE WERE CERTAIN TIMEFRAMES AGREED UPON.  WE DID

19  THE SEARCHES.  WE PRODUCED WHAT WAS RELEVANT WITHIN THOSE

20  TIMEFRAMES.

21          SO, YOU KNOW, I DON'T KNOW WHAT TO SAY OUTSIDE OF

22  THAT BECAUSE WE AGREED ON A PLAN OF ACTION, AND THEN WE MOVED

23  FORWARD, AND THEN MADE A MOTION ABOUT, YOU KNOW, TALKING TO US

24  ABOUT ANYTHING ELSE.  THEY ALSO DIDN'T DEPOSE MY CLIENT, YOU

25  KNOW, IF THEY WANT TO KNOW HOW THINGS HAPPENED, THEY HAD AN

1  OPTION TO TAKE A DEPOSITION, BUT WE'VE PRODUCED WHAT WAS

2  REQUESTED WITHIN THE TIMEFRAMES THAT EVERYBODY AGREED UPON IN

3  THIS CASE.

4          THE COURT:  JUST CERTIFY THAT YOU'VE DONE THAT, AND I

5  ASSUME YOU HAVE ANYWAY BUT --

6          MS. IZMAYLOVA:  WELL, THE TIMEFRAME WAS FROM AUGUST

7  1ST, 2018 UNTIL NOW, SO IF THE FOUR INVOICES POPPED UP LIKE HOW

8  DID THEY COME ABOUT.

9          MS. MATZ:  THAT WASN'T THE TIMEFRAME AGREED UPON

10  ACTUALLY --

11          MS. IZMAYLOVA:  IT IS, YES --

12          MS. MATZ:  EXCUSE ME, THAT WAS THE TIMEFRAME THAT YOU

13  SAID IN THE REQUEST ABOUT THAT YOU'RE SAYING IS MEDIA AND

14  BLOGGERS, BUT THERE WERE SPECIFIC COMMUNICATIONS, WE'VE PUT

15  THIS IN OUR AFFIDAVIT, IT'S IN THEIR MEET AND CONFER LETTERS

16  THAT THERE WERE OTHER LIMITATIONS PUT ON CERTAIN OF THE

17  COMMUNICATIONS, AND I'D BE HAPPY TO READ THEIR OWN LETTER TO

18  THE COURT IF YOU WOULD LIKE.

19          THE COURT:  NOT THE FULL THING, BUT IF YOU HAVE A

20  PROVISION RELATED TO THIS, YES.

21          MS. MATZ:  SURE, OF COURSE, SO THIS CAME UP IN THE

22  CONTEXT OF THERE WAS A LETTER, I'M LOOKING AT THE LETTER DATED

23  AUGUST 31ST, 2020, IT WAS ABOUT THE INTERROGATORIES, BUT THERE

24  WERE TWO SETS, THERE WERE INTERROGATORIES AND DOCUMENT DEMANDS

25  PROPOUNDED ON THE EXACT SAME THING, AND I HAVE IT UP RIGHT

1   NOW.  I'M SORRY, YOUR HONOR, JUST GIVE ME ONE MOMENT, I'M

2   TRYING TO FIND IT.

3           YEAH, SO THEY ASKED FOR US TO IDENTIFY COMMUNICATIONS

4   WITH THESE SAME INDIVIDUALS, AND THEN THEY ALSO ASKED FOR

5   COPIES OF THE COMMUNICATION, AND THEN IN THEIR LETTER, AND THIS

6   IS ATTACHED AS EXHIBIT 3 TO THEIR MOTION, IT SAYS TO CLARIFY

7   I'M ASKING FOR ANY COMMUNICATIONS PLAINTIFF HAD WITH ANY OF THE

8   NAMED PERSONS REGARDING MS. KEBE OR THIS LITIGATION STARTING ON

9   AUGUST 1, 2018 UNTIL PLAINTIFF FILED THE FORGOING LAWSUIT,

10  OKAY, AND IN MEET AND CONFERS ON THIS TOPIC, WE SPECIFICALLY

11  ASKED THEM, WE SAID WE ARE UNDERSTANDING THAT THAT IS THE TIME

12  PERIOD YOU WANT US TO SEARCH THE COMMUNICATIONS FOR AND RESPOND

13  TO THE INTERROGATORIES AND THE DOCUMENT DEMANDS FOR THOSE

14  INDIVIDUALS, AND THEY SAID YES.  WE EVEN PUT IT IN OUR

15  SUPPLEMENTAL RESPONSES THAT THAT WAS THE AGREEMENT REACHED, AND

16  THAT'S EXACTLY WHAT WE DID.

17          THE COURT:  WHEN WERE THESE INVOICES; WHAT PERIOD DO

18  THEY COVER?

19          MS. IZMAYLOVA:  RIGHT AFTER SHE FILED THE LAWSUIT

20  FROM APRIL 2019 THROUGH JULY 2019, AND THE LETTER THAT MS. MATZ

21  IS QUOTING IS ACTUALLY A DEFICIENCY LETTER I SENT WITH REGARDS

22  TO THEIR RESPONSES TO OUR INTERROGATORIES.  THEY RECEIVED A

