## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

BELCALIS MARLENIS
ALMÁNZAR,

              Plaintiff,

v.

LATASHA TRANSRINA KEBE a/k/a

LATASHA  TRANSRINA  HOWARD
and

KEBE STUDIOS LLC,

              Defendants.

CIVIL ACTION FILE NO:

1:19-CV-01301-WMR

## <u>ORDER</u>

This matter is before the Court on Plaintiff's Motion for Summary Judgment. [Doc. 92]. Having reviewed the parties' filings, considered the parties' arguments at the hearing, and reviewed the entire record on this matter, the Court hereby **GRANTS IN PART** and **DENIES IN PART** Plaintiff's Motion for Summary Judgment. [Doc. 92].

## I.    FACTUAL BACKGROUND

This is a defamation action brought on behalf of Belcalis Marlenis Almanzar ("Plaintiff") for statements allegedly made by Latasha Transrina Kebe, a/k/a Latasha Transrina Howard ("Defendant Kebe"). Plaintiff is a citizen and resident of the State of California, and is a Grammy award-winning musical artist, songwriter, and television personality, professionally known as "Cardi B." [Doc. 69, ¶ 9]. Plaintiff

has a YouTube channel (Cardi B) with approximately 17 million subscribers, a Twitter account with approximately 18 million followers, and an Instagram account with approximately 94.8 million followers.

Defendant Kebe is a citizen and resident of the State of Georgia. Defendant Kebe is an entertainment and celebrity news blogger who produces, hosts, and publishes videos on her YouTube channel entitled "unWinewithTashaK," [Doc. 79, ¶¶ 193-95], with approximately 939,000 subscribers. She calls her site "a drama-based blog." (The 04/23/19 Video at 17:30). Defendant Kebe Studios LLC ("Kebe Studios") is a Georgia limited liability company owned by Defendant Kebe. Plaintiff claims that it was formed "as an alter ego or mere business conduit for Kebe's activities." [Doc. 69, ¶¶ 4,5].

On September 19, 2018, Defendant Kebe published on her YouTube Channel a video of an interview she conducted with Starmarie Jones.[1] [Doc. 79, ¶ 208]. The interview claimed to reveal information about Plaintiff and was the beginning of the events culminating in this case. In the sixteen months preceding the filing of this lawsuit, Defendants uploaded at least thirty-eight videos referencing Plaintiff. [Doc. 69, ¶ 23].

---

[1] Starmarie Jones was a former defendant in this matter. The claim against Jones was terminated on November 11, 2020.

A. <u>**Timeline of Videos and Alleged Defamatory Statements**</u>

- The 09/02/18 Video

  o The 09/02/18 Video contains the statement that Plaintiff "prostituted for a living." (09/02/18 Video at 5:50).

- The Jones Video (09/13/18) posted on Instagram Live by Starmarie Jones

  o Jones claims to have known Plaintiff before her musical career and to have worked and lived with Plaintiff in New York. Jones currently promotes herself and her entertainment endeavors through social media. Her Instagram account (@hanukkah_triton) has approximately 26,600 followers. [Doc. 69, ¶¶ 15-16].

  o Jones made the statement that "[Plaintiff] got herpes." (Jones Video at 9:38).

  o Jones stated, referring to Plaintiff, "I guess they were supposed to have sex, exchange sex for money." (Jones Video at 15:50).

- The Instagram Comment

  o Shortly after Jones released the Jones Video, on or around September 13, 2018, Jones also posted comments on her Instagram account to third parties that said Plaintiff is "just a Grammy Nominated Prostitute, running around spreading her herpes."

- The 09/19/18 Video

  o Defendant Kebe recorded and later published a video of herself interviewing Jones regarding the Jones Video on YouTube entitled "Exclusive: Cardi B's Ex-FRIEND ALLEGES Cardi B. Kept A Huge Box filled with MONlSTAT & REVEALS More!"

  o The 09/19/18 Video has garnered over four million views.

- 09/19/18

  o Plaintiff sent a Cease and Desist Letter to Defendants demanding immediate removal of the video shortly after the 09/19/18 video was published.

