```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
 2                       ATLANTA DIVISION


 3


 4   BELCALIS MARLENIS ALMÁNZAR,      )
                                      )
 5                 Plaintiff,         )
                v.                    )   CIVIL ACTION
 6                                    )   FILE NO. 1:19-CV-01301-WMR
     LATASHA TRANSRINA KEBE and       )
 7   KEBE STUDIOS LLC,                )
                                      )   PRETRIAL CONFERENCE
 8                 Defendants.        )
     _____)
 9


10


11   -------------------------------------------------------------

12           BEFORE THE HONORABLE WILLIAM M. RAY, II

13                  TRANSCRIPT OF PROCEEDINGS

14                     NOVEMBER 9, 2021

15   -------------------------------------------------------------

16


17           Proceedings recorded by mechanical stenography
18            and computer-aided transcript produced by

19


20              WYNETTE C. BLATHERS, RMR, CRR
                   Official Court Reporter
                    1714 U.S. Courthouse
21                75 Ted Turner Drive, SW
                   Atlanta, Georgia  30303
22                     (404) 215-1547

23


24


25
```

```
1   APPEARANCES:

2   For the Plaintiff:        SARAH M. MATZ
                              Attorney at Law
3                             Adelman Matz, P.C.
                              1173A Second Avenue
4                             Suite 153
                              New York, New York  10065
5
                              LISA F. MOORE
6                             WILLIAM A. PEQUIGNOT
                              Attorney at Law
7                             Moore Pequignot, LLC
                              887 West Marietta Street
8                             Suite M-102
                              Atlanta, Georgia  30318
9
    For the Defendants:       OLGA IZMAYLOVA
10                            SADEER SABBAK
                              Attorneys at Law
11                            Sabbak & Izmaylova, LLP
                              1875 Old Alabama Road
12                            Suite 760
                              Roswell, Georgia  30076
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    Tuesday Morning Session

2                     November 9, 2021

3                       9:40 a.m.

4                        -  -  -

5                P R O C E E D I N G S

6          COURTROOM SECURITY OFFICER:  All rise.  United States

7  District Court for the Northern District of Georgia, Atlanta

8  Division, is now in session, the Honorable Judge William M.

9  Ray, II presiding.

10         THE COURT:  Thank you, sir.

11         COURTROOM SECURITY OFFICER:  Please be seated and

12 come to order.

13         THE COURT:  Where does Ms. Izmaylova live?

14         MR. SABBAK:  Good morning, your Honor.  Sadeer

15 Sabbak.  Ms. Izmaylova lives in Cumming, Georgia.

16         THE COURT:  In Cumming?

17         MR. SABBAK:  Cumming, yes, sir.

18         THE COURT:  So who's going to be lead counsel during

19 the trial?  Is it going to be you or her?

20         MR. SABBAK:  It will be her, your Honor.

21         THE COURT:  I'll talk about some preliminary matters

22 that you can just convey.  So the exhibit lists that have been

23 submitted with your pretrial orders are not going to be

24 sufficient for a trial.  For one thing, it's just really

25 unfathomable that this many exhibits are being proposed in a
```

1  case that is relatively simple from an issue perspective.

2  There may be a lot of information that the plaintiff wants to

3  submit that they contend forms the basis of their claim, and

4  there may be a lot of information that the defendant will want

5  to dismiss and it will want to submit to form the basis of the

6  reasons why Ms. Kebe said what she said.  But this is way too

7  many exhibits.

8          I mean, it's really ridiculous to -- the lists don't

9  provide anything other than everything that's in there in the

10  known world, and it certainly doesn't help me in knowing what

11  you're going to submit.  And the exhibit lists also don't --

12  are not formatted the way that they need to be formatted.  I

13  have to have, before the trial begins from each side, a list

14  of all possible exhibits like certainly likely exhibits with

15  the numbers that you've given them.  They have to be

16  premarked.  The court reporter is not going to mark any of

17  your documents for you.

18          The plaintiff will mark all their documents with

19  plaintiff's stickers, and the defendants will do the same.

20  The list I have has to have the numbers corresponding with the

21  documents, and it also needs to have a description.  Neither

22  of you have provided me any exhibit list that provides a

23  description with the attachment -- Attachment G-1 and

24  Attachment G-2 were simply numbers.  Cardi, underscore --

25  Document No. 2 for the plaintiff, Cardi, underscore, 231.  I

1    don't know what that is.  I have no idea.

2          And certainly in the course of a trial if you ask me

3    if a document has been admitted or not or previously

4    identified and admitted -- for example, it would be likely

5    that you'll make a mistake with so many documents and maybe

6    have the same document formatted, labeled twice.  I won't be

7    able to assist you in any way.

8          Lee tells me she's provided to you a list of an

9    example of an inventory sheet that I need of all your

10   documents to have before trial, and I want that on the first

11   day of trial.  I'm not going to use the attachments to your

12   pretrial orders because there's just not enough information

13   there.

14         Let me talk a little bit about the trial itself, and

15   I want everybody to hear me.  I'm going to make this clear.

16   This is not going to be a trial where the lawyers become the

17   issue in court.  If you are discourteous to either of the

18   opposing counsel, expect to be held in contempt.  I'm not

19   saying that because I say it in every case.  I don't.  But in

20   this case the lawyers have been discourteous repeatedly to

21   each other.

22         There may be a reason why you feel the way you feel

23   about each other.  That doesn't matter.  You may be totally

24   justified.  That doesn't matter.  In this courtroom you're not

25   going to be discourteous to each other in front of the jury.

1  Now, if the jury is out of the room and we have to have an

2  argument about something and you want to get a little bit

3  heated, that's one thing.  But the case is going to be decided

4  based on the evidence, not based on the lawyers' passion or

5  sense of outrage in any regards.

6          And related to that is when you have an objection to

7  make in front of the jury, I will not allow speaking

8  objections.  You want to object because something is lack of

9  foundation, then object.  If you want to object because of

10  hearsay, object, but you're not going to make a two or three

11  sentence statement in front of the jury unless I invite you to

12  do that.

13          Probably the best example of lawyers taking over a

14  courtroom and it not being about the facts of the case was the

15  original O.J. Simpson case where the judge allowed the lawyers

16  to become the show.  You're not going to be.  And if you try

17  to become the show, I'm going to shut you down in front of the

18  jury.

19          And, you know, I will certainly tell the jury at the

20  end of this case that I have no opinion about the case.

21  Obviously, I think that there are debatable issues here or I

22  would have completely ended the case at the summary judgment

23  stage.  And I will tell them that based on the things that I

24  have said and done during the course of the case, that they

25  should not interpret that as being any indication on my part

1   as to who I think should prevail.  But I can't promise you

2   that jurors are going to obey what I say in that regard.

3          And the fact of the matter is that I think jurors, as

4   they try to fit themselves into the mechanism which is the

5   courthouse and the courtroom, more closely identify with the

6   judge than they do anyone else because neither the jurors nor

7   the judge have a stake in the case.  And so if they think that

8   I'm upset with you because you're not obeying the rules, then

9   subconsciously that's got to have some effect in how they

10  interpret the evidence and the arguments that you make.

11         So please don't test me there because I'm going to

12  let you try your case, but I'm not going to let you become the

13  show in the case.  That will be the evidence.  You'll

14  certainly have the opportunity to have zealous advocacy in the

15  way you ask your questions and in the way you argue to the

16  jury at the beginning and at the end of the case -- or not

17  argue at the beginning but outline in your opening statement,

18  you know, what the case is about and what the evidence is

19  going to be.  But it's not going to be through theatrics that

20  are not within the confines of protocol.

21         The trial will begin on Wednesday the 5th.  Right now

22  I can't tell you the exact time.  I know that we'll start at

23  least by immediately after lunch.  I have asked the judge --

24  right now our protocol -- and it could change between now and

25  January.  But our protocol is that we're only selecting juries

1  twice a day in this courthouse because of a more slow process

2  because of Covid.  The amount of jurors that we want to bring

3  into a room for jury orientation at any one time is limited.

4       It's really not that big of a deal because we'd

5  probably only pick three or so a day before Covid.  But I have

6  the jury selection slot for Tuesday morning, which doesn't

7  work out, so I've also asked now, as of yesterday, for the

8  Thursday afternoon time slot, which was available -- excuse

9  me -- Wednesday afternoon, which was available.  Wednesday

10  morning was not available.

11       Another judge is scheduled to start that day.  I have

12  asked that judge to take Tuesday morning that I had so that I

13  could have Wednesday morning so that I maximize our

14  opportunity of trying to get a jury selected in one day.  No

15  guarantee that it would happen in one day even if we started

16  first thing in the morning, but it's more likely.  And he is

17  willing to do it subject to his lawyers commitments for

18  Tuesday.  So I should know in a day or so, after his office

19  checks with counsel in the case that he's scheduled to bring

20  in, whether or not that's going to work.  But either way we'll

21  start on Wednesday.

22       I am currently scheduled to be out of town on Monday

23  and Tuesday the following week.  If that changes, I will let

24  you know.  If it doesn't change, then we would be taking those

25  two days off.  Whether I go to this event or not is just up in

1  the air right now.

2        I guess it is possible that we could have an

3  intervening holiday in the middle of trial depending on how

4  long it takes.  Martin Luther King weekend will occur around

5  the 16th, 17th.  I'm not exactly sure which day it is.  We

6  would obviously not be meeting that day.

7        We will not -- well, I don't think as a federal judge

8  I have ever had court on Saturday.  I did when I was a state

9  judge, but that was rare.  It's a little harder in federal

10  court than it is in state court to do it just because of the

11  facility and the location of the courthouse, that kind of

12  thing.  So I would not expect that we would be working on a

13  Saturday even after the jury deliberates, even after they have

14  the case.

15        Our hours for jury -- for the jury every day will be

16  9:30 to 5:00.  I give them a little bit more time in the

17  morning because of the distance.  Some jurors have to travel

18  to get here, especially jurors in the northern part of the

19  Atlanta Division, like Woodstock area.  It's pretty difficult

20  to get here at times, so I give them a little bit of extra

21  time to get here.

22        We will generally take a break in the morning,

23  mid-morning, and then we'll generally take two short breaks in

24  the afternoon.  But we will almost always end at 5:00, and the

25  only exception to that, as a matter of protocol, is if I have

1  a witness who's, you know, fairly easily going to be finished

2  in five or so minutes.  I will let that person go.  But even

3  though it may be inconvenient to your witnesses, you know, if

4  they can go another 30 minutes to an hour and be done, one,

5  there's just no guarantee -- no one ever really knows how long

6  it will take unless it's just another couple of questions.

7  And even then you're talking about cross-examination and

8  redirect if they're on direct.

9         So inconvenienced witnesses I understand, but it's

10 either an inconvenience to witnesses or an inconvenience to

11 all the jurors.  And the jurors generally, you know, they're

12 not here voluntarily.  The witnesses sometimes are,

13 particularly if they're paid witnesses because they're

14 experts.  The experts are the only ones that get up in arms

15 really about it, but that's just the way it is.

16        So I've gone through your jury voir dire questions.

17 Both of you lodged a couple of objections to the other

18 person's questions, which I'm overruling both sides'

19 objections, and you can ask the questions the way you

20 submitted them.

21        The way the jury selection process will work is the

22 jurors will be seated in the gallery unless we have to have --

23 unless we have to use the jury booth.  We won't, but it really

24 depends on how many jurors we bring in.  I had read something

25 in the pretrial order this morning about that y'all anticipate

```
 1   or at least the plaintiff alleged that they felt like it might
 2   be difficult to get a jury because of publicity, and you would
 3   want more jurors.  Ms. Matz, were you asking that we bring 40
 4   in to have questioning or we have qualified 40 to pick from?
 5   Because the 40 to pick from doesn't really make a lot of sense
 6   because at that point we've got way more than we need.  What
 7   were you exactly asking?
 8           MS. MATZ:  So, your Honor, it was actually
 9   defendant's request.  We did agree with it.  We didn't have
10   any dispute, but I'd defer that question to them.
11           THE COURT:  Okay.  I'm sorry.
12           MS. IZMAYLOVA:  Your Honor, it was for questioning,
13   not to --
14           THE COURT:  It was not to pick from.
15           MS. IZMAYLOVA:  Not to pick from, yes, your Honor.
16           THE COURT:  So let me just jump around a little bit.
17   So the jurors -- that means that we'll probably be able to do
18   them here in this courtroom, assuming the rules are the same.
19           Here's the way masks are going to work, is that
20   everyone is going to be required to wear a mask except when
21   they're speaking.  If that person has been -- and I'm assuming
22   all of you have been immunized -- wait a minute.  Let me be
23   specific.  I don't want to be Aaron Rogers of Green Bay.  I'm
24   assuming all of you have been fully vaccinated.  That's going
25   to also mean that you've had your booster shot, if you're
```

1  eligible for it, which probably everybody is.  If that is the

2  case, then you can take your mask off when you're speaking at

3  the podium.  We will use the shields to interrupt any, you

4  know, intermittent flow from you to anyone that you're

5  speaking to, like the witness or to me or to the jury, when

6  we're talking about closing statements and opening arguments.

7  And you can take your mask off during those periods of time.

8        You are confined to the podium when the trial is

9  ongoing when you have your mask off.  If you're not

10  vaccinated, then you have the option of either wearing your

11  mask or wearing a face shield, and we have some of those if

12  you want.  Face shields are cumbersome to deal with.  They

13  bother you, I think, if you're using them, particularly if you

14  wear glasses.  It's like double trouble, right, because you

15  have on glasses, and you have on the shield as well.  So I

16  hope everybody has been vaccinated.

17        When witnesses come to testify, I will ask every

18  witness if they have been vaccinated.  If they say they have,

19  then I will ask them to remove their mask while they're on the

20  stand testifying.  If they have not been -- and I've only had

21  one so far since we restarted trials back in late spring --

22  then we will provide a face shield for that person to wear

23  while they testify.  There will be a shield in front of them

24  towards the jury.  So hopefully jurors will feel comfortable,

25  and they'll feel comfortable as well.

1        One thing we haven't done -- and, Jennifer, if you'll
2    just take notice of this -- is I'm going to put a shield in
3    front of each counsel table during jury voir dire because the
4    jurors -- hopefully we'll be able to have them all in the
5    gallery, and then you can take your mask off, as long as
6    you're standing behind the shield while you're talking to the
7    jury.
8        I will ask the questions that you have submitted for
9    me to ask.  It's really more than I would normally ask because
10   a lot of it is do you know the witnesses, do you know the
11   parties, that kind of thing.  And normally I leave it to y'all
12   to ask those kinds of questions, but I'll ask them since y'all
13   have submitted them and everyone has agreed.  After I ask
14   those questions, then I will call on the plaintiff to ask your
15   general questions to all jurors at the same time.  All the
16   jurors will have numbers that correspond to the number that
17   they have been assigned by the jury assembly office.
18       When you ask the general voir dire questions, they
19   are questions that can be answered by raising their hand, like
20   has anyone ever been a party to a lawsuit, they raise their
21   hand.  Does anyone have any strong feelings against the
22   plaintiff in this case that will affect your ability to be
23   fair?  They raise their hand, that type of thing.  You don't
24   follow up with the jurors once they've raised their hand, at
25   that time.

1          After both sides have asked your general questions

2   that can be answered by raising the hand with the number so

3   you'll have their number, then we'll have individual voir dire

4   where I'll call out each juror's name sequentially, and first

5   the plaintiff and then the defendant will have an opportunity

6   to ask questions, you know, questions that you couldn't ask

7   because they weren't really general questions, follow up

8   questions, that kind of thing.

9          If there is a new question that comes to your mind

10  based on a response of the juror to the general questions you

11  have asked or to any of the individual questions that you have

12  asked of that juror, then you can ask it.  But I'll be relying

13  on opposing counsel to object if you think that it's

14  objectionable.

15         A good example of the leniency that I allow -- first

16  of all, let me just say this:  I do not allow advocacy during

17  voir dire.  I'm not going to ask you questions that are

18  designed to elicit a certain response.  A good example of that

19  is the question that the district attorney in "My Cousin

20  Vinny" asked to the juror who had a hesitancy of giving the

21  death penalty, you know, if you recall that movie and that

22  question.  If you haven't, it's a good movie to watch, to me

23  at least.

24         And I'm not going to allow you to ask issue-oriented

25  advocacy questions designed to elicit partiality on behalf of

1    any particular juror.  But if come up with a new question

2    during the discourse that you're having with a juror, as long

3    as it's consistent with the spirit of the kinds of questions

4    that I'm allowing, go ahead and ask it.  You run the risk of

5    the opposing counsel objecting, and my overruling that if you

6    stray too far from the tenor of the questions that you've

7    already submitted and that everybody has agreed to, except for

8    the couple that I've overruled the opposing party's objection.

9         If after you both have asked some questions to a

10   juror and you have a follow-up question that you didn't think

11   about originally, just ask me, and I'll give you the

12   opportunity to ask that as well.

13        The jurors will be requested, when it's their time

14   for individual voir dire, to come to the center of the room

15   where there will be a microphone.  The most probably

16   irritating thing during the course of the trial, other than

17   that we're going to be wearing masks -- and I'm going to be

18   wearing them too, except when I'm talking -- is that whenever

19   you approach a microphone -- and the jurors are going to have

20   to do this too -- you're going to need to place a bag over the

21   microphone so that we don't have to disinfect the microphones.

22        These bags are ugly.  They're Glad bags.  You know,

23   they're not anything that's made specifically.  They're just

24   what we have.  I would suggest, like your masks, that when you

25   leave the podium, you leave the microphone, you take your bags

1   with you and just keep them and recycle them and use them over

2   and over again.  I don't want other people to have to touch

3   your bags when they put a new bag on.  We'll take care of that

4   with the witness up here, but you need to take your own

5   microphone's, principally the one on the podium that you'll be

6   sharing with opposing counsel.

7           And the jurors will do that too.  They'll put a bag

8   on their microphone.  They'll answer your questions.  We'll

9   ask them to take their masks off during the individual voir

10  dire part of the case.  You can see we've got a pretty big

11  well there in the middle of the jury verdict.  So when they do

12  that, everybody else will have a mask on.  They will be a good

13  bit of distance away from their fellow jurors.

14          So somebody -- and I don't remember which side, and

15  maybe it was the defendant -- thought that we would have a

16  hard time finding a jury based on Covid.  That's not really

17  proven to have been a problem.  I've probably tried four jury

18  cases, maybe five, since we've resumed, and I don't think I've

19  had a juror who by the time they made it into the courtroom

20  here, voiced any concern about serving because of Covid,

21  except for one.

22          The last trial that I just finished last Friday, I

23  had a juror who was wearing a bandanna during jury selection,

24  and he was a good bit of distance away from me.  I thought

25  that's what it was.  I wasn't sure because he was in the back

1  of the room, but, honestly, I just assumed he would not get

2  selected because he couldn't seem to follow the instructions,

3  although he says the instructions were a little bit ambiguous

4  because the jury summons said you have to wear a mask or a

5  face covering.  And he interpreted a bandanna to be a face

6  covering, which we don't consider that to be because it's so

7  thin.

8          So he actually made it onto the jury as an alternate,

9  and so then I told him that he was going to -- I didn't

10 specifically call him out, but it was clear that that's

11 probably who I was talking to -- you have to wear a mask.  I

12 showed them the mask that I had.  It can't be anything, you

13 know, thin like a bandanna or scarf.  And so suddenly that

14 night he had come down with Covid, and he had all the symptoms

15 that would disqualify you from serving.  And I thought it was

16 a ruse, but, you know, I had him come in anyway on Tuesday.  I

17 required him to go get a test, and he was negative.  And we

18 excluded him, which is what he wanted.  But, you know,

19 obviously he wasn't going to follow instructions, and so we

20 had to exclude him.

21         But other than that one juror, I really haven't had

22 another juror that has had any concern, expressed at least,

23 about wearing masks or about serving.  So I just don't

24 anticipate that to be a big problem.

25         I also am a little doubtful that we're going to have

1  a hard time with jurors wanting -- who express biases because

2  of the parties involved.  Actually, I think it's the opposite.

3  I think the fact that we have a celebrity that is involved in

4  this lawsuit is going to cause people to want to be a part of

5  the case.

6          My last case, which was the same one with the juror

7  with the mask, was a similar situation.  It involved a group

8  called Swinging Atlanta, which is exactly what it sounds like,

9  and there were no jurors who were prejudiced, that expressed

10 any kind of prejudice, they could all be fair and impartial

11 because the subject matter seemed pretty interesting.  It

12 might have ended up being a little less interesting because it

13 wasn't salacious testimony, but the subject matter was very

14 interesting.  And so jurors were, you know, open-minded, and

15 they understood the burden of proof and the need not to make

16 decisions until the case was completely given to them.

17         And there were -- I don't think there was a motion,

18 even a motion to excuse anyone for cause in that case.  Might

19 have been one, but it wasn't typical.  And I really expect

20 that to be the case here, but you never know.  But I think

21 we'll probably have a little easier time getting a jury

22 selected than maybe anticipated.

23         Before the start of trial, on the first day of trial,

24 I'll need your requested jury instructions.  No need to stray

25 too far or stray at all from the pattern jury instructions.

1   When there's a pattern instruction, I'm going to give it if

2   it's applicable to the case, obviously looking first to the

3   Eleventh Circuit's pattern charges, certainly the Eleventh

4   Circuit's charges when it comes to procedural issues.

5           And as to Georgia's substantive law issues to which

6   there is no Eleventh Circuit pattern, then I will be looking

7   to Georgia Superior Court jury charges, which are actually

8   approved by the Supreme Court.  That doesn't prevent the

9   Supreme Court from reversing cases from time to time because

10  they say instructions are not right, even though they've

11  approved them, but, you know, that's just a little minor

12  detail, I guess.  But that's what I'm going to do.  That's

13  what most judges in this area do.

14          And I'm not going to give your requested principal

15  additionally just because you might submit charges that are

16  based on case law if it's already covered by a pattern charge.

