```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
 2                       ATLANTA DIVISION


 3


 4   BELCALIS MARLENIS ALMÁNZAR,      )
                                      )
 5                 Plaintiff,         )
                      v.              )   CIVIL ACTION
 6                                    )   FILE NO. 1:19-CV-01301-WMR
     LATASHA TRANSRINA KEBE and       )
 7   KEBE STUDIOS LLC,                )
                                      )   JURY TRIAL
 8                 Defendants.        )
     _____)   VOLUME I OF X
 9


10


11   -----------------------------------------------------------


12         BEFORE THE HONORABLE WILLIAM M. RAY, II


13             TRANSCRIPT OF PROCEEDINGS


14                 JANUARY 10, 2022


15
     -----------------------------------------------------------

16


17

                 Proceedings recorded by mechanical stenography
18               and computer-aided transcript produced by


19

                     WYNETTE C. BLATHERS, RMR, CRR
20                     Official Court Reporter
                        1714 U.S. Courthouse
21                    75 Ted Turner Drive, SW
                       Atlanta, Georgia  30303
22                        (404) 215-1547


23


24


25
```

```
 1   APPEARANCES:

 2   For the Plaintiff:          SARAH M. MATZ
                                 Attorney at Law
 3                               Adelman Matz, P.C.
                                 1173A Second Avenue
 4                               Suite 153
                                 New York, New York  10065
 5
                                 LISA F. MOORE
 6                               WILLIAM A. PEQUIGNOT
                                 Attorney at Law
 7                               Moore Pequignot, LLC
                                 887 West Marietta Street
 8                               Suite M-102
                                 Atlanta, Georgia  30318
 9
     For the Defendants:         OLGA IZMAYLOVA
10                               SADEER SABBAK
                                 Attorneys at Law
11                               Sabbak & Izmaylova, LLP
                                 1875 Old Alabama Road
12                               Suite 510
                                 Roswell, Georgia  30076
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        <u>**I N D E X**</u>

2

3                                                        <u>**Page**</u>

4   Jury Selection (Voir Dire)                             27

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    Monday Morning Session

 2                      January 10, 2022

 3                        9:00 a.m.

 4                         -  -  -

 5                  P R O C E E D I N G S

 6          THE COURT:  Good morning.

 7          COURTROOM SECURITY OFFICER:  All rise.  United States

 8  District Court for the Northern District of Georgia, Atlanta

 9  Division, is now in session, Judge William M. Ray, II

10  presiding.

11          THE COURT:  Thank you, sir.

12          COURTROOM SECURITY OFFICER:  Please be seated and

13  come to order.

14          THE COURT:  Good morning.  This is the first day of

15  trial for Case No. 19-CV-1301.  So the jury is doing their

16  orientation right now and probably are about to conclude up in

17  the courtroom on 23.  I've gone up this morning and taken a

18  look.  The courtroom up there is more than double the size of

19  this courtroom because it's an extension from one side all the

20  way across, and there's areas in between the two courtrooms.

21  The jury is going to be fairly spread out.

22          There's two sets of tables similar to what we have in

23  here that are centrally located in the room.  When we break to

24  go up there, if y'all would arrange yourselves the same way,

25  and the attorneys who would be actually removing your masks
```

for purposes of the jury voir dire, make sure you're sitting
at the table furthest away from the jurors or closest to the
bench like you are now.  But your tables will be a little bit
closer to the bench.  It's a much bigger room.

We will have two, really three, standing shields that
will be in the vicinity of your tables, the first sets of
tables that you'll be sitting at.  There will be two
immediately in front of your table and then for the plaintiff
there will be a table to your right or my left -- not table
but a shield.  And then for the defendant there will be a
shield to your right because there are going to be some jurors
that you might be turning in those directions while you're
removing your mask.

And let me just reiterate what I said last week.  You
don't have to remove your mask during any part of the trial.
You just have an option to do so as long as you are fully
vaccinated as defined by the CDC, which would be currently two
vaccinations.  I think that's going to quickly change to
booster shots as well, but it hasn't as of yet.  So I'm not
going to impose that.

When we start the trial in here, which we will
tomorrow, the jurors will be seated in the jury box.  I'm
going to give jurors an option of sitting in the gallery as
well, and if any jurors decide that they will sit in the
gallery, then the right side of the gallery from your

1   orientation will be reserved for jurors only.  So anyone that

2   is coming to watch will either have to sit on the left side of

3   the courtroom -- we also have arrangements to close circuit a

4   version of the trial in an adjoining courtroom as well.  I

5   don't know if we'll need to do that or not.  It really just

6   depends on how many people show up and decide they want to sit

7   in the courtroom.

8          No one is allowed to be in the courtroom without

9   wearing a mask.  I'm not wearing one now, and you're not going

10  to be wearing one when you're speaking unless you choose to do

11  that.  But, otherwise, everyone will have to have masks on at

12  all times or they will not be allowed to stay.  And for that

13  matter, that really applies to the other courtroom as well.

14  I'm not sure what arrangements we have for monitoring that

15  courtroom.  That's something we need to talk about because we

16  have to ensure that there are no members of the public that

17  are recording in that courtroom as well.

18         Federal rules in courts do not allow any audio,

19  photographic or video to be operated while in the courtroom.

20  The jurors will have -- will be allowed, as you have been

21  allowed, to bring their phones with them, but one of the

22  things I'll tell them this morning is that if their phones --

23  they take the phones out in the courtroom, then we will take

24  their phones from them until the end of the day.  So we

25  haven't really had a problem with that, which is a fairly new

1  rule that we instigated during Covid to allow jurors to keep

2  their phones.  It's probably going to end up being permanent

3  here.  It has not been up until Covid protocols began.

4         So I know there's a few issues that y'all indicated

5  y'all want to talk about.  Let me just mention that I've

6  looked very briefly at the defendant's objections to the

7  deposition of Latasha Kebe and -- is it Cheickna?  Is that how

8  you say Mr. Kebe's name?

9         MR. KEBE:  That's correct, Cheickna.

10        THE COURT:  Cheickna Kebe.  When I say I've looked at

11 them, I've looked at what you've filed.  I haven't gone and

12 looked at the deposition transcripts.

13        Ms. Matz, how would you anticipate that if the

14 deposition transcripts are used, that they would be used?  I'm

15 guessing for cross-examination purposes?

16        MS. MATZ:  Yes, your Honor.  I do think that mainly

17 at this point they'll be used for cross-examination.  There

18 are a couple of issues with this that I'd be happy to address

19 if you'd like, but I think some of this should be worked out

20 with opposing counsel.  We received these last night.

21        THE COURT:  I'm guessing y'all haven't even talked

22 about it.

23        MS. MATZ:  No, we haven't.  There are several issues

24 that we've been -- this we got last night.  But there are

25 several issues right now that we've been trying to arrange a

```
 1   time to discuss with them.  They thus far have not been
 2   willing to get on a phone call with us, but they're issues
 3   that I would not prefer to have to waste the Court's time
 4   with.
 5          THE COURT:  Well, we're not going to talk in detail
 6   about these objections.  But let me just say about this, I
 7   mean, there's no way I can rule on a relevance objection to a
 8   deposition question until I know the context in which the
 9   party that seeks to bring that question and the answer that
10   was given up before the jury.  I mean, I have to know the
11   context, and typically from an impeachment standpoint, if a
12   similar question is asked in trial and the person gives an
13   evasive answer or an answer that's inconsistent with what they
14   gave previously and then the opposing counsel who is
15   cross-examining that witness is able to impeach their
16   testimony by bringing up what they said, previous question.
17          Normally what I expect to see in an objection is --
18   to a deposition transcript question is where you object to the
19   form of the question where the question was confusing or
20   misleading and something like that, but 99 percent of the
21   objections that have been filed are relevance objections.
22   Those aren't typically handled by Courts pretrial.
23          MS. MATZ:  I agree with your Honor, and just to be
24   frank with you, these designations actually don't match the
25   designations we gave them.  But the portions we're planning on
```

1 using, I frankly think the relevance is going to be blatantly

2 obvious to the Court.

3      THE COURT:  It's hard for me to imagine if there's

4 much -- and this goes both ways -- about the plaintiff's art

5 and her complaints against the defendant that's -- poor way of

6 wording it because my point ultimately is there's going to be

7 a lot that's relevant that ordinarily wouldn't seem to be

8 relevant in court.  This isn't a divorce case, but it's like a

9 divorce case.  None of you may have ever tried a divorce case.

10 I've tried tons of them as a lawyer and a judge in my previous

11 job.  There's hardly anything that isn't relevant in a divorce

12 case because conduct is relevant, a person's alleged bad

13 conduct or perhaps, you know, their conduct is relevant for

14 issues of division of property and child custody and all those

15 things.

16      This is kind of like that because we're talking about

17 defamation, and so what the plaintiff says was defaming to her

18 opens the door to a lot from her perspective but also from the

19 defendant's perspective because of the need of the plaintiff

20 to prove malice.  And so I can't imagine that there's much

21 that's going to be -- that would have been -- having not read

22 the deposition transcripts, I'll say that there's not much

23 that I can imagine that was asked about that's not going to

24 arguably be relevant in this case.  And it's just going to

25 take me hearing the context of the time that the person seeks

1  to ask the question in court to know.

2        All right.  So I'm not going to address anymore about

3  these objections at this point in time.  I'm not sure that I'm

4  going to -- I'm not sure there's much I'm going to address at

5  all of the objections because they don't appear to go to the

6  form of the question, which is what I would typically see.

7        So what issues do the plaintiff want to talk about

8  this morning before jury selection?

9        MS. MATZ:  So what we wanted to talk about was a

10  couple of things.  We have an ongoing concern about -- so both

11  the parties, we've been trying to -- everyone has been working

12  on the exhibit list, and we've been trying to work with the

13  other side to come up with joint exhibits.  There are many

14  exhibits that, frankly, should be joint.  They were either on

15  both parties' lists or they were already authenticated by

16  requests for admission or they were stipulated to at

17  deposition.  And we haven't been able to get them to agree to

18  make any of those joint.  So that is one issue that is just --

19        THE COURT:  What difference does that make to the

20  plaintiff's case?

21        MS. MATZ:  Well, it just makes a difference from the

22  fact that your Honor had indicated that you wanted us to try

23  to agree on what we could agree on to make things smooth for

24  trial.  But the bigger concern, I think, is that --

25        THE COURT:  Let me just say this:  Joint exhibits

1 aren't something you see a lot of in the Atlanta federal

2 system.  I mean, normally you might see it because the other

3 side doesn't object when you offer things and they -- but you

4 don't really see a joint -- you know, like a jointly marked

5 exhibit very often.

6 　　　　MS. MATZ:  I think usually there's a few when

7 everybody is agreeing there's certain evidence that's coming

8 in, but I take your Honor's point you would just encourage us

9 to do that.  My bigger concern is that we got an exhibit list

10 sent to us last night around 10:00 o'clock that was completely

11 renumbered from the exhibit list that they had previously sent

12 us, which we will deal with.  But we have not had a chance to

13 file objections to it, and there were new exhibits added.  The

14 bigger issue, though, is that we have --

15 　　　　THE COURT:  I'm sorry.  Were there exhibits added

16 that were not part of the pretrial order?

17 　　　　MS. MATZ:  Yes.

18 　　　　THE COURT:  I mean, they're probably not coming in

19 unless there's a really good reason.

20 　　　　MS. IZMAYLOVA:  That's not true, your Honor.

21 　　　　THE COURT:  Well, if it's not true, then you don't

22 have anything to worry about then.

23 　　　　MS. MATZ:  Part of the issue here is that -- and I

24 can try to discuss this with them and work it out with them,

25 but, you know, part of the issue is that it looks like some of

1   the things were reproduced in discovery.  They redacted Bates

2   numbers, so it's very difficult for us to tell what they've

3   even added at this point.

4        But the bigger concern is that it is very apparent

5   from their exhibit list that what they are going to be doing

6   is trying -- the vast majority of the exhibits on their list

7   are still related to their counterclaims, which the Court

8   dismissed.  And we have an entire motion in limine on this

9   issue, and we have a very real concern that they are going to

10  get up in their opening and make this case about issues that

11  are completely irrelevant and prejudice the jury into hearing

12  things that your Honor has already ruled on.

13       The entire -- many exhibits on the defense exhibit

14  list relate to this Dennis Byron person who they sought

15  discovery on related to their counterclaims for assault, which

16  as your Honor recalls were entirely dismissed.  We had a

17  motion in limine hearing on this.  So we have a very real

18  concern that they are going to be trying to do that still, and

19  we'd like to be -- you know, from our perspective there's no

20  proffer what any of this is related to, and we have a very

21  real concern that they are going to be trying to introduce

22  evidence and telling the jury about evidence that ultimately

23  your Honor has already ruled should not be part of this case.

24       THE COURT:  Well, without asking the defendants to

25  comment, let me just say that Rule 11 is a real thing, and I

1  will not hesitate to utilize Rule 11 and the sanctions that

2  come with it if motions in limine are violated.  It would be

3  pretty easy for me to determine whether something is relevant

4  to the plaintiff's claims or not.  It's about what the

5  defendant said about the plaintiff and whether or not it's

6  true or whether the plaintiff -- the defendant had a good

7  faith basis to think that it was true and/or did the plaintiff

8  suffer any damage to her reputation, personal damages

9  otherwise based on what was said.  I mean, that's all we're

10 talking about in this case at this point.

11          So, you know, I mean, I don't know that I've ever had

12 an attorney in a large scale way attempt to vitiate pretrial

13 rulings on motions for -- in motions in limine and try to seek

14 to introduce things that have been excluded by the Court.

15 There are a lot of sanctions available to me in addition to

16 Rule 11 sanctions, such as striking answers and entering

17 judgments as a matter of law and then changing the trial to be

18 one of damages.  And that's with an inherent power of the

19 Court to do those types of things.

20          It would probably be viewed by the defendant as a

21 very drastic remedy.  But, look, the plaintiff -- excuse me.

22 The defendants hired their lawyer.  The defendants are

23 responsible for their lawyers' actions, and if there's an

24 attempt to do the things that the Court has said cannot be

25 done, that's a real possibility, that being that there could

1   be an answer struck and liability entered subject only to a

2   claim of damages.  That would entirely change the nature of

3   this trial.

4          I have no idea what's going to happen in this case as

5   it relates to the jury's decision.  You know, I let the issue

6   go to trial.  I did not grant the plaintiff summary judgment

7   on the plaintiff's claims.  It's possible that the jury could,

8   you know, find no liability or it's possible that the jury

9   could find that there has been an abridgment of the

10  plaintiff's rights but no damages.  It's also possible that

11  the jury could find that there's been abridgment of the

12  plaintiff's rights and that there are significant damages.

13         But the defendant would be making it very easy if

14  they acted in such a way that the only issue then put to the

15  jury is what are the amount of damages, and it changes a lot.

16  It, in fact, may even mean that some things that were

17  admissible or beneficial to the defendant are no longer

18  admissible to the defendant.  So I just trust that the lawyers

19  will honor their oath to the court, their responsibility for

20  professionalism under the Georgia Code of Professional

21  Responsibility.  It applies to all the lawyers in here no

22  matter what type of admission they have to the court for this

23  case and act accordingly.

24         Anything else, Ms. Matz?

25         MS. MATZ:  No.  I very much appreciate your time,

1  your Honor.

2        THE COURT:  Anything from the defendants that y'all

3  need to talk about this morning?

4        MS. IZMAYLOVA:  Thank you, your Honor.  We have also

5  a similar issue regarding the exhibit list that we received

6  from the plaintiffs.  If you recall during the pretrial

7  conference that we had in November, the plaintiff had

8  something like 986 exhibits on their exhibit list, and your

9  Honor stated that that was too many exhibits and that both

10 sides should work on cutting their exhibit list down.

11       We received their exhibit list two days ago that has

12 1300 exhibits on it.  I did reach out via email to plaintiff's

13 counsel to let them know that a lot of these exhibits that's

14 listed on here go directly against the Court's rulings on the

15 motions in limine, some of which the plaintiff had filed.  So

16 that's a concern for us because it's 1300 exhibits.  It's

17 basically every single piece of discovery ever served on us

18 throughout this three-year litigation.

19       In addition to that, we have not received any

20 redacted exhibits.  So there's obviously some of the exhibits

21 that they would be able to introduce but may have some, you

22 know, hearsay or some other evidence not admissible, but the

23 rest of the exhibit is admissible.  And so we have not

24 received any, not even one, exhibit that's been redacted to

25 where it would be, you know, fully admissible in evidence.

```
 1            And, also, I was planning on filing a motion this
 2   morning, and I had some technical difficulties.  I've already
 3   spoken with Ms. Lee about it.  She helped me to scan the
 4   documents in, so I do have a motion that I wanted to --
 5            THE COURT:  What's your motion that you want to file?
 6            MS. IZMAYLOVA:  I'm sorry?
 7            THE COURT:  What is your motion?
 8            MS. IZMAYLOVA:  It's a motion to reconsider one of
 9   the Court's rulings on the motion in limine based on some
10   newly discovered for me evidence.
11            THE COURT:  Okay.  We're not going to talk about that
12   this morning.  We don't need to.  We can talk about that
13   tomorrow morning.
14            MS. IZMAYLOVA:  Yes, sir.
15            THE COURT:  Not this morning.  Anything else?
16            MS. IZMAYLOVA:  The exhibit list is really the main
17   concern because, I mean, there are so many exhibits on there
18   that are inadmissible, so I'm not sure how it went from 96 to
19   like 1320.
20            THE COURT:  So let me just say this generally, okay,
21   to both sides complaining about the lack of the ability to
22   correlate your efforts in streamlining the production of -- or
23   the introduction of documents.  I'm sorry that that's the
24   case, but the trial is starting today.  And so, you know, if
25   the presentation of the evidence is more disjointed for the
```

1   jury, the jury is going to blame somebody.  We'll see who they

2   blame at the end of the case, I guess, but there's nothing

3   more I can do to help you.  I certainly can't arbitrarily

4   limit the number of exhibits that might be introduced at

5   trial.  I mean, the question is are they relevant to the

6   issues, and were they produced during discovery such that

7   they're not a surprise.  Assuming that that's not the case,

8   then each side is in control of what it presents.

9         You know, I don't know that I'm going to be making

10  any cumulative decisions in this case.  I don't generally try

11  to interject when I think enough is enough.  I just know that

12  jurors don't like it when they feel like their time is being

13  wasted, and so I trust that both sides will make its decision

14  about when is enough enough about what you need to introduce

15  to support your claims or your defenses.

16        And don't expect me to just interpose myself in that

17  kind of discussion.  It's just like hearsay questions.  You

18  know, when you ask a hearsay question or maybe the better

19  example is a leading question to your own witness, you know,

20  I'm not going to stop you unless the other side objects

21  because sometimes there's strategic decisions why a lawyer may

22  not object.  You know, you don't want to be viewed negatively

23  by the jury or maybe you just don't care what the answer is

24  and you think it makes your side look good no matter what.

25        So don't expect me to manage the case for you.  I

1   will certainly respond when you file objections.  Probably the

2   one exception to that is that when a witness is being

3   argumentative and evasive on the stand, I will get involved in

4   that sometimes without being asked.  I'm not going to let the

5   witness waste my time too by not answering the question and

6   then having to have the opposing counsel continue to spin

7   their wheels in trying to get the answers to the question that

8   they ask rather than an answer to a question that they didn't

9   ask.

10          But other than that, I'm not going to get involved

11   right now in any dispute that y'all have about whose witness

12   list hasn't been streamlined or has grown, or whatever.  I

13   mean, as long as it's within the confines of the pretrial

14   order and it's been adequately -- notice has adequately been

15   given, I'm just not going to be involved in it at this point.

16          Anything else before --

17          MS. MATZ:  Yes, I just wanted to --

18          THE COURT:  Hold on a second.

19          MS. MATZ:  I apologize.  I thought you were pointing

20   to me.

21          THE COURT:  Ms. Izmaylova, anything else?

22          MS. IZMAYLOVA:  I just had a follow-up question.  I'm

23   not saying this is going to happen.  But if for some reason

24   there's an attempt to introduce an exhibit that's been already

25   ruled out during the motion in limine --

1        THE COURT:  I'm sorry.  If you attempt to?

2        MS. IZMAYLOVA:  No, no, if opposing counsel attempts

3    to, just based on the exhibits they've put on the exhibit

4    list, how does your Honor want us to handle that?  Do we --

5        THE COURT:  Object.  Say, your Honor, this exhibit is

6    not proper for consideration in this case pursuant to the

7    pretrial order.  That's a discussion that we're probably going

8    to have to have outside the presence of the jury, but you can

9    alert me to the dispute that way.  It's pretty generic without

10   being argumentative.  As I told y'all last week, you know -- I

11   think I told you last week.  I don't allow lawyers to have

12   speaking objections.  I don't view that as a speaking

13   objection, but if you start giving me all the reasons why,

14   then that's a speaking objection.

15       MS. IZMAYLOVA:  I was just saying in regards to -- do

16   we mention that there was a pretrial order or that there was

17   motions in limine in front of the jury because --

18       THE COURT:  Just say, Judge, I object to the

19   admission of the document as being inconsistent with the

20   pretrial order.  That's enough that we can talk about it

21   without really telling the jury anything.  In fact, at some

22   point I'm either going to sustain your objection or overrule

23   your objection, so the jury will figure out whether I agree

24   with you or not ultimately.  Okay?

25       MS. IZMAYLOVA:  Thank you.

1        THE COURT:  Anything else from the defendant?

2        MS. IZMAYLOVA:  Nothing from me.

3        THE COURT:  Ms. Matz, anything else?

4        MS. MATZ:  I just wanted to respond very briefly.  We

5   don't have 1300 exhibits, and I know you're not telling us to

6   streamline.  But we took things off of our exhibit list, and

7   we kept the numbering.  And there were a few things added that

8   came later, but you'll hear that when it comes up.  And the

9   only other thing I wanted to say is that, you know, your Honor

10  did not order us to redact documents at the pretrial

11  conference --

12       THE COURT:  It would have been the first time I've

13  ever done it if I did.

14       MS. MATZ:  Yeah, it was never an order, so I don't

15  know exactly what Ms. Izmaylova is referring to.  But, you

16  know, we made that clear in our email response to her last

17  night that we reviewed the pretrial order.  There's no order

18  for redaction of documents, so I'm not sure what she's talking

19  about.

20       THE COURT:  Probably what I did say was, are we

21  really going to introduce this many documents?  Come on.

22       MS. MATZ:  I hope not.

23       THE COURT:  Something like that.  And so it's going

24  to be really difficult for the jury if all this stuff comes

25  in, even if it's relevant.  But I'm not in the business of

1  deciding for you what you need.  You know, that's what y'all

2  decide.

3          MS. MATZ:  Of course.  And, I mean, I think, as your

4  Honor knows, because you've been doing this a long time, a lot

5  of that will depend on what comes out on the stand and what's

6  needed to get certain facts in.

7          THE COURT:  Okay.  I want to make sure that when we

8  get to testimony, which will be sometime tomorrow afternoon --

9  and I'll give you a little bit of update about that in a

10 minute -- that you have exhibits on the witness stand so when

11 you call your witnesses, you can refer them to documents

12 without having to approach them.  I understand there may be

13 some occasions where you feel like you need to approach to

14 help marshall them in the right direction, but otherwise your

15 documents need to be there.

16         You need to lay the foundation.  Before you start

17 asking questions the opposing counsel needs to be alerted to

18 what document you're talking about.  The better way is that

19 each of you have a copy of each other's exhibits with the same

20 numbers, and hopefully they're going to be in binders where

21 they can just go directly to the tab and look at the document

22 itself.  But don't start asking questions until you have

23 clearly identified it to the opposing counsel so that if they

24 have a problem about the document that you're going to try to

25 lay a foundation to and ask some questions about, they can

1    object to it before we get too far into it.  Okay.

2         As far as our schedule is concerned, what I'm going

3    to -- my hope is that we'll have our jury today.  I don't

4    think that we won't unless all of a sudden, you know, all of

5    our jurors have concerns about Covid or something and they

6    don't want to serve.  I would have the jury report tomorrow at

7    12:00.  As we discussed, the football game that I think a lot

8    of people are going to have interest in potentially on the

9    jury -- I certainly do.  I canceled my plane tickets to fly to

10   Indianapolis last night at 10:30 when I was sure that there

11   wasn't going to be something that was going to come up.  I'm

12   happy to start the case, but if it fell apart, I wanted to

13   keep the option of maybe going to the game.  I plan to watch

14   the game, and I'll be in a really good mood or a really bad

15   mood in the morning.

16        So I'm going to ask the jurors to report at

17   12:00 having eaten their lunch before they report.  I will

18   probably ask y'all to report earlier than that so that we can

19   talk about whatever this motion is that the defendants

20   indicated they may file or anything else that may come up

21   between now and in the morning.

22        MS. MATZ:  May I ask one other question, your Honor?

23   I'm sorry.  This was actually on my list earlier.  And if

24   you'd prefer to handle it tomorrow, that's absolutely fine.

25   We did have a question about how you want to handle stipulated

1    facts.  Are you going to read those to the jury or should we

2    just read them to them at the time we feel is appropriate?  Is

3    there a specific way you want to do that?

4              THE COURT:  I have no real preference.  I mean,

5    typically what happens is the party that is most connected to

6    the stipulated facts and wants them in, at some point during

7    their case will just simply read those to -- we'll admit the

8    stipulated facts in writing so we can have it as an exhibit so

9    that if the jury wants to go back and look at it, they can.

10   But you will just simply read it into the record as a

11   stipulated fact.

12             MS. MATZ:  Great.  And they were attached to the

13   pretrial order, so we'll just make sure that there's an

14   additional copy for the jury when they go back.  Thank you

15   very much, your Honor.

16             THE COURT:  Yes, ma'am.

17             MS. IZMAYLOVA:  I'm sorry, your Honor.  We did make

18   binders for the Court and for Ms. Lee.  We were planning on

19   introducing the exhibits via, you know, just electronically

20   but --

21             THE COURT:  So here's the way it normally works, is

22   you ask the juror to look at Document No. 16.  Opposing

23   counsel knows what document you're talking about.  If they've

24   got an objection to anything about it, then they'll bring it

25   up, but normally that doesn't happen.  So it might happen in

1   this case, but normally it doesn't.  The juror will -- you'll

2   ask questions about the juror to the document just as if

3   you've handed them a document.  Once they've laid the

4   foundation, you think sufficiently, then you'd move the

5   document into evidence.  I'll hear if there's an objection or

6   there's no objection.  If it's admitted, then you're able to

7   publish it, and we won't hand the jury the document.  If you

8   scan them, then you can just simply upload it, hit the button.

9   Ms. Lee will control your document, and she will publish it to

10   the jurors.

11          It will go -- each of the jurors in the jury box will

12   have a screen directly in front of them.  For those jurors, if

13   any, that choose to sit in the audience, they'll be able to

14   see the document on that screen to the right of the courtroom.

15   The documents will also appear on these other screens as well

16   but not until it's been admitted and you've asked to publish

17   it.

18          MS. IZMAYLOVA:  So we definitely need to make a

19   binder then, a physical binder for the witness?

20          THE COURT:  Yes.  That way you don't have to approach

21   the juror (sic) to hand them the document because every time

22   you approach the jury, you're going to have to have your mask

23   on.  They will likely not -- they'll either not have a mask on

24   at all or they'll have a face shield on.  And it just becomes,

25   you know, becomes cumbersome.  This is a relatively new

1  technique that we're requiring, but it's also a technique that

2  lawyers have been using in the Atlanta district really for a

3  long time since we have the technology for it.  But you've got

4  to have all your documents scanned so that you can upload it.

5  Lawyers typically will come up to the podium, attach their

6  computer to our interface, and then they'll have access to the

7  screens.

8          MS. IZMAYLOVA:  We already have all of them uploaded.

9          THE COURT:  Have y'all worked out the technology?

10         MS. IZMAYLOVA:  Yes, sir.

11         THE COURT:  All right.  Yes, ma'am.

12         MS. MATZ:  I would just ask that we either get a copy

13  of their binders or at least an electronic copy.

14         THE COURT:  You should have a copy, yes.

15         MS. MATZ:  Okay.  We don't have one yet.  We brought

16  one for them today, but maybe they've brought one for us.

17         THE COURT:  Y'all need to get a binder for the

18  prosecutor -- for the plaintiff and a binder for the Court and

19  then a binder for the witness as well.

20         MS. MATZ:  Thank you.

21         THE COURT:  You still will physically admit your

22  document, and so any document admitted you also need to give a

23  copy to the clerk.  You don't necessarily have to give a copy

24  to the clerk right then, though, you know.  That can be done

25  at the end of the case.  But we still will have to create a

1  record that goes to the clerk.  The clerk, I guess, will scan

2  every document in that was actually admitted during the trial,

3  and then that's in the appellate file.  All the files are

4  transmitted to the Court of Appeals electronically these days.

5      MS. IZMAYLOVA:  In regards to the video evidence, do

6  you want us to --

7      THE COURT:  Video evidence?  I mean, you have to lay

8  the foundation the same way you always would have to.  We'll

9  play it for the jury.  If a jury wants to -- the jury wants to

10 see a video that's been admitted and published or maybe not

11 published at any point in time during deliberations, they have

12 the option to do that.  They have to do it in the courtroom,

13 though.  I don't allow jurors to take videos to the back room

14 and watch them at their leisure.  I will allow them to watch

15 any time they want, but it's got to be in the courtroom.

