```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF GEORGIA
 2                          ATLANTA DIVISION


 3


 4   BELCALIS MARLENIS ALMÁNZAR,     )
                                     )
 5              Plaintiff,           )
                    v.               )  CIVIL ACTION
 6                                   )  FILE NO. 1:19-CV-01301-WMR
     LATASHA TRANSRINA KEBE and      )
 7   KEBE STUDIOS LLC,               )
                                     )  JURY TRIAL
 8              Defendants.          )
     _____)  VOLUME II OF X
 9


10


11   -------------------------------------------------------------

12            BEFORE THE HONORABLE WILLIAM M. RAY, II

13               TRANSCRIPT OF PROCEEDINGS

14                    JANUARY 11, 2022

15   -------------------------------------------------------------

16


17


18       Proceedings recorded by mechanical stenography
            and computer-aided transcript produced by

19

20            WYNETTE C. BLATHERS, RMR, CRR
                 Official Court Reporter
21                1714 U.S. Courthouse
                75 Ted Turner Drive, SW
22                Atlanta, Georgia  30303
                     (404) 215-1547

23


24


25
```

```
 1   APPEARANCES:

 2   For the Plaintiff:        SARAH M. MATZ
                               Attorney at Law
 3                             Adelman Matz, P.C.
                               1173A Second Avenue
 4                             Suite 153
                               New York, New York  10065
 5
                               LISA F. MOORE
 6                             WILLIAM A. PEQUIGNOT
                               Attorney at Law
 7                             Moore Pequignot, LLC
                               887 West Marietta Street
 8                             Suite M-102
                               Atlanta, Georgia  30318
 9
     For the Defendants:       OLGA IZMAYLOVA
10                             SADEER SABBAK
                               Attorneys at Law
11                             Sabbak & Izmaylova, LLP
                               1875 Old Alabama Road
12                             Suite 510
                               Roswell, Georgia  30076
13

14

15

16

17

18

19

20

21

22

23

24

25
```

**INDEX TO EXAMINATIONS**

**WITNESS**                                                    **PAGE**

LATASHA TRANSRINA KEBE

    Cross-Examination By Ms. Matz                          78

**INDEX TO EXHIBITS**

**P L A I N T I F F ' S   E X H I B I T S**

|  |  | IDENTIFIED | ADMITTED |
|---|---|---|---|
| 61 | Screenshot of video entitled "Exclusive:  Cardi B's Ex-Friend Alleges... | 99 | 99 |
| 312 | Instagram Post from @unwinewithtasha | 109 | 109 |
| 314 | Instagram Post from @unwinewithtasha | 97 | 97 |
| 317 | Instagram Post from @unwinewithtasha | 106 | 106 |
| 517 | Cease and Desist Letter | 104 | 104 |
| 519 | Video entitled "Cardi B Jumped in My DM... | 113 | 113 |
| 524 | Video entitled "Exclusive Tasha K Leaks Private Call... | 135 | 135 |
| 532 | Video entitled "Cardi B Disrespectful... | 85 | 85 |
| 534 | Video entitled "Exclusive: Cardi B's Ex-Friend Alleges... | 93 | 93 |
| 585 | Video entitled "Actual Proof Cardi B Knew her Ex-Roommate... | 123 | 123 |

```
1                    Tuesday Morning Session

2                      January 11, 2022

3                        11:23 a.m.

4                         -  -  -

5                  P R O C E E D I N G S

6          COURTROOM SECURITY OFFICER:  All rise.  United States

7  District Court for the Northern District of Georgia, Atlanta

8  Division, is now in session, the Honorable Judge William M.

9  Ray II presiding.

10         THE COURT:  Thank you, sir.

11         COURTROOM SECURITY OFFICER:  Please be seated and

12 come to order.

13         THE COURT:  All right.  Good morning.  Sorry I'm a

14 little bit late, but I hope y'all understand the

15 circumstances.  It wasn't that I wasn't up, and it's not like

16 I had too much to drink last night because I didn't.  And I

17 was up early, but when it comes to Georgia winning a

18 championship, that doesn't come around that often.  So I was a

19 little bit slow getting going, so I apologize for keeping you

20 waiting.

21         I see that I've got a defendant's written exhibit

22 list.  Is there one for the plaintiffs as well?

23         MS. MATZ:  Yes, your Honor.  May I approach, your

24 Honor?

25         THE COURT:  Sure.  When y'all need to give me things,
```

1  if you'll just give them to Ms. Lee.  Because of logistics

2  it's just easier.  Did the plaintiff file a response last

3  night to the motion filed by the defendants?

4          MS. MATZ:  No, your Honor.

5          THE COURT:  Okay.  It was late.  I know y'all were

6  busy.  So let's just for the record to reflect, this is the

7  second day of the trial.  It's going to be a shorter day

8  today.

9          But, in any event, I read the plaintiff's motion last

10  night during the first half when things weren't going so well

11  for Georgia.  So I did read it and I want to ask -- I

12  certainly want to hear the defendant's -- the plaintiff's

13  response to it.  But, Ms. Izmaylova, so just -- I didn't go

14  back and look at your motion in limine From earlier.  You were

15  wanting, as part of the motion, to keep out everything

16  including the original letter sent by plaintiff?

17          MS. IZMAYLOVA:  I'm sorry, your Honor?

18          THE COURT:  You were wanting to keep out everything

19  originally, including the letter sent by the plaintiff to the

20  defendants --

21          MS. IZMAYLOVA:  I can read it exactly how it was

22  written if your Honor would like.

23          THE COURT:  Well, if you could just sort of -- I

24  mean, I don't need you to read it to me, but just, generally

25  speaking, was your aim to keep out everything, the plaintiff's

1    letter to you, your response?  When I say you, the pronoun

2    you, I'm referring to the parties.  But the defendant's

3    response to that letter as well?

4         MS. IZMAYLOVA:  As well as the -- the whole entire

5    thread, the thread of that conversation.  Like, it started

6    with the plaintiff sending their retraction letter and then my

7    client's response to that and then the plaintiff's attorney's

8    response to my client.  That was the -- that's what I meant by

9    email correspondence between our client and plaintiff's

10   counsel.

11        THE COURT:  And originally did you argue that the

12   reason was because it was a part of an offer in compromise?

13        MS. IZMAYLOVA:  Correct.  I said that the whole

14   conversation should not be admitted because it was all kind of

15   settlement negotiations.

16        THE COURT:  Well, okay.  Now, does the tort of

17   defamation require as a presuit requirement that there be some

18   demand for retraction?

19        MS. IZMAYLOVA:  The only thing that I know in the

20   statute is that if -- it matters as far as punitive damages

21   are concerned if, you know, plaintiff is going to ask for

22   punitive damages, they can use evidence of the fact that they

23   sent a retraction request and whether or not that was, you

24   know, followed or not followed.

25        THE COURT:  So unless it's -- if that's true -- and

 1    I'm not saying it's not.  I'm just -- I don't have defamation

 2    suits every day, so I just want to make sure I understand the

 3    parameters.  If a requirement for punitive damages being

 4    authorized is -- let me back up and say it this way, not a

 5    requirement.  If a factor about whether or not punitive

 6    damages are authorized is whether or not the plaintiff asked

 7    for a retraction and didn't receive one and your contention

 8    then is that the offer or the demand for a retraction is an

 9    offer in compromise, then how would you ever get that into

10    evidence?

11         MS. IZMAYLOVA:  Your Honor, no, I meant like -- I'm

12    not saying that -- we're not going to object to that for the

13    purposes of the punitive damages.  We would stipulate that she

14    received the retraction -- a demand to retract it.  What I'm

15    saying is once that was sent, that's what started off the

16    conversation about, you know, settlement negotiations.  That's

17    when the email started going back and forth.  So we're not

18    trying to keep it out so that the plaintiffs cannot present

19    the fact that they sent the demand to retract.  The letter in

20    and of itself, we would stipulate that she received that, but

21    that's what kicked off the settlement conversation.

22         THE COURT:  The party doesn't have to stipulate to

23    anything; right?  I mean, like, for example, one side, if they

24    don't want something coming in, can't pretermit the opposing

25    party's introduction of evidence by simply saying that we

1  stipulate or we'll stipulate to that.  Now, I'm not saying

2  that it doesn't happen sometimes.  I can give you a good

3  example.

4       In a criminal case where there are -- the best

5  example is it's illegal under federal law to possess a gun if

6  you've been convicted of a felony, under federal law and under

7  state law in most places too.  And so the government has the

8  obligation to prove prior convictions, and so typically what

9  happens is that defendant and the government stipulate to the

10 prior conviction so that the government doesn't introduce the

11 conviction itself, which can be pretty aggravating if it's a

12 very serious underlying conviction.

13      That is typically done, but there are due process

14 issues there because of the unique nature that criminal law

15 has and the fact that someone has been convicted of a crime,

16 the prejudice that's inherent in that.  I would think in the

17 context of slander and libel or defamation generally, that it

18 is pretty standard for demand letters for retractions to be

19 introduced.

20      MS. IZMAYLOVA:  Your Honor, here's the -- my

21 preference is this.  The only thing that was said or sent was

22 that demand letter itself.  That's not objectionable, and that

23 would not be -- you know, that would be admissible.  I'm not

24 even -- the demand letter is not the issue in and of itself.

25 I only mentioned it because that's what -- that's the reason

1  why the email communications began.  So if they --

2        THE COURT:  Wait a minute.  Wait a minute.  What part

3  of it then of the chain if you're -- so are you saying you

4  don't have a problem with the demand letter coming in?

5        MS. IZMAYLOVA:  No.

6        THE COURT:  Okay.  What do you have a problem with?

7  With your response coming in?

8        MS. IZMAYLOVA:  My client's response -- basically the

9  communications via email that she was having between herself

10 and the plaintiff's attorney.

11       THE COURT:  All right.  Give me just a second.  Okay.

12 Jennifer, I'm looking on the drive.  You said you put the --

13 in the drive today?

14       COURTROOM DEPUTY:  Uh-huh.

15       THE COURT:  The renewed motion, what's the docket

16 number?

17       MS. IZMAYLOVA:  I didn't file it, your Honor, because

18 it's confidential communication.

19       THE COURT:  I'm looking in the wrong thing.  Hold on

20 a second.

21       COURTROOM DEPUTY:  It's in the main folder.

22       THE COURT:  You have a copy?  Thank you.  Thank you.

23 I'm speaking to the defense counsel.  Do you recognize that

24 within what you've labeled as Defendant's Exhibit 3 to your

25 motion for reconsideration, there are admissions made by the

1  defendant that are certainly relevant in this lawsuit about

2  what she did and did not know about the things that she, the

3  defendant, was publishing?

4         MS. IZMAYLOVA:  I read the email, yes, sir.

5         THE COURT:  So you don't think that's admissible?

6         MS. IZMAYLOVA:  I don't think the whole communication

7  is admissible because it is part of discussions about

8  settlement negotiations.

9         THE COURT:  Well, you're telling me that if someone

10  makes a -- if we assume for a moment it's settlement

11  negotiation -- and that's a pretty broad interpretation that

12  the defendant applies to this letter -- but even so, that if

13  within that if there's an admission made that goes to an

14  element of the defense that has been charged, that that

15  renders the admission inadmissible?

16         MS. IZMAYLOVA:  Correct.

17         THE COURT:  What's your law?  What law do you have

18  that would say that?

19         MS. IZMAYLOVA:  I mean --

20         THE COURT:  I guess I'm specifically saying that's

21  your logic.  I get that.  But do you have any case law that

22  would say that if in the course of negotiation, if we say

23  that's what this is, that if someone makes a critical

24  admission against interest about the facts that are relevant

25  to the legal dispute, that the admission against interest

1    about those facts is inadmissible because it's a settlement

2    discussion?  I mean, if you don't have any cases, just say you

3    don't.

4          MS. IZMAYLOVA:  No, I mean, I don't.  I'm trying to

5    process what your Honor says to see if I can think of an

6    argument that's legitimate to state that.  But I was just more

7    so saying in looking at Defendant's Exhibit 3 and 4 together,

8    because it was both the communications from my client to them

9    and them to my client, it's very clear that this was all talks

10   during settlement negotiations.  And so that was the motion to

11   reconsider, to exclude the whole thread of the conversations.

12         THE COURT:  All right.  Anything else you'd like to

13   say about your motion before I ask Ms. Matz to respond?

14         MS. IZMAYLOVA:  I'm sorry?

15         THE COURT:  Anything else you'd like to say about

16   your motion before I ask Ms. Matz to respond?

17         MS. IZMAYLOVA:  No.  I would just ask the Court to

18   consider the full communications because that was the whole

19   point, was that all of the communication was not -- the first

20   hearing, for some reason part of the response, the plaintiff's

21   counsel's response, was not presented to the Court.  So I just

22   wanted the Court to view the communication as a whole and

23   determine whether it was or was not, you know, communications

24   about settlement because I think that it is.

25         THE COURT:  All right.  Thank you.  Ms. Matz, your

1  response?

2          MS. MATZ:  Yes.  Thank you, your Honor.  So the first

3  thing is, just to take you back to the first pretrial

4  conference, you actually looked at both the demand letter

5  to -- the demand for retraction that was sent to defendant.

6  It was not an offer of compromise.  It's actually -- under

7  Georgia law a plaintiff cannot even seek punitive damages.

8  It's not a factor.  They cannot even seek punitive damages

9  unless they send a demand for retraction, and it is not taken

10  down within seven days.

11          So the original demand letter was not an offer of

12  compromise.  Nowhere in that letter did it say if you take

13  down the videos, we're good.  There was no offer of

14  compromise.  It wasn't marked under Rule 408.  It basically

15  said under Georgia law we're giving you this notice that you

16  need to take them down, and she responded.  And when your

17  Honor looked at these two communications last time, you ruled

18  this isn't an offer of compromise.  It's admissible.  It's

19  coming in.  It touches a lot of different things, the

20  allegations, et cetera.

21          I'd like to point out a couple of other things.

22  Also, there is no new evidence here.  All of these

23  communications that we're talking about, Ms. Izmaylova saying

24  there are more full versions of them, are actually on our

25  exhibit list.  They had them.  They've had them for years.

1  They were produced in discovery in October of 2020 and they

2  actually --

3         THE COURT:  Hold on a second.  So we've got to deal

4  right here right now with the casual conversations that happen

5  with defense counsel.  Throughout this case most of these

6  discussions have been by Zoom.  But when the opposing counsel

7  is making statements, and sometimes when defense counsel is

8  making statements, sir, you always want to chime in, and you

9  want to say things.  That's not way the way it's going to

10 work.  There's a notepad on your desk, and if you want to

11 communicate to your co-counsel, you write out a note to her.

12 But I'm not going to tolerate you speaking when I'm trying to

13 listen to someone else speak.

14        I understand there's a need to communicate, but

15 writing is sufficient.  And if when Ms. Matz is finished, if

16 you want to consult with Ms. Izmaylova before she responds,

17 fine.  Just say I need a chance to confer.  But this casual

18 conversation that goes on between the two of you is not

19 professional in a court of law when there's proceedings

20 because it interrupts those proceedings.  So let's just nip

21 that in the bud, and let's not have that happen again.  All

22 right?

23        MR. SABBAK:  Understood, your Honor.  Yes, sir.

24        THE COURT:  All right.  Thank you, sir.  Thank you,

25 ma'am.

1           MS. MATZ:  Thank you, your Honor.  I'm sorry.  I

2     forgot where I was -- discovery.  Thank you.  I appreciate

3     that.  We produced all of this in this discovery, and I'd

4     actually like to bring one other thing to the Court's

5     attention that actually didn't come up at the last hearing.

6     It kind of did.  At the last hearing when they made their

7     motion, the defense made their motion to preclude settlement

8     communications, they did not attach or refer to any specific

9     Bates numbers or exhibits.

10          And at the last conference when we were talking about

11    this, I said to the Court, I presume this is what they're

12    talking about, and I made an assumption.  And I apparently

13    made a bad assumption because last night I went back and

14    checked the exhibit list and their objections to it.  They

15    didn't actually even raise this objection to either of the

16    exhibits that your Honor is looking at.  There was no

17    settlement objection raised in the pretrial conference when

18    all the objections were due.

19          So from our perspective, in addition to there being

20    nothing new to actually reargue here because they had every

21    opportunity -- this was their motion to exclude.  They should

22    have known what exhibits they were talking about.  They had

23    all of them.  They had every opportunity to make this argument

24    before, and they didn't.  So, you know, there shouldn't be a

25    reargument when there's truly nothing new, and the standard

1  for new evidence is that somebody did have it or with

2  reasonable diligence they couldn't have discovered it, and

3  they don't meet that standard.

4       Also, just to make this point, the motion is also

5  late under the local rules.  The local rules of this court say

6  the motions for reconsideration are supposed to be filed

7  within 28 days, and I believe that the last pretrial

8  conference was maybe November 7th or November 8th.  And I

9  apologize I don't remember the exact date, your Honor.  But,

10  you know, from that perspective it's waived.

11       But I think those are all reasons that you wouldn't

12  even have to consider this motion or entertain it, but at the

13  end of the day, I don't think it actually qualifies as a

14  settlement communication in the first place.  The initial

15  letter we sent was not a settlement offer, and her response

16  also wasn't one.

17       THE COURT:  So there's no question when the initial

18  letter was sent, that the plaintiff was considering litigation

19  as a means of enforcement, but it's also clear that it wasn't

20  a settlement offer.  In fact, if you look at the response that

21  came from the plaintiff's counsel to the defendant's

22  counsel -- excuse me -- to the defendant in response to the

23  communication, to me the only proper way to interpret that is,

24  okay, you withdraw or retract the statements that you've made

25  and stop doing them -- because you're continuing to do them as

1  we speak -- and we can talk about a settlement.  I mean,

2  that's the way I interpret it.

3          And, you know, I'm not too hung up about the rules,

4  the local rules, as it relates to timing because the issue

5  about timing, and particularly about local rules, will not

6  insulate me from being reversed by the Court of Appeals

7  because our local rules are not their rules.  And even if they

8  are their rules, if a judge on the Court of Appeals or the

9  majority of judges that hear this appeal decide that they

10  think I was wrong and that it was a big deal that I was wrong,

11  they may not care so much about whatever procedural impediment

12  may have existed because they may think it's unfair.

13          And I'm not criticizing the Court of Appeals.  I

14  mean, I just think that how you look at an issue sometimes

15  when you're an appellate judge depends on how -- depends on

16  what you think is fair overall.

17          So, in any event, the timing issues doesn't really

18  bother me, but I think particularly if Georgia law does

19  require not as factor but as a condition, that a retraction

20  demand had been sent, the fact that the plaintiffs sent the

21  demand, the fact that the defendant responded to the demand

22  when there was no lawsuit pending or other terms discussed and

23  made critical admissions against interest, that's relevant,

24  and that's coming in.  And the defendant should know that.

25  The defendant should have known that when she made the

1  statement that I don't know if these things are true or not.

2         I mean, that goes to whether or not that if we assume

3  that they're not true, whether or not the defendants -- the

4  plaintiff can pierce the malice prong of defamation against a

5  public figure or semipublic figure, which is clearly in play

6  here because I know the defendant is going to say that, well,

7  it was reasonable for me to rely on what these people were

8  telling me or what I was seeing on the internet.  But there's

9  a responsibility that goes along with that, and that's a duty

10  to investigate and determine whether or not there's a basis or

11  not.  You just can't blindly say something that someone else

12  says just because.

13         You can put this in the criminal context.  In fact,

14  it seems like everything can be put in the criminal context.

15  But a judge who is issuing a warrant can't simply rely on the

16  fact that the police or the FBI have a confidential informant

17  without knowing whether or not the confidential informant has

18  some credibility to them, is it someone that has assisted the

19  government in the past and has proved successful in the

20  statements that they've made.

21         And if not, then there's got to be some other

22  independent indicia that would show that what the person is

23  saying is true, which is why when a confidential informant

24  gives information about drug dealing, the police often send in

25  the confidential informant or someone else to make a buy to

1   determine whether or not what they have been told is true.
2   And that establishes credibility.
3        So the defendants are going to have to show that when
4   they rely on, at least arguably so, when they rely on
5   statements made to them by people about what those people know
6   about the plaintiff, that there is some reason that they can
7   trust those statements.  One thing I think y'all know is
8   that, as that one juror was saying yesterday, the internet is
9   full of falsity, sometimes truth.  But, you know, you've got
10  to figure it out, whether it's true or not.
11       So the motion for reconsideration is denied.  I think
12  the letter sent by the plaintiff and response sent by the
13  defendant are admissible for issues that are critical to this
14  case.
15       All right.  So I will just stick with the defendant
16  since we started with the defendant.  Is there any other
17  issues we need to talk about before we start this morning?
18       MS. IZMAYLOVA: Yes.  Your Honor, yes.  I just want
19  to address the fact that since that is coming in, even though
20  we believe it was part of settlement negotiations, I don't --
21  I wanted to meet pretrial and make sure that the plaintiff
22  understands because they've made all these allegations
23  yesterday about how we're going to introduce evidence that's
24  violating the Court's order.  But Ms. Kebe allowed to put in
25  evidence of state of mind, of what was going on around the

1  time that she wrote that email and explain --

2        THE COURT:  State of mind generally?  I mean, I don't

3  know.  I mean, just because there's anything that she might

4  know about anything doesn't come in.  It's still got to be

5  relevant so --

6        MS. IZMAYLOVA:  Right.  So it's hard to explain why

7  she wrote that email, why she said what she said.  She's able

8  to introduce that evidence if they introduce evidence of

9  that -- of her statements in that email.

10        THE COURT:  Well, they're going to introduce evidence

11  of that statement, sure.  And so when she wrote that email,

12  she wants to introduce what she was relying on to say I don't

13  know if this stuff is true or not?

14        MS. IZMAYLOVA:  No.  She wants to introduce evidence

15  as to why she even chose to respond to her attorneys in the

16  first place while she was pro se.

17        THE COURT:  You've got to give me -- I mean, if

18  you're going to seek to introduce something that's not been

19  permitted pursuant to previous rulings, you've got to give me

20  more than that.

21        MS. IZMAYLOVA:  For example, like the fact that she

22  was being harassed and stalked and, you know, had to, you

23  know, move.  And now we have actual evidence that the person

24  who was doing all that was in direct communication -- was

25  hired by the plaintiff to do so --

1      THE COURT:  She has no evidence period that anyone

2  that may have been harassing her was associated with the

3  plaintiff.

4      MS. IZMAYLOVA:  No, no.  The evidence that we do have

5  for the one person -- I'm specifically speaking about Dennis

6  Byron she --

7      THE COURT:  You've got to enunciate a little more

8  clearly because you've got a mask on, and it's hard to hear.

9      MS. IZMAYLOVA:  I'm sorry.

10      THE COURT:  And you and I both have accents, and

11  they're not the same.  So I know I need to do the same.

12      MS. IZMAYLOVA:  I apologize.  I'm not speaking about

13  the, you know, random or like, you know, the Instagram users.

14  I'm not speaking about that evidence at all.  I'm speaking

15  specifically about there's evidence that we have that a person

16  named Dennis Byron was going to different states taking out

17  protective orders against Ms. Kebe, trying to, you know, get

18  her arrested, like doing all these things right around this

19  time.  Then we also have evidence that he was hired by the

20  plaintiff, and on the same dates they were communicating back

21  and forth about him doing these things.

22      THE COURT:  You're using pronouns.  They were

23  communicating --

24      MS. IZMAYLOVA:  The plaintiff and Mr. Byron.

25      THE COURT:  That the plaintiff and Dennis Byron were

1 communicating generally about your client?

2          MS. IZMAYLOVA:  He was retained by the plaintiff --

3 Dennis Byron was retained by the plaintiff specifically to,

4 quote unquote, help with the investigation for the case.

5          THE COURT:  Okay.

6          MS. IZMAYLOVA:  And so he would report to the

7 plaintiff directly things that -- you know, like they would

8 come up with plans or schemes of what, you know, what to do

9 next to basically harass her, to intimidate Ms. Kebe.

10          THE COURT:  Okay.  So the problem when you argue, is

11 you inject a lot of speculation in your lawyer argument into

12 what are the facts.  You don't know what scheming, in quotes,

13 the plaintiff did with Dennis Byron.  That's just your

14 characterization about the communications you know about.  So

15 let's just talk specifically about the communications you know

16 about.  So summarize for me those communications.

17          MS. IZMAYLOVA:  They were via text messages and we

18 received -- I don't know if your Honor recalls.  You had

19 received an in camera -- a lot of messages that your Honor had

20 reviewed, and from those I did include several -- not the

21 whole production but several depositions that I believe are

22 the most relevant around the same dates and time.

