```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF GEORGIA
 2                          ATLANTA DIVISION


 3


 4   BELCALIS MARLENIS ALMÁNZAR,      )
                                      )
 5               Plaintiff,           )
                     v.               )   CIVIL ACTION
 6                                    )   FILE NO. 1:19-CV-01301-WMR
     LATASHA TRANSRINA KEBE and       )
 7   KEBE STUDIOS LLC,                )
                                      )   JURY TRIAL
 8               Defendants.          )
     _____)   VOLUME III OF X
 9


10


11   -----------------------------------------------------------


12           BEFORE THE HONORABLE WILLIAM M. RAY, II


13               TRANSCRIPT OF PROCEEDINGS


14                    JANUARY 12, 2022


15   -----------------------------------------------------------


16


17


              Proceedings recorded by mechanical stenography
18             and computer-aided transcript produced by


19


                    WYNETTE C. BLATHERS, RMR, CRR
20                     Official Court Reporter
                        1714 U.S. Courthouse
21                     75 Ted Turner Drive, SW
                       Atlanta, Georgia  30303
22                         (404) 215-1547


23


24


25
```

```
 1   APPEARANCES:

 2   For the Plaintiff:        SARAH M. MATZ
                               Attorney at Law
 3                             Adelman Matz, P.C.
                               1173A Second Avenue
 4                             Suite 153
                               New York, New York  10065
 5
                               LISA F. MOORE
 6                             WILLIAM A. PEQUIGNOT
                               Attorney at Law
 7                             Moore Pequignot, LLC
                               887 West Marietta Street
 8                             Suite M-102
                               Atlanta, Georgia  30318
 9
     For the Defendants:       OLGA IZMAYLOVA
10                             SADEER SABBAK
                               Attorneys at Law
11                             Sabbak & Izmaylova, LLP
                               1875 Old Alabama Road
12                             Suite 510
                               Roswell, Georgia  30076
13

14

15

16

17

18

19

20

21

22

23

24

25
```

| 1 | | **INDEX TO EXAMINATIONS** | | |
|---|---|---|---|---|
| 2 | | | | |
| 3 | **WITNESS** | | | **PAGE** |
| 4 | LATASHA TRANSRINA KEBE | | | |
| 5 | Cross-Examination (Cont'd) By Ms. Matz | | | 8 |
| 6 | | | | |
| 7 | | **INDEX TO EXHIBITS** | | |
| 8 | | **P L A I N T I F F ' S   E X H I B I T S** | | |
| 9 | | | IDENTIFIED | ADMITTED |
| 10 | 51 | Screenshot of YouTube Video | 68 | 68 |
| 11 | | Entitled "Cardi B I Just Wiped My A**... | | |
| 12 | 233 | Demand for Retraction Letter | 18 | 18 |
| 13 | 236 | Appendix to Demand for | 171 | 171 |
| 14 | | Retraction sent to Olga Izmaylova | | |
| 15 | 250 | Twitter Post from | 40 | 40 |
| 16 | | @unwinewithtasha as posted on October 5, 2018 | | |
| 17 | 264 | Twitter Post from | 29 | 29 |
| 18 | | @unwinewithtasha as Posted on November 7, 2019 | | |
| 19 | 269 | Twitter Post from | 177 | 177 |
| 20 | | @unwinewithtasha as Posted on March 24, 2019 | | |
| 21 | 276 | Twitter Post from | 14 | 14 |
| 22 | | @unwinewithtasha as posted on January 25, 2019 | | |
| 23 | 286 | Twitter Posts from | 32 | 32 |
| 24 | | @unwinewithtasha as Posted on September 21, 2020 | | |
| 25 | | | | |

**INDEX TO EXHIBITS (Cont'd.)**

**P L A I N T I F F ' S   E X H I B I T S**

|      |                                                                                          | IDENTIFIED | ADMITTED |
|------|------------------------------------------------------------------------------------------|------------|----------|
| 320  | Instagram Post from @unwinewithtashak Containing Screenshot of Text Messages with Kyle Anfernee | 123        | 123      |
| 325  | Screenshot of Instagram Comment from @unwinewithtashak                                    | 173        | 173      |
| 370  | Facebook Post from Tasha K as Posted on December 24, 2018                                 | 37         | 37       |
| 521  | Video Entitled "Part 1 I'm Addressing Everything!" as posted...                           | 153        | 153      |
| 522  | Video entitled "part 2 Im Addressing Everything"                                          | 10         | 10       |
| 525  | Video entitled "Cardi B I Just Wiped My A With Your Demand...                             | 66         | 66       |
| 549  | Video entitled "Exclusive, Cardi B & Offset...                                            | 27         | 27       |
| 550  | Video Entitled "Cardi B Responds to my Tweet.  She is pressed"...                         | 83         | 83       |
| 576  | Video entitled "Exclusive, New R. Kelly Enablers Revealed...                              | 65         | 65       |
| 579  | Video Entitled "Patreon Live With Tasha K as Posted by...                                 | 154        | 154      |
| 581  | Video Entitled "Cardi Baby Girl.  I Mean Baby Bird as Posted by Wino Gang...              | 100        | 100      |
| 583  | Video Entitled "Tasha K Responds to Cardi B's #muteblackblogs Agenda...                   | 43         | 43       |

**INDEX TO EXHIBITS (Cont'd.)**

**P L A I N T I F F ' S   E X H I B I T S**

| | | | IDENTIFIED | ADMITTED |
|---|---|---|---|---|
| 592 | Video Entitled "Exclusive, Cardi's New Lover amid Divorce?  Kylie Jenner... | | 69 | 69 |
| 606 | Video entitled "9.24.20 - Pt. 2 - EXCLUSIVE INTERVIEW with Tasha K on Larry Reid... | | 9 | 9 |
| 615 | Video Entitled "Live, DJ Boof, Megan Thee Stallion & More... | | 125 | 125 |
| 649 | Video Entitled "Exclusive, Jessie Woo x Tasha K _ Cardi B... | | 144 | 144 |
| 651 | Recording of Instagram Live stream from @unwinewithtashak | | 87 | 87 |
| 655 | Video Entitled "Breaking News_Wendy William's (Relapsed Again)... | | 169 | 169 |
| 853 | Tweet from @unwinewithtasha on October 11, 2018 | | 35 | 35 |
| 887 | Video Recording of SMS Messages Between Tasha K and Kyle Anfernee | | 102 | 102 |
| 942 | Tweets from @iamcardib on May 2, 2018 | | 51 | 51 |
| 943 | Facebook Post from Tasha K | | 23 | 23 |
| 946 | TSDR Records for Unwine With Tasha K as of October 18, 2021 | | 61 | 61 |
| 986 | Comments from InnerG Enlightenment LLC and unWinewithTashaK to YouTube Community post by... | | 184 | 184 |

**INDEX TO EXHIBITS (Cont'd.)**

**P L A I N T I F F ' S   E X H I B I T S**

|      |                                                                                    | IDENTIFIED | ADMITTED |
|------|------------------------------------------------------------------------------------|------------|----------|
| 987  | YouTube Community Post by unWinewithTashaK YouTube Account                          | 178        | 178      |
| 999  | Tweet from @unwinewithtasha on November 8, 2021                                     | 180        | 180      |
| 1000 | Comments from @unwinewithtashak to Instagram Post by @unwinewithtashak on November 8, 2021 | 181        | 181      |

```
 1                    Wednesday Morning Session

 2                      January 12, 2022

 3                        9:35 a.m.

 4                         -  -  -

 5                  P R O C E E D I N G S

 6         COURTROOM SECURITY OFFICER:  All rise.  United States

 7  District Court for the Northern District of Georgia, Atlanta

 8  Division, is now in session, the Honorable Judge William M.

 9  Ray II presiding.

10         THE COURT:  Thank you, sir.

11         COURTROOM SECURITY OFFICER:  Please be seated and

12  come to order.

13         THE COURT:  Good morning.  We're ready to begin,

14  Ms. Matz?

15         MS. MATZ:  Yes, your Honor.

16         THE COURT:  Did I get it right this time?

17         MS. MATZ:  No.

18         THE COURT:  I want to say it right.

19         MS. MATZ:  It's Matz.

20         THE COURT:  Matz.

21         MS. MATZ:  Yeah, perfect.

22         THE COURT:  All right.  Ms. Kebe if you'd come on up.

23  You can have a seat.  The jury should be here shortly.

24         COURTROOM SECURITY OFFICER:  All rise.

25         (Whereupon, the jurors entered the courtroom.)
```

```
 1              COURTROOM SECURITY OFFICER:  Please be seated and
 2   come to order.
 3              THE COURT:  All right.  Good morning.  Thank y'all
 4   for returning this morning.  I appreciate you being on time,
 5   and we're ready to proceed.  Plaintiff will proceed with her
 6   questions.
 7              MS. MATZ:  May I inquire, your Honor?
 8              THE COURT:  We're ready to proceed.
 9              MS. MATZ:  Thank you.
10                      LATASHA TRANSRINA KEBE,
11         herein, having been previously duly sworn, was
12   examined and testified as follows:
13                      CROSS-EXAMINATION (Cont'd)
14   BY MS. MATZ:
15   Q   All right.  Good morning, Ms. Kebe.
16   A   Good morning, Ms. Matz.
17   Q   So yesterday when we ended, we were talking about the
18   video recording of the Lovely TI conversation.  Do you recall
19   that?
20   A   Yes, ma'am.
21   Q   Okay.  And you gave some testimony yesterday that
22   Ms. Lovely TI -- do you know Lovely TI's real name?
23   A   It's Tope, I believe.  I can't pronounce her last name
24   because it's Nigerian.
25   Q   Okay.  I'll call her Lovely TI.
```

1  A   Yes, ma'am.

2  Q   So we were talking about some of your conversations with

3  Lovely TI, and you gave some testimony that Lovely TI had said

4  to you prior to publication of the Starmarie Jones video, that

5  she had some information that would debunk her.  Do you recall

6  that?

7  A   Yes, ma'am, on the day that I recorded the interview, yes,

8  ma'am.

9  Q   And that you didn't have a lot of information about what

10  that was.  Do you recall that?

11  A   Yes, ma'am.

12  Q   Okay.  But do you recall making a video where you said,

13  you know -- where you admitted that Lovely TI did tell you

14  that she had actually received receipts that the girl is

15  lying?

16  A   Yes, ma'am.

17         MS. MATZ:  Okay.  I'd like to pull up Plaintiff's

18  606.  Your Honor, this is Plaintiff's 606.  This was admitted

19  by Request for Admission No. 109.  And I --

20         MR. SABBAK:  No objection, your Honor.

21         THE COURT:  P-606 is admitted without objection.

22         (Whereupon, Plaintiff's Exhibit 606 was marked for

23  purposes of identification and admitted into evidence.)

24         MS. MATZ:  And we're going to start at around 26 --

25  the 26-minute mark.

1            (Whereupon, a video recording was played.)

2   BY MS. MATZ:

3   Q    Okay.  So you admit in this video that you did at least

4   know that Lovely TI had receipts which you defined as some

5   kind of documentation that Starmarie was lying; correct?

6   A    Yes, ma'am, to my knowledge.

7   Q    All right.  And you also made reference yesterday to

8   between the time you had the original conversation with Lovely

9   TI and the time when you had that recorded conversation.  You

10  made reference to Lovely TI kind of changing her position.  Do

11  you recall that?

12  A    No.  Can you help me to recall?

13  Q    Well, yes.  So you recall saying in the video that now

14  we -- Lovely TI who exploited Star -- actually, you know what,

15  let me show you the video.  Let's pull up Exhibit 522.

16            And, your Honor, I'd offer this into evidence.  It

17  has been admitted by stipulation, Request for Admission No. 4.

18            THE COURT:  Any objection?

19            MS. IZMAYLOVA:  No objection.

20            THE COURT:  522 is admitted without objection.

21            MS. MATZ:  Thank you, your Honor.

22            (Whereupon, Plaintiff's Exhibit 522 was marked for

23  purposes of identification and admitted into evidence.)

24            MS. MATZ:  And if we could start at around 6:44.

25            (Whereupon, a video recording was played.)

1    BY MS. MATZ:

2    Q   All right.  Let's pause.  So in that statement you made

3    some reference to it changed when Lovely TI became friends

4    with Cardi?

5    A   Yes, ma'am.

6    Q   Okay.  And that's -- and you said that's when all the

7    videos were pulled down?

8    A   Yes, ma'am.

9    Q   Were you referring to Lovely TI pulling down videos?

10   A   Yes.  She pulled down the initial video that Starmarie

11   talked about with -- you know, concerning her relationship

12   with your client, Cardi B, and all the fighting and stripping.

13   And so when Cardi B jumped --

14   Q   So that's what you were referring to?

15           THE WITNESS:  Can I explain?

16           MS. MATZ:  I just asked what she was referring to.

17           THE COURT:  Well, the problem generally is that she's

18   talking and you're talking, and there's no way the transcript

19   is going to reflect anything coherent.  So why don't you start

20   your answer again.  When she's finished, then you can ask her

21   to clarify.  Okay?

22           THE WITNESS:  Yes, sir.  So the video that we're

23   talking about in this live stream here that you're watching is

24   about the initial video that went viral before I interviewed

25   Starmarie.  But when I took the interview and me and Lovelyti

1 had planned, she said, hey, I received receipts that

2 counteract what she's saying.  I did the interview to

3 elaborate more on the things that she said in her initial live

4 stream that went live.  And so when Cardi B DM'd both of us,

5 she decided to side with Cardi B and take the initial video

6 down that she took viral back, got over 800,000 views that got

7 this entire campaign started.

8 BY MS. MATZ:

9 Q   Okay.  Thank you.  I appreciate that.

10 A   Yes, ma'am.

11 Q   But in this video you said that you -- I wanted the money.

12 I have an agency that's watching me.  They want to see certain

13 numbers every month.  That's what you said?

14 A   Yes, ma'am.  We are a studio company, so that is why we're

15 in business, is to generate ratings, views, as well as money.

16 Otherwise, why am I on the internet doing stories?  I don't

17 just do it for hobby.

18 Q   So you're saying that you didn't pull the video down at

19 least in part because you wanted to leave it up so it would

20 continue to get views and ratings; correct?

21 A   Yes, ma'am, because I believed --

22 Q   Thank you.

23 A   -- Starmarie's story.  That's why I left my video up --

24        MS. MATZ:  Move to strike, your Honor.  I asked a yes

25 or no question.

1          THE COURT:  So, ma'am, you're answering questions

2    that aren't asked.  The why is not the question.  The what is

3    the question.  So I'm going to --

4          THE WITNESS:  Yes, sir.

5          THE COURT:  You've done it some yesterday as well.

6    It's not helpful.  The Court strikes the response you've given

7    as being nonresponsive.  So let me just ask you.  You left it

8    up for ratings; is that correct?

9          THE WITNESS:  Yes, sir.

10          THE COURT:  Okay.  So in the future when anybody asks

11    you questions, just give the answer to the question asked.

12          THE WITNESS:  Yes, sir.

13          THE COURT:  And understand you're going to have a

14    chance to answer questions from your lawyers as well.

15          THE WITNESS:  Yes, sir.

16          THE COURT:  I'm sure they're going to ask you things

17    that they think are important, and I'm sure you'll have some

18    influence on the questions they ask you as well.  Okay?

19          THE WITNESS:  Yes, sir.

20          THE COURT:  Thank you.

21    BY MS. MATZ:

22    Q    All right.  You have also referred to my client as

23    #HerpesB in various social media posts; correct?

24    A    Yes, ma'am.

25    Q    Okay.  If we can pull up plaintiff -- let me just -- if we

1  can pull up Plaintiff's 276.  All right.  Have you ever seen

2  this before?

3  A    Yes, ma'am.

4  Q    And is this a copy of a tweet that you sent out from your

5  unWinewithTashaK account on January 25th of 2019?

6  A    Yes, ma'am.

7            MS. MATZ:  Your Honor, I'd offer this into evidence.

8            MR. SABBAK:  No objection.

9            THE COURT:  Plaintiff's 276 is admitted without

10 objection.

11           (Whereupon, Plaintiff's Exhibit 276 was marked for

12 purposes of identification and admitted into evidence.)

13           THE WITNESS:  Your Honor, the jury was trying to get

14 your attention, sir.

15           COURTROOM DEPUTY:  It's not shown until it's

16 admitted.  Thank you.

17 BY MS. MATZ:

18 Q    All right.  So in this below your handle you said, Awwh

19 @iamcardib.  You see that?

20 A    Yes, ma'am.

21 Q    I thought we left you and your confirmed irritated p***y

22 in 2018.  You see that?

23 A    Yes, ma'am.

24 Q    And what is the word with the stars in it that you were

25 trying to convey in this message?

1  A    Pussy.

2  Q    Okay.  So you're saying I thought we left you and your

3  confirmed irritated pussy in 2018.  But I see you're up to

4  your old ways again.  I got word on what you're doing

5  #HerpesB.  You see that?

6  A    Yes, ma'am.

7  Q    And you wrote that and defendants both published that on

8  January 25th of 2019?

9  A    Yes, ma'am.

10  Q    So yesterday when we were talking about the difference

11  between a hashtag and a -- and when you actually put someone's

12  handle in it, I just want to go over that with reference to

13  this message.  So the #HerpesB is intended to mean that when

14  people search for that or something like that, this message

15  will come up; correct?

16  A    Yes.  But this was a direct to your client.  We were

17  conversating.

18  Q    Okay.  Well, I was just wondering about the HerpesB, but I

19  was about to get to that.  So thank you.

20  A    Yes, ma'am.

21  Q    So you also what's called tagged her, right, at the very

22  beginning when you said @iamcardib?

23  A    Yes, ma'am.

24  Q    Okay.  And so that's when you were -- yesterday when we

25  were talking about the difference between a hashtag and when

1  you tag her actual username, the top part of this when you put

2  @iamcardib in blue, that means it actually is brought to her

3  attention through Twitter; correct?

4  A   Yes, ma'am.

5  Q   Okay.  So it was directed at her so she would see it?

6  A   Yes, ma'am.

7          THE COURT:  Let me ask a question if I can, please.

8  But is it also publicly available for anyone to see who may be

9  on Twitter?

10          THE WITNESS:  Yes, sir.

11 BY MS. MATZ:

12 Q   All right.  And just for time reference, you posted

13 this -- this was in January of 2019 which was months after you

14 received the first cease and desist letter from my client;

15 correct?

16 A   Yes, ma'am.

17 Q   In this also you talk about your -- excuse my language --

18 your confirmed irritated pussy.  You see that?

19 A   Yes, ma'am.

20 Q   That has nothing to do with cold sores on someone's mouth;

21 correct?

22 A   No, ma'am.

23 Q   In February of 2019, shortly after this post, you received

24 a second letter from a lawyer representing my client; correct?

25 A   Yes, ma'am.

1  Q   And that letter was from my firm; correct?

2  A   I believe so.

3        MS. MATZ:  All right.  If we could please pull up

4  Plaintiff's 233.  And just while we are pulling this up for a

5  moment I would just, for the jury, let you know that the

6  parties have stipulated to the facts that on February 2018 --

7  excuse me -- February 28th, 2019, plaintiff's counsel sent

8  Kebe a demand letter to take down the September 19th video and

9  the September 21st video and retract the alleged defamatory

10 statements contained in the videos; that Kebe received the

11 February 28th, 2019, letter; and Kebe did not take down the

12 September 19th 2018 video, the September 21st, 2018, video or

13 issue any retractions.

14       All right.  Have you ever seen this document before?

15       THE WITNESS:  Yes, ma'am.

16 BY MS. MATZ:

17 Q   All right.  And is this a copy of the demand for

18 retraction that was sent to you by my firm?

19 A   Yes, ma'am.

20       MS. MATZ:  All right.  Your Honor, I'd offer this

21 into evidence.

22       MR. SABBAK:  No objection, your Honor.  If I could

23 get an exhibit number.

24       THE COURT:  233.  No objection?

25       MR. SABBAK:  No objection.

1          THE COURT:  233 is admitted without objection.

2          MR. SABBAK:  Thank you, sir.

3          MS. MATZ:  Thank you, your Honor.

4          (Whereupon, Plaintiff's Exhibit 233 was marked for

5    purposes of identification and admitted into evidence.)

6    BY MS. MATZ:

7    Q    All right.  Did you look at this letter when it came in?

8    A    I'm sorry.  Could you repeat the question.

9    Q    Did you read this letter when it came in?

10   A    Yes, ma'am, I did.

11   Q    Okay.  And can you please read for the jury the defamatory

12   statements in the defamatory statements column that you were

13   being asked to retract.

14   A    Just the statements alone or the titles with the

15   statements?

16   Q    You can read the titles with the statements.  That's fine.

17   A    I guess title one, Cardi B disrespectful -- Cardi B

18   disrespectful comedy skit mocking Martin Luther King extra

19   marital affairs.  Defamatory statement, that Ms. Almánzar

20   prostituted for a living.

21          Number two, Exclusive:  Cardi B's ex-friend alleges

22   Cardi B kept a huge box filled with Monistat and reveals more.

23   The defamatory statements are, you:  You said that Cardi B

24   prostituted.  Ms. Jones:  Yes.  You:  Was a drug user.

25   Ms. Jones:  Yes.  You:  Cocaine and molly to be specific.

1  Ms. Jones:  Yes.

2          The third one, Exclusive:  Cardi B's ex-friend

3  alleges Cardi B kept a huge box filled with Monistat and

4  reveals more.  You:  She has herpes?  Ms. Jones:  Yes.

5          Number four, Cardi B -- Exclusive:  Cardi B's

6  ex-friend alleges Cardi B kept a huge box filled with Monistat

7  and more.  So you, as in me:  You were living with her at the

8  time she had herpes outbreaks on her mouth?  Ms. Jones:  Yes.

9          The next video, Actual proof Cardi B knew her

10  ex-roommate, Drake, Funky Dineva vs Tamar, Beyonce Black

11  Majic.  Everything that we said, that everything that Star

12  said was accurate.

13          The last, this is a tweet.  Awwh Cardi B I thought we

14  left your confirmed -- Awwh Cardi B I thought we left your

15  confirmed irritated pussy in 2018.  But I see you're up to

16  your old ways again.  I got word on what you're doing

17  #HerpesB.  See y'all tonight.  #YouTube, #unwinewithtashak,

18  #nowigottagobye.  In particular, your reference to #HerpesB.

19  Q   Thank you.  In the next paragraph you see the line where

20  the letter advised, the above identified statements, defined

21  as the defamatory statements, are false and constitute

22  defamation per se as well as invasion of privacy placing our

23  client in a false light in the public eye.

24          You see that?

25  A   Yes, ma'am.

1   Q   And so you understood from this letter that plaintiff was

2   telling you that from her perspective these were false and

3   were defaming her; correct?

4   A   Yes, ma'am.

5   Q   Okay.  And you also understand that you were being asked

6   to remove the videos from your YouTube channel, Twitter, and

7   any other social media platform website where you control your

8   content.  You understood that; correct?

9   A   Yes, ma'am.

10  Q   And you were asked to issue a retraction and repudiation

11  of all of the defamatory statements in your next YouTube video

12  and on Twitter.  Do you see that?

13  A   Yes, ma'am.

14  Q   Okay.  And you were asked to comply with those items

15  within three days; is that correct?

16  A   Yes, ma'am.

17  Q   Okay.  Did you comply with that within three days?

18  A   No, ma'am.

19  Q   Did you comply with all of those demands ever?

20  A   Never.

21  Q   All right.  Do you recall testifying that -- do you recall

22  testifying that you don't know if our client has herpes or

23  anything like that?

24  A   Yes, ma'am.

25  Q   All right.  And do you also recall testifying that you

1  used hashtags to provoke a reaction?

2  A   Yes, ma'am.

3  Q   Okay.  And that sometimes you use hashtags like coldsoreB

4  or CardiB even if you're not talking about my client to create

5  traffic to the site?

6  A   Yes, ma'am.

7  Q   All right.  So you use those hashtags because the B is

8  clearly in reference to my client; correct?

9  A   Yes, ma'am.

10  Q   And it's so that when people search for hashtags like

11  CardiB and similar things, it will drive traffic to your

12  Instagram, your Twitter, your YouTube; correct?

13  A   Yes, ma'am.

14  Q   And you do that sometimes even in instances when whatever

15  you're posting about has nothing to do with my client;

16  correct?

17  A   Yes, ma'am.

18  Q   And do you recall giving testimony that you had said that

19  you were going to call my client Cardi, and then when she

20  fucks up, pardon my French, I'm going to call her cold sore B?

21  A   Yes, ma'am.

22  Q   All right.  And you also recall giving testimony that

23  those hashtags and your use of that was probably directed at

24  my client in videos?

25  A   Yes, ma'am, it was.

1    Q    All right.  If we can look at Plaintiff's 943.  All right.

2    Have you ever seen this document before?

3    A    Yes, ma'am.

4    Q    And is this a copy of -- actually, which social media

5    platform is this?

6    A    Looks like Facebook, if I'm not mistaken.

7    Q    Okay.  And this is a copy of a post that you posted on

8    December 18th, 2018?

9    A    Yes, ma'am.

10   Q    All right.  And are your -- all of your social media

11   accounts for the unWinewithTashaK platform, are they all

12   publicly available?

13   A    Yes, ma'am.

14   Q    Okay.  So I wouldn't have to be friends with you in order

15   to go online and see the account -- the content you're

16   posting; correct?

17   A    No, ma'am.

18   Q    And that's the same for anyone in the world who has social

19   media.  Because these accounts aren't private, they can see

20   everything you're posting; correct?

21   A    Yes, ma'am.

22        MS. MATZ:  Thank you.  All right.  Your Honor, I'd

23   offer this into evidence.

