```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF GEORGIA
 2                          ATLANTA DIVISION


 3

 4   BELCALIS MARLENIS ALMÁNZAR,        )
                                        )
 5                  Plaintiff,          )
                        v.              )   CIVIL ACTION
 6                                      )   FILE NO. 1:19-CV-01301-WMR
     LATASHA TRANSRINA KEBE and         )
 7   KEBE STUDIOS LLC,                  )
                                        )   JURY TRIAL
 8                  Defendants.         )
     _____)   VOLUME IV OF X
 9

10

11   ------------------------------------------------------------

12          BEFORE THE HONORABLE WILLIAM M. RAY, II

13               TRANSCRIPT OF PROCEEDINGS

14                  JANUARY 13, 2022

15   ------------------------------------------------------------

16

17

            Proceedings recorded by mechanical stenography
18           and computer-aided transcript produced by

19

                 WYNETTE C. BLATHERS, RMR, CRR
20                   Official Court Reporter
                      1714 U.S. Courthouse
21                   75 Ted Turner Drive, SW
                     Atlanta, Georgia  30303
22                        (404) 215-1547

23

24

25
```

```
1   APPEARANCES:

2   For the Plaintiff:        SARAH M. MATZ
                              Attorney at Law
3                             Adelman Matz, P.C.
                              1173A Second Avenue
4                             Suite 153
                              New York, New York  10065
5
                              LISA F. MOORE
6                             WILLIAM A. PEQUIGNOT
                              Attorney at Law
7                             Moore Pequignot, LLC
                              887 West Marietta Street
8                             Suite M-102
                              Atlanta, Georgia  30318
9
    For the Defendants:       OLGA IZMAYLOVA
10                            SADEER SABBAK
                              Attorneys at Law
11                            Sabbak & Izmaylova, LLP
                              1875 Old Alabama Road
12                            Suite 510
                              Roswell, Georgia  30076
13

14

15

16

17

18

19

20

21

22

23

24

25
```

**INDEX TO EXAMINATIONS**

**WITNESS**                                                                    **PAGE**

CHEICKNA KEBE

    Cross-Examination By Mr. Pequignot                                        38

BELCALIS MARLENIS ALMANZAR

    Direct Examination By Ms. Moore                                           67

    Cross-Examination By Ms. Izmaylova                                       139

    Redirect Examination By Ms. Moore                                        192

**INDEX TO EXHIBITS**

**P L A I N T I F F ' S   E X H I B I T S**

|      |                                                              | IDENTIFIED | ADMITTED |
|------|--------------------------------------------------------------|------------|----------|
| 1    | Medical Test Results from UCLA Health                        | 116        | 116      |
| 2    | Medical Test Results from UCLA Health                        | 118        | 118      |
| 24   | Invoice from Edge Empowerment Group for Therapeutic Coaching... | 133      | 133      |
| 45   | Invoice from Dr. Sherry Enterprises for Therapeutic Coaching Session... | 135 | 135 |
| 247  | Article Published by Bet.com as Posted on May 3, 2018        | 131        | 131      |
| 509  | Tweets from @iamcardib Posted on May 2, 2018                 | 129        | 129      |
| 813  | Video View Totals for unWinewithTashaK YouTube Channel       | 49         | 49       |

**INDEX TO EXHIBITS (Cont'd.)**

**P L A I N T I F F ' S   E X H I B I T S**

| | | IDENTIFIED | ADMITTED |
|---|---|---|---|
| 834 | January 1, 2018 to November 21, 2020 Traffic Report for unwinewithtashak.com... | 52 | 52 |
| 1005 | Picture of Belcalis Almanzar at the Recording Academy Pre-Grammy Gala... | 120 | 120 |
| 1007 | Picture of Belcalis Almanzar at Sue's in a White Outfit | 122 | 122 |
| 1013 | Instagram Post by @iamcardib on June 15, 2020 | 125 | 125 |
| 1018 | Picture of Belcalis Almanzar | 117 | 117 |

**INDEX TO EXHIBITS**

**D E F E N D A N T ' S   E X H I B I T S**

| | | IDENTIFIED | ADMITTED |
|---|---|---|---|
| 1 | Cardi IG Live, with Towel on her Head re: Suing Kebe | 188 | 188 |
| 6 | Clip of Cardi on Stage at Summer Jam Yelling "We Selling Pussy" to the Crowd | 170 | 170 |
| 36 | Cardi IG Live Where She States that She's Lived Everything She Raps About | 150 | 150 |
| 37 | Clip from Cardi B's Song Everything Where She Raps About Prostitution and Drug Use | 152 | 152 |
| 57 | Video of Cardi Referring to Herself as a Stripper Ho | 165 | 165 |

| | | INDEX TO EXHIBITS (Cont'd.) | | |

**D E F E N D A N T ' S   E X H I B I T S**

| | | | IDENTIFIED | ADMITTED |
|---|---|---|---|---|
| 58 | | Video of Cardi Where She Says "Imma Always be a Hoe" | 166 | 166 |
| 60 | | Video of Cardi Where She Calls Herself a Stripper Hoe" | 166 | 166 |
| 61 | | Video of Cardi Where She Advises Women to Retaliate by Cheating if their Man Cheats | 156 | 156 |
| 63 | | Video of Cardi Where She Discusses the 3 Rules of Dealing with a Trick | 167 | 167 |
| 106 | | Conversation Between Remy Roja and Cardi B | 190 | 190 |

```
 1                    Thursday Morning Session

 2                      January 13, 2022

 3                         9:20 a.m.

 4                          -  -  -

 5                  P R O C E E D I N G S

 6          COURTROOM SECURITY OFFICER:  All rise.  United States

 7  District Court for the Northern District of Georgia, Atlanta

 8  Division, is now in session, the Honorable Judge William M.

 9  Ray II presiding.

10          MS. MOORE:  Good morning, your Honor.

11          THE COURT:  Good morning.  All right.  So it's

12  interesting -- today is, by the way, Thursday the 13th, Day 4

13  of our trial.  The Court has given counsel a note that a juror

14  has submitted.  It was interesting watching y'all read it,

15  reminded me of an incident when I used to coach kids'

16  baseball, had a son who played baseball.  And when they were

17  young, at the end of practice or the beginning of practice

18  you'd say y'all run out to the Zaxby's sign or run out to the

19  Chevron sign.  The kids would just start taking off for the

20  outfield, and you could tell they're reading.  They're trying

21  to figure out where is that sign, just like y'all were reading

22  the note, kind of a deja vu moment.

23          So a couple of things to talk about, and this note is

24  one.  The other one, which I'll start with, is that we had a

25  juror last night after the day was over with, I guess right
```

1 | before she left the courthouse, turn on her phone because her
2 | phone was off during the day.  And she found out that her son
3 | who lives in her home in the basement, albeit I guess an adult
4 | son, had tested positive for Covid.  And so I never spoke with
5 | her.  Ms. Lee talked with her a couple of times, maybe in
6 | person and by phone.  So what we found out was that she
7 | doesn't really see him a lot.

8 | I had consulted with our Clerk of Court as to the
9 | most recent CDC recommendation, and it's kind of hard to stay
10 | on top of them.  They seem to change so quickly.  But the
11 | latest CDC recommendation is that if you have been fully
12 | vaccinated, which I think the only way to interpret that is
13 | that you've had a booster, if you're booster eligible, that if
14 | you have come in contact with Covid -- and granted we probably
15 | are all coming into contact with Covid every day -- and you're
16 | showing no signs of Covid, then you don't have to quarantine.

17 | So in checking with this juror, it was clear that she
18 | had been vaccinated but had not been boosted and if she is due
19 | for a booster shot, by a few months.  But the other part of
20 | the CDC recommendation is that if you haven't been fully
21 | vaccinated, including the booster, if you are eligible, and
22 | your exposure to that person is less than 15 minutes in any
23 | 24-hour period of time, then you also do not have to
24 | quarantine.  And this juror assures us that she is within that
25 | category, that she only sees her son intermittently.  They

1    have a shared kitchen area.

2         I've got an adult son who's clerking right now, so

3    he's making less money.  He's a lawyer and living in my

4    basement, and that's pretty much the same thing.  I see him

5    when he comes to get food, and that's just about it.

6         So, you know, I think we can continue with this

7    juror, though per the CDC guidelines, but I do feel like I

8    need to tell the other jurors without revealing who this juror

9    is to make sure that the jurors are all comfortable with that.

10   I really expect that they all will be, and I think at most

11   what will happen is maybe a juror will -- I mean, I might be

12   surprised if somebody may say they don't want to serve

13   anymore.  But, you know, maybe a juror would request to sit in

14   the gallery.  If that's the case, then I will have to close

15   the right side of the gallery and let jurors only sit there.

16        I had thought about overnight, you know, do I have

17   that conversation with each juror individually or do I do it

18   collectively and tell them about it and give them an

19   opportunity to tell me if they've got an issue.  In light of

20   this new situation, then maybe I'll just do it individually

21   because it would give some cover to the identity of the juror

22   who wrote this note, that I pull every juror out individually

23   and speak with them about the Covid situation.  And so it may

24   be difficult for them to figure out or anyone to figure out

25   who wrote this note.  I mean, I don't intend to give them the

1  note.

2           So the next question becomes what do we do about the

3  information that's included in the note, which will be marked

4  as Court's Exhibit 1 for the record.  So the note for the

5  record basically says that after one of our sessions yesterday

6  where a video was shown that showed Ms. Kebe interacting with

7  one of her children, the video did not show her child, but it

8  was obvious that the child had entered the room where she was

9  recording one of her unwine sessions.

10          The juror was obviously disturbed by either the fact

11 that the child was in the home when the defendant was engaging

12 in the type of language that she was using, which is obviously

13 pretty typical for her performances, or possibly that she

14 dealt with her child in the manner that she dealt with her

15 child.

16          Now, I'm not surprised that a juror would have those

17 types of feelings, like probably everybody that heard the

18 video wondered what effect the language generally and the fact

19 that the daughter was in the home, if it's a daughter -- I'm

20 assuming it was a daughter or child -- was in the home

21 generally or that the child was talked to the way the child

22 was talked to might impact how the juror felt about this case.

23          That doesn't bother me that the juror might think

24 that.  I mean, they're certainly entitled to draw their own

25 opinions about whether or not some of that, if any of it,

1  could or should impact the decisions that have to be made in

2  this case.

3       But the issue that I'm concerned about is that this

4  juror was talking about it, not because I think that there was

5  anything that was inherently prejudicial about what was said,

6  but the fact that the juror may not be able to follow my

7  instructions, which has been that you don't talk about the

8  case until jury deliberation.  So I'm going to start with the

9  defendant to the extent that you've had a chance to form an

10 opinion about what you think ought to happen.  I'm going to

11 listen to you first since the tide of this juror's comments

12 really goes against your client.

13      MS. IZMAYLOVA:  Your Honor, our position is that we

14 would seek the juror to be removed from the panel simply

15 because of what your Honor said, the fact that the -- your

16 Honor's instructions was violated, and we don't feel

17 comfortable with the fact that that happened.  It's clear that

18 other jurors also do not feel comfortable with that, and

19 that's why they brought it to the Court's attention.  So our

20 position would be that it would be best that that juror would

21 be removed, you know, to prevent any further potential

22 violations of the Court's, you know, instructions and orders.

23      THE COURT:  So in that vein, if I were to do that, I

24 guess the best way I can think about to do that is to call the

25 jurors all out individually to talk to them about Covid

1  because I have that issue and then at some point, you know,

2  pull out Juror No. 20, maybe not first but somewhere in there.

3  Well, they'll be talked to as well, but I guess pretty early

4  on.  I guess we'd maybe pull out a male juror first because

5  obviously this was a woman, I think, and then pull out Juror

6  No. 20 and talk about Covid to Juror No. 20 but also talk

7  about this situation and find out what the identity of the

8  juror was but, you know, at the end of the day to excuse the

9  juror who made the comment but not to talk about the situation

10  any further in front of the rest of the people simply because,

11  you know, I don't want to put anymore -- I don't want to put

12  necessarily undue emphasis on the comments that were made --

13         MS. IZMAYLOVA:  Yes, sir.

14         THE COURT:  -- but I might very well comment at some

15  point before the end of the day that the juror has been

16  excused because she was talking about the case to highlight

17  how important it is not to talk about the case.

18         MS. IZMAYLOVA:  We agree with your Honor.

19         THE COURT:  Okay.  From the plaintiff, Ms. Matz.

20         MS. MATZ:  I mean, I realize it was a failure not to

21  follow your instructions, and I'm not saying that I don't take

22  that seriously also.  I think, though, that in terms of how

23  many people we have and the potential that we could lose

24  jurors to Covid and things like that, I am wondering if it

25  would be also maybe appropriate as an alternative to remind

1  the jury and make sure it doesn't happen again, maybe try to

2  find out who the person is.  But I don't know that they

3  necessarily need to be excused.

4       I mean, honestly it's probably something that would

5  be discussed during deliberation also.  And I realize they

6  shouldn't have discussed it now, and I'm not saying they

7  should have.  But I think as long as it's not an ongoing

8  situation, I mean, there probably are minor things that

9  happen, and I'm just concerned that since we don't have -- you

10 know, if we lose one juror to this and another to Covid, we

11 have another week of trial.  So I'm just concerned about, you

12 know, not having to try this case twice.  That's my concern,

13 but I leave it to the Court's discretion.

14      THE COURT:  Well, I mean, I understand the

15 plaintiff's point as well.  I mean, I do have concerns about

16 leaving the case.  As I told you all last week, you know, if

17 we have a Covid situation that comes up that causes us to

18 stop, my intent is to stop but not mistry the case based on

19 that.  I think we just have to deal with Covid as an ongoing,

20 you know, environmental issue that will sometimes cause us to

21 delay our trial.

22      I'm going to take about five minutes.  I want to

23 think about it and talk about it with my law clerk, and I'll

24 come back in just a minute and let you know what I decide.

25 Thank you.

1           MS. MATZ:  Thank you, your Honor.

2           MS. IZMAYLOVA:  Thank you, your Honor.

3           COURTROOM SECURITY OFFICER:  All rise.  Court is in

4     recess for about five minutes.

5           (Brief recess.)

6           COURTROOM SECURITY OFFICER:  All rise.  This Court is

7     again in session.

8           THE COURT:  Thank you.

9           COURTROOM SECURITY OFFICER:  Please be seated and

10    come to order.

11          THE COURT:  All right.  So, yeah, I'm going to remove

12    the juror.  Let me say this:  I don't think I have to.  I

13    think I could leave the juror on, and if we had two juror

14    alternates or one juror alternate, I probably would.  I don't

15    think I will get reversed by the Court of Appeals by removing

16    the juror because the juror has demonstrated her inability to

17    follow my instructions or unwillingness to do that, and that

18    would provide a ground for me to remove the juror.

19          I really don't think I would get reversed if I left

20    her on because what she said is not any kind of extrajudicial

21    information.  It was simply her opinion based on what had

22    occurred in the courtroom, but I'm less sure about that issue

23    than I am if I remove her.  In other words, I think it's

24    possible that, you know, a panel on the appellate court might

25    disagree with my decision to leave her on, though I think

1  there would be no disagreement with my decision to remove her.

2         And as I've said before, I have no interest in who

3  prevails in this case.  My interest is to make sure that the

4  trial occurs pursuant to the rules of evidence, that each side

5  is treated fairly, and that we try the case one time.  So in

6  the spirit of the last of those, which is to make sure that we

7  try this case one time, I'm going to remove the juror, and I

8  think it could have actually some positive effect as it

9  relates to the remaining jurors about the importance of

10  following the instructions that the Court gives and that the

11  failure to do so can have ramifications.

12         And so what I'm going to do is I'm going to -- we'll

13  pull one of the male jurors out first because I know that a

14  male juror didn't write the note, I'm pretty sure.  That was a

15  female juror; right?  Yeah.  And then I'm going to pull out

16  Juror No. 20.  I've got her name, so I can give you her name

17  if you don't know it.  And then I'm going to pull out -- after

18  that, I will pull each individual juror out and continue to

19  question them only about Covid.  The only juror that I'm going

20  to talk to about -- the only juror that I'm going to talk to

21  about this situation is going to be the juror who made the

22  report and the juror who I'm removing.  So I've got to explain

23  that.

24         MS. MATZ:  Your Honor?

25         THE COURT:  Yes, ma'am.

1          MS. MATZ:  I just want to say one thing, and that is

2     that obviously several of the other jurors also heard this

3     comment.  And then this person is now going to be removed.  Is

4     there any way you could just say -- give the whole jury or the

5     people who heard the comment some kind of an instruction that

6     this is just about the failure to follow the rules?

7          THE COURT:  Yeah, I'll do that at the end when I

8     bring everybody else back in the courtroom.  I just mean

9     individually when I pull them out.

10          MS. MATZ:  Okay.  Great.  And then maybe, you know, I

11     think there are a lot of videos with a lot of strong language.

12     So, you know, maybe just reminding everybody that -- reminding

13     everybody of the instruction again would be helpful just

14     because I don't want this situation to happen again.  People

15     are going to have opinions about this, and I just don't want

16     to lose jurors who -- I just don't want to keep losing jurors.

17     That's all.

18          THE COURT:  I don't know if I shared with y'all I had

19     a trial once where a Spanish interpreter -- did I tell y'all

20     about that --

21          MS. IZMAYLOVA:  No, sir.

22          THE COURT:  -- where the jury was instructed to not

23     talk about the case, and it was a case involving a Hispanic

24     murder victim and a lot of Hispanic people who were witnesses

25     or defendants.  And one of the jurors reported during the

1  middle of the trial that another juror had said that the

2  interpreter who was translating everything for the jurors was

3  getting it wrong.  This juror was supposedly fluent in Spanish

4  as well.  So I ended up having to talk to all the jurors.  I

5  ended up declaring a mistrial for two reasons.  One was I

6  didn't know whether or not the interpretation was correct or

7  not, and I thought it probably was because I had my -- our

8  most senior Cuban American interpreter who was great.  But I

9  didn't speak Spanish fluently at all, and so I couldn't say.

10          And then it was the fact that the jurors were all

11  talking about the information that was provided by the other

12  juror, and so it turns out the interpreter had it right all

13  along.  It was the juror who had it wrong.  And so maybe it

14  was to our benefit that the jury was disregarding my

15  instructions because had that juror never said that, then he

16  might have gotten into the jury deliberations and said the

17  interpreter had it wrong.  We would have never known.

18          So this is an unfortunate situation, obviously, but,

19  you know, I did go with four, and so we do have enough folks.

20  I don't intend for Covid to derail the case.  It might delay

21  it but not end it, so I think we'll be okay.  I just think

22  this is the safest way for me to go.

23          MS. MATZ:  I understand, your Honor.  I also just

24  don't want jurors to get the impression that they can't have

25  whatever feelings they're having from the videos themselves.

1          THE COURT:  Absolutely.  I understand.  I'll make it

2     clear.

3          MS. MATZ:  Thank you, your Honor.  I really

4     appreciate that.

5          THE COURT:  All right.  Looking at our list, could

6     you bring out Mr. Dorsey.

7          (Whereupon, Mr. Dorsey entered the courtroom.)

8          THE COURT:  Mr. Dorsey, good morning.

9          THE JUROR:  Good morning.

10         THE COURT:  Good to see you.  So, Mr. Dorsey, one of

11    the things we need to discuss with all the jurors is we had --

12    late yesterday afternoon we had a juror who reported that a

13    member of the juror's family, an adult son that lived in the

14    juror's basement that this juror really interacted with very

15    infrequently, had tested positive for Covid.  The juror was

16    vaccinated but not boosted and was eligible to get a booster.

17         CDC protocol currently would be that that juror does

18    not have to quarantine and would not be at any more risk of

19    having Covid than anyone else as long as the juror wasn't

20    around the juror's son for more than 15 minutes in a 24-hour

21    period.  So my intent is to let the trial go on as normal at

22    this point without taking any kind of a pause.  And I just

23    wanted to make sure.  Are you comfortable under those

24    circumstances continuing to serve?

25         THE JUROR:  Yes.

1          THE COURT:  Okay.  All right.  Thank you, sir.  If

2   you'll just give the microphone to the court security officer.

3   Thank you.  Do we have a stand?

4          COURTROOM DEPUTY:  We do.  Let me find it.

5          (Whereupon, Mr. Dorsey exited the courtroom.)

6          THE COURT:  If you would, bring out Ms. Bearden,

7   Juror No. 20.

8          (Whereupon, Ms. Bearden entered the courtroom.)

9          THE COURT:  So, Ms. Bearden, two things we need to

10  talk about.  The first thing is that -- I'm going to talk with

11  every juror -- it has to do with Covid issues and I'm not sure

12  who -- what the juror's was that reported this yesterday.  But

13  one of our jurors reported yesterday that when she turned --

14  when the juror turned the juror's phone on at the end of the

15  day, they found out that an adult member of their household, a

16  child, adult child, that lives in the basement that the juror

17  engages with infrequently had tested positive for Covid.  And

18  so the juror also reported being fully vaccinated but not

19  being boosted, being eligible for a booster.

20          The CDC guidelines state today -- we'll see what they

21  state tomorrow -- but today they state that if you have

22  infrequent contact, defined as 15 minutes or less in any

23  24-hour period, with someone who is positive, that you don't

24  have to quarantine unless you have symptoms.  And the juror

25  has reported no symptoms.  And so, you know, my decision is

1  that we would continue with the trial as normal unless that

2  juror has some symptoms.  And if that juror has some symptoms,

3  then we'd probably take a time out in the trial.  But I just

4  want to make sure that you'd be comfortable continuing to

5  serve under that circumstance.

6          THE JUROR:  I am very comfortable.

7          THE COURT:  Okay.  The other thing I want to talk to

8  you about is your note.  Now, I don't intend to tell any other

9  juror that you sent me the note.  I do intend to tell the

10  jurors that there was a note sent.  And it was the reason why

11  I brought another gentleman out first before you, to give you

12  some comfort that it wouldn't be obvious that the note was

13  from --

14          THE JUROR:  I appreciate that, your Honor.

15          THE COURT:  I may have to apologize to him later if

16  anybody thinks it was him.  So what I need to know is I need

17  to know who the juror was, to the extent that you can identify

18  that juror for me, so that I can speak with that juror

19  specifically about the note.

20          THE JUROR:  Okay.  I don't know the juror's number.

21  The first name was Patricia.

22          THE COURT:  Can you say that first name one more

23  time.

24          THE JUROR:  Patricia.

25          THE COURT:  Patricia.  Okay.  All right.  Thank you.

1  So if you'll go back to the jury room.

2          THE JUROR:  Thank you, your Honor.

3          THE COURT:  Well, let me ask you one more question.

4  So we have two Patricias on our jury.  What are the odds of

5  that?  Both are retired.  You don't happen to know where she

6  is from, do you?

7          THE JUROR:  Do not.

8          THE COURT:  Okay.  All right.  Thank you.

9          (Whereupon, Ms. Bearden exited the courtroom.)

10         THE COURT:  So we have two Patricias on our jury.

11  They're both retired so, you know, not necessarily typical,

12  but I'm guessing they're older because of that.  One is named

13  Patricia Ann Garcia, Juror No. 17, and the other one is

14  Patricia Eidson.  As I remember, Ms. Garcia was not -- did not

15  appear to be Hispanic, so it's not like I could use any kind

16  of, you know, stereotypical ethnic features to identify her.

17  How would y'all suggest I find out which one it is?  I can

18  always ask them if they had made the comment.  I don't know if

19  I'll get an honest answer.

20         MS. MOORE:  Your honor, I have a suggestion.

21         THE COURT:  I'm sorry?

22         MS. MOORE:  I have a suggestion, your Honor.

23         THE COURT:  Okay.

24         MS. MOORE:  So if you call the jury in just briefly,

25  even under sort of false pretenses, and you ask Juror No. 20

1    to just visually look -- privately call her back in, ask her

2    just to look and see what the juror is wearing and then you

3    excuse them, and then she can come back in and tell you which

4    one it is.  I think that's better than maybe doing it all

5    together, but that's just one idea, your Honor.

6            THE COURT:  I want to do it in a way that brings less

7    attention to Juror 20 having been the one to identify.  I

8    don't want any juror, for example, if something later happens

9    that's inappropriate, be reluctant to say it because then

10   everybody else finds out that that juror told them something.

11           MS. MATZ:  What if your Honor just -- we do the rest

12   of the Covid questions and maybe have -- is the Court staff

13   allowed to pass Juror 20 a note at some point?

14           THE COURT:  Court staff allowed to do what?

15           MS. MATZ:  Pass Juror 20 a note just asking her to --

16   like leave the whole jury here for the day --

17           THE COURT:  Sure.  I've got you.

18           MS. MATZ:  -- and then ask Juror 20 to just look at

19   what the person is wearing and pass a note back at some point.

20   And then we would know tomorrow, and then the person just

21   hears another day of testimony which ultimately doesn't really

22   matter.  And, actually, maybe less time between the incident

23   happening and a juror being excused would, you know, draw less

24   attention to Juror No. 20 and the situation in general.

25           THE COURT:  So I like your proposal, but I don't know

1  that I like waiting the rest of the day -- what is this first

2  word, Jennifer?

3          COURTROOM DEPUTY:  I don't know.

4          THE COURT:  I don't know.  Oh, okay.  So I will call

5  out Juror 20 -- excuse me.  I'm going to call the Patricias

6  last, and when I get near there, I'm going to have Jennifer go

7  to the door and ask if she can speak to Ms. Bearden.  Is that

8  her name?

9          COURTROOM DEPUTY:  Yes.

10          THE COURT:  Ms. Bearden and just bring her out here

11  quickly and talk to her, and I think it will be less obvious

12  what we're doing because in the meantime we'll be still

13  pulling jurors out into the courtroom.

14          MS. MATZ:  Okay.  Thank you, your Honor.

15          THE COURT:  All right.  So, if you would, bring out

16  Kiplyn Lewis.  I'm not sure if that's a man or -- oh, it's a

17  woman.  Thank you.  I'll remember that.

18          (Whereupon, Ms. Lewis entered the courtroom.)

19          THE JUROR:  Good morning.

20          THE COURT:  Good morning, Ms. Lewis.  If you'd have

21  a -- you can stand for just a second.  So yesterday at the end

22  of the day -- this could have been you, I'm not sure who it

23  was -- a juror reported that a member of their household had

24  tested positive for Covid, an adult son that was in the

25  basement that the juror reported having infrequent contact

1   with, less than 15 minutes a day.

2          And the reason that's important is the juror was not

3   completely vaccinated, vaccinated but not boosted, and was

4   eligible for a booster.  And the CDC's recommendations say

5   that if a person has been exposed for less than 15 minutes in

6   a 24-hour period to someone that is positive for Covid but not

7   completely vaccinated, that that juror does not have to

8   quarantine if they don't have symptoms.

9          THE JUROR:  Okay.

10         THE COURT:  And the juror reported no symptoms.  So

11  my point is that I intend, based on the CDC guidelines, to

12  continue with the trial, not take a pause.  But I just wanted

13  to make sure you were comfortable with that situation.

14         THE JUROR:  I'm fine.

15         THE COURT:  Okay.  All right.  Thank you, ma'am.

16         THE JUROR:  Thanks.

17         (Whereupon, Ms. Lewis exited the courtroom.)

18         THE COURT:  All right.  Go ahead and go pull her out

19  and do that to start.  And she may have to go back in for a

20  few minutes and then come back out to make it less obvious

21  what she's doing.  Okay?

22         Juror No. 13, John Dukes.

23         (Whereupon, Mr. Dukes entered the courtroom.)

24         THE COURT:  Mr. Dukes, good morning.

25         THE JUROR:  Good morning.

1          THE COURT:  Yesterday after trial ended, we had a

2   juror and when that juror cut their phone on, had a message

3   that an adult son that lives in the juror's home in the

4   basement had tested positive for Covid.  The juror reports

5   having been fully vaccinated but not yet boosted though

6   eligible for a booster, and also reported having no symptoms

7   of Covid.  The juror didn't have any.

8          And current CDC guidelines suggest that when a juror

9   has been exposed to Covid and it's less than 15 -- with a

10  person who's tested positive for less than 15 minutes in a

11  24-hour period, even if they're not fully boosted, that the

12  juror would not need to quarantine unless the juror had Covid

13  symptoms, and the juror reports none of those.

14          So based on those guidelines, you know, my desire is

15  to continue with the trial at this point, not take a time out.

16  I don't intend for this trial to be lost because of Covid at

17  any time, but I will pause if necessary.  But I don't think

18  it's necessary, but I wanted to make sure you would be

19  comfortable continuing.

20          THE JUROR:  I'm comfortable.

21          THE COURT:  All right.  Thank you, sir.

22          (Whereupon, Mr. Dukes exited the courtroom.)

23          THE COURT:  All right.  Thank you.  Juror No. 14,

24  please, Ms. Rose Kopinski -- Rose Kopanski.  Excuse me.

25          (Whereupon, Ms. Kopanski entered the courtroom.)