23  COMPLETELY SEPARATE DEFICIENCY LETTER IN REGARDS TO THEIR

24  RESPONSES TO OUR REQUESTS FOR PRODUCTION.  SHE'S QUOTING FROM A

25  DIFFERENT LETTER THAT HAS NOTHING TO DO WITH WHAT I'M ASKING

1  ABOUT.

2          MS. MATZ:  WE SPECIFICALLY HAD THIS CONVERSATION,

3  YOUR HONOR, AND I'M SORRY BUT I REALIZE IT IS IN A DIFFERENT

4  LETTER, THAT'S THE FIRST THING I JUST SAID TO THE COURT, OKAY,

5  BUT WE HAD NUMEROUS MEET AND CONFERS, AND WE SPECIFICALLY ASKED

6  IF THIS LIMITATION -- BOTH ANDREW, LISA AND I WERE ALL ON THIS

7  CALL.  WE SPECIFICALLY ASKED IF THIS LIMITATION WAS APPLICABLE

8  TO THE EXACT SAME DOCUMENT DEMANDS.  WE WENT THROUGH THEM BY

9  NUMBER WITH RESPECT TO THESE OTHER INDIVIDUALS.

10          MS. IZMAYLOVA:  THAT'S NOT TRUE, AND THAT DID NOT

11  HAPPEN, AND IF THAT WAS TRUE THEN YOU WOULDN'T HAVE PRODUCED

12  THE INVOICES BECAUSE THEY WOULD HAVE BEEN OUTSIDE THE SCOPE OF

13  THE DATES.

14          MS. MATZ:  THERE WAS A SEPARATE REQUEST FOR THE

15  INVOICES, AND THERE WAS NOT A TIMEFRAME AGREED UPON, AND THAT

16  IS WHY WE PRODUCED THOSE, YOUR HONOR, AND I DON'T THINK AN

17  INVOICE MEANS THERE HAS TO BE AN AGREEMENT OR ANYTHING ELSE.

18          THE COURT:  MS. MATZ, HOLD ON A SECOND, I UNDERSTAND

19  YOUR FRUSTRATION BASED ON YOUR ACCOUNT OF WHAT OCCURRED, BUT IF

20  THERE WERE OTHER COMMUNICATIONS BETWEEN THE PLAINTIFF AND THIS

21  GUY, WHY SHOULDN'T SHE PRODUCE THEM?

22          MS. MATZ:  BECAUSE I DON'T THINK THEY HAVE ANY TYPE

23  OF RELEVANCE.  THIS IS PART OF THE PROBLEM, YOUR HONOR.  THEY

24  ARE TRYING TO CREATE A CASE OUT OF SOMETHING THAT DOESN'T

25  EXIST.  THEY'RE SAYING --

```
 1              THE COURT:  HOLD ON A SECOND.  WHAT DOES THE
 2  PLAINTIFF SAY THAT THE INVOICES TO THIS GUY WAS ABOUT?
 3              MS. MATZ:  I'D HAVE TO PULL THEM UP, BUT WHAT THEY'RE
 4  SAYING HE DID IS THEY'RE SAYING HE WENT -- AND ACTUALLY MS.
 5  MOORE MIGHT BE ABLE TO SPEAK TO THIS, BUT WHAT THEY'RE SAYING
 6  HE DID IS THEY'RE SAYING HE WENT TO HER OLD HOUSE AND ASKED A
 7  NEIGHBOR IF SHE LIVES THERE.
 8              IN WHAT UNIVERSE IS THAT HARASSMENT?
 9              MS. MOORE:  YOUR HONOR, IF I MAY, MR. BYRON WAS HIRED
10  TO HELP EFFECTUATE SERVICE FOR A DEFENDANT EVADING SERVICE.
11  THAT IS CUSTOMARY IN CIVIL LITIGATION.  THAT'S NOT STALKING.
12  THEY WERE EVADING SERVICE.
13              THE COURT:  WHAT WAS THE -- HOW MUCH MONEY WAS HE
14  PAID FOR THIS?
15              MS. MOORE:  I DON'T HAVE THE EXACT NUMBER IN FRONT OF
16  ME.  IT MAY HAVE BEEN A COUPLE THOUSAND.  IT WAS REFLECTED ON
17  WHAT WE SENT THEM.  WE PRODUCED ALL OF IT.
18              THE COURT:  YEAH, WHAT DID THE INVOICES SAY --
19              MS. IZMAYLOVA:  YOUR HONOR --
20              MS. MOORE:  GO AHEAD, MS. MOORE.
21              MS. MOORE:  THANK YOU, YOUR HONOR, THE INVOICES
22  REFERENCE RESEARCH WHICH WAS TRYING TO FIND AN ADDRESS SO WE
23  COULD SIMPLY EFFECTUATE SERVICE, AND WHEN WE FINALLY DID
24  EFFECTUATE SERVICE, SHE THREATENED TO BLOW MR. BRYON'S HEAD OFF
25  ON A RECORDING THAT WE HAVE.  SO WE WERE SIMPLY TRYING TO
```