- The 09/21/18 Video

  o Defendant Kebe published a second video entitled "Actual PROOF Cardi B. Knew her Ex-Roommate, Drake, Funky Dineva vs Tamar, Beyonce Black Majic," where she stated that everything said in the 09/19/18 Video was true.

  o Defendant Kebe claims that "[e]verything that we said, that everything that [Jones] said was accurate," (09/21/18 Video at 2:11), and that Jones was "the source" (09/21/18 Video at 4:38).

- The 12/18/18 Video

  o On December 18, 2018, Defendant Kebe published a video on YouTube entitled "Tasha K. RESPONDS To Cardi B's Diffimation SUIT & Offset's Dad calling Cardi B. OUT & more." (The "12/18/18 Video").

  o The 12/18/18 Video contains the statement that Plaintiff "f***** herself with beer bottles on f****** stripper stages." (12/18/18 Video at 10:10).

- The 12/18/18 Facebook Post

  o On December 18, 2018, Defendant Kebe published a post on Facebook referring to Plaintiff as "Herpes B."

- The 01/04/19 Video

  o On January 4, 2019, Defendant Kebe published a video on YouTube entitled "Exclusive | Cardi's Cousin ANGRY! Diddy & Cassie, Toni & Birdman, Tiffany Haddish, R. Kelly & More."

  o The 01/04/19 Video contains the statement that Plaintiff was a prostitute. (01/04/19 Video at 41:35).

- The 01/25/19 Tweet

  o On or around January 25, 2019, Defendant Kebe tweeted that Plaintiff had herpes.

- 02/28/19

  o On February 28, 2019, Plaintiff sent a demand for retraction and repudiation of defamatory statements to Defendant Kebe. [Doc. 69 at 18].

- 03/25/19

  o Defendants temporarily unlisted, or took down, the 09/19/21 and 09/21/19 Videos. [Doc. 69, ¶ 67].

- 03/26/19

  o Defendants re-listed/re-posted the 09/19/21 and 09/21/19 Videos.

- The 04/23/19 Video

  o On April 23, 2019, Defendant Kebe published a video on YouTube entitled "Tasha K. RESPONDS to Cardi B.'s #MUTEBLACKBLOGS Agenda! Cardi CALLS Shade Room Owner a Water Buffalo."

  o The 04/23/19 Video contains a statement that Plaintiff "stuck beer bottles up her [genitals], she actually took beer bottles from pedestrians. This is on video, she took the beer bottle from the pedestrian . . . stuck it in her [genitals], drank the beer bottle and gave it back to him." (04/23/19 Video at 22:40).

- The "Lovelyti Call"

  - On April 25, 2019, Defendant Kebe published a recording of a phone call that Defendant Kebe had with another YouTube blogger named Lovelyti entitled "Exclusive Tasha K. LEAKS Private Call Proving Lovelyti Tasha K. PLANNED Starmarie Interview."

  - In the Lovelyti Call, Defendant Kebe states that Jones "told some truths, she didn't tell all truths." (Lovelyti Call at 16:04).

  - In the Lovelyti Call, Defendant Kebe states, ". . . here's my thing, all of these strippers are lying . . . ," referring to Jones, Plaintiff, and a third-party. (Lovelyti Call at 11:02).

- The 07/19/19 Video

  - On July 19, 2019, Defendant Kebe published a video on YouTube entitled "Exclusives | Lala & Carmelo, Cardi & Offset, Megan The Stallion, Dwight Howard, Kevin Spacey & More!"

  - The 07/19/19 Video contains a statement that Plaintiff engaged in prostitution. (07/19/19 Video at 45:40).

- The 11/08/19 Video

  - On November 8, 2019, Defendant Kebe published a video on YouTube entitled "Exclusive | New R.Kelly ENABLERS REVEALED, Whitney Houston, Ti, Evelyn & O.G., Cardi B., & more!"

7

- o   The 11/08/19 Video contains a statement that Plaintiff engaged in prostitution. (11/08/19 Video at 58:45).

- The 12/30/19 Video

  - o   On December 30, 2019, Defendant Kebe published a video on YouTube entitled "Cardi's Husband allegedly CONTACTED his EX GIRLFRIEND Jade."

  - o   The 12/30/19 Video contains a statement that Plaintiff "was sitting on beer bottles, she was taking pedestrians' beer bottles, they was drinking and they could have had some cold sores and she sat on the f****** beer bottles." (12/30/19 Video at 7:00).