17  And in my experience, lawyers like to submit advocacy-oriented

18  instructions where the appellate courts have really looked at

19  stuff and they have said, yeah, this was okay, but that

20  doesn't mean that we needed an additional instruction on it

21  when the pattern has already covered it.

22          I noticed that at least one of you asked for an hour

23  to close, and that's fine with me assuming that's what both

24  sides agree on.  In your closing I will allow you to use any

25  evidence.  This is a, or could be I suppose, a digital-heavy

1  case, a lot of videos, if that's still the right term used to

2  describe them.  And if you want to play during your closing

3  videos that have been admitted during the case, I'm fine with

4  that.  You certainly, if it was a document, you could show it

5  again to the jury and enlarge it and all of that, so I don't

6  think there's really any difference.  But you're still going

7  to be limited in time, so understand that.

8         I do not typically allow jurors to play videos in the

9  jury room, but if they request to see a video that has been

10 admitted previously, then I will bring them out.  If they

11 express that, I will bring them out, and I will let them watch

12 it in the courtroom.  And the reason I do it that way is that

13 way I know what they're looking at and that they're not

14 looking at something else that's not been admitted.  In other

15 words, I'm not going to give them access to the internet to go

16 and find these videos themselves.

17        When I've had video-heavy cases before that jurors

18 have requested to see them again, I just bring them in the

19 courtroom, we show them what they want to see, and then we

20 send them out.  I remind them that the evidence that they have

21 now seen again should be received and considered with all the

22 other evidence that has been presented.  Of course, the

23 written documents they're able to look at at any time because

24 they'll have all that with them.

25        I'm trying to make sure I've covered everything I

1  wanted to talk about as far as the trial is concerned.  Bench

2  conferences I will -- we will have them to your left over here

3  on the side.  There's a microphone there, and so we'll need to

4  talk loud enough to where we hear each other while we wear

5  them.  We will wear our masks during those bench conferences.

6  But, of course, we don't want the jurors to hear us, so it's

7  got to be low enough to where they don't hear.  If we need to

8  have a more lengthy discussion it becomes clear, then I will

9  send the jury out, and we can do that.

10         I certainly like to keep bench conferences to a

11  minimum, so when you anticipate issues coming up at or near

12  the time you think they'll come up, then I ask you to bring

13  them up before the jury is in the courtroom so that we can do

14  it before they're here so we don't have to send them out.  And

15  if it's something that can wait, then, you know, I might defer

16  on it until we would have a break.

17         That's a less common thing that I do because normally

18  it's something that's happened right now, and we need to

19  address it right now before we move forward.  But occasionally

20  there are things that come up, you know, like one side may

21  say, well, your Honor, I know the evidence wasn't going to

22  come in, but they've now opened the door.  So I'm just

23  alerting you that we think this door has been opened but yet

24  it's not that person's time to even be asking questions, and

25  so I'll say, well, then let's wait and we'll talk about that

1   at our next break.

2           That's really all I can think of right now.  I may

3   think of some other things -- jury strikes, okay, jury strikes

4   will be silent strikes.  We will pick two alternates.  We'll

5   pick a jury of six plus two alternates.  The named alternates

6   are a misnomer.  They're just extra jurors.  They will

7   participate.  They will deliberate.  We've got to have six,

8   but there's no limit on how many we have to have.  I'm going

9   to pick eight so I've got a couple of extra.

10          You will receive for the six jurors, for the first

11  six jurors that aren't struck for cause, you will each receive

12  three strikes.  We will look at the jurors one by one starting

13  with Juror No. 1.  And the plaintiff will either accept or

14  strike that juror, and the defendant will either accept or

15  strike that juror.  Once we have our six jurors who have

16  not -- our first six jurors that have not been struck for

17  cause or struck for peremptory reasons, we'll then begin

18  selecting the additional two alternates.

19          And when we get to that point, we will -- what you'll

20  do is you'll consider the next six jurors.  Okay.  And of

21  those six jurors I will give you each two strikes so once

22  you -- again, we'll go juror by juror.  So let's just say, for

23  example, that the 12th juror on the list becomes our 6th juror

24  so that completes our panel that we had to have.  Then we'll

25  look at 13, 14, 15, 16, 17 and 18, assuming that none of those

1   have been struck for cause.  And then you'll be able to

2   exercise two strikes in that six, each side, and the two

3   jurors who were not struck.  The first two jurors that are not

4   struck out of the next six will be our alternates.

5        Okay.  Strikes for cause will not be done in front of

6   the jury panel.  When we have a break in jury selection, I

7   will invite you to make your -- any strikes for cause that

8   have occurred that you believe are proper.  I won't

9   necessarily make you wait until the end.  We're just not going

10  to do it in front of the jury.

11        And let me just talk about English-speaking folks,

12  English-speaking issue.  Obviously, someone has got to be able

13  to read and speak English to serve on this jury, but my

14  experience, I live in a very diverse county in Atlanta.  And

15  over my years as a trial judge there, the demographics of our

16  county changed tremendously, and I am particularly sensitive

17  to efforts, I think, to remove jurors prematurely based on

18  their expression of some concern about speaking the English

19  language.

20        Some jurors that are naturalized and/or -- maybe they

21  weren't naturalized, but they just don't speak English as

22  their primary language.  Some jurors express concern about

23  that because they just don't want to be on the jury, and some

24  jurors have legitimate concerns.  But as to both categories,

25  they often really do understand, and they can read and they

1   can speak, maybe just not as proficiently as they wish they

2   did.  But as long as they can understand, they can understand

3   the words spoken, they can speak and they can read, they're

4   qualified.

5         I mean, I've had jurors that have had 30-year careers

6   in customer service where they speak English, express concern

7   about their ability to understand.  I think part of that is,

8   is that because of the Latin words that we commonly use and

9   terms that are just not maybe even Latin but they're just not

10  used outside the legal framework, jurors sometimes are

11  expressing their concern that they be able to understand those

12  words.  Well, the lawyers have trouble sometimes with those

13  words.  So my point is because a juror simply says, for

14  example, I can only understand 70 percent of what's spoken,

15  don't take that as gospel that juror is going to be excused

16  for cause.

17        When we have a situation like that occur, that is

18  when I'm going to probably ask some questions, after you're

19  finished, to the juror that aren't related specifically to

20  their ability to understand.  I will simply have that juror

21  talk some.  I will ask them questions about themselves and

22  their family and their job, where they live, things that don't

23  really go to whether they're a good juror necessarily or not,

24  but can they understand the questions I'm asking and if they

25  answer the questions.

1          If they can answer all those questions and they've

2     answered all your questions, despite that they may have said I

3     don't understand everything, that has not been demonstrated,

4     and I'm not going to excuse them for cause necessarily just

5     because of that.  It's great that we have a procedure that

6     ensures that we have a cross section of our community that is

7     summoned to come and serve on the jury, but if we prematurely

8     eliminate jurors because of their self-reports that aren't

9     really backed up in reality, then we don't end up having a

10    cross section of our community.

11         So I'm just saying that in advance.  And that doesn't

12    matter whether you agree or not.  I mean, you may agree with

13    each other that you want to get rid of a juror who has said

14    they don't understand, but if they otherwise do understand and

15    can speak, based on what they've demonstrated in the

16    courtroom, I'm leaving them in.  I'm just telling you that in

17    advance.  I'm not going to be hard headed about it, but

18    there's got to be some objective basis for me to know that

19    they can't understand.

20         That objective basis might be contrived on their

21    part.  I've had jurors do that where they've not answered

22    questions; they've just looked around like are you talking to

23    me because they pretend they don't -- maybe they don't

24    pretend.  Maybe they really don't understand.  I can't get

25    into their mind and their head and determine if they do

1  something like that, whether they're acting or whether it's

2  real.  I usually assume that it's real, but I need something

3  like that before I can necessarily say that they're not

4  qualified.

5          And if there is a *Batson* issue that arises in this

6  case, then we will not take that up in the jury's presence.  I

7  will ask you before the jury is announced whether either side

8  has a *Batson* issue, and if you believe that there is a *Batson*

9  issue, we will excuse all the jurors.  The party that brings

10 it up will, of course, have to go through and establish that

11 there's a prima facie case, that there's been some

12 discrimination based on statistics.

13         And then we'll follow -- I'll follow procedure where

14 the opposing side will be asked to give me your reasons for

15 striking someone, assuming that they were race neutral.

16 Obviously, if you give me a race-based reason, then that's

17 going to be a problem.  And then, you know, assuming that

18 there is a sufficient reason that's been given, then I will

19 obviously give the movant an opportunity to respond to that

20 and argue why it's pretextual as opposed to genuine.

21         If I determine that there was a *Batson* violation, my

22 solution is the person that you've excluded for *Batson* reasons

23 is going to be on the jury, and then we'll adjust on the back

24 end.  I mean, frankly, it doesn't -- you don't see it that

25 often anymore.  I mean, I think lawyers have become so

1    accustomed in coming up with good reasons, that it's really

2    hard to know.

3            I did try a case one time as a state judge where it

4    was a divorce case, and the lady was representing herself.

5    The husband had an attorney, and the husband's attorney struck

6    all the women from the jury group and I asked him -- and the

7    wife did not know, you know, about *Batson*, but I brought it

8    up.  And I said, look, it looks like you've struck all the

9    women, and why did you strike all the women?  And his reason

10   was, well, Judge, I struck all the women because they're more

11   likely to give alimony than all the men.

12           I'm like, well, it doesn't work that way.  So I put

13   all the women on the jury that he had struck.  I could have

14   understood it if it had been the reverse, like if the wife who

15   was representing herself had struck all the men and said I

16   struck them because I didn't figure they'd want to award

17   alimony to anybody.  But she doesn't know law.  He should have

18   known the law, and he obviously did not.

19           All right.  So that's the basic trial procedure.  We

20   will begin every day at 9:00 o'clock in here.  I understand

21   your situation being late today.  Let's don't make it a habit.

22           MS. IZMAYLOVA:  My apologies, your Honor, I won't.

23           THE COURT:  Unfortunately, Cumming is one of those

24   long places.  There's no real good option to get here from

25   Cumming, so I would assume you'd want to be here early every

1   day anyway.  I used to live in eastern Gwinnett.  And it was

2   the same way, so I got here every morning at 5:30 when I lived

3   in eastern Gwinnett because there was no way for me to predict

4   how long it would take me to be here other than it was going

5   to be a long, long time.  Now I live in southern Gwinnett,

6   closer to Atlanta, so I don't usually come early anymore but

7   still try to make sure I'm here, you know, at a sufficient

8   time.

9           I'm not saying if there's a problem, that we won't

10  accept it, but please try to account for travel distances if

11  you don't -- if you live in Atlanta and you live far away

12  because Atlanta traffic is not a great thing.  We have not

13  been foresighted in this state as far as public transportation

14  at all.

15          Okay.  So I guess I want to now talk about the

16  motions in limine.  If there's anything anybody wants to talk

17  about today generally that I haven't covered about the

18  trial -- well, let me just ask about trial.  Do you have any

19  questions about the trial?  Yes, ma'am.

20          MS. IZMAYLOVA:  Your Honor, in regards to the

21  alternates and the six jurors, you said something about that

22  the alternates will also deliberate.  Are they going to at the

23  beginning, like as soon as the jury has the case, they all go

24  together to --

25          THE COURT:  They all go.  So that's the difference in

1  the state and federal system in Georgia.  In the state system

2  alternates do not participate unless they substitute.  In the

3  federal system, the law requires a minimum, but it doesn't set

4  a maximum.  So they will be jurors just like anyone else.

5  　　　　MS. IZMAYLOVA:  That's fine.  I just wanted to

6  clarify that.  Thank you.

7  　　　　THE COURT:  Which I think is the right way to do it.

8  When I would have long trials, murder trials, interesting

9  trials, and then all of a sudden you tell the alternate, well,

10  go home, we'll call you if we need, you know, it's a little

11  defeating to them, I think, once they've participated, that

12  they can't actually share in the exercise of the right to make

13  a decision once they've invested the same thing that the other

14  jurors have.  Is that all your questions?

15  　　　　MS. IZMAYLOVA:  Yes.  That was it.

16  　　　　THE COURT:  Any questions, Ms. Matz?

17  　　　　MS. MATZ:  I have one question, your Honor, and that

18  is, you mentioned you're going to ask the witnesses if they've

19  been vaccinated in terms of taking off their mask.  Is that

20  going to happen in front of the jury?

21  　　　　THE COURT:  It will.  So the jurors -- they're going

22  to take the stand.  I'm going to ask them if they -- now, if I

23  already know that they haven't and if you know that they

24  haven't, it's your witness, you might want to go ahead and ask

25  them.  But you've got to let me know so I will -- I mean, if

1  you're concerned about something like that, I will tell the --
2  then if you're going to ask, then I can tell the jury in
3  advance of trial that we will ensure that everyone is, one way
4  or the other.  But, you know, one is I think the jury and I
5  think opposing counsel and probably even the examining lawyer
6  is going to want the jury to be able to see the face of the
7  person that's testifying.  But that's balanced with the safety
8  element for everyone, and I want the jury to feel comfortable
9  that they're not going to be exposed as -- I want the risk to
10 be as low as possible.  With a mask on or a face shield on, it
11 is lower.  And I want the jurors to feel comfortable too
12 because they're sitting, other than myself, they're sitting
13 closest to the witness than anyone.  So if you're concerned
14 about somebody specifically, witness, then what I would
15 suggest is that you go ahead and get a face shield from us.
16 We have some.  And then you have that juror, when you call
17 them, come to the stand with it on.
18         MS. MATZ:  I appreciate that, your Honor.  I don't
19 have a specific concern right now.  I was just thinking that
20 in today's climate if the answer to that question was no, it
21 might be better to take care of it in advance rather than have
22 a potential witness have to explain a medical exemption or
23 something like that.
24         THE COURT:  Yeah.  I mean, so it's really -- I don't
25 think in the courtroom here it's that much of an issue as it

1    might be in general society.  And, also, you're dealing with

2    the Northern District of Georgia, Atlanta Division, where

3    vaccination rates are really high compared to say the Rome

4    Division.  When I would go to Rome for cases before the

5    vaccination, you know, I'd walk into the courthouse, and very

6    few people, even though they're all supposed to be wearing

7    masks, very few really are.  So it's just a little different

8    in the Atlanta area.  I mean, it's not -- you're from New

9    York.  It's not New York, but it's better.  And, you know, to

10   see the two Georgias, just look at the election results.

11   There's a big difference in metro Atlanta versus everywhere

12   else.

13          MS. MATZ:  I certainly wasn't implying anything of

14   the contrary.  I just wanted to know, your Honor --

15          THE COURT:  I understand.  But unless you've told me

16   that -- unless I see them with a face shield and a witness

17   comes in and takes the stand, and unless you've told me

18   something, like you needed one of them to be asked, then I'm

19   going to assume that I need to ask because, you know, I think

20   that's my responsibility.  Things could change.  I mean, the

21   mayor of Atlanta last night announced a change in the mask

22   policy where the law has been since Delta took over midsummer,

23   the law has been in Atlanta you had to wear masks indoors.

24   The mayor doesn't control the courtroom, but we have basically

25   followed that maybe for our own independent reasons.  We may

1    very well change it, but I really don't expect it to be

2    changed because I think we'll have some concern about holiday

3    gatherings, more people being exposed to each other, alcohol

4    being involved, maybe less awareness of masks.  And, you know,

5    if it follows like it has traditionally, then usually the

6    first couple of weeks after a holiday, there's going to be a

7    problem.  So we'll probably still all be wearing masks in

8    January.  Maybe by spring we'll be done with that.

9         All right.  So let's talk about the motions in

10   limine.  We'll begin with the plaintiff's.  So I'm looking at

11   Document 163, which is plaintiff's motions in limine.  I

12   assume there's been no supplement.  I haven't seen one if

13   there has been.  We'll just kind of go through it.  And I

14   noticed on the docket this morning that there were some

15   responses filed.  I didn't see them until this morning, and I

16   haven't reviewed your responses for another reason, which is I

17   just didn't do it in the courtroom, since I hadn't seen it in

18   advance, and just try to do a cram-down of it.

19        But we'll just begin with Number A on page 3,

20   Evidence Related to Kebe's Dismissed Counterclaim is

21   Inadmissible.  I think both sides have agreed to that;

22   correct?

23        MS. IZMAYLOVA:  Your Honor, yeah, we did make a

24   similar motion.

25        THE COURT:  Okay.  All right.  So that's agreed to.

```
 1          MS. MATZ:  Your Honor, the only issue I would say I
 2  do think should be agreed to is I think that the other side
 3  has maintained certain things on their exhibit list.  So as
 4  long as they're agreeing that the exhibits we've put on our
 5  list should be struck for that purpose, then I believe the
 6  issue should be resolved because I agree there shouldn't be
 7  any evidence related to the counterclaims.  They're dismissed.
 8  It would be a waste of everyone's time.
 9          THE COURT:  Yes, ma'am.
10          MS. IZMAYLOVA:  Yes, your Honor.  I agree, and my
11  response is that we will not present evidence if it only
12  related to the counterclaims.  However, there is some evidence
13  that was related -- that was relevant for both the defenses
14  and the counterclaims at the same time.  So that evidence we
15  would, you know, be still potentially planning on presenting.
16          THE COURT:  Well, I'm not going through the witness
17  list today, so I'm just telling you.  I mean, we're not doing
18  that.  But to me this is a settled issue, issues related only
19  to the issues of -- documents and testimony related only to
20  the issue of what Ms. Kebe said happened to her because of her
21  dispute with the plaintiff are inadmissible in this case.
22  They don't touch on any of the issues of whether the plaintiff
23  was damaged by any defamation or invasion of privacy or
24  intentional infliction of emotional distress because it's the
25  plaintiff's claims in that regard that matter.
```

 1              So Item No. B, Allegations Concerning Pending

 2    Criminal Matter are Inadmissible.  So help me understand that.

 3    So Ms. -- I'm sorry.  How do you say your client's last name?

 4    Almanzar?

 5              MS. MATZ:  Yes.  I believe that's correct.

 6              THE COURT:  And how does she wish to be referred to

 7    in court?

 8              MS. MATZ:  That's a good question, and I will find

 9    out.

10              THE COURT:  Why don't today I refer to her as her

11    last name, but if she wishes to be referred to differently,

12    then I will follow that.  But Ms. Almanzar, so she's got some

13    kind of pending criminal matter that you are afraid may come

14    in -- that they may want to bring in?

15              MS. MATZ:  Yes, your Honor.  She was charged in New

16    York with some assault cases or with an assault charge related

17    to an incident at a bar, and the defendant has put several

18    exhibits on their exhibit list that are news articles about

19    these charges.

20              There has not been a trial.  There has not been a

21    conviction.  There has not been a guilty plea of any type.

22    They've put several exhibits on their exhibit list about these

23    charges and my client's alleged relationship with

24    co-defendants and alleged gang activity and all these things

25    which are completely irrelevant to the claims at issue.  There

1  is no longer any assault counterclaims pending against my

2  client, and they're highly prejudicial to our client.

3          They also -- allowing them in would hamper our

4  client's ability to defend the case in New York.  She

5  shouldn't have to be questioned about something that has no

6  relevance to this where the jury is essentially --

7          THE COURT:  What's the allegation in New York?  I

8  don't have any idea.

9          MS. MATZ:  I believe the allegation is that -- I

10  don't even believe my client was there, but my understanding

11  is the allegation is that some people my client allegedly knew

12  assaulted a bartender and that my client has been allegedly

13  connected to that.

14          THE COURT:  Has she been indicted or accused with

15  that?

16          MS. MATZ:  Has she what?

17          THE COURT:  Has she been indicted or accused?  Has

18  there been a charging document filed against her?

19          MS. MATZ:  Yes.  There is a charging document filed

20  against her, your Honor.

21          THE COURT:  So are there allegations that that was

22  somehow gang related?

23          MS. MATZ:  I don't believe that those are former

24  allegations in the case, although, your Honor, just to be

25  clear, I don't represent her in that.  I don't practice

1    criminal law.  But my understanding is that she's pled not

2    guilty to the charges.  I do believe the media articles about

3    this make such insinuations, but I don't believe that there

4    has actually been that as part of the indictment.

5         THE COURT:  So, you know, here's the difficult thing

6    about the plaintiff's overall approach in the motions in

7    limine, is there is a lot of stuff that the defendant wants to

8    use that you don't want them to use but arguably is relevant

9    to the reasons why the defendant said what she said or wrote

10   what she said.  And so that's why I asked about the gang part

11   of that.

12        The newspaper articles normally would not be

13   admissible, but when you sue somebody for slander, you have to

14   prove malice, and then as part of their defense, they're able

15   to say, well, I didn't have malice because I read, saw or

16   heard this.  It then becomes an issue about whether it was

17   reasonable for them to rely upon what they read, saw or heard,

18   and so if there's an article that the defendant says, you

19   know, this is what I was basing my decision on, how do you

20   keep that from coming into evidence so that the jury on the

21   slander claim at least and maybe the other -- a couple of the

22   other claims can view whether or not it was reasonable for the

23   defendant to rely upon that information?

24        MS. MATZ:  Sure.  And that's a perfectly fair

25   question, your Honor.  But the answer is that none of these

1    articles and none of these allegations actually have anything

2    to do with the defamatory statements that are at issue.  The

3    defamatory statements that are at issue is that my client has

4    highly stigmatic STDs, namely HPV and herpes.  That is one of

5    the statements that the defendant made.  Another one of the

6    statements is that she is a prostitute and has engaged in

7    prostitution.  Another one of the statements is that she has

8    committed adultery, which is a crime in Georgia.

9         Another one of the statements is that she has engaged

10   in debasing acts with a beer bottle, namely that -- and I

11   apologize; some of this is a little graphic -- but namely the

12   defendant saying that she on stage, while stripping, put beer

13   bottles up her private parts.