16     All right.  Anything else?  All right.  So jury

17 orientation is done.  We'll take a ten-minute recess while you

18 relocate upstairs.  I'll be on the bench about 9:40 up there.

19 Okay?

20     MS. MATZ:  Can we leave our exhibits in the

21 courtroom?

22     THE COURT:  I'm sorry?

23     MS. MATZ:  Can we leave our exhibits in the

24 courtroom?

25     THE COURT:  Sure.

1          MS. MATZ:  Thank you, your Honor.

2          THE COURT:  Can we lock this door after we exit?

3          COURTROOM SECURITY OFFICER:  Yes, sir.  I can lock

4    it.

5          THE COURT:  All right.  Thank you.  Okay.  So we've

6    got a lot of jurors, and we may pick more than two alternates.

7    I'll tell y'all.  I just want to see how things are

8    progressing.  If it looks like we're progressing at a pretty

9    rapid pace, we may very well pick maybe up to two more

10   alternates.  I'll let you know.  But I'm not going to extend

11   jury selection into tomorrow to do that, but if I've got time

12   to do it today, I might.  Okay.  All right.  We'll see y'all

13   in about ten minutes.

14         MS. MATZ:  Thank you, your Honor.

15         COURTROOM SECURITY OFFICER:  All rise.

16         (Whereupon, there was a break, courtroom change, and

17   the prospective jurors entered the courtroom.)

18         THE COURT:  All right.  Ladies and gentlemen, good

19   morning.  My name is William Ray.  I am a United States

20   district judge for the Northern District of Georgia.  The

21   Northern District of Georgia is the federal court for the

22   northern half of Georgia, although the lines for the district

23   are a little bit weird because Athens, Georgia you would think

24   is in north Georgia.  But it's not in the northern district of

25   Georgia.  But otherwise, you know, it is the northern part of

1    our state.

2          I know you've been here for a while.  I got here

3    about 7:00 o'clock this morning, and I walked up about 8:00

4    o'clock or so.  And I know that y'all were in jury orientation

5    at that time watching a fabulous film that I'm sure you all

6    thought was worth the drive to Atlanta today, but I do

7    recognize that you had to leave early to be here.  And while

8    maybe commuting right now is not as bad as things were

9    pre-COVID in Atlanta, it's still Atlanta and traffic can be a

10   nightmare.  So thank you for being here and for -- I know most

11   of you were here on time.  A few of you had a little bit of

12   trouble getting here because of whatever reason, but I thank

13   you for being here.

14         I'm also very appreciative that you're here in light

15   of what's going on in our country.  For about 13, 14 months

16   when Covid began, the courts did not have trials.  We

17   continued to work often remotely but sometimes in person.

18   Probably just about all the time I was in the courthouse

19   having hearings, but most of the people that were having

20   hearings with me were not here.  They were connected by Zoom.

21   And I still, in fact, have lots of hearings and matters on

22   Zoom.

23         In May of 2020 we began having trials again in

24   Atlanta in the Northern District of Georgia, and I've had

25   quite a few.  This is probably my fifth or sixth trial that

1   I've had during that period of time.  Trials are not something

2   that really -- that you're able to do remotely because it's

3   not just what is said that is very important for jurors as you

4   try to decide a case.  It's also how they're said, the body

5   expressions that are used, facial expressions that are

6   important because one of the biggest things that you as a

7   juror, if you're selected for the case, will do is you'll have

8   to decide who to believe and who not to believe.  And it's

9   just very difficult to do that unless we're all together so

10  that everything happens in your presence.

11          So, again, you know, I'm not oblivious to what's

12  happening with Covid.  I'll tell you that I recently recovered

13  from Covid that I caught over the break for the Christmas

14  period, holiday period.  I am negative now.  So I understand

15  that for you coming today, some of you it probably didn't

16  really matter.  Some of you were probably a little concerned

17  about Covid, and we're going to have some questions that we

18  ask you today that talk about how you feel about being here in

19  light of the pandemic and how things are currently situated.

20          But this is an important case that you're going to be

21  asked to consider if you're selected for this jury.  It's not

22  going to be a quick case.  It's not going to be a two-day case

23  or three-day case.  It's probably at least a two-week case,

24  maybe three.  It really just depends.  I'm going to tell you a

25  little bit more about the case in a moment.

1          I know just knowing the length of the case, forget

2    about Covid, just knowing the length of the case itself, just

3    being here knowing that Covid is an issue, is a concern,

4    knowing that it's a long case is probably a concern as well.

5          I would love to serve on a jury, never had that

6    opportunity.  I've been a judge for 20 years now.  I became a

7    judge in January of 2002.  I was appointed to serve as a judge

8    on the Gwinnett Superior Court where I live and still live and

9    where I had had my law practice.  And a couple of times I've

10   been called into the courtroom to be questioned, but as you

11   can imagine, if parties want a jury case -- want a trial and

12   they've asked for a jury trial, they don't really want a judge

13   on their panel because if they wanted a judge to make their

14   decision or participating making their decision, they would

15   have asked for a bench trial.  So I've never quite been

16   selected though I have been questioned before.

17         For me as a judge, if I were to be asked to serve on

18   a jury, it would be an inconvenience but not an economic one

19   because I work in the courthouse anyway, and I would otherwise

20   be there doing my job as a judge.  So I understand some of you

21   are going to have some economic concerns, though, about

22   serving on the jury.  It's one of the reasons that we have so

23   many of you here, is so that we can hear about things like

24   that that you think could affect your ability to serve.  Just

25   because you might have some economic concerns doesn't mean

1   that you aren't eligible to and might not still make it onto

2   the jury, but those kinds of things we'll take into

3   consideration when we go to pick the jury, which will happen

4   hopefully sometime later this afternoon.

5          Hold on just one minute if you would.

6          (Brief Pause.)

7          THE COURT:  So a little bit about myself.  I told you

8   that I've been a judge for a long time.  I practiced law in

9   Gwinnett County in Lawrenceville where I've lived since I

10  graduated from law school.  I went to the University of

11  Georgia, so I do have a little bit on my mind today other than

12  jury selection, if you follow football, given a big game

13  that's going to occur tonight.  Had this trial been postponed,

14  I would be in Indianapolis because I actually had plane

15  tickets to go to Indianapolis that I canceled late last night.

16  I actually dropped my adult son and his girlfriend off at the

17  airport this morning at 6:30 to put them on a plane to go to

18  Indianapolis.

19         My wife and I live in Gwinnett.  My wife is a

20  psychologist, and we've raised three boys there, all who are

21  now adults.

22         I was appointed to the superior court in Gwinnett

23  County, which is the general trial court in Georgia, serving

24  primarily for cases that were in Gwinnett County, although I

25  did try some cases as a judge in other parts of the state from

1    time to time when asked to.  In late or -- excuse me -- 2012 I

2    was appointed to the Georgia Court of Appeals where I served

3    reviewing trial court work, trials and things like -- and

4    motions and things like that that had been decided at trial

5    court.  And I served in that capacity for six years and was

6    appointed in 2018 by the President to serve as a trial judge

7    again, this time in the federal court system.

8            It's not really that much difference in what happens

9    at your local county courthouse and what happens in federal

10   court.  In federal court from a civil standpoint -- and this

11   is a civil case that you'll be serving on -- we hear cases

12   that sometimes involve only state law like this case.  This is

13   a state law case, but it's brought in federal court because

14   the amount of money that is at issue is in excess of what the

15   jurisdictional limit is of $75,000 or more, and the parties

16   are from different states.

17           And so when that situation exists where a case is

18   worth more than $75,000 allegedly and the parties are from

19   different states, then the case can be brought in federal

20   court.  And so that's why this case is here.  So it's much

21   like a case that I would normally be trying when I was a

22   superior court judge.

23           You've noticed, I'm sure, some things that are

24   probably not that unusual now but would have been unusual to

25   you when we first started having court again.  You're being

1  asked to wear a mask, and I will wear a mask other than when

2  I'm talking.  The lawyers will wear masks at all times except

3  when they're talking.  And when they are talking, they'll be

4  standing in front of shields to prevent, you know, any

5  migration of Covid if they happen to unknowingly have it.

6       The witnesses who will take the witness stand will

7  also wear a mask if they have not been vaccinated per the CDC

8  requirements, and if they haven't been -- if they have been

9  vaccinated, they'll take their mask off, but there will be

10 shields in front of them and you as the jurors in the case.

11 If they haven't been vaccinated, then they will wear face

12 shields.  We will ask them to take their mask off when they

13 testify because, as I told you, it's important for you to be

14 able to see and hear everything that happens in the court, and

15 that includes watching a witness and how he or she might

16 testify.

17       So some of our other procedures are changed.  The

18 lawyers will only ask you questions from a podium where there

19 are shields in front of them.  They won't migrate around the

20 courtroom.  It won't be like a law show that you might see, a

21 movie that you might see where the lawyer can kind of roam

22 around and be very theatrical.  They can be as theatrical as

23 they want as long as they stay put in the same spot and so

24 that we limit the risk.

25       For those of you that are selected to serve on the

1    jury, the trial will not take place in this courtroom.  This

2    is our largest courtroom, and we reserve it, other than for

3    ceremonial reasons, for really big trials.  We reserve this

4    courtroom right now for jury selection so that we can space

5    you out more.  Once the jury is selected and we begin

6    testimony, it will be in my regular courtroom, which is a

7    little less than half the size of this courtroom.  The jurors

8    will be spaced out in the jury box, but if there's any juror

9    who's selected that feels like -- or feels uncomfortable

10   sitting within a couple of seats of someone else, then half of

11   my courtroom, the gallery where you're sitting which again is

12   much smaller, but half of that I'll make available for the

13   jurors to sit in as well to get a little bit more space, if

14   that makes anybody who might be selected more comfortable.

15          Now, if you choose to sit in the gallery, it's not as

16   comfortable to sit because the seats are the hard benches like

17   you're sitting on now for most of you, not the more plush

18   seats that are available in the jury box.  But, as I said,

19   we're all going to wear masks.  We're going to make things as

20   safe as possible for everybody during the course of the case.

21          One of the things that we've changed during Covid is

22   we now let you bring, if you're a juror, bring your phone with

23   you to court.  Federal court rules do not allow any videotape,

24   audiotape, still or motion photographs to be taken in court by

25   anyone, and typically we've controlled that in Atlanta or

1    north Georgia courts by not letting you bring phones in

2    because it's easier to control if nobody can bring phones.

3    We're letting the jurors bring their phones in, though.  We'll

4    let you bring your phones, but you've got to keep your phones

5    in your pocket or your pocketbook or bag or whatever you have.

6    You cannot use it at any time while you're in the courtroom.

7    You can use it in the hallway, outside, whatever, but not in

8    the courtroom.  And if any juror were to violate that rule,

9    then your phone would be confiscated and probably not given

10   back to you at least until the end of the day if not the end

11   of trial.

12          So, you know, I haven't had a problem with people

13   getting their phones out, so just please don't abuse that

14   right so that you don't lose your phone.  If you're like me,

15   you know, if you don't have your phone on you every minute,

16   you kind of feel like there's an important part of you left at

17   home.  So I want you to have your phones with you, but please

18   don't get them out or use them.

19          It's very important that you follow all of the

20   court's guidelines, particularly those about wearing masks.

21   That means that you have to wear a mask fully.  It has to be

22   over your entire face, including your mouth and your nose.  I

23   wear glasses to read.  I know that can be a problem for those

24   of you that need your glasses, but we just have to do the best

25   we can.  I had a juror selected for a case a few months ago

1  who was wearing a bandanna, and I probably should have said

2  that beforehand, can't wear a bandanna.  That juror ended up

3  having a problem.  You have to wear a cloth mask.  It cannot

4  be thin like a bandanna.  I'm not going to be too particular

5  otherwise but just to say you've got to wear what is normally

6  seen out there.  And I recognize that -- and it can't be a

7  Gator either.  I recognize that it's questionable how good a

8  mask is and how much it works, but, in any event, you've got

9  to wear them.

10        I want you to understand how important jurors are in

11  our system, in our system of justice.  I want you to think of

12  it this way if you would:  It doesn't matter what the United

13  States Congress or the Georgia General Assembly, which is

14  starting today for their 2022 session, what laws they make

15  that the governor or that the President agree to.  If this was

16  a criminal case, it would not matter that the government

17  brings charges.  None of that matters until a jury says it

18  matters.

19        It is the jury system in our country that decides

20  what is what.  It is your job as jurors to take the law that I

21  give to you and apply that law to the facts as you find them

22  to be.  Jurors have the power to send people to prison or to

23  let people go and in civil cases to decide if someone, you

24  know, has been wronged in some way or not and if you decide

25  that someone has been wronged, to decide what to do about

1  that.  When jury trials are involved, judges don't make those

2  decisions nor do any other governmental person, just regular

3  people make -- some of you might be lawyers.  I haven't really

4  looked.  But it's not your legal knowledge or skill that we're

5  interested in.  It's your common sense and your ability to

6  decide what's fair based on the law.

7        If you think of it this way, there are two really

8  important boxes in government.  We need only look back to the

9  2016 or 2020 election to realize how important the ballot box

10 is, but even more important than the ballot box is the jury

11 box.  And those of you selected on this trial are going to

12 have some very important decisions to make.

13       The first part of a trial isn't something you see

14 very often in the movies or on television.  It's jury

15 selection.  We call it voir dire, which is a Latin word which

16 means to speak the truth.  It is the job today, this morning

17 and this afternoon, for the lawyers to get to know you a

18 little bit better by asking you questions to find out a little

19 bit about who you are -- we have some very basic information,

20 but that's all -- who you are and maybe where you work.  Other

21 than -- and where you live, the city that you may live in.

22 But other than that, we don't really have any information

23 about you.

24       And voir dire is designed so that the lawyers can try

25 to discover those of you who are best suited to sit on this

1   case.  I'm sure you're all very fine people, but some jurors,

2   some people, are better jurors in certain kinds of cases than

3   others.  I'll give you an example.  When I was a teenager, my

4   father was murdered, when I was 13 years old.  So my guess is

5   that a criminal defense lawyer would probably think maybe I'm

6   not the best kind of person to sit on a trial for someone that

7   may be charged with murder.  I think I can be fair.  I mean,

8   it's my job.  But, in any event, they may not think so, and so

9   that kind of case -- in that kind of case the lawyers might

10  decide that I would be better suited to hear a different type

11  of case.

12          And some of you may have some experiences in your

13  life which are similar to what this case is about or you

14  might, you know, have some prejudice against one side or the

15  other not because, again, you're bad people but just because

16  we all naturally have things that we like or we don't like

17  that might make us better suited for one kind of case or

18  another.  And so that is the process of jury selection, for

19  the lawyers to find out a little bit about you so that they

20  can make the best decision when we go to pick the jury later

21  this afternoon.

22          And I hope you understand that while you might be

23  asked and will be asked questions that you find are personal

24  to you, the lawyer is not trying to pry into your personal

25  affairs really in any unwarranted way but just to know who you

1  are, what your experiences have been, and ultimately whether

2  you can be fair in this case.

3        All the questions that you have been asked I have

4  looked at and approved, and you will have to answer those

5  questions unless you're specifically excused by me from doing

6  so.

7        Now, if you're asked something this morning or this

8  afternoon that is sensitive to you, is private to you that you

9  would rather not answer in front of all the other jurors, then

10  that's okay.  You just need to let me know you'd rather answer

11  it in private, and we'll give you an opportunity to answer the

12  question without all your fellow jurors that you've met today

13  being in the courtroom while you answer the question.  When we

14  take a break -- and we'll take routine breaks -- then we'll

15  have you either hang around and answer the question then or

16  come back a little later, a little earlier than everyone else

17  and then we'll ask the question in a private setting.

18  Everyone you see in the courtroom up here, the lawyers and the

19  court staff, we'll all be here, but the other jurors will not

20  be.

21        It's very important -- and you have a legal

22  responsibility and duty -- to answer every question fully and

23  truthfully.  If a question is asked and you think that it

24  could apply to you but you're not quite sure depending on what

25  the question asker means, go ahead and assume that it applies

1  to you, provide us with that information, whatever it might

2  be, and let us decide, let the lawyer decide who asked you the

3  question whether or not that information was important.

4       I can give you a good example.  Someone may ask a

5  question -- if this was a criminal case, for sure this

6  question would be asked.  Has anyone in your family ever been

7  charged with a crime?  And you don't know whether that third

8  cousin on your mom's side counts as family or not, depending

9  on the question or thought.  Just go ahead assume in that

10 situation that that applied to your third cousin, and go ahead

11 raise your hand and answer the question affirmatively.

12       The lawyer will then, later in the day, will follow

13 up with you about that information, and the lawyer will then

14 be able to decide whether that really mattered to him or her

15 for purposes of the selection.  So, in other words, assume a

16 question applies to you if there's any doubt and go ahead and

17 let us know that.

18       If a question is asked to you either during the

19 general voir dire or in the specific individual voir dire --

20 and I'll explain what those two things mean in a minute --

21 that you don't respond but then later today before we pick the

22 jury you remember something that came to your mind that you

23 should tell us that would have been responsive, then let us

24 know that.  Let the bailiffs know that, the court security

25 officers or my staff know that, and I'll be sure to circle

1  back to you and give you an opportunity to give us that

2  information.

3       If you're not selected for the jury, I hope that you

4  don't take it personally.  We're only going to select either

5  eight or ten jurors.  We have to have six.  We're going to

6  pick at least two alternates.  We might pick two additional

7  alternates depending on how things go today.  By the way, if

8  you're an alternate, you'll be a regular juror.  You'll hear

9  the evidence.  You'll help make the decisions in this case.

10  It's just that we have to have six.  We can't have below six,

11  but we can have as many as we want.

12       Given that this trial will take a couple of weeks

13  potentially, I may pick a few more alternates than I normally

14  would.  But if you're not one of those people, don't take it

15  personally.  Everybody can't serve.  Only about a quarter of

16  you could serve, and hopefully if -- of course, if you don't

17  want to serve, then, hey, all the better to you; right?  If

18  you did want to serve, then hopefully you'll be given a chance

19  to serve in another case some other time.

20       I want to give you a little bit of information about

21  our jury schedule.  So we will generally go until 5:00 o'clock

22  every day.  We might end a little bit early.  We don't

23  typically go later than 5:00 o'clock beyond a just a few

24  minutes to try to finish something if we can.  I recognize

25  you've got other lives, and some of you have further to drive

1 than others.  So I'll make sure you get out of here at a

2 reasonable time, no longer than the normal business day.

3         We will generally start at 9:30 in the morning,

4 meaning that you would have to be here parked in the building

5 and in the jury room by 9:30.  I'll start a little bit later,

6 certainly later than this morning, but a little bit later than

7 maybe courts other places would start because I know that all

8 of you are coming from very different places and that you need

9 time to get here and to get parked.

10        Tomorrow in recognition of that ballgame that I

11 referred to, the jury will not report until noon tomorrow.  So

12 if any of you are selected and you're planning on staying up

13 late watching the football game, then you can do that and just

14 get here by noon.  The lawyers and I will probably get here a

15 little bit before that so that we can talk about issues.  In

16 fact, normally every day we will start before you get here so

17 that we can have everything ready to go by the time you would

18 arrive.

19        Tomorrow only, if you're selected for the jury, then

20 I ask that you either bring something with you to eat or that

21 you eat lunch before you come.  We would probably have three

22 afternoon sessions of testimony with some breaks in between

23 but not a lunch break tomorrow.

24        I want to tell you a little bit about what this case

25 is about because it's going to be important as it relates to

1   the questions that you're asked.  The case in which you may be

2   selected to serve in my courtroom this week and the next or so

3   is a case known as Belcalis Marlenis Almánzar v. Latasha

4   Transrina Kebe and Kebe Studios LLC.  This is a civil case.

5   The plaintiff is also known as Cardi B.  The plaintiff, Cardi

6   B, has sued the defendants claiming that based on videos that

7   the defendants posted on YouTube about the plaintiff, that the

8   defendants are liable for defamation, invasion of privacy,

9   false light, and intentional infliction of emotional distress.

10  The defendants have denied these claims.

11          All right.  So I'm going to ask you a series of

12  questions.  I'm not going to ask you a ton of questions.  Most

13  of the questions are going to be asked by the attorneys.

14  They're going to be asking you in a general format, meaning

15  that if the question applies to you, you would raise your hand

16  with your number so that we can see your number.

17          No one is going to follow up with you during the

18  general questions that I ask or that the lawyers ask right

19  away with anything that you may have indicated by raising your

20  hand.  But later they will come back and ask you questions

21  individually because I will call out each juror's name, and

22  then each attorney team will have an opportunity to ask some

23  questions to you at that time.  Okay.  So please raise your

24  hand with your numbers.  So my questions are as follows:

25          Is there anyone here who is not a United States

1   citizen?  If so, please raise your hand.  There is no

2   response.

3          Is there any of you that are under the age of 18

4   years of age?  Please raise your hand.  There is no response.

5          Are any of you over the age of 70 years old?  The

6   reason I ask that is if you're over 70, you don't have to

7   serve if you don't want to.  So unless somebody can age

8   themselves real quickly if you were hoping not to serve, the

9   Court sees no response.

10         Have any of you not resided at your present address

11  for at least one year?  And when I say your present address, I

12  mean this current address or any other address that is not

13  included in Cherokee, Clayton, Cobb, DeKalb, Douglas, Fulton,

14  Gwinnett, Henry, Newton or Rockdale County.  So, in other

15  words, if there's anyone who has not lived in one of these

16  counties -- and you could have lived in more than one for at

17  least a year total from this date going backwards -- please

18  raise your hand.  The Court sees no response.

19         Have any of you been convicted in any state or

20  federal court with a felony or any other crime punishable by

21  imprisonment of one year or more?  Court sees no response.

22         Is there anyone who is unable to read, write, speak

23  or understand the English language?  Court sees no response.

24         Is there anyone who has any special disability,

25  impairment or problem that would make serving as a juror in

1    this case difficult or impossible?  The Court sees no

2    response.

3          Is there anyone who is the primary care provider for

4    a child, elderly person or anyone with a physical or mental

5    disability that would impair your ability to sit on this jury?

6    Juror No. 5, Juror No. 39.  Any others?  All right.  Thank

7    you.  Y'all can put your hand down.  When we're asking

8    questions generally, if you raise your hand, keep your hand up

9    with your number until the lawyer who's asking you questions

10   recognizes your number, then you can put your hand down so

11   that means we've seen it.  So 5 and 39.  Thank you.

12         Are any of you an active member of the United States

13   armed forces or any fire or police department?  Court sees no

14   response.

15         Do any of you currently hold public office in the

16   executive, legislative or judicial branch of government,

17   federal government or state government?  Court sees no

18   response.

19         Do any of you know personally or have you ever met

20   the plaintiff, Belcalis Almánzar?  Court sees no response.

21         Do any of you know of any employees or

22   representatives of the plaintiff or know anyone who has ever

23   done work for her or with her?  Court sees no response.

24         Do any of you know or have you ever met the

25   plaintiff's attorneys who are Lisa Moore, Andrew Pequignot,

1   Sarah Matz, and Gary Adelman or any other attorneys or

2   employees of the law firms of Moore Pequignot and Alderman or

3   Matz?  So I may not have got that exactly right because I

4   believe they work in different firms here in Atlanta and maybe

5   also in New York, so I'll have them introduce themselves to

6   you when they start asking questions.  And then they can

7   follow up on that again.

8          Have you or any members of your immediate family ever

9   worked for any of the attorneys that I just mentioned?  Court

10  sees no response.

11         Do any of you know personally or have any of you ever

12  met the defendant, Latasha Kebe, who's also known as Tasha K?

13  Court sees no response.

14         Have any of you had any personal or business

15  interaction with the defendant, Kebe Studios LLC, or have any

16  of you or any member of your immediate family ever worked for

17  the defendant, Kebe Studios LLC?  Court sees no response.

18         Do you know any of the employees or representatives

19  of Defendant Kebe Studios LLC or know anyone who's done any

20  work with Defendant Latasha Kebe or Defendant Studios LLC?

21  Court sees no response.

22         Do any of you know or have any of you ever met the

23  defendant's attorneys, Sadeer Sabbak or Olga Izmaylova or any

24  of the other attorneys or employees of the law firm of Sabbak

25  & Izmaylova P.C.?  There's no response.

1          Have any of you or any members of your immediate

2     family ever worked for or been represented by these attorneys?

3     No response.

4          Do any of you know personally or have you ever met

5     Starmarie Ebony Jones?  No response.

6          I'm going to read the names of some potential

7     witnesses in this case, and if you know any of these witnesses

8     personally, then if you would raise your hand.  I've already

9     asked you about the plaintiff and the defendant, Ms. Kebe.

10    Does anyone know Cheickna Kebe?  No response.  Dr. Sherry

11    Blake?  Sherry L. Blake?  No response.  Dr. Tamara Grisales?

12    No response.

13         Ladies and gentlemen, if you're selected as a juror

14    in this case, is there anyone who would be unable to render a

15    verdict based solely on the evidence presented at trial and in

16    the context of the law that I will give to you in my

17    instructions disregarding any other ideas, notions or beliefs

18    that you may have encountered in reaching your verdict?  Court

19    sees no response.

20         Now, this is a hard question to ask when people are

21    wearing masks, but I'm going to ask it anyway.  Raise your

22    hand if you, before you came to court today, knew any of the

23    other jurors that are in this courtroom or potential jurors in

24    this courtroom.  Now, if later you change your mind about that

25    because you see somebody with a mask off during one of our

1    breaks, or whatever, then let me know if you recognize

2    someone.

3            Does anyone recognize or know any of the court staff?

4    So I'm going to ask all the court staff if you would raise

5    your hand so that anyone associated with us -- anyone know any

6    of us?  Okay.  Court sees in response.

7            Finally, is there any one of you that has been

8    disqualified from serving on a jury before?  And I don't mean

9    that you weren't picked.  I mean that a judge said you're not

10   qualified to serve on a jury because of some reason like you

11   had a criminal conviction or something like that.  All right.

12   The Court sees no response.

13           As I said earlier, this is going to be a long case.

14   The parties estimate that the case will take approximately

15   seven to nine working days for them to present their case and

16   make all their arguments to you.  Once the case goes to the

17   jury, you know, I have really no way of telling you how long

18   it will take the jury to make its mind up about what should

19   happen in this case because that is controlled by the jury for

20   the most part.

21           I realize that this trial being a lengthy one is a

22   significant time commitment for each of you.  I want to make

23   sure you understand you're not going to be sequestered.  You

24   will be able to go home each day.  I will do all I can to make

25   sure that the trial moves along as speedy as possible, but

1   there are certain things I just can't control that I just

2   can't anticipate that could happen.  We'll be mindful of your

3   time and will be anxious I'm sure about the plaintiff and the

4   defendant to get this case over as soon as possible.

5          I've already told you about our general hours each

6   day, so you know what to expect in that regard.

7          Based upon what you know about this case so far, is

8   there any one of you that believes you know anything about

9   this case or that you've heard anything about this case?

10  We've given you very little information.  Juror No. 43 has

11  responded to that.  Anyone else that might know anything about

12  this case?

13         I want you to understand that the complaint that has

14  been filed by the plaintiff is not evidence.  It's just an

15  allegation.  It's the jury's job to decide if what has been

16  alleged in the complaint is true and if these allegations are

17  true, what they mean legally.  I will give you the law, and

18  then the jury will apply the law to the facts.

19         If you think of it, it's kind of like a criminal

20  case.  The prosecutor brings charges, but that doesn't mean

21  that they're true.  It's up to the jury to decide whether the

22  charges are true or not.

23         In jury trials the jury decides all questions of fact

24  and applies it to the law that the judge gives you.  It is the

25  judge who decides what the laws are, and then the judge will

1   instruct the jury about those laws.  The jury must accept the

2   law as given to you by the judge even though you as an

3   individual juror might not agree that that's a fair law or the

4   right law.  Is there any one of you that might be on this jury

5   who would not be able to accept or follow the law that I give

6   to you to apply in this case?  Court sees no response.

7          Do any of you have any moral or religious convictions

8   that would discourage you or prevent you from serving as a

9   juror making a decision in this case?  Court sees no response.

10         Do any of you have any health related problems such

11   as impaired hearing or eyesight or perhaps the taking of

12   certain medications that might affect your ability to

13   concentrate in this case?  And I'm not sure exactly -- Juror

14   No. 26.  Anyone else?  And I already have made a note for us

15   to talk to Jurors 5 and 39 about their issues, whatever they

16   might be.  Anyone else?  All right.  Thank you.

17         I realize that many people are concerned about

18   Covid-19 and may be uncomfortable about serving on a jury

19   because of health concerns.  I hope you appreciate that we

20   will take every precaution we can to keep you safe by

21   requiring everyone to wear a mask and by using shields and

22   barriers when appropriate and socially distancing when we can

23   do that as well.  Despite this, though, is there any one of

24   you that believes that your service on the jury would be an

25   extraordinary or unusual difficulty for you because of your

1   concerns about Covid-19?  Court sees no response.

2          So let me ask it a different way.  Is there any one

3   of you that believes that you would not be able to properly

4   concentrate on this trial because of safety concerns about

5   Covid-19?  Court sees no response.

6          All right.  Ladies and gentlemen, we're now going to

7   begin the voir dire process.  It will begin first by the

8   plaintiff's attorneys introducing themselves to you and asking

9   questions to all of you as a group -- will you raise your hand

10  with your card just like you did with me -- and then the

11  defendants will have the opportunity to do the same thing.