23          THE COURT:  Just kind of get to the point.  What

24 specifically are you talking about?  And what was the date of

25 those things in reference to this letter?

1          MS. IZMAYLOVA:  So --

2          THE COURT:  Well, let's back up.  None of those

3    communications between the plaintiff and Byron -- what's his

4    name again?

5          MS. IZMAYLOVA:  Dennis Byron.

6          THE COURT:  Dennis Byron was known to your client at

7    the time; right?

8          MS. IZMAYLOVA:  She did not know --

9          THE COURT:  Okay.  All right.  So those are out the

10   window right there because they couldn't have formed any basis

11   of the reason she sent this letter.  That's her trying to

12   prove that there is some relationship.  So what would she have

13   known about at the time she sent this letter?

14         MS. IZMAYLOVA:  What she knew about was that Dennis

15   Byron was --

16         THE COURT:  Doing things.

17         MS. IZMAYLOVA:  -- doing things to her.

18         THE COURT:  Okay.  Without going into more discussion

19   about what Dennis Byron was doing, how did she know at that

20   time that Dennis Byron was associated with the plaintiff?

21         MS. IZMAYLOVA:  She didn't have any, you know, solid

22   proof or evidence, but she figured that he was because the

23   plaintiff is associated with a lot of people.  She was in --

24   she's in a gang.  She's a gang member.  So that was the state

25   of mind that my client had at the time that she was receiving

1   these communications from Mr. Byron.  In addition to that,

2   Dennis Byron did post -- made a Facebook post at some point in

3   time way before we found out about the text messages that, oh,

4   Cardi B called my daughter to say happy birthday so there

5   was --

6           THE COURT:  Cardi B called my daughter to say happy

7   birthday.

8           MS. IZMAYLOVA:  Right.

9           THE COURT:  So are you telling me that your client

10  will testify that at the time she sent this letter, that she

11  had seen some kind of post that Dennis Byron had said Cardi B

12  called to wish my --

13          MS. IZMAYLOVA:  I'm not sure of the day of the post.

14  What I'm saying is like there was a lot of different other

15  people that was also harassing Ms. Kebe.  As you remember,

16  Judge, we've already, I think, discussed it before.  But it

17  started at the end of 2018 and went through to about the

18  middle of 2019.  This email was sent in March of 2019, so it

19  was in the midst of all of those communications.

20          THE COURT:  So she would explain that while I sent

21  this letter where I acknowledge I don't know what's true and

22  what's not true -- because I was generally being harassed by

23  people that I thought were sympathetic to the plaintiff, that

24  were fans or otherwise -- so I was scared of the plaintiff,

25  and so I sent this response.  So that's one thing she would

1  say.  What else would she say?

2       MS. IZMAYLOVA:  Your Honor, not only -- she was

3  scared enough to break her lease at one home to move to a

4  completely different address.  So it wasn't just that --

5       THE COURT:  When did she break her lease?

6       MS. IZMAYLOVA:  She broke her lease at the end of

7  2018.  She moved into her new home February 2019 --

8       THE COURT:  Hold on.  Hold on.  Hold on.  That's what

9  she did.  That's not what she knew.  That's all I'm focused

10 on, what she knew.  She knew that she had generally been

11 harassed by people online that she felt were sympathetic to

12 the plaintiff and that they might be controlled by the

13 plaintiff.  That's one thing she knew.  And she doesn't know

14 whether these people had any relationship to the plaintiff or

15 not, but that's what she would say she thought.  And what

16 else?  What else?

17      MS. IZMAYLOVA:  I'm sorry, your Honor.  May I have a

18 second to confer?

19      THE COURT:  Sure.

20      MS. IZMAYLOVA:  Thank you.

21      (Brief Pause.)

22      THE COURT:  I'm sorry.  His name is Byron Nelson

23 again?

24      MS. IZMAYLOVA:  I'm sorry?

25      MR. SABBAK:  Dennis Byron.

1          THE COURT:  And the reason I'm questioning that in my
2   mind is that sounds like a former pro golfer, Byron Nelson.
3   All right.  So she knew what was happening social media wise
4   directed towards her.
5          MS. IZMAYLOVA:  Yes, your Honor.
6          THE COURT:  That's one thing she knew was happening
7   to her.  Whether or not she could say who was doing it or not
8   is highly questionable.  And then what else?
9          MS. IZMAYLOVA:  I mean, I guess obviously she made
10  specific, you know, moves or specific --
11         THE COURT:  That's what your client did.  I'm not
12  interested in what your client did.  I'm interested in what
13  she knew that would have formed the opinion in this letter.
14  So she knew this general harassment was occurring to her by
15  online people.
16         MS. IZMAYLOVA:  Right.
17         THE COURT:  And then what else did she know?
18         MS. IZMAYLOVA:  She knew that the plaintiff was a
19  gang member and --
20         THE COURT:  So she --
21         MS. IZMAYLOVA:  -- from the plaintiff's own
22  admissions.
23         THE COURT:  She doesn't know that the plaintiff is a
24  gang member.  That's an issue that's in dispute.  But she
25  thought that the plaintiff was a gang member based on things

1  that she had seen or heard.

2          MS. IZMAYLOVA:  Your Honor, there was a GQ article

3  write-up where the plaintiff gave direct quotes about being a

4  gang member.  So it wasn't like it was a --

5          THE COURT:  That's probably coming in I get, and

6  so -- but, I mean, you can't say that it's a fact.  There's

7  been no -- wait a minute.  Let's just say this.  I do have the

8  right to interrupt, but you don't.

9          MS. IZMAYLOVA:  My apologies, your Honor.

10          THE COURT:  I'm sorry.  That's just the way it is in

11  court.  What she says she knew is often based on her

12  speculation and what she wants maybe it to be, but that

13  doesn't make it fact.  It doesn't mean it's not fact.  But,

14  obviously, if the plaintiff was a gang member or is a gang

15  member and your client can prove that, that might prove some

16  defense to some of the things that she said.  But let's use it

17  in the most basic form.  She knew she had been harassed by

18  people online that she associated to be with the plaintiff for

19  whatever reason.  She had read or seen or heard or thought

20  that the plaintiff was in a gang.  And what else?

21          MS. IZMAYLOVA:  Correct.  She knew that there was a

22  person -- some person who was posing as an investigator coming

23  to try to, you know, interview her neighbors, which is one of

24  the reasons why she moved.  That person was Dennis Byron.

25          THE COURT:  Okay.  She would testify that it was --

1  how does she know that that person was doing that?

2          MS. IZMAYLOVA:  The neighbor.  One of the neighbors

3  told her.

4          THE COURT:  Okay.

5          MS. IZMAYLOVA:  And he was asking questions about her

6  daughter, her family.

7          THE COURT:  Are you calling the neighbors to testify

8  in this case?  I guess not.

9          MS. IZMAYLOVA:  No, your Honor.

10          THE COURT:  Okay.  So it's hearsay as to whether or

11  not somebody was actually investigating but it's probably

12  admissible not for the truth of the matter asserted but to

13  form a basis for what was in her mind --

14          MS. IZMAYLOVA:  That's exactly what I'm talking

15  about.

16          THE COURT:  And what else?

17          MS. IZMAYLOVA:  What she will be testifying generally

18  is that, you know, she was -- she herself was pregnant, so she

19  was dealing with that at the same --

20          THE COURT:  That wouldn't have anything to do with

21  whether the plaintiff was doing anything to her, but she would

22  say I was under a lot of stress because --

23          MS. IZMAYLOVA:  A lot of stress.  She had a high-risk

24  pregnancy.

25          THE COURT:  Worried about the pregnancy and how this

1  was all going to affect that.  Okay.  What else?

2          MS. IZMAYLOVA:  I mean, really it was just these

3  things I just wanted to make sure because previously --

4  especially the plaintiff's, you know, potential gang

5  affiliations, what have been ruled out.  So I just wanted to,

6  you know, re-bring that up because that is -- those were

7  things that my client did consider.  Whether true or not, like

8  your Honor said, she had good reason to believe these things,

9  and that explains her state of mind when she wrote the email.

10 And that's kind of what -- all I was trying to say to you was

11 that those things should be admissible now to -- for her to

12 explain her state of mind.

13         THE COURT:  Well, let me just say this:  It's

14 questionable whether she had a good faith reason to believe

15 any of those things, and that's an issue that is obviously

16 squarely in this lawsuit because if she said things that

17 aren't true, then you're going to be able to introduce

18 evidence to demonstrate why she would believe those things.

19         What the Court has ruled previously is, in granting

20 the plaintiff's motion for summary judgment against the

21 defendant's counterclaim, was that your client had no

22 admissible proof that could tie the things that she, the

23 defendant, complained about and said was the plaintiff's

24 responsibility, could not tie those to the plaintiff.  It was

25 speculation.  It was based on hearsay and supposition.  So, in

1    any event, I understand your argument.

2          Anything else you want to say?  Then I'll go back to

3    Ms. Matz and see what Ms. Matz has to say about it.

4          MS. IZMAYLOVA:  The only other thing is there's also

5    evidence -- we did submit, you know, evidence of what she

6    believed the plaintiff's affiliation.  I know that there's

7    several tweets from the plaintiff herself admitting that she's

8    in a gang as well.  So those are all the types of, you know,

9    information that my client relied on to make that conclusion

10    that the plaintiff is in a gang.

11          THE COURT:  Ms. Matz.

12          MS. MATZ:  So, your Honor, honestly, I'm really

13    surprised right now.  This feels like a very prejudicial back

14    door attempt to reargue basically the entirety of our motion

15    in limine which your Honor granted.  You specifically ruled

16    that all mention of gang related activity was far too

17    prejudicial because it's actually not in this case.  None of

18    the statements at issue relate to any type of violence or

19    anything else about my client.  We went through this at length

20    at the pretrial conference.

21          THE COURT:  Look.  Let me just start here.  It would

22    seem that if you want -- and you do -- if you want to get in

23    the letter where she says I don't know if these things are

24    true and I'll withdraw them, it would seem that they've made a

25    credible argument that, okay, maybe I did say those things.

1    It wasn't really true -- I'm not talking about the allegations

2    that plaintiff sued about -- but maybe I did agree that I

3    didn't know if these things were true.  But I was scared, and

4    this is why I was scared and this is why I would say what I

5    said when what I said wasn't true in the letter itself.

6         I mean, that -- you're asking me to prevent her from

7    explaining why she said what she said.  In my mind it's

8    inviting me to commit reversible error because you're always

9    able to explain and -- if that's her explanation.  And,

10   honestly, I don't think it makes a lot of sense because there

11   is no credible evidence to back up her claim.

12        But if she says that's what I relied on, that's what

13   she, I guess, relied on, and then the jury has to make a

14   decision whether they believe it or not.  I mean, you know,

15   let's don't rely on rulings and things like that.  Let's deal

16   with the argument she's making.  The argument she's making is

17   that's why I said what I said.  And how do I cut her off from

18   her explanation?

19        MS. MATZ:  Sure.  It's not a defense to defamation.

20   It's simply not.  Saying I sent something --

21        THE COURT:  You're relying on she's admitted that she

22   didn't know if they were true.  Okay.  You're relying on that

23   statement.  Otherwise, how about this.  You can just stop at

24   your letter.  If you just stop at your letter, you made a

25   demand for a retraction, you didn't get a retraction -- I

1    mean, I think everybody agrees that never happened.  In fact,

2    the defamation, according to the plaintiff, continues to this

3    day.  So you could stop at that letter and say we demanded a

4    retraction.  Jury, here it is.  So now we can sue for punitive

5    damages.  But you want to go further, and you want to get her

6    admission.  Okay.  You're entitled to it, but she's also

7    entitled to explain why she made the admission.  The jury

8    would have to decide whether they believe that or not.

9            But it seems to me that if you want to get that part

10   in that, hey, here's the admission against interest, then

11   she's entitled to explain it.  I can't cut her off at the

12   knees from explaining it.

13           MS. MATZ:  So I disagree with that for a couple of

14   reasons, respectfully, one of which is that the prejudice of

15   allowing some of this in -- if she wants to say Dennis Byron

16   was coming around my house, maybe we could talk about the

17   prejudice of that, but we haven't had that conversation

18   because your Honor did rule on this.  And I just want to say

19   that I think that those things should be considered to the

20   extent you're considering rereviewing your ruling because we

21   did prepare in reliance upon it.

22           However, any mention of gang activity -- and we

23   talked about this at length about the *Jernigan* case.  Any

24   mention of gang activity in this case is so highly

25   prejudicial, and it is absolutely speculative.

1          THE COURT:  You're in control.  You can withdraw

2    trying to seek admission of that letter, and there will be no

3    mention of it.  It would not be relevant then.  So the

4    plaintiff is in control.  If you're willing not to admit the

5    letter where she makes the admission, then there will be no

6    mention of any of those things.

7          MS. MATZ:  Okay.  I mean, honestly, I just want to

8    put on the record that we are objecting.  I don't think that

9    being scared is a defense to making admissions.

10         THE COURT:  It's an explanation.

11         MS. MATZ:  At the same time --

12         THE COURT:  So look, Ms. Matz, here's the bottom

13   line, is I'm not going to get reversed on this.  If you want

14   to admit the letter, then you're opening the door for her to

15   explain why she said what she said.  If you don't admit that

16   letter, you only admit your letter where you demand a

17   retraction and then you ask her did she ever -- I mean, the

18   facts are going to prove she never retracted it.

19         MS. MATZ:  Yes.

20         THE COURT:  Then you've proved your case as it

21   relates to punitive damages.  If you want to admit her letter,

22   her email response where she makes certain admissions, then

23   you cannot prevent her from explaining what was in her mind.

24   The stuff that happened after the letter, yeah, I agree that

25   can't be a part of it.  But the stuff that she knew and she

1  could say that she was aware of at the time that formed the

2  basis of her opinion is going to be admissible for that.  So

3  the key is it's your decision, not mine.

4       MS. MATZ:  I hear you.  If you'd just permit me to

5  put one more objection on the record only to preserve it for

6  appeal --

7       THE COURT:  Sure.

8       MS. MATZ:  -- and that is that I do feel that this is

9  really prejudicial.  This wasn't raised in any of their

10 written papers.  This was clearly their plan.  I did say to

11 your Honor yesterday that they're clearly trying to get in all

12 of this Dennis Byron evidence.  They served written papers

13 last night that made absolutely no mention of this and then

14 orally requested that you reconsider all of your rulings on

15 the bench without giving us any opportunity to prepare written

16 submissions or even know that this argument was coming.  None

17 of these arguments were made last time and --

18      THE COURT:  Okay.  So how much more time do you need

19 to consider to argue against this motion?

20      MS. MATZ:  I'm not sure it's going to change your

21 Honor's mind.  I'm just putting it on the record that --

22      THE COURT:  Not that.  I'm just saying if you say

23 you're not prepared, what would you have to prepare for?  You

24 would have to prepare to defend against things that they can't

25 prove.  So what is there to prepare for?  To ask your client

1  when she testifies -- and I presume she's going to testify

2  either on direct or she's going to be called for

3  cross-examination by the defendant to say these things aren't

4  true.  I mean, in fact, we're not really even going to prove

5  those things.  She's able to testify what was in her mind.

6          I mean, there's going to be evidence, I guess, that

7  is really uncontroverted about what your client may have said

8  in the past.  I mean, there's going to be some videos at the

9  very least where she's discussed some of these things, some of

10  the videos that we've actually seen.  I mean, you say it's --

11  it's not prejudicial just because it hurts your case.  So it's

12  got to be something more than that.  Is there something else

13  that you need to do to get prepared for this trial and to deal

14  with that allegation about what she says she relied on when

15  she made the statement that you want admissible?

16          MS. MATZ:  So I haven't had a chance to review any of

17  the dates that they're talking about, and to the extent your

18  Honor is taking that into consideration, yes, I do think that

19  we have been a bit prejudiced because we didn't know this

20  argument was coming.

21          I also think that to the extent that there is also a

22  very clear analysis to be done here of the prejudice of

23  specific gang-related activity outweighing the probative value

24  versus general harassment and saying I was scared and

25  stressed, especially when the gang-related activity is

1  speculative and this isn't something that -- this was all

2  ruled out on the motion for summary judgment, and this is why

3  we made the motion --

4        THE COURT:  Summary judgment doesn't limit evidence

5  at trial.  It just simply rules on claims.  And, yes, I said

6  that there was no basis for them to have a counterclaim.

7        MS. MATZ:  Your Honor, I understand that, but we

8  moved to exclude all of the evidence related to their

9  counterclaims at the last motion in limine hearing, and these

10  were all specifically part of what we ruled -- of what we

11  asked to exclude.  And your Honor agreed.  As a separate

12  motion in limine, we moved to exclude any mention of

13  gang-related activity, and your Honor agreed.  And they said

14  at the last hearing this was not a defense, and we also had

15  this conversation about the settlement email.  This was not

16  something that was ever raised as in it's opening the door on

17  argument.

18        And part of the issue is that they said we might

19  still use some of the evidence related to the counterclaims to

20  prove our defenses.  This is not related to a defense that

21  they have asserted in this case, and the entire purpose of

22  forcing parties to plead every affirmative defense that they

23  have and do this ahead of time is that so no one is surprised

24  at trial.

25        THE COURT:  Well, there is no surprise to the

1  plaintiff that this is what the plaintiff -- that this is what
2  the defendant has said.  I mean, this isn't something new.
3  Whether or not it would be admissible, that's, you know, in
4  all fairness to the plaintiff, perhaps a new thing.  But the
5  plaintiff says that these allegations aren't true.  The
6  defendant has no proof that they're true.  The defendant says
7  it was what she had read and heard, was in her mind about how
8  she was afraid, so that's why she said what she said.

9          I can't see anything that the plaintiff could do to
10  prepare to disprove what was in the defendant's mind when the
11  plaintiff says these things aren't true, so I fail to see how
12  there's been prejudice to the plaintiff other than you don't
13  want it to be mentioned.  Then I come back to the fact that it
14  doesn't have to be mentioned if you don't admit her letter in
15  response, which is not needed for you to set forth your claim
16  on punitive damages and to qualify for the jury to decide to
17  award them to you.  It is only helpful to your claim because
18  there are admissions in there that you want from the defendant
19  about what she knew and didn't know about the allegations she
20  had against the plaintiff.

21          So I respect that the plaintiff wants to use that.  I
22  would want to use that if I was in the plaintiff's shoes, but
23  it comes with certain warts.  And this is one of the warts, is
24  that it gives and opens the door for the defendant to explain
25  what was in her mind at the time.  She doesn't have any proof

1   that the things that were in her mind are, in fact, true, but

2   it still goes -- she's still entitled to give an explanation.

3          So I'm going to let her do that.  I'm not going to

4   let her talk about things that post date the letter.  I'm not

5   going to let her or her counsel argue that those things are

6   true or proven just because she thought about them.  But she's

7   going to be entitled to give an explanation for the statement,

8   and the plaintiff is in control about whether she gets to give

9   that explanation as to whether or not you admit the letter,

10  and I'll leave it up to you to decide.

11         So let's move on to another issue.  Ms. Izmaylova,

12  anything else from the defendant?

13         MS. IZMAYLOVA:  If I could have one moment, your

14  Honor?  No, your Honor.  I think that --

15         THE COURT:  And I also need to remind everybody the

16  federal rules are rules of inclusion, not exclusion, and it is

17  relevant to her thinking at the time.  All right.  Anything

18  else from the plaintiff about any other issue?  I'm not going

19  to talk about this anymore.

20         MS. MATZ:  The only other thing we just wanted to

21  raise now is that at some point when the trial starts,

22  Mr. Kebe should be excluded from the courtroom.  He is on our

23  witness list.

24         THE COURT:  So let's talk about that.  Is the

25  plaintiff right about that?

1          MS. IZMAYLOVA:  Your Honor, Mr. Kebe is one of the

2    two named direct -- two shareholders of Kebe Studios LLC,

3    which is a defendant in this case.

4          THE COURT:  Well, just because he's one of the two

5    doesn't mean he gets to be in here.  There's another way to

6    argue it.  Do you want to try that?

7          MS. IZMAYLOVA:  He's her husband.  I don't know --

8          MR. SABBAK:  He's her husband.

9          THE COURT:  I'm sorry?

10          MR. SABBAK:  Her husband.

11          THE COURT:  Well, the husband thing doesn't work

12    either.  Husbands don't get to be in, unfortunately.

13          MS. IZMAYLOVA:  I don't know of any other --

14          THE COURT:  Who's your representative for your LLC?

15          MS. IZMAYLOVA:  Mr. Kebe.

16          THE COURT:  He can be in here for that purpose.

17    That's what I was assuming all along, that he was in here

18    because he was the representative of the LLC.  It doesn't have

19    to be the same person.

20          MS. IZMAYLOVA:  Yes, sir.

21          THE COURT:  As the individual.  So he's going to be

22    allowed to stay.  All right.  Anything else from the

23    plaintiff?

24          MS. MATZ:  No, your Honor, except I would like a few

25    minutes just to confer.  This is a big change from our last

1  meeting.

2          THE COURT:  Sure.  How long do you need?

3          MS. MATZ:  I think, if you don't mind, if we could

4  take a half an hour -- I don't know what time, if you were

5  planning to break for lunch or what the break schedule is for

6  today, but I --

7          THE COURT:  No, I'm not planning on breaking for

8  lunch, but in light of, you know, the decision I've made

9  today, I'll give you half an hour.  If we'll just let the jury

10 know, Ricky, that we've got a little issue here that is going

11 to take us 30 minutes to resolve, and they can stand at ease,

12 just to be back in the jury room by 12:40.

13         COURTROOM SECURITY OFFICER:  Yes, sir.

14         MS. MATZ:  Can I just ask for one other clarification

15 on the record?

16         THE COURT:  Yes.

17         MS. MATZ:  So your ruling about this opening the door

18 only pertains to this email.  We are not talking about her

19 being allowed to open the door for other purposes that have

20 not been articulated, and otherwise your Honor's ruling from

21 the last conference stands?

22         THE COURT:  Well, I certainly couldn't extend my

23 ruling to things that we haven't talked about.  So this is all

24 we've talked about, and so, yes, I'm agreeing with your

25 statement that these issues about what's in her mind about

1  gang membership -- let me back up.  Is part of the defamation

2  statements that she may have made about gang affiliation?  I

3  don't remember that.

4          MS. MATZ:  No.  Absolutely not.

5          THE COURT:  One person at a time, please.

6          MS. MATZ:  No.  Absolutely not, your Honor.

7          THE COURT:  Okay.  And what else did you ask about?

8  Gang membership and --

9          MS. MATZ:  So both the --

10          THE COURT:  About Byron Nelson, I guess, and what he

11  did.

12          MS. MATZ:  And generally this theory that Ms. Kebe

13  was being stalked or harassed by my client which related to

14  our motion in limine to dismiss --

15          THE COURT:  I can't see that any of that stuff is

16  admissible for anything other than her explanation about why

17  she sent the letter agreeing that things weren't true or she

18  didn't know that they weren't true.

19          MS. MATZ:  So would you mind asking the defense to

20  make that representation?  Because we have other statements

21  she's made publicly in videos, and, you know, we're obviously

22  going to talk about what we want to do in light of your

23  Honor's ruling.  But, you know, I do feel that there is

24  some -- it is a little unfair if we can't rely on this and

25  have some specifics about how broadly this is given that we're

1  discussing it today.

2          THE COURT:  I mean, I don't know if it's unfair or

3  not.  This is the only thing that's been presented to me.  Is

4  there any other reason that the things we've talked about,

5  Byron Nelson and --

6          MS. IZMAYLOVA:  Dennis Byron, your Honor.

7          THE COURT:  I'm sorry.  Dennis Byron.  Byron Nelson

8  is a PGA player.  I'm sorry.  That's why it keeps coming up in

9  my mind.  Dennis Byron, about Mr. Byron.  I grew up near a

10  town called Byron, Georgia, so I can remember Mr. Byron.  All

11  right.  Anything about Mr. Byron that would be related to

12  anything else?

13          MS. IZMAYLOVA:  No.  It's only relevant to explain

14  her state of mind, and, of course, we would not bring it up if

15  she didn't need to explain.

16          THE COURT:  There's no defamation allegations related

17  to any claims by the defendant that try to associate the

18  plaintiff with gang membership; right?