24        MR. SABBAK:  No objection, sir.

25        THE COURT:  No objection?

```
1            MR. SABBAK:  No, sir.
2            THE COURT:  Plaintiff's 943 is admitted without
3  objection.
4            (Whereupon, Plaintiff's Exhibit 943 was marked for
5  purposes of identification and admitted into evidence.)
6  BY MS. MATZ:
7  Q   Okay.  So in this post you're saying done Herpes B see you
8  in court; correct?
9  A   Yes, ma'am.
10 Q   And the Herpes B is again a reference to my client;
11 correct?
12 A   Yes, ma'am.
13 Q   Okay.  And the photo underneath this is, you at least have
14 contended, a photo of my client; correct?
15 A   Yes, ma'am.
16 Q   And you found this photo on the internet; correct?
17 A   Yes, ma'am.
18 Q   And do you recall giving testimony that you don't know
19 where it came from or if it was edited in any respect?
20 A   Yes, ma'am.  It was on the internet but I am -- yes,
21 ma'am.
22 Q   Thank you.
23 A   Okay.
24 Q   And earlier when you testified that or you recall giving
25 testimony that sometimes when you use Herpes B, you're looking
```

1  to get a reaction?  Do you remember talking about that?

2  A    Somewhat.  Can you help me --

3  Q    Yes.  Do you recall giving testimony then when you were

4  asked what the reaction is, that you were looking for

5  engagement on a post?

6  A    Can I see where that was said in the deposition so I can

7  recall?

8  Q    Sure.

9  A    Yes, ma'am.

10  Q    Why don't we go ahead and look at the November 19th

11  deposition.  I'll get you the page and line number.  Okay.

12  Why don't you look at page 141 through -- sorry.  Page 141,

13  line 14 through page 142 line 13.

14  A    So start at 141, line 14, and I go all the way to 142 to

15  what number?

16  Q    Line 13.  If you could, go ahead and read it into the

17  record.

18  A    Okay.  Yes, ma'am.  So page 141, November 19.  And you've

19  also used -- this is you -- that as a hashtag to reference our

20  client in other posts; right?  I said, yes, it depends on the

21  post.  I probably was talking about somebody else and just

22  used Herpes B to get a reaction.  But, yes, Herpes B does

23  reference Cardi B, yes.  You said, okay.  When you say it was

24  probably talking about somebody else and you used Herpes B to

25  get a reaction, I would just like to clarify that for a

1   moment.  Are you saying the post might have been someone else,

2   but you were using Herpes B to drive traffic because that was

3   a reference to our client?

4          Answer, not to drive -- well, yes.  Question, what's

5   the reaction you're looking for?  A, me, answer, just

6   engagement on the post, that's all.  Question, meaning that

7   you're hoping that the Herpes B reference to my client will

8   drive viewers to the post and your channels?  I answered yes.

9   Q   Okay.  So when I was asking you about when you were

10  talking about getting a reaction, you meant engagement on a

11  post; correct?

12  A   Yes, ma'am.

13  Q   All right.  And engagement on a social media post

14  generally consists of a few things, including people going to

15  the link in your bio based off of the post or commenting on

16  your post or liking the post; correct?

17  A   Can you repeat that question again.

18  Q   Sure.  I just want to make sure I'm understanding what

19  you're talking about when you mean engagement.  When you're

20  talking about engagement on a post, you mean people on the

21  internet other users of social media finding the post and then

22  interacting with it in some way, maybe going to the website

23  from the link in your bio or liking the post using the heart

24  button or something else or commenting on the post; correct?

25  A   Yes, ma'am.

1  Q   And the more -- isn't it true that the more engagement a

2  post gets, the more chance it is that it will show up in

3  someone else's news feed even if they weren't looking for you

4  specifically; right?

5  A   Yes, ma'am.

6  Q   Because the way -- at least in a general sense your

7  understanding is the way social medial algorithms work is that

8  people who are interested in certain types of topics will get

9  fed posts with high engagement; correct?

10 A   Yes, ma'am.

11 Q   Thank you.  Okay.  Do you also recall giving testimony

12 that you have used Herpes B enough times in direct reference

13 to my client that you would expect all of your viewers to know

14 every time you use that that you are referencing my client?

15 A   Yes, ma'am.

16 Q   Okay.  Have you ever seen a photo of my client from when

17 she was younger?

18 A   Yes, ma'am.

19       MS. MATZ:  Okay.  All right.  If we can, please pull

20 up plaintiff's -- I'm sorry.  I believe I offered this into

21 evidence already.

22       THE COURT:  The one you were just looking at, yes.

23       MS. MATZ:  Okay.  Thank you, your Honor.  Can we

24 please pull up Plaintiff's 549.  I have not offered it yet.

25 And, your Honor, I will submit that Plaintiff's 549 has been

1   stipulated to by Request for Admission No. 43, and I'd offer

2   it into evidence.

3          MR. SABBAK:  No objection, your Honor.

4          THE COURT:  549 is admitted without objection.

5          (Whereupon, Plaintiff's Exhibit 549 was marked for

6   purposes of identification and admitted into evidence.)

7          MS. MATZ:  Okay.  We're going to look at a clip

8   around 39:19.

9          (Whereupon, a video recording was played.)

10  BY MS. MATZ:

11  Q   All right.  If we can pause there, please.  Do you recall

12  making that statement in that video?

13  A   Yes, ma'am.

14  Q   Okay.  And when you were saying, well, bitch, you are my

15  content, you're my motherfucking content, when you said that,

16  you were referring to my client; correct?

17  A   Yes, ma'am.

18  Q   Okay.  And if we could actually pull Plaintiff's 941 back

19  up for a moment.  All right.  Do you recall giving testimony

20  that when you were using the hashtag HerpesB, admitting that

21  the implication of this post is that you're saying our client

22  has herpes?

23  A   Yes, ma'am.

24  Q   Okay.  And when you were -- do you also recall that when

25  you were being questioned about responding to her through the

1    @ symbol tag and hashtagging her, that you when you were asked

2    why use the hashtag as opposed to just responding to her and

3    tagging her with that iamcardib, you said because it's

4    entertaining and it irritates her?

5    A    Yes, ma'am.

6    Q    And that was from your deposition; correct?

7    A    I believe so, yes, ma'am.

8    Q    All right.  Do you also recall testifying that when you

9    were asked whether or not you know it upsets our client when

10   you hashtag her HerpesB saying she has herpes, you testified

11   yes?

12   A    Yes, ma'am.

13   Q    Okay.  And you also recall during your deposition that you

14   were asked if you were doing it intentionally to upset her,

15   and you said yes?

16   A    Yes, ma'am.

17   Q    All right.  If we could pull up Plaintiff's 264 now.  Have

18   you ever seen this document before?

19   A    What was the question?

20   Q    I asked if you've ever seen this document before.

21   A    Yes, ma'am.

22   Q    And is this a post that you authored on November 7th of

23   2019?

24   A    Yes, ma'am.

25   Q    Okay.  And do you know what platform you posted this on?

1    A    It looks like Twitter.

2    Q    Okay.  And at the bottom of the page there where it says

3    Retweets, that would indicate that it's Twitter; correct?

4    A    Yes, ma'am.

5              MS. MATZ:  Your Honor, I'd offer this into evidence.

6              MR. SABBAK:  No objection, sir.

7              THE COURT:  Plaintiff's 264 is admitted without

8    objection.

9              MS. MATZ:  Thank you, your Honor.

10             (Whereupon, Plaintiff's Exhibit 264 was marked for

11   purposes of identification and admitted into evidence.)

12   BY MS. MATZ:

13   Q    So when you published this on Twitter, in this you used

14   the hashtag ColdSoreB.  Do you see that?

15   A    Yes, ma'am.

16   Q    And you've also used that hashtag in addition to HerpesB

17   multiple times to refer to my client; correct?

18   A    Yes, ma'am.

19   Q    Okay.  Do you recall giving testimony during your

20   deposition that in this case that your attorneys told you

21   about the medical records that were produced by my client?

22   A    Yes, ma'am.

23   Q    So you were aware during this lawsuit that there were

24   medical records produced by my client regarding HPV and herpes

25   results; correct?

1   A   Just the herpes, not HPV.

2   Q   Okay.  All right.  Let's go to -- oh, I'm sorry.  I have

3   one other question about this.  Just so we can explain to the

4   jury what this is, at the bottom when it said 133 Retweets and

5   553 Likes, do you see that?

6   A   Yes, ma'am.

7   Q   A like is when someone uses the feature of that particular

8   social media platform to indicate that they like a post; is

9   that correct?

10  A   That is correct.

11  Q   And that is one of the factors that drives up engagement,

12  which we were talking about earlier; correct?

13  A   That is correct.

14  Q   Okay.  And retweets, particular to Twitter, is when

15  someone hits the retweet button when they see your post and

16  then it actually publishes to all of their followers as well;

17  correct?

18  A   That is correct.

19  Q   Okay.  And, on Twitter at least, when someone retweets a

20  post, that is also one of the factors that drives engagement

21  up with respect to any particular post; correct?

22  A   That is correct.

23  Q   And so at least with respect to this particular post, at

24  the time this was taken November -- actually, at the time this

25  was taken, it had 133 retweets; correct?

1    A    Yes, ma'am.

2    Q    So that's saying that 133 people had then hit the button

3    to then share this with all of their followers as well?

4    A    No, ma'am.  When they like it, they just like it.  When

5    they retweet it, is when they share it to their followers.

6    Q    I believe I said retweet.  But let me ask the question

7    again.

8    A    I'm sorry.  Okay.

9    Q    What I said was when -- so in this particular post 133

10   people, when they hit retweet, have then published this post

11   again to all of their followers; correct?

12   A    Yes, ma'am.

13   Q    Okay.

14   A    Okay.  I got the likes and the retweets confused because

15   normally the likes is first and the retweets are second.

16   Q    Okay.  When someone likes a post on social media, will

17   that also drive up engagement that it might be then fed to

18   their friends because it's something that they like?

19   A    It could be, yes, ma'am.

20   Q    Okay.  Thank you.  If we could please pull up Plaintiff's

21   286 for a moment.  All right.  Do you see these two posts?

22   A    Yes, ma'am.

23   Q    And did these come from your Twitter account?  You posted

24   these two tweets?

25   A    Yes, ma'am.

1  Q    Okay.  And they both have dates on them of September 21st?

2  A    Yes, ma'am.

3           MS. MATZ:  Okay.  And that September 21st date --

4  well, first, your Honor, I'd offer these into evidence.

5           THE COURT:  The number is what again?

6           MS. MATZ:  It is Plaintiff's 286.

7           THE COURT:  Any objection?

8           MR. SABBAK:  No, sir.

9           THE COURT:  No objection?

10          MR. SABBAK:  No, sir.

11          THE COURT:  Thank you.  It's admitted without

12  objection.

13          MS. MATZ:  Thank you.

14          (Whereupon, Plaintiff's Exhibit 286 was marked for

15  purposes of identification and admitted into evidence.)

16  BY MS. MATZ:

17  Q    So the screenshots of these two tweets, the first thing

18  I'd like to just talk about is the date for a minute.  Based

19  on the content of these tweets where it says September 21st

20  and you're talking about deleting your Cardi drag, are these

21  around the September date of the publication of the

22  videos about Starmarie -- the Starmarie Jones video?

23  A    I'm not sure because there's no, I guess, year.

24  Q    Okay.

25  A    This had been going on since 2018, so I don't know exactly

1  when these were posted.  Then I could tell you.

2  Q   Right.  Well, when you say in here, yo, I'm deleting my

3  Cardi drag in one hour, it's on my backup channel titled

4  winogang, I know y'all are enjoying the show -- you see that?

5  A   Yes, ma'am.

6  Q   Winogang, is that the backup channel?

7  A   Yes.  It's my second YouTube channel.

8  Q   Okay.  And do you post all of your content there or just

9  some?

10  A   Just some.

11  Q   Okay.  And do you recall deleting a video and posting it

12  on your backup channel specifically about my client?

13  A   Yes.

14  Q   Okay.  And do you know which video that was?

15  A   Not particular to this post, no.  There's so many.

16  Q   So there's been multiple times you've taken a video off of

17  your main channel and then republished it on your backup

18  channel?

19  A   Say that again.

20  Q   I said there's been many times you've taken a video off of

21  your main channel and republished it on your backup channel?

22  A   About Cardi?

23  Q   Yeah.

24  A   No, ma'am.

25  Q   I'm sorry.  Isn't that what you've just testified?

1    A    No, ma'am.

2    Q    So there have not been many instances where you've done

3    this?

4    A    No, ma'am.

5    Q    But you can't recall the instance where you did do this?

6    A    No, ma'am.

7    Q    Okay.  You also say here, hey, Winos, I had to delete the

8    posts.  They were being taken down by IG for bullying.  I'm

9    sure the other blogs got screenshots.  You see that?

10   A    Yes, ma'am.

11   Q    So the posts you were taking down were taken down by

12   Instagram.  That's the IG reference; correct?

13   A    Yes, ma'am.

14   Q    For bullying?

15   A    Yes, ma'am.

16   Q    Okay.  This wasn't the only time you got deleted on

17   Instagram; correct?

18   A    No, ma'am.

19   Q    Okay.  You also got deleted on Instagram in October of

20   2018; is that correct?

21   A    I believe so.  I don't know the exact date.

22   Q    All right.  If we could take a look at Plaintiff's 853.

23   All right.  Have you ever seen this before?

24   A    Yes, ma'am.

25   Q    And this is a copy of a social media post that you posted

```
 1   on October 11th of 2018; is that correct?
 2   A   Yes, ma'am.
 3           MS. MATZ:  Your Honor, I'd offer this into evidence.
 4           THE COURT:  Any objection?
 5           MR. SABBAK:  No, your Honor.
 6           THE COURT:  Plaintiff's 853 is admitted without
 7   objection.
 8           (Whereupon, Plaintiff's Exhibit 853 was marked for
 9   purposes of identification and admitted into evidence.)
10   BY MS. MATZ:
11   Q   All right.  So do you know which platform this was?
12   A   I can't tell.  Okay.  Twitter.  I looked at the handle.
13   Q   Okay.  So on this you said, PSA Winos with a wine glass.
14   Do you see that?
15   A   Yes, ma'am.
16   Q   And #PSA, is that meant to reference public service
17   announcement?
18   A   Yes, ma'am.
19   Q   Okay.  And then you say winos.  Is winos the name that
20   you've given to your followers?
21   A   They came up with it.
22   Q   But it's how you refer to them now?
23   A   Yes, ma'am.
24   Q   Okay.  And then you said, we got deleted again on
25   Instagram for not following the rules.  You see that?
```

1  A   Yes, ma'am.

2  Q   Okay.  Then you said, sorry, however, and then a wine

3  glass, is still being served on Instagram via

4  iamunwinewithtashak.  Do you see that?

5  A   Yes, ma'am.

6  Q   So is this you indicating to your followers that even

7  though your other account was being deleted by Instagram, they

8  could find your content on a new account and giving them that

9  information?

10 A   Yes, ma'am.

11 Q   Have there been more than two instances where you were

12 deleted by Instagram?

13 A   Yes, ma'am.  I believe three, if I'm not mistaken.

14 Q   Okay.  All right.  So yesterday we watched the Starmarie

15 video and the video that you posted earlier in September, as

16 well as clips from a couple of other videos that you posted

17 shortly after the Starmarie video.  Do you remember that?

18 A   Yes.  Yes, ma'am.

19 Q   And those were all posted in September of 2018; correct?

20 A   I believe some of them.

21 Q   All right.  If we could please pull up Plaintiff's 370.

22 All right.  Have you ever seen this document before?

23 A   Yes, ma'am.

24 Q   Okay.  And is this a Facebook post from your TashaK

25 Facebook account?

1    A    Yes, ma'am.

2    Q    It was published on October 24th of 2018?

3    A    Yes, ma'am.

4    Q    And you authored this post; correct?

5    A    Yes, ma'am.

6             MS. MATZ:  Your Honor, I'd offer this into evidence.

7             MR. SABBAK:  No objection, your Honor.  Exhibit

8    number, please?

9             THE COURT:  370.  370 is admitted without objection.

10            MR. SABBAK:  Thank you, sir.

11            (Whereupon, Plaintiff's Exhibit 370 was marked for

12   purposes of identification and admitted into evidence.)

13   BY MS. MATZ:

14   Q    Okay.  So this was posted several weeks after all of the

15   videos that we watched yesterday where you were discussing my

16   client; correct?

17   A    Yes, ma'am.

18   Q    Okay.  And in this you say -- actually, can you read the

19   post into the record, please.

20   A    Sure.  PSA Winos, I want us to personally thank #YOUTUBE

21   for believing in our channel.  They have personally reached

22   out to work with me over the next eight months to come up with

23   ways to improve our channels performance.  They are impressed

24   with the organic traffic we've built since the beginning and

25   look forward to helping us grow more.

1          They have seen a 340 percent increase in traffic over

2   the last 90 days and want to help us triple that.  I will keep

3   you updated on the new improvements over the next eight

4   months.  Road to 500k.  We're breaking wine bottles out here.

5   New video on the channel as well.  Here is the link.  Now grab

6   your glass.  #unwinewithtashak, #nowigottagobye.

7   Q   Okay.  So in this post when you said they've seen a

8   340 percent increase in traffic over the last 90 days, you're

9   talking about roughly August, September, and October of 2018;

10  correct?

11  A   I believe July, August, and September, yes, ma'am.

12  Q   The end of July or you think the full month of July?

13  A   Probably the full month because we're kind of in arrears.

14  Okay.  Yes, ma'am.

15  Q   So July, August, and September of 2018?

16  A   Yes, ma'am.

17  Q   September also being the month when you posted all of

18  those videos about my client; correct?

19  A   Yes, ma'am.

20  Q   Thank you.  Okay.  Also, in October of 2018 -- well,

21  actually, withdrawn.  If we can pull up Plaintiff's 250.  If

22  you could just zoom in so she can read it.  Have you ever seen

23  this before?

24          MS. IZMAYLOVA:  Your Honor, can I approach?

25          THE COURT:  Sure.  Thank you.

1           THE WITNESS:  May I grab some water?

2           THE COURT:  Sure.  Mr. Sabbak, if you can bring your

3    client some water.

4           (Whereupon, a bench conference was held between the

5    Court and counsel.)

6           MS. IZMAYLOVA:  I don't know for sure, but I think

7    that this line of questioning is about to go down into

8    potentially her husband cheating, which has been ruled out as

9    of, you know, by -- in the pretrial conference.

10          THE COURT:  Why would you really care about that

11   because it was their motion to keep it out, not yours.  I

12   mean, they can open the door to something they sought to keep

13   out; right?

14          MS. IZMAYLOVA:  I just wanted to --

15          THE COURT:  We'll see if it happens.

16          MS. IZMAYLOVA:  They said we couldn't bring any in.

17          THE COURT:  Sure.  Sure.  And if they bring it up,

18   they may be opening the door to something.  I don't know.  It

19   depends on what comes out.

20          MS. IZMAYLOVA:  I wanted to make sure.

21          THE COURT:  Thank you.

22          (Whereupon, the following proceedings continued in

23   open court.)

24          MS. MATZ:  Your Honor, may I have one moment?

25          THE COURT:  Sure.

```
 1              (Brief Pause.)

 2              MS. MATZ:  Thank you, your Honor.

 3              All right.  If we could take a look at Plaintiff's

 4  250, I believe the question I had asked was if you've ever

 5  seen a copy of this.

 6              THE WITNESS:  Yes, ma'am.

 7  BY MS. MATZ:

 8  Q   Okay.  And is this a copy of a tweet that you authored on

 9  October 5th of 2018?

10  A   Yes, ma'am.

11              MS. MATZ:  Okay.  Your Honor, I'd offer this in

12  evidence.

13              THE COURT:  Any objection?

14              MR. SABBAK:  No objection, your Honor.

15              THE COURT:  250 is admitted without objection.

16              (Whereupon, Plaintiff's Exhibit 250 was marked for

17  purposes of identification and admitted into evidence.)

18  BY MS. MATZ:

19  Q   Okay.  And in this tweet you wrote PSA Winos.  Do you see

20  that?

21  A   Yes, ma'am.

22  Q   And again that's public service announcement?

23  A   Yes, ma'am.

24  Q   Okay.  And that hashtag, again just for the jury to

25  understand, that means that anyone who's searching PSA might
```

1  find this; correct?

2  A   Yes, ma'am.

3  Q   Okay.  This says, the DM's sent to me by one of Cardi's

4  alleged friends was a hoax in order to attempt to discredit my

5  blog.  That will never happen because I expose everything.

6  ESP if it's a lie.  Do you see that?

7  A   Yes, ma'am.

8  Q   And ESP there is meant to be a shorthand for especially;

9  correct?

10  A   Yes, ma'am.

11  Q   Okay.  So what you're conveying to followers or people who

12  could find this publicly, is that that will never happen again

13  because you expose everything, especially if it's a lie;

14  correct?

15  A   Can you repeat that question, please.

16  Q   Actually, you know what, I'll withdraw it.  The exhibit is

17  in evidence.

18          All right.  One of the statements that you had made

19  or that was made in the Starmarie video and Starmarie Jones

20  interview and in the earlier September video that we viewed

21  yesterday, was that my client was a prostitute; correct?

22  A   Yes, ma'am.

23  Q   Okay.  And those two videos are not the only time you've

24  said that; correct?

25  A   No, ma'am.

1   Q   Okay.  Could we pull up Cardi Video 34, please.  Actually,

2   I apologize.  Do you have an exhibit number?  You know what,

3   we'll move on to something else and come back to this while we

4   get that.  Can we pull up Plaintiff's --

5          THE COURT:  Before you do, you referred to it as

6   Cardi Video 34.  Is there a separate list other than your

7   overall exhibit list?

8          MS. MATZ:  Your Honor, we had referred to the Bates

9   numbers in some of our outlines.

10          THE COURT:  Okay.  As far as exhibit list, I mean, is

11   this -- if you were going to publish this video, has it been

12   admitted already?

13          MS. MATZ:  No, it hasn't, and I would authenticate

14   it.  But we'll -- I'll find it.

15          THE COURT:  I was just trying to find it to be ready.

16          MS. MATZ:  No, I'm going to come back to it.

17          All right.  Plaintiff's 583 if we can do that.

18          Okay.  You also recall making statements that my

19   client stuck beer bottles up her vagina; correct?

20          THE WITNESS:  Yes, ma'am.

21          MS. MATZ:  All right.  Can we please look at

22   Plaintiff's 583 for a moment.

23          And, your Honor, for Plaintiff's 583 this has been

24   stipulated to by Request for Admission 85.

25          THE COURT:  Any objection to the admission of this

1  video?

2       MR. SABBAK:  No objection, sir.

3       THE COURT:  It's admitted without objection.

4       (Whereupon, Plaintiff's Exhibit 583 was marked for

5  purposes of identification and admitted into evidence.)

6       MS. MATZ:  All right.  And I'd just like to read one

7  stipulated fact into the record quickly.  And that is that, on

8  April 23rd of 2019 the defendants, plural, published a video

9  on YouTube.  And that is the 4-23-2019 video.

10      All right.  We're going to take a look at this

11  beginning at approximately 22 minutes and 40 seconds.

12      (Whereupon, a video recording was played.)

13  BY MS. MATZ:

14  Q   All right.  Do you recall giving testimony regarding this

15  video during your deposition?

16  A   Yes, ma'am.

17  Q   Okay.  And what you were referring to in that video when

18  you were saying she took a beer bottle from the pedestrian,

19  stuck it in her cooch, drank the beer bottle, and gave it back

20  to him, you were referring to a video that you claim you saw

21  on the internet; correct?

22  A   Yes, ma'am.

23  Q   Okay.  And do you recall testifying that the video you

24  were referring to, you found it on Pornhub; is that correct?

25  A   Yes, ma'am.

1  Q    Okay.  And do you recall also admitting during your

2  deposition that the Pornhub video, you don't know who made it

3  or where it came from; is that correct?

4  A    Yes, ma'am.

5  Q    Okay.  And you have no idea if someone made changes to it;

6  is that correct?

7  A    Yes, ma'am.

8  Q    You also have no idea if it was actually my client; is

9  that correct?

10  A    Yes, ma'am.

11  Q    And you also had no idea whether or not the video that you

12  saw on the internet was edited in any way?

13  A    Yes, ma'am.

14  Q    All right.  But based on viewing it, you made the

15  statements in this video; is that correct?

16  A    Yes, ma'am.

17  Q    And do you also recall when you were being questioned

18  about this during your deposition, that you were aware that

19  there's a lot of false information on the internet?

20  A    Yes, ma'am.

21  Q    All right.  Your answer during the deposition was yes of

22  course; correct?

23  A    Yes, ma'am.

24  Q    All right.  And do you also recall testifying that you

25  were aware that videos and photos and things like that can be

```
 1   edited to make something appear as if it's happening when it's
 2   not?
 3   A   Yes, ma'am.
 4   Q   And you don't know who produced the video that you saw on
 5   Pornhub; correct?
 6   A   No, ma'am.
 7   Q   And there were no credits in it, anything like that?
 8   A   There was a title.
 9   Q   I asked if there were any credits.
10   A   That's a credit.
11   Q   Well, during your deposition when you were asked if there
12   are any credits, you testified, no, ma'am, not that I noticed.
13   Isn't that true?
14   A   It's a title.
15   Q   Okay.  Let's --
16         THE COURT:  So the question wasn't -- the question
17   was what you said.  Why don't you show her a copy of her
18   deposition to make sure.
19         MS. MATZ:  That's what I was just going to do, your
20   Honor.  Thank you.
21         THE COURT:  Answer the question that is asked, not
22   what you want to have been asked.
23         THE WITNESS:  Yes, sir.
24         THE COURT:  All right.  I'm really getting tired of
25   you doing that.  So don't do it again.
```

1          THE WITNESS:  Okay.

2          THE COURT:  It's not helpful to anybody.  It delays

3  the trial.  It causes sometimes an objection to be made,

4  causes me to be concerned.  So stop doing it.

5          THE WITNESS:  Yes, sir.

6  BY MS. MATZ:

7  Q   All right.  If you could please look at your November 30th

8  deposition transcript.  Give me one moment, and I'll get you

9  the page number.  Okay.  If you could please go to page 82,

10  I'm going to direct your attention -- let me know when you're

11  at the page.

12  A   I'm sorry?

13  Q   I said let me know when you're at the page.

14  A   Yes, I'm here.

15  Q   On line 20 you were asked, okay, so you don't know who it

16  was produced by.  Were there any credits in the video?

17  Answer, no, ma'am.  Not that I noticed.

18          Is that the testimony you gave?

19  A   Yes, ma'am.

20  Q   Okay.  Are you saying that that testimony is untrue?

21  A   No, ma'am.

22  Q   Okay.  Thank you.  All right.  And with regards to how you

23  found this video on Pornhub, do you recall giving testimony

24  that someone had sent it to you?