1          THE COURT:  Ms. Kopanski, good morning.

2          THE JUROR:  Good morning.

3          THE COURT:  I'm sorry to delay us starting this

4    morning, but I needed to just talk briefly with you about a

5    situation that occurred yesterday after court.  A juror turned

6    on the juror's phone at the end of the day and had a message

7    that an adult son that lives in the juror's basement had

8    tested positive yesterday for Covid.  The juror reports

9    infrequent contact with the adult son, kitchen sharing but

10   that's about it.  And the juror also reports being vaccinated

11   fully but not yet having been boosted, even though the juror

12   is eligible to be boosted.

13          And what the CDC says about that situation right now

14   is that if the juror is not -- if a person has been exposed

15   but has not been fully vaccinated, which I think would be

16   interpreted to be boosted in this situation and doesn't have

17   symptoms, as long as the contact with a person who is positive

18   is less than 15 minutes a day cumulative, that the juror would

19   not need to quarantine.

20          So based on those guidelines, I continue -- I want to

21   continue with the trial.  I'm not going to let the trial be

22   lost because of Covid.  If we had to stop at some point for a

23   while, we would, but I just want to make sure that you, under

24   the circumstances I've described, you would be comfortable

25   continuing.

```
1              THE JUROR:  Yes, I would.

2              THE COURT:  Okay.  All right.  Thank you, ma'am.

3              THE JUROR:  Thank you.

4              (Whereupon, Ms. Kopanski exited the courtroom.)

5              THE COURT:  All right.  Let's go ahead and pull

6    Ms. Richardson out so I can talk to her about her exposure.

7              (Whereupon, Ms. Richardson entered the courtroom.)

8              THE COURT:  Good morning, Ms. Richardson.

9              THE JUROR:  Good morning.

10             THE COURT:  So I believe maybe you're the one that

11   made the report yesterday about Covid?

12             THE JUROR:  Yes.

13             THE COURT:  And I just want to just verify with you

14   the circumstances.  You've been vaccinated but not yet

15   boosted, you have no symptoms, and you would describe your

16   contact with your son of being less than 15 minutes a day?

17             THE JUROR:  Oh, yeah.

18             THE COURT:  Okay.  I've got a similar situation.

19   I've got an adult son who lives in my basement.  I might see

20   him a little bit more than that per day but not much more.

21   And so my intent is to continue with trial unless you develop

22   symptoms.  And if you do that, I'm not going to end the trial.

23   We would probably just pause the trial.

24             Are you comfortable going forward at this time?

25             THE JUROR:  Oh, yes.
```

```
 1              THE COURT:  Okay.  All right.  If things change, if
 2    you'll let me know.  Okay?
 3              THE JUROR:  I will.
 4              THE COURT:  And I'm just alerting all the other
 5    jurors about it.  I'm not identifying you.  I'm not even
 6    telling them that it was a female who made the report.  I'm
 7    trying to keep it as anonymous as I can, but I want them to
 8    know about the situation.
 9              THE JUROR:  Okay.  That's fine.
10              (Whereupon, Ms. Richardson exited the courtroom.)
11              THE COURT:  Ms. Rodriguez, Chelsey Rodriguez.
12              (Whereupon, Ms. Rodriguez entered the courtroom.)
13              THE COURT:  Ms. Rodriguez, good morning.
14              THE JUROR:  Good morning.
15              THE COURT:  I'm sorry for our delay getting started
16    this morning.  Yesterday at the end of the day one of the
17    jurors cut on their cell phone -- I know I'm using
18    inappropriate -- I'm using wrong pronouns, but I don't want to
19    identify the person -- and the juror's cell phone had a
20    message on it that showed that an adult child living in the
21    juror's basement had tested positive for Covid.  And the juror
22    reports being fully vaccinated but not having yet been boosted
23    despite being eligible for a booster and having less than 15
24    minutes per day interaction with that adult son.
25              And the reason that's important is the CDC guidelines
```

1    currently state that if a person who comes in contact with

2    someone who is positive for Covid and has not -- and that

3    person has not yet been fully vaccinated, which would be fine

4    to include the booster, if eligible, then as long as that

5    contact is less than 15 minutes in a 24-hour period and the

6    juror has no symptoms, they don't need to quarantine.

7            So based on that, I intend to continue with the trial

8    today.  I don't intend for the trial to be lost for Covid

9    anyway.  If we had a Covid situation, we would probably just

10   stop until that was resolved and then come back, but I wanted

11   to make sure that all the jurors are comfortable moving

12   forward today understanding what had been reported.

13           THE JUROR:  Sure.  I am.

14           THE COURT:  Okay.  All right.  Thank you, ma'am.

15           THE JUROR:  Sure.  Thank you.

16           (Whereupon, Ms. Rodriguez exited the courtroom.)

17           THE COURT:  All right.  If we could bring out Juror

18   No. 17, Patricia Garcia.

19           (Whereupon, Ms. Garcia entered the courtroom.)

20           THE COURT:  Good morning, Ms. Garcia.  Ms. Garcia,

21   yesterday at the end of the day when, I guess, everybody was

22   leaving, one of the jurors cut on that juror's phone and had a

23   message from someone in the family that indicated that an

24   adult son that lives in the juror's basement has tested

25   positive for Covid.  The juror reports having been vaccinated,

1   you know, both rounds, I guess, but not having been boosted

2   yet despite being eligible to get the booster shot but reports

3   no Covid symptoms, no cold symptoms of any type that the juror

4   has.

5           What the CDC guidelines currently state is that if a

6   person comes in contact with someone who is positive for Covid

7   but yet that person has no symptoms and if they're not fully

8   vaccinated to include the booster, if eligible, as long as

9   that contact is less than 15 minutes a day with the positive

10  person, that juror does not need to quarantine.  So under this

11  circumstance as described by the CDC that meet this juror's

12  situation, the juror would not need to quarantine.

13          And based on that, I intend to continue with the

14  trial today.  I don't intend for the trial to be lost anyway

15  because of Covid.  If we had a Covid situation, which could

16  occur, we would just stop the trial for a while until it

17  resolved, and then we would come back.  But I just wanted to

18  make sure that all the jurors were comfortable going forward

19  today with the circumstances I've described.

20          THE JUROR:  Oh, yes, sir.  I have no problem with

21  this.

22          THE COURT:  All right.  Thank you, ma'am.

23          THE JUROR:  Thank you.

24          (Whereupon, Ms. Garcia exited the courtroom.)

25          THE COURT:  Mr. Sapp, Cameron Sapp.

```
 1              (Whereupon, Mr. Sapp entered the courtroom.)

 2         THE COURT:  Good morning, Mr. Sapp.

 3         THE JUROR:  Good morning.

 4         THE COURT:  Sorry to delay our trial beginning this

 5    morning.  I just wanted to alert you to a situation.

 6    Yesterday after trial, a juror, when that juror cut on his or

 7    her phone, had a message from a family member that indicated

 8    that an adult son that lives in the juror's basement tested

 9    positive for Covid yesterday.  The juror reports having very

10    infrequent contact with the adult son, less than 15 minutes a

11    day cumulative.  And the juror also reports having been

12    vaccinated fully but not yet having been boosted despite being

13    eligible to receive a booster.

14              What the CDC guidelines currently state is that in

15    that situation so long as the juror -- not juror -- so long as

16    a person who's been exposed to a positive individual doesn't

17    have Covid symptoms, which the juror doesn't report that

18    themselves, then the juror -- then a person would not need to

19    quarantine.

20              And so based on the CDC guidelines and what the juror

21    has reported, I would want to continue with the trial today.

22    I don't intend for the trial to be lost because of Covid

23    anyway.  If we had a Covid situation that occurred with anyone

24    in our case, then we would probably just stop the case for a

25    while and then come back and resume it.  But with that
```

1  understanding, I just wanted to make sure that if I continue

2  today under those circumstances, that you would be comfortable

3  continuing to serve with a juror who had been exposed but not,

4  you know, more than 15 minutes a day.

5           THE JUROR:  Absolutely, Judge.

6           THE COURT:  Okay.  Thank you, sir.

7           (Whereupon, Mr. Sapp exited the courtroom.)

8           THE COURT:  Okay.  That would leave us all but, I

9  think, Ms. Eidson.  And so Ms. Richardson -- it's Richardson;

10  right?  Ms. Richardson reported --

11           COURTROOM DEPUTY:  Bearden.

12           THE COURT:  Ms. Bearden -- excuse me -- reported that

13  the juror had gray hair and a gray mask and that she thought

14  it was Ms. Eidson, and I'm going to bring her out now.  What

15  I'm going to do is I'm going to go ahead and tell her what I

16  know.  I'm going to tell her that she's going to be excused

17  for talking about the case.  When she walks out of the

18  courtroom, if we could segregate her, maybe put her into the

19  other jury deliberation room and ask her to stay there for a

20  moment, bring the other jurors into the courtroom, and then

21  you can assist her to get out.  Okay.  All right.  Thank you.

22           (Whereupon, Ms. Eidson entered the courtroom.)

23           THE COURT:  Ms. Eidson, good morning.

24           THE JUROR:  Good morning.

25           THE COURT:  So I'm certainly not trying to embarrass

1  you, and I apologize if it does.  But I have to tell you that

2  it was reported to me that yesterday after one of the videos,

3  you went into the jury room and made a comment about the

4  language that Ms. Kebe was using on the video when her child

5  was in the house, obviously in the house.  Did that happen?

6  Did you make those comments?

7        THE JUROR:  I remember the comment being made, but I

8  don't think I made the first -- I may have commented on the

9  comment that was made.

10        THE COURT:  So you didn't -- you didn't make the

11  original comment?

12        THE JUROR:  I don't believe so.

13        THE COURT:  You don't believe so?

14        THE JUROR:  No, because I think I heard somebody say

15  something about they couldn't believe that her child or

16  something was there, and I think somebody said something about

17  they thought that the child was outside.  And I think I may

18  have agreed and said I agree or something about whatever they

19  were saying.

20        THE COURT:  Well, so the problem with that is that

21  it's contrary to the instructions that I'd given earlier about

22  not talking about the case at all.

23        THE JUROR:  I understand.

24        THE COURT:  And so everybody is entitled to think

25  what they want to think about whatever the evidence is, any of

1  the evidence, and so, you know, I'm not -- I don't have an

2  opinion about what you said or what someone else may have

3  said, just about the fact that it was discussed.  And as I

4  told the lawyers, you know, I'm in a difficult situation as

5  the manager of the case because my job is to make sure that

6  everyone is treated fairly, and it's also to make sure that we

7  don't try the case but once.

8          There's a significant investment that both sides make

9  into the case, and if we have to try it again, we have to try

10  it again.  But then the amount of money that they invest, as

11  well as emotional time that occurs -- because, I mean,

12  obviously this case is going to be emotional for anybody

13  that's involved in it -- simply doubles or maybe even

14  synergistically increases by more than that.  So if I left you

15  on the jury, then I would have some concern about what the

16  Court of Appeals might say about that if whoever did not win,

17  then said, well, the judge should have removed that juror.

18          Now, if I remove you from the jury, I'm certain that

19  I'm within my discretion to do that and that there couldn't be

20  a reversal of whatever verdict would come.  So I regret to

21  inform you I am going to remove you from the jury.

22          THE JUROR:  I understand.

23          THE COURT:  And I'm not faulting you in any way about

24  feeling however you felt.  It's just the talking about the --

25          THE JUROR:  I understand.

1           THE COURT:  So here's what's going to happen:  The

2    court security officer is going to take you back, put you in

3    another jury room.  We're going to bring the other jurors in

4    the courtroom, and then you'll be excused and you can gather

5    all your things.  And despite that this hasn't worked out for

6    you to stay part of this for the entirety of the case, I still

7    do appreciate you being here this week and that it was a

8    significant time commitment for you.

9           THE JUROR:  Okay.  Sorry for the delay.

10          THE COURT:  All right.  Thank you, ma'am.

11          THE JUROR:  Thank you.

12          (Whereupon, Ms. Eidson exited the courtroom.)

13          THE COURT:  So, you know, I'm not sure if what

14   Ms. Eidson said is true or not true, that she was simply

15   responding to a comment that was made as opposed to initiating

16   the comment.  If someone else made the comment and she was

17   just responding to it, then it presents the scenario that

18   maybe there's someone else we should talk to, but I think to

19   figure that out could be quite destructive and might even

20   highlight the information that was said in the jury room and

21   amplify it more than either side would really want.

22          So my intent would -- you know, my initial intent is

23   to just not do that, to tell the jury, of course, that

24   Ms. Eidson was excused because of the conversation and hope

25   that that would act as a prophylactic message to please follow

1   my instructions that I've given you before.

2          Does the plaintiff have any disagreement with that

3   approach and not following up further?

4          MS. MATZ:  No, I think that that approach -- I agree

5   with your Honor, and I think that interrogating everybody will

6   just draw more attention to it.

7          THE COURT:  Okay.  How about the defense?

8          MS. IZMAYLOVA:  We agree with your Honor as well.

9          THE COURT:  Okay.  All right.  Well, then let's bring

10  the remaining panel, the members of the panel in and if you'll

11  excuse her.  Thank you.

12         COURTROOM SECURITY OFFICER:  All rise.

13         (Whereupon, the jurors entered the courtroom.)

14         COURTROOM SECURITY OFFICER:  Please be seated and

15  come to order.

16         THE COURT:  Good morning.  So, ladies and gentlemen,

17  thank you for indulging us this morning as we dealt with a

18  couple of things.  One of the things was the Covid discussion

19  that we had.  There was another issue too that I dealt with

20  during the same period and that was that it had been reported

21  yesterday that a juror had talked about the case, about her

22  views about something that was said on one of the videos or

23  one of the things that occurred during the videos, and so that

24  was reported to me.  I can't ignore that it happened, and so I

25  needed to find out if it happened and who was the person that

1  actually had made the initial comment and began that

2  discussion.

3          And so in the course of all of that, I had a great

4  situation because I could talk about the Covid thing that I

5  needed to deal with anyway but also, you know, do a little bit

6  of investigation about what was said and who said it.  On the

7  basis of the report and on the basis of what I had found out

8  this morning, I have excused Ms. Eidson from the jury, and

9  she's not going to participate any longer.

10          I want to reiterate this point or emphasize this

11  point:  I have no opinion about what was said or about what

12  any of you may have thought at this point about anything that

13  you have seen or heard.  That's not my concern.  My concern is

14  that all of you follow the instructions that I've given that

15  you not talk about the case.  You can think about the case any

16  way you wish.  Just don't talk about it.

17          I did ask you to and I think at least one of the

18  lawyers asked you, if not both, to wait until the case is over

19  to make up your mind about the facts, but I can't control what

20  you think.  But I have to be able to count on you to honor

21  your pledge to follow my instructions and not talk about the

22  case with anyone, including each other, until the case is

23  over.

24          So, you know, as I told Ms. Eidson, that I'm not mad

25  at her in any way.  In fact, I have some empathy for her

1   because I think she probably would have liked to continue to

2   serve, but my job is to make sure that the case is tried once

3   and it's tried fairly.  And as I told her and I told the

4   lawyers, that if I removed her, I didn't think I would be

5   second guessed by the appellate court.  And while I didn't

6   really think I would be second guessed if I left her on, that

7   I was less sure about that because she had indicated that --

8   demonstrated that she maybe couldn't follow my instructions.

9          So, in any event, let's just let that be a lesson to

10  all of us, but these instructions are very important.  The

11  lawyers, the parties, have invested and will continue to

12  invest substantial resources into this case and emotional, you

13  know, feelings into the case, and I don't want that to happen

14  more than once, if possible.  So, in any event, again I

15  apologize for the delay in proceeding with the trial this

16  morning.

17         Is plaintiff ready to call her next witness?

18         MR. PEQUIGNOT:  Yes, your Honor.  We're calling

19  Mr. Kebe.

20         THE COURT:  All right.  Thank you.  Mr. Kebe, if you

21  would take the stand, please.

22         Are you calling him for purposes of

23  cross-examination?  Mr. Pequignot, are you calling him for

24  purposes of cross-examination?

25         MR. PEQUIGNOT:  Yes, your Honor.

```
 1              COURTROOM DEPUTY:  Please raise your right hand.
 2                          CHEICKNA KEBE,
 3         herein, having been first duly sworn, was examined
 4  and testified as follows:
 5              COURTROOM DEPUTY:  Thank you.
 6              THE COURT:  Mr. Kebe, you've been vaccinated and
 7  boosted; correct?
 8              THE WITNESS:  That is correct.
 9              THE COURT:  Okay.  Could you remove your mask while
10  you testify, please.
11              COURTROOM DEPUTY:  Please state and spell your name
12  for the record.
13              THE WITNESS:  Cheickna Kebe.
14                        CROSS-EXAMINATION
15  BY MR. PEQUIGNOT:
16  Q   Good morning, Mr. Kebe.
17  A   Good morning.
18  Q   Can you spell your last name.
19  A   K-e-b-e.
20              THE COURT:  If you want to just take the base of the
21  mike and pull it a little bit closer to you, then you don't
22  have to lean forward when you answer.
23  BY MR. PEQUIGNOT:
24  Q   Mr. Kebe, you've been married to Defendant Latasha Kebe
25  for over 15 years; is that correct?
```

```
1   A    Yes.
2   Q    How long has your wife been in the celebrity gossip
3   business?
4   A    Since 2016.
5   Q    And so then it's fair to say you've been married to her
6   for the entire time she's been in the celebrity gossip
7   business?
8   A    Yes.
9   Q    Your wife's celebrity gossip business is all currently run
10  through the company Kebe Studios LLC; is that correct?
11  A    Yes.
12  Q    Is this the only line of business that Kebe Studios is
13  engaged in?
14  A    (Nods head.)
15  Q    Is that a yes?
16  A    Yes.
17  Q    As previously noted on the record, the parties have
18  stipulated that Kebe Studios LLC was formed on or about
19  April 14, 2018, and the parties have also stipulated that you
20  and your wife are the only members of that company and that
21  you each own 50 percent of the company.
22       Mr. Kebe, you don't have an operating agreement for
23  Kebe Studios; correct?
24  A    Yes.  No, we don't have an operating agreement.
25       THE COURT:  Can you raise the mike a little bit.
```

```
1              THE WITNESS:  A little bit.

2              THE COURT:  We had it down for your wife.

3              THE WITNESS:  Okay.

4              THE COURT:  Thank you.

5   BY MR. PEQUIGNOT:

6   Q   And you don't have any written resolutions or other formal

7   documentation of any agreement between you and your wife

8   concerning the company?

9   A   No, we don't.

10  Q   And yesterday we heard testimony that your wife owns a

11  federal trademark registration for the trademark

12  unWinewithTashaK.  Do you recall that testimony?

13  A   Yes.

14  Q   And she's listed as the owner of that trademark

15  registration?

16  A   Yes.

17  Q   And there's no agreement between her and the company

18  regarding the company's use of that registration or that mark?

19  A   No.

20  Q   At the time of your deposition on November 29, 2020, had

21  Kebe Studios filed tax returns?

22  A   No, not at the time.

23  Q   Your wife published celebrity gossip videos before you

24  formed the company in 2018; is that correct?

25  A   Yes.
```

1   Q   And there are not any written agreements that convey any

2   rights on those videos to Kebe Studios; is that correct?

3   A   Yes.

4   Q   And when you formed the company in 2018, your wife had

5   already been developing her unWinewithTashaK brand?

6   A   Yes.

7   Q   And there's not any written agreement that conveys

8   whatever rights she developed in that brand to Kebe Studios;

9   correct?

10  A   Yes.

11          THE COURT:  So that answer and the one he gave

12  earlier is ambiguous to me.  You said there's not.  The

13  question was there's not something, and his answer is yes.  So

14  I think maybe we all know what he means, but I'm not sure on a

15  cold record that the appellate court would review that that

16  answer would be clear so --

17          MR. PEQUIGNOT:  Thank you, your Honor.

18          THE COURT:  -- you might want to ask it again.

19  BY MR. PEQUIGNOT:

20  Q   So sorry to have to go through that again.  I apologize,

21  Mr. Kebe.

22          So your wife published celebrity gossip videos before

23  you formed the company in 2018; correct?

24  A   Yes.

25  Q   And there is not any -- the company does not have any

1   written agreement between the -- there's no written agreement

2   between the company and your wife concerning the use of those

3   videos by Kebe Studios?

4   A   Yes.  There's no written agreement.

5   Q   And when you formed the company, your wife had already

6   been developing her unWinewithTashaK brand; is that correct?

7   A   Yes.

8   Q   And there is not any written agreement that conveys

9   whatever rights she had developed in her brand to Kebe

10  Studios; that's correct?

11  A   Yes.

12  Q   And there is not any written agreement that conveys rights

13  and any other assets that your wife might have developed and

14  owned before forming Kebe Studios; that's correct?

15  A   Yes.

16  Q   And you don't believe an agreement to convey these rights

17  and these pre-existing assets is necessary because you and

18  your wife and Kebe Studios are one in the same; is that

19  correct?

20  A   Yes.

21  Q   In fact, isn't it true that at your deposition you

22  testified that there is no difference between you and your

23  wife and the company?

24  A   Yes.

25  Q   Do you help your wife manage the unWinewithTashaK YouTube

1  channel?  Is that correct?

2  A    Yes.

3  Q    And you've been doing that full-time since 2019?

4  A    Yes.

5  Q    You seem maybe you were a little unsure about that.  2019;

6  that's correct?

7  A    Yes.  That is correct.

8  Q    And before that you were helping your wife on a part-time

9  basis?

10  A    Yes.

11  Q    Is it fair to say you've helped her manage the YouTube

12  channel either full-time or part-time for as long as Kebe

13  Studios has been in existence?

14  A    Yes.

15  Q    And what's your official title with Kebe Studios?

16  A    I am the manager and half owner, co-owner of Kebe Studios.

17  Q    And you don't have any other title?

18  A    No.

19  Q    You're responsible for interfacing with advertisers that

20  want to place ads in your wife's YouTube videos; is that

21  correct?

22  A    That is correct.

23  Q    And your wife's social media channels generate revenue

24  through advertising; is that correct?

25  A    That is correct.

1  Q   More specifically, you explained in your deposition that

2  her YouTube videos are an advertising income in two ways.

3  Revenue from YouTube advertising is one; is that correct?

4  A   Yes.

5  Q   And the other one was revenue from companies that want to

6  advertise on your wife's videos; is that correct?

7  A   Yes.

8  Q   And regarding that first category, can you explain how

9  YouTube advertising works for those who might not be familiar

10 with that?

11 A   Well, the way YouTube advertising works, once you upload a

12 video into YouTube, then YouTube will play -- will add

13 advertising slots to that video based upon the content.  And

14 when you click on the video to play it, those advertisements

15 will come on the screen, and you have the option to skip them

16 or to watch them.

17 Q   So they're always at the beginning of the video?

18 A   It could be at the beginning.  It could be in the middle.

19 It could be at the end.

20 Q   Do you have any control over which ads appear in those

21 videos?

22 A   No.

23 Q   So when you upload them to YouTube, you just check up that

24 functionality on the channel that allows advertisements, and

25 then YouTube does the rest?

```
1   A    Yes.
2   Q    And regarding that second category, the ad revenue that
3   you earn directly from advertisers, I think you explained
4   during your deposition there are essentially three types of
5   videos that you include advertising in.  Do you recall that
6   testimony?
7   A    Yes.
8   Q    First you mentioned dedicated videos.  I think you
9   described those are when an entire video is dedicated to a
10  particular brand; is that correct?
11  A    Yes.
12  Q    The second category you mentioned was what you called
13  happy hour videos, and you've described that as sort of a fan
14  Q and A; is that correct?
15  A    Yes.
16  Q    And the third type you mentioned were celebrity related
17  videos, and those are celebrity gossip videos?
18  A    Yes.
19  Q    And those are videos like the videos about my client?
20  A    Yes.
21  Q    And you have different rates for the different types of
22  videos?
23  A    Yes.
24  Q    The way this would work generally is that an advertiser
25  would reach out to you and ask you, you know, to put an ad in
```

1  one of your videos and ask you a rate; is that correct?

2  A    Yes.

3  Q    And you would quote a rate to them in response to their

4  request?

5  A    Yes.

6  Q    And you've testified in your deposition that you give them

7  rates based on something called a Social Bluebook.  Do you

8  recall that?

9  A    Yes.

10  Q    Can you tell us what the Social Bluebook is?

11  A    Social Bluebook is a website that is -- that once you

12  create an account, you can connect it to your social media

13  handles, and they will decide how much -- how valuable your

14  platform is and how much you should charge per video whether

15  it's a dedicated video or a mention in the video.

16  Q    So I guess it's sort of like a blue book that you have for

17  automobiles, sort of tells you what your car is worth based

18  off of a variety of factors, like condition, et cetera?

19  A    Yes.

20  Q    And so do you typically quote rates just based off of

21  whatever the Social Bluebook tells you?

22  A    No.

23  Q    So how do you decide based off of the information you get

24  from the Social Bluebook?

25  A    It depends.  Sometimes they'll reach out to us, and they

```
1   don't want to go with the rating of the Social Bluebook and
2   they won't negotiate with us.  So I will look and see what is
3   fair and determine the rating.
4   Q    And then you quote a rate, and then the advertiser will
5   either accept that rate or try to negotiate?
6   A    Yes.
7   Q    And you don't have any written agreements with the
8   advertisers.  They just pay the rate, and you run the ad; is
9   that correct?
10  A    Some.
11  Q    Can you explain?  What do you mean by some?
12  A    Well, we have advertise -- certain advertisers, they'll
13  reach out to us.  These are big companies.  They will send us
14  their own contracts which will be a written agreement, and
15  there are some smaller companies we don't have no written
16  agreement in place.
17  Q    Okay.  So you don't have any of your own written
18  agreements, but sometimes advertisers will send you an
19  agreement that they want you to sign?
20  A    Yes.
21  Q    And all of the revenue from your wife's celebrity gossip
22  business, that goes into the Kebe Studios bank account; is
23  that correct?
24  A    Yes.
25  Q    And that's been the case since the formation of the
```

1  company in 2018; is that correct?

2  A   Yes.

3  Q   I'm going to show you what has been marked as Plaintiff's

4  Exhibit 813, and this has already been admitted into evidence.

5  Actually, I'm sorry.  It has not.  Scratch that.  Can you see

6  the document, Mr. Kebe?

7  A   I see a list of documents.

8  Q   Can you see it now?

9  A   Yes.

10  Q   Do you recognize this document?

11  A   Yes.

12  Q   Can you tell me what it is?

13  A   This is what appears to be a YouTube algorithm deciding

14  the views and the ratings that have been published on the

15  channel.

16  Q   The unWinewithTashaK YouTube channel?

17  A   Yes.

18  Q   Was this prepared on or around the time of your

19  deposition, November 29th, 2020?

20  A   Yes.

21          MR. PEQUIGNOT:  Your Honor, I'd like to admit

22  Plaintiff's Exhibit 813 into evidence.

23          THE COURT:  Any objection?

24          MR. SABBAK:  No, sir.

25          THE COURT:  Plaintiff's 813 is admitted without

```
 1  objection.
 2          (Whereupon, Plaintiff's Exhibit 813 was marked for
 3  purposes of identification and admitted into evidence.)
 4  BY MR. PEQUIGNOT:
 5  Q   Do you recognize the title of the video that's at the very
 6  top?
 7  A   Yes.
 8  Q   Is that the video that your wife did with interviewing
 9  Starmarie Jones?
10  A   Yes.
11  Q   That was published on September 19th, 2018?
12  A   Yes.
13  Q   And this shows that at the time the video had been viewed
14  4,224,087 times?
15  A   Yes.
16  Q   And at the time that this was created, on or around
17  November 29, 2020, that this was the most viewed video on the
18  YouTube channel?
19  A   Yes.
20  Q   I'm going to now show you Plaintiff's Exhibit 834.  Do you
21  recognize this document?
22  A   Yes.
23  Q   Can you tell me what it is?
24  A   This is one of our YouTube analytics that shows the number
25  of views, the visits, and the unique visitors between -- yes,
```

1  that's what it is.

2  Q    The unique visitors to what?

3  A    To the video.

4  Q    This is for the video or is this for the website?

5  A    It's hard to say.  I can't tell at this time.

6  Q    Do you see the unique visitors and the page views?

7  A    Pardon me?

8  Q    You see at the top the unique visitors and the page views?

9  A    Yes.

10  Q    And at the bottom you see top devices by visits?

11  A    Yes.

12  Q    And then you see top sources by visits?

13  A    Sources by visit --

14  Q    I'm going along the bottom.

15  A    Oh.  Could you zoom it in some more?

16  Q    Yes.  So you see the graphs at the bottom?

17  A    Yes.

18  Q    Where it says top devices by visits?

19  A    Can you put the curser on it?

20  Q    I'm sorry?

21  A    Could you put the cursor on it?

22  Q    Yeah.

23  A    Yes.

24  Q    On the bottom left do you see that?

25  A    Yes.

```
 1   Q    And then to the right of that you see the one labeled "top
 2   sources by visits?"
 3   A    Yes.
 4   Q    And then you see top browsers by visits?
 5   A    Yes.
 6   Q    And then top operating systems by visits?
 7   A    Yes.
 8   Q    Does that information refresh your recollection as to what
 9   this information is regarding?
10   A    Yes.
11   Q    What is it?
12   A    Excuse me?
13   Q    And what is it?
14   A    Top operating systems top --
15   Q    I'm talking about the document in general.  Does the
16   information provided at the bottom, does that refresh your
17   recollection as to what this document is -- what information
18   it's giving you?
19   A    It's hard to say.
20   Q    Okay.  Well, I'm going to help you recall using your
21   deposition testimony.  Can you just turn to page 194.
22   A    Pardon me?
23   Q    Sorry.  Can you turn to page 194.  And starting at 14 this
24   was Exhibit 22 in your deposition.  So if you can read on line
25   14 down to line 22.
```

1   A    Line 14 to line 22?

2   Q    That's correct.

3   A    Okay.  Exhibit 22 marked for identification.  Do you see

4   this?  Yes.  Do you know what this is?  That looks like the

5   analytics from the website.  And what's the website?  That's

6   referring to from unWinewithTashaK.com.  Okay.  This gives a

7   timeline and shows the number of visits during those times.