1  EFFECTUATE SERVICE.  THAT'S ALL THIS GENTLEMAN WAS HELPING US

2  DO WAS EFFECTUATE SERVICE.

3          THE COURT:  WHERE DOES MR. BYRON, DOES HE LIVE IN

4  ATLANTA?

5          MS. IZMAYLOVA:  YES, HE DOES, YOUR HONOR, AND MS.

6  KEBE WAS SERVED I BELIEVE AT THE END OF MARCH OR I THINK MAYBE

7  APRIL, BUT NOT ONLY THAT, THE FIRST INVOICE IN APRIL HE'S

8  REIMBURSED FOR TRAVELING TO VIRGINIA WHICH IS WHERE HE WENT TO

9  TAKE A COMPLETELY ILLEGITIMATE PROTECTION ORDER OUT AGAINST MY

10  CLIENT THAT I PERSONALLY HAD TO DEFEND HER ON, AND HAD TO GET

11  DISMISSED.  THAT'S IN THE INVOICE TRAVEL TO VIRGINIA, LEGAL

12  FEES.  WHY WOULD HE BE PAID FOR THAT BY THE PLAINTIFF IF SHE

13  WAS NOT THE DIRECTING HIM TO GO DO THOSE KIND OF THINGS.

14          THE COURT:  WELL MAYBE BECAUSE SHE HIRED HIM TO SERVE

15  YOUR CLIENT --

16          MS. IZMAYLOVA:  MY CLIENT HAD ALREADY BEEN SERVED.

17          THE COURT:  AND DID YOUR CLIENT THREATEN HIM?

18          MS. IZMAYLOVA:  NO.

19          THE COURT:  HAVE YOU NOT HEARD THIS TAPE THAT MS.

20  MOORE IS TALKING ABOUT?

21          MS. IZMAYLOVA:  WHEN SHE WAS GETTING SERVED BY A

22  PROCESS SERVER WHO WAS NOT DENNIS BYRON, IT WAS A WHILE MALE

23  WHO SHE DIDN'T KNOW.  HE WAS THERE AT 11:45 P.M.  HE ASKED --

24  HE CAME UP TO HER CAR.  SHE WAS LIKE WHO ARE YOU, AND THEY HAD

25  SOME WORDS, BUT THAT WASN'T EVEN DENNIS BYRON.

```
 1          MS. MOORE:  DENNIS WAS WITH HIM AS YOU KNOW, AND
 2   THERE IS A RECORDING --
 3          MS. IZMAYLOVA:  NO, I DON'T KNOW THAT --
 4          MS. MOORE:  I HEARD IT IN REALTIME.  I WAS ON THE
 5   PHONE, AND HE WAS RECORDING, AND DENNIS WOULD NOT HAVE HAD TO
 6   TAKE OUT A RESTRAINING ORDER AGAINST YOUR CLIENT HAD SHE NOT
 7   THREATENED TO BLOW HIS HEAD OFF BY SIMPLY TRYING TO EFFECTUATE
 8   SERVICE --
 9          THE COURT:  HOLD ON A SECOND, HOLD ON A SECOND, HOLD
10   ON A SECOND, YOU KNOW, WAS THERE A RESTRAINING ORDER THAT WAS
11   SOUGHT IN VIRGINIA?
12          MS. IZMAYLOVA:  YES.
13          THE COURT:  I'M NOT TALKING TO YOU.  I'M TALKING TO
14   MS. MOORE.  MS. MOORE, WAS IT SOUGHT IN VIRGINIA?
15          MS. MOORE:  I DON'T THINK IT WAS, YOUR HONOR, AND I
16   DON'T KNOW IF DENNIS WAS LIVING HERE OR NOT.  I DON'T KNOW WHY
17   THE VIRGINIA JURISDICTION WAS INVOKED.  I'M NOT SURE.  I DON'T
18   KNOW WHY.
19          THE COURT:  IT COULDN'T BE.  I MEAN THERE'S NO
20   JURISDICTION AT ALL IN VIRGINIA FOR SOMETHING THAT HAPPENS IN
21   ATLANTA UNLESS THERE'S SOME CONTACT MADE WITHIN THE STATE.  I
22   MEAN THAT'S INTERNATIONAL --
23          MS. MOORE:  YES, YOUR HONOR, BUT I BELIEVE HIS
24   PLEADING WHEN HE MOVED FOR THAT DID SUBSTANTIATE THAT THERE
25   WERE CONTACTS WITHIN THE FORUM.  IT WASN'T DISMISSED OUT OF
```