- The 04/24/20 Video

  - o   On April 24, 2020, Defendant Kebe published a video on YouTube entitled "This is Why I CANT WERK!".

  - o   The 04/24/20 Video contains a statement that Plaintiff has herpes. (04/24/20 Video at 1:00:23).

- The 09/18/20 Video

  - o   On September 18, 2020, Defendant Kebe published a video on YouTube entitled "Exclusive | Cardi's NEW LOVER amid Divorce?, Kylie Jenner, Andrew Gillum, August Alsina, Nicki Minaj."

8

- The 09/18/20 Video contains the statements that Plaintiff was a prostitute (1:07:50), that Plaintiff has HPV (1:16:11), and that Plaintiff committed infidelity. (09/18/20 Video at 1:15:37, 1:16, 1:16:29, 1:19:17, 1:19:45, 1:21:31).

- The 09/21/20 Video

  - On September 21, 2020, Defendant Kebe published a video on YouTube entitled "Cardi BABY girl. I MEAN baby Bird!"

  - The 09/21/20 Video contains statements that Plaintiff was a prostitute and that Plaintiff is engaging in adultery. (09/21/20 Video at 7:10, 7:54).

- 10/02/20

  - On October 2, 2020, Plaintiff sent an additional demand for retraction and repudiation to Defendant Kebe demanding a retraction and repudiation of the other subsequently discovered defamatory statements. [Doc. 69, ¶¶ 95, 96].

## B. **Plaintiff's Complaint**

Plaintiff filed her Complaint on March 21, 2019. [Doc. 1]. In the Complaint, Plaintiff asserts four claims against Defendants: (1) slander per se, (2) slander, (3) libel per se, and (4) false light. Plaintiff's First Amended Complaint on July 12, 2019, added a fifth count for intentional infliction of emotional distress, and sought

punitive damages and attorneys' fees pursuant to O.C.G.A. § 13-6-11. [Doc. 11].
Plaintiff filed the Second Amended Complaint on November 29, 2020. [Doc. 69].

Plaintiff denies the truth of any statements regarding cocaine use, herpes outbreaks, and prostitution, among the other statements outlined above. Plaintiff also asserts that Defendant was aware of the probable falsity of the statements at the time she published them. [*Id*. at 9]. Thus, Plaintiff asks the Court to award damages for Defendants' conduct, enjoin Defendants from further publishing any other allegedly defamatory remarks, and order a retraction of the previously published remarks.

## C. **Defendant's Counterclaims**

Defendant Kebe alleges that she began receiving threats on her social media accounts in December 2018, including use of derogatory names and references to gang member connections. [Doc. 79, ¶ 226]. She claims to have received these threatening messages on social media and calls on her cell phone from people directed to do so by Plaintiff. [*Id*]. This includes Cardi B's fans and Skeemo, who Defendant Kebe claims is closely connected to Plaintiff and a member of a violent gang. [*Id*. at ¶ 216]. Defendant Kebe also claims that Plaintiff ranted about her on social media, including Instagram Live videos, and responded to fans who also made remarks against Defendant Kebe.

As a result, Defendant Kebe claims that she contacted the FBI Atlanta Field Office about the alleged threats and that she feared for her safety. She also contends

that she experienced an increase in her stress, anxiety, and depression during this time. [*Id*. at ¶ 219]. Defendant Kebe was also experiencing a high-risk pregnancy and states that she was forced to relocate her family. [*Id*. at ¶ 231].

Based on this information, Defendant Kebe filed a Counterclaim against Plaintiff on May 8, 2019. [Doc. 5]. Kebe's Amended Counterclaim was then filed on July 7, 2019. [Doc. 12]. Defendants answered Plaintiff's Second Amended Complaint and filed their Second Amended Counterclaims on December 13, 2020. [Doc. 79]. Defendants' Second Amended Counterclaims assert claims of (1) assault, (2) intentional infliction of emotional distress (IIED), (3) punitive damages, and (4) expenses of litigation and attorneys' fees.