14        THE COURT:  Why don't we just talk about that

15   specifically because I've seen that video in the course of

16   this case.  We've looked at that video, and the defendant's

17   view of that is different from these criminal charges but the

18   defendant is going to, I suppose, is going to say that I saw

19   that video, and I thought that video was the plaintiff.  And

20   so when I said the plaintiff had done these things, that was a

21   reasonable thing for me to do, to say in light of what I saw.

22        Now, I'm not saying it was the plaintiff at all.  The

23   defendant may be saying that it was the plaintiff, and if that

24   is, in fact, the defendant's defense, how do you keep the jury

25   from seeing the video so that the jury can decide whether it

1  was reasonable for the defendant to have said what she said

2  based on what that video depicts?

3       MS. MATZ:  I think the jury will see that video

4  because it's directly relevant to one of the claims.  And I

5  agree with you, your Honor.  The jury is going to see that

6  video, and they're going to look at my client.  And I don't

7  believe any of them are going to think that's true, but that's

8  my opinion.  Either way, I agree that the jury is going to see

9  that video but --

10       THE COURT:  So back to the criminal charges where I

11  was asking about gang charges.  Wasn't there also -- wasn't

12  also a part of your case that there was slander because the

13  defendant accused the plaintiff of being associated with

14  gangs?

15       MS. MATZ:  No.  Absolutely not.

16       THE COURT:  That's not a part of your case?

17       MS. MATZ:  That was not part of our defamation

18  claims.  It has nothing -- the only, the only place that came

19  up is the defendant's counterclaims, that they said that our

20  client had assaulted her, and the whole theory was because

21  they stipulated that our client never said anything directly

22  threatening or never did anything.  Their whole theory on the

23  counterclaims, which your Honor dismissed on summary judgment,

24  was that because our client had alleged gang activity, that

25  she had had, you know, other people threaten her, our client

1    had other people threaten the defendant for her.  There was

2    absolutely not one scintilla of admissible evidence to support

3    that on summary judgment, which is why your Honor dismissed

4    the claim.  So the only place that was ever at issue in this

5    case was on defendant's counterclaims that are no longer at

6    issue in this case.

7        THE COURT:  So the newspaper articles, for example,

8    of the criminal charges, there may be some mention of gang

9    affiliation of these other co-defendants.  Anything else in

10   that that you would expect the defendant would argue is

11   somehow relevant to the case?

12       MS. MATZ:  No.  I don't think so.  I think that their

13   argument is essentially -- I mean, your Honor, this has been

14   an issue since the beginning of the case.  When the defendant

15   testified during her deposition, you know, she was asked

16   questions about this.  And her essential M.O. is she thinks

17   our client is in a gang; therefore, it's okay for people to do

18   terrible things to my client literally.  I asked her, do you

19   think the fact that you're saying my client is a gang member

20   means it's okay if people do terrible things to her?  Answer,

21   absolutely.  And that includes you?  Answer, absolutely, yes.

22       So from the beginning the defendant's entire defense

23   was to try to paint my client in a certain light.  That's

24   completely inappropriate because it has nothing to do with the

25   defamation charges.

1        You know, we cited case law in our brief, the
2   *Jernigan* case, which is an Eleventh Circuit case here and I
3   believe would be controlling.  It's a really interesting case
4   because the case acknowledges that -- I'm happy to read part
5   of it to your Honor.  The judge said, we don't want to
6   understate the prejudicial effect that a criminal defendant's
7   gang membership may entail.  Modern street gangs are popularly
8   associated with a wealth of criminal behavior and social ills,
9   and an individual's membership in such an organization is
10  likely to provoke strong antipathy in a jury.
11       So the entire purpose of them trying to introduce
12  this evidence is to get the jury to hate my client and get
13  them to have an emotional reaction and distract her from the
14  claims at issue.  The interesting thing, actually, about the
15  *Jernigan* case is, just so you know, is that in that case they
16  actually let the gang activity in, but there was a very
17  specific reason.
18       It was a gun charge case.  A gun was found in a car
19  where there were two people.  The gun was covered in a red
20  bandanna.  And one of the defendants said the other one is in
21  a gang.  The red bandanna has some significance to that.  So
22  it was directly relevant to his defense to show that this
23  other co-defendant, that the gun didn't belong to him.  Here
24  there's no relevance to the case.  The only purpose of this is
25  to prejudice the jury against my client because it doesn't

1  have any relevance to that alleged defamatory conduct.

2         THE COURT:  All right.  Thank you, ma'am.  All right.

3  The defendant's response.  And remember the issue is

4  allegations concerning pending criminal matter in New York.  I

5  guess New York.

6         MS. IZMAYLOVA:  Yes, your Honor.  The more important

7  not -- the news articles didn't even address, the plaintiffs,

8  you know, that's one of the overall themes in their case, is

9  that our client has specifically targeted their client and

10  only posts videos, you know, to defame her or to harass her

11  and, you know, et cetera.

12         There are a few videos that my client has made at the

13  time that these allegations came out that led to the criminal

14  charges.  My client stated that she did not believe the

15  accusers and was actually, you know, saying positive things,

16  things that were, you know, good for the plaintiff basically.

17  And so that was the only -- those were the only videos that I

18  was talking about, you know, wanting to introduce because it

19  goes directly against their accusation, allegation that all

20  our client does is harass or, you know, only post videos as

21  defamatory against their client.  So --

22         THE COURT:  Let me make sure I understand what you're

23  saying.  So you're saying that she would be bringing, she

24  being your client, would be bringing up these allegations

25  because your client said she didn't -- at some point had said

1  she didn't agree with them or she didn't believe them?

2        MS. IZMAYLOVA:  Before there was any charging

3  documents, when the alleged victims, you know, I guess spoke

4  to the media.  I don't know how it came about but --

5        THE COURT:  The victims in the New York situation?

6        MS. IZMAYLOVA:  The New York situation, yes, your

7  Honor.

8        THE COURT:  But does it really matter?  I mean, is

9  evidence of prior good conduct relevant to whether or not the

10  conduct complained of was bad?

11        MS. IZMAYLOVA:  Yeah.  The video -- the purpose of

12  introducing that is not to show that plaintiff has, you know,

13  pending criminal charges.  It's to show that our client in

14  this case does not have the -- like as the plaintiff alleges.

15  She specifically targeted the plaintiff to make these -- all

16  these defamatory videos about her.  She's always hated her.

17  She's never said anything nice about her.  This --

18        THE COURT:  Wait a minute.  The always hated her

19  allegation, if that is something that the plaintiff is making,

20  has no legal relevance anyway.

21        MS. IZMAYLOVA:  Yeah, but I guess if that's the kind

22  of theme that they're presenting to the jury, I do want the

23  jury to know that my client doesn't just only make videos that

24  they view as, quote unquote, defamatory, that there has been

25  videos that she's made where she speaks positively on the

1  plaintiff, you know, whether it be her music or, you know,

2  these type of situations.  That's the only purpose that I --

3  the limited purpose for which I would want to introduce that

4  video.  It just happens to be about this case that has now led

5  to criminal charges.  At the time she made the video --

6         THE COURT:  Do you have other examples of good stuff

7  that your client would have said about the plaintiff other

8  than criminal -- than the fact that she may not, she being the

9  defendant, may not agree with or believe the bad stuff?  Do

10 you have other examples of good stuff that she would have just

11 said, you know, like she's a great musician, she's --

12        MS. IZMAYLOVA:  She's spoken about her music.  She

13 said that she's enjoyed, you know, throughout -- it's been

14 three years, so sometimes she says that she doesn't like a

15 song when it comes out.  Sometimes she does like a song.  I

16 know that she listens to some of the plaintiff's music, so she

17 does discuss that.

18        THE COURT:  Talk a little slower.  Okay?  Because

19 you're not -- when you're standing, which is fine, you need --

20 maybe even bring your microphone over --

21        MS. IZMAYLOVA:  To me closer?

22        THE COURT:  -- to put it right in front of you.  It's

23 got a long cord, so if you will pick it up, if you will move

24 it all the way over there -- yeah.  There you go.

25        MS. IZMAYLOVA:  Sure.

1          THE COURT:  Thank you.  All right.  Well, so how do

2     we deal then with Rule 403, which says the Court may exclude

3     relevant evidence?  You're making an argument that this is

4     relevant because it shows that your client didn't necessarily

5     believe the stuff, and so that shows that she, being the

6     defendant, didn't have -- harbor ill will towards the

7     plaintiff generally because she defended her, or whatever.

8          MS. IZMAYLOVA:  Yes, your Honor.

9          THE COURT:  But the rule says the Court may exclude

10    relevant evidence if its probative value is substantially

11    outweighed by a danger of one or more of the following:

12    Unfair prejudice, confusing the issues, misleading the jury.

13    There's some other factors, which really don't apply here.

14         And the argument that the plaintiff makes is that if

15    the jury is aware that she has pending criminal charges in New

16    York and/or the circumstances about that, then that will

17    prejudice the jury's view of the plaintiff.

18         MS. IZMAYLOVA:  Your Honor --

19         THE COURT:  Hold on a second.  Here's the thing.  No,

20    no, no.  Here's the way it works in court.  One lawyer talks.

21    When I ask who is going to be talking, you know, if we go

22    from -- we're talking right now about these issues, and so

23    Ms. Izmaylova is going to address them because she started

24    addressing them.

25         So, I mean, I think it seems to me that's a fair

1    point.  There is nothing probably any more prejudicial than

2    knowing that someone has criminal charges.  That's why when we

3    charge a criminal defendant, there are very strict rules about

4    letting the jury know about even previous convictions.  They

5    have to have a very limited purpose, and they have to be

6    substantially related.  And in this case we're talking about a

7    civil case and letting the jury know about criminal charges

8    for which there's not been a conviction.

9            MS. IZMAYLOVA:  Your Honor, just a couple of points.

10   The case law from which Ms. Matz was reading, I believe that

11   was a criminal case so --

12           THE COURT:  I'm talking Rule 403 is what I'm --

13           MS. IZMAYLOVA:  The preferred resolution that I would

14   propose because there aren't -- you know, my client should be

15   able to -- because they're going to get up and say she's never

16   posted a video that speaks, you know, positively about the

17   plaintiff, and that's not true and so --

18           THE COURT:  I'm sorry.  What's not true?

19           MS. IZMAYLOVA:  It's not true that my client has

20   never posted a video that speaks positively.  Their allegation

21   is that my client has only posted negative videos about the

22   plaintiff.  I would propose giving a limiting instruction at

23   the time, you know, if you do believe that this evidence

24   should be played.  Read the limiting instruction right before

25   it's played, after it's played, and then again during the jury

1   charge.

2          THE COURT:  Okay.  I've never heard the plaintiff

3   argue, her lawyers argue, that the defendant has never said

4   anything positive about the plaintiff.  And we're not at the

5   trial yet.  I mean, if the plaintiff doesn't argue at trial

6   that the defendant has never said anything positive, that it's

7   all been negative -- and I'm going to guess the plaintiff is

8   not going to argue that --

9          MS. IZMAYLOVA:  If they don't argue that, then the

10  best evidence is not relevant then.

11         THE COURT:  Excuse me?

12         MS. IZMAYLOVA:  It won't be -- we won't introduce it

13  because we won't need to because --

14         THE COURT:  Well, if they don't argue that your

15  client has never said anything positive or has always been

16  negative --

17         MS. IZMAYLOVA:  Yes, and the alternative that all her

18  videos are defamatory.

19         THE COURT:  Okay.  Well, I mean, that doesn't

20  necessarily deal with the 403 issue but -- okay.  Ms. Matz,

21  let me ask you, do you intend to argue that the defendant has

22  never done anything positive?  I would assume that that's not

23  your case at all.

24         MS. MATZ:  No.  Absolutely not, your Honor.  Our case

25  is about specific videos and those specific videos

1    establish -- and other evidence, obviously, establishing the

2    elements of our claim.  But I don't think that we have ever

3    said that she's never said anything positive.  I don't think

4    that that really has any relevance to this whatsoever.  So,

5    no, that's not our intention.  Our intention is to focus on

6    the videos that are defamatory and the videos that are at

7    issue.

8           It would be next to impossible, just so you know,

9    your Honor, to present every video that has ever been done

10   about my client, and we are not intending to do that.  There

11   are many videos that have been about my client that just have

12   no relevance to this case because they didn't contain

13   defamatory statements or they aren't otherwise at issue.

14          THE COURT:  Ms. Izmaylova, do you have any other

15   argument you want to make on this particular issue?

16          MS. IZMAYLOVA:  I don't, your Honor, and even in the

17   response I preempt that -- you know, I specifically said if

18   this is the theme, then this is what we want to introduce it

19   for.  So if that's not their theme, then we don't have a

20   problem.

21          THE COURT:  Well, I'm not ruling that it's admissible

22   even if they make that argument because I still have to do

23   the -- I have to weigh the balancing test of Rule 403.  And if

24   there are other videos that exist and evidence that exists

25   that would support your theme that the defendant has been

1  positive or at least not defamatory towards the plaintiff on

2  other occasions but they don't talk about criminal behavior at

3  all, then that would satisfy the same principle that you seek

4  to advance with this evidence.  So I'm not saying it will be

5  admissible if the plaintiff makes that argument that your

6  client has never been positive, but I'm just saying the motion

7  as made right now with the evidence, as I understand it to be,

8  is that it's not relevant and that it would be prejudicial

9  even if it were.

10        So right now I'm granting the motion, and if you

11  believe somehow that the plaintiff has opened the door to it

12  later, then you would need to bring that up with the Court

13  before you actually do that in the courtroom.

14        MS. IZMAYLOVA:  Yes, your Honor.

15        THE COURT:  All right.  No. C or Item C, Messages by

16  Starmarie Jones are Inadmissible.  Starmarie Jones, as I

17  remember, she was the lady that supposedly lived with the

18  plaintiff at some point in time that may have been -- it's

19  alleged at least maybe she was a stripper of some sort and

20  maybe she said -- am I getting this right?  And then she said

21  some bad stuff about the plaintiff?  So tell me what this is

22  about.

23        MS. MATZ:  Sure.  Starmarie Jones alleges she lived

24  with my client.  My client denies that.  But Starmarie Jones

25  is the individual who the defendant interviewed, and that

1   interview was published.  And that interview does contain

2   defamatory statements.  What we are talking about here in our

3   motion is a very limited subset of communications between

4   Ms. Kebe and Starmarie Jones that don't really have any

5   relevance to this case.  They would be barred by hearsay, and

6   they're highly prejudicial.  We're talking about text messages

7   from after or around this case with the filing of this case.

8          I believe it was -- it may have been right after the

9   retraction letter.  I don't remember the exact date.  But the

10  text messages we're talking about don't actually bear on what

11  Ms. Kebe thought at the time of publishing the video or

12  anything along those lines.  They are text messages that are

13  completely unsubstantiated where Ms. Jones, Starmarie Jones,

14  claims that my client put her in a position where she would be

15  raped, which my client obviously does not agree with.  But

16  these are, again, they're highly prejudicial.  They don't --

17         THE COURT:  Let's say Ms. Jones came and testified.

18  Would that issue be admissible?

19         MS. MATZ:  I don't think it would be admissible, but

20  she's also not on anybody's witness list.  So these are

21  inadmissible hearsay.

22         MS. IZMAYLOVA:  Your Honor, and I agree.  And the

23  defense has filed a similar motion, Defendant's Motion in

24  Limine No. 6 with any -- obviously outside the video where my

25  client interviews Starmarie Jones because I know that's the

1   video that, you know, has sparked this lawsuit.  Outside of

2   that, any evidence pertaining to Starmarie Jones is

3   inadmissible because used to be a named co-defendant.  She's

4   no longer a named co-defendant.  She's not coming to court.  I

5   agree with Ms. Matz on that.

6           THE COURT:  All right.  So this item is granted then.

7           MS. MATZ:  Thank you, your Honor.

8           THE COURT:  Page 8, Item D, Allegations of Infidelity

9   by Plaintiff's Husband are Inadmissible.  So as it relates to

10  any infidelity, did the plaintiff sue based on allegations

11  against her husband or about allegations related to her

12  marriage about herself?

13          MS. MATZ:  Allegations only relating to her.  So the

14  defamation allegations with respect to this relate to

15  Ms. Kebe's claims that my client committed adultery, which my

16  client takes the position that those are clearly false.  So

17  the motion is -- and to the extent they are trying bootstrap

18  in allegations and discussions about my client's husband

19  committing infidelity, that's not relevant to this matter.

20          THE COURT:  Okay.  Does the defendant agree?

21          MS. IZMAYLOVA:  We do not, your Honor, because the

22  only time that my client even mentions anything about the

23  plaintiff, you know, she and her husband, whatever, is during

24  when she's discussing the infidelity of plaintiff's husband.

25  It's literally -- she doesn't just, you know, ever say that

1  statement outside of when she's talking about the plaintiff's

2  husband being --

3          THE COURT:  So you agree, and you don't think there's

4  any basis for any allegation of defamation based on anyone's

5  marital fidelity.  Is that what you're saying?

6          MS. IZMAYLOVA:  I'm sorry, your Honor?

7          THE COURT:  Well, do you agree that allegations about

8  the plaintiff's husband's commitment to his marriage or any

9  affair he may have had is inadmissible?

10          MS. IZMAYLOVA:  I do not agree with that because the

11  only reason why my client is even commenting upon anyone's

12  infidelity in that relationship is because of the husband's

13  infidelity.  So that kind of explains where she's coming from

14  when she's saying these comments.

15          THE COURT:  Okay.  So you agree that there should be

16  no mention of the plaintiff's allegations that the plaintiff's

17  husband had an affair; right?

18          MS. IZMAYLOVA:  I do not agree, no.

19          THE COURT:  Okay.  So what is it relevant to?

20          MS. IZMAYLOVA:  It's relevant --

21          THE COURT:  If the plaintiff's husband had an affair,

22  how is that relevant to the allegations that the plaintiff has

23  made against the defendant that she was defamed?

24          MS. IZMAYLOVA:  It is the same -- it's the

25  same example as your Honor stated previously.  It's like if

1   they don't -- if we're not allowed to mention anything about

2   the husband, then how will she explain what her reasoning was

3   for saying these things about the plaintiff?

4          THE COURT:  What did she say about the plaintiff

5   relative to affairs?

6          MS. IZMAYLOVA:  The only thing I know off the top of

7   my head is --

8          THE COURT:  What is it alleged that she said about

9   the plaintiff?

10          MS. IZMAYLOVA:  She said, you know, Offset, which is

11   the name of the plaintiff's husband, Offset keeps stepping out

12   on her.  I heard that she got herself a sidepiece, which is

13   like, you know, a boyfriend or somebody else that she's, you

14   know, in addition to Offset.  So it's like in the same

15   sentence.  I'm not really sure how they're going to be able to

16   keep evidence of that out but then keep evidence in of my

17   client talking about just the plaintiff.

18          THE COURT:  All right.  Thank you.  Ms. Matz, so how

19   do we parse that then?

20          MS. MATZ:  Yeah, listen.  I think that part of the

21   issue here is that there's numerous instances of exhibits on

22   their list where they are not -- that is not the example.

23   Okay.  I guess some of this, alleged piece of this, might come

24   in to the extent that the videos also relate to my client, but

25   there's numerous examples of exhibits, both video and

1  documents on their witness list where Ms. Kebe is only talking

2  about my client's husband allegedly cheating on her.  And it

3  is not part of those videos.

4       And I think that to the extent that it comes in in

5  some small way, it shouldn't become a second piece of this

6  trial where all of these inadmissible hearsay documents, where

7  there's no proof that this actually occurred, is being thrown

8  in the jury's face to prejudice them and make them think

9  negative things about my client.

10       THE COURT:  Okay.  So what I hear the plaintiff

11  saying is it might come in in the limited context that you

12  have said, if it was a part of a statement about where she

13  said, she being Kebe, said, well, I heard she's also,

14  plaintiff, stepping out on the side as well but not as an

15  independent thing, not where you have other evidence that just

16  goes to whatever the plaintiff's husband may have done.  Do

17  you agree with that?

18       MS. IZMAYLOVA:  I do agree with that.  So no

19  evidence --

20       THE COURT:  All right.  So I'm going to grant the

21  motion with that limitation, that if it's a part of the

22  overall allegation and statement, I don't know how you parse

23  it out of that same video, particularly if it's closely

24  aligned in time and is said by the defendant as part of the

25  reporting relative to the plaintiff's husband.

1          All right.  So let's move on to Item E, Videos About

2    Plaintiff "Drugging and Robbing" Men are Inadmissible.  You've

3    got to tell me what videos you have about that.  What videos

4    exist?

5          MS. MATZ:  So there are -- I mean, there's multiple

6    videos about this, some of which the defendant made -- there's

7    an unauthenticated compilation video of very -- I honestly

8    don't even know where it came from, that they've produced

9    where a piece of it is a clip from a video that they're saying

10   was posted on my client's Instagram Live video talking --

11         THE COURT:  Who's going to say that?

12         MS. MATZ:  I don't know.

13         THE COURT:  Kebe is going to say that?

14         MS. MATZ:  I think so.  She says it in many of her

15   videos also.  So she accuses my client of this behavior.  And,

16   again, this is -- to us this is exactly the same as the gang

17   related activity and, you know, this other alleged

18   unsubstantiated criminal behavior, that they are purely

19   introducing it to try to poison the jury, evoke an emotional

20   reaction.  And at the end of the day, it doesn't really have

21   any relevance to the claims here.

22         THE COURT:  Of course, I don't -- y'all have seen all

23   this stuff.  I have not.

24         MS. IZMAYLOVA:  If I may, your Honor?

25         THE COURT:  Yeah.  Tell me about this.

1          MS. IZMAYLOVA:  The videos that we're talking about

2  is a video that the plaintiff made and posted on her IG Live,

3  her recalling or telling her fans how did she pay for studio

4  time when she was making her first album.  It details stories

5  of tricking men to going back with her from the strip clubs to

6  her hotel room.  It goes towards basically she's admitting to

7  drug consumption and prostitution, and it's out of her mouth.