12  They're not going to follow up on the responses that you give.

13  They will do that later, and that might be after lunch.  It

14  just depends on what time we're finished with the general

15  questions.

16         So I would call on the plaintiff's team, one lawyer,

17  if you would please introduce your co-counsel and then begin

18  your questioning.

19         MR. PEQUIGNOT:  Your Honor --

20         THE COURT:  You can take your mask off, yes, sir.

21         MR. PEQUIGNOT:  Thank you, everyone.  I just want to

22  first just echo what the judge said about our appreciation.

23  We all understand that this is a big sacrifice for all of you

24  to be here and just wanted to reiterate that we really

25  appreciate that.

1          THE JUROR:  Can you speak up a bit, please.

2          MR. PEQUIGNOT:  Sure.

3          THE COURT:  The mikes probably need to be pulled a

4    little bit closer to you.

5          MR. PEQUIGNOT:  My name is Andrew Pequignot.  I'm

6    with the law firm Moore Pequignot.  I'm here with my law

7    partner, Lisa Moore, sitting in the gray suit; our co-counsel,

8    Sarah Matz, who's from Adelman Matz of New York.  We're here

9    with our legal assistant of Moore Pequignot, Tommy Moorman.

10   He's sitting on the far end.  And we're all here collectively

11   on behalf of our client, the plaintiff, Ms. Almánzar.  As you

12   may have already heard, she's a mother of two young children

13   and a musical artist who performs under the name Cardi B.

14         So my first question is have you personally been

15   trained or employed in a law-related field?  So, for example,

16   as a law clerk, a paralegal, a judge, a legal secretary, a

17   lawyer or a court employee?  35.  And I have the same question

18   for any -- I'm sorry.  Did I miss one?  I got 5 or 2 and 35.

19   Okay.  Same question for any close friend or relative in your

20   family, trained or employed in a legal field.

21         THE COURT:  Would you'll call the numbers out so that

22   people know to put them down, please.

23         MR. PEQUIGNOT:  So 7, 9, 12, 13, 14, 15, 28, 37, 40

24   and 43.

25         Have you personally been trained or employed in a law

1  enforcement field?  So, for example, as a corrections officer,

2  a security officer, parole officer, probation officer,

3  investigator, any law enforcement that you personally -- 22.

4        The same question for any close friend or relative in

5  law enforcement or law enforcement related field.  So 11, 9,

6  12, 15, 24, 32, 17, 26, 30, 36, 37, 39.

7        THE COURT:  14 as well, please.

8        MR. PEQUIGNOT:  Oh.  14 and 28.

9        THE COURT:  45.

10        MR. PEQUIGNOT:  Has anyone here personally been

11  trained or employed in the insurance business?  For example,

12  as a claims investigator or adjuster?  23.

13        Same question as to close a friend or relative that

14  you know is.  Okay.  So 13, 15, 23, 37, 25 and 37.

15        Has anyone here personally trained in the field of

16  psychology?  No responses.

17        What about close friend or relative trained in

18  psychology?  13, 24, 25, 9, 18, 37, 39 and 42 and 48.

19        Does anyone here have any strong feelings about

20  psychologists, either for or against?  32.  Would anyone here

21  accept or reject any part of the testimony of a witness solely

22  because the witness's area of expertise is psychology?

23        Does anyone here have any strong feelings about

24  people or companies who bring lawsuits?

25        Have you personally ever filed a claim or a lawsuit

1  of any kind?  32.

2          What about the same question for a close friend or

3  relative?  7, 10, 15, 20, 24, 34, 36, 37, 13.

4          Has anyone ever filed a claim or lawsuit against you

5  personally?  45, 37.

6          What about the same question for a close friend or

7  relative?  7, 25, 37.

8          Has anyone here ever testified in a trial or a

9  deposition?  20, 28, 32, 33, 3, 45.

10          Have any of you ever served on a jury in a civil or a

11  criminal case?  5, 33, 9, 19, 21, 40, 45.

12          For those who answered yes, have you personally ever

13  served as a foreperson on a jury?  21.

14          Has anyone ever served on a grand jury, which is a

15  form of jury, but some people consider it differently?  39.

16          Does anyone have any strong feelings about

17  celebrities?  30.

18          Are you or a close friend or family member in the

19  entertainment industry?  12, 29, 34.  I've got 29.

20          THE COURT:  I'm sorry.  Juror No. 26, you raised

21  yours?

22          PROSPECTIVE JUROR:  My ex-husband, does that count?

23          THE COURT:  That's probably a good example.  You're

24  right.  So they can follow up with you.  Thank you.  Juror 26.

25          MR. PEQUIGNOT:  Thank you.  22, 39, 42 and 43 and 48.

 1          Are you or a close friend or family member a blogger
 2    or social media personality?  48, 12, 28, 24, 29.
 3          Does anyone here regularly watch a television show
 4    about celebrities?  Wendy Williams Show would be an example of
 5    that.  7, 29.
 6          Do any of you follow any celebrity gossip accounts on
 7    social media?  7 and 10, 24, 36.
 8          PROSPECTIVE JUROR:  Can you repeat the question.
 9          MR. PEQUIGNOT:  Yeah.  Do any of you follow any
10    celebrity gossip accounts on social media?  29.
11          Does anyone follow defendant, Latasha Kebe, otherwise
12    know as Tasha K, on social media?
13          Has anyone ever followed or viewed any of the social
14    media accounts for Defendant Latasha Kebe, otherwise known as
15    Tasha K, including her unWinewithTashaK accounts?
16          Does anyone here regularly listen to rap music?  I
17    have 8, 6 -- I've got 8 -- 9, 10 and 11, 24, 28, 29, 30 and
18    34, 31 and 36, 22, 39, 40 and 44.  Oh, 48.  Sorry.
19          Does anyone here have any strong feelings about rap
20    music or artists who perform that genre of music?  29, 30, 36,
21    48.
22          PROSPECTIVE JUROR:  I'd like to ask a question.  Is
23    it okay, your Honor?  Do you mean in the negative sense?
24          MR. PEQUIGNOT:  Could be negative or positive.
25          PROSPECTIVE JUROR:  Mine is negative.

1          MR. PEQUIGNOT:  Does anybody follow any rap artists

2   on social media?  I've got 7, 10, 11, 24, 29, 34, 31, 36, 22,

3   39 and 44, 48.  Does anyone follow our client on social -- oh,

4   the last question, 13.

5          Does anyone follow our client on social media?  I've

6   got 7, 10 and 11, 29, 34, 39, 48.

7          Have any of you ever been harassed online or cyber

8   bullied?  48.

9          THE COURT:  12.

10         MR. PEQUIGNOT:  12, 13.

11         Has anyone ever been publicly portrayed in a manner

12  they thought was untrue or misleading or accused of doing

13  something that you did not do?  36.

14         Does anyone here believe it is okay to post things on

15  the internet that are not true?

16         Does anyone think that in general people should have

17  thicker skin when it comes to things said about them online?

18  So we have 7, 6, 12 and 13, 29, 22 and 27, 42, 48.

19         Does anyone think it's okay to say untrue things

20  about celebrities because they are in the public eye?

21         Does anyone have any strong feelings about our

22  client?  30.

23         Would anyone here be reluctant to award damages to

24  our client solely because of her public persona or because

25  she's perceived as a wealthy celebrity?  48 maybe.

1           PROSPECTIVE JUROR:  And 30.

2           MR. PEQUIGNOT:  30, 27.  Your Honor, that's all the

3    general questions I have.

4           THE COURT:  All right.  Thank you.  So before we

5    begin with the general questions from the defendant I'm going

6    to have a ten-minute recess, let everyone go to the restroom

7    if you need to.  On this floor -- and you may have already

8    discovered on a previous break, but there's a women's room to

9    your left and then there's a men's room to your right.  I'm

10   going to ask you to stay on this floor.  Don't go anywhere

11   else from this floor.  You obviously don't have to go to the

12   restroom if you don't need to.  I am going to ask you all to

13   go out of the courtroom, though.

14          To the lawyers and the parties, I'm going to ask that

15   you go to the restroom on a floor other than the 23rd floor so

16   that it mitigates any chances of encountering or having any

17   discussions that would be heard by any of the jurors.

18          Now, ladies and gentlemen, most of the time when I

19   stand before you in a case and tell you not to read the

20   newspaper, not to google or look on the internet, it's for

21   some boring insurance declaratory judgment case or something

22   like that that nobody would be writing about.  This is not

23   that kind of case.  There have already been articles written

24   this morning about this case in Atlanta.  There are reporters

25   here today in the courtroom who may very well be posting

1    things throughout the day and throughout the trial.

2            So here's the thing.  You cannot read or look at any

3    of that stuff.  There's no way to be fair and impartial unless

4    you decide the case based on what you hear and see in the

5    courtroom.  And it's not anyone else's view, not even my view

6    of the evidence or the charges that matter.  It's your view,

7    your view along with those of your fellow jurors who are

8    selected and chosen.

9            So I'm instructing you not to google, not to look at

10   any articles, not going and looking for any articles or any

11   social media or anything else like that that may have been

12   posted or may be posted about this case.  For that matter,

13   tonight, tomorrow if you're selected, or whenever, there could

14   be stories in the press, stories, you know, on television, on

15   the radio about this case.  If you are to encounter anything

16   like that, your job, part of your oath is that you will not

17   listen to it.  You'll turn it off, and you won't hear it.

18           There's no way to unring the bell, if you know what I

19   mean.  Once you've heard something, you can't unhear it.  You

20   can't unsee it.  So please stay away from it.  It would be

21   juror misconduct for you to make yourself able to see and hear

22   and read any of these things.  So I recognize that that can be

23   a little bit of a hardship on you if your normal habits are --

24   for those of you that are on social media, for example.  And

25   specifically for those of you that indicated that you follow

1  the plaintiff on social media, I ask you to do this for me.

2  Unfollow that person during the course of this trial.  So

3  during the break, if you have your tablet or your phone,

4  without reading anything that might be on social media just go

5  to the site and unfollow that person for the duration of the

6  trial.

7        Most people that are public people that have social

8  media, they don't approve your following them or not.  You

9  just automatically get to do it if you click the button.  So

10  it won't be difficult for you to unclick the button, and then

11  when the trial is over with, if you want to, click it back.

12        That's important because you and your colleagues,

13  those of you on this trial, you're going to spend a good bit

14  of time with us, if you're selected, trying this case.  I'm

15  sure that you want whatever happens in this case, whatever you

16  decide, to be the law of the case, to be the decision.  I

17  don't entirely control it because there's an appellate court,

18  the Eleventh Circuit Court of Appeals, that will most

19  certainly review what happens here.  But what you don't want

20  is to participate in this case, to make the decision that you

21  think is fair, to have some judge, me or some other group of

22  judges, say you get to re-tee, you get to do it over because a

23  juror didn't obey the rules, didn't shield themselves from

24  publicity.

25        And, again, there's no way for the judges to know if

1  it made a difference or not.  But if they find out, if I find

2  out that you've been exposed to it, then we'll probably have a

3  duty to start over.  So let's don't do that.  You'll have all

4  the time in the world to read up about this case when it's all

5  over with if you're selected or if you're not.

6         I don't know how many of you watch Ted Lasso on

7  Apple.  It's one of my favorite shows.  This season there's a

8  character on there named Nathan who made a really good call in

9  an English football game and became famous instantly for it.

10  And he couldn't take his face off of social media wanting to

11  read and consume everything that was written about him.  It

12  caused him a lot of problems on the show, caused him to be

13  arrogant and not humble and not to be the person that caused

14  him to get the job to start with.

15         So social media is fine.  I don't have a problem with

16  social media or news or anything like that, but during this

17  case I do have a problem with it.  So let's don't take a case

18  that's about social media and then use social media or the

19  internet generally or the news and the press generally to

20  cause us all to have to do this again.  So I'm sorry you had

21  to listen to me preach a little but, but I think it's

22  important in this case that you hear that, that I've said that

23  to you.

24         We'll take a ten-minute recess.  So we'll say at

25  11:20, a little more than ten minutes, if you will be outside

1  and when the doors are opened back up, if you'll come back in

2  and have a seat in the same spot that you're in right now.

3  All right.  Court stands in recess for ten minutes.

4         COURTROOM SECURITY OFFICER:  All rise.  Court stands

5  in recess for ten minutes.

6         (Whereupon, the prospective jurors exited the

7  courtroom and there was a brief recess.)

8         COURTROOM SECURITY OFFICER:  All rise.  This Court is

9  again in session.

10        THE COURT:  All right.  If y'all would ask the jurors

11  to come back in.

12        (Whereupon, the prospective jurors entered the

13  courtroom.)

14        THE COURT:  If counsel would have a seat.  I need to

15  make sure we have one juror who was not quite in yet.  We're

16  good?

17        COURTROOM SECURITY OFFICER:  Yes, sir.

18        THE COURT:  All right.  Thank you.  So we're ready

19  for the defendant's general voir dire questions.  If you'll

20  introduce your team, please.

21        MR. SABBAK:  Thank you.  Ladies and gentlemen, good

22  morning.  My name is Sadeer Sabbak.  I represent Latasha Kebe

23  and her company that she owns with her husband, Cheickna Kebe,

24  which is Kebe Studios LLC.  Kebe Studios LLC provides or

25  produces a variety of multi or media content, digital

1  advertisement, documentaries, entertainment shows, and the

2  like.  Specifically, in this case you're going to hear about

3  one of those media outlets that Kebe Studios is in charge of,

4  and that's unWinewithTashaK.  And so you'll hear Kebe Studios,

5  they are the parent company who owns the brand that Ms. Kebe

6  was operating under.

7         This is my law partner, Olga Izmaylova.  We're good

8  friends and partners, which is interesting at times.  We're

9  not married.  Sometimes people want to know that, but we're

10 not.  We are actually from North Fulton, grew up here, went to

11 high school, Chattahoochee, and have known each other for

12 quite some time.  And we both -- we enjoy each other's

13 company, and we both enjoy what we do here so we decided to do

14 it together.

15        All right.  I've done something for you folks.  I've

16 cut down a lot of my questions because they've already been

17 asked, so I won't waste your time.  Okay.  I'm going to do the

18 same thing as my colleague here, go around.  I'll ask a

19 general question.  I'd ask you to put your number in the air,

20 and then I will repeat it.  One caveat, though.  I'd like to

21 do a little bit of a different system.  If I could label that

22 section "Section 1", you in the middle section "Section 2" and

23 to my right "Section 3."

24        So when I ask the question, I'm going to look at 1.

25 You guys have your things up.  2 and 3, you can wait until I

1  get there.  And I'll stick to 2, and I'll keep moving that

2  way.  And then, hopefully, I won't have to be all over the

3  place.  Okay.

4         THE COURT:  So when you say middle, you mean

5  everything out there is middle; right?

6         MR. SABBAK:  Yes, sir, right here.  So everyone

7  against that wall would be No. 1.  Actually, the jury box is

8  No. 1.  Y'all would be the middle in the back corner.  Y'all

9  would be the middle as well.  Okay.  Okay.  Thank you.

10        Does anyone here consider themselves a fan of

11 Ms. Almánzar?  Section 1?  No. 7.  Section 2?  Professionally

12 known as Cardi B.  All right.  So I'm looking at Section 1.

13 I've got No. 8, No. 7, No. 10, No. 11.  Looking at Section 2,

14 No. 23, 29, 34, 31.  And I'm looking at No. 33 -- Section 3

15 rather -- No. 44, 39 and 48.  Thank you.

16        Is anyone familiar with the show "Love & Hip Hop?"

17 All right.  Section 1, No. 5, No. 6, No. 7, No. 9, No. 10,

18 No. 11, No. 2 here, No. 28, No. 24, No. 33, No. 29, 34, 30,

19 31, and the last section here 39 and 47.

20        Does anyone personally know, either yourself or from

21 friends or family, do you know anyone who is employed or

22 represents or works with the plaintiff's husband, Kiari

23 Cephus, professionally known as Offset or his rap group called

24 the Migos?  They're from Lawrenceville, Georgia, I believe.

25 Section 1?  Section 2?  Section 3?  No. 48.  All right.  Thank

1  you.

2        Does anyone watch YouTube more than once or twice a

3  week?  Section 1?  No. 6, No. 8, No. 9 --

4        THE COURT:  I'm sorry.  What was the question again?

5        MR. SABBAK:  Does anyone watch YouTube more than two,

6  two, three times a week.

7        THE COURT:  Okay.  I was going to suggest maybe you

8  ask how many people don't because so many people --

9        MR. SABBAK:  Is that right?  How about we do it this

10  way:  Who watches YouTube every day?  Let's do that.  Is that

11  all right?  Okay.  Section 1?  I've got No. 6, No. 8, No. 9,

12  No. 10, 12, 13.  Section 2 here?  14, 28, 29, 25, 34, 30, 26,

13  31, 36, 27, 22, 18.  Thank you.  And last section, Section 3?

14  40, 42, 37, 45 and 48.

15        Regarding bloggers, social media personalities or

16  just people who discuss entertainment news or celebrity

17  gossip, does anyone here, raise your hand if you have strong

18  feelings -- and strong feelings can be positive or negative,

19  whichever of those -- if you have strong feelings about

20  entertainment news journalists, reporters, bloggers, however

21  you want to call it, positive or negative.  Section 1?  No. 4.

22  Thank you, sir.  Section 2?  29, 30, 36.  Thank you.  And last

23  section here, 48.

24        MS. MOORE:  Your Honor, I'm sorry.  Is there any way

25  Mr. Sabbak could slow down a little bit?  I can't even write

1    the question before -- just a slight bit, please.

2            MR. SABBAK:  The questions are on the pretrial --

3            MS. MOORE:  Okay.  Could you just slow down a little

4    bit.  It's just hard to --

5            MR. SABBAK:  Sure.

6            MS. MOORE:  Thank you.

7            MR. SABBAK:  Sure.  No problem.  I'm actually done so

8    you don't have to worry about it.  Thank you.

9            THE COURT:  All your questions?  Okay.

10            MR. SABBAK:  Thank you.

11            THE COURT:  All right.  So, ladies and gentlemen, I'm

12    going to call your name out, and let me just apologize if I

13    mispronounce your name.  I'm certainly not doing that

14    intentionally for anyone, including the lawyers or the parties

15    for that matter.

16            When I call your name, what I need you to do is leave

17    where you are and come to the microphone closest to you.

18    There's one on the right side of the room over here.  There's

19    one on the left side of the room over here.  I'm going to ask

20    that you remove your mask while you're at the microphone,

21    which is why we have shields in front of you and the mike.

22    That will be the really only chance that the lawyers and the

23    parties have a chance to see fully who you are.

24            I mean, you know, you obviously are a lot more than

25    just what's covered up by your mask, but it's important that

1   the lawyers be able to see your responses to their questions.

2   And if there's anybody who's not comfortable with that, then

3   let me know, and so we'll skip you and we'll come back to you.

4   And then we'll ask you questions where you can take your mask

5   off when we have a break so that we'll just move the mike

6   further back from everyone.

7            So I want to respect how you feel, but it is

8   important that we be able to see your face when the questions

9   are asked, which is why I'm kind of giving you an alternative.

10  So just let me know.  It's not going to hurt my feelings at

11  all if anybody wants to use that procedure, just like if

12  you're asked something that you think is private, too private

13  to discuss publicly in front of everybody, you know, I'm

14  willing to have a private caucus with you with the lawyers to

15  ask you any of the questions as well.

16           All right.  So Juror No. 1, Vickie Edmonds, if you

17  would come to the mike.  And I'm sorry about the distances you

18  have to travel to get to it.  But normally in a regular world

19  we would have a mike, and we would just send it around and let

20  everybody handle it.  But we just feel like this is probably

21  the safest approach.

22           PROSPECTIVE JUROR:  Yes.  Good morning.

23  BY MR. PEQUIGNOT:

24  Q   Ms. Edmonds, thanks again for being here.  Can you tell me

25  your marital status.

1    A    I'm divorced.

2    Q    And do you have children?

3    A    Yes.  I have one son.

4    Q    How old is your son?

5    A    40.

6    Q    Do you have any adults that live in your household with

7    you?

8    A    No.

9    Q    Do you have any parents or siblings that live nearby?

10   A    My parents are deceased, and my only sibling is deceased.

11   Q    Where does your son live?  Does he live nearby?

12   A    In Kennesaw.

13   Q    Okay.  Would you consider yourself close with him?

14   A    Yes.

15   Q    Ms. Edmonds, where did you grow up?

16   A    Excuse me?

17   Q    Where did you grow up?

18   A    I grew up in Norfolk, Virginia.

19   Q    Are there any other cities other than Acworth and -- you

20   said Norfolk?

21   A    Norfolk, Virginia.

22   Q    Are there any other cities where you've lived for longer

23   than a year?

24   A    No.

25   Q    When did you move here to Acworth or in the Atlanta area?

1  A   About 12 years ago.

2  Q   And what brought you here?

3  A   I was having a grandchild.

4  Q   How many grandchildren do you have?

5  A   I have two now.

6  Q   What are their ages?

7  A   Eight and six.

8  Q   Are they boys?  Girls?

9  A   One girl, one boy.

10 Q   Those are fun ages.  So safe to say you see them a lot?

11 A   Almost daily.

12 Q   Can you describe your educational background.

13 A   I'm a four-year college graduate.  I'm a registered nurse.

14 Q   And where did you go to school?

15 A   At the University of Virginia.

16 Q   That's a great school.  Do you have any post graduate

17 education?

18 A   No.

19 Q   Was your major there nursing?

20 A   Yes.

21 Q   I assume with nursing you probably have lots of other

22 certifications and whatnot?

23 A   Yes.

24 Q   Any other educational background other than outside

25 nursing or outside, like, you know, getting certifications?

1  Have you had any other educational courses?

2  A   No.

3  Q   So are you currently employed as a nurse for Ross

4  Memorial?

5  A   Yes.

6  Q   Is that on a full-time basis?  Part-time basis?

7  A   Kind of three-quarter.

8  Q   Do you currently hold any other jobs?

9  A   I'm sorry?

10 Q   I'm sorry.  Do you currently hold any other jobs like on a

11 part-time basis?

12 A   No.

13 Q   What is your -- do you have a title or position there at

14 the hospital?

15 A   I'm an RN supervisor.

16 Q   And how many other employees do you supervise there?

17 A   300.

18 Q   How long have you been in that position?

19 A   Six years.

20 Q   And did you hold any supervisory positions before that?

21 A   No.

22 Q   Have you ever worked in any jobs outside of the nursing

23 field?

24 A   Only when I was younger.  I worked at a grocery store.

25 Q   Have you ever owned your own business?

```
1   A    No.

2   Q    How long have you been divorced?

3   A    36 years.

4   Q    Your parents, before they passed away what did they do?

5   A    My father was in the Navy for 28 years, and my mother,

6   when we were young, she was a stay-at-home mom.  And then she

7   went to work as a secretary for an electric company.

8   Q    How old was your sibling when he passed away?

9   A    He was 62.

10            THE COURT:  All right.  So hold on.  I need to have a

11  conference with the lawyers.  Do we have a microphone,

12  Wynette, anywhere for you to pick up my conversation?  All

13  right.  If I could have whoever of the two who is examining,

14  just one per team, if y'all could come up, please.  Walk

15  around.  Just come up this way.

16            (Whereupon, there was a bench conference held between

17  the Court and counsel.)

18            THE COURT:  There is no way that possibly all the

19  information you're asking about could be used while picking a

20  jury.  Asking about somebody's age of their brother when

21  you're asking -- give me a break.  I mean --

22            COURT REPORTER:  Judge?

23            THE COURT:  I'll just put it on the record at the

24  break.

25            (Whereupon, there was an off-the-record discussion.)
```

1            THE COURT:  That was just one example I was using.

2    That wasn't the only one.  Go ahead, sir.

3    BY MR. PEQUIGNOT:

4    Q   Ms. Edmonds, what type of nursing are you in?  Is there a

5    specific specialty that you --

6    A   This is rehab nursing.

7    Q   Ms. Edmonds, what newspapers and magazines do you

8    frequently read?  Where do you get your news?

9    A   I watch the news every morning, sometimes twice a day --

10           COURT REPORTER:  Her microphone.  I can't hear her.

11   Excuse me.

12           THE COURT:  Okay.  Jennifer, if you -- ma'am, could

13   you step a little closer?  Will you tap it and make sure

14   it's -- you're just going to have to stand a little bit

15   closer.  You're very soft spoken.

16           COURT REPORTER:  You've got to turn the mike on.

17           COURTROOM DEPUTY:  It says it's on.  We can try the

18   wireless.

19           THE COURT:  Make sure that one is on.

20           COURTROOM DEPUTY:  All right.  One second.

21           THE COURT:  All right.  So for the time being I'm

22   just going to have to ask you to talk a little bit louder than

23   you would normally comfortably do.  I'm sorry.  We'll get

24   somebody up here to try to figure out what's going on with

25   them.  That's what we're going to have to do, just go ahead

1  and call.

2  BY MR. PEQUIGNOT:

3  Q    I think you were saying that you watch the news and you

4  read the newspaper?

5  A    Yes.

6  Q    What news station?

7  A    I usually watch Fox News every morning.  I watch Good Day

8  Atlanta.

9  Q    And the newspaper?

10  A    I get the Marietta Journal.

11  Q    Do you use any social media platforms regularly?

12  A    Facebook.

13  Q    Any others?  Just Facebook?

14  A    (Nods head.)

15  Q    How do you usually spend your free time?  Like what are

16  your hobbies and interests?

17  A    I walk every day.  Of course, I'm always with my

18  grandkids, taking them different places.

19  Q    Are you involved with any social, civil, political or

20  religious organizations?

21  A    My church.

22  Q    What's the name of your church?

23  A    Acworth.

24  Q    Do you have any positions there?  Like do you serve any

25  roles either in an employment or volunteer capacity?

```
1   A    Help clean up the kitchen.

2   Q    So I think, based on general questions, you said that you

3   had not participated in a jury before; is that correct?

4   A    No.

5   Q    And you've never filed a lawsuit or been -- had a lawsuit

6   filed against you?

7   A    No.

8   Q    Have you ever retained an attorney?

9   A    No.

10  Q    I asked a few questions about rap music.  Do you have any

11  thoughts about rap music?

12  A    No.

13  Q    Do you know if any of your family members listen to that

14  type of music?

15  A    I don't know.  I don't know.

16  Q    In determining whether someone is telling the truth, are

17  there things that you think should be considered?

18          THE COURT:  Hold on.  Hold on.  I mean, you can ask

19  questions that are designed to get at the person's background

20  and their general experiences, but we're not going to have

21  a -- we're not going to ask people to start defining those

22  kinds of things.  I mean, that's just a wholly irrelevant kind

23  of question.

24          MR. PEQUIGNOT:  Understood, your Honor.

25          THE COURT:  That's not on anything that I've -- is
```

1  that on the list?

2          MR. PEQUIGNOT:  I thought it was, but I could be

3  mistaken.

4          THE COURT:  Okay.  Well, let's concentrate on

5  questions that are designed to tell you about this person's

6  experiences.

7  BY MR. PEQUIGNOT:

8  Q   Is there anything else you feel is important for the

9  parties in this case to know about you?

10 A   Not that I can think of.

11 Q   Is there anything, whether covered or not in the previous

12 questions, that would affect your ability to be a fair and

13 impartial juror or would in any way be a problem with you

14 serving on the jury?

15 A   No.  I don't think so.

16          MR. SABBAK:  Ms. Edmonds, thank you.  No questions.

17          THE COURT:  Juror No. 2, Kiplyn Lewis.

18          PROSPECTIVE JUROR:  Juror No. 2.

19 BY MR. PEQUIGNOT:

20 Q   Hi, Ms. Lewis.

21 A   Hi.

22 Q   So in response to the general question about a law-related

23 field, I assume that's your position at the George Creal Law

24 Firm?

25 A   Yes, sir.

1  Q   And what type of law does that firm practice?

2  A   Criminal defense, majority D.U.I. law firm.

3  Q   And how long have you worked there?

4  A   Three years.

5  Q   Were you at another firm here in town before that?

6  A   No.

7  Q   Do you have any parents or siblings that live nearby?

8  A   No.  The closest is in North Carolina, Asheville.

9  Q   Are you married?  Do you have any children?

10  A   I'm not married.  I have a son who's 15.

11  Q   Does he live with you?

12  A   Uh-huh, yes.

13  Q   Can you describe your educational background.

14  A   I graduated high school '91.  That's the extent of my

15  education.

16  Q   And so have you always been a legal assistant or have you

17  held other positions?

18  A   I've held other positions.  I was a model for a long time

19  back in my -- 18 up to like 28.  I lived in Los Angeles and

20  then got into doing property management.

21  Q   Do you have any management or supervisory responsibilities

22  at your current position?

23  A   I do.  I manage the office, do paralegal work.  I handle

24  three defense attorneys.  I handle their calendars, office,

25  whatever needs to be done.

1    Q    Have you ever owned your own business?

2    A    No.

3    Q    How do you get your news?  Newspaper?

4    A    I watch "Good Morning America" in the morning, "CNN

5    Morning Express."

6    Q    Do you use social media regularly?

7    A    Facebook, Instagram, not a lot, though.

8    Q    How do you spend your free time?  What are your hobbies or

9    interests?

10   A    I play tennis, and then I have my 15-year-old son that I

11   have to keep up with.

12   Q    Are you involved in any social, civil, political or

13   religious organizations?

14   A    No.

15   Q    Do you do any volunteer work?

16   A    Not so much.

17   Q    I think I understood from your answers to the general

18   questions you haven't been on a jury before?