19          MS. IZMAYLOVA:  No, your Honor, but now that I think

20  about it, there is another -- there is going to be another

21  issue about opening the door.  So I guess we should just

22  probably address it now, I think.  On plaintiff's motion in

23  limine to exclude all evidence about plaintiff's husband's

24  infidelity, your Honor, had ruled on that.  There are several

25  videos that are referenced in the amended complaint, which I'm

1    presuming the plaintiff will present, you know, in evidence

2    that are -- that basically only discuss the plaintiff's

3    husband's infidelity.  So --

4           THE COURT:  Wait a minute.  Wait a minute.  So you're

5    saying the plaintiff would seek to admit videos where the

6    plaintiff discussed her husband's alleged --

7           MS. IZMAYLOVA:  I'm sorry, no.  I'm sorry.  The

8    plaintiff filed a motion in limine, and the Court had decided

9    to exclude any of my client's discussions of the plaintiff's

10   husband's infidelity but --

11          THE COURT:  Did plaintiff sue based on the claims of

12   infidelity that the defendant had said her husband had engaged

13   in?

14          MS. IZMAYLOVA:  No, but she did -- one of the

15   alleged, you know, defamatory statements is that my client

16   said that plaintiff was, you know -- cheated on her husband

17   but --

18          THE COURT:  Okay.  And what was the evidence of that?

19          MS. IZMAYLOVA:  I'm saying she said it in a video.

20          THE COURT:  She being --

21          MS. IZMAYLOVA:  My client.

22          THE COURT:  Said that the plaintiff may have --

23          MS. IZMAYLOVA:  May have cheated at the same time

24   that she was reporting about the plaintiff's husband cheating

25   on the plaintiff.

```
 1              THE COURT:  All right.  What's your argument?

 2              MS. IZMAYLOVA:  So my only -- I bring this up because

 3    there's a lot of exhibits on plaintiff's exhibit list that

 4    address other videos that my client has published that don't

 5    really talk about plaintiff or anything like that, but they do

 6    talk about plaintiff's husband's infidelity.  And so if they

 7    bring those -- if they introduce those videos, then that's

 8    going to open the door to the topic of plaintiff's husband's

 9    infidelity, and I just wanted to make sure that --

10              THE COURT:  I would assume that the plaintiffs

11    wouldn't admit documents or videos that say what they want to

12    keep out.

13              MS. IZMAYLOVA:  Me too, but they put them on their

14    exhibit list.  So I just want to make sure they understand

15    that that opens the door as well.

16              MS. MATZ:  Your Honor, if I can just refresh, I think

17    I can cut to the chase if you don't mind.

18              THE COURT:  Okay.

19              MS. MATZ:  When we dealt with this issue, we dealt

20    with it in a split manner.  There were some videos where

21    Ms. Kebe, the defendant, says -- and I am paraphrasing here --

22    says something like that the plaintiff's husband was cheating,

23    so she stepped out too or she got herself a side piece or

24    something like that.  We already agreed that to the extent

25    she's talking about both of them, those are probably coming in
```

1 because there's not a way to parse the statements.

2      The motion we made was to preclude excessive evidence

3 where these statements are only about the defendant's

4 husband -- excuse me -- about the plaintiff's husband.  I

5 apologize.  I misspoke.  So I don't really see how that

6 changes anything.  This shouldn't become a trial -- my client

7 did not assert defamation claims based on what the defendant

8 said about her husband.

9      THE COURT:  Nor could she.  Nor could she.

10      MS. MATZ:  I'm not sure she could, but it's not at

11 issue.  So the point was to not allow unfairly prejudicial

12 evidence about this to the extent it's not relevant to the

13 claims.

14      MS. IZMAYLOVA:  Agreed.  And then they put a whole

15 bunch of videos on their witness list where my client only

16 talks extensively about her husband's infidelity.

17      THE COURT:  Okay.  There's really nothing for me to

18 rule on here.  I mean, we'll just wait and see what the

19 plaintiff introduces, and even if she does introduce videos

20 that exclusively talk about her husband's -- the allegations

21 against her husband for allegedly having an affair -- two

22 double alleges there, I'm sorry -- I'm not sure what the

23 defendant even knows about it.  I mean, probably nothing

24 unless the defendant knows the plaintiff.

25      But it's just not relevant to the plaintiff's --

1    there's no way that one person can sue another person for what

2    that other person said about someone who's not a party to the

3    lawsuit.  There is no standing if we think about it in the

4    typical standpoint, even though it would be very hurtful,

5    obviously, if the allegations were true normally, I would

6    think, most people would think.  So I just don't think there's

7    anything for me to rule on right now.

8            MS. MATZ:  Yeah, so we kind of diverged a little bit.

9    I would just like to go back to what I asked, and that is

10   that -- because the things I was mainly concerned was with the

11   Dennis Byron, which your Honor did ask, and Ms. Izmaylova said

12   there's nothing else that we're planning on making that

13   argument for, the general stalking and harassing claims, and

14   then the gang membership.  Those were the three things.  I'd

15   just like to make sure that there's a representation here that

16   they're not trying to reargue those in some other manner.

17           THE COURT:  So general stalking claims, would that

18   be -- how would that be relevant to anything if this letter is

19   not in?

20           MS. MATZ:  I don't think it is.  I'd just like --

21           THE COURT:  I'm speaking to Ms. Izmaylova.

22           MS. MATZ:  I apologize, your Honor.

23           THE COURT:  I'm sorry.  I'm not looking at her.

24           MS. IZMAYLOVA:  Your Honor, I can't imagine how it

25   would be, and I would just say that if some evidence comes out

1  during plaintiff's case in chief that reopens the door to this

2  evidence, that would be the only time that --

3       THE COURT:  Okay.  So here's the ruling I can give

4  you:  If somebody opens the door to something, the door gets

5  opened.  I mean, that's just law.  That's just procedural law,

6  but I can't rule when that might happen.  You'll just have to

7  let me know that if there's something that has been prohibited

8  and you believe the door has been opened, before you try to

9  introduce that evidence then we've got to have a discussion

10  outside the presence of the jury about why you think the door

11  has been opened.  You cannot mention it to the jury either

12  directly as an attorney or by question to any witness until

13  we've talked about it at a side bar or out of the presence of

14  the jury.  Okay?

15       MS. IZMAYLOVA:  We're good.

16       THE COURT:  Anything else, Ms. Matz, then?

17       MS. MATZ:  No, your Honor.

18       THE COURT:  Okay.  All right.  So we'll take a break

19  for 30 minutes.  Thank you.

20       COURTROOM SECURITY OFFICER:  All rise.  This Court is

21  in recess for 30 minutes.

22       (Whereupon, a recess was taken from until 12:20 p.m.

23  to 12:53 p.m.)

24       COURTROOM SECURITY OFFICER:  All rise.  This court is

25  again in session.  Please be seated and come to order.

```
 1              THE COURT:  All right.  Is plaintiff ready to

 2   proceed?

 3              MS. MATZ:  Yes, your Honor, we are.

 4              THE COURT:  All right.  So let me just clarify for

 5   the record my thinking about the admissibility should the

 6   plaintiff seek to admit the defendant's response to the demand

 7   for retraction.  The Court finds that it's admissible, that it

 8   was not an offer in compromise, that it's admissibility,

 9   though, is based on the admissions that the defendants make in

10   the letter that would aid the plaintiff's proof at the very

11   least of the malice element and the recklessness of the

12   decision of the defendant to make the statements that she

13   made.  And we'll just wait and see if the plaintiff seeks to

14   introduce it or not, but the Court would intend to admit it

15   should the plaintiff offer it in evidence.

16              All right.  Call the jury, please.

17              COURTROOM SECURITY OFFICER:  Yes, sir.

18              MS. MATZ:  Your Honor?

19              THE COURT:  Yes, ma'am.

20              MS. MATZ:  I'm sorry.  Can I bring up one thing

21   before the jury comes in?

22              THE COURT:  Yes.

23              MS. MATZ:  I apologize.

24              THE COURT:  So those of you that are sitting on the

25   right side of the courtroom, I'm going to ask you to relocate
```

1  to the left side of the courtroom.  If any jurors want to sit

2  in that area, it's going to be reserved for the jurors.

3        I'm sorry.  Is there something else you wanted to

4  talk about?

5        MS. MATZ:  Yeah.  I was just going to ask -- I'm

6  prepared to proceed with opening arguments.  I was wondering

7  if, however, we could start with testimony tomorrow morning

8  because it does impact a few things in our case that we had

9  based around the last rulings and --

10       THE COURT:  No, we're starting now.  You can -- you

11  just have to -- lawyers have to make adjustments on the fly.

12  So I gave you a continuance of 30 minutes before opening.

13  I've got to be respectful of the --

14       MS. MATZ:  Understood, your Honor.

15       THE COURT:  Okay.  Thank you -- respectful of the

16  jury's time.  Yes, sir.

17       COURTROOM SECURITY OFFICER:  All rise.

18       (Whereupon, the jurors entered the courtroom.)

19       THE COURT:  So as y'all come in and have a seat, I'm

20  going to ask you to try to leave some space, kind of stagger

21  your seating.  And let me also say, does anyone want to sit in

22  the pews as opposed to sitting in our chairs?  We've got 14

23  chairs, and there's 10 of you.  So if you want some more

24  space, then you can have it, and you can have the whole left

25  side of the courtroom over there if you would like.  Don't be

1 shy.  If anybody wants to go have a seat in the pews, feel

2 free to do that.  Does anybody want to go and have a seat in

3 the gallery?  If you ever change your mind, just let me know,

4 and I'll be glad to accommodate you sitting there.

5           There are video monitors in front of you in the jury

6 box, but there is also a monitor that points towards the

7 gallery area as well when documents and things like that are

8 introduced.  So I want to make sure everybody feels

9 comfortable as best we can for the space limitation that we

10 have.

11          So let me just start off saying that I'm in a great

12 mood today, had a good night for my football team.  A little

13 tired I suppose, but it was well worth it to have had the

14 experience last night.  I appreciate y'all indulging us by

15 starting a little bit later today.  I know for a fact I'm not

16 the only person in the courtroom that watched the game.

17 Hopefully, some of you were interested and you had a chance to

18 do that as well.

19          Ladies and gentlemen, I need to administer an oath to

20 you as the jurors that have been selected to try this case.

21 Give me just a second.  I'm going to ask if you would all

22 raise your right hand, please, and at the end of the oath I'll

23 ask you to say I agree.

24          (Whereupon, an oath was administered to the jurors.)

25          THE COURT:  All right.  You can put your hands down.

1  Does anybody except from the oath?  The Court sees none.  All

2  jurors have been sworn.

3         Members of the jury, now that you've been sworn I

4  want to explain some basic principles to you about a civil

5  trial and your duty as jurors.  These are preliminary

6  instructions.  I'm going to give you more detailed

7  instructions at the end of the trial.

8         It's your duty to listen to the evidence, to decide

9  what happens, and to apply the law to the facts.  It's my job

10 as the judge to provide you with the law which you must apply

11 and you must follow even if you disagree with the law.

12        You must decide the case on only the evidence that is

13 presented in the courtroom.  Evidence comes in many forms.  It

14 can be the testimony about what someone saw or heard.  It can

15 be an exhibit or a photograph.  It can be someone's opinion.

16        Some evidence may prove a fact indirectly.  For

17 example, let's say that a witness saw wet grass outside and

18 people walking into the courthouse carrying wet umbrellas.

19 This may be indirect evidence that it's rained, even though

20 the witness didn't personally see it rain.  Indirect evidence

21 like this is also called circumstantial evidence.  It's simply

22 a chain of circumstances that likely prove a fact.  As far as

23 the law is concerned, it makes no difference whether evidence

24 is direct or indirect.  You may choose to believe or

25 disbelieve either kind.  Your job is to give each piece of

1  evidence whatever weight you think it deserves.

2        During the trial you're going to hear certain things

3  that are not evidence, and you must not consider them.  First,

4  the lawyers' statements and their arguments are not evidence.

5  In their opening statements that you'll hear in a few moments

6  and closing arguments at the end of trial, the lawyers will

7  discuss the case with you.  Their remarks may help you follow

8  each other's -- each side's arguments and presentation of the

9  evidence, but the remarks themselves are not evidence and

10  should not play a role in your deliberations.

11        Second, the lawyers' questions and the objections to

12  those questions are not evidence.  Only the witness's answers

13  are evidence.  Don't decide that something is true just

14  because a lawyer's question suggests that it is.  For example,

15  a lawyer may ask a witness, you saw Mr. Jones hit his sister,

16  didn't you?  The question is not evidence of what the witness

17  saw or what Mr. Jones did unless the witness agrees with the

18  question.

19        There are rules of evidence that control what the

20  Court can receive into evidence.  When a lawyer asks a

21  question or presents an exhibit, the opposing lawyer may

22  object if he or she thinks that the rules of evidence don't

23  permit it.  If I overrule the objection, then the witness may

24  answer that question or the Court may receive that exhibit.

25  If I sustain the objection, then the witness cannot answer

1   that question, and the Court cannot receive the exhibit.  When

2   I sustain an objection to a question, you must ignore the

3   question and not guess what the answer might have been.

4         Sometimes I may disallow evidence; that is, I might

5   strike evidence that has come in and order you to disregard or

6   to ignore it.  That means that you cannot consider that

7   evidence when you're deciding the case.  I may allow some

8   evidence only for a limited purpose.  When I instruct you that

9   I've admitted an item of evidence for a limited purpose, you

10   must consider it only for that purpose and for no other.

11         To reach a verdict you may have to decide whether

12   testimony -- let me start that over.  To reach a verdict you

13   may decide -- you may have to decide which testimony to

14   believe and which testimony not to believe if there is some

15   that you don't believe.

16         You, as the jury, may believe everything a witness

17   says, part of what that witness says or none of it.  When

18   considering a witness's testimony, you may take into account

19   the witness's opportunity and ability to see, hear, and know

20   the things about which that witness testifies, the witness's

21   memory, the witness's manner while testifying, any interest

22   the witness has in the outcome of the case, any bias or

23   prejudice that the witness may have, any other evidence that

24   contradicts the witness's testimony, the reasonableness of the

25   witness's testimony in light of all the other evidence, and

1    any other factor which you believe affects believability.

2          At the end of the trial, I will reiterate these

3    guidelines for determining a witness's credibility.

4          The case before you today is a civil case brought by

5    the plaintiff against the defendants in which the plaintiff

6    claims that based on videos that the defendants posted on

7    YouTube about the plaintiff, that the defendants are liable

8    for defamation, invasion of privacy, false light, and

9    intentional infliction of emotional distress.

10         The plaintiff has the burden of proving her case by

11   what is called a preponderance of the evidence.  That means

12   that the plaintiff must prove that in light of all the

13   evidence which she claims is more likely true than not.  So if

14   you could put the evidence favoring the plaintiff and the

15   defendants on opposite sides of a balancing scale, the

16   plaintiff needs to make the scales tip to her side.  If the

17   plaintiff fails to meet this burden as to any particular

18   claim, then as to that claim you must find in favor of the

19   defendants.

20         To decide whether any claim has been proved by a

21   preponderance of the evidence, you may, unless I instruct you

22   otherwise, consider all the testimony of the witnesses

23   regardless of who called them and all of the exhibits that the

24   Court has allowed regardless of who introduces them.  After

25   considering all of the evidence, if you decide that a claim or

1  fact is more likely true than not, then the claim or fact has

2  been proved by a preponderance of the evidence.

3         While serving on a jury you may not talk with anyone

4  about anything related to the case.  You should tell people

5  that you're a juror and give them information about when you

6  must be in court, but you must not discuss anything about the

7  case itself with anyone.  And this includes with each other.

8  You shouldn't talk about the case with each other until you

9  begin your jury deliberations after the closing arguments and

10 after the Court gives to you the law that applies to the case.

11        You want to make sure that you've heard everything,

12 all the evidence, the lawyers' closing arguments, and my

13 instructions on the law before you begin to deliberate.  You

14 should keep an open mind until the end of the trial.

15 Premature discussions may lead to premature decisions.

16        So it's a different world than it was 30 years ago.

17 People might not talk, but they often use social media and

18 other technology to communicate.  So I want to emphasize that

19 in addition to not talking face to face with anyone, you must

20 also not communicate with anyone by any other means, not

21 emails, not text messages, not the internet, including any

22 social media platforms.

23        You should not google or search online or offline for

24 any information about this case, about the parties or about

25 the law.  Do not read or listen to the news about this case or

1  visit any places related to this case that might be described

2  by the evidence.  Do not research any fact, law or issue

3  related to this case.  The law forbids jurors to talk with

4  anyone else about the case and forbids anyone else to talk to

5  the jurors about it.

6         As I stated yesterday before we ended our session,

7  that it's -- you must base your decision only on what happens

8  in the courtroom.  There are certain rules about what can be

9  received and what can't come into court.  The parties are

10 entitled to know what is presented and what you might

11 consider, and so you should limit it only to what comes in in

12 court pursuant to those rules.

13        The law often uses words and phrases in special ways.

14 Legal words have legal meanings sometimes different from the

15 general meaning, and it's important that any definitions you

16 hear about what these words mean comes from me and not from

17 any other source.

18        Only you, the jurors, can decide a verdict in this

19 case.  The law sees only you as fair, and only you have

20 promised to be fair.  No one else is so qualified.

21        So if you want to take notes, then this is going to

22 be a long trial, and that probably will be helpful to at least

23 some of you.  Please don't share your notes with each other

24 during the course of the trial until jury deliberations, if

25 you see fit at that time to do so.  I would ask that you put

1  your name on the first page of your notepad and have your note

2  taking be on the subsequent pages.  That way at the end of the

3  day you can leave your notes in the jury deliberation room,

4  and they can be disseminated the next day without anyone

5  having to look at what your notes may have said.

6        Now, don't let your note taking, though, distract you

7  from carefully listening to what is said in court and

8  observing the witnesses and their manner of testifying.

9  Whether or not you take notes, you should rely on your own

10  memory of the testimony.  Your notes are there only to help

11  your memory.  The notes are not entitled to greater weight

12  than your memory or impression about the testimony.

13        Whether you take notes or not, please pay careful

14  attention to the witnesses and their testimony because after

15  the trial, while you're deliberating I will not be able to

16  provide you with a transcript of what has been said.

17        The lady in front of me is a court reporter that

18  works in this courtroom.  She is creating a transcript, but

19  her version of things won't be final until after the trial is

20  over with because she'll have to go back, and she'll listen to

21  the testimony and she'll proofread the stuff that she does on

22  a daily basis.  You know, we all make mistakes, and some of

23  the process of creating a transcript uses artificial

24  intelligence.  And, you know, it doesn't often do it

25  correctly, and you have to go back and make it correct.  And

1   so the bottom line is while I might be able to read along some

2   with what is going on in the courtroom on an unofficial

3   translation, it's not complete.  It's not final until way

4   after trial.

5          So the bottom line is you can't miss something that

6   occurs and then think, well, I can read about it later because

7   you're not going to be able to read it until afterwards.  The

8   record that's created here is for purposes on appeal later and

9   not for purposes of the jury's consideration during the trial

10  itself.

11         So let me talk a little bit about the trial process.

12  First the plaintiff and the defendant will have an opportunity

13  to make an opening statement.  They don't have to, but I

14  expect that they will.  I want you to remember what I said.

15  The lawyers making an opening statement is not evidence.  It's

16  not supposed to be argumentative.  It's just an outline of

17  what that party believes they can prove or what the evidence

18  will show during the course of the trial.

19         After opening statements, the plaintiff will then

20  present her witnesses and ask them questions.  After the

21  plaintiff asks a question of her witnesses, the defendant's

22  counsel may also ask witnesses, those witnesses, questions.

23  That's called cross-examining the witnesses.

24         Once the plaintiff has introduced all of her

25  evidence, testimony of witnesses, any documents or exhibits

1  that might be introduced through those witnesses, it will then

2  be the defendant's opportunity to present their witnesses.

3  Any witnesses called by the defendants can also be questioned

4  by the plaintiff's counsel, cross-examined, as the defendant

5  also has that right relative to the plaintiff's witnesses.  I

6  want to remind you, you should base your decision in this case

7  on all of the evidence regardless of which party presented it.

8         After all of the evidence has been introduced, the

9  parties will present closing arguments to you in which they

10  will summarize and interpret for you the evidence that you

11  have heard.  I will then give you the law, jury instructions,

12  and then you will go out to begin your deliberations.  That is

13  the first time that you should begin talking about the case.

14         I think jurors often wonder why we don't give you the

15  law now, and the reason we don't do that is twofold.  One is

16  I'm not going to know all of the law that might be applicable

17  to this case until all the evidence is presented.  The law has

18  to be adjusted to the evidence.  Certain things, certain parts

19  of the law that could apply might not apply depending on what

20  the evidence ends up being.  So I have to wait until the end

21  to make that decision.

22         And the second reason is probably the most important

23  reason, is I don't want you to concern yourself with the law

24  at this point in time.  I want you to concern yourself with

25  determining, based on from what you see and hear and read,

1    what happened.  And then at the end, once you've had all that

2    evidence, I'll give you the law, and you can discuss what

3    you've decided happened and apply it to the law to determine

4    what the verdict in this case should be.

5          Sometimes parties agree that certain facts are true.

6    Their agreement is called a stipulation.  If any stipulations

7    are presented to you, then you must treat these stipulations

8    as facts that have been proved for purposes of this case.

9          Now, a deposition is a witness's sworn testimony that

10   is taken before trial.  During a deposition the witness is

11   under oath, and he or she swears to tell the truth.  And the

12   lawyers for each party can ask questions of that witness.  A

13   court reporter is present and records the questions that are

14   asked and the answers that the witnesses give.

15         Deposition testimony is entitled to the same

16   consideration by you as live testimony, and you must judge it

17   in the same way as if the witness was here testifying in

18   court.  In considering a deposition testimony, do not place

19   any significance on the behavior or the tone of the voice of

20   the person who may be reading those questions and the answers

21   that the witness gave.

22         From time to time it's going to be necessary, I'm

23   sure, for me and the lawyers to have discussions outside of

24   your ability to hear.  Typically we'll go over here to the

25   right side of the bench.  There's a microphone over there.  So

1  we'll talk loud enough that the court reporter can hear us but

2  hopefully not loud enough for you to hear us.  And the reason

3  we have these bench conferences is that we're trying to make

4  sure that we're all following the correct rules of evidence

5  that apply before something is said or done that it is the

6  right decision.

7          If those discussions become lengthy or involved more

8  than what we can just do while we whisper on the side of the

9  bench, then I might have to send you outside the courtroom so

10  that we can discuss the matter in a little bit more open

11  environment.  We'll do our best to keep those to a minimum,

12  but I just want to alert you to the fact that that will likely

13  happen at some point during the course of the trial.

14          All right.  Ladies and gentlemen, we are now ready to

15  have opening statements.  The plaintiff in this case has the

16  burden of proof, and so they have an opportunity to make their

17  opening statement first.

18          For the plaintiff -- and just to make sure that

19  counsel knows, you both have 30 minutes.  The plaintiff's time

20  will be on the clock to the left behind the jury, and the

21  defendant's time will be on the right.  I will not give you a

22  warning when your time is about to expire, but when it is up,

23  I'll tell you that you need to wrap up.  Okay.  Thank you.

24          MS. MATZ:  Good afternoon.  Members of the jury, my

25  name is Sarah Matz.  I represent the plaintiff, Belcalis

1    Almánzar, who is professionally known as Cardi B.  Many of you

2    have likely heard of her before.  She's a very talented rap

3    artist.

4           And you heard some things in this case yesterday, but

5    today, as the judge said, you are going to start to hear the

6    actual evidence.  The judge is going to instruct you on the

7    law, and based upon what you heard yesterday, you might think

8    you know a little bit about this case.  But today you're

9    actually going to start hearing about it.

10          You're here to decide three basic claims.  Our client

11   has brought claims for defamation, invasion of privacy, and

12   putting someone in a false light and intentional infliction of

13   emotional distress.  But make no mistake.  The evidence is

14   going to show you that you're actually here because of the

15   defendants and their behavior.

16          This is not a case where the defendants merely said

17   things that weren't true, that weren't harmful or criticized

18   my client or her music.  That's not what this case is about.

19   The evidence is going to show you that this case is about the

20   defendant's making repeated and relentless statements that are

21   both vile and false about my client to torture her out of

22   greed and spite.

23          I apologize in advance.  You are going to hear some

24   curse words today and probably many days in this trial.  I

25   will assure you these are not necessarily my words, but these

are the words I'm going to describe in some of the evidence

you're going to hear today.  So I'm going to use some of the

words that you will hear later in evidence.