25  A   Yes, ma'am.

1   Q    And do you recall not knowing who that was?

2   A    Yes, ma'am.

3   Q    Okay.  You recall giving testimony that it's your

4   understanding that Pornhub is a free forum where anyone can

5   upload and start an account?

6   A    Yes, ma'am.

7   Q    Okay.  And that you went to Pornhub to see the video that

8   had been floating around; is that correct?

9   A    Yes, ma'am.

10  Q    All right.  And so you also recall giving testimony, when

11  you said anyone can have an account, that that meant literally

12  anyone, you, me, anyone could have an account and upload

13  videos.  That's your understanding; correct?

14  A    Yes, ma'am.

15  Q    Okay.  And do you recall testifying that you had no idea

16  whether or not Pornhub does any kind of verification about who

17  is in the videos?

18  A    Yes, ma'am.

19  Q    Yes, you recall giving that testimony?

20  A    Yes, ma'am.

21  Q    All right.  Do you also recall indicating that, in

22  response to being questioned about whether or not you had any

23  understanding of what, if anything, Pornhub was doing to

24  verify information, that you testified that, after you said

25  you didn't know, you also testified that you've seen underaged

1  girls on the site.  So, yeah, do you recall giving that

2  testimony?

3         MR. SABBAK:  Objection.  Relevance.

4         THE COURT:  Objection is overruled.

5         THE WITNESS:  Can you repeat the question?

6  BY MS. MATZ:

7  Q   Sure.  I said, in response to being questioned about

8  whether or not you knew whether or not Pornhub did any

9  verification, if any, on their site, after you said you did

10 not know if they did, you also said, I mean, I've seen

11 underaged girls on that site.  And they say they -- you

12 know -- so, yeah.

13        Do you recall that?

14 A   Yes, ma'am.

15 Q   Okay.  And do you also recall when you were asked whether

16 you think they probably don't do any verification, you said,

17 yeah, but I've never go -- gone through the process myself; is

18 that correct?

19 A   Yes, ma'am.

20 Q   And you also recall testifying that you did not make any

21 effort to find out what Pornhub does regarding their

22 verification process, if there is one; correct?

23 A   Yes, ma'am.

24 Q   All right.  Do you also recall admitting that you have no

25 idea or you have no way of knowing whether or not it's my

1  client in the video you saw?

2  A   Yes, ma'am.

3  Q   Do you know who Luna Bell is?

4  A   No, ma'am.

5  Q   Were you aware at any time prior to the publication of the

6  video or after, of other people on the internet saying that it

7  was actually them in the video, not my client?

8  A   No, ma'am.

9  Q   Okay.  You have admitted, though, that my client has never

10  said it was her in the video; correct?

11  A   Yes, ma'am.

12  Q   You have also admitted that you never asked my client if

13  it was her in the video; correct?

14  A   Yes, ma'am.

15  Q   All right.  Do you recall giving testimony that you looked

16  to see if my client had made any public statements about this

17  video?

18  A   Yes, ma'am.

19  Q   Okay.  And do you recall giving testimony that normally if

20  it isn't her, referencing my client, she's known to try to

21  shut it down, but in this case you're saying you didn't see

22  her respond?  Do you recall giving that testimony?

23  A   Yes, ma'am.

24  Q   All right.  And do you recall testifying that my client,

25  meaning Cardi B, is known for making statements on Twitter?

1  And you agree with that; correct?

2  A   Yes, ma'am.

3  Q   And you generally follow her socials; is that correct?

4  A   Yes, ma'am.

5  Q   And do you recall when you were questioned about this

6  particular video at your deposition, when I asked you if you

7  actually looked at any of my client's social media channels to

8  see if she had made statements about this, you testified, no,

9  I did not look at her social media, just only on Google?  Do

10 you recall that?

11 A   Yes, ma'am.

12 Q   So even though you knew that my client would typically, if

13 something wasn't her or she disagreed with something, make a

14 statement on her social media, you didn't actually look there

15 before you published this video; correct?

16 A   Yes, ma'am.

17 Q   You have, though, seen statements from my client in her

18 Twitter saying that this was not her in the video; correct?

19 A   Yes, ma'am.

20 Q   All right.  And you saw those during the course of this

21 litigation; is that correct?

22 A   Yes, ma'am.

23 Q   All right.  I'd like to take a look at I'd like to take a

24 look at Plaintiff's 942, please.  Have you ever seen these

25 tweets before?

1          THE COURT:  I'm assuming y'all are trying to reorient

2    it?

3          MS. MATZ:  Yes, your Honor.  Actually, just give us a

4    second.

5          THE COURT:  Let's just wait for you to orient it.

6          (Brief Pause.)

7    BY MS. MATZ:

8    Q    All right.  Have you ever seen these tweets before?

9    A    Yes, ma'am.

10   Q    And it's your understanding the iamcardib is my client's

11   Twitter handle?

12   A    Yes, ma'am.

13         MS. MATZ:  Your Honor, I'd offer these into evidence.

14         MR. SABBAK:  No objection.

15         THE COURT:  All right.  9 -- I'm sorry.  Is it 42 or

16   22?  42?

17         MS. MATZ:  942, your Honor.

18         THE COURT:  942 is admitted without objection.

19         (Whereupon, Plaintiff's Exhibit 942 was marked for

20   purposes of identification and admitted into evidence.)

21   BY MS. MATZ:

22   Q    Okay.  And are these the tweets that you have seen from my

23   client saying that it's not her in that video?

24   A    Yes, ma'am.

25   Q    All right.  Even though you have seen these after the time

1  you saw these during the course of this litigation, you still

2  have not taken the videos you posted saying my client stuck

3  beer bottles up her vagina down; correct?

4  A   Yes, ma'am.

5  Q   All right.  And in the second tweet on this page, okay,

6  you can see my client is telling you not to or saying not --

7  excuse me, not telling you -- let me start that over.  You can

8  see that my client is saying not to spread fake shit about

9  her; correct?

10 A   Yes, ma'am.

11 Q   Okay.  And these were published on May 2nd of 2018?

12 A   Yes, ma'am.

13 Q   Okay.  And the video we just looked at, that was the

14 April 23rd, 2019, video that I read the stipulated facts for;

15 correct?

16 A   Yes, ma'am.

17 Q   So these would have been available had you looked for them

18 on the internet; correct?

19 A   Yes, ma'am.

20 Q   And these weren't just on my client's social media, you're

21 also aware that there were actually news articles written

22 about the fact that this was not my client in the video;

23 correct?

24 A   Yes, ma'am.

25 Q   Okay.  And you recall seeing a BET.com article?

```
 1  A   Yes, ma'am.

 2  Q   All right.  If we can pull up Plaintiff's 247.  Hold on

 3  one moment.  Okay.  Have you ever seen this before?

 4  A   Not this article, no, ma'am.

 5  Q   Okay.  You said you've seen a BET article but not this

 6  one?

 7  A   The first line on the page.

 8  Q   What do you mean the first line on the page?

 9  A   May I elaborate?  I didn't read the article.  I just saw

10  the headline when I googled it.

11  Q   Oh.  You saw a Google result for this, but you didn't

12  click on it or read it?

13  A   That is correct.

14  Q   Okay.  All right.  But when you say the first line on the

15  page, is that the title of the article?

16  A   Yes, ma'am.

17  Q   All right.  So you acknowledge on a Google result you have

18  seen an article that was titled, "No, That Disturbing Video of

19  a Stripper with a Beer Bottle is Not Cardi B," correct?

20  A   I believe so.

21  Q   Okay.  Thank you.  All right.  We can go ahead and take it

22  down.

23          All right.  Okay.  And do you recall giving testimony

24  about you said that you didn't look on my client's social

25  media, but you did google the video?
```

1  A    Yes, ma'am.

2  Q    Okay.  And do you recall during your deposition looking at

3  some Google results?

4  A    Yes, ma'am.

5  Q    Okay.  And do you recall that one of the -- that you

6  gave -- you gave me during the deposition the search terms

7  that you believed that you used when you googled this; is that

8  correct?

9  A    Yes, ma'am.

10  Q    Do you recall what those search terms were?

11  A    Some article came up.

12  Q    No, I just asked you if you recall what the search terms

13  were.

14  A    No, ma'am.

15  Q    Okay.  If we could look at your November 30th deposition

16  transcript for a moment, and if you could go to, please, page

17  111.

18  A    You said 111?

19  Q    Yeah, page 111 of the November 30th transcript.

20  A    I'm here.

21  Q    Okay.  So beginning at line 6 you were asked, okay, do you

22  remember what you googled?  Answer, I just put in, you, know

23  Cardi B dancing on -- you know, Cardi B stripping on beer

24  bottle, and it comes right up.  You see that?

25  A    Yes, ma'am.

1  Q   Okay.  Does that refresh your recollection about the

2  search terms you used?

3  A   Yes, ma'am.

4  Q   And do you recall looking at Google search results during

5  your deposition using the Cardi B stripping on beer bottle

6  search terms?

7  A   Yes, ma'am.

8  Q   Okay.  And are those -- were those results that we looked

9  at during your deposition when you saw the BET article that we

10 were talking about -- excuse me -- the result with the title

11 of the BET article?

12 A   I believe so, yes, ma'am.

13         MS. MATZ:  Okay.  Your Honor, I'm going to move on to

14 a different line of questioning, and I don't really know what

15 time you were planning on --

16         THE COURT:  I was about to call a break, so if you're

17 ready, we'll do that.

18         Ladies and gentlemen, we'll take a break until 11:10.

19 We'll come back at 11:10 and probably go until about 12:30 and

20 break for lunch at 12:30.  So if you'll can leave your notes

21 in your chair or take them with you, at your wish, we'll see

22 you in about ten minutes.

23         COURTROOM SECURITY OFFICER:  All rise.

24         (Whereupon, the jurors exited the courtroom.)

25         THE COURT:  Anything we need to talk about during the

```
 1  break?
 2          MS. IZMAYLOVA:  Not from us, your Honor.
 3          THE COURT:  All right.  See y'all at 11:10.
 4          MS. MATZ:  Thank you, your Honor.
 5          COURTROOM SECURITY OFFICER:  Court is in recess until
 6  11:10.
 7          (Brief recess.)
 8          THE COURT:  All right.  You can proceed.  Thank you.
 9  BY MS. MATZ:
10  Q   All right.  If we could actually -- I have one more
11  question to ask you about -- two more questions to ask you.
12  But the video that we just watched, if we could go back to
13  Plaintiff's 583, please, and we're going to start again at
14  approximately 22 minutes and 40 seconds.  And this was already
15  admitted, your Honor.
16          (Whereupon, a video recording was played.)
17  BY MS. MATZ:
18  Q   All right.  Can we pause for a moment.  All right.
19  Ms. Kebe, during your deposition do you remember giving
20  testimony that there's different ways that you receive
21  advertising revenue from the videos that you post on YouTube?
22  A   Yes, ma'am.
23  Q   Okay.  And I just want to talk briefly about a couple of
24  those ways.  One of those ways is that you receive advertising
25  revenue from YouTube from the ads that YouTube places before
```

1  your video airs; correct?

2  A   Yes, ma'am.

3  Q   Okay.  And this, what we're looking at on the screen, is

4  not an example of that; right?

5  A   No, ma'am.

6  Q   An example of that would be when you go to watch a YouTube

7  video, for the first four seconds some random ad pops up, and

8  then at some point you can skip it; is that right?

9  A   Yes, ma'am.

10  Q   And you don't decide what advertising goes in there.  In

11  the ones in the beginning that Google puts in, Google just

12  puts them in, and you receive a portion of the revenue;

13  correct?

14  A   Yes, ma'am.

15  Q   You also testified that you receive advertising directly

16  from advertisers that contract with you; correct?

17  A   Yes, ma'am.

18  Q   Okay.  And is what we're looking at here an example of you

19  placing those advertisements in your video for the advertisers

20  that pay you directly?

21  A   Yes, ma'am.

22  Q   Okay.  And so they pay you to essentially air their ad

23  during a portion of your show, like what we're talking about

24  here; correct?

25  A   Yes, ma'am.

1   Q   And they -- the part behind the Offset and trouble ticker

2   along the bottom with my client's image, the part behind that

3   is what they've provided to you; correct?

4   A   Yes, ma'am.

5   Q   And you imposed on whatever image they gave to you the

6   ticker along the bottom and my client's image over here on the

7   right-hand side; correct?

8   A   Yes, ma'am.

9   Q   Okay.  So this is being advertised while you're talking

10  about my client and her image is being displayed on the

11  screen; is that correct?

12  A   Yes, ma'am.

13  Q   Okay.  And is that -- do you have a lot of advertisers

14  that engage with you in this way?

15  A   Yes, ma'am.

16  Q   And do you typically place their advertisements during

17  these -- this type of video?

18  A   No, ma'am.

19  Q   No.  You just did it on this one?

20  A   Yes, ma'am.

21  Q   Did the advertiser know ahead of time that you'd be

22  placing their video while you were doing a segment about my

23  client?

24  A   No, ma'am.

25  Q   You made that decision; is that correct?

1   A    Yes, ma'am.

2   Q    I'm sorry.  I didn't hear the answer.

3   A    Yes, ma'am.

4   Q    Okay.  Thank you.  All right.  And the video we just

5   watched where you were talking about my client being --

6             THE COURT:  Hold on a second.  Just to eliminate that

7   happening, why don't you pull your mike closer to you.  So if

8   you'll just grab the mike stand and pull the whole thing over

9   and then take the -- look at me -- take it and sort of bend it

10  up so that it's kind of like almost underneath your --

11            THE WITNESS:  The plexiglass is tricking me.

12            THE COURT:  Pull the mike, and you can lower it a

13  little bit.

14            THE WITNESS:  How's that?  Is that good?

15            THE COURT:  Maybe even lower it a little bit more.

16  Just grab it like about three inches from the top and bend it

17  like that.  Just bend it up.

18            THE WITNESS:  Oh, bend it up.  Okay.

19            THE COURT:  Then you can lower it a little bit.  That

20  way it will get your voice a little more.  I think because of

21  the mask your voice will project downward and you won't hit

22  it.

23            THE WITNESS:  May I have permission to tie the

24  plastic tight so it won't move?

25            THE COURT:  Sure.

1  BY MS. MATZ:

2  Q   You're ready?

3  A   Yes, ma'am.

4  Q   Great.  Do you recall testifying that you're the person at

5  the company, Kebe Studios, that's responsible for publishing

6  all the content on YouTube?

7  A   Yes, ma'am.

8  Q   Okay.  And do you recall being asked whether it was your

9  position that the business is responsible for publishing the

10  content, you testified I am the business?

11  A   Yes, ma'am.

12  Q   Okay.  And do you also recall testifying that when you

13  were asked in your mind whether or not you saw a distinction

14  between you and the business, that you said, no, I mean, I am

15  the business?  Do you recall that?

16  A   Yes, ma'am.

17  Q   Okay.  The domain name unWinewithTashaK.com, that is your

18  website; correct?

19  A   Yes, ma'am.

20  Q   Okay.  And you are personally the registrant, the person

21  who that website is registered to; correct?

22  A   I believe so.

23  Q   And you also filed for a trademark; is that correct?

24  A   Yes, ma'am.

25  Q   And that's -- you filed for a trademark for

1   unWinewithTashaK.  Is that also correct?

2   A   Yes, ma'am.

3   Q   Okay.  And you are personally the listed owner of that

4   trademark with the United States Trademark Office; correct?

5   A   Yes, ma'am.

6   Q   All right.  I'd like to pull up Plaintiff's 946.  Is this

7   a copy of the mark information for the trademark that you and

8   I were just discussing from the trademark office?

9   A   Yes, ma'am.

10          MS. MATZ:  Your Honor, I'd offer this in evidence.

11          MR. SABBAK:  No objection.

12          THE COURT:  Plaintiff's 946 is admitted without

13   objection.

14          (Whereupon, Plaintiff's Exhibit 946 was marked for

15   purposes of identification and admitted into evidence.)

16   BY MS. MATZ:

17   Q   Okay.  And if we can just take a look at the first page,

18   the trademark that you applied for is depicted kind of small

19   in the upper right-hand corner; is that correct?

20   A   Yes, ma'am.

21   Q   And that's your logo unWinewithTashaK?

22   A   Yes, ma'am.

23   Q   Okay.  And if you can look at the goods and services

24   section, you have applied for that in Entertainment Services.

25   Do you see that?

1   A    Yes, ma'am.

2   Q    Okay.  And so that trademark is in relation to your

3   unWinewithTashaK platform; correct?

4   A    Yes, ma'am.

5   Q    And if we can go to the next page.  All right.  And if you

6   see under the current owner information, it says Latasha Kebe.

7   Do you see that?

8   A    Yes, ma'am.

9   Q    So you individually own the trademark?

10  A    Yes, ma'am.

11  Q    And do you have a license agreement with your business,

12  Kebe Studios?

13  A    I believe so, yes, ma'am.

14  Q    You have a written license agreement?

15  A    Could you elaborate more?

16  Q    I'm asking if you -- if there is a license agreement,

17  meaning a written form of a document that licenses the company

18  the right to use the trademark that you've registered.

19  A    No, ma'am.

20  Q    Okay.  So you just -- the business, Kebe Studios, just

21  utilizes it even though you own it; is that correct?

22  A    Yes, ma'am.

23  Q    And do you and your husband have an operating agreement

24  for the company?

25  A    No, ma'am.

```
1   Q    And it's an LLC; correct?

2   A    Yes, ma'am.

3   Q    And when you make decisions, do you do written resolutions

4   or anything like that?

5   A    No, ma'am.

6   Q    So you don't follow any of those types of corporate

7   formalities; correct?

8   A    No, ma'am.

9   Q    But you are, even though you own the business with your

10  husband 50/50, you're the face of the company; correct?

11  A    Of unWinewithTashaK, yes, ma'am.

12  Q    Well, the company is Kebe Studios.  Are you the, I mean --

13  and the company's business is unWinewithTashaK; correct?

14  A    One of them, yes, ma'am.

15  Q    Is it the predominant business?

16  A    No, ma'am.

17  Q    You have other businesses under it?

18  A    Yes, ma'am.

19  Q    So you are the face of the unWinewithTashaK portion of the

20  business?

21  A    Yes, ma'am.  That's correct.

22  Q    Is your husband the face of other portions of the

23  business?

24  A    Yes, ma'am.

25  Q    Okay.  Are you the president of the company?
```

```
1   A    No, ma'am.

2   Q    Is he?

3   A    Yes, ma'am.

4   Q    Just one more question about the videos we were looking at

5   where you were talking about my client putting beer bottles up

6   her vagina.  That video that we were just looking at is not

7   the only time that you have published videos repeating that

8   same statement that my client was the person in that video

9   putting beer bottles up her vagina; correct?

10  A    Yes, ma'am.

11  Q    All right.  And you have also -- when we were talking

12  earlier about the statements you made that my client was a

13  prostitute, you've also made that statement on many other

14  occasions; correct?

15  A    Yes, ma'am.

16  Q    And in many forums; correct?

17  A    Yes, ma'am.

18  Q    Including going online and saying that my client -- my

19  client's statement that she did not sell pussy is a lie; is

20  that right?

21  A    Yes, ma'am.

22          MS. MATZ:  Okay.  If we can please take a look at

23  Plaintiff's 576.  Your Honor, this was stipulated to by

24  Request for Admission 78, and I would offer it into evidence.

25          THE COURT:  Any objection?
```

 1          MR. SABBAK:  No objection, sir.

 2          THE COURT:  Plaintiff's 576 is admitted without

 3  objection.

 4          (Whereupon, Plaintiff's Exhibit 576 was marked for

 5  purposes of identification and admitted into evidence.)

 6          MS. MATZ:  Okay.  And we're going to take a look at

 7  approximately 58 minutes and 45 seconds, please.

 8          (Whereupon, a video recording was played.)

 9  BY MS. MATZ:

10  Q   All right.  Can we pause there.  All right.  In the video

11  we just looked at you were making that statement, and you were

12  referring directly to my client; correct?

13  A   That is correct.

14  Q   All right.  Do you recall giving testimony -- well, you

15  testified earlier that you did not remove the videos, the

16  video of the -- excuse me -- of the Starmarie interview or the

17  other September 21st video.  You did not remove those within

18  three days after the demand for retraction was sent; correct?

19  A   Yes, ma'am.

20          MS. MATZ:  Okay.  You do recall, though, at some

21  point -- well, actually, I'm going to just read a stipulated

22  fact into the record.  On March 21st, 2019, the plaintiff

23  filed this action.  On March 25th, 2019, Kebe temporarily

24  unlisted or made private the September 19th, 2018, video and

25  the September 21st, 2018, video on the Main YouTube channel.

1          On or around March 26th, the next day, Kebe re-listed

2   and/or made public the 9-19-2018 video and the 9-21-2018 video

3   on the Main YouTube channel.

4          Okay.  And earlier when we were looking at the demand

5   letter that came from my firm, you also posted a video about

6   that letter; correct?

7          THE WITNESS:  I believe so.

8   BY MS. MATZ:

9   Q   And was that video entitled "Cardi B I Just Wiped My Ass

10  with Your Demand Letter, I said what I said?"

11  A   Yes, ma'am.

12         MS. MATZ:  Okay.  Can we please pull up Plaintiff's

13  525.  All right.  Hold on one second.  Your Honor, this was

14  stipulated to by Request for Admission No. 7, and I'd offer it

15  into evidence.

16         MR. SABBAK:  No objection.

17         THE COURT:  Plaintiff's 525 is admitted without

18  objection.

19         (Whereupon, Plaintiff's Exhibit 525 was marked for

20  purposes of identification and admitted into evidence.)

21         MS. MATZ:  Go ahead and play it.

22         (Whereupon, a video recording was played.)

23  BY MS. MATZ:

24  Q   All right.  Is that the video that you posted after

25  receiving the demand for retraction from my firm?

```
1   A    That is correct.
2   Q    Okay.  All right.  So in that video you talked about the
3   fact that your name wasn't even right on it?
4   A    That is correct.
5   Q    All right.  And that's because the letter was addressed to
6   LaTasha Howard; correct?
7   A    Yes, ma'am.
8   Q    But you do admit that that was your name for a period of
9   time but just wasn't your married name; correct?
10  A    Yes, ma'am.
11  Q    So when you received the letter, you did understand that
12  it was for you and that you had received it; correct?
13  A    Yes, ma'am.
14  Q    All right.  In this video you reference that unless Cardi
15  sends you court papers making you show up in court, that the
16  videos aren't coming down; correct?
17  A    That is correct.
18  Q    And this video was posted in February -- on February 28th
19  of 2019?
20  A    I believe so.
21  Q    All right.  Excuse me.  This lawsuit was started on
22  March 21st of 2019.  So you did receive court papers; correct?
23  A    Yes, ma'am.
24  Q    But the videos are still up as of this day; correct?
25  A    Yes, ma'am.
```

1    Q    All right.  You also are talking to Cardi in this video;

2    is that correct?

3    A    That is correct.

4    Q    And so this video is actually directed at her when you

5    said bye, bitch.  You were talking to her; correct?

6    A    Yes, ma'am.

7    Q    If we can, please look at Plaintiff's 51.  Have you ever

8    seen this before?

9    A    Yes, ma'am.

10   Q    Is this a screenshot of the YouTube page where the video

11   we just watched is accessible?

12   A    Yes, ma'am.

13   Q    And you posted this on your YouTube channel?

14   A    Yes, ma'am.

15          MS. MATZ:  Your Honor, I'd offer this into evidence.

16          MR. SABBAK:  No objection.

17          THE COURT:  Plaintiff's 51 is admitted without

18   objection.

19          (Whereupon, Plaintiff's Exhibit 51 was marked for

20   purposes of identification and admitted into evidence.)

21   BY MS. MATZ:

22   Q    Okay.  And so here in this screenshot we can see your

23   face; is that correct?

24   A    Yes, ma'am.

25   Q    And that's because the video was paused at that particular

1  time when the screenshot was taken; correct?

2  A   Yes, ma'am.

3  Q   And underneath the video you can see the title of the

4  video, "Cardi B I Just Wiped My Ass With Your Demand Letter";

5  correct?

6  A   Yes, ma'am.

7          MS. MATZ:  All right.  We are going to take a look at

8  Plaintiff's 592.  And, your Honor, this was stipulated to by

9  Request for Admission 98 and I'd offer it into -- actually, I

10  apologize.  Did I offer the last -- 51 into evidence?

11          THE COURT:  You did.

12          MS. MATZ:  Okay.  So Plaintiff's 592, this was

13  stipulated to by Request for Admission 98.  I'd ask that it be

14  moved into evidence.

15          MR. SABBAK:  No objection.

16          THE COURT:  592 is admitted without objection.

17          (Whereupon, Plaintiff's Exhibit 592 was marked for

18  purposes of identification and admitted into evidence.)

19  BY MS. MATZ:

20  Q   All right.  If we can, let's take a look starting at

21  around a minute 14 and 10 seconds -- I apologize.  Just one

22  more.  There was a stipulated fact on this that on

23  September 18th, 2020, defendants published this video on

24  YouTube.

25          (Whereupon, a video recording was played.)

1  BY MS. MATZ:

2  Q   All right.  Let's pause.  All right.  So a couple things.

3  The first thing is in this video when you said that -- you

4  said I know you're fucking somebody else, you were talking

5  about my client; correct?

6  A   That is correct.

7  Q   And you're talking about my client having sex with someone

8  else other than her husband Offset; correct?

9  A   That is correct.

10 Q   All right.  And in this you also said that if you know --

11 you know Cardi is watching; correct?

12 A   Yes, ma'am.

13 Q   And then you said if you have a problem with this, just

14 hit the lawyers; correct?

15 A   Yes, ma'am.

16 Q   And you're referring to your lawyers in this lawsuit;

17 correct?

18 A   Yes, ma'am.

19 Q   All right.  And that's because you published this video in

20 September of 2020 while this lawsuit was pending; right?

21 A   Yes, ma'am.

22 Q   So after making statements that my client had herpes and

23 was a prostitute and used cocaine and stuck beer bottles up

24 her vagina and then getting sued for it, you also went online

25 and said she was fucking someone else and said I know you've

1  got HPV; is that right?