8   Q    During the time right there below the visits, January 1st,

9   2018, to November 21st, 2020?

10  A    Yes.

11          MR. PEQUIGNOT:  I'd like to admit Plaintiff's Exhibit

12  834 into evidence.

13          MR. SABBAK:  No objection, sir.

14          THE COURT:  It's admitted.  Thank you.

15          (Whereupon, Plaintiff's Exhibit 834 was marked for

16  purposes of identification and admitted into evidence.)

17  BY MR. PEQUIGNOT:

18  Q    And do you see that first spike on the chart?

19  A    Yes.

20  Q    And that first spike is around September, October of 2018;

21  is that correct?

22  A    Yes.

23  Q    And that's around the same time as the video that your

24  wife did interviewing Starmarie Jones?

25  A    Yes.

1  Q   Mr. Kebe, you're also involved in the technical side of

2  producing your wife's videos; is that correct?

3  A   Yes.

4  Q   And at your deposition you told us that you set up cameras

5  and lighting for your wife's videos?

6  A   Yes.

7  Q   And you said that once everything is set up, you press

8  record and leave the room until she's done?

9  A   Yes.

10 Q   And you also said that sometimes you take some of her

11 longer videos and you cut them into shorter videos to be

12 repurposed; is that correct?

13 A   Yes.

14 Q   So, for example, like if she's got a really long video

15 that may be two hours long that covers a variety of topics,

16 you might cut that into shorter videos that are for each

17 topic; is that correct?

18 A   Yes.

19 Q   And you also said that sometimes you help her with other

20 technical aspects like, you know, putting a photograph that

21 she found online into one of her videos?

22 A   Yes.

23 Q   And other than these technical roles we just walked

24 through and your interactions with advertisers that we've

25 previously discussed, you're not involved with anything else;

1   is that correct?

2   A    Yes.

3   Q    Your wife controls everything else; is that correct?

4   A    Yes.

5   Q    You do not upload or publish any of the videos that your

6   wife produces; is that correct?

7   A    Yes.

8   Q    That's always handled by your wife?  That's correct?

9   A    Yes.

10  Q    And you don't appear in her videos or other content; is

11  that correct?

12  A    Yes.

13  Q    It's fair to say your wife is the face of the

14  unWinewithTashaK brand?

15  A    Yes.

16  Q    They come to her social media channels to hear what she

17  has to say; correct?

18  A    Yes.

19  Q    And you don't get involved in the creation of any of the

20  content that appears in her YouTube videos; is that correct?

21  A    Yes.

22  Q    That's always handled by your wife; is that correct?

23  A    Yes.

24  Q    And you don't get involved in the creation of any of the

25  content that appears on any of her other social media

```
1   accounts; is that correct?

2   A    Yes.

3   Q    And, in fact, you avoid getting involved in the creation

4   of any of her content because you don't want your judgment to

5   affect what she might post; is that correct?

6   A    Yes.

7   Q    You said that you don't appear in her videos and that you

8   typically just hit record, and you leave the room.  Have you

9   ever been present in any of her -- when your wife is recording

10  any of her videos?  Let me state that again more clearly.

11  Have you ever been in the room, the same room as your wife,

12  while she was recording one of her videos for her channels?

13  A    Yes.

14  Q    And how often would say that that occurs?

15  A    Few times.

16  Q    Just a few times?

17  A    Yes.

18        MR. PEQUIGNOT:  Tommy, can you bring up Plaintiff's

19  Exhibit 579.  And this was admitted into evidence already,

20  Time Stamp 24:30.

21        (Whereupon, a video recording was played.)

22  BY MR. PEQUIGNOT:

23  Q    Did you hear the male voice?  I know it's kind of hard

24  because of the two -- your wife and the male voice were

25  talking over each other.  Could you hear that or do we need to
```

1  replay it for you?

2  A   Yes.

3  Q   And what did the male voice say?

4  A   You don't know that.

5  Q   Referring to your wife's statement about our client

6  sleeping with somebody else?

7  A   Yes.

8  Q   Was that your voice in the video?

9  A   I believe so.

10  Q   So when you said you don't know that, you were

11  expressing -- you were expressing your view that she couldn't

12  know that our client had slept with another man; is that

13  correct?

14  A   Yes.

15  Q   Have you ever asked your wife whether or not she knows

16  that the statements she's made about our client are true?

17  A   No.

18  Q   Do you care whether they're true?

19  A   Yes.

20  Q   Are you aware that everything your wife publishes could be

21  false?

22  A   Yes.

23  Q   And you're sure your wife knows that too; correct?

24  A   I believe so.

25  Q   But you own half the company; correct?

1   A    Yes.

2   Q    And you don't get involved -- you don't get involved with

3   her posting things that you know could be false even though

4   you own 50 percent of the company; correct?

5   A    Yes.

6   Q    So you just said that you do care whether -- you just said

7   that you do care that the things that your wife is publishing

8   could be false.  Was that your testimony?

9   A    Yes.

10  Q    That was a little bit different than what you said in your

11  deposition; is that correct?

12  A    No.

13  Q    So I'm going to direct you to page 179.  If you'll look at

14  line 21.

15  A    Yes.

16  Q    The question was, it doesn't matter to you whether or not

17  the contents being published is actually true?  And your

18  answer?

19  A    No.  It's entertainment gossip.  It's an entertainment

20  gossip channel.

21  Q    So in your deposition you were saying that it doesn't

22  matter whether it's true?

23  A    It matters.  It's an entertainment gossip channel.

24  Q    Right.

25  A    Yes.

1  Q   You were saying, no, it doesn't matter whether it's true

2  or not because it's an entertainment gossip channel?

3  A   I didn't say it doesn't matter.  I said, no, it's an

4  entertainment gossip channel.

5  Q   Can you look at the next page, page 180, line 10.  But you

6  leave that half of the business as to whether or not that's

7  actually what happened and what is happening up to your wife?

8  Answer, it's all based on rumors, gossip and rumors.  So

9  whether it's true or not, it's rumor.  It's based on rumor and

10 gossip.

11         So were you trying to suggest with that answer that

12 it doesn't matter whether it's true or not?

13 A   Excuse me?

14         MR. SABBAK:  Your Honor, objection.

15         THE COURT:  What's your objection?

16         MR. SABBAK:  Rule of completeness.

17         THE COURT:  Objection is overruled.

18 BY MR. PEQUIGNOT:

19 Q   Do you need me to repeat the question?

20 A   Yes, please.

21 Q   So starting on line 10 the question was, but you leave

22 that half of the business as to whether or not that's actually

23 what happened -- what is happening up to your wife?  And your

24 answer, it's all based on rumors, gossip and rumor.  So

25 whether it's true or not, it's rumor.  It's based on rumor and

1  gossip.

2          So the question was, are you suggesting there that it

3  doesn't matter whether it's true or not because it's rumor and

4  gossip?

5  A   No.

6          THE COURT:  All right.  Ladies and gentlemen, we're

7  going to take a break.  I know y'all haven't been in here as

8  long.  But we started in the courtroom about 9:20 so we have

9  not left the courtroom, and I want to make sure everybody has

10 a chance to go to the restroom if they need to.  So we'll take

11 a break for ten minutes.  Again we'll come back, and then

12 we'll probably go until around 12:30 before we break for

13 lunch.  All right.  Thank you.

14          (Whereupon, the jurors exited the courtroom.)

15          THE COURT:  All right.  We'll stand at ease for ten

16 minutes.  Thank you.

17          (Brief recess.)

18          COURTROOM SECURITY OFFICER:  All rise.  This Court is

19 again in session.

20          THE COURT:  All right.  Thank you.

21          COURTROOM SECURITY OFFICER:  Please be seated and

22 come to order.  All rise.

23          (Whereupon, the jurors entered the courtroom.)

24          COURTROOM SECURITY OFFICER:  Please be seated and

25 come to order.

1          MR. PEQUIGNOT:  Your Honor, it occurs to me you might

2    not have a copy of the deposition so I'd just like to --

3          THE COURT:  Thank you.

4    BY MR. PEQUIGNOT:

5    Q    Mr. Kebe, before the break we were talking about your

6    deposition testimony.  I think maybe some of our signals got

7    crossed, and so just to make sure it's clear for the record,

8    I'm going to try this again, see if we can do a better job or

9    I can do a better job.

10         So if you'd look at page 179 of your deposition

11   transcript.  So just so it's clear, so starting on line 7, do

12   you see that?

13   A    Yes.

14   Q    The question that was asked of you was, have you ever

15   asked your wife whether or not she knows that the statements

16   she's made about my client are true?  And your answer was no;

17   is that correct?

18   A    Yes.

19   Q    And the next question that was asked of you is, do you

20   care whether they are untrue -- I'm sorry.  I misspoke.  Do

21   you care whether they are true?  And your answer?  I don't get

22   involved in the deal -- I don't get involved in the, pause,

23   the deal we have.  I don't get involved in the creation of the

24   content.  Was that your testimony?

25   A    Yes.

1  Q   And your response to the question do you care whether they

2  are untrue -- I don't know why I keep saying that.  Your

3  response to the question do you care whether they are true,

4  you did not respond yes to that question; is that correct?

5  A   Yes.

6  Q   And then on line 21 the question was, it doesn't matter to

7  you whether or not the contents being published is actually

8  true?  And your answer, no.  It's an entertainment gossip

9  channel.

10         Was that your testimony?

11  A   Yes.

12  Q   And then on page 180, on line 16, the question was asked

13  of you, well, when you say it's based on rumor or gossip, are

14  you saying basically you know there's a chance it's not true?

15  And your answer, yes, absolutely.

16         Was that your testimony?

17  A   Yes.

18  Q   Starting on line 23 the question was, you mean you're sure

19  she's aware of that as well?  And your answer, I said I'm sure

20  she would be aware of that.  Question, okay.  Answer, that

21  some stories may be accurate, some may not be accurate.

22         That was your testimony?

23  A   Yes.

24  Q   But even though you knew that, you didn't discuss that

25  with her; right?

1   A    Yes.

2   Q    During your wife's testimony she testified as to each of

3   the cease and desist letters and demands for retraction that

4   she received from our client through her attorneys.   In

5   response to those cease and desists letters -- do you know

6   what I'm referring to?

7   A    Yes.

8   Q    In response to those letters, you were not involved in any

9   decision to leave the videos up in response to those letters;

10  is that correct?

11  A    Yes.

12  Q    And you were not involved in the decision to take any --

13  take certain videos down and subsequently republish them; is

14  that correct?

15  A    Yes.

16  Q    Your wife makes those decisions entirely on her own; is

17  that correct?

18  A    Yes.

19  Q    And if you received a cease and desist letter, for

20  whatever reason it came to you, you would simply forward that

21  to your wife; is that correct?

22  A    Yes.

23  Q    Because she would be the one to handle the response; is

24  that correct?

25  A    Yes.

```
 1   Q   So even though you own 50 percent of the company, your
 2   wife actually controls the actions of the company; is that
 3   correct?
 4   A   Yes.
 5             MR. PEQUIGNOT:  I am going to bring up Plaintiff's
 6   Exhibit 236.  It should already be in evidence.  Actually, it
 7   may not be in evidence.  Your Honor, may I confer with my
 8   co-counsel for one second?
 9             THE COURT:  Sure.
10             (Brief Pause.)
11   BY MR. PEQUIGNOT:
12   Q   Mr. Kebe, do you recognize this letter which has already
13   been admitted into evidence?
14   A   Yes.
15   Q   And have you seen this document before?
16   A   Yes.
17   Q   But consistent with the testimony that you just gave, you
18   were not involved in any discussions about whether or not to
19   remove videos that were listed in this document?
20   A   Yes.
21   Q   Or issue a retraction; is that correct?
22   A   Yes.
23   Q   Mr. Kebe, during your wife's testimony she was asked about
24   other businesses or other lines of business under the Kebe
25   Studios company.  I understood your answer to my prior
```

```
 1   question, that there are no other lines of business under Kebe
 2   Studios; is that correct?
 3   A    No.
 4   Q    No, that there are not?
 5   A    Excuse me?
 6   Q    I'm just clarifying your response.  No, there are not
 7   other lines of business under Kebe Studios?
 8   A    Yes.
 9   Q    And so when she said that, she was mistaken?
10   A    No.
11   Q    So can you clarify?
12   A    Yes.  We have other businesses, but for Kebe Studios, that
13   is entirely dedicated to media publishing, creation and
14   publishing.
15   Q    Okay.  So what you're saying is you have other businesses
16   aside from Kebe Studios?
17   A    Yes.
18   Q    But under Kebe Studios, that's entirely your
19   unWinewithTashaK and related businesses or business?
20   A    Could you repeat the question one more time.
21   Q    What I'm just trying to clarify, you said you have other
22   businesses; correct?
23   A    Yes.
24   Q    Those other businesses are not operated under Kebe
25   Studios?
```

```
 1   A    Yes.
 2           THE COURT:  Okay.  So that's another example, yes.
 3   They're not operating under Kebe Studios, yes.  So does the
 4   yes mean they are operating under Kebe Studios or that they're
 5   not?  I think if you end -- and you've done it sometimes.  If
 6   you end your sentence with is that correct, then the yes is
 7   self explanatory.
 8           MR. PEQUIGNOT:  Yeah.  Thank you, your Honor.
 9           THE COURT:  If you don't, I'm not sure.
10   BY MR. PEQUIGNOT:
11   Q    Yeah, so let me rephrase.  So just to be clear, you
12   testified that you have other businesses; is that correct?
13   A    That is correct.
14   Q    Those other businesses are not operated under Kebe
15   Studios; is that correct?
16   A    Yes.
17   Q    So when your wife testified that they were, that's not
18   true; is that correct?
19   A    Pardon me?
20   Q    When your wife testified that there were other businesses
21   operated under Kebe Studios, that was not true; is that
22   correct?
23   A    I don't recall her exact words.
24   Q    But if that were her testimony, that would be untrue; is
25   that correct?
```

```
1   A    Yes.

2   Q    When I asked you earlier whether you had any other titles,

3   you did not list president as a title; is that correct?

4   A    Yes.

5   Q    So when your wife testified that your title is president

6   of Kebe Studios, that's not correct, is it?

7   A    President owner is the same thing.

8   Q    So when you said owner, you think that's the same thing as

9   a president?

10  A    Yes.

11  Q    Do you ever use the title president?

12  A    No.

13  Q    So then is that fair to say since your wife is a co-owner

14  of Kebe Studios, that she is also president?

15  A    Yes.

16          MR. PEQUIGNOT:  All right.  If I could just confer

17  with counsel for one second?

18          THE COURT:  Sure.

19          (Brief Pause.)

20  BY MR. PEQUIGNOT:

21  Q    Mr. Kebe, are you sitting in the courtroom during this

22  trial as a corporate representative of Kebe Studios?

23  A    Yes.

24          MR. PEQUIGNOT:  That's all I have at this time, your

25  Honor.
```

```
 1            THE COURT:  Is the defendant going to defer
 2   questioning of Mr. Kebe until your case is presented?
 3            MR. SABBAK:  Yes, sir.
 4            THE COURT:  All right, sir.  You can step down.
 5            THE WITNESS:  Thank you.
 6            THE COURT:  All right.  The plaintiff can call her
 7   next witness.
 8            MS. MOORE:  Your Honor, I'll call our client, Cardi
 9   B, to the stand.
10            THE COURT:  Thank you.  Give us just a second to
11   change the cover off the microphone if you would.
12            COURTROOM DEPUTY:  Please raise your right hand.
13                        BELCALIS MARLENIS ALMÁNZAR,
14            herein, having been first duly sworn, was examined
15   and testified as follows:
16            COURTROOM DEPUTY:  Thank you.
17            THE COURT:  All right.  And you've been fully
18   vaccinated?
19            THE WITNESS:  (Nods head.)
20            THE COURT:  If you could remove your mask when you
21   testify.  Thank you.
22                        DIRECT EXAMINATION
23   BY MS. MOORE:
24   Q   Cardi, can you please state your full name for the jury.
25   A   My name is Belcalis Marlenis Almánzar.
```

```
1   Q   Cardi, where were you born?

2   A   I was born in Washington Heights.

3   Q   Is that in New York?

4   A   Yes.

5   Q   Are your parents still alive?

6   A   Yes.

7   Q   What did your parents do for a living when you were

8   growing up?

9   A   My mom, she worked at a college cafeteria as a cashier,

10  and my dad was a cab driver.

11  Q   Do you have any siblings?

12  A   Yes.

13  Q   Brother or sister?

14  A   Both.  Younger, older.

15  Q   One is older and one is younger?

16  A   Yes.

17  Q   Is your sister older or younger?

18  A   Huh?

19  Q   Is your sister older or younger?

20  A   Younger.

21  Q   How would you describe your family?

22  A   My family?

23  Q   Uh-huh.

24  A   I have a very big family from both side of my family.

25  We're very, very close.  We're very close.  We're a very fun
```

```
 1  family.  We usually link up every weekend in our grandmother's
 2  house -- not a house but our grandmother's apartment where
 3  she's been living there for like 30 years.
 4  Q    Were grandparents a big part of your life?
 5  A    Yes.
 6  Q    On both your mom and dad's side?
 7  A    Both.
 8  Q    Cardi, what was your childhood like?
 9  A    Well, I grew up in a very rough neighborhood.  I grew up
10  in a very rough neighborhood.  I grew up in the Bronx, and I
11  went to school.  I always say this.  I always say this
12  because -- I always tell people that I felt like I didn't have
13  much of a childhood because I had very chronic asthma when I
14  was growing up, so I couldn't do like a lot of activities that
15  I wanted to do.  Like, I couldn't play in the snow because the
16  winter agitates my asthma.  My mom didn't let me run, didn't
17  let me play much outside, so I was really like always in the
18  house.  So I became like a teenager and she just --
19  Q    So, Cardi, you said you grew up in a rough neighborhood.
20  Was it also a poor neighborhood?
21  A    Yeah, poor neighborhood.
22  Q    So you weren't born with a silver spoon in your mouth
23  suffice it to say?
24  A    No.
25  Q    Did you grow up in a religious household?
```

```
1   A    Yes.  I did grow up in a religious household, which is
2   kind of funny.  It's kind of funny because my mom, she's
3   Christian, and my dad is Catholic.  But since my -- since,
4   like, my dad, he kind of overruled it, so I'm more Catholic.
5   And I studied more Catholic, and I went to a Sunday Catholic
6   church.  So, yeah, very religious, but it was -- it was like
7   they were trying to teach me both, but I went more the
8   Catholic way.
9   Q    Did you go to Catholic Sunday school every Sunday?
10  A    Yes, for two years until I made my first communion.
11  Q    So your faith is important to you?
12  A    Yes.
13  Q    Do you consider yourself a deeply religious person?
14  A    I have a very strong faith in God.  I pray every single
15  day.  I consider myself very, very faith -- very much.
16  Q    Are you married, Cardi?
17  A    Yes.
18  Q    When did you meet your husband?
19  A    I met him in 2017.
20  Q    How long have you been married?
21  A    Four years.
22  Q    And do you and your husband have children?
23  A    Yes.
24  Q    How many?
25  A    Two.
```

```
1    Q    And how old are they?
2    A    I have a three-year-old daughter and a four-month-old baby
3    boy.
4    Q    So is it fair to say that you're very busy juggling your
5    career and two very young children?
6    A    Yes, very fair, overly fair.
7    Q    Cardi, can you tell us a little bit about your education.
8    A    Well, I graduated high school.  I graduated high school,
9    and after high school I went to a community college.  I did
10   two semesters.  I did two semesters.  Then I dropped out for a
11   little bit.  Then I went for one semester that I didn't
12   complete it.  So I'd say like two and a half semesters in
13   college.
14   Q    Did you go to a regular high school?
15   A    Yes, public high school.
16   Q    Was it a public high school that had any emphasis on
17   performing?
18   A    Yes.  It's called Renaissance High School for Musical
19   Theater and Technology.
20   Q    When did you graduate from high school?  What year?
21   A    I graduated in 2010.
22   Q    Have you always wanted to be a performer?
23   A    Yes.
24   Q    What was the name of the community college you went to?
25   A    Borough of Manhattan Community College.
```

1  Q   What neighborhood is that in?

2  A   The college?

3  Q   Uh-huh.

4  A   It's in Manhattan, like really deep downtown, Chambers

5  Street.

6  Q   Cardi, approximately when did you start dancing?

7  A   I started dancing when I was 18.  I would say about six

8  months before I turned 19.

9  Q   Was that around the time you were in college?

10  A   Yes.

11  Q   So you were in college and dancing at the same time?

12  A   Yes.

13  Q   Why did you start dancing?

14  A   There's a story.  Well, I was working at a supermarket

15  that was in the same block as my college, and I got fired.  So

16  I kept talking to the manager, and I kept telling him like

17  please can you talk to the supervisor.  It was a mistake.  I'm

18  a little late, I know, but I don't live very far.  And he was

19  like I don't think you really want to hear it, but, like, he

20  suggested me to go and audition across the street from the

21  supermarket and across the street from my school.  It was a

22  strip club.  He was saying how like, you know, I'm really --

23  I'm pretty and I'm petite, and I might make good money there.

24  So I auditioned, and I got the job.

25  Q   I'll bet he's regretting that decision.

1              So, Cardi, your school, your -- if I understood you

2    correctly, did you say your school, the community college you

3    referenced, the strip club, and the supermarket where you had

4    been working, were in the same vicinity together?

5    A    Yes.

6    Q    Was there any financial motive to become a stripper apart

7    from you'd lost your job at the supermarket?

8    A    Yes.  Well, at the time I was living with my boyfriend and

9    I really -- it was a very, very toxic abusive relationship.  I

10   really wanted to move out.  I really just -- I just really

11   needed money.  I couldn't even pay my phone bill at the time,

12   couldn't even pay my phone bill at the time.

13   Q    So, Cardi, where were you stripping?  What was the name of

14   the club?

15   A    It's called New York Dolls and -- it's called New York

16   Dolls, and I decided to just dance there for a week because I

17   was afraid for somebody from my school to see me, see me

18   there.  So I went to different strip clubs in Manhattan to

19   hire me, but, you know, they usually hire you like 21 and

20   older.  So there was this one strip club that hired me on 42nd

21   Street.  It was called Lace 2.  So I worked there for a long

22   time.

23   Q    How did the -- when you first started stripping, how did

24   the money you were making dancing compare to, for example, the

25   money you were making at the supermarket?

1  A   Well, I could say this:  I was usually getting paid from

2  the supermarket about $270 a week, and the first night that I

3  worked I made $300.  And I was like, oh, my goodness.  Wow.

4  Like this is what I made my whole week, and I worked five

5  days.  So, yeah, it was like a difference.

6  Q   So that enabled you to become financially independent?

7  A   Yes.

8  Q   When you were stripping, Cardi, did you meet a woman named

9  Starmarie Jones?

10 A   I met her at a club.  I met her at the club that I started

11 working when I was about -- I'll say about 19 turning 20.  I

12 seen her, and she was very, I would say, like unique.  Like,

13 she had, like, a very strange personality.  And she had, like,

14 a very strange personality, so a lot of girls didn't like her.

15 Like, a lot of girls didn't like her.  They didn't really like

16 her, so I felt like they would kind of like pick on her

17 because she would do certain things that I wasn't really aware

18 of.  But, like, she would do like certain things that she

19 ended up doing to me.  Then I was, oh, okay.

20 Q   Can you be more specific?  Like what types of things?

21 A   Like when girls are dancing and people are throwing money

22 in the air, she would pick up people's money.  She would --

23 you know, if a girl has a customer and you have to go on stage

24 and dance, she would go to the customer even though, like,

25 that's like somebody's customer.  I don't know.  People

1   just -- girls don't like that.

2         So I remember her -- I specifically remember her,

3   that there was this one night that some girls, they really

4   wanted to beat her ass.  They wanted to beat her ass, and I

5   felt like they were, like, super ganging up on her.  So I was

6   like, yo, y'all need to chill.  Y'all need to chill because

7   they were, like, already, like, kind of throwing her stuff.

8   They were kind of like putting their fingers, like, in her

9   face.  And she was, like, by herself, so I was, like, y'all

10  need to chill, like, y'all need to relax.

11        And I went to, like, the bathroom, and I told, like,

12  the house mom, like, yo, they wilding, like they're bugging

13  out in there, like, in the dressing room.  So I guess, like,

14  the house mom is like the lady that, like, sell clothes and

15  everybody goes to.  So she went and she stopped it.

16        And from there on I felt like Starmarie, she was

17  like -- will come up to me like really randomly and give me a

18  compliment, like, hi, Camilla.  You look nice today.  Camilla,

19  I saw how -- that was my dancer name, by the way.  I saw how

20  you was dancing.  I saw that you was dancing.  Wow, you're

21  really good at that pole dancing.  She just kept, like, kind

22  of wanting to be like my friend.

23  Q   Were you friends with Starmarie Jones?

24  A   I was never friends with her.  I was never friends with

25  her.

```
1    Q    Did you ever spend time with her when you weren't dancing?
2    A    Never.  I never spent time with her ever, ever.
3    Q    And you didn't socialize or go to parties or --
4    A    Never.  Never.  I never seen her out the club.  I don't
5    know nothing about her personal life, nothing.  I feel like
6    there was two -- the biggest encounters that I ever had was
7    that day that she was going to get herself beat up, and then
8    there was another time that I was dancing, you know, I was
9    dancing.
10           And, like I said, when you're dancing and somebody,
11   they throw money in the air but you're still dancing, you're
12   not picking up the money.  So she started picking up some of
13   my money, and I kind of like -- I kind of like, like touched
14   her with my feet like what are you doing?  So whatever.  She
15   just kept, like, kind of grabbing -- she just kept, like,
16   grabbing some money, and then she left.  And then in the
17   dressing room --
18   Q    So, Cardi, let me interrupt you for a second.  I'm sorry.
19   When you were defending her and you felt like these women were
20   about to attack her --
21   A    Uh-huh.
22   Q    -- did I understand that you said that she was sort of
23   acting off, like she was sort of acting altered?  Is that what
24   you said?
25   A    Yes.  Like, it was something about her that it just wasn't
```

1  like normal.

2  Q   Do you think that she perhaps suffered from a mental

3  illness?

4  A   I think so.  I always felt like she just wasn't there.

5  Like, everybody noticed that she just wasn't there.

6  Q   Okay.  So going back, I'm sorry.  So she never -- you

7  never hung out with her?

8  A   Never.

9  Q   You didn't talk to her on the phone?

10  A   Never.

11  Q   Did she ever come to where you lived?

12  A   Never.

13  Q   She'd never been in your home?

14  A   No.

15  Q   Had you ever been in her home?

16  A   No.

17  Q   Did you sue Starmarie Jones for the defamatory and

18  disgusting lies she told about you?

19  A   Yes, I did.

20  Q   And where was that lawsuit filed?

21  A   In New York.

22  Q   Cardi, going back to your -- sort of the evolution of your

23  professional career, can you sort of take us from the time you

24  started stripping.  Did you say you were 17?  18?

25  A   I was 18.

1  Q   18.  So you started stripping.  Obviously, that's a big

2  jump from where you are today --

3  A   Uh-huh.

4  Q   -- one of the biggest, if not the biggest, stars on the

5  planet.  Can you tell us a little bit about how you went from

6  stripping to where you are today just briefly.

7  A   Well, you know, I was stripping and I became -- I became

8  like, I guess, like an internet sensation.  I would just talk

9  about different type of topics on social media.  Well, not

10 really different type of topics, more like woman and girl

11 things that were going on or, like, things that I will see or

12 hear or experience in the strip clubs, and I just kept

13 dancing.

14         I was hosting parties all over the United States, and

15 I made enough money to fund my music career.  So around, I

16 would say, when I was 22 years old -- so when I was 22 years

17 old, I started making enough money to get studio sessions and

18 being able to fund my music videos.

19         I guess when I was around 23 I had a manager, and he

20 gave me the opportunity to be on this TV show called Love &

21 Hip Hop, and that made me way much bigger.  That made me way

22 much bigger.  It's a drama TV reality show.  It's a drama TV

23 reality show.  And, you know, I wanted -- I wanted, like, to

24 be in it for more exposure, but I was doing music at the time

25 as well.  And when they offered me to do a third season, I

1 declined because I felt like it was bad for my career, for my

2 music career, and that's where my passion was, my music.  So I

3 just decided to, like, even though the money was good for Love

4 & Hip Hop, I'd rather just step away from it for my music

5 career.