1  HAND BECAUSE OF A JURISDICTIONAL ISSUE.

2          MS. IZMAYLOVA:  NO, IT WAS DISMISSED ON ITS MERITS

3  BECAUSE I FILED THE MOTION TO DISMISS --

4          THE COURT:  SO THIS HAPPENED IN 2018 --

5          MS. IZMAYLOVA:  2019, YOUR HONOR.

6          THE COURT:  OKAY.  SO AT OR ABOUT THE TIME THE

7  LAWSUIT WAS SERVED, RIGHT?

8          MS. MATZ:  YES.

9          THE COURT:  HAS THERE BEEN ANY OTHER CONTACT BETWEEN

10  THE PLAINTIFF -- I MEAN BETWEEN THIS GENTLEMAN AND THE

11  DEFENDANT SINCE THEN TO THE DEFENDANT'S KNOWLEDGE.

12          MS. IZMAYLOVA:  OH, YEAH, HE POSTED VIDEOS ON HIS

13  FACEBOOK WITH VALE -- NOT EVEN VALE THREATS, ACTUAL THREATS

14  SAYING, YOU KNOW, WHO ARE YOUR ATTORNEYS, THIS AND THAT, THIS

15  IS GOING TO KEEP GETTING WORSE AND BLAH, BLAH, BLAH, BLAH, AND

16  YOU DON'T EVEN KNOW WHAT I'M DOING AND ALL THIS OTHER STUFF

17  LIKE WE HAVE THE VIDEO.  WE SERVED IT TO THEM IN DISCOVERY, YOU

18  KNOW, AND THEN HE RECORDED, YOU KNOW, TRIED TO FLAG ONE OF MY

19  CLIENT'S INSTAGRAM ACCOUNTS TO THE POINT WHERE IT GOT

20  COMPLETELY DISABLED, SHUT DOWN AND SHE HAD TO RESTART IT ALL

21  OVER.  I MEAN HE'S BEEN HARASSING HER FOR -- LIKE AT LEAST FOR

22  A YEAR HE WAS HARASSING HER, AND HE LIVES HERE BECAUSE I LOOKED

23  HIM UP TO TRY TO SERVE HIM WITH A TPO, BUT HE WAS AVOIDING

24  SERVICE.

25          MS. MATZ:  YOUR HONOR, I DON'T THINK THAT THE

1  TIMEFRAMES MS. IZMAYLOVA JUST SAID ARE ACCURATE, AND I ALSO DO

2  NOT -- IF THERE'S ALL THESE THREATS ON THE INTERNET, WHY

3  HAVEN'T THEY BEEN PRODUCED IN DISCOVERY --

4        MS. IZMAYLOVA:  THEY ARE --

5        MS. MATZ:  EXCUSE ME, WE'RE GETTING VERY FAR AFIELD

6  OF WHAT THE COMPLAINT IS ABOUT.  HER COMPLAINT FOR ASSAULT IS

7  SAYING THAT PEOPLE -- ACTUALLY HER COMPLAINT FOR ASSAULT IS

8  LIMITED TO VERY NARROW FACTS.  SHE TESTIFIED ABOUT THIS.  SHE

9  SAID IT'S ABOUT THIS LIVE VIDEO THAT SHE'S CLAIMING HAPPENED ON

10  MY CLIENT'S INSTAGRAM ACCOUNT, AND THAT, YOU KNOW, A PERSON

11  NAMED "SKEMO" MADE SOME COMMENTS, AND THEN POSTED THINGS TO HIS

12  OWN INSTAGRAM ACCOUNT, AND WHEN SHE WAS DEPOSED THOSE WERE THE

13  ONLY FACTS THAT SHE TESTIFIED WERE IN SUPPORT OF HER CLAIM.  IT

14  IS CONFIRMED BY HER OWN INTERROGATORY RESPONSES.  THAT ALL

15  HAPPENED PRIOR TO THE COMPLAINT BEING FILED.

16        THIS IS BECOMING A FISHING EXPEDITION ABOUT THINGS

17  THAT HAVE NOTHING TO DO WITH THIS LAWSUIT.  IF THEY HAVE AN

18  ISSUE WITH MR. BYRON, YOU KNOW, THAT HAS NOTHING TO DO WITH