Plaintiff filed her Motion for Summary Judgment on December 30, 2020, [Doc. 92], in which she seeks judgment as a matter of law on her defamation per se claim (Count I), her demand for injunctive relief, as well as her IIED Claim (Count V). Plaintiff also seeks summary judgment as to all of Defendant's Counterclaims. This Motion is now before the Court. [Doc. 92].

## II.    LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party seeking summary judgment has the burden of informing the court of the basis for her motion and identifying the portions of the record that she believes

11

demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions" that cannot be made by the court when considering whether to grant summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).

If a movant meets its burden, the party opposing summary judgment must present evidence that shows there is a genuine issue of material fact or that the movant is not entitled to judgment as a matter of law. *See Celotex*, 477 U.S. at 324. In determining whether a genuine issue of material fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment "and all justifiable inferences are to be drawn" in favor of that opposing party. *Anderson*, 477 U.S. at 255; *see also Herzog v. Castle Rock Entertainment*, 193 F.3d 1241, 1246 (11th Cir. 1999). "If the evidence [offered by the non-movant] is merely colorable, or is not significantly probative, summary judgment may be granted." *Manning v. Engelhard Corp.*, 929 F. Supp. 1508, 1512 (M.D. Ga. 1996) (quoting *Anderson*, 477 U.S. at 249-50); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, summary judgment for the moving party is proper."

### III.   DISCUSSION

#### A. **Plaintiff's Claims**

##### i.   Defamation Per Se

Plaintiff bases her slander and slander per se claims on Defendant Kebe's

statements, including that:

> Plaintiff was a prostitute, that Plaintiff was a user of cocaine, that
> Plaintiff had and still has herpes, that Plaintiff has had herpes outbreaks
> on her mouth, that Plaintiff had and still has HPV, that Plaintiff engaged
> in a debasing act with a beer bottle, and that Plaintiff committed
> infidelity.

[Doc. 69, ¶ 100]. Plaintiff also claims that Defendant Kebe "did not make reasonable

attempts to verify the false and defamatory statements" before publishing the videos

and, thus, acted with reckless disregard of whether the statements were true or not.

[*Id.* at ¶¶ 106, 110]. As such, Plaintiff moves for summary judgment on her

defamation per se claims, seeking damages and injunctive relief from the Court.

Under Georgia law, a plaintiff can establish defamation by proving: "(1) a

false and defamatory statement concerning the plaintiff; (2) an unprivileged

communication to a third party; (3) fault by the defendant amounting at least to

negligence; and (4) special harm or the actionability of the statement irrespective of

special harm." *Stoploss Specialists, LLC v. Vericlaim, Inc.*, 340 F. Supp. 3d 1334,

1346 (N.D. Ga. 2018) (quoting *Smith v. DiFrancesco*, 341 Ga. App. 786, 787-88

(2017)). Defamatory statements must be false to be actionable. *StopLoss Specialists,*

*LLC v. VeriClaim, Inc.*, 340 F. Supp. 3d 1334, 1346 (N.D. Ga. 2018). Although the Court can on occasion determine defamation as a matter of law, "as a general rule[,] the question whether a particular communication is defamatory is for the jury." *Speedway Grading Corp. v. Gardner*, 206 Ga. App. 439, 441 (1992).

In this case, there is no dispute that Defendant Kebe's statements were published and disseminated on her website through video and other forms of media. As such, the second element requiring publication to a third party is satisfied. However, as to the first and third elements, the Court finds these to be questions of fact that should be left for the jury's determination.

There is a genuine dispute of material fact about whether all the statements that Defendant Kebe made were in fact false and defamatory. Although Plaintiff vehemently denies the information contained in the statements, Defendant Kebe has represented to the Court through video evidence that Plaintiff has at least admitted to being a prostitute and as to her use of drugs. For example, in a video produced in opposition to Plaintiff's Motion for Summary Judgment, it appears that Plaintiff is discussing engaging in sexual acts for money. [Doc. 115-1 (Kebe 019) at 0-0:10, 2:07-2:16, 5:17-5:26]. In that same video, Plaintiff discusses her use of drugs and about having to "pop pills" sometimes when necessary. [*Id.* at 3:15]. As to Defendant Kebe's other assertions, such as claiming that Plaintiff has herpes, Kebe allegedly saw a photo that Plaintiff posted online in which Plaintiff had visible cold sores.