8  I'm planning on introducing it during the plaintiff's

9  testimony, not from my client.

10          THE COURT:  Okay.  And so in that -- and let's assume

11  that the plaintiff did post this video and that it says what

12  it says.  It's relevant to defend against exactly what

13  defamation or other claim?

14          MS. IZMAYLOVA:  That she is not a prostitute and did

15  not ever use drugs.

16          THE COURT:  Prostitute and what?

17          MS. IZMAYLOVA:  And that she has never used drugs.

18          THE COURT:  Okay.  Is the defamation claim based --

19  there is a defamation claim where plaintiff claims that the

20  defendant has defamed her by saying that she was a prostitute.

21  I'm sure about that one.  And there's also a defamation claim

22  where the defendant allegedly defamed the plaintiff claiming

23  that she is a drug user; is that right?

24          MS. MATZ:  It's specific to cocaine, your Honor.

25          THE COURT:  Is the video specific as to a different

1  type of drug?

2           MS. MATZ:  No.  And, actually, I think

3  Ms. Izmaylova's recitation of what this video says is

4  completely inaccurate.  My client does not admit to using any

5  kind of drug in this, and she doesn't admit to any kind of

6  prostitution so --

7           THE COURT:  Do y'all have the video in your

8  computers?

9           MS. MATZ:  Yes, I do.

10          THE COURT:  All right.  Why don't you connect up.

11 What do they have to do to connect up?  And let's just look at

12 it.

13          MS. MATZ:  Can you do that?  Just give us one moment,

14 your Honor.  It's Kebe -- it's going to be at Mr. Moorman's

15 table.

16          THE COURT:  Why don't we take a recess.  It's 11:00

17 o'clock, and I generally try to take a recess about this time.

18 So we'll take a ten-minute recess.  Thank you.

19          MS. MATZ:  Okay.  Thank you, your Honor.

20          COURTROOM SECURITY OFFICER:  All rise.  Court is in

21 recess for ten minutes.

22          (Brief recess.)

23          COURTROOM SECURITY OFFICER:  All rise.  Please be

24 seated and come to order.

25          THE COURT:  All right.  Is the video ready?

1         MS. MATZ:  It is, your Honor.  And before we play it

2    there's just a little bit of information I'd like to give the

3    Court.  So this is a -- it is clearly a compilation video.  I

4    don't know where it was obtained.  I don't know if any of the

5    footage was edited.

6         The video you're about to see first was on

7    defendant's exhibit list.  With reference to the first part of

8    this, this is not the portion that we're talking about, and I

9    just want to be clear about that because I just told your

10   honor that the portion we're talking about is not something

11   where she talked about being a prostitute.  The first portion

12   that you're going to see in this compilation video is actually

13   part of a longer video where my client was wearing a Halloween

14   costume and joking around.

15        The longer video is actually on our exhibit list, and

16   we are not saying that this first clip, in terms of admitting

17   the longer video, would not be admissible.  I don't think it

18   would be admissible as part of this compilation exhibit

19   because this compilation exhibit contains a lot of other

20   things that I think are highly prejudicial and are not

21   relevant.

22        THE COURT:  So like this person that is shown here on

23   the left, is that the defendant?  Who is that?

24        MS. IZMAYLOVA:  No, that's not her.

25        MS. MATZ:  That's the plaintiff.

```
1              MS. IZMAYLOVA:  That's another YouTube --

2              MS. MATZ:  Oh, on the left.  I'm sorry.

3              THE COURT:  I'm sorry.  It's who?

4              MS. IZMAYLOVA:  It's another, like, YouTube blogger

5    who has their own channel.

6              THE COURT:  So you captured this from a YouTube

7    channel?

8              MS. IZMAYLOVA:  From YouTube.  Your Honor, if I'm not

9    correct, then I apologize, but I have never seen a longer

10   version of this video.  We did ask the plaintiff to serve us

11   with -- if they're going to claim that, you know, this was

12   edited, we didn't edit this, obviously.  If they can serve us

13   the originals, we would just play those.

14             MS. MATZ:  Your Honor --

15             MS. IZMAYLOVA:  That was the whole issue.  If they

16   could tell me what Bates stamp it is, then I would, you know,

17   be happy to review it, but I've never seen the longer version

18   of this clip.

19             THE COURT:  This video that we're fixing to watch,

20   where did it come from?

21             MS. IZMAYLOVA:  YouTube.

22             MS. MATZ:  I have no idea.

23             THE COURT:  Well, how did the plaintiff get it?

24             MS. IZMAYLOVA:  We served it to them.

25             MS. MATZ:  I didn't get it.  The defendant did.
```

1          THE COURT:  Okay.  So where did the defendant get it?

2          MS. IZMAYLOVA:  YouTube.

3          THE COURT:  Excuse me?

4          MS. IZMAYLOVA:  YouTube.

5          THE COURT:  She pulled this off of YouTube, and she

6    is going to say what about this video?

7          MS. IZMAYLOVA:  We pulled it off of YouTube because

8    it depicts --

9          THE COURT:  You pulled it off of YouTube?

10          MS. IZMAYLOVA:  As part of the investigation.

11          THE COURT:  Okay.  Well, what is the defendant going

12   to say about this video?

13          MS. IZMAYLOVA:  She's not.  I'm going to ask the

14   plaintiff about this video because it depicts the plaintiff.

15   The plaintiff is on the right hand on the video.  It's her.

16          THE COURT:  Okay.  So let me make sure I understand.

17   Ms. Matz, what part of it -- why don't you stop it when you --

18   why don't you each time -- let's go through it.  Show me the

19   parts that you object to, if there are some parts that you

20   don't.

21          MS. MATZ:  Sure.

22          THE COURT:  Okay.  That's just the easiest way for me

23   to try to follow all this.

24          MS. MATZ:  I object to the entirety of the video, but

25   I'll explain each part.  And that's fine, your Honor.  That's

1  no problem.  So this first segment we're about to watch I'll

2  just explain before we start.  This is part of the longer --

3  there is a longer video that is on our list.  It's Plaintiff's

4  Exhibit 914, Cardi Video -- the Bates stamp is Cardi Video

5  164.  It was produced in discovery.  There is a longer -- I

6  don't know if this has been edited or whatnot, but the video

7  we produced my client is talking about her Halloween costume.

8  That has been edited out of this, and that is part of the

9  reason we object to it.  To the extent the longer video is

10  going to be used, we understand there's a potential for that.

11          THE COURT:  How long is this video?

12          MS. MATZ:  It's 5 minutes total, your Honor.

13          THE COURT:  All right.  Give me a second.  Go ahead.

14          MS. MATZ:  All right.  Whenever your Honor is ready.

15          THE COURT:  I'm ready.

16          (Whereupon, a video recording was played.)

17          MS. MATZ:  That first portion of the video that you

18  just watched, it is our position that this has been edited.

19  There's a longer version.  That's what I just said.  It's

20  Plaintiff's Exhibit 914.  So we object to the introduction of

21  this because it's been edited.  I don't know if there have

22  been other things that have been changed about it.

23          THE COURT:  Okay.  So what about that point,

24  Ms. Izmaylova, if you're just showing a part -- this isn't

25  something -- this is something that your investigation has

1  revealed.  If there's another video where all that is put in

2  context, wouldn't federal rules require that the whole thing

3  come in?

4          MS. IZMAYLOVA:  Yes, sir.  I agree with that, and,

5  again, I have not seen it.  This is the first time I'm hearing

6  that they actually served it on us, but if there is -- I would

7  be glad to play the whole video.  I've requested the whole

8  video.

9          THE COURT:  All right.  914 is what you said.

10          MS. MATZ:  Yeah.  Also, I just want to say we

11  literally put the Bates stamp of this in our motion, so this

12  cannot be the first time defense counsel is hearing about the

13  longer version of this video.  This was an argument in our

14  written paper.

15          THE COURT:  All right.  Go ahead.

16          MS. MATZ:  Go ahead.

17          (Whereupon, a video recording was played.)

18          MS. MATZ:  Stop.  No, play the rest of the first

19  video -- sorry, your Honor.  He switched exhibits.  He was

20  going to show you the longer video, but I don't think we need

21  to watch it.

22          THE COURT:  Yeah, I don't think I need to see that.

23          (Whereupon, a video recording was played.)

24          THE COURT:  Wait a minute.  Wait a minute.  Hold on.

25  The sound is not loud enough for me.  One time we had it up

 1   here.  It's no longer on my speaker.  Did you do anything to
 2   turn it down?
 3         COURTROOM DEPUTY:  No.
 4         MS. MATZ:  Your Honor, because I think this has been
 5   edited and put together, I think the volume changes at various
 6   points in the video, just so you know.
 7         (Whereupon, a video recording was played.)
 8         THE COURT:  Okay.  Stop it right.  So what's your
 9   point about that one?
10         MS. MATZ:  I think it's highly prejudicial.  She's
11   not talking about consuming drugs.  She's not talking about
12   engaging in prostitution.  And they're trying to introduce
13   this in order to essentially just introduce irrelevant
14   evidence.
15         THE COURT:  What was she talking about there?
16         MS. MATZ:  To be honest, I don't even know if what
17   she's saying is true.  I don't believe it is, but I think
18   she's talking about things that -- you know, how she made her
19   first album, the fact that nobody was helping her and kind of
20   how she had to get by.
21         THE COURT:  And what does she say she was doing to
22   get by?
23         MS. MATZ:  I mean, I can quote what she said in the
24   video.
25         THE COURT:  Well, I mean, so the language, it's not

1 like I followed every single word because it's very high

2 pitched, it's very fast, and the sound quality is not great.

3 But I guess the defendant is saying she's saying she slept

4 with people to get stuff.  Is that what the defendant is

5 saying?  What are you saying that this says?

6          MS. IZMAYLOVA:  That's what she says.

7          THE COURT:  Well, I mean, that's what I got from it.

8 Let's assume for a minute that that's what it said, is that

9 she's talking about what she had to do to get things done and

10 that it involved sleeping with people to get things done.

11 That's not relevant?

12          MS. MATZ:  She didn't actually say she slept with

13 anyone.  She said -- what she said -- and I'm sorry.  I

14 don't --

15          THE COURT:  Tell me what you heard her say.

16          MS. MATZ:  Sure.  I'm about to use some curse words,

17 your Honor, so I apologize.  I would not normally use ex --

18          THE COURT:  I'm going to guess we're going to be

19 using a lot of them during this trial.

20          MS. MATZ:  I think we are.  I think we are.  My

21 understanding of what she was saying was people -- I'm not

22 comfortable using the N word.  People used to say that --

23          THE COURT:  Use initials if you want.

24          MS. MATZ:  N word used to say that they wanted to

25 fuck me, so I'd say yeah, yeah, yeah, come on.  I'd take them

1   back to the hotel, and then I'd drug them and I'd rob them.

2   That's my understanding of what she said.  That's not

3   prostitution, and it's not talking about her own drug use.

4         THE COURT:  What about that?

5         MS. IZMAYLOVA:  Your Honor, she's literally admitting

6   to telling -- to agreeing to the person to take them back to

7   their hotel and to sleep with them and ended up taking their

8   money and drugging them.

9         THE COURT:  That's not prostitution; right?

10         MS. IZMAYLOVA:  I mean --

11         THE COURT:  I mean, is it?  Prostitution is when you

12   agree to have sex for money.

13         MS. IZMAYLOVA:  Well, that's what she did do to get

14   them back to their hotel room.

15         THE COURT:  She agreed to have sex with them, and

16   then she stole money from them, if this is true.  But that's

17   not prostitution, is it?

18         MS. MATZ:  No.

19         MS. IZMAYLOVA:  To ruse them to hotel she would

20   have -- she said she agreed to sleep with them so that they

21   would go back with her to the hotel.

22         THE COURT:  That happens in America and around the

23   world all the time.  People agree to have sex, and they go

24   back to hotel rooms.  I guess the bad stuff there is that if

25   she did it for purposes of robbing them, but that doesn't go

1   to any of the allegations in the complaint that the defendant

2   said about her; right?

3           MS. IZMAYLOVA:  Your Honor, if I may, that's not the

4   full video that we were going to introduce.  She does, I

5   believe, refer in that video to these men also as tricks,

6   which is another like slang word for --

7           THE COURT:  Let's play it again.  Let's play it

8   again.  Anything else that you want me to look for?

9           MS. IZMAYLOVA:  I have the fuller version of that

10  same video, which is what we thought we were going to be

11  watching so we can --

12          THE COURT:  Is this video on your witness list?

13          MS. IZMAYLOVA:  Yes, your Honor.

14          THE COURT:  Are you going to use this one?

15          MS. IZMAYLOVA:  Well --

16          THE COURT:  Let's talk about this one, and if there's

17  another one we need to talk about, we'll talk about that too.

18  But let's hear what she says in this one.  Okay.  Play it

19  again.

20          (Whereupon, a video recording was played.)

21          THE COURT:  So I'm not saying she didn't use the word

22  "tricks," but I didn't hear it.

23          MS. MATZ:  I didn't hear it either, your Honor.

24          THE COURT:  I don't think that video, from what I've

25  seen, that particular portion -- that's No. 2 of this

1 compilation.  I don't think it speaks to any of the

2 allegations in the complaint, so that part of the video is

3 out.  All right.  Go ahead.

4        MS. MATZ:  Go ahead.

5        (Whereupon, a video recording was played.)

6        THE COURT:  All right.  Your argument about that one?

7        MS. MATZ:  Again, I mean, this has to do with the

8 whole video, but this has nothing to do with allegations of

9 prostitution.  And I understand that on the next slide whoever

10 created this video put this up here, but this is essentially

11 instructing the jury about, you know, something -- the use of

12 a word which does not necessarily mean that someone is a

13 prostitute in terms of having committed a crime.

14        Someone referring to themselves as a ho or -- I

15 apologize, your Honor.  I'm going to keep apologizing when I

16 use these words.  But, you know, someone referring to

17 themselves as these could refer to a lot of things.  It could

18 refer to attitudes towards consensual relationships that have

19 nothing to do with illegal behavior, and I think putting a

20 video in front of the jury where they are literally giving a

21 definition to a statement that our client made that is not --

22 that is telling the jury what to think --

23        THE COURT:  Who would be giving the definition?

24        MS. MATZ:  I guess -- I don't know who they're going

25 to be showing this --

1          THE COURT:  Nobody would know what the term "stripper

2    ho" means as used by the plaintiff except the plaintiff;

3    right?

4          MS. MATZ:  I agree with that.

5          THE COURT:  I mean, it's just slang, and it means

6    different things in different contexts; right?

7          MS. MATZ:  Right.  But this video, if you look at the

8    screen, this is what they want to show the jury.

9          THE COURT:  Well, that wouldn't come in.  That part

10   of it wouldn't come in for sure.  That's testimony.

11         MS. IZMAYLOVA:  Yes, your Honor.  We submitted this

12   as an exhibit obviously during discovery to them, but

13   obviously we're not going to show this part of it where --

14         THE COURT:  It's on the witness list.  I mean it's on

15   the exhibit list.

16         MS. IZMAYLOVA:  I mean, it's one -- the way that we

17   were able to obtain it from YouTube is just this one

18   compilation.  So we didn't want to cut stuff out and then

19   be -- you know, there would be allegations that we're editing

20   stuff.

21         THE COURT:  When something makes it onto the exhibit

22   list and it hasn't been reformed to say, well, this is all

23   that we're going to use of this, then it's reasonable for the

24   opposing party to assume that you're going to use this

25   evidence.  Certainly this definition stuff doesn't come in,

1  but before that why would her calling herself a stripper ho

2  come in as it relates to the allegations?

3          MS. IZMAYLOVA:  Because, I mean, my understanding of

4  what a ho is, is a person who gets money -- who gives someone

5  sex for money, which is a prostitute.

6          THE COURT:  So when my teenage boys are sitting

7  around with other boys, if they called a girl in high school

8  or middle school, wherever, if they called them a ho, that's

9  what they meant?

10          MS. IZMAYLOVA:  I mean, I'm not saying that's what

11  they mean, but she says I'm a ho, I'm a stripper ho, I'm about

12  that "shmoney," which means I'm all about that money.  I mean,

13  this is -- it's not like --

14          THE COURT:  So your argument is that that video then,

15  had your client seen it -- and I don't know whether your

16  client saw it or not.  But had she -- I guess she didn't, and

17  you're saying this basically goes to prove that the allegation

18  that the plaintiff has made about the fact is that she really

19  is a stripper, is that that video would show that she

20  really -- not a stripper, that she's a prostitute, that video

21  would show that she's a prostitute?  That's an admission

22  against interest.

23          MS. IZMAYLOVA:  I'm not saying -- you know, I don't

24  know for a fact whether or not plaintiff was, in fact, a

25  prostitute, but this is information that she put, she, the

1  plaintiff herself, put out for people to consume.  So then for

2  her to turn around and say she's never said that or it's not

3  true, you know, and then assuming our client will -- I think

4  we should be able to --

5       THE COURT:  What other video do you have that slice

6  of video in?  Do you have another video where that's in

7  without all these compilations, without all the definitions

8  added in?

9       MS. IZMAYLOVA:  There's another, whole nother

10  exhibit, of, also from YouTube, that is a compilation of only

11  plaintiff videos from Instagram Live.  It doesn't contain this

12  particular clip, but it does contain other clips where she

13  also refers to herself as a ho and stripper ho and a number of

14  other things.

15       I mean, again, the plaintiff made this video on her

16  phone on her Instagram account.  If we could just receive the

17  original version, we would just play that and not have to

18  worry about, you know, working on these compilations.

19       MS. MATZ:  Your Honor, if I may say one other thing?

20       THE COURT:  Sure.

21       MS. MATZ:  I think that the defendant's attempt to --

22  and their client tried to do this at the deposition also, and

23  I think it's part of what's going to happen.  The attempt to

24  equate seeing videos about legal activity -- we're talking

25  about stripping -- my client was a stripper before she was a

1   rap artist.  There is not a dispute about that.  But taking

2   legal activity and saying because I'm a stripper and I'm all

3   about the money that suddenly she's a prostitute is highly,

4   highly prejudicial, and it does nothing but continue to

5   advance extremely gender-biased stereotypes about women.

6          And to the extent that they want to -- you know,

7   that's part of their defense, I don't think that statements

8   where they are essentially instructing the jury what to think

9   about that should be admissible.  They're just prejudicial.

10          THE COURT:  You mean like that?  What we're looking

11   at right now?  That's not coming in.

12          MS. IZMAYLOVA:  That's not admissible.  We agree with

13   that.

14          THE COURT:  That's not coming in.  The problem I have

15   overall with it all, though, is it's not just a question of

16   checking the elements of the offense of slander and libel as

17   to whether or not there were things said about the plaintiff

18   that aren't true.  It's also a question about whether or not

19   it harmed your reputation.  And her reputation is what it is,

20   and she has cultivated a certain image, which might be art,

21   you know, shtick.

22          I think about my generation, Madonna, who had various

23   reincarnations of who she was, and if someone then says

24   something about her that is consistent with a general image

25   that she has cultivated, even if that image is just, you know,

1  a marketing thing, the question becomes whether she can really

2  be damaged, not whether or not it was slander or libel, but

3  whether or not it actually harmed her or not.

4        You know, I can think of sports analogies right now

5  as we sit here today.  Probably one of the more unpopular

6  sports personalities is the Green Bay quarter back.  He's

7  cultivated a certain image about himself, and if someone made

8  an allegation against him consistent with that image, at least

9  in part, that's untrue, you know, like -- I can't even think

10 of a specific example.  But I'm sure most of you know what I'm

11 talking about where he didn't get his -- he said he was

12 immunized, but he wasn't vaccinated.  And he caught Covid, and

13 he's been very defensive about it.  And, you know, some people

14 might say he's extremely arrogant.

15       So someone else came out and said that, you know, he

16 attended an anti-vacs convention or rally when he really

17 didn't, and that would be untrue.  The question would become

18 whether or not that statement about him caused him any harm

19 because he himself said things that were at least ambiguous,

20 if not outright dishonest, about whether or not he had been

21 vaccinated, which might imply that he does at least sympathize

22 with people that are anti-vacs in their orientation.

23       So, you know, that's the problem here, is that your

24 client has done and said a lot of things that are somewhat, at

25 least from my generation, a little counterculture.  That

1   doesn't mean she's a prostitute, but when she says stuff like

2   she said in the video that we just watched, you know, as a

3   reasonable -- you know, could that affect whether a juror

4   believes she's been actually harmed by the falsity.  So

5   address that point, if you would.  I know it took me a long

6   time to make it.

7           MS. MATZ:  No, that's a fair question, your Honor.  I

8   think that, you know, all of this has to be a balancing test

9   in terms of the things that are going to be highly prejudicial

10  to her and potentially confusing and misleading the jury.  So

11  while I understand that some of -- you know, I don't think

12  that they don't have a right to get my client on the stand and

13  ask her if she's ever necessarily referred to herself as a ho

14  and what did you mean by that.  I'm not saying that.

15          But I think that some of these videos, these

16  compilation videos, that contain highly prejudicial, both

17  definitions and then also criminal type of allegations, should

18  not come in because in those cases the harm really does

19  outweigh any probative value, any potential relevance that

20  some of that might have.  And it's going to, I think, confuse

21  the jury into thinking that that is part of their task in

22  terms of deciding whether or not all of these other ancillary

23  things are true.

24          And that's part of the reason that we've said like,

25  for example, that Halloween video that I showed you the first

 1  time, I think that's probably coming in.

 2         THE COURT:  Okay.  So let's parse it a little bit.  I

 3  will agree with you that someone calling themselves a stripper

 4  ho does not necessarily mean that they are a prostitute, but

 5  it's not -- it's also not a very favorable term to call

 6  yourself, much less to call someone else.  Why would the jury

 7  not be entitled to hear her refer to her as a stripper ho?