19   A    No.

20   Q    You haven't filed a lawsuit or been a defendant in a

21   lawsuit?

22   A    No.

23   Q    Is there anything else you feel is important for the

24   parties to know about you?

25   A    I don't think so.

1   Q    Is there anything, whether or not covered in the previous

2   questions, that would affect your ability to be a fair and

3   impartial juror or would in any way be a problem with you

4   serving on the jury?

5   A    No.

6            MR. PEQUIGNOT:  All right.  Thank you.

7            MR. SABBAK:  Thank you, Ms. Lewis.  No questions.

8            PROSPECTIVE JUROR:  Thank you.

9            THE COURT:  Juror No. 3, Charla Jenkins.

10           PROSPECTIVE JUROR:  I'm Juror No. 3.

11  BY MR. PEQUIGNOT:

12  Q    Good morning.

13  A    Good morning.

14  Q    Ms. Jenkins, do you have any other adults that live in the

15  household with you?

16  A    My son that's 22.

17  Q    Do you have any parents or siblings that live nearby?

18  A    No.

19  Q    Can you describe your educational background.

20  A    Some college.

21  Q    And where was that at?

22  A    SNH, Southern New Hampshire and in Illinois, Illini.

23  Q    What was your major of study in college?

24  A    Business administration.

25  Q    Have you attended any other educational programs, like

```
1   evening schools or certifications?
2   A   I'm a phlebotomist.  I'm a certified phlebotomist.  I went
3   to medical school.
4   Q   You are an administrative assistant at UPS?
5   A   That's correct.
6   Q   Are you full-time?  Part-time?
7   A   Full-time.
8   Q   How would you describe your job there?
9   A   Busy.  I work in marketing, so I put in global contracts.
10  Q   And how long have you been there?
11  A   20 years.
12  Q   Always in that position or --
13  A   Different.  I was in human resources in the beginning, and
14  then I went to marketing for the last 15 years.
15  Q   Do you have any management or supervisory
16  responsibilities?
17  A   Not in this current position.
18  Q   What about previous positions?
19  A   I was an office manager at a medical doctor's office.
20  Q   What type of doctor's office?
21  A   It was bariatrics, weight loss.
22  Q   Have you ever owned your own business?
23  A   I do catering before Covid hit, and I'm currently doing
24  it.
25  Q   Is that a side business?
```

1    A    Yes.  It's Cooking Joy, CJ Catering Company.

2    Q    Ms. Jenkins, how do you usually get your news?  TV --

3    A    Listen to the radio.  But I really don't watch the news.

4    Q    Do you use social media regularly?

5    A    Facebook.

6    Q    Ms. Jenkins, how do you spend your free time?  Like what

7    are your hobbies, your interests?

8    A    I have a 15-year-old daughter.  So she's in track, and she

9    does cheerleading.  So she keeps me busy other than catering,

10   cooking.  And then I do charity work with the Fraternal Order

11   of Eagles, which I'm a member of.

12   Q    Are you involved with any other, other than that one, any

13   other social, civil, political or religious --

14   A    No.

15   Q    You had indicated in response to the general questions,

16   that you had testified in a previous trial or deposition.  Can

17   you tell us more about that.

18   A    It was my ex-husband.  He had got -- he went to court

19   about child abuse or something like that.  I'm not for sure

20   exactly what the charges were, but I did have to testify in

21   there because we were currently married at the time.

22   Q    You said you were married at the time?

23   A    That they made me testify, uh-huh.

24   Q    Is there anything else you feel is important for the

25   parties to know about you?

1   A    No.

2   Q    Is there any reason you believe you could not be a fair or

3   impartial juror in this case?

4   A    No.

5            MR. PEQUIGNOT:  Thank you.

6            MR. SABBAK:  Thank you, Ms. Jenkins.  No questions.

7            THE COURT:  Thank you, ma'am.  Juror No. 4, Irving

8   Andino.

9            PROSPECTIVE JUROR:  Juror No. 4.

10  BY MR. PEQUIGNOT:

11  Q    Mr. Andino, are you married?  Do you have children?

12  A    No.  I'm single.

13  Q    Do you have any other adults that live in your household?

14  A    No.  I live by myself.

15  Q    Do you have any parents or siblings that live nearby?

16  A    No.  My parents are deceased, and my sister live in North

17  Carolina.

18  Q    Where did you grow up?

19  A    I was born and raised in Ponce, Puerto Rico and then came

20  to Georgia in 1979.

21  Q    When you came to Georgia, did you come to the Atlanta

22  area?

23  A    Yes, Snellville.

24  Q    Can you describe your educational background.

25  A    High school, technical school.

```
1   Q    Was that here or in Puerto Rico?

2   A    Puerto Rico.

3   Q    Have you attended any other educational programs like --

4   A    No, I did not.

5   Q    Your current occupation is listed as a warehouse worker

6   for Canon?

7   A    Yes.

8   Q    What type of -- I guess it's just --

9   A    Shipping and receiving.

10  Q    Are you full-time or part-time?

11  A    Full-time.

12  Q    Do you have any other jobs?

13  A    No.

14  Q    What's your official title of your position?

15  A    It's referred to as Warehouses 2.

16  Q    And do you have any management or supervisory

17  responsibilities there?

18  A    No.

19  Q    Have you worked in any other occupations?  Any other

20  different fields?

21  A    I used to work part time for LongHorn Steakhouse.

22  Q    Mr. Andino, where do you get your news?

23  A    Basically I watch MSN News, Fox News, and then I get the

24  Atlanta Journal Constitution and the Wall Street Journal.

25  Q    Do you use any social media platforms regularly?
```

1   A    None at all.

2   Q    How do you spend your free time?  What are your hobbies

3   and interests?

4   A    I enjoy walking, long walks, enjoy reading good books and

5   love to watch documentaries.

6   Q    Are you involved in any social, civil, political or

7   religious organizations?

8   A    I'd rather discuss that privately if you don't mind.

9   Q    Sure.  Do you do any volunteer work?

10  A    Yes, I do.

11  Q    Is that wrapped up into the --

12  A    Yes.

13  Q    -- previous question?  So in response to the general

14  questions, you had indicated that you had strong feelings

15  about rap music.  Can you explain that?

16  A    Yes.  I think it's very demeaning toward women,

17  disrespectful to authority, even to parents.  I don't listen

18  to the music but just the fact that sometimes when I'm walking

19  and I hear the radio blaring out loud and the words they use,

20  it's just quite disturbing to me.

21  Q    Do you feel that way about any other genres of music?

22  A    Not really.  I'm real old fashioned.  I just enjoy

23  listening to jazz, 40s and 50s and 60s music.

24  Q    So you know that our client is a musical artist who

25  performs in this genre of music, of rap music.  Given your

1  feelings about rap music, are those feelings that you could

2  set aside in order to be a fair and impartial juror in this

3  case?

4  A   That's a good question.  Honestly, because I never heard

5  her music, I don't know how to answer that question.  But the

6  most rap that I've heard because of people blaring it on the

7  road is just negative to me.

8  Q   So I guess the challenge for us is that we have to sort of

9  get past sort of an equivocal point of view here.  So I'll

10  give you an example.  If I asked an airline pilot if he felt

11  good about flying a plane today and he said he wasn't sure,

12  that probably wouldn't be a response that I would be able to

13  make a decision based off of.  So given what you know and if

14  you were to assume that our client, her music is similar to

15  the types of rap music that you've heard, would you be able to

16  set aside that prejudgment about those lyrics and be an

17  impartial juror in this case?

18  A   I don't think so.  It would be very hard.

19  Q   Is there anything else that you feel is important for the

20  parties in this case to know about you?

21  A   Not that I can think of.

22          MR. PEQUIGNOT:  Okay.  That's all I have on that.

23          MR. SABBAK:  Thank you, Mr. Andino.  No questions.

24          THE COURT:  All right.  Thank you, sir.  Juror No.

25  5 -- and this is the last juror that we're going to talk to

1  prior to lunch, just so everybody knows.  Juror No. 5, Phyllis

2  Pettis.  Is that right, ma'am?  Is Pettis your last name?  Is

3  your last name Pettis.

4        PROSPECTIVE JUROR:  Juror No. 5.

5        THE COURT:  Pettis?

6        PROSPECTIVE JUROR:  Yes.

7        THE COURT:  Ms. Pettis, I wanted to ask you before

8  Mr. Pequignot started.  You had indicated in reference to my

9  question, about some disability or medical issues or

10  something.  Can you tell me about that.

11        PROSPECTIVE JUROR:  Well, on the 26th of December my

12  37-year-old son had a motorcycle accident, and so on last

13  Friday he came home to my house instead of going home to his

14  wife because she's not able to handle him.  He broke his back.

15  So it's me and my husband who is his caretaker now until he

16  heals.

17        THE COURT:  All right.  So I just want to make sure I

18  understand.  Your son broke his back in a motorcycle wreck.

19  He's at your home.  You're taking care of him.  Is that

20  something that your husband is able to do while you're gone

21  during the day?  Or just tell me how you feel about that.

22        PROSPECTIVE JUROR:  Well, his father is there helping

23  him, so I just want you to know that I -- me and his father

24  were his caretakers until he heal.

25        THE COURT:  Okay.  So describe, if you would, whether

1  you would be able, if you were selected in this case to serve,

2  knowing that it's going to be about two weeks, knowing what's

3  going on at your house and your husband's ability to take care

4  of him or lack thereof -- I don't want to assume that he's not

5  as equally capable as you.  But since you brought it up, I

6  just want to make sure that I understand.  Do you think that

7  your husband could do it and that you could serve or do you

8  think there's some conflict?

9          PROSPECTIVE JUROR:  Personally I don't think I could

10  take nine days or anywhere near that off from them.

11          THE COURT:  All right.  I'm going to let the lawyers

12  go ahead and ask you some questions.  I promise you we'll take

13  what you've had to say and consider it.  Okay?

14          PROSPECTIVE JUROR:  Okay.

15          THE COURT:  Thank you.

16  BY MR. PEQUIGNOT:

17  Q    Thank you, Ms. Pettis.  How old is your son?

18  A    37.

19  Q    Is that your only child?

20  A    No.

21  Q    What other --

22  A    Well, I have two others that I had, and I have three other

23  stepkids.  So it's six in all, but they're all grown.  We have

24  six.

25  Q    Currently living with you is it just your husband and your

1  son until he can recover?

2  A   Really just my son -- I mean just my husband, but my son

3  came in on Friday.

4  Q   Ms. Pettis, have you always lived in the Atlanta area?

5  A   Yes.  We're here in Clayton County.

6  Q   Have you always lived in this area?

7  A   Yes.  Fulton County, yes.

8  Q   What's your educational background?

9  A   High school graduate.

10  Q   Have you attended any other educational programs?

11  A   No, I haven't.

12  Q   The information we have is that you're a retired

13  housekeeper.  Is that --

14  A   Yes, I am.

15  Q   And before you retired were you always a housekeeper?  Did

16  you hold any other occupations?

17  A   Not always.  I have worked at different places, like I

18  worked at JCPenney for a while, and there's a place that's

19  called Stevarino's.  I don't know if you know about that or

20  not, but I worked as a supervisor there.

21  Q   How many employees did you supervise there?

22  A   About four, a small place.

23  Q   Ms. Pettis, where do you usually get your news?

24  A   Excuse me?

25  Q   Where do you usually get your news?

```
1    A    Local news.

2    Q    On television or newspaper?

3    A    Television.

4    Q    Which channel?

5    A    5, Channel 5, Channel 11.

6    Q    Do you use any social media platforms regularly?

7    A    Facebook.

8    Q    What do you like to do in your free time?  What are your

9    hobbies and interests?

10   A    Well, we have an RV, so we do a lot of traveling when we

11   can.  And when it's cold we'll really -- I really do work like

12   at my church, volunteer, and from that we're just, you know,

13   just being at home.

14   Q    What do you do for your church as a volunteer?

15   A    We do the cooking for the church or either the serving.

16   Q    Is that the only social, civil, political or religious

17   organization that you're involved with?

18   A    Yes, it is.

19   Q    I believe you responded in response to the general

20   questions that you had previously served on a jury?

21   A    Excuse me?

22   Q    Have you previously served on a jury?

23   A    Yes, I have.

24   Q    Okay.  Can you tell me about that case.

25   A    Well, it was like an armed robbery and someone -- this guy
```

1  had robbed a cab driver.  He was found guilty.

2  Q    Is there anything else that you feel is important for the

3  parties to know about you?

4  A    No, I don't.

5          MR. PEQUIGNOT:  All right.  Thank you.

6          MR. SABBAK:  Ms. Pettis, thank you, ma'am.

7          PROSPECTIVE JUROR:  Okay.

8          THE COURT:  All right.  So, ladies and gentlemen,

9  we'll take a break for lunch at this time.  So let me tell you

10  what your options are.  On the LP level of this building is

11  the lower plaza.  That's what LP stands for.  There's a

12  cafeteria there.  It has some prepared foods, like maybe

13  salads and things that they've already put together.  There's

14  also a little bit of a small salad bar.  It is a short-order

15  cook kind of place.  There's some hot foods.  It admittedly is

16  not a very extensive menu of things to choose from, but I

17  rarely eat there.  I usually bring my lunch, but I'm told that

18  it's not bad.  That's about the best endorsement I can give

19  you.  It's not bad.

20          There is another federal building next door, the Sam

21  Nunn Building, which is actually two buildings, that has a

22  much larger cafeteria that you could go to.  The only downside

23  in going there is it's across the street, sort of catty corner

24  to this building.  You'll have to go through security over

25  there, because it's a federal building, to get in there, and

1   then you'll have to come back through security here.  It

2   shouldn't be as hard to get back through security, if you keep

3   your juror badges on you, as maybe it was this morning if you

4   want to venture over there.

5          You also can leave the building if you want to, but

6   we're going to start back -- it's 12:15.  We're going to start

7   back at 1:30.  I'll give you an extra 15 minutes beyond the

8   normal lunch period to give you some time if you want to go

9   across the street or to go somewhere else.

10          What I'd like you to do is I'd like everybody to be

11  outside by 1:30, outside this courtroom.  We'll open the door

12  as you come in and have a seat, and then we'll be able to

13  figure out if everybody is here or not.  It's still my hope

14  that we'll get finished with jury selection today, but to make

15  that happen we need everybody to cooperate and to be back here

16  on time.

17          I want to remind you to wear your mask while you're

18  in the building.  Obviously if you're eating, you don't have

19  to have it on.

20          I want you to be mindful of being around any of the

21  lawyers or the parties in this case.  If you happen to see

22  them in the quarters of the building, in the dining hall

23  downstairs, or wherever, that you get away from them.  I'm

24  sure they're not bad people, but they've got this trial on

25  their mind, you have this trial perhaps and whether you get

1   selected on this on your mind.  I don't want them hearing you

2   or you hearing them if you're talking about the case.

3        If you happen to eat lunch with any of your neighbors

4   here that you've met on the jury, that's great, that's fine,

5   just don't talk about the case.  Okay.  And remember my

6   instructions earlier about not doing any research on Facebook,

7   Google, Twitter, Instagram, anything where you might be

8   exposed to something about this case.

9        Okay.  We'll see y'all back at 1:30.  Leave your

10  numbers in your seat and just come back to your spot.  Thank

11  you.

12       COURTROOM SECURITY OFFICER:  All rise.  Court is in

13  recess until 1:30.

14       (Whereupon, the prospective jurors exited the

15  courtroom.)

16       THE COURT:  So I want to talk about the first five

17  jurors if we can.  Any motions to excuse for cause from the

18  plaintiffs?

19       MR. PEQUIGNOT:  Yes, your Honor.  I think we believe

20  Juror No. 4 has established that he cannot serve as an

21  impartial juror given the nature of this case.

22       THE COURT:  Any objection from the defendant?

23       MR. SABBAK:  Not for No. 4, your Honor.

24       THE COURT:  Okay.  So Juror No. 4 is excused for

25  cause by agreement.  Anyone else from the plaintiff so far?

```
 1              MR. PEQUIGNOT:  We have no others, your Honor.

 2              THE COURT:  All right.  Any from the defendant?

 3              MR. SABBAK:  Yes.  Ms. Jenkins -- I'm sorry.

 4    Ms. Pettis, No. 5, your Honor, is dealing with her son.

 5              THE COURT:  I'm sorry.  What's your motion based on?

 6              MR. SABBAK:  A motion to strike.

 7              THE COURT:  For cause, what's the for-cause reason?

 8              MR. SABBAK:  Huh?

 9              THE COURT:  What's the for-cause reason?

10              MR. SABBAK:  She can't be away from him.

11              THE COURT:  She what?

12              MR. SABBAK:  She can't be away from him for nine

13    days.

14              THE COURT:  That's a hardship.  I mean, that doesn't

15    go to prejudice.  I hear you about the hardship part, and I'm

16    not going to ignore that, but as far as prejudice you don't

17    have any --

18              MR. SABBAK:  No, not prejudice.

19              THE COURT:  Okay.  As it relates to Ms. Pettis, I'm

20    likely to excuse her for her hardship that she's expressed,

21    but I'm going to wait.  She's already here today.  I want to

22    wait until I figure out what's going on with the rest of the

23    panel before I make that final decision.  Okay.  I mean, I

24    think we're going to be fine because not a single person

25    indicated they had any Covid concerns.  And, you know, I think
```

1  maybe three raised their hand about strong feelings about

2  people that are in the music industry, rap, hip hop, whatever.

3  So I'm optimistic that we'll be able to get a jury on this.

4       As it relates to the side bar that we had, just so I

5  can put that on the record, the point that I raised with the

6  plaintiff's attorney was he was asking a lot of questions that

7  were conversational but in my opinion designed to get to the

8  background of a juror and their ability to be fair and

9  impartial.

10      The question, not the first question that I in my

11  mind objected to, but the first one that caused me to call the

12  conference was he asked how old was your brother when he died.

13  I can't see where that has any relevance to anything, much

14  less whether or not this juror would be prejudiced for or

15  against anybody.  And that question was not on the list, and I

16  may have it confused.  That may be the question that caused me

17  to say something out loud as opposed to having the bench

18  conference.  There wasn't a list -- the pretrial order, the

19  list of questions that I looked at were questions that y'all

20  ask during general voir dire.

21      Look, I don't have to allow y'all to ask anything.  I

22  can ask everything, and I can assure you about half of what

23  you ask I wouldn't ask.  I'm okay with it, though, as long as

24  it's designed to tell you something about the juror.  But,

25  look, I tried cases as a lawyer too.  There is no way that a

1  lot of the information that you ask about is really going to

2  factor into your decision making.  It's information overload.

3  So ask things that are critical to telling you whether the

4  juror would be prejudiced for or against the plaintiff or the

5  defendant that's, you know, and in the general experiences.

6          You know, asking about -- I never have objected to

7  people asking about what TV shows do you watch, what kind of

8  music do you listen to or stuff like that.  I think that's

9  important to tell you whether someone is overly conservative

10 or overly not conservative or overly progressive, or whatever.

11 It tells you a little bit about their attitude towards life.

12 But not stuff like, well, you know, how many people did you

13 supervise.  Okay.  So the fact that someone is a supervisor,

14 okay, maybe that shows a level of being authoritative and

15 liking structure and system, but it doesn't -- how many?  Does

16 that really matter?

17         I mean, think about your questions because it's got

18 to be helpful to you really.  I don't view jury questioning as

19 an opportunity for you to establish that you're just a good

20 guy.  I mean, that's -- that doesn't matter to me.  And so I'm

21 going to keep you focused on questions that go to who someone

22 is and who they're not, and that's it.

23         All right.  We'll see y'all at 1:30.  Thank you.

24         COURTROOM SECURITY OFFICER:  All rise.  Court stands

25 in recess until 1:30.

```
 1              (Whereupon, a recess was taken from 12:20 until 1:30

 2  p.m.)

 3              COURTROOM SECURITY OFFICER:  All rise.  This

 4  honorable court is again in session.

 5              THE COURT:  All right.  Thank you.  If we could bring

 6  the jurors back in.

 7              (Whereupon, the prospective jurors entered the

 8  courtroom.)

 9              THE COURT:  All right.  The jurors, you can go ahead

10  and have a seat.  Thank you.  Looking around the room to make

11  sure we have everybody.  Are we missing somebody on the far

12  right over there?

13              COURTROOM SECURITY OFFICER:  Maybe No. 29.

14              THE COURT:  What about Juror No. 6?  Who's 6?  Okay.

15  She's hiding behind the -- all right.  So we're going to go

16  ahead and start.  If there's a missing juror or two, they

17  should be in place before we get to them.

18              Juror No. 6, if you would come to the microphone,

19  please.  Juror No. 6, please, Ms. Anderson, Olivia Anderson.

20              PROSPECTIVE JUROR:  Juror No. 6, Olivia Anderson.

21              THE COURT:  May have to adjust the mike just a tad

22  for her, please.  Thank you.  Ms. Anderson, are you

23  comfortable taking your mask off for us while we ask you

24  questions?  All right.  Thank you.

25              PROSPECTIVE JUROR:  Juror No. 6, Olivia Anderson.
```

```
1              THE COURT:  Go ahead, sir.
2   BY MR. PEQUIGNOT:
3   Q   Hi, Ms. Anderson.  Ms. Anderson, what's your marital
4   status?  Are you married?
5   A   No.  Single.
6   Q   Are there any other adults that live in your house with
7   you?
8   A   Yes.
9   Q   Who would that be?
10  A   My brother Willie and my sister Betty.
11  Q   And your brother and sister, what's their occupation?
12  A   Retired.
13  Q   What was their occupation before they retired?
14  A   My brother Willie was a UPS dock worker.  My sister Betty,
15  she worked in the federal building in childcare.
16  Q   Do you recall what type of federal building?
17  A   All I know is a federal building.  She's been in childcare
18  43 years, and all I know is the federal building downtown
19  here.
20  Q   Ms. Anderson, have you lived in the Atlanta area your
21  whole life?
22  A   Yeah, Atlanta and DeKalb.
23  Q   Can you describe your educational background.
24  A   I had -- I graduated high school at David T. Howard, and I
25  went on to dental school at Atlanta College of Dental.  And I
```

1  went to Atlanta Area Tech, and I had some community vocational

2  school class at DeKalb County community technology program.

3  Q    And you're currently a library worker?

4  A    Yes.

5  Q    What do you do for the library?

6  A    I'm a library technician, and I process all library

7  materials to go out to different branches in DeKalb County.

8  Q    Have you always been employed in a similar occupation?

9  A    No.

10  Q    What other occupations?

11  A    I worked for the federal government in Department of

12  Income Tax Division.  Then I worked for the state government

13  Income Tax and Title Division.  And let me see.  I've worked

14  at -- I think that's it.  That ought to be it.

15  Q    When you said the income tax divisions, what was your role

16  there?

17  A    Well, what I had to do for the federal and state, I had to

18  open up the envelopes, take the forms out, and make sure that

19  the taxpayer had all their documents correctly.

20  Q    Do you currently have any other second jobs or part-time

21  jobs other than your library --

22  A    No, huh-uh.

23  Q    Have you ever owned your own business?

24  A    No.

25  Q    Ms. Anderson, where do you typically get your news from?

```
 1   Do you watch --

 2   A    Television.

 3   Q    -- news shows?  Do you read the newspaper?

 4   A    Sometimes.

 5   Q    What news shows and newspapers do you typically --

 6   A    Huh?

 7   Q    Which news shows and newspapers do you --

 8   A    WSB, CBS in the morning, and that's it.

 9   Q    And the newspaper?  The AJC or a different --

10   A    Atlanta Journal, AJC.

11   Q    Do you use any social media platforms regularly?

12   A    No.

13   Q    Ms. Anderson, what do you do in your free time?  What are

14   your hobbies and your interests?

15   A    Shoot.  I don't have none now but my two grandbabies.

16   They take up most of my time with their bad self.

17   Q    Are you involved with any organizations, like a church or

18   a political organization or anything?

19   A    Well, since the virus going on, no, I don't go out

20   nowhere.

21   Q    What about before the virus?

22   A    Huh?

23   Q    What about before the virus?

24   A    Yeah, I would go to church, but I wasn't a member of a

25   church.  But I would attend, you know, like visiting churches.
```

1   Q    Do you do any volunteer work?

2   A    No, not now, huh-uh.  I used to volunteer with Grady.

3   Q    I'm sorry.  What was that?

4   A    I said I used to volunteer with Grady.

5   Q    Grady?

6   A    Yeah.

7   Q    Like what did you do for them?

8   A    Just read books and play with kids that was patients at

9   the hospital, that was in the hospital.  And I would go up on

10  the rooftop and play with them and read books to them.

11  Q    Ms. Anderson, one of the general questions that I asked

12  was whether you thought people should have thicker skin when

13  it comes to things said about them online, and you answered

14  yes in response to that.  Can you elaborate on that?

15  A    I mean, you know, just because somebody say something

16  about you, you can't let it bother you.  People are going to

17  say a lot about you, good and bad.  And if they say something

18  bad, you've just got to, you know, learn to deal with it and

19  shake it off.

20  Q    It sounded like, from your response, that sort of sounds

21  like you're referring to criticism, like if somebody is saying

22  you're not doing a good job or --

23  A    Yeah.  I mean, you know, we all going to have problems.

24  You just have to learn how to deal with it.

25  Q    But would you answer differently if we were talking about

1  something that was untrue?

2  A    If it was untrue, no.  I wouldn't feel different about it

3  because, I mean, you know, if somebody say something untrue

4  about it, so what.  You just have to learn how to deal with

5  that too.  You know it's untrue.  What are you going to do

6  about it?  You can't do nothing about it.

7  Q    So I think what you've heard before are sort of the

8  general allegations here.  So our client has brought claims

9  against the defendants for publishing certain --

10            MR. SABBAK:  Your Honor, I'm going to object.

11            THE COURT:  Well, the question wasn't fully

12  developed, so I really can't respond to it until I hear the

13  whole question.  Go ahead and finish your question, sir.

14  BY MR. PEQUIGNOT:

15  Q    So I'm just referring to the general allegations that the

16  judge summarized at the outset, that this case in general is

17  about our client has brought claims against the defendant for

18  publishing certain statements about her that she alleges are

19  false.  So given that, do you believe that you could be

20  impartial and if the facts warranted, rule in our client's

21  favor given the response that you just gave, that you believe

22  people in similar situations should just deal with it?

23  A    I mean, yeah, I would have to, you know, listen to the

24  evidence and what that person said about her and everything.

25  And, I mean, like I said, you can't stop people from saying

1  nothing about you.  You just can't.  I mean, if they keep

2  saying it, then what else can you do?  What you going to do if

3  they keep saying bad stuff about you and making allegations

4  against you?  You do what you've got to do.

5  Q   So I don't want to belabor the point.  I just -- I think

6  what we're just trying to get to is sort of an equivocal

7  response -- an unequivocal response where if the allegations

8  that I just summarized for you that we are alleging, that the

9  defendants published certain false statements about our client

10  and she is seeking damages, and she's seeking for them to stop

11  making those statements.  That's what this lawsuit is about.

12  A   Yes, if I hear -- if she has evidence that what somebody

13  else said about her, that wasn't untrue and she figure it was

14  damaging to her, then that person should be punished.  She

15  should be given something.

16  Q   Okay.  Thank you for clarifying.  Is there anything else

17  you feel is important for us to know about you?

18  A   Oh, you didn't finish with me?

19  Q   Yeah, I'm sorry.  Just one last question.

20  A   Uh-huh.

21  Q   Is there anything else that you feel like is important to

22  tell us?

23  A   No.

24  Q   Okay.

25  A   You through yet now?

1   Q   Yes.

2   A   Okay.

3           MR. SABBAK:  Thank you, Ms. Anderson.

4           THE COURT:  Juror No. 7, Wendy -- is it Weiner?

5           PROSPECTIVE JUROR:  Weiner, yes.

6           THE COURT:  Wendy Weiner.

7   BY MR. PEQUIGNOT:

8   Q   Can you pronounce your last name for me.

9   A   Weiner.

10  Q   Weiner.  Thank you.  Ms. Weiner, are you married?

11  A   Yes.

12  Q   Do you have children?

13  A   No children.

14  Q   Do you have any other adults in your household?

15  A   No adults.

16  Q   What's your husband's occupation?

17  A   Wife, and she owns a restaurant.

18  Q   Can you describe your educational background.

19  A   I have a bachelor of arts in journalism from the Henry

20  Grady School of Journalism at UGA and occasional extenuating

21  art classes throughout the evenings over the last 20 years.

22  Q   Where did you get your degree?

23  A   UGA.

24  Q   Your current occupation is graphic design?

25  A   Yes.

1  Q    Do you have any other jobs, part-time jobs, second jobs in

2  addition --

3  A    I've been a graphic designer since 1985.

4  Q    So in response to one of the general questions we asked,

5  if there was a close friend or relative who was trained or

6  employed in a law related field --

7  A    Uh-huh, yeah.  My best friend since college is an

8  attorney.

9  Q    That he?  She?

10  A    She.

11  Q    And where is she an attorney at?

12  A    Right now she is at Arnall Golden Gregory.

13  Q    Do you know what type of law she practices?

14  A    Real estate mostly.

15  Q    You also responded that close friend or relative had filed

16  a lawsuit.  Can you elaborate on that.

17  A    Yes.  My partner, who owns a restaurant, has been involved

18  in many lawsuits where she's both been the defendant and the

19  plaintiff.

20  Q    What's the name of her restaurant?

21  A    The first restaurant she started was called The Flying

22  Biscuit Cafe, and the second one that she owns now is Delia's

23  Chicken Sausage Stand.

24  Q    We used to live in Candler Park, so Flying Biscuit was one

25  of our favorites.