The evidence is going to show that the defendants,

Ms. Kebe and her company, Kebe Studios, which is under her

control, published despicable falsehoods about my client in

videos and written posts that were put on social media for the

world to see.  The evidence is going to show that they contain

statements that my client engaged in disgusting and debasing

acts with a beer bottle.  The evidence is going to show you

that one of the statements that was made is that my client

allegedly, while naked on a stage, took a beer bottle from a

patron, put it in her vagina, took it out, drank a sip out of

it, and handed it back to the patron.

The evidence is also going to show that the

defendants took to social media and published videos and posts

saying that my client has herpes and HPV.  The evidence is

also going to show the defendants published videos on the

internet that contain statements that my client committed

adultery, cheated on her husband, that she engaged in

prostitution, and used cocaine.

The evidence is also going to show you that none of

this is true and that the defendants knew these statements

were false or had a reckless disregard for whether or not they

were true prior to publishing them repeatedly.  This is not an

1   isolated incident.  The evidence is going to show that for

2   years the defendants have continued to make these statements

3   and republish them and have taken pleasure in doing that to my

4   client.

5        Some of the evidence you're going to see is that

6   defendants would, in their tweets and Instagrams, would call

7   my client Hashtag Herpes B as a play on her professional name,

8   Cardi B, or they would tag her by actually using her handles

9   on those social media applications to ensure both that they

10  could use that as clickbait to drive viewers and ad revenue to

11  their platform and to ensure that everyone knew, including my

12  client, that those were directed at her so that she would see

13  the lies they were spreading about her.

14       You're also going to hear evidence that all of the

15  defendant's statements are provably false.  You're going to

16  see medical records that show that my client does not have

17  herpes and does not have HPV, and you're going to hear that in

18  testimony as well.

19       You're going to hear that the defendant did not have

20  any reliable information or proof that my client had those

21  sexually transmitted infections before she went online and

22  said it or published videos saying it.

23       You're also going to hear the defendant admit that

24  her source of the statement that my client had herpes was

25  completely unreliable, that Ms. Kebe herself actually thought

1  that that person was lying, that that source had told Ms. Kebe

2  that she had a criminal past, and that Ms. Kebe believed that

3  the source had mental issues prior to publishing the

4  statements.  But Ms. Kebe published them anyway.

5          You're also going to hear Ms. Kebe admit that she

6  didn't obtain any corroborating documentation from this

7  alleged source and, also, that prior to the time she published

8  the statements about my client having herpes, that she knew

9  there were documents out there that another person she knew

10  who helped her get this interview would debunk her source.

11  She knew that before she published the statements, and the

12  evidence will show you that she published them anyway.

13          With reference to Ms. Kebe's statements that my

14  client has HPV, you're going to hear evidence that shows that

15  when she told the world and millions of people that my client

16  has HPV, that she thought the story was false, but she put it

17  out anyway.

18          You're also going to hear that my client has never

19  engaged in a debasing act with a beer bottle or a sexual act

20  with a beer bottle the way Ms. Kebe described or in any

21  manner.  You're going to hear evidence that my client has not

22  only never done that but that the source that Ms. Kebe is

23  going to try to rely on, a video online, doesn't resemble my

24  client at all and that no reasonable person could have looked

25  at that video and thought it was my client without a complete

1  and utter reckless disregard for the truth.

2          You're also going to hear that despite the fact that

3  Ms. Kebe follows my client on social media and the fact that

4  she's aware that my client often goes on social media to talk

5  about allegations being made about her, that she didn't bother

6  to look at my client's social media even though she knew that

7  my client might have made statements saying that that wasn't

8  her in the beer bottle video, which actually my client had

9  made statements publicly, both on Twitter and that was picked

10  up in many news articles, showing that it was not her in the

11  video.

12          But, again, the evidence is going to show you that

13  Ms. Kebe stuck her head in the sand and decided to proceed

14  anyway despite the fact that there was no reasonable basis for

15  her to do so.

16          You're also going to hear evidence that my client

17  never engaged in adultery.  She's never engaged in

18  prostitution, and she has never done cocaine.  Despite all of

19  this -- and you're going to hear evidence about the various

20  timeframes defendants had knowledge and the fact that at each

21  step they had more and more and more knowledge -- they have

22  continued to make these statements, many times even while this

23  lawsuit was pending, after it was filed.  The evidence is

24  going to show you that defendants are never going to stop

25  unless you stop them.

1          You're going to see evidence that my client sent not

2   one, not two, but three separate cease and desist and demands

3   for retraction prior to filing a lawsuit.  That didn't stop

4   the defendants.  You're going to see that after defendants

5   received the first one, Ms. Kebe went online and told the

6   world she was going to wipe her ass with it.  You're going to

7   hear evidence that even after this lawsuit, Ms. Kebe still

8   refused to take the statements down.

9          You're also going to hear evidence that directly

10  prior to this lawsuit being filed, Ms. Kebe was sent another

11  demand for retraction that went unheeded, and again she went

12  online and told viewers that she would wipe her ass with it.

13  The evidence is going to show that even after this lawsuit was

14  filed, even after my client took the step of starting this

15  lawsuit to stop the campaign of defamation, that the

16  defendants continued to publish videos reiterating many of

17  these statements.

18         You're also going to hear evidence that during this

19  lawsuit another demand for retraction was sent regarding some

20  of the new videos and that defendant didn't even bother to

21  read it.  Instead, she told her attorneys to tell us to fuck

22  off.

23         Members of the jury, the evidence will show you that

24  we're here today because the defendants have just kept going.

25  They refused to stop, and they've said that they are never

1  going to stop or take the videos down unless a court makes

2  them.  And that's why we're here today.  The defendants have

3  no incentive to take them down.  They're making money using my

4  client as clickbait and these defamatory statements as

5  salacious ways to draw consumers in.  And Ms. Kebe, you're

6  going to hear her that she freely admitted that she knows this

7  upsets my client, and she does it intentionally.

8        Now, the defense is going to try to convince you that

9  the unWinewithTashaK platform is opinion -- you heard that

10  word a lot yesterday -- or that the defendants had some belief

11  that the statements that they were making were true or even

12  more disgustingly that this is some kind of humor.  But you're

13  all smart people, and the evidence that we're going to put

14  before you is going to clearly show that none of that is the

15  case.  The defamatory statements are not opinion.  The

16  evidence is going to show that these are statements of fact

17  that are capable of being proven true or false, and as I said

18  a moment ago, you're going to hear evidence that they are

19  demonstrably false.

20        You are going to hear evidence also that that is

21  exactly how Ms. Kebe presented them to the viewers of her

22  platform.  She presented them as facts.  She told people,

23  everything I said was accurate.  She has also referred to

24  herself as a journalist to her viewers and has admitted that

25  she has, although admits that she does not actually consider

1  herself a journalist.

2          MR. SABBAK:  Your Honor, I'm going to object.  This

3  is argument.

4          THE COURT:  I'm sorry.  It's what?

5          MR. SABBAK:  Argument.

6          THE COURT:  Objection is overruled.  You may proceed.

7          MS. MATZ:  Thank you, your Honor.  You're going to

8  hear that by doing that, she's misleading her own viewers.

9          The evidence is also going to show that based upon

10  the circumstances surrounding all of these and even some of

11  defendant's own statements in later videos, that the

12  defendants knew that some of these statements were false at

13  the time they published them.  And as to the others, that they

14  clearly engaged in a reckless disregard for the truth because

15  they knew that the sources, the sources of the alleged

16  information, weren't credible, and they had doubts about the

17  veracity of those statements.

18          The evidence is also going to show that this isn't

19  funny.  Saying people have highly stigmatic diseases and have

20  engaged in disgusting and vile sexual acts with objects is not

21  a joke.  You're even going to hear Ms. Kebe admit that she

22  knows that statements like this, if false, are defamatory and

23  if someone said them about her, she would sue them.

24          The evidence is going to show at the end of this that

25  Ms. Kebe's conduct and her company is so extreme it goes

1    beyond all possible bounds of decency, and it's atrocious and
2    shouldn't be tolerated in a civil society.
3          You're also going to see evidence that the defendants
4    have intentionally done what they can to hurt and injure my
5    client, and that unfortunately that's succeeded.  It kind of
6    has hurt my client.  You're going to hear evidence that -- who
7    my client is.  She's both a worldwide famous performer, she's
8    also a young mother.  And at the end of the day, this conduct
9    has hurt her, and she suffered a tremendous amount of
10   emotional pain from the statements and the impact that they've
11   had on her.
12         Now, most of you might have come in here thinking
13   that my client isn't exactly like every single person in this
14   room, and maybe she's not.  She is an incredibly talented rap
15   artist, an incredibly talented performer, and she's a woman
16   and she's a mother and she's many things.  But at the end of
17   the day, she's also a human being.  You're going to see
18   evidence that she's come from humble beginnings, and although
19   she's achieved a high level of success, this shouldn't be the
20   price.
21         Is it okay for defendants to go on the internet in
22   front of millions of people and say that my client has herpes
23   and HPV?  Is it okay for the defendants to say that my client
24   engaged in sexual acts with a beer bottle?  Is it okay for the
25   defendants to say that my client engaged in adultery or

1 prostitution or cocaine when the evidence is going to show you

2 that those things aren't true?  Of course not.  Becoming

3 successful and famous doesn't give anyone the right to spread

4 malicious falsehoods.

5        Members of the jury, the judge is going to instruct

6 you on the law, and after you've seen the facts here, we

7 respectfully submit that there's only going to be one

8 conclusion, and that is that the defendants are liable for the

9 conduct that they've alleged.  We greatly appreciate your time

10 and your patience during this process.  Thank you.

11        THE COURT:  All right.  For the defendant?

12        MR. SABBAK:  Ms. Kebe's favorite childhood memory was

13 the time she spent with her mother, her uncles, brothers, at

14 home watching celebrity news and making fun of the people they

15 saw.  This led to her interest in radio broadcast, which she

16 began part-time while she was working at the Cheesecake

17 Factory.

18        She worked for -- many people know Clark Howard who

19 is a close mentor of hers.  And as she tried to break into

20 radio and found it very difficult, YouTube was a new avenue, a

21 new platform, a new opportunity for creative people who want

22 to get themselves out there to do it themselves.

23        Now, Mr. Kebe has his own interest.  That was video

24 production, video editing, and this is something he's always

25 done, music videos, films, commercials, advertisements.  And

1   it just so happens that while Ms. Kebe is trying to bring

2   herself up as a radio personality Mr. Kebe is trying to bring

3   himself up in video editing, and they meet in 2004 at the

4   Cheesecake Factory in Maryland.  Mr. Kebe asked Ms. Kebe out

5   on a date two weeks after she started.  They got married in

6   2006, 2010 moved to Atlanta.

7        In 2015 while Mr. Kebe was at work Ms. Kebe was at

8   home enjoying a glass of wine, and she saw a news article, a

9   clip, some gossip news about Lil Wayne, who's a rapper, and

10   his girlfriend breaking up.  And it was probably the wine, but

11   Ms. Kebe decided to made a video about it, just her general

12   thoughts.  Well, she made the video, posts it on Facebook,

13   went to sleep.

14        A few hours later her husband runs in the house.

15   What did you do, Tasha?  My family can see all those videos --

16   or this video.  Why did you post this?  What are you talking

17   about?  Says it has 5 million views.  It went viral instantly.

18   And at that moment Ms. Kebe and Mr. Kebe found their path in

19   life, and that's when unWinewithTashaK, the YouTube channel

20   that's at issue today, began.

21        Now, as I said, this project started in about 2015,

22   and with all good things they take time to build.  And if you

23   want to build something with a solid foundation, that's one

24   brick at a time, and so Ms. Kebe and Mr. Kebe have been

25   building their dream one brick at a time.

1          Now, in 2018 that was a particularly good year for

2     unWinewithTashaK.  She had broken many stories, particularly

3     stories about R. Kelly, just before the story that we're at --

4     we're here to listen today.  And so Ms. Kebe at that point had

5     already garnered much media attention.  Her subscriber list

6     had grown, and the momentum was going forward.

7          In about beginning to middle of September 2018 what

8     you're going to hear is that an individual named Starmarie

9     Jones posted a video or was on a live chat with her followers,

10    and the topic of plaintiff, Ms. Almánzar, came up.  And during

11    that video she made some allegations, but she alleged and

12    you'll hear that the plaintiff and Starmarie, they lived

13    together.  They worked at the same strip club in New York.

14    Okay.  And from that knowledge, her living with Ms. Almánzar,

15    them working together, she made a few statements about

16    Ms. Almánzar.  And that, those statements, Ms. Kebe saw.

17    Those statements went viral.

18          Those statements include things about, like I said,

19    living with the plaintiff, her brush in time with

20    prostitution, her drug use, and certain other things.  And you

21    will hear that video.  That video went viral.  You'll hear

22    that it was not Mrs. Jones's intent for that video to go viral

23    or to publish a video about the plaintiff.  It happened to

24    come up during an unrelated live event.  Regardless, it goes

25    viral, and as all good journalists or reporters do, they want

1  to get the scoop.  They want to get the story.  And the reason

2  why we're here today is because Ms. Kebe got that story.

3        And so Ms. Kebe, a few days after this IG Live was

4  released, arranged a story or an interview with Ms. Jones,

5  which you will get to see.  It's about 45 minutes to an hour

6  where it details Ms. Jones's relationship with the plaintiff,

7  their time together in New York.  You'll see how it describes

8  the statements that are at issue here today.  You will hear

9  Ms. Jones's version of it, and you will hear Ms. Kebe

10 cross-examining her as though she was an attorney to get the

11 truth.

12        You'll also hear how plaintiff contacted Ms. Kebe,

13 and you will hear how Ms. Kebe offered her an opportunity to

14 discuss the video.  Plaintiff declined.  Plaintiff suggested

15 that Ms. Kebe should talk to her other friends, friends that

16 worked at the same strip club in New York, which she did.  And

17 you will see -- you will hear that those friends confirmed

18 those suspicions.

19        But, most importantly, aside from Starmarie Jones,

20 the reason why it sparked this whole lawsuit, these

21 allegations that the plaintiff claims are defamation, you will

22 hear direct evidence showing that they are, in fact, true.

23 And the majority of that evidence comes from the plaintiff's

24 own mouth, her issue of prostitution, drug use.  As far as

25 this allegation of genital herpes, none was made.  It was an

1   allegation about cold sores said in passing during that

2   interview.

3           But if plaintiff left it alone at that interview,

4   which wasn't a big, huge follow-up interview, but by plaintiff

5   commenting, making statements to the media, she now raises the

6   profile of that video.  And so now it becomes more popular,

7   and every time plaintiff comments on Ms. Kebe's videos or

8   statements, that video garners more and more views.

9           Everyone is familiar with humor.  Everyone is

10  familiar with opinion.  And everyone needs context in order to

11  appreciate that.  And so what you will get throughout this

12  trial, ladies and gentlemen, is context.  And so I beg you to,

13  as the judge said, wait for the evidence to be presented, and

14  take all of these allegations in the context.  And context is

15  not just in statement before, as we know.  It's the statements

16  prior and just after.

17          Okay.  And so I ask you not to make any judgment

18  about what the plaintiff is alleging Ms. Kebe said until you

19  actually hear the videos in the context because context is

20  everything, especially in the media business.

21          Finally, ladies and gentlemen, you're going to hear

22  about the true reason why you're here today.  You will hear

23  what it really is the plaintiff is asking you to do to

24  Ms. Kebe, Mr. Kebe, and their company.  You will see a video

25  from the plaintiff discussing this issue, alleging things also

1  untrue but not at issue today, that Ms. Kebe is harassing her

2  friends and the like.  Mind you these will be the same friends

3  you will hear were the ones that plaintiff instructed Ms. Kebe

4  to follow up with, which she did.  No matter.  Because she

5  followed up with them, she classified it as harassing her

6  friends, which she stated was too far, and because I can't put

7  my hands on you, I'm going to sue you for diffimation of

8  character.

9      And so what you're really going to be asked to do

10  here today by the plaintiff is to put your hands on these

11  people.  And what you're going to find, ladies and gentlemen,

12  is that Ms. Kebe had no malice, had no malice in this case.

13  Mr. Kebe, by continuing to allow the videos to stay up also

14  has no malice in this case.  And at the end once you hear all

15  the statements in their proper context, you will find there's

16  no liability for Ms. Kebe, Mr. Kebe or Kebe Studios.  Thank

17  you.

18      THE COURT:  All right.  Thank you.  That ends the

19  opening statements, and we will proceed with the plaintiff's

20  case.  Plaintiff can call her first witness.

21      MS. MATZ:  Thank you, your Honor.  As our first

22  witness, we call the defendant, Latasha Kebe.

23      MS. IZMAYLOVA:  May we approach briefly?

24      THE COURT:  Sure.

25      (Whereupon, a bench conference was held between the

1   court and counsel.)

2          MS. IZMAYLOVA:  I'm not sure if this is going to come

3   up or not, but I did hear something about a criminal history

4   of Starmarie Jones, and your Honor had ruled out any evidence

5   of Starmarie Jones except for the video, obviously.  And I

6   just wanted to bring it up because I don't know if it's going

7   to come out or not from her opening.

8          MS. MATZ:  It's in the video Starmarie discusses the

9   history and defendant admitted -- excuse me -- the defendant

10  admitted to her telling us in the deposition and that wasn't

11  something the Court ruled on.  The Court ruled Starmarie

12  communications except for video texts were out, not the video

13  we're talking about where Starmarie admitted that she was on

14  parole and wasn't even supposed to be in the state at the time

15  this was all happening.

16         MS. IZMAYLOVA:  I just wanted to bring it up for the

17  record just in case.

18         THE COURT:  I don't think there's anything for me to

19  rule on.  I don't need you to explain.  Thank you.

20         (Whereupon, the following proceedings continued in

21  open court.)

22         THE COURT:  All right.  Ms. Kebe, it's my

23  understanding you're not yet fully vaccinated; is that

24  correct?

25         THE WITNESS:  No.

```
 1              THE COURT:  So if you will assemble that face shield
 2    and then wear that in lieu of your mask.  It's beautiful, and
 3    you're going to want to keep it.  Ms. Kebe, if you would
 4    remain standing, the clerk is going to administer an oath,
 5    please.
 6              COURTROOM DEPUTY:  Please raise your right hand.
 7                       LATASHA TRANSRINA KEBE,
 8              herein, having been first duly sworn, was examined
 9    and testified as follows:
10              COURTROOM DEPUTY:  Thank you.  Please be seated, and
11    state and spell your name for the record.
12              THE WITNESS:  Okay.  Latasha Transrina Kebe, and
13    that's spelled L-a-t-a-s-h-a.  My middle initial -- Oh, I'm
14    sorry.  My middle name Transrina, T-r-a-n-s-r-i-n-a.  Last
15    name, Kebe, K as in kite, E as in elephant, B as in boy, E as
16    in elephant, Kebe.
17              Is the mike okay?
18              COURTROOM DEPUTY:  You can lower it a little bit.
19    Thank you.
20              THE WITNESS:  If the chair raises, I can reach the
21    mike.  I don't know if the chair raises.  Okay.  We're good.
22    All right.
23              MS. MATZ:  May I inquire, your Honor?
24              THE COURT:  You may.
25              MS. MATZ:  Thank you.
```

1                    CROSS-EXAMINATION

2   BY MS. MATZ:

3   Q    Good afternoon, Ms. Kebe.

4   A    Good afternoon.

5         MS. MATZ:  I'd actually like to start by reading some

6   of the stipulated facts in this action into the record just

7   for some background items.

8         THE COURT:  Yes, ma'am.

9         MS. MATZ:  Stipulated -- do I need to read the

10  numbers out, your Honor?

11        THE COURT:  You mean of the stipulations?

12        MS. MATZ:  Yeah.

13        THE COURT:  Whatever you -- however you want to do

14  it.

15        MS. MATZ:  All right.  Ms. Kebe was previously known

16  as Latasha Howard.  Kebe Studios was formed on or about

17  April 14th of 2018 as a Georgia limited liability company.

18  The defendants, which was defined in this stipulation as Kebe

19  and Kebe Studios, the company, produce, host, and publish

20  videos on YouTube under the moniker "unWinewithTashaK."

21  Defendants advertise and sometimes post these videos on

22  various social media platforms including Twitter and

23  Instagram.  Kebe Studios only has two members, each of whom

24  own 50 percent of its membership units.  Kebe Studios' only

25  members are Ms. Kebe and Cheickna Kebe.  Cheikna Kebe is

1   Ms. Kebe's husband.

2          Kebe is in control of, and makes all of the decisions

3   regarding the content that the defendants publish on YouTube

4   and other social media platforms.

5          Defendants own or control the following platforms and

6   websites:  Www.unwinewithtashak.com, which is defined as the

7   "Website"; amazon.com/shop/unwinewithtashak;

8   streamlabs.com/unwinewithtashak/merch; the YouTube channel,

9   which is referred to as the "Main YouTube Channel"; a second

10  YouTube channel referred to as the "Wino Gang Podcast," which

11  until April of 2019 was called unWinewithTashaK Live.  Also,

12  the Patreon Page https://www.patreon.com/TashaK.

13         Defendants also own and control the following

14  platforms and/or social media accounts slash -- excuse me --

15  social media handles/accounts:  The Facebook account, which is

16  @unWinewithTashaK.  And that's facebook.com/unwinewithtashak;

17  The Facebook - Tasha Kebe, which is facebook.com/tashakebe;

18  the Twitter account with the handle @unwinewithtasha; the

19  Instagram account with the handle @unwinewithtashak.  This

20  account was deactivated on August 10th of 2018 and was

21  reactivated on October 7th of 2019, as well as the Instagram

22  account wineisthenewtea.

23         Defendants previously owned and/or controlled the

24  following social media platforms or social media handles and

25  accounts, although all of these are now deactivated:

```
 1  Instagram - @unwinewithtashakofficial, Instagram -
 2  @thewinebloggerlady, Instagram - @iamunwinewithtashak,
 3  Instagram - @unwinewithtasha and Instagram - tashakunwined,
 4  e-d at the end.
 5          Defendants publish content and gain more viewers and
 6  followers to their media channels and, as a result, more
 7  advertising revenue.
 8          The defendants receive revenue through advertising on
 9  YouTube, as well as from monetization of videos on Patreon and
10  sometimes directly from advertisers.
11          And defendants receive those monies through Patreon
12  PayPal, Venmo, and direct payments into bank accounts.
13          All right.  Ms. Kebe, do you recall publishing a
14  video on September 2nd of 2018?
15          THE WITNESS:  Not off the top of my head.  Could you
16  remind me of that video, please?
17  BY MS. MATZ:
18  Q   Sure.  Can you pull up Plaintiff 532.
19          I'm going to show you what's been previously marked
20  as Plaintiff 532.
21  A   Will it show right here?
22  Q   It's shown in a moment.
23  A   Okay.
24          COURTROOM DEPUTY:  So it's only going to be on the
25  witness screen.
```

```
 1              THE COURT:  Are y'all controlling to show on this
 2    screen?
 3              COURTROOM DEPUTY:  It's connected to plaintiff's back
 4    table.
 5              THE COURT:  Why are you looking at me?
 6              MS. MATZ:  Huh?  I didn't hear you, your Honor.
 7              THE COURT:  I said why are you looking at me?
 8              MS. MATZ:  Oh.  I thought you were saying something.
 9    I'm sorry.
10              THE COURT:  No.  I was talking to her.  So I guess
11    we're waiting for it to show up on the witness's screen?
12              MS. MATZ:  Yeah.  Could we actually side bar?  I just
13    have one quick question with counsel.
14              (Whereupon, a bench conference was held between the
15    Court and counsel.)
16              MS. MATZ:  So a lot of these videos have actually
17    been authenticated by requests for admission and were
18    admitted, so I guess I just wanted to know how you would like
19    me to handle -- would like me to put requests for admission
20    into evidence.
21              THE COURT:  I would just simply just say, you know,
22    like, your Honor, we're about to use a video.
23              MS. MATZ:  Yeah.
24              THE COURT:  Your Honor, we've already stipulated that
25    it's --
```

1          MS. IZMAYLOVA:  I object it's to foundation.

2          THE COURT:  You're not --

3          MS. IZMAYLOVA:  No.

4          THE COURT:  Well, then --

5          MS. IZMAYLOVA:  She's already admitted that she --

6          THE COURT:  Just say, your Honor, exhibit whatever is

7  a video.  The parties have agreed that foundation is proper,

8  that the video is admissible without further foundational

9  evidence.  And if I hear no objection, I'll say you can

10 publish the video or I'll admit it or even if you want to play

11 it, it's got to be tendered.  You're tendering the exhibit.

12 So the same thing, I guess, you're agreeing to it being

13 admitted to.