2  A   Yes, ma'am.

3  Q   All right.  If we can go -- when you were saying, you

4  know, hit the lawyers, I know you're watching this, were you

5  talking to her?

6  A   Yes, ma'am.

7  Q   Meaning my client?

8  A   Yes, ma'am.

9  Q   So you were directing this at her?

10  A   That is correct.

11        MS. MATZ:  Okay.  Thank you.  All right.  If we can

12  please go to 1:23:20.

13        (Whereupon, a video recording was played.)

14  BY MS. MATZ:

15  Q   All right.  Let's pause.  So again you've used the term

16  "receipts" in this video?

17  A   Yes, ma'am.

18  Q   When you're talking about you having receipts?

19  A   Yes, ma'am.

20  Q   And by receipts, you are referring to corroborating

21  documents; correct?

22  A   Yes, ma'am.

23  Q   Okay.  So you're telling people who are watching this that

24  when you publish something, you have corroborating documents;

25  correct?

1   A   Yes, ma'am.

2   Q   And you also said in this video if I get it wrong, I have

3   no problem retracting; correct?

4   A   That is correct.

5   Q   All right.  Do you have any corroborating documents that

6   my client has had sex with a man that's not her husband?

7   A   No, ma'am.

8   Q   Okay.  And do you have any corroborating documents that my

9   client has HPV?

10  A   No, ma'am.

11  Q   So when you told people that what you publish you have

12  receipts for -- I mean corroborating documents -- you don't

13  always; correct?

14          THE COURT:  I'm sorry?  Why are you looking at me?

15          THE WITNESS:  Oh, I thought you were about to say

16  something.  Sorry about that.

17          THE COURT:  No.  I was just responding to an email

18  and put my glasses on.

19          THE WITNESS:  I'm sorry about that.  Okay.  Repeat

20  the question.

21  BY MS. MATZ:

22  Q   I said, so when you're telling viewers that you have

23  receipts, meaning corroborating documents, for the things you

24  publish on your channel, that's not always true; correct?

25  A   Yes, ma'am.

```
1   Q   All right.  You also said if I get it wrong, I have no
2   problem retracting; correct?
3   A   That is correct.
4   Q   All right.  But you have never issued a retraction to my
5   client?
6   A   I have -- not to her personally but to my viewers.
7   Q   You've issued a retraction to your viewers?
8   A   Yes, ma'am.
9   Q   When did you do that?
10  A   On the Winogang channel.
11  Q   You issued a retraction and said that everything -- what
12  did you retract?
13  A   I said I knew that the story was fake and that it was
14  probably planted.
15  Q   You're talking about this story?
16  A   This particular story, yes, ma'am.
17  Q   Okay.  But you've never issued a retraction for any of the
18  other videos you've published about my client; correct?
19  A   I mean, I can't say that.  I don't know which ones you're
20  talking about.  I've done a lot of --
21  Q   Have you ever issued a retraction to my client for any of
22  the videos where you have said that she is a prostitute?
23  A   No, ma'am.
24  Q   Have you ever issued a retraction to my client for any of
25  the videos where you said she has herpes?
```

1  A    No, ma'am.

2  Q    Have you ever issued a retraction for any of the public

3  postings that you made where you used Herpes B or Cold Sore B

4  to refer to my client?

5  A    No, ma'am.

6  Q    Have you ever issued a retraction to my client for saying

7  that she put beer bottles up her vagina?

8  A    No, ma'am.

9  Q    And you have never taken any of those videos down, they're

10  all still up today; correct?

11  A    Yes, ma'am.

12  Q    All right.  So let's talk about what you just said,

13  though, about this particular video where you said that my

14  client had sex with another man while she was married and that

15  she has HPV.  Correct?

16  A    Yes, ma'am.

17  Q    All right.  So you have admitted that the -- you thought

18  the information that was given to you before you published

19  this video was false; correct?

20  A    Yes, ma'am.

21  Q    Okay.  And you've also admitted that you believed it was

22  false before you put the video out; correct?

23  A    That is correct.

24  Q    All right.  And you recall giving testimony about the

25  reasons why you believed before you published this video that

1  the source of the information was not reliable; correct?

2  A   That is correct.

3  Q   Okay.  And so with respect to that, you received a DM and

4  then an anonymous phone call; is that right?

5  A   That is correct.

6  Q   All right.  And do you know the name of the person who

7  DM'd you?

8  A   No, ma'am.

9  Q   Okay.  And do you know the name of the person who you

10 claim you received the anonymous phone call from?

11 A   No, ma'am.

12 Q   Okay.  And the woman who called you actually refused to

13 give you her name when she called you; correct?

14 A   That is correct.

15 Q   All right.  And when we were watching the beginning of

16 this when you said the woman who called you was playing a

17 recording, you don't have a copy of that; is that correct?

18 A   That is correct.

19 Q   All right.  And before you published this video part of

20 the reason you thought that whoever had called you and was

21 claiming to be the source of this information, part of the

22 reason you thought that it wasn't credible was because you

23 asked for a copy of the recording, and that person would not

24 provide it to you; is that correct?

25 A   That is correct.

1   Q    And how did you ask for that?  Did you ask for it on the

2   phone call or in a DM?

3   A    On the call.

4   Q    Okay.  And then it never came to you; is that right?

5   A    They refused, yes, ma'am.  That's correct.

6   Q    Okay.  You also testified that one of the other reasons

7   that you did not believe that the source or the alleged source

8   of this story was credible is because you didn't actually

9   think that the person who DM'd you and the person that called

10  you were the same person; isn't that right?

11  A    That is correct.

12  Q    And that usually when people reach out to you, they DM

13  you, and then you exchange numbers and at some point you speak

14  to them; is that right?

15  A    That is correct.

16  Q    But that's not what happened here?

17  A    No.  That is correct.

18  Q    Someone just called you out of the blue; is that right?

19  A    Yes, ma'am.

20  Q    And part of the other reason you didn't think that this

21  was credible was that you felt like if you're playing a

22  recording for me and you don't send it to me, that you then

23  can't back the information up; correct?

24  A    That is correct.

25  Q    Because they could be playing you anything?

1   A    Yes, ma'am.

2   Q    But regardless of you believing that the person who was

3   calling you and who was the alleged source of this story was

4   not at all credible, you went ahead and published the video

5   that contained the statement that my client cheated on her

6   husband and has HPV; correct?

7   A    That is correct.

8   Q    You've testified that you think my client planted this

9   story; correct?

10  A    That is correct.

11  Q    But you've also admitted that you don't have any evidence

12  that my client planted the story; correct?

13  A    That is correct.

14  Q    And it wasn't even just that you had doubts about the

15  alleged source of this story and serious doubts, that wasn't

16  it; right?  You've actually admitted that before you published

17  this video, in your words, you thought it was fake?

18  A    That is correct.

19  Q    You've also admitted during your deposition that you

20  assume every story could not be true?

21  A    That is correct.

22  Q    Do you recall giving testimony that you think it's funny

23  to say that people have sexually transmitted infections?

24  A    That is correct.

25  Q    All right.  And specifically when you were asked do you

1  think it's funny to say that people have sexually transmitted

2  infections, you said it's a part of life, yes, I do; right?

3  A   Yes, ma'am.  That is correct.

4  Q   All right.  And when you were also asked if you think it

5  would also be funny to say that someone had AIDS, you said

6  it's funny sometimes, yeah, I mean, especially if they were

7  reckless in getting it.  I mean, that's the reality of it.

8  Some people just don't know.  Is that the testimony you gave?

9  A   That is correct.

10 Q   All right.  In this video that we were just watching, when

11 you said that if you get it wrong, you have no problem issuing

12 a retraction and then you said -- you said you did give a

13 retraction, but when you were asked about this at your

14 deposition -- well, let me ask you this:  The retraction we're

15 talking to, is that the baby bird video?

16 A   I'm sorry?

17 Q   Is the retraction you're saying you gave for this video

18 the baby bird video?

19 A   The baby bird?

20 Q   Where you refer to my client as baby bird?  Or are you

21 talking about a different video?

22 A   I have no -- no, I have no idea.

23 Q   Okay.  We'll watch it in a minute.  But did you -- when do

24 you think you gave that retraction?

25 A   I remember exactly.  It was when I talked -- can I

1  elaborate?  Sorry.

2          THE COURT:  Well, you've got to answer the question.

3  The question was when do you think you gave the video -- I

4  guess the retraction.

5          MS. MATZ:  The retraction.

6          THE WITNESS:  It was within a week of receiving the

7  story.

8  BY MS. MATZ:

9  Q   All right.  So very close in time; correct?

10 A   Yes, ma'am.

11 Q   And this story came out, just to make sure I get the date

12 right, this was September of 2020; correct?

13 A   I believe so.  I don't know the date.

14 Q   Yeah, that was a stipulated fact I read into the record.

15 So September of 2020.  And you were deposed in -- one of the

16 dates you were deposed in this case was November 30th; right?

17 A   That is correct.

18 Q   And do you recall testifying at that point -- not that you

19 had given a retraction, but that if you were given a negative

20 HPV result of my client, when you were asked if you would give

21 a retraction, you said, no, because that was dark comedy.  I

22 didn't say that like it was an absolute fact.

23 A   That is correct.

24 Q   It's correct that that's the testimony you gave?

25 A   That is correct.

1   Q   Okay.  So in the deposition you didn't say I had already

2   issued a retraction; correct?

3   A   That is correct.

4   Q   All right.  And even though -- so you say here I didn't

5   say that as if it were an absolute fact; right?

6   A   That is correct.

7   Q   And yesterday when you were testifying, you talked about

8   certain pieces when referring to my client as being opinion

9   pieces; correct?

10  A   That is correct.

11  Q   And you remember acknowledging that you had testified that

12  opinion pieces were when someone else gives you information

13  and you're relaying it; correct?

14  A   That is correct.

15  Q   All right.  But in your video that we just saw, you said

16  that 98 percent of what you do is fact; right?

17  A   That is correct.

18  Q   Okay.  So you are relaying to people watching your video

19  on a regular basis that what you are publishing are facts;

20  isn't that right?

21  A   That is correct.

22  Q   Okay.  Do you also recall during your deposition admitting

23  that you have made multiple false statements about my client?

24  A   That is correct.

25  Q   All right.  And specifically -- and specifically in

1   reference to the statements we just watched; correct?

2   A    That is correct.

3   Q    Okay.  And, again, when you were questioned actually

4   during the 11-19 -- excuse me -- the November 19th deposition,

5   when you were asked if you'd ever issued a retraction about

6   those particular statements -- question, okay, have you ever

7   issued a retraction?  Answer, no.  That was your testimony;

8   correct?

9   A    That is correct.

10  Q    All right.  So what you just said a moment ago on the

11  stand, that you believe you did issue a retraction, that is

12  not what you testified to when you were under oath at your

13  deposition; correct?

14  A    That is correct.

15  Q    All right.  The video that we just watched that says that

16  my client cheated on her husband and has HPV is still up;

17  right?

18  A    That is correct.

19  Q    Meaning I could go online tonight and watch it?

20  A    That is correct.

21  Q    And anyone else, any member of the public, could go online

22  and watch the video and see those statements?

23  A    Yes, ma'am.

24  Q    All right.  And on the YouTube channel where you can see

25  the video, do you have a disclaimer under there at this point

1  that says there are statements in this video that aren't true?

2  A   Yes, ma'am.

3  Q   You have a disclaimer up there now?

4  A   There is a disclaimer.

5  Q   When did that go up?

6  A   I'm not sure.

7  Q   And do you specifically tell them that the statements

8  about my client having HPV and cheating on her husband aren't

9  true?

10 A   Can you repeat the question?

11 Q   Does the disclaimer specifically say that the statements

12 that my client has HPV are not true?

13 A   No, ma'am.

14 Q   Does the disclaimer say that the statements that my client

15 cheated on her husband are not true?

16 A   No, ma'am.

17 Q   What does the disclaimer say?

18 A   Am I able to read it?  It's pretty long.

19 Q   Can you give me a general idea?

20 A   Something like this is for entertainment purposes only.

21 All commentary is alleged, opinion based, comedy, satire,

22 parody.

23 Q   Okay.  Did you start putting that disclaimer on your

24 videos after you got sued?

25 A   I'm not sure.  I don't remember an exact date.

1   Q   Okay.  But in the video the statement that you're

2   presenting facts is still there; right?

3   A   That is correct.

4   Q   That wasn't edited out?

5   A   No, ma'am.

6   Q   All right.  You've also made statements that if Cardi

7   wants you to delete the videos, she needs to give you money;

8   right?

9   A   Yes, ma'am.

10          MS. MATZ:  All right.  Can we pull up Exhibit 550.

11   Your Honor, this video was stipulated to by Request for

12   Admission 44, and I'd offer it into evidence.

13          MR. SABBAK:  No objection.

14          THE COURT:  Plaintiff's 550 is admitted without

15   objection.

16          (Whereupon, Plaintiff's Exhibit 550 was marked for

17   purposes of identification and admitted into evidence.)

18          MS. MATZ:  All right.  If we could please start at

19   around 4 minutes and 15 seconds.  This is 550?  I'm sorry,

20   your Honor.  Could I have one moment?

21          THE COURT:  Sure.

22          (Brief Pause.)

23          MS. MATZ:  So we're going to start this video at 4

24   minutes and 15 seconds, please.

25          (Whereupon, a video recording was played.)

1  BY MS. MATZ:

2  Q   Let's pause there.  Okay.  So in this video where you're

3  saying because she thinks she's going to run my platform, she

4  wants me to delete the videos, well, bitch, you need to give

5  me a check, you're talking about my client; correct?

6  A   That is correct.

7  Q   Okay.  And the videos that you're talking about that she

8  wants deleted are the videos we've been discussing with the

9  statements in them; correct?

10  A   That is correct.

11  Q   The statements that my client is saying are defamatory;

12  correct?

13  A   That is correct.

14  Q   All right.  And in this you are -- are you talking to her?

15  Is this supposed to be directed at her?

16  A   My audience.

17  Q   Okay.  So this is for your audience.  And you're saying

18  that if the -- if she wants the videos down, she needs to pay

19  you; right?

20  A   That is correct.

21  Q   And you said, you want me to delete these videos, you

22  better give me the money I was supposed to make off the videos

23  or more because it's residual income?

24  A   That is correct.

25  Q   All right.  When you say the money I was supposed to make

1   or more because it's residual income, are you talking about

2   the fact that as long as the videos remain up, they continue

3   to create revenue for you?

4   A   That is correct.

5   Q   All right.  So you're essentially saying that to take the

6   videos down, my client has to pay you out for what you think

7   you're going to make on these videos by leaving them up?

8   A   That is correct.

9   Q   All right.  And when you say I may not use her name -- no,

10  you said -- excuse me -- you want this shit down on my

11  platform, you've got to pay for that.  It's a business over

12  here.  And then you say, but knowing me, I'd find a way to

13  still give it to you.  I may not use her name, but I'd be like

14  there's this rapper.  You said that; right?

15  A   That is correct.

16  Q   And is what you're intending to convey when you say that,

17  that even if she did pay you to take these down and you took

18  them down, that you would continue to make the statements

19  without using her name and just say there's this rapper?

20  A   That is correct.

21  Q   All right.  So you're essentially conveying that no matter

22  what my client does, you're going to continue to make these

23  statements about her?

24  A   That is correct.

25  Q   And part of the reason you were laughing when you said I'd

1   be like there's this rapper, is because you've talked about my

2   client enough that you would expect that all your viewers

3   would still know who you were talking about if you said

4   there's this rapper; right?

5   A   That is correct.

6   Q   You've also admitted that you're publishing stories about

7   my client to get back at her for starting this lawsuit; right?

8   A   That is correct.

9   Q   All right.  Could we please take a look at Exhibit 651.

10  Okay.  Before this is published to the jury do you -- all

11  right.  Do you recognize what's up on the screen here?

12  A   Yes, ma'am.

13  Q   Is that you in the upper left-hand corner?

14  A   Yes, ma'am.

15  Q   And at the top left-hand corner next to the little circle

16  it says unWinewithTasha.  You see that?

17  A   Yes, ma'am.

18  Q   Was this an Instagram Live video that you published on

19  your channel?

20  A   On Instagram.

21          MS. MATZ:  Your Honor, I'd offer this into evidence.

22          THE COURT:  Any objection?

23          MR. SABBAK:  No objection, your Honor.  Thank you.

24          THE COURT:  Plaintiff's 651 is admitted without

25  objection.

1          MS. MATZ:  Thank you, your Honor.

2          (Whereupon, Plaintiff's Exhibit 651 was marked for

3    purposes of identification and admitted into evidence.)

4    BY MS. MATZ:

5    Q    All right.  If we can take a look at it starting at 11

6    minutes and 10 seconds, please.  And before we start this, is

7    this a recording of a phone call?

8    A    I'm sorry?

9    Q    Is this a recording of a -- excuse me -- a face time?

10   A    No.  This is an Instagram Live.

11   Q    Okay.  And you had four people on it?

12   A    Yes.

13   Q    Okay.  Before we show this I just want to ask you a couple

14   questions about what an Instagram Live is.

15   A    Sure.

16   Q    Could you explain what an Instagram Live is.

17   A    So an Instagram Live is a feature and this story icon

18   where you see my little face above my head.  I'm in the black

19   shirt.  So you'll click that icon when you're on Instagram,

20   and you'll have the option to go live.  And they allow you to

21   go live with others as well, up to four.  And so I brought in

22   other bloggers during this conversation to discuss a multitude

23   of things.

24   Q    Okay.  So it's essentially like a way to broadcast a live

25   conversation, and that can be just you or it could be a

1    conversation with other people; correct?

2    A    That is correct.

3    Q    All right.  And do you know how long these stay up on

4    Instagram?

5    A    There's two options.  So 24 hours -- no, not 24 hours.  So

6    you have the option to delete it right away or you can share

7    it to your Instagram, and it will stay if it processes.  So --

8    Q    Okay.

9    A    Yes.

10   Q    Great.  Thank you.  And did you share this one with your

11   Instagram?

12   A    I tried, yes, ma'am.

13   Q    Okay.  All right.  Let's look at 11 minutes and 10

14   seconds.

15              (Whereupon, a video recording was played.)

16   BY MS. MATZ:

17   Q    All right.  Who are the other people you're talking to?

18   A    I believe that is The Wiley Show next to me at the top.

19   Below is Spoken Reasons, a YouTuber, and I'm not sure who that

20   is in the dark.  I can't remember right offhand.

21   Q    Okay.  And this was published --

22   A    Oh, I remember.  Larry Reid Live.  He's another YouTuber.

23   Q    Thank you.  This was published in August of 2021; correct?

24   A    I believe so.

25   Q    All right.  And when you were saying, when she filed that

1  lawsuit, that was the only reason I started to drag her ass,

2  you're talking about my client, Cardi B; correct?

3  A   That is correct.

4  Q   And is drag her ass slang for talking negatively about

5  someone?  Putting it politely.

6  A   More so reading her, critiquing her more.

7  Q   All right.  But since this lawsuit was filed, you've done

8  more than just critique her; correct?

9  A   Yes, ma'am.

10  Q   Because we've looked at all of these tweets where you

11  refer to her as Herpes B and the video that we just looked at

12  where you said she had HPV and cheated on her husband;

13  correct?

14  A   That is correct.

15  Q   All right.  And so that would be included -- that type of

16  conduct would also be included in what you're describing as

17  when you started to drag her ass; correct?

18  A   That is correct.

19  Q   All right.  So part of the reason you did those things

20  was -- or the reason you did those things is because she filed

21  a lawsuit.  That's what you're saying in this video?

22  A   That is correct.

23  Q   All right.  Do you recall giving testimony that you don't

24  know for sure that my client has HPV?

25  A   That is correct.

1  Q    And you testified also that you think it's a joke; right?

2  A    That is correct.

3  Q    And you also remember testifying that part of the reason

4  you said she had HPV is because you think it's amusing; right?

5  A    That is correct.

6  Q    Okay.  And when asked if when you said that, you knew it

7  would upset my client, you admitted that you knew it would

8  upset my client; correct?

9  A    That is correct.

10  Q    And that's part of the reason you did it; correct?

11  A    That is correct.

12           MS. IZMAYLOVA:  May we approach?

13           THE COURT:  Yes.

14           (Whereupon, a bench conference was held between the

15  court and counsel.)

16           MS. IZMAYLOVA:  In that deposition my client wants to

17  explain the other reasons why she was doing this was because

18  of the threats and everything we discussed yesterday, so she's

19  opening the door to that and I just wanted --

20           THE COURT:  What is it she's --

21           MS. IZMAYLOVA:  She was like saying, you know, I

22  wanted her to be upset, like, you know, when I was posting the

23  videos, when I was --

24           THE COURT:  That's a way to back door in the stuff

25  that's not allowed.  The reason that she would go on the

1  record and say mean stuff is because of the threats against

2  her?

3         MS. IZMAYLOVA:  She was saying that because of all

4  those things in addition to filing the lawsuit and --

5         THE COURT:  Wait a minute.  I don't understand.

6  Start over.

7         MS. IZMAYLOVA:  Sorry.  I'm trying to -- she said

8  those things in addition to because she filed the lawsuit and

9  also because she's been harassing her and, you know --

10         THE COURT:  So she said things that were consistent

11  with the things that she'd been saying all along.

12         MS. IZMAYLOVA:  Correct.

13         THE COURT:  Well, that's not believable, number one.

14  It's in direct violation of the motion in limine.  I'll let

15  you make a record of that at the break, but we're not going to

16  back door -- find a way for her to back door in everything

17  that I've eliminated.  To say that I've been talking crap

18  about her and because they threatened to sue me, I continued

19  to talk crap about her, in addition to the fact that I think

20  it's amusing and I make money from it and all that, no, that's

21  not believable.  And it's just an attempt by defense to simply

22  back door in things that have been specifically excluded by

23  the Court.

24         MS. IZMAYLOVA:  I'm not trying to back door it in.

25  I'm just saying it's getting to that point where she keeps

1  asking her about her state of mind.

2          MS. MATZ:  I'm not asking about her state of mind.

3          THE COURT:  I'm not sure what question -- what

4  question asked about her state of mind?

5          MS. IZMAYLOVA:  She's saying like you thought this

6  and you thought that.  Like I'm saying --

7          MS. MATZ:  She admitted those things.

8          MS. IZMAYLOVA:  I understand but she also -- I'm

9  just --

10          MS. MATZ:  So I don't -- go ahead.

11          MS. IZMAYLOVA:  I'm going to bring it back up if I

12  think it's getting more close, I guess.

13          THE COURT:  Okay.  Well, so in her deposition --

14          MS. IZMAYLOVA:  Correct.

15          THE COURT:  -- she said what?  She said I brought

16  that -- I did that because you -- because I was mad about that

17  I was being harassed?

18          MS. MATZ:  Not in response to the questions I just

19  asked --

20          MS. IZMAYLOVA:  Not --

21          MS. MATZ:  Excuse me.  In many places -- and this was

22  a giant problem -- she went off because there was obviously no

23  one in the room controlling her.  She went off on these giant

24  tangents like calling my client a gang banger and just saying

25  all these inflammatory things, and we are not offering that

 1  testimony here because the Court has specifically excluded it.

 2  And in response to the questions that I just asked, that is

 3  not the answers that she gave.

 4       THE COURT:  Yeah, I don't understand the defendant's

 5  point at this point.  But I'll tell you I'm not going to let

 6  the defendant create -- like at one point she herself said

 7  that what she wanted to say was going to open the door.  She

 8  can't open the door by saying stuff.  The only way the

 9  proverbial door could be opened is if a question is asked that

10  does that.

11       MS. IZMAYLOVA:  I understand.

12       THE COURT:  At this point I'm not exactly sure that I

13  have a motion before me, but I fail to see that the defendant

14  can be able to say things that she wants to say just because

15  she wants to say them because she think it makes herself look

16  better.  I mean, so at this point there's nothing for me to

17  rule on.

18       MS. MATZ:  Thank you, your Honor.

19       Before we break I'm actually about to play a fairly

20  long video since --

21       THE COURT:  How long is it?

22       MS. MATZ:  It's more than 15 minutes, I believe.  Let

23  me just check the time codes.

24       THE COURT:  You're going to have questions for her

25  after you play it I'm sure or you'll have questions in

1  between?

2        MS. MATZ:  I'll have questions for her after I play

3  it.  So it's at least 18 minutes long.

4        THE COURT:  We're going to break for lunch.

5        MS. MATZ:  Thank you.

6        MS. IZMAYLOVA:  Thank you.

7        (Whereupon, the following proceedings continued in

8  open court.)

9        THE COURT:  Sorry that we had to have such a long

10  discussion.  I used to tell jurors when I was a state judge

11  that if they -- and this is true.  If you ever can't hear

12  something, then ask us to speak up.  I'm not sure if I said

13  this in this trial or not, but when we're whispering over

14  there, don't ask us to speak up because that's intentional.

15        In the course of discussing some evidentiary matters,

16  it's come to my attention that there's going to be -- the next

17  item for the plaintiff is going to be a video that itself will

18  take 18 minutes or so.  There will be questions intermitted as

19  well, as well as following.  It will probably make sense that

20  we go ahead and break for lunch now rather than just wait ten

21  minutes for artificial -- the artificial time that I said at

22  12:30.  So we'll break now at 12:20.  I'll ask if you'll

23  return to the jury deliberation room at 1:20.

24        I should have mentioned this yesterday and I didn't,

25  that we also have the use of the adjoining courtrooms' jury

1   deliberation area.  So if y'all want to -- if some of you are

2   staying up and you want to spread out in there, then feel free

3   to do that, and court security staff will make that available

4   to you, assuming I'm right and it's still available.

5          There was a judge there -- his picture was on the

6   wall -- one of the few African American judges that's ever

7   served on this court, a great man.  He was on the Georgia

8   Court of Appeals before I was ever there, and then he came

9   here.  And he just recently -- as a federal judge, you can

10  take senior status when you reach a certain age depending on

11  when you went on the bench, which allows you to continue to

12  serve and hear some cases.  Oftentimes senior judges continue

13  to hear full case loads even after they retire, which is

14  really nice because the government is already paying them, and

15  they don't get paid anything more to serve.  He served well

16  into his eighties and just recently retired, and so his

17  courtroom is vacant.