6         And, you know, I did my mixed tape --

7 Q   What year was that, Cardi, that you dropped your first

8 mixed tape?

9 A   I dropped my mixed tape like around I'd say about 2016,

10 but I'd already dropped songs already and dropped my mixed

11 tape 2016.  A lot of people -- it was really hard for people

12 to take my music seriously because, you know, I was already on

13 Love & Hip Hop.  I had to prove that I'm a real artist.  So I

14 just kept recording, recording.  I was hosting parties around

15 the United States.  So every party that I was going in the

16 United States I was performing my songs, and people would

17 listen to it.

18         So I recorded people listening and rapping to my

19 music, so when I presented it to a record label in 2017 and I

20 showed them the numbers that my music was doing and I showed

21 them me going to different states and people rapping to my

22 music, they gave me a record label deal.  And when I signed my

23 record label deal, I thought things were going to be

24 different.  I thought, you know, that's the -- every artist's

25 goal, but I still felt like my music wasn't mainstream.  It

1  wasn't mainstream.

2          I still felt like people wasn't listening to me on

3  the radios.  I wasn't being invited to music show awards,

4  music show awards, music events.  I felt like I wasn't really

5  being invited yet.  And in 2017, six months -- I'd say about

6  six to five months later after I signed my record label deal,

7  I did one song, and that song changed my life forever.  It

8  made me -- everything that I worked hard for, that's -- it

9  finally paid off.

10  Q   What song was that?

11  A   It's called Bodak Yellow.

12  Q   Cardi, can you explain for the jury, please, what a mixed

13  tape is.

14  A   A mixed tape is -- a mixed tape is -- it's almost like an

15  album, but people would consider it your mixed tape because

16  certain songs have samples of other music that are, like, not

17  authorized yet.  So you will put, like, a project with a

18  couple of your songs out.

19  Q   So it sounds like one reason you left dancing was to focus

20  exclusively on your music; is that correct?

21  A   Yes.

22  Q   Were there other aspects of stripping that you didn't

23  like?

24  A   There was a lot of things about stripping that I didn't

25  like.  Well, first, I always tell this to people because

1   people will think that, like, stripping is, you know, you make

2   a lot of money, you make this and that.  But sometimes you

3   will leave home with $15 or sometimes you will leave negative.

4   And when I'm talking about negative, you have to pay a house

5   fee to work.  So in New York City when I used to work, I would

6   have to pay $150 to work.  And sometimes if you didn't make

7   the $150, you already paid the $150 so you just went home

8   negative.

9          On top of that there was just sometimes men

10  disrespecting you, disrespecting your space, talking to you in

11  a crazy way.  You know, sometimes men are -- men, you know,

12  they're having fun, and sometimes, like, you just have to

13  continuously repeat the rules.  Like as a dancer, you have to

14  continuously repeat the rules because men have to follow

15  certain rules when they're in the strip clubs.  So as a

16  dancer, when they were doing those type of things, it

17  aggravated me, and I felt like violated, you know, like you're

18  not respecting me as a human.  You know what I'm saying?

19  Q   Yes.  Cardi, were there strict rules when you were dancing

20  at a strip club about prohibiting prostitution?

21  A   Of course.  Prostitution in New York and in the strip

22  clubs, it's illegal.  And if you get caught prostituting, not

23  only would you get fired, you will go to jail.  And that is

24  the major rule and -- that is the major rule for the dancers,

25  and for males, they cannot even touch your vaginal area or

1  your breasts or, like, play with your underwear, nothing like
2  that.  So it was very, very strict rules.
3  Q   So obviously dancing and the criminal activity of
4  prostitution are entirely different?
5  A   Yes.
6  Q   But it sounds like from what you're saying some of the men
7  coming to this club assumed that strippers were also
8  prostitutes?
9  A   Yes.  And I had a --
10 Q   That's incorrect?
11 A   Huh?
12 Q   And that's incorrect?
13 A   And that's very incorrect.
14 Q   I wanted to go back to one thing.  When you were dancing
15 and Starmarie Jones was working in the same club with you --
16 A   Yes.
17 Q   -- you testified that you weren't friends.  She'd never
18 come to your house; you didn't socialize?
19 A   Never.
20 Q   So she had no basis to know anything about your life?
21 A   None.
22 Q   Cardi, when is the first time you heard of Tasha K, one of
23 the defendants in the courtroom?
24 A   The first time I heard of Tasha K was when I was in my
25 hashtags, on my Cardi B hashtag.

1    Q   Can you explain for the jury what you mean when you say in

2    your hashtags.

3    A   Okay.  So a hashtag is like when somebody, like, hashtags

4    your name or a place or a restaurant.  And if you go to the

5    hashtags, like there is -- you know, like, it says like tags,

6    hashtags, and you could see the hashtags.  And you type in

7    what do you want to see.  So if you like -- I don't know.  If

8    you like McDonald's, and you're looking for a McDonald's

9    around, I don't know, you put McDonald's and hashtag

10   McDonald's.  Then you will see different pictures of people in

11   McDonald's or something about McDonald's or McDonald's

12   probably hashtag it.  My hashtag, of course, is Cardi B, so

13   when I search my hashtag with my name, I see her -- I see her

14   stuff pop up.

15   Q   So when you're talking about your hashtag Cardi B --

16   A   Uh-huh.

17   Q   -- you're talking about your hashtag that's on social

18   media; correct?

19   A   Yes.

20   Q   Okay.  So I'm sorry.  You were in your comments, and what

21   exactly did you see the first time you came across Tasha K?

22   A   I saw that she was practically talking about how she had

23   an exclusive with Starmarie about this whole herpes thing and

24   that she lived with me and all this thing, all of that.

25   Q   So in addition to using the hashtag, which as you just

1   explained to the jury, people can do searches on social media

2   with hashtags; correct?

3   A   Yes.

4   Q   Were you also tagged?

5   A   Yes.  I was tagged various times, like tagged with the ad.

6   Q   So the difference being when you're tagged, you get a

7   notification; correct?

8   A   Yes.

9   Q   Cardi, if you -- I know it's probably hard, but if you can

10  go back to that moment in time when you were in your hashtags

11  and you first saw this woman -- well, you saw Tasha K

12  promoting this interview --

13  A   Uh-huh.

14  Q   -- saying these vile and disgusting and untrue things

15  about you --

16  A   Yes.

17  Q   -- what were you thinking?  How did you feel?

18  A   I was very upset because -- I was upset because, like, I

19  really -- like, I didn't really understand, you know, because

20  it's like not that -- I didn't understand.  It's like out of

21  anybody, like, you know, she -- I felt like Starmarie, she

22  didn't know me.  She doesn't know me, you know.  We worked in

23  the same strip clubs, but you don't know me.  You know what

24  I'm saying?  I never had a friendship with you.  I never went

25  outside the club with you.  I never hung out with you.  I

1  never spoke on the phone with you, so I was just so confused.

2  Like, I couldn't even believe that somebody would say so much

3  lies about me that I don't even know.

4  Q   So the things that were being said in that promo were

5  untrue; is that correct?

6  A   Yes.

7  Q   So just to make sure I understood you correctly, when you

8  were in your hashtags and you saw that for the first time --

9  A   Uh-huh.

10 Q   -- you had not ever heard of Tasha K prior to that moment?

11 A   No.  I never heard of her.

12 Q   You were not aware of her unWinewithTashaK platform?

13 A   No.

14 Q   You were not aware of any of her other various handles or

15 channels?

16 A   No, I wasn't.

17 Q   What did you do when you came across this?

18 A   When I came across it, I wrote a couple of comments under

19 her post, and I just kept saying, like, this is not true, this

20 is not true.  She never lived with me.  And I was trying to

21 give Tasha K some receipts that that woman doesn't know me,

22 and I also went to her direct messages, which are called DMs.

23 And I was try to explain to her, like, yo, this woman is

24 lying.  I never lived with her.  She never lived with me.  I

25 don't even know her.

1   Q    So you were making it clear that she didn't live with you?

2   A    Yes.

3   Q    She didn't know anything about your life?

4   A    No.

5   Q    And that you -- at that point had you seen her accusation

6   that you were a prostitute and did cocaine?

7   A    She was saying like she has an exclusive of the thing that

8   Starmarie was saying.

9   Q    So you saw the defamatory statements; correct?

10  A    Yes.  And I also saw like a clip of what they were -- what

11  they were going to speak about.

12  Q    Right.  So even though you knew this woman in the sense

13  that I might know the facilities person at my law firm who

14  does janitorial work, but I don't know anything about him, is

15  that what you're saying?

16  A    Exactly.  Just because we were co-workers, it doesn't mean

17  that I know you or you know me.  I mean --

18  Q    Did Tasha -- so when you -- did Tasha K respond to your

19  comments, the first thing you did saying this is not true,

20  none of these things are true?  Did she respond in the

21  comments to you?

22  A    She was kind of like baiting me to like keep responding

23  because the more comments that I made, the more engagement,

24  the more engagement she was getting on her page.  And then I

25  hit her on the direct message, and she asked me if I wanted to

```
 1   come on her platform and address the things.  And I said no.
 2   Q   Why did you decline her interview?
 3   A   I declined her interview because I felt like it was going
 4   to be bigger than what it was and because my management, they
 5   was not going to accept that.
 6   Q   So you didn't want to bring anymore attention to it.  Is
 7   that what you're saying?
 8   A   No.
 9   Q   You just wanted her to stop and then to go away; is that
10   correct?
11   A   Yes, to stop and at least take some considerations to the
12   truth.
13   Q   You wanted her to stop saying defamatory things about you;
14   correct?
15   A   Yes.
16   Q   And when you declined her offer to go on her show --
17   A   Yes.
18   Q   -- what did she do?
19   A   She just kept posting and posting and kept making more --
20   she just kept posting.  She just kept hashtagging me.  She
21   just kept at-ing me.  She just kept making things like to bait
22   me in, to bait me in to keep hitting her up and for people to
23   keep on seeing and for people to go see the video.
24   Q   Did you feel like, when you saw that hashtag, that you had
25   to immediately speak out to let her know it wasn't true, those
```

1  things were not true?

2  A   Immediately.  And that's exactly what I did.  I went to

3  her comment defending myself, letting her know that I don't

4  know this woman, and I never lived with her.  And I went to

5  her direct messages when she -- where she asked me if I could

6  go -- if I want to address it on her platform.

7  Q   And when you said just now, when you testified that she

8  kept talking and talking and talking, are you saying that she

9  continued to repeat the same defamatory lies that you are --

10 that she said you are a prostitute, that you used cocaine,

11 that you have herpes?  Is that what you're referencing when

12 you say talking, talking, talking?

13 A   Yes.

14 Q   How did that make you feel in the face of putting her on

15 notice immediately that those things weren't true and then

16 reaching out to her directly to ask her to stop, that she just

17 continued doing this anyway?

18 A   I felt like she didn't care for the truth because -- she

19 never cared for the truth.  She only cared about, like, the

20 views or, like, the clickbait on her pages because even around

21 this time that it was going on, there was a lot of receipts

22 debunking everything that Starmarie was saying, and she still

23 didn't care.  And other YouTubers that reported on the whole

24 Starmarie and me thing, they got those receipts, and they

25 actually retracted what they said.  And she never did.  She

1  never even cared to -- she never even cared to care about it.

2  Q    Did that make you feel helpless?

3  A    It made me feel helpless, of course, made me feel helpless

4  and just made me feel like damn, like --

5  Q    Like I've asked this woman nicely to stop, and she doesn't

6  care at all --

7           MS. IZMAYLOVA:  Objection.  Leading.

8           THE COURT:  Sustained.

9  BY MS. MATZ:

10 Q    How else do you feel, Cardi, besides frustrated and

11 helpless?  How else were you feeling when she's continuing to

12 repeat these disgusting defamatory statements about you over

13 and over and over?

14 A    At first I felt irritated, of course.  I felt irritated

15 the first day, and a couple of days.  But then she just kept

16 doing this every single week, and I started getting depressed

17 because I felt really hopeless, helpless and hopeless.  On top

18 of that, she just kept saying more lies about me, more lies

19 about me, kept harassing me, kept harassing my family, kept

20 saying very disturbing lies about my family, especially one

21 about my father where she claimed that my father raped a

22 teenager.  It was just constant harassment.

23 Q    Was this -- I'm just trying to understand the time frame.

24 So when you told her you would not come on her show --

25 A    Huh?

1   Q    When you told her you would not come on her show --

2   A    Yes.

3   Q    -- she immediately sort of doubled down on these things,

4   and she was talking, talking, talking.  Was it -- let me ask

5   my question.  Was that at the same time that she was saying

6   these things about you, she was also saying things about your

7   family members?

8   A    Not at that time.

9   Q    Okay.

10  A    Not at that time --

11  Q    So clarify --

12  A    -- she just kept continuing over time.  Over time she just

13  kept -- if she couldn't make something up about me, she would

14  make up something about my family.

15  Q    Cardi, what do you understand the term "dragging" to mean?

16  A    All right.  So this is how I would describe dragging.

17  This is how dragging is.  All right.  So you know when you

18  fight somebody; right?  When somebody is fighting somebody and

19  they're dragging somebody on the floor, like, I'm dragging

20  you, so online if somebody say I'm about to drag you, it's

21  like they're going to drag you but with their words.  So it's

22  like it's -- when somebody is going to say they're going to

23  drag you online, it's that they're going to say very negative

24  messed up things about you, like nothing positive.

25  Q    So not just criticism?

1   A    Huh?

2   Q    Not just criticism?

3   A    Not just criticism.  It could just be anything.  I mean,

4   when you're dragging somebody, when you're fighting, you're

5   not having regards of how they're getting hurt.  So when

6   you're dragging somebody online, you're not having regard

7   whether it's criticism or not, like you're dragging them to

8   hurt.

9   Q    Cardi, do you have herpes?

10  A    No.

11  Q    Do you have HPV?

12  A    No.

13  Q    Are you a prostitute?

14  A    No.

15  Q    Have you ever been a prostitute?

16  A    No.

17  Q    Have you ever used cocaine?

18  A    No.

19  Q    Why is the statement that you use cocaine so offensive to

20  you?

21  A    Cocaine, to me it's offensive.  I don't like to judge

22  people.  Okay.  I don't like to judge people for what they do,

23  but where my community -- where I'm from cocaine is something

24  that is looked down upon because it just goes from crack

25  cocaine.  And crack is like -- crack cocaine, like, really

1  messed up my community.  You know what I'm saying?  Like, it

2  just all involved the crack.  Everybody know the term "crack

3  is whack."  It's not something that is cute to do.  Like, it's

4  just something that is like very beneath to you or to people

5  from my community.  Like, we just don't think that that's to

6  do.  Like, I don't like that.

7  Q    It's not acceptable is what you're saying?

8  A    It's not acceptable.

9  Q    Cardi, have you ever engaged in a performance where you

10  took a beer bottle from a stranger --

11  A    Uh-huh.

12  Q    -- and I apologize for my language -- and you stuck it up

13  your vagina and pleasured yourself and then took it out of

14  your vagina, took a sip of it, and then handed it back to the

15  same stranger?

16  A    No.  I never did those things.

17  Q    Have you ever engaged in any debasing act with a beer

18  bottle, public or private?

19  A    No.

20  Q    Have you ever cheated on your husband?

21  A    No.

22  Q    Cardi, we heard a lot of testimony the past two days about

23  the numerous posts and videos where Tasha K is talking about

24  you.

25  A    Uh-huh.

```
 1   Q    Did you feel like these posts and videos were directed to

 2   you?

 3   A    It was directed at me for sure.

 4   Q    And why do you feel that way?

 5   A    Because she was talking to me.

 6   Q    What else was she doing to direct it to you?

 7   A    She was at-ing me.  She was hashtagging me.

 8   Q    So she was taking sure that you saw it and that you got

 9   notified?

10   A    Yes.

11   Q    So by doing that, by using the hashtag --

12   A    Yes.

13   Q    -- and by using your user name --

14   A    Uh-huh.

15   Q    -- that actually tags you --

16   A    Yes --

17   Q    -- that means that everybody else on social media could

18   see those same vile statements; correct?

19   A    Yes.  And one thing about YouTube, right, one thing about

20   YouTube, that if you hashtag the artist's name, those videos

21   will come out -- come under the artist's video.  So if you go

22   on YouTube and you type in Cardi B, right, some of my music

23   videos will come up but also other gossip blogs' videos that

24   they made about me.  So it would just all be in the Cardi B

25   algorithm.  So sometimes it might be a music video that is the
```

1  first video they see, and the second one might be hers.

2  Q   So I just want to be clear for the jury.  Cardi, when you

3  said she was at-ing you, you meant she was using your username

4  as a tag @ --

5  A   Username and she was hashtagging, hashtagging me on every

6  platform.

7  Q   How does it make you feel to have spent more than two

8  years trying to make the defendants stop and they've refused?

9  A   A lot of feelings.  It makes me feel helpless.  It gave me

10  fatigue, tired, anxiety.  When this whole thing was

11  happening and -- when this whole thing started happening, I

12  fell into a deep depression.  Every morning I was waking up --

13  every time that I'd wake up I was having anxiety, and so I

14  slept and slept as soon as I can.  I was feeling like I was

15  getting like panic attacks.

16       I felt extremely suicidal, like I had -- I had

17  suicidal thoughts every single day to the point that I just

18  felt like I was being a burden to my family because, like, my

19  family, like, my mother, my husband, like, they could notice

20  it.  They could notice that I wasn't happy.  They could notice

21  that I couldn't, like -- I couldn't even think straight.

22       I would shake when I'm, like, holding my baby.  I

23  felt like -- I felt like I didn't deserve my kid and I felt --

24  and I say that, right, because I felt like I'm so sad.  And

25  I'm depressed, and I have the biggest gift from God.  And I

1  also felt like I was, like, ungrateful to what God has given

2  me, and I felt ungrateful because I'm married.  Every girl

3  want to be married.  Every girl want to have a beautiful

4  child.  I have a gorgeous daughter, and I have a successful

5  career.  And that's everything that I prayed to God to give

6  me, and God gave me that.

7          And I felt depressed, like, I felt like I let him --

8  I showed God that the devil took my mind.  And I say that

9  because it's like the things that I felt like she was doing,

10  it was demonic, like only an evil person, a demon, could do

11  that shit.  Sorry.  Sorry my language.  That's just how I

12  felt, and that's how I was feeling at the time.

13          I lost a lot of weight.  I lost a lot of weight.  I

14  kept getting headaches because I kept crying.  I kept being

15  angry.  And that is the development of something that I

16  developed that I found out in 2020, that I have migraines.

17  And I also was afraid of what people would think about me in

18  my business because I'm also an actress.  You know what I'm

19  saying?  I'm about to do a movie, and I always felt like I'm

20  not going to have people wanting to kiss me or, you know, do

21  certain things for TV or for my music videos because they

22  think that I have this disease that you claim that I had.

23  Q   Do you mean like in a movie, for example, somebody would

24  not want to be your love interest?

25  A   Like my love interest.

```
1   Q   Like their role?

2   A   Like their role, exactly.

3   Q   Cardi, the anxiety and depression and suicidal thoughts

4   you were just talking about --

5   A   Uh-huh.

6   Q   -- did you have any of that before this started with Tasha

7   K?

8   A   I never had any of that and -- I never had any of that.

9   Like I said, I've had rough times.  I've been homeless.  I've

10  been beat up by men that I've been with.  I grew up very poor,

11  but I never felt like I wanted to die.  I felt for like -- I

12  felt for a long time that I'd rather be dead than alive.  I

13  felt like my -- I felt like I was just a person just living,

14  just living but dead, dead in the inside.  I didn't want to

15  live.

16  Q   When you were talking about feeling guilty because you

17  felt like you wanted to die but you had a baby --

18  A   Yeah.

19  Q   -- how old -- were you referencing your daughter?

20  A   Yes.

21  Q   How old was Kulture at that point?

22  A   She was a couple of months old, like just -- this whole

23  thing was happening, she was a couple of months old, and it

24  just kept happening throughout her whole life.  Like, this

25  woman had been talking crazy about me throughout her whole
```

1  life.

2        And I don't know if this is part of the question or

3  not, but I even felt limited to doing certain things that I

4  feel like it's normal to do because of the shit that people

5  would say in the comments.  Like, for example, right, I posted

6  a picture of my daughter when she was a couple of months old

7  where I'm kissing her slightly on the lips.  And there were

8  comments under it talking about, Cardi, don't you have herpes?

9  Wait a minute.  Cardi, if you have herpes, that mean that your

10  daughter have herpes too; right?  Oh, Cardi, you shouldn't be

11  kissing your daughter on the lips.  You know, you have -- you

12  know, they say that you have herpes; right?

13  Q   So, Cardi, I think I heard you mention a few minutes ago

14  that your parents were very alarmed at your mental state; is

15  that correct?

16  A   Yes.

17  Q   Can you elaborate on that?

18        MS. IZMAYLOVA:  Objection.  Hearsay.

19        THE COURT:  So the purpose that you asked that

20  question is what exactly?

21        MS. MOORE:  Could you be more specific, Cardi, about

22  what your parents were saying to you?  I'm just trying to

23  understand what her family was saying to her in this moment.

24  Were they -- how they were communicating their concern for

25  you.  That's the question.

```
1         THE COURT:  So it seems to me that the question is
2   not seeking the information for the truth of the matter
3   asserted but that it was actually said to her, which could
4   factor into the claims that she's made in the case.  So the
5   objection is overruled.
6         MS. MOORE:  Thank you, your Honor.  Go ahead, Cardi.
7         THE WITNESS:  You know, my mom just kept saying,
8   like, pray, pray, everything is going to be all right.  You're
9   blessed, pray, pray, pray.  But then she also was having,
10  like, really bad concerns to a point that, like, she just kept
11  talking to my husband about it.  So we decided to get a
12  therapist.  They decided to get a therapist for me.
13  BY MS. MOORE:
14  Q   How did this -- how did this affect your marriage?
15  A   It affected my marriage because I didn't want it to look
16  to my husband weak.  And when these type of things are running
17  through my mind, rushing through my mind, I didn't felt
18  like -- I wasn't feeling sexually aroused, like, I just didn't
19  want to have no type of sexual activity.  Like, I just wanted
20  to go to sleep.  I couldn't even focus.  I didn't felt sexy.
21  I didn't felt like I wanted to do anything but just go to bed.
22  I couldn't focus.  Who can focus?
23  Q   So you were sleeping a lot?
24  A   Yes.
25  Q   Cardi, I heard you testify about how these statements
```

1   affected the way you interacted with social media; is that

2   correct?

3   A   Yes.

4   Q   So you felt like you couldn't even put pictures of

5   yourself with your newborn baby on social media?

6           MS. IZMAYLOVA:  Objection.  Leading.

7           THE COURT:  Sustained.  You need to not lead.  I'm

8   sorry.

9   BY MS. MOORE:

10  Q   Did this affect the way you interacted with your fans?

11  A   Kind of did; kind of didn't.  You know what I'm saying?

12  Q   Were any of your fans repeating these statements?

13  A   They were repeating these statements, and I could just

14  tell like certain fans, they were like tired of like defending

15  me.  They just felt overly defeated because no matter how many

16  times, you know, like your fans will bring up receipts about

17  the truth, she didn't care about the truth.  And she just kept

18  spreading it, spreading it, spreading it, so everybody just

19  felt defeated.  Everybody just felt tired.

20  Q   So when you were talking about the comments of people

21  responding to the pictures you'd post with Kulture --

22  A   Uh-huh.

23  Q   -- how did those comments make you feel?

24  A   I was very upset.  I was very upset, and that's why I kept

25  telling myself, like, this is why this got to stop because --

1   and to this day, and to this day if people search this up,

2   people still call me Herpes B.  People call me Cold Sore B.

3   She still calls me that.  So it always get brung up.  To this

4   day people say like, hey, yeah, but Cardi was in the strip

5   club fucking herself with a beer bottle, which is not true,

6   which it wasn't me.  So it still affects me, and it's still

7   going on.

8   Q   Does it concern you that Kulture and your son, when they

9   get older, will see these disgusting statements on social

10  media or these videos or these accusations of you doing these

11  things?

12  A   Of course.  Of course.  All the time.  And I'll be, you

13  know -- you know, I don't have the same -- I didn't grow up as

14  a child with the same worries that they will be having, so

15  sometimes I just think about they mental health because I'm an

16  adult.  You know what I'm saying?  And I'm going through this

17  as an adult, and I feel defeated.  I feel depressed.  I feel

18  like a body just walking.  So sometimes I feel like what am I

19  going to do to help my kids with these type of -- these type

20  of like things that's going on.

21          MS. MOORE:  Your Honor, I'm sort of at a natural

22  breaking point where I'm going to go in a different direction.

23  Would you like to break for lunch now?

24          THE COURT:  We can break.  We can break now.

25          Ladies and gentlemen, we'll break for lunch.  We'll

1   come back at 1:30.  That's at least 5 minutes longer than

2   normal.  Take your notes with you into the jury deliberation

3   room.  Remember my instructions about not talking about the

4   case over your lunchtime, and we'll see you back in an hour.

5   Thank you.

6           COURTROOM SECURITY OFFICER:  All rise.

7           (Whereupon, the jurors exited the courtroom.)

8           THE COURT:  Anything we need to talk about before

9   1:30?

10          MS. IZMAYLOVA:  I do have something, your Honor, but

11  we can do it before we -- when we get back.

12          THE COURT:  Well, let's do it now because I don't

13  want to hold the jury up when they come back.  You can have a

14  seat, ma'am, or you can step down if you wish.  Yes, ma'am.

15          MS. IZMAYLOVA:  Yes, your Honor.  The plaintiff

16  testified on direct, as your Honor heard, that she had

17  saved -- the way she was able to pay for her album and her

18  music career is by hosting parties and saving money to do

19  that.

20          THE COURT:  Sorry.  Say that again now?

21          MS. IZMAYLOVA:  I'm sorry.

22          THE COURT:  I'll tell you what, Ms. Moore, why don't

23  you step back and let her come to the --

24          MS. MOORE:  Sure.  Yeah, of course, your Honor.

25          MS. IZMAYLOVA:  Sorry.  The plaintiff just testified

1  on direct that she used to host parties nationwide and save

2  money from that, and that is how she was able to finance her

3  music career, her album and her music career.  I don't know if

4  your Honor recalls, at the pretrial conference there is a

5  video of the plaintiff stating that she -- the way she was

6  able to finance her music career was by having to drug and rob

7  men to do so.

8          Now, your Honor had ruled that out previously, and I

9  am asking before I do it because I don't want to, you know --

10  I don't want to have a mistrial, but I would want to impeach

11  her with that specific video because it is contradictory to

12  what the plaintiff testified to.

13          THE COURT:  Okay.  So I remember the video that

14  you're talking about.  I don't remember it in relationship to

15  funding her career.  I thought it was simply that -- I mean,

16  we didn't see the whole video.  I saw a snippet of the video,

17  and I may not remember it all correctly.  But there was some

18  statements made by the plaintiff about bringing people back,

19  depending on how you interpreted the language, drugging them,

20  taking money from them.

21          I'm not sure that I ruled that out.  I thought that

22  was relevant to the issue of whether or not -- I thought the

23  defendant was saying that that video substantiated claims or

24  at least provided a good faith basis to the defendant to say

25  that she had prostituted.  I don't remember saying that that

1  was out.

2        MS. IZMAYLOVA:  That was what I was arguing at that

3  time, your Honor, and I didn't -- it is relevant for this

4  purpose as well.  We do have the video --

5        THE COURT:  Wait a minute.  Let's focus on the

6  fact -- you say I ruled it out?

7        MS. IZMAYLOVA:  Well, I believe you said that we

8  could not use that as evidence of prostitution, is what you

9  said.  And because it was -- you know, of course, you know, it

10  would be prejudicial because of the, you know, admissions made

11  in the video.

12        THE COURT:  I might have to see it again to

13  understand because I remember seeing the video.  I just

14  don't -- I didn't remember my ruling that way.  I happen to

15  have a former staff lawyer here who was working with me when

16  we made those decisions.  But you're saying that regardless of

17  whether or not it supported the prostitution defense or not,

18  that it support -- that it would be admissible to counteract

19  her testimony that she had the parties to help fund her music

20  career?

21        MS. IZMAYLOVA:  Correct, as impeachment evidence

22  because in the video she states that that's how she got the

23  money to make her -- to get studio time to make her first

24  album.