19  THIS.  THEY HAVE NOT ALLEGED THAT MR. BYRON IS PART OF ANY OF

20  THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS OR THE ASSAULT

21  CLAIM.

22        MS. IZMAYLOVA:  WHY WOULD WE NAME HIM PERSONALLY IN

23  OUR INITIAL INTERROGATORY REQUEST THEN IF WE WEREN'T ALLEGING

24  THAT.  WE PRODUCED ALL OF THESE VIDEOS AND ALL OF THESE

25  COMMUNICATIONS THAT MS. MATZ IS TALKING ABOUT, SO I'M NOT EVEN

1  SURE HOW SHE HAS THE AUDACITY TO SAY THAT WE HAVEN'T PRODUCED

2  THEM LIKE --

3          THE COURT:  OKAY.  ALL RIGHT.  WE'RE DONE WITH IT.

4  HERE'S WHAT I WANT TO HAPPEN, MS. MATZ, IS ANY COMMUNICATION

5  BETWEEN THE PLAINTIFF AND MR. BYRON SEND THAT TO MY OFFICE FOR

6  ME TO REVIEW, AND IF I FIND IT TO BE RELEVANT, THEN I'LL LET

7  THE PARTIES KNOW AND GIVE YOU A CHANCE TO BE HEARD IF I THINK

8  IT SHOULD BE PRODUCED.  RIGHT NOW I PROBABLY DON'T, BUT WE'LL

9  SEE WHAT'S THERE.  IF THERE'S NOTHING THERE OR IF THE

10 COMMUNICATION IS JUST ABOUT GETTING THE DEFENDANT SERVED, THEN

11 PROBABLY THAT'S ALL WE'LL BE DOING WITH IT, BUT IF IT'S ABOUT

12 SOMETHING MORE THAN THAT THEN OBVIOUSLY THERE'S A BIGGER ISSUE.

13         ALL RIGHT.  OKAY.  SO I THINK EVERYBODY HAS PRETTY

14 MUCH HAD IT FOR THE DAY SO I DO WANT TO SAY THIS IF YOU WOULD

15 COLLECTIVELY INDULGE ME FOR A MINUTE.  WE'RE REFERRED TO AS

16 COUNSELORS, THAT IS A COMMON WAY JUDGES REFER TO LAWYERS IN THE

17 COURTROOM, AND I GUESS THERE WAS A TIME WHERE MAYBE THAT WAS

18 PRETTY GENERALLY USED IN THE PUBLIC, AS WELL.

19         I THINK IT COMES WITH A DUTY FOR US TO NOT JUST TELL

20 OUR CLIENTS WHAT THEY WANT TO HEAR, AND WHEN CLIENTS COME TO

21 YOU AND SAY THEY WANT CERTAIN THINGS TO HAPPEN, I THINK WE HAVE

22 A DUTY AS PROFESSIONALS TO COUNSEL OUR CLIENTS THAT THAT IS NOT

23 WHAT'S GOING TO HAPPEN, AND, IN FACT, I HAD A FORMER GEORGIA

24 GOVERNOR WHO IS A LAWYER TELL ME ONE TIME THAT IN ALL OF HIS

25 FEE AGREEMENTS WITH HIS CLIENTS HE PUTS IN THE FEE AGREEMENT

1    THAT HE HAS SOLE AUTHORITY WHETHER TO GRANT THE OPPOSING

2    COUNSEL DISCRETION TO FILE SOMETHING LATE, TO EXTEND TIME

3    LIMITS, TO EVEN EXCUSE A FAILURE TO FILE SOMETHING UNDER THE

4    STATUTE OF LIMITATIONS.  OF COURSE THE CLIENT DOESN'T HAVE TO

5    AGREE TO THAT, AND IF HIS CLIENT WON'T AGREE TO THAT, HE JUST

6    WON'T REPRESENT THEM BECAUSE THAT'S THE WAY I DO BUSINESS.

7            AND MY POINT IN BRINGING IT UP HERE, I MEAN THIS

8    BECAME JUST A STREET BRAWL LATE THIS AFTERNOON, AND IF THAT'S

9    THE WAY IT'S GOING TO BE, THEN IT'S REALLY GOING TO BE HARD FOR