14

Assuming, of course, that Kebe's testimony is admissible, it is at least possible that a reasonable jury might believe that these alleged defamatory statements made by Defendant Kebe are true.

As for the third element, the level of fault that must be established depends on whether Plaintiff is an all-purpose or limited-purpose public figure. In *New York Times Co. v. Sullivan*, the Supreme Court held that a public official could not recover damages for defamatory statements regarding his or her official conduct unless it was proven that the statement was made with "actual malice." 376 U.S. 254, 279-80 (1964). The Supreme Court required this heightened standard of proof, as opposed to negligence, to guarantee the constitutional protections of free speech and free press. *Id.*

Then, in *Curtis Publishing Co. v. Butts*, the Supreme Court extended the "actual malice" rule to apply to criticism of public figures. 388 U.S. 130, 164 (1967). Public figures were defined as individuals who are "intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large." *Id.* Thus, as a result of *Curtis Publishing*, both public officials and public figures are required to prove that the statements about them were made "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 280.

The Supreme Court examined and highlighted the differences between private and public-figure plaintiffs in defamation cases in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974). It pointed out that "[p]ublic officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." *Id*. at 344. And, because of the nature of their jobs, public officials and public figures "accept certain necessary consequences of [ ] involvement in public affairs," such as learning to deal with criticism that may inevitably arise. *Id.* at 344-45.

After taking into account these public policy considerations, the Court here readily concludes that Plaintiff is a public figure. *See Mathis v. Cannon*, 276 Ga. 16, 22 (2002) ("Whether a person is a public figure is a question of law..."). Plaintiff herself admits in the Second Amended Complaint that she is a "Grammy award-winning musical artist, songwriter, and television personality" whose "musical works have reached peak positions on charts in the United States and around the world." [Doc. 69, ¶¶ 9-10]. As such, she has "had ready access to the media for many years…and [has] voluntarily placed [herself] in a position and acted in a manner which invited public scrutiny and comment." *Silvester v. American Broadcasting Cos.*, 839 F.2d 1491, 1494 (11th Cir. 1988). Thus, this Court considers Plaintiff to be a public figure for purposes of her defamation claims.

Yet, in *Gertz*, the Supreme Court went even further and made a distinction between all-purpose public figures and limited public figures. For example, "an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts." *Gertz*, 418 U.S. at 351. However, other individuals become public figures for a limited range of issues when they "voluntarily inject[ ] [themselves] or [are] drawn into a particular public controversy." *Id.* Under this analysis, a court "must isolate the public controversy, examine the plaintiff's involvement in the controversy, and determine whether the alleged defamation was germane to the plaintiff's participation in the controversy." *Atlanta Journal-Constitution v. Jewell*, 251 Ga. App. 808, 817 (2001) (adopting test set forth in *Silvester,* 839 F.2d at 1494).

In this case, Plaintiff argues that it does not matter whether Plaintiff is a limited or all-purpose public figure because she is able to establish that Defendant Kebe acted with actual malice. The Court agrees that the appropriate standard is actual malice because Plaintiff has reached a level of fame and notoriety that has thrust her into the public eye. As such, to succeed on her claims, Plaintiff must demonstrate that Defendant Kebe published the statements knowing that they were false or with reckless disregard as to their truth or falsity. *New York Times*, 376 U.S. at 280.

The question of whether Defendant Kebe acted with actual malice—namely whether she published the statements with "obvious reasons to doubt the veracity of the informant or the accuracy of h[er] reports"—presents several genuine disputes of material fact. *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968). For example, there is a question of fact about whether Jones was a reliable source for Defendant Kebe's statements about Plaintiff being a prostitute and a drug user. Although Jones claims that she knew Plaintiff well and was able to attest to the information she provided to Defendant Kebe, whether it was reasonable for Kebe to rely on those representations is a matter for the jury to resolve.