 8  Because in that last scene she wasn't talking about any

 9  criminal activity.  That was the second one we looked at.  The

10  third one she's just calling herself a stripper ho.

11         Wouldn't that be consistent with the defendant's

12  theory that even if we said something about her that wasn't

13  true, that it couldn't harm her because that's how she refers

14  to herself?

15         MS. MATZ:  I think that obviously their defense could

16  be that, and, you know, part of the rebuttal is that that's

17  not actually -- she didn't refer to herself as a prostitute.

18  But my point is that I don't think that they have these

19  exhibits in any kind of a non-prejudicial form.  That's part

20  of the problem here.  We have all these compilation exhibits

21  where -- I'm not even sure how they're going to get them in

22  because they can't be authenticated.

23         To get a video in you have to show that you know

24  where it came from and that it hasn't been altered or edited,

25  and it can't have text and other things written across the

1   screen that are prejudicial.  So if they had a clip of just my

2   client saying I'm a stripper ho and it didn't truncate or, you

3   know, create a video that is some prejudicial -- in some

4   prejudicial manner meaning where's the rest of that

5   statement --

6           THE COURT:  Well, was your client's deposition taken

7   in this case?

8           MS. MATZ:  They never took our client's deposition.

9   This is part of the issue here.

10          THE COURT:  That's a little surprising really that

11  they didn't.  How will you admit -- I absolutely agree with

12  the plaintiff as it relates to the text and the add-ons and

13  things like that.  But how will you authenticate this?  Let's

14  say we take out the add-ons and anything else that I say that

15  is more prejudicial than probative.  How will you authenticate

16  it?

17          MS. IZMAYLOVA:  I would ask the plaintiff because

18  she's the one that -- I mean she --

19          THE COURT:  Show it to her in front of the jury to do

20  that.

21          MS. IZMAYLOVA:  Right, but we can, I guess, show it

22  to her without the jury seeing it --

23          THE COURT:  Or having a deposition during the middle

24  of trial.  So you've got to have a way to authenticate when

25  she gets up on the stand that can't be playing it in front of

1  the jury and having her identify that that's her.  That's what

2  a deposition would have done, but you didn't do that.  So I

3  don't know how you get it in.

4          MS. IZMAYLOVA:  It does depict her.  So she gets on

5  the stand and says she's never said these things or, you know,

6  then -- but she did.

7          THE COURT:  Okay.  So let me ask you this.  Okay.

8  Let's go down that road.  So if you have her up on the stand

9  and you say, you know, ma'am, have you ever referred to

10 yourself as a stripper ho and she says, yes, I have, then what

11 you do?

12         MS. IZMAYLOVA:  Then that's it.  We move on.

13         THE COURT:  You're right.

14         MS. IZMAYLOVA:  She admitted that she did say that

15 about herself.  That's the whole point of showing this.

16         THE COURT:  I think the last video I saw is

17 admissible under the ambit of whether or not she's truly been

18 harmed or damaged by any slander or libelist material.  But I

19 agree with the plaintiff that you've got to have a way to

20 authenticate it.  And you're not going to do that in front of

21 the jury where they see it, and then she says it's not her.

22 Because she could say that.

23         She certainly would say that about the video of her

24 dancing.  That probably comes in anyway, as the plaintiff has

25 acknowledged, because the defendant says that's what she was

1  basing her statement about the whole beer bottle incident on.

2  So it probably comes in.  And I saw it one time in my office,

3  and I didn't look at it close enough to try to figure out was

4  that the plaintiff or not the plaintiff, but if it's clearly

5  not the plaintiff, as the plaintiff has said through her

6  lawyers today, then they probably want it to be seen because

7  it demonstrates the level of unreasonableness that the

8  defendant exhibited.

9       I will allow the jury to see that last clip that we

10  just saw if the plaintiff denies that she has ever called

11  herself or referred to herself that way for impeachment

12  purposes at the very least.  Otherwise, you've got to lay a

13  foundation, and it doesn't seem like to me you can because

14  you're not going to do that on the stand in front of the jury.

15       All right.  Let's play the next video or the next

16  clip of this video.  I can't hear it.  Sorry.  Start it over

17  if you would.

18       (Whereupon, a video recording was played.)

19       THE COURT:  I'm not exactly sure what she said in any

20  of that other than it does appear that she uses the word

21  "tricks."  So same situation.  How would you ask that question

22  to her about that video?

23       MS. IZMAYLOVA:  Have you ever said that you've

24  "tricked?"

25       THE COURT:  Ever said what?

1          MS. IZMAYLOVA:  That you've tricked.

2          THE COURT:  That I do tricks?

3          MS. IZMAYLOVA:  No, that you've tricked.  She said,

4   however, I have tricked, as a verb which means prostitute.  I

5   mean, that's a slang word for prostitute.

6          THE COURT:  I mean, I can't really think of another

7   reason it would be said like that.  What about that, Ms. Matz?

8   What if she is asked if she's ever said I have tricked?

9          MS. MATZ:  First of all, I don't think that's what

10  she's saying.  I think she's saying I have tricks.

11         THE COURT:  I have tricks.

12         MS. MATZ:  First of all, she's saying in that

13  video -- and again I'm about to curse.  She says, I didn't

14  sell my pussy.  I have tricks.  She's talking about engaging

15  in sexual acts with her boyfriend.  This is part of the

16  problem of these compilation videos pulling pieces of videos

17  completely out of context where you can't even hear the

18  preceding statements and then trying to use them as

19  admissions.

20         THE COURT:  That was at the end of about three

21  sentences, maybe four.  So there's really nothing out of

22  context about the word "tricks."  I mean, there may have been

23  other stuff but --

24         MS. MATZ:  Saying I have tricks, plural -- and I'm

25  sorry.  It's a little hard to talk with the mask on.

1          THE COURT:  I have tricks.

2          MS. MATZ:  Saying I have tricks, I have tricks in the

3   ways I interface with my boyfriend and the way I have

4   intercourse with him is different than saying I have tricked

5   e-d.

6          THE COURT:  I don't know.  I mean --

7          MS. IZMAYLOVA:  That's not what I heard.

8          THE COURT:  That's your argument.  That may be what

9   she says that she meant when she said that, but I don't know

10  that's what she meant.  I mean, certainly the word "tricks"

11  uniformly has been used to refer to someone who is a

12  prostitute, and I think tricks would generally refer to the

13  transactions.  I think that comes in.

14         MS. MATZ:  My understanding of what she's saying,

15  just so you know, your Honor, is she's saying I don't have to

16  sell my pussy because I have tricks up my sleeve.

17         THE COURT:  I have tricks up my sleeve.  Well, I'm

18  going to let that come in.  Y'all can argue what it means.  It

19  would come in, I guess, if she denies ever using the word

20  "tricks."  And if she goes to explain this is the context that

21  I used it in and the defendant has a good faith basis to say

22  that that's just not true, given what we've seen here I think

23  this probably can be played.

24         MS. MATZ:  I'm assuming, though, however, that that

25  would not include this slide afterwards.

1              THE COURT:  None of the words added, the commentary,
2    can come in.
3              MS. IZMAYLOVA:  I was just about to ask, your Honor.
4    So, again, this was one video that we sent the plaintiffs.  We
5    can isolate the clips and send it to them for review.  That
6    way before January 5th there's not any issues about, you know,
7    any other thing potentially -- you know, the jury seeing
8    anything that's not admissible.  If everyone is okay with
9    that, then we can do that so that that way we isolate the ones
10   that are admissible in the event --
11             THE COURT:  I'm just ruling on what can come in and
12   can't come in.  I don't want to get in on the details of how
13   y'all manage it.  All right.  Show me the next one, please.
14             (Whereupon, a video recording was played.)
15             MS. MATZ:  I'm sorry, your Honor.  Before we go on
16   can I ask you one other question?
17             THE COURT:  Yes, ma'am.
18             MS. MATZ:  The defendant's counsel has said that they
19   pulled this off the internet.  How does this actually have any
20   relevance if their client didn't see this before she made the
21   statements?
22             MS. IZMAYLOVA:  She sent us the links.  We downloaded
23   the videos.
24             THE COURT:  Well, it has relevance because if your
25   client denies that she is a prostitute or has prostituted but

1 she uses words that seem to indicate that she has, then

2 whether or not the defendant saw it before she said what she

3 said, it's relevant to whether or not the allegation is true

4 or false that she's a prostitute or has been a prostitute.

5            Understand I'm not calling anybody anything.  I'm

6 just saying --

7            MS. MATZ:  I understand, your Honor.  Okay.  We'll

8 keep going.

9            THE COURT:  All right.

10            (Whereupon, a video recording was played.)

11            THE COURT:  Yes, ma'am.

12            MS. MATZ:  I mean, again, I don't think that she's

13 using trick in any kind of a word to refer to prostitution.

14 She's talking about tricks.

15            THE COURT:  You can explain that.  I mean, she can

16 say, when she's asked, did she ever say she's done tricks or

17 has tricks, or whatever, and she can say yes.  She can say no,

18 and then the videos get played.  She can say yes, but this is

19 the context in which I meant it.  And if the defendant has a

20 good faith basis to believe that the videos that they have

21 impeach her explanation of the context that she says she used

22 the word "tricks," they can play it.

23            Now, if you show her the video and she says that's

24 not me, it probably still gets played because it's going to be

25 up to the jury to decide if that's her, just like it's up to

1  the jury to decide whether or not, you know, that was her on

2  the video from the strip club that involved the beer bottle.

3  But there's no way I can keep it out.

4         And don't ask me -- let's think of it this way:  Both

5  of you represent a party who wants a desired outcome.  I have

6  no desired outcome except for one, and that is I don't want to

7  try this case twice.  And I'm not going to yield to what is a

8  desire that you have that is earnest -- and I understand it --

9  if I think it's going to potentially lead to, you know, a

10 reversal, and I just think this is relevant.

11        I know if I was on the appellate court, I would think

12 it's irrelevant -- I would think it's relevant, and you let

13 the jury make the decision.  And, again, you know, this is all

14 in the context of a global image that the plaintiff has for

15 herself.  I mean, I've been told about some of her music

16 videos.  The only one I've ever seen is the one with Bruno

17 Mars, and I actually kind of like it because I love Bruno

18 Mars.  But I've heard of others that are out there that are

19 really not that great, you know, from my own personal

20 standpoint.  I'm sure from other people's standpoint they're

21 perfectly fine.

22        But she's got this image.  And, you know, she's the

23 one that's come to court, and she has every right to be here.

24 But really everything that's related to the claim has got to

25 come in, and I think this is relevant.  So I'm going to allow

1  the video part to be played if she denies that she used the

2  word "tricks" and/or her explanation isn't consistent with the

3  good faith basis on what the -- how the defendant interprets

4  it.

5          So is there more for me to look at?

6          (Whereupon, a video recording was played.)

7          THE COURT:  I don't know what racks are, but I

8  certainly know what Rolexes are, although I don't know if --

9  do people still buy those today?  I guess they do.  How is

10  that not relevant to the issue of prostitution?

11          MS. MATZ:  Your Honor, she's rapping in this video,

12  and part of the issue here is it's been taken out of context.

13  She's freestyling.

14          THE COURT:  That's just argumentative.  I mean,

15  that's -- nothing wrong with being argumentative, but that

16  doesn't make it not relevant.  That's her spin on it, her view

17  on it.  I mean, let's say that it was a rap song.  The rap

18  song would be admissible if it's about being in a gang or

19  being a prostitute or doing the kinds of things that the

20  plaintiff is complaining about.  That's all relevant, right,

21  because it goes to the issue of whether it's true or not.  It

22  also goes to the issue of damages because of the issue, you

23  know, of the image because you have to be harmed too.

24          MS. MATZ:  I hear you, but the issue here is that by,

25  again, by pulling these clips out of context and not having

1    any of the longer -- it does.  It becomes highly prejudicial

2    even if it's relevant.  If they want to play the whole song,

3    the whole song lyrics or have that available so that they can

4    be used rather than compilation videos, then that's a

5    different story.  But it can't be that the only piece that's

6    in the record and the only piece that's available because they

7    haven't provided the longer videos, they haven't provided the

8    only piece that's here is something where it's not even

9    where --

10          THE COURT:  Let's say they only played part of it.

11   Then you can play the whole thing, can't you?

12          MS. MATZ:  That provides me to have -- that would

13   require me to have it and then have produced a longer version

14   of it in discovery, which a lot of this stuff, because they've

15   pulled it off the internet and edited and compiled formats --

16          THE COURT:  So let's say that's all they have.  Does

17   that mean they can't use it because you say there should be

18   longer versions that they don't have?

19          MS. MATZ:  I think that is a question of weighing the

20   prejudice of certain portions of it with the probative value.

21          THE COURT:  Y'all are wanting me to basically pre-try

22   the case, and I'm not going to do it.  So if they're playing

23   parts of videos and you think that there's other parts, then

24   you need to bring the other parts, and you need to play them.

25   I'm not doing it.

1          So there's nothing that was in that that I find

2     objectionable as it relates to the issues that the jury has to

3     try.  So when I said -- when I denied summary judgment and

4     said there was going to be a trial, I meant it.  So y'all have

5     got to do your job and present the case you want to present

6     and don't have me to try to basically right the rules so that

7     the trial isn't a real trial.  I mean, that's the way I feel

8     is that you want me to put my thumb on the scale, and I'm not

9     going to do it.  The jury is going to decide that.

10          So there's nothing I saw there.  Assuming the

11    foundation can be laid or assuming it's not laid but through

12    impeachment, you know, I think it's coming in.  So go ahead.

13          (Whereupon, a video recording was played.)

14          THE COURT:  Okay.  So certainly there is an

15    implication in what she says there that she's used drugs.  So

16    if she denies that she has used drugs and she denies that

17    she's talked about using drugs, why wouldn't that be

18    admissible?

19          MS. MATZ:  So, first of all, our defamation

20    allegation only relates to cocaine.

21          THE COURT:  That's parsing.  Okay.  If someone said,

22    okay, so, I mean, molly is an illegal narcotic too and so

23    cocaine -- I use molly, but, man, I would never touch cocaine,

24    I mean, look, that's disingenuous to argue that it's any

25    different as it relates to defamation and the harm that would

1  occur to someone.  Using drugs is completely consistent with

2  her image anyway.  I mean, that's coming in.

3        MS. MATZ:  There were not --

4        THE COURT:  I'm really surprised that you think that

5  this stuff isn't relevant.  It is.

6        MS. MATZ:  Just so you know, your Honor, part of the

7  issue here is that we put some of these compilation videos on

8  the list because they have certain parts that we had big

9  problems with.  If I can just bring you back to our motion for

10 a moment, part of the motion here was the drugging and the

11 robbing of the men comment that you've already talked about.

12       THE COURT:  And that's the only one that I've agreed

13 to you -- is there something else like that?

14       MS. MATZ:  I think that same clip plays at the end.

15 I wasn't actually intending to take you through this clip each

16 piece by each piece.  I think that there are pieces of this

17 that it would -- there are pieces of this that it would agree

18 on, A, what our client says at trial and, B, how it's being

19 used.  But the primary purpose of the reason this exhibit was

20 called out specifically was the first portion -- I'm sorry.

21 It's technically the second portion of it because the first

22 portion was that Halloween video.

23       THE COURT:  All right.  So then let's talk about

24 another video then, I mean, if there's another one to talk

25 about.  But as it relates to the drugging and robbing men,

1  which was Item E, that's out, but the rest of it, depending on

2  how it's asked and authenticated, can come in.  I'm going to

3  move on to Item No. F --

4          MS. MATZ:  Thank you, your Honor.

5          THE COURT:  -- on page 10.  Let me read it again.

6  All right.  So I haven't looked at the exhibits, but I

7  understand your motion in Item F.  Is there a reason why

8  exhibits about what the plaintiff may have said about third

9  parties would be admissible?

10          MS. IZMAYLOVA:  Your Honor, it's not just about third

11  parties.  It goes to show, which is one of our theories, is

12  that she -- the reason why -- the real reason why she filed

13  this lawsuit, not because these statements are untrue, it's

14  because she does not -- the plaintiff cannot process or handle

15  any negative comments about her whatsoever.

16          And these comments show her being extremely mean and

17  hateful to any, like, random different people anytime they say

18  anything negative about her, even if it's something like I

19  didn't really like that song or I don't like her outfit.  It's

20  her M.O. to always, you know, jump on the defensive and start

21  basically sometimes even bullying or taking it too far.

22          THE COURT:  Okay.  So let's assume that she has as

23  thin of a skin as you have stated.  What difference does that

24  make?

25          MS. IZMAYLOVA:  I think it goes to her true motive

1  for filing the lawsuit that --

2          THE COURT:  Wait a minute.  It goes to what?

3          MS. IZMAYLOVA:  It goes to her -- the real motive of

4  her filing this lawsuit, not that these statements are not

5  true.  It's just that she didn't want my client talking about

6  her, and that's it because --

7          THE COURT:  She's got to prove that they're untrue,

8  and if she can prove that they're untrue, she's got to prove

9  that your client said them or published them and that your

10  client had malice.  And then she's got to prove that she was

11  damaged about, you know, when they were said.  What difference

12  does it make that if she does have a thin skin, as long as

13  they were untrue, that your client said them, your client had

14  malice, and she was damaged?

15         MS. IZMAYLOVA:  To basically put it into perspective

16  for the jury, this is not an isolated incident between the

17  plaintiff and one person.  She does this with tons and tons of

18  people.

19         THE COURT:  That's not relevant.  That's not relevant

20  to the issues in this lawsuit.  I mean, I agree with the

21  plaintiff on that.  So the items that are referenced in No. F

22  is not going to come in.

23         MS. MATZ:  Thank you, your Honor.

24         THE COURT:  You always have to focus on what the

25  elements are, and that just doesn't go to any of them.  In

1  fact, you know, if you want to say anything, it's perhaps the

2  then skull theory.  You know, a person who, thin skull theory

3  from law school, somebody has got a thin skull and a hammer

4  falls on them from a construction site that wouldn't have hurt

5  anyone else but hurts them doesn't make the negligence less

6  negligent.  She may have a thin skin, but if she was wronged,

7  then she's equally entitled to recover just even if she got

8  more offended than someone else would have gotten based on it.

9       All right.  I'm going to move to defendant's motion

10  in limine.  It's Document No. 165.  All right.  Item No. 1 --

11  the pages are unnumbered.  But Item No. 1 suggestions or

12  implications that Kebe is involved in illegal activity and

13  that Kebe formed Kebe Studios -- I'm paraphrasing now -- as an

14  alterego or business conduit for her illegal activities.  Now,

15  Kebe Studios is a defendant in this case because Kebe Studios

16  allegedly published, disseminated the libelist materials that

17  Ms. Kebe herself has sued for, some or all of them.  Is there

18  an alterego theory to that as well from the plaintiff or is it

19  just that they actually did it, they the studios, did it too

20  or did some of them themselves?

21       MS. MATZ:  So the publication issue you're correct,

22  your Honor.  That's part of it.  But, you know, to the

23  extent -- part of the issue here is that the other side is

24  presenting their defense as if each and every element has to

25  be proved as to both of the defendants so the alterego piece

1    of this is relevant to the extent that, not just the

2    publication is against Kebe Studios as well, which they've, by

3    the way, admitted most of the publication, but in terms of

4    them being held jointly and severally liable, Ms. Kebe and her

5    husband, who's the other member of this LLC, admitted at the

6    deposition -- both of them made statements to the effect of

7    there's no difference between us and the company.

8           So, just so we're clear, we are not -- we have not

9    made any argument or statement that Kebe Studios engaged in

10   illegal activity.  What they are talking about is statements

11   at the deposition that they are one in the same and that

12   Ms. Kebe makes all the decisions and the statements at the

13   deposition that as of a certain date they had not filed any

14   tax returns or paid taxes on certain income that's potentially

15   relevant to the alterego issue and there just being no

16   separation between the two.

17          THE COURT:  When was Kebe Studios formed?

18          MS. MATZ:  I believe it was in late 2018.  I would

19   have to -- we have the certificate of formation in our exhibit

20   list.

21          THE COURT:  There's testimony that Kebe Studios has

22   not filed tax returns in its individual name?

23          MS. MATZ:  Yes or that -- and that the two

24   individuals did not file tax returns for that income because

25   depending on how it was set up --

```
 1            THE COURT:  That's not relevant, is it?

 2            MS. MATZ:  Well, I think it's relevant to the extent

 3  that they're not following any corporate formalities.

 4            THE COURT:  Wait a minute.  So you're saying that

 5  neither party filed tax returns for the income that was

 6  generated by the activities that the plaintiff sues about?

 7            MS. MATZ:  And that was received into Kebe Studios.

 8            THE COURT:  Well, I mean, that's a problem, but it's

 9  a problem for the IRS.  And as it relates to not filing a

10  corporate or partnership or LLC tax return, it certainly to

11  some degree indicates a merging of identity.  But I am

12  concerned about the jury being told that nobody has filed tax

13  returns.  I mean, I can understand the plaintiff wanting to

14  say, okay, the corporation or the LLC -- excuse me -- didn't

15  file a tax return, whereas if it was a separate entity, that

16  it should have.  But if you want to tell them that none of

17  them filed tax returns, then that's more than showing kind of

18  a merger.  That's showing bad, wrongful conduct of an

19  unrelated matter.  See my point?

20            MS. MATZ:  I hear what you're saying --

21            THE COURT:  To me that would be like saying, well,

22  Ms. Almanzar hasn't filed tax returns either.  That doesn't

23  really touch any issues in this case, but if the jury found

24  out she didn't pay tax returns and jurors have paid their

25  taxes, then they would be upset by that perhaps.
```

1         MS. MATZ:  It could also touch on financial motives.
2    So just so you know, the corporation was formed in April of
3    2018, and that was shortly before the defamatory conduct
4    began.  And, you know, there is a financial element here that
5    goes to both actual malice and the punitive damages piece.
6         THE COURT:  But not both of them.  I'm still focused
7    on the fact that nobody filed tax returns with income that
8    would have been generated by all this.  That goes to crimes,
9    you know.  That's criminal and civil.
10         Well, let me ask this:  Does the defendant -- well,
11    you certainly can have -- let me just say you certainly can
12    have a corporate merging claim as part of the overall claim
13    where they basically say there's no difference between the LLC
14    and the individuals.  That's done fairly routinely in
15    litigation.  And if with that theory that the plaintiff has is
16    that the LLC is really just a subterfuge, wouldn't it be
17    relevant that the LLC hasn't filed its own tax returns?
18         MS. IZMAYLOVA:  Your Honor, if I may, first of all,
19    individually Mr. and Mrs. Kebe did file tax returns.  I mean,
20    this is obviously not really relevant here but --
21         THE COURT:  Aren't the LLCs required to file tax
22    returns?
23         MS. IZMAYLOVA:  They are, and so they've been working
24    with the same tax lawyer that we have for our firm since maybe
25    one and a half years ago, and he's been going through and --

1    you know, because they didn't really know what they were doing

2    is really what it was.  And so for them to, for the

3    plaintiff --

4           THE COURT:  That's your argument.  But my point is if

5    somebody -- if an LLC hasn't filed a tax return, wouldn't that

6    be relevant as to whether or not it is real?  I mean, it may

7    have registered, but if it's not operating, if it hasn't kept

8    separateness --

9           MS. IZMAYLOVA:  But I just don't see the relevance of

10   it because I know that for a fact in actual real life they are

11   working with a tax attorney --

12          THE COURT:  They haven't.  You can't testify to

13   anything.  They can certainly testify to that, sure, but --

14   and you said they have filed their own individual returns?