1   A    Oh, yeah.

2   Q    You had indicated that you watch television shows about

3   celebrities.  What specifically did you have in mind?

4   A    My favorite ones are celebrity real estate shows.

5   Q    What about celebrity gossip accounts?

6   A    Well, the news that I follow is always online.  I am more

7   of a news aggregator person, like a Flipboard (sic) or a

8   Facebook, that type of stuff.  So it's not really specific

9   accounts.  It's just general topics.

10  Q    Where do you get your news from?

11  A    Like I said, mostly it's online from Flipbook or Apple

12  News, you know, somebody that aggregates a bunch of different

13  magazines or newspapers.  So it's not really one source.  They

14  tap into a million different sources.

15  Q    Which social media platforms do you use regularly?

16  A    Well, for graphic design I use a lot of Facebook,

17  Instagram mostly, a little bit of Twitter, and a tiny bit of

18  Tik Tok.

19  Q    And is there one in particular you'd say you --

20  A    I'd say Instagram the most.

21  Q    What do you like to do in your free time?  What are your

22  hobbies and interests?

23  A    I do a lot of art projects.

24  Q    Just for yourself or for --

25  A    Mostly for myself.  I, of course, work for the restaurants

1  and do a lot of projects with restaurants, maybe pictures that

2  will go on the walls or t-shirts that they sell, that kind of

3  stuff.

4  Q   Got you.  And do you do any other art projects like in the

5  community or --

6  A   I do a lot of volunteer work through maybe helping people

7  design brochures or newsletters, a lot of nonprofit stuff.

8  Q   How does that work come to you, the nonprofit?

9  A   Usually word of mouth.

10 Q   Are there any particular organizations that you're

11 involved with more than others?

12 A   I do a lot with Happy Tails Pet Therapy.  I have a dog

13 that is an official comfort animal that can go around to

14 hospitals and visit kids and old people and good stuff like

15 that.

16 Q   Are there any other occupations that you've held other

17 than graphic design?

18 A   No.

19 Q   So one of the questions we'd asked in the general

20 questions was do you think people should have thicker skin

21 when it comes to things said about them online.

22 A   Well, my basis for answering that question is dealing with

23 restaurant reviews, when people complain about a pancake or a

24 piece of sausage, you know, it's their opinion, and I think

25 that, you know, you just have to roll with it.

1   Q   So in that case you think we should have thicker skin

2   about --

3   A   I think, you know, as the chef creating that food it's

4   very personal to that person, and they have to just say, you

5   know what, I'm not for everybody.

6   Q   Right, right.  So it sounds like from your response you're

7   referring to somebody just having an opinion or a criticism?

8   A   Yes, correct.

9   Q   You might feel differently if it was something that was

10  untrue?

11  A   Right, right.

12  Q   My apologies for misspeaking about your spouse by saying

13  husband.

14  A   No problem.

15  Q   The nature of this is that we're thinking about 15 things

16  at the same time and so --

17  A   I understand.

18  Q   -- my apologies.  I didn't mean to -- is there anything

19  else you think we should know about you?

20  A   No.

21          MR. PEQUIGNOT:  Okay.  Thank you.

22          THE COURT:  Ms. Weiner, there may be a few questions

23  for you from the defense.

24  BY MR. SABBAK:

25  Q   Sorry, Ms. Weiner.  You're the first.  My apologies.  I

1  gave you no indication otherwise.  Ms. Weiner, you indicated

2  during the judge's general questions, one of their general

3  questions, pardon me, that you were a fan of Ms. Almánzar?

4  A   Yes.

5  Q   Being a fan of Ms. Almánzar, would that impact your

6  ability to be a fair and impartial juror here?

7  A   I hope not.

8  Q   Are you unsure?

9  A   I'm unsure only because I don't know the facts about what

10 this is.  I have seen some alluding to it in social media

11 previously.  It hasn't been one of my primary focuses, but I

12 would hope that I would be impartial.

13 Q   But you can't state definitively whether or not you're

14 able to separate at this moment because you haven't heard the

15 facts?

16 A   Right.

17 Q   Okay.  So you don't know whether or not you can be

18 impartial?

19 A   I would hope that I would lean towards that but, you know.

20 Q   But the answer is no?

21 A   The answer is maybe.  I can say yes, but I would probably

22 be lying.

23 Q   I wouldn't ask you to do that.

24        THE COURT:  Ms. Weiner, if I could follow up with you

25 about that, so what we want for any juror is that when they

1   come into the case, that they're not leaning one direction or

2   the other already.  The burden of proof on this case, as I'll

3   tell the jurors, is on the plaintiff and that the plaintiff

4   has to prove her case by a preponderance of the evidence.

5   That standard of proof means that whichever side is most

6   believable prevails.  It's not like a criminal case that's

7   beyond a reasonable doubt.  Some people think the criminal

8   burden of proof is being beyond the shadow of a doubt, and

9   that's not really true.  You can have some doubt.  It just

10  can't be a reasonable doubt.  But in a civil case it's, if you

11  think about the scales of justice, you know, that we sometimes

12  refer to, someone has carried their burden of proof if it tips

13  even just a little bit to their side.  But when we start out

14  the case, we want the scales to be completely balanced and

15  even.  So in your mind, based on following the plaintiff on

16  social media, do you feel like you already have leaned her way

17  some?

18          PROSPECTIVE JUROR:  Well, being a fan of Cardi B and

19  not being a fan of the other party because I don't really know

20  them, I would have to say yes.  I am right now skewed towards

21  that.

22          THE COURT:  All right.  Thanks for your honesty about

23  that.  You said you went to Georgia.  You started your career

24  in '85.  When did you graduate from Georgia?

25          PROSPECTIVE JUROR:  '85.

```
1              THE COURT:  '85.  So did I.

2              PROSPECTIVE JUROR:  Go Dawgs.

3              THE COURT:  The bicentennial class of '85.

4              PROSPECTIVE JUROR:  That's right.

5              THE COURT:  Long time ago for me at least.

6              PROSPECTIVE JUROR:  Yeah, me too.

7              THE COURT:  Feels like it was a generation ago.

8              PROSPECTIVE JUROR:  Right.

9              THE COURT:  All right.  Thank you, ma'am.

10             All right.  Juror No. 8, Mariany Zapata.  Mariany --

11   I'm sorry.  If you'll tell us how to pronounce your first

12   name.

13             PROSPECTIVE JUROR:  Juror No. 8.

14             THE COURT:  I'm sorry.  How do you pronounce your

15   first name?

16             PROSPECTIVE JUROR:  Mariany.

17             THE COURT:  Thank you, ma'am.

18   BY MR. PEQUIGNOT:

19   Q   How do you pronounce your last name?

20   A   Osorio Zapata.

21   Q   Are you married?

22   A   I am.

23   Q   Do you have children?

24   A   No children.

25   Q   What's your spouse's occupation?
```

1   A   He has a landscaping company.

2   Q   Do you have any other adults that live in your house?

3   A   My in-laws.

4   Q   What are your in-laws' occupations?

5   A   My father-in-law works with my husband in the landscaping

6   company, and my mother-in-law is a stay-at-home mom.

7   Q   What's your educational background?

8   A   I have a bachelors degree in information and security.

9   Q   And where is that from?

10   A   Georgia Gwinnett College.

11   Q   Have you attended any other educational programs, like any

12   certifications or --

13   A   I have a networking certification.

14   Q   What is UKG?

15   A   Oh, it stands for Ultimate Kronos Group.

16   Q   I'm sorry.  Can you say that --

17   A   Ultimate Kronos Group.

18   Q   What's their line of business?

19   A   They handle -- they have a payroll system and we

20   help them.  We have major companies, and we handle their

21   payroll.

22   Q   How long have you been employed there?

23   A   Three years.

24   Q   Have you always been employed in this same line of work,

25   technical support?

```
1   A    No.  I did a sales associate job before that.

2   Q    And where was that?

3   A    Macy's.

4   Q    Where do you get your news?  TV?  Newspaper?  Radio?

5   A    Mainly social media.

6   Q    Are there any particular social media platforms that you

7   use regularly?

8   A    Instagram, Tik Tok.

9   Q    What are your hobbies and interests?  What do you do in

10  your free time?

11  A    I enjoy walking or going for runs.

12  Q    Are you involved in any organizations, like any religious

13  organization or political organization?

14  A    My church.

15  Q    What's the name of your church?

16  A    Holy Cross.

17  Q    Do you do any volunteer work?

18  A    I'm a Sunday school teacher.

19  Q    Is there anything else you feel is important for us to

20  know about you?

21  A    Not at this time, no.

22  Q    Is there any reason, based on what you've heard here

23  today, that you feel like you couldn't be a fair and impartial

24  juror in this case?

25  A    No.
```

1          MR. PEQUIGNOT:  All right.  Thank you.

2    BY MR. SABBAK:

3    Q    Ms. Zapata?

4    A    Yes.

5    Q    How are you?

6    A    I'm good.

7    Q    My understanding is you are a fan of the plaintiff?

8    A    Yes.

9    Q    And we appreciated Ms. Weiner's honesty.  We really do.

10   And I'm going to ask you the same.  Would you being a fan of

11   Ms. Almánzar, would that impact your ability to be a fair and

12   impartial juror?

13   A    No.

14   Q    It will not?

15   A    It will not.

16          MR. SABBAK:  Thank you.

17          THE COURT:  All right.  Thank you, ma'am.

18          Juror No. 9, Timothy Dorsey.

19          PROSPECTIVE JUROR:  Juror No. 9.

20   BY MR. PEQUIGNOT:

21   Q    Hi, Mr. Dorsey.  Are you married?

22   A    No.

23   Q    Do you have any children?

24   A    No.

25   Q    Do you have any other adults that live in your household

1  with you?

2  A    Nope.

3  Q    Did you grow up here in the Atlanta area?

4  A    Yes.

5  Q    And you've lived here your whole life?

6  A    Yes.

7  Q    In this area?  Can you describe your educational

8  background for us.

9  A    Computer science degree.

10 Q    And where is that from?

11 A    Valdosta State.

12 Q    Have you attended any other educational programs?  I guess

13 in your line of work there's probably lots of certifications?

14 A    No.

15 Q    You're an IT manager.  I'm assuming by your title you

16 manage a team.  How big is your team that you manage?

17 A    There's four now.

18 Q    It says Warner Media.  Is that Turner or --

19 A    Yes, formerly Turner or formerly Time Warner.

20 Q    And you're a full-time employee there?

21 A    Yes.

22 Q    Have you always been occupied in this line of work?

23 A    Yes, technical.  Originally started off doing some web

24 development, video editing, then moved into video game

25 testing, and then back into the online video streaming space.

1   Q    When you say online video streaming space, can you be more

2   specific about that.

3   A    So in my line of work my team is responsible for live

4   streaming for all of Warner Media, so CNN, TBS, Adult Swim,

5   and also any live event, such as NBA and Bleacher Report.

6   Q    Have you ever owned your own business?

7   A    No.

8   Q    Where do you typically get your news?  Internet?  TV?

9   Radio?

10  A    Internet, Google News feed, CNN, and Reddit.

11  Q    And do you use social media regularly?

12  A    Facebook and sometimes Twitter and Instagram.

13  Q    So I guess Facebook the most?

14  A    Yes.

15  Q    How do you spend your free time?  What are your hobbies

16  and interests?

17  A    Home improvements, research on financial advice, and

18  building with Lego.

19  Q    Are you involved in any organizations, religious,

20  political?

21  A    No.

22  Q    Do you do any volunteer work?

23  A    Yes.

24  Q    Where do you volunteer?

25  A    Technical adviser for a nonprofit that does suicide

1   prevention.

2   Q    Awesome.  So in response to the general questions you had

3   said that you had a close friend or relative that is in a

4   legal-related field?

5   A    Yes.

6   Q    Can you elaborate on that?

7   A    I had a cousin who was previously a lawyer, and now she's

8   a judge in Minnesota.

9   Q    Do you recall what type of law she practiced?

10  A    It was family law.

11  Q    You had also indicated you had a close friend or relative

12  that had been trained in psychology?

13  A    Yes.

14  Q    Who is that?

15  A    Who is that?

16  Q    Yeah.  Can you elaborate on that?

17  A    One of my best friends.  He is -- he works for the VA in

18  Portland.

19  Q    You indicated you had served on a jury before?

20  A    Yes.

21  Q    What type of case was that?  Do you recall?

22  A    It was a murder trial.

23  Q    Is there anything else you think is important for us to

24  know about you?

25  A    Nope.

1  Q    Is there anything you've heard that would lead you to

2  believe you could not be a fair and impartial juror for this

3  case?

4  A    No.

5             MR. PEQUIGNOT:  Okay.  Thank you.

6             MR. SABBAK:  Mr. Dorsey, thank you, sir.

7             THE COURT:  Thank you, sir.

8             Juror No. 10, Kenyon Mitchell.

9             PROSPECTIVE JUROR:  Juror No. 10.

10  BY MR. PEQUIGNOT:

11  Q    Hi, Ms. Mitchell.

12  A    Hello.

13  Q    Ms. Mitchell, are there any other adults that live in your

14  household?

15  A    I have a roommate.

16  Q    What is your roommate's occupation?

17  A    She's still in school.

18  Q    In school?

19  A    Yeah.

20  Q    Where is she in school?

21  A    Georgia State.

22  Q    Are you from this area?  Atlanta?

23  A    Yes, I am.

24  Q    You've lived here your whole life?

25  A    Uh-huh, yes.

1   Q   Can you describe your educational background.

2   A   I just graduated in the summer with a bachelor of science

3   in biology from Georgia State.

4   Q   And you're now working as a dental assistant?

5   A   Yes.

6   Q   Is that a full-time job?

7   A   Yes.

8   Q   Have you ever owned your own business?

9   A   No.

10   Q   Where would you say you get your news from?

11   A   Apple News and Twitter.

12   Q   Do you use any social media platforms regularly?

13   A   Yes, twitter, Instagram, and Tik Tok.

14   Q   Which one of those would you say you use most often?

15   A   Probably Twitter.

16   Q   What are your interests outside of work?

17   A   I hang out with my friends.  I do art.  I read.

18   Q   Are you involved in any organizations, like a church or a

19   political organization or --

20   A   No.

21   Q   Do you do any volunteer work?

22   A   Occasionally I help out with Habitat for Humanity.

23   Q   You had indicated that a close friend or relative had

24   filed a lawsuit.  Can you elaborate on that.

25   A   Yes.  My sister was burned in a bonfire due to the parents

1  improperly supervising, so I think it was against the parent's

2  insurance company that they filed a lawsuit.

3  Q   I'm sorry that happened.

4  A   It's okay.

5  Q   You had indicated that you follow some celebrity gossip

6  accounts on social media.  Can you recall which ones?

7  A   I follow The Shade Room on Instagram.

8  Q   Have you heard about this case before today?

9  A   No.

10  Q   Is there anything else you think is important for us to

11  know about you?

12  A   No.

13  Q   How do you feel about celebrity gossip in general?

14  A   I mean, I use it as a source of entertainment, and I know

15  that often it does affect celebrities, especially when it's

16  stuff that's not untrue.  I know a lot of them do either go

17  into the comments and they defend themselves or like speak out

18  on their platforms against it.  However, I don't really use it

19  as a news source because I know that it is likely that it's

20  untrue most of the time.  So for me it's just entertainment.

21  Q   So it sounds, based on what you're saying, that when you

22  read celebrity gossip, that you assume that most of it is

23  untrue.  Is that fair?

24  A   Yeah.  Yeah, I would -- I mean, most of the -- and not a

25  hundred percent of the time is it negative.  So there's like

1  not always something -- I never try to pick sides.  I just

2  kind of read it and move on.  But, yeah, there's always the

3  underlying thought in my mind that it could be untrue, so I

4  never believe what I read a hundred percent of the time.

5  Q   Do you think it's okay that --

6  A   No.  I don't agree with it even though I do use it as

7  entertainment.

8  Q   And so just given what you know about this case already,

9  do you feel like you could be impartial in reviewing the facts

10 of this case and, if warranted, ruling in our client's favor,

11 you know, under a similar fact pattern?

12 A   I do.

13          MR. PEQUIGNOT:  That's all I have.

14 BY MR. SABBAK:

15 Q   Good afternoon, Ms. Mitchell.

16 A   Good afternoon.

17 Q   You stated that you could be fair and impartial towards

18 the plaintiff, Ms. Almánzar; is that right?

19 A   Yes.

20 Q   Is that because you are a fan of hers?

21 A   I mean --

22 Q   Let me ask you this:  Could you extend the same courtesy

23 to Ms. Kebe and Mr. Kebe?

24 A   Yes.

25 Q   And so as a fan of Ms. Almánzar, you wouldn't let that

1   impact your ability to hear the evidence?

2   A    No.

3   Q    You indicated that if any information comes from a

4   celebrity gossip news site or blog, you would presume it's

5   false?

6   A    I would say yes and then that's not -- it's not always

7   false, but they are always asked to be the understanding that

8   it could be.

9   Q    And so because you stated that you presume it's false,

10  would that impact your ability to be fair and impartial

11  towards Ms. Kebe?

12  A    I mean, I'm not exactly sure what was -- what she does or

13  what she posted, so that would probably play a factor in my

14  decision.  However, I'm not sure what she's -- what she posted

15  or what is listed in social media.

16  Q    Would you agree that if -- you have agreed that you will

17  prejudge this news.  And do you agree that it doesn't much

18  matter what she says if you'd prejudge the information anyway?

19  Do you agree with that?

20  A    Yes.

21  Q    So you can't be fair and impartial?

22  A    I guess not, no.

23          THE COURT:  Hold on, ma'am.  Any follow up questions

24  from the plaintiff?

25          MR. PEQUIGNOT:  Yes.  So as you can probably imagine,

1    we're both coming at this from opposite ends of this spectrum,

2    right, and we're just trying to get to the bottom of whether,

3    you know, you believe you can be impartial.  So I think both

4    of us are just asking for honesty about that, and it sounds

5    like you gave sort of a general impression about what you

6    believe celebrity gossip news is in general.  And what I

7    followed up was, you know, assuming the facts support our

8    client's claims, you could be fair and impartial in that

9    situation; right?  Is that what you --

10             THE WITNESS:  Yes.

11   BY MR. PEQUIGNOT:

12   Q    Is that fair?

13   A    Yes.

14   Q    And defendant's counsel then asked you sort of the flip

15   side of that, and I understand your response to be that you

16   don't know the facts about her particular situation.  And if

17   the evidence supported her side of this case, that the stuff

18   is actually true, then if that were the case, could you be

19   fair and impartial and rule in her favor?

20   A    Yes.  Like I said previously, I go -- my first impression

21   is that things aren't always true, but that doesn't mean that

22   like some of these statements don't have truth to them.

23   There's definitely things that are posted that are true, and

24   evidence comes out along with those statements to back up what

25   was said.  However, sometimes, I mean, there are rumors that

```
 1  are posted as well, and those are not valid statements.  So, I
 2  mean, I just assume that anything coming from one of those
 3  sources is not -- I cannot assume that it's reliable all the
 4  time.  There's not people fact checking and stuff like that.
 5           MR. PEQUIGNOT:  Okay.
 6           MR. SABBAK:  Thank you, Ms. Mitchell.
 7           PROSPECTIVE JUROR:  You're welcome.
 8           THE COURT:  Juror No. 11, Zanaiya Thompson.
 9           PROSPECTIVE JUROR:  Juror No. 11.
10  BY MR. PEQUIGNOT:
11  Q   Ms. Thompson?
12  A   Hi.
13  Q   Ms. Thompson, are you married?
14  A   No.
15  Q   Do you have children?
16  A   No.
17  Q   Are there any other adults that live in your household
18  with you?
19  A   My mother and my stepdad and my grandfather.
20  Q   And what is each of their occupations?
21  A   They're all retired.
22  Q   What were their occupations before they retired?
23  A   My grandfather used to work at a garage.  My stepdad, he
24  used to do MTA, and my mom was a corrections officer.
25  Q   Did you say MTA?
```

1  A    Yes.

2  Q    What is that?

3  A    In New York, transit.

4  Q    Oh, got you.  Can you describe your educational

5  background.

6  A    I went to school in the Bronx, in New York, and I also

7  went to school on the upper east side.  I went to school in

8  New Jersey for my certificate for phlebotomy.  I also went to

9  school for medical assisting in New York.

10  Q    Is phlebotomy the only type of medicine that you've worked

11  in or have you worked in other specialties?

12  A    Yes, so far just phlebotomy.

13  Q    Where do you get your news from?  The internet or

14  television?

15  A    Mostly from what my mom tells me.  I don't really get into

16  TV too much.

17  Q    Do you read news on the internet?

18  A    Not really, no.

19  Q    Do you use any social media platforms regularly?

20  A    Tik Tok.

21  Q    Is that it?

22  A    Yeah.

23  Q    Are you employed full-time?

24  A    Yes.

25  Q    What are your hobbies and interests outside of work?

1    A    I read, and I watch documentaries.

2    Q    Are you involved in any organizations, religious,

3    political or otherwise?

4    A    I used to be involved with my church, but since I've moved

5    down here, no.

6    Q    When did you move down here from New York?

7    A    It was October of 2019, and then I left and then came back

8    again in 2020.

9    Q    Do you do any volunteer work?

10   A    No.

11   Q    Is there anything else you feel like is important for the

12   parties to know about you?

13   A    No.

14   Q    Is there anything about what you've heard here today that

15   would lead you to believe you might not be able to be a fair

16   and impartial juror?

17   A    No.

18           MR. PEQUIGNOT:  I think that's all I have.

19   BY MR. SABBAK:

20   Q    Ms. Thompson, good afternoon.

21   A    Good afternoon.

22   Q    You indicated that you were a fan of Ms. Almánzar?

23   A    Yes.

24   Q    And you've heard me ask other people whether or not they

25   could be fair and impartial because of that?

1   A   Yeah, I can be.

2   Q   I'm going to put the same question to you.  What was that?

3   A   I can be fair and impartial, yes.

4   Q   You indicated that you were from the Bronx?

5   A   Yes -- well, Harlem, but I went to school in the Bronx.

6   Q   As a fan of Ms. Almánzar, you're aware that she also grew

7   up in the same neighborhood or borough of New York?

8   A   Yes.

9   Q   And as a fan who grew up in the same neighborhood, would

10  that impact your ability to be fair and impartial?

11  A   No.

12          MR. SABBAK:  Thank you.

13          THE COURT:  All right.  Thank you, ma'am.  I just had

14  to smile because the Bronx is a little more than a

15  neighborhood.  Juror No. 12, Max Nissenbaum.

16          PROSPECTIVE JUROR:  Juror No. 12.

17  BY MR. PEQUIGNOT:

18  Q   How do you pronounce your last name?

19  A   Nissenbaum.  It's German.

20  Q   Mr. Nissenbaum, are you married?

21  A   No.

22  Q   Do you have children?

23  A   No.

24  Q   Do you have any other adults that live in your house with

25  you?

1   A    My mom.

2   Q    What's your mom's occupation?

3   A    Stay-at-home wife.

4   Q    Was she -- has she ever had any other occupations?

5   A    She worked in hotels up until the time that she married my

6   father.

7   Q    Is your father still alive?

8   A    Yes.

9   Q    What's his occupation?

10  A    He is the CEO of the Dan Hotel Group in Israel.

11  Q    I may have written this down incorrectly, but did you

12  indicate that someone, a close friend or relative, was in a

13  law related field?

14  A    I have a friend who is working to be a bodyguard.  I don't

15  know if that was mentioned in the process.

16  Q    But not a lawyer or a judge or --

17  A    No.

18  Q    What's your educational background?

19  A    I graduated college with a bachelor's in business

20  administration.

21  Q    And where from?

22  A    Les Roches in Switzerland.

23  Q    So when did you first move to this area?

24  A    Probably when I was eight, so probably like 2002 maybe.

25  Q    So you lived here, and then you went to school abroad and

1  came back afterwards?

2  A   We traveled all over when we were growing up.  So I was

3  born in England, and then I moved across Europe, settled here,

4  moved to Singapore during high school and then came back.  And

5  then I went to college in Switzerland.

6  Q   I won't ask you to go into detail.  So what's your current

7  occupation?

8  A   I'm a freelance video editor.

9  Q   Do you have your own business where you do that or do you

10  do that for --

11  A   I work under my father's kind of company.  He has a

12  license, so I work under that.  I work for a few YouTubers

13  as -- this is just freelance, so it's kind of my own business.

14  But most of the expenses and finance go through his stuff.

15  Q   How would you describe like what you do for these --

16  A   Well, I work for several different YouTubers, you know,

17  some gaming, some lifestyle.  I just produce videos for them

18  so they can upload it to their social media, like Tik Tok and

19  YouTube and Instagram.

20  Q   Got you.  Is that sort of a full-time job of yours?

21  A   It's become one.  I started last year so.

22  Q   What were you doing before that?

23  A   I was working in hotels.

24  Q   Doing something similar or --

25  A   No.  I was working -- the last job I had before I left to

1  be a video editor was I was the lead finance in HR for a hotel

2  up in Alpharetta.

3  Q   Any of these YouTubers, are they in celebrity gossip by

4  chance?

5  A   No.  It's more niche, more just like exclusive to

6  platform, like mobile gaming, keyboard reviews, NFTs, kind of

7  stuff like that.

8  Q   Where do you get your news?  Internet or --

9  A   Mostly internet, whatever I come by.  I don't really

10  actively search for it or anything like that.  It's whatever I

11  pass by on social media.

12  Q   Do you watch any news channels or read any newspapers?

13  A   No.

14  Q   Obviously, sounds like from your line of work that you

15  would have to be using social media but just for your -- for

16  personal reasons do you use social media regularly?

17  A   Yeah.  I use pretty much everything, so Tik Tok, Twitter,

18  Instagram, yeah.

19  Q   Is there any one in particular you would say you use more

20  often than the other?

21  A   I use Discord mostly to communicate with my clients,

22  Twitter to find clients, and then YouTube mostly because I'm

23  checking, you know, statistics and building a portfolio on

24  there.

25  Q   What about -- what do you do when you're not working on

1   your business?  What do you do in your free time?

2   A    Mostly video games.  I bike, play guitar.

3   Q    Are you involved in any organizations, any --

4   A    No.

5   Q    -- social, political or -- do you do any volunteer work?

6   A    Not recently, no.

7   Q    What about in the past?  Any particular --

8   A    When I was in high school, like, I, you know, bowled with

9   like special needs kids, but that was the extent of it.

10  Q    I think you had indicated that you or a close friend or

11  family member are in the entertainment industry.  Were you

12  just referring to what you had just --

13  A    Both me and my cousin.  He works in Beverly hills as a

14  director for like music videos and stuff like that, worked

15  with Post Malone.

16  Q    You had also indicated that you or a close friend or

17  family member was a blogger or social media personality?

18  A    I have a few friends that are and plus my co-workers kind

19  of -- my clients are all social media presence.

20  Q    So any in sort of the nature of celebrity gossip?

21  A    Nowhere towards like celebrity I would say, nothing of

22  that status.

23  Q    You indicated that you -- in response to a general

24  question of whether anyone had been harassed online or cyber

25  bullied?

1  A   That just happens in the video game space.  So people are

2  kind of mean on there, so you kind of have to just shrug it

3  off a lot.  But that just exists on there.  That's just the

4  breeding ground for it.

5  Q   You had also indicated in response to a general question

6  that people should have a thicker skin when it comes to things

7  said about them online?

8  A   Kind of goes in tangent with what I said before that, you

9  know, experience a lot of -- you know, seeing people getting

10  cyber bullied in those spaces and, you know, also working in

11  content creation I see a lot of like people I work for, you

12  know, get bullied in some way or other.  And I think like if

13  you're going to be a presence in any sort of media

14  entertainment, you kind of have to have a thick skin for

15  criticism.

16  Q   Do you distinguish between criticism and someone having an

17  opinion that your music is terrible versus somebody saying

18  something that's untrue about somebody?  Do you view those two

19  situations differently?

20  A   I think it depends because some consecrators use that

21  controversy to get bigger.  Sometimes those untrue things can

22  be good things on social media for the benefit of the

23  consecrator.  I mean, there could be negative ways that it's

24  used, right, you know, in detriment to whoever.  But, you

25  know, there's good ways and bad ways.

1  Q   So just to kind of sort of how we've talked about this in

2  connection with some of the other potential jury members, you

3  know, the general allegations in this case are that our client

4  has alleged that the defendants have published certain false

5  things about her online.  That's her allegations.

6  A   Got you.

7  Q   So given your feelings about people online having a

8  thicker skin, in the event that you know our client, the

9  evidence shows that her allegations are true that these

10  statements they published about her are false and that she has

11  suffered harm, do you feel like you can be a fair and

12  impartial juror and rule in her favor given that evidence?

13  A   Without further context I think I'm already biased towards

14  the defendants in that particular circumstance, but maybe with

15  further evidence, you know, I'd probably be a little less

16  biased if it was a little more gray.

17  Q   And what leads you to believe that you would be biased?

18  A   Just from the fact that I believe, you know, people need

19  to have thicker skin online.

20  Q   So in your view, you know, even if something is untrue, if

21  somebody published it online, you should have thicker skin

22  and --

23  A   I think it's hard to be an entertainer or an online

24  presence in general if you don't have, you know, a sort of

25  shell because you're going to get -- you know, people just

1   hate you for random reasons, and people are going to say nasty

2   things.  And some people have platforms to say it to a lot of

3   people, but, you know, I think you've just got to kind of be

4   ready for that.