14         MS. IZMAYLOVA:  Correct.

15         MS. MATZ:  Yeah, there's only a couple where there

16 might be for impeachment only, but that's not going to be this

17 one or the next one.  Maybe we can talk about -- the only

18 question I had about that is how you handle it in terms of

19 like showing the jury or not showing the jury if only being

20 offered for impeachment because usually impeachment evidence

21 doesn't move in but the jury can hear it.  I just wanted to

22 raise that before I get too far into my questioning.

23         THE COURT:  If the video is going to be played for

24 the jury to see, it still has to be admitted into evidence for

25 impeachment purposes.  So I don't agree with that.  It still

1  is admitted for impeachment, just wouldn't be admitted with

2  the case in chief unless you have to use it for impeachment.

3  Then it comes in because the jury could decide what -- what

4  did the video say?  Was she really impeached?  That can't go

5  back unless admitted.  It's the impeachment that makes it

6  admissible, not that it's not admitted.  It's still admitted

7  like any other document.  Same reason.

8       MS. MATZ:  You're a hundred percent right.  I

9  apologize.  I misspoke.  My thinking was the document --

10  oftentimes the witness looks and then they're impeached.  Then

11  the Court let's you move it in.  Is she going to view the

12  piece first?

13       THE COURT:  You would ask her, I suppose, did you say

14  something and she would say, no, I didn't.  And then at that

15  point in time you lay the foundation of the video, and if it's

16  stipulated the foundation, then you move it into evidence for

17  purposes of impeachment.  And I would grant the motion and

18  then it would be shown.

19       MS. IZMAYLOVA:  Stipulate to videos as far as

20  foundation is concerned, I'm not sure which -- I don't know

21  what you're referring --

22       MS. MATZ:  I don't think it's -- I do think it was

23  the majority of them, and it's not going to come up right now.

24  So we can deal --

25            (Whereupon, the following proceedings continued in

1  open court.)

2  BY MS. MATZ:

3  Q   Before this starts, is September of 2018 the first time

4  you ever published a video about my client, Cardi B?

5  A   No, ma'am.

6  Q   Okay.  So what your attorney just said in his opening

7  statement, that that was the first time, was not true;

8  correct?

9  A   I'm sorry.  I couldn't hear you.

10  Q   So what your attorney just said about September of 2018

11  being the first time you ever published a video about my

12  client, that's not true?

13          MR. SABBAK:  Objection, your Honor.  It's a

14  misstatement of fact.

15          THE COURT:  It's what?

16          MR. SABBAK:  Misstatement of the fact.

17          THE COURT:  Objection is overruled.  The question?

18  Go ahead.

19          THE WITNESS:  That is not correct, no, ma'am.

20  BY MS. MATZ:

21  Q   No, it's not the first time you've ever published a video

22  about my client; correct?

23  A   No.

24  Q   Okay.  Do you recall the approximate time frame of the

25  first time you ever published a video about my client?

1   A    No, ma'am.

2   Q    Okay.  All right.  We are going to show you -- excuse me.

3   Strike that.  I'll withdraw.  Was the interview with Starmarie

4   Jones -- it wasn't the first time that you published a video

5   saying that my client prostituted; correct?

6   A    No, ma'am, it was not.

7   Q    I'm sorry.  I'm having trouble hearing you.

8   A    Sorry.  No, ma'am, it was not.

9   Q    Okay.  If we can look at -- I'm going to show you what's

10  been premarked as Exhibit 532.  Your Honor, this was

11  stipulated to as in Request for Admission No. 15.

12          THE COURT:  No objection?

13          MS. IZMAYLOVA:  No objection.

14          THE COURT:  All right.  532 is tendered and admitted

15  without objection.

16          (Whereupon, Plaintiff's Exhibit 532 was marked for

17  purposes of identification and admitted into evidence.)

18          MS. MATZ:  And before the video plays I'd like to

19  just read one other statement from the request for admission

20  and that is on -- excuse me, not the request for admission --

21  the stipulated facts and that is on September 2nd of 2018 the

22  defendants published the video on YouTube.

23          Okay.  If we can, please look at approximately 5

24  minutes and 50 seconds into the video.  Maybe start like 10

25  seconds before that.

1          Your Honor, would you want to -- I'm sorry.  It looks

2    like we're having a couple technical difficulties trying to

3    get the video cued up.  Were you planning on taking a restroom

4    break anytime soon because I don't want to waste anybody's

5    time.

6          THE COURT:  I really wasn't planning on doing it so

7    quickly, but I will.

8          MS. MATZ:  I just don't want to --

9          THE COURT:  All right.  We'll go ahead and take just

10   a ten-minute recess and come back, and maybe our technology

11   will cooperate.  Ladies and gentlemen, if you want to go

12   downstairs to the concession, then feel free to do that, but

13   be back in approximately 10 minutes.  Now, one thing I didn't

14   tell you yesterday you may have discovered already, that there

15   is a refrigerator here for you to use.  So you can bring stuff

16   with you if you'd like to, but in the meantime if someone

17   wants to run downstairs a few minutes, that's fine.  We'll see

18   you in about ten minutes.

19         COURTROOM SECURITY OFFICER:  All rise.

20         THE WITNESS:  Am I excused?

21         (Whereupon, the jurors exited the courtroom.)

22         THE COURT:  Just a couple of things, one alluded to

23   yesterday, if you haven't supplied us with your requests to

24   charge, we need those.  Really we were supposed to have them

25   yesterday, but you need to go ahead and send those to us if

1   you haven't.  And y'all have got to get your technology

2   together.  I mean, we can't -- this has got to be seamless if

3   we're going to have any chance to try this case without, you

4   know, problems down the road.  But I'll trust y'all will be

5   able to do that, but let's get our act together, if we can,

6   technology wise.  All right.  We'll take a ten-minute recess.

7            MS. MATZ:  Thank you, your Honor.

8            (Brief recess.)

9            THE COURT:  All right.  Go ahead, ma'am.

10           MS. MATZ:  Thank you, your Honor.  All right.  So

11  we're going to -- Ms. Kebe, we're going to play you a portion

12  of Plaintiff's 532 moved into evidence starting at

13  approximately 5 minutes and 40 seconds.

14           (Whereupon, a video recording was played.)

15  BY MS. MATZ:

16  Q   Thank you.  In this video you just said that my client

17  prostituted for a living; correct?

18  A   Yes, ma'am.

19  Q   And that's not the only time that you have made that

20  statement in videos that were published on the internet;

21  correct?

22  A   No, ma'am, it's not.

23  Q   Okay.  That statement was also made -- contained in the

24  September 19th, 2018, video; is that correct?

25  A   Which video are you referencing, please?

1   Q    The interview with Starmarie Jones.  Was that --

2   A    No, ma'am, not in that particular video.

3   Q    Hold on.  I will rephrase the question.  Was the statement

4   that my client was a prostitute also contained in the

5   interview with Starmarie Jones?

6   A   Yes, ma'am.

7   Q    All right.  And isn't it true that you found out about

8   Starmarie Jones through another blogger called Lovely TI?

9   A    Yes, ma'am.

10  Q    And you called Lovely TI and then reached out to

11  Starmarie; is that correct?

12  A    Yes, ma'am.

13  Q    Okay.  And isn't it true that you also admitted during

14  your deposition that your fans were not actually asking you to

15  do this video?

16  A    I don't recall what exactly you're saying.  Could you give

17  me more context, please.

18  Q    Why don't we take a look at your deposition transcript.

19          MS. MATZ:  Your Honor, may I approach?

20          THE COURT:  You may.  So when you approach the

21  witness, put your mask on, please.  Sorry.

22  BY MS. MATZ:

23  Q    All right.  Isn't it true that you had heard about

24  Starmarie through a video that she had previously published?

25  A    Yes, ma'am.

1   Q   Okay.  And then you testified that no one asked you to do

2   the video of her; is that correct?

3   A   I don't recall my exact statement.

4   Q   Please take a look at page 188 -- excuse me -- page 189.

5   A   Okay.

6   Q   Can you please read lines 2 through 6 into the record.

7   A   Did you have people reaching out to you at that point

8   asking you if you would do an interview of her?  Were your

9   fans asking for that?  No, nobody asked me to.

10  Q   Thank you.  All right.  And based on the content of the

11  prior video that you had seen of Starmarie Jones, you knew

12  that Starmarie Jones was saying that my client, Cardi B, was a

13  prostitute, had used cocaine, and had herpes; isn't that true?

14          MR. SABBAK:  Objection, your Honor.  That's a

15  compound question.

16          THE COURT:  Why don't you break it in parts if you

17  would.

18  BY MS. MATZ:

19  Q   Sure.  Based on the content of the prior video that you

20  saw of Starmarie Jones, isn't it true that you knew that Jones

21  was saying that my client, Cardi B, was a prostitute?

22  A   I don't remember her saying that she was a prostitute.  I

23  remember other statements.

24  Q   If we could please look at page 189 of your deposition

25  transcript.

1    A    Okay.

2    Q    You were asked -- isn't it true that you were asked,

3    starting on line 21, you knew, based on the content of the

4    original Jones video, that Jones was alleging that our client

5    was a prostitute; right?  Answer, yes.

6              Did you give that testimony?

7    A    Yes, ma'am.

8    Q    Okay.  And by Jones that we were discussing during this

9    deposition, we're talking about Starmarie Jones; correct?

10   A    Yes, ma'am.

11   Q    All right.  And it's also true that you knew that Jones

12   was making statements that our client was using illegal drugs,

13   like cocaine; isn't that correct?

14   A    Yes, ma'am.

15   Q    Okay.  And you also knew that Jones was saying my client

16   had herpes; correct?

17   A    Cold sores to be exact.

18   Q    Ms. Kebe, I'm going to refer you to your deposition

19   transcript, page 190, line 9, beginning at line 9.  Okay.  And

20   you knew that our -- that Jones was alleging that our client

21   had herpes?  Answer, yes.

22              Is that the testimony you gave?

23   A    Yes, ma'am.

24   Q    Thank you.  And isn't it also true that when you decided

25   to interview her, you decided to interview her about those

1   topics?

2   A    Yes, ma'am.

3   Q    Isn't it also true that the Starmarie Jones' video was

4   prerecorded?

5   A    Yes, ma'am.

6   Q    So you knew all of the content that was going to be in the

7   video you posted to the internet before you posted it;

8   correct?

9   A    Yes, ma'am.

10  Q    Okay.  Do you recall testifying that one of the things you

11  wanted to do was drop this video before anyone debunked it?

12  A    Yes, ma'am.

13  Q    And you also recall testifying that you wanted to get it

14  out before someone else dropped information that might have

15  contradicted the video; correct?

16  A    I don't remember the context.  I can't recall.  Could you

17  add more context to that, please?

18  Q    I'm asking if you recall giving that testimony in this

19  case during your deposition.

20  A    I don't recall.

21  Q    Okay.  If you can, please look at your transcript, page

22  281.  I'm going to begin at line 10.

23  A    You said line 10?

24  Q    Uh-huh.  Actually, I'm going to begin at line 5.  You were

25  asked, okay, and do you also recall that one of the things you

1    said was that you wanted --

2            MR. SABBAK:  Your Honor, objection.  This is improper

3    impeachment.  The witness said she did not recall.

4            THE COURT:  I think she just asked her to look at the

5    transcript; right?  So what's improper about the question?

6            MR. SABBAK:  She should refresh her recollection, not

7    read it into the record.

8            THE COURT:  She asked her if she knew.  She said she

9    couldn't recall, and so now she's asking her to look at what

10   she's testified previously.

11           MR. SABBAK:  She's just reading the statement into

12   the record.

13           THE COURT:  Objection is overruled.

14           MR. SABBAK:  Okay.

15           THE COURT:  Thank you.

16   BY MS. MATZ:

17   Q   Beginning at line 5.  Okay.  And do you also recall that

18   one of the things that you said was that you wanted to drop it

19   before anyone debunked it?  Answer, yes, of course, I wanted

20   to get it out if someone was going to debunk it, so yes.

21   Question, okay, so you wanted to get it out before somebody

22   else dropped information that might have contradicted the

23   video?  Answer, yes, absolutely.

24           Did you give that testimony?

25   A   Yes, ma'am.

1   Q   Do you recall giving testimony that one of the reasons you

2   wanted to drop it first was in order to get ratings?

3   A   Yes, ma'am.

4   Q   And that your decision to publish it had more to do with

5   the fact that you wanted to make money off of it and get the

6   most ratings; correct?

7   A   Yes, ma'am.

8   Q   All right.  If we can please pull up plaintiff's 534.

9   It's a video.  And, your Honor, I'll represent that this has

10  been stipulated by Request for Admission No. 19.

11          THE COURT:  What was the number again?

12          MS. MATZ:  The number of the exhibit or the number of

13  the request for admission?

14          THE COURT:  The request to admit -- I'm sorry.  The

15  exhibit number.

16          MS. MATZ:  The exhibit is Plaintiff's 534, your

17  Honor.

18          THE COURT:  All right.  Hearing no objection, 534 is

19  admitted.

20          MS. MATZ:  Thank you, your Honor.

21          (Whereupon, Plaintiff's Exhibit 534 was marked for

22  purposes of identification and admitted into evidence.)

23          MS. MATZ:  Okay.  We're going to start this one from

24  the beginning.

25          (Whereupon, a video recording was played.)

1  BY MS. MATZ:

2  Q   All right.  If we can stop this for a moment.  This is a

3  video of the interview, your interview, with Starmarie Jones;

4  correct?

5  A   Yes, ma'am.

6  Q   Okay.  And is this -- it's true that this is not usually

7  the format of your unWinewithTashaK videos; correct?

8  A   I have many formats.

9  Q   Okay.  But is it typical for you to prerecord videos?

10 A   Yes, ma'am.

11 Q   It's typical for you to prerecord interviews with third

12 parties?

13 A   Yes, ma'am.

14 Q   Okay.  All right.  You started this video.  We just saw

15 you start this video with three questions; correct?

16 A   Yes, ma'am.

17 Q   Okay.  And you asked -- you asked Ms. Jones, you said,

18 that Cardi B prostituted?  And Jones said yes; right?

19 A   Yes, ma'am.

20 Q   You then said, was she a drug user?  Ms. Jones said, yes,

21 cocaine to be specific; correct?

22 A   Yes, ma'am.

23 Q   And then you asked, she has herpes?  And Jones said, yes.

24 Correct?

25 A   Yes, ma'am.

1   Q    Okay.  Do you recall giving testimony that you

2   intentionally started the video with those three questions?

3   A    I don't recall that testimony.  Could you remind me.

4   Q    Okay.  If we could look at page 209 of your deposition

5   transcript beginning at line 8.  The question was, okay, why

6   did you start the interview with those three questions?

7   Answer, because those are the three things that Starmarie had

8   stated in her previous live testimony that went viral.

9             Did you give that testimony?

10  A    What line are you on again?  I'm sorry.

11  Q    Sure.  I started at line 8 on page 209.

12  A    Yes, ma'am.

13  Q    Isn't it true that you started the video also with those

14  three questions because of the testimony you gave, that you

15  confirmed you gave earlier, that you wanted the video to get

16  the most ratings; correct?

17  A    No, ma'am.  That is not correct.

18  Q    When you interviewed Starmarie Jones before you published

19  this video on the internet, isn't it true that you teased it

20  on social media?

21  A    Could you state that question again.

22  Q    Do you need it repeated or restated?

23  A    Repeated.  Sorry.

24  Q    Sure.  I said, isn't it true that before you published the

25  video online you teased the video on social media?

1   A   Yes, ma'am.  That's our standard.

2   Q   I'm sorry.  I didn't hear it.

3   A   That's our standard, our company standard.

4   Q   Okay.  And the purpose of teasing the video is to get

5   viewers excited to watch it so that when it's released, it

6   will have more views; correct?

7   A   We preview the content.  We can't tell if someone is going

8   to watch it or not, but we preview and it gives them an

9   option.

10          THE COURT:  The question was the purpose.  What's the

11   purpose that you do that?

12          THE WITNESS:  To preview the content.

13          THE COURT:  What's the purpose that you preview?

14          THE WITNESS:  So that our viewers know what's coming.

15          THE COURT:  And what's the purpose of that?

16          THE WITNESS:  So that people can view it.

17          THE COURT:  Okay.

18   BY MS. MATZ:

19   Q   Thank you.  All right.  If we could pull up Plaintiff's

20   314 for a moment.  Is this a true and accurate copy of a post

21   that you posted on Instagram on September 18th of 2018?

22   A   Yes, ma'am.

23          MS. MATZ:  Your Honor, I'd offer this into evidence.

24          THE COURT:  Any objection?

25          MR. SABBAK:  No objection.

1          THE COURT:  P-314 is admitted without objection.

2          MS. MATZ:  Thank you, your Honor.

3          (Whereupon, Plaintiff's Exhibit 314 was marked for

4   purposes of identification and admitted into evidence.)

5   BY MS. MATZ:

6   Q   In this post you say, Winos #cardib in the comments of my

7   Instagram going the fuck over my interview with her

8   ex-roommate.  Do you see that?

9   A   Yes, ma'am.

10  Q   Okay.  And were you letting people know that Cardi B had

11  been in your comments talking about one of the teasers of the

12  interview?

13  A   Yes, ma'am.

14  Q   Okay.  And did you hashtag her in this post so that when

15  people searched the hashtag, they would find the post?

16  A   Yes, ma'am.  It's right there.

17  Q   I'm sorry.  I didn't hear the last part.

18  A   It's right there, the hashtag Cardi B.

19  Q   Okay.  And in the side window next to it you wrote,

20  @iamcardib.  Do you see that?

21  A   Yes, ma'am.

22  Q   And your understanding is that's my client's Instagram

23  handle; correct?

24  A   Yes, ma'am.

25  Q   Okay.  And you said, vs @iamlovedstarmarie13.  Do you see

1  that?

2  A    Yes, ma'am.

3  Q    And is that Starmarie's Instagram handle?

4  A    It was at the time, yes, ma'am.

5  Q    And then you said in this, I gotta to tell you, this is by

6  far the best interview I've ever done.  The ex-roommate went

7  the fuck in.  Do you see that?

8  A    Yes, ma'am.

9  Q    Okay.  And then there are some more hashtags below this,

10 including another one for Cardi B.  Do you see that?

11 A    Yes, ma'am.

12 Q    Was one of the purposes of posting this to promote the

13 fact that you had a video coming out and that my client was

14 engaging with it?

15 A    Yes, ma'am.

16 Q    All right.  If we can pull up Plaintiff's 61 for a moment.

17        Is this a copy of the -- a screenshot of what the

18 video would look like on your YouTube channel?

19 A    Yes, ma'am.

20        MS. MATZ:  Okay.  Your Honor, I'd offer this into

21 evidence.

22        THE COURT:  I'm sorry.  So Exhibit 61?

23        MS. MATZ:  Yeah, P-61.

24        THE COURT:  Any objection?

25        MR. SABBAK:  No objection.

1          THE COURT:   61 is admitted without objection.

2          (Whereupon, Plaintiff's Exhibit 61 was marked for

3   purposes of identification and admitted into evidence.)

4   BY MS. MATZ:

5   Q    Now, as you can see on this, this was captured on

6   January 3rd of 2019.  Do you see that?

7   A    Yes, ma'am.

8   Q    And this was how people would view the Starmarie Jones

9   video that we just saw a portion of; correct?

10  A    Yes, ma'am.

11  Q    Okay.  And underneath the title -- well, before the title

12  of the video on the mid left-hand side there's #unwined

13  #cardib and #exclusive.  Do you see that?

14  A    Yes, ma'am.

15  Q    And do you -- isn't it true you put those hashtags there

16  to again -- so that when people were searching the internet

17  for hashtags for my client, that they would find the videos?

18  A    Yes, ma'am.

19  Q    Okay.  And below the title of the video it says, 2,777,669

20  views.  Do you see that?

21  A    Yes, ma'am.

22  Q    Is that the way YouTube indicates the number of views as

23  of a particular date for a video?

24  A    Yes, ma'am.

25  Q    So as of this date, that video had been viewed more than

1  2.7 million times; correct?

2  A   Yes, of that date.

3  Q   And since then, it's gotten even more views; correct?

4  A   Yes, ma'am.

5  Q   It's well over 3 million; correct?

6  A   I think 4.8 to be exact, million.

7  Q   Okay.  And then underneath at the very bottom left after

8  underneath with -- unWinewithTashaK under Published on

9  September 19, 2018, you have more hashtags.  Do you see that?

10 A   Yes, ma'am.

11 Q   Okay.  And is the purpose of repeatedly hashtagging my

12 client and words like exclusive and trending to ensure that

13 your video gets picked up in searches?

14 A   That's not a repeat.  Those are the actual hashtags.

15 Those are the same ones that are in the description box.  So

16 what happens is when you put things in the description box

17 under the unWinewithTashaK where it says Published, only three

18 of them show at the top, so that's just a repeat.  I didn't

19 write those twice.

20 Q   Okay.  And then underneath that there's a link that says

21 https teespring.com.  And it looks like it then says backslash

22 nowigottago.  Do you see that?

23 A   Yes, ma'am.

24 Q   Nowigottago is a common way that you sign off from videos;

25 correct?

1   A   Yes, ma'am.

2   Q   And it's in hashtags in lots of your posts and videos on

3   various social media platforms?

4   A   Yes, ma'am.

5   Q   And do you kind of consider it a signature of yours?

6   A   Yes, ma'am.

7   Q   Okay.  Is this link for teespring.com going to a

8   merchandise page for nowigottago merchandise?

9   A   Yes, ma'am, t-shirts to be exact.

10  Q   Okay.  So you were also promoting the sale of your goods

11  in the link where you're promoting the video; correct?

12  A   Yes, ma'am.  The link is in all of our videos.

13  Q   All right.  Before you published this video you admit that

14  Starmarie Jones had told you that she had criminal charges

15  against her in the past; correct?

16  A   No.  No, ma'am.

17  Q   Before you published this video online she hadn't told you

18  that she was on parole?

19  A   She told me in the interview.

20  Q   But that was before you published it; right?  Because it

21  was recorded?

22  A   I got confused with the question.  I apologize.

23  Q   So before you published the video on YouTube you

24  acknowledge that Starmarie Jones had told you that she had

25  criminal charges in her past; correct?

1  A   She was on probation, yes, ma'am.

2          THE COURT:  I'm sorry.  So what's the answer to the

3  question?

4          THE WITNESS:  Yes.  Yes, sir.  Your Honor.  I'm

5  sorry.

6          THE COURT:  Answer the question that's asked and not

7  a question that's not asked.  Okay?

8          THE WITNESS:  Yes, your Honor.

9          THE COURT:  Thank you.

10  BY MS. MATZ:

11  Q   Okay.  I'm sorry.  You just said she was on probation.

12  Isn't it true she told you she was on parole and was supposed

13  to be in Georgia?

14  A   I spoke too soon probation, parole.

15  Q   Okay.  And in the video she's actually told you on camera

16  that during the time period she was describing having

17  interactions with my client, that she was in New York despite

18  the fact that she was not supposed to leave the state of

19  Georgia; correct?

20  A   Yes, ma'am.

21  Q   Okay.  And you testified that it was your understanding,

22  based on those conversations, that she was in New York legally

23  to acquire money to pay for her legal fees back in Atlanta;

24  correct?

25  A   Yes, ma'am.

1  Q   Isn't it true that you also testified that you thought

2  that Starmarie had mental problems?

3  A   Yes, ma'am.

4  Q   And you also admitted that Ms. Jones, Starmarie Jones, did

5  not actually show you any documents or anything that

6  corroborated her story; correct?

7  A   Yes, ma'am.

8  Q   You also admitted that you never saw any medical records

9  of my client before the interview aired; correct?

10 A   Yes, ma'am.

11 Q   All right.  After you posted the September 19th video, you

12 received a cease and desist letter; is that correct?

13 A   Yes, ma'am.

14 Q   Okay.  I'm just going to read three stipulated facts:

15 Plaintiff's prior counsel sent a letter dated September 19th,

16 2018.  Kebe received the September 19, 2018 letter, and Kebe

17 did not remove the September 19th, 2018 video.

18         All right.  If we could please pull up Plaintiff's

19 517.  I'm showing you what's previously been marked as

20 Plaintiff's 517.  Is this a copy of the cease and desist

21 letter that you received?

22 A   Yes, ma'am.

23 Q   Okay.  All right.  Following receipt of that letter, did

24 you post that letter online, on the internet?

25 A   Yes, ma'am.

1   Q   Okay.  If we can please pull up --

2             THE COURT:  Do you intend to tender 517?

3             MS. MATZ:  Yes.  I'm sorry, your Honor.  I'd move it

4   into evidence.