18         There's currently pending before the United States

19  Congress the nominee -- nomination of our President Biden the

20  two new judges to this court, and I expect both of them to be

21  confirmed soon.  And one of them will take that office, and

22  that courtroom might not be available to us then.  But it is

23  now, and so if you want to spread out in there either now or

24  at any of our other breaks we'll make it available to you.  So

25  we'll see you at 1:20.  Take your notes with you and leave

1  them in the jury deliberation room given that it's going to be

2  an extended break.  Thank you.

3          COURTROOM SECURITY OFFICER:  All rise.

4          (Whereupon, the jurors exited the courtroom.)

5          COURTROOM SECURITY OFFICER:  Please be seated.

6          THE COURT:  All right.  So anything we need to talk

7  about before lunch?

8          MS. IZMAYLOVA:  No, your Honor.

9          THE COURT:  Nothing from the plaintiff?

10          MS. MATZ:  No, your Honor.  Thank you.

11          THE COURT:  All right.  We'll see y'all in an hour.

12  Thank you.

13          (Whereupon, a recess was taken from 12:20 p.m. until

14  1:24 p.m.)

15          COURTROOM SECURITY OFFICER:  All rise.

16          THE COURT:  Thank you.

17          COURTROOM SECURITY OFFICER:  Please be seated and

18  come to order.

19          THE COURT:  Yes, ma'am, if you'd come on up and have

20  a seat.

21          COURTROOM SECURITY OFFICER:  All rise.

22          (Whereupon, the jurors entered the courtroom.)

23          COURTROOM SECURITY OFFICER:  Please be seated and

24  come to order.

25          THE COURT:  Let me say something if I can about the

1  temperature.  So it's a little cool, and I think it's cool

2  because yesterday I thought it was getting kind of hot in

3  here.  And I complained and asked them to do something about

4  it.  Well, they have.  So I am somewhat reluctant to ask them

5  to warm it up.  I'm not afraid where we'll go, but I may wait

6  the rest of the day just to see what happens a little bit

7  later today.  And if it's too cold, then we'll tell them and

8  see if they can adjust it a little bit maybe in between.  But

9  it's kind of a slow process.

10        This building was built in 1980, I think.  It's a

11  famous building, not by name, but any of the Marvel movies,

12  things like that that are -- and so many movies are now filmed

13  in Atlanta and in Georgia because of the tax laws here.  This

14  building is frequently blown up in movies.  If you watch it,

15  you'll see it going up in flames and things like that.

16        We don't have like our individual system of air

17  really.  It's all kind of computerized and involves piping and

18  things like that.  So we'll see if we can -- we'll see what we

19  end up with tomorrow, but I do apologize.  If I'm a little

20  cold, I know people are cold because I'm not normally cold.

21  Maybe nobody was hot yesterday, but I thought it was getting

22  kind of hot in here yesterday.  But we'll see if we can try to

23  find a happy medium.  Thank you.

24        All right.  Plaintiff can resume her questioning.

25        MS. MATZ:  Yes, your Honor.  Thank you.

1          Ms. Kebe, I believe before we broke for lunch that

2    one of the things you testified to was that you claim at

3    least, although you didn't say it in your deposition, that you

4    posted a retraction video regarding the video where you said

5    my client cheated on her husband and had HPV; is that correct?

6          THE WITNESS:  Can you repeat the question?  I

7    couldn't hear you.

8    BY MS. MATZ:

9    Q    Sure.  Make this a little closer.

10   A    Thank you.

11   Q    Sure.  I said I believe before we broke for lunch that you

12   had testified that, although you didn't say you had done a

13   retraction video when you were deposed, you think you did do a

14   retraction video regarding the video where you said that my

15   client had HPV and had cheated on her husband; is that

16   correct?

17   A    That is correct.

18   Q    And I believe you also said that you posted that on your

19   Wino Gang channel; is that correct?

20   A    That is correct.

21   Q    Okay.  And the Wino Gang channel is your back up channel;

22   correct?

23   A    That is correct.

24   Q    And the video that we looked at earlier where you said my

25   client had HPV and had cheated on her husband, that was posted

1  not on the back up channel; right?

2  A   Repeat the question, please.

3  Q   Was the video where you said my client had HPV and had

4  cheated on her husband, was that also posted on back up video

5  or was it posted somewhere else?

6  A   No, it was -- we cut it up and put it on the back up

7  channel as well.

8  Q   But where was it first posted?

9  A   On my main channel, unWinewithTashaK.

10 Q   Okay.  And whatever retraction you're saying you issued,

11 did you also issue it on the main channel?

12 A   No, ma'am.

13 Q   Okay.  And does your back up channel have less viewers

14 than your main channel?

15 A   Yes, ma'am.

16 Q   And would you say it has substantially less viewers?

17 A   Yes, ma'am.

18 Q   So anyone -- whatever you're saying you said is a

19 retraction, even though you didn't specify you were retracting

20 that my client didn't have HPV or that my client didn't cheat

21 on her husband, the people who saw that video on the main

22 channel would not have seen the retraction; correct?

23 A   That is correct.

24          MS. MATZ:  All right.  I would like to pull up

25 Plaintiff's 581.  And this has been stipulated by Request for

1  Admission No. 82, so I'd offer it into evidence, your Honor.

2           THE COURT:  What's the number again?

3           MS. MATZ:  The RFA number or the exhibit number?

4           THE COURT:  Exhibit number.

5           MS. MATZ:  Plaintiff's 581.

6           THE COURT:  Is there any objection?

7           MR. SABBAK:  No objection, your Honor.

8           THE COURT:  Plaintiff 581 is admitted without

9  objection.

10          (Whereupon, Plaintiff's Exhibit 581 was marked for

11 purposes of identification and admitted into evidence.)

12          MS. MATZ:  And there is a stipulated fact that on

13 September 21st, 2020, defendants published a video on YouTube.

14          (Whereupon, a video recording was played.)

15 BY MS. MATZ:

16 Q   If we can just pause this for one second.  I am going to

17 let this video play out, but just before we go into this, when

18 you're talking about we're about to catch a bitch or check a

19 bitch, you're talking about my client; right?

20 A   That is correct.

21 Q   Okay.  Let's go ahead and play the rest of the video.

22          (Whereupon, a video recording was played.)

23 BY MS. MATZ:

24 Q   All right.  Ms. Kebe, in that video when you were talking

25 about making up stories out of thin air and posting false

1  statements, you were referring back to the video that we had

2  looked at before lunch where you said my client had HPV and

3  cheated on her husband; correct?

4  A   That is correct.

5  Q   All right.  If we can go to section -- the minute mark of

6  3:24 for a moment approximately.

7         (Whereupon, a video recording was played.)

8  BY MS. MATZ:

9  Q   Let's take a pause.  All right.  In this where you're

10  talking about I knew the shit was fake, I even talked to

11  the -- no, I'm not going to tell you who I talked to besides

12  Kyle, who is Kyle?

13  A   Kyle owns a blog called The Neighborhood Talk on

14  Instagram.

15  Q   Okay.  And you talked to Kyle about the story that you

16  published saying my client had HPV and cheated on her husband

17  before you published it; correct?

18  A   Yes, I did.

19  Q   Okay.  And you actually texted him about that story;

20  correct?

21  A   That is correct.

22  Q   And you told him that you thought that it was fake, but

23  you were going to put the BS out anyway; correct?

24  A   That is correct.

25  Q   All right.  If we can just take a -- I want to just leave

1    this cued, but we're going to look at Plaintiff's 887 for a

2    moment.  All right.  And before we hit play on this, this is

3    what's been previously marked as Plaintiff's 887.  Do you

4    recognize this?

5    A    Yes, I do.

6    Q    Is this a screen recording of your text messages with Kyle

7    that you provided in discovery in this case?

8    A    Yes, they are.

9         MS. MATZ:  Your Honor, I'd offer this into evidence.

10        MR. SABBAK:  No objection.

11        THE COURT:  887 is admitted without objection.

12        (Whereupon, Plaintiff's Exhibit 887 was marked for

13   purposes of identification and admitted into evidence.)

14        MS. MATZ:  All right.  If we can publish it for the

15   jury for a moment.

16        (Whereupon, a video recording was played.)

17   BY MS. MATZ:

18   Q    You're scrolling through your text messages so that we can

19   see them all; correct?

20   A    Who said hold on?

21   Q    Did you want the video to stop?

22   A    Oh, that was my voice from the video.  Oh, that's fine.  I

23   thought somebody was saying hold on in the court.  Okay.

24   Yeah, keep scrolling.

25        (Whereupon, a video recording was played.)

1  BY MS. MATZ:

2  Q   All right.  We can go ahead and pause.  So this is you

3  scrolling through this text chain so that you can provide it

4  pursuant to a discovery request; correct?

5  A   That is correct.

6  Q   Rather than taking screenshots of it?

7  A   Well, I just wanted you to see that it was real.  That is

8  correct.

9  Q   Okay.  If we can scroll down a little, go forward a

10  little.  Yeah, right there.  Okay.  So on the text messages

11  that are being portrayed here, this is your phone; correct?

12  That we're looking at?

13  A   That is correct.

14  Q   And the upper left-hand corner says Kyle 2.  So in terms

15  of the colors on the screen, just so we're all clear what

16  we're looking at, the messages in the gray bubbles are coming

17  from Kyle; is that correct?

18  A   That is correct.

19  Q   And the messages in the, I'm going say aqua bubbles, are

20  your messages; correct?

21  A   Yes, ma'am.

22  Q   And these are messages you authored and sent to him;

23  correct?

24  A   Yes, ma'am.

25  Q   Okay.  And it looks like you sent them on -- well, I'm

1  going to start where it says Friday September 18th, 2020.  You

2  see that?

3  A    Okay.

4  Q    Okay.  And it says I think the chick that called me is a

5  set up by Cardi.  You see that?

6  A    Yes.

7  Q    And you said I've been texting the bitch all day; is that

8  correct?

9  A    Yes, ma'am.

10  Q    And so are you referring to what you testified about

11  earlier, that it was your belief that the source or the

12  alleged source that called you was being planted by my client?

13  A    That is correct.

14  Q    Even though you admitted that you have no evidence that

15  that's actually the case; correct?

16  A    That is correct.

17  Q    All right.  Can we go forward a little.  Maybe the other

18  direction.  All right.  Stop.  Actually, go forward a tiny

19  bit.  I apologize.  Yeah, forward a little more.  Okay.  And

20  then you said -- I realize it's a little blurry -- I'm going

21  to still put out the BS.  You see that?

22  A    Yes, I do see that.

23  Q    Okay.  And BS in that is referring to bullshit; correct?

24  A    That is correct.

25  Q    All right.  So you're essentially telling Kyle that the

1   story that you're about to put out was bullshit, but you were

2   putting it out anyways?

3   A   That is correct.

4   Q   All right.  Can we go down a little more.  I'm sorry.  I

5   actually meant down in the chain, which I think is earlier in

6   the video.  Sorry, your Honor.  Okay.  Stop.  Okay.  And then

7   here around 1:08 p.m. you were saying cause why won't she give

8   me the recording or send some sort of photos.  You see that?

9   A   Yes.  That is correct.

10   Q   So that's referring to what you were testifying about

11   earlier, that one of the reasons you believed that this person

12   who called you is fake is because you asked them for the

13   recording, and they didn't send you a copy; is that right?

14   A   That is correct.

15   Q   Okay.  Thank you.

16   A   You're welcome.

17   Q   All right.  If we can go back to the other video, please,

18   what we were looking at, which is Plaintiff's 581.  All right.

19   So is what we just looked at in the text chain the

20   conversation that you were referring to in this video when you

21   said you talked to Kyle?

22   A   I'm sorry.  Could you repeat the question.

23   Q   Sure.  The quote we saw in the video before we switched

24   over to the other exhibit was, I was just like I know this

25   shit is fake, but since bitch wants to sent send out fake

1    something news -- motherfucking news, guess what, I'm going to

2    tell the world what already knows anyways -- I'm sorry.  I

3    started that a little early.  Said I even talked to the -- no,

4    I ain't going to tell you who I talked to besides Kyle.  You

5    remember saying that?

6    A   Yes, ma'am.

7    Q   Okay.  So is the conversation we just looked at the

8    conversation you had with Kyle?

9    A   Yes, ma'am.

10            MS. MATZ:  Okay.  All right.  And then if we can go

11   to 4:10.

12            (Whereupon, a video recording was played.)

13   BY MS. MATZ:

14   Q   All right.  Let's pause.  So in this portion of the video

15   you're talking about someone putting a gag order or an

16   injunction on you; correct?

17   A   Yes, ma'am.

18   Q   Okay.  And a couple of times in this video you said

19   statements to the effect of I don't care, and I'm never going

20   to stop.  You heard yourself say that; correct?

21   A   That is correct.

22   Q   And is that because unless someone actually forces you to,

23   you are never going to stop repeating these statements about

24   my client?

25   A   That is correct.

1          MS. MATZ:  If we can go to 7:10, please.

2          (Whereupon, a video recording was played.)

3    BY MS. MATZ:

4    Q   All right.  Can we pause.  Okay.  So here you said, you're

5    a nasty bitch.  I'm not surprised if you were sharing panties

6    with another bitch.  So, first of all, when you said you're a

7    nasty bitch, you're talking about my client; right?

8    A   That is correct.

9    Q   All right.  And throughout a lot of this video you seem to

10   be talking directly into the cameras as if you're talking to

11   my client; correct?

12   A   I was talking to -- no, ma'am.

13   Q   Okay.  So you were talking to your viewers?

14   A   Yes, ma'am.

15   Q   Okay.  All right.  So you said I wouldn't be surprised if

16   you were sharing panties with another bitch.  So you're

17   referring to my client wearing another woman's panties; is

18   that correct?

19   A   That is correct.

20   Q   Okay.  And you've previously said in many statements that

21   we've heard today that she has herpes; correct?

22   A   That is correct.

23   Q   Okay.  And here when you're saying she's sharing panties

24   with another woman, you're saying that was funny as fuck;

25   correct?

1   A   Yes, ma'am.

2   Q   Okay.  All right.  And then you said again in this video

3   that I know you're fucking somebody else; right?

4   A   Yes, ma'am.

5   Q   And you were talking about my client?

6   A   Yes, ma'am.

7   Q   So you were saying I know that you're having sexual

8   relations with a person that's not your husband; correct?

9   A   That is correct.

10          MS. MATZ:  All right.  Let's start at 7:54, and I'll

11   tell you when to stop.

12          (Whereupon, a video recording was played.)

13   BY MS. MATZ:

14   Q   All right.  Let's pause there.  So when we looked at the

15   video earlier, the video where you said my client has HPV and

16   the video where you said my client was cheating on her

17   husband, you said at some point that you put disclaimers on

18   your video saying that statements are alleged; right?

19   A   That is correct.

20   Q   Okay.  But in this video you're saying -- well, when you

21   say oh, oh, why won't you leave me alone, y'all are lying on

22   me, you're imitating my client; right?

23   A   That is correct.

24   Q   Okay.  And then you said, no, bitch, no.  You're a nasty

25   bitch.  You are.  That's no allegedly; correct?

1  A   Yes, ma'am.

2  Q   So you're saying that the things you said about my client

3  are not allegedly; correct?

4  A   Yes, ma'am.

5          MS. MATZ:  All right.  If we can go to around 8:38,

6  please.

7          (Whereupon, a video recording was played.)

8  BY MS. MATZ:

9  Q   All right.  Can you pause for a moment.  Thank you.  Okay.

10  So again when you're talking about I knew it was fake and

11  guess what, because I knew it was motherfucking fake, guess

12  what, because I knew it was fake I still made that shit go

13  motherfucking viral.  You heard that?

14  A   That is correct, yes, ma'am.

15  Q   Okay.  And the thing you're talking about knowing was fake

16  was again the video where you said my client had HPV and that

17  her husband cheated on her; correct?

18  A   Yes, ma'am.

19  Q   All right.  And then you said I made that shit go

20  motherfucking viral.  All right.  When you put it out knowing

21  it was fake, you were trying to make it go viral; correct?

22  A   Yes, ma'am.

23  Q   Okay.  And you recall giving testimony in this case when

24  you were deposed, that your intention was to bring traffic?

25  A   That is correct.

1  Q   To your platform; correct?

2  A   Yes, ma'am.

3  Q   Where you monetize your videos and you receive ad revenue;

4  correct?

5  A   Yes, ma'am.

6  Q   And do you recall also that when you were asked didn't you

7  care whether or not it was fake because you don't think it

8  does anything to affect your credibility, you testified, no,

9  you didn't care because you sell drama?

10  A   That is correct.

11  Q   And you also recall testifying that when you were asked

12  that you don't care if it's fake, you testified, yes, you

13  don't care if it was fake.  That's what you said in the video;

14  correct?

15  A   Correct.

16       MS. MATZ:  All right.  Can we look at -- go to time

17  code 9:01.

18       (Whereupon, a video recording was played.)

19  BY MS. MATZ:

20  Q   All right.  Let's pause.  All right.  So here you're again

21  talking about my client's female genitalia; correct?

22  A   That is correct.

23  Q   All right.  And you're essentially implying that she was

24  sitting in a taxi with no panties on; correct?

25  A   That is correct.

1   Q   And are you saying that that would have happened -- that

2   that's a disgusting thing to do?

3   A   Yes, it is.

4   Q   Okay.  And that you could potentially pick up some sort of

5   infection from that?

6   A   Yes.

7   Q   Okay.  And that's also what you meant when you

8   referenced -- and I'm sorry to use this language -- but pussy

9   probably itching like a motherfucker?

10  A   Part of it but yes.

11          MS. MATZ:  Okay.  You also -- if we could go to 9:36

12  for a second.

13          (Whereupon, a video recording was played.)

14  BY MS. MATZ:

15  Q   All right.  Let's pause.  So you said, if I get something

16  wrong, I don't have no problem telling you, but I knew this

17  bullshit was bullshit.  You heard that?

18  A   Can you repeat the question.  I was coughing.  Sorry.

19  Q   No problem.  You said if I get something wrong, I don't

20  have no problem telling you, but I knew this bullshit was

21  bullshit?

22  A   That is correct.

23  Q   Okay.  So are you essentially saying that if you think

24  something is false, you will issue a retraction but that you

25  knew this was false?

1   A   Can you repeat that question.  I didn't understand it.

2   Q   Sure.  In the first part of it when you said if I get

3   something wrong, I don't have no problem telling you -- so

4   let's just pause there.  Are you saying that if you get

5   something wrong in one of your stories, you'll issue a

6   retraction?

7   A   That is correct.

8   Q   Okay.  And then you said but I knew this bullshit was

9   bullshit; right?

10  A   That is correct.

11  Q   So if you already knew it was wrong, at this point you

12  published this video and -- is there a retraction in this

13  video?

14  A   Yes.  Yes, ma'am.

15  Q   Is this the retraction video you testified about?

16  A   Yes, ma'am.

17  Q   You think this is a retraction?

18  A   Yes, ma'am.

19  Q   All right.  So you're saying this is a retraction video,

20  but earlier you said in this video that you knew she was

21  cheating on her husband again; correct?

22  A   Yes, ma'am.

23  Q   So your idea of a retraction is to repeat some of the

24  statements that you're retracting and say that you know

25  they're true?

1   A    No, ma'am.

2   Q    But that's what you did here; right?

3   A    No, ma'am.

4   Q    Well, you did say I know you're cheating on him; correct?

5   A    I did.  Yes, ma'am.

6          MS. MATZ:  All right.  Okay.  Let's go to 10:24.

7          (Whereupon, a video recording was played.)

8   BY MS. MATZ:

9   Q    All right.  Hold on.  Okay.  So here again you are

10  conveying that the videos are staying up no matter what;

11  right?

12  A    Yes, ma'am.

13  Q    And even though you said in some of the videos that we

14  watched yesterday that you wanted my client to handle it

15  legally and you weren't going to take them down unless she

16  filed court papers, now in this video, long after she filed

17  court papers, you're basically saying I don't care, the videos

18  are staying up unless a judge orders me to take them down; is

19  that right?

20  A    That is correct.

21  Q    So the only way at this point these videos are ever going

22  to come down is if this Court forces you to; is that right?

23  A    That is correct.

24          MS. MATZ:  Okay.  And if we can go to 10:50, I

25  believe.

1          (Whereupon, a video recording was played.)

2          MS. MATZ:  All right.  I'm sorry.  Where are you

3    stopped?  Oh, no.  Keep going.

4          (Whereupon, a video recording was played.)

5    BY MS. MATZ:

6    Q   All right.  Let's pause.  Okay.  So you said here if you

7    continue to send me fake stories, I'm going to air them as

8    they are, ho.  You're talking about my client there; right?

9    A   That is correct.

10   Q   Okay.  And you also said, every fucking story I get, just

11   like every story I get on every celebrity that I can put out

12   that's not damaging to my career, I'm going to fucking put

13   out.  It's gossip, bitch.  You heard that; right?

14   A   Yes, ma'am.

15   Q   Okay.  And when you talk about not damaging to your

16   career, what you actually mean is every story that you can put

17   out that's good for your platform you're going to put out;

18   correct?

19   A   That is correct.

20          MS. MATZ:  All right.  All right.  If we can go to

21   12:30.

22          (Whereupon, a video recording was played.)

23   BY MS. MATZ:

24   Q   All right.  Let's pause there.  When you're talking about

25   she should be live right now, you're talking about my client;

1  right?

2  A    That is correct.

3  Q    Okay.  And is that because you expected that when -- your

4  expectation was that when she -- when you posted this fake

5  story about saying that she had -- excuse me -- saying that

6  she had HPV and her husband cheated on her, you expected her

7  to go live and say something about it; is that right?

8  A    That is correct.

9  Q    And if she had, that would have been good for your

10 platform; right?

11 A    That is correct.

12 Q    It would have driven traffic there?

13 A    Yes, ma'am.

14 Q    And that would have increased viewership?

15 A    Yes, ma'am.

16 Q    And ad revenue; correct?

17 A    Yes, ma'am.

18         MS. MATZ:  Okay.  If we can go to 14:52.

19         (Whereupon, a video recording was played.)

20 BY MS. MATZ:

21 Q    All right.  Let's pause.  Okay.  So in this part of the

22 video you're saying if you want someone to know you've got an

23 STD, bitch, send it to me, and I'm going to put it out and let

24 every motherfucking body know.  That's what you said?

25 A    That is correct.

1  Q    Okay.  So you were specifically referencing the part of

2  the video where you said my client had HPV; correct?

3  A    No, ma'am.

4  Q    You were referencing something else?

5  A    Yes, ma'am.

6  Q    Were you referencing something else in a different video?

7  A    Yes, ma'am.

8  Q    What video were you referencing?

9  A    The Starmarie Jones interview that I conducted on

10 September 18th or 19th, I believe.

11 Q    Okay.  So when you say -- so you're actually talking about

12 the comment that my client had herpes when you're talking

13 about that?

14 A    Yes, ma'am.

15 Q    Okay.  So you're saying if you want somebody to let --

16 somebody to know that you've got an STD, referencing herpes,

17 to send it to you and you'll put it out?

18 A    Yes, ma'am.

19 Q    Do you think my client set up the Starmarie Jones

20 interview?

21 A    No, ma'am.

22 Q    Okay.  But you're essentially saying here that if you

23 think my client -- if you thought my client sent you

24 information saying she had an STD, you would publish it?

25 A    Yes, ma'am, if that's what I was told to do, yes, ma'am.

1   Q   Even if you didn't know whether or not my client was

2   actually behind it; correct?

3   A   Yes, ma'am.   That's correct.

4   Q   You'd go ahead and publish it?

5   A   Yes, ma'am.

6   Q   Just like you published this video -- excuse me -- the

7   video prior to this where you said my client has HPV; correct?

8   A   Yes, ma'am.

9   Q   So it wouldn't matter whether any of that information --

10  it wouldn't matter if all that information was false.   You'd

11  go ahead and publish it; correct?

12  A   No, ma'am.

13  Q   Well, I just asked you if it was sent to you but you had

14  no -- you didn't actually know if it came from my client, if

15  you'd publish it; correct?

16  A   Yes, ma'am, you did.

17  Q   So you'd publish it without having any idea whether or not

18  the source that it came from had anything to do with my

19  client; correct?

20  A   No, ma'am.

21  Q   Now you're saying you wouldn't.   You would check?

22  A   Yes, ma'am.

23  Q   Okay.   But here in this video, in the prior video when you

24  said my client had HPV, you've already admitted that you

25  didn't have any corroborating information and thought that the

1   information you were being given was fake; right?

2   A   No, ma'am.  I never said your client had HPV.

3   Q   Well, that's what we heard you say in a video before the

4   lunch break.

5   A   No, ma'am, that is incorrect.

6   Q   All right.  Well, we can go back and look at that.  You're

7   saying that in the last video we saw, you didn't say I know

8   you've got HPV?

9   A   Yes, ma'am.  That is exactly what I'm saying.

10  Q   You're saying those words didn't come out of your mouth?

11  A   Yes, ma'am.

12  Q   All right.  Can we go to Plaintiff's 592.  And, actually,

13  hold on one moment.  Just hold on.  Actually, no.  I'm going

14  to direct you to your deposition testimony dated

15  November 19th.

16  A   What page?

17  Q   Page 242.  And when you gave testimony at your deposition,

18  you understood you were under oath; correct?

19  A   Yes, ma'am.

20  Q   You understood you were under oath under penalties of

21  perjury just as if you were sitting here in this case?

22  A   Yes, ma'am.

23  Q   Okay.  And at your deposition did you give the following

24  testimony starting on line 14?  Do you recall making

25  statements that my client has HPV?  Answer, yes.

```
1   A   Yes, ma'am.

2   Q   That's the testimony you gave?

3   A   Yes, ma'am.

4   Q   So you did say my client has HPV?

5   A   I said she probably has STD (sic).  It wasn't a fact.

6   Q   Ma'am, did you give the testimony I just read into the

7   record?

8   A   Yes, ma'am.

9           MS. MATZ:  Okay.  Thank you.

10          MS. IZMAYLOVA:  Your Honor, can we approach?

11          (Whereupon, a bench conference was held between the

12  Court and counsel.)

13          MS. IZMAYLOVA:  Because my client is not able to

14  explain --

15          THE COURT:  You've got to be louder.

16          MS. IZMAYLOVA:  Because she's not able to explain

17  anything, this is starting to get really tricky.  I think --

18          THE COURT:  Hold on.  Hold on.

19          MS. IZMAYLOVA:  -- she said now I can't say that for

20  a fact.  So if she would replay the clip, she can explain

21  herself, though.  I mean, this is getting really crazy.

22          MS. MATZ:  I'm looking at her deposition testimony --

23          MS. IZMAYLOVA:  I know what the video says.

24          THE COURT:  She's on cross-examination.  The question

25  is not improper.  She's on cross-examination.
```

1          MS. IZMAYLOVA:  Well, she's getting confused.

2          THE COURT:  No point of argument.

3          (Whereupon, the following proceedings continued in

4     open court.)