25        THE COURT:  How is it necessarily inconsistent then,

```
 1  though?  I mean, how does the video impeach her testimony

 2  today in court?

 3          MS. IZMAYLOVA:  Because today in court she said

 4  she -- the way she was able to finance that was through

 5  hosting parties all over the country and save money from that.

 6          THE COURT:  Okay.  Let's assume that what she

 7  testified today is true.  Let's assume that your

 8  interpretation of the video is correct, that she said that I

 9  funded my music career based on taking these men to do

10  whatever.  I'm not sure that those are necessarily mutually

11  exclusive things.

12          MS. IZMAYLOVA:  I guess my question is, am I allowed

13  to ask her about it then?  Because I don't want to do that

14  without first bringing it up to the Court.

15          THE COURT:  Well, as long as you have a purpose and

16  the purpose would be --

17          MS. IZMAYLOVA:  First, I would ask, you know -- well,

18  I guess she's here, so she's going to know now.  But, you

19  know, was that the full way you financed the music career?

20  And if she said no, then that would then make it impeachment

21  evidence.

22          THE COURT:  If she said no, it would make it

23  admissible?

24          MS. IZMAYLOVA:  It would be make it, you know -- it

25  would be impeachment.  Like if she said that the parties were
```

1    the sole way she financed her music career, then that would

2    be --

3            THE COURT:  Well, but does it -- okay.  Let me assume

4    for a minute that the videos are out for the purpose of

5    prostitution.  Okay.  If she said, no, that's not the sole way

6    that I -- it's not the sole way I funded my music career.

7    Introducing the reason -- or excuse me -- introducing the

8    other ways that she financed her music career doesn't impeach

9    what she said, so it's not admissible for that purpose.  It's

10   a collateral issue not relevant to the issues in the lawsuit.

11           If she said, yes, the only way I financed my career

12   was these parties, then perhaps it would be impeaching for

13   that point.  Then the question becomes whether that point is a

14   material point or not to which the prejudicial nature of the

15   video itself might outweigh the probative value of the desire

16   to impeach because it's not an issue really that's in the

17   lawsuit.

18           Really then it comes back to whether or not the video

19   is admissible for the basis of the plaintiff's claim -- excuse

20   me -- the defendant's claims that she had prostitution.  So

21   let's focus on that because I'm not sure I'm with you about

22   what you've said today.  And Ms. Matz has been eager to speak

23   about that, I'm guessing.  So what else do you want to say

24   about that?

25           MS. IZMAYLOVA:  Yeah, if I may just make one more

1  point, while I understand that it may be a collateral issue,

2  but her character for truthfulness is you know at the

3  forefront.  That's going to be one of the things that the jury

4  has to decide, and it's, you know, basically her word against

5  my client's word.  And so you know --

6       THE COURT:  Her word against your client's word about

7  what?  Let's back up.  Your client doesn't know her.  I'm

8  guessing the first time she ever saw her in person was Monday;

9  right?

10       MS. IZMAYLOVA:  Right.  What I mean is it's going to

11  be what she's saying and her credibility versus what my client

12  says and my client's credibility.

13       THE COURT:  Yeah, but the rules of evidence don't

14  stop right there.  You still have to -- you still have to

15  consider the factors that are found in Rule 403 and so --

16  which 403 says the Court may exclude relevant evidence if its

17  probative value is substantially outweighed by danger of one

18  or more of the following:  Unfair prejudice, confusing the

19  issues, misleading the jury, undue delay, wasting time and

20  needlessly presenting cumulative evidence.  And then there's

21  also, you know, some consideration, I suppose, of Rule 402 as

22  well.

23       But, in any event, let's go back to the issue of the

24  video itself.  What do you remember -- okay.  Let me do this.

25  Let me go to Ms. Matz and hear what she has to say about the

1  video and then come back and hear what you have to say.

2          MS. IZMAYLOVA:  Do you want me to step back to --

3          THE COURT:  I've already ruled on it, but I didn't

4  remember it the way y'all say I ruled.  But that doesn't mean

5  that's not what I said back then.  So let's hear what Ms. Matz

6  says.

7          MS. IZMAYLOVA:  Should I step away so she can --

8          THE COURT:  Yeah, let her come up.  So come on up so

9  you can speak into the microphone so it makes it easier for

10 the court reporter's transcript.

11         MS. MATZ:  Thank you, your Honor.  Your Honor, just

12 to make it easier for you also, I do have the -- oh, I'm

13 sorry, habit.  No, thank you, your Honor.  I appreciate the

14 reminder.  So just so you recall, I do have the pretrial

15 conference transcript up, and the discussion of this began on

16 page 64.  And it was approximately two pages long, just to

17 help your Honor find the prior conversations about this.

18         When we watched the video, Ms. Izmaylova said -- you

19 know, we all watched the language.  We watched the video.

20 Ms. Izmaylova made an argument that she thinks that -- she

21 thinks my client was literally agreeing to some sort of

22 prostitution by admitting to take a person back to their hotel

23 room and sleep with them and then ended up taking their money.

24 Your Honor, we had a long discussion about this.  Your Honor

25 ruled that that wasn't prostitution, that, you know, this

1   was -- to the extent we're talking about an agreement to have

2   sex with someone, that's something people do in America every

3   single day.

4          So the prior ruling, we had moved in limine to

5   exclude this on a couple of grounds.  One was relevance, but

6   the other was prejudice here.  And I do not agree with

7   Ms. Izmaylova at all, just to make this point about the other

8   point she's making, that my client made any admissions or

9   statements in that video that would contradict her testimony

10  on the stand.

11         THE COURT:  Why don't we do this?  Somebody has got

12  that video handy.  Why don't we play it again.  Let me just

13  look at it again, refresh my memory.  I'm sure I've had --

14  you've certainly had access to it, and you've probably seen it

15  since I've seen it.  Let me remind myself about why I ruled

16  the way I've ruled because that's been some -- I mean, that's

17  probably been what, nine months ago that I looked at it?

18         MS. MATZ:  Yeah, it was in November and --

19         THE COURT:  This year?

20         MS. MATZ:  Yes.  And just so your -- to help your

21  Honor --

22         THE COURT:  I looked at it in November this year?

23         MS. MATZ:  We were supposed to go to trial on the

24  8th, and that was adjourned because there was a medical

25  situation.

```
 1              THE COURT:  And not before the August September time
 2    frame?
 3              MS. MATZ:  No, I'm talking about I think it was --
 4              THE COURT:  Let me look at it again.
 5              MS. MATZ:  That's fine, your Honor.
 6              THE COURT:  All right.  Are you connected?  Show me
 7    the relevant parts.
 8              (Whereupon, a video recording was played.)
 9              THE COURT:  Hold on.  Back it up to where you started
10    because when it first started, the other video was playing
11    too, and I couldn't hear it.
12              MR. SABBAK:  Sorry, your Honor.
13              (Whereupon, a video recording was played.)
14              THE COURT:  All right.  So, first of all, man, you
15    talked fast in that video, hard for me to keep up with
16    everything that you said, but now I recall.  There certainly
17    is nothing there that makes it sound like to me that the
18    plaintiff was admitting to prostitution.  At best it sounds
19    like she says that I had sex with men, and I robbed them.
20              I've certainly had cases in the past where people
21    have done that, and robbing crews come in and they rob people.
22    And I'm not saying that's what happened here, but it sounds
23    like it could be something like that.  But it doesn't sound
24    like it's prostitution.  I understand why the defendant would
25    want to use it because if that's played to the jury, the
```

1  jurors' impression might be like my impression is, that, you

2  know, that there was some misrepresentation to the men about a

3  romantic or maybe just a one night situation that was all

4  designed for purposes of robbing them and not for the

5  companionship of that night.

6       And if, in fact, that is true, that's not good, but

7  it's not prostitution.  And the purpose that the defendant

8  would want to use that for would be to cast the plaintiff in a

9  false light -- excuse me -- not a false light necessarily, a

10  negative light.  And that doesn't go -- while that impression

11  might not be a good one, it doesn't go to prostitution, which

12  is the allegation that the defendant made when she said that

13  she was a prostitute.

14       So I stand by now with my memory refreshed, with my

15  original decision, that it's not relevant to the issue of

16  prostitution, and I don't see that it is admissible at this

17  point.  If you ask the plaintiff on cross-examination were

18  there other ways that you raised money to fund your studio

19  time and development of your music career and she said no,

20  then arguably it might be relevant then.  I don't know that

21  she's going to say no.  If she were to say -- nor am I ruling

22  that it is admissible.  I'll have to think about that a little

23  bit.

24       If she were to say there were other ways, then the

25  other ways aren't relevant to the issues in this lawsuit other

 1  than the fact the defendant wants to use it because they want

 2  the jury to hear it because they think that the jury would not

 3  like the plaintiff because of the other things that she may

 4  have done.  We're not opening the door for the other things

 5  that people have done that aren't good things.

 6          MS. IZMAYLOVA:  Your Honor, I didn't ask her those --

 7          THE COURT:  Hold on a second.  I'm talking.  I'm just

 8  talking theoretically here because the bad things that the

 9  plaintiff may have done in her life, the bad things that the

10  defendant, Ms. Kebe, has done in her life or her husband may

11  have done in his life just aren't relevant to the issues of

12  this lawsuit, that the defendant made statements about the

13  plaintiff that weren't true, with malice or recklessness, and

14  was the plaintiff damaged because of those statements.

15          So, you know, I will think about, during the next 50

16  or so minutes, about whether or not -- if the plaintiff says

17  that the exclusive way she raised funds for her music career

18  promotion was simply having these parties, that's pretty vague

19  in itself to me.  I don't know really what that means.  But if

20  she says they weren't exclusive, then it's not going to be --

21  this video is not going to be admissible for the purposes that

22  the defendant has proffered it, which is to prove --

23  originally, which was to prove prostitution or a good faith

24  basis for that.

25          So is there anything else you want to talk about?

1          MS. IZMAYLOVA:  Not at this time.  Thank you.

2          THE COURT:  All right.  Thank you.

3          MS. MATZ:  Thank you, your Honor.

4          COURTROOM SECURITY OFFICER:  All rise.  Court stands

5  in recess until 1:30.

6          (Whereupon, a recess was taken from 12:40 p.m. until

7  1:30 p.m.)

8          COURTROOM SECURITY OFFICER:  All rise.

9          THE COURT:  Thank you.

10          COURTROOM SECURITY OFFICER:  Please be seated and

11  come to order.

12          THE COURT:  The plaintiff can return to the stand.

13          So before we bring the jury back in, which one of you

14  are going to ask questions?  Okay.  Don't stand up again.  All

15  right?  You.

16          MR. SABBAK:  Yes, sir.

17          THE COURT:  You've objected once during her

18  cross-examination, at least that's what --

19          MR. SABBAK:  No, sir.

20          THE COURT:  -- various parties have told me, that

21  you've objected.

22          MS. IZMAYLOVA:  He did not.

23          THE COURT:  I know I saw you start to stand up one

24  time, and then you sat back down.

25          MR. SABBAK:  We were standing when the jury was

1   coming, sir.  I never --

2          THE COURT:  No, no.  That's not what I'm talking

3   about.  You actually started to stand up one time, and I

4   didn't see you -- I didn't see you object, but I've been told

5   by my staff you did object --

6          MR. SABBAK:  Object?

7          THE COURT:  -- during the last testimony.

8          MR. SABBAK:  It's in the transcript, sir.

9          THE COURT:  Just don't do it.  If you didn't do it,

10  then there's no worries.

11         MR. SABBAK:  All right, sir.

12         THE COURT:  But don't do it because if you do it,

13  then I'm going to call you out for it because it's one lawyer

14  per witness.  That's pretty universal.

15         You can bring the jury back in.

16         COURTROOM SECURITY OFFICER:  All rise.

17         (Whereupon, the jurors entered the courtroom.)

18         COURTROOM SECURITY OFFICER:  Please be seated and

19  come to order.

20         THE COURT:  All right.  Thank you.  Ms. Moore, you

21  can proceed.

22         MS. MOORE:  Thank you, your Honor.

23         Cardi, did you ever share underwear with Starmarie

24  Jones?

25         THE WITNESS:  No.

1  BY MS. MOORE:

2  Q    Did you ever sit in a taxicab with no underwear on?

3  A    I think so.  You know, sometimes I don't wear underwear.

4  Q    But you never shared panties with Starmarie Jones?

5  A    No.

6  Q    Okay.  So that part is a lie?

7  A    Yes.

8  Q    Have you ever asked anyone to send a story to Tasha K or

9  to Kebe Studios about you?

10  A    No.

11  Q    Have you ever sent a story to Tasha K or Kebe Studios

12  about yourself?

13  A    The only time that I ever, like, sent her anything was

14  that time that I said, in the beginning when I was explaining

15  to her that I didn't know Starmarie.  That was the only time

16  I -- and I was commenting, and I was telling her, like, she

17  never lived with me.  I don't know her.  She only worked at

18  the club that I worked in.  That was the only time from

19  myself, from myself.  I typed it from my page.

20  Q    I'd like to pull up, please, P-1.  Cardi, have you seen

21  this before?

22  A    Yes.

23  Q    What is this?

24  A    That right there is -- well --

25  Q    There we go.  The right one is on now.

1  A    Yes.  Those are my results for my herpes test that I took

2  at UCLA.

3  Q    Okay.  So this right here are the test results from when

4  you were tested for herpes at UCLA?

5  A    Yes.

6  Q    And when were you tested for herpes?

7  A    I was tested in August 12th, 2020.

8  Q    And what was the result?

9  A    Negative.

10  Q    And who performed this test at UCLA?

11  A    My doctor, Grisales.

12  Q    Cardi, when is your birthday?

13  A    10-11-92.

14  Q    Does your date of birth appear anywhere on this record?

15  A    Yes.

16  Q    Why does it say Bonnie Crown?

17  A    Because I go through different alias -- alias?  I don't

18  know if I'm saying it correctly -- for security purpose.  You

19  know, everybody --

20  Q    An alias?

21  A    Yes, an alias.  You know, everybody knows my name, so for

22  security purpose and privacy purpose.

23           MS. MOORE:  Your Honor, I'd like to move P-1 into

24  evidence.

25           THE COURT:  Any objection?

```
 1              MS. IZMAYLOVA:  No objection.

 2              THE COURT:  Let me just ask, are these the test that

 3   was subject to -- that was sent directly to the court or is

 4   it --

 5              MS. MOORE:  No, your Honor.  Thank you for

 6   clarifying.  These are the ones that were originally

 7   submitted, and we have the certificate of authenticity which

 8   your Honor has seen.

 9              THE COURT:  All right.  Thank you.  P-1 has been

10   admitted.

11              MS. MOORE:  Thank you, your Honor.

12              (Whereupon, Plaintiff's Exhibit 1 was marked for

13   purposes of identification and admitted into evidence.)

14   BY MS. MOORE:

15   Q   I'd like to show you now P-1018.  Cardi, have you seen

16   this before?

17   A   Yes.

18   Q   What is it?

19   A   That was me when I was seven years old.

20   Q   So that picture fairly and accurately represents what --

21   reflects what you looked like when you were seven years old?

22   A   Yes.

23              MS. MOORE:  Your Honor, I'd like to move in P-1018.

24              THE COURT:  Any objection?

25              MS. IZMAYLOVA:  No objection.
```

```
 1              THE COURT:  P-1018 is admitted without objection.

 2              MS. MOORE:  Thank you, your Honor.

 3              (Whereupon, Plaintiff's Exhibit 1018 was marked for

 4  purposes of identification and admitted into evidence.)

 5  BY MS. MOORE:

 6  Q   Cardi, in this photograph what is on the left side of your

 7  mouth that's very close to your lip?

 8  A   It is my birthmark.

 9  Q   You were born with a birthmark?

10  A   Yes, right here.  It's a beauty mark.

11  Q   You've had that birthmark since you were born?

12  A   Yes.

13  Q   Cardi, is it funny to be accused of having herpes?

14  A   No, it's not funny.

15  Q   I'd like to show you P-2, please.  Cardi, have you ever

16  seen this before?

17  A   Yes.

18              MS. MOORE:  Your Honor, I'd like to move P2 into

19  evidence, please.

20              MS. IZMAYLOVA:  No objection.

21              THE COURT:  She really hasn't laid the foundation --

22              MS. MOORE:  I'm sorry.  I'm sorry.  I apologize.  I

23  jumped ahead.  Thank you, your Honor.  I appreciate it.

24              Cardi, what is this?

25              THE WITNESS:  Those are test results that I did in
```

1  UCLA for HPV.

2          MS. MOORE:  Okay.  Great.  Your Honor, I'd like to

3  move this in evidence, please.

4          MS. IZMAYLOVA:  No objection.

5          THE COURT:  All right.  P-2 is admitted without

6  objection.

7          (Whereupon, Plaintiff's Exhibit 2 was marked for

8  purposes of identification and admitted into evidence.)

9  BY MS. MOORE:

10  Q   Cardi, what was the date that you were tested for HPV at

11  UCLA?

12  A   9-23, 2020.

13  Q   Cardi, do you see your birthday anywhere on this test

14  result?

15  A   Yes.  It's right there.  It says DOB 10-11-1992.

16  Q   Above where it says negative for high risk HPV DNA?

17  A   Yes.

18  Q   Okay.  Cardi, why does this say Elizabeth Chambers?

19  A   Because I use different alias -- ail --

20  Q   Alias?

21  A   Alias.  I'm sorry y'all.  I use different alias for

22  security reasons, for privacy, literally everywhere.

23  Q   Have you ever found it funny to be accused of having HSV?

24  A   No.

25  Q   Do you have any tattoos?

1   A    Yes, I do.

2   Q    Do you have more than one?

3   A    Yes.

4   Q    How many do you have?

5   A    I have one, two, three, four, five, a really big one, six,

6   and seven is like a big, big tattoo from the beginning of my

7   back from like the back of my thigh.

8   Q    What's the first tattoo you got?

9   A    My first tattoo was this one.  It's my mother's name.

10  Q    Can you tell us what it says.

11  A    Belkis.

12  Q    That's your mother's name?

13  A    Uh-huh.

14  Q    I'd like to show you, Cardi, P-1005.  Have you seen this

15  before?

16  A    Yes.

17  Q    What is this?

18  A    I'm not sure if, like, the screens are showing everywhere

19  or just mine.

20  Q    Ignore the writing.  I'm just talking about the

21  photograph.

22  A    Okay.  That is me at a red carpet before the Grammys, and

23  those are my tattoo.  One of them says Hennessy, and the other

24  one says Loyalty and Royalty.

25          MS. MOORE:  Okay.  Stop there.  Your Honor, I'd like

1    to move P-1005 into evidence.

2         MS. IZMAYLOVA:  No objection.

3         THE COURT:  1005 is admitted without objection.

4         (Whereupon, Plaintiff's Exhibit 1005 was marked for

5    purposes of identification and admitted into evidence.)

6    BY MS. MOORE:

7    Q   So, Cardi, this picture fairly and accurately depicts what

8    you looked like at the time it was taken; correct?

9    A   Yes.

10   Q   Okay.  So your first tattoo was your mother's name on your

11   wrist, this big mark right here?

12   A   Yes.

13   Q   Okay.  Is it your right wrist or your left wrist?

14   A   Right.

15   Q   Okay.  When did you get your second tattoo?  Actually,

16   let's stop for a second.  So let's go back to the photograph.

17   Let's look back at P-1005 for a second.  So I see the tattoo

18   we were just talking about, the first one.  And I apologize

19   because I think I cut you off.  Can you -- I'm sorry.  Can you

20   tell us -- yeah, can you zoom in for a second, please.  What

21   is this tattoo right here?  Can you tell us about this?

22   A   It's my mother's name.

23   Q   No, no.  I'm sorry.  Can you look at the screen?

24   A   This right here?

25   Q   Yes.  Is it zoomed in?  Do you see this tattoo right here?

1  A    Yes.

2  Q    That's your mother's name?

3  A    Yes.  Right here on my wrist is my mother's name.

4  Q    Right.  But do you see where he zoomed in on your arm?

5  A    Yes.

6  Q    Okay.  I'm sorry.  I wasn't being clear.  That's the

7  tattoo I'm looking at.

8          THE COURT:  You're pointing on -- we can't see your

9  finger.

10         MS. MOORE:  Yes, I know.  I'm sorry, your Honor.

11         Sorry, Cardi.  Cardi, what is the tattoo that appears

12  on your arm right here?

13         THE WITNESS:  It says Loyalty and Royalty.

14  BY MS. MOORE:

15  Q    And when did you get that?

16  A    I got that tattoo in 2010.

17  Q    Okay.  Loyalty and Royalty?

18  A    Yeah.

19  Q    Okay.  Could you zoom over to the other side of the

20  photograph, please.  There.  Cardi, on your other arm near

21  your shoulder, that very large prominent tattoo, what does

22  that say?

23  A    That says Hennessy, and that's my little sister's name,

24  younger sister name.

25  Q    And when did you get that tattoo?

1  A   In 2010.

2  Q   Can you please zoom out so we can see the whole image.

3  Thank you.  Are there any other tattoos depicted in this

4  photograph?

5  A   There's one on my left wrist.

6  Q   Okay.  Can you zoom in to that, please.  Cardi, what does

7  that tattoo say?

8  A   It says Tommy.

9  Q   I'm not going to ask you why it says Tommy.  Okay.

10 A   G, Tommy G.

11 Q   Okay.  I'd like to show you P-1007.  Have you seen this

12 before?

13 A   Yes.

14 Q   And what is it?

15 A   It's a picture of me in the strip club with my stripper

16 outfit on.

17        MS. MOORE:  Your Honor, I'd like to move this into

18 evidence, P-1007.

19        MS. IZMAYLOVA:  No objection.

20        THE COURT:  P-1007 is admitted without objection.

21        MS. MOORE:  Thank you, your Honor.

22        (Whereupon, Plaintiff's Exhibit 1007 was marked for

23 purposes of identification and admitted into evidence.)

24 BY MS. MOORE:

25 Q   Cardi, what is this tattoo, this large tattoo depicted on

1  your hip?  What does that say or what is it?

2  A    It is a cheetah, and it's on my left hip and stomach.

3  It's a cheetah.

4  Q    And when did you get this tattoo?

5  A    I got that tattoo in 2011.

6  Q    Okay.  So your first tattoo you said you got in 2008?

7  A    Yes, when I was 15, my mom's name.

8  Q    Your second tattoo, the peacock, you said -- no, no, not

9  the peacock.  The Loyalty and Royalty you got in 2010?

10  A    Yes.

11  Q    And then the Hennessy you also got in 2010; is that

12  correct?

13  A    Yes.

14  Q    And when did you get the Tommy tattoo?

15  A    I'll say 2016.

16  Q    Okay.  And the cheetah tattoo, you said 2011; is that

17  correct?

18  A    Yes.

19  Q    Okay.  I'd like to show you P-1011, please.  Cardi, have

20  you seen this before?

21  A    Yes.

22  Q    What is it?

23  A    It's a picture of me in the strip club.

24        MS. MOORE:  Your Honor, I'd like to move P-1007 (sic)

25  into evidence.

1          MS. IZMAYLOVA:  No objection.

2          THE COURT:  P-1007 (sic) is admitted without

3    objection.

4    BY MS. MOORE:

5    Q    Thank you, your Honor.

6          Cardi, can you describe this tattoo that we see in

7    this photograph across a large part of your side and stomach

8    and back area.

9    A    Okay.  This is a tattoo that starts a little bit under my

10   bra line, and it ends all the way to the bottom of my -- to my

11   thigh.  It's like from the back of my thighs, and it's very

12   big.  It's a big peacock with flowers surrounding it.  It

13   covers almost practically like my whole entire -- covers my

14   whole entire side really, and it's very colorful, very bright.

15   It's really big on my butt as well.  It's a big tattoo.

16   Q    Cardi, if you don't mind, would you mind just standing up?

17   It's a little hard to see because you're sitting.  Could you

18   stand up and show us exactly where it --

19   A    So my tattoo starts from here all the way from here and

20   then goes from here going here.  So just this whole --

21   Q    Thank you, Cardi.

22   A    -- right side of me.

23   Q    Thank you.  I'd like to show you P-1013, please.  Have you

24   seen this before, Cardi?

25   A    Yes.

1   Q    What is it?

2   A    It's a before and after of how my tattoo used to look.

3   This is when -- this is how my tattoo was when I first got it

4   tatted in 2010.

5        MS. MOORE:  Okay.  Just stop there for one second.

6   I'd like to move into evidence P-1013.

7        MS. IZMAYLOVA:  No objection.

8        THE COURT:  P-1013 is admitted without objection.

9        MS. MOORE:  Thank you, your Honor.

10       (Whereupon, Plaintiff's Exhibit 1013 was marked for

11  purposes of identification and admitted into evidence.)

12  BY MS. MOORE:

13  Q    So I'm sorry, Cardi.  Could you start again, please.  What

14  is this an image of?

15  A    All right.  So I got this tattoo in 2010, and as you could

16  see, it starts all the way up here.  It got flowers.  It got

17  smoke.  In the butt area it got like a tree trunk, and it got

18  smoke with red skies and flowers.  And down my thighs it goes

19  with feathers, and the right was the updated version because I

20  gave her a renovation in 2020.  So that's the before, and this

21  is the after.

22  Q    And when did you get peacock?

23  A    I got her in 2010.

24  Q    Okay.

25  A    She's a girl.

1  Q   So did you have all of the tattoos we've looked at before

2  you were stripping?

3  A   Yes.

4  Q   Cardi, you've heard testimony that the defendants have

5  repeatedly published statements that you appear in what we

6  called the beer bottle video.

7  A   Yes.

8  Q   Have you seen that video?

9  A   Yes.

10  Q   Does that woman look anything like you?

11  A   No.

12  Q   Are there any tattoos anywhere on that woman's body?

13  A   No.

14  Q   When is the first time, Cardi, that you heard the rumor

15  that this was you in the beer bottle video engaging in this

16  debasing act with the beer bottle?

17  A   I think in 2017.

18  Q   Apart from your prominent tattoos, are there any

19  differences between you and the woman that is depicted in that

20  video?

21  A   Yes.

22  Q   What are those?

23  A   I have bigger breasts, darker areolas.  I think I'm a

24  little bit more color than the girl, got more color than her.

25  Q   When you say color -- I'm sorry -- do you mean her skin

1  tone is different?

2  A    Than my skin tone, yeah, to me, yes.

3  Q    Okay.  So what did you do when you first heard the rumor

4  that it was you in the beer bottle video doing this act with

5  the bottle?

6  A    I addressed it and said that wasn't me.

7  Q    Okay.  So when you say you addressed it, I'm sorry.  You

8  addressed it where?

9  A    I addressed it on Twitter, and I left like a couple of

10  comments just saying that that wasn't me.

11  Q    So you made public statements on social media as soon as

12  you saw that it was not you?

13  A    Yes.

14  Q    And what happened after you made those public statements

15  denying that it was you in the video?

16  A    I saw, like, publications of, like, people saying that

17  that wasn't me.

18  Q    Okay.  So I want to -- I want to show you, Cardi, P-509.

19  Your Honor, this has already been admitted into evidence.

20  Cardi, have you seen this before?

21  A    Yes.

22  Q    What is it?

23  A    Those are tweets from my page.

24  Q    Okay.  And, I'm sorry, could you be more specific?  Which

25  page?

1   A    My Twitter page.

2   Q    Okay.  Your Twitter page.  Thank you.  And what is the

3   date that you made these?

4   A    In 2018.

5   Q    Okay.  So you posted these immediately after seeing the

6   rumor; correct?

7   A    This is -- this where I'm a little bit thing because I

8   said like in 2017 because --

9          THE COURT:  I'm sorry to interrupt.  I don't have

10  P-509 as having been admitted.  Can y'all check your records,

11  please.

12         MS. IZMAYLOVA:  I'm pretty sure Ms. Matz admitted it.

13         MS. MOORE:  Ms. Matz admitted it.

14         THE COURT:  As P-509?

15         MS. IZMAYLOVA:  I don't know what the number was now,

16  but I know that she admitted this exhibit.

17         THE COURT:  I'm just looking at my list and the

18  number, and I could have gone to the wrong document.

19         COURTROOM DEPUTY:  I don't have that number either.

20         MS. MATZ:  I recall admitting it yesterday.

21         MS. MOORE:  I know you admitted it, but we need to

22  obviously make sure.

23         THE COURT:  Yeah, I just don't have 509 checked.  And

24  you don't either, Jennifer?

25         COURTROOM DEPUTY:  I don't have that number.

```
1            THE COURT:  It's the number that I'm concerned about.
2   I remember reading the document but --
3            MS. MATZ:  Hold on.  Let me look.  There might be a
4   duplicate.
5            MS. MOORE:  There might be a duplicate, your Honor.
6            MS. MATZ:  Give me one moment, your Honor.
7            THE COURT:  Let's just do this.  Let's do this.
8   We'll just go ahead and see if I could stipulate that 509 is
9   admissible.
10           MS. IZMAYLOVA:  Yes, your Honor.
11           THE COURT:  All right.  So I will mark it as being
12  admitted, and maybe we'll find that it was a duplicate.
13           MS. MATZ:  I believe it was 508, your Honor, just so
14  you know.  I just looked, but I'll check my notes.
15           THE COURT:  I don't have 508 indicated either, but
16  we've admitted 509.
17           MS. MOORE:  Thank you, your Honor.
18           (Whereupon, Plaintiff's Exhibit 509 was marked for
19  purposes of identification and admitted into evidence.)
20  BY MS. MOORE:
21  Q   So I'm sorry, Cardi.  I think what you were saying was
22  that you had been confused about when you saw the rumor?
23  A   Yeah.  It's because 2017, 2018 kind of confused me.  But I
24  feel like this was the first time -- I know this was like the
25  first time that I started addressing this.  And I said, that's
```

1 not even me so get off my dick, because it was like a video of

2 it.  And then I posted a picture that -- I guess the picture

3 is not here.  The picture was like me, like, with, like, a

4 stripper outfit on.  And I said, that's me.  As you can see,

5 my tufts, which I'm trying to say tits, is big and I'm tatted.