10   LAWYERS TO COUNSEL THEIR CLIENTS WHEN IT'S TIME FOR THIS TO

11   STOP.  IN OTHER WORDS, IF IT BECOMES ABOUT THE FIGHT AND NOT

12   ABOUT THE ISSUES, THEN THE CASE IS GOING TO GO FORWARD BECAUSE

13   THE LAWYERS ARE GOING TO BE MAD AT EACH OTHER AND IGNORE THE

14   OTHER SIDE'S PARTY, AND WE LOSE THE FOREST FOR THE TREES, AND

15   WE DON'T REMAIN OBJECTIVE.

16           I ALWAYS TELL CRIMINAL DEFENDANTS WHO SEEK TO

17   REPRESENT THEMSELVES THAT I WOULD NEVER REPRESENT MYSELF EVEN

18   THOUGH I HAVE PROBABLY TRIED 400 CRIMINAL CASES IN MY LIFETIME

19   AS A JUDGE, AND ABOUT MAYBE A HUNDRED CIVIL CASES AND

20   PERSONALLY TRIED AS A LAWYER PROBABLY OVER A HUNDRED CASES OVER

21   THAT PERIOD, BUT I WOULD NEVER REPRESENT MYSELF BECAUSE I CAN'T

22   BE OBJECTIVE, AND SO WHEN YOU'RE NOT OBJECTIVE YOU DON'T MAKE

23   GOOD DECISIONS, AND IF YOU ALL ARE GOING TO BE SO MAD WITH EACH

24   OTHER, AND I KNOW YOU'RE SITTING THERE THINKING HE'S SAYING IT

25   AT ME BUT IT'S REALLY THE OTHER SIDE, I KNOW THAT'S WHAT YOU'RE

1  THINKING, BUT STILL IF YOU'RE GOING TO BE SO MAD WITH EACH

2  OTHER, THEN YOU'RE NOT GOING TO DO YOUR CLIENT SERVICE BECAUSE

3  YOU'RE NOT GOING TO BE ABLE TO OBJECTIVELY ADVISE THEM GOING

4  FORWARD.

5         BUT, YOU KNOW, BUT I UNDERSTAND LITIGATION IS TOUGH,

6  AND LITIGATION CAN CAUSE HARD FEELINGS AND ALL, BUT IT'S OUR

7  DUTY AS LAWYERS TO HAVE IT WHERE AT THE END OF THE DAY WE COULD

8  SIT DOWN AND ENJOY EACH OTHER'S COMPANY SOCIALLY IF WE WERE

9  EVER PUT IN THAT SITUATION.  RIGHT NOW I DON'T SENSE THAT ANY

10  OF YOU ALL COULD.

11         OKAY.  THAT'S ENOUGH PREACHING FOR ME, MAYBE MORE

12  THAN ENOUGH.  ALL RIGHT.  SO THERE'S NOT GOING TO BE A WRITTEN

13  ORDER ENTERED IN THIS CASE.  IT'S ALL GOING TO BE DONE BY

14  MINUTE ORDER.  I'M GOING TO TERMINATE THE MOTIONS TO COMPEL

15  BECAUSE I HAVE RESOLVED THEM IN THIS HEARING.

16         IF WE HAVE A DISPUTE ABOUT WHAT I'VE ORDERED TODAY,

17  THAT'S WHY WE HAVE A COURT REPORTERS, AND I'LL GET A

18  TRANSCRIPT, AND I'LL RESOLVE IT THAT WAY.

19         MS. MATZ:  YOUR HONOR.

20         THE COURT:  YES, MA'AM.

21         MS. MATZ:  JUST YOU KNOW I APPRECIATE WHAT YOU JUST

22  SAID, AND I THINK IT SHOULD BE TRUE.  THERE'S ONE OTHER THING

23  I'D JUST LIKE TO BRING UP.  WOULD YOU ENTERTAIN ALLOWING IN

24  TERMS OF THE SUPPLEMENTAL WORK THAT PLAINTIFF IS GOING TO NEED

25  TO DO ON SOME OF THESE RESPONSES RELATED TO THEIR DEMANDS, WE

1  HAVE MADE A MOTION FOR SUMMARY JUDGMENT THAT WE FEEL IS