There are also some facts suggesting that Defendant Kebe may have posted and published statements without knowing whether the information was true. In the Lovelyti Recorded Call, Defendant Kebe states, "…here's my thing, all of these strippers are lying . . ." referring to Jones, Plaintiff and a third party. [Ex. 12 to Kebe Dep. at 11:02].; 11/19 Dep. 265:4-66:3.) Also, in that same call, Defendant Kebe states that Jones "told some truths, she didn't tell all truths." [*Id.* at 16:04]. Thus, a reasonable jury could determine that Defendant Kebe acted with actual malice when she published her statements. But, because a jury could also conclude that Defendant Kebe's sources were reliable, the Court finds that granting summary judgment on these defamation claims would be improper and that the more appropriate course of action would be to allow a jury to resolve these issues at trial.

18

### ii.  Intentional Infliction of Emotional Distress

Plaintiff also sues Defendants for intentional infliction of emotional distress ("IIED"). A claim for IIED has four elements: "(1) intentional or reckless conduct (2) which is extreme and outrageous and (3) caused the emotional distress (4) which is severe." *Pyle v. City of Cedartown*, 524 S.E.2d 7, 9 (Ga. Ct. App. 1999) (citation omitted). Plaintiff has only sought summary judgment on the first two elements of this claim.

A reasonable jury could find that Plaintiff has provided sufficient evidence to prove that Defendant Kebe acted intentionally or recklessly when publishing the statements in her videos. For example, Plaintiff pointed to a video of Defendant Kebe in which she stated that she had a "personal vendetta" against Plaintiff. [Disk 2-Cardi Video 45 (10/7/19 Video) 39:15]. This testimony could, thus, be used to suggest that Kebe had a motive to impugn Plaintiff's character and that she intentionally made these crude statements to harm Plaintiff.

Additionally, from an objective perspective, the statements that Defendant Kebe made could be considered extreme and outrageous conduct. Georgia courts have held that the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Plantation at Bay Creek Homeowners Ass'n, Inc. v. Glasier*, 349 Ga. App. 203, 211, 825 S.E.2d 542, 550

(2019). Despite this stringent standard, the Court finds that the conduct at issue might support a claim for intentional infliction of emotional distress and that it is possible for a jury to conclude that the conduct rises to the requisite level.[2]

However, a jury could also find otherwise and may conclude that the conduct at issue is not extreme, when fully considering the circumstances. *See Howerton v. Harbin Clinic, LLC*, 333 Ga. App. 191, 205, 776 S.E.2d 288, 300 (2015) ("Conduct that can be characterized as merely vulgar, tasteless, rude, or insulting" generally will not support a claim for IIED). Because of this reasonable possibility, the Court finds it more appropriate to deny the Motion as to this claim. A genuine dispute of material fact exists, and because Plaintiff is not moving for summary judgment on the second two elements, the jury will nonetheless be tasked with determining causation and whether severe emotional distress resulted. As such, all issues should be left for the jury's determination.

### iii.  Invasion of Privacy

Plaintiff has not moved for summary judgment on her invasion of privacy claim, nor have Defendants. As such, it will be determined by a jury at trial.

---

[2] The Court reserves the right to reexamine this issue again after hearing all the evidence at trial.

### iv.  Punitive Damages/Attorneys' Fees

Because the Court has denied summary judgment on Plaintiff's substantive claims, the punitive damages and attorneys' fees claims will also remain in the case for the jury's determination. In considering Plaintiff's other claims, a reasonable jury could certainly determine that Plaintiff is entitled to receive punitive damages and attorneys' fees.

### B. <u>Defendant's Counterclaims</u>

### i.  Assault

The Court grants Plaintiff's Motion for Summary Judgment as to Defendant Kebe's assault counterclaim. Even viewed in the light most favorable to Defendant Kebe, the evidence is insufficient to support her claim.

Under Georgia common law, an assault occurs "where all the apparent circumstances, reasonably viewed, are such as to lead a person reasonably to apprehend a violent injury from the unlawful act of another." *Greenfield v. Colonial Stores, Inc*., 139 S.E.2d 403, 405 (Ga. Ct. App. 1964) (quoting *Quaker City Life Ins. Co. v. Sutson*, 115 S.E.2d 699, 702 (Ga. Ct. App. 1960)). And, as is always required in a tort action, the claimant must prove that the alleged wrongdoer in fact caused the harm to occur. *Norman v. Xytex Corp.,* 310 Ga. 127, 131, 848 S.E.2d 835, 839 (2020), *reconsideration denied* (Oct. 19, 2020). In this case, however, Defendant Kebe has failed to do so.