15          MS. IZMAYLOVA:  During those times which now, you

16   know, have to be, you know, corrected.  But the point is that

17   the implication is that they are doing something fraudulent,

18   and they're not.  And I know that for a fact.

19          THE COURT:  Well, I'm not using it for that purpose,

20   but my point is if the income that was made was really the

21   LLC's, the LLC would have had an obligation to have filed a

22   tax return and reported it.  And if the LLC didn't do that,

23   then the question becomes was it a real LLC or was it just

24   them.

25          I mean, I think this was a pretty close call just

1   because of the implication that it, you know, that there may

2   have been some -- I don't know.  I don't know where the

3   criminal behavior begins and ends because people don't always

4   file their tax returns on time.  But the fact of the matter is

5   they haven't filed theirs, and they certainly didn't file --

6   even if they file it before January, they wouldn't have filed

7   it on time.  Isn't that evidence that maybe they were

8   operating arguably as individuals and not as an LLC?

9          MS. IZMAYLOVA:  I mean, I don't see how that's

10  relevant at all, but their concern is that the plaintiff is

11  suggesting that the whole reason why they created the LLC is

12  to like hide money, which is not --

13         THE COURT:  Hide money or -- that's not the way I

14  interpreted it.  I interpret it more as a way to try to create

15  a liability shield for the fraudulent -- or not the

16  fraudulent, the libelist behavior.  If we said, well, it was

17  the corporation that was doing it -- here's what we know.

18  Okay.  Here's one thing that we know:  If the LLC -- I'm sorry

19  I referred to it as the corporation.  But if the organization

20  published it, the organization can be responsible for it.  And

21  if Ms. Kebe is the one in the organization that made the

22  decision to and actually communicated it, she can also be held

23  liable as well; right?

24         MS. IZMAYLOVA:  Right.

25         THE COURT:  While you don't agree that anybody should

1   be liable for that, you would agree that the individual can be

2   responsible, and if she did it on behalf of a company, that

3   they could also be responsible; right?

4           MS. IZMAYLOVA:  I do agree with that.  So my -- we're

5   not denying that part.  My only problem is if it starts to

6   insinuate some kind of criminal -- like, you know, that they

7   did this with criminal intent or, you know, criminal behavior,

8   fraudulent or anything like that.  That's where this motion is

9   about.

10          THE COURT:  You're saying they can't argue that

11  that's why in their closing arguments, that that's why she

12  created the corporation obviously, because she was trying to

13  shield herself for what she knew was wrongful behavior?

14          MS. IZMAYLOVA:  Because there's actually no evidence

15  of that.  That's just sheer speculation.

16          THE COURT:  No, but it's probably a -- it's one of

17  the primary reasons people create companies that possibly

18  could be subject to double taxation, is to get the liability

19  shield.  And if you're also doing something wrong, which they

20  claim the defendant was, I mean, the libelist stuff wrong,

21  then -- well, let me just put it this way:

22          I'm going to reserve ruling on whether or not the

23  lack of paying taxes could be admissible against anyone.  I'm

24  a little concerned about that, but as it relates to the

25  argument that there's been a merging of identity between the

1  corporation or the LLC and the individuals, and even if there

2  hasn't been, that the LLC can be responsible for the acts of

3  Ms. Kebe and her husband.  To the extent that he did anything

4  or that even if the publication was technically by an entity,

5  because that's who Ms. Kebe operated through, that she herself

6  still could have individual liability.  I think those issues

7  are going to be issues for the jury to decide.

8          MS. IZMAYLOVA:  Well, we're not denying that, what

9  you just said.

10         THE COURT:  But the tax return part I'll reserve

11  ruling on as to that.  So I'm not granting your motion because

12  you're trying to limit the argument they can make and that --

13  a lot of that depends on what happens at trial.  I don't know

14  what all the evidence is going to be, and that argument might

15  be apt at the closing depending on what comes out.

16         All right.  So basically as to No. 1, I'm allowing

17  the argument to make that there's a merger but as to -- I'm

18  not allowing -- I'm reserving ruling on the tax return

19  evidence.  Remind to ask me about that before trial.  And I'm

20  not otherwise limiting argument that can be made which is a

21  fair extrapolation from the evidence, and I'll just have to

22  wait and see what the evidence is.

23         No. 2, Kebe's Prior Arrest and Criminal History.

24  Does the plaintiff agree that none of that is relevant?

25         MS. MATZ:  Yes, your Honor.  We went back and took a

1  look at the deposition testimony.  And there was some check

2  fraud stuff, but it was a pretty long time ago.  So we've

3  agreed in our response papers that that's okay because we've

4  made the same argument regarding criminal history.

5      THE COURT:  What about No. 3, Evidence of Other

6  Claims or Lawsuits?  I'm not aware of any of those.  But are

7  there other lawsuits that Kebe has been involved in or the

8  company?

9      MS. MATZ:  I don't think that this is about other

10 claims about other lawsuits necessarily.  I think that -- I

11 don't know exactly what their argument is, but I know the

12 purposes for which we want to use certain evidence.

13 Obviously, a failure to retract a statement that you know is

14 false can be used as evidence towards actual malice and --

15     THE COURT:  In this case but not other cases.

16     MS. MATZ:  Well, so there's two other specific

17 incidents.  One is that Ms. Kebe was questioned at her

18 deposition about her general practices.  She says she's a

19 blogger, that this has happened to her before, and what she

20 typically does.  There is one instance --

21     THE COURT:  She typically does.  What do you mean?

22     MS. MATZ:  What she typically does in terms of if

23 there is a claim made that something she published is false

24 and what actions she takes after that.

25     THE COURT:  What does she say?  What did she say

1  about that?

2        MS. MATZ:  So there is one specific example of a

3  statement that she made that she found out later was false,

4  and she said that she issued a retraction.  And when we asked

5  her questions about whether or not she would issue plaintiff a

6  retraction if she found out it was false, the answer was no.

7        THE COURT:  About the plaintiff?

8        MS. MATZ:  Yes.  She did not care.  Even if it was

9  false, she was never going to issue a retraction because she

10 doesn't like our client.  That's the gist of it.

11       THE COURT:  Okay.  Why would the jury need to know

12 that she did another retraction in another instance for

13 someone else?  Wouldn't all they need to know is that she

14 appreciated that what she said was wrong about your client,

15 but she refused to retract it?  What more would there need to

16 be?

17       MS. MATZ:  I actually think that a departure from

18 standard practice is very compelling evidence of actual malice

19 and that there is an actual motive here in terms of her

20 dislike for my client.  So if she has a standard practice of

21 doing --

22       THE COURT:  Wait a minute.  Let me ask, is the malice

23 judged from the time that the original publication was made or

24 from the point of time where the retraction is refused?

25       MS. MATZ:  So that's an interesting question here.  I

1    think that you're going to judge malice on an ongoing basis

2    because we have evidence of the original publication.  We have

3    evidence that directly after my client filed this lawsuit, she

4    took some of the videos down and then republished them.  She

5    has also throughout this lawsuit continued to repeat the

6    defamatory statements.  She actually did last night.  Last

7    night she went on Twitter and referred to my client as Herpes

8    B again.  So the actual malice is an ongoing -- it's an

9    ongoing judgment for the jury because there's repeated

10   defamatory statements.

11        THE COURT:  Okay.  So when somebody says something

12   untrue about the first person but believed it to be true and

13   then is informed that it's not true and appreciates that it

14   was not true and refuses to retract.  So that's the point

15   where we're at.  Okay.  So that's a lot of assumptions to get

16   to that point.  If the person does retract, does that provide

17   them with a defense?

18        MS. MATZ:  If they do it within a certain amount of

19   time, it provides them with a defense to punitive damages,

20   yes, and the refusal to do so can be considered by the jury

21   for that purpose as well.

22        MS. IZMAYLOVA:  For punitive damages, yeah, but not

23   for the general trial.  And, also, she's never -- she still

24   does not -- she has not admitted that any of these statements

25   are false, so I'm not sure what Ms. Matz is talking about.

1        THE COURT:  Well, the jury is ultimately going to

2   decide what was true and what --

3        MS. IZMAYLOVA:  Right, correct.

4        THE COURT:  Yeah, I don't think it's relevant what

5   may have happened in other contexts with other people, so I'm

6   going to grant that motion.  The evidence of other claims or

7   other lawsuits is not admitted.  So Item 3 under defendant's

8   motion in limine is granted.

9        I think probably both of you agree that discussions

10  or offers regarding possible compromise are not admissible;

11  correct?

12       MS. MATZ:  We agree with that premise, but I don't

13  know exactly what they're talking about.  We have only been

14  able to speculate what they're talking about on our exhibit

15  list.

16       THE COURT:  Have there been some offers made here?

17  Because my understanding was y'all weren't really even talking

18  about it.

19       MS. MATZ:  So there was -- there's only two things on

20  the exhibit list that I could possibly think of that this

21  could be geared towards.  One is actually on their exhibit

22  list that we have moved to exclude, and that is text messages

23  between Ms. Kebe's husband and someone who said they were a

24  representative of my client, who we have no idea who it is,

25  talking about settlement, which I don't even know who this

1   person -- they don't even know who it is.  It was a person who

2   called themselves Billy.  I don't think that those are really

3   the issue --

4           THE COURT:  Called Billy?

5           MS. MATZ:  Yeah.

6           THE COURT:  It wasn't me.  That's what I call myself.

7           MS. MATZ:  The only other communication that I can

8   surmise that they might be talking about -- and they didn't

9   include an exhibit list, so I'm speculating a little bit here,

10  your Honor -- is Ms. Kebe herself sent an email to my office

11  shortly after this lawsuit was filed after she had counsel and

12  decided to do this without counsel where she admitted that she

13  has no idea -- I honestly have no idea if those things were

14  true about your client, and after consulting with those around

15  me, it was my ego that wouldn't allow me to yield to your

16  client's demands.

17          I'm going very fast.  She tells -- she said that she

18  is going to be making an official public apology in the days

19  to come, and the videos will come down by midnight.  This was

20  not marked as a settlement communication.  There were no

21  offers of settlement sent to her prior to this and I think --

22          THE COURT:  An answer has already been filed in the

23  lawsuit?

24          MS. IZMAYLOVA:  No, your Honor.

25          MS. MATZ:  No, your Honor.

```
 1              MS. IZMAYLOVA:  This was before she was -- she was
 2    pro se first of all.
 3              THE COURT:  Is that what you want to keep out?
 4              MS. IZMAYLOVA:  Correct, because their firm sent her
 5    communication and she was responding --
 6              THE COURT:  What was the communication they sent?
 7              MS. IZMAYLOVA:  It was an email telling cease and
 8    desist or remove the email or --
 9              THE COURT:  She responded by --
10              MS. IZMAYLOVA:  She was pro se.  She was not
11    represented by any attorney --
12              THE COURT:  That doesn't matter.
13              MS. IZMAYLOVA:  -- so what I'm saying is she was
14    responding to their -- they were going back and forth about,
15    you know, how to settle this without the lawsuit.
16              THE COURT:  Have you got a copy of the email?
17              MS. MATZ:  I do.  I have it.  And just to be very
18    clear, she said she had counsel in the email and not that it
19    mattered but --
20              THE COURT:  Let me just see the email.
21              MS. MATZ:  Sure.  May I approach, your Honor?
22              THE COURT:  Yes.
23              MS. IZMAYLOVA:  I can bring you our tentative
24    agreement and the date.
25              MS. MATZ:  It was in response to our demand for a
```

1   retraction that we had to send pursuant to Georgia code.

2           THE COURT:  Can you just email it to me?

3           MS. MATZ:  Sure.

4           THE COURT:  Why don't you email it to me at -- our

5   email address is kind of weird.  Do y'all have Jennifer's

6   email?  Just send it to Jennifer.  Ours is similar but --

7           MS. MATZ:  Yeah.  Just give me one --

8           THE COURT:  Send it to Jennifer.  And, Jennifer,

9   forward that to me as soon as you get it.

10          MS. MATZ:  If you don't mind, just give me one

11  moment, your Honor, please.

12          THE COURT:  Sure.

13          COURTROOM DEPUTY:  I have your email, and I'll send

14  you one right now.

15          MS. MATZ:  I actually just found one of yours.  Thank

16  you so much.

17          THE COURT:  And just for y'all's -- if you're

18  thinking about lunch, we're going to finish with the

19  defendant's motion -- let me make sure; a lot of it is just

20  proforma stuff -- and then we'll take a lunch break and we'll

21  come back.  And the only other thing that I know that we need

22  to discuss is the motion to exclude Dr. Shelly Blake and

23  Dr. Tamara Grisales.  There may be other issues that I'm just

24  not thinking of that I will certainly give you a chance to

25  bring up.

1          MS. MATZ:  May I ask one question, your Honor?

2          THE COURT:  Yes, ma'am.

3          MS. MATZ:  Do you want the original retraction

4   communication that was sent to her?  Because it is a

5   separate --

6          THE COURT:  I just want to see the email.

7          MS. MATZ:  Okay.  All right.

8          THE COURT:  Did anywhere in the retraction thing did

9   you demand in full settlement and compromise?

10          MS. MATZ:  I will open it up, but I do not believe

11   so.  My understanding --

12          THE COURT:  Oh, yeah.  Why don't you just go ahead

13   and send me both.

14          MS. MATZ:  My understanding is that we were demanding

15   retraction under Georgia law because there's that statute that

16   says you have to do it before you can make a punitive damages

17   claim.  All right, your Honor.  I just sent it to you --

18   excuse me.  Ms. Lee, I just sent it to you.  There's three.

19          THE COURT:  I've got it.  Hold on.  Who is John

20   Warner?  One of your partners?

21          MS. MATZ:  He was an associate that worked in my

22   office at the time.

23          THE COURT:  Tell him I just promoted him.

24          MS. MATZ:  He'll be very happy to hear that, your

25   Honor.

1          THE COURT:  So is this what you were referring to,

2    this exchange, or is there something else?  About offers of

3    compromise.

4          MS. IZMAYLOVA:  Is that the one that was --

5          THE COURT:  Yeah, I mean other than this thing where

6    plaintiff's counsel sent a retraction demand and your client

7    responded directly.  Was there something else that you were --

8          MS. IZMAYLOVA:  The one that was sent prior to the

9    lawsuit being filed.

10         THE COURT:  Sent by who?

11         MS. IZMAYLOVA:  Is that the one that was sent prior

12   to the lawsuit being filed?  It was a week before the lawsuit

13   was filed?

14         THE COURT:  That's not an offer in compromise.

15   That's admissible.  That's coming in.  It touches on a lot of

16   things, whether she thought the allegations were true.  Heck,

17   if she had just followed what she said she was going to do in

18   that email, you know, maybe this lawsuit doesn't exist today.

19   That's relevant information.  That's coming in.  Maybe she

20   should go through her lawyers next time, but that's coming in.

21         So if that's all that No. 4 goes to, then No. 4 is

22   denied as it relates to the email sent by the defendant

23   directly to the plaintiff.  You know, did you -- you took her

24   deposition; right?

25         MS. MATZ:  Yes, your Honor.

1            THE COURT:  Did you ask her about that?

2            MS. MATZ:  Yes, your Honor.

3            THE COURT:  She admitted that she sent it?

4            MS. MATZ:  Yes, your Honor.

5            THE COURT:  Okay.  So the foundation could be laid

6    without counsel having to testify.

7            All right.  No. 5, Mention of Kebe's Counterclaims.

8    I think both sides agree that they shouldn't be admitted.

9            No. 6, Evidence Pertaining to Starmarie Jones.  I

10   think we've already dealt with that in the plaintiff's motion.

11   Is this anything new or different?

12           MS. IZMAYLOVA:  I just want to, because the

13   plaintiff's motion was specifically about the messages between

14   my client but there's -- there is -- we were served with like

15   a default judgment that the plaintiff got against Ms. Jones in

16   New York because she didn't respond to that complaint.  I just

17   want like nothing, no evidence or anything pertaining, you

18   know, to --

19           THE COURT:  To a lawsuit?

20           MS. IZMAYLOVA:  I'm sorry?

21           THE COURT:  To a different lawsuit?

22           MS. IZMAYLOVA:  No, well, I mean they had to -- after

23   they dismissed that, the co-defendant, he had to refile.  But

24   it's a default judgment, so it wasn't like there was a

25   decision on the merits.  And I, you know, I don't believe that

1  that --

2          THE COURT:  A default judgment really is a decision

3  on the merits.

4          MS. IZMAYLOVA:  Well, not on the merits that this is

5  defamation, and so if they're allowed to include that, then

6  the jury --

7          THE COURT:  It's a decision on the merits about

8  whatever the lawsuit about Ms. Jones was about relative to

9  Ms. Jones, but that doesn't mean it's admissible here anyway.

10  But would anything to do with -- Ms. Matz, would anything to

11  do with the lawsuit, separate lawsuit against Ms. Jones, be

12  admissible here?

13          MS. MATZ:  I think it would be, and I'll explain why,

14  your Honor, because -- so there's two things.  The first thing

15  is Ms. Jones is the one who made some of the statements in the

16  video that the defendant elicited and then published.  As to

17  Ms. Jones, those statements have been adjudicated, and I

18  understand that your Honor would need to give a limiting

19  instruction to the jury that they would need to, you know,

20  they have to make their own determination as to Kebe.  But

21  there should not be a question in the jury's mind that my

22  client did not pursue both of these women who made these

23  statements and published them.  And as to Ms. Jones --

24          THE COURT:  I'm sorry.  Okay.  But what relevance

25  does that have to do with whether or not the defendant here

1  committed defamation or other torts?

2        MS. MATZ:  Well, it also has to do with whether or

3  not it is -- I think it also relates to actual malice because,

4  again, you have republication of these statements with

5  mounting evidence against them which Ms. Kebe has continued to

6  ignore and continued to make these statements.  So every time

7  she's making them the jury can decide whether or not it was

8  reasonable for her to be making those statements.

9        THE COURT:  So your argument is that because you sued

10  Ms. Jones and got a judgment against Ms. Jones for

11  defamation -- I guess it's defamation.

12        MS. MATZ:  It was.

13        THE COURT:  -- that that means that if Ms. Kebe

14  continues to repeat and publish the statements that came from

15  Ms. Jones, that that wasn't reasonable for her to do that

16  because she knows that Ms. Jones as a matter of law has been

17  held liable for that?

18        MS. MATZ:  So, yes, but I think it's a little more

19  nuanced than that, if I can explain.  So as your Honor noted

20  in the summary judgment motion -- and this also came up at

21  oral argument -- there were a number of red flags as to

22  Ms. Jones.  And as your Honor aptly pointed out in the summary

23  judgment motion decision, whether or not it was reasonable for

24  Ms. Kebe to rely on and believe that these statements were

25  true, which is a key piece of her own defense, she -- you

1   know, she's presumably going to get up on the stand and say I

2   didn't have any reason to believe that they were false.  So

3   the mounting evidence which includes --

4           THE COURT:  What did Ms. Jones say that was -- what

5   was she the source of that was restated by Kebe or published

6   by Kebe that was libelist?

7           MS. MATZ:  The statement that my client had herpes,

8   the --

9           THE COURT:  I thought that was based on a photograph.

10          MS. MATZ:  That's one of the things that Ms. Kebe has

11  said but --

12          THE COURT:  Did Jones also say that the plaintiff

13  admitted she had it?

14          MS. MATZ:  I'm not going to say that Jones said the

15  plaintiff admitted that she had it, but I believe that she

16  said that Jones said she had it.  And she republished these

17  statements, and then she's continued to publish them on her

18  own now, the prostitution and the cocaine use.  So those are

19  the three statements that Ms. Kebe elicited from Ms. Jones and

20  then published the edited interview about.

21          And there were other things in that video also and

22  that Ms. Kebe admitted to knowing about Jones that go directly

23  to whether or not she was -- it was objectively reasonable for

24  Kebe to say that she believed those things could be true or

25  didn't entertain serious doubts about them.

1          THE COURT:  I will allow the plaintiff to elicit

2     testimony from her client that she has sued Ms. Jones for

3     libel, but I'm not going to allow the plaintiff to use the

4     default judgment as a basis to why the defendant should not

5     continue to rely upon what Ms. Jones has said because while it

6     is conclusively determined that the plaintiff is entitled to

7     libel against Ms. Jones, that doesn't -- there's a lot of

8     reasons why people go into default.  They don't have the money

9     to defend, they don't have any money at all, so it doesn't

10    matter even if they're innocent.