5   Q    Is there anything else you feel like is important for the

6   parties in this case to know about you?

7   A    What was that?

8   Q    Is there anything else that you think is important for the

9   parties in this case to know about you?

10  A    Not off the top of my head.

11          MR. PEQUIGNOT:  I think that's all I have.

12          MR. SABBAK:  Thank you, Mr. Nissenbaum.

13          THE COURT:  Thank you, sir.  Juror No. 13, John

14  Dukes.

15          PROSPECTIVE JUROR:  Juror No. 13.

16  BY MR. PEQUIGNOT:

17  Q    Good afternoon, Mr. Dukes.

18  A    Good afternoon.

19  Q    Mr. Dukes, are you married?  Do you have children?

20  A    I am married, and I have a son and stepson.

21  Q    And how old are your children?

22  A    14, both of them.

23  Q    What's your spouse's occupation?

24  A    She's a teacher, Butts County.

25  Q    What grade teacher?

```
1    A    Currently first.

2    Q    Do you have any other adults that live in your house with

3    you?

4    A    We do not.

5    Q    Have you always lived in the McDonough area?

6    A    No.  I actually was born in Norfolk as well -- sorry.

7    Spent most of my childhood in Norfolk and then grew up all

8    around Atlanta.

9    Q    When did you move to Georgia?

10   A    '93, '94.

11   Q    What is your educational background?

12   A    Some college.

13   Q    I'm sorry?

14   A    Some college.

15   Q    Which colleges?

16   A    I went to Gordon, and then I went to UGA actually for a

17   little while.

18   Q    What were your fields of study?

19   A    Biology and computer science.

20   Q    Have you attended any other educational programs, like

21   evening schools or certifications?

22   A    Nothing specific, stuff related to my work.  That's about

23   it.

24   Q    Can you give some more background information about your

25   work?
```

1    A    Currently I'm working facilities maintenance basically for

2    Amazon.  I actually work -- I'm with another company who's

3    contracted to deal with this, one of the one-man standalone

4    groups.  I work for Daifuku North America, and they're

5    Japanese multinational.  We do all sorts of electrical work,

6    plumbing, building, et cetera.

7    Q    What's the nature of that company, the business that you

8    said.  I can't pronounce the business.

9    A    Daifuku?

10   Q    Yeah.

11   A    Material handling is really -- support and service.  My

12   job prior to the one I'm at right now is actually -- I was at

13   the airport working on the baggage handling system doing their

14   conveyor belts.  It can be anywhere from heavy industrial to

15   electrical, almost home maintenance.  It's kind of a full stop

16   shop.

17   Q    Do you have any other employees that work for you that you

18   manage or supervise?

19   A    No, not in this role.

20   Q    Have you always been in that line of work?

21   A    No.  Back in 2006 I spent a lot of time with American Red

22   Cross, Hurricane Katrina relief, that type of stuff.  And then

23   prior to that I was a valet for a couple of years.

24   Q    So are you -- so is that like working on houses?

25   A    More heavy industrial, conveyor belts specifically.  I've

1  done it all the way from about 2006 until about 2020 when all

2  the Covid stuff went down.  And then the airport kind of was

3  hurting, and it was time to find something else.

4  Q    Where do you get most of your news?

5  A    News aggregator, Google news typically.

6  Q    Do you watch any news shows or read any newspapers?

7  A    Not too much specifically.  I mean, I kind of try and -- I

8  have to try and see the whole picture.  I'll go all the way

9  from WaPo and CNN to, oh, Fox.

10  Q    Do you use any social media platforms regularly?

11  A    I do.

12  Q    Which ones?

13  A    Facebook and Instagram.

14  Q    Would you say you use one of those more often than --

15  A    Facebook.

16  Q    Are you employed full-time?

17  A    I am.

18  Q    What do you like to do in your free time?  What are your

19  hobbies and interests?

20  A    Fishing, video games.  I've got my boys, and we'll hang

21  out, movies.

22  Q    What are your sons into?

23  A    Video games.

24  Q    I think they all are.

25  A    Yeah, PS5 and XBox.

1  Q    Are you involved in any organizations, any religious

2  organizations or political organizations?

3  A    Not presently.  Like I said, I worked for the American Red

4  Cross there for a while.

5  Q    Do you do any volunteer work?

6  A    No.

7  Q    So I think in response to some of the general questions

8  you had indicated that you had a close friend or relative who

9  was in a law-related field?

10  A    Both my mother and stepfather are lawyers.

11  Q    What type of law do they practice?

12  A    My mom is corporate, and my stepdad is business.

13  Q    Is what?

14  A    Business.

15  Q    You had also indicated that you had a close friend or

16  relative who had been trained or employed in the insurance

17  business.  Can you clarify that?

18  A    Yes.  My father-in-law is an insurance adjuster or at

19  least he was for many years.  He's kind of on-again off-again.

20  Q    And you have a close friend or relative that's been

21  trained in the field of psychology?

22  A    My sister, she's got a practice here.

23  Q    Here in the Atlanta area?

24  A    Yeah.

25  Q    Does she have a particular specialty of psychology?

1   A    I can't remember off the top of my head.

2   Q    You indicated that a close friend or relative had filed a

3   claim or lawsuit.  Can you clarify that?

4   A    That actually was me.  I didn't answer quite quick enough

5   on the first one.  I did.  I filed suit for custody of my son.

6   Q    How far did that action -- how far did that case go?  Did

7   it go --

8   A    It was okay.  There was a guardian ad litem appointed and

9   it's --

10  Q    You don't have to elaborate.

11  A    Thank you.

12  Q    I was just getting into how long the case, you know, how

13  long down the track you made it.

14  A    Yeah.  We got a custody agreement and are both joint

15  custody now.

16  Q    You indicated that you had been harassed online or cyber

17  bullied.  Can you elaborate on that.

18  A    Well, as the previous gentleman mentioned, I do video

19  games and online gaming.  And it is -- it can be a very toxic

20  environment.  Kind of do have to come with a little bit of

21  thick skin and be ready to report when it's getting bad.

22  Q    This is really making me worry about my son right now.

23  A    Well, some of the stuff out there can be real bad.

24  Q    You had also indicated that you thought in general that

25  people should have a thicker skin when it comes to things said

1  about them online.  Can you elaborate on that?

2  A   Same deal.  I mean, if you're going to be in those places,

3  you have to be able to expect to it to a point.  I think if

4  it's involving somebody's psychological health or their

5  livelihood, that's definitely that point.

6  Q   So I won't, you know, I won't go through the whole drill

7  again, but just given what you've heard, is there anything

8  that would lead you to believe that you couldn't be fair and

9  impartial in this case given what you know about it?

10  A   No.

11         THE COURT:  Sorry.  What was the question?

12         MR. PEQUIGNOT:  I said given everything he knows, is

13  there any reason why he couldn't be a fair and impartial juror

14  in this case.  Is there anything else you think we should know

15  about you?

16         PROSPECTIVE JUROR:  No.

17         MR. PEQUIGNOT:  Okay.  Thank you.

18         MR. SABBAK:  Thank you, Mr. Dukes.

19         PROSPECTIVE JUROR:  Thank you.

20         THE COURT:  Juror No. 14, Rose Kopanski.  Could you

21  pronounce your last name, ma'am, for me?

22         PROSPECTIVE JUROR:  Kopanski.

23         THE COURT:  Kopanski.

24         PROSPECTIVE JUROR:  Yes.

25  BY MR. PEQUIGNOT:

1   Q    Hi, Ms. Kopanski.  Are you married?  Do you have children?

2   A    I am married.  I have three grandchildren.

3   Q    What's your spouse's occupation?

4   A    He's a telemetry technician in the ER at Kennestone

5   Hospital.

6   Q    Has he ever been involved in any other specialties of

7   medicine or is that --

8   A    Well, when he was in the Navy, he served in Bethesda

9   Medical Center, so he did a lot of different things there.

10  Q    But since he's been in private practice, that's been sort

11  of the nature of his medical occupation?

12  A    And patient care, some patient care, but that wasn't his

13  forte.

14  Q    Do you have any other adults that live in your house?

15  A    Yes.  I have -- my eldest son lives with my husband and I.

16  Q    What are your sons' occupations?  You said you have three

17  sons?

18  A    I have a daughter and two sons.  My son that lives with

19  us, he works remotely.  He works on a -- in customer service

20  for a financial platform similar to PayPal.

21  Q    Okay.  What about your other children?  What are their

22  occupations?

23  A    My daughter is -- she works in accounting, and she works

24  remotely from home.  And then my son is an entrepreneur, and

25  he works in the film industry.

1  Q    What does he do in the film industry?

2  A    Mostly marketing, videos, and it could be political.  It

3  could be real estate.

4  Q    So like marketing videos for organizations or --

5  A    Like the most recent one was for a real estate company in

6  Virginia.  But he's also done some filming for campaigns

7  recently and over the years.

8  Q    Political campaigns?

9  A    Yes, political campaigns.

10  Q    What is -- what's your educational background?

11  A    I have a high school education and lots of continuing

12  education.  When technology came out, as a secretary I had to

13  learn a lot about technology, so I took a lot of courses at

14  Kennesaw State College and other places also.

15  Q    You're currently an executive assistant; is that right?

16  A    Yes.

17  Q    And office manager at Zeist Company.  What nature of

18  business is that company?

19  A    The Zeist Company is a private wealth management company,

20  and the family I work for also has a private foundation.

21  Q    The private foundation, does that have a -- is there a

22  particular --

23  A    Mission?

24  Q    -- mission.  Thank you.

25  A    Yes.  They concentrate on the underserved areas of Atlanta

1   in regards to youth and family services.

2   Q    Have you ever owned your own business?

3   A    No.

4   Q    Where would you say you get most of your news?  Internet?

5   TV?

6   A    Well, depending on how well our antenna works for the day,

7   it's usually the local news on 11, 5 or Channel 2.

8   Q    Do you read any newspapers?

9   A    Not generally.

10  Q    Do you use any social media platforms regularly?

11  A    Facebook and time to time Instagram.

12  Q    What do you do in your free time?  Like what are your

13  hobbies and interests?

14  A    I like to spend time with my family.  My husband and I, we

15  like to go wherever the water is, spend some long weekends on

16  St. George, and I enjoy photography, shelling.  Also research,

17  family genealogy, is one of my favorite things to do.

18  Q    You indicated that a close friend or relative was in a

19  law-related field.  Can you --

20  A    My best friend's daughter, whom I've known all of her

21  life, she's a paralegal at one of the law firms in Buckhead,

22  but I'm not sure which one.

23  Q    Do you happen to know what type of law she --

24  A    I think it's accident and injury.

25  Q    Are you involved in any organizations, social, civic,

1  political, religious?

2  A    No.

3  Q    Do you do any volunteer work?

4  A    I volunteer at Agape Youth and Family Services when they

5  have different events, like the backpack giveaway around

6  school time, their holiday Christmas store.  We try to do it

7  as a group effort in the office, so we volunteer together.

8  Q    What would you say is your primary form of entertainment?

9  Like do you watch television shows or do you watch movies?

10 A    I like to watch movies.  I like to watch documentaries.  I

11 like to read.

12 Q    Is there anything else you think is important for us to

13 know about you?

14 A    No.

15 Q    Is there anything you've heard so far today that would

16 lead you to believe you could not be a fair and impartial

17 juror in this case?

18 A    No.

19         MR. PEQUIGNOT:  That's all I have.

20         MR. SABBAK:  Thank you.

21         THE COURT:  All right.  Thank you.  We're going to go

22 ahead and take a recess, ladies and gentlemen.  We're going to

23 take a recess until 3:15.  That's a little more than 15

24 minutes.  That gives me a chance to talk with the lawyers a

25 little bit and then also give them a break.  If you'll again

1  leave your numbers in your seat, step out in the hallway, the

2  bathrooms are on both sides.

3        If anybody wants to go down to the first floor -- and

4  when I say the first floor, I mean LP.  There are some vending

5  machines down there, and if you want to bring a drink up with

6  you, that's fine.  I would ask if you do, though, you bring

7  one with a top as opposed to a can.  That way you mitigate,

8  you know, the chances of spilling.  And we'll see y'all at

9  3:15.  Thank you.

10        COURTROOM SECURITY OFFICER:  All rise.  This

11  honorable court stands in recess.

12        (Whereupon, the prospective jurors exited the

13  courtroom.)

14        THE COURT:  All right.  So let me -- all the jurors

15  are out; right?  So let me hear from the plaintiff any motions

16  to excuse for cause for the jurors that we've just talked to

17  which begin with Juror 6 and go through Juror 14.

18        MR. PEQUIGNOT:  Your Honor, if I can talk briefly

19  with co-counsel?

20        THE COURT:  Briefly.

21        (Brief Pause.)

22        THE COURT:  Yes, sir.  From the plaintiff?

23        MR. PEQUIGNOT:  Yes, your Honor.  Regarding 6, yeah,

24  we'd like to move to strike No. 6 for cause.  She expressed

25  her opinion about not being able to -- that people should

1  essentially take whatever somebody says about them online and

2  that they should have no recourse for that.  I tried to give

3  her an opportunity to indicate that she could nonetheless be a

4  fair and impartial juror in this case, and I believe her

5  response was pretty strident, that she'd maintain that

6  viewpoint regardless of the evidence in this case.

7          THE COURT:  I'm sorry.  What was that last statement?

8  You said that her response was --

9          MR. PEQUIGNOT:  She was strident that she would

10  maintain that viewpoint regardless of the evidence in this

11  case.

12          THE COURT:  All right.  Defendant's response?

13          MR. SABBAK:  She never said she couldn't be

14  impartial, Judge.

15          THE COURT:  What I wrote that she said -- and this is

16  the really short lady -- people say stuff about you.  You have

17  to shake it off and deal with it -- she did say deal with it

18  probably three or four different times -- because you can't do

19  nothing about it.  Didn't she say at the very end when one

20  side or the other, I don't remember who was questioning her,

21  that she could actually award damages if stuff wasn't true?

22          MR. PEQUIGNOT:  I believe that was the very next

23  potential juror.

24          THE COURT:  Right, and you were asking her --

25          MR. PEQUIGNOT:  I asked her that to clarify because

1  it seemed like she -- the next Juror, No. 7, was --

2         THE COURT:  We're talking about Juror 6.

3         MR. PEQUIGNOT:  Yeah.

4         THE COURT:  So anything that Juror 6 said couldn't

5  have been influenced by anything that Juror 7 said.

6         MR. PEQUIGNOT:  No, no, no.  I understand.  I was

7  just trying to clarify that I think that you're recalling the

8  response from No. 7.  No. 6 given the same opportunity

9  never --

10        THE COURT:  And Juror 7 never said she could be fair.

11 Juror 7 said she couldn't be fair.

12        MR. PEQUIGNOT:  I'm just recalling No. 7.  We went

13 back and forth.

14        THE COURT:  Yeah.  Juror 7 is the white lady who went

15 to Georgia.

16        MR. PEQUIGNOT:  Right.

17        THE COURT:  Who said that she couldn't be fair;

18 right?

19        MR. PEQUIGNOT:  No. 7, she --

20        THE COURT:  In fact, hold on a second.  Hold on a

21 second.  She said sometimes you just have to roll with

22 criticism.  She's a fan of the plaintiff.  She said she hoped

23 she could be fair, but then she also said she probably should

24 be excused -- well, I'm sorry.  I wrote that in parentheses

25 she probably should be excused for cause.  She's the one that

1  said -- questioned whether she could be fair; right?

2          MR. PEQUIGNOT:  Right.

3          THE COURT:  But not 6?

4          MR. PEQUIGNOT:  Not 6.

5          THE COURT:  Are you moving 7 too?

6          MR. PEQUIGNOT:  No.

7          THE COURT:  Well, how can you move 7 -- how can you

8  move 6 who never said she couldn't be fair, and you're not

9  moving on 7 who said she couldn't be fair?  Because she said

10  she likes your client?

11          MR. PEQUIGNOT:  I believe that 7 clarified her answer

12  that she had -- she both believed that lots of things said

13  online are untrue but that she -- my point about 7 is that she

14  was essentially, given the opportunity, said that given the

15  evidence, that she could be fair and impartial.

16          THE COURT:  That's not what 7 said at all.  She said

17  she couldn't be.

18          MR. PEQUIGNOT:  I'm sorry, your Honor.  I'm confused

19  about --

20          THE COURT:  So who are you moving to excuse?

21          MR. PEQUIGNOT:  Huh?

22          THE COURT:  Who are you moving to excuse?

23          MR. PEQUIGNOT:  6.

24          THE COURT:  The short African American lady --

25          MR. PEQUIGNOT:  Yes.

1          THE COURT:  -- who said she could award damages if
2    stuff weren't true?
3          MR. PEQUIGNOT:  Who said that she --
4          THE COURT:  She said that people need to toughen up
5    and roll with the punches, and there's not a lot you can do
6    about it but also said upon your question, not me and not the
7    defendant, said that she could award damages if someone is
8    saying something that's not true.
9          MR. PEQUIGNOT:  Your Honor, my recollection is that
10   she said repeatedly that there's nothing you can do about it
11   when somebody says something untrue about you online.
12         THE COURT:  Well, you misremembered it if that's what
13   you said.  She did say that she could award damages if someone
14   said something that wasn't true.  In fact, I think she used
15   the word "that lady" I believe she said.  But do you not
16   recall that was the last thing she said?
17         MR. PEQUIGNOT:  I don't recall her saying that, but
18   she may have said that.  I don't know.
19         THE COURT:  So are you also moving -- but you're not
20   moving on 6 who said -- I mean, come on.  I mean, look, don't
21   stand before me and make objections to remove just the people
22   that say stuff that you think is objectionable that maybe
23   don't like your client's position and those that do.  I mean,
24   you've got to be consistent or you have no credibility --
25         MR. PEQUIGNOT:  Your Honor, I'm sorry, but I think

1  what's happening is I got confused with 7 and another

2  potential juror.

3       THE COURT:  Yeah, you're talking maybe about

4  Ms. Zapata who said she could be fair, who spoke right after

5  the other who was juror number --

6       MR. PEQUIGNOT:  Yeah, I'm not defending against 7

7  because --

8       THE COURT:  Ms. Thompson.  Ms. Thompson is the one

9  that said -- who was from Bronx and was a fan of your client.

10  All right.  I'm just going to concentrate on No. 6.  All

11  right.  I heard what you said about 6.  I'm not sure that I

12  think that you fairly characterized what she said.  But what's

13  the defendant's response to No. 6, Olivia Anderson?

14       MR. SABBAK:  She said she could award damages.

15       THE COURT:  I'm sorry?

16       MR. SABBAK:  She said she could award damages.

17       THE COURT:  She did say that.  She said I will have

18  to listen to the evidence, is what she said.  Let me just say

19  this about Ms. Anderson:  Ms. Anderson may be the nicest

20  person I've ever seen in jury selection, polite, honest in

21  tone, in my estimation.  I have no doubt that she thinks that

22  people have to have thick skin because she said it so many

23  times, but that's not the standard.  That's not the standard

24  for cause.  Just because someone may have a predisposition for

25  a view of life that's different from a party's arguments

1  doesn't mean that they can't be fair.

2       And there's really nothing about her responses that

3  would say she's fair, unlike Juror No. 7, who the plaintiff

4  likes, who is a fan of the plaintiff.  And when I say

5  plaintiff, I don't mean necessarily you've talked about this

6  with your client.  I'm just referring to the plaintiffs and

7  defendants who basically said that the scale wasn't even

8  because remember that's when I used the scale of justice

9  thing.

10       There's nothing about 6 that I thought was biased

11  other than her just view of life and that people have to be

12  tough.  People should be tough; right?  I mean, I don't think

13  there's anyone that necessarily disagrees with that as a

14  general premise.  The question is what does that mean to them,

15  and we don't really know.  So while I would certainly have no

16  objection if the plaintiff excused Juror No. 6 as a

17  peremptory, I don't see a for-cause reason to exclude her, so

18  I'm going to overrule the objection to No. 6.  Does the

19  plaintiff have any other objections to any other jurors?

20       MR. PEQUIGNOT:  So No. 12, your Honor.

21       THE COURT:  Mr. Nissenbaum.  Do you want to state

22  your reasons?

23       MR. PEQUIGNOT:  This was the person who said again in

24  response to whether someone should have thicker skin.  And he

25  believed that, you know, basically people should accept

1    whatever is said about them online and that, you know, that

2    people should just accept it and move on.  I specifically

3    asked him the follow-up question whether if given the evidence

4    supported our client's allegations, whether he could be a fair

5    and impartial juror.  I believe his response was to the effect

6    that he believed that he could be.

7            THE COURT:  Well, that's not exactly what he said.

8    He may have even said it a little stronger than that.  What

9    does the -- does the defendant have any response to No. 12?

10            MR. SABBAK:  He said he was biased towards us.  I

11    don't know what else -- he was pretty clear.

12            THE COURT:  He did.  He said without context he's

13    biased towards the defendant, when placed in context he might

14    be less biased but still biased.  So what I'm hearing is the

15    plaintiff has moved on 12, and the defendant is not objecting.

16    So Juror No. 12 is removed for cause.  Any others from the

17    plaintiff?

18            MR. PEQUIGNOT:  No, your Honor.

19            THE COURT:  Any motions to excuse for cause from the

20    defendant?

21            MR. SABBAK:  Yes, your Honor.  Juror No. 7.

22            THE COURT:  Any objection to Juror No. 7 being

23    removed for cause from the plaintiff?

24            MR. PEQUIGNOT:  No, your Honor.

25            THE COURT:  Juror No. 7 is removed for cause.  Any

1  others?

2          MR. SABBAK:  Yes, your Honor, one more, Juror No. 10.

3  I would consider Ms. Mitchell's circumstances similar to

4  Mr. Nissenbaum's circumstances, Juror No. 12.  She indicated

5  she is a fan of the plaintiff.  She indicated that she assumed

6  before hearing anything that if it comes from a celebrity

7  gossip site, that it is not true.

8          THE COURT:  So do I and so do most people that read

9  celebrity gossip.  I mean, let's go old school and talk about

10  People Magazine or Us or some of the other knock-offs.  Does

11  that mean that someone that assumes that much of what they

12  would read in a celebrity magazine would be not true, would be

13  unfit if a celebrity then sues someone?

14          MR. SABBAK:  She wavered on being impartial.  She

15  said, yes, I could be impartial.  Then she said I couldn't be

16  impartial, back and forth.  She was wavering on that.  I know

17  she never gave a solid answer, but there was a lot of

18  wavering.  And so for someone who like she said assumes,

19  someone who's fan of the plaintiff, she wavered back and

20  forth.  I think that would weigh against her.

21          THE COURT:  So if she wavered back and forth, how did

22  she waver?  I could be fair, well, maybe I can't be fair, but

23  maybe I can be fair?

24          MR. SABBAK:  Could be impartial.

25          THE COURT:  Or impartial.  Same thing.  I could be

1    fair -- when plaintiff's question, I could be fair, impartial

2    and fair is the same thing, right, in this context?

3              MR. SABBAK:  Sure.

4              THE COURT:  And then you asked her some questions,

5    and she kind of said maybe, low tone of voice, well, maybe

6    not.  And then when the plaintiff asked her questions again,

7    she said she could be?

8              MR. SABBAK:  Yes.

9              THE COURT:  Yeah.  She's a good example about why

10   judges shouldn't ask questions, because I think whoever talked

11   to her last was going to get the response.

12             MR. SABBAK:  Exactly.

13             THE COURT:  But there's really nothing about her or

14   her tone, the way she presented herself, the things that she

15   said, that led me to believe that she would be prejudiced.  I

16   can understand why the defendants might strike her but not for

17   cause reasons.  And just like I'm leaving on Juror No. 6 that

18   the defendant objects to the objection, I'm going to leave on

19   Juror No. 10 as well unless the plaintiff agrees to take her

20   off.

21             MR. PEQUIGNOT:  We don't agree.

22             THE COURT:  So the plaintiff does not agree with the

23   objection.  The Court is going to overrule the objection and

24   leave Juror No. 10 on.  There's really no difference to me in

25   No. 10 and No. 11 for that matter.  I thought 10 and 11 were

1  essentially the same.  The only thing 10 didn't do, she didn't

2  get questioned quite as much by the defendant and she was a

3  little -- you know, she didn't show any inconsistency at all.

4  There's nothing about what 10 said and the way she said it,

5  which is an important part of my ruling.  I know that doesn't

6  really -- for the appellate courts isn't available to them,

7  but it is available to me, and I felt like she was being

8  honest when she responded that she could be fair.

9          And if we put this in context, if you assume that

10  someone is a fan of someone, you would assume that they'd want

11  to be on the jury and that they would be totally unequivocal

12  in their stated fairness so that they could stay on the jury,

13  and that's not what she did.

14          You were, you being the defense counsel, was asking

15  her some leading questions.  And, you know, it's kind of like

16  the question, well, isn't it possible that you might be

17  unfair?  And, you know, I guess that question asked to anybody

18  should be always responded to by saying, well, I guess it's

19  possible because anything is possible but my -- the way I

20  interpreted what she said is that she could be fair, and I

21  felt like she can be.  I don't think she'll be on the jury,

22  but I'm going to leave her in the pool for selection.  Any

23  other motions to excuse for cause from the defendant?

24          MR. SABBAK:  Thank you, your Honor.

25          THE COURT:  No?  Okay.  All right.  That leaves us

 1 | then with if we assume that we're going to also strike Juror
 2 | No. 5 for hardship, then that's going to leave us, I think,
 3 | with ten jurors, one, two, three, four, five, six, seven,
 4 | eight, nine, ten.  And we're going to qualify 16.  We need 16
 5 | jurors to get eight.  So probably that's where we're going to
 6 | end up, is with eight jurors.
 7 |        So we'll take a break for ten minutes from now,
 8 | ten-minute break, short break, and we'll see y'all back and
 9 | then we'll finish up with our selection.  I will, of course,
10 | call another recess at the end of the -- when I think we've
11 | gotten enough jurors questioned that will be beyond question
12 | and hear any objections you have.  And then we'll bring the
13 | jury back in again and begin selection.
14 |        MS. MATZ:  Your Honor, could I ask one clarifying
15 | question?
16 |        THE COURT:  Yes.
17 |        MS. MATZ:  At the first pretrial conference -- I have
18 | reread all the transcripts this weekend.  You said we each had
19 | three peremptory strikes.  When we met last week, you said we
20 | had two, so I just want to know --
21 |        THE COURT:  You have two because of -- I checked the
22 | federal rules.  The federal rules say you get three.  Okay.
23 | And then you get one strike for each two additional
24 | alternates.
25 |        MS. MATZ:  Got it.

```
1              THE COURT:  Is what the federal rules say.  So we're
2   only going to pick two alternates, so you'll get a fourth
3   strike.  So plaintiff gets four strikes.  Defense gets four
4   strikes.  We'll seat eight jurors.  So we'll be looking at the
5   first 16 jurors who have not been excused for cause, and
6   that's where our jury will come from.
7              MS. MATZ:  Thank you for the clarification, your
8   Honor.  I appreciate that.
9              THE COURT:  All right.  Thank you.
10             MR. SABBAK:  Thank you, Judge.
11             COURTROOM SECURITY OFFICER:  All rise.
12             (Brief recess.)
13             COURTROOM SECURITY OFFICER:  All rise.  This
14  honorable court is again in session.
15             THE COURT:  Thank you.  Y'all can be seated.  Y'all
16  can have a seat.  We'll wait.  All right.  So I mentioned to
17  y'all, indirectly at least when I was talking to the jurors,
18  that when I was 13, my dad was murdered, which is true, and I
19  was with my father the day that he died, most of the day, not
20  when he was killed.  But that made me a witness to the events
21  of that day because the person who killed him claimed that he
22  had been harassing them during that day.
23             To make a long story short, when the murder trial
24  happened -- there were a couple of trials.  But when the
25  murder trial happened, I was a witness in a small rural county
```

1  in middle Georgia and couldn't be in the courtroom.  Jurors

2  were -- the witnesses were sequestered.  And I was 14, I

3  think, when the trial happened, might have still been 13.  I

4  was 13 when he died.  But, in any event, at some point my mom

5  comes to get me to take me to see the judge.

6        And this is a rural courthouse.  I mean, in a small

7  county like where I grew up, the courthouse was the -- the

8  courtrooms on the top of the courthouse and all the county

9  offices are on the bottom.  And there was only one way of

10  access to the courtroom, and that was on the stairwell on the

11  outside of the building, two stairs that led to a landing that

12  led to a door to go inside.

13        And my mom said, yeah, the judge wants to see you.

14  I'm 13, 14 years old, and I was scared to death.  They take me

15  into this room with the prosecutor and the defense lawyers,

16  plural, and the judge who I happened to have known the judge,

17  a family acquaintance, who told me that a bailiff had seen me

18  trying to sneak a note to the jury.  As you were going up that

19  landing on the outside to go into the courtroom, there were

20  two windows.  One window was the judge's office, and one

21  window was the juror's room.

22        Another thing that we could figure out is that the

23  bailiffs, who were really older retired people, had seen me

24  pick a flake of paint off this old building where paint was

25  coming off, which I remember doing that, and thought it was a

1    white piece -- a note.  And it was near the window sill, and

2    maybe he thought I was trying to slip a note in.  There was

3    never a note found.  So, you know, it still was terrifying, if

4    you'd imagine.  And I'm bringing this up to illustrate this

5    story, and that is this:  I don't know if it's true or not,

6    but it's been reported, ma'am, are you -- the lady sitting in

7    the chair far left, are you a reporter?