5             THE COURT:  Any objection?

6             MR. SABBAK:  No objection, your Honor.

7             THE COURT:  517 is admitted without objection.

8             (Whereupon, Plaintiff's Exhibit 517 was marked for

9   purposes of identification and admitted into evidence.)

10  BY MS. MATZ:

11  Q   Okay.  If we can please pull up Plaintiff's 317.  Have you

12  ever seen this document before?

13  A   Yes, ma'am.

14  Q   Okay.  And that's your Instagram handle at the top there;

15  correct?

16  A   Yes, ma'am, it was.

17  Q   And you posted this photo and the text directly beneath it

18  on Instagram; correct?

19  A   Yes, ma'am.

20            MS. MATZ:  Okay.  Your Honor, I'd offer this exhibit

21  into evidence.

22            MR. SABBAK:  Your Honor, objection.  It contains

23  hearsay within the document.

24            THE COURT:  I'm sorry.  The document that your client

25  posted is hearsay?

1          MR. SABBAK:  The comments underneath, from somebody

2    else, your Honor.

3          THE COURT:  But this is your client's document;

4    right?

5          MR. SABBAK:  This is a screenshot that the plaintiff

6    got from the internet of my client's post, but underneath

7    there are random people who we're not sure who they are that

8    had their own opinions about whatever.  So it's -- that's

9    showing.

10         THE COURT:  It's not hearsay that your client posted

11   it; right?

12         MR. SABBAK:  No.  The client's post is not hearsay,

13   but comments by unidentified individuals are.

14         THE COURT:  Well, the Court admits the screenshot for

15   what it is, an Instagram post that your client put on the

16   internet.  You're arguing that the comments that she posted

17   are hearsay --

18         MR. SABBAK:  Not the --

19         THE COURT:  Excuse me?

20         MR. SABBAK:  Not the comments she posted, your Honor,

21   the comments other Twitter followers posted.

22         THE COURT:  You're arguing that the comments that are

23   included within your client's post are hearsay.  The document

24   is admitted because it is a document -- screenshot of a

25   document that your client posted on the internet, so it's

1  admitted for that purpose only.  Thank you.

2          So I'm sorry.  This is 317?

3          MS. MATZ:  Yes, your Honor, Plaintiff's 317.

4          THE COURT:  317 is admitted over objection.

5          (Whereupon, Plaintiff's Exhibit 317 was marked for

6  purposes of identification and admitted into evidence.)

7  BY MS. MATZ:

8  Q   And, Ms. Kebe, this is a -- at the top of the page that's

9  a photo of the cut off cease and desist letter we were just

10 looking at; correct?

11 A   Yes, ma'am.

12 Q   Okay.  And then underneath that, after it says 1,016

13 likes, it says unwinewithtasha in bold.  Do you see that?

14 A   Yes, ma'am.

15 Q   And that's the text that you actually wrote and posted;

16 correct?

17 A   Yes, ma'am.

18 Q   Okay.  And you wrote -- you tagged my client first;

19 correct?

20 A   Yes, ma'am.

21 Q   Okay.  And you said, iamcardib I told you once and I'm

22 gonna to tell you again, you need to check

23 @iamlovedstarmarie13.  Why the fuck are you sending me a cease

24 and desist?  You're a clown.

25          Do you see that?

1  A    Yes, ma'am.

2  Q    Okay.  And then you also said, tell your lawyer, as I had

3  my team do in an email, that I'm gonna wipe my fucking ass

4  with this piece of paper.  Do you see that?

5  A    Yes, ma'am.

6  Q    Okay.  And then you followed that up with saying, I'm a

7  grown woman.  Do you see that?

8  A    Yes, ma'am.

9  Q    Okay.  And then you say, if you have yet to send your

10 lawyers after her and come after me.

11           Do you see that?

12 A    Yes, ma'am.

13 Q    Okay.  And isn't it true that you were saying that to

14 encourage my client to go talk to Starmarie Jones if she had a

15 problem?  Correct?

16 A    Yes, ma'am.

17 Q    And then at the bottom again you hashtagged my client by

18 putting #cardib.  Do you see that?

19 A    Yes, ma'am.

20 Q    And that's so that when people searching Instagram

21 specifically looked for my client, this would come up;

22 correct?

23 A    Yes, ma'am.

24 Q    All right.  And that helps drive people to your Instagram

25 and your YouTube channel, your platform in general; correct?

```
1   A    Yes, ma'am.

2   Q    Okay.  After you sent this -- after you posted this, you

3   didn't take the video down; correct?

4   A    No, ma'am.

5   Q    And you actually kept promoting it; right?

6   A    Yes, ma'am.

7   Q    All right.  If we could please pull up Plaintiff's 312.

8   Is this a copy of an Instagram post that you posted on your

9   Instagram channel?

10  A    Yes, ma'am.

11  Q    And you posted this on 9-20; correct?

12  A    It doesn't have a date on it.

13  Q    Do you see the date at the top left-hand corner of the

14  page, 9-24-18?

15  A    Okay.  Yes, ma'am.

16  Q    At the bottom right it says posted 4 days ago.  Do you see

17  that?

18  A    Yes, ma'am.

19  Q    Okay.  So would that refresh your recollection that you

20  posted this on September 20th?

21  A    Yes, ma'am.

22  Q    Okay.  All right.  And that's the day after you received

23  the cease and desist and posted it on the internet; correct?

24  A    I don't have the exact date of the cease and desist.

25  Q    The letter we were looking at was just dated September 19;
```

1  right?

2  A    May I see the date?

3  Q    Sure.  We can pull it up again.  Can we please pull up

4  Plaintiff's 517.  Does this refresh your recollection when you

5  received the cease and desist letter?

6  A    Yes, ma'am.

7  Q    Okay.  So the promotion that we just saw -- and if we

8  could go back to Plaintiff's 312, please.  So this was the day

9  after you received the cease and desist letter; correct?

10  A    Yes, ma'am.  The 20th, yes, ma'am.

11         MS. MATZ:  Okay.  Your Honor, I'd offer Plaintiff's

12  312 into evidence.

13         MR. SABBAK:  Your Honor, defense objects, and again

14  this document contains inadmissible hearsay.

15         THE COURT:  The Court admits 312 over objection and

16  states that 312 is admitted for what it is, which is a post on

17  the defendant's Instagram account.  I may not have

18  specifically said as it relates to 317 or 312, which is this

19  particular document, the jury should ignore any comments that

20  are made that are not attributable to the defendant herself.

21  So it's admitted.

22         (Whereupon, Plaintiff's Exhibit 312 was marked for

23  purposes of identification and admitted into evidence.)

24  BY MS. MATZ:

25  Q    Okay.  Ms. Kebe, in this exhibit what we're seeing on the

1  left is actually a screenshot of your YouTube; is that

2  correct?

3  A   Yes, ma'am.

4  Q   Okay.  And at the lower left-hand corner, that has your

5  YouTube channel title; correct?

6  A   Yes, ma'am.

7  Q   So somebody who found this post on Instagram could very

8  easily find your YouTube channel; correct?

9  A   Sometimes.

10  Q   But the purpose of screenshotting it with that included is

11  so they were able to find your YouTube channel; correct?

12  A   Yes, ma'am.

13  Q   And in the portion of this exhibit to the right this --

14  where after it says unwinewithtasha in bold, that's the

15  portion you actually -- the first part of that, that's the

16  portion you wrote; correct?

17  A   Where it says New Video Alert?

18  Q   Yes, where it says New Video Alert down to the #StarMarie;

19  correct?

20  A   Yes, ma'am.

21  Q   So that's the portion that you wrote and published?

22  A   Yes, ma'am.

23  Q   Okay.  And in this you said New Video Alert, Link in BIO

24  or visit unWinewithTashaK.com.  Do you see that?

25  A   Yes, ma'am.

1  Q   Okay.  And Link in BIO means that if they go to your

2  Instagram page, they will actually find a link there that

3  leads to your website; correct?

4  A   That is correct.

5  Q   Okay.  And that was so that people who saw this and wanted

6  to see it easily could very easily just click on the link in

7  your bio in your Instagram and go to this video; correct?

8  A   That is correct.

9  Q   Okay.  And then you also said here, grab your -- and then

10  there are some symbols.  Can you tell me what those symbols

11  are?

12  A   I believe one is a wine glass, and the other is someone

13  running.  And I'm not sure what that other sign is.  I haven't

14  used that sign before then.  Sometimes when Instagram changes

15  or iPhone or Samsung changes, emojis, they show up different,

16  so I'm not sure what that one is.

17  Q   Okay.  But you were kind of intending to say grab your

18  wine; right?

19  A   Yes, ma'am.

20  Q   Okay.  And that's one of your signatures in your channel,

21  is that while you are delivering videos you're typically

22  having a glass of wine; correct?

23  A   Yes, ma'am.

24  Q   Okay.  And you encourage your viewers to do the same

25  thing; correct?

1   A    At their discretion.

2   Q    Okay.  So you said, grab your wine because this story is

3   hella funny.  Hurry up.  It's on the channel.

4           Do you see that?

5   A    Yes, ma'am.

6   Q    Okay.  And so you were encouraging viewers to go to the

7   channel?

8   A    Yes, ma'am.

9   Q    All right.  And then I will also note that you again

10  hashtagged my client twice in this post; correct?

11  A    Yes, ma'am.

12  Q    Is there any difference between those two hashtags and how

13  a search would work in Instagram?

14  A    No, just when we're detailing numbers as entertainment

15  news sites, we all use hashtags just to search engine the name

16  and the story.

17  Q    Okay.  All right.  The day you published the original

18  Starmarie Jones video -- excuse me -- the Starmarie Jones

19  interview you also posted a second video later that day;

20  right?

21  A    I don't recall.

22  Q    Okay.  Could we please take a look at Plaintiff's 519.

23          And before we play this, your Honor, I will offer

24  that this was stipulated to by Request for Admission No. 1,

25  and I'd offer it into evidence.

1          MR. SABBAK:  No objection, your Honor.

2          THE COURT:  519 is admitted without objection.

3          (Whereupon, Plaintiff's Exhibit 519 was marked for

4   purposes of identification and admitted into evidence.)

5          MS. MATZ:  Go ahead.

6          (Whereupon, a video recording was played.)

7   BY MS. MATZ:

8   Q   All right.  So in that video we just heard you refer to

9   yourself as a journalist; correct?

10  A   Yes, ma'am.

11  Q   Isn't it true that you've given testimony in this case

12  that you're not a journalist?  Correct?

13  A   Yes, ma'am.

14  Q   And you've also admitted under oath at your deposition

15  that when you have been telling your viewers that you get paid

16  to be a journalist, that's not true; correct?

17  A   I don't recall that statement.  Can you remind me?

18  Q   If we can please look at page 66 of your November 19th

19  deposition, which is the one in front of you, you can start at

20  line 7.  When you have been telling your viewers that you get

21  paid to be a journalist, that's not true; right?  Answer, of

22  course, because I'm not a journalist, no.  So I'm not a

23  graduated journalist, no.

24  A   No, I have not graduated --

25  Q   You gave that testimony; correct?

```
1   A    Yes, ma'am.

2   Q    Thank you.  And in that video when you were talking about

3   the video having gone viral before, you're referring to the

4   video that Star Jones originally posted; right?

5   A    Yes, ma'am.

6   Q    Okay.  But isn't it true also that you posted a video

7   repeating those statements, and then, as we've just heard you

8   testify, promoted it and encouraged people to view it;

9   correct?

10  A    Yes, ma'am.

11  Q    Okay.  You also said in that video that, if it's not true,

12  it's, quote, straight fucking defamation; correct?

13  A    Yes, ma'am.

14  Q    Okay.  And then you also said and you specifically made

15  that statement with reference to if someone called you a coke

16  head, said you had herpes or prostituted; correct?

17  A    In that particular video?

18  Q    Yes, in that video.

19  A    Yes, ma'am.

20  Q    Sorry.  What was the answer?

21  A    Yes, ma'am.

22  Q    Okay.  Thank you.  And you also in that video told Cardi

23  to handle that legally; correct?

24  A    Yes, ma'am.

25  Q    And to get her lawyers on it; right?
```

1   A   Yes, ma'am.

2   Q   Okay.  And when you published this video, you were talking

3   to Cardi; correct?

4   A   Yes, ma'am.  I was responding to her.

5   Q   Okay.  But this video was published after you had received

6   a cease and desist letter to you; correct?

7   A   So this video was published when?  Is this what we're

8   referencing right here in the video we just watched?

9   Q   Uh-huh.

10   A   So the cease and desist letter came on the 19th?

11   Q   Correct.

12   A   Which is the day after the video dropped.  And this video,

13   I think -- okay.  I'm confused on the dates now.

14   Q   Well, when you said she was coming for you, you were

15   talking about the fact that you had just received a letter

16   from her lawyer; right?

17   A   No.  She came for me before that letter.  We were already

18   going back and forth on Instagram.

19   Q   Okay.  So you wanted her lawyer to handle it.  And then

20   you did get a cease and desist letter at some point that day;

21   right?

22   A   If that -- we weren't -- it was a couple of days.  So on

23   the 19th, yes, we got the cease and desist letter.

24   Q   And this video was published on the 19th.  This was later

25   the day you published the Starmarie video; correct?

1   A    Yes, ma'am.

2   Q    Okay.  So at some point that day you did get the cease and

3   desist letter?

4   A    This?  No, I -- can I correct her, your Honor?  Can I

5   correct her statement?  Because this video right here, because

6   I have on the same outfit that I had on when I did the

7   interview, so, no, this was not published on the day that the

8   interview dropped.

9   Q    Well --

10  A    So you have to give me the date to this video.  Then I'll

11  know.  But I have on the same clothes that I had on because I

12  did it that night after I published the trailer, and Cardi B

13  got in the comments and was -- in my DMs and started

14  addressing --

15  Q    Okay.  So your testimony is that this came out -- your

16  testimony is that you published a trailer before you published

17  the video and, the interview itself, and that Cardi got in the

18  comments; correct?

19  A    Yes, ma'am -- in my DM.

20  Q    In your DM?

21  A    Yes, not in my comments.

22  Q    And that then you published the video after that, after

23  she was already communicating with you telling this wasn't

24  true?

25  A    Yes, ma'am.

1  Q   All right.  So your testimony actually is my client also

2  told you that the statements weren't true before you published

3  the interview; correct?

4  A   Yes, ma'am.

5  Q   Okay.  And that before you published the interview, if

6  this video is before you published the interview, that you

7  were already saying if it's not true, it's straight

8  defamation; correct?

9  A   Yes, ma'am.

10  Q   Okay.  Also in that video you make some reference to

11  saying that Starmarie had an opinion; correct?  Please answer

12  the question yes or no.

13  A   Yes, ma'am.

14  Q   Okay.  Thank you.  All right.  If we could please look at

15  Plaintiff's 535.  And before I offer this in I'd like to read

16  a stipulated fact into the record:  That on September 21st,

17  2018, defendants published a video on YouTube.

18          And, your Honor, Plaintiff's 535 was admitted by

19  Request for Admission No. 20.

20          MR. SABBAK:  No objection, your Honor.  Thank you.

21          THE COURT:  535 is admitted.  Thank you.

22          MS. MATZ:  Thank you, your Honor.

23          Okay.  If we could please -- oh, actually -- all

24  right.  If we could please start the video at -- you know

25  what, I'm sorry, your Honor.  Can I confirm one thing really

1  quickly?

2           THE COURT:  Yes.

3           MS. MATZ:  Thank you.

4           (Whereupon, there was a brief pause and then a video

5  recording was played.)

6  BY MS. MATZ:

7  Q   All right.  If we can pause here.  So in the beginning of

8  this video you are talking about showing receipts for the Star

9  Jones interview; right?

10 A   Yes, ma'am.

11 Q   Okay.  You already admitted earlier that Star didn't

12 actually give you anything to corroborate what she said in the

13 interview; correct?

14 A   No, ma'am.  Cardi.

15 Q   I'm asking you if you testified that about Star Jones.

16 A   No, ma'am.

17 Q   Okay.  And you also told your viewers that, if shit isn't

18 together, you'd issue an apology; correct?

19 A   That is correct.

20 Q   And you're referring to the fact that if you had misstated

21 something, you would intend to give an apology; correct?

22 A   Within reason.

23 Q   Okay.  And then you said, but we're not giving any

24 apologies; right?

25 A   That is correct.

1    Q    Okay.  And it's correct that you have never apologized to

2    my client publicly about the statements in the Starmarie

3    video; correct?

4    A    No, ma'am.

5    Q    No, you have not; correct?

6    A    No, ma'am.  No, I haven't.

7    Q    Okay.  And then you repeated here that everything you

8    said -- everything that Star said was accurate; correct?

9    A    Yes, ma'am.

10   Q    Okay.  All right.  If we can please -- actually, let me

11   ask you this:  Had you received additional information from

12   between the time you posted the video of the original

13   interview and this video?

14   A    Had I received -- repeat the question.  I'm sorry.

15   Q    Sure.  Had you received any additional information between

16   the time you posted the Starmarie Jones interview and the time

17   of this interview?

18   A    Concerning what exactly?

19   Q    Concerning the statements in Starmarie Jones's video.

20   A    Yes.  I received additional information.

21   Q    Okay.  And the additional information you're referring to

22   is that you talked to some of my client's old co-workers;

23   correct?

24   A    Yes, ma'am.

25   Q    Okay.  And were you intending to convey to viewers that

1  because of this additional information you received, that you

2  believed that everything that you published before was

3  accurate?

4  A   Yes, ma'am.

5  Q   Okay.  But you hadn't actually received anything to

6  corroborate the statements that my client had herpes, that my

7  client was a prostitute or that my client used cocaine;

8  correct?  Yes or no, please.

9  A   I can't answer yes or no to that question because --

10 Q   Do you recall giving that testimony in this case --

11            THE COURT:  Hold on.  Hold on.  It's got to be one at

12 a time.

13            THE WITNESS:  Okay.

14            THE COURT:  So she was still talking.  Let her finish

15 what she said.  If you have an objection to the response, then

16 make that objection.  So the question was you hadn't received

17 anything to verify those three allegations.  And your answer

18 was?

19            THE WITNESS:  No.  For that particular video, no.

20            MS. MATZ:  Thank you.  Okay.  If we can look at time

21 stamp 3:30.

22            THE COURT:  What's the number again?

23            MS. MATZ:  We're in Plaintiff --

24            THE COURT:  Still in the video?  Same video?

25            MS. MATZ:  Yeah, same video.  I'm just moving to a

1   different time code, your Honor.

2            THE COURT:  All right.

3            (Whereupon, a video recording was played.)

4   BY MS. MATZ:

5   Q   Can you pause.  So the interview you're referring to in

6   this clip was your interview with Starmarie when you said the

7   interview was highly requested; correct?

8   A   The interview, yes, ma'am.

9   Q   So you were trying to convey to the people viewing your

10  channel that it had been highly requested, that you'd do that

11  interview; right?

12  A   Yes, ma'am.

13  Q   Okay.  But you admitted earlier that no one actually

14  reached out to you and asked you to do the video; correct?

15  A   You mean in my testimony in my deposition?

16  Q   Yes, in your testimony at your deposition.

17  A   Yes, ma'am.

18  Q   Okay.  So what you said to your viewers is not actually

19  true?

20  A   It depends in what context because no one reached out to

21  me personally, but the viewers were basically on the internet

22  stating do the interview.  But no one knows me personally

23  because they're viewers.

24  Q   Okay.  So they weren't talking to you.  They were just

25  people on the internet?

1  A    Yes, ma'am.  They weren't talking to me directly.  On

2  Instagram or on Live people will like tag you and say, hey,

3  @unWinewithTashaK -- it happens all the time because I'm a

4  news reporter.  And they'll want me to follow up on the story,

5  so that's what I did.  But if you're saying personally, no.

6  No one called me or anything, no, ma'am.

7  Q    But you believe that tagging you is a form of

8  communication; correct?

9  A    Yes, ma'am.

10  Q    It comes to you; correct?

11  A    Yes, ma'am.

12  Q    And a tag, just to differentiate between the two, a tag is

13  when you @ and then put the person's handle; correct?

14  A    Yes, ma'am.

15  Q    And then a hashtag is when you could hashtag -- put a

16  hashtag and then a word; correct?

17  A    Yes, ma'am.

18  Q    And the first thing we talked about, the tag, that is a

19  form of communication that brings it to that user's attention,

20  whoever you tagged; right?

21  A    It depends in what context.

22  Q    But in the context of people tagging you, that came to

23  your attention because they were tagging you.  That's what you

24  just said; correct?

25  A    Because they used the @ sign.  But a hashtag doesn't

1  personally contact anyone.

2  Q   No, correct.  That's what I'm asking.  Does the @ symbol

3  plus the person's handle, a tag -- let's differentiate between

4  the two here.  A tag contacts someone whereas a hashtag is

5  just how something can turn up in the search results; right?

6  A   Yes, ma'am.

7          MS. MATZ:  Okay.  Great.  Thank you.  All right.  If

8  we can move to Plaintiff's 585.  Your Honor, I'd like this to

9  just be shown to the deponent first for a moment.

10         THE COURT:  Okay.

11         MS. MATZ:  And, actually, if you don't mind, let me

12  just ask opposing counsel one quick thing.

13         (Brief Pause.)

14         MS. MATZ:  Thank you, your Honor.  I just spoke with

15  opposing counsel, and I'd offer this in by stipulation.  It's

16  actually a duplicate.  There was a technical problem with the

17  first video.  This hasn't been part of the requests for

18  admission, but opposing counsel had agreed and stipulated it.

19         THE COURT:  And this is P-585?

20         MS. MATZ:  That's correct.

21         MR. SABBAK:  No objection.

22         THE COURT:  585 is admitted without objection.

23         (Whereupon, Plaintiff's Exhibit 585 was marked for

24  purposes of identification and admitted into evidence.)

25         MS. MATZ:  Okay.  If we could please go to 725.

```
1              (Whereupon, a video recording was played.)
2   BY MS. MATZ:
3   Q   If you can pause.  All right.  When we just heard you
4   talking in this video, talking about that you were talking to
5   Lovelyti.  Is that Lovely TI?  Is that correct?
6   A   Yes.  Yes, ma'am.
7   Q   And that's the same person who you spoke with before you
8   actually reached out to Starmarie; correct?
9   A   Yes, ma'am, just asking her if she knew Starmarie when she
10  uploaded the video.
11  Q   Okay.  And you said you talked to her a few times that
12  weekend; right?
13  A   Yes, ma'am.
14  Q   All right.  And you're talking about the weekend before
15  you did the interview; is that correct?
16  A   I talked to her twice, so once when she uploaded the
17  original interview of Starmarie Jones making allegations and
18  telling her story and then the second time after I had
19  interviewed Starmarie because she informed me that she had
20  received some information that counteracts what she was
21  saying.  And so that's when I spoke with her.
22  Q   Okay.  But that was before -- it was after you did the
23  interview but before you published the video; correct?
24  A   Yes, ma'am.  That is correct.
25  Q   All right.  That's when you had this conversation with
```

1    Lovelyti; correct?

2    A    Yes, ma'am.

3    Q    Okay.  And in that conversation you're saying that

4    Lovelyti informed you that she had some information to -- I

5    think the word you used was "counteract" what Starmarie Jones

6    had said.  Is that true?

7    A    Yes, ma'am.

8    Q    Okay.  And do you recall giving deposition testimony in

9    this case where you said, and so, Lovely TI stated, okay, I

10   just wanted to make sure.  Because I have receipts on her

11   that's going to debunk some of the things.  But I needed to

12   know some of the things that she had said?

13   A    Can I see that full conversation?

14   Q    Sure.

15   A    Thanks.  What page?

16   Q    It's actually a different transcript.  Hold on one moment.

17   A    Okay.

18          MS. MATZ:  May I approach, your Honor?

19          THE COURT:  You may.

20          THE WITNESS:  So what date is this one?

21   BY MS. MATZ:

22   Q    That's the 19th.

23   A    The 19th.  This is the 18th.

24   Q    It's on the cover.

25   A    Oh, okay.  Sorry about that.  Okay.

1  Q   Perfectly fine.  Okay.  If you can please look at page 73,

2  and I'll give you the line number.  Line 19 through 23.  Does

3  that refresh your recollection that you gave the testimony I

4  just read?