5     BY MS. MATZ:

6     Q    Okay.  If we can go to -- actually, hold on.  I apologize.

7     All right.  You also recall in this same deposition on

8     November 19th of 2020 admitting that you made statements that

9     my client committed infidelity; is that correct?

10    A    That is correct.

11         MS. MATZ:  All right.  If we can go to 16:10 of

12    the -- yes.  That's the video.  Thank you.

13         (Whereupon, a video recording was played.)

14         THE COURT:  Hold one second.  Yes, y'all can't see

15    it?  Okay.

16         MS. MATZ:  Thank you for letting us know.

17         THE COURT:  Make it available to the jury.

18         (Whereupon, a video recording was played.)

19    BY MS. MATZ:

20    Q    All right.  Let's pause for a moment.  When you just

21    started reading something, Tasha, nobody cares, whatever that

22    was, was that a comment that was coming up?

23    A    Yes, ma'am.

24    Q    Are you -- you're very engaged with your fans; is that

25    correct?

1    A    That is correct.

2    Q    And you read most of the comments that are posted on your

3    videos?

4    A    No, ma'am.

5    Q    You don't read them?

6    A    Not a lot, no, ma'am.

7    Q    Okay.  Do you read -- so this was -- was this a live?

8    A    Yes, ma'am.

9    Q    Okay.  And in a live video the comments are coming up as

10   you're talking into the video.  And you're live; that's

11   correct?

12   A    Yes, ma'am.  That's correct.

13   Q    Okay.  So they're in your line of sight as you're looking

14   at your phone?

15   A    Yes, they're moving.

16   Q    And when you do live videos -- was this on Instagram?

17   This was a live on Instagram?

18   A    No, ma'am.  This was on my second YouTube channel, Wino

19   Gang, and I think we had approximately like 3,000 watching at

20   the time.

21   Q    Okay.  And so do you usually read the comments as you're

22   in lives or you don't read comments that much at all?

23   A    Not much at all.

24            MS. MATZ:  Okay.  If you can go to 18:24.

25            (Whereupon, a video recording was played.)

1   BY MS. MATZ:

2   Q   All right.  Let's pause for a minute.  So here when you're

3   saying you ain't going to be able to shut me up, you want to

4   shut me up, let me tell you how to shut me up, pay me bitch,

5   when you say that and you're saying pay me, bitch, you're

6   talking to my client; correct?

7   A   Yes, ma'am.

8   Q   And you're basically saying that if my client wants to

9   shut you up, she has to pay you?

10              THE COURT:  Yes?  No?

11              THE WITNESS:  No, ma'am.

12  BY MS. MATZ:

13  Q   Okay.  Because you wouldn't take the videos down no matter

14  what; correct?

15  A   Yes, ma'am.  That is correct.

16  Q   All right.  Can we look at Plaintiff's 320.  All right.

17  Have you seen this before?

18  A   Yes, ma'am.

19  Q   This is a post that you posted on Instagram; is that

20  correct?

21  A   Yes, ma'am.

22  Q   And the top part is a screenshot of part of the

23  conversation we just saw on your cell phone?

24  A   Yes, ma'am.

25  Q   Okay.  And the bottom part is the message that you posted;

1  is that correct?

2  A   Yes, ma'am.

3         MS. MATZ:  All right.  Your Honor, I'd offer 320 into

4  evidence.

5         MR. SABBAK:  No objection, your Honor.

6         THE COURT:  Plaintiff's 320 is admitted without

7  objection.

8         (Whereupon, Plaintiff's Exhibit 320 was marked for

9  purposes of identification and admitted into evidence.)

10 BY MS. MATZ:

11 Q   All right.  So you posted this on Instagram.  And do you

12 recall when you did that?

13 A   I believe it was right after the live stream that I made

14 on my backup channel, the Wino Gang.  I'm not sure of the

15 actual date, so around September 20, 21st or something.

16 Q   But approximately around the time that we -- of the video

17 we just saw; correct?

18 A   Yes, ma'am.

19 Q   Okay.  And in this -- so the top part of this, now that

20 the jury can see it, this is a screenshot of the text messages

21 with Kyle; right?

22 A   That is correct.

23 Q   Okay.  And I see there's a red mark over it.  That's over

24 his phone number; right?

25 A   That's correct.

1  Q   And this is the messages we saw where you said I'm going

2  to put the BS out, and then he responded, oh, my God, really,

3  exclamation point.  You see that?

4  A   Yes, ma'am.  That is correct.

5  Q   That's how he responded.  Okay.  And then in the message

6  below, after the unWinewithTashaK, that's the message that you

7  actually authored when you posted this; right?

8  A   Yes, ma'am.

9  Q   And so just to make sure the jury understands, when you do

10 an Instagram post, you can upload a photo or video, and then

11 you have an opportunity to write something underneath it;

12 correct?

13 A   That is correct.

14 Q   And what do you generally call this section where you

15 write something?

16 A   The caption section.

17 Q   Okay.  Great.  So that's the caption section.  Okay.  So

18 in the caption section here again you wrote, but I knew the

19 bullshit was made up.  I ran the story because I knew your ass

20 was that pressed.  And so again we're talking about the video

21 where you said my client has HPV and had an affair; is that

22 correct?

23 A    Yes, ma'am.

24         MS. MATZ:  Thank you.  All right.  Can we look at

25 321, please.  Actually, no.  Sorry.  I don't think we need

1  that.  Okay.  If we can take a look at Plaintiff's 615,

2  please.

3          THE COURT:  Sorry.  The number again?

4          MS. MATZ:  Plaintiff's 615.  And, your Honor, this

5  has been stipulated by Request for Admission No. 118, and I'd

6  offer it into evidence.

7          THE COURT:  Any objection?

8          MR. SABBAK:  No, sir.

9          THE COURT:  615 is admitted without objection.

10          (Whereupon, Plaintiff's Exhibit 615 was marked for

11  purposes of identification and admitted into evidence.)

12          THE COURT:  You called out 321, but then you moved

13  on.  So you're not tendering that?

14          MS. MATZ:  I'm not.  It was a pretty close duplicate

15  to the last one, and I don't think it's -- thank you, your

16  Honor.  I appreciate you asking, though.

17          All right.  If we can go to -- I believe it's around

18  the hour mark at 1 hour, 2 minutes, 42 seconds, please.

19          (Whereupon, a video recording was played.)

20  BY MS. MATZ:

21  Q   All right.  Let's pause.  So in this you say -- well,

22  first of all, this was published in September of 2020;

23  correct?

24  A   I'm not sure when this was published.

25  Q   All right.  We can get to that.  In this -- well, first of

1    all, let me ask you a question.  Was this published on your

2    YouTube page or is this a Patreon video?

3    A    This is a Patreon video.

4    Q    All right.  And Patreon is a platform that people have to

5    pay to see content; correct?

6    A    That is correct.  It's an exclusive platform for your VIP

7    subscribers and viewers.

8    Q    Okay.  So unlike YouTube, the content you put out on your

9    YouTube channel where on YouTube anyone in the world could go

10   and watch your content; correct?

11   A    That is correct.

12   Q    But on Patreon if a person wanted to watch your content,

13   they would have to create an account with Patreon; correct?

14   A    Yes, and put in their credit card details and personally

15   pay to view the videos.

16   Q    And do they just pay Patreon and you get a cut of it or

17   they subscribe to your channel directly and you get paid for

18   that?

19   A    I'm not sure of the actual contracting.  My husband

20   handles that.  That would be a question for him.

21   Q    Okay.  But all the content you put out on Patreon you get

22   paid for because people -- not from ad revenue but from people

23   subscribing to it; correct?

24   A    That is correct.

25   Q    And because -- you said for VIPs a minute ago; right?

1  A   Yes, ma'am.

2  Q   So is part of what you do, you publish exclusive bits of

3  content on Patreon so that people will want to pay to go watch

4  those; is that right?

5  A   Yes, ma'am.  That's part of it.

6  Q   Okay.  And then do you also at some point publish that on

7  YouTube or do you leave that on Patreon only?

8  A   Depending on the content.  It just depends.  Sometimes

9  yes.

10  Q   Okay.  So sometimes you leave it on Patreon, and sometimes

11  you put it on YouTube also; correct?

12  A   Yes, ma'am.

13  Q   And if you were to put it on YouTube also, then you would

14  also receive ad revenue and the monetization from it being on

15  YouTube; correct?

16  A   That is correct.

17  Q   Okay.  Thank you.  All right.  So we just heard you say in

18  this video what the fuck, I ain't seen her medical records and

19  nor do I care; correct?

20  A   That is correct.

21  Q   At the time this video -- so are you -- excuse me.  Let me

22  start that over.  At the time you're making this statement,

23  are you basically saying you don't care what the medical

24  records say?

25  A   That is correct.

1  Q   That you're not going to change what you're saying?

2  A   That is correct.

3          MS. MATZ:  All right.  Okay.  Let's -- if you can let

4  the clip play a little further, please.  Thank you.

5          (Whereupon, a video recording was played.)

6  BY MS. MATZ:

7  Q   All right.  Let's pause there.  You're, in this portion of

8  the video that we just saw, you're referring to Starmarie

9  Jones telling you that she and my client shared underwear?

10 A   Yes, ma'am, from the original interview.

11 Q   Okay.  And that threw you for a loop; correct?

12 A   Yes, ma'am.

13 Q   You were surprised by that?

14 A   Yes, ma'am.

15 Q   That seemed kind of strange that they couldn't have their

16 own underwear?

17 A   Yes, ma'am.

18          MS. MATZ:  All right.  Let's keep going.

19          (Whereupon, a video recording was played.)

20 BY MS. MATZ:

21 Q   All right.  Okay.  Now, here you're talking about -- when

22 you said she couldn't stop fucking long enough to get rid of a

23 yeast infection, who are you talking about?

24 A   Your client, Cardi B.

25 Q   Okay.  And you also said that's why people are still up in

```
 1  arms about that interview, referring to the Starmarie Jones
 2  interview; correct?
 3  A   That is correct.
 4  Q   Because the shit she said, I'm like this is crazy.  That's
 5  what you said?
 6  A   That is correct.
 7  Q   Okay.  And then you reference your conversation with
 8  Lovely TI again; correct?
 9  A   That is correct.
10  Q   Not the call we heard that was recorded but the original
11  call that you had with her after the interview but before you
12  published the interview; correct?
13  A   That is correct.
14  Q   Okay.  And you said, that's when I heard Lovely TI had
15  documented -- sorry -- had information like saying that you
16  don't know, she don't know her?
17  A   That is correct.
18  Q   Okay.  So you were talking about that Lovely TI had told
19  you that Lovely TI had information that Starmarie Jones didn't
20  know Cardi; is that correct?
21  A   That is correct.
22  Q   So you did know a little bit before you published that
23  original interview about the content at least of the
24  information that Lovely TI said she had; correct?
25  A   That is correct.  Everyone --
```

1  Q   All right.  Thank you.

2  A   -- knew that Cardi B said she didn't know her.

3       MR. SABBAK:  Objection, your Honor.  She's allowed to

4  answer the question.  She's speaking over her.

5       MS. MATZ:  It was a yes or no answer.

6       THE COURT:  Hold on a second.

7       MS. MATZ:  Sure.

8       THE COURT:  Objection is overruled.

9       MS. MATZ:  All right.

10      THE COURT:  Let me just elaborate.  The question

11  called for a yes or no answer.  No explanation was necessary

12  or really appropriate to the question asked.

13      MS. MATZ:  Thank you.

14      Okay.  Then you said that you said to Lovely TI,

15  well, I'm like shit, drop it, I don't give a fuck about this

16  bitch, drop it; correct?

17      THE WITNESS:  That is correct.

18  BY MS. MATZ:

19  Q   And when you say I don't give a fuck about this bitch,

20  you're actually talking about Starmarie Jones; right?

21  A   I'm talking about Cardi B.

22  Q   Oh, okay.  So you're saying even though Starmarie --

23  excuse me.  You're saying that even though Lovely TI told you

24  that she had information that was going to contradict the

25  interview you were putting out, your attitude was drop it, I

1  don't give a fuck about Cardi, drop it?

2  A   That is correct.

3       MS. MATZ:  Okay.  Let's go to the same video hour

4  mark, 1 hour 5 minutes and approximately 41 seconds, please.

5       (Whereupon, a video recording was played.)

6  BY MS. MATZ:

7  Q   All right.  Let's pause.  A couple of minutes ago you said

8  when I tried to get the girl back on the phone, she didn't

9  want to do it, so I'm like maybe this story is fake.  It's

10 probably fake.  But guess what, I didn't make it up.

11 A   That is correct.

12 Q   Okay.  So is it your position that it's okay for you to

13 say things, make statements about other people that other

14 people have told you as long as you didn't make it up?

15 A   That is correct.

16 Q   Even if you think that that person might be making it up;

17 correct?

18 A   That is correct.

19 Q   All right.  You also said in there that -- you said that's

20 what I heard; correct?

21 A   Yes, ma'am.

22 Q   And you said, now, if I don't know something, I will

23 literally say allegedly; right?

24 A   Yes, ma'am.

25 Q   Okay.  But in the video that we watched earlier when --

1  the one where you said my client had HPV and had cheated on

2  her husband, you testified that you said that everything else

3  I do, 98 percent on this channel is fact; correct?

4  A    That is correct.

5          MS. MATZ:  All right.  Your Honor, I'm having a

6  natural breaking point.  I don't know when --

7          THE COURT:  Yeah, I was hoping you were about to.

8  We've been going for about an hour and a half, maybe a minute

9  or two longer, so we'll take a ten-minute recess.  We'll come

10  back a little bit after 3:00.

11          MS. MATZ:  Is there any way we can make it 20 so I

12  can just figure out what I have left?

13          THE COURT:  How about 15?  We'll make it 15.  So

14  we'll see you at 5 or so after 3:00.

15          MS. MATZ:  Thank you, your Honor.  I appreciate that.

16          COURTROOM SECURITY OFFICER:  All rise.

17          (Whereupon, the jurors exited the courtroom.)

18          THE COURT:  We'll break until 10 after 3:00.  That's

19  almost 18 minutes.  So we'll see you then.  Thank you.

20          MS. MATZ:  Thank you, your Honor.  I very much

21  appreciate that.

22          COURTROOM SECURITY OFFICER:  Court stands in recess.

23          (Brief recess.)

24          COURTROOM SECURITY OFFICER:  All rise.  This

25  honorable court is again in session.

1          THE COURT:  Let me take a moment and just say this:

2     It's been reported maybe not -- maybe a misinterpretation,

3     Mr. Sabbak, that at times you've been -- with regard to your

4     client, you've been making motions about either keep talking

5     or don't talk.  I don't know if it's true.  I do know this:

6     That I have seen you during the course of the last couple of

7     days at times shaking your head yes or no.

8          I didn't think you should be doing it, but I honestly

9     thought that, you know, sometimes when people talk -- when we

10    hear someone talking and we agree with what they're saying,

11    we're shaking yes or we're shaking no.  I mean, it can be a

12    natural occurrence, so it wasn't enough for me to say anything

13    to you about it necessarily then.  But when I kind of put that

14    in context with what has been reported has occurred as it

15    relates to motions you were making presumably intentionally

16    towards your client, it just causes me to say this.  Don't be

17    doing anything.  You should never be making any motions at all

18    that have any kind of nonverbal communication, intentionally

19    or otherwise.

20          So to the extent that this is unintentional, I need

21    you to be more aware of your body gestures so that you

22    don't -- it's not -- that someone doesn't think you're doing

23    it.  If I see you doing it, you know, from this point forward,

24    I'm probably going to say something to you about it.  But just

25    preemptively I wanted to mention what I had noticed so that

1  you could be more careful.  All right.

2           Let's bring the jury back, please.

3           COURTROOM SECURITY OFFICER:  All rise.

4           (Whereupon, the jurors entered the courtroom.)

5           COURTROOM SECURITY OFFICER:  Please be seated and

6  come to order.

7           THE COURT:  All right.  Thank you.  You can proceed.

8           MS. MATZ:  May I inquire, your Honor?

9           THE COURT:  You certainly may.

10          MS. MATZ:  Thank you, your Honor.  I appreciate that.

11          All right.  I'd like to take a look at Plaintiff's

12  549.  And, your Honor, this was already admitted into

13  evidence.  I'd like to start around 3 minutes and 5 seconds,

14  please.

15          (Whereupon, a video recording was played.)

16  BY MS. MATZ:

17  Q   All right.  Let's pause.  In this video we just heard you

18  say several times Cold Sore B, we're going to be talking about

19  Cold Sore B tonight, bitch.  You heard that?

20  A   Yes, ma'am.

21  Q   Okay.  And you were referring to my client when you said

22  that; correct?

23  A   Yes, ma'am.

24  Q   Okay.  And when you said since y'all should have had a

25  motherfucking gag order, did you hear yourself say that?

1  A    Yes, ma'am.

2  Q    Okay.  And are you essentially saying that to stop you

3  from calling my client Cold Sore B, my client needs to get a

4  gag order?

5  A    Yes, ma'am.

6  Q    Okay.  And when you say gag order, you're talking about an

7  injunction in court; correct?

8  A    That is correct.

9  Q    All right.  Thank you.  All right.  Let's go to 45 -- I'm

10  sorry -- 27-minute mark.

11         (Whereupon, a video recording was played.)

12  BY MS. MATZ:

13  Q    So again here you're calling my client Cold Sore B; is

14  that correct?

15  A    That is correct.

16         MS. MATZ:  All right.  Can we go to 39:58, please.

17         (Whereupon, a video recording was played.)

18  BY MS. MATZ:

19  Q    All right.  Let's pause.  All right.  So we just heard you

20  say this is for Cardi; right?

21  A    That is correct.

22  Q    And you were referring to the ad that during this video

23  you put up on the screen; is that correct?

24  A    That is correct.

25  Q    And the ad is for Pangaea wash; is that right?

1  A    That is correct.

2  Q    Am I pronouncing that correctly?

3  A    Yes, ma'am.

4  Q    Okay.  And what is Pangaea wash?

5  A    It is a pH balanced foaming vegan cleanser for the vaginal

6  area.

7  Q    Okay.  So you're saying that -- you're saying that this

8  vaginal wash is for my client; is that correct?

9  A    That is correct.

10  Q    Okay.  Once again referring to my client's genitalia?

11  A    That is correct.

12  Q    Okay.  Now, earlier we talked about the different kinds of

13  advertising that you do and you receive money from.  Do you

14  recall that?

15  A    Yes, ma'am.

16  Q    Okay.  And is this another example of a direct

17  advertisement where someone contracts with you directly to

18  place an advertising spot during one of your videos?  Is that

19  correct?

20  A    Yes, ma'am.

21  Q    And in this one you specifically, as you put the

22  advertisement up on the video, called my client out?

23  A    Yes, ma'am.

24  Q    Okay.  And I'm noticing at the bottom left-hand corner of

25  the screen this also says get 10 percent off when you use the

1  code TashaK at checkout.  Do you see that?

2  A   Yes, ma'am.

3  Q   Do you also receive any kind of revenue for people who

4  then use that code?

5  A   No, ma'am.

6  Q   Okay.  So that's a promotion that you do as part of your

7  advertising contract with them generally?

8  A   Yes, ma'am.

9  Q   Okay.  And is the reason they -- do they ask you to put

10 that today code on your advertisements?

11 A   Yes, ma'am.

12 Q   And is that so that they can track how many viewers are

13 checking out with the discount code that came from you?

14 A   Yes, ma'am.

15 Q   And is that so that they can make decisions about whether

16 or not continuing to advertise with you is financially good

17 for them; correct?

18 A   Yes, ma'am.

19 Q   Okay.  So obviously the more people that use your code

20 with these advertisers, the more valuable you become to them;

21 correct?

22 A   That is correct.

23 Q   And you can then demand more advertising dollars from them

24 as you renew your contracts; correct?

25 A   You'll have to talk to my husband about that.  He deals

1  with the contracts.

2  Q   Okay.  But, generally speaking, increases in viewership

3  and seeing these ads is good for your brand; correct?

4  A   That is correct.

5  Q   Okay.  Thank you.  All right.  In the advertisement that

6  we looked at earlier there was an image of my client's face

7  superimposed over it.  Do you recall that?

8  A   No, ma'am.  Can you show me again.

9  Q   Sure.  All right.  Can we please go to Plaintiff's 583,

10  and I believe it was around the 23 minute and 49 second mark.

11          (Whereupon, a video recording was played.)

12  BY MS. MATZ:

13  Q   All right.  You can pause.  Does this refresh your

14  recollection?

15  A   Yes, ma'am.

16  Q   Okay.  So my client's image is superimposed over the

17  advertisement; correct?

18  A   Yes, ma'am.

19  Q   And you oftentimes use images of my client during your

20  videos when you're talking about her; is that right?

21  A   Yes, ma'am.

22  Q   And that's so that people, to the extent they don't hear

23  you say Cardi B or something like that, know who the segment

24  is about; is that right?

25  A   Could you repeat the question.  I'm trying to hold back a

1  sneeze.  Okay.  Go ahead.  Repeat the question.  Sorry.

2  Q   I said and that is so viewers, when they are viewing the

3  video, to the extent they don't hear exactly who you're

4  talking about, they know by looking at the screen; is that

5  right?

6  A   That is correct.

7  Q   Okay.  And do these photos also drive engagement to your

8  platform?

9  A   No, ma'am.

10  Q   Okay.  And do you get licenses for these photos?

11  A   No, ma'am.

12  Q   You take them off the internet; right?

13  A   Yes, ma'am.

14        MS. MATZ:  Okay.  Let's look at Plaintiff's 651,

15  okay, and go to minute mark 17.

16        (Whereupon, a video recording was played.)

17  BY MS. MATZ:

18  Q   All right.  Let's pause.  At the beginning of that clip we

19  heard you say I didn't give a fuck about her feelings; is that

20  correct?

21  A   That is correct.

22  Q   And you're talking about my client, Cardi B; correct?

23  A   That is correct.

24  Q   And then towards the end when you were saying I did kind

25  of hit her hard, that video got like 5 million views, you

1  heard that; right?

2  A    That is correct, yes, ma'am.

3  Q    And you're talking about the Starmarie Jones interview; is

4  that right?

5  A    Yes, ma'am.

6  Q    Okay.  And you're acknowledging -- when you're talking

7  about this, you're acknowledging that the video hit Cardi kind

8  of hard; is that correct?

9  A    Yes, ma'am.

10  Q    Okay.  And then you say -- well, you made a comment in the

11  middle of there about how she was young, and at that age you

12  might have cared but at your age you don't give a shit.  You

13  heard that; right?

14  A    Yes, ma'am.  I heard that.

15  Q    Okay.  And are you saying that you understand that if you

16  had been younger and somebody was saying that about you, it

17  might have bothered you, but now you're at an age where you

18  don't care?

19  A    Can you repeat that.  I'm sorry.

20  Q    Sure.  I said were you essentially saying that if you were

21  younger, someone saying that about you or doing that to you

22  might have bothered you, but now you're at an age where, as

23  you said, you don't give a shit?

24  A    Yes, ma'am.  That's what I said in the video.

25  Q    Okay.  And you acknowledge that my client is younger than

1  you; correct?

2  A    Yes, ma'am.

3  Q    Do you know how old she is?

4  A    I believe almost 30, if I'm not mistaken.

5  Q    Okay.  And when this occurred, she was in her, what, late

6  20s?

7  A    Probably around 26, 27, I believe.

8  Q    Okay.  Then you also said -- you said, I did kind of hit

9  her hard.  That video got like 5 million views, but she gave

10 it life?

11 A    That is correct.

12 Q    Okay.  And when you're saying she gave it life, are you

13 saying that part of the reason so many people watched it is

14 because my client did something?

15 A    That is correct, yes, ma'am.

16 Q    And is what she did getting in your DMs and go online and

17 talk about it?

18 A    That is correct.

19 Q    Okay.  So you're essentially saying -- and I believe we

20 heard you say this in another video earlier -- that she should

21 have just left it alone.  Is that what you're saying?

22 A    That is correct.

23 Q    So your testimony is that the fact that so many people

24 have seen this video is my client's fault?

25 A    That is correct.

1  Q   All right.  But you you've also acknowledged that you've

2  done a lot of promotion for this video; correct?

3  A   That is correct.

4          MS. MATZ:  Okay.  If we can go to 11:40.

5          (Whereupon, a video recording was played.)

6  BY MS. MATZ:

7  Q   All right.  Let's pause.  So in this call where you said I

8  swear I'm just being petty just to be motherfucking petty, you

9  heard yourself say that?

10 A   Yes, ma'am.

11 Q   And you're talking about not taking the video down of my

12 client?

13 A   Yes, ma'am.

14         MS. MATZ:  Okay.  All right.  If we can go to

15 Exhibit 649 -- excuse me -- Exhibit 649.  And, your Honor, I'd

16 like it if the witness could just watch a moment of this

17 first.

18         THE COURT:  I'm sorry?

19         MS. MATZ:  Could the witness just see a moment of

20 this first?

21         THE COURT:  Sure.  With or without sound?  Because if

22 there's sound, everyone is going to hear it.

23 BY MS. MATZ:

24 Q   Well, do you recognize the cover of this page?

25 A   Yeah.  That's my opening, yes, ma'am.

1  Q    Okay.  So this is the opening of a video that you posted?

2  A    Yes, a video.  I'm not sure which video it is.

3           THE COURT:  Why don't you turn the sound down and

4  play 10 seconds of it and let her see if she can identify this

5  being her video.

6           MS. MATZ:  Great.  Thank you, your Honor.  I

7  appreciate that.

8           MS. IZMAYLOVA:  Your Honor, I think it's still

9  projected to the jury, though.