6 That video with the bitch putting a beer on her vagina is not.

7 I was a stripper, and I'm not ashamed.  But don't go around

8 spreading fake shit about me.

9 Q   Okay.  I'd like to show you P-247 which I believe has been

10 previously admitted.

11          THE COURT:  247 has not been -- it was discussed, but

12 I don't believe it was admitted.

13          MS. MATZ:  It was not, Lisa.

14          MS. MOORE:  Okay.  I'm sorry.  So, Cardi, have you

15 seen this before?

16          THE WITNESS:  Yes.

17 BY MS. MOORE:

18 Q   And what is this?

19 A   That is one, I guess, one publication saying that that is

20 not me putting the beer bottle in.

21          MS. MOORE:  Okay.  I'd like to move P-247 into

22 evidence, your Honor.

23          THE COURT:  Any objection?

24          MS. IZMAYLOVA:  No objection.

25          THE COURT:  P-247 is admitted without objection.

1           (Whereupon, Plaintiff's Exhibit 247 was marked for
2   purposes of identification and admitted into evidence.)
3   BY MS. MOORE:
4   Q   So, Cardi, going back for a moment, when you said -- I
5   asked you what happened after you posted immediately upon
6   finding this rumor --
7   A   Yeah.
8   Q   -- and you said that publications started picking it up.
9   A   Yeah.
10  Q   Did you mean publications like this?
11  A   Yeah, publications that was, like, on Google and, like,
12  certain pages on Twitter just saying, like, look, that's not
13  Cardi and especially because the girl that's actually in the
14  video, she admitted it for that being her.  She was actually
15  proud.  She calls herself --
16          MS. IZMAYLOVA:  Objection.  Hearsay.
17          THE COURT:  All right.  Your response to the
18  objection?
19          MS. MOORE:  Well, your Honor, I was -- I'll ask it
20  another way.  I think the witness just --
21          THE COURT:  It may not have been what you asked, but
22  the objection is sustained.  So you can't tell us what other
23  people have said for the truth of the matter.  In other words,
24  if someone said this is me, that person has got to come in
25  here and say that.  You can't say that I heard that person say

1    that because it really serves no purpose other than that.  So

2    just tell us about what you observed and heard and saw and not

3    what other people told you or you heard that other people have

4    said.  Okay?  You understand the difference?  We're talking

5    about a rule called hearsay, and under the rule of hearsay

6    people have to come into court and testify.  They can't

7    testify through other people.

8              So I'll tell you what, let's just try it this way:

9    Ask your question again or ask another question.

10             MS. MOORE:  Sure.  Thank you, your Honor.

11             Cardi, that is not you in the beer bottle video;

12   correct?

13             THE WITNESS:  No.

14   BY MS. MOORE:

15   Q    Do you know the woman in the beer bottle video?

16   A    Yes.

17   Q    Cardi, you testified before we took a lunch break that

18   your emotional distress was so extreme that you needed to see

19   a therapist; is that correct?

20   A    Yes.

21   Q    How much money have you spent on therapy related to the

22   defamatory statements and the emotional distress that it

23   caused you?

24   A    Therapy, I would say about $10,000 or a little bit more

25   but roughly around that.

1    Q    How many times have you seen your therapist about this?

2    A    Over ten times, little bit over that, yeah.

3    Q    Cardi, I'd like to show you P-024, please.  Have you seen

4    this before?

5    A    Yes.

6    Q    What is this?

7    A    This is when I flew my therapist --

8    Q    Okay.  Go ahead.

9    A    This is when I flew my therapist to New York City because

10   I had a mental break down.

11            MS. MOORE:  Okay.  Stop there.  I'd like to move into

12   evidence P-24, please.

13            MS. IZMAYLOVA:  No objection.

14            THE COURT:  P-24 is admitted without objection.

15            MS. MOORE:  Thank you, your Honor.

16            (Whereupon, Plaintiff's Exhibit 24 was marked for

17   purposes of identification and admitted into evidence.)

18   BY MS. MOORE:

19   Q    So, Cardi, you were just testifying this is when you flew

20   your therapist to New York because you were in the middle of a

21   mental health crisis; correct?

22   A    Yes.

23   Q    When did that happen?  When did your therapist come to New

24   York?

25   A    It happened around 2018, say about like --

1  Q    Was it near the time of the videos?

2  A    Yes.  It was like around super late October going to

3  November.

4  Q    Okay.  And why did you feel the need to fly her to New

5  York to see you?

6  A    I just was having like a mental freaking crisis, like, I

7  couldn't stop crying.  I couldn't stop shaking.  I couldn't --

8  I couldn't even think.  My family was getting very concerned,

9  so I just told her like to fly to me because I just -- I felt

10 like I couldn't really talk to her on the phone, like, she

11 just had to see me.  That's how I felt at the time.  It was

12 just -- it was very intense.  It was very intense.  I kept

13 shaking.  I wasn't trying to eat.  And my mom was very scared,

14 so I decided I had to call in Sherry to see me.

15 Q    How long was she in New York with you?

16 A    She was in New York, I would say, about like a weekend,

17 like a whole weekend.

18 Q    Did you do -- how many sessions did you do over the

19 weekend?  Or -- go ahead.  Just go ahead and answer.

20 A    I'd say it was like about over eight hours.  I don't know

21 if that's, like, considered, like, four sessions or so.  I

22 know I talked to her for about eight hours.

23 Q    Have you seen this therapist since that New York trip?

24 A    Yes.

25 Q    How many times have you seen her since that New York trip?

1   A    I saw her about -- saw or speak?

2   Q    How many times have you done a session with her, whether

3   it was virtually or in person?

4   A    All together I have done about ten sessions.  I'm not sure

5   if it's one more.

6   Q    I'd like to show you P-45, please.  Have you seen this

7   before?

8   A    Yes.

9   Q    And what is this?

10  A    I guess that's how much she charged me for a session.

11         MS. MOORE:  I'd like to move P-45 into evidence,

12  please.

13         MS. IZMAYLOVA:  No objection.

14         THE COURT:  P-45 is admitted without objection.

15         (Whereupon, Plaintiff's Exhibit 45 was marked for

16  purposes of identification and admitted into evidence.)

17  BY MS. MOORE:

18  Q    So this invoice, Cardi, reflects a bill for one of your

19  sessions; correct?

20  A    Yes.

21  Q    And what is the rate that you pay her for each of your

22  sessions?

23  A    About 250, 250, unless like that time that I flew her in

24  it was, of course, a little bit more because she had to fly

25  in, and I would pay her flights and stuff like that coming

1  here.

2  Q    How many of your sessions have been virtual, and how many

3  have been in person?

4  A    I think about four sessions was in person.

5  Q    Cardi, do you recall how much the New York trip cost you?

6  A    I'm not sure if it was like around 4,000, around there,

7  around that.

8  Q    Have these sessions with your therapist helped?

9  A    It did help and I -- it's a little bit more personal, but

10  I feel like I gained like a friend or something, like, I don't

11  know, personal.

12  Q    Are you still suffering from extreme emotional distress?

13  A    I am because I still get anxiety.  I get anxiety because I

14  feel like it's going to continue.  I'm not in a super dark

15  place that I was in 2018, 2019 when I felt extremely suicidal,

16  extremely dead inside, but to this day I still feel very

17  anxious.  I get very scared because I feel like it's still

18  going to continue.  It still continues.  It's still going on

19  now, so yeah.

20  Q    You mentioned earlier in your testimony that you have felt

21  humiliated.  Do you still feel humiliated by these posts and

22  videos?

23  A    I do feel humiliated because to this day people still call

24  me Herpes B.  People still claim I have herpes.  People to

25  this day think that that's me, the girl putting a freaking

1  beer bottle up her -- inside her coochie.  So, yes, I do feel

2  humiliated, and I feel like forever I will have to defend

3  myself because of that when it's not true.

4  Q   Are you continuing to work with your therapist, Cardi?

5  A   Yes.

6  Q   I'd like to show you P-4, please.  Do you recognize this?

7  A   Yes.

8  Q   What is this?

9  A   It's the sessions, the hotel, the travel, airport

10  transfer, all of that.

11          MS. MOORE:  Okay.  I'd like to move P-4 into

12  evidence, please.

13          MS. IZMAYLOVA:  No objection but I think that --

14          MS. MOORE:  I think you're right.  I think this is

15  the same one as -- yeah, that's fine.

16          THE COURT:  So are you --

17          MS. MOORE:  I'm moving this into evidence, your

18  Honor.

19          THE COURT:  I'm sorry?

20          MS. MOORE:  I'm moving this into evidence.

21          THE COURT:  You said it's the same as which one?

22          MS. MOORE:  It's the same as P-24.  Actually, let's

23  just do this.  Can you pull up P-24, please, which is already

24  admitted.

25          Cardi, does this invoice reflect the amount you spent

1  on that weekend-long therapy and travel expenses with your

2  therapist?

3          THE WITNESS:  Yes.

4  BY MS. MOORE:

5  Q   And what is that amount?

6  A   I thought it was about roughly 4,000, but I guess not.

7  It's $5,480.37.

8  Q   Cardi, besides Starmarie Jones and the defendants, have

9  you ever sued anyone else for defaming you?

10  A   No.

11  Q   So the only individuals you've ever sued are the

12  defendants and Starmarie Jones; correct?

13  A   Yes.

14  Q   Cardi, do you think you have thin skin?

15  A   Sorry.  Let me drink water.  I don't think I have thin

16  skin for criticism.  I don't think I have thin skin for

17  criticism, but I have thin skin for lies, for outrageous lies.

18  I do have thin skin for outrageous lies.

19          MS. MOORE:  Your Honor, may I confer with co-counsel

20  quickly?

21          THE COURT:  Sure.

22          (Brief Pause.)

23  BY MS. MOORE:

24  Q   Cardi, you've testified to your extreme emotional distress

25  that you have experienced because of the vile and disgusting

1  lies that the defendants have published about you?

2  A    Excuse me.  Can you say that again.

3  Q    You've testified about your extreme emotional distress

4  that resulted from the disgusting and vile provably false

5  lies --

6  A    Yes.

7  Q    -- that the defendants posted about you; correct?

8            MS. IZMAYLOVA:  Objection, your Honor.  Counsel is

9  testifying.

10            THE COURT:  It's argumentative.  It really is.

11            MS. MOORE:  I'll withdraw.  I'll withdraw.

12            Cardi, has it been difficult to be here in court this

13  week?

14            THE WITNESS:  It has been very difficult, more than I

15  ever thought.  It has been very difficult because it's like I

16  have to relive it.  I've got to relive it, feel like I'm

17  getting PTSD from it, and I'm just, like, emotional.  And I

18  know I've been calling you, and I've been telling you how I've

19  been feeling like I've been having panic attacks in the

20  morning because this just still continues.

21            MS. MOORE:  I have no further questions, your Honor.

22            THE COURT:  All right.  Thank you.  Ms. Izmaylova.

23            MS. IZMAYLOVA:  Yes, your Honor.

24                        CROSS-EXAMINATION

25  BY MS. IZMAYLOVA:

1  Q   Good afternoon, Ms. Almánzar.  I'm going to ask you a lot

2  of, I guess, a lot of questions, so I'm going to try to break

3  them up into categories so we can all kind of follow along.

4  Okay.  First, I would like to speak with you about some of

5  your personal and professional accomplishments.  Okay.  In

6  February of 2019 you won a Grammy for best rap album; is that

7  correct?

8  A   Yes.

9  Q   Okay.  And then in May of 2019, the same year, you won a

10  top female rap artist at Billboard Music Awards; is that

11  right?

12  A   Yes.

13  Q   That sounds right?  In December of 2019 you posted that

14  you had purchased a home that you called your, quote, dream

15  home here in Atlanta; is that right?

16  A   Yes.

17  Q   And, of course, the pandemic probably slowed things down.

18  But in August of 2020 you released a song with another artist

19  named Megan Thee Stallion -- the song was called "WAP" -- and

20  that was a very successful hit; is that correct?

21  A   Yes.

22  Q   Also in 2020 you became the first female rapper to be

23  named Woman of the Year at the Billboard Women in Music

24  Awards; is that right?

25  A   Yes.

1   Q   In October of, I guess not this year, of 2021 you were

2   able to attend the Paris Fashion Week in Paris?

3   A   Can you say that again?

4   Q   I'm sorry.  Did you attend the Fashion Week in Paris in

5   October of 2021?

6   A   Yes.

7   Q   Okay.  And then in November of 2021 you were the host of

8   the American Music Awards; is that right?

9   A   Yes.

10  Q   And at that awards show you actually won an award for one

11  of your songs called "Up?"

12  A   Yes.

13  Q   Also, I believe somewhere around November of 2021 you had

14  signed a deal with Warner Chappell Music; is that right?

15  A   What did you say?  Repeat the question.

16  Q   I'm sorry.  Warner Chappell Music, you signed on with them

17  in November of 2021?

18  A   I'm not sure if it was October or November, but I did.

19  Q   Toward the end of 2021 at some point?

20  A   Yes.

21  Q   Okay.  And then also right around -- somewhere right

22  around that time did you purchase a home in New York?

23  A   Yes.

24  Q   You were kind of busy toward the end of last year.  You

25  had released a vodka whipped cream called Whipshots?

1    A    Yes.

2    Q    And then also you collaborated with Halle Berry on a

3    soundtrack for a movie called "Bruised?"

4    A    Yes.

5    Q    And then I believe toward the end of last year sometime

6    you had posted that you were the first female rapper to have

7    earned three diamond singles; is that right?

8    A    Yes.

9    Q    And you now also have been named the creative director for

10   Playboy Magazine; is that correct?

11   A    Yes.

12   Q    Also, I think toward the end of last year you were -- and

13   your husband celebrated his birthday in a -- looks like a club

14   type setting?

15   A    Yes.

16   Q    And you were able to give to him for his birthday

17   $2 million?

18   A    Yes.

19   Q    And throughout that party did you all throw a lot of cash

20   into the audience?

21   A    Not into the audience.  We threw it at dancers that we

22   hired to dance.

23   Q    Okay.  And do you remember how much in total that was

24   thrown?

25   A    I'm not sure because, his money.

1  Q    Okay.  So now I want to move on and talk a little about

2  social media use.  Okay.  You are a frequent user of social

3  media; is that fair to say?

4  A    Yes.

5  Q    And specifically I'll be speaking about Instagram and

6  Twitter.  You're familiar with those two platforms?

7  A    Yes.

8  Q    And I believe on both of the platforms your username is @,

9  the at symbol, iamcardib?

10  A    Yes.

11  Q    Is that correct?

12  A    Yes.  I'm not sure if it's changed now to cardib, but

13  amcardib, that was, yeah.

14  Q    Okay.  And I don't know if you know the specifics, but do

15  you know around how many followers you have on Instagram, you

16  know, currently or last time that you checked?

17  A    Now it's like in the hundred millions.  I'm not --

18  Q    If I checked at the end of 2021 and I saw 120 million,

19  does that sound about right?

20  A    Yes.

21  Q    And then as far as Twitter is concerned, at the end of

22  last year I saw about 20 million followers.  Does that sound

23  about right to you?

24  A    Yes.

25  Q    And I believe that you have testified on direct that you

1  have been using Instagram before you even became like a famous

2  rap artist; is that right?  I think you have referred to

3  yourself -- you said that you were -- it was, quote, like an

4  internet sensation?

5  A  I'm not sure if I said that, but I was using Instagram

6  before I became famous.

7  Q  But when you -- before you became like -- before you

8  started making music or I guess before you became famous from

9  making music you had quite a large following on Instagram; is

10 that right?

11 A  Yes.  It went little by little, yes.

12 Q  But you gained -- I mean, I would say -- is it fair to say

13 it was about a million followers or so before your first,

14 like, hit on record?

15 A  Uh-huh.

16 Q  And a lot of the content that you would have posted was in

17 the form of videos, like maybe short little video clips and

18 stuff like that?

19 A  Yes.

20 Q  And a lot of it was just you speaking on whatever topic

21 you wanted to speak on?

22 A  Yes.

23 Q  Not exclusively but a lot of the videos were you talking

24 to basically your followers?

25 A  Yes.

1   Q    All right.  When you testified on direct about what

2   dragging, the term "dragging" means, you stated that it's when

3   a person will say negative things about someone; is that

4   right?

5   A    Yes.

6   Q    But is it fair to say that negative things do not a

7   hundred percent of the time mean false things?

8   A    Can you repeat that again?

9   Q    Negative things and false things, those are two different

10  things; is that correct?

11  A    It's two different things, but when you drag somebody, you

12  could do both.

13  Q    Right.  But just because you're dragging someone doesn't

14  mean you're doing both all the time?

15  A    Not all the time.

16  Q    Okay.  Do you recall making a video where you're, I think,

17  sitting getting your make-up done, and you're talking about

18  what hip hop means to you?

19  A    Can you repeat that?

20  Q    I'm sorry.  Do you recall making a video while, I think,

21  you were getting your make-up done by somebody else, and you

22  were talking about, you know, what hip hop means to you?  I

23  can read you some quotes, if you would like, to maybe refresh

24  your memory.

25  A    Yes.  I remember.

```
1   Q    You remember the video I'm talking about?

2   A    Yes.

3   Q    Okay.  And if I -- can I -- I would like to show you just

4   without playing it but the beginning of Defense 36 just for

5   identification purposes, your Honor.  He's going to do it.

6             (Whereupon, a video recording was shown.)

7   BY MS. IZMAYLOVA:

8   Q    Does that look like the video that I'm talking about?  Do

9   you remember this?

10  A    Yes.

11            MS. IZMAYLOVA:  Okay.  Your Honor, at this time I

12  would like to move Defense Exhibit 36 into evidence.

13            THE COURT:  Any objection?  Ms. Moore, any objection?

14            MS. MOORE:  Yes, your Honor.  I'm sorry.  We're not

15  clear that this video is authentic or where it came from.

16            THE COURT:  Well, I mean, your client just said it

17  was her.  What else would need to be shown to --

18            MS. MOORE:  That's her, but we're not sure that the

19  video itself has been edited or where it came from.

20            THE COURT:  All right.  I'm going to ask the jury if

21  y'all would go to the jury room and let me have a conversation

22  with counsel for a moment.  Thank you.

23            COURTROOM SECURITY OFFICER:  All rise.

24            (Whereupon, the jurors exited the courtroom.)

25            THE COURT:  All right.  Have a seat.  Before we
```

 1  finish, though, we'll take a break so that -- we've kind of

 2  eliminated another break that would happen in 30 minutes

 3  anyway.  I'm going to assume that the plaintiff had

 4  produced -- excuse me -- that the defendant had produced this

 5  video to plaintiff prior to trial; right?

 6          MS. IZMAYLOVA:  Yes, your Honor.

 7          THE COURT:  Right?  Right, Ms. Moore?

 8          MS. MOORE:  Your Honor, I was simply saying that she

 9  had not said this is true and accurate, that she hadn't laid a

10  foundation.

11          THE COURT:  Okay.  All right.  Did you have the video

12  before trial?

13          MS. IZMAYLOVA:  Me or them?

14          THE COURT:  Talking to the plaintiffs, Ms. Moore.

15          MS. MOORE:  Yes, a week ago, your Honor.

16          THE COURT:  Okay.  So you had the video.  Do you

17  question its authenticity?

18          MS. MOORE:  I was just simply --

19          THE COURT:  Well, let me put it this way.  Did you

20  watch the video?  And based on -- and if you did, based on

21  watching the video, do you have any doubt that it is a true

22  video of statements made by your client?

23          MS. MOORE:  Your Honor, we have had doubts about --

24          THE COURT:  Answer my question.  Answer my question.

25          MS. MOORE:  I'm sorry, your Honor.

1          THE COURT:  After watching the video, do you have

2    doubts that the video is an accurate video of what your client

3    said or did?

4          MS. MOORE:  We have doubts the video is complete,

5    your Honor.

6          THE COURT:  That it's complete?

7          MS. MOORE:  Yes.

8          THE COURT:  Meaning what?  Meaning what?

9          MS. MOORE:  Meaning that it's the entire video or it

10   hasn't been edited.

11          THE COURT:  Entire video -- well, what belief can you

12   provide to me -- not belief.  But what evidence do you have

13   that it has been edited or that it's not complete?  In other

14   words, do we need to have your client watch the video in court

15   before we show it to the jury?  How long a video is this, by

16   the way?

17          MS. IZMAYLOVA:  It's maybe 10 seconds, maybe 15

18   seconds.

19          THE COURT:  All right.  Let's watch the video.  Let's

20   play it from beginning to end.

21          MR. SABBAK:  All right, sir.

22          (Whereupon, a video recording was played.)

23          THE COURT:  A little longer than 10 seconds.  But so

24   based on that, you have questions about whether there was

25   something taken out of -- from the beginning the video began

1  to the end of the video?

2          MS. MOORE:  No, your Honor.  Now that we've seen it,

3  no.

4          THE COURT:  Well, you had it prior to trial.  You

5  said you had it a week ago.  I'm not going to put up with

6  bogus objections being made during the course of the

7  defendant's presentation.  Those objections weren't made

8  during your presentation of a lot of videos.  So y'all need

9  to -- if you've got concerns about videos that you have been

10 shown that the defendant has provided to you that you think

11 they may introduce, then you need to raise them with me prior

12 to doing it this way.

13         MS. MOORE:  Okay.  Yes, your Honor.

14         THE COURT:  It is un -- the best way I can put it, it

15 is unfair for you to raise an objection when you don't really

16 have an objection, particularly if it's simply to throw the

17 other side off their presentation of their evidence.  So let's

18 take a ten-minute recess, and let's not have this situation

19 happen again.  And I'm happy to hear valid objections, but

20 this wasn't a valid objection.  Thank you.

21         COURTROOM SECURITY OFFICER:  All rise.  This Court

22 stands in recess.

23         (Brief recess.)

24         COURTROOM SECURITY OFFICER:  All rise.

25         (Whereupon, the jurors entered the courtroom.)

```
 1              THE COURT:  All right.  Thank you.  So when we last
 2    were together, the plaintiff had tendered -- excuse me -- the
 3    defendant had tendered Defendant's Exhibit 36.  Does the
 4    plaintiff maintain its objection or withdraw its objection?
 5              MS. MOORE:  No, I'm withdrawing it, your Honor.
 6              THE COURT:  All right.  So 36 is admitted.  Thank
 7    you.
 8              (Whereupon, Defendant's Exhibit 36 was marked for
 9    purposes of identification and admitted into evidence.)
10              MS. IZMAYLOVA:  Your Honor, at this time I would like
11    to publish Defendant's 36 to the jury.
12              THE COURT:  Thank you.
13              (Whereupon, a video recording was played.)
14    BY MS. IZMAYLOVA:
15    Q   Ms. Almánzar, that was you; is that correct?
16    A   Yes.
17    Q   And you stated that everything that you say or that you
18    rap about you did yourself; is that correct?
19    A   I stated that in the video, but it's really like
20    fictitious, like, not everything that you say in your music is
21    not about yourself.  It's not an autobiography about yourself.
22    It's things that really happen in your neighborhood.  It's
23    practically telling a story.  It's an artistic form.
24    Q   So when you said everything that I say I motherfucking did
25    on God, did you not hear yourself say that?
```

1  A   I did say that.

2  Q   And did you not testify on direct that your faith is very

3  important to you?

4  A   I did.

5  Q   So if you use, you know, expressions like "on God," would

6  you not -- do you not mean whatever you say when you use such

7  expressions?

8  A   Can you repeat that again, please?

9  Q   You stated that you're a religious person; correct?

10 A   Uh-huh.

11 Q   And in the end of this video, the last thing that you say

12 is on God; right?

13 A   Uh-huh.

14 Q   Which means that you swear to God that you're telling the

15 truth.  Basically that's what that means?

16 A   I'm not swearing to God.  Swearing to God is I swear.

17 Q   So what does on God mean?

18 A   On God, it just mean like practically, like, period, like,

19 on God, but I'm not swearing.  Swearing -- do you know what

20 swearing is?

21 Q   I do.

22 A   I swear to God, do you swear.

23 Q   Right.  So you're saying as a religious person you just

24 use God like whenever?

25 A   Yeah.

1   Q   Okay.  Did you release a song called "Everything?" --

2   that's the name of the song -- in 2016?

3   A   Yes.

4   Q   Okay.  And I would like to play a part of that song for

5   you now and then ask you some questions about that afterwards.

6   Is that okay?

7   A   Okay.

8           THE COURT:  Are you admitting a file that includes

9   the song or --

10          MS. IZMAYLOVA:  Yes, your Honor.

11          THE COURT:  What exhibit number is it?

12          MS. IZMAYLOVA:  Defendant's Exhibit 37.

13          THE COURT:  All right.  Any objection to Defense 37?

14          MS. MOORE:  No, your Honor.

15          THE COURT:  Defendant's Exhibit 37 admitted.

16          (Whereupon, Defendant's Exhibit 37 was marked for

17  purposes of identification and admitted into evidence, and an

18  audio recording was played.)

19          MS. IZMAYLOVA:  Can you pause it.  Sorry, I just --

20  never mind.  Actually, just play the whole thing.

21          (Whereupon, an audio recording was played.)

22  BY MS. IZMAYLOVA:

23  Q   You can pause it.  That's the song called "Everything?"

24  A   Uh-huh.

25  Q   Okay.  Obviously that's not the whole song, but that's

1   part of it.

2   A   Yes.

3   Q   Did -- correct me if I'm wrong, but what I heard you

4   saying is, quote, don't be fucking trick N-word just so you

5   can eat.  That's the shit I did, and it really makes me weak.

6   I would close my eyes dying for it to be over.  The thought of

7   a stranger inside, I just can't be sober.  Is that the correct

8   quote?

9   A   Yes.

10  Q   And you were -- before that quote you addressed it to your

11  sister, Hennessy; is that correct?

12  A   Yes.

13  Q   And that is, in fact, your sister's name?

14  A   Yes.

15  Q   In real life?

16  A   Yes.

17  Q   Okay.  You have stated that one of the ways in which my

18  client has defamed you is by alleging that you are a user of

19  drugs; is that correct?

20  A   Yes.

21  Q   And you have denied being a drug user; is that right?

22  A   I have denied doing cocaine, and that's what your client

23  has accused me of.  Your client has accused me of doing

24  cocaine --

25  Q   If you could just answer my questions yes or no just like

1   my client was doing with your attorney yesterday --

2          THE COURT:  Hold on a second.  Hold on a second.

3   Okay.  So if she's talking, then you can object to the

4   nonresponsiveness of the answer, but you don't just get to cut

5   her off.  Your question was drug user; right?

6          MS. IZMAYLOVA:  Correct.

7          THE COURT:  And so she was explaining that she had

8   denied using cocaine and going further, and then you cut her

9   off.  So if you wanted to ask her a more specific question,

10  then you can, but I think that answer was responsive to the

11  answer.

12         MS. IZMAYLOVA:  Yes, your Honor.

13         THE COURT:  So you can finish your answer if you can

14  remember the question.

15         THE WITNESS:  Your client has accused me of doing

16  cocaine repeatedly, and I have denied it repeatedly.

17  BY MS. IZMAYLOVA:

18  Q   So you do not deny that you use other drugs.  Is that what

19  you're saying?

20  A   I have used certain other things.

21  Q   Like molly?

22  A   I -- the thing about molly is --

23         THE COURT:  Yes or no?

24         THE WITNESS:  Yes, yes.

25  BY MS. IZMAYLOVA:

1   Q    And Percocets?

2   A    I have done Percocets when I was prescribed Percocets

3   because I've done a couple of surgeries.

4   Q    So your testimony is that you're a drug user of other

5   drugs except for cocaine?

6   A    I'm not a drug user because I don't do it.

7   Q    But you have done drugs?

8   A    I have done it before.

9   Q    But you've never done cocaine?

10  A    I've never done cocaine.

11  Q    Have you smoked weed?

12  A    I've smoked weed before.

13  Q    You drink alcohol I'm assuming?

14  A    Yes.

15  Q    So just cocaine is the thing that you do not do?

16  A    I don't do cocaine.

17  Q    On December 5th, 2018, you had tweeted, I think, either

18  tweeted or put on Instagram an announcement that you and your

19  husband had separated at that time.  Do you recall that?

20  A    Can you repeat that again.

21  Q    I'm sorry.  On December 5th of 2018, you made an

22  announcement to the media -- I don't remember which platform

23  you used, but in general you made an announcement that you had

24  split from your husband at that time?

25  A    Yes.

1  Q    Okay.  And then on January 31st, 2019, about two months

2  later, you had made another announcement that you guys -- the

3  two of you had reconciled; is that correct?

4  A    Yes.

5  Q    And you have stated that another way that my client

6  allegedly defamed you is by saying that you have cheated on

7  your husband; is that right?