2  DISPOSITIVE OF ALL OF THEIR CLAIMS, AND, YOU KNOW, THEY FILED

3  AN OPPOSITION, ALTHOUGH IT WAS FILED LATE AND AFTER YOUR HONOR

4  ALLOWED THEM A LITTLE BIT OF EXTRA TIME, AND OUR REPLY IS

5  COMING UP.

6          IN THE INTEREST OF EFFICIENCY I GUESS I'M WONDERING

7  IF IT WOULD BE POSSIBLE TO ALLOW, YOU KNOW, HAVE YOUR HONOR'S

8  RULING STAND, BUT IN TERMS OF CONSERVING RESOURCES IF OUR

9  MOTION GETS RID OF ALL OF THEIR CLAIMS, THEN A LOT OF THIS

10 BECOMES UNNECESSARY, AND IT WOULD NARROW SIGNIFICANTLY THE

11 ISSUES, YOU KNOW, THE THINGS WE'VE ASKED FOR WE CLEARLY KNOW

12 WEREN'T A PART OF OUR MOTION, AND WE NEED THEM FOR TRIAL, BUT,

13 YOU KNOW, IN TERMS OF THE THINGS THAT THE OTHER SIDE HAS ASKED

14 FOR FROM US IF WE PREVAIL ON THE MOTION IT BECOMES IRRELEVANT.

15         SO I GUESS WHAT I'M WONDERING IS WOULD IT BE POSSIBLE

16 TO HAVE THE COURT'S ORDER AS TO THE PORTIONS KICK IN AFTER, YOU

17 KNOW, IMMEDIATELY WHEN THE DECISION IS ISSUED IF IT'S STILL,

18 YOU KNOW, IF THOSE CLAIMS STILL SURVIVE.  IT JUST FEELS THAT IT

19 MIGHT BE IN EVERYONE'S EFFICIENT INTEREST ON BOTH SIDES BECAUSE

20 THERE'S WORK TO BE DONE IN TERMS OF THEM GETTING US LISTS AND

21 US AGREEING ON KEYWORDS AND SOME OF THESE THINGS THAT MAY NOT

22 EVEN NEED TO BE DONE.

23         THE COURT:  SO IN A PERFECT WORLD I WOULDN'T HAVE A

24 PROBLEM WITH THAT, BUT WE DON'T LIVE IN THAT, AND I'VE GOT LOTS

25 OF CASES.  YOU'VE GOT LOTS OF CASES.  WE'VE JUST GOT TO WORK IN

1  THE PLACE THAT WE FIND OURSELVES.

2          I CAN'T TELL YOU WHEN I'M GOING TO RULE ON YOUR

3  MOTION FOR SUMMARY JUDGMENT.  I'M GOING TO HAVE ARGUMENT ON

4  THEM I'M SURE IN THE NEXT 30 DAYS OR SO.  I'M SURE WE'LL BE

5  SCHEDULING IT SOON IF IT HASN'T ALREADY.  I'M A LITTLE

6  SURPRISED THAT IT HADN'T ALREADY BEEN SCHEDULED.

7          HAVE YOU FILED YOUR REPLY BRIEF TO THEIR RESPONSE

8  YET?

9          MS. MATZ:  OUR REPLY BRIEF -- WELL, THEIR OPPOSITION

10  WAS UNTIMELY, BUT WE ARE PLANNING ON FILING A REPLY BRIEF

11  ANYWAYS, ALTHOUGH, YOU KNOW, OUR POSITION IS IT SHOULDN'T BE

12  CONSIDERED AT ALL, BUT I THINK THAT'S THAT DUE MONDAY OR

13  TUESDAY.

14          THE COURT:  HASN'T THAT ALREADY BEEN DECIDED THAT

15  THEY COULD FILE LATE?

16          MS. MATZ:  THEY WERE GIVEN UNTIL JANUARY 22ND, YOUR

17  HONOR DID GIVE THEM SOME ADDITIONAL TIME.

18          THE COURT:  AND THEY STILL HADN'T FILED, OR THEY

19  FILED LATER THAN THE 22ND?

20          MS. MATZ:  YES, THEY FILED ON THE 25TH OR THE 26TH,