First, Defendant Kebe has failed to produce any evidence that Plaintiff herself threatened Kebe or made her believe that she was going to harm her. [Doc. 93-1 at 166]. Instead, Kebe has only made allegations that others who may be associated with Plaintiff made these threats. And, while an individual certainly can be held liable for the tortious actions of another, Defendant Kebe has failed to demonstrate here that the threats she alleges occurred were directed by Plaintiff or committed by an agent acting on Plaintiff's behalf.[3] *See Selma v. Goddard*, 197 S.E. 250 (Ga. 1938) (explaining that a person may be civilly liable for injury done to another if they "procure" the injurious act to be done). There is no material evidence linking Plaintiff to the threats made from Instagram accounts other than a reference to Plaintiff's (or variations of her) well-known name, Cardi B. Further, these accounts are inaccessible as Defendant Kebe's Instagram page that received them has been deleted, and the messages were not saved. [Doc. 93-1 at 183:23-25; 184]. Moreover, in messages between Plaintiff and Skeemo, Plaintiff did not direct Skeemo to take specific violent action against Defendant Kebe. [*Id*. at 166]. Any argument that she did is mere speculation, unsupported by any evidence thereof. Thus, because

---

[3] An agent is as one who acts for another. "An agency relationship exists where one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf." *Bouve & Mohr, LLC v. Banks*, 618 S.E.2d 650, 654 (Ga. Ct. App. 2005) (citing O.C.G.A. § 10-6-10). There is no such relationship established between Plaintiff and the individuals committing the alleged assault.

Defendant Kebe has failed to establish through material evidence that Plaintiff would be the actual cause of any alleged assault, the claim cannot survive.[4]

### ii.  Intentional Infliction of Emotional Distress

To survive summary judgment on an IIED claim, a plaintiff must show all four elements: "(1) intentional or reckless conduct (2) which is extreme and outrageous and (3) caused the emotional distress (4) which is severe." *Pyle v. City of Cedartown*, 524 S.E.2d 7, 9 (Ga. Ct. App. 1999) (citation omitted). While physical impact is not a required element, in its absence, the party seeking to assert the IIED claim must also show, "that the conduct in question was directed at her." *Jones v. Fayette Fam. Dental Care, Inc,* 718 S.E.2d 88, 90 (Ga. Ct. App. 2011).

Defendant Kebe has failed to provide material evidence demonstrating that Plaintiff's actions caused Defendant Kebe extreme emotional distress. Defendant Kebe points to threats and intimidation from Cardi B fans as the main source of her emotional distress. Yet, there is no evidence that these actions were committed by Plaintiff or otherwise directed by her, as discussed above. Thus, causation has not been established.

---

[4] Regardless of causation, the Court is also skeptical that Defendant Kebe's assault claim could succeed as there is a lack of evidence indicating an objectively reasonable apprehension of further injury. *See Bullock v. Jeon*, 487 S.E.2d 692, 696 (Ga. Ct. App. 1997) (holding that an assault claim failed because a reasonable person could not have apprehended injury where violence was not threatened and no one attempted to touch the defendant).

The Court acknowledges that Defendant Kebe may have been in a particularly precarious situation because of her high-risk pregnancy that Plaintiff and others knew about. *See Patterson v. Xerox Corp.*, 901 F. Supp. 274, 279 (N.D. Ill. 1995) (explaining that knowledge of a pregnancy and that someone is particularly susceptible to emotional distress may make the behavior outrageous). Yet, without proof that these alleged threats and comments were attributable to Plaintiff, Defendant Kebe has failed to establish causation, and the Court must dismiss the counterclaim as a matter of law. Accordingly, the Court grants Plaintiff's Motion as to Defendant Kebe's claim for IIED.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment is **GRANTED** as to Defendant Kebe's assault and IIED claims. [Doc. 92]. Consequently, Defendant Kebe's punitive damages and attorneys' fees claims are also dismissed. Additionally, Plaintiff's Motion for Summary Judgment is **DENIED** as to Plaintiff's claims. [Doc. 92].

**IT IS SO ORDERED,** this 8th day of July, 2021.

William M. Ray II

WILLIAM M. RAY, II
UNITED STATES DISTRICT JUDGE

24