11          And I don't think that forms a basis as to whether or

12    not it was reasonable for Ms. Kebe to continue to publish and

13    rely upon what Ms. Jones had told her as being the source of

14    that information.  So, yes, I'll allow you to use the -- I'll

15    allow you to elicit testimony and to argue that you've sued

16    her and you are holding her responsible so that the jury

17    doesn't think that you're just picking on Ms. Kebe but not the

18    default judgment itself because that's -- it has not been

19    decided on the merits in any kind of collateral estoppel kind

20    of way.  And so I think that would be -- because there are

21    other explanations as to why Ms. Jones didn't answer.

22          Ms. Jones isn't here.  She can't tell us why she

23    didn't answer; right?  We don't know.  It may be because it's

24    all true or it may be because it doesn't matter because she

25    has no money.  So I'm not going to let you use the default

1  judgment, but you can use the lawsuit as a basis to explain

2  that you've gone after her too and you intend to hold her

3  responsible as well.

4          All right.  I'm moving on.

5          MS. MATZ:  I think --

6          THE COURT:  All right.  So I think the rest of these

7  are just kind of proforma things that, you know, that the

8  rules of evidence and ethics speak to.

9          No. 7, yes.

10          No. 8, yes.  That applies to all lawyers in this

11  case.

12          No. 9, yes.  I mean, we're going to -- people have to

13  prove the contents of writings, recordings or photographs by

14  the rules of evidence.

15          No. 10, yes.  Right, so let's talk about --

16  Ms. Almanzar, she can talk about what she has endured, how she

17  has felt, how the things that were said about her have

18  affected her.  I don't think it's really a medical opinion for

19  a person to say that they are depressed.  I think depression

20  is so subjective anyway that a person can say that they're

21  depressed.  That is like saying they're sad and they're

22  distraught and they're low and they're upset.

23          But as far as what her medical professionals or

24  psychiatrists or psychologists or counselors have diagnosed

25  her with, then that has to come from those people and not from

1 the witness.  The witness, the plaintiff, can talk about what

2 medication she has been taking because of what has been

3 prescribed for her, what kind of therapy she's undergoing and

4 things like that, but the diagnosis itself has to come from

5 the medical professionals.

6           I suspect everybody probably agrees that's the right

7 way.  Ms. Matz, do you agree with that?

8           MS. MATZ:  I do, but I think that that's missing a

9 little bit of what their argument is.

10           THE COURT:  Okay.

11           MS. MATZ:  And I'm sorry, your Honor.  I don't mean

12 to -- but --

13           THE COURT:  Let me --

14           MS. IZMAYLOVA:  I agree with your Honor.

15           THE COURT:  Okay.  So now.  Okay.  Go ahead.

16           MS. MATZ:  I think that what they're actually trying

17 to exclude is my client testifying about some tests that she

18 got, and we've produced negative HPV and negative herpes tests

19 in this.  And my client is, of course, going to be able to

20 testify that she went and got a test.  She's going to be able

21 to testify about the names that she used.  She's going to be

22 able to testify about all of those facts and the results she

23 obtained.

24           THE COURT:  How can she do that?  How can she -- I

25 mean, would she be doing it so that the jury would know she

```
 1   was responsible and she went and got tested or that she wants

 2   the jury to believe she doesn't have those conditions?

 3          MS. MATZ:  So I think that part of the issue here is

 4   that they are trying to challenge the authenticity of the test

 5   results, which we've produced a business records affidavit

 6   for.  And to the extent that there are certain things that --

 7          THE COURT:  How are they going to challenge it then

 8   if you've got a business records affidavit?

 9          MS. IZMAYLOVA:  It's not an affidavit, your Honor.

10   It's not even notarized.

11          THE COURT:  What?

12          MS. IZMAYLOVA:  It's not even notarized.  It's not an

13   affidavit.

14          MS. MATZ:  I'm sorry, your Honor.  It's a

15   certification that was signed under penalties of perjury under

16   the statute that's -- I'm sorry.  I'm forgetting the -- the

17   signature without in lieu of certification.

18          MS. IZMAYLOVA:  902.

19          THE COURT:  Under federal rule?

20          MS. MATZ:  Yeah, under a federal law.

21          THE COURT:  Tell me the rule, if you would.

22          MS. MATZ:  Sure.  No problem.  28 U.S.C. 1746 says

23   that you can certify something as long as there's certain

24   language in there without taking an oath.

25          THE COURT:  I'm sorry.  What's the code section
```

1  again?

2          MS. MATZ:  It's 28 U.S.C. 1746.  This is how all the

3  declarations have been submitted in this case because usually

4  in federal court people submit declarations and certifications

5  without notarization.

6          THE COURT:  Yes, but declarations aren't admissible

7  at trial.

8          MS. IZMAYLOVA:  Right.

9          THE COURT:  Declarations are like affidavits.

10  They're not admissible at trial.

11          MS. MATZ:  It's just a business records

12  certification.

13          THE COURT:  Okay.  So you're going to business --

14  have you got the document?

15          MS. MATZ:  Yes --

16          MS. IZMAYLOVA:  It's not a certification of a

17  business record, your Honor.

18          MS. MATZ:  I do have the document, your Honor.

19          MS. IZMAYLOVA:  It's not even made by the custodian

20  of records.

21          THE COURT:  So you're traveling then really under

22  Rule 803; right?

23          MS. IZMAYLOVA:  803, I guess --

24          THE COURT:  I'm talking to the plaintiff.

25          MS. IZMAYLOVA:  I'm sorry.

```
 1            MS. MATZ:  Yes, your Honor.

 2            THE COURT:  So what subsection is it?

 3            MS. MATZ:  It's 803 -- it's 9-02-11 that says

 4   certified domestic records of a regularly conducted

 5   activity --

 6            THE COURT:  I'm sorry.  Hold on.

 7            MS. MATZ:  And that references Rule 803(6)(A) through

 8   (C).  And I'd be happy to read your Honor the rules.

 9            THE COURT:  I've got 803 open.  Let's see.  Read the

10   certification to me, if you would.

11            MS. MATZ:  Sure.  No problem, your Honor.  The

12   certification says:  Pursuant to 28 U.S.C. Section 1746, and

13   for the purpose of Federal Rule of Evidence 902(11), I,

14   Dr. Tamara Grisales, state as follows:

15            I am a doctor employed by the Center for Women's

16   Pelvic Health at UCLA, Suite 140, 200 Medical Plaza, Los

17   Angeles, California 90095.  I am familiar with the types of

18   documents and records received, created, and relied upon by

19   the Center for Women's Pelvic Health in the ordinary course of

20   its business.  I certify that the following records attached

21   hereto as Appendix A are true and correct copies of original

22   records in the custodian (sic) of such business for the

23   patient, Belcalis Marlenis Almanzar, with a birth date of

24   October 11, 1992, under the aliases "Bonnie Crown" and

25   "Elizabeth Chambers," defined as the records.
```

1        The results -- and then she just describes the two

2    records.  Happy to read this.  One, the results of a test for

3    the Herpes Simplex Virus, HSV, from a genital swab taken from

4    the patient at our office on August 12th, 2020; and the

5    results of a test for the Human Papillomavirus Infection, HPV,

6    from a cervical swab taken from the patient at our office on

7    September 23, 2020.

8        The swabs were tested at UCLA, and these records

9    containing the results of these tests were created by and are

10   maintained by UCLA.

11       I further state that:  The records were made at or

12   near the time of the test results or from information

13   transmitted by a person with knowledge; the records were kept

14   in the course of a regularly conducted activity of the

15   business; and making the records is a regular practice of that

16   activity.

17       I certify under penalty of perjury that the foregoing

18   is true and correct.  It is signed.  It is dated November 1st,

19   2021, and the two records that were previously produced in

20   discovery are attached.

21       THE COURT:  So what about that?  That seems to track

22   the statute perfectly, doesn't it?

23       MS. IZMAYLOVA:  It says unless the source of

24   information or the method or circumstances of --

25       THE COURT:  You're talking way too fast.

1          MS. IZMAYLOVA:  I'm sorry.  The beginning part of

2     that, of 803(6), unless the source of information or the

3     method or circumstances of preparation indicate lack of

4     trustworthiness.  We have filed a number of motions to exclude

5     this particular doctor and the actual records themselves

6     because for, you know, for -- obviously, I believe that

7     Mr. Sabbak will address the reasons --

8          THE COURT:  The medical record that was maintained by

9     a medical professional.  The records were kept in the regular

10    course of business.  It's their practice to do that and to

11    make the records at or near the time of the event described.

12    Now, you may have a separate motion to exclude the doctor's

13    testimony about something.  We're going to talk about that.

14    But under the hearsay exceptions, why is this not admissible

15    given that all the requirements are met?

16         MS. IZMAYLOVA:  Because they're not medical records.

17    It's two printouts, two sheets of paper that don't even have

18    the doctor's name nor the plaintiff's name on them.  So we --

19         THE COURT:  Attached to the certification?  What more

20    has to occur under -- I mean, look at Rule 806 -- 803(6).  The

21    record was made at or near the time.  The record was kept in

22    the ordinary course of business.  It was a regular practice to

23    make the record.

24         MS. IZMAYLOVA:  Okay.  So --

25         THE COURT:  There's a certification by the individual

1  who states all of that.  So it's not hearsay if it meets that

2  rule.

3  　　　　MS. IZMAYLOVA:  But there's also additional

4  information in there that --

5  　　　　THE COURT:  Like.

6  　　　　MS. IZMAYLOVA:  Like what the plaintiff's alleged,

7  you know, AKAs or the names that she went by to get those

8  records, that we should be able to -- that subject to

9  cross-examination we should be able to cross-examine them on.

10  That should not be --

11  　　　　THE COURT:  Doesn't the rule give you an opportunity

12  once you're notified that the proponent of the record intends

13  to use it, that you're then able to challenge it by whatever

14  means, like, for example, taking the deposition of the doctor

15  or whatever to determine if there's something that's amiss

16  about the record?

17  　　　　MS. IZMAYLOVA:  We received the certification like

18  maybe five days ago.

19  　　　　THE COURT:  When did you receive the notice that they

20  were going to use the record?  Was a record included on the

21  original --

22  　　　　MS. IZMAYLOVA:  We had the record.  We did not

23  receive the doctor's name because the record does not contain

24  a doctor's name.

25  　　　　MS. MATZ:  That's not true, your Honor.

```
1              THE COURT:  Okay.  All right.  So we have -- luckily,
2    I guess for you, that if you want to challenge it, we're
3    sitting here on the 9th of November, and the trial is the 5th
4    of January.  So if you think that there's a problem with it,
5    then I guess you can go to Los Angeles and take the deposition
6    of the individual; right?
7              MS. IZMAYLOVA:  Okay.
8              THE COURT:  I don't think you really think it's a
9    problem with it.
10             MS. IZMAYLOVA:  I do think it's a huge problem and I
11   think that --
12             THE COURT:  What's the problem?  You don't think --
13             MS. IZMAYLOVA:  The certification should -- because
14   the only time -- like after we made the allegations and filed
15   the motions that these are, I don't think, the plaintiff's
16   records because they don't contain the plaintiff's name, and
17   they're in two separate other people's names.  Then we
18   received this, you know --
19             THE COURT:  Doesn't include the plaintiff's name.
20             MS. IZMAYLOVA:  Not like -- Belcalis Almanzar is not
21   on there.  It's a different name.
22             THE COURT:  It's a different name on the --
23             MS. IZMAYLOVA:  On the medical record.
24             THE COURT:  The certification says what?
25             MS. IZMAYLOVA:  The certification that we received
```

1  five days ago says that these are two names she uses, but that

2  was the first time we ever received anything that would

3  connect the plaintiff to the actual medical records.  And this

4  lawsuit is almost three years old.  So, like, that's why we've

5  been put the plaintiff on notice that we do not -- that we

6  have issue with these records.

7          THE COURT:  So you don't think that those names are

8  necessarily her names that she goes by, and you think the

9  certification is fraudulent then essentially?

10         MS. IZMAYLOVA:  I mean, there's no other evidence or

11  any indication that this is -- that those two names have

12  anything to do with the plaintiff ever except for in the

13  certification --

14         THE COURT:  Well, what if the plaintiff offers that

15  testimony during her testimony?

16         MS. IZMAYLOVA:  Sure.  I mean, she --

17         THE COURT:  Let's assume she will.

18         MS. IZMAYLOVA:  Okay.

19         THE COURT:  Well, how about this:  The Court orders

20  that the plaintiff -- that the defendant is entitled to obtain

21  any and all medical records from this UCLA clinic involving

22  any diagnoses or tests for any type of STD directly from the

23  source.  And if you need an order from me, which you probably

24  will under HIPAA, to order that they be are provided directly

25  to you, then I will sign that order.  But your responsibility

1  is to get it to me for me to sign, and you need to run it by

2  the plaintiff's counsel as well.  These will be limited to

3  just medical records related to STD testing.

4       MS. IZMAYLOVA:  Yes, your Honor.

5       MS. MATZ:  Your Honor, may I ask you one thing?  I

6  apologize, and I didn't want to interrupt you, which is the

7  only reason I didn't.  But before that is the ruling I'd like

8  to point out two things.  One is we produced these medical

9  records to them in September of 2020, months before discovery

10 closed, months.  They had every opportunity to issue a

11 subpoena, to do this during discovery, to depose a

12 representative of UCLA.

13      THE COURT:  They're not going to be able to probably

14 take a deposition between now and January just because doctors

15 are, you know, they are very difficult.  But what's the harm

16 here?  Let them subpoena the medical records related to STDs

17 of any of the names that they're aware that the plaintiff has

18 gone under.  I mean, it's the records that you say you're

19 using; right?

20      MS. MATZ:  I don't have an issue with that as long as

21 it's limited to those two records.  They are the only

22 records --

23      THE COURT:  Limited to records regarding the issue of

24 STDs.

25      MS. MATZ:  Sure.  I believe that those are the only

1  two records.  I'm just saying I don't want it brought into

2  other of my client's medical records.  That's my only issue.

3          MS. IZMAYLOVA:  Your Honor will have the order before

4  I --

5          THE COURT:  Excuse me?

6          MS. IZMAYLOVA:  Your Honor will be able to review the

7  order, as the plaintiff, before I'm able to get anything, so

8  you'll know exactly what it says.

9          THE COURT:  I think this meets the rule.  I mean, I

10  think these documents are going to be admissible unless you

11  can demonstrate that they're not genuine.  Otherwise it

12  satisfies the rule.  And I'll allow you to subpoena just those

13  records, and I will sign an order that orders the custodian to

14  supply you with those records because it's relevant to the

15  very document that the plaintiff seeks to use.  But, I mean,

16  I'm assuming all the lawyers are acting in good faith here, so

17  I don't know that it's going to do you any good.  Otherwise,

18  the rule is satisfied.  803 is satisfied.

19          MS. MATZ:  Your Honor, can I make one request?

20          THE COURT:  Yes.

21          MS. MATZ:  And that is when the subpoena gets

22  returnable -- and I don't mind if UCLA discloses how many

23  pages they provide -- are we able to just do a privilege

24  review to make sure that there aren't medical records that are

25  accidentally sent that have nothing to do with --

```
 1                THE COURT:  Why don't they just send them directly to
 2    me, and we'll do that.
 3                MS. MATZ:  Even better.
 4                THE COURT:  Okay.
 5                MS. MATZ:  Thank you, your Honor.
 6                THE COURT:  So the order should direct that it be
 7    directly sent to my office.
 8                MS. IZMAYLOVA:  Yes, sir.
 9                MS. MATZ:  Understood, your Honor.  No problem.
10                THE COURT:  Okay.  All right.  We're almost finished
11    with this.
12                MS. MATZ:  Your Honor, could we just go back to two
13    of the ones that you dealt with very summarily that I just
14    want to make two quick points on?
15                THE COURT:  Which ones?
16                MS. MATZ:  I'd like to make a quick point on lawyer
17    as a witness.
18                THE COURT:  Okay.
19                MS. MATZ:  No one is intending to offer any type of
20    substantive testimony in this matter.  There's only two --
21    there's really only -- well, now there's really only one
22    document at issue with respect to this, and that is a google
23    search that was run that's a printout of results.  It was
24    during Defendant Kebe's deposition, and it just relates to her
25    testimony that she -- that my client engaged in the debasing
```

1  acts with a beer bottle and the claim that she saw this video

2  online.

3      She testified to doing online research.  We

4  questioned her about the exact terms that we use.  Those were

5  then plugged into Google, and we showed her the results and

6  questioned her about them.

7      So to the extent that there is argument that those

8  weren't the results at the time but to the extent it's

9  admissible for impeachment purposes, it may not actually go

10  in.  But I don't know why it couldn't be admissible to ask her

11  if she saw certain results or not.

12      THE COURT:  You're not being a witness when you ask a

13  question.

14      MS. MATZ:  I agree with you, but that's what their

15  motion was directed towards.  I don't think I am being a

16  witness in this circumstance but I just --

17      THE COURT:  The problem is if she denies it.  If she

18  denies what you say happened, then you do become a witness

19  when you take the stand.  But, I mean, like in all trials, all

20  judges tell jurors that what the lawyers say as questions are

21  not -- is not evidentiary.  It's only the answers that are

22  evidence.

23      MS. MATZ:  Yeah.

24      MS. IZMAYLOVA:  But the further point is that the

25  search that Ms. Matz completed was completed two years after

1  the search that my client completed --

2          THE COURT:  That doesn't go to the issue of the

3  motion.

4          MS. IZMAYLOVA:  They're going to try to argue that

5  because the results that she already had in there that, you

6  know, like their client denies being in this video, that that

7  means it must have been also -- those results must have been

8  the exact same results that my client saw two years ago.

9          THE COURT:  Okay.  They can argue that, and you can

10  argue otherwise.  But what's your point?

11          MS. IZMAYLOVA:  Because that's just not -- that is

12  very -- that's not the facts.  That's not how Google works.

13          THE COURT:  That's not how what works?

14          MS. IZMAYLOVA:  That's not how Google works.  Like, I

15  mean, you know, it's going to change.  Results are going to

16  change based on, you know, popularity or how many times you

17  click into something.  Over the two years, between the two

18  Google searches, it's just no way that it would --

19          THE COURT:  It doesn't sound like you're asking me to

20  prevent the lawyer from testifying.  You're asking me to say

21  that the plaintiff's lawyer's interpretation is just not

22  reasonable, and that's what argument is for.  And that's what

23  you can argue, and they can argue the opposite of that.  I

24  mean, I'm not --

25          MS. IZMAYLOVA:  So will they be able to submit their

1  screenshots of their results of their Google search?  Because

2  I don't see how that's relevant at all.  That's speculative

3  because it has nothing to do with at the time of my client's

4  search what she saw.

5      THE COURT:  They can ask questions to the witness is

6  what they can do, and the witness will give the answers that

7  she gives.  Can they take the stand and say that they did

8  certain things, the lawyers?  No.

9      MS. IZMAYLOVA:  Okay.  That's all I --

10      THE COURT:  Could the lawyer's investigator take the

11  stand and say that they did certain things?  Maybe.  And then

12  could you argue, well, those results aren't reflective of what

13  it looked like two years earlier?  Sure.

14      MS. IZMAYLOVA:  Okay.

15      THE COURT:  I mean, that's speculation.  We don't

16  know it's the same or not.  It probably isn't.  It could be

17  substantially, but that's argument.  But lawyers can't take

18  the stand and testify, the lawyers trying the case that is,

19  but other witnesses can.  It happens all the time.  I mean,

20  think about it.  Police investigators take the stand.  They're

21  working with the lawyers.  They take the stand all the time

22  and talk about what they found, you know, when they looked and

23  saw and went somewhere.

24      MS. IZMAYLOVA:  Yeah, but that's usually around the

25  same time as the crime occurred, not two years later.

1          THE COURT:  That's argument, ma'am.  That doesn't

2    have anything to do with the rules of evidence.  Okay.  And

3    I'm not in the business of telling people that they can't make

4    the arguments that they want to make that's somehow linked to

5    the evidence.  You can argue what you want to argue.  And the

6    jury, look, internet searches aren't going to be foreign to

7    the jurors.  They all have experience that they rely on, and

8    so if yours is the most reasonable explanation, then the

9    jurors will agree with you, I guess.  Yes, ma'am.

10          MS. MATZ:  The other was Point 9 in their motion.  So

11    my understanding of the motion they're making is actually a

12    kind of a -- I understand the two rules they've cited, but the

13    way they're trying to use them I do not agree with whatsoever.

14    Their argument is actually that I shouldn't be allowed to

15    elicit testimony from the defendant as to the statements she

16    made, the defamatory statements she made, and by the way

17    admitted to making most of them under oath, without showing

18    them the entirety of these videos.  And this is actually a

19    very big problem from our perspective because there is a

20    lot -- your Honor mentioned something about the exhibit list

21    earlier.  There are tons of exhibits.  And part of the problem

22    here is we are not able to get even basic stipulations on some

23    of the contents of those videos that truly are not disputed.

24    I shouldn't be forced to show the jury a two-hour long video

25    when what I want to show them --

1           THE COURT:  I'm not requiring you to do that.

2           MS. MATZ:  Well, I hope -- that's why I wanted to --

3  because you just said yes to this point.

4           THE COURT:  Well, I said yes to the general prospect

5  that writings and recordings and photographs are going to be

6  introduced pursuant to the rules of evidence basically, is my

7  point.  And, no, I am not going to require that if any side

8  wants to show a part of a video, I'm not going to require that

9  they show the whole video then and there.  When it's your turn

10 to ask questions of that witness, you can show it unless

11 there's parts that have been excluded for some purpose.