8              UNIDENTIFIED WOMAN:  No, I am not.

9              THE COURT:  Who are you?

10             UNIDENTIFIED WOMAN:  I am just working with the

11   attorney's office.

12             THE COURT:  With whose office?

13             UNIDENTIFIED WOMAN:  The attorney's office.

14             THE COURT:  The attorney's office?

15             UNIDENTIFIED WOMAN:  Yes, sir.

16             THE COURT:  U.S. Attorney?

17             UNIDENTIFIED WOMAN:  Yes, sir.

18             THE COURT:  Okay.  It's been stated that you were

19   recording something.  Is that right?

20             UNIDENTIFIED WOMAN:  No, sir, I was not.

21             THE COURT:  Did you have your phone out?

22             UNIDENTIFIED WOMAN:  I did have it out but after we

23   took a break.

24             THE COURT:  Okay.  Well, like I said, I don't know if

25   it's true or not.  And I just told you my situation to

1  illustrate it, and so I'm assuming that it's not true.

2          UNIDENTIFIED WOMAN:  It is not.

3          THE COURT:  And I don't know that there's really been

4  anything that, you know, interesting that's necessarily

5  occurred today.  But if I find during the course of trial --

6  and there are some reporters that are here; right?  Some of

7  you are reporters?  At least one of you are.  If I find that

8  anybody has violated the United States court's rules to take

9  any photographs or record any of the testimony or any of the

10 arguments that are made during court, then I'll deal with it

11 harshly I'm just saying.

12         So, in any event, I'm glad I brought it up because,

13 you know, it was some misunderstanding as to who you might be,

14 and your phone was seen.  And the thought was maybe you were

15 recording.

16         UNIDENTIFIED WOMAN:  Yes.  Absolutely, no, sir, I was

17 not, and I would not disrespect --

18         THE COURT:  Well, I'm sorry that I have scared you by

19 standing up and looking at you, but I did tell my story;

20 right?  So there was some benefit, I guess.

21         UNIDENTIFIED WOMAN:  Still no disrespect, Judge --

22         THE COURT:  Okay.  Thank you.  Thank you.  All right.

23 Let's bring the jurors back in, and we will hopefully finish

24 in the next hour and a half or so.

25         (Whereupon, the prospective jurors entered the

1   courtroom.)

2          THE COURT:  Let me point out to the lawyers that when

3   we go to actually select the jury -- I'm not anticipating any

4   *Batson* issues, but after we select the jury, if either side

5   has a *Batson* issue, you need to alert me to that before we

6   announce the name of the jurors.  Okay?

7          MS. IZMAYLOVA:  Yes, your Honor.

8          THE COURT:  All right.  Ladies and gentlemen, thank

9   you.  We're going to continue with our voir dire.  I'll just

10  tell you that I still right now expect that we'll be done

11  sometime close to 5:00.  It may be a few minutes after that,

12  but my hope is to still get finished with our selection today.

13         Juror No. 15, Susan Richardson.

14         PROSPECTIVE JUROR:  Juror 15.

15  BY MR. PEQUIGNOT:

16  Q   Hi, Ms. Richardson.

17  A   Hello.

18  Q   Good afternoon.  Are you married?

19  A   Yes.

20  Q   What's your husband's occupation?

21  A   Chiropractor.

22  Q   Has he had any other occupations?

23  A   Geologist.

24  Q   That was --

25  A   Quite a jump, yes.

```
1   Q    How long has he been a chiropractor?

2   A    34 years.

3   Q    Do you have any children?

4   A    Yes.

5   Q    How many?

6   A    Son 39, daughter 33.

7   Q    And what are their occupations?

8   A    My daughter is now -- she's an executive assistant at the

9   CDC.  My son is a freelance graphic artist.

10  Q    Do you have any other adults that live in your house with

11  you?

12  A    My son lives with us.

13  Q    Have you lived in the Atlanta area --

14  A    Yes.

15  Q    -- all your life?

16  A    Since 1972.

17  Q    Can you describe your educational background.

18  A    I have a degree in journalism from Georgia Southern

19  University, no additional schooling after that.

20  Q    Any other type of educational programs, like evening

21  school or certifications?

22  A    No.

23  Q    So your occupation is listed as journal administrator.

24  What does that entail?

25  A    I'm a journal administrator for emerging infectious
```

1    diseases journal.  I work for a contracting company that has a

2    contract with the CDC for that journal.

3    Q    How long have you been working with that journal?

4    A    I'm going into my fifth year.

5    Q    And where were you before that?

6    A    Well, Coca-Cola as a merchandising materials manager.

7    Q    Are you a full-time employee?

8    A    Yes.

9    Q    You don't have any other jobs or occupations?  Part-time?

10   A    I'm only taking care of a disabled brother and a mother in

11   assisted living.  I'm POA for both of them.

12   Q    They live here?

13   A    Yes, and that's my hobby.

14   Q    Have you ever owned a business?

15   A    No.

16   Q    Where do you regularly get your news?

17   A    Fox News, WSB.

18   Q    Is that online or on TV or --

19   A    Television and radio.

20   Q    Do you use any social media regularly?

21   A    Facebook intermittently.

22   Q    What are your hobbies and interests outside of work?

23   A    Really just probably antiquing, reading.

24   Q    Do you belong to any organizations, like social, civil --

25   A    No, I don't.

1  Q   Do you do any volunteer work?

2  A   In the past it was Habitat for Humanity and did some work

3  with Canine Pet Rescue, but that was pre-pandemic.

4  Q   You had indicated that you have a close friend or relative

5  that's in the legal field?

6  A   I have a sister-in-law in Birmingham who is an attorney

7  and, let's see, I believe it's for an insurance company.  She

8  handles those cases.  My daughter was a paralegal for an

9  immigration law firm for about three years here locally,

10 Vazquez & Servi.

11 Q   You had also indicated that you had a close friend or

12 relative that was trained or employed in insurance business?

13 A   Well, I think I was thinking of my sister-in-law at the

14 time because she was working for that insurance company.

15 Q   And you had indicated that you had a close friend or

16 relative that had filed a claim or a lawsuit.  Can you --

17 A   Yes.  My mother and father filed a lawsuit against a

18 doctor for malpractice because that situation had led to my

19 brother's brain injury.

20 Q   Is there anything else that you think that the parties

21 should know about you?

22 A   This has been nagging at me, and I guess it's because of

23 the questionnaire when we were first given the notice about

24 working for the federal government and whether we did or not.

25 And I did not consider myself as an employee of the federal

1  government because I was working for a contractor.  I'm

2  employed by the contractor company itself who has the contract

3  with the CDC, and I just didn't -- you know, I didn't flag

4  that in that questionnaire.

5  Q   That's helpful.  Thank you for clarifying that.

6  A   Sure.

7  Q   Based on anything else that's been said today, is there

8  any reason why you think you couldn't be fair --

9  A   No.  I'd be fine.

10          MR. PEQUIGNOT:  That's all I have.

11          MR. SABBAK:  Thank you, Ms. Richardson.

12          THE COURT:  Thank you.  Juror No. 16, Chelsey

13  Rodriguez.

14          PROSPECTIVE JUROR:  Juror 16.

15  BY MR. PEQUIGNOT:

16  Q   Hi, Ms. Rodriguez.  Ms. Rodriguez, do you have any other

17  adults or children that live with you?

18  A   My husband and my son.

19  Q   Okay.

20  A   Well, my son is not an adult.  My husband.

21  Q   And what's your husband's occupation?

22  A   He is an engineer with Dell.

23  Q   What type of engineer?

24  A   Network security and administration.  He designs security

25  systems.

1   Q   Have you always lived in the Atlanta area?

2   A   Yes, except for one year where I lived out of state, but

3   the rest of my life I've been here.

4   Q   Can you describe your educational background.

5   A   I have a master's degree in special ed and behavior

6   analysis.

7   Q   Where did you get your degree?

8   A   Penn State.

9   Q   Have you attended any other educational programs aside

10  from that line of work?

11  A   Huh-uh.

12  Q   Can you tell us a little bit about your current

13  occupation.

14  A   I'm a board certified behavior analyst.  I work with

15  children with autism developing treatment plans.

16  Q   I assume you're a full-time employee then?

17  A   Uh-huh, I am.

18  Q   What about your parents?  What line of work were your

19  parents in?

20  A   My father works in construction, and he's a contractor.

21  He does like wallpaper, and my mom was a school cafeteria

22  lady.

23  Q   So where would you say you most often get your news from?

24  A   I don't watch or follow much news, honestly.  It's just

25  whatever I come across, so I may occasionally watch local news

1  on the TV, Channel 2, Channel 11.

2  Q    Which social media platforms do you use regularly?

3  A    I don't use anything regularly.  I occasionally use

4  Facebook.

5  Q    What would you say you use Facebook for?  Do you use it to

6  just keep up with friends or --

7  A    Yes, just keeping up with friends and family.

8  Q    What do you like to do in your free time?  What are your

9  hobbies and interests?

10  A    I read, and I spend a lot of time outside with my son.

11  Q    Are you involved in any organizations, like social, civil,

12  political, religious?

13  A    No.

14  Q    Do you do any volunteer work?

15  A    Not very recently.

16  Q    What about in the past?

17  A    In the past I've done working with children with special

18  needs and animal rescue.

19  Q    Is there anything else you feel like would be important

20  for the parties to know about you?

21  A    I don't believe so.

22  Q    Is there anything you've heard today that would cause you

23  to believe you might not be able to be fair and impartial?

24  A    No.  I don't believe so.

25            MR. PEQUIGNOT:  That's all I have.

```
 1            MR. SABBAK:  Thank you, Ms. Rodriguez.

 2            PROSPECTIVE JUROR:  Thank you.

 3            THE COURT:  Juror No. 17, Patricia Garcia.

 4            PROSPECTIVE JUROR:  Juror 17.

 5   BY MR. PEQUIGNOT:

 6   Q   Ms. Garcia, do you have any other adults that live in your

 7   household?

 8   A   Yes.  I've been married 43 years to my husband.

 9   Q   And what's your husband's occupation?

10   A   He's a real estate broker.

11   Q   Have you always lived in the Atlanta area?

12   A   My whole life.

13   Q   What about your husband?

14   A   He moved from Florida 50 years ago.

15   Q   Do you have any siblings that live nearby?

16   A   I have three siblings that live within an hour of each

17   other.

18   Q   What are their occupations?

19   A   Two of them are retired.  One of them is a bookkeeper with

20   a skilled nursing facility.

21   Q   And the two that are retired, what was their primary

22   occupation before retirement?

23   A   She was a bookkeeper for a computer software company, and

24   my brother retired from RCA.

25   Q   Can you describe your educational background.
```

1    A    I graduated high school.

2    Q    Here in the Atlanta area?

3    A    Yes '71, Columbia High School.

4    Q    Have you received any sort of other educational

5    certifications or --

6    A    No, sir.

7    Q    So it says that you're retired now.  What was your

8    occupation before retirement?

9    A    For 20 years I worked in a skilled nursing facility as a

10   bookkeeper.

11   Q    Were you always in that line of work as a bookkeeper?

12   A    Yes, punching numbers.

13   Q    You had indicated that you had a close friend or relative

14   that is in the law enforcement field.  Can you clarify that?

15   A    Yes.  I have a nephew that's with Hall County Sheriff's

16   Department for five years, a nephew in Fort Worth Police

17   Department for ten years, and my son works for Henry County

18   law enforcement for five years.

19   Q    Where do you typically get your news from?

20   A    I don't watch the news.  I find it depressing.

21   Q    Do you read the news?

22   A    I do not.

23   Q    What about social media?  Do you use any social media?

24   A    Never.

25   Q    How do you like to spend your free time?  What are your

```
 1  hobbies and interests?

 2  A    Reading, quilting, sewing, gardening, family.

 3  Q    Are you actively involved in any organizations, like a

 4  social, civil, political or religious organization?

 5  A    We've been members of our church for 28 years, and I am a

 6  supporter of a cancer support group.

 7  Q    Are you involved in any volunteer work?

 8  A    Other than the cancer support group, no.

 9  Q    Is there anything else you feel like is important for the

10  parties to know about you?

11  A    I don't believe so.

12  Q    Is there anything you've heard today that would cause you

13  to believe you might not be able to be impartial in this case?

14  A    No.  I believe I could be fair.

15            MR. PEQUIGNOT:  That's all.

16            MR. SABBAK:  Thank you, Ms. Garcia.

17            PROSPECTIVE JUROR:  Thank you.

18            THE COURT:  All right.  Thank you.

19            Juror No. 18, Nam -- I'm sorry.  You'll have to tell

20  me how to pronounce your name, H-u-y-n-h.

21            PROSPECTIVE JUROR:  Juror 18, my name is Nam Huynh.

22            THE COURT:  Huynh?

23            PROSPECTIVE JUROR:  Yes.

24            THE COURT:  Thank you.

25  BY MR. PEQUIGNOT:
```

1   Q    Good afternoon.

2   A    Good afternoon.

3   Q    Do you have any other adults that live in your household

4   with you?

5   A    Yes, my wife.

6   Q    What's her occupation?

7   A    She is a pharmacist.

8   Q    Do you have any children?

9   A    No.

10  Q    What's your educational background?

11  A    I graduated with a bachelor in genetics at UGA, and then I

12  went to PCOM or Philadelphia College of Osteopathic Medicine

13  and got my D.O. degree.

14  Q    What type of medicine do you specialize in?

15  A    Internal medicine.

16  Q    Have you always been in internal medicine?

17  A    Yes.

18  Q    You indicated that you have a close friend or relative

19  that's been trained in the field of psychology?

20  A    Yes.  One of my close friends is actually getting his

21  Ph.D. in psychology right now.

22  Q    Did you say your best friend?

23  A    No, just close.

24  Q    Close friend.  Where do you get most of your news from?

25  A    Mostly CNN, sometimes Fox.

1    Q    Do you read news on the internet?

2    A    Not so often.

3    Q    What about social media platforms?  Do you use any social

4    media?

5    A    Just Facebook.

6    Q    What do you use Facebook for?

7    A    Just to keep communication with my colleagues.

8    Q    How do you like to spend your free time?  Like what are

9    your hobbies and interests?

10   A    Well, I mean, before the pandemic was going fishing,

11   running, playing sports, but ever since the pandemic, not so

12   much.

13   Q    When you said internal medicine, is there any subspecialty

14   within that at all or is it just --

15   A    No.  It's basically I work at a hospital.  So we admit

16   patient, and we treat them for almost all kind of illnesses,

17   mostly cardiac related pneumonia, GI issues, so all the

18   internal organs.

19   Q    Got you.  Are you involved in any organizations outside of

20   work?

21   A    Nope.

22   Q    Are you involved in any volunteer work?

23   A    Before in college but not recently.

24   Q    What was the nature of the volunteer work?

25   A    It was a nonprofit organization that we worked for just to

1  take care of like the underserved patient, and then I also

2  volunteer at the hospice house.

3  Q   Is there anything else that you feel would be important

4  for the parties to know about you in this case?

5  A   Not that I can think of.

6  Q   And is there anything you've heard here today that would

7  cause you to believe you could not be impartial in this case?

8  A   Nope.

9           MR. PEQUIGNOT:  That's all I have.

10          MR. SABBAK:  Thank you, Doctor.

11          THE COURT:  No questions from the defendant?  I'm

12  sorry.

13          MR. SABBAK:  No questions, your Honor.  I'm sorry.

14          THE COURT:  Juror No. 19, Linda Bahan.

15          PROSPECTIVE JUROR:  Juror No. 19.

16  BY MR. PEQUIGNOT:

17  Q   Hi, Ms. Bahan.

18  A   Bahan.

19  Q   Do have any other adults living in your household?

20  A   Yes, my husband.

21  Q   And what's your husband's occupation?

22  A   Retired.

23  Q   What was he before retirement?

24  A   He was a sales representative.

25  Q   For what type of company?

1   A    For a vitamin company.

2   Q    Do you have any children?

3   A    No.

4   Q    Can you describe your educational background.

5   A    High school and a couple years of college.

6   Q    And what was your area of study in college?

7   A    I was going to be a physical education teacher.

8   Q    Have you taken any other educational classes,

9   certifications, anything you can think of?

10  A    No.

11  Q    So it indicates as your occupation retired office manager?

12  A    Yes.

13  Q    Where were you an office manager?

14  A    I worked with my husband.

15  Q    Was what that your own business?

16  A    No.  He was an independent representative, I guess, for a

17  larger company that's headquartered in Wisconsin.

18  Q    Have you held any other occupations?

19  A    Yes.  I was a sales -- inside sales representative for a

20  telecommunications company here in Atlanta.

21  Q    Anything else?

22  A    No.  I did that for 17 years.

23  Q    Have you ever owned your own business?

24  A    No.

25  Q    Where do you get your news from?

1  A   Mainly from Fox News.

2  Q   Do you get any news on the internet?

3  A   Yes.  I read that on the computer sometimes.

4  Q   Any sites in particular that you --

5  A   No, just when you pull up Google.

6  Q   What about any radio shows that you listen to regularly?

7  A   No, just listen to the radio in the car.

8  Q   Like music?

9  A   No, mostly talk radio.

10 Q   Talk radio?

11 A   Uh-huh.

12 Q   Any shows in particular or any personalities in

13 particular?

14 A   Whatever the station, 750, 750 am. I don't know.  Whatever

15 my husband had the -- has it tuned to I just listen to it.

16 Q   So I guess is it sports or is it politics?

17 A   I guess it's politics.  I mean, it's just between the

18 house and the grocery store, so it's not exactly a long period

19 of time.

20 Q   Are there any social media platforms that you use

21 regularly?

22 A   No.  I have just a presence on Facebook for family and

23 friends.

24 Q   What do you like to do in your free time?  Like what are

25 your interests?

1   A   I swim and do yoga.

2   Q   Are you involved in any organizations?

3   A   No.

4   Q   Do you do any volunteer work?

5   A   No.

6   Q   I think you had responded in response to the general

7   questions that you had served on a jury before?

8   A   Yes.

9   Q   Can you tell me what type of case that was.

10  A   I think you would call it a criminal case.  It was just in

11  May of last year in Cobb County, and it was domestic violence.

12  So I don't know how you'd describe that.

13  Q   Is there anything else that you feel is important for the

14  parties in this case to know about you?

15  A   No.

16  Q   Is there anything that's been said today that would tend

17  to lead you to believe that you could not be impartial as a

18  juror in this case?

19  A   No.

20          MR. PEQUIGNOT:  That's all I have.

21          MR. SABBAK:  Thank you, ma'am.

22          THE COURT:  Juror No. 20, Lorrie O Bearden.

23          PROSPECTIVE JUROR:  Juror No. 20.

24  BY MR. PEQUIGNOT:

25  Q   Hi, Ms. Bearden.

1   A    Hi.

2   Q    Sorry about the repetitive nature of these questions.  I'm

3   sure everyone is rolling their eyes at me at this point.

4   Unfortunately, this is the nature of this process.  Do you

5   have any other adults that live in your house with you?

6   A    I do, my husband and my daughter.

7   Q    How old is your daughter?

8   A    She's 33.

9   Q    And what are their occupations?

10  A    My husband works in quality assurance for Oracle, and my

11  daughter works in food service.

12  Q    I'm sorry.  What was that?

13  A    She works in food service.

14  Q    Do you have any parents or siblings that live nearby?

15  A    Not close by.

16  Q    Can you describe your educational background.

17  A    Sure.  I have a doctorate in educational leadership.

18  Q    Where is your degree from?

19  A    My undergrad is from Auburn University.  My master's is

20  from West Georgia, and my specialist and doctorate degree are

21  from Kennesaw State University.

22  Q    Our form just says you're currently employed in education

23  for Fulton County Schools.  Can you elaborate?

24  A    Sure.  I'm a principal at an elementary school.

25  Q    I assume you've always been involved in education, like

1   all your occupations post graduate have been in education?

2   A    Post graduate, yes.

3   Q    In response to the general questions, you had indicated

4   that a close friend or relative had filed a claim or a

5   lawsuit.  Can you clarify that?

6   A    That is correct.  My husband and his brother own a

7   corporation, and they own several buildings that they lease.

8   And they've had to file lawsuits against maybe someone who

9   didn't pay their rent or someone who broke their lease.  It

10  would be that type of thing.

11  Q    You also indicated that you had testified in a trial or a

12  deposition?

13  A    I have.  My father was involved in a class action suit

14  mesothelioma.  And I was called, I guess, in a grand jury or

15  something like that.  It was like to be a juror, but it

16  wasn't.  It wasn't the actual trial, so I wasn't sure how to

17  respond to that.  So I apologize if I misled.

18  Q    No, I appreciate the clarification.  Where would you say

19  you typically get your news from?

20  A    I tend not to follow news.

21  Q    You said principal.  Did you say lower school?

22  A    Elementary school, K through 5.

23  Q    Do you use any social media platforms regularly?

24  A    I do not.

25  Q    So what are your hobbies and interests?  What do you do

1   when you're not at work?

2   A   I spend a lot of time with my family.  I'm very fortunate

3   my granddaughters live in the same neighborhood, and so I

4   spend a lot of time outside and playing with them.

5   Q   Are you involved in any organizations outside of work?

6   A   I am not.

7   Q   Do you do any volunteer work?

8   A   As a part of my role, we do a lot of community service

9   projects for local charities, so that would be the extent of

10  my volunteer work.

11  Q   Is there anything else you feel is important for the

12  parties to know about you?

13  A   I do not.

14  Q   Anything you've heard today that would lead you to believe

15  you could not be fair and impartial in this case?

16  A   I have not.

17          MR. PEQUIGNOT:  I don't have anything else.

18          MR. SABBAK:  Thank you, Ms. Bearden.

19          THE COURT:  Juror No. 21, Patricia Eidson.

20  BY MR. PEQUIGNOT:

21  Q   Hi there.  How do you pronounce your last name again?

22  A   Eidson.

23  Q   Eidson.  Ms. Eidson, do you have any other adults living

24  in your household with you?

25  A   My sister.

1   Q    Is your sister retired as well?

2   A    No.  She works as a business manager for a vet.

3   Q    Can you describe your educational background.

4   A    Just graduated from high school and just things I've

5   picked up or learned when I was working.

6   Q    Have you always lived in the Atlanta area?

7   A    No.  I just moved here in '82, came from Charlotte, North

8   Carolina.

9   Q    It has as your occupation retirement marketing manager.

10  Where were you a marketing manager?

11  A    It was BellSouth, which is now AT&T.

12  Q    During your career were you always working in marketing?

13  A    Pretty much.

14  Q    Sounds like there might have been some exceptions.

15  Anything noteworthy?

16  A    No.  When I first started, I was a mail clerk pushing a

17  mail buggy around the business office when I was 17.  So a

18  couple years later I moved into management.  I was really good

19  at what I did.

20  Q    You had indicated in response to the general questions

21  that you previously served on a jury?

22  A    Several juries, yes.

23  Q    Can you tell me about those cases, just the general

24  nature.

25  A    One was a civil case.  It was an insurance situation.  And

1  the last two were criminal cases.  The very last one was a

2  murder case.  That's where I was a foreman or foreperson.

3  Q   And the insurance case, do you recall the nature of the

4  claims?

5  A   I really don't.  It was long ago.

6  Q   And you were the foreperson?

7  A   Yes.

8  Q   For?

9  A   The murder case.

10  Q   One of the cases?

11  A   Yes.

12  Q   Where would you say you get most of your news from?

13  A   Probably the internet, from the browser I use.  They kind

14  of capitalize everything worldwide, financial, local news and

15  stuff, so from that.

16  Q   Do you use any social media platforms regularly?

17  A   Just Facebook to keep up with my animal rescue groups and

18  stuff.

19  Q   What are your primary hobbies and interests now that you

20  have more time?

21  A   I spend a lot of time with my kids.  I've got some four

22  legged kids I spend a lot of time with, volunteer -- before

23  Covid I was volunteering at the library.  I did the children's

24  reading hour, story telling and stuff, but mainly just

25  reading, and I have some artistic endeavors that I'm working

1   on.

2   Q    When you say artistic endeavors, can you be more specific

3   in that.

4   A    Well, what I do mainly is people that have pets, I get

5   with them and get pictures of the animal and stuff, and then

6   what I do is cut out a plywood board that has the animal's

7   outline.  And then I take, anybody that knows this, decoupage

8   pictures of the animals and stuff on there, so the whole board

9   is covered.  So that's all.  It's kind of neat.

10  Q    Are you involved in any organizations, church or political

11  organizations, civil --

12  A    No.

13  Q    Are you involved in any volunteer work other than what you

14  had just mentioned?

15  A    Well, one thing I've done, since Covid and everything, is

16  we have quite a few seniors in our neighborhood, and my sister

17  and myself and a couple of other neighbors, what we do is work

18  with them to run errands, pick up groceries, do odd jobs

19  around the house, the yard, and those kind of things.

20  Q    Is there anything else you feel is important for the

21  parties to know about you?

22  A    No.

23  Q    Is there anything you've heard today that would lead you

24  to believe that you could not be impartial in this case?

25  A    No.

1          MR. PEQUIGNOT:  That's all I have.

2          MR. SABBAK:  Ms. Eidson, thank you, ma'am.

3          THE COURT:  Juror No. 22, Glenn Jones, Glenn David

4    Jones.

5          PROSPECTIVE JUROR:  Juror No. 22.

6    BY MR. PEQUIGNOT:

7    Q   Hi, Mr. Jones.

8    A   How are you doing?

9    Q   Do you have any other adults that live with you in your

10   house?

11   A   Just my baby mama.

12   Q   I'm sorry?

13   A   My baby mama.

14   Q   What's her occupation?

15   A   IT support at Apple.

16   Q   Did you grow up here in Atlanta?

17   A   No.  I grew up in Memphis.

18   Q   How long have you been here in the Atlanta area?

19   A   About five years.

20   Q   Do you have any parents or siblings that live nearby?

21   A   Yeah, I've got siblings.

22   Q   Do they live here in the Atlanta area?

23   A   Yeah, east Atlanta.

24   Q   What are their occupations?

25   A   My sister work for Google.

1  Q   Can you describe your educational background.

2  A   High school, some community college.

3  Q   What was your area of study in community college?

4  A   I didn't get that far.

5  Q   Have you attended any other educational programs?

6  A   Yeah.  I did cyber security certification at Georgia Tech.

7  Q   What's your current occupation?

8  A   So I sell handmade soaps and skincare products.

9  Q   Is that your own business or --

10 A   Yes, sir.  It's my business.

11 Q   Do you have any employees?

12 A   My kids, but they don't count, off the books.

13 Q   How old are your kids?

14 A   I've got a 5-year-old and 14.

15 Q   Where do you usually get your news from?

16 A   Outside.  I look around, see what I see, hear what I hear.

17 You know what I'm saying.

18 Q   So no newspapers --

19 A   I try to stay away from them.  I do like a once-a-month

20 type of check, make sure we're ain't fixing to die or

21 something like that.

22 Q   What social media platforms do you use regularly?

23 A   I'm an Instagram type of dude.

24 Q   Would you say you're pretty active on Instagram?

25 A   I really try to post.  You know what I'm saying.  I try to

1  stay away from it, you know, reading because, you know, it

2  will take your whole day up real quick.

3  Q   What would you -- how would you describe the nature

4  generally of your posts?  Is it to promote your business or

5  for friends or --

6  A   So, yeah, promote my business, and I also do music,

7  promote music on there too.

8  Q   Are you a musician yourself?

9  A   Yes, sir.

10  Q   How would you characterize your music?

11  A   Some super groovy beats, you know, something you want to

12  put on when you're chilling with your lady friend or, you know

13  what I'm saying, laid back, kicking it, PM music.

14  Q   So when I ask you about hobbies and interests, I'm

15  assuming I'm going to hear music?

16  A   Say it again?

17  Q   I said hobbies and interests.  Would that include your

18  music?

19  A   Good smoke and drink and philosophical conversation with

20  the fellow dredges of society, you know.

21  Q   Are you involved in any organizations?

22  A   No.

23  Q   Do you do any volunteer work?

24  A   No.

25  Q   So I'm not sure if I wrote this down correctly, but I

1  think you said in response to a general question, that you had

2  been trained or employed in law enforcement?

3  A    Oh, no.  You said security officer too so --

4  Q    Okay.  Yeah, I did definitely say that.  So you were a

5  security officer for --

6  A    Yeah.  I did security work for like three years.

7  Q    For what type of business?

8  A    Security officer in Blackstone, which is Kaiser

9  Permanente, so healthcare.

10  Q    In response to the question whether you or a close friend

11  or family member is in the entertainment industry, you said

12  yes.  Is that just you or is that somebody else?

13  A    Oh, yeah, that's just me and all my friends, no family.

14  Q    Do you listen to our client's music?

15  A    If it come on, I ain't going to turn it off.

16  Q    In response to the question of whether you think in

17  general that people should have thicker skin when it comes to

18  things said about them online, you said yes to that.  Can you

19  elaborate.

20  A    I mean, online ain't really a safe place, you know.  There

21  are a bunch of strangers entitled to their opinions and what

22  have you, so I think if you're going to, you know, take the

23  good, you've got to take the good with the bad, part of the

24  game.

25  Q    I thought you used the word "criticism."  Would you

1  distinguish between criticism and statements that are untrue.

2  A    I mean, a criticism could be true.  You know what I'm

3  saying.  I don't think there is a difference between criticism

4  and truth.  I think it's a difference between slander, you

5  know what I'm saying, and true criticism.