5  A   Yes, ma'am.

6  Q   Okay.  All right.  So after you recorded the video and

7  before you published it, you became aware that there was at

8  least some additional information that some of the things

9  Starmarie was saying might not be true; right?

10 A   Very vague.  She didn't go into detail, but, yes, ma'am.

11 Q   Okay.  And do you recall talking about what you and Lovely

12 TI did in terms of the release of your -- excuse me -- the

13 publication of your interview and then her release of the

14 information debunking it as a set up?

15 A   Not as a set up.

16 Q   You don't recall saying that in the video?

17 A   I don't recall.

18 Q   Okay.  All right.  If you could take a look at

19 Exhibit 651.

20         THE COURT:  So let's do this.  Let's take a break

21 because we've been going a little bit more than an hour and a

22 half.  We'll take a break until 4:00.  We'll come back, and we

23 will finish up with about another hour if that's enough.

24 Okay.  If the jury would go with the court security, we'll see

25 you at 4:00 o'clock.

```
 1              COURTROOM SECURITY OFFICER:  All rise.

 2              (Whereupon, the jurors exited the courtroom.)

 3              THE COURT:  All right.  We'll take a recess until

 4    4:00 o'clock.  Thank you.

 5              MS. MATZ:  Thank you, your Honor.

 6              COURTROOM SECURITY OFFICER:  Court stands in recess.

 7              (Brief recess.)

 8              COURTROOM SECURITY OFFICER:  All rise.  This

 9    honorable court is again in session.  Please be seated and

10    court come to order.

11              THE COURT:  All right.  Ms. Kebe, if you could come

12    on back up, please.

13              MS. MATZ:  Your Honor, is it okay if I move the mike

14    a little bit so that it's closer to me?

15              THE COURT:  As long as it still picks you up it

16    doesn't matter.

17              COURTROOM SECURITY OFFICER:  All rise.

18              (Whereupon, the jurors entered the courtroom.)

19              COURTROOM SECURITY OFFICER:  Be seated and come to

20    order.

21              MS. MATZ:  May I inquire, your Honor?

22              THE COURT:  Okay.

23    BY MS. MATZ:

24    Q    Thank you.  So I believe I had just asked you if you

25    recall making a statement that Lovely TI would come in with
```

```
 1  rebuttal, so it was like a whole motherfucking set up.

 2  A    That was just a part of the statement.  That's not the

 3  whole statement.

 4  Q    Do you recall making a statement that includes that?  Do

 5  you want me to read the whole thing in?

 6  A    Yes, ma'am.

 7  Q    Okay.  So you recall saying, that interview was just kind

 8  of something -- I was like, well, shit.  The shit is funny.

 9  Let me put her on my platform so Lovely TI will come in with a

10  rebuttal.  So it was like a whole motherfucking set up.  I'm

11  going to put the picture up.  You tell her she's lying.  It

12  was perfect.

13          Do you recall saying that?

14  A    Yes, ma'am.

15  Q    Okay.  And you said that in a video that you published on

16  Instagram; correct?

17  A    I don't know if it was on Instagram or YouTube.

18  Q    But you published it on the internet?

19  A    Yes, ma'am.

20  Q    Okay.

21          THE COURT:  Let me ask a question if I can.  And I

22  thought about this when it occurred, but you just never know

23  what people might know.  A question a juror mentioned

24  somewhere, I guess in the hallway, that they didn't know what

25  DM meant.  So you might want to ask that that term be
```

1   designated or answered.

2        MS. MATZ:  Absolutely.  Why don't we cover that now.

3        Do you know what the term "DM" means?

4        THE WITNESS:  Direct message.  It's when someone

5   messages you on social media, like Instagram.  It's a private

6   messaging center that's created.

7   BY MS. MATZ:

8   Q   So it's like a text message, but it's through your

9   Instagram account if it's on Instagram; correct?

10  A   Yes and no.  Text messages are more private and personal

11  with people who have your number, but Instagram direct message

12  is open to anyone.  So anybody in the world can send you a

13  message --

14  Q   But it does --

15  A   -- whatever.

16  Q   It does go directly to you; correct?

17  A   Yes, ma'am.

18  Q   And then on Twitter the same thing, direct messages that

19  users can send directly to you through the Twitter application

20  would also be called a DM; is that right?

21  A   Yes, ma'am.

22  Q   And when you were saying they're more public, is part of

23  what you're saying that somebody could just find your handle

24  on Instagram and then send you a DM as opposed to a text

25  message where you'd actually have to have their phone number

1   first?

2   A   Yes, ma'am.

3   Q   Okay.  Great.  All right.  I believe we were looking at

4   P-585.  If we could cue that up to 8:12 approximately.

5        (Whereupon, a video recording was played.)

6   BY MS. MATZ:

7   Q   All right.  If you can pause.  All right.  So in this

8   video you just said Star has shown me some stuff.  Do you see

9   that?

10  A   Yes, ma'am.

11  Q   Okay.  But earlier you do recall testifying in this case

12  that Star had not actually given you any corroborating

13  documentation; correct?

14  A   Yes, ma'am.

15       MS. MATZ:  Okay.  Go ahead.  If you can keep playing

16  it.

17        (Whereupon, a video recording was played.)

18  BY MS. MATZ:

19  Q   All right.  If we can pause this.  Okay.  When you're

20  talking about receipts, are you talking about documentation?

21  A   Yes, ma'am.

22  Q   Okay.  Do you receive -- isn't it true that part of what

23  you receive in preparing stories sometimes are screenshots?

24  A   What was the question?  I'm sorry.

25  Q   I said isn't it true that part of what you receive when

1   you're preparing stories sometimes are screenshots?

2   A   Oh.  Yes, ma'am.  It's hard to hear you.  Sorry.

3         THE COURT:  I don't want to be presumptuous.  So let

4   me just have you go ahead and ask the witness what screenshots

5   are.

6         MS. MATZ:  Sure.  Is a screenshot essentially a

7   digital photograph of -- or purports to be a digital

8   photograph of another document or something like that?

9   A   No, ma'am.  A screenshot is what you take, like if I post

10  something on Instagram, I can screen it and save it -- so

11  that's what a screenshot is -- on any social media platform.

12  You could really do it on anything, phone calls, emails,

13  whatever.

14  Q   So it's like a photo?

15  A   Yes.  It's like a -- yes.

16  Q   Okay.  But you also recall acknowledging that screenshots

17  can be photoshopped; correct?

18  A   There are apps that -- you can't photoshop a screenshot.

19  There are apps where people create actual fake-looking

20  screenshots, so there's a difference.

21  Q   Okay.

22  A   Yes, ma'am.

23        MS. MATZ:  Okay.  If we could go to 14:05.

24        (Whereupon, a video recording was played.)

25        THE JUROR:  Guys, are we supposed to be able to see

1   this right now?

2            THE COURT:  The video?  Is it not showing up on your

3   screen?

4            THE JUROR:  We don't have anything on our screen.

5            COURTROOM DEPUTY:  It's been admitted.

6            THE COURT:  It's been admitted.

7            MS. MATZ:  Yeah.  This was admitted.

8            THE COURT:  I'm sorry.  Why don't you back up at

9   least to the start of this last clip.

10           MS. MATZ:  Yeah.

11           THE WITNESS:  Your Honor, can I get my water?

12           THE COURT:  Sure.

13           THE WITNESS:  My throat is dry.

14           MS. MATZ:  I'm sorry.  I didn't hear.

15           THE COURT:  Hold on just a second.

16           THE WITNESS:  My water.  That's not mine.  That's

17  Sadeer's.  Mine is right on that table where my husband is

18  sitting.  Thank you.

19           MS. MATZ:  All right.  Can you cue it up to 8:12.  I

20  believe that was where we started with this session.

21           (Whereupon, a video recording was played.)

22           MS. MATZ:  All right.  You can pause now.  Okay.

23  That was the first clip, and then why don't we start this

24  second clip over.  I think we were going to 14:05.

25           (Whereupon, a video recording was played.)

1  BY MS. MATZ:

2  Q   Okay.  If you can pause this.  So is what you're talking

3  about here that you believe that these comments confirmed that

4  my client knew Starmarie Jones?

5  A   Yes.  This was an actual dancer that Cardi gave me to

6  research and get her side of the story from, and her name is

7  Ash Cash Legit.  This is actual -- a thread that was taken out

8  of my comments section under the actual post.

9  Q   Okay.  But what you're saying you understood was that the

10  two of them, meaning Cardi and Starmarie, knew one another

11  because they worked together; correct?

12  A   Yes, ma'am.

13  Q   Okay.  And is this one of the people earlier when we

14  talked about your testimony, where you said you talked to some

15  of her prior co-workers, but they didn't confirm the herpes,

16  the prostitution or the cocaine use?

17  A   Yes, ma'am.

18  Q   You recall that?

19  A   Yes, ma'am.

20  Q   So this is part of what you were referring to when you

21  said you went out and talked to some people, and then you

22  continued to post about the interview; correct?

23  A   Yes, ma'am.

24       MS. MATZ:  Okay.  All right.  If we can please go to

25  39:11.

1      (Whereupon, a video recording was played.)

2  BY MS. MATZ:

3  Q   All right.  If we can pause here.  All right.  And so here

4  again you're talking about a cease and desist letter that you

5  received; is that correct?

6  A   Yes, ma'am.

7  Q   Okay.  And that's the one you received from Cardi's

8  attorney?

9  A   At the time I didn't believe that it came from an actual

10  attorney because it wasn't signed.

11  Q   Okay.  But you understand now that it did; correct?

12  A   I believe so.  I mean, you're a different attorney so from

13  the one that sent the first one, and it wasn't notarized.

14  Q   Do you know if all the -- have your attorneys ever sent a

15  cease and desist letter on your behalf?

16  A   Yes, ma'am.

17  Q   Did they notarize it typically?

18  A   They sign it.

19  Q   They sign it but not notarize it?

20  A   Yes.  They sign every cease and desist.

21  Q   So you don't think the cease and desist letters have to be

22  notarized?

23  A   Well, that cease and desist didn't actually have my

24  correct name on it, and it wasn't signed.  So I didn't take it

25  as a serious cease and desist that came from an attorney.  So

```
 1   I thought it was something that was just drafted from anybody
 2   that was sent to me just to stop with the story.
 3          THE COURT:  So the question was, you don't think
 4   cease and desists have to be notarized.  What's your answer?
 5          THE WITNESS:  No, they don't have to be notarized,
 6   just signed.  I got that -- I mixed that up.  I apologize.
 7          MS. MATZ:  Okay.  If we can cue up the Cardi 006, and
 8   I'm going to find the number right now.
 9          THE COURT:  What's the number?
10          MS. MATZ:  I'm sorry, your Honor.  Give me one
11   second.  It's Plaintiff's 524.  And, your Honor, this
12   document -- this video has been -- this recording has been
13   stipulated by Request for Admission No. 6.
14          THE COURT:  You're tendering 524?
15          MS. MATZ:  Yes.
16          THE COURT:  Any objection?
17          MR. SABBAK:  No objection.
18          THE COURT:  524 is admitted without objection.
19          (Whereupon, Plaintiff's Exhibit 524 was marked for
20   purposes of identification and admitted into evidence.)
21          MS. MATZ:  And I'd like to just read one stipulated
22   fact into the record, and that is, on April 25th of 2019
23   defendants published a recording of a phone call Kebe had with
24   Lovely TI, and that was defined as the Lovely TI Recorded
25   Call.
```

1            All right, if you could start playing this for a

2  moment.

3            (Whereupon, an audio recording was played.)

4  BY MS. MATZ:

5  Q   If we can just pause.  Just so we can identify for the

6  members of the jury and members of the courtroom whose voice

7  is whose, in this recording that you just heard you said, hey,

8  you got a second; right?

9  A   Uh-huh.

10 Q   And the more we'll say softer voice on the other end of

11 the line that picked up and said hello, that's Lovely TI;

12 correct?

13 A   Yes, ma'am.

14 Q   Okay.  Thank you.  And is this recording the recording of

15 the call that you testified about earlier that you had with

16 her on a weekend after you recorded the interview with

17 Starmarie Jones but before you published it?

18 A   No.  This is not that call.

19 Q   This is not that call?

20 A   No, ma'am.

21 Q   There's a different call?

22 A   Yes.  There was a different call, but I didn't record that

23 call.  I recorded this one after the initial interview was

24 published, when she decided to break ties with me and side

25 with Cardi because Cardi had reached out to her.  She was a

1    little star struck.

2         MS. MATZ:  Okay.  Why don't we start playing it at --

3    oh, I'm sorry.  Is this not up on the Court's screen?

4         THE COURT:  It's up on my screen.  I'm seeing a

5    photograph so I guess --

6         MS. MATZ:  They can see it?

7         COURTROOM DEPUTY:  They can see it.  I just emailed

8    about why these went off.

9         MS. MATZ:  No, that's fine as long as everybody

10   else's is working.  Okay.  If you can start playing at

11   around 4:20 please.

12         (Whereupon, an audio recording was played.)

13   BY MS. MATZ:

14   Q   Let's pause for a moment.  So in this call you're saying

15   that the call you had with Lovely TI when she originally told

16   you that she had some information to debunk Starmarie's video,

17   that's not the call that we're listening to now, but that is

18   the call you're discussing with her; correct?

19   A   Yes.  Yes, ma'am.

20   Q   Okay.  All right.  And the call you're discussing is the

21   one that you had prior to the publication of the actual

22   interview?

23   A   In that particular part.  But that's a two-hour phone call

24   right there.

25   Q   Okay.  All right.  Let's go to 10:17.  Actually, let me

1  ask you a question before this starts playing.  At this point

2  is it -- is what's going on on this call that the two of you

3  are -- you're saying you disagree with her about what was said

4  on the other call?

5  A   No, ma'am.

6  Q   Okay.

7  A   That's not what's in that call.  You can play the entire

8  call and hear exactly what I said, but we were arguing about a

9  multitude of things.  But, no, that's not the gist of it.  The

10 gist of it was the harassing and bullying that went down of

11 Starmarie Jones.  That's what we were referencing.

12 Q   But one of the things you were talking about in that call

13 just there is that she at least said, Tasha, I never told you

14 to publish anything --

15 A   Can you play that part, please, and play the full context

16 so I'll know what I'm referencing because I don't want to

17 speak without knowing.

18         MS. MATZ:  Sure.  You want to start at 4:20 again.

19         (Whereupon, an audio recording was played.)

20 BY MS. MATZ:

21 Q   Okay.  So the fake new -- you're saying everybody is

22 saying I'm putting out fake news; correct?

23 A   Yes, ma'am.

24 Q   And that's referencing the Starmarie interview; correct?

25 A   Yes, ma'am.

1  Q   Okay.  And you were just saying but I got the story from

2  you; correct?

3  A   Yes, ma'am.

4  Q   And you're saying I got the story from you, Lovelyti?

5  A   Yes, ma'am.

6           MS. MATZ:  Okay.  Keep going.

7           (Whereupon, an audio recording was played.)

8  BY MS. MATZ:

9  Q   All right.  So in there what you're saying to her is

10 that -- you're saying that Lovely TI had information from

11 Cardi's team before she dropped the video, and you're saying

12 you didn't give that to me; correct?

13 A   Yes, ma'am.

14 Q   And are you referencing -- earlier when you testified

15 about your conversation where she said she had information

16 debunking it, you said you didn't know exactly what it was.

17 Is that what you're referencing in this conversation?

18 A   Can you repeat the call.  I got distracted with the -- not

19 the call, the question, please.  Sorry.

20 Q   Sure.  When you -- in this conversation when you're

21 talking to her about you said -- I'm sorry.  Could we just

22 play the clip back again.

23           (Whereupon, an audio recording was played.)

24 BY MS. MATZ:

25 Q   All right.  Let's pause.  So what I was asking is, when

1    you're talking to her about the information that you're saying

2    she had from Cardi, that she let you drop it anyway, you're

3    saying that's the information she had when the two of you

4    originally had that call where she told you she had some

5    information debunking Starmarie's interview; correct?

6    A    I do not understand your question.  I'm sorry.  It was

7    really long.

8            MS. MATZ:  Can you read back?

9            (Whereupon, the record was read.)

10           THE WITNESS:  Can you rephrase the question?

11   BY MS. MATZ:

12   Q    I want to understand the information you're talking about

13   with her.  You said you had information from Cardi's team that

14   you didn't share with me before I dropped it; right?

15   A    Yes, ma'am.

16   Q    And I want to understand.  The information that you are

17   referencing, is it true that that information is the

18   information that you said she had debunking the video before

19   you posted it?

20   A    Well, I didn't really know she was going to debunk the

21   video.  That's not what we talked about.  She said she wanted

22   to know when we had our original phone call after I

23   interviewed Starmarie Jones about the allegations she made on

24   a previous video, she wanted to make sure that I felt that she

25   was truthful because she had received some things from Cardi's

1  team and the internet that said otherwise.

2         And so that was the end.  That is all we talked

3  about.  We didn't talk about what she had.  I didn't know what

4  she had until her video went out because we worked together.

5  It was like Fox News against CNN.  So I'm on this side; she's

6  on that side.

7  Q   But you knew she had it.  She told you -- you just

8  testified earlier that she had -- she told you she had

9  information debunking it --

10  A   But I didn't know to what extent.

11  Q   Okay.  You didn't know to what extent.  Did you ask her

12  for it?

13  A   No, because we don't do that as bloggers.

14  Q   Okay.  Thank you.  Move to strike.  Nonresponsive, your

15  Honor.

16         THE COURT:  Objection is overruled.  The answer will

17  remain.

18         MS. MATZ:  All right.  If we can go to 10:17.

19         (Whereupon, an audio recording was played.)

20  BY MS. MATZ:

21  Q   All right.  If we can pause for a minute.  Okay.  So in

22  this video -- excuse me.  In this recording we just heard you

23  admit that you believe that Star has a mental illness; is that

24  correct?

25  A   Yes, ma'am.

1   Q    Okay.  And do you recall you also just said here's my

2   thing, all these strippers are lying?

3   A    Yes, ma'am, including Cardi B.

4   Q    So I was going to say in your deposition testimony you

5   recall giving testimony that when you said all these strippers

6   are lying, you were referring to Cardi B and the co-workers of

7   hers that you spoke to and Starmarie Jones; correct?

8   A    Yes, ma'am.

9   Q    So you thought all of them were lying?

10  A    Yeah.  They told some lies and some truths, yes, ma'am.

11          MS. MATZ:  Okay.  All right.  If you could go to

12  16:04.

13          (Whereupon, an audio recording was played.)

14  BY MS. MATZ:

15  Q    All right.  If we can pause just there.  So you understood

16  at the time that, at least in your mind, you thought both

17  Starmarie Jones and Cardi were lying; correct?

18  A    Can I provide context, please?

19          THE COURT:  You've got to answer the question before

20  you --

21          THE WITNESS:  Okay.  So yes and --

22          MS. MATZ:  Thank you.

23          THE COURT:  You can explain your answer.

24          THE WITNESS:  Oh, I can explain my answer?  Okay.

25          Starmarie had told another blogger that I offered her

1   a radio, I guess, deal at the station that I had contracted to

2   record the interview.  And so when I was referring to

3   Starmarie lying, I was talking about that because that's the

4   information me and Lovelyti were referencing in this call that

5   you didn't play.  And so when it came to Cardi B, Cardi B

6   denounced on social media that she did not know Starmarie and

7   then later made a video and said she did.  So this recording

8   here, this two-hour call, was a come to Jesus meeting on

9   everything that we had received from social media, all the

10   strippers, Cardi B, Starmarie, and all the other bloggers that

11   were in play because it was a firestorm of media once the

12   interview came out.

13   BY MS. MATZ:

14   Q   And do you recall giving testimony -- this video was

15   released in April of 2020.  Do you recall giving testimony

16   that you think you recorded it approximately six months before

17   that?

18   A   Around that time, yes, ma'am.

19   Q   Okay.  So that would have been October of 2019?

20   A   I can't say, and I think I told in the testimony I

21   couldn't remember to be exact -- I mean in the deposition.

22   Q   I'm sorry.  I actually misstated that.  The stipulated

23   fact was that on April 25th you published the recorded call.

24   And so you think that this was recorded approximately six

25   months before that, so that would be October of 2018?

1  A    I was just throwing numbers out there to you because you

2  wanted an exact date, and I couldn't give it to you.  So,

3  yeah, it was an old call.

4  Q    Okay.  So when you told me that it was approximately six

5  months, you were just throwing numbers out there?

6  A    I told you that because you kept asking me the same

7  question over and over in the deposition, so I just threw a

8  number out there to get you to move on because you were

9  frustrated that I couldn't remember.

10  Q    Okay.  So when you were frustrated in your deposition, you

11  just said things, you weren't sure that they were true?

12  A    No.  That's not what I said.  I just said six months per

13  se.  I didn't give an exact statement.  We can read the

14  statement.  Can we refer to it?

15  Q    We'll get there.

16          THE COURT:  What does six months per se mean to you?

17          THE WITNESS:  Just, you know, it was recorded months

18  back.  So she wanted an exact date, and I couldn't give one.

19  And it was -- I believe this was on the first day of my

20  deposition where I had never been through a deposition, so I

21  was nervous.  And her questions were very combative towards

22  me, so I was really frustrated in the deposition.  And I admit

23  that.  So when she was trying to get an exact date, I couldn't

24  give her one, so I got frustrated and I said six months or

25  something like that.  So it wasn't definite, and I made that

1  clear.

2  BY MS. MATZ:

3  Q   I did just ask you if it was approximately six months, but

4  we'll move on.  All right.  So you just said that what you

5  were referring to when you were talking about Starmarie Jones

6  lying, was that at this point Starmarie Jones was actually

7  lying about something that you had said to her; right?

8  A   She took it out of context for the conversation happened.

9  But from her perspective she explained it wrong.

10 Q   But you just said that when you were on that video talking

11 about lying, that that's what you were talking about.

12 A   Yes, ma'am.

13 Q   That she said that you had offered her a job and that

14 that's not what you said, and when you called that lying, that

15 that's what you were talking about; correct?

16 A   Yes, ma'am, in reference to that call, yes, ma'am.

17 Q   Okay.  So you at least at this point in time knew that

18 Starmarie was potentially lying about your interactions with

19 her?

20 A   About that particular statement she made but not about

21 other things that she said.

22 Q   And you also testified earlier that when you were

23 referencing all the strippers and you thought all of them were

24 lying, that that also included Cardi, Ash Cash Legit, and the

25 other people you talked to and Starmarie Jones; correct?

1  A    It was a multitude of strippers.  I believe it was like

2  four that I spoke to, including her make-up artist.  So

3  everyone told lies and truth, so I can't give you a definite

4  answer on that because some things they did lie about and some

5  things they did tell the truth on.  But we're talking about

6  about six people in range that I had conversations with to

7  corroborate Starmarie's story at Cardi B's request.

8  Q    So right.  But my point is that you at least thought that

9  all of them were lying about something; correct?

10  A    About something, yes, ma'am.

11  Q    Okay.  Do you recall also giving testimony that you said

12  in this phone call -- you said in this phone call that you had

13  said as far as the herpes and shit, I don't know?

14  A    Yes, ma'am.

15  Q    Okay.  And when you said as far as the herpes shit, I

16  don't know, you were saying on this call that you didn't have

17  any personal knowledge of whether or not my client has herpes

18  or not; correct?

19  A    Not to -- I didn't have any paperwork, no, ma'am.

20  Q    Well, that's not how you answered the question at your

21  deposition, is it?

22  A    Can I look at the deposition, please?

23  Q    Sure.  Let's look at November 30th.

24  A    Okay.  November 30th.  Okay.

25  Q    Okay.  Starting at line 11, the question was, and when you

1  said, as far as --

2  A   I'm sorry, Sarah.  What page?

3  Q   Oh, I'm sorry.  44.

4  A   Okay.

5  Q   The question was, and when you said, as far as the herpes

6  and shit -- and I said, I apologize for cursing, I'm just

7  repeating the words.  You said, I understand.  I said, not

8  trying to be rude.  When you said as far as the herpes and

9  shit, I don't know, were you saying that you did not have

10  personal knowledge of whether or not my client has herpes or

11  not?  And you said, yes, I was.

12          Did you give that testimony?

13  A   You said it was Monday November 30th?  Because I'm on page

14  44, and I don't see -- all I see is about emails and stuff

15  that was searched.

16  Q   I'm sorry.  Page 45.  I apologize.

17  A   Okay.

18  Q   Starting at line 11.

19  A   So what line again?  I'm sorry.

20  Q   11.

21  A   Okay.  And when you said, as far as the herpes and shit --

22  I'm sorry for cursing, I'm just repeating the words --

23          I don't know what context.  Am I allowed to read the

24  context, so I'll know how I answered that because that is --

25  that's your question; correct?