10          THE COURT:  No.  We can play it without the jury

11  seeing it.  So just play it without the jury seeing it with no

12  sound.

13          THE WITNESS:  I can see it.  I saw the --

14          THE COURT:  So ask your foundational questions then.

15  BY MS. MATZ:

16  Q    Yeah.  Is this a copy of a recording you published on your

17  YouTube channel?

18  A    Yes, ma'am.

19          MS. MATZ:  Okay.  Your Honor, I'd offer this into

20  evidence.

21          THE COURT:  649?

22          MS. MATZ:  Yes.

23          THE COURT:  Any objection?

24          MR. SABBAK:  No objection.

25          THE COURT:  Plaintiff's 649 is admitted without

1  objection.

2          (Whereupon, Plaintiff's Exhibit 649 was marked for

3  purposes of identification and admitted into evidence.)

4          MS. MATZ:  Thank you, your Honor.  All right.  If we

5  can go to 1 hour and 9 minutes, please.

6          (Whereupon, a video recording was played.)

7  BY MS. MATZ:

8  Q   All right.  Let's pause for just one moment.  Who is

9  this -- well, who's on the left-hand side of the screen?

10  A   This is an artist and entertainer.  She goes by the name

11  of Jessie Woo.

12  Q   And that's you on the right-hand side of this; is that

13  correct?

14  A   That is correct.

15  Q   And is -- are you interviewing her?

16  A   Yes, ma'am.

17  Q   Okay.  And was this pre-recorded?

18  A   Yes, ma'am.

19  Q   So the content in this video, you knew what you said in it

20  before you posted it online; correct?

21  A   That is correct.

22          MS. MATZ:  Great.  Let's go ahead.

23          (Whereupon, a video recording was played.)

24  BY MS. MATZ:

25  Q   Okay.  When you were talking with this young woman in this

1  video and she said she never makes any commentary with

2  malicious intent and you responded that sometimes you do, is

3  that what we heard you say?

4  A   That is correct.

5  Q   And were you talking about my client at all in this

6  interview?

7  A   No, ma'am.

8  Q   Okay.  Do you think that that's applicable to my client?

9  A   No, ma'am.

10        MS. MATZ:  Okay.  Let's go to Exhibit 606.  I believe

11  it's admitted into evidence already.

12        THE COURT:  This is the same video; right?

13        MS. MATZ:  Yeah.  We're just playing a different

14  clip.

15        Okay.  If we can go to 11:08.

16        (Whereupon, a video recording was played.)

17  BY MS. MATZ:

18  Q   All right.  Let's pause for a minute.  When you said now

19  the baby story, you know, they gave that to me so I put it

20  out?

21  A   That is correct.

22  Q   And when you're talking about the baby story, you're

23  talking about the video we watched earlier; is that correct?

24  A   That is correct.

25  Q   The video where you said that my client had HPV and

1  cheated on her husband; correct?

2  A   That is correct.

3  Q   All right.  And you said that -- so this video was posted

4  on September 24th.  At this point you were still saying you

5  know they gave that to me, yeah?

6  A   That is correct.

7  Q   Okay.  And then you said so I put it out.  I wanted to let

8  them know who was still the queen; is that correct?

9  A   That is correct.

10 Q   And when you said I wanted to let them know who was still

11 queen, you're referring to yourself as who's still queen;

12 right?

13 A   That is correct.

14 Q   In that comment, who's still queen, are you talking about

15 the fact that you still have the power to upset my client?

16 A   That is correct.

17 Q   Okay.  All right.  So earlier you said that you thought

18 that the video that we watched where you admitted that you

19 made up fake stories and you repeated again that you knew my

20 client was fucking somebody else, you testified that you

21 thought that was a retraction; right?

22 A   Can you repeat that question?  I got a little confused at

23 the beginning.

24 Q   Sure.  I said earlier you testified that the video that we

25 watched where you were talking about the fact that you knew

1  the other video was fake and you put it out anyways and where

2  you repeated that my client -- you knew she was fucking

3  somebody else, you testified that you thought that was a

4  retraction; right?

5  A    Yes, ma'am.

6  Q    Okay.  And that was published on September 21st of 2020;

7  correct?

8  A    I believe so.

9  Q    And so several days later, on September 24th, you're still

10  giving interviews about those videos; correct?

11  A    That is correct.

12  Q    So you are still giving them life; correct?

13  A    That is correct.

14  Q    And driving viewers to see them; correct?

15  A    That is correct.

16        MS. MATZ:  All right.  If we can take a look at

17  Exhibit 625.  All right.  Your Honor, I'm about to show you

18  what's been previously marked as Exhibit 625.  This was

19  stipulated to by Request for Admission 126, I believe.

20        THE COURT:  So the plaintiff moves this exhibit.  Any

21  objections?

22        MR. SABBAK:  Objection, your Honor.  This violates

23  the Court's pretrial order.

24        THE COURT:  Do you need to have a discussion off the

25  record?

1          MR. SABBAK:  Yes, your Honor.

2          THE COURT:  Can we do it on side bar?

3          MR. SABBAK:  Yes, sir.

4          (Whereupon, a bench conference was held between the

5   Court and counsel.)

6          MS. MATZ:  Are they switching attorneys, your honor?

7          THE COURT:  Yeah.  Well, they've been doing it all

8   along.  We're not going to do it after this witness.

9          MR. SABBAK:  So the pretrial --

10          THE COURT:  You've got to be a little bit louder.

11          MR. SABBAK:  Sorry.  In the pretrial order we

12   discussed several other --

13          THE COURT:  Can you hear?  You've got to be louder

14   for her.

15          MR. SABBAK:  I'm trying.  Sorry.  In the pretrial

16   order, Judge, we discussed any other evidence where Ms. Kebe

17   retracted stories; right?  And one of them is Creflo Dollar

18   and another one is a Chris Brown story.  This video on their

19   witness list has to do with the Creflo Dollar.  Your Honor has

20   already ruled all of that inadmissible.  They're trying to

21   bring it in now.

22          THE COURT:  So what's in this video that you're going

23   to ask her about?

24          MS. MATZ:  There's a clip where she says if anybody

25   watches Tasha K -- I actually need to grab my computer to tell

1  you exactly.

2         THE COURT:  Well, let me ask, is it going to be about

3  any other stories that are about your client that she

4  retracted?

5         MS. MATZ:  It's just about her general -- she just

6  says I won't take stuff down.  But it wasn't -- my

7  understanding of the pretrial order -- and I have to play

8  this.  But my understanding is that we weren't allowed to --

9  the motion they made was about we weren't allowed to bring in

10  other accusations of defamation to like prove it up there was

11  some sort of a pattern, which makes sense because at the end

12  of the day, like, whether or not someone actually defamed --

13  was defamed in another case, especially if there was a

14  judgment or something like that, wouldn't -- it would just be

15  a whole confusing issue for the jury, which I totally

16  understand.  But the clip I'm playing only has to do with her

17  saying I won't take anything down so --

18         THE COURT:  But does she talk about other cases?

19         MS. MATZ:  Well, I wasn't intending to play any of

20  those clips but --

21         MR. SABBAK:  I think she's gotten that in, though.

22         MS. MATZ:  What?

23         MR. SABBAK:  You've gotten that fact in, I believe.

24         THE COURT:  About other people?

25         MR. SABBAK:  She just -- in other videos.

```
 1            THE COURT:  I think the only one that's ever really
 2   mentioned anyone else has been the defendant.  She mentioned
 3   Creflo -- I guess that's Creflo Dollar, a well known
 4   evangelist.
 5            MS. MATZ:  And that wasn't necessarily a defamation
 6   claim.  My understanding was the Chris Brown one that was
 7   actually --
 8            MR. SABBAK:  Are in the same category, those things
 9   that have to do with outside cases where my client made a
10   retraction.  None of that is admissible.
11            MS. MATZ:  I'm not talking about making retractions.
12   I'm talking about --
13            THE COURT:  You're talking about what?
14            MS. MATZ:  I said I'm just talking about her making
15   statements that she will not take anything down.  That's all.
16            THE COURT:  Well, that's not really -- that's not a
17   retraction but that's --
18            MR. SABBAK:  Also applies to --
19            THE COURT:  It's close, akin to it.
20            MS. MATZ:  I don't have to play it.  It's okay.
21            THE COURT:  Well, I mean, okay.  So the point that --
22   the point that you want to make, that she doesn't take crap
23   down, she's made that herself over and over and over again
24   today.  And so if -- I agree with the defendant that if it's
25   going to be talking about other situations where people have
```

1   threatened defamation against her, that should not come in.

2         MS. MATZ:  I wasn't planning on playing that part

3   because I'm -- you know, I understand.  And I'm sorry.  You

4   made another comment.  The thing that was played in the other

5   video, I disagree with that.  Also, you guys didn't object.

6   And, frankly, what she said in the other video had nothing to

7   do with retraction.  What she said was I also knew that story

8   was fake, and it has nothing to do with being accused of

9   defamation or retraction or anything else.  She's talking

10  about her own habits of putting up videos that are fake.

11        THE COURT:  Let may just say this.  I haven't seen

12  the video, so I don't know what it says.  If it doesn't

13  include language in it that would imply or state that someone

14  has made a demand for a retraction and threat of a lawsuit --

15        MS. MATZ:  It did not.

16        THE COURT:  -- then you decide whether you're going

17  to admit it or not but --

18        MS. MATZ:  We already admitted it.  He made a comment

19  that I just wanted to make sure I responded to because --

20        THE COURT:  This video has been -- no, this video --

21        MS. MATZ:  This is not being --

22        THE COURT:  All I'm talking about is what we have

23  before us, which is 625.  So if you want to admit it --

24        MS. MATZ:  Your Honor, you're right.  She's made the

25  point.

```
 1              THE COURT:  Okay.  All right.
 2              (Whereupon, the following proceedings continued in
 3   open court.)
 4              MS. MATZ:  All right.  We are going to look at
 5   Exhibit 521.
 6              THE COURT:  Before we move on I've got to make sure
 7   my notes are correct.  So I've got marked down that I admitted
 8   625, but I don't remember checking it because there was an
 9   objection made.  Maybe I checked it in error.  Was it entered
10   into evidence earlier?
11              MS. MATZ:  No.  This was not, your Honor.  So that's
12   not in evidence.
13              THE COURT:  It's not admitted.  It was tendered but
14   objected to, and it hasn't been admitted?
15              MS. MATZ:  It hasn't been what?  No, it has not been
16   admitted, and we're going to move on.
17              THE COURT:  Okay.  Thank you.
18              MS. MATZ:  Okay.  We are going to look at Exhibit 521
19   which has been stipulated to by Request for Admission -- I'm
20   just trying to see if it was already admitted.  All right.
21   This has not been previously admitted, your Honor, but this
22   was stipulated to by Request for Admission No. 3.  And I would
23   offer it into evidence?
24              THE COURT:  Any objection?
25              MR. SABBAK:  No objection.
```

1          THE COURT:   521 is admitted without objection.

2          (Whereupon, Plaintiff's Exhibit 521 was marked for

3   purposes of identification and admitted into evidence.)

4          MS. MATZ:   Okay.   If we can go to Time Code 14:09.

5          (Whereupon, a video recording was played.)

6   BY MS. MATZ:

7   Q   All right.   Let's pause.   You posted this in the late fall

8   of 2018; correct?

9   A   I believe so, yes, ma'am.

10  Q   Okay.   And this was -- what you're discussing in this

11  video about Cardi B being in the comments, you're talking

12  about comments related to your Starmarie Jones video; correct?

13  A   That is correct.

14  Q   And I'm sorry.   I should correct myself.   The Starmarie

15  Jones interview; correct?

16  A   That is correct.

17  Q   And in this video you said, holy shit, it's really going

18  to bring some motherfucking views.   You saw that?

19  A   That is correct.

20  Q   Okay.   So after you published the Starmarie Jones video --

21  interview and my client started responding, you felt that that

22  helped drive traffic to your platform; right?

23  A   Yes, ma'am.

24  Q   Okay.   And then after that, you continued to post about my

25  client and that interview; correct?

1   A   Yes, ma'am.

2   Q   Okay.  And was that in the hopes that continuously posting

3   about this subject would drive even more traffic and viewers

4   to your platform?

5   A   That is correct.

6   Q   And even more ad revenue?

7   A   That is correct.

8   Q   Okay.  So again you were also trying to increase

9   significantly the number of people who would see the Starmarie

10  Jones interview where you published Starmarie's statements

11  that my client had herpes and used cocaine and was a

12  prostitute; correct?

13  A   Yes, ma'am.

14          MS. MATZ:  Okay.  If we could please look at

15  Plaintiff 579.  Your Honor, this has not been previously moved

16  into evidence, but it was stipulated to by Request for

17  Admission No. 80, 8-0.

18          THE COURT:  Any objection to Plaintiff's 579?

19          MR. SABBAK:  N objection, sir.

20          THE COURT:  579 is admitted.

21          MS. MATZ:  Thank you, your Honor.

22          (Whereupon, Plaintiff's Exhibit 579 was marked for

23  purposes of identification and admitted into evidence.)

24          MS. MATZ:  Okay.  If we could look at approximately 5

25  minutes and 57 seconds, please.

1              (Whereupon, a video recording was played.)

2    BY MS. MATZ:

3    Q    Can you pause that for a minute.  The video wasn't

4    synchronized right there for a moment, but the who was Cardi's

5    side peen, he works for Atlantic, he's high up on the Richter

6    scale, that was your voice; correct?

7    A    That is correct.

8    Q    Okay.  And when you said who is Cardi's side peen -- first

9    of all, you're obviously referring to my client; correct?

10   A    That is correct.

11   Q    And were you reading a question?

12   A    Yes, from the comment section.

13   Q    Okay.  And was this video on --

14              THE COURT:  Let's do that.  Let's explain how that

15   works.  It just seems to me that at times when she's looking

16   at her computer screen, I'm guessing that there are comments

17   that are being posted by viewers contemporaneous.  I don't

18   know if I'm right or not, but if I am right or if I'm wrong,

19   you could ask some questions to clarify how that works.

20              MS. MATZ:  I was actually just going to.  I was going

21   to ask her what platform it was on, but thank you, your Honor,

22   I appreciate that.

23              Was this video on Patreon or YouTube?

24              THE WITNESS:  I believe this one was on Patreon.

25   BY MS. MATZ:

1   Q    And on Patreon can people write in and ask you questions

2   while you're doing a video?

3   A    Yes, ma'am.

4   Q    And does that happen live or do they send them in in

5   advance?

6   A    It's a live stream, and the comments come up on the screen

7   as you're talking.  Pretty much every platform has it that

8   way.

9   Q    Okay.  And so what else is on your screen?

10  A    You mean during -- while the comments are coming up?

11  Q    Yeah, while you're making the video.

12  A    Just me and the comments on the side, and, you know, in

13  this particular video we just kind of cropped them down.

14  Q    Okay.  And then do they come up in a list?

15  A    What do you mean a list?

16  Q    Well, I mean, you said they come up.  Like, do they come

17  up chronologically?  How do they look?

18  A    Yes.  As people make comments randomly, you know, they

19  just scroll.  They move pretty fast.

20  Q    And when you say they move pretty fast, you mean that

21  Patreon's system of having comments sent in, scrolls upwards

22  as new comments come in; correct?

23  A    No, ma'am.  That's not Patreon's system.  This is

24  StreamYard system.  It's a third party app that we sync to

25  Patreon.  Patreon doesn't have any video streaming software at

1  all.

2  Q    Okay.  But the app that you use, they stream in and

3  essentially scroll up the page?

4  A    Yes, ma'am, that is correct.

5  Q    I'm just trying to give the jury an idea of what visually

6  it could look like.

7  A    No problem.

8  Q    And when you said they move pretty fast, you mean that

9  because a lot of comments could be coming in, that the scroll

10 could be moving quickly; is that right?

11 A    Yes, ma'am, thousands per se.

12 Q    Okay.  And in order to send you a comment and view your

13 live stream on Patreon, someone has to subscribe to your

14 channel; correct?

15 A    That is correct.

16 Q    All right.  And so all of the people who are sending you

17 comments are subscribers to you, and you get revenue from

18 this; correct?

19 A    No, ma'am.

20 Q    People can send in comments without being subscribers?

21 A    Anybody can come into a live stream.  They don't have to

22 subscribed necessarily.

23 Q    Okay.  So are there any special perks for live streams for

24 subscribers?

25 A    Repeat that question.

1  Q   Are there any special perks or any type of exclusivity

2  that subscribers get during a live stream?

3  A   No, ma'am.

4  Q   Okay.  And do people have to pay to send comments or they

5  can just send them?

6  A   They can send them.  It's a free forum.

7  Q   Okay.  So when you were looking at your screen and you

8  said who is Cardi's side peen, was that a question?  Well,

9  you've described them as comments.  Are they often also

10  questions?

11  A   Yes.  That is correct.

12  Q   Okay.  And so when you were looking at the screen and

13  saying who is Cardi's side peen, was that a question that was

14  written in?

15  A   That was a question that was written on the screen.

16  Q   Okay.  And so when you said he works for Atlantic, he's

17  high up on the Richter scale, you were answering that

18  question; correct?

19  A   That is correct.

20  Q   Okay.  And when the question being who is Cardi's side

21  peen -- and again forgive my language but are you talking --

22  when you say peen, p-e-e-n, are you talking about male

23  genitalia?

24  A   Yes, ma'am, penis.

25  Q   Okay.  Thank you.  And so the intonation behind this

1  question, or at least as you understood it when you were

2  answering it, is who is my client sleeping with on the side

3  other than her husband; correct?

4  A   That is correct.

5  Q   Okay.  And this was published close to the time that you

6  published the story that my client had HPV and was cheating on

7  Offset that we looked at earlier; correct?

8  A   That is correct.

9      MS. MATZ:  Okay.  Can we go to Time Code 24 minutes

10 and 30 seconds.

11     (Whereupon, a video recording was played.)

12 BY MS. MATZ:

13 Q   All right.  Let's pause for a minute.  Okay.  When you

14 said Cardi is sleeping with somebody else, who was the other

15 person in the room with you?

16 A   There was about five other people in the room with me.

17 Q   Sorry.  Was there anyone physically in the room with you?

18 A   Yes, ma'am.

19 Q   Okay.  And there were 500 people in the room?

20 A   No, ma'am.  There were five people.

21 Q   I'm sorry.  I misheard you.

22 A   Sorry about that.

23 Q   It's okay.  There were five people in the room with you?

24 A   Yes, ma'am, I believe that day.

25 Q   And do you know who they were?  Do you remember any of

1  them?

2  A   You mean the person who asked me the question --

3  Q   Yeah.

4  A   -- because that came from the comment section.  That

5  didn't come from in the room.

6  Q   You didn't hear -- no, no, no.  Sorry.  Not the question.

7  After you said Cardi is sleeping with somebody else, did you

8  hear someone say you don't know that?

9  A   No, ma'am.  Could you play that again?

10  Q   Yeah, sure.  Can we turn the volume up a little.

11          (Whereupon, a video recording was played.)

12  BY MS. MATZ:

13  Q   You hear that?  Did you hear that?

14  A   Yes, ma'am.

15  Q   You heard someone say you don't know that?

16  A   Yes, ma'am.

17  Q   Okay.  And was that person physically in the room with

18  you, that voice we heard?

19  A   Yes, ma'am.

20  Q   And do you know who that was?  Do you recall?

21  A   It was either Jasmine or my husband at the time.  The

22  voice was kind of deep so -- or Mike because, you know, I

23  don't know who -- I don't remember who actually said that

24  comment.

25  Q   Okay.  But it was one of the people who was in the room

1  while you were recording?

2  A   Yes, ma'am.

3  Q   Okay.  And then you responded but I do, my source told me

4  that, when have my sources lied to me; correct?

5  A   That is correct.

6  Q   But you had just published a video that you admit you knew

7  was fake before you published it; correct?

8  A   Yes, ma'am.  This was concerning a different story.

9  Q   Okay.  A different story of my client sleeping with

10  someone else?

11  A   That is correct.

12  Q   Okay.  But you had just had an instance where a source was

13  giving you information that you knew was false?

14  A   That is correct.

15  Q   So were you being a little facetious when you said when

16  have my sources lied to me?

17  A   Repeat that again.

18  Q   Were you being facetious when you said when have my

19  sources lied to me?

20  A   No, ma'am.

21         MS. MATZ:  Okay.  Can we please go back to 576.  And,

22  your Honor, I believe -- I'll double check, but I believe this

23  was already admitted.

24         THE COURT:  576 has been admitted previously.

25         MS. MATZ:  Thank you, your Honor.  All right.  Can we

1  please go to Time Code 51:50.

2           (Whereupon, a video recording was played.)

3  BY MS. MATZ:

4  Q   So you're showing a picture here of my client having

5  whited out the hashtag or Cold Sore B?

6  A   That is correct.

7  Q   But you acknowledge that there's many other instances in

8  this video where you went ahead and called her that; correct?

9  A   That is correct.

10          MS. MATZ:  Okay.  We are going to take a look at 655

11 and if we could turn the -- don't publish this to the jury

12 yet.  If we could turn the volume down and have you look at it

13 for a moment.

14          MS. IZMAYLOVA:  What was the number?

15          MS. MATZ:  It's Plaintiff's 655.

16          (Whereupon, a video recording was played.)

17          THE WITNESS:  Yes.  I know this video.  Sorry.  I

18 forgot you even asked that.

19 BY MS. MATZ:

20 Q   No, no.  I was just letting you look at it for a moment.

21 And is this a video that you created?

22 A   That is correct.

23 Q   And was it published on one of your platforms?

24 A   Yes, our main channel, I believe, if I'm not mistaken.

25          MS. MATZ:  Okay.  I'd offer this into evidence, your

1   Honor.

2           THE COURT:  Any objection?

3           MR. SABBAK:  Objection, your Honor.  Pretrial order.

4           THE COURT:  All right.  If y'all will approach,

5   please.

6           (Whereupon, a bench conference was held between the

7   Court and counsel.)

8           THE COURT:  You need to be close enough to the mike.

9           MR. SABBAK:  Sorry, Judge.  Let's see, which number

10  did you say?

11          MS. MATZ:  651.

12          THE COURT:  I'm sorry.  I thought you said 655.

13          MS. MATZ:  I did.  I'm sorry, your Honor.  I

14  apologize.

15          MR. SABBAK:  655, that's what you said.

16          MS. MATZ:  Sorry.

17          MR. SABBAK:  First of all, I'm not sure -- none of

18  this is about her, our client, unless she has something

19  specific.  But I'm going back to the same pretrial order that

20  we were up here before.  This is opening the door again to

21  something your Honor excluded, which I guess might be

22  redactions or retractions or times when my client released a

23  fake story.  I have no idea what she -- but they have nothing

24  to do with the case that we're here for.

25          MS. MATZ:  I'm sorry.  Is your objection that it has

1  nothing to do with the case --

2       MR. SABBAK:  -- the pretrial order.

3       MS. MATZ:  I'm trying to find out which provision

4  because I'm sorry, your Honor, I'm just -- he's talking really

5  fast, and I'm not understanding what the violation is.

6       MR. SABBAK:  The violation is you want to discuss a

7  time when my client --

8       MS. MATZ:  I'm sorry.  Can I ask you this?

9       MR. SABBAK:  When my client allegedly pled to the

10  story or had to make a redaction or something like that.

11      MS. MATZ:  No, I'm not.

12      MR. SABBAK:  What are you playing it for?

13      MS. MATZ:  I'm playing it because -- let me get the

14  quote up.

15      MR. SABBAK:  Her name is in the title.

16      MS. MATZ:  Just because her name is in the title

17  doesn't mean that she's not in the document.  The clip we were

18  planning on playing is the clip where it's everything we did

19  on Cardi is mother F-ing true -- sorry.  I'm trying to --

20      MR. SABBAK:  She said that before, Judge.  You have

21  played that repeatedly.

22      THE COURT:  You don't get to decide what they play

23  and what they don't.  So what's your objection?  That doesn't

24  violate anything pretrial -- whoa, whoa, whoa.  Wait a minute.

25  Okay.  When I'm talking, nobody else talk, please.  That

1    doesn't violate the pretrial order to have her say something

2    that she may have already said; right?

3         MR. SABBAK:  Yes.  But what she's trying to do is

4    introduce the entire exhibit, which has things in it that do

5    violate the pretrial order.

6         THE COURT:  Well, it is problematic if there's things

7    in it that aren't admissible but -- and that only becomes an

8    issue if the jury wants to see it.  But what's going to happen

9    is if they want to see it again, and, honestly, I don't think

10   they are going to want -- I think at the end of the trial the

11   jury is going to decide what they believe.  Do they think that

12   she committed defamation, yes or no; do they think that

13   plaintiff was damaged, yes or no.  And I think they're going

14   to have to look back at the videos to make that decision.  And

15   you'll both have the availability to play parts of the videos

16   that have been admitted and played before the jury to do that

17   again during your closing if you want.  You only have so much

18   time, so you have to make those decisions.

19        But we're not going to send out the whole video to

20   them.  They're going to have to ask us what they want played,

21   if they want it played again during jury deliberations, and

22   we're only going to play the stuff that's been specifically

23   given to them before, which means played for them before.

24   Okay?

25        MR. SABBAK:  Okay.  All right.

1          MS. MATZ:  Your Honor, that's why I've been calling

2     out the time codes.  And I'm not going to show other parts of

3     the video and list all of her videos.  She talked about a lot

4     of different things, and we've been trying to keep it focused

5     on the portions that --

6          THE COURT:  All right.  So you still have an

7     objection then?

8          MR. SABBAK:  Not after your Honor's specification.

9     Thank you, Judge.

10          THE COURT:  All right.

11          MS. MATZ:  Your Honor, can I just -- I just want to

12     go back to my table, if you don't mind, because I'd like to

13     make sure the time code is right because obviously I don't

14     want there to be any mis --

15          THE COURT:  Okay.

16          (Whereupon, the following proceedings continued in

17     open court and there was a brief pause.)

18          MS. MATZ:  Your Honor, if you could just indulge us

19     for one moment, we're just going to check that time code.

20          THE WITNESS:  Your Honor?  Your Honor, is it okay if

21     I use the restroom?  I've been trying to hold it.

22          THE COURT:  Sure.  Why don't we -- we'll just take a

23     quick recess.  We're still not going to go past 5:00, but

24     we'll still take a ten-minute recess.