8  A    Yes.

9  Q    Have you ever encouraged anyone to cheat on their

10 significant other?

11 A    When I was around 21, when I was doing videos, I wasn't

12 encouraging.  I was just saying, like, hey, if a guy cheat on

13 you, you should cheat on him back.  But that's when I was

14 single.

15 Q    But you did make that video; right?

16 A    Yes, I did.

17        MS. IZMAYLOVA:  And so at this point, your Honor, I

18 would like to introduce Defense Exhibit 61 into evidence.

19        THE COURT:  I'm assuming the plaintiffs have your

20 list.  Any objection to 61?

21        MS. MOORE:  No, your Honor.

22        THE COURT:  61 is admitted.

23        (Whereupon, Defendant's Exhibit 61 was marked for

24 purposes of identification and admitted into evidence.)

25        MS. IZMAYLOVA:  And may I publish to the jury, your

1   Honor?

2          THE COURT:  Yeah.  Once something has been admitted

3   you can publish it to the jury.

4          MS. IZMAYLOVA:  Thank you, Judge.

5          (Whereupon, a video recording was played.)

6   BY MS. IZMAYLOVA:

7   Q    That is you in the video?

8   A    Yes.  That is me.

9   Q    Is this the video that you were referring to earlier?

10  A    Yes.

11  Q    On your direct examination you testified that my client

12  was the first person or was the person, the source, that told

13  everybody that you have cold sores; is that correct?

14  A    Can you repeat that again.

15  Q    I'm sorry.  On your direct examination you testified that

16  my client, Ms. Kebe, was the source who told everyone, like,

17  you know, social media, whoever, the public, that you had cold

18  sores; is that right?

19  A    She was one of them, and she was the only one that didn't

20  retract it.

21  Q    And you also testified that my client was the one that

22  made up the nickname Cold Sore B?

23  A    Yes, and Herpes B.

24  Q    Now, in May of 2018 Azealia Banks -- do you know who --

25  you're familiar with Azealia Banks; right?

1  A    Yes.

2  Q    She's another celebrity like yourself?

3  A    Yes.

4  Q    I mean, she's probably not as widely known, but she's a

5  celebrity.  Could we agree to that?

6  A    Uh-huh.

7  Q    In 2018 Azealia Banks called you a, quote, mediocre cold

8  sore having bird, end quote.  Do you remember that?

9  A    I really don't remember that, but I'm pretty sure that it

10 happened.

11 Q    And then after she said that, you and her got into an

12 online feud with one another.  Do you remember that?

13 A    Yes.

14 Q    And she even went on the Breakfast Club to talk about it.

15 Do you remember that?

16 A    Yes.

17 Q    And that all happened in May of 2018?

18 A    Yes.

19 Q    And the Starmarie Jones interview was not released until

20 September of 2018; correct?

21 A    Yes.  But your client also made --

22 Q    Correct?

23 A    -- the Herpes B.

24         MS. IZMAYLOVA:  Your Honor, if you would --

25         THE COURT:  Yeah.  So, ma'am, you need to follow the

1  same rules that I had for Ms. Kebe, that you only answer the

2  question that's asked.  Your lawyer will get a chance to come

3  back and ask you questions again after Ms. Izmaylova is

4  finished.  So if there's things that need to be clarified, I'm

5  sure she'll give you the opportunity to do it.

6           THE WITNESS:  Okay.

7           THE COURT:  Thank you.

8           MS. IZMAYLOVA:  Thank you, your Honor.

9           And after the feud, the online feud with Azealia

10  Banks, that's when the internet started giving you the

11  nickname of Cold Sore B; isn't that correct?

12           THE WITNESS:  No.

13  BY MS. IZMAYLOVA:

14  Q   You do not recall it that way?

15  A   I do not recall it that way.

16  Q   So your testimony is that the first time the, you know,

17  nickname or the word, the term "Cold Sore B" was ever on the

18  internet was when my client, Ms. Kebe, posted it onto the

19  internet; is that correct?

20  A   Correct.

21  Q   Thank you.  In regard to your feud with Azealia Banks, you

22  state -- you deny that you have cold sores or any herpes

23  virus; is that correct?

24  A   Uh-huh.

25  Q   And, you know, those video -- the video of the Breakfast

1  Club interview with Azealia Banks is still available online;

2  correct?

3  A   I guess so, yes.

4  Q   And her tweets and posts where she said, you know, that

5  you're a mediocre cold sore having bird, they're still

6  available online; correct?

7  A   Yes.

8  Q   You have never sued Azealia Banks for defamation; is that

9  right?

10 A   No, because --

11 Q   Just yes or no thank you.

12 A   No, I haven't.

13        THE COURT:  That's a good example.  If the because is

14 important, Ms. Moore will come back and ask you why.

15        THE WITNESS:  Okay.  I don't know if this --

16        THE COURT:  If it's a question you can answer yes or

17 no, then that's the way you should answer.

18        THE WITNESS:  Okay.

19        THE COURT:  If it's not a question you can answer yes

20 or no, you can tell me you can't answer it that way and tell

21 me why perhaps.  But if it's yes or no, it's yes or no, and

22 your lawyer can ask you why.

23        THE WITNESS:  Okay.

24        MS. IZMAYLOVA:  Thank you, your Honor.

25        I want to briefly speak about the test results that

1  your attorney moved into evidence on your direct examination

2  from UCLA.  Do you recall what I'm talking about?

3          THE WITNESS:  Yes.

4  BY MS. IZMAYLOVA:

5  Q   And you've already said that your name -- by your name I

6  mean Belcalis Almánzar -- is not on the record; correct?

7  A   No, it's not.

8  Q   And your testimony, I believe, was that it was for -- that

9  was for privacy reasons; is that right?

10 A   Yes.

11 Q   Both of the tests that your attorney introduced were done

12 in 2020; is that right?

13 A   Yes.

14 Q   And you filed this lawsuit in March of 2019; correct?

15 A   Yes.

16 Q   And you took those tests specifically for this lawsuit; is

17 that right?

18 A   Yes.  However, can I --

19         THE COURT:  There's no other question pending.  Thank

20 you.

21         THE WITNESS:  Okay.  Sorry.

22 BY MS. IZMAYLOVA:

23 Q   And despite that, you still chose to use not one but two

24 separate aliases; is that right?

25 A   Yes.  I choose different alias all the time.

```
1   Q   I don't want to keep having to tell you -- I'm sorry.  I

2   don't want to be rude but --

3           THE COURT:  I think that was a fair one.

4           MS. IZMAYLOVA:  Okay.

5           THE COURT:  I don't want to comment beyond that, but

6   I think that explanation made sense --

7           MS. IZMAYLOVA:  We'll move on.

8           THE COURT:  -- in the context of the question that

9   you asked.

10          MS. IZMAYLOVA:  Thank you, Judge.

11          I believe that you had testified also -- now I want

12  to talk a little about the tattoos that we saw that you

13  testified about.  And I could have -- maybe I misheard you,

14  but did you state that you got that Tommy tattoo in 2016?

15          THE WITNESS:  I'm not sure if it was 2015 or 2016.

16  It was definitely around those two times.  I was in a

17  relationship with somebody around that time, and it's on my

18  left wrist.

19  BY MS. IZMAYLOVA:

20  Q   I got you.  But I feel like most of the other ones are

21  kind of closer to 2010.  Is that fair to say?

22  A   Yes.

23  Q   So this one was not at the same time as those; is that

24  fair?

25  A   No.  Those wasn't, not that one.  This one wasn't.
```

1  Q   Okay.  And you, I believe, stated on direct that you had

2  gotten all of the tattoos that we were discussing or that your

3  attorney was discussing while you were stripping?

4  A   No.  My peacock tattoo and my tattoos right here, they

5  were before stripping.  Actually, got my peacock tattoo -- I

6  started getting my peacock tattoo the same day that I turned

7  18.

8  Q   Do you remember what year that was by any chance?

9  A   That was I'm saying about October 11, 2010.

10 Q   2010.  Okay.

11 A   Yes.

12 Q   But in regards to 2015 or 2016, were you still stripping

13 at that time or were you no longer doing that?

14 A   No, I wasn't.

15 Q   Okay.  Now, another alleged defamatory statement that my

16 client made is that you were a prostitute; is that correct?

17 A   Yes.

18 Q   And you have obviously denied that statement?

19 A   Yes.

20 Q   So in that denial did you -- by denying that statement, do

21 you deny that you ever referred to yourself as, you know, a ho

22 or stripper ho or anything of the like?

23 A   Can you repeat that again.

24 Q   You deny being a prostitute; right?

25 A   Yes.

1  Q   And with that denial, do you also deny that you have ever

2  called yourself -- referred to your own self as a stripper ho

3  or a ho or any of those types of terms?

4  A   No, I never denied that.  I deny myself calling -- I deny

5  prostitute, prostitute.  I never denied saying I'm a stripper

6  ho, not nothing like that.

7  Q   And there's a difference to you?

8  A   There is a difference.

9  Q   Okay.  But you do not deny that you have called your own

10 self a stripper ho?

11 A   I never denied that.

12 Q   Okay.  So, your Honor -- well, let me ask you this.  A lot

13 of the times that you were referring to yourself in these

14 terms, was that captured on videos that you had posted to the

15 internet?

16 A   Yes.

17         MS. IZMAYLOVA:  Your Honor, at this time I would like

18 to show Ms. Almánzar Defense Exhibit 57 for identification.

19         THE COURT:  Okay.

20         MS. MOORE:  No objection.

21 BY MS. IZMAYLOVA:

22 Q   Does that look like you?

23 A   Yes.

24 Q   Okay.  So you remember making that video?

25 A   Yes.

1          MS. IZMAYLOVA:  Your Honor, I would like to move

2  Defense Exhibit 57 into evidence.

3          THE COURT:  Any objection?

4          MS. MOORE:  No, your Honor.

5          THE COURT:  57 is admitted.

6          (Whereupon, Defendant's Exhibit 57 was marked for

7  purposes of identification and admitted into evidence and a

8  video recording was played.)

9          MS. IZMAYLOVA:  Your Honor, I would like to show

10 Ms. Almánzar Defense 58 for identification purposes.

11          THE COURT:  Thank you.

12          MR. SABBAK:  Excuse me.  Sorry.

13 BY MS. IZMAYLOVA:

14 Q    Does that look like you?

15 A    Yes.

16 Q    Do you remember making that video?

17 A    I don't remember but I practically -- it's there.  I did

18 it.

19          MS. IZMAYLOVA:  Okay.  So I would like to move

20 Defendant's Exhibit 58 into evidence, your Honor.

21          THE COURT:  Any objection?

22          MS. MOORE:  No, your Honor.

23          (Whereupon, a video recording was played.)

24          THE COURT:  Okay.  Let me rule before you start the

25 videos if you don't mind.  That's the second time you've done

1    that, and the record needs to have my response.  And then you

2    can play the video.  Thank you.

3              (Whereupon, Defendant's Exhibit 58 was marked for

4    purposes of identification and admitted into evidence and a

5    video recording was played.)

6    BY MS. IZMAYLOVA:

7    Q    That's you in the video?

8    A    Yes.

9              MS. IZMAYLOVA:  At this time I would like to show

10   Ms. Almánzar Defense Exhibit 60 for identification purposes.

11             THE COURT:  Yes, ma'am.

12   BY MS. IZMAYLOVA:

13   Q    Is that you in that video?

14   A    Yes.

15             MS. IZMAYLOVA:  Okay.  You can pause it.  Your Honor,

16   we move Defense Exhibit 60 into evidence.

17             THE COURT:  Any objection?

18             MS. MOORE:  No, your Honor.

19             THE COURT:  60 is admitted.

20             (Whereupon, Defendant's Exhibit 60 was marked for

21   purposes of identification and admitted into evidence and a

22   video recording was played.)

23   BY MS. IZMAYLOVA:

24   Q    And that's you in that video as well?

25   A    Yes.

```
 1            MS. IZMAYLOVA:  At this time I would like to show
 2   Ms. Almánzar Defense Exhibit 63 for identification purposes.
 3            THE COURT:  Yes, ma'am.
 4   BY MS. IZMAYLOVA:
 5   Q   Does that look like you in the video?
 6   A   Yes.
 7            MS. IZMAYLOVA:  Okay.  I would move Defense
 8   Exhibit 63 into evidence, your Honor.
 9            THE COURT:  Any objection?
10            MS. MOORE:  No, your Honor.
11            THE COURT:  63 is admitted without objection.
12            (Whereupon, Defendant's Exhibit 63 was marked for
13   purposes of identification and admitted into evidence and a
14   video recording was played.)
15   BY MS. IZMAYLOVA:
16   Q   Is that you in that video?
17   A   Yes.
18   Q   And the rules -- at the beginning you said, Rule No. 1,
19   never fall in love with a trick; is that correct?
20   A   Yes.
21   Q   And a trick is another term for a john, is it not?
22   A   What is a john?  I don't know what is a john.
23   Q   A john is someone who seeks the companionship of a
24   prostitute.
25   A   No.  A trick is a rich -- you would say a rich boyfriend
```

1   or a man that you have a relationship with.  You don't really

2   love him, but you're not selling your vagina.  You're in a

3   relationship with him.  It's like having a rich boyfriend.

4   Q   So then in that Defense 63, the video we just watched,

5   when you say Rule No. 3, shit ain't for free, make sure you

6   get that cheese before you give a little tease, what are

7   you -- aren't you referring to the exchange of money for

8   sexual favors?

9   A   No, it's not even that.  It's like, you know, you don't

10   have to sleep with a man right away.  You don't have to sleep

11   with a man right away.  I'm married.  I didn't sleep with my

12   husband right away just because I liked him, and he also

13   bought me gifts and took me to really nice expensive dates

14   before I ever slept with him.  And I'm married to him.  He's

15   my husband.

16   Q   Do you think that that's a requirement, someone has to pay

17   you first before you sleep with them?

18   A   That is not paying.  That is not paying.  You're not

19   paying me to sleep with me.  That is a requirement that I

20   have.  I require -- I require to be with a man that could

21   financially sustain me, that could buy me nice things, that

22   could help me pay bills -- well, half on the bills now.  You

23   know what I'm saying.  I'm married -- and take me to expensive

24   dates.  That is the requirement that I have with everybody,

25   every -- that I always have, even with my own husband, of

1    course.  I'm not going to date -- I dated broke men.  I'm not

2    going to date broke guys, no.

3    Q    Okay.  Do you recall performing at the Hot 97 Summer Jam

4    in 2019?

5    A    Yes.

6    Q    It was -- I believe it was thrown by Tidal, the streaming

7    service Tidal?

8    A    Most likely, yeah.

9    Q    Okay.  And so you do recall performing there?

10   A    Yes.

11            MS. IZMAYLOVA:  I would like to show Ms. Almánzar

12   Defendant's Exhibit 6 for identification purposes only.

13            THE COURT:  All right.

14   BY MS. IZMAYLOVA:

15   Q    Do you see that video?

16   A    Yes.

17   Q    Does that look like the performance I'm speaking of?

18   A    Yes.

19   Q    Do you remember that now?

20   A    Excuse me?

21   Q    Do you remember performing at the Summer Jam now?

22   A    Yes.

23            MS. IZMAYLOVA:  Okay.  Your Honor, at this time I

24   would move Defense Exhibit 6 into evidence.

25            THE COURT:  Any objection?

1          MS. MOORE:  No, your Honor.

2          THE COURT:  Defendant's 6 is admitted.

3          (Whereupon, Defendant's Exhibit 6 was marked for

4    purposes of identification and admitted into evidence and a

5    video recording was played.)

6    BY MS. IZMAYLOVA:

7    Q    That was you in that video; correct?

8    A    Yes.

9    Q    And when you were speaking, did you hear yourself say,

10   quote, we getting money scamming, selling pussy 9:00 to 5:00,

11   one way or another we hustling?

12   A    Yes.  I'm talking to the audience, like we're getting

13   money whichever type of way.  I'm not discriminating what

14   you're getting.  That's why I said 9:00 to 5:00 scamming,

15   hustling, selling pussy.  That's what I'm saying.  Clearly I'm

16   an artist, so I'm not selling pussy or I'm scamming or I'm

17   having a 9:00 to 5:00.  I'm literally an artist, so I'm

18   describing different type of incomes to the crowd.

19   Q    But you said we as in collective; correct?

20   A    Yes, because we are all in the building.

21   Q    Is that correct?

22   A    Correct.

23   Q    Thank you.  I believe you already admitted on direct that

24   you did work with Starmarie Jones; is that correct?

25   A    I did.

1    Q   So you knew her for -- so to say that you just didn't know

2    her at all, that would not be correct?

3    A   It is correct because I don't know her -- I didn't know

4    her real name.  I didn't know her age.  I didn't know where

5    she lived.  I know that she was my co-worker because we worked

6    in the same club, but I didn't know her, just the same way as

7    you don't know me but we're here.  I didn't know her, and I

8    still don't know her.

9    Q   In about December of 2018 -- it was toward the end of

10   2018.  It was after Ms. Kebe had published the interview with

11   Starmarie Jones.  Do you recall going on your Instagram Live

12   and addressing that situation?  You were in a hotel room, and

13   you had like a towel on your head or something like that.  Do

14   you remember that?

15   A   I don't remember.

16           MS. IZMAYLOVA:  Okay.  I would like to show

17   Ms. Almánzar Defense Exhibit 1 for identification purposes

18   only.

19           THE COURT:  Thank you.

20           MS. MATZ:  What was the number?

21           MS. IZMAYLOVA:  No. 1.

22   BY MS. IZMAYLOVA:

23   Q   Can you see that video?

24   A   Yes.

25   Q   Is that you in that video?

1  A    Yes.

2  Q    Does seeing that now refresh your memory about that video?

3  A    No.  It actually don't.

4  Q    You don't remember making this video?

5  A    Clearly I did it, but I don't remember what I said.

6  Q    Right.  But you remember that you made it?

7  A    Yes.

8           MS. IZMAYLOVA:  Okay.  Your Honor, at this time I

9  would like to move Defense Exhibit 1 into evidence.

10          THE COURT:  Any objection?

11          MS. MOORE:  Your Honor, I'd like to confer, please.

12          THE COURT:  You want to confer with --

13          MS. MOORE:  No, your Honor, at the bench, yes.

14          (Whereupon, a bench conference was held between the

15  court and counsel.)

16          THE COURT:  Yes, ma'am.

17          MS. MOORE:  Your Honor, I just wanted to mention that

18  this --

19          THE COURT:  A little bit louder.

20          MS. MOORE:  I'm sorry.  Can you hear me okay?

21          THE COURT:  I can hear you but I want to make sure

22  she --

23          MS. MOORE:  Okay.  I just want to make sure that --

24  there's a mention of the counterclaims in this video and this

25  was -- any mention of counterclaims was ruled out in the

1    pretrial order.  So if you're not going to show that, there's

2    no concern.

3            MS. IZMAYLOVA:  I have a specific time stamp because

4    I cut out the part where she talks about Skeemo but I don't --

5    I only cut out the part where it would be like potential

6    gangs.

7            THE COURT:  About what?

8            MS. IZMAYLOVA:  About potential gangs.

9            MS. MOORE:  But you have stuff in that video that go

10   to Ms. Kebe's counterclaims.  Those are not -- that isn't

11   excluded.

12           MS. IZMAYLOVA:  I don't know for -- is there a way we

13   can take a minute to make sure?

14           MS. MOORE:  Once you show the jury you unring the

15   bell --

16           MS. IZMAYLOVA:  I was not trying to -- I don't think

17   I do, but I don't want to --

18           THE COURT:  Well, then don't play it then until you

19   know.  You can come back to it after the next break.

20           MS. MOORE:  Yeah, we'll take a break, and we'll

21   listen to it.

22           THE COURT:  We'll take another break about 4:00, and

23   you can listen to it in the break.

24           MS. IZMAYLOVA:  I want (inaudible) --

25           THE COURT:  Well, then do you have head phones?  Put

1  your head phones on and listen to it.

2       MS. MOORE:  If you want to take a bathroom break, I

3  can use one.  I've been drinking a lot of water so --

4       THE COURT:  No, we're not -- I don't want to take

5  one.  We just took one 40 minutes ago.

6       MS. MOORE:  Okay.

7       MS. IZMAYLOVA:  I mean, I specifically -- whenever I

8  listened to it, I specifically --

9       THE COURT:  How long is it?

10      MS. IZMAYLOVA:  From 6:50 to 9:15 --

11      MS. MOORE:  You're going to have to listen it to.

12      THE COURT:  Yeah.  I mean, you can't play it if it's

13  in there.

14      MS. IZMAYLOVA:  That's what I'm saying.  I don't

15  think that clip --

16      THE COURT:  Well, you've got to give you some

17  certainty, and you can't.  So why don't you have your

18  co-counsel listen to it or just go sit down and listen to it.

19  We'll sit quietly for three minutes while y'all listen to it.

20      MS. MOORE:  Thank you, your Honor.

21      (Whereupon, the following proceedings continued in

22  open court.)

23      THE COURT:  So, ladies and gentlemen, we're going to

24  just take a time out here for three minutes so that the

25  defendant's counsel can listen to this post just to make sure

1  that it doesn't have something in it that I had ruled out of

2  the evidentiary presentation, just to make sure.

3         MS. IZMAYLOVA:  Judge, may I approach?

4         THE COURT:  Hold on a second.  You both can.

5         (Whereupon, a bench conference was held between the

6  court and counsel.)

7         MS. IZMAYLOVA:  I just realized something.  This

8  video was made in December 2018.  The lawsuit wasn't filed

9  yet, so there would have been no Kebe counterclaims.

10        THE COURT:  Did y'all just listen to it?

11        MS. IZMAYLOVA:  No.

12        THE COURT:  Well, listen to it.

13        MS. IZMAYLOVA:  I don't have --

14        MS. MOORE:  Well, we would like to listen to it, your

15  Honor.

16        THE COURT:  I thought y'all were listening.

17        MS. MOORE:  We had just started the first second and

18  then she --

19        THE COURT:  Okay.  Let's let them finish listening to

20  it.  Then they may have no objection to it.

21        MS. IZMAYLOVA:  Thank you.

22        MS. MOORE:  Yeah, we haven't started.  We're going to

23  start right now.

24        (Whereupon, the following proceedings continued in

25  open court.)

1          THE COURT:  All right.  So, plaintiff, do you have an

2    objection to anything on the video?

3          MS. MOORE:  Yes, your Honor, pretrial conference.

4          THE COURT:  All right.  Well, hold on.  Let me just

5    ask the jury if y'all would step out for a few moments.  I was

6    trying to -- hoped that I could handle it without you having

7    to go out.

8          COURTROOM SECURITY OFFICER:  All rise.

9          (Whereupon, the jurors exited the courtroom.)

10         THE COURT:  All right.  Y'all can be seated.  So

11   given the prohibition on cameras in the courtroom, I didn't do

12   it, but I really wanted to take a picture of the two of you

13   with your headphones on.  And y'all looked like y'all were in

14   high school listening to some great album.

15         So what's your objection?

16         MS. MOORE:  Your Honor, this video was specifically

17   ruled on by your Honor at the motion in limine hearing.  This

18   is a video that defendants have contended the entirety of this

19   case prove that my client is a gang member, and there is

20   language in this video concerning bury a block, I'll go to

21   jail for my kid, that they have used in their motion for

22   summary judgment in support of their counterclaims that your

23   Honor dismissed in their entirety, to infer that this was

24   showing that my client was threatening Tasha K, to kill her,

25   and that she was in a gang because bury a block is a gang

 1   reference.  So this has been excluded on multiple grounds.

 2           THE COURT:  Okay.  Let's just play it, let me see it,

 3   and then I'll know what you're talking about.  Okay.

 4           MS. IZMAYLOVA:  And just for the record I'm only

 5   wanting to play -- I was only going to publish from minute

 6   60 -- sorry -- 6:50 until 9:15.

 7           MS. MOORE:  And that's the section we just listened

 8   to, your Honor.

 9           THE COURT:  Okay.  6:50 until 9:15.  All right.  Go

10   ahead.

11           MR. SABBAK:  Yes, sir.

12           (Whereupon, a video recording was played.)

13           THE COURT:  So that was the length of what you were

14   intending to play?

15           MS. IZMAYLOVA:  Yes, sir.

16           THE COURT:  And so what was the purpose of it?

17           MS. IZMAYLOVA:  To -- well, because she specifically

18   talks about suing my client for defamation of character, and

19   she goes on to say I can't be -- I hate being famous because

20   that means I can't put my hands on people, so I'm going to sue

21   you instead.

22           THE COURT:  What is that relevant to?  What issue is

23   that -- I mean, we know she sued your client so --

24           MS. IZMAYLOVA:  Because, I mean, our whole entire

25   position is that she sued her because she couldn't have -- she

1  couldn't physically fight her.

2        THE COURT:  What is that relevant to in the lawsuit,

3  though?  The lawsuit is your client said stuff allegedly

4  about -- your client said stuff about her.  That's not

5  allegedly but that it allegedly defamed her and allegedly

6  caused her damage and that there was no -- and that your

7  client had malice when she did what she did or she was in

8  reckless disregard for the truth when she published what she

9  did.  So assuming that the plaintiff wanted to lay her hands

10 on the defendant and felt like she couldn't do that because

11 she's famous and she would be herself then in trouble for

12 doing that, what difference does it make?  I mean -- go ahead.

13       MS. IZMAYLOVA:  I'm sorry, your Honor.  I didn't mean

14 to cut you off.  Basically that she doesn't really feel like

15 she was defamed.  She's just filing a suit because she can't

16 put her hands on my client.

17       THE COURT:  Your logic makes no sense.  It is the

18 fact that she was defamed, which is the purpose that she

19 wishes she could put her hands on your client, I guess.  I

20 mean, I don't think this goes to any of the issues in the

21 lawsuit.  I mean, I understand your point about, okay, maybe

22 she wasn't defamed because she said things that your client

23 can argue provided the bases for your client's claims against

24 her or even if she was defamed, then maybe she wasn't damaged

25 because of the way she talks about herself and her life.  I

1  understand those things, but I don't think this video goes to

2  any of that.  So did you have any other basis that this would

3  be admissible?

4          MS. IZMAYLOVA:  No, just for her state of mind of why

5  this has been going on for three years.  I mean, that's

6  what --

7          THE COURT:  Her state of mind.

8          MS. IZMAYLOVA:  -- our basis is, is that.

9          THE COURT:  Explain that, her state of mind.

10         MS. IZMAYLOVA:  Like, I mean, I have -- I had this

11  thing and then two more questions about, like, her anger

12  towards my client and the fact that she just wants to attack

13  her.  I mean, that has nothing to do with gangs.  That has

14  nothing to do with -- I mean, anyone can want to fight

15  somebody.  It doesn't mean that they're necessarily in a gang.

16  I'm not even broaching that subject at all.

17         THE COURT:  Well, that's true but I still -- her

18  state of mind.  So the Skeemo part, I mean, when he was

19  mentioned at the very end, I mean, nobody really knows that's

20  involved in this trial, the jurors I mean, who Skeemo is.  So

21  that's not going to alert anybody to anything necessarily if

22  that's where it's cut off.

23         MS. IZMAYLOVA:  I mean, I can cut it off before she

24  mentions his name even because she says what I -- the thing

25  that I am going to ask her about she says right before then.

1  I just -- the only reason why I did it, so because it made

2  like she -- I didn't want to cut it off in the middle of her

3  talking to not make it seem like we were trying to hide

4  something.  That's all.  But we can cut off his name even from

5  being mentioned.  That's not relevant at all to what I'm going

6  to ask her, if that's the concern.

7          THE COURT:  Ms. Moore.

8          MS. MOORE:  Your Honor, in addition to what I

9  previously said about this being specifically excluded --

10         THE COURT:  I mean, she makes a good point.  There's

11 really nothing about that that's gang related in that

12 inherently --

13         MS. MOORE:  In the Skeemo part?

14         THE COURT:  No, not that but the stuff before that.

15         MS. MOORE:  I just want to note, your Honor, that --

16 and I'm not suggesting that Ms. Izmaylova did this

17 intentionally, but when we conferred, when I requested to

18 confer, she represented to you twice that she'd taken the

19 Skeemo part out.  And I said we needed to check, and you just

20 heard the Skeemo part.

21         MS. IZMAYLOVA:  There was another Skeemo part that I

22 was referring to where she said that Skeemo turned me hat.

23 That's the part I was talking about.

24         THE COURT:  Well, why don't you go ahead and tell me

25 why -- and I say you, Ms. Moore, why --

1           MS. MOORE:  I want to make sure, your Honor --

2           THE COURT:  What is prejudicial about what she says?

3  I mean, I kind of get the point that, okay, she's not really

4  emotionally damaged.  I mean, that's the allegation.  It's

5  just all about retribution, you know, it's about revenge.

6  What about that?

7           MS. MOORE:  Your Honor, under Rule 403 and 404 any

8  suggestion that my client is in a gang.  Bury a block is a --

9           THE COURT:  Wait a minute.  What was the suggestion

10 about gang there?  I didn't hear it.