21  YOUR HONOR.  THEY COMPLETELY IGNORED THE ORDER.

22          THE COURT:  AND THE GROUNDS THAT YOU -- AND YOU'RE

23  SEEKING WITH REGARD TO THEIR CLAIMS THEY'VE GOT THE INTENTIONAL

24  INFLICTION, THEY'VE GOT THE ASSAULT CHARGE, AND THAT'S IT?

25          MS. MATZ:  YES, THEY WITHDREW THE SLANDER

1  COUNTERCLAIMS, SO THERE'S ONLY TWO COUNTERCLAIMS STILL

2  STANDING, AND OUR MOTION FOR SUMMARY JUDGMENT SEEKS DISMISSAL

3  OF BOTH.

4        THE COURT:  WELL, I'VE MADE NO SECRET EARLIER TODAY

5  THAT I'M NOT A BIG FAN OF INTENTIONAL INFLICTION CLAIMS ANYWAY

6  SO I WAS JUST KIND OF THINKING ABOUT THE ASSAULT CLAIM.

7        NO, I THINK WE'RE JUST GOING TO GO AHEAD.  WE'VE GOT

8  TO GO AHEAD, AND I WILL HAVE IT ARGUED SOONER.  I WILL GET IT

9  SET DOWN TO BE ARGUED.  I'VE GOT TO THINK ABOUT HOW THE LATE

10  FILING AFFECTS IT, AND I'M SURE WHEN YOU FILE YOUR RESPONSE,

11  YOU'LL GIVE ME THE LAW ON MY DISCRETION IN THAT REGARD.

12        MS. MATZ:  YES, YOUR HONOR, OF COURSE.

13        THE COURT:  AND I WILL HAVE THE ARGUMENTS SOONER

14  RATHER THAN LATER, AND IF I CAN DECIDE THE CASE SOONER I WILL,

15  BUT I JUST CAN'T PROMISE YOU.

16        FEDERAL JUDGES OPERATE WITH THESE DEADLINES OF MARCH

17  31ST AND SEPTEMBER 30TH.  WE HAVE A 6-MONTH LIST, AND SO

18  OBVIOUSLY I'M GOING TO BE MORE FOCUSED ON THAT IN THE NEXT 45

19  DAYS THAN ANYTHING ELSE, BUT THIS IS A CASE THAT PROBABLY WON'T

20  SURPRISE YOU, I WOULDN'T HAVE A HARD TIME GETTING TO WORK ON

21  JUST BECAUSE OF WHO THE PEOPLE ARE.  SO IT MAY BE A CASE THAT

22  WE'D TURN TO PRETTY QUICKLY, BUT I JUST CAN'T MAKE ANY

23  PROMISES.

24        MS. MATZ:  I APPRECIATE THAT, YOUR HONOR, THANK YOU.

25        THE COURT:  YOU ALL HAVE A GOOD EVENING.

```
 1              (PROCEEDINGS CONCLUDED)

 2

 3

 4                    C-E-R-T-I-F-I-C-A-T-E

 5

 6   UNITED STATES OF AMERICA

 7   NORTHERN DISTRICT OF GEORGIA

 8

 9              I, ANDRE G. ASHLEY, DO HEREBY CERTIFY THAT I AM A

10   U.S. DISTRICT REPORTER FOR THE NORTHERN DISTRICT OF GEORGIA,

11   THAT I REPORTED THE FOREGOING AND THE SAME IS A TRUE AND

12   ACCURATE TRANSCRIPTION OF MY MACHINE SHORTHAND NOTES AS TAKEN

13   AFORESAID.

14              IN TESTIMONY WHEREOF I HAVE HEREUNTO SET MY HAND ON

15   THIS 2ND DAY OF MARCH, 2021.

16

17

18

19

20                         S/ ANDRE G. ASHLEY
21                         ANDRE G. ASHLEY
                           OFFICIAL COURT REPORTER
22                         NORTHERN DISTRICT OF GEORGIA

23

24

25
```