12          MS. IZMAYLOVA:  No one is disagreeing with what your

13 Honor just said.  What I disagree with that Ms. Matz said is

14 that instead of showing any part of the video that contains

15 the actual quote that they just want to pluck out of the

16 context, they just want to ask, you know, about the certain,

17 you know, two sentence, you know, quotes without providing any

18 sort of a context under the best evidence rule.  That's not

19 the way to prove the content of any --

20          THE COURT:  I don't follow what you're saying.  Can

21 you give me an example?

22          MS. IZMAYLOVA:  Yes.  You know --

23          THE COURT:  All right.  For example, isn't it true

24 that on such and such date you said X, Y and Z?

25          MS. IZMAYLOVA:  Right.  And then so, yes, it is, but

1  it's within like -- by itself it may sound a lot more harsh,

2  but within the context of which it was said, it has a

3  completely different meaning.

4          THE COURT:  Okay.  So then when you ask that witness

5  the question, then you make sure that the jury understands

6  that it was in a broader context.  I mean, essentially what

7  you're arguing is they're taking her statement out of context.

8          MS. IZMAYLOVA:  Correct.

9          THE COURT:  So then you put it in proper context on

10  your examination.

11          MS. IZMAYLOVA:  Well, part of my argument was that

12  under Rule 105, I believe, not 106.

13          THE COURT:  105?

14          MS. IZMAYLOVA:  I think it's 105, rule of

15  completeness.

16          THE COURT:  Hold on.  Hold on.

17          MS. MATZ:  Rule 106 that she's referring to which

18  basically --

19          THE COURT:  Hold on a second.  Hold on.

20          MS. MATZ:  Sorry, your Honor.  I apologize.

21          THE COURT:  Rule 106 in the Federal Rules of

22  Evidence?

23          MS. MATZ:  Yes, your Honor.  That's what was cited in

24  their --

25          THE COURT:  I see.  I see it.  I just wasn't finding

1   it.  Okay.  I am not going to interpret that rule.  When we're

2   talking about like, for example, a two-hour deposition,

3   two-hour video, or whatever, that the whole two-hour video be

4   played, I don't think that rule is meant in that context.

5   It's meant for like a statement where they're immediately

6   preceding or immediately succeeding another statement that

7   puts that statement in context.

8           I mean, y'all both have really complained about this.

9   The plaintiff complained about it too.  The plaintiff

10  complained about the defendant taking a snippet of this

11  compilation video and not showing the broader context of it.

12  In the overall video that it was in, the argument was that it

13  takes -- that little snippet takes the whole thing out of

14  context.

15          The way I'm going to resolve it is that you've got

16  the witness too, and you can play the entire video that you

17  want played if there was no other problems with it when you

18  have them -- in fact, to me that's more effective anyway

19  because if opposing counsel is being disingenuous, is being

20  selective and unfair by portraying a specific part in a false

21  light, then they lose credibility overall.  But in the context

22  of long, large videos, there's no way that I can interpret

23  this rule to apply to that.

24          MS. IZMAYLOVA:  I didn't mean for the whole video.  I

25  meant just for the context that surrounds that particular --

1  whatever the quote is that's being pulled out.

2          THE COURT:  I'm not sure how I would even manage that

3  in the course of a trial other than saying you get the chance

4  to play the whole thing that you want played when it's your

5  turn.

6          MS. IZMAYLOVA:  We'll just play it when it's our

7  turn.

8          THE COURT:  Okay.

9          MS. IZMAYLOVA:  Thank you.

10          MS. MATZ:  Thank you, your Honor.

11          THE COURT:  All right.  So go ahead.  I'm sorry.

12          MS. IZMAYLOVA:  Your Honor, we want to address a

13  quick point regarding the lay opinion -- I'm sorry -- medical

14  opinion by lay witnesses.  Since the medical records will be

15  able to come in as is, but the plaintiff is still not allowed

16  to testify about the results of the test because that is a

17  medical opinion; is that correct?

18          THE COURT:  They will have the medical record that

19  will tell the result.  I mean --

20          MS. IZMAYLOVA:  Correct.  So she's not going to be

21  able to --

22          THE COURT:  Well, what difference does it make

23  really?  I mean, if the result comes in and the result says

24  she doesn't have herpes, whether she says it or not -- yeah, I

25  mean, she's not able to diagnose herself, but she's able to

1   testify I got my result and my result said no -- I mean, if

2   it's in evidence.  Now, if it's not in evidence, I understand

3   your point, but otherwise what are we doing?

4          MS. IZMAYLOVA:  That was my -- just in general so

5   that --

6          THE COURT:  Yeah, let's assume that it's in.  So

7   let's say the medical records come in, and then the plaintiff

8   says, yeah, I got tested, I didn't have herpes.  Objection,

9   your Honor, that's hearsay.  Yeah, but we already have the

10  evidence in so --

11         MS. MATZ:  Right.

12         THE COURT:  I mean --

13         MS. IZMAYLOVA:  I wouldn't do that.  That's not -- I

14  meant if they don't come in.

15         THE COURT:  So References to Motion in Limine.

16  Obviously, no side or in front of the jury should be talking

17  about motions in limine in any regard.

18         All right.  So we're going to take -- we'll take a

19  lunch break until 2:00, and at 2:30 we're going to come back

20  and we're going to talk about this motion to exclude.  Is

21  there any other issue we need to talk about other than the

22  motion to exclude?

23         MS. MATZ:  Can I ask at the risk of kind of a silly

24  question, your Honor, about pretrial procedures?  I apologize.

25  And this is just because I'm not from this area.  My

1   understanding is it takes a little while to get in and out of

2   the courthouse.  For lunch breaks during the trial is there a

3   place where we'll be able to go to stay in the courthouse?

4          THE COURT:  We have at least one -- how many rooms do

5   we have here on the side?

6          COURTROOM DEPUTY:  Well, four, but we share them with

7   Judge Ross.

8          THE COURT:  Don't need but two.  Just tell them we

9   need two of them during that week, during that period of time

10  so each of you can have a room.

11         MS. MATZ:  Okay.  Perfect.  Thank you so much, your

12  Honor.  I really appreciate that.

13         THE COURT:  We'll come back at 2:00, and then we'll

14  hear the last motion and talk about any other issues that come

15  up between now and then.  Okay.

16         MS. MATZ:  Thank you, your Honor.

17         THE COURT:  All right.  We'll see y'all in an hour.

18  Thank you.

19         COURTROOM SECURITY OFFICER:  All rise.  This court is

20  in recess for an hour.

21         (Whereupon, a recess was taken from 1:00 p.m. until

22  2:00 p.m.)

23         COURTROOM SECURITY OFFICER:  All rise.  This

24  honorable court is again in session.

25         THE COURT:  Thank you.  Y'all can be seated.

1          All right.  Ms. Izmaylova, are you ready to argue

2    your motion relative to Dr. Blake and Dr. Grisales?

3          MS. IZMAYLOVA:  Your Honor, yes, but I would like to

4    make a quick announcement.

5          THE COURT:  Let me ask you while you're arguing the

6    motion, are you vaccinated?

7          MS. IZMAYLOVA:  Yes, I am.

8          THE COURT:  Okay.  You can come to the mike and take

9    your mask off if you want to, either way.  Just why don't you

10   come on up here because I'll probably hear you better from

11   this microphone.

12         MS. IZMAYLOVA:  Sure.  I will do that.

13         THE COURT:  You don't have to take your mask off,

14   though.  That's your personal preference.

15         MS. IZMAYLOVA:  Your Honor, so when we filed this

16   motion, obviously we were anticipating that the trial would

17   start this week.  Based on the rulings of your Honor

18   throughout today and the fact that we do have a trial now in

19   January, we will -- we're withdrawing our motion as regards to

20   Dr. Grisales.

21         And in regards to Dr. Blake, basically the gist of it

22   was that we did not get notice of her as a witness or as an

23   expert witness until the day before discovery was closed.  And

24   the first --

25         THE COURT:  When was that?

1          MS. IZMAYLOVA:  On November 29th, 2020, was when we

2   got notice of her, and November 30th, 2020, was when discovery

3   was closed.  The first report that actually made any kind of

4   medical diagnosis we received on December 7th, 2020.  So if

5   the Court -- we'll withdraw the motion if the Court will allow

6   us to obtain our, you know, expert for the defense, you know,

7   because now we have actual medical diagnosis that we did not

8   know about.

9          THE COURT:  Well, as you understand it, what would

10  Dr. Blake be testifying to?

11         MS. IZMAYLOVA:  I believe that she is the expert that

12  will be testifying regards to the IIED claim.

13         THE COURT:  To her what claim?

14         MS. IZMAYLOVA:  In regards to the plaintiff's

15  intentional infliction of emotional distress claim.

16         THE COURT:  Okay.  And Dr. Blake is what type of

17  doctor?

18         MS. IZMAYLOVA:  A psychologist.

19         THE COURT:  A psychologist?

20         MS. IZMAYLOVA:  Yes, your Honor.

21         THE COURT:  Okay.  So how would an expert witness

22  assist you given that that expert witness hasn't examined the

23  plaintiff?  Would he or she just look at the notes and

24  records?

25         MS. IZMAYLOVA:  The purpose of it would be for

1  testimony -- to elicit testimony regarding general practice of

2  how do you, you know, how do you -- you know, to diagnose

3  someone with, you know, severe distress or, you know, the

4  diagnosis that this doctor made, what is the standard practice

5  in the field of psychology.  That would be the -- it wouldn't

6  so much be to -- we wouldn't have to like, you know, examine

7  the plaintiff or anything like that.  It would be more for

8  general information.  Otherwise, there's not going to be any

9  testimony in that regard.

10         THE COURT:  So you don't anticipate any type of IME

11  of the plaintiff, in other words, an independent medical --

12  it's not medical because we're talking about psychology -- but

13  an independent psychological exam of the plaintiff?

14         MS. IZMAYLOVA:  No, that's not what we're asking for.

15  No, your Honor.

16         THE COURT:  Do you have reason to suspect that the

17  methodology used by Dr. Blake was not consistent with normal

18  procedure?

19         MS. IZMAYLOVA:  Well, I don't know because initially

20  the report that we first received was just a -- it was just

21  like a therapy report, the one that we got on the 29th of

22  November.  So I didn't --

23         THE COURT:  What did it say?

24         MS. IZMAYLOVA:  It was just, like, we met one time in

25  November 2018 over a weekend, over the weekend.  So I don't

1  know how many times they actually met, but in November 2018

2  this doctor, Dr. Blake, flew to New York to meet with the

3  plaintiff to provide, like, counseling and therapy.  It was

4  not for, like, diagnosis or any -- those type of purposes.

5  And then in December --

6          THE COURT:  Isn't diagnosis an inherent part of

7  therapy?

8          MS. IZMAYLOVA:  Specifically the report said that no,

9  like, psychological diagnosis was made because they were only

10 focused on counseling.  That's what the report said.

11         THE COURT:  Okay.  So have you received something

12 else recently?

13         MS. IZMAYLOVA:  Well, not recently, but in

14 December 7th, 2020, we received a second report from the

15 same doctor that did make a psychological diagnosis because

16 they --

17         THE COURT:  And what did Dr. Blake say about the

18 plaintiff?

19         MS. IZMAYLOVA:  That she had -- I think she diagnosed

20 anxiety, depression --

21         THE COURT:  Okay.  Anxiety and depression.

22         MS. IZMAYLOVA:  And she --

23         THE COURT:  Pretty common diagnosis for people that

24 are in counseling, but it's not necessarily an objective test.

25 It's more of a subjective diagnosis, as I understand it, and I

1  know a little bit about psychology because my wife is a

2  psychologist.  So I'm just not sure how an expert witness will

3  help you.

4       So the plaintiff has -- let me just assume the

5  plaintiff's expert is going to testify that she has

6  diagnosed -- I assume it's a she -- but that Dr. Blake has

7  diagnosed the plaintiff with depression and anxiety.  I don't

8  know if she still has those things or she just had them at the

9  time or they've been continuing.  And your expert would help

10  you understand whether or not Dr. Blake used the common and

11  accepted methodology to determine whether or not an individual

12  had anxiety or depression?

13       MS. IZMAYLOVA:  Well, the reason being -- and I think

14  I didn't mention this -- is that the plaintiff only saw

15  Dr. Blake one other time after the 2018 weekend visit.  So --

16       THE COURT:  When was that?

17       MS. IZMAYLOVA:  Which time?

18       THE COURT:  When was the other time?

19       MS. IZMAYLOVA:  I believe it was November 2020.

20       THE COURT:  Okay, as far as you know.  So she saw her

21  twice and has diagnosed her, and your person might testify

22  that that's not enough to --

23       MS. IZMAYLOVA:  I don't know.  I don't know whether

24  it is or is not, but I'm not going to be able to bring that

25  fact in that it's not enough unless we do have --

1          THE COURT:  So I guess I'm trying to understand why

2     am I just now hearing about this.  I mean, why didn't you --

3     when the plaintiff named Dr. Blake as an expert witness, gave

4     you a report in 2020, approximately a year ago, why didn't you

5     then move to reopen discovery and name your own expert and all

6     of that?

7          MS. IZMAYLOVA:  I mean, I guess I don't really have a

8     good reason for that.  We were focusing on the other things

9     that were due at that time, like summary judgment motions and

10    those types of things.

11         THE COURT:  Okay.  So let's make sure I understand.

12    You're withdrawing your objection for Dr. Grisales.

13    Dr. Grisales is a medical doctor?

14         MS. IZMAYLOVA:  Based on your ruling is the one from

15    UCLA.

16         THE COURT:  Okay.  And then Dr. Blake, you've told me

17    that you would withdraw your objection as long as you could

18    name your own expert who could take a look at, I guess,

19    whatever medical records or psychological records you have and

20    then give you an opinion as to whether it was possible to know

21    under the circumstances if the plaintiff had depression and

22    anxiety and otherwise just comment on the procedures used by

23    Dr. Blake?

24         MS. IZMAYLOVA:  Correct, but not to -- if we're not

25    able to, you know, get that information, you know, within

1  enough time for the trial to start on the 5th, we're not

2  asking for the trial to be continued or anything like that.

3  We're just saying will we be able to have the possibility of

4  contacting someone to see if we even need or if that's

5  testimony that would be available to provide, you know, to

6  rebut Dr. Blake.

7          THE COURT:  All right.  Thank you.

8          MS. IZMAYLOVA:  If not, it's fine, then we will

9  withdraw this motion as well.

10          THE COURT:  All right.  Let me hear from Ms. Matz.

11          MS. IZMAYLOVA:  Thank you, your Honor.

12          MS. MATZ:  So the first thing you should know is that

13  the psychological treatment summaries that were produced

14  during discovery, they were produced on November 30th and

15  December 7th.  Just to take the Court back for a moment, if

16  you recall, both parties at the end of December made extensive

17  motions to compel here.  And including the defendant's, they

18  made two omnibus motions to compel.  At that point they were

19  fully aware that we were intending to use Dr. Blake as an

20  expert.  They were fully aware of the treatment summaries.

21  They didn't seek any additional discovery with respect to

22  them.

23          There's no reason to be going back and doing this

24  now.  For them to ask the day the trial should be starting to

25  retain a new expert is -- it's just too late, and it's

1 prejudicial to our client.  I mean, at this point they have

2 known there was a deadline for the parties to disclose their

3 experts, which we did, and that deadline was September 10th.

4 We disclosed the required report under 26(1)(c), and at this

5 point there's just no reason for them to be asking to retain

6 another expert.

7 The other issue is without -- for them to retain an

8 expert also to just opine on general psychology practices,

9 they can accomplish whatever they want to accomplish on cross.

10 If they want to try to attack the credibility of the expert

11 that we're going to be providing and they want to attack the

12 methodology which she uses to treat her patients, they can do

13 that and make those points to the extent they want to when

14 they cross-examine her.

15 THE COURT:  So I'm trying to understand the timing

16 issue that the defendant is complaining about.  They insinuate

17 that you were late.  You say you're not late.

18 MS. MATZ:  No.

19 THE COURT:  So what is it that -- how do you

20 understand their argument that you were late?

21 MS. MATZ:  I don't understand their argument that we

22 were late.  We disclosed -- sorry --

23 THE COURT:  What did you disclose, according to them,

24 right before discovery expired?

25 MS. MATZ:  We disclosed the summaries of the

1   treatment sessions that were provided by Dr. Blake.  We

2   also -- after those were disclosed, we also supplemented our

3   interrogatory responses to identify her as a witness, and the

4   latest of those disclosures had started on November 30th.  The

5   latest of those disclosures was December 7th.  They filed

6   their omnibus motions for discovery, I believe, on

7   December 21st.  If your Honor recalls, those were heard in

8   February of this past year.  So we're talking about 11 months

9   have passed, and they didn't raise any of this in those

10  motions.  They could have asked for whatever they wanted at

11  that point.

12          Your Honor granted both parties certain additional

13  discovery as a result of those motions.  Also, we disclosed

14  Dr. Blake as an expert in accordance with the Court's own

15  expert disclosure deadlines on September 10th, and they waited

16  until now, until literally this hearing, to even be able to

17  ask for the relief they're asking for now.  I don't think

18  there would be any basis to exclude her, but I also don't

19  believe that there's a basis for them to be making an untimely

20  motion to essentially have additional discovery now.

21          THE COURT:  And in a nutshell what is Dr. Blake going

22  to say in this case as revealed by her report?

23          MS. MATZ:  Sure.  Just so you know, she's a treating

24  physician here.  She's not an expert who was hired

25  independently.  She's going to be --

1          THE COURT:  Is she a psychologist?

2          MS. MATZ:  Yes, she is.  And she's going to talk

3   about essentially what she summarized in her written -- in her

4   report summaries, which are that plaintiff was experiencing

5   embarrassment, decreased appetite, anxiousness, loss of sleep,

6   those types of things, and the treatment, the therapy, that

7   they have done together.

8          This goes direct -- it's not for the intentional

9   infliction of emotional distress exactly.  I believe it goes

10   to a number of the claims, but it's essentially the emotional

11   harm that has been done to my client as a result of the

12   defamation, the intentional infliction of emotional distress,

13   the claim.  So it's going towards my client's pain and

14   suffering, which is essentially what she's going to be

15   testifying about.

16          And your Honor aptly said earlier that to the extent

17   my client can't testify as to what she was diagnosed with,

18   that's for the expert to do, and that's why we have her.  And

19   that's been her sole purpose, limited purpose, the entire

20   time.

21          THE COURT:  Yeah, but I do think that your client can

22   say she was depressed.  I think to me saying I'm depressed is

23   like saying I'm sad.  I mean, they're very closely related in

24   a lot of ways too, but it has a more -- what's the right word?

25   A more common understanding, that you don't have to be a

1  psychologist, I think, to say that I feel depressed.  To say I

2  have depression maybe is a little bit different.

3          Okay.  All right.  Thank you, ma'am.

4          MS. MATZ:  Thank you.

5          THE COURT:  All right.  Ms. Izmaylova, any response

6  that you want to make to what you've heard?

7          MS. IZMAYLOVA:  No, your Honor.  I'll just reserve

8  for you.

9          THE COURT:  Okay.  I think if this were an issue, it

10  was an issue that should have been brought up a long time ago.

11  So as it relates to the motion to exclude either or both of

12  the individuals, I don't think there's really any basis there.

13  I'm not really hearing a *Daubert* challenge.  You want to make

14  a *Daubert* challenge?

15          MS. IZMAYLOVA:  No, your Honor.

16          THE COURT:  And as far as the right to call in any

17  additional witnesses, I think that ship has sailed a long time

18  ago, so I'm not giving the permission to conduct anymore

19  discovery or add any new expert witnesses.  The witnesses are

20  what they are.  At the end of the day, I mean, from what I

21  know about depression -- and I think Dr. Blake would probably

22  agree with this -- is that while it might be an objective

23  diagnoses, it relies not exclusively necessarily but

24  substantially on a subjective report by patients.

25          And so I think there will be plenty to cross-examine

1   the plaintiff with in that regard, as well as the doctor as

2   well about, you know, the fact that whatever the plaintiff

3   reports that she has endured is an essential part of that

4   conclusion.  To the extent that the defendant believes that

5   there really is no emotional distress, then I think you'll

6   have a sufficient chance to -- or even damages related to any

7   of the other torts based on emotional distress, you'll have an

8   opportunity to probably get at all of that.

9           All right.  Anything else we need to talk about

10  today?

11          MS. IZMAYLOVA:  Not from the defense, your Honor.

12          THE COURT:  Okay.  So I thought I was going to make

13  some announcement maybe about the January -- that would affect

14  the January trial, but I'm not prepared to do that yet.  If

15  something develops -- I've got a criminal case.  I'll just

16  give you the background.  I've got a criminal case where a

17  defendant is representing himself and we're trying to figure

18  out -- we're having a hard time figuring out when his speedy

19  trial time period runs.  It's possible it could affect our

20  being able to have this trial in January.  I'm hopeful that's

21  not the case, but if it does, I'll let you know.

22          So all right.  Thank y'all.  Have a good day.

23          MS. MATZ:  Thank you, your Honor.

24          MS. IZMAYLOVA:  Thank you, your Honor.

25          COURTROOM SECURITY OFFICER:  All rise.

1          (Whereupon, the proceedings were adjourned at 2:20

2  p.m.)

3                        -   -   -

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTERS CERTIFICATE

    I, Wynette C. Blathers, Official Court Reporter for
the United States District Court for the Northern District of
Georgia, with offices at Atlanta, do hereby certify:

    That I reported on the Stenograph machine the
proceedings held in open court on November 9, 2021, in the
matter of BELCALIS MARLENIS ALMANZAR v. LATASHA TRANSRINA KEBE
and KEBE STUDIOS LLC, Case No. 1:19-CV-01301-WMR; that said
proceedings in connection with the hearing were reduced to
typewritten form by me; and that the foregoing transcript
(Pages 1 through 145) is a true and accurate record of the
proceedings.

    This the 19th day of December, 2021.




                              _____
                          /s/ Wynette C. Blathers, RMR, CRR
                              Official Court Reporter