6  Q    Yeah.  Well, I guess what I was getting to is when you

7  said people should have thicker skin, it's one thing to say

8  someone should have thicker skin with respect to a criticism

9  or an opinion about them, like their music is terrible --

10  like, that's an opinion about her music -- but what I'm trying

11  to distinguish is statements that are made about her that are

12  statements of fact that are untrue.  Would you -- do you still

13  believe that someone should have a thick skin if people are

14  saying things online that are untrue about them?

15  A    One more time?  What's the question?

16  Q    So in response to the question where you said you thought

17  in general people should have thicker skin, I understood sort

18  of your response to be alluding to sort of criticism, like

19  somebody says your music is not very good, like, that's just

20  somebody having an opinion about your music; right?

21  A    Okay.

22  Q    So that's sort of one category where you could say people

23  should have thick skin about that.  What I'm trying to

24  distinguish is this separate category, which is something

25  that's not an opinion.  It's a statement about that person

1   that is false, that is untrue.  So in that situation do you

2   still feel like somebody should have thick skin?

3   A   Well, I think it absolutely shouldn't, you know what I'm

4   saying, bother you unless it, you know what I'm saying, cause

5   other things to happen to you.  Know what I'm saying?  Like if

6   somebody say something about you and it's not true --

7          THE COURT:  Hold on a second.  That mike is not on,

8   so we're having a little bit of a hard time hearing.  I don't

9   know if y'all are.

10         MR. SABBAK:  Yeah.

11         THE COURT:  I think we're having the same problem

12  with that mike we were having earlier with this one.  So give

13  us just a second.  Let's swap our mikes out.  We're winding

14  down, I'll tell everybody, fairly soon here.

15         That one is not on either?

16         COURTROOM DEPUTY:  I have batteries.  We might just

17  need to change the batteries.  Can we use this while we swap

18  it?

19         THE COURT:  Tap that again.  Mr. Jones, just talk a

20  little bit louder if you can.  So do you remember the

21  question?

22         PROSPECTIVE JUROR:  The question was information

23  versus criticism?

24         MR. PEQUIGNOT:  Essentially, yes.

25         PROSPECTIVE JUROR:  And should somebody have thicker

1  skin because somebody said something that's not true?

2        MR. PEQUIGNOT:  So when you responded that you

3  thought people should have thicker skin, I'm basically asking

4  if you think that with respect to both defamatory statements,

5  which is what you used, and criticism.

6        PROSPECTIVE JUROR:  Could defamatory statements take

7  away from --

8        THE COURT:  I'm sorry.  We're still having a little

9  bit of trouble.  Why don't you come over here and just grab

10  the mike and hold it up to you.  Yes.

11        PROSPECTIVE JUROR:  Like right here?  Going to need

12  some leave.  All right.  All right.  Mike check.  All right.

13  Now I'm comfortable, feel good.

14        Yeah, I would say that if the statement that's made

15  toward somebody is false and it take away from that person

16  opportunities that they would have if that false statement had

17  not been said, then, you know what I'm saying, I don't think

18  it's an issue for thick skin.  I think, you know what I'm

19  saying, it's an issue for damages.

20        MR. PEQUIGNOT:  Okay.  So if the evidence in this

21  case would support our client's allegations that certain

22  statements were published about her that are untrue and have

23  caused her harm in that situation, if the evidence supported

24  that, you could rule in favor of our client?

25        PROSPECTIVE JUROR:  If it was quantifiable, yeah.

```
1              THE COURT:  I'm sorry.  If it was what?

2              PROSPECTIVE JUROR:  If it was quantifiable, yeah.

3              THE COURT:  The damages or the --

4              PROSPECTIVE JUROR:  The damages.

5   BY MR. PEQUIGNOT:

6   Q   Can you just -- quantifiable, what do you mean by that

7   term?

8   A   I mean if you say that you missed the opportunity,

9   opportunity was, you know, X amount of this and it was a

10  direct result of this action, then, you know, I could support

11  that.

12             THE COURT:  So let me just state this:  Of course, I

13  don't know what is going to happen in this case, and I don't

14  know what the jury will decide.  And I'm not commenting on the

15  evidence in any fashion because I'm not even really fully

16  apprised of what all the evidence in this case will be.  But,

17  generally speaking, if it were to be found that a person was

18  defamed either with libel or slander -- and those things are

19  different.  One is in writing and the other one is spoken.  So

20  they both make up what we call defamation.  But if it's found

21  that someone is injured by defamation, one form of damages

22  might be general damages that are determined by the

23  enlightened conscience of the jury.

24             PROSPECTIVE JUROR:  Yes, sir.

25             THE COURT:  It's not math or anything necessarily for
```

1  that type of damage, and so I guess the question I need to ask

2  you is if you believe that the evidence in this case were to

3  demonstrate that the plaintiff was injured by defamation, what

4  is your opinion about the type of damages that aren't math

5  based but are just based on whatever the jury thinks is fair

6  in light of the circumstances?

7         PROSPECTIVE JUROR:  Like how do I feel about it?

8         THE COURT:  Yeah.  I mean could you award those types

9  of damages if you felt the evidence supported them.

10        PROSPECTIVE JUROR:  Yeah, if the evidence supported

11  it, yeah.

12        THE COURT:  Anything else that you have, sir, to ask?

13        MR. PEQUIGNOT:  No.

14        THE COURT:  Okay.  Anything from the defendant?

15        MR. SABBAK:  Mr. Jones, thank you, sir.

16        THE COURT:  All right.  Thank you, Mr. Jones.

17        All right.  Juror No. 23, Claire Stratton.  And I'm

18  not sure if it's working.  Can you talk loud?  Okay.  That's

19  good.  Let's try that.  And I'm sorry about our technology

20  problem.

21  BY MR. PEQUIGNOT:

22  Q   Hi, Ms. Stratton.

23  A   Hi.

24  Q   Are there any other adults that live with you?

25  A   Yeah, my husband.

1   Q    What is your husband's occupation?

2   A    He is a benefits consultant.

3            THE COURT:  I don't know if she heard you.  Can you

4   say that one more time.

5            PROSPECTIVE JUROR:  Yeah, employee benefits

6   consultant.

7            THE COURT:  Just yell at us.  Okay.  Don't worry

8   about it.

9            PROSPECTIVE JUROR:  Do you want me to put my mask on?

10           MR. PEQUIGNOT:  I'm comfortable.

11           MS. MOORE:  I'm comfortable.

12  BY MR. PEQUIGNOT:

13  Q    Who is his employer?

14  A    Gallagher.

15  Q    Do you have any children?

16  A    No.

17  Q    Do you have any parents or siblings that live nearby?

18  A    Yes.  My parents live nearby.

19  Q    Did you grow up here in Atlanta?

20  A    Yes.

21  Q    What occupation are your parents in?

22  A    My dad is an executive recruiter, and my mom manages bonds

23  for certain companies.

24  Q    Can you describe your educational background.

25  A    Yeah.  I went to high school in Miami of Ohio.  I

1  graduated with communications degree, and then I got licensed

2  in insurance and got my commercial lines coverage specialist

3  designation.

4  Q    Have you attended any other educational programs like --

5  A    No, just those licenses.

6  Q    So you're an insurance broker also at Gallagher?

7  A    I am.

8  Q    And is there a particular type of insurance that you --

9  A    I'm all property and casualty lines.  I'm a producer which

10  is a sales person, so I'm calling on companies trying to do

11  full insurance packages.

12  Q    I'm sorry if you've said this already, but have you always

13  been an insurance broker, always worked in that field?

14  A    Yes, since post college.

15  Q    When you -- in response to the general question when you

16  said you and a close friend and relative were in the insurance

17  business, that's you and your husband.  Anybody else?

18  A    I have a cousin and an uncle also in insurance, also

19  property and casualty.

20  Q    Where do you get your news from?

21  A    Do you know what the Morning Brew is?  It's an email that

22  I get every morning.  It just kind of summarizes.

23  Q    Is that more local or national?

24  A    National.

25  Q    Do you use any social media regularly?

1  A   Facebook, Instagram.

2  Q   Would you say one more than the other?

3  A   Pretty similar.

4  Q   What are your hobbies and interests?  What do you do in

5  your free time outside of work?

6  A   Hang out with my family, friends, walk, tennis.

7  Q   Are you involved in any organizations, religious or

8  other --

9  A   Not really.  I go to church but not involved besides

10  going.

11  Q   Are you involved in any volunteer work?

12  A   Occasionally, Atlanta Community Food Bank, Arthritis

13  Foundation.

14  Q   Is there anything else you feel like the parties should

15  know about you?

16  A   I don't think so.

17  Q   Is there anything you've heard today that would lead you

18  to believe you could not be fair and impartial in this case?

19  A   No.

20          MR. PEQUIGNOT:  That's all I have.

21          MR. SABBAK:  No questions.  Thank you, ma'am.

22          PROSPECTIVE JUROR:  Thanks.

23          THE COURT:  All right.  Thank you.  If I can have the

24  lawyers approach, please.  Thanks.  I'll put this on the

25  record afterwards.

```
 1              (Whereupon, there was an off-the-record discussion.)
 2              THE COURT:  All right.  We need to go through a few
 3   more jurors.  So Juror No. 24, Cameron Sapp.
 4              PROSPECTIVE JUROR:  Juror 24.
 5   BY MR. PEQUIGNOT:
 6   Q   Hi, Mr. Sapp.
 7   A   How are you doing?
 8   Q   Mr. Sapp, do you have any other adults living in your
 9   house with you?
10   A   Just my wife.
11   Q   And what's your wife's occupation?
12   A   Clinical nurse manager for a hospital here in Atlanta.
13   Q   Is there a particular specialty of medicine that she's
14   focused --
15   A   Cardiac.
16   Q   Cardiac?
17   A   Yeah.
18   Q   Do you have any children?
19   A   Yes, a 19- and a 15-year-old.
20   Q   Is your 19-year-old in college or school?
21   A   Yes, sophomore in college, Augusta University.
22   Q   It's a son or daughter?
23   A   Son.
24   Q   What is he studying?
25   A   Cyber security engineering.
```

1  Q    Can you describe your educational background.

2  A    Bachelor's degree in mass communications, Dillard

3  University, an HBCU in New Orleans.

4  Q    Did you grow up in New Orleans?

5  A    No, sir, just went to school, as far away as possible.

6  Q    Did you grow up here in Atlanta?

7  A    No.  I'm originally from Rochester, New York.  Moved here

8  to Atlanta in 2015.

9  Q    Was that right after school?

10  A    No.  I actually graduated school in '06, so quite a few

11  years after then decided to move.

12  Q    Can you just help us understand your current occupation.

13  A    So I'm an instructional designer, slash, trainer for an

14  automotive company here in Atlanta.

15  Q    So like what type of training?

16  A    So I create content, build content for trainers.  So let's

17  say you're a new hire coming into a company, right, you need

18  to be trained on the processes and procedures of that specific

19  company.  I build the content, create the content, PowerPoint,

20  Adobe, and then I train the trainers.  And then they train the

21  agents or the new hires that are coming into the company.

22  Q    So are you training them to be salespersons or --

23  A    No, just training -- I mean, let me say this.  Customer

24  service training.  I'm sorry.  I should have said that.

25  Q    And that's full-time I assume?

1  A    Yes, sir.

2  Q    Have you always been involved in this type of work or have

3  you had other occupations?

4  A    Yeah.  I just got in this role I want to say probably

5  about four or five months ago.  It was a promotion for me.

6  Prior to that I was a manager at the automotive company as

7  well as I was a manager for a loan servicing company in

8  Atlanta as well.

9  Q    Where do you get your news?

10  A    So similar to like one of the other ladies, I use this app

11  called Smart News, which kind of gives you local, national,

12  government news; sometimes Facebook, Instagram here and there.

13  Q    Do you use any other social media other than Facebook and

14  Instagram?

15  A    LinkedIn.

16  Q    Would you say you're a frequent user of social media?

17  A    Not really frequent.  I might check it a couple of times a

18  day maybe, not like my wife.

19  Q    How do you like to spend your free time outside of work?

20  A    Some people might not think this is a free time, but I'm

21  actually a coach for the Atlanta Hawks.  When I say coach, I'm

22  a manager.  And there's a neighborhood that I run called Make

23  a Moment, and that's actually something I actually like to do.

24  I like to work out as well.  I've become a post Covid chef, if

25  that makes sense but, yeah.

1  Q    I think a lot of us have tried to become post Covid --

2  A    There you go.  That's what I should have said.

3  Q    Are you involved in any organizations?

4  A    Through my company we have an organization called MB Night

5  where we do different cultural events, whether it's in the

6  Atlanta area volunteering.  That's pretty much it.

7  Q    I was going to ask about volunteer work.  So is that sort

8  of -- is there any other type of volunteer work that you've

9  been involved with?

10  A    Habitat for Community, Food Bank.  That's probably about

11  it.

12  Q    In response to the general questions, you had indicated

13  that you have a close friend or relative that's in law

14  enforcement or some related field?

15  A    Yeah.  One of my cousins, he actually lives in Milton,

16  Florida.  He's a cop in Milton, Florida.

17  Q    You also indicated that you have a close friend or

18  relative who's trained in the field of psychology?

19  A    Yes, a church member I go to church with, not a close,

20  close friend, but a friend that I know, attend church with,

21  yes.

22  Q    You also indicated that a close friend or relative had

23  filed a claim or a lawsuit?

24  A    This is actually my father-in-law.  This was from many

25  years ago, probably about 15 years ago.  My wife told me that

1  he took an insurance company to court and actually won.

2  Q   You had indicated that you or a close friend or family

3  member was or is a blogger or social media personality?

4  A   I have a good friend in Rochester, New York who does

5  social media personality.  He's not, you know, like super

6  famous but, you know, got a couple thousand followers.

7  Q   What's the nature of his content?

8  A   He just does skits, just funny comedic skits really.

9  Q   You had indicated that you followed some celebrity gossip

10 accounts?

11 A   The Shade Room, probably about the only one.

12 Q   Is there anything else you feel like the parties should

13 know about you?

14 A   No.

15 Q   Is there anything you've heard today that would cause you

16 to believe you might not be able to be fair and impartial in

17 this case?

18 A   No, sir.  I can be fair.

19        MR. PEQUIGNOT:  That's all I have.

20        MR. SABBAK:  Thank you, Mr. Sapp.

21        THE COURT:  All right.  I think that's going to end

22 our questioning.  That gives us 20 jurors to select from.

23 We're going to actually pick 10 jurors, and some of you may be

24 going 20, wait a minute, we've gone through Juror No. 24, so

25 that just can't be.  But the Court has excluded the following

1  jurors based on comments that were made during our jury

2  selection as well as argument of counsel and some requests

3  made by the jurors themselves.

4         Juror No. 4 is excused from those that we've

5  questioned.  Juror No. 5 is excused.  Juror No. 7 is excused,

6  and Juror No. 12 is excused.  So unless you are those four

7  jurors, 4, 5, 7 and 12, and you've been questioned, so up

8  through the last Juror No. 24, then you're not going to be

9  selected for the trial.

10         We called in double the jurors that we needed because

11  in a case involving, you know, a high profile party and when

12  you throw on top of that the Covid surge that we've suffered

13  through the last month and a half, it's just really unknown

14  how many folks responding it's going to take to be able to

15  pick a jury.  But our jury is going to come from our first 24

16  jurors minus the 4 jurors whose names I've called out.  The

17  rest of you, the 4 that I've excused from the 24 that we've

18  questioned and the others who did not get questioned will be

19  released from jury service in this case.

20         You will still have to continue to check online or by

21  phone, however you have to check in every day, to see if

22  you're called in until your two weeks of jury service is up.

23  I'm guessing those two weeks started last Monday and perhaps

24  go through this week, but I'm not positive about that.  This

25  trial was originally going to start last week, but we pushed

1   it off a couple of days.  But whatever your jury summons says,

2   you go by that.  You'll need to continue to check in every day

3   to see if they need you to come in tomorrow.  I don't think

4   there's going to be another trial starting this week, but I'm

5   not positive.  So don't take me for the gospel on that.

6   Continue to check in.

7          Jurors 1 through 24 minus the 4 jurors' names who

8   I've called, I'm going to ask you to step outside for about 10

9   minutes while I allow the lawyers to look over their notes.

10  We're then going to bring you back in, and we're going to pick

11  our jury.  And then if you're not selected, you'll be free to

12  go like everyone else.

13         So just to be clear, Jurors 1 through 24 except for

14  Jurors No. 4, 5, 7 and 12 take a ten-minute break, and then

15  line up back outside.  The rest of you will be excused for the

16  day -- I've just been told that if you're not picked for this

17  jury, your service is over, so you will not continue to need

18  to check in at all.  You're just done.  Thank you very much

19  for your time today.  I know it's been a long day for all of

20  you.  Jurors 1 through 20, except the 4 excused, line back up

21  outside in ten minutes.  Thank you.

22         COURTROOM SECURITY OFFICER:  All rise.

23         (Whereupon, the prospective jurors exited the

24  courtroom.)

25         THE COURT:  All right.  Here's so what you're going

1    to do.  You're going to look at the list of the first 24

2    jurors.  We will mark off the 4 jurors who've been excused.

3    We will then circulate the list between counsel's table,

4    plaintiff-defendant, plaintiff-defendant, back and forth.

5    Each time the table comes to you mark down who was just struck

6    by the opposing side and then pick another person to strike

7    off the list.  You'll be looking at the first 24.  Four will

8    be struck already.

9              And when we get finished, after each side has

10   exercised their five strikes, then there will be 10 people

11   left that will not be struck.  Technically four alternates,

12   the last four alternates, are going to serve regardless.

13   Okay.

14             COURTROOM DEPUTY:  18 has an issue they want to

15   address with you.

16             THE COURT:  Too late.  Too late.  18 should have

17   brought it up during selection.  It's too late.

18             (Whereupon, there was a recess and then prospective

19   jurors entered the courtroom.)

20             THE COURT:  If everybody will just have a seat in

21   your regular spot.  All right.  So the way this selection is

22   going to work is that there's a list that's going to be

23   circulated by the clerk between the plaintiff's table and the

24   defendant's table, and each time the list goes -- and you can

25   go ahead and start Jennifer -- each time the list goes back

1  and forth each side will essentially strike a name off the

2  list of 20 of you that remain.

3        So to say we pick a jury is really a misnomer.  We

4  don't pick the people that serve on the jury.  They're going

5  to be able to strike names off the list.  Under federal law a

6  lawyer or side can strike a name off the list for any reason,

7  even a bad reason, as long as it's not a discriminatory

8  reason.  They can't strike you based on your race or sex or

9  national origin or sexual orientation or anything like that.

10 But they can strike you based on your job, if they don't like

11 your job, they think -- some jurors they may think are more

12 susceptible to believe their side of the case than the

13 other's -- that's probably the best example I can give you --

14 or some experience that you expressed during the voir dire.

15       So once they have completed that process and assuming

16 there's not any issues that arise in this selection process,

17 we'll then name the ten of you who are selected.  And at that

18 point in time I'm just going to ask the ten of you that are

19 selected to go over -- or who are not struck to go over and

20 have a seat on the left side in the benches over there.  We're

21 going to quickly disperse.  But the court security officers

22 are going to take you down to the 17th floor where we'll be

23 trying the case and show you where you will return in the

24 morning or at lunch tomorrow, actually not in the morning.

25       I'm assuming that everybody has got your, at least

1  for today, you've got your parking validated.  And then every

2  day that you come for those of you that are picked you will,

3  you know, get your parking tickets validated so that you don't

4  have to pay for parking.  We'll be finished in just a few

5  minutes, and then we'll let you know the outcome.

6            (Brief recess.)

7            THE COURT:  Any *Batson* issues from the plaintiff?

8            MR. PEQUIGNOT:  No, your Honor.

9            THE COURT:  Any *Batson* issues from the defendant?

10            MR. SABBAK:  No, sir.

11            THE COURT:  All right.  Ladies and gentlemen, again,

12  as I call your name out and your number, if you will go and

13  have a seat over here on the left side of the courtroom or my

14  right side just so that the lawyers can look at you to make

15  sure we've -- that I've called out the right names, then we'll

16  shortly be done for the day.

17            Juror No. 2, Kiplyn Lewis; Juror No. 9, Timothy

18  Dorsey; Juror No. 13, John Dukes; Juror No. 14, Rose Kopanski;

19  Juror No. 15, Susan Richardson; Juror No. 16, Chelsey

20  Rodriguez; Juror No. 17, Patricia Garcia; Juror No. 20, Lorrie

21  Bearden; Juror No. 21, Patricia Eidson; Juror No. 24, Cameron

22  Sapp.

23            All right.  Is this the jury as selected by the

24  plaintiff?

25            MR. PEQUIGNOT:  Yes, your Honor.

```
1              THE COURT:  Is this the jury as selected by the
2    defense?
3              MR. SABBAK:  It is, your Honor.
4              THE COURT:  So for the ten of you that weren't
5    selected, you know, I'm not sure whether you wanted to be or
6    not.  I mean, this was a case obviously that would be a lot
7    more interesting than a lot of cases that come before the
8    Court, and so if you're disappointed, I do feel some empathy
9    for you.  I think it would have been fun for you if service
10   was something that you were interested in.
11             We appreciate you being here today, and thank you.
12   And if you want to check back in with us in a couple of weeks,
13   we'll certainly let you know how the case turned out.  It
14   probably will be in the news anyway, so you'll be able to
15   figure it out.  Thank you very much, and so y'all are
16   dismissed.
17             (Whereupon, the prospective jurors exited the
18   courtroom.)
19             THE COURT:  All right.  Counsel, if y'all will have a
20   seat for just a second.  Ladies and gentlemen, I want to just
21   reiterate what I told you yesterday -- it seems like
22   yesterday.  It's been a long day; right?  What I said earlier
23   today about no newspaper, no social media, particularly
24   internet-based stuff, stay away from anything related to this
25   case.
```

```
 1              I want you to think of it this way too.  You're going
 2    to be with us for about two weeks.  You're going to hear a
 3    lot.  You're going to see a lot.  You're going to have an
 4    informed opinion at the end of the case about what you think
 5    should happen, hopefully conformed by the law, and also what
 6    you think about the facts.  No one that you could talk to
 7    outside of court is going to know what you know because
 8    they're not going to be here, and I don't care if it's press
 9    that's casually covering the article -- I mean casually
10    covering our case or not.  They're not going to hear and see
11    everything, but you are going to hear and see everything.
12              It's also not their responsibility to have to make a
13    decision.  So when you've got the weight of the
14    responsibility, then how you view things is somewhat different
15    than if you're just a casual observer.  And one of the things
16    that TV shows about law have made -- the affect that it's had
17    on our society that's not in my opinion a really good one is
18    that it's made experts out of all of us because we all have
19    had an opportunity, if we are so inclined to watch TV shows in
20    the last 20, 30 years or longer about law, and so we've kind
21    of become in some ways set in our beliefs about what should
22    happen and how things should happen and what should have been
23    done, et cetera.
24              A good example is a criminal case.  I mean, people
25    have been so conditioned by the scientific things that occur
```

1  in criminal cases about fingerprinting and forensics that they

2  expect that to happen in every case, and, quite honestly, it

3  happens in a very small percentage of criminal cases.  Most

4  cases are solved by old fashioned policing, you know, talking

5  to people and trying to figure things out, but yet jurors have

6  this expectation of what they think should be the evidence

7  based on what they've seen on TV.  So if you start talking to

8  people about the case, then they're going to bring their own

9  inherent biases into the case without having heard the

10  evidence.

11          And the other thing that Americans are is we're real

12  opinionated.  We tend to offer our opinions unsolicited,

13  myself included -- and, you know, I will not offer you my

14  opinion in this case because it's my job not to do that -- but

15  just in general conversation.  And, again, those opinions will

16  not have the same legitimacy as yours since those people who

17  would be offering opinions would not have really heard what

18  you heard.

19          So it's important not to talk about the case with

20  your family.  Obviously, there are going to be people

21  interested that you know that you're sitting on a case of such

22  a high profile nature as this.  And it's okay to tell people

23  that, if someone asks from your family or otherwise, that

24  you've been selected for this case.  But don't discuss the

25  facts of the case at any point in time until the case is over

1    with anyone, and don't allow anyone to discuss it with you.

2            If anyone were to try to discuss the case with you

3    improperly, then it would be your duty to let me know that by

4    letting the court security officer know or letting the court

5    personnel know at an as soon as possible moment so that I

6    could try to prevent anything from happening that would cause

7    us to lose this trial and have to start over.

8            We have a day invested today, but as time goes on

9    we're going to have more and more time invested.  And I'm sure

10   you share the concern or will as the case goes on that I have,

11   that the case be tried one time and not more than one time,

12   not punting this to someone else to decide.  The lawyers have

13   decided, based on the jurors that were summoned, that you're

14   the ten best people to try this case, and so let's keep it

15   that way and be -- have fidelity to the oath that you will

16   take and the promise that you've made to be fair and impartial

17   by not allowing any external influence to come into your

18   sphere at all.

19           You're going to return tomorrow.  I ask if you'll

20   return to the jury room outside of Courtroom 1705, which is

21   the courtroom where we'll try this case -- that's my

22   courtroom -- that you return tomorrow by noon.  I'm going to

23   ask the lawyers to return tomorrow about 11:00 a.m., and we'll

24   discuss any legal issues that we have at that time.

25           When you get here tomorrow at noon, we will have

1  opening statements.  I will give you some preliminary jury

2  instructions.  Then we'll have opening statements, and then

3  we'll immediately begin with the testimony.  As I said this

4  morning, we'll go to approximately 5:00 o'clock, and then

5  we'll adjourn for the day.  We'll take several breaks, at

6  least two, maybe three during the course of the afternoon.

7       For the rest of the week we will be meeting on

8  Tuesday, Wednesday, Thursday.  We will not be meeting on

9  Friday.  I've got a prior set doctor's appointment to take my

10 wife for some medical diagnostic testing on Friday, and then

11 Monday is a federal holiday; right?  Monday is MLK Day, so we

12 will not be meeting on MLK Day.  So you'll have a four-day

13 weekend, and then we'll come back on Tuesday.

14      So please let your employers know, if you have people

15 that you need to inform, that you've been picked for the

16 trial, that it's going to take this week.  It's likely to take

17 all of next week, and it very likely will go into the next

18 week.  I just don't know how far.  Of course the case could

19 end at any time.  You just never know because things can

20 happen, but that's the best estimate I have of the schedule

21 that we'll be operating on.

22      I won't be working on anything else.  I'll have no

23 other hearings or anything like that in any other kind of

24 case.  All my other work will be pushed aside.  This case will

25 take priority for everything that I'm working on at this point

1   in time.

2           Do you have any questions of me from the jurors about

3   our schedule or our general procedures that we'll be using?

4   Keep your badges with you.  I know they're just paper, but

5   wear them tomorrow.  I'm assuming you all came in in the

6   basement area today through the gulch, the loading dock area.

7   Tomorrow one of the court security officers, Ricky, who was

8   here this morning -- he gets here early every day -- he will

9   probably meet y'all there to kind of speed you through that

10  process.  And then you'll -- from there you'll come up to the

11  17the floor to the jury room that you are about to be taken

12  to.  So if there's nothing else, I hope you have a nice

13  evening.  Yes, sir.

14          THE JUROR:  Regular meet time will be 9:30?

15          THE COURT:  Regular time except for tomorrow will be

16  you'll arrive at 9:30.  We'll take a break in the lunchtime

17  hour somewhere, 12:00, 12:30, and then we'll end at 5:00.

18          THE JUROR:  Thank you.

19          THE COURT:  Okay.  All right.  I'll see you tomorrow

20  at noon.  Thank you very much.

21          (Whereupon, the jurors exited the courtroom.)

22          THE COURT:  All right.  Anything else we need to talk

23  about today?

24          MS. MOORE:  Go Dawgs.

25          THE COURT:  All right.  Go Dawgs.  We'll see y'all

1  tomorrow.  Thank you.

2          MS. MATZ:  Actually, your Honor, there is one thing.

3  I was going to ask if we're going to argue motions tomorrow

4  morning, do we have any idea if I can know what it's about?

5  Can I have a copy?

6          MS. IZMAYLOVA:  I'm going to file it as soon as I

7  can.

8          THE COURT:  It's 5:20.  You'll have it to them by

9  7:00 o'clock?

10         MS. IZMAYLOVA:  Yes, sir.

11         MS. MATZ:  Thank you, your Honor.

12         (Whereupon, the proceedings were adjourned at 5:23

13  p.m.)

14                              -  -  -

15

16

17

18

19

20

21

22

23

24

25

```
 1                     REPORTERS CERTIFICATE

 2

 3

 4          I, Wynette C. Blathers, Official Court Reporter for

 5   the United States District Court for the Northern District of

 6   Georgia, with offices at Atlanta, do hereby certify:

 7          That I reported on the Stenograph machine the

 8   proceedings held in open court on January 10, 2022, in the

 9   matter of BELCALIS MARLENIS ALMÁNZAR v. LATASHA TRANSRINA KEBE

10   and KEBE STUDIOS LLC, Case No. 1:19-CV-01301-WMR; that said

11   proceedings in connection with the hearing were reduced to

12   typewritten form by me; and that the foregoing transcript

13   (Volume I of X, Pages 1 through 208) is a true and accurate

14   record of the proceedings.

15          This the 27th day of February, 2022.

16

17

18

19                            _____

20                        /s/ Wynette C. Blathers, RMR, CRR
                               Official Court Reporter

21

22

23

24

25
```