1  Q   Yeah.  And then the next question and answer where you

2  ended with, yes, I was.

3  A   I answered that question I understand because I was

4  referencing our entire conversation --

5  Q   If you could please look -- if you could please read the

6  lines in order and let me know if you gave that deposition

7  testimony.

8  A   Okay.  So from 11 to what number am I supposed to read?

9  Q   20.

10 A   Okay.  And when you said, as far as herpes and shit -- and

11 I apologize for cursing, I'm just repeating words.  I

12 answered, I understand.  You said, not trying to be rude.

13 When you said, as far as herpes and shit, I don't know, were

14 you saying that you did not have personal knowledge of whether

15 or not my client has herpes or not?  And I answered, yes, I

16 was.

17 Q   Okay.  So you did give that testimony; correct?

18 A   Yes, ma'am.

19 Q   Okay.  Thank you.  Okay.  And in a clip we listened to a

20 couple of minutes ago you talked about saying Cardi has an

21 entire team to protect her, if people defame her or anything,

22 that's Cardi's job?  Do you remember hearing that?

23 A   Yes, ma'am.  I said that.

24 Q   Okay.  And do you recall giving testimony in this case

25 that you think it's okay for you to put out information about

1  my client that's false?

2  A    I don't -- I don't understand the context and when I said

3  that.  Can we refer to it, please?

4  Q    Sure.

5  A    Okay.

6  Q    Going to go to the 11-19 transcript.

7  A    You said November 19th?

8  Q    Uh-huh.

9  A    Okay.  What page?

10  Q    266.

11  A    366?

12  Q    266.

13  A    Okay.  And what line?

14  Q    Okay.  Starting at line 15 the question was, do you think

15  it's okay for you to put information out there about my client

16  that is false?  Answer, if it's an opinion piece, yes.

17  A    Yes.

18  Q    An opinion -- and when you use the word "opinion piece,"

19  you mean things that you're saying that other people have

20  alleged?  Answer, correct.  Okay.  And so it's okay for you to

21  put out stories on your platform that you know are false that

22  defame my client, as long as someone else is the one that gave

23  you the information?  Answer, if I feel that a story is

24  entertaining and what the public wants, I will put the story

25  out in the manner in which I want to put it out, so it's my

1  platform, yes.

2          Did you give that testimony?

3  A   Yes, ma'am.

4          MS. MATZ:  Okay.  If we could go to 24, approximately

5  24 minutes and 59 seconds, please.

6          (Whereupon, an audio recording was played.)

7  BY MS. MATZ:

8  Q   Can we pause for a minute.  When you just said she was

9  definitely manipulating that damn interview, you were talking

10 about Starmarie Jones; correct?

11 A   I don't know in which context you were in, but yes.  I

12 assume so, yes.

13         MS. MATZ:  Okay.  Go ahead.

14         (Whereupon, an audio recording was played.)

15         MS. MATZ:  I'm sorry.  Can you start it over.  That

16 way you can hear the whole clip in context since I asked you a

17 question in the middle.

18         (Whereupon, an audio recording was played.)

19 BY MS. MATZ:

20 Q   All right.  Let's pause there.  Okay.  Even though you

21 said in this video that I didn't know you had receipts

22 debunking it, as you admitted earlier, you did know that at

23 least Lovely TI had told you she had information debunking it,

24 even if she didn't know what it was; correct?

25 A   Yes, ma'am.

1  Q   Okay.  And then we just heard you say I didn't care

2  because here's the thing, it's up to the fans, it's up to the

3  viewers to make their own decisions?

4  A   Yes, ma'am.

5  Q   Okay.  And so when you put out content that other people

6  provide to you, you think that people should just decide what

7  they believe themselves; correct?

8  A   It depends on what context I've put out, information piece

9  is on.  So every story is different, so I can't say yes or no

10  to that question because every single story is different.

11  Q   Well, let's talk about --

12  A   But I was talking about this particular story and based on

13  what we had at the time.  But the story evolved as the months

14  went.

15  Q   Okay.  And when you say it evolved, you mean you got more

16  information and more letters and things like that?

17  A   No.  I'm talking about as far as, you know, we're getting

18  the story, Starmarie alleges the information about your

19  client, and then I do the interview.  Lovelyti receives

20  information that she got from fans later I found out wasn't

21  from Cardi with photoshopped receipts.  And then I later found

22  out by word of your -- by your client uploading a video that

23  she did, in fact, know Starmarie.  So she said she didn't know

24  her and then later came back and said she did know her.

25          So it evolved.  It was a series of videos that came

1  out that added different context -- I'm sorry.  I should

2  address -- that added different context to the initial story

3  in which Starmarie told when she uploaded her first live

4  alleging her relationship with Cardi B.

5  Q   Okay.  But part of what you're talking about here also is

6  your interview; correct?

7  A   Part of it, yes, ma'am.

8  Q   Yeah.  And when you're talking -- so you just said

9  something interesting.  You said that it came out that Cardi B

10 did know Starmarie; correct?

11 A   Yes, ma'am.

12 Q   When you were deposed, you told me that prior to doing

13 what you do now, one of the places you worked was Seasons 52;

14 is that right?

15 A   Yes, ma'am.

16 Q   And that's a restaurant; correct?

17 A   Yes, ma'am.

18 Q   Okay.  And I presume you had co-workers at this

19 restaurant; yes?

20 A   Yes, ma'am.

21 Q   Okay.  And you knew some of them; correct?

22 A   Yes, ma'am.

23 Q   Okay.  Did all of the co-workers you worked with have

24 intimate details of your personal life, intimate details of

25 your sex life and things like that?  Is that something you

1  shared with your co-workers?

2  A   Some of them, yes.  I've always been very open about

3  myself.

4  Q   Okay.  Is that something that you think everyone shares

5  with their co-workers?

6  A   I can't speak for everyone else.  I'm only speaking for

7  myself.

8  Q   Okay.  But your testimony is that because -- you believed

9  Starmarie because at some point you found out that my client

10  had actually worked with her and knew her; is that right?

11  A   Yes, ma'am.

12  Q   Okay.  All right.  Let's go to 27:36.

13          (Whereupon, an audio recording was played.)

14  BY MS. MATZ:

15  Q   All right.  Let's pause there for a second.  Okay.  So we

16  just heard you say Cardi can handle getting dragged.  Did you

17  hear that?

18  A   Yes, ma'am.

19  Q   Okay.  And dragged is a slang term for speaking negatively

20  about someone or --

21  A   Criticized.  That's the lingo for criticized.

22  Q   All right.  And you're saying Cardi can handle getting

23  criticized because she has the resources, she can get therapy,

24  medication, she can hire lawyers, do anything; correct?

25  A   Yes.  She's in the limelight.  She's an entertainer, so

1  entertainers typically get criticized.  And they know the

2  business that they're coming into just as public figures do.

3  Q   But in your deposition you went further than that; right?

4  You said that you think it's okay for people to defame my

5  client and that it's her job to get people to take that stuff

6  down.  Do you recall giving that testimony?

7  A   Can I see that, where I said that so I can know what

8  context in which I said it?

9  Q   Do you recall giving the testimony, Ms. Kebe?

10  A   I don't recall.  May I review it, please?

11  Q   Okay.  If we can look at 263.

12  A   Which one?  November 30th or --

13  Q   November 19th.

14  A   -- 19th?  November 30th or 19th?

15  Q   November 19th.

16  A   Okay.  And what page?

17  Q   263.

18  A   And what number?

19  Q   I'm going to start at line 25.  Question -- I'll wait for

20  you to get there.

21  A   You said line --

22  Q   25.  Question was, okay, is it your belief that it is okay

23  for people to defame my client and it's her job to get people

24  to take that stuff down?  Answer, yes.

25       Is that your testimony that you gave in this

1    deposition in this lawsuit under oath?  Yes or no, please.

2    A    You said 262, November 19th?

3    Q    No.  I said 263 beginning -- I'm sorry.  No, I said 263

4    beginning at line 25.

5    A    263, line 25.

6    Q    And going to 264, line 5.  And I'd just like an answer to

7    the question of whether or not you gave that testimony.

8    A    Okay.  Is it your belief -- okay for people to defame my

9    client, that's her job to get people to take it down?  Yes.

10          MS. MATZ:  Great.  Okay.  If we can take -- go to

11    41:58.

12          (Whereupon, an audio recording was played.)

13    BY MS. MATZ:

14    Q    All right.  Let's pause.  So in this clip that we just

15    listened to, when you're talking about the person who we --

16    and we knew as two educated black women this woman has a

17    mental illness, you heard that?

18    A    Yes, ma'am.  That was my opinion.  I didn't have any facts

19    on that, but that was my opinion.

20    Q    Right.  You believed that even if you knew or you believed

21    that she had a mental illness, that you felt it was, quote,

22    fucked up for you to exploit her; is that right?

23    A    Yes.  I later found out after the interview.

24    Q    Well, in this call you just said even if we knew; correct?

25    A    Yeah.  But I was speaking hypothetically.

1    Q    Okay.  So even though earlier in the call you already

2    admitted that you believed she had a mental illness, now

3    you're saying you're talking hypothetically?

4    A    When I say I believed, I didn't say I know.  I said I

5    believed.  That's my opinion.

6    Q    And I'm asking you what your belief was.

7    A    That she had a mental illness after -- your Honor?  This

8    will open the door if I go into context, and I don't want to

9    do that because I heard your ruling earlier but --

10        THE COURT:  So the question was did you believe that.

11   It wasn't why did you believe that.  It was did you believe

12   that.

13        THE WITNESS:  Yes, sir.  Yes, your Honor.  Yes,

14   ma'am.

15        MS. MATZ:  Okay.  Let's go to 1:46:40.

16        (Whereupon, an audio recording was played.)

17   BY MS. MATZ:

18   Q    All right.  Let's pause there.  All right.  So one of the

19   things we just heard in this video is you acknowledging that

20   you again did think that Starmarie was lying about some of the

21   things she said in the video; correct?

22   A    Yeah.  I mean, the video was 45 minutes long.  I mean, it

23   was -- yeah.

24   Q    And have you ever issued a retraction or a statement

25   taking down the portions that you think she's lying about?

1   A   Well, I was talking --

2   Q   Yes or no, please.

3   A   -- in reference to her telling --

4           MS. MATZ:  Your Honor?

5           THE WITNESS:  -- her viewers.

6           MS. MATZ:  I asked a very simple question.

7           THE WITNESS:  Not for that, no, ma'am, because this

8   is a different context.

9           THE COURT:  So I think she answered it now.  Do you

10  want me to intercede now that you've gotten the answer?

11          MS. MATZ:  No.  I'm fine with the answer.

12          Okay.  Your Honor, I'm probably going to move on to

13  another line of questioning.  I know it's 4:55, and I don't

14  know what time you're planning on ending today.

15          THE COURT:  So if you're going to change subtopics,

16  then we'll adjourn for the night.  Ladies and gentlemen, so

17  we'll adjourn for this evening.

18          I want to talk just a little bit -- I guess I want to

19  preach a little bit about, similar to my discussions with you

20  yesterday, about not talking about the case.  The temptation

21  is probably even a litter greater today for, at the very

22  least, for people that you will see this evening to ask you

23  what you heard.  Yesterday you just knew who the people were

24  and what the general allegations were, but today you know more

25  about it than you did yesterday.  And I think it will be

1   natural for others to want to request of you to give them sort

2   of a run down of what you heard.

3           That won't be appropriate, and, you know, I won't

4   make this speech every day, but this will be the last time

5   that -- it will be something new, and the something new is now

6   had testimony.  I trust that you all will adhere to your oath

7   which requires that you obey the Court's instructions

8   according to the law, that you won't talk about the case.

9           I hope you have a good evening.  I'm going to ask if

10  you will return tomorrow at 9:30, and we'll see you then.

11  Leave your notes in the jury deliberation room, please.

12          COURTROOM SECURITY OFFICER:  All rise.

13          THE COURT:  And thank you for letting us know that

14  the monitors weren't on.  I trust you'll always tell me.

15  Okay.  All right.  Thank you, sir.

16          (Whereupon, the jurors exited the courtroom.)

17          THE COURT:  All right.  Ma'am, you can step down if

18  you would.  Not sit down.  You can go on back.

19          THE WITNESS:  No, I'm putting on my shoes.

20          THE COURT:  Oh, I'm sorry.  I thought you were just

21  getting comfortable.  Why don't you keep your mask with you

22  and then tomorrow morning just put it back on once you come

23  up.  You don't have to take it home, but you --

24          THE WITNESS:  I'll bring another one because this one

25  is kind of uncomfortable at the top.

1          THE COURT:  You have a shield at home?

2          THE WITNESS:  Yeah, it's an eyeglass shield.  I can't

3   wear it.  I'll just wear --

4          THE COURT:  An eyeglass shield --

5          THE WITNESS:  I can't put my --

6          THE COURT:  An eyeglass shield, does it cover your

7   face?

8          THE WITNESS:  It does, but I can't put the eyeglasses

9   over these eyeglasses.  Because she's going to be asking me to

10  read exhibits, so I just need my glasses.

11         THE COURT:  Okay.  I'm sorry.

12         THE WITNESS:  That's okay.

13         THE COURT:  All right.  I do want to talk just a

14  minute about what will happen when the plaintiff has finished

15  with its questioning.  Georgia has a procedural rule in the

16  state of Georgia that says that a party can call their

17  opposing party for cross-examination, and there is no

18  intervening questioning by defense counsel.  I really haven't

19  had this come up in federal court.  It's like I've probably

20  tried 15 cases in the last three years.

21         Trying to look ahead to what the defendant's

22  intention will be as to your client once the plaintiff is

23  finished.  I really can't get a firm answer on that looking at

24  federal rules.  To me it's an open question.  I haven't done

25  any case law search, but we've looked at the rules today.  I

1   suppose a lot of it is discretionary, so here's what I've

2   settled on absent being pointed to some law otherwise, is that

3   I'm going to allow the defendant to cross-examine -- not to

4   cross-examine, to examine their client after the plaintiff is

5   finished with her as to the matters brought up during the

6   cross-examination by the plaintiff.

7           I will also allow you to go into other matters then

8   if you wish, but if you go into other matters, then it's going

9   to be subject to then further cross-examination before you're

10  done.  And I'm not going to give you a chance to then recall

11  her later.  So you have to make an election.  Do you want to

12  just cross her on the things she's testified to or do you want

13  to get her whole testimony out?

14          I have discretion under the rule to allow that to

15  happen if you look under -- what's the rule number again?

16  Rule 11?  611.  Rule 611 because I can make decisions that are

17  designed to streamline and make efficient presentation, but

18  I'm not going to let you have two bites at the apple.  I'm not

19  going to let you go beyond the initial cross by the plaintiff

20  and then call her again to do the same thing into other

21  avenues, so you'll just have to make your decision at that

22  time.

23          MS. IZMAYLOVA:  Your Honor, we plan on

24  rehabilitating -- directing her on only the matters that the

25  plaintiff has crossed her on, and then we will recall her in

1  our case in chief.

2          THE COURT:  And when you recall her in your case in

3  chief, the items that you've questioned her about likewise in

4  the plaintiff's case I'm not going to let you go over them

5  again.  It's going to be a one-time discussion, and that's it.

6  Okay?  Understand?

7          MS. IZMAYLOVA:  Yes, your Honor.

8          THE COURT:  All right.  Yes, ma'am.

9          MS. MATZ:  The only thing I was going to ask is if

10  your Honor could just make a clear instruction for everyone

11  about no discussing testimony while we're off for the

12  evenings --

13          THE COURT:  Sure.  Well --

14          MS. MATZ:  -- since the testimony is ongoing, and the

15  witness is still under oath.

16          THE COURT:  Yes.  If we're not talking -- I'm not

17  going to prevent counsel from talking to their clients.  I'm

18  not going to do that.

19          MS. MATZ:  That's not what I meant.  I meant

20  discussing matters that were examined because there was an

21  issue in the deposition.  That's the only reason I'm raising

22  it.

23          THE COURT:  Matters that are --

24          MS. MATZ:  I'm talking about the ongoing testimony,

25  not trial strategy in general.

1          THE COURT:  It's really kind of hard to police it.  I

2     mean, I can't prevent counsel and plaintiff from talking.  If

3     we're talking about a third party witness, I can certainly say

4     that there's no need to have ongoing counseling of a third

5     party witness, but when we're talking about a client, there's

6     a need for legal strategizing.  And so if I said, well, you

7     can talk legal strategy but you can't talk about your

8     testimony, I'm just not sure how that -- how I police that.

9          And if you think that they have talked about it, then

10    what do I do about that?  Because if they don't admit that

11    they have, then I'm left in a quandary.  I mean, I don't

12    exactly know how -- I don't know how to deal with what you're

13    talking about.  I mean, I understand your point, but that's

14    part of when you call a witness later in a day who's a party,

15    then that's, I guess, a risk that's there, that you might not

16    finish before you're done.  And so they would then have some

17    chance just like at a break to talk with them.

18          MS. MATZ:  No, I hear you.  Like I said, there was an

19    issue at the deposition and it wasn't -- it was agreed, that

20    part of what happened.  It was stated on the record.  I just

21    didn't want to have that happen here.  And usually -- I

22    apologize, your Honor.  Usually in New York in federal court

23    that is an instruction that's given to witnesses.

24          THE COURT:  Don't talk to their --

25          MS. MATZ:  No.  It's just that they can't discuss the

1  ongoing -- the testimony that was given in any attempts to

2  change the answers or anything like that.

3       THE COURT:  Well, we will note -- I mean, if she

4  comes back in the morning and she says I need to clarify, then

5  we're going to -- she's going to be impeaching herself, kind

6  of a self-impeachment; right?  All of a sudden I've got to

7  talk about stuff, change my story that I gave you yesterday.

8  So what can you believe or what can you not believe.  Just

9  like when you testify at a deposition to something and you

10  come into court and you start changing your testimony, you

11  self-impeach yourself.

12       I don't think it's particularly helpful, Ms. Kebe, to

13  deny things that you know are on record, and then you give the

14  plaintiff's attorney an opportunity to just simply read off

15  what you said previously.  It makes it sound like you're

16  either not being honest or that you're just difficult to deal

17  with or both, particularly when your persona in your videos is

18  totally different than your persona in court.  I mean, that

19  may apply not just to you.  It could apply to the plaintiff

20  too, but it is what it is.

21       And so I don't know exactly how I can -- what I can

22  say to the defendant that I ever could enforce, you know.  And

23  that's my point, because they do have a right to talk about

24  their case, unlike a third party witness where they don't have

25  that right nor that need.  So I guess I'll put it this way:  I

```
 1   will leave it up to the attorneys to comply with the
 2   Professional Code of Georgia.  Okay.
 3             MS. IZMAYLOVA:  Your Honor?
 4             THE COURT:  Nothing beyond that.
 5             MS. IZMAYLOVA:  I just need to clarify -- I wanted to
 6   ask for clarification about previously, about what we talked
 7   about with us directing our client during --
 8             THE COURT:  Okay.
 9             MS. IZMAYLOVA:  So because right now like little
10   bits, pieces of stuff is being played.  So if we, like, if we
11   have her on the questioning, would we then be prevented from
12   playing the full version of that, you know, of the video or
13   the call or whatever on -- in our case in chief?
14             THE COURT:  I can't tell you because I don't know
15   what we're talking about, but what I'm not going to let you do
16   is ask the same questions about the same subject matter twice.
17             MS. IZMAYLOVA:  When you say subject matter, do you
18   mean like the Lovelyti call or just like the specific question
19   that we --
20             THE COURT:  That's a good example.  I'm not going to
21   let you go into the Lovelyti call that we've just been talking
22   about now and then go into it later too.  You get one chance.
23             MS. IZMAYLOVA:  Okay.  So then in that event can we
24   tell you tomorrow morning what we plan on doing as far as --
25   because that changes our answer, I think.  It might change our
```

1  answer.

2          THE COURT:  I'm not going to preapprove anything,

3  just tell you that I'm only going to let you do it once.

4          MS. IZMAYLOVA:  Okay.

5          THE COURT:  If it were me, unless I felt like it was

6  critical to get it out now, I probably would wait and cross

7  my -- I would probably wait and ask questions to my client

8  when I had complete control so I would not risk broaching into

9  a subject matter and then having the judge say later, well,

10  you already had a chance to question about that, you don't get

11  two chances.

12          MS. IZMAYLOVA:  Yes, sir.

13          THE COURT:  That's what I would do because this is

14  not a criminal case where there will be a directed verdict

15  considered, you know.  I mean, I guess there could be a

16  directed verdict, but it's unlikely.  I mean, normally when I

17  think of a criminal case, defendant stands up once the

18  government -- and says they haven't proved their case, they

19  can't carry their burden, and so we want judgment as a matter

20  of law.

21          So in a civil case, particularly this case where

22  there's clearly issues that are going to have to be decided by

23  the jury, I would not expect a directed verdict to be granted,

24  certainly not on the defamation claims.  Arguably on the

25  intentional infliction claims, I guess, but not likely to be

granted because of it wouldn't as a matter of procedure, it

wouldn't make sense for me to take that issue away from the

jury even if I agreed with the defendants to the extent that

the argument was that it was not sufficient under Georgia law

to be outrageous enough.  Because if I'm wrong about that,

I've got to retry the case, and it just makes sense to let the

jury go ahead and decide it.  And then I can do with it what I

want to as a matter of law and have that verdict there in case

the appellate courts disagreed with me.

        But I'm not telling you not to cross your client.  I

think it's fair that if you decide you want to, that you can.

I'm even giving you the right to go beyond the scope of

direct.  But so two things.  I'm just summarizing.  If you

only talk about things that have been brought up during the

cross-examination that the plaintiff makes of her now, you

certainly can go into new things later.  But I'm not letting

you go into the things you've already had a chance to go into

and did touch on.

        MS. IZMAYLOVA:  Understood.

        THE COURT:  And number two is if you go beyond the

scope of the cross-examination in the plaintiff's case, then

I'm not letting you call your client again except possibly for

rebuttal purposes if something new were to come up during the

course of the plaintiff's case that she would have to rebut

just that.

```
 1            MS. IZMAYLOVA:  Understood, your Honor.

 2            THE COURT:  So I think it's cleaner if you wait until

 3   your case to go personally, but I'll leave it up to you.  In

 4   absence of a concrete rule in federal procedure, I'm trying to

 5   be fair about it to both sides.

 6            MS. IZMAYLOVA:  Thank you, your Honor.

 7            THE COURT:  Ms. Matz, you pronounced your name a

 8   little differently a while ago.  Have I been pronouncing your

 9   name wrong all along?  I've been saying Matz.  And it's -- how

10   do you say it?

11            MS. MATZ:  I said it Matz.

12            THE COURT:  I'm sorry.  I didn't intend to --

13            MS. MATZ:  It's okay.  I honestly -- and I don't mean

14   to -- I assumed it was your accent.

15            THE COURT:  Well, no, it's not.  It's really my

16   brain, unfortunately.

17            So anything else you need to talk about tonight?

18            MS. MATZ:  No.  If I could just confer with my

19   counsel?

20            MS. IZMAYLOVA:  Nothing from us, your Honor.

21            MS. MATZ:  All right.  Thank you very much, your

22   Honor.

23            THE COURT:  All right.  I should be here at 9:00 in

24   the morning.  If y'all have any issues, alert Ms. Lee of it.

25   Otherwise, you know, we'll start at 9:30.  Okay.
```

1            MS. IZMAYLOVA:  Thank you.

2            THE COURT:  Thank you.

3            COURTROOM SECURITY OFFICER:  All rise.  Court stands

4   in recess.

5            (Whereupon, the proceedings were adjourned at 5:10

6   p.m.)

7                              -  -  -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                      REPORTERS CERTIFICATE

2

3

4          I, Wynette C. Blathers, Official Court Reporter for

5    the United States District Court for the Northern District of

6    Georgia, with offices at Atlanta, do hereby certify:

7          That I reported on the Stenograph machine the

8    proceedings held in open court on January 11, 2022, in the

9    matter of BELCALIS MARLENIS ALMÁNZAR v. LATASHA TRANSRINA KEBE

10   and KEBE STUDIOS LLC, Case No. 1:19-CV-01301-WMR; that said

11   proceedings in connection with the hearing were reduced to

12   typewritten form by me; and that the foregoing transcript

13   (Volume II of X, Pages 1 through 168) is a true and accurate

14   record of the proceedings.

15         This the 27th day of February, 2022.

16

17

18

19                            _____
                              /s/ Wynette C. Blathers, RMR, CRR
20                                Official Court Reporter

21

22

23

24

25
```