25          THE WITNESS:  Thank you so much.

1          MS. MATZ:  Thank you, your Honor.

2          COURTROOM SECURITY OFFICER:  All rise.

3          (Whereupon, the jurors exited the courtroom.)

4          THE COURT:  All right.  Why don't you go ahead and

5     go.

6          THE WITNESS:  Thank you.

7          THE COURT:  Let me just talk quickly about an issue

8     that kind of came up in the last hour, an issue about

9     different counsel being involved and the discussions relative

10    to a witness.  Ms. Matz raised that question the first time

11    the objection came, during the last hour.  You can go

12    ahead and go.

13         THE WITNESS:  Okay.  Thank you.

14         THE COURT:  You can stay if you want, but I don't

15    think you're going to find this too interesting.

16         You know, federal courts generally ask specifically

17    to utilize a one-witness one-lawyer rule.  That had already

18    been violated when Ms. Matz asked about it but -- so after

19    this witness, the person that stands up and objects at the

20    table or, you know, concedes to the admissibility of evidence

21    is the same person that needs to approach when you approach,

22    we don't have two different lawyers doing it, in addition to

23    not having two different lawyers come up at the same time for

24    the same side.  Okay.  So let's keep it consistent from this

25    point forward.  All right.

1           MS. IZMAYLOVA:  Yes, sir.

2           THE COURT:  All right.  Thank you.

3           MS. MATZ:  Thank you, your Honor.

4           THE COURT:  We'll take a ten-minute recess.

5           COURTROOM SECURITY OFFICER:  Court stands in recess.

6           (Brief recess.)

7           COURTROOM SECURITY OFFICER:  All rise.

8           THE COURT:  All right.  Thank you, sir.

9           MS. MATZ:  All right.  I believe the witness had said

10  she recognized the video.  I had just offered it into evidence

11  and that was where we --

12          THE COURT:  You've got to remind me the number.

13          MS. MATZ:  Oh.  The jury is not here.

14          THE COURT:  Yeah, but just tell me what number it

15  was.

16          MS. MATZ:  Oh.  It was Plaintiff's 655, your Honor.

17          THE WITNESS:  Ms. Matz, this video right here, is

18  this the one we're talking about?

19          MS. MATZ:  Yes.

20          THE WITNESS:  Okay.  Thank you.

21          COURTROOM SECURITY OFFICER:  All rise.

22          (Whereupon, the jurors entered the courtroom.)

23          COURTROOM SECURITY OFFICER:  Please be seated and

24  come to order.

25          THE COURT:  All right.  Thank you.  So you had a

1  motion as it related to a document or exhibit?

2        MS. MATZ:  Yes.  I had requested to move Exhibit 655

3  into evidence.

4        THE COURT:  All right.  655 is admitted.

5        (Whereupon, Plaintiff's Exhibit 655 was marked for

6  purposes of identification and admitted into evidence.)

7  BY MS. MATZ:

8  Q   Okay.  I'm going to play you a very short clip.  The time

9  code -- well, first of all, before we start this you said that

10  this is a video that you published; correct?

11  A   That is correct.

12  Q   On your YouTube channel?

13  A   I believe so.

14  Q   And this is a somewhat recent video; correct?  This was

15  published in the fall of 2021?

16  A   I don't remember the exact date.

17  Q   Okay.  Do you recall that it was later in 2021, though?

18  A   I don't recall.  I post so many videos.

19        MS. MATZ:  All right.  We're going to start a clip at

20  1 hour, 11 minutes, and 15 seconds.

21        (Whereupon, a video recording was played.)

22  BY MS. MATZ:

23  Q   Okay.  So in this video you are conveying to viewers that

24  everything you did on Cardi is, in your words, motherfucking

25  true; is that correct?

1   A   That is correct.

2   Q   Okay.  All right.  On October 2nd of 2020, you received a

3   third cease and desist letter from my client; is that true?

4   A   I believe so, yes.

5   Q   If we could please look at P-235.  And I will just read

6   into the record that it is a stipulated fact that on

7   October 2nd of 2020 plaintiff's counsel sent Kebe's counsel a

8   third letter.  Actually, you know what, pull up P-236, please.

9           All right.  If you can, please take a look at this

10  document, Ms. Kebe.  Have you ever seen this before?

11  A   Yes, I have.

12  Q   Okay.  And this is a copy of the letter that was sent to

13  your counsel on October 2nd of 2020; correct?

14  A   That is correct.

15  Q   From the Moore Firm; is that correct?

16  A   That is correct.

17  Q   And you understand that to be co-counsel for my client,

18  Cardi B, in this case?

19  A   That is correct.

20  Q   Okay.  When you got this letter, do you recall testifying

21  that you didn't really read it?

22  A   That is correct.

23  Q   Okay.  But you were aware nevertheless that the letter was

24  demanding retraction of certain statements; is that correct?

25  A   That is correct.

1  Q   Okay.  And you understood that among the statements in

2  this letter that my client was demanding take down and

3  retraction of were statements that you had made since the

4  second letter that we looked at earlier; is that correct?

5  A   I believe so.

6  Q   And you understood that that included that you take down

7  or retract statements that my client was fucking herself with

8  beer bottles?

9  A   No, ma'am.  I wasn't sure on what actual statement.

10        MS. MATZ:  Okay.  I'm sorry.  I'd offer this -- did I

11  move this in?

12        THE COURT:  Is this -- I'm confused.  Is this 235 or

13  236?

14        MS. MATZ:  This is 236, your Honor.

15        THE COURT:  Any objection?

16        MR. SABBAK:  No objection, sir.

17        THE COURT:  236 is admitted.

18        MS. MATZ:  Thanks.

19        (Whereupon, Plaintiff's Exhibit 236 was marked for

20  purposes of identification and admitted into evidence.)

21  BY MS. MATZ:

22  Q   Before I start reading from it can you go to the next

23  page.  Have you ever seen this before?

24  A   Something similar to it, the first one you showed earlier,

25  I believe yesterday, if I'm not mistaken.

```
1   Q   But you understand -- you understood this to be a list of
2   the statements that my client was demanding retraction of; is
3   that correct?
4   A   Yes, ma'am.
5   Q   Okay.  And did you remove any of these from your YouTube
6   channel, Twitter or any other social media platform?
7   A   Yes, ma'am.
8   Q   And did you issue any retraction or repudiation?
9   A   No, ma'am.
10  Q   And do you recall testifying that you didn't really look
11  at the statements that were being asked for you to retract
12  because you had no intention of retracting them?
13  A   That is correct.
14  Q   All right.  And you also recall testifying that regardless
15  of the reason behind any particular statements, you gave
16  testimony that you weren't taking the videos down; correct?
17  A   That is correct.
18  Q   All right.  And do you also recall testifying that you
19  didn't really go through them, I just told you, you know, Olga
20  to, quote, to tell you guys to fuck off?
21  A   Is that a question?  Sorry.
22  Q   Yes.  Do you recall giving that testimony during your
23  deposition in this case?
24  A   That is correct.
25  Q   That's the testimony you gave; correct?
```

1    A    Yes, ma'am.

2    Q    Could we look at Plaintiff 325.  Okay.  Have you ever seen

3    this before?

4    A    I don't remember.  No, ma'am.

5    Q    Are the -- do you see at the top of the screen it says

6    unWinewithTashaK?  Do you see that?

7    A    Yes, ma'am.

8    Q    Is that a comment you posted?

9    A    Below -- under the realtortishamack?

10   Q    At the very top and then, yes, in the middle as well.

11   A    Yes, ma'am.

12   Q    Those are two comments that you posted on Instagram under

13   your unWinewithTashaK handle; correct?

14   A    That is correct.

15   Q    And you authored those; correct?

16   A    I'm sorry.  Say that again.

17   Q    You authored those?  You wrote them?

18   A    Yes, ma'am.

19           MS. MATZ:  Okay.  Your Honor, I'd offer this into

20   evidence, Plaintiff's 325.

21           THE COURT:  Any objection?

22           MR. SABBAK:  No, sir.

23           THE COURT:  325 is admitted.

24           (Whereupon, Plaintiff's Exhibit 325 was marked for

25   purposes of identification and admitted into evidence.)

BY MS. MATZ:

Q   Okay.  And in the middle of -- well, the first comment, it says unWinewithTashaK I'm serious.  You see that; correct? And then there's a comment by someone, realtortishamack.  You see that?

A   That is -- yes, ma'am.

Q   Okay.  And that comment is talking to you about your coverage of my client; correct?

A   Yes, ma'am.

Q   Okay.  And you respond to that comment by saying, I don't like the bitch.  When we're done with this lawsuit, I will go back to being fair.  Do you see that?

A   That is correct, yes, ma'am.

Q   Okay.  All right.  Do you recall giving testimony during your deposition that you agreed that you have posted highly offensive things about my client?

A   That is correct.

Q   You admitted that during your deposition; correct?

A   Yes, ma'am.

Q   And you also admitted during your deposition that you have targeted my client in a lot of your videos; correct?

A   That is correct.

Q   And you were also asked whether or not you would describe what you've done as hating on a person.  You remember that?

A   Parts of it.  Can you phrase the question for me, please.

1    Q    Well, why don't we just take a look at your deposition

2    testimony.  We can go to your November 19th deposition.

3    A    Okay.

4    Q    And we're going to go to page 155 beginning at 07.  I'm

5    sorry.  A couple of lines down from that.

6    A    155, line what?  I'm sorry.

7    Q    I believe it starts at line 14, which is, and would you

8    describe what you've done as hating on a person?  Answer, yes.

9    Is that the testimony you gave?

10   A    You said -- I'm on page 155.  Line 7?

11   Q    No.

12   A    Okay.  Line 15.  Sorry about that.  Okay.  And would you

13   describe what you've done as hating on a person?  I answered

14   yes, ma'am.

15   Q    Okay.  Thank you.  So that was your testimony?

16   A    Yes, ma'am.

17   Q    All right.  So you've admitted that you were made aware by

18   your attorneys of some of the medical records that were

19   produced in this case; correct?

20   A    That is correct.

21   Q    And specifically you were made aware of the test results

22   for the herpes test; correct?

23   A    That is correct.

24   Q    Okay.  And you also have admitted that you are aware and

25   you've seen articles in my client's public statement saying

1  that she's not the person in the beer bottle video; correct?

2  A   That is correct.

3  Q   And that you don't know how that video was put together or

4  verified or anything else; right?

5  A   That is correct.

6  Q   And you don't know if it's actually her in it; correct?

7  A   That is correct.

8  Q   And you've also admitted to receiving at least three

9  separate take-down requests; correct?

10 A   That is correct.

11 Q   Okay.  And yet again all the videos that we've watched

12 today with the statements that my client has alleged are

13 defamatory in them are still up; correct?

14 A   Yes, ma'am.

15 Q   To this day?

16 A   Yes, ma'am.

17 Q   Can we please look at Plaintiff's 269.  Okay.  Have you

18 ever seen this before?

19 A   Yes, ma'am.

20 Q   Is this a copy of a Twitter post that you authored?

21 A   Yes, ma'am.

22 Q   And this was posted on March 24th of 2019?

23 A   Yes, ma'am.

24 Q   And that would have been days after this lawsuit was

25 filed; is that correct?

1  A   I believe so.

2  Q   I'll just remind you that it was stipulated that this

3  lawsuit was filed on March 21st of 2019.

4  A   That is correct.

5       MS. MATZ:  Okay.  And I'm sorry.  Your Honor, I'd

6  offer this in evidence.

7       MR. SABBAK:  No objection.

8       THE COURT:  This is 269?

9       MS. MATZ:  Yes, your Honor.

10      THE COURT:  It's admitted without objection.

11      (Whereupon, Plaintiff's Exhibit 269 was marked for

12  purposes of identification and admitted into evidence.)

13  BY MS. MATZ:

14  Q   All right.  So in this post you have said all videos are

15  live and will stay live until a judge orders them down;

16  correct?

17  A   That is correct.

18  Q   And that's testimony you've given earlier today, that

19  you've made that statement and statements to that effect many

20  times; correct?

21  A   Yes, ma'am.

22  Q   Okay.  And then you said, let's suit up and let the white

23  folks decide.  Do you see that?

24  A   Yes, ma'am.

25  Q   So again in the post you're publicly proclaiming that

1  you're not going to take the videos down until there's a

2  verdict or an order ordering you to do so; correct?

3  A   Yes, ma'am.

4  Q   You've published some additional very recent posts

5  continuing to call my client Herpes B; is that correct?

6  A   Yes, ma'am.

7  Q   Long after you acknowledge that you were aware of the

8  medical records; correct?

9  A   That is correct.

10 Q   Okay.  Can we please pull up Plaintiff's 987.  Have you

11 ever seen this before?

12 A   Yes, ma'am.

13 Q   And is this a copy of a post you made on YouTube?

14 A   Yes, ma'am.

15 Q   Okay.  And you authored this and posted it on your

16 channel; correct?

17 A   That is correct.

18 Q   And the date of this is November 11th of -- excuse me --

19 November 8th of 2021?

20 A   That is correct.

21         MS. MATZ:  Your Honor, I'd offer this into evidence.

22         MR. SABBAK:  No objection.

23         THE COURT:  P-987 is admitted.

24         (Whereupon, Plaintiff's Exhibit 987 was marked for

25 purposes of identification and admitted into evidence.)

1  BY MS. MATZ:

2  Q    All right.  In this you said, we live tonight at 10:30

3  est/ 3:30 a.m. UK.  You see that?

4  A    Yes, ma'am.

5  Q    And then you said, I apologize for the lateness.  However,

6  my say has been full.  And then you said, we got major wine

7  tonight on Mrs. HerpesB.  You see that?

8  A    Yes, ma'am.

9  Q    Okay.  And again this is HerpesB as referring to my

10 client; correct?

11 A    Yes, ma'am, Cardi B.

12 Q    And you posted this on November 8th of 2021?

13 A    That is correct.

14 Q    Okay.  You also posted this on Twitter at that time; is

15 that right?

16 A    That is correct.

17 Q    Okay.  If we could please pull up Plaintiff's 999.  Do you

18 recognize this document?

19 A    Yes, ma'am.

20 Q    Is this a true and accurate copy of the Twitter -- the

21 Twitter post of what we were just looking at from November 8th

22 of 2021?

23 A    Yes, ma'am.

24          MS. MATZ:  Your Honor, I'd offer this into evidence.

25          THE COURT:  Any objection?

1          MR. SABBAK:  No, sir.

2          THE COURT:  P-999 is admitted.

3          (Whereupon, Plaintiff's Exhibit 999 was marked for

4   purposes of identification and admitted into evidence.)

5   BY MS. MATZ:

6   Q   All right.  So this is the same message that we were just

7   looking at that you posted on Twitter; correct?

8   A   Yes, ma'am.

9   Q   Okay.  And again you're calling my client Mrs. HerpesB?

10  A   That is correct.

11  Q   All right.  If we can please look at Plaintiff's 1000.

12  All right.  There's two posts on this, the second one and the

13  fourth one.  Have you ever seen those before?

14  A   I believe so, yes.

15  Q   Okay.  And is that your handle on Instagram?

16  A   Yes, ma'am.

17  Q   And you posted those posts on Instagram; correct?

18  A   Yes, ma'am.

19          MS. MATZ:  Okay.  Your Honor, I'd offer this into

20  evidence.

21          MR. SABBAK:  Objection, your Honor.  Inadmissible

22  hearsay.

23          THE COURT:  I'm sorry.  What's the objection?

24          MR. SABBAK:  Inadmissible hearsay.

25          THE COURT:  You've got to talk a little slower and a

1   little louder.

2          MR. SABBAK:  I'm sorry, Judge.  Inadmissible hearsay.

3          THE COURT:  Well, I'm assuming that the plaintiff is

4   not seeking to admit it for purposes of the comments made by

5   others but comments made by the defendant; is that correct,

6   Ms. Matz?

7          MS. MATZ:  No, we're not seeking to introduce any of

8   the other comments as truth.  One is a question the defendant

9   answers, and then the other one is just a statement.

10         THE COURT:  So the objection is overruled.  The

11  document is admitted.  The comments of the defendant are

12  comments that are relevant to the case.  Comments or

13  statements made by some other party is not admitted for

14  purposes of the truth of the matter, and the Court should

15  disregard any implication about the truth of what someone else

16  may have said that's not in here, not in court to testify to

17  those facts.

18         MR. SABBAK:  Thank you, Judge.

19         THE COURT:  So P-1000 is admitted.

20         (Whereupon, Plaintiff's Exhibit 1000 was marked for

21  purposes of identification and admitted into evidence.)

22  BY MS. MATZ:

23  Q   Do you recognize these as comments to the Instagram

24  version of the posts we were just looking at?

25  A   Yes, ma'am.

1  Q   Okay.  Because you referred to my client in that post also

2  as Mrs. HerpesB; correct?

3  A   I believe so, yes.

4  Q   All right.  And you were asked, Mrs. Herpes, who is that;

5  right?

6  A   Yes, ma'am.

7  Q   Okay.  And you responded -- well, can you read your

8  response into the record.

9  A   I put Chile Cardi.

10 Q   And you're referring to my client, Cardi B; correct?

11 A   Cardi B.  That is correct.

12 Q   All right.  And then in response to another comment

13 partway down the page, you responded, fuck Cardi?

14 A   That is correct.

15 Q   Okay.  So this also would have occurred at or around

16 November of 2021; correct?

17 A   I believe so, yes.

18 Q   Okay.  Thank you.  Did you later delete the fuck Cardi

19 comment?

20 A   I'm not sure.  Sometimes my comments get reported, so

21 they'll disappear.  But it depends.  If I make an error

22 writing, then, yes, I'll delete and rewrite it.  But as far as

23 deleting, what I said is what I said.

24 Q   Do you recall deleting this particular comment?

25 A   No, ma'am.

1  Q    Okay.  So if it were no longer up, it would have been

2  because it got reported?

3  A    Yes, ma'am.  That is correct.

4  Q    And just so the jury understands, when you say it got

5  reported, you mean that other users can report comments to

6  Instagram or Facebook, or whatever platform we're talking

7  about, for violation of their rules or community standards;

8  correct?

9  A    That is correct.

10 Q    And so you said that sometimes your comments get reported

11 for violation of those standards?

12 A    Yes, ma'am.

13 Q    Okay.  And is it your understanding that this comment got

14 deleted for violation of those standards?

15 A    I'm not sure.  It probably -- it may be still there just

16 buried in the comments because, I mean, the comments are so

17 deep.

18 Q    Okay.  Let's look at Plaintiff's 986.  Have you ever seen

19 this before?

20 A    I believe so.  It looks like a comment from my YouTube

21 channel, a community tab.

22 Q    And specifically I'm talking about the second thing down.

23 Is that your handle?

24 A    Yes, ma'am.

25 Q    And does that indicate you -- your comment right there at

1  the second line?

2  A   Yes, ma'am.

3  Q   Okay.  So you authored that?

4  A   Yes, ma'am.

5       MS. MATZ:  All right.  Your Honor, I'd offer this

6  into evidence.

7       MR. SABBAK:  Your Honor, objection again for hearsay.

8       THE COURT:  All right.  So same ruling as before.

9  The document, which is Plaintiff's 986 is admitted.  The jury

10  should not consider any comments made by any person who is not

11  in court to testify, and so they're not admitted for the truth

12  of the matter asserted therein.  The jury can consider the

13  comments attributable to the defendant for whatever purpose

14  that the jury sees fit.

15       (Whereupon, Plaintiff's Exhibit 986 was marked for

16  purposes of identification and admitted into evidence.)

17  BY MS. MATZ:

18  Q   Was this also -- were these comments -- is it your

19  understanding these were also in response to the YouTube

20  version of the Mrs. HerpesB post that we were just looking at

21  from November?

22  A   I'm not sure.  I've had so many posts that said Herpes B,

23  so I don't know where you took this comment from.

24  Q   Okay.  And your post was responding to a question; is that

25  true?

1  A   Yes, ma'am.

2  Q   So the question was, are you even supposed to call her

3  Herpes B lol, and you responded I am?

4  A   That is correct.

5          MS. MATZ:  All right.  Your Honor, could I have a

6  quick side bar with you?

7          THE COURT:  I'm sorry?

8          MS. MATZ:  Could I have a quick side bar?

9          THE COURT:  Sure.

10         (Whereupon, a bench conference was held between the

11  Court and counsel.)

12         MS. MATZ:  I think I'm almost done.  I think the only

13  thing I'd like-- I mean, I could just end, but I'd like to

14  just -- I think I'm pretty much finished.

15         THE COURT:  Why don't you just review your notes and

16  see.

17         MS. MATZ:  Okay.  Yeah, that would be great.  I just

18  want a few minutes to make sure.

19         THE COURT:  Okay.

20         MS. MATZ:  All right.  Thank you.

21         MR. SABBAK:  Appreciate it, Judge.

22         (Whereupon, the following proceedings continued in

23  open court.)

24         THE COURT:  Ladies and gentlemen, I'm giving

25  plaintiff's counsel just a few moments to look at her notes to

1  determine if she has any other questions or not, so if you'll

2  just sit for just a minute or two, we'll be back to you in

3  just a few minutes.  We're going to end at 5:00 no matter

4  what.

5          (Brief recess.)

6          MS. MATZ:  I don't have anything further for this

7  witness at this time, your Honor.

8          THE COURT:  All right.  Thank you.  All right.

9  Ladies and gentlemen, we're going to end for the day.  I want

10  to remind you of our schedule.  We're going to meet tomorrow.

11  If you'll return to be in the jury deliberation room by 9:30,

12  hopefully we can start as soon as everyone is present.  We're

13  not going to meet on Friday.  I told you I had a medical

14  situation that I needed to accompany my wife to for an exam.

15  And Monday is a federal holiday, Martin Luther King Day, great

16  day, and I hope you'll be able to celebrate it.

17          I understand it's forecasted that we could have bad

18  weather here, and that's a relative term.  Plaintiff's counsel

19  may not think it's too bad, but for us it's bad.  And so there

20  may be some frozen weather on Sunday, but everything I

21  understand right now is that -- you know, this is Georgia, and

22  so we'll know by Monday.  We will not be meeting Monday

23  anyway.  Of course, if I'm wrong about that, if the weather

24  forecasts are wrong or -- this trial will last another week or

25  so, so we could have another round in there somewhere else.

1          Here's the policy I follow on whether we would meet

2    or not:  If any school in any of the counties in which you

3    live or that you would have to pass through to get here are

4    closed, then because -- and, of course, schools don't close

5    anymore.  Since Covid, they all just go digital.  But if their

6    buses aren't running, then they've made a decision that they

7    think that travel could be dangerous, particularly for

8    southerners who aren't experienced in driving in it.  And so

9    if that is the case, then we would not meet.

10         We're not going to make you -- you know, I don't know

11   where you all live necessarily and whether you live on a hill

12   or a valley or whatever.  I'm not going to make you drive in a

13   dangerous situation to get here.  We would also let you know

14   that.  But that's what you could expect, is that if it's

15   inclement weather, probably the furthest county is -- is

16   someone from Woodstock?  Anybody from Cherokee County on the

17   jury?  Yeah, I thought we had one.  Then you would have to

18   come a long way, and then you're further north than anyone

19   else.  So probably Cherokee County schools is a pretty good

20   prediction about whether we would meet or not.  But whatever

21   we're supposed to have Sunday, I think by Monday afternoon it

22   will be fine, and so we should be able to meet back on

23   Tuesday.

24         But we'll have a full day tomorrow, and I look

25   forward to seeing you again.  If you'd leave your notes in the

1  jury deliberation room, and we'll see you in the morning.

2  Thank you.

3            COURTROOM SECURITY OFFICER:  All rise.

4            (Whereupon, the jurors exited the courtroom.)

5            THE COURT:  You can step down if you'd like.

6            THE WITNESS:  Yes, sir.

7            THE COURT:  Thank you.  So let's talk a little bit

8  about what to expect tomorrow relative to the defendant's

9  questioning of your client.  Do you intend to go forward

10  tomorrow?  Do you intend to just defer until it's your case in

11  chief?

12            MS. IZMAYLOVA:  Yes, sir.

13            THE COURT:  Okay.  All right.  So, Ms. Matz, if you

14  can kind of give me an indication of what witnesses or how

15  many witnesses you'll have tomorrow, I just want to make sure

16  we have a full day understanding that we will be breaking

17  tomorrow for the weekend.

18            MS. MATZ:  I think we will probably have two

19  witnesses tomorrow.

20            THE COURT:  Okay.  All right.  So just be sure that

21  you can fill the day is my only --

22            MS. MATZ:  Understood, your Honor, completely.

23            THE COURT:  In that regard.  All right.  Well,

24  anything else we need to talk about before the morning?

25            MS. IZMAYLOVA:  Not from us, your Honor.

1            THE COURT:  All right.  We'll see y'all at -- I'll be

2   here at 9:00.  If you have something to talk about then, let

3   Ms. Lee know.  Otherwise, we'll convene at 9:30.

4            MS. IZMAYLOVA:  Thank you.

5            MS. MATZ:  Thank you, your Honor.

6            COURTROOM SECURITY OFFICER:  All rise.  Court stands

7   in recess.

8            (Whereupon, the proceedings were adjourned at 4:58

9   p.m.)

10                            -  -  -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    REPORTERS CERTIFICATE

 2

 3

 4          I, Wynette C. Blathers, Official Court Reporter for

 5   the United States District Court for the Northern District of

 6   Georgia, with offices at Atlanta, do hereby certify:

 7          That I reported on the Stenograph machine the

 8   proceedings held in open court on January 12, 2022, in the

 9   matter of BELCALIS MARLENIS ALMÁNZAR v. LATASHA TRANSRINA KEBE

10   and KEBE STUDIOS LLC, Case No. 1:19-CV-01301-WMR; that said

11   proceedings in connection with the hearing were reduced to

12   typewritten form by me; and that the foregoing transcript

13   (Volume III of X, Pages 1 through 189) is a true and accurate

14   record of the proceedings.

15          This the 27th day of February, 2022.

16

17

18

19                          _____
                            /s/ Wynette C. Blathers, RMR, CRR
20                              Official Court Reporter

21

22

23

24

25
```