11          MS. MOORE:  Bury a block, your Honor.  I want to make

12 sure we're talking about the same thing, your Honor.  I'm

13 sorry.  I may not be talking about the same part of the video

14 that you are right now, with Olga.  I want to make sure --

15          THE COURT:  I'm just talking about the video.  Was

16 there a part of the video that referenced a gang?

17          MS. MOORE:  Your Honor, the reference to bury a

18 block, that's --

19          THE COURT:  That's a reference to violence but not

20 gang.

21          MS. MOORE:  Well, your Honor, what I'd like to say is

22 the defendants have pursued this entire case citing that video

23 as evidence that our client is in a gang, so I find it very

24 disingenuous that they're in here today, number one.  Number

25 two, this references her counterclaims which were dismissed on

1  summary judgment.

2        THE COURT:  That doesn't reference a counterclaim.

3  What's in there that says about a counterclaim?

4        MS. MOORE:  That suggestion that she's going to kill

5  Tasha, like I'm going to go to jail for my daughter --

6        THE COURT:  Wait a minute.  Wait a minute.

7  Ms. Moore.  Ms. Moore.  Okay.  So one of the things that

8  Ms. Izmaylova pointed out when y'all were still listening, was

9  that this video was made before a lawsuit was ever filed.  Is

10  that true?

11        MS. IZMAYLOVA:  Yes.

12        MS. MOORE:  Yeah?  What is -- I don't know the date.

13  What is the date of this lawsuit -- I mean the video?

14        MS. IZMAYLOVA:  December 2018.

15        THE COURT:  When is the lawsuit filed?

16        MS. MOORE:  March 21st.

17        THE COURT:  Of 2019; right?

18        MS. MOORE:  Yes.

19        THE COURT:  So it couldn't have been referencing any

20  kind of counterclaim because there was no counterclaim filed.

21  There was no lawsuit filed.  So the point I had before that

22  has escaped me, but there's nothing in there that mentions a

23  gang, number one.  Number two, there are no counterclaims

24  pending.  The jury knows about -- does not know about any

25  counterclaims.  They won't know about any counterclaims by

1   listening to this video.  What they will know about is that

2   the plaintiff was expressing frustration -- they'll have to

3   decide whether it was justified or not -- and that she was

4   expressing some general desire to beat up your client -- I

5   mean, beat up their client, beat up the defendant.

6           They'll have to decide whether that was justified.

7   Some people probably would think it is.  Some may not.  I

8   don't know.  But I kind of understand the point that, you

9   know, we're dealing with damages and liability.  I mean,

10  there's -- I don't know what the jury is going to do about

11  liability.  They could rule either way.  If they rule in favor

12  of the plaintiff on liability, then they still have the

13  damages question, and they have to decide is she really -- has

14  she really been emotionally distressed, has she had depression

15  and all of those things.  And there may be other witnesses,

16  but I know what we know right now, which is what the testimony

17  is.

18          The evidence on that is based right now on the

19  credibility of your client.  And if the jury were to determine

20  that she's really not emotionally distressed, she's just mad,

21  then that does kind of cut the legs out of the emotional

22  distress claim in light of the lack of any other evidence at

23  this point.  So I'm assuming again that there's going to be

24  more evidence, but still, I mean, it seems like it's something

25  they can at least argue and that her claim -- her statements

1  in there that seems to imply that she would like revenge is

2  maybe relevant.

3        MS. MOORE:  Your Honor -- I didn't mean to interrupt

4  you, your Honor.

5        THE COURT:  Go ahead.

6        MS. MOORE:  I thought you were finished.  I'm sorry.

7  Go ahead.

8        THE COURT:  I'm done for now.

9        MS. MOORE:  Okay.  Thank you.  I just want to make

10  sure I wasn't cutting you off, your Honor.  I think my concern

11  again, the entirety of this case the defendants have taken the

12  position in multiple papers before this Court --

13        THE COURT:  Wait a minute.  This was my point I was

14  trying to make earlier.  The jury doesn't know about any of

15  that stuff, so let's deal with the here and the now.

16        MS. MOORE:  I am, your Honor.  Please hear me out.

17        THE COURT:  The fact that they took the position she

18  was in a gang is irrelevant.  There is no allegation or

19  testimony.

20        MS. MOORE:  No.  No, your Honor.  You're

21  misunderstanding.  My point is they've taken the position in

22  all of their papers that the statement "bury a block" is an

23  explicit gang reference, not that she's in a gang.  I'm making

24  a different point, your Honor.  In all of their writings

25  before the Court they said that bury a block is clearly a gang

1  reference.  So I am very hard pressed to understand for two

2  and a half years how they've taken the position in writing

3  multiple times that that is so obvious that it's a gang

4  reference that they could stand here and say it's not now.

5  Respectfully, that is a gang reference.

6        MS. IZMAYLOVA:  If I may, your Honor?

7        THE COURT:  No, you may not, not now.  There are no

8  claims in this case about gang affiliation.  I would argue in

9  my generation bury a block is a Mafia reference, not a gang

10 reference.  It may be a gang reference, but there have been

11 plenty of people in areas where there's no formal Mafia that

12 have found themselves murdered in the bottom of wells and

13 ponds and things like that.  It's certainly a reference to

14 violence.  I get that.  And that's sort of the defendant's

15 point, that this lawsuit is about revenge as opposed to

16 psychological harm, seems to me.

17       So I think we're -- I think the plaintiffs are making

18 way too much of it, honestly.  I mean, my argument would be to

19 the jury that, heck, yeah, she was pissed off.  She should

20 have been pissed off if the stuff wasn't true, and

21 particularly given the cavalier attitude that the defendant

22 has taken about whether or not truth even matters in what she

23 puts out there.  That would make anybody mad.

24       I mean, let's go back and think of the Michael

25 Douglas movie -- I can't remember the name of it, the one

1  where he was a commuter, and he was just mad at traffic and he

2  just kind of lost it.  You know, things can trigger a lot of

3  emotions.  Mess with someone's daughter -- I don't have a

4  daughter.  But mess with someone's child generally, and

5  parents can lose it.

6        I'll tell you this:  The most dangerous cases I've

7  ever been involved in as a judge are divorce cases.  When you

8  start messing with custody issues with children, parents go

9  crazy because that's all they can think about is their

10  children.  So I have a hard time telling them they can't use

11  the references here that I saw other than up to the part where

12  Skeemo was discussed because it arguably goes to their defense

13  that this isn't about psychological harm.  I mean, they've got

14  a lot of defenses but -- to revenge, so I'm not going to

15  prevent that from being played.

16        And, again, don't ask me to do things that could get

17  you in trouble if you win this case and they appeal.  And I

18  think that's one of the kind of things that would matter.  I

19  don't know that it would be controlling.  I probably could

20  exclude it, but I know it's the kind of thing that appellate

21  judges look at when you start telling folks that evidence

22  can't come in that is arguably relevant to that their case.

23  And that's arguably relevant to the positions they've taken,

24  not the gang positions but the real motivation of the lawsuit

25  that's filed.  So I'm going to let them play that but not up

1  into the -- not past the Skeemo part -- not up to the Skeemo

2  part.

3        MS. IZMAYLOVA:  I want to cut it off as soon as she

4  says I hate being famous because I can't put my hands on

5  people.  Then we'll just cut it off right there.  That's like

6  several seconds before she mentions his name.

7        THE COURT:  That's actually arguable for the -- you

8  can spin that -- that's actually favorable to the plaintiff.

9  She does what she should do, what people should do.  They come

10  to court and ask judges and juries to intervene and not take

11  matters into their own hand.  That's my perspective of it.  So

12  I'm going to let them play that.  I'm going to admit that

13  document over the objection of the plaintiff, and I don't

14  remember.  Was it 1?

15        MS. IZMAYLOVA:  It was Defense Exhibit 1, your Honor.

16        THE COURT:  Okay.  Let's call the jury back, please.

17        MS. MOORE:  Your Honor, may I say one thing before

18  you do, please, your Honor?

19        THE COURT:  Sure.

20        MS. MOORE:  I would just expect that Ms. Izmaylova's

21  questioning will not try to back door into any gang reference.

22        THE COURT:  Well, I mean, she knows that she's not

23  supposed to go there, it could cause a mistrial if it does go

24  there, and that that would necessarily entertain Rule 11

25  sanctions.  So I hope she understands she can't.

1        MS. MOORE:  Thank you, your Honor.

2        THE COURT:  Thank you.  Thank you, sir.

3        COURTROOM SECURITY OFFICER:  All rise.

4        (Whereupon, the jurors entered the courtroom.)

5        COURTROOM SECURITY OFFICER:  Please be seated and

6  come to order.

7        THE COURT:  All right.  Thank you.  I apologize for

8  the break that we had.  Defendant has moved Defendant's

9  Exhibit 1.  The plaintiff has objected.  The Court has

10  sustained the objection in part to a small part of the video.

11  The rest is admitted over the objection of the plaintiff, and

12  you can play the part other than the part that we have -- that

13  I have ruled is inadmissible.  Thank you.

14        MS. IZMAYLOVA:  Thank you.

15        (Whereupon, Defendant's Exhibit 1 was marked for

16  purposes of identification and admitted into evidence and a

17  video recording was played.)

18  BY MS. IZMAYLOVA:

19  Q   Is that you in that video, Ms. Almánzar?

20  A   Yes.

21  Q   And when you -- when you refer to that blogger, are you

22  speaking about Ms. Kebe, my client?

23  A   Yes.

24  Q   And when you say I'm going to take all your fucking bread,

25  are you referring -- is that like a slang term for saying I'm

```
 1  going to take all your money?

 2  A   It means I'm going to sue you, yes.

 3  Q   But is bread a slang term for money?

 4  A   Yeah.

 5  Q   Okay.  Thank you.  Do you have -- do you know somebody by

 6  the name of Remy Roja?

 7  A   Yes.

 8          MS. IZMAYLOVA:  I would like to show Ms. Almánzar

 9  Defendant's Exhibit 106 just for identification purposes only.

10          THE COURT:  What's the number?

11          MS. IZMAYLOVA:  106, your Honor.

12          THE COURT:  Thank you.

13  BY MS. IZMAYLOVA:

14  Q   Are you able to see that on the screen or would you like

15  that to be bigger?

16  A   No, I can't.

17  Q   You can't see it?

18          THE COURT:  You might need to make it bigger if it's

19  possible.  Can you enlarge it?

20  BY MS. IZMAYLOVA:

21  Q   Are you able to see that better?

22  A   Yes.

23  Q   Do you recognize what this depicts?

24  A   Uh-huh.

25  Q   Can you tell me what that is?
```

1   A   Excuse me?

2   Q   Can you tell me what that document depicts?

3   A   That is me and Remy Roja, which I was cool with at the

4   time, talking about Tasha K because Tasha K claimed that

5   somebody that I know, her, is a crackhead.

6   Q   But you do -- so you remember having this conversation

7   with Remy Roja?

8   A   Yes.

9           MS. IZMAYLOVA:  Your Honor, at this time I would move

10   Defendant's Exhibit 106 into evidence.

11          THE COURT:  Any objection to 106?

12          MS. MOORE:  No, your Honor.

13          THE COURT:  106 is admitted without objection.

14          (Whereupon, Defendant's Exhibit 106 was marked for

15   purposes of identification and admitted into evidence.)

16   BY MS. IZMAYLOVA:

17   Q   And in this conversation that you're having, did you

18   write, quote, I want to kill Tasha K, yo, I'm sick of that

19   woman?

20   A   Yes.

21          MS. IZMAYLOVA:  Okay.  Thank you.  Your Honor, may I

22   confer with counsel for one second?

23          THE COURT:  Sure.

24          (Brief Pause.)

25          MS. IZMAYLOVA:  Just one or two more questions, your

1  Honor.

2         Ms. Almánzar, yesterday when my client was

3  testifying, you were sitting here.  Obviously, you were

4  watching her testify; correct?

5         THE WITNESS:  Uh-huh.

6  BY MS. IZMAYLOVA:

7  Q   Do you recall when you -- toward the end of her testimony

8  when you started hitting your hand with a fist, and you took

9  your jacket off and your attorney had to calm you down?  Do

10  you remember that?

11  A   Yes, but I had took my jacket off.  I was hot.  It was hot

12  in here.

13  Q   So you don't recall saying anything to my client as she

14  walked past you?

15  A   No, I didn't tell her anything.

16  Q   You didn't?  And your attorney didn't have to calm you

17  down?

18  A   Yes.  My attorney had to calm me down.

19         MS. IZMAYLOVA:  Okay.  Thank you.  No further

20  questions at this time, your Honor.

21         THE COURT:  Any redirect, Ms. Moore?

22         MS. MOORE:  Yes, your Honor.  Your Honor, could we

23  take a short break?

24         THE COURT:  Sure.  We'll take -- we didn't break

25  while y'all were out.  We were in here talking and watching

1  the video so I'm going to let -- we'll take a short break for

2  anyone to go to the restroom.  We'll come back, and we'll go

3  until this witness is finished or 5:00 o'clock, whichever

4  first happens.  Okay.  Thank you.

5          COURTROOM SECURITY OFFICER:  All rise.

6          (Whereupon, the jurors exited the courtroom.)

7          THE COURT:  Please be back in here by 4:00 o'clock.

8          MS. MATZ:  Yes, your Honor.  Thank you.

9          MS. MOORE:  Thank you, your Honor.

10         (Brief recess.)

11         COURTROOM SECURITY OFFICER:  All rise.  This

12  honorable court is again in session.

13         THE COURT:  Ms. Moore, you're ready to begin?

14         MS. MOORE:  Yes, your Honor.

15         COURTROOM SECURITY OFFICER:  All rise.

16         (Whereupon, the jurors entered the courtroom.)

17         COURTROOM SECURITY OFFICER:  Please be seated and

18  come to order.

19         THE COURT:  You can begin.

20                      REDIRECT EXAMINATION

21  BY MS. MOORE:

22  Q   Cardi, have you ever rapped about cheating on Offset?

23  A   No.

24  Q   Have you ever rapped that you put a beer bottle in your

25  vagina?

```
1   A   No.

2   Q   Have you ever rapped that you've done cocaine?

3   A   No.

4   Q   Have you ever rapped that you have herpes?

5   A   No.

6   Q   Have you ever rapped that you have HPV?

7   A   No.

8   Q   Cardi, have you done cocaine?

9   A   No.

10  Q   Have you done crack cocaine?

11  A   No.

12  Q   Have you done DMT?

13  A   No.

14  Q   Have you done heroin?

15  A   No.

16  Q   Have you done inhalants?

17  A   No.

18  Q   Have you done ketamine?

19  A   No.

20  Q   Have you done LSD?

21  A   No.

22  Q   Have you done peyote?

23  A   No.

24  Q   Have you done methamphetamine?

25  A   No.
```

```
1    Q    Have you done opioids?

2    A    What?

3    Q    Prescription opioids?

4    A    When I needed, yes.

5    Q    When they're prescribed by your doctor?

6    A    Yeah, prescribed.

7    Q    Have you done salvia?

8    A    No.

9    Q    Oxycontin?

10   A    When I was prescribed, yes.

11   Q    When you were prescribed by your doctor; correct?

12   A    Yes.

13   Q    Bath salts, have you done bath salts?

14   A    No.

15   Q    PCP?

16   A    No.

17   Q    Speed?

18   A    No.

19   Q    Whippits?

20   A    No.

21   Q    Shrooms?

22   A    No.

23   Q    So it isn't true that you do all the other drugs?

24   A    No.

25   Q    Cardi, can you explain for the jury the circumstances when
```

1   you did molly.

2   A    Okay.  So when I did molly, I didn't voluntarily did

3   molly.  And even though I don't do it regularly, I feel like

4   this is an important part of my life story.  When I was 20, I

5   met a young man.  He was really cute.  He was very smart,

6   persuasive and everything, and I went to a club with him.  I

7   went to hang out with him, and I was drinking Hennessy.  I

8   remember it was like my first shot of Hennessy.  I feel good.

9         Then I'm drinking Hennessy again, but this time that

10  I'm drinking it I feel extremely, extremely aroused.  I feel

11  extremely aroused.  I felt like I was like flying.  I felt

12  very aroused, and I'm, like, asking the guy, like, literally

13  almost like moaning in the club and breathing hard, like, did

14  you put something, like, on my drink or something?  And he was

15  laughing.  He was, like, I put a little molly in it.  You

16  good.  And I felt good at the moment.  I felt really good at

17  the moment, and of course, you know, we went home and

18  everything.

19        But I'll say about four days straight I couldn't

20  sleep.  I felt wired.  I felt like why am I not going to

21  sleep?  Why am I -- I had like -- I just didn't like the

22  feeling that it gave me, so I just never did it again, like.

23  But I did experience it.  It was an experience that I had with

24  it.  I practically tasted it, so I know what it is.  So I'm

25  never going to say that I never did it, but I never did it

1  regularly or anything.  It was a one-time experience.

2  Q   You didn't do it voluntarily?

3  A   No.

4  Q   Cardi, why do you not sue Azealia Banks?

5  A   I didn't sue Azealia Banks because she didn't say that I

6  have herpes, and on top of that Azealia Banks have apologized

7  to me.

8  Q   Cardi, the message, the screenshot of the messages you saw

9  where you said I want to kill Tasha K, were you speaking

10  literally or figuratively?

11  A   I was speaking figuraty -- figuratively.  Sorry.  I was

12  speaking figurely -- I was speaking that way.  Okay.  Sorry.

13  I was really -- I've been really upset because actually the

14  video that the defendant lawyers played, it was literally me

15  talking about how she was harassing my friends, and that was

16  the girl that she was harassing and making accusations that

17  she did crack, crack.  And I was just really upset because

18  this is something that continues, and if it's not me, it's

19  going to be somebody that I'm close with.

20          So, of course, this -- it just doesn't -- who

21  wouldn't be upset?  Like, who wouldn't say figuratively, oh,

22  my God, I want to kill this person, I want to kill this bitch?

23  Like I'm so tired of it.  Of course, like, I'm emotionally

24  stressed because of it.  Like, I have anger.  I have

25  depression.  I have so many different feelings, negative

1  feelings about everything that she had been doing.

2  Q   Cardi, when defense counsel asked you a few minutes ago

3  about when you got upset during the baby bird video -- that's

4  the 18-minute video --

5  A   Yes.

6  Q   -- where was Tasha K sitting when you got emotional and I

7  touched your arm?

8  A   She was right here.

9  Q   She was on the witness stand; correct?

10  A   Yes.

11  Q   She was not walking in front of our table, was she?

12  A   No.

13  Q   So what Ms. Izmaylova said is incorrect?

14  A   Yes.

15        MS. MOORE:  No further questions.

16        THE COURT:  Ms. Izmaylova, any further cross on the

17  issues brought up on redirect?

18        MS. IZMAYLOVA:  If you'll give me one moment, your

19  Honor.

20        (Brief Pause.)

21        MS. IZMAYLOVA:  No, your Honor.

22        THE COURT:  All right.  Ma'am, you can step down.

23  You can step down.

24        I'm assuming this is the last witness that the

25  plaintiff has here today based on our conversation yesterday;

1   is that correct?

2          MS. MOORE:  Yes, your Honor.

3          THE COURT:  All right.  Ladies and gentlemen, we're

4   going to end for the week at this point.  I really don't have

5   a forecast for you about the length of the trial.  I just

6   haven't had a chance to talk to the lawyers about that.  At

7   the very least, though, I do think you need to plan to be with

8   us next week.  I want to remind you we will not be meeting

9   tomorrow.  We will also not be meeting on Monday because it's

10  a holiday, and we will return Monday morning (sic).  The

11  parties and counsel are instructed to be back in the courtroom

12  at 9:00 o'clock for any -- for a conference, if needed, and

13  I'm going to ask if you would return by 9:30 on Tuesday.

14         We talked a little bit about whether there might be

15  some inclement weather over the weekend, and it looks like

16  there is likely to be some.  I don't think it will be a

17  problem on Tuesday morning, but if it were to be, then I would

18  have Ms. Lundy, my judicial assistant, or Ms. Lee, the

19  courtroom deputy clerk here, to text you.  We've got your

20  phone numbers, I think, for everybody, and we would probably

21  use texting as the way to contact you first.

22         And so if we contact you and tell you not to come --

23  we're not going to contact you and tell you to come.  The

24  first communication would be not to come.  If you would please

25  respond to the text so that we know that you've received it.

1   I guess if we don't hear from you, then we'll probably try to

2   reach you in another way.  But once we know that you know,

3   then we will -- you know, we can quit worrying that you didn't

4   get the message.

5          The same rules over the weekend -- it's a long

6   weekend -- as would normally exist about not reading anything

7   about this case or searching for anything on the internet.

8   And when the case is over with and you -- one thing that we

9   know about the internet is that if it was put on the internet,

10  it's probably going to stay on the internet.  And so anything

11  you might have missed you can go back and read about but just

12  not before then.

13         And obviously the juror who, unfortunately, you know,

14  we had to excuse today is a good example about how important

15  we take that you decide the case based on what you hear in

16  this courtroom and from no other location and, of course, that

17  you not talk about it with anyone, including yourselves.

18         So have any questions from any of you that you want

19  to ask me that you have been dying to ask?  Not about the case

20  itself but about procedures?  Otherwise, I appreciate your

21  time this week.  And leave your notes in the jury deliberation

22  room, and we'll see you on Tuesday morning at 9:30.

23         COURTROOM SECURITY OFFICER:  All rise.

24         (Whereupon, the jurors exited the courtroom.)

25         THE COURT:  Okay.  The door is closed.  Y'all have a

1  seat for just a moment.  Let me do get a little bit of an

2  indication about where we are as far as the progress of the

3  case.  How many more days and/or witnesses does the plaintiff

4  expect to have?

5          MS. MATZ:  I believe we only have one more witness,

6  your Honor, and I think -- I don't know exactly how long it

7  will be, but I would imagine we will be done by the end of

8  Tuesday for sure.  And it may be that cross can be completed

9  by the end of Tuesday as well.

10         THE COURT:  The cross.  I'm sorry?

11         MS. MATZ:  I'm talking about their cross.  It's not

12 going to be a super long witness from our perspective.  I

13 think it will probably --

14         THE COURT:  Oh, their cross of your witness.  I see.

15         MS. MATZ:  Yeah, I think it will probably be a half

16 day on our part, and then I don't know how long they'll need.

17         THE COURT:  Okay.  From that perspective I think the

18 defendant needs to be prepared to start with your own

19 witnesses.  I mean, you obviously have Mr. and Ms. Kebe to

20 present again if you wish.  How many days, once the case is

21 given to the defendant, would you estimate at this point in

22 time?

23         MS. IZMAYLOVA:  Between two and three, your Honor.  I

24 would probably say maybe potentially three only because, you

25 know, some of the videos are a little bit long that we do

1  intend on introducing into evidence.  But we would try to go

2  as quickly as possible.

3       THE COURT:  Okay.  And then we've got your, I'm

4  guessing -- I haven't heard otherwise.  Do we have both sides'

5  jury instructions?

6       MS. IZMAYLOVA:  Yes, sir.

7       THE COURT:  All right.  We'll be working on those.

8  We would have a charge conference after all the evidence is

9  in, probably not before then, and I would for the most part

10 just tell you what I'm going to give based on what you've

11 submitted.  And I don't know how similar they are.  I will

12 tell you -- and I probably should have mentioned this earlier

13 if I didn't, that I'm going to use the Eleventh Circuit

14 pattern instructions and the Council of Superior Court Judges

15 of Georgia's pattern instructions primarily.

16      There's probably no real unique item of law that's

17 not covered.  There could be a few things, maybe a few

18 evidentiary things.  But most of it is going to be covered in

19 the pattern, and I'm not going to stray much from that because

20 while there is no guarantee that the appellate courts might

21 not later decide that a pattern was wrong, they've had an

22 opportunity to have input in all of the patterns before they

23 were created.  So this is always the safest way to go.

24      May have been one other thing I wanted to tell you.

25 Can't think of it now, so it must not be too important.

1          MS. IZMAYLOVA:  Your Honor, just so you're aware, we

2    did submit a joint, and the ones that each side objected to is

3    noted within the submission.

4          THE COURT:  All right.  Anything else that we need to

5    talk about before Tuesday?

6          MS. IZMAYLOVA:  Not from the defense, your Honor.

7          THE COURT:  Anything else from the plaintiff?

8          MS. MOORE:  No, your Honor.

9          MS. MATZ:  No, your Honor.

10          THE COURT:  I remember the other thing.  So I have a

11    criminal case on next Thursday afternoon that we're going to

12    try to schedule for a plea at 4:00 o'clock.  It's just a

13    case -- are you able to?  Does that fit?  It's just something

14    I need to do.  If I don't do it now, I might not be able to do

15    it until March because of some time issues, and so there may

16    be one day where we end prematurely early so I can get to

17    that.

18          As it relates to the jury deliberations, we may get

19    there next week; we may not get there next week.  I don't

20    intend to have the jury deliberate over the weekend.  I don't

21    have -- I don't intend for them to deliberate anything other

22    than regular business hours.  And so, you know, it may be that

23    they need to come back the following week even if we get it to

24    them on Friday, for example.  Friday seems like it's possible

25    but not guaranteed.

1          MS. IZMAYLOVA:  May I ask a question?

2          THE COURT:  Yes.

3          MS. IZMAYLOVA:  I'm sorry.  What is the Court's rule

4    on when -- during deliberations does counsel have to be inside

5    the building or what is the discretion on that?

6          THE COURT:  Well, yeah, because you've got to be

7    close so if I get questions, I have to deal with questions

8    with your presence and with your input.  So you'll need to be

9    in the building.  You don't have to be in the courtroom.  I'm

10   also going to give the jury the option of using the jury

11   deliberation -- I mean, using the courtroom to deliberate if

12   they want, which would mean we would be outside the courtroom.

13   I don't sense that they're going to take it.

14          I think they would probably take the jury

15   deliberation room, and the deliberation room that I have is

16   not quite as big as the one next door, which is also a little

17   bit more modern.  So they may actually choose that.  But given

18   that nobody has had a Covid issue concern, my guess is they're

19   going to choose probably to be in the back.  And you had

20   something else?

21          MS. MATZ:  Yeah, just a small scheduling thing which

22   may or may not be an issue, but I figured I would just raise

23   it.  I have a court-ordered mediation on the 25th, which is

24   actually on California time.  It doesn't start until 4:00 p.m.

25   so --

1          THE COURT:  On California time 4:00 p.m. here?

2          MS. MATZ:  4:00 p.m. eastern.  It starts at 1:00 p.m.

3  California time.  So I would just ask that if we're still on

4  that day, I might need to break a little early.  I apologize.

5  This was scheduled before we had moved the trial a little bit.

6  I just didn't think there was any way we'd be going that far.

7          THE COURT:  And what's the date again?

8          MS. MATZ:  The 25th.  So we're talking about Tuesday

9  after next week.

10          THE COURT:  I'll think about it.  I'm less concerned

11  about your clients in a case in California than I am in the

12  case I have and the jury I have, and so I don't know.

13          MS. MATZ:  Well --

14          THE COURT:  I can't promise you.  I mean, under any

15  rules of conflict that I've ever seen, when people are on

16  trial, that takes preference over something else.  And so you

17  may be able to do it; you may not be able to do it.  If I've

18  got a jury that's close to getting a verdict, I can't tell

19  them they've got to go home and come back another day when

20  they may be over.

21          MS. MATZ:  Yeah, no, I was thinking it was very close

22  to the end of the day, and if we go that long, I can also see

23  what I can do about moving it.  Only because it's court

24  ordered I just wanted to raise it.  That's all.

25          THE COURT:  Court ordered, and what court is this in?

1          MS. MATZ:  It's in Central District of California,

2    but I can talk to opposing counsel about moving it if we're

3    getting that far.  I just wanted to make the Court aware of

4    the potential for it sooner rather than later.  That's all.

5          THE COURT:  Okay.  Thank you.  All right.  We'll see

6    y'all on Tuesday morning.

7          MS. MOORE:  Thank you, your Honor.

8          MR. SABBAK:  Thank you, Judge.

9          COURTROOM SECURITY OFFICER:  All rise.  Court stands

10   in recess.

11          (Whereupon, the proceedings were adjourned at 4:20

12   p.m.)

13                         -  -  -

14

15

16

17

18

19

20

21

22

23

24

25

REPORTERS CERTIFICATE

1

2

3

4        I, Wynette C. Blathers, Official Court Reporter for

5   the United States District Court for the Northern District of

6   Georgia, with offices at Atlanta, do hereby certify:

7        That I reported on the Stenograph machine the

8   proceedings held in open court on January 13, 2022, in the

9   matter of BELCALIS MARLENIS ALMÁNZAR v. LATASHA TRANSRINA KEBE

10  and KEBE STUDIOS LLC, Case No. 1:19-CV-01301-WMR; that said

11  proceedings in connection with the hearing were reduced to

12  typewritten form by me; and that the foregoing transcript

13  (Volume IV of X, Pages 1 through 205) is a true and accurate

14  record of the proceedings.

15       This the 27th day of February, 2022.

16

17

18

19  _____

20                              /s/ Wynette C. Blathers, RMR, CRR
                                    Official Court Reporter

21

22

23

24

25