1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION

3

4   BELCALIS MARLENIS ALMÁNZAR,      )
                                     )
5              Plaintiff,            )
           v.                        )   CIVIL ACTION
6                                    )   FILE NO. 1:19-CV-01301-WMR
    LATASHA TRANSRINA KEBE and       )
7   KEBE STUDIOS LLC,                )
                                     )   JURY TRIAL
8              Defendants.           )
    _____  )   VOLUME V OF X
9

10

11  ------------------------------------------------------------

12         BEFORE THE HONORABLE WILLIAM M. RAY, II

13              TRANSCRIPT OF PROCEEDINGS

14                  JANUARY 18, 2022

15  ------------------------------------------------------------

16

17

            *Proceedings recorded by mechanical stenography*
18          *and computer-aided transcript produced by*

19

                 WYNETTE C. BLATHERS, RMR, CRR
20                  Official Court Reporter
                    1714 U.S. Courthouse
21                  75 Ted Turner Drive, SW
                    Atlanta, Georgia  30303
22                    (404) 215-1547

23

24

25

```
1   APPEARANCES:

2   For the Plaintiff:          SARAH M. MATZ
                                Attorney at Law
3                               Adelman Matz, P.C.
                                1173A Second Avenue
4                               Suite 153
                                New York, New York  10065
5
                                LISA F. MOORE
6                               WILLIAM A. PEQUIGNOT
                                Attorney at Law
7                               Moore Pequignot, LLC
                                887 West Marietta Street
8                               Suite M-102
                                Atlanta, Georgia  30318
9
    For the Defendants:         OLGA IZMAYLOVA
10                              SADEER SABBAK
                                Attorneys at Law
11                              Sabbak & Izmaylova, LLP
                                1875 Old Alabama Road
12                              Suite 510
                                Roswell, Georgia  30076
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1 | **INDEX TO EXAMINATIONS**

2

3 | **WITNESS**                                            **PAGE**

4 | SHERRY L. BLAKE, PH.D.

5 |     Direct Examination By Ms. Moore                      6

6 |     Cross-Examination By Ms. Izmaylova                  38

7 |     Redirect Examination By Ms. Moore                   58

8 | LATASHA TRANSRINA KEBE

9 |     Direct Examination By Mr. Sabbak                    64

10

11 | **INDEX TO EXHIBITS**

12 | **P L A I N T I F F ' S   E X H I B I T S**

13 |                                     **IDENTIFIED**   **ADMITTED**

14 | 46       Invoice from Dr. Sherry            36          36
   |          Enterprises for Therapeutic
15 |          Coaching Session...

16 | 1011     Screenshot of Article from         62          62
   |          medium.com Containing Picture
17 |          of Belcalis Almanzar at Sue's

18

19 | **INDEX TO EXHIBITS**

20 | **D E F E N D A N T ' S   E X H I B I T S**

21 |                                     **IDENTIFIED**   **ADMITTED**

22 | 5        Kebe 9/19/18 YouTube Video of     105         105
   |          Interview with Starmarie Jones
23 |
   | 24       Kebe 1/9/19  Tweet re:  Going      87          87
24 |          Viral for R. Kelly Content

25

**INDEX TO EXHIBITS (Cont'd.)**

**D E F E N D A N T ' S   E X H I B I T S**

| | | | IDENTIFIED | ADMITTED |
|---|---|---|---|---|
| 67 | Screenshot of Name of Video from Kebe YouTube Page with Starmarie Jones Interview | | 104 | 104 |
| 75 | Screenshot of Name of Kebe 9/2/18 YouTube Video Re: MLK Skit | | 91 | 91 |
| 76 | Screenshot of Name of Kebe 9/21/18 YouTube Video re: Starmarie Receipts | | 128 | 128 |
| 96 | Screenshot of Text Conversation Between Johnny Lester (Dr. Blake's Agent) and Lynda Burton... | | 40 | 40 |
| 97 | Screenshot of Text Conversation Between Johnny Lester and Lynda Burton re: Dr. Blake's Second... | | 42 | 42 |
| 98 | Screenshot of Text Johnny Lester Sent to Lynda Burton on 2/11/19 re: Cardi Informing Dr. Blake... | | 43 | 43 |
| 99 | Dr. Blake's Therapeutic Coaching Summary re:  Coaching Sessions... | | 53 | 53 |
| 103 | Dr. Blake's Psychological Treatment Summary, Dated 12/3/20 re: two 1-hr Individual... | | 56 | 56 |

```
 1                     Tuesday Morning Session

 2                       January 18, 2022

 3                          9:00 a.m.

 4                          -  -  -

 5                 P R O C E E D I N G S

 6         COURTROOM SECURITY OFFICER:  All rise.  United States

 7  District Court for the Northern District of Georgia, Atlanta

 8  Division, is now in session, the Honorable Judge William M.

 9  Ray II presiding.  Please be seated and come to order.

10         THE COURT:  Thank you.  Good morning.  Is everybody

11  ready to proceed?

12         MS. IZMAYLOVA:  Yes, your Honor.

13         THE COURT:  All right.  Yes, sir.

14         COURTROOM SECURITY OFFICER:  All rise.

15         (Whereupon, the jurors entered the courtroom.)

16         COURTROOM SECURITY OFFICER:  Please be seated and

17  come to order.

18         THE COURT:  Good morning.  The plaintiff can call her

19  next witness.

20         MS. MOORE:  Thank you, your Honor.  Plaintiff calls

21  Dr. Sherry Blake.

22         THE COURT:  Thank you.  Good morning, Dr. Blake.  Are

23  you vaccinated, ma'am?

24         THE WITNESS:  Yes.

25         THE COURT:  All right.  If you could remove your mask
```

```
 1   while you testify, and the clerk will administer an oath to
 2   you, please.
 3          COURTROOM DEPUTY:  Please raise your right hand.
 4                      SHERRY L. BLAKE, PH.D.,
 5          herein, having been first duly sworn, was examined
 6   and testified as follows:
 7          COURTROOM DEPUTY:  Thank you.
 8                      DIRECT EXAMINATION
 9   BY MS. MOORE:
10   Q   Good morning, Dr. Blake.
11   A   Good morning.
12   Q   Would you please state your full name.
13   A   Dr. Sherry L. Blake.
14   Q   And, Dr. Blake, what is your profession?
15   A   I'm a clinical psychologist.
16   Q   Do you have a specialty within clinical psychology?
17   A   I do.  I specialize in -- as a clinical psychologist, I
18   work with issues in a lot of different areas of expertise.
19   Q   Where were you born, Dr. Blake?
20   A   I'm sorry?
21   Q   Where were you born?
22   A   Nashville, Tennessee.
23   Q   So you grew up in Nashville?
24   A   Yes.
25   Q   Is that where you went to high school?
```

```
1   A    No.  I went to high school in a little small town called
2   Mt. Juliet, Tennessee.
3   Q    Where did you go to undergrad?
4   A    Tennessee State University.
5   Q    And what did you study when you were at Tennessee,
6   Tennessee State University?
7   A    Psychology.
8   Q    And do you recall what year you graduated from Tennessee
9   State?
10  A    1979.
11  Q    And what was your degree?
12  A    A bachelor of science degree.
13  Q    Do you have master's degree?
14  A    I do.
15  Q    And where did you receive that from?
16  A    From Vanderbilt University.
17  Q    And what was that master's degree in?
18  A    In psychology.
19  Q    And do you recall when you received your master's degree?
20  A    In 1983.
21  Q    Do you have a Ph.D.?
22  A    I do.
23  Q    And where did you receive your Ph.D. from?
24  A    Also received my Ph.D. at Vanderbilt University.
25  Q    And what was your doctorate in there that you received?
```

1  A    I received a doctorate of psychology degree in clinical

2  psychology in 1985.

3  Q    Did you do any post doctorate work?

4  A    Yes.

5  Q    And what was that?

6  A    I did post doctorate work in a program that was a

7  combination of University of Georgia and Georgia State

8  University, and the post doctoral work was in

9  neuropharmacology and psychopharmacology.

10  Q    And can you describe some of the classes, the courses you

11  took in that post doctorate work.

12  A    There were a lot of classes.  A lot of the classes was

13  around neuropsychology, neuroanatomy.  I took classes to

14  understand medication, a lot of pharmaceutical work, as well

15  as behavioral, how that impacted behavior.

16  Q    And can you describe your areas of expertise within

17  clinical psychology.

18  A    Yes.  I have several areas of expertise, clinical

19  intervention, clinical crisis intervention.  I do assessments,

20  psychological assessments, which includes psychology

21  assessments, neuropsych assessments, assessments for learning

22  disabilities and any issues along that line.  Also do therapy,

23  individual, family, and group therapy.  Also have area

24  expertise in trauma as well as work in terms of I do public

25  speaking.

```
1              I do mental health -- I'm considered a mental health
2    expert, but I also do media consultation.  I do content
3    development.  In addition to content development regarding
4    psychology, I do work in terms of just understanding the area
5    of psychology in different settings, including some
6    therapeutic coaching as well as, again, public speaking on the
7    matter.
8    Q   I think the first thing you mentioned was clinical
9    intervention.  Can you describe what that is.
10   A   When there are emotional issues or there's emotional
11   concerns, as a clinical interventionist what I do is assess
12   what the problem is, decide what the need for treatment is.
13   Q   And what about crisis intervention.  You mentioned crisis
14   intervention?
15   A   Crisis intervention similar except usually there's a
16   crisis, and when you do crisis intervention, you're trying to,
17   again, once you assess the crisis, the best route to resolve
18   the crisis, and you implement a treatment plan.
19   Q   And you also mentioned psychological assessment.  Could
20   you describe that further, please.
21   A   Psychological assessment is a process that you do for
22   diagnosing and treatment.  I was trained on all the basic and
23   some of the advanced -- a lot of advanced instruments of
24   psychological testing, everything from intellectual ability to
25   educational ability to neurological deficits.  And
```

1  neurological deficits include those deficits with the brain.

2  Given my post doctoral degree, I also looked at how medication

3  or other things may impact behavior.

4  Q   And I believe you also mentioned trauma related issues.

5  Could you expand on that, please.

6  A   Yes.  With trauma related issues, I have worked in terms

7  of trying to help people understand trauma, how to help them

8  understand the impact of trauma.  I've worked in terms of a

9  program in Texas where I developed to look at trauma after

10 Hurricane Harvey.

11 Q   And what were you doing?  Was that Hurricane Katrina?

12 A   I worked with victims of Trina, but I developed a program

13 for Harvey, Hurricane Harvey, after Hurricane Harvey.

14 Q   And can you describe that program a little more, please.

15 A   The program was in trauma and resiliency, helping victims

16 reestablish their life and a sense of understanding because

17 many victims were displaced for years.  They lost their homes.

18 They lost their families.  They were just really traumatized,

19 so I helped them work through that.  And what I did with that

20 is developed a program that I trained teachers and families to

21 help work especially with children through that.

22 Q   And you also mentioned individual, marital, and group

23 therapy.  Could you elaborate on that, please.

24 A   I do a lot of marital therapy and group therapy.  Marital

25 therapy, I do premarital therapy as well as marriage therapy.

1  Where couples have problems, they have conflict, I help

2  resolve that and understand what the issues are with that.

3  Q    And you also mentioned that you do a lot of public

4  speaking?

5  A    I do.

6  Q    On what topics?

7  A    Anything to do with mental health.  In my specialty I do a

8  lot of work with self-care, a lot of work with women in

9  transition, a lot of work in terms of speaking about reducing

10 mental health stigma, understanding mental health, especially

11 in African American and other underserved communities, also

12 grief and anything related to depression, grief, death, and

13 dying, I speak a lot on that.

14 Q    Do you ever speak on anxiety?

15 A    I do.

16 Q    Do you speak on trauma?

17 A    Absolutely.  That's all a part of it.

18 Q    And you also mentioned that you serve as a media

19 consultant.  Could you describe that, please.

20 A    As a media consultant I've served in terms of reviewing

21 programs to see the psychological content, the appropriateness

22 of it.  I work in terms of just understanding how psychology

23 is presented in the media as well.

24 Q    And I think you mentioned therapeutic coaching.  Could you

25 describe what that is, please.

```
 1  A    Therapeutic coaching is working with people towards being
 2  goal oriented, trying to reserve -- trying to resolve issues
 3  where they may be stuck and trying to work through those.
 4  That's different from therapy in that therapy is working with
 5  emotional healing.
 6  Q    And I think, lastly, you mentioned content creation.  What
 7  type of content are you creating?
 8  A    I write a lot of content for AARP.  With AARP I write
 9  content in terms of psychology.  I do a lot of their
10  presentations for AARP, but I also have produced videos and
11  things to help the public understand depression, anxiety, and
12  other issues and, again, especially for minority communities.
13  Q    Dr. Blake, I think you've testified that you got your
14  Ph.D. in 1985; is that correct?
15  A    Yes.
16  Q    Are you board certified?
17  A    No, I'm not board certified.  That's not necessary in this
18  field.
19  Q    Do you have any professional credentials?
20  A    I do.  My credentials include, of course, my Ph.D., but,
21  also, I'm a licensed clinical psychologist.  I've been
22  licensed since 1988.  Also, I'm part of a national registry
23  for psychologists, health professionals of psychology.
24  Q    Have you been practicing clinical psychology continuously
25  since 1988?
```

1   A    I have.

2   Q    How many hours of clinical experience do you have?

3   A    Now I'm beginning to tell my age, but I have over a

4   hundred thousand hours, over 30 years of experience.

5   Q    Have you received any honors or awards for your work?

6   A    I have.

7   Q    Could you tell us what some of those are.

8   A    For my work with the Harvey victims, the Hurricane Harvey

9   victims, I received the Congressional Recognition by the

10  Congressman Sheila Jackson Lee -- I think it's Sheila Jackson

11  Lee -- in Houston, Texas for my work with that.  I also

12  received honors and recognition from the Georgia black

13  legislation, the black caucus, Georgia Legislative Black

14  Caucus, for my work in mental health.  I've received an honor

15  from the Georgia House of Representatives for my work in terms

16  of mental health and the things I do in the community.

17         In addition to that, I received the Shining Star

18  Award, Shining Star Award from NOBEL.  NOBEL is the National

19  Organization of Elected Black Legislators.  That was a big

20  honor, and that was with my work again with mental health.

21         In addition to that, I've received the RICE Award

22  which is rising -- which stands for rising in excellence in --

23  community excellence, Rising in Community Excellence.  And

24  another honor that I did receive was the Practitioner of the

25  Year Award from Control Magazine.

1  Q    Where were you living, Dr. Blake, when you started

2  practicing in 1988?

3  A    In Atlanta.

4  Q    And where were you practicing?

5  A    I started practicing in -- first, I was working at

6  Ridgeview, Ridgeview Institute.  Ridgeview Institute is a

7  psychiatric institute.  It's been around for a long time.  I

8  think it's still working with people.  I worked there

9  providing psychological services to children, adolescents, and

10 their families.

11 Q    How long were you at Ridgeview Institute?

12 A    Approximately three to four years.

13 Q    Was that doing inpatient work or --

14 A    That was doing inpatient work, and I did do some follow up

15 with outpatients for some of the patients but mostly

16 inpatient.

17 Q    So when you left Ridgeview, where were you practicing

18 after that?

19 A    After leaving Ridgeview, I started private practice, and I

20 started private practice at Ramey & Associates.  I provided

21 psychological services, which included psychological

22 assessment, different types of assessments, assessments for

23 learning disabilities, assessments for psychological

24 personality type issues.  Also provided therapy in terms of

25 individual family, marital therapy.  And those services were

1  all provided as part of an outpatient program.

2          In addition to outpatient with Ramey & Associates, I

3  did do inpatient work where I would go to hospitals and do

4  psychological assessments.

5  Q   Which hospitals did you do that at?

6  A   At that time I was doing Ridgeview, I was doing Charter

7  Peachford Hospital, all the primary hospitals, including

8  Crescent Pines.  There were a combination of hospitals that I

9  would go to to provide treatment.

10 Q   And how long were you in private practice at Ramey &

11 Associates?

12 A   Ramey & Associates for several years.  It was over ten

13 years.

14 Q   All right.  And where were you practicing after Ramey &

15 Associates?

16 A   After Ramey & Associates, I started practicing in

17 Touchstone, Touchstone Psychological, which was also an

18 outpatient program where we did -- it was an outpatient

19 practice where I did a lot of work, primarily the same work

20 that was done at Ramey & Associates, but the model had changed

21 so we changed -- things changed.

22 Q   And how long were you at Touchstone, Dr. Blake?

23 A   Again, approximately six, seven years.

24 Q   And after Touchstone, where were you in practice then?

25 A   Cornerstone Psychological Service.

1  Q    And can you describe the work you were doing at

2  Cornerstone, please.

3  A    In addition to basic services with Cornerstone, I was

4  doing more and more work in the community in terms of reducing

5  mental health stigma.  I continued to do the therapy, the

6  psychological assessments, also just making the community

7  aware of things.  Also, while I was at the -- while I was at

8  Cornerstone I did a lot of government contracts.  I did state

9  and federal contracts where I worked in terms of the

10 Department of Defense.

11         And with the Department of Defense, I worked in terms

12 of looking at individuals to assess their appropriateness to

13 be in the military.  So if anybody had a problem where they

14 were questioning if they could go in the military, they were

15 sent to me, and I did the assessment, also worked in terms of

16 doing therapy for the VA Hospital.  Working there I was able

17 to do a lot of assessments looking at issues regarding people

18 that had been in the military service.  I also worked with

19 their families.

20         In addition to the VA Hospital, I did work in terms

21 of the Department of Labor, Department of Labor Vocational

22 Rehabilitation.  With those, again, most of it was assessments

23 and looking at the appropriateness in terms of their ability

24 to go back to work or their ability to transition into the

25 community.

1  Q   Were you doing any work with DFACS at that time?

2  A   I also did a lot of work with DFACS.

3  Q   And could you describe that work and also what DFACS is,

4  please.

5  A   Department of Family and Children Services.  I did lot of

6  assessments for the Department of Family and Children

7  Services, mostly parental fitness.  Once a child was removed

8  from the home, I had to assess to see if it was appropriate

9  for that child to go back looking at the psychological status

10 of the parent.  Also, with that there were times I did

11 individual therapy or family therapy that was separate from

12 the assessments.

13 Q   How long, Dr. Blake, were you at Cornerstone?

14 A   I'm sorry?

15 Q   How long were you at Cornerstone?  How long were you

16 practicing at Cornerstone?

17 A   Cornerstone has been open for years.  In fact, it's still

18 open in terms of providing traditional services, but I no

19 longer work there.

20 Q   During that time were you also providing psychological

21 services to any athletic leagues?

22 A   I'm sorry?

23 Q   Were you providing any services to any athletic leagues?

24 A   Oh, absolutely.  I'm sorry.  Part of what I did for

25 Cornerstone that was part of me transitioning out, I worked

1  for the NFL.  I was the southeastern regional psychologist for

2  the NFL for approximately four years.  And what I did is I

3  worked with all of the players from Texas to North Carolina

4  and from Tennessee down to the tip of Florida.  Anytime

5  players got into trouble, anytime issues emerged, I was the

6  person they sent them to for an assessment.  I also did

7  consultation with them.

8  Q   Dr. Blake, where are you practicing now today?

9  A   Dr. Sherry Enterprise.

10 Q   Is that your company?

11 A   It is.

12 Q   And could you describe what types of services you're

13 furnishing under Dr. Sherry Enterprise?

14 A   Dr. Sherry Enterprise, the model is a little different.

15 I've worked a lot with high profile clients that have

16 demanding schedules that cannot do traditional weekly therapy

17 or biweekly therapy because of what they do.  A lot of the

18 work is focused on sports and entertainers.  I work a lot in

19 terms of just providing different type service, more of a

20 concierge type service.

21 Q   Do you also work with noncelebrities?

22 A   Absolutely.  In my work with noncelebrities -- and I call

23 them noncelebrities, but they also have high profile jobs, a

24 lot of pressure.  They're doing a lot and have a hard time,

25 you know, again, being in the traditional type setting for

1  therapy.

2  Q    Dr. Blake, have you written any books?

3  A    I have.  I've written two.  The first book I wrote was

4  called "The Single-Married Woman."  That's a book that's about

5  women that do too much, and many of us know women that do too

6  much.  They may be married, but they feel like they're single

7  because of all the work they do.  And the second book was --

8  I'm sorry.

9  Q    I was just going to ask, what year did you write that

10 first book, "The Single-Married Woman?"

11 A    "The Single-Married Woman" was written in 2014, '13 or

12 '14.

13 Q    And I'm sorry for interrupting you.  What was the second

14 book?

15 A    I'm sorry.  "Care for the Caregiver," that is a book --

16 it's called Care for the Caregiver:  Surviving the Emotional

17 Stress -- the Emotional Roller Coaster of Caregiving.  And

18 this is a book -- I had worked a lot with people that were

19 caring for loved ones and was really stressed and I had to --

20 I put together a survival manual, and that book emerged after

21 my own personal work with my parents.  I was the caregiver for

22 both of my parents until they died in 2016, and the stress of

23 all of that really helped me put together a book to help

24 others so they don't have to go through that level of stress.

25 Q    Are you featured in any magazines?

1  A    I am.  I'm featured in Essence Magazine.  Essence

2  Magazine, I used to write a column.  I wrote a column for

3  Essence Magazine for many years, and not only did I write the

4  column for Essence Magazine, I also presented at their music

5  festival, which is their largest event each year.  In addition

6  to Essence Magazine, I also write articles as needed for other

7  journals as well.  But a lot of the work I'm writing is right

8  now for the Sisters Magazine, which is part of AARP.

9  Q    And AARP stands for?

10  A    American -- AARP, I always have to think about that.

11  American Association of Retired Persons.  I should remember

12  that one.

13  Q    And you mentioned earlier, Dr. Blake, that you do a lot of

14  presentations --

15  A    I do.

16  Q    -- and lectures.  Can you tell us more about what you're

17  speaking on.

18  A    Mostly mental health issues, and those issues are related

19  to depression, to anxiety, to self-care, to issues regarding

20  basic issues regarding transition, when -- when I say life

21  transitions, I don't care if it's life transitions about women

22  about to get married, women about to get divorced, children

23  leaving the home, children coming home.  And one of the topics

24  I'm working on now is there's a whole concern now where people

25  are, women especially, are fearful of growing old alone.  And

1  that's part of some of the writings I'm doing and some of the

2  things I'm doing a presentation on because what we find is a

3  lot of successful women find themselves divorced or they find

4  themselves widowed, and they're really fearful of growing old

5  alone.

6  Q   Do you also speak on mental health stigma?

7  A   I do a complete work on mental health stigma.  I've been

8  doing that for years, especially in the African American

9  community.  Often we're the most underserved community, and

10 with that that's a real concern because the need is great.

11 Q   Do you have any additional professional training?

12 A   Every two years I have to have 40 hours of continuing

13 education to maintain the license, and so I do a lot of

14 continuing education work.

15 Q   What about volunteer work?  Do you volunteer?

16 A   I do.  I do a lot of volunteer work.  Not only do I

17 volunteer in terms I'm a board member of the Girls

18 Incorporated of Metropolitan Atlanta where we service young

19 girls that have difficult upbringings -- and we're trying to

20 help them become leaders and become emotionally stable and

21 provide some basic needs -- but I also do a lot of work in

22 faith-based institutions, faith-based settings.  I do a lot of

23 things in terms of trying to help clergy help people in the

24 church understand mental health.

25        I've found that mental health -- the church is one of

1  the first places people run to when there's a crisis, but a

2  lot of times although churches are great with spiritual

3  guidance, but understanding psychological issues has always

4  been a problem, at least in the African American church.  So I

5  work a lot in terms of receiving information, doing workshops

6  for people, and helping them.  That's all volunteer.  I work a

7  lot with the women too within the church.

8  Q   Do you serve on any other boards?

9  A   I serve -- I have served on -- I've been president of the

10  Mental Health Association of Atlanta.  I was president, and I

11  was also a board member like, as I stated previously, I'm a

12  current board member of the Girls Incorporated, Inc.

13  Q   What is the Mental Health Association of Metropolitan

14  Atlanta?

15  A   Mental Health Association of Metropolitan Atlanta is an

16  organization that services all the mental health needs of the

17  region, and what it does is provide information, it provides

18  service.  You can call Mental Health and get their service

19  line and get directions for different things where it's a

20  crisis line, how do you do this.  I was president, and part of

21  that is dealing with suicide, dealing with depression, dealing

22  with all those issues that impact your health, mental health.

23  Q   So you've testified, Dr. Blake, that you've been working

24  continuously as a clinical psychologist since 1988; is that

25  correct?

1   A   Yes.

2   Q   And if I have my math right, is that 34 years?

3   A   Long time, approximately 34 years, yes.

4   Q   How many days a week do you perform clinical work?

5   A   Four to seven days depending on my schedule.

6   Q   Are you considered an expert in mental health?

7   A   Yes.

8   Q   Have you appeared or been featured as a mental health

9   expert on any television programs?

10  A   I have, CNN, ABC, CBS, NBC, MSNBC.  I've been featured on

11  most affiliates.

12  Q   Any radio programming?

13  A   Lots of radio programs, including a lot of syndicated

14  programs, again speaking about mental health.

15  Q   How do you know my client?

16  A   Your client was referred to me by her management team.

17  Q   And when did you -- when did they reach out to you, the

18  management team?

19  A   2018.

20  Q   And what did they tell you at that time when they reached

21  out to you?

22  A   At the time she was referred, they wasn't clear what was

23  going on.  They were very concerned about her emotional

24  functioning, but they didn't know what was happening.  And it

25  was a crisis, and they had asked me to come to New York.

1  Q   When in 2018 was that that they reached out to you?

2  A   They reached out a few days before November the 1st

3  because I went to New York on November the 1st, and I was

4  there from the time they called.  It was less than 72 hours.

5  Q   Do you recall the date that you traveled to New York?

6  A   Arrived on November the 1st.

7  Q   And when did your initial session with Cardi take place?

8  A   As soon as I landed.

9  Q   Where did that session take place?

10 A   That session took place in a hotel in New York in the

11 hotel suite.

12 Q   Were you in New York City?

13 A   Yes.

14 Q   In Manhattan?

15 A   New York City, Manhattan.

16 Q   Dr. Blake, based on your education, training and

17 professional experience, what did you observe in this first

18 session with Cardi in New York?

19 A   When I first arrived and started talking to her, I was

20 able to establish a rapport, but what I observed is that she

21 was very lethargic, had very little energy.  There was fear --

22 a lot of depressive symptoms, such as she was very tearful,

23 had explained to me she had just lost interest.  She was

24 sleeping a lot.  In fact, the day that I initially saw her she

25 was in bed, and she was laying across the bed.  And laying

1  across the bed she talked about not knowing what she was going

2  to do, not having any interest in doing anything.  She had

3  lost her appetite.  She wasn't eating and she wasn't -- and

4  she was sleeping as much as possible.

5  Q   Did she seem anxious?

6  A   She was quite anxious.  She was quite worried, and the

7  anxiety that I saw came out in terms of not only what she was

8  saying but how she was saying it.  And she constantly was

9  checking her phone with social media in that she was talking

10  about all the negative things that was happening at the time.

11  Q   And when you said she'd lost interest in doing thing,

12  could you elaborate.

13  A   She had been in bed for several days.  She reported that

14  she hadn't been out of bed for several days.  She didn't want

15  to do anything.  She didn't want to go to work.  She was

16  crying.  Like I said, she was quite tearful.  Her affect was

17  flat, meaning there was not a lot of facial expression as she

18  talked, and she was emotionally exhausted.

19  Q   Did she seem agitated?

20  A   Yes.  When we talked about certain things, she seemed

21  quite agitated.

22  Q   What did you understand to be the source of this distress?

23  A   She explained to me that there had been a blogger, a Tasha

24  K, that she didn't know, had never met, that was writing and

25  posting lies and doing videos about her.  She said that the

1  videos were horrible in terms of the content.  She talked

2  about the lies being that -- such as she was doing cocaine,

3  lies being that she had herpes and HPV.  She was devastated by

4  the lies because she felt the lies were going to hurt her

5  reputation, and in hurting her reputation she was just getting

6  started.

7          At that point her music industry and her -- was just

8  really beginning to take off, and she had reached out in

9  trying to get people to help stop it because she wanted -- she

10 was really concerned and devastated that that was going to

11 just kill her career.

12 Q   When you say she reached out to someone to stop it, what

13 do you mean?

14 A   She attempted to get some of the social media outlets to

15 take the posts down.  No one would take the posts down.  She

16 said that she had been online, had said to people she didn't

17 do that, you know, that's not true.  But people were believing

18 it, and the lies was being repeated.  So not only was Tasha K

19 publishing the lies, but what was happening at that time, of

20 course, it continued.  The lies were repeated by her own

21 followers.

22 Q   Did she tell you that she'd reached out to Tasha K?

23 A   At that time she did tell me she had attempted everything.

24 I was not clear initially if she had reached out to Tasha K

25 herself, but she said she had tried and had been on social

```
 1  media and tried her best to get things to stop.  And all she
 2  wanted her to do is stop posting the lies.
 3  Q    How would you describe the level of Cardi's mental
 4  distress when you observed her that weekend in New York?
 5  A    I was quite concerned.  If you talk about levels, if I can
 6  say a level from 1 to 10 with 1 being the best and 10 being
 7  the worst, she was definitely a 10.
 8  Q    Dr. Blake, what did you observe -- let me go back.  How
 9  many sessions did you have with Cardi that weekend in New
10  York?
11  A    Eight hours.
12  Q    And was that broken up?
13  A    That was broken up into four sessions, two hours each.
14  Q    And were all of these sessions at the same location?
15  A    No.
16  Q    Where were the other sessions?
17  A    There was one session in Harlem.
18  Q    What did you observe in the three other sessions you had
19  with Cardi that weekend?
20  A    I observed a continuation of distress.  She was
21  overwhelmed.  She was emotionally overwhelmed because she felt
22  helpless.  I heard her feelings in terms of her expression of
23  helplessness.  She felt like she had no support.  She
24  continued to cry and continued to be very anxious, and
25  depression remained.
```

1  Q   What was your opinion of the status of her mental health

2  at that time?

3  A   At that time I felt she was depressed.  She was -- had a

4  lot of anxiety.  I also felt at that time that her mental

5  health -- she was in a crisis, and it was not very well at

6  all.

7  Q   What diagnoses did you make based on your sessions with

8  Cardi in New York that weekend?

9  A   That weekend I did not make a formal diagnosis.  I looked

10 at depression and anxiety as a working diagnosis, and at that

11 time when I went and I didn't know for sure what was going on

12 and she started talking about the blogger, I was under the

13 belief that this was a temporary thing.  The source of her

14 stress, the source of her anxiety was focused on Tasha K.

15 Q   Did you make any recommendations to Cardi about how to

16 manage all of these emotions?

17 A   Yes.  I made the recommendation -- I made three

18 recommendations, one given that everything I saw with anxiety.

19 There was no prior history.  I did check out there was no

20 prior history of depression.  There was no prior history of

21 anxiety.  There was no prior history of a mental disorder.

22 Given that -- and she did not appear suicidal at that time.

23 She was extremely stressed, but she was just overwhelmed.  At

24 that time given the source of the stress was Tasha K, I

25 recommended that she turn her -- turn Tasha K and the issues

1    with that over to her management team and her legal team and

2    let them deal with that.

3            I suggested that she -- the second recommendation was

4    she take a break, she and her family -- she was exhausted --

5    take a break, try to disconnect as best as she could from the

6    social media to clear her head and to let them have an

7    opportunity to take that on.

8            The third thing was individual therapy.  At that time

9    I had no reason, when I left New York, to believe that if her

10   legal team stopped the lies from being posted, her depression

11   and her anxiety would be eliminated.  It would get resolved.

12   Q    When did you next see Cardi?

13   A    In 2020.

14   Q    How many sessions -- did you have multiple sessions with

15   her in 2020?

16   A    I did.

17   Q    Did Cardi's management team reach out to you about setting

18   up those sessions?

19   A    They did.

20   Q    And what did they tell you when they reached out to you?

21   A    At that point they again was concerned, and they needed me

22   to see her.  And I think at that point she also had wanted to

23   talk to me.

24   Q    During those sessions in 2020 what were your observations

25   of Cardi?

1  A   I was totally surprised.  Her mental health status had

2  just deteriorated.  Things were much worse than they had been

3  when I left New York.  I had assumed that Tasha K was going to

4  respond to the legal team's requests to stop and decease.

5  That had not happened.  The posts not only had continued, they

6  had increased, and they were being repeated over and over

7  again.  Not only that, Cardi was devastated.  She was feeling

8  totally hopeless, totally helpless.

9          She was being taunted.  People were calling her

10  Cardi -- instead of Cardi B, Herpes B.  She was embarrassed.

11  She was humiliated.  She felt that she was bringing shame to

12  her family.  Her family was very important to her.  She was

13  really, really overwhelmed that -- she felt that her efforts

14  was all bringing attention and shame to her family, and she

15  didn't want that.

16          She was also struggling in terms of her appetite.  At

17  that point she had lost weight.  At that point she was having

18  headaches.  At that point she was just overall just doing what

19  she needed to get by in terms of functioning, and I say that

20  meaning that she would go out, do what she needed to do, and

21  come home and just go back to bed.

22  Q   So was she continuing to have sleep disturbances?

23  A   She was sleeping as much as she could, yes, and she also

24  was struggling in terms of just being engaged.  She isolated a

25  lot.

1  Q   Was she angry?

2  A   Very angry, very angry.  And at that point with her anger

3  I had helped her process the fact that her legal team was

4  working on issues.  She did not want to sue.  She did not want

5  to go to court.  Her whole goal was just to stop the lies and

6  stop the posting.  And it was at that point she had talked

7  about having reached out to Tasha K personally to try to get

8  her to stop because she felt like if she could, you know, get

9  her to stop personally because they had some things in common,

10  being a mother, she would listen.

11          And rather than stop it, that information was

12  taken -- a video was apparently made, and she was mocked.  And

13  so she was further humiliated.  She was further embarrassed.

14  She was devastated.  She was forever explaining or denying

15  that she had herpes or that she used cocaine or she cheated on

16  her husband.  That was a real concern because she felt like

17  her family did not deserve any of the attention.  Also, there

18  had been stories recorded that her father had abused someone.

19  Q   Did you think Cardi was suicidal at that time?

20  A   I was about to say I was quite concerned about her mental

21  health status.  At that point she talked about having feelings

22  of suicide.  She talked about not wanting to live, talking

23  about that she was bringing so much shame and so much -- she

24  just couldn't go on and because she could not get any

25  reprieve.  She couldn't get help from the social media

1  platforms.  She had followed my suggestion, followed my

2  recommendation, turned it over to the legal team, and that

3  wasn't working.  She didn't know which way to turn.

4  Q    Did you make a safety plan for Cardi?

5  A    I did.  I was quite concerned about the possibility of

6  suicide.  I did a risk analysis where I really looked at the

7  risk factors in terms of suicide.  She didn't have a prior

8  history.  At that point she didn't have a plan, but she had

9  some protective factors that I felt was strong enough for me

10  to just do a safety plan.  And her protective factors included

11  issues with her faith.  She believed.  She prayed.  She talked

12  about how she prayed a lot, prayed for this to be resolved.

13  Her faith was one of those protective factors, her family, the

14  fact that she had a child.  So I did a safety plan, and she

15  agreed to it.

16  Q    How are Cardi's coping skills?

17  A    Impaired.

18  Q    Did you have serious concerns about her mental health

19  status?

20  A    I had very serious concerns, and I had serious concerns

21  because I work a lot with celebrities and entertainers as well

22  as other people.  But I also knew that -- in the back of my

23  mind I also know that suicide is the second leading cause of

24  death in this age range.  With suicide being the second

25  leading cause of death, I had to consider the risk factors in

1  terms of public -- and what happens is when we think about

2  depression and suicide, a lot of times we don't look at the

3  health issues as the same as in physical health.  And I

4  couldn't help thinking about people not knowing and not

5  understanding what happened to Robin Williams, which was a

6  comedian, or Katie Spade, very successful people, but they all

7  committed suicide, or Anthony Bourdain.

8         One of the things that when I say people

9  underestimate, I was real concerned because in physical health

10 what happens -- and let me give you an example.  If someone

11 walked in this courtroom and was stabbed in the chest, we

12 would all be horrified.  We would see the blood.  We would see

13 them cringe.  We would see the pain.  We may even hear them

14 scream.  That person -- people would probably go into action

15 to help.  They would go into action.  Somebody would try to

16 help the person.  I'm sure they would call 911.  Everybody

17 would get involved.

18        We would see the bleed outwardly.  In mental health

19 the wound and the stab wound is there, but the stab wound and

20 the bleeding is all internal.  So she bleeds as in mental

21 health, and it's just they bleed internally but you don't see

22 the blood.  Therefore, nobody comes to help.  Nobody talks

23 about it a lot of times, and that person bleeds continuously

24 internally.

25        And in Cardi's case if I had to look at that analogy,

1  every post, every lie, everything was like a constant stab,

2  and she was stabbed over and over again.  Trying to get it to

3  stop made it worse because she was stabbed again.  And the

4  blood, the bleeding, we just didn't see it, but it was

5  internal.  So when I spoke with her, I was quite concerned.

6  Q    Dr. Blake, based on your experience, training, and

7  education, what was your diagnoses of my client at that time?

8  A    Major depressive disorder and anxiety disorder.

9  Q    In your opinion how did Cardi's mental state in 2018

10 compare to 2020 that you've been describing?

11 A    Her mental status had definitely deteriorated.  Her coping

12 skills were definitely impaired.  She felt helpless.  She felt

13 hopeless, and as I mentioned, she had thoughts of suicide.

14 When I looked at -- looking at a rating scale, as I mentioned,

15 when I saw her in New York, she was at a 10 with 10 being the

16 worst.  But when I saw her in 2020, she was off the scale.  It

17 was way beyond 10 and I was -- I spent time talking to her

18 and, you know, trying to look at coping skills.

19 Q    Did you have therapy sessions with Cardi in 2021?

20 A    I did.

21 Q    How would you describe Cardi's mental state during your

22 sessions in 2021?

23 A    In 2021 she continued to struggle and suffer a depression.

24 She was extremely sad that nothing had changed.  She felt

25 extremely helpless, that again she had made repeated efforts.

1   She had done what I had asked her.  She had her legal team

2   working, and nothing had changed.  And she was continuing to

3   bleed internally, and at that point I felt like she was

4   hemorrhaging.

5   Q   Dr. Blake, I'd like to show you Plaintiff's Exhibit 24.

6           This is already in evidence, your Honor.

7           THE COURT:  It's going to pop up on your screen.

8           THE WITNESS:  Thank you.

9   BY MS. MOORE:

10  Q   Dr. Blake, do you recognize this?

11  A   Yes.

12  Q   What is this?

13  A   That's an invoice for the trip to New York.

14  Q   Has this invoice been paid in full by my client?

15  A   It has.

16  Q   How many sessions have you had with Cardi?

17  A   16.

18  Q   How much have you invoiced her to date for these almost 20

19  therapy sessions?

20  A   $10,000.

21  Q   Have you been paid in full?

22  A   Yes.

23  Q   I'd like to show you what's been marked Plaintiff's

24  Exhibit 45.

25          Your Honor, this is also previously admitted.  Do you

1  recognize this, Dr. Blake?

2  A   I do.

3  Q   What is this?

4  A   That's an invoice for a therapy session.

5  Q   And is your fee recited there in the invoice?

6  A   Yes.

7  Q   And what is that?

8  A   $250.

9  Q   Does your rate change depending on whether you're seeing

10 somebody locally versus traveling?

11 A   Yes.

12 Q   I'd like to show you Plaintiff's 46.  This has not been

13 admitted yet, your Honor.  Dr. Blake, do you recognize this?

14 A   Yes.  It's an invoice.

15          MS. MOORE:  I'd like to move this into evidence, your

16 Honor.

17          MS. IZMAYLOVA:  No objection.

18          THE COURT:  Plaintiff's 46 is admitted without

19 objection.

20          (Whereupon, Plaintiff's Exhibit 46 was marked for

21 purposes of identification and admitted into evidence.)

22 BY MS. MOORE:

23 Q   Dr. Blake, what is this invoice for?

24 A   $250 for a therapy session an hour.

25 Q   So this is an invoice for one of the sessions you had with

1  my client?

2  A    Yes.

3  Q    Dr. Blake, have you seen Cardi in 2022?

4  A    Yes.

5  Q    What is your opinion of Cardi's mental health today?

6  A    Cardi continues to be depressed.  She continues to fight

7  to hold it together.  She is very anxious underneath, quite

8  depressed that nothing has changed, still bleeding internally.

9  We just don't see it.

10  Q    Do you think she's suicidal today?

11  A    I don't think she's suicidal today.  However, she's still

12  emotionally distressed today.

13  Q    Do you think Cardi's emotional pain will continue into the

14  future?

15  A    Yes.  I think part of that is the videos, the social media

16  posts.  All of that still remains up.  Although those things

17  need to come down, the trauma, the issues in terms of

18  depression, anxiety, and all of the horrific, you know,

19  stories that were told, they're permanent in her memory.

20        MS. MOORE:  Your Honor, may I have a moment to confer

21  with -- thank you.

22        (Brief Pause.)

23  BY MS. MOORE:

24  Q    Dr. Blake, one last question.  The opinions you've

25  expressed today about Cardi's mental health status, what have

1   you based those opinions on?

2   A   I base those opinions on over 30 years of experience, 30

3   years of training, education, and my clinical work.

4           MS. MOORE:   Thank you.   I have no further questions

5   your Honor.

6           THE WITNESS:   May I have some more water?

7           THE COURT:   Sure.   She'd like another bottle of

8   water.   Jennifer, maybe y'all can just grab her one.

9           THE WITNESS:   Thank you.   She's bringing me one.

10          THE COURT:   Okay.   She's got one.

11          THE WITNESS:   Thank you.

12          MS. MOORE:   May I approach the witness, your Honor?

13          THE COURT:   Yes.

14          MS. MOORE:   Thank you.

15          THE WITNESS:   Thank you.

16          THE COURT:   All right.   Questions from the defendant?

17          MS. IZMAYLOVA:   Thank you, your Honor.

18                          CROSS-EXAMINATION

19  BY MS. IZMAYLOVA:

20  Q   Good morning, Dr. Blake.

21  A   Good morning.

22  Q   Back in 2018 there was a person named Johnny Lester that

23  worked for you; is that correct?

24  A   Correct.

25  Q   And in 2018 Johnny Lester was the person that was

1  communicating with plaintiff's representatives on your behalf;

2  is that correct?

3  A   I'm sorry.  Would you repeat your question.

4  Q   Excuse me.  In 2018, prior to your trip to New York,

5  Johnny Lester, was he the one that was communicating with

6  plaintiff's representatives on your behalf?

7  A   He was the one that makes the schedule.  He takes care of

8  my scheduling.

9  Q   So he had contact with plaintiff's representatives?

10  A   When they called, they would have gotten him, yes.

11  Q   And there was also text messages exchanged between Johnny

12  Lester and representatives for the plaintiff?

13  A   I don't know how they communicated, but he would be the

14  contact person.

15  Q   Okay.  I would like to show you what's been marked as

16  Defendant's Exhibit 96 for identification purposes.

17         THE COURT:  All right.  It's about to come up on the

18  screen for you.

19         THE WITNESS:  Thank you.

20  BY MS. IZMAYLOVA:

21  Q   96.  Do you see that now on your screen?

22  A   Yes.

23  Q   Is this one of the communications that Johnny Lester had

24  on your behalf?

25  A   Let me put on my glasses.

1    Q    Yes, ma'am.

2    A    I'm sorry.  Your question?

3    Q    Does that look like one of the communications that Johnny

4    Lester had with plaintiff's representative on your behalf?

5    A    I don't have his communications, so I don't know.

6    Q    Does that communication mention your name and your session

7    with the plaintiff?

8    A    It does.

9          MS. IZMAYLOVA:  Okay.  Your Honor, I would like to

10   introduce Defendant's Exhibit 96 into evidence.

11         THE COURT:  Is there an objection from the defendant?

12         MS. MOORE:  No, your Honor.

13         THE COURT:  All right.  Plaintiff's Exhibit 96 is

14   admitted -- I'm sorry.  Defendant's Exhibit 96 is admitted.

15         MS. IZMAYLOVA:  Thank you, your Honor.

16         (Whereupon, Defendant's Exhibit 96 was marked for

17   purposes of identification and admitted into evidence.)

18   BY MS. IZMAYLOVA:

19   Q    And in this communication toward the top it says, Lynda,

20   hope your Saturday is well.  Just checking in.  Dr. Sherry and

21   CB had a great first session.  Dr. Sherry gave great feedback

22   when I spoke with her.  They scheduled another session today.

23   I know CB has moved to a new address other than The London

24   about half an hour away.

25         Is that correct?  Is that what's in the text message?

1   A    Yes.

2   Q    Okay.  And you see toward the bottom it says November 5th,

3   2018.  That's another communication that was made?  Do you see

4   that date?

5   A    Yes.

6   Q    Okay.  So this would have been at the same time that you

7   were in New York; is that correct?

8   A    What's the date again?  November?

9   Q    Toward the bottom of the screen it's November 5th, 2018.

10  So --

11  A    I wasn't in New York on November 5th.

12  Q    When he's referring to you I hope your Saturday is well

13  and your first session, that is referring to your session in

14  New York; is that correct?

15  A    I assume.  I don't know.

16  Q    Did you see the plaintiff at The London Hotel?

17  A    I don't recall the name of the hotel.  It could have

18  easily been.  Everything was sort of where I was taken, so I

19  wasn't real sure.

20  Q    I would like to show you now what's been marked as

21  Defendant's Exhibit 97 for identification purposes.  Are you

22  able to see that on your screen, Dr. Blake?  Are you able to

23  see the exhibit?

24  A    Yes.

25  Q    And does that look like more communication from Johnny

1  Lester regarding your session with the plaintiff?

2  A   This is a communication regarding that.  It's not about

3  the session.  It's regarding the session.

4  Q   Right.  So regarding one of the sessions that you had with

5  the plaintiff?

6  A   Yes.

7         MS. IZMAYLOVA:  I would move Defendant's Exhibit 97

8  into evidence.

9         THE COURT:  Any objection?

10         MS. MOORE:  No, your Honor.

11         THE COURT:  97 is admitted without objection.

12         (Whereupon, Defendant's Exhibit 97 was marked for

13  purposes of identification and admitted into evidence.)

14  BY MS. IZMAYLOVA:

15  Q   And toward the top of that page Johnny Lester says, also,

16  I did get word from Dr. Sherry the second session went very

17  well yesterday.  She felt she turnt a corner with CB about

18  establishing and maintaining a stress plan.  My understanding

19  is CB is headed to the DR.  Dr. Sherry was hoping this could

20  be a time for her and her husband to have down time.  But

21  CB -- and then it looks like the two last texts came in.  It

22  looks like the last line should have been -- should have come

23  in first and then the second to last line.  But basically it

24  should have been flipped.  I think that the way the text came

25  in was out of order, but I'm going to read how I believe it

1   should have came in.

2          So it says, CB informed Dr. Sherry others were going

3   with them.  Dr. Sherry's feedback was she'd rather less people

4   go, and if issues arise while they are on vacation, she will

5   make herself available to go to CB.

6          Do you see all that in Exhibit 97?

7   A   I see it.

8   Q   And presumably CB would be the plaintiff?

9   A   Yes.

10  Q   Now I would like to show you what has been premarked as

11  Defendant's Exhibit 98 for identification purposes.  Are you

12  able to see that on your screen, Dr. Blake?

13  A   Yes.

14  Q   And does that look like another communication from -- sent

15  by Johnny Lester on your behalf to the same representative of

16  the plaintiff?

17  A   Yes.

18          MS. IZMAYLOVA:  I would like to move Defendant's

19  Exhibit 98 into evidence.

20          THE COURT:  Any objection?

21          MS. MOORE:  No, your Honor.

22          THE COURT:  98 is admitted without objection.

23          MS. IZMAYLOVA:  Thank you, your Honor.

24          (Whereupon, Defendant's Exhibit 98 was marked for

25  purposes of identification and admitted into evidence.)

1  BY MS. IZMAYLOVA:

2  Q   This message was sent on February 11, 2019.  Do you see

3  that date all the way at the top?

4  A   Yes.

5  Q   I'm just going to read the full message.  It says, Lynda,

6  Happy New Year, Johnny with Dr. Sherry and I hope and pray all

7  is well and CB is well.  When CB expressed to Dr. Sherry she

8  would not be continuing services, Dr. Sherry does not like to

9  push back to give the client space to see if this is truly

10  what they would like to do.  I know Dr. Sherry has checked in

11  with Latabia off and on, but if the need arises for more

12  services, I did want to let you know we are here.  When

13  Dr. Sherry sees resistance, she finds it best to be invited

14  back in rather than be forceful.  As always, any questions I'm

15  here.  Johnny.

16          Is that what that message said?

17  A   I'm sorry.  Was that message sent?  Is that what you

18  asked?

19  Q   What I just said, is that what you see on Defendant's

20  Exhibit --

21  A   It's what I see, yes.

22  Q   The things that you discussed on your direct examination

23  as far as things that, you know, the plaintiff was stating

24  that was happening to her, those are all -- and I may not be

25  using the right term -- but I believe self-reports; is that

1  correct?

2  A   Correct.

3  Q   And can you please explain what self-report means.

4  A   She reported what she was experiencing and what she had

5  encountered.

6  Q   So basically when you -- you're just repeating what she

7  has told you.  Is that fair to say?

8  A   No.  Not only did I repeat what she had told me.  Some of

9  the things, I talked about my observation and my assessment of

10 what was going on.

11 Q   Aside from the, you know, the clinical diagnoses that you

12 may have -- I mean, like the factual scenarios about, you

13 know, my client and what they had going on, those were all

14 self-reports from the plaintiff to you during your sessions;

15 is that correct?

16 A   Yes.

17 Q   Okay.  And you did write two summaries as a result of

18 the -- one in 2018 and one in -- well, scratch that.  Did you

19 write any summaries regarding your sessions with the

20 plaintiff?

21 A   Yes.

22 Q   Okay.  And at this point I would like to show you what's

23 been marked as Defendant's Exhibit 99 for identification

24 purposes.

25          MS. MOORE:  Objection.

 1          THE COURT:  Sorry.  You have an objection to her

 2  showing the document to the witness for identification

 3  purposes?

 4          MS. MOORE:  I have an objection based on the pretrial

 5  conference, your Honor.  May we approach the bench?

 6          THE COURT:  Sure.

 7          MS. MOORE:  Thank you, your Honor.

 8          (Whereupon, a bench conference was held between the

 9  Court and counsel.)

10          MS. MOORE:  Your Honor, some white noise for the

11  jury, some white noise so they can't hear.

12          THE COURT:  We activate whatever we have.

13          MS. MOORE:  Thank you, your Honor.  So, your Honor,

14  these two summaries, there was a statement that one of the

15  things that Tasha K was reporting about my client was that

16  she'd drugged and robbed men --

17          THE COURT:  Said that she was what?

18          MS. MOORE:  One of the things that she self-reported

19  was that one of the lies was that she'd drugged and robbed

20  men, and that has been specifically excluded by your Honor.

21          THE COURT:  So is 99 more than just the one letter?

22  I read the one letter a while ago.

23          MS. MOORE:  I'm sorry?

24          THE COURT:  Let me grab it.  Hold on.  All right.  So

25  she asked her to identify 99.

```
1              MS. IZMAYLOVA:  Sorry.  It's two --

2              THE COURT:  I know there's a second page.  This is a

3    two-page letter memo.

4              MS. IZMAYLOVA:  From Dr. Blake.

5              THE COURT:  Is this what you're looking at?

6              MS. MOORE:  Yes.  And, your Honor --

7              MS. IZMAYLOVA:  There's two.

8              THE COURT:  I'm sorry.  All I have is a hundred after

9    that.

10             MS. IZMAYLOVA:  It's marked, I think, 103 or

11   something like that, the second one.

12             THE COURT:  Did you ask her to identify 103?

13             MS. IZMAYLOVA:  Not yet, not yet.

14             MS. MOORE:  What I want to say, your Honor, is we

15   don't have an objection to the first one, but the second one

16   has a reference to drugging and robbing, which we have an

17   objection to.

18             THE COURT:  Well --

19             MS. MOORE:  So if there's a limitation that's not --

20             THE COURT:  Let me just --

21             MS. MOORE:  Of course, your Honor.  No one has opened

22   the door to that, your Honor.

23             THE COURT:  103 hasn't even been identified at this

24   point.  Are you going to -- do you intend to do that?

25             MS. IZMAYLOVA:  I do intend to do that.  My intention
```

1   is to question this report does not have anything about -- say

2   anything about suicide or suicidal or anything like that.

3   That's what my intention is for this report, not to ask her

4   about -- I didn't even know that was written in there.

5           MS. MOORE:  She could ask that without the jury

6   seeing that language.

7           MS. IZMAYLOVA:  We can redact it.

8           THE COURT:  You want it redacted?

9           MS. MOORE:  Yes, sir.

10          THE COURT:  Okay.

11          MS. IZMAYLOVA:  We can redact it.

12          MS. MOORE:  Then I have no objection, your Honor.

13          THE COURT:  One at a time.  Do you have an objection

14   to redacting that line?

15          MS. IZMAYLOVA:  No, but we'll have to do it real

16   quick.

17          THE COURT:  All right.  I'm not sure if you can do

18   it -- can you do it and scan it so that you -- if you intend

19   to show the jury now, you're going to have to do it and scan

20   it or you're going to have to do it in the hard form.

21          MS. IZMAYLOVA:  I believe Mr. Sabbak can do it on the

22   software that we have, but we'll just need time to --

23          MS. MOORE:  My assistant might be able to help you if

24   you need.

25          MS. IZMAYLOVA:  I believe he can do it.

1          THE COURT:  All right.  So let's just go ahead and
2  take -- we'll take a ten-minute recess, and then y'all can
3  deal with that.  I do want to talk a little bit more about it
4  without the jury in the room.
5          MS. IZMAYLOVA:  Sure.
6          MS. MOORE:  Okay.  Thank you, your Honor.
7          (Whereupon, the following proceedings continued in
8  open court.)
9          THE COURT:  Ladies and gentlemen, we're going to take
10  a ten-minute recess, our morning recess, a little early so
11  that we can deal with an administrative issue related to a
12  document.  So we'll see you in about 10 minutes.  Thank you.
13          COURTROOM SECURITY OFFICER:  All rise.
14          (Whereupon, the jurors exited the courtroom.)
15          COURTROOM SECURITY OFFICER:  Please be seated and
16  come to order.
17          THE COURT:  All right.  So the objection that was
18  made is premature.  The objection was made in response to
19  Document No. 99.  Maybe that was not what Ms. Moore had in her
20  mind, but that's when the objection came forward.  I don't
21  think that the plaintiff has any objection to Document No. 99.
22  Is that correct, Ms. Moore?
23          MS. MOORE:  That's correct, your Honor.
24          THE COURT:  All right.  The plaintiff's objection
25  really goes to the expected tender momentarily of Document

1    103, and Document 103, as far as I understand it, the part of

2    the objection has to do with the second paragraph, fourth

3    sentence -- excuse me -- fifth sentence that states as

4    follows:  Ms. Almánzar stated that some of the lies that Tasha

5    K published about her included that she is a prostitute, she

6    has herpes and HPV, she's a drug addict, she is not a good

7    mother, she has drugged and raped men, she filed for divorce

8    from her husband because he had gotten another woman pregnant

9    and claimed that her father was a rapist.

10          Now, my understanding is that the plaintiff's concern

11   is over the part of it that says she has drugged and raped

12   men, and the plaintiff's objection goes to the motion in

13   limine which eliminates any evidence of that from the case

14   and/or that -- I guess that the plaintiff's complaint for

15   slander and libel does not rest on that alleged statement by

16   the defendant.  The defendant is agreeing to redact that

17   specific clause; is that correct?

18          MS. IZMAYLOVA:  That's correct, your Honor.

19          THE COURT:  Ms. Moore, anything else?

20          MS. MOORE:  No, your Honor.  That's it.  Thank you.

21          THE COURT:  All right.  So in our break if y'all can

22   figure out how to redact it if you want to show it to the jury

23   now.  You can do it later and show it to the jury later, but

24   if you want to do it now, you can do it now.  If you can do

25   it, you can admit it.

```
 1              Let me just state for the record I wouldn't have
 2   redacted it personally because it says lies, you know.  I
 3   mean, it's not testimony.  It's what plaintiff says was a lie,
 4   but the defendant has agreed to that redaction, so that's what
 5   we will do.  We'll take a ten-minute recess.  Thank you.
 6              MS. IZMAYLOVA:  Your Honor, I have a quick question.
 7   When we do redact it, do you want us to give it the same
 8   exhibit number or --
 9              THE COURT:  The same exhibit.  Just redact it, and
10   it's still Exhibit 103.  And I guess when you tender that,
11   there will be no objection because it will be in redacted
12   form.
13              MS. IZMAYLOVA:  And once it's redacted I can email
14   everyone a copy of that.
15              THE COURT:  However y'all do that.
16              MS. IZMAYLOVA:  Thank you, your Honor.
17              THE COURT:  All right.  Thank you.
18              COURTROOM SECURITY OFFICER:  Court stands in recess
19   for 10 minutes.
20              (Brief recess.)
21              COURTROOM SECURITY OFFICER:  All rise.  Please be
22   seated and come to order.
23              THE COURT:  Did y'all get it?
24              MS. IZMAYLOVA:  We were able to get it.
25              THE COURT:  Okay.  All right.  You're ready for the
```

```
 1  jury?

 2          MS. IZMAYLOVA:  Yes.

 3          THE COURT:  Thank you.

 4          COURTROOM SECURITY OFFICER:  All rise.

 5          (Whereupon, the jurors entered the courtroom.)

 6          COURTROOM SECURITY OFFICER:  Please be seated and

 7  come to order.

 8          THE COURT:  All right.  So before we broke the

 9  plaintiff -- excuse me -- the defendant had showed -- is it

10  Exhibit 99?

11          MS. IZMAYLOVA:  Yes, your Honor.

12          THE COURT:  Exhibit 99 to the witness.  I'm not sure

13  it had yet been identified yet so --

14          MS. IZMAYLOVA:  Not yet, your Honor.

15          THE COURT:  So go ahead.

16  BY MS. IZMAYLOVA:

17  Q   Ms. Blake, if you would, look at your screen and let me

18  know if you're familiar with the document that's on the

19  screen.

20  A   Yes.

21  Q   And could you tell us what that is.

22  A   It was a summary.

23  Q   I'm sorry.  Can you give a little more detail about it.

24  What kind of summary?

25          THE COURT:  Is that a summary you prepared, ma'am?
```

1          THE WITNESS:  I'm sorry, yes.  I couldn't hear.

2          MS. IZMAYLOVA:  I'm sorry.  Thank you, Judge.

3          So this was a summary that you prepared after some

4    sessions with the plaintiff?

5          THE WITNESS:  Yes.

6          MS. IZMAYLOVA:  And at this time I would move

7    Defendant's Exhibit 99 into evidence, your Honor.

8          THE COURT:  No objection?

9          MS. MOORE:  No, your Honor.

10          THE COURT:  All right.  99 is admitted.

11          (Whereupon, Defendant's Exhibit 99 was marked for

12    purposes of identification and admitted into evidence.)

13    BY MS. IZMAYLOVA:

14    Q   And let me ask you a little bit -- a couple of questions

15    about the document itself.  You have already testified that

16    you went to New York at the beginning of November of 2018; is

17    that correct?

18    A   2018, correct.

19    Q   And this summary is about those sessions that you had in

20    New York; is that correct?

21    A   Correct.

22    Q   The date of the summary, if you can see at the top, is

23    dated on October 26th, 2020; is that correct?

24    A   Correct.

25    Q   So that was about -- almost two years after the actual

1  sessions had occurred?

2  A   Correct.

3  Q   And then in the, I guess, second paragraph on this page

4  toward the bottom of the second paragraph you specifically

5  noted, Ms. Almánzar denied any suicidal or homicidal

6  ideations; is that correct?

7  A   Correct.

8  Q   And then if we could go to the second page of the same

9  summary, and at the end of the summary you note that, given

10 psychotherapy was not conducted, a clinical diagnosis was not

11 made; is that correct?

12 A   Correct.

13 Q   And I believe you testified on direct that during your

14 2018 sessions the plaintiff had mentioned or told you that my

15 client was saying that the plaintiff had HPV; is that correct?

16 A   She had mentioned -- I'm not sure of the exact date, but

17 she had mentioned that she had herpes or reported she had

18 herpes.  I'm not sure exactly when that occurred, but by the

19 time I wrote this summary, I was aware of it.  And she had

20 reported it.

21 Q   Okay.  I would like to now show you what has been marked

22 as Defendant's Exhibit 103 for identification purposes.

23           THE COURT:  Hold on a second.  Before we leave that

24 last question, can you define who the "she" was.  You said

25 "she" had mentioned that "she" had herpes or reported "she"

```
 1  had herpes is what you said or something like that.  Can you
 2  use names --
 3              THE WITNESS:  Absolutely.
 4              THE COURT:  -- so that we know and we don't have
 5  pronoun reference issues?
 6              THE WITNESS:  Absolutely.  Cardi had reported that
 7  Tasha K had posted lies and videos regarding that.
 8  BY MS. IZMAYLOVA:
 9  Q    Thank you.  Again, I'm going to show you what's been
10  marked as Defendant's Exhibit 103 for identification purposes.
11  Do you recognize this document?
12  A    Yes.
13  Q    And can you tell us what it is.
14  A    It's another treatment summary.
15  Q    And did you write that as a result of some other sessions
16  that you had with the plaintiff?
17  A    Yes.
18              MS. IZMAYLOVA:  Your Honor, at this time I would move
19  Defendant's Exhibit 103 into evidence.
20              THE COURT:  Document 103 as redacted?
21              MS. IZMAYLOVA:  Yes, your Honor.
22              THE COURT:  Any objection?
23              MS. MOORE:  No, your Honor.
24              THE COURT:  103 is redacted and is admitted.
25              MS. IZMAYLOVA:  Thank you.
```

1            (Whereupon, Defendant's Exhibit 103 was marked for

2   purposes of identification and admitted into evidence.)

3   BY MS. IZMAYLOVA:

4   Q   And this was a summary of the sessions that you testified

5   about that you had in November of 2020; is that correct?

6   A   This is a session I had -- these sessions was both 2020

7   and 2021.  This was a summary of that.  I reflected back from

8   what had happened in New York and her coming back.

9   Q   Right.  So I think in the first paragraph I think you

10  summarized the previous, the 2018 sessions, and then you move

11  into the 2020 sessions.  Is that fair to say?

12  A   Yes.

13  Q   And the document itself is dated December 3rd, 2020?

14  A   Yes.

15  Q   Is that correct?

16  A   December 3rd, 2020, yes.

17  Q   Okay.  And I don't know how long ago was the last time

18  that you had read it, but there's no mention in this document,

19  in the two pages, of the plaintiff -- anything about the

20  plaintiff being suicidal or having suicidal thoughts.  If you

21  need to take a moment to read that, just let me know when

22  you're done.

23  A   Okay.

24  Q   Did you see any mention of plaintiff being suicidal or

25  having any suicidal thoughts in this document?

```
 1            THE WITNESS:  You want to move to page 2, please.
 2            MR. MOORMAN:  Sure.
 3            THE WITNESS:  I did not use the term "suicidal" in
 4  this.  I talked about her symptoms and what was reported.
 5  BY MS. IZMAYLOVA:
 6  Q    So there is no mention about her being suicidal?
 7  A    No.  This was in December 2020.
 8  Q    So just a couple more questions.  Both of these summaries
 9  were put together or written after the plaintiff had filed
10  this lawsuit; is that correct?
11  A    I'm not sure if the lawsuit was actually filed.  The
12  request was made at some point, so I'm not sure of the dates
13  and the sequence.
14  Q    If the lawsuit was filed in March of 2019 and both of
15  these summaries is dated -- was written in 2020, is it fair to
16  say that they were both written after the lawsuit was filed?
17  A    Yes.
18  Q    And you spoke with the plaintiff's attorneys before you
19  came to court today to prepare for your testimony?
20  A    I'm sorry?
21  Q    Did you speak with the plaintiff's attorneys to prepare
22  for your testimony in court today?
23  A    I'm not sure what you mean by prepare.
24  Q    To go over your testimony.
25  A    No.
```

1    Q    You did not?

2    A    No.  We talked about just making sure, you know, I was

3    familiar with what I had submitted but not -- I don't know

4    what you mean by prepare.

5    Q    I don't mean that they told you what to say.  I mean did

6    you speak with them about your testimony in general to, you

7    know, jog your memory about some things or, you know, to go

8    over the documents that you've prepared.

9    A    No, they did not try to jog my memory.

10   Q    And you're being compensated by the plaintiff to be here

11   today?

12   A    I'm compensated by the plaintiff, yes.

13           MS. IZMAYLOVA:  Your Honor, if I may have one moment.

14           THE COURT:  Sure.

15           (Brief Pause.)

16           MS. IZMAYLOVA:  I have no further questions,

17   Dr. Blake.  Thank you.

18           THE COURT:  Any redirect, Ms. Moore?

19           MS. MOORE:  Yes, your Honor, just briefly.

20                       REDIRECT EXAMINATION

21   BY MS. MOORE:

22   Q    Dr. Blake, is it uncommon for people suffering from

23   significant mental health distress to be hesitant about

24   continuing psychotherapy?

25   A    Absolutely.

1  Q    Why is that?

2  A    Oftentimes they underestimate themselves personally, the

3  severity of it, also because they have schedules.  Many times

4  for most people in general, not just celebrities, mental

5  health is put on the back burner.  You do the job.  You work.

6  You do everything you need to do, but a lot of times we, as

7  people, take care of ourself last.  And our mental health

8  definitely is put on the back burner.

9  Q    And when you did your four sessions with Cardi in New York

10 in November of 2018, you testified that at that time you did

11 not believe she was suicidal; correct?

12 A    Correct.

13 Q    Based on your opinion, observation of my client, when do

14 you believe she developed suicidal ideations?

15 A    She developed suicidal ideations by the time I saw her in

16 2020.  She was extremely stressed, and she was overwhelmed.

17 It wasn't -- she felt totally helpless, so it wasn't an issue

18 of, well, she was just still upset.  When I saw her in New

19 York, she was upset, but this was beginning to be the tip of

20 the iceberg because at this time in 2020 she didn't have any

21 idea if this was ever going to come to an end.

22 Q    I think you testified earlier that she expressed a desire

23 to end her life to you; is that correct?

24 A    Yes.

25 Q    Would you have put a -- can you describe what a safety

1  plan is?

2  A    Yes.  After a risk assessment is done and I look at the

3  factors that may contribute to suicide, there are levels, you

4  know, of action.  I didn't feel she needed hospitalization.

5  She didn't make that criteria.  However, a safety plan is an

6  agreement in terms of if she had any intent in terms of action

7  to commit -- she would call me.  And I don't care if it's

8  24/7.

9  Q   Would you have put a safety plan in place had she not been

10  suicidal?

11  A    No.

12          MS. MOORE:  No further questions, your Honor.

13          THE COURT:  Any further questions from the defense?

14          MS. IZMAYLOVA:  No, your Honor.

15          THE COURT:  May this witness be excused?  Ms. Moore,

16  do you wish to excuse this witness?

17          MS. MOORE:  Oh, I'm sorry, your Honor.  Yes, I do.

18  Thank you, Dr. Blake.

19          THE COURT:  Any objection from the defendant for this

20  witness being excused?

21          MS. IZMAYLOVA:  No, your Honor.

22          THE COURT:  All right.  Thank you, Doctor.

23          THE WITNESS:  Thank you.

24          THE COURT:  All right.  Any other witnesses or

25  evidence from the plaintiff?

1          MS. MATZ:  No further witnesses, your Honor.  There

2    was one small question about two exhibits if we could have a

3    moment and a side bar.

4          THE COURT:  All right.

5          (Whereupon, a bench conference was held between the

6    court and counsel.)

7          MS. MATZ:  Thank you, your Honor.  We just noticed

8    over the weekend in reviewing the transcripts that there were

9    two exhibits we thought were moved in that we didn't have you

10   officially saying as in.

11         THE COURT:  Which ones?

12         MS. MATZ:  Plaintiff's 615.

13         THE COURT:  I've marked it in.

14         MS. MATZ:  Okay.  And defendant's, I believe, is in

15   as well.  I just wanted to put something on the record.  And

16   then Plaintiff's 1011, and they have this one marked in as

17   well.

18         THE COURT:  10 and 11?

19         MS. MATZ:  1011.  Sorry.  One thousand eleven.

20         THE COURT:  I do not have 1011 marked in.  An

21   article?  Picture of an article?

22         MS. MATZ:  It was one of the photos of the tattoos

23   that we offered into evidence.

24         THE COURT:  Does that describe it?

25         MS. MATZ:  Yes, screenshot of -- sorry, your Honor.

1   Yes.  Yes, absolutely.

2          THE COURT:  So you --

3          MS. IZMAYLOVA:  Also, I have it marked as it was

4   admitted into evidence as well.

5          THE COURT:  Does the defendant have any objection to

6   it being admitted?

7          MS. IZMAYLOVA:  No, I don't.

8          THE COURT:  All right.  So 1011 is admitted.

9          (Whereupon, Plaintiff's Exhibit 1011 was marked for

10  purposes of identification and admitted into evidence.)

11         MS. IZMAYLOVA:  What I have was that -- the minutes

12  reflected that 1008 was admitted, but I do not have that

13  marked as admitted.

14         THE COURT:  I do not have 1008.

15         MS. MATZ:  I didn't have 1008.  We had 1007.

16         THE COURT:  You said the minutes.  You mean the

17  court's minutes online?

18         MS. IZMAYLOVA:  That's what I -- I believe that's

19  what I wrote down.

20         THE COURT:  Yeah, I don't have 1008 admitted or

21  tendered or necessarily even talked about.

22         MS. IZMAYLOVA:  Right, and me neither.  So I just

23  wanted to make sure.

24         MS. MATZ:  And I don't believe so either.  I think it

25  was 1007 which --

```
1              THE COURT:  Anything else?

2              MS. MATZ:  No.  Thank you, your Honor.

3              MS. IZMAYLOVA:  No, your Honor.

4              MS. MATZ:  I appreciate that.

5              (Whereupon, the following proceedings continued in

6    open court.)

7              THE COURT:  Does the plaintiff rest?

8              MS. MOORE:  We do, your Honor.

9              THE COURT:  Thank you.  Is the defendant ready to

10   proceed with its case?

11             MS. IZMAYLOVA:  Yes.  We're ready, your Honor.

12             THE COURT:  All right.  You can call your first

13   witness.

14             MR. SABBAK:  Your Honor, the defense calls

15   Ms. Latasha Kebe to the stand.

16             THE COURT:  Thank you.  All right.  Do you still have

17   your face shield?  Do you need another one?

18             THE WITNESS:  Am I still under oath?

19             THE COURT:  I'm sorry?

20             THE WITNESS:  Are you going to swear me in again?

21             THE COURT:  Yeah, so I was going to just mention the

22   oath that you ascribed to earlier still controls your

23   testimony.

24             THE WITNESS:  Okay.

25             THE COURT:  Thank you.
```

```
1              THE WITNESS:  Has this been changed?

2              THE COURT:  It has been.

3              THE WITNESS:  Okay.

4              MR. SABBAK:  Thank you for everyone's patience.  We

5   appreciate it.

6                        LATASHA TRANSRINA KEBE,

7         herein, having been previously duly sworn, was

8   examined and testified as follows:

9                        DIRECT EXAMINATION

10  BY MR. SABBAK:

11  Q    Good morning.

12  A    Good morning.

13  Q    State your name for the record, please.

14  A    Latasha Transrina Kebe.

15  Q    Ms. Kebe, you're the defendant in this case?

16  A    Yes, sir.

17  Q    All right.  I want to first start off by introducing

18  yourself to the jury past your name.  Let's get to know a

19  little bit about you.  Let's start in 2010.  How did you first

20  become interested in, I guess, media celebrity gossip news,

21  all that stuff?

22  A    I'm sorry.  Can you repeat the question.  It was kind of

23  low.

24  Q    Sorry.  I want to familiarize the jury with your

25  background a little more, and so I wanted to start around 2010
```

1   when your interest in media first came about.  Can you tell

2   the jury about that.

3   A    Okay.  Well, I was a -- you went way back.  Okay.  2010 I

4   was a server in Hagerstown, Maryland.  I worked at Buffalo

5   Wild Wings as a server, bartender, key manager on certain

6   days.  Buffalo Wild Wings did a lot of marketing per se to get

7   business into the restaurant, and they used the radio

8   stations.  And so whenever they hire radio stations, sometimes

9   the radio stations couldn't make it, and so I decided to pick

10  up the mike and do birthday shout outs.  I would let them know

11  how much wings were and things like that and what specials we

12  had going on, what prizes and stuff we were giving out, things

13  of such.

14        So that's kind of the first time I picked up a mike,

15  and from there, I believe, like maybe two years into working

16  for Buffalo Wild Wings -- because I started around 2009 per

17  se, 2008, 2009 -- I interned at a radio station in Frederick

18  because Hagerstown really didn't have that many good radio

19  stations.  And so I drove like an hour to Frederick, Maryland

20  and worked the street team and things like that, and I

21  helped -- I'm sorry.  My mouth is dry.

22  Q    Let me ask you another question.

23  A    Okay.

24  Q    So let's talk about the radio station.  So from Buffalo

25  Wild Wings the radio station was interested in you; is that

1   right?

2   A    Yes, sir.

3   Q    Okay.  And then you started interning with the radio

4   station in Maryland in about 2011.  What did you do there?

5   A    I was more so street team.  I assisted the radio host in

6   the morning with the prep of the morning show and stuff like

7   that.  I did birthday shout outs.  I used to sing a lot

8   because I am -- you know, I used to sing coming up, so I would

9   do, you know, birthday shout outs and sing happy birthday and

10  things like that.

11  Q    At some point did you decide to, I guess, dive deeper into

12  your media career?

13  A    Yes.  When I first picked up a microphone in front of a

14  stage -- in front of a crowd of people, I was addicted, and

15  so, of course, I didn't have the credentials working at

16  Buffalo Wild Wings to host a morning show, you know, FCC

17  regulations and things like that.  So I decided to intern.  I

18  started for free.  Then they started paying me because I was

19  so good, because I did a lot of in between shifts at Buffalo

20  Wild Wings.  I was an hour away in Frederick set up at

21  somewhere like, I don't know, Weis Markets in the cold, snow,

22  doing shout outs trying to get people coupons and things like

23  that.

24          And so from there I had a conversation with my

25  husband.  It was around like 2011, 2012 I sought out the same

1  radio broadcasting school as Monique, the comedienne, and so

2  she had graduated from that school like 30 years prior.  And

3  so when I went to -- I guess, wow, you really went back.  When

4  I went to apply, the first day of class I had found out that

5  they were operating out of a house.  I don't know what you

6  call those houses, downtown Baltimore, and it wasn't as kept

7  up as, you know, I thought a radio school should be.

8  Q    At some point do you decide to move down to Atlanta?

9  A    Yes.  So when I couldn't -- you know, when I wasn't

10 satisfied with the school that was in Baltimore, I researched

11 the radio markets, and so I was between New York, LA, and

12 Atlanta.  Atlanta is where I pretty much found my independence

13 because we lived in Atlanta before we moved to Maryland to

14 start our transportation company.

15         And when I moved to, you know, Maryland, of course,

16 you know, changing careers, my husband and I had a

17 conversation.  He saw how serious I was about pursuing radio,

18 and he agreed to relocate us back from Maryland to Atlanta

19 after we figured out LA was too expensive, New York just

20 wasn't the lifestyle for us.  And so I'm from the south, from

21 Panama City, Florida, and so we decided on Atlanta.

22 Q    What did Mr. Kebe do to help further this radio career?

23 A    He stayed back in Maryland and worked while me and my

24 daughter drove down and got settled in Atlanta.  So he stayed

25 back and worked in Maryland as a restaurant manager for about

1  a year and paid bills and two houses.

2  Q   Okay.  And you moved to Atlanta with your daughter?

3  A   Yes.  She was six years old at the time, yes, sir.

4  Q   And what did you do when you moved down here besides get

5  an apartment and --

6  A   Well, first, because I've always been in the restaurant

7  industry, it was easy money.  It made it flexible for me to

8  pretty much pursue my career in broadcasting and work, you

9  know, and be a mom full-time as well.  So I first applied at a

10  lot of radio stations, V103 to be exact.  That is my absolute

11  favorite radio station.  Frank Ski is my guy, and he said no.

12  So they wanted to give me more so street team and I was just

13  like --

14  Q   Ms. Kebe, what is street team?  Can you explain that,

15  please.

16  A   Okay.  It's a marketing team where you drive around

17  Atlanta.  You set up at different business locations, and we

18  broadcast live from on location to let people know to come

19  out, we're here, the radio station is here, we've got coupons,

20  deals of that such.  And so that's pretty much what they

21  wanted to do per se.

22  Q   At some point did you start working for a radio station

23  called Love 860?

24  A   Yes.

25  Q   Can you tell us about that.

```
 1  A   So after getting turned down by pretty much every radio
 2  station, a Christian radio station that Dr. Martin Luther King
 3  himself used to broadcast out of wanted a more health driven
 4  perspective show for the Christians to listen to in between
 5  like bible segments and things like that, and so they offered
 6  me a segment.  It was paid.  It didn't pay much.  It took more
 7  money out of my pocket for me to keep it.  That show lasted
 8  about a year.  I got some great experience and so yeah.
 9  Q   Can I ask you, when you say it cost you more money out of
10  your pocket to keep it than to have it?
11  A   Well, because I was working.  I was a mom full-time.  My
12  husband had just relocated from Maryland.
13  Q   I'm sorry.  Ms. Kebe, if you would just try to slow down a
14  little bit.
15  A   I'm sorry.
16  Q   I know you're a little nervous.
17  A   I'm sorry.
18  Q   You speak a little fast.  You make sense, but you're
19  speaking a little fast.
20  A   Okay.
21  Q   All right.  Let me be more specific then.  Why would it
22  cost you money to have this job at the radio station?  Why are
23  you spending money?
24  A   Because research, obviously taking time off from work, you
25  know, hiring -- because we had to pay a lot of guests to come
```

1   on to talk about health and wellness, such as, like, you know,

2   experts that have been in the field for a long time, they

3   don't do it for free per se.  And so I had to come out of my

4   pocket hundreds of dollars just to get them onto the show to

5   disseminate information to the listeners that would, you know,

6   help to inspire their health and wellness journey.

7   Q   Ms. Kebe, who is Clark Howard?

8   A   He was one of my mentors.

9   Q   Who is Clark Howard?

10  A   A consumer expert nationally -- well, former nationally

11  syndicated host.  He helped to mentor me while I had my show

12  as well as Willard Harbor -- I'm sorry.  Willard Arbor.  I

13  always get his name -- because I call him Will.

14  Q   Ms. Kebe, if you would, I remember 96 Rock days from my

15  youth.  If you would just explain who Willard Arbor is to the

16  jury.

17  A   He is a veteran radio host inducted into the rock radio

18  show -- Radio Hall of Fame.  Willard Arbor hosted 96 Rock for

19  over 30 years here in Atlanta.

20  Q   All right.  And remember when I said slow it down.

21  A   I'm so sorry.  Okay.  Let me get some water, and I'll slow

22  down.  I'm so sorry.  I'm so used to talking so fast.

23  Q   Ms. Kebe, at some point you were again dissatisfied with

24  the pace or progress of your career.  So 2014, 2015 what do

25  you start doing?

1    A    2014 --

2    Q    Posting videos to Facebook?  Something like that?

3    A    Yeah, so --

4              MS. MATZ:  Objection, your Honor.

5              THE WITNESS:  -- I went into a deep --

6              THE COURT:  Hold on a second.  The objection is

7    leading?

8              MS. MATZ:  Leading.

9              THE COURT:  And it was.  So apparently preliminary

10   but let's don't make it a habit.

11             MR. SABBAK:  Yes, sir.  2014, 2015.

12             THE WITNESS:  Okay.  So around that time after I lost

13   the radio show, I couldn't afford to keep it going, I hit a

14   deep depression.  And so I went back to, you know, the

15   restaurant full-time and wasn't happy, felt like everything

16   that my husband and I had planned from Maryland to move down

17   here we had failed pretty much.  And so I was taking money out

18   of my pocket.  My husband was working.  I wasn't working that

19   much, and so I decided with the advice of my therapist, to go

20   to the internet.  He said the world was moving forward.

21             In traditional media we was told that only rejects go

22   to the internet so that's kind of what -- I was just like, no,

23   I'm not going to the internet, like, you know, I want to move

24   like how Monique moved or Steve Harvey or, you know, people

25   like that.  But after about a year of working with him, I

1  decided to put my first video on the internet with a glass of
2  wine to calm my nerves.  And so --
3  BY MR. SABBAK:
4  Q   Okay.  So please tell us about that video.  Where was this
5  video posted?
6  A   Facebook, my personal Facebook.  I'm sorry.  I'm so
7  nervous.  I guess having to open up my life like this I'm so
8  nervous.
9  Q   Just slow down.
10  A   I'll slow down.  Okay.  I don't get nervous that much, but
11  I'm nervous today.
12          Okay.  So when I made that video, I just randomly
13  made that video.  I had a glass of wine.  I was working at a
14  wine bar at the time, and I saw a reality show with Christina
15  Milian.  Lil Wayne, he featured sometimes, but it was more so
16  about her show.  She's an R&B artist.  And so Lil Wayne had
17  gotten caught with a stripper.
18  Q   Who is Lil Wayne?
19  A   I'm sorry.  He's a rap artist.  And so two high profile
20  celebrities in the media.  And so he had gotten caught
21  cheating, and there was a picture that posted, that got posted
22  or leaked to the internet with the girl, the stripper,
23  standing in front of a mirror.  So Christina Milian saw the
24  picture.  She instantly knew it was Lil Wayne's house, and she
25  called him up on a reality show and said we're done.

1          And so I thought that was really inspirational

2    because, you know, a lot of times as women when we're

3    embarrassed like that, I thought her confidence and not

4    needing her mother's permission or her friends' permission.

5    You know, she saw the picture.  She immediately called him and

6    said, you know, this is done.  And so I pretty much reiterated

7    that she didn't need anybody.  You know, she was confident in

8    herself, and she didn't allow him to continue to disrespect

9    her.  And it was, you know, a nationally syndicated show.

10         And so went to sleep, of course, because I was a

11   little tipsy.  I woke up.  The video had 10 million views.

12   And so that was pretty much my first video in the celebrity

13   gossip arena.

14   Q   Okay.  And then after that, did you stay on Facebook or

15   did you move your platform?

16   A   No.  I got off Facebook because my husband worked in

17   corporate America, and after we had -- and I discussed that I

18   was going to leave radio alone, he came home because some

19   people at work -- because he, of course, is a manager at a

20   restaurant -- had said, you know, did you see your wife on,

21   you know, Facebook and what she had to say?  And I guess they

22   showed him a glimpse of the video, and I had on a neglige but

23   it was covered.  I was kind of leaning down so you couldn't

24   see.

25         And he came home.  You know, of course his family is

```
1   on social media, and he's like take it down.  It's
2   unprofessional.  Take it down.  And so I took it down and, you
3   know, went into hiding.
4   Q   And did you switch platforms at some point?
5   A   Yes.
6   Q   What platform?
7   A   I had a secret YouTube channel.  It was at the time --
8   Q   Why was it secret, Ms. Kebe?
9   A   Because my husband didn't know that I had it.  Yeah, he
10  didn't know that I had it.  I had named it -- it was just
11  under my regular name, Tasha Kebe.  It was under the radio
12  show name at the time.  It was titled "Real Health Real
13  Beauty", so it was titled under that.  I erased the title, put
14  my name, Tasha Kebe, and started posting videos in about 2016
15  on YouTube.
16  Q   What was your first video?
17  A   Ray J and princess.  They had did -- can I elaborate?
18  Q   No --
19  A   I'm sorry.
20  Q   -- thank you.  Let me ask you this:  At what point did
21  Tasha Kebe become unWinewithTashaK?
22  A   I want to say a year after I posted my first video on
23  YouTube.
24  Q   Around what year?
25  A   2016, yeah, because I posted my first video, yeah,
```

1 | February 2016.  So around December-ish 2016.

2 | Q   Did you come up with the name?

3 | A   No.  My viewers did because I used to drink wine and

4 | pretty much comment on celebrity gossip.

5 | Q   Ms. Kebe, what's the mission of unWinewithTashaK?  What do

6 | you do?

7 | A   Well, I take stories from sources that are already on the

8 | internet and I -- of course, I investigate the stories, and I

9 | publish them either as fake news or real news.  So that is the

10 | mission.

11 | Q   So is it fair to say that you verify whether or not rumors

12 | or news on the internet is true or false?

13 |         MS. MATZ:  Objection, your Honor.  Leading.

14 |         THE COURT:  Sustained.  You've just got to ask her

15 | what she does.  You can't suggest what it might be.

16 |         MR. SABBAK:  Okay.  I'll move on.

17 |         So you described two types of -- I guess you will

18 | verify a video, and two things will happen.  Can you describe

19 | the -- tell us the two things and describe the two ways you

20 | would classify those videos.

21 |         THE WITNESS:  Okay.  So is it better if I give -- can

22 | I give an example?  That's better.

23 | BY MR. SABBAK:

24 | Q   That's fine.

25 | A   Okay.  All right.  So --

1   Q   Unrelated.

2   A   Unrelated.  All right.  So Blac Chyna, recently I did a

3   story on Blac Chyna.  She's a very controversial Instagram

4   model per se, has a bad reputation, as people would put it,

5   because of her lifestyle that people don't agree with.  And so

6   there was a story that was circulating basically stating that

7   she had somehow kidnapped a white woman.

8           And so, of course, social media is in a frenzy.

9   Black China has not the great reputation.  And I was looking

10  at the video, and I was, like, the video is too short to

11  really classify a kidnapping.  And so when I was investigating

12  the source -- and a lot of times at the level that I'm at now

13  the sources just reach out to me because this is recent.

14  Before I used to have to go after sources, but this particular

15  source reached out to me.  And he was the actual source that

16  uploaded the video of Black Chyna in a hotel room.

17          And the girl comes out crying as if she was like, you

18  know, let free or something and so, you know, basically said

19  he had a few interviews scheduled with the source and a lot of

20  other big publications, Billboard, Rolling Stone, and he

21  wanted to talk to me because I'm big in the urban area.  And I

22  said, no problem.  And so when he spoke to me, I had no idea,

23  of course, what his angle was going to be.  I was just going

24  to ask him about the video in question that he had posted.

25          And so as we're talking -- it was about a 30-minute

1  interview.  We had no pre-interview because I typically don't
2  do pre-interviews because that's how you get the most natural
3  reaction and the most real reaction.  It keeps them from being
4  prepped per se, and so, you know, when I was speaking to him,
5  you know, he was talking a lot about he had met Blac Chyna,
6  you know, at an event.  He had some friends that knew her as
7  well and that she invited them back to the hotel room.  And he
8  was with his friend who happened to be a Caucasian girl.  And
9  so when they got in the room, some things were going down, and
10  Black Chyna instantly got mad at what he said.
11         So when she got mad, he said that she told him to get
12  out the room, but her friend could stay.  And the other
13  friends that they had came with couldn't stay.  And so, of
14  course, he's like, well, I'm leaving.  And so the girl -- he
15  was like, come on.  I think her name was Jennifer.  He was
16  like, come on, Jennifer.  Come with me.  And so Black Chyna
17  was like, no, she stays, you go.  And so when he left, he
18  said, Jennifer, you need to come out.  And so I guess --
19  Q   Ms. Kebe, what ended up happening at the end?
20  A   I'm sorry.  Am I taking too long?
21  Q   We don't need all the details, ma'am.  Just tell us what
22  happened when you interviewed the source, what did you
23  uncover, and what did you put out.
24  A   Okay.  I concluded with the conclusion that he was upset
25  that Black Chyna had embarrassed him in front of his friends

1  and asked him to leave.  There was no kidnapping because the

2  girl was in the room all of three minutes, and once he asked

3  her to -- okay.  I'm sorry.

4  Q   Ms. Kebe, just listen to me.  You've got to slow down.

5  All right?

6  A   Okay.  My mouth is dry.

7  Q   That's fine.  You interviewed this source; correct?

8  A   Yes.

9  Q   All right.  Tell me what happened.  What did you

10  determine?  Just tell me what you determined.

11  A   Basically that --

12  Q   Not why but what.

13  A   That it was a lie.

14  Q   Thank you.  All right.  And then what -- did you put a

15  video on it?

16  A   Yes, because there was a police investigation.

17  Q   All right.

18  A   So, yes, I put a video out basically stating that it was a

19  lie.

20  Q   And when you put a video out debunking some rumors, what

21  would you consider that?  What would you classify that as?

22  What are you doing?

23  A   As pretty much he had created fake news.

24  Q   No, ma'am.  Generally what do you classify that as when

25  you debunk news that's floating out on the internet?

```
 1   A    I don't understand your question.  Can you rephrase the
 2   question?  I'm sorry.
 3   Q    Okay.  So I guess my question is, are you talking about
 4   fake news or are you talking about rumors?  What are you
 5   talking about when you're verifying, this example you just
 6   gave?  Are you talking about fake news?
 7   A    I'm talking about a story that was circulating as real
 8   news, and I classified it as fake news after I spoke to the
 9   source.
10   Q    Okay.
11   A    Before I made a conclusion.
12   Q    So you debunked fake news.  Is that what you're saying?
13   A    Yes, all the time.  Sorry.  I'm so sorry.
14   Q    Ms. Kebe, when Ms. Matz asked you whether or not it's okay
15   to put out fake news, you said yes?
16   A    Yes.
17   Q    Okay.  What did you mean by that?
18   A    Because, you know, there's a lot of fake news going around
19   the internet, and in order to classify it as fake or real,
20   you've got to do an investigation.  And so before I put it out
21   I classify it -- you know, after I investigate, talk to
22   sources and publish it, okay, this was fake news or this was
23   real news.  And so, you know, we don't know until people do
24   investigations.
25   Q    Okay.  But when you put it out there, do you classify it
```

1  as fake news that you've debunked?

2  A   Yes, of course, yes.

3  Q   All right.  So the purpose of this is to let your viewers

4  know that this information is false out there, and you are not

5  to believe it; is that correct?

6  A   That is correct.

7  Q   All right.  So you're not just simply publishing fake news

8  as though it is real?

9        MS. MATZ:  Objection, your Honor --

10       THE WITNESS:  No.  No, sir.

11       MS. MATZ:  -- he's leading the witness.

12       THE COURT:  I'm sorry.  When you hear an objection,

13  if you'll stop.  The objection is leading, and the objection

14  is sustained.  You can't lead your own witness.  You've got to

15  ask questions about things.

16  BY MR. SABBAK:

17  Q   Have you ever debunked any fake news regarding

18  Ms. Almánzar?

19  A   Yes, sir.

20  Q   Give me an example.

21  A   Without --

22  Q   One we've heard in court.

23  A   I'm sorry?

24  Q   Give me an example of fake news that you've debunked from

25  what we've heard in court.

1  A    Well, that would -- am I allowed to answer that question?

2  It would be --

3          THE COURT:  You're not allowed to testify about

4  things that have not been talked about in this courtroom

5  during this trial in front of the jury.  Did you have another

6  objection?

7          MS. MATZ:  I was just waiting until --

8          THE COURT:  So if it hasn't been talked about -- the

9  question goes to what you've heard in court while we were

10 engaged in the trial.

11         THE WITNESS:  Okay.  I'm sorry.

12 BY MR. SABBAK:

13 Q   Ms. Kebe, let me ask you this:  There was an accusation

14 you published a fake story as real regarding Ms. Almánzar's

15 father and a minor?

16 A   Oh, that is incorrect.  I never published that story.

17 Q   Can you explain to the jury what you did with that story,

18 please.

19 A   Okay.  So the story was emailed to me.  And so I took a

20 look at the story, of course, googled Ms. Almánzar's father

21 and were able to pull up arrest records, and I found out that

22 it wasn't true.  And I published it on my Instagram that I was

23 not covering that story because it was absolute fake news and

24 it was defaming.

25 Q   So you did not publish it as real?

```
 1  A    No, sir.

 2  Q    Okay.

 3  A    No.

 4  Q    Did you classify that story as fake news on your YouTube

 5  channel?

 6  A    No, sir, just on my Instagram.

 7  Q    I'm sorry.  But you didn't publish it to your YouTube?

 8  A    No, sir.

 9  Q    Okay.

10  A    No, sir.

11  Q    So you never classified it as real anywhere, only fake?

12  A    Yes.  That is correct, yes, sir.

13  Q    Okay.  What is a viral video?

14  A    A viral video is a video that typically gets anywhere from

15  250- to 300,000 views on up.

16  Q    Have you ever had a viral video?

17  A    Yes, lots of them, yes, sir.

18  Q    The date at issue here is September 19th, 2018.  That's

19  the date the Jones interview was published.  Prior to that had

20  you had any viral videos prior to September 19th, 2018?

21  A    Oh, yes.  Yes, sir.

22  Q    Any idea how many?

23  A    60 plus since I started my channel.

24  Q    I'm just speaking about prior to September 19th.

25  A    Around I would say between 50 or 60.  It's kind of hard to
```

1   gauge because I get so many.

2   Q    Okay.  And do you know how many of those viral videos

3   prior to September 19th, 2018, mentioned the plaintiff?

4   A    A few, maybe two or three per se.

5   Q    And how many videos have you published in total just on

6   YouTube?

7   A    Close to -- well, I checked last night.  It was like 916,

8   916.

9   Q    Do you know how many views total you've ever gotten on all

10  your videos?

11  A    We're almost to 200 million, so that's another big

12  milestone.

13  Q    Okay.  All right.  I'm showing you what's already been

14  admitted into evidence as Plaintiff's Exhibit 834.  Do you

15  remember seeing this, Ms. Kebe?

16  A    Yes, sir.

17  Q    Now, these are -- do you know what this is?

18  A    It looks like the analytics from either my website or

19  YouTube.  They typically look like that.

20  Q    Okay.  Now, I want to focus on September to January of

21  2019.  Did you have any viral videos around this time?  This

22  is September 2018 to January 2019.  Were there any viral

23  videos that you published?

24  A    Yes.  Yes, sir.

25  Q    Which ones?

1   A   They were mainly my R. Kelly stories per se.

2   Q   Okay.  When did you publish those about?

3   A   I published them from 2017 all the way up until 2020.  I

4   still publish them, but they had all went viral collectively

5   because a documentary had came out.  And so it pushed my

6   channel into the -- it pushed the stats per se.

7   Q   So here this is September 1st.  Was the Jones interview

8   released at this point?

9   A   Yes, sir, around --

10  Q   September 1st?  This dot is at September 1st.  Had the

11  Jones interview been released September 1st, 2018?

12  A   Yes, sir.  It was released on, I believe, September 18th

13  or 19th, if I'm not mistaken.

14  Q   Correct.  So this -- do you see where I'm -- look at the

15  screen.

16  A   Yes, sir.

17  Q   Is that September 1st?

18  A   I believe so, yes, sir.

19  Q   So that was before the Jones interview was released?

20  A   Yes, sir.

21  Q   Okay.  So the Jones interview did not cause this spike?

22         MS. MATZ:  Objection, your Honor.  He's leading the

23  witness and she's -- well, I have one other thing, but I'd

24  like a side bar.

25         THE COURT:  It is leading.  Let me tell the jury a

little bit about that.  So under Rule 611 of the Federal Rules
of Evidence, Courts are directed to exercise reasonable
control over the mode and order of examining witnesses and
presenting evidence so as to -- Particularly it states in this
rule that leading questions should not be used on direct
examination except as necessary to develop the witness's
testimony.  Ordinarily the Court should allow leading
questions on cross-examination or when a party calls a hostile
witness, an adverse party or a witness identified with an
adverse party.

So just to summarize, when a lawyer is asking
questions to his or her own witness, normally questions should
not be leading.  A leading question is a question that
suggests the answer in the question itself.  I used an example
of this in my opening remarks for -- a version of that is:
So, Mr. Jones, how long have you been beating your wife?  That
is leading and in some regards because it suggests an answer
or at least a premise that someone has been beating their
wife.

If you watch -- there used to be a show called "The
Lawmakers" which was on Channel 8, Channel 30 something to --
depending on where you are, maybe on a different Georgia
Public Broadcasting station.  State legislators are required
by rule within the state legislature to ask questions, and
they frequently ask questions leading, like isn't it true,

1    Senator, that X and X is true?  Or, Senator, it's not true

2    that X and X is true; correct?  So those are examples of

3    leading questions.

4         So I'm just telling you just because we've had a lot

5    of discussion about leading questions, not just today.  It's

6    been -- objection has been made with regard to questions that

7    both sides of lawyers have asked, but just so that you

8    understand what the basis is of my rulings.

9         So back to the point at issue specifically, you've

10   got to ask open ended questions to your client.  Don't ask

11   leading questions, please.

12         MR. SABBAK:  All right.  Okay.

13         Now, Ms. Kebe, go back to this graph.  How many R.

14   Kelly videos do you believe were released around this time?

15         THE WITNESS:  I didn't release them.  They were

16   already released and so they had -- because of the documentary

17   that came out, the search engine pushed them, and so that's

18   what caused the initial spike.  It was really big for our

19   channel around that time.

20   BY MR. SABBAK:

21   Q   Okay.  I want to show you what's been premarked as Defense

22   Exhibit 24.  Ms. Kebe, are you familiar with this?

23   A   Yes.

24   Q   Without testifying to the content, what is it?

25   A   That is a tweet.

1  Q    And who posted this tweet?

2  A    I did.

3  Q    And is this tweet a fair and accurate representation of

4  the tweet you posted?

5  A    Yes, sir.

6  Q    And is that the correct date that you posted it?

7  A    Yes, sir.

8        MR. SABBAK:  All right.  Your Honor, we move

9  Defendant's Exhibit 24 into evidence.

10        THE COURT:  Any objection?

11        MS. MATZ:  No, your Honor.

12        THE COURT:  24 is admitted without objection.

13        (Whereupon, Defendant's Exhibit 24 was marked for

14  purposes of identification and admitted into evidence.)

15  BY MR. SABBAK:

16  Q    All right.  Ms. Kebe, if you would, please, slowly read

17  this out for the members of the jury -- first, please tell us

18  what date -- excuse me.  What date was this posted?

19  A    Looks like January 19th -- on the 9th of January.  Sorry.

20  Q    Okay.  And, if you would, ma'am, I would just ask you to

21  please read that out loud for everyone.

22  A    PSA Winos #wonthedoit.  We are officially viral.  All of

23  our #Rkelly content is trending online, radio and TV.  Every

24  one of our exclusives are in the millions.  We had a million,

25  but now they are tripled and we are up almost 20K subs in 48

1  hours bruh.   #wonthedoit #numbersdontlie.  7:12 pm, the 9th of

2  January 2019.

3  Q   And so again, if you would, just for the jury please read

4  out what dates does this part cover?

5  A   The dates, August, September, October, November, December,

6  January 2019, February 2019 -- yeah, 2019.

7  Q   And from August to January, what year is that?

8  A   2019.

9  Q   Are you sure?

10 A   You said from -- oh, yeah.  2018 leading into 2019.

11 Sorry.

12 Q   Thank you.  And this again was posted on?

13 A   January 9, 2019.

14 Q   Ms. Kebe, do you recall releasing a video regarding

15 Ms. Almánzar's participation in an MLK skit?

16 A   Yes, sir.

17 Q   I'm going to show you what's been marked as Defendant's

18 Exhibit 75.  Ms. Kebe, without testifying to the contents of

19 that document, do you recognize it?

20 A   Yes, sir.

21 Q   What is it?

22 A   It looks like a screenshot from my YouTube channel of the

23 video.

24 Q   Now, is this document a fair and accurate representation

25 of a screenshot from your YouTube channel?

1  A    Yes.  I mean, I can't see the words because they're

2  blurred but for the most part, yes.

3  Q    Pardon me.

4  A    Yes, sir, that is correct.

5         MR. SABBAK:  Your Honor, defense moves Defendant's

6  Exhibit 75 into evidence.

7         THE COURT:  Any objection?

8         MS. MATZ:  Yes, your Honor.  Side bar, please.

9         (Whereupon, a bench conference was held between the

10  court and counsel.)

11         MS. MATZ:  I just wanted to raise this.  Some of

12  these weren't actually on their original pretrial exhibit

13  list, so they've added several new exhibits.  So I'm just not

14  sure how we're going to deal with them because at the pretrial

15  conference right before this trial your Honor said you wanted

16  to deal with them while we were on the spot.  So I don't know

17  if we should have a conversation about that.

18         MR. SABBAK:  I'm not sure what you're talking about,

19  but just so you know, you introduced many exhibits.

20         THE COURT:  The court reporter won't pick you up if

21  you're not a little louder.

22         MR. SABBAK:  Last week we allowed them to introduce a

23  lot of exhibits that we received just a week prior.  So I'm

24  not really sure how this --

25         THE COURT:  Other than the contention that this

1  document is not on the pretrial order, is there any other

2  objection?

3       MS. MATZ:  No, and I think I'm okay with this one.  I

4  honestly just wanted to confront the issue because there are

5  several that were problematic that were not originally on

6  their list, and I just figured I would raise it initially.

7  But we're okay with letting this one in, but I don't want to

8  not waive the position.  That's all I'm saying.

9       MR. SABBAK:  We cut up the clips that she requested

10  us to do in the pretrial order.

11       MS. MATZ:  That's not what I'm talking about.  That's

12  actually not what I'm talking about.  I understand that we

13  didn't object on those grounds, and those already came in.

14  I'm talking about there are several things on your exhibit

15  list that were --

16       MR. SABBAK:  I can't confirm or deny.  I don't know

17  what you're talking about.

18       MS. MATZ:  Okay.  Well --

19       THE COURT:  So do you want to fight about this one

20  not being on the pretrial or you just want to preserve that?

21       MS. MATZ:  No, I just want to preserve it, and I just

22  wanted to mention it right now.  That's all, your Honor.

23       THE COURT:  All right.

24       MS. MATZ:  Okay.

25       (Whereupon, the following proceedings continued in

1  open court.)

2       THE COURT:  All right.  So without waiving any

3  objection to any other exhibit in the future, does the

4  plaintiff have an objection to this document?

5       MS. MATZ:  No, your Honor.

6       THE COURT:  And so Exhibit 75 is admitted.

7       (Whereupon, Defendant's Exhibit 75 was marked for

8  purposes of identification and admitted into evidence.)

9  BY MR. SABBAK:

10 Q   All right.  Ms. Kebe, if you would, please read the title

11 out for the jurors here.

12 A   Cardi B's Disrespectful Comedy Skit Mocking Martin Luther

13 King's Extramarital Affairs.

14 Q   And can you make the date out?

15 A   Yes.  Yes, sir, September 2nd, 2016.

16 Q   Is that a 6?

17 A   Is it 6?  '18, yes '18.  Sorry about that.

18 Q   And was this before or after the Starmarie Jones interview

19 was published?

20 A   This was before.

21 Q   Okay.  All right.  I'm showing you what's been already

22 admitted into evidence, Plaintiff's Exhibit 532.  You

23 recognize this video, Ms. Kebe?

24 A   Yes, sir.

25       MR. SABBAK:  Okay.  Your Honor, I only intend to play

1   the first 6 minutes and 11 seconds.  If you want to let us

2   play that and then go to lunch, up to you.  May I proceed?

3           THE COURT:  Yes.

4           MR. SABBAK:  Thank you, sir.  And before I play this,

5   was this the MLK skit that we heard last week during the

6   plaintiff's case in chief?

7           THE WITNESS:  Yes, sir.

8   BY MR. SABBAK:

9   Q   And is this a fuller version than what we heard last week?

10  A   Yes, sir.

11          MR. SABBAK:  Okay.  Playing Plaintiff's Exhibit 532

12  from 0 minutes to 6 minutes 11 seconds.

13          (Whereupon, a video recording was played.)

14  BY MR. SABBAK:

15  Q   Ms. Kebe, do you go on to discuss Ms. Almánzar, to your

16  recollection, after this?

17  A   No, sir.

18  Q   What is cancel culture?

19  A   Cancel culture is a group, a society of people who take

20  pleasure in taking down big name celebrities, politicians per

21  se over things that they did in their past.  So they've

22  succeeded in getting a lot of celebrities and politicians

23  canceled.  And so they were in this moment in this video

24  coming for Cardi B at the rise of her fame.

25  Q   So cancel culture, is that the theme of this video?

1  A    Yes.

2  Q    How is that?

3  A    Because cancel culture was the one that actually pulled

4  the skit, posted it on Twitter, and basically, you know, was

5  saying that, you know, she had no business disrespecting

6  Martin Luther King, a prominent, you know, figure in our

7  community as black people, that she, you know, took pride in

8  laughing at, you know, the things that, I guess, maybe he did.

9  But he had reason for doing it, and so they were really

10  basically trying to cancel Cardi B at the height of her

11  career.

12          MS. MATZ:  Your Honor?  Objection.  Side bar.

13          (Whereupon, a bench conference was held between the

14  Court and counsel.)

15          MS. MATZ:  The witness is very clearly speculating

16  and talking about what a lot of other people out of court are

17  saying, and she doesn't really have any basis for this

18  knowledge.

19          THE COURT:  Why are we doing this in a side bar?

20  This is the kind of objection that --

21          MS. MATZ:  I didn't want to do a speaking objection

22  in front of the jury, your Honor.  I'm sorry.

23          THE COURT:  Well, I mean, objection, speculation.

24  Objection, irrelevant.  I have yet to figure out the relevance

25  unless it's that she has somehow defended Cardi B on occasion.

1   I don't know.  What is the relevance of this whole thing?

2   What is the relevance of this whole questioning about --

3          MR. SABBAK:  Plaintiff were saying that she --

4   towards her that she is obsessed with her, that she makes her

5   living off of her.  It's the theme of their entire case, your

6   Honor.

7          THE COURT:  Well, certainly that's true as it relates

8   to the comments that are sued about, but to the extent that

9   the defendant's position is she has nothing against Cardi B

10  because she has in some aspects defended Cardi B from those

11  who might attack Cardi B, that would be relevant to the issue

12  of whether or not on the other occasions when she said what

13  she said about the plaintiff, that she did it with either

14  malice or -- I don't know that it really goes to recklessness

15  or not but certainly to the malice point.

16         MS. MATZ:  It's an interesting point because this was

17  actually discussed at the pretrial conference, and we've never

18  taken the position that she's never said anything positive

19  about our client.  That's not the position we've taken, and I

20  don't see that these -- that while we're discussing now, A,

21  has anything to do with any of the defamatory statements or,

22  B, how she has any actual competency to give the testimony

23  she's giving.  She's talking about mobs of people on the

24  internet and her under -- you know, it's just -- it doesn't

25  actually have relevance to the issue.

 1          THE COURT:  To the issue of malice?

 2          MS. MATZ:  No, I don't think it does.  We've never

 3   taken the position that she's never said anything nice, and I

 4   guess if they're trying to make that point that she's

 5   defending her, maybe it has some limited relevance.  But that

 6   doesn't overcome the part that she's testifying about what

 7   other people think and feel.

 8          THE COURT:  Right.  But she used the terms in her

 9   video, and so he asked her about the term that she used in her

10   video about cancel.  I think she used the term "cancel

11   culture" but even if she didn't --

12          MR. SABBAK:  Canceling wouldn't --

13          THE COURT:  I don't know.  This case isn't -- the

14   pretrial order is not the Bible or Koran of everything.  It's

15   relevant to an issue which was malice, and, you know, the jury

16   will have to make their mind up at some point whether they

17   believe if they decide that the statements made about the

18   plaintiff were not true, whether the defendant did it with

19   malice or with recklessness.  Either of those, I guess,

20   potentially could satisfy the plaintiff's burden, but the

21   defendant is entitled to present evidence to the jury that she

22   doesn't have malice towards the plaintiff.  And this is one of

23   the examples that they would point to.

24          MS. MATZ:  Your Honor, like I said, the objection I

25   actually came up here to, though, was competency because what

1  she's talking about she's very clearly speculating about what

2  other people are thinking and feeling.

3        THE COURT:  Okay.  Those types of objections you're

4  going to have to handle from your chair.

5        MS. MATZ:  Okay.  No problem.  I was being careful,

6  your Honor.

7        MR. SABBAK:  Just for the Court's knowledge, I have a

8  couple of follow up questions.  Then I have a 45-minute video.

9        THE COURT:  Okay.  So we'll break after your

10 follow-up questions.

11       MR. SABBAK:  Okay.  Thanks.

12       (Whereupon, the following proceedings continued in

13 open court.)

14 BY MR. SABBAK:

15 Q   Ms. Kebe, what is cancel culture?

16       THE COURT:  Why don't we ask it what does she -- how

17 does she define cancel culture.  How about that.

18 BY MR. SABBAK:

19 Q   Ms. Kebe, how do you define cancel culture?

20 A   As I guess I was saying before, cancel culture is a group

21 of people online, specifically Twitter per se.  They dig up

22 old things that people have done in their past, and they use

23 it against them at the height of their career.  And they do it

24 to cancel the person's career.

25 Q   Why did you make this MLK video?

1  A   Because cancel culture had gotten, you know, a response

2  from Cardi B, and basically she was defending herself against

3  the skit per se.  And so I made it in defense of her to say

4  that, you know, listen, you know, just because somebody plays

5  a role, they didn't create that role, and they should have

6  canceled the director who happened to be black and the writers

7  who hired Cardi B and the other women to play the roles in

8  which they were hired to do.  So she accepted a paid gig per

9  se.

10       MR. SABBAK:  Your Honor, that's a natural break if

11  your Honor --

12       THE COURT:  Okay.  All right, ladies and gentlemen.

13  We're going to break for lunch at this point because the next

14  line of the defense's presentation involves a very long video.

15  So I don't want you sitting there thinking more about lunch

16  and less about the evidence, so we'll break now.

17       Same precautions as last week.  Just be careful at

18  lunch, if you're eating outside of the jury room, that you're

19  far enough away from anyone else that you would not

20  unintentionally overhear any discussions about the case.  And,

21  of course, don't talk about the case, and we'll see you back

22  here.  Going to ask if you'll return, we'll say, at 25 after.

23  We'll just say 1:30, just go ahead and say 1:30.  We'll see

24  you at 1:30.  Thank you.

25       COURTROOM SECURITY OFFICER:  All rise.

1          (Whereupon, the jurors exited the courtroom.)

2          THE COURT:  Anything else we need to talk about

3   before lunch?  Nothing from the plaintiff?

4          MR. SABBAK:  Not from the defense.  Thank you, Judge.

5          THE COURT:  All right.  We'll see y'all at 1:30.

6          MR. SABBAK:  Thank you, sir.

7          (Whereupon, a recess was taken from 12:18 p.m. until

8   1:30 p.m.)

9          THE COURT:  The Court will mark as Court's Exhibit 2

10  a note from Juror 16 on the original jury inventory list.  The

11  note reads as follows:  I am familiar with someone mentioned

12  by the defendant, Willard Arbor.  He is a friend's father and

13  I have known him for approximately 30 years.  Not sure if it's

14  relevant to the case, but I wanted to be transparent.  Thank

15  you.

16         My opinion is that this doesn't really matter that

17  the juror may know a witness.  That doesn't mean that the

18  juror is biased, and, honestly, it would have been the

19  lawyers' responsibility, I guess, to find out during jury voir

20  dire if the juror knew a witness to the extent that that

21  matters.  So that's my initial belief, is that we just -- that

22  I should just tell the juror that I've got her note and that

23  she will continue to serve as a member of the jury without any

24  other elaboration.

25         Ms. Matz, what does the plaintiff say about that?

```
 1           MS. MATZ:  Yeah, I mean, I don't think that from this
 2    note I see any problem.  It doesn't even sound like it's a
 3    close relationship.  She says familiar with.  So unless there
 4    was such a strong relationship there would be some kind of
 5    bias created, I don't see an issue with this.
 6           THE COURT:  Anything else from defendant?
 7           MS. IZMAYLOVA:  No, your Honor, just that this person
 8    is not going to be a witness, just somebody that our client
 9    mentioned in passing during her direct.
10           THE COURT:  So I obviously agree with y'all because
11    y'all are agreeing with me.  The only part -- the only
12    implication I might disagree with is that it matters at all at
13    this point because if she didn't answer a question and she
14    didn't withhold information from us during jury selection, it
15    really doesn't matter.  When you think about small town places
16    where everybody knows everybody and yet, you know, as long as
17    they've said, if asked, that they could be fair, that's all
18    that really matters.  At this point unless she had been
19    dishonest at the beginning, I just don't think it's an issue.
20           So I'm just going to deal with it in a very general
21    way.  I'm not going to call the juror out by name, just say
22    I've got your note, you'll continue to serve, and leave it at
23    that.  Okay.
24           MS. IZMAYLOVA:  Thank you, your Honor.
25           THE COURT:  All right.  Ms. Kebe, if you want to come
```

1   on back up to the witness stand, we can bring the jury in.

2           COURTROOM SECURITY OFFICER:  All rise.

3           (Whereupon, the jurors entered the courtroom.)

4           COURTROOM SECURITY OFFICER:  All rise.  Please be

5   seated and come to order.

6           THE COURT:  All right.  Ladies and gentlemen, one of

7   you sent me a note at lunch about the fact that you might know

8   directly or indirectly one of the individuals whose name was

9   mentioned by the defendant during her testimony this morning

10  and you wanted us to know that.  And I've considered your note

11  along with the advice of counsel, and we don't see any problem

12  with the juror who sent me the note.  All right.  You can

13  proceed, Mr. Sabbak.

14          MR. SABBAK:  Thank you, your Honor.

15          Ms. Kebe, welcome back.

16          THE WITNESS:  Thank you.

17  BY MR. SABBAK:

18  Q   We're going to slow down this afternoon; right?

19  A   Yes.

20  Q   Okay.  The jurors will appreciate it.  I want to talk

21  about the Jones interview.  Do you recall what I'm talking

22  about?

23  A   Yes, Starmarie Jones.  Yes, sir.

24  Q   All right.  So can you tell me how you first heard about

25  Starmarie Jones?

1  A    I believe it was New York fashion week.  Cardi B had

2  attacked Nicki Minaj at an event.

3  Q    And who is Nicki Minaj?

4  A    She's another artist such as Cardi B.

5  Q    Is she on the same level of Cardi B as far as fame and

6  popularity?

7  A    Yeah, you could say, yeah.  And the story was super viral

8  and being that it was super viral, you know, us entertainment

9  news reporters, we all go after the story.  And so there was

10  many different angles as per se everybody was going.  And so I

11  came to know Starmarie because Starmarie had uploaded a live

12  stream basically detailing her relationship with Cardi B and

13  basically said that Cardi B had attacked her similar to how

14  she attacked Nicki Minaj at New York Fashion Week.  I believe

15  it was like a week or so prior.

16  Q    Okay.  And where did you see Ms. Jones make these claims?

17  A    It was on Lovely 2002's YouTube channel.  It was a live

18  stream that Starmarie had recorded on her Instagram, and

19  Lovelyti took the live stream that Starmarie didn't save.  And

20  she uploaded it to her YouTube channel, and that's why where I

21  saw it.

22  Q    Let me stop you.  Who is Lovelyti or Lovely TI?

23  A    She's another entertainment news reporter such as myself.

24  Q    And when you say Lovelyti, that is the same person that

25  plaintiff referred to as Lovely TI?

1    A    Can you say that again?  I'm sorry.

2    Q    When you say Lovelyti, is that the same person that

3    plaintiff referred to as Lovely TI?

4    A    That is correct, yes, sir.

5    Q    Okay.  Now, you said the first time you became aware of

6    Ms. Jones's statements was when you watched Lovelyti's video?

7    Is that what you said?

8              MS. MATZ:  Objection, your Honor.  Leading.

9              THE WITNESS:  Yes, sir.

10             MR. SABBAK:  Okay.

11             THE COURT:  Objection is sustained.

12   BY MR. SABBAK:

13   Q    Okay.  So when you watched that video, what did you

14   observe?

15   A    Oh.  I called Lovelyti, and I asked her if she knew

16   Starmarie.  And she said no because I was like the video is

17   pretty interesting, you know, and so I asked her if she had

18   any contact information.  So she was the one that grabbed the

19   live stream and reposted it on her YouTube channel.  And she

20   said, I believe her name is at the top.  And so I reached out

21   to Starmarie via Instagram direct message to ask for an

22   interview.

23   Q    Okay.  And were you able to message with Ms. Jones?

24   A    Yes, sir.  She replied directly, immediately.

25   Q    What did you ask her?

1   A   I asked her if she would be interested in doing an

2   interview on my YouTube channel to elaborate on the

3   allegations that she had made against Cardi B.

4   Q   Okay.  Did she agree?

5   A   Yes, at first.  Then she was a little hesitant because of

6   the fan situation.  The fans are very interesting when it

7   comes to these things.

8   Q   Okay.  I believe that.  Now, the interview, was this a

9   live interview like most of your other or how was the format?

10  How was it done?

11  A   No, sir.  It was prerecorded.

12  Q   Okay.  I'm going to show you what's been premarked Defense

13  Exhibit 67.  Ms. Kebe, without testifying to the contents of

14  this exhibit, do you recognize this exhibit?

15  A   It hasn't showed up yet on the screen.

16        COURTROOM DEPUTY:  Is it plugged in?

17        THE WITNESS:  It's still not there.

18        COURTROOM DEPUTY:  Okay.  It's up.

19        MR. SABBAK:  Is it good?

20        COURTROOM DEPUTY:  Uh-huh.

21        MR. SABBAK:  All right.  Thank you, ma'am.  My

22  apologies.

23        Ms. Kebe, again without testifying to the contents,

24  do you recognize this document?

25        THE WITNESS:  Yes, sir.

1  BY MR. SABBAK:

2  Q   How do you recognize it?

3  A   It's a screenshot from my YouTube channel.  It's from the

4  Starmarie interview.

5       MR. SABBAK:  Your Honor, we move Defense Exhibit 67

6  into evidence.

7       THE COURT:  Any objection?

8       MS. MATZ:  No, your Honor.

9       THE COURT:  67 is admitted.  Thank you.

10      MR. SABBAK:  Thank you, your Honor.

11      (Whereupon, Defendant's Exhibit 67 was marked for

12  purposes of identification and admitted into evidence.)

13  BY MR. SABBAK:

14  Q   All right.  Ms. Kebe, if you would, please read to the

15  jury the title of your video.

16  A   Exclusive:  Cardi B's Ex-friend Alleges Cardi B Kept a

17  Huge Box filled with Monistat and Reveals More.

18  Q   And what date was this published?

19  A   September 19th, 2018.

20  Q   I'm going to show you now what has been premarked as

21  Defense Exhibit 5.  All right.  Ms. Kebe, do you recognize

22  this?

23  A   Yes, sir.

24  Q   How do you recognize it?

25  A   It's a video from my YouTube channel of the Starmarie

1  interview on -- Starmarie interview.

2  Q   And was this the interview that was uploaded to your

3  YouTube channel?

4  A   Yes, sir.

5       MR. SABBAK:  Your Honor, defense moves Defense

6  Exhibit 5 into evidence.

7       THE COURT:  Any objection to 5?

8       MS. MATZ:  No, your Honor.

9       THE COURT:  So Defendant's 5 is admitted without

10  objection.

11       MR. SABBAK:  Thank you, your Honor.

12       (Whereupon, Defendant's Exhibit 5 was marked for

13  purposes of identification and admitted into evidence.)

14       MR. SABBAK:  Let me just get an accurate time.  Your

15  Honor, we have a -- let me see the exact time here -- a

16  46-minute video that we intend to play in its entirety without

17  interruption.

18       THE COURT:  Yes, sir.

19       MR. SABBAK:  All right, sir.  Whenever you're ready,

20  ma'am.

21       COURTROOM DEPUTY:  Do you want me to dim the lights?

22       MR. SABBAK:  A little bit.  All right.

23       (Whereupon, a video recording was played.)

24  BY MR. SABBAK:

25  Q   In the interview we just saw there was some discussion

1  about Monistat.  What is Monistat?

2  A   Monistat is a medication used to treat yeast infections in

3  women.

4  Q   Why were you talking about that?

5  A   Cardi B has -- you mean why have we -- repeat the

6  question.  I'm so sorry.

7  Q   Why were you talking about that?

8  A   In the video?

9  Q   Why was it relevant for that interview?

10  A   I mean, because Cardi B has always been like quite verbal

11  about her yeast infections on the internet.

12  Q   Have you seen anything?

13  A   Yeah.  I think the first time I heard it it was like a

14  Rolling Stone article where she talked to, I guess, the person

15  who was writing the article on her, and she basically yelled

16  out, my vagina is, I guess, itching like a screaming taco or

17  something like that.  Don't quote me, but basically she was,

18  you know, telling the person who wrote the article that, you

19  know, she was suffering from a yeast infection.

20  Q   Was this an article you saw prior to the Starmarie Jones

21  interview?

22  A   Oh, yes.  Oh, yes.

23  Q   I'm showing what's been previously marked as Defendant's

24  Exhibit 52.  Have you seen this video before?

25  A   Oh, yeah.

1  Q    Is this a video that you saw prior to the Starmarie Jones

2  interview?

3  A    I can't remember if it was prior or after.  I can't

4  remember.

5  Q    Do you know if this was made before or after the Starmarie

6  Jones interview?

7  A    That's hard to say.

8  Q    Okay.

9  A    But it's a pretty viral video.

10  Q    So you have seen it before, though?

11  A    Oh, yes.  Yes, sir.

12         MR. SABBAK:  Your Honor, at this time we move

13  Defendant's Exhibit 52 into evidence.

14         THE COURT:  Any objection?

15         MS. MATZ:  Can you give me one moment, your Honor?

16         (Brief Pause.)

17         MS. MATZ:  Violation of pretrial order, your Honor.

18         THE COURT:  If y'all would approach, please.

19         (Whereupon, a bench conference was held between the

20  Court and counsel.)

21         MS. MATZ:  Your Honor, this was one of the exhibits

22  that was not on their original exhibit list.  This wasn't even

23  produced in discovery, and this is also not one of the videos

24  that they cut out from their prior montages pursuant to the

25  other order.

1          THE COURT:  How can you use a video that you didn't

2    produce in discovery and isn't on the pretrial order?

3          MR. SABBAK:  I did.

4          THE COURT:  Is it on the pretrial order?

5          MR. SABBAK:  I have no idea.

6          THE COURT:  Why don't you take a look.

7          MR. SABBAK:  I mean, I filed my new exhibit list.

8    I'm sorry.  If I may, what she's complaining of, they did the

9    exact same thing, and we allowed it all last week.  So I'm not

10   really sure what the objection is.

11         THE COURT:  All right.  So here's the question --

12         MR. SABBAK:  I have no idea.

13         MS. MATZ:  It was not --

14         THE COURT:  Hold on a second.

15         MS. MATZ:  Sorry, your Honor.

16         THE COURT:  Are you going to let me talk?

17         MS. MATZ:  Yes, sir.  I apologize.

18         THE COURT:  Okay.  All right.  So I don't know what

19   you allowed last week.  I don't make rulings on objections

20   based on, for example, hearsay, the fact that you didn't

21   object to someone else's hearsay.  I don't let you get into

22   hearsay.  If I did, then probably all the questions you asked

23   that were hearsay I could have allowed in.

24         I have to respond to objections.  The plaintiff has

25   made an objection that this document -- this video is not on

1  the pretrial order.  Whether it's on the exhibit list or not

2  doesn't control it.  You need to go check and see if this and

3  any other exhibit you intend to use is on your pretrial order.

4        MR. SABBAK:  Okay.

5        THE COURT:  And if it's not, you've got to give me

6  the reason why you should be allowed to use it despite the

7  fact that it wasn't.

8        MR. SABBAK:  Okay.  And so if your Honor is aware

9  that we did refile our exhibit list per our individual

10  agreement.  The plaintiff --

11        MS. MATZ:  No, we did not have an agreement that you

12  could just add on new exhibits.  The new exhibits we had, your

13  Honor, just so you know, half occurred after the pretrial

14  order was filed, and that's not even at issue right now.  We

15  had an agreement mutually that we could add until

16  October 20th.  This came last week.  This was not agreed to,

17  and I don't even know where it came, just to be honest.

18        THE COURT:  Hold on a second.  I don't know about

19  your agreement, but aside from the agreement, when was this

20  video produced to the plaintiff?

21        MR. SABBAK:  This was part of a collaboration or --

22  I'm sorry.  I'm almost certain this was part of a montage that

23  we had a pretrial hearing about, your Honor.

24        THE COURT:  Almost certain doesn't do it for me.

25        MR. SABBAK:  Well, I mean, I'm not -- Judge, the

1  point to me because I'm --

2          THE COURT:  Okay.  So she can't point on an exhibit

3  list and say this document is not on there.  You need to point

4  to me where this exhibit is on your pretrial order.  So why

5  don't you go take a look at your pretrial order, and then let

6  me know where it is.

7          MR. SABBAK:  Okay.

8          MS. MATZ:  Thank you, your Honor.

9          (Whereupon, the following proceedings continued in

10  open court.)

11          MR. SABBAK:  Your Honor, it's No. 52 on your Honor's

12  exhibit list.  I'm not sure exactly what --

13          THE COURT:  I've asked you about the pretrial order.

14  So is this document on the pretrial order, the order that was

15  entered by the Court?

16          MR. SABBAK:  It's on the exhibit lists that were

17  filed.

18          THE COURT:  So is your answer, no, it's not on the

19  pretrial order?

20          MR. SABBAK:  I just don't understand what you're

21  asking.

22          THE COURT:  The pretrial order has an exhibit and

23  attachment to it that has all the evidence that either party

24  might use at trial.  Was it listed on the pretrial order?

25          MR. SABBAK:  It was filed.  It was listed on the most

1  recent exhibit list that both parties filed last week.

2         THE COURT:  So your answer is it's not on the

3  pretrial order?

4         MR. SABBAK:  I don't know but I know --

5         THE COURT:  Why don't you look and see if you can

6  find it on the pretrial order.  That's what governs the case

7  absent some further order of the -- I'll tell you what, I'm

8  going to ask y'all to step out, and I'll call for you as soon

9  as I can.  We'll probably take a break before I call you back

10  just so we don't have to break again.  So if y'all need to go

11  to the restroom or go downstairs, then go ahead and do it now.

12         COURTROOM SECURITY OFFICER:  All rise.

13         (Whereupon, the jurors exited the courtroom.)

14         THE COURT:  Y'all can now have a seat, please.  All

15  right.  So the pretrial order is Docket 159 and then -- let's

16  see.  The plaintiff's exhibit list is Attachment G1.  I

17  presume then the defendant's exhibit list to the pretrial

18  order would be G2.

19         MS. MATZ:  Yes, your Honor.  It is G2.

20         THE COURT:  All right.  So I am now at Attachment G2,

21  defendant's exhibit list.  This video would be found under

22  which number, if any, of the list of exhibits on the

23  defendant's exhibit list?

24         MR. SABBAK:  Your Honor, it would be 718, but I

25  believe this was part of the video that your Honor -- that

1 they objected to at the pretrial conference.  It was a

2 montage, and the Court instructed us to break it up.  I

3 believe that's what it is.  I'm trying to confirm that.

4          THE COURT:  718?

5          MR. SABBAK:  Yes, sir.  The montage included 200

6 clips.

7          THE COURT:  718.

8          MR. SABBAK:  Kebe 718, sir.  My apologies.  That's

9 the Bates number.

10          THE COURT:  So the exhibit list that I have to the

11 actual pretrial order stops at plaintiff -- excuse me -- Kebe

12 or the defendant's exhibits at 362.

13          MR. SABBAK:  Yes, sir.  The pretrial conference --

14 sir, that was filed prior to the pretrial conference.  At the

15 pretrial conference is when they objected to the montage of

16 200 clips.  Your Honor said if you intend to introduce any of

17 those, you need to cut the clips up, which is what we did and

18 re-served them.

19          THE COURT:  But the montage is found under what

20 document number?

21          MR. SABBAK:  That's what I'm trying to figure out

22 right now.  I know it's in there but --

23          THE COURT:  It can't be a number greater than 362.

24          MR. SABBAK:  I just have to, you know -- it's going

25 to take me a second to find it, but I know it exists.

1      THE COURT:  Let's find it.

2      MR. SABBAK:  And I will, sir.

3      (Whereupon, there was a pause in the proceedings.)

4      THE COURT:  So let me just ask this:  In light of

5  this clause that is -- that was included at the back end of

6  the section of the pretrial order that talks about exhibits,

7  is there a subsequent list that was produced in exchange

8  between counsel of October 2021 or earlier that would have

9  shown this document either as it exists today or as part of

10  the montage?

11      MS. IZMAYLOVA:  Your Honor, if I may refresh your

12  recollection about the pretrial conference because, as you'll

13  recall, I was making the argument --

14      THE COURT:  Okay.

15      MS. IZMAYLOVA:  -- at the time we filed the pretrial

16  order, both sides agreed that we would be able to add more

17  exhibits to the exhibit list from both sides.  That was an

18  agreement.  It's written in the actual pretrial order that we

19  submitted to the Court.

20      THE COURT:  Right.  That's what I'm looking at but up

21  until -- it says up until Wednesday October 20th.

22      MS. IZMAYLOVA:  But then when we had the pretrial

23  conference, if your Honor remembers, on the 9th I believe it

24  was, of November, we went through everything.  Your Honor at

25  the beginning specifically stated that neither party's exhibit

1  lists were in conformity with what the Court wanted it to be,

2  and you directed us to edit them and make sure they were, you

3  know, not as long as they were at the time and to basically

4  use the forms that the Court wanted us to use.  And so --

5        THE COURT:  Yeah, but that's -- okay.  Let me just

6  stop you right there.  The form has to do with a form that I

7  use that I've been using to admit documents.  Once you talk

8  about documents I make a mark.  Once you tender a document I

9  make a mark on this form, and if there's an objection made, I

10  normally make a mark.  And then if I admitted the document or

11  thing, I also make a mark to keep a record so that I can

12  double check what's been admitted and what hasn't.

13        There's nothing about that, though, that extends any

14  time period.  I mean, under the normal federal rules, the

15  exhibit list is firm as of the date of the pretrial order.  In

16  this case the parties reserved the right to amend the pretrial

17  order.  I guess I've agreed to that because I didn't object to

18  its inclusion in the pretrial order, but that's only through

19  October the 20th.

20        MS. IZMAYLOVA:  Your Honor?

21        THE COURT:  So is this document listed on any exhibit

22  list exchanged in between the parties as of October the 20th?

23        MS. IZMAYLOVA:  I believe if it's in the compilation,

24  then it would be Bates stamped Kebe 258, if it's in that

25  compilation of those Instagram videos.

1          THE COURT:  Well, this is a video.  So Bates stamp,

2  how are you Bates stamping a video?  Just with a reference to

3  it?

4          MS. IZMAYLOVA:  That's how we identify for our

5  purposes and for purposes of when we served it in discovery.

6          THE COURT:  Well, let's look at that and see if the

7  document that you've just identified, the exhibit that was

8  referenced, includes this or not.  If it doesn't include this,

9  then we've got a problem.

10          MS. IZMAYLOVA:  If I also may, the other videos that

11  were right around the same Bates stamp when we cut them up,

12  now it has Bates Stamp, you know, Kebe 718, or whatever it is,

13  the other videos right around those same numbers were already

14  admitted into evidence on --

15          THE COURT:  So what difference does that make?

16          MS. IZMAYLOVA:  So that means that we did serve it to

17  them at the same time as those other videos.

18          THE COURT:  Because you tendered it in court and it

19  was not objected to, that means it was served?

20          MS. IZMAYLOVA:  Because we labeled exhibits in

21  chronological order, your Honor.

22          THE COURT:  Okay.  Let me just be clear.  This is

23  your case.  You contend that this document -- this video is a

24  part of an exhibit that was previously identified consistent

25  with the pretrial order and the clause that the pretrial order

1 has in it.  So you should be able to point to where it was

2 referenced.  If you can't point to where it was referenced, I

3 can't admit it absent an agreement of counsel because they

4 have objected.  So just point to where it was.  This is your

5 case.  It's not mine.  I can't find it.

6          MS. IZMAYLOVA:  I mean, it's referenced in the

7 defense exhibit list which we've exchanged with counsel.

8          THE COURT:  Okay.  Show that to me.  Show me -- not

9 the defense exhibit list.  You want to compare apples and

10 oranges.  What y'all exchanged before trial is irrelevant for

11 the pretrial order.  The pretrial order is the governing

12 document.  I mean, that's pretty standard; right?

13          MS. IZMAYLOVA:  So then all the exhibits that they've

14 introduced on their case in chief that they served to us

15 literally one week ago for the first time ever, we should have

16 objected to those as well?

17          THE COURT:  Maybe you should have.  They are

18 objecting, and so all I can do is go to the documents.  And so

19 I'm asking you per the documents to show me where this video

20 was listed.  If it's listed, you can admit it subject to, you

21 know, other foundational and relevance considerations.  But if

22 it's not listed, then you've got to give me a good reason.

23 The only reason I'm hearing is because we let them, quote,

24 because we let them introduce other things.

25          Is this a video that you would have always had access

1   to?  Right?

2          MS. IZMAYLOVA:  I mean, it's a video that's on the

3   internet, so I would imagine so, yes.  It's relevant because

4   it's specifically -- it's the plaintiff's own words discussing

5   the exact topic that Mr. Sabbak was just questioning our

6   client about which -- and he asked her has she seen this

7   video, and she says yes.  So it also goes to show what

8   information she had in her head when she was making these

9   statements.  So that's the purpose of the document.

10          THE COURT:  Okay.  Relevance is certainly a

11   consideration.  I'll take you at your word that it's relevant,

12   but if it's not on the list, then why should you be able to

13   introduce it?

14          MS. IZMAYLOVA:  Because, in all honesty, we were

15   under the impression that we were -- if we served the

16   discovery just like the plaintiff served us discovery and we

17   served it to them, no objections were made.  And then they

18   served us their exhibit list.  We served, you know --

19          THE COURT:  I'm sorry.  No objections to discovery.

20   What do you mean no objection to discovery?  Because they

21   didn't file a motion in limine to keep it out?

22          MS. IZMAYLOVA:  Correct.

23          THE COURT:  That's not the way the law works.

24          MS. IZMAYLOVA:  I mean, I really didn't foresee this

25   happening because we never had any conversations about the

1   fact that, oh, you're serving this late or any of those types

2   of conversations because they literally served us discovery up

3   until five days ago, maybe six days ago.

4          THE COURT:  They served you something five or six

5   days ago that you didn't have?

6          MS. IZMAYLOVA:  Not before that day.

7          THE COURT:  Now, certainly that may be true as it

8   relates to invoices of recent --

9          MS. IZMAYLOVA:  It wasn't.

10         THE COURT:  Recent -- what was it?

11         MS. IZMAYLOVA:  They were the photographs of the

12  plaintiff with all of her tattoos back from 2016, 2015, and

13  all those photographs that was introduced into evidence.

14         THE COURT:  This video is how long?

15         MS. IZMAYLOVA:  It's maybe, I don't know --

16         MR. SABBAK:  15 seconds.

17         MS. IZMAYLOVA:  Let's say maybe 30 seconds.

18         THE COURT:  And it goes to show what exactly?

19         MS. IZMAYLOVA:  It goes to show what information

20  Ms. Kebe had relied upon when, you know, making her own

21  statements in her own video.

22         THE COURT:  Play the video.  Let me see it.

23         MS. IZMAYLOVA:  Yes, your Honor.

24         THE COURT:  So I know what I'm talking about.

25         MR. SABBAK:  It goes to the tweet at issue, your

1  Honor.

2         THE COURT:  I don't re -- that's been 30 minutes ago

3  now.

4         MR. SABBAK:  That's fair.

5         (Whereupon, a video recording was played.)

6         THE COURT:  That goes to the testimony that Ms. Kebe

7  gave about -- or about Starmarie Jones's testimony about

8  Monistat or what?

9         MR. SABBAK:  It explains this tweet which is on one

10  of the claims.

11         THE COURT:  I'm sorry.  It explains exactly what

12  about the tweet?

13         MR. SABBAK:  Yes, sir.  So this was one of the tweets

14  that is part of the claims.  When Ms. Kebe refers to irritated

15  p-u-s-s-y, she's not saying that plaintiff has herpes or

16  anything down there.  She's talking about the Monistat and the

17  yeast infection, which is what Starmarie Jones described,

18  which is what the plaintiff talks about in that video.  So it

19  explains the --

20         THE COURT:  I'm sorry.  It's not -- say that again.

21  It's not what?

22         MR. SABBAK:  So when Ms. Kebe says we left you and

23  your confirmed irritated pussy in 2018, she's not talking

24  about herpes.  She's talking about yeast infections, which is

25  the whole Monistat video.  They're trying to say that Ms. Kebe

1    is referring to herpes, and we are trying to explain why

2    that's not the case.

3         THE COURT:  Okay.  So my question is, do you think

4    the jury is an idiot?  I mean, it uses the word "hashtag

5    herpes B," and that's going to be her answer, is I was

6    referring to a video where she was sitting in a cab not

7    wearing underwear and explaining why she wasn't was, you know,

8    to give her body a break.  That's like -- that's ridiculous.

9    I mean, that basically assumes that every juror that we

10   selected just has no common sense.  Herpes B is in the

11   hashtag.

12        I mean, if I'm the plaintiff's lawyer, I'd probably

13   let it come in because I think it just totally blows any

14   credibility out of the water as to that contention, which then

15   the jury is able to take it and say, well, if we can't trust

16   her about what this one tweet means, then we can't trust her

17   about anything.

18        I mean, that may be -- there's an old instruction

19   given under Georgia law -- and there may be a similar one

20   under federal law -- that basically says that when a witness

21   testifies about something and is found to have lied about it,

22   then you're entitled to disregard all the balance of their

23   testimony unless it's otherwise corroborated by the evidence.

24   And I just don't think any reasonable person would look at

25   this tweet and say, oh, yeah, she wasn't talking about herpes

1  at all, herpes B hashtag.

2          So I don't know what to do about the documents

3  exchanged between the two of you at the late hour.  Certainly

4  a list of documents -- there can be grounds for expanding the

5  list of those documents by later discovered and/or innocuous

6  documents.  The photo of the plaintiff's -- the photos of the

7  plaintiff's various tattoos or body art saves the jury from

8  potentially, you know, having to examine those tattoos in

9  court and saves the plaintiff the embarrassment of having to

10  unclothe in court to show the jury what she could legally do

11  because you wouldn't have to put a demonstration of tattoos on

12  the exhibit list; right?  You would just take your clothes off

13  and show someone.

14          So I don't really think that that's that much of an

15  accommodation from the standpoint of surprise.  I mean, I'm

16  going to guess the defendants knew that the plaintiff had

17  tattoos, and so you were not surprised by that.  The issue of

18  a photograph of the plaintiff when she was, you know, a

19  preteen, likewise I'm not sure provides anything surprising,

20  if it's her.  The defendant did not object to that document.

21          All I can do is really react to what happens in this

22  Court, as I mentioned on our side bar.  The plaintiff asked a

23  ton of leading questions, and I suppose strategically the

24  defendants did not object.  The defendant has asked some

25  leading questions or been asked some leading questions, not

1  all of which have been objected to but some of which have been

2  objected to.  Now, if I was following the, well, they got to

3  do it so we get to do it rule, then I would have denied the

4  plaintiff's motion or objections for leading questions because

5  the plaintiff certainly asked leading questions to its own

6  witnesses.

7         But as I told y'all pretrial, I rule on what I'm

8  asked to rule on.  And so now I'm -- just like I wasn't asked

9  to rule on plaintiff's leading questions and so I didn't rule

10  on them and did rule on the defendant's leading questions when

11  asked but not the ones that I was not asked, I am now asked to

12  rule on an exhibit, a video, which apparently is not on the

13  exhibit list through the date of the pretrial order.

14         So all I can do is go on the document that I've got.

15  I'm not party to what y'all were thinking and what you felt

16  was right or fair.  I'm governed by the document, and I'm not

17  given a compelling reason why you should be allowed to

18  introduce this based on what the documents say.  Certainly

19  this is not innocuous like a photograph of the plaintiff when

20  she was a preteen or a photograph or photographs of the

21  plaintiff's body art that she could have otherwise

22  demonstrated in court anyway.

23         So if you can't find a document through the exhibit

24  list of October the 20th that's referencing this particular

25  video or exhibit, then the Court's ruling is this video does

1  not come into evidence, and it applies to anything else that

2  the defendant might seek to introduce that the plaintiff

3  objects to.

4          So one more time.  If you've found an exhibit

5  referenced through October the 20th, which is what the

6  pretrial order says, then let's take a look at it.  Otherwise,

7  we'll take a break and move on.

8          MR. SABBAK:  We're ready to move on, Judge.

9          THE COURT:  Okay.  Let's take a ten-minute recess.

10  We'll see y'all at 3:10.  Thank you.

11          COURTROOM SECURITY OFFICER:  All rise.

12          (Brief recess.)

13          COURTROOM SECURITY OFFICER:  All rise.  This

14  honorable court is again in session.

15          THE COURT:  Come on back up.  All right.  So before

16  we bring the jury in let me just say, as far as this last

17  document is concerned, the ruling preventing the document from

18  being used at this time does not prevent the defendant from

19  answering questions about why she said what she said or what

20  she was relying on when she said what she said.

21          That doesn't mean that the document is admissible.

22  Of course, there always could be things that could occur in

23  the balance of the case that would make a document that was

24  not otherwise admissible thereby admissible.  You know, for

25  example, the plaintiff could open the door for some reason.  I

1  don't expect that to happen, but maybe it does.  And if it

2  does, then you can seek to introduce it at that time.  All

3  right.  Anything else?

4       MS. IZMAYLOVA:  Yes, just briefly, your Honor.  And

5  they didn't object before, but the screenshots of the titles

6  of the videos, those were also served at the same time as this

7  video that just got objected to.  Now, previously they didn't

8  object to our introduction of that.  They do have all those

9  listed on their own exhibit list, so I just want to make sure

10 we're not going to have any issues or should we just call out

11 the plaintiff's exhibit number instead of our own to introduce

12 those.

13      THE COURT:  Okay.  So we're talking about something

14 you have not yet tendered and has not yet been tendered?

15      MS. IZMAYLOVA:  No, but it's about to be.

16      THE COURT:  All right.  Ms. Matz, what about that?

17      MS. MATZ:  I don't know exactly which ones they're

18 talking about, but, your Honor, I'm trying -- as I said, we're

19 not objecting to everything to the extent that it was on our

20 list in some way, shape or form, and I'm not making every

21 objection under the book.  I'm trying to be mindful of that.

22 But, like I said, we were unable to find that one in the

23 compilations, and that's why the objection was tendered to the

24 video.

25      I am obviously going to see -- I'm not going to say

1  that I don't have any other objections based off of anything

2  they added to their pretrial order because I do, but I'm not

3  going to be making it to necessarily everything to the extent

4  it was already on our list and it's -- I think the one they

5  introduced earlier, you know, it was related to a video we've

6  introduced, so obviously I didn't object to that.  I just made

7  the Court aware of the issue.

8      THE COURT:  When you refer -- the defendant refers to

9  the plaintiff's list, what list are we talking about?  Are we

10  talking about the list that they submitted on the first day of

11  trial or the list that was included with the pretrial order?

12      MS. IZMAYLOVA:  The list they submitted on the first

13  day of trial because the list they submitted with the pretrial

14  order didn't have any descriptions or anything like that.

15      MS. MATZ:  Your Honor, I'm sorry.  Do you mind if I

16  address this?  I think this is a little bit misleading.  First

17  of all, documents were exchanged in discovery, and everything

18  was Bates stamped.  So I understood at the last pretrial

19  conference that your Honor wanted descriptions and wanted

20  everything formatted in a particular way.  And we've done

21  that, and we absolutely want it to be in a form that's

22  workable for the Court.

23      The list that we served with our pretrial conference

24  order, it is not as if these were served in a manner in which

25  the defendants didn't know what they were looking at because

1  both sides did their initial exchange based upon the Bates

2  numbers that everyone used in discovery, which is usually a

3  unique identifier.  And it is not as if we added things, you

4  know, willy nilly after the fact.  There's been a lot of

5  accusations thrown about, why we did what we did, and I would

6  have been happy to explain any of those to the Court and still

7  would be.

8        THE COURT:  Well, I don't know that I need any

9  explanation right now.  Here's -- you know, for both sides,

10  I'm operating with the list that existed as of October the

11  20th, and if there are other things that either party seeks to

12  tender that's not on that list and there's an objection, then

13  unless there's a good reason, like we only discovered this

14  document after the date of the pretrial order and thus could

15  not have listed it on the pretrial order -- that would be one

16  example -- then the document generally won't come in.

17        That's the -- that's why pretrial orders exist, to

18  make sure that everything has been exchanged and is known by

19  each side.  Obviously, if something is subsequently

20  discovered, then that was impossible perhaps, so, I mean,

21  that's the only way I know how to handle any objections to

22  documents that are not listed on the pretrial order.

23        MS. IZMAYLOVA:  Just for the record, we have

24  exchanged all of the documents listed on our -- even the

25  exhibit list that you have in front of your Honor and just

1  like they've had them in advance of trial.

2          THE COURT:  It doesn't matter.  You don't get to just

3  rewrite the Rules of Civil Procedure as prescribed in the

4  federal court just because you've done something else out of

5  court.  And I understand that in criminal law, you know, you

6  don't have a pretrial order that governs civil cases, but in

7  civil cases under the federal rules you do.  And that is the

8  governing document.  It is not the end all be all.  There can

9  be exceptions made, but there has to be a good reason.  And

10  absent a good reason, then I cannot make an exception because

11  that would be an abuse of discretion without a good reason.

12          And a good reason in my estimation is not because we

13  let them do it.  I just -- you know, that just doesn't satisfy

14  what I think a good reason has to be.  It has to be something

15  based on the circumstances and why it was not listed to start

16  with.  Okay.

17          MS. IZMAYLOVA:  Okay.

18          THE COURT:  All right.  Let's bring the jury back,

19  please.

20          COURTROOM SECURITY OFFICER:  All rise.

21          (Whereupon, the jurors entered the courtroom.)

22          COURTROOM SECURITY OFFICER:  Please be seated and

23  come to order.

24          THE COURT:  All right.  The defense can ask her next

25  question.

```
 1              MR. SABBAK:  Thank you, your Honor.

 2              Ms. Kebe, I'm showing you what's been previously

 3    marked as Defendant's Exhibit 76.  Do you recognize that?

 4              THE WITNESS:  Yes, sir.

 5    BY MR. SABBAK:

 6    Q    How do you recognize that?

 7    A    It's a screenshot from my YouTube channel.

 8              MR. SABBAK:  Your Honor, we move Defense Exhibit 76

 9    into evidence.

10              THE COURT:  Any objection?

11              MS. MATZ:  One moment, your Honor.

12              (Brief Pause.)

13              MS. MATZ:  No objection, your Honor.

14              THE COURT:  76 is admitted without objection.

15              MR. SABBAK:  Thank you, your Honor.

16              (Whereupon, Defendant's Exhibit 76 was marked for

17    purposes of identification and admitted into evidence.)

18    BY MR. SABBAK:

19    Q    All right.  Ms. Kebe, if you would read to the jury the

20    title of your video.

21    A    Actual Proof Cardi B Knew Her Ex-Roommate, Drake, Funky

22    Dineva vs Tamar, Beyonce, the Black Magic.

23    Q    And, if you would, ma'am, please let the jury know about

24    what date is that.  I don't know if you can make that out.

25    A    Yeah, it's hard, but I know what date this video is.  I
```

1  believe it's September 21st, 2018.

2  Q   And do you recall how many days after you published the

3  Starmarie Jones interview to your channel did you publish

4  this?

5  A   Two, I believe.

6  Q   Okay.  All right.  Ms. Kebe, I'm going to now show you

7  what's been previously marked as Defendant's Exhibit 11.  Do

8  you recognize this?

9  A   Yes, sir.

10 Q   What is this without testifying to the contents?

11 A   This is --

12         MS. MATZ:  Objection, your Honor.  Before the witness

13 discusses this, this is a violation of the pretrial order.

14         THE COURT:  All right.  So generically describe what

15 this is.  This is a -- I'm guessing this is another video of

16 one of your performances; is that right?

17         THE WITNESS:  Yes, sir.

18         THE COURT:  All right.  So if y'all would approach,

19 please.

20         MR. SABBAK:  Okay.  Defense moves Defendant's Exhibit

21 11 into evidence.

22         THE COURT:  Okay.  So there's an objection.  Let's

23 talk about that.

24         (Whereupon, a bench conference was held between the

25 court and counsel.)

1          THE COURT:  What about that?

2          MR. SABBAK:  Let me double check to make sure this

3    one was redacted.

4          MS. MATZ:  Okay.

5          (Brief Pause.)

6          MR. SABBAK:  Your Honor, there's no violation in

7    there.

8          MS. MATZ:  This discusses the federal indictment of

9    the bartender's case at a minute 37.25.  It discusses the

10   alleged drugging and robbing of men at 38.  So I realize

11   there's portions of this that are not objectionable, and I

12   don't have an issue with that but --

13         MR. SABBAK:  I'm not sure that that's correct.

14         THE COURT:  What do you mean you're not sure it's

15   correct?

16         MR. SABBAK:  I don't know about that one.

17         THE COURT:  So here's what happens:  If you play it

18   and it violates the pretrial order --

19         MR. SABBAK:  Sure.

20         THE COURT:  -- then the plaintiff can move for a

21   mistrial --

22         MR. SABBAK:  I understand.

23         THE COURT:  -- which they would probably receive if

24   they wanted it.  And then your client would be sanctioned or

25   you would be sanctioned for the entire cost of this trial

1    which might include plaintiff's legal fees.  So you need to be

2    sure.

3              MR. SABBAK:  I got you.

4              THE COURT:  So you're sure?

5              MR. SABBAK:  Do you want to give me the time stamps

6    that you have?

7              MS. MATZ:  I have three of them, but what time stamps

8    are you playing?  Not every video has this issue.  I just

9    don't want it to come out of your client's mouth before, you

10   know, because --

11             MR. SABBAK:  I have to verify that.  I just don't

12   recall that in the video.  That's all.  I mean, there's a lot

13   of --

14             MS. MATZ:  And I know a lot of these videos are

15   very --

16             MR. SABBAK:  And they run very long, so I mean I

17   can't --

18             MS. MATZ:  I don't know what portions you're planning

19   on playing.  Well, then why don't you tell me which portions

20   you're planning on playing.

21             MR. SABBAK:  Let me see your time stamps.  I'll look

22   over it and I'll let you if they're refer to this video --

23             MS. MATZ:  I know it includes these four, 37, 38, 44,

24   and 113, but I don't know if there's others.  And that's why

25   I'm asking what you're planning on playing.

1          MR. SABBAK:  I plan on playing the video in its

2    entirety as to -- I don't know that that is correct, so we can

3    watch the video but --

4          MS. MATZ:  Well, I mean -- sorry, your Honor.  I

5    don't want to talk if you're thinking.  I just --

6          THE COURT:  Well, I mean --

7          MS. MATZ:  We reviewed our videos before we played

8    them.

9          THE COURT:  So the plaintiff is saying that this

10   video has objectionable material, and you're saying it

11   doesn't.  So what happens if we play it and it does?

12         MR. SABBAK:  What your Honor just said.

13         THE COURT:  Are you asking for a mistrial?

14         MR. SABBAK:  No, sir.  Can I have five minutes to --

15         THE COURT:  Are you saying for the court that you're

16   certain that this video doesn't have those things in it?

17         MR. SABBAK:  I'm saying I'm not certain.

18         THE COURT:  Well, then aren't you supposed to be?  I

19   mean, isn't that -- wait a minute.  Isn't that what motions in

20   limine are all about, is you get the rulings and you go and

21   you form your documents and your videos based on that?

22         MR. SABBAK:  So we are all under the impression that

23   that does not exist in there.  I'm not saying she's a liar.

24   I'm saying now I don't know, but my whole team is under the

25   impression that that's not in there.  So I don't know what I'm

1  supposed to do.

2          THE COURT:  Let's play it and see what happens.  I

3  mean, I'm not going to sit here and go through every video.

4  If it's in there, there's going to be serious consequences.

5          MR. SABBAK:  Of course.  Could we have five minutes

6  to verify it?

7          THE COURT:  I'm just going to leave it -- look, we'll

8  just have to trust that he's doing his job.  Otherwise, then

9  there will be serious ramifications.

10         MR. SABBAK:  I understand that, sir.

11         THE COURT:  I can't have an objection and then

12 pre-listen to every video before it's played.  I have to trust

13 that the lawyers have done their job.  If they haven't done

14 their job, then I will react accordingly.

15         MR. SABBAK:  Of course.

16         THE COURT:  That's all I can do.

17         MR. SABBAK:  I understand.  Look, Judge, she just put

18 this in our lap.  Can I have three minutes to verify it?

19         THE COURT:  It's not her responsibility to make sure

20 that the video you intend to play doesn't have what the Court

21 has already ruled out.  That's your job.

22         MR. SABBAK:  Do you have your time stamps then to

23 verify?  Let me --

24         (Brief Pause.)

25         MS. MATZ:  All right.  Listen.  I'm not going to make

1  a representation that these are the entirety of them but --

2  I'm sorry.  Go ahead, your Honor.

3          THE COURT:  I'm listening.

4          MS. MATZ:  I know there's something at 37:25 about

5  the federal indictment.

6          MR. SABBAK:  But does it say federal indictment?

7  What does it say specifically?

8          MS. MATZ:  I don't have the quote, but, again, you've

9  pre-reviewed all of our videos to ensure that none of them

10  violated the pretrial order and --

11         MR. SABBAK:  So --

12         MS. MATZ:  Excuse me.  I'm talking -- and only played

13  the portions that did not.  We were very careful that the same

14  things --

15         MR. SABBAK:  Let's talk about this.  This does not

16  talk about a federal indictment.  This doesn't reference a

17  case that she has an active civil or criminal case for.

18         MS. MATZ:  It talks about the bartender case.  It

19  talks about the bartender case --

20         MR. SABBAK:  There's two bartender cases.  There's

21  one that she's being sued for, and there's one that was

22  involving Nicki Minaj.  That's all she's talking about.

23         MS. MATZ:  There's also -- at 38 there's a drugging

24  and robbing men.  At 44:50 there's an entry of a federal

25  indictment, and then now at 13:30 something about a federal

1   case.  And, frankly, even if it's -- to the extent it is

2   talking about your client is referencing a federal indictment

3   to be finished up and exists and she means a state court

4   indictment that does exist, either way it would fall under --

5   shouldn't you know?

6           MR. SABBAK:  Shouldn't you know because you're the

7   one saying it, Sarah?  It doesn't say that is my point.

8           THE COURT:  All right.  So in total how many hours of

9   videos do you intend to play?

10          MR. SABBAK:  So I have a two-hour call.  This one is

11  supposed to be 46 minutes.  I might have one more video, your

12  Honor, so we're looking at three to four hours.

13          THE COURT:  All right.  Y'all have a seat.

14          MR. SABBAK:  Yes, sir.

15          MS. MATZ:  Thank you, your Honor.

16          (Whereupon, the following proceedings continued in

17  open court.)

18          THE COURT:  All right.  Ladies and gentlemen, I'm

19  going to let you go for the day.  I'm going to ask you to

20  return in the morning or tomorrow -- actually, not in the

21  morning.  I'm going to ask you to return at noon.

22          I've got to have some extensive discussions with

23  counsel to make sure that the evidence you receive is proper.

24  As you know, I don't want to try this more than once.  This is

25  a long trial, and I want to make sure that we get everything

1   right to start with.  Sorry that this is going to invariably

2   delay the conclusion of the case.  In the greater scheme of

3   the case it's what's in the best interest of making sure that

4   we only try the case one time.

5        I would ask if you would leave your notes in the jury

6   assembly room, and we'll see you tomorrow.  Let's do this:

7   Let's have you return at 12:00 o'clock tomorrow, 12:00 o'clock

8   tomorrow.  That gives us plenty of time and still let's us get

9   in at least a full three sessions in the afternoon.  Okay.

10  We'll see you tomorrow.  Thank you.

11        COURTROOM SECURITY OFFICER:  All rise.

12        (Whereupon, the jurors exited the courtroom.)

13        THE COURT:  All right.  Y'all can have a seat for a

14  minute.  I'm not going to stay in court and listen to these

15  videos, but the lawyers are going to review the videos before

16  they're admitted.  So I want the plaintiff to receive the --

17  I'm not sure what you call the meter that -- the meter running

18  time of each video that the defendant intends to introduce at

19  trial and then have an opportunity between today and in the

20  morning to review it.

21        You know, frankly, if I had thought a little bit more

22  clearly in the moment, I would have told the jury to come back

23  first thing in the morning because I was thinking I was going

24  to be sitting in the courtroom reviewing these documents with

25  you -- videos with you, but I'm not going to do that.  I'm

1  going to let you look at them, and then in the morning at

2  10:00 o'clock I want you to appear and -- well, say 10:30

3  appear so that I have enough time to hear any objections that

4  the plaintiff might have to whatever the defendant wishes to

5  play and rule on that and still give you an opportunity to

6  have a little time for lunch before the jury appears.  I told

7  the jury 12:00?  Yeah, so let's say 10:30.

8        Frankly, it is remarkable to me that we have reached

9  a point where mid trial during the defendant's case that I've

10  got to have the defendant tell us exactly what it wants to

11  introduce by way of video or audio testimony for the rest of

12  your case, but I have no choice but to do that because the

13  defendant has not given me any assurances that in the videos

14  it wants to play that there are materials that have been

15  excluded by the pretrial order.  Instead, counsel is asking

16  plaintiff to tell him what's in there that's objectionable.

17  Come on.  That's not the way this works.

18        We had a pretrial hearing.  We had motions in limine

19  that were argued.  I made rulings.  It's counsel's job to go

20  and review what they intend to introduce and to redact or

21  remove anything that the Court has prohibited.

22        Mr. Sabbak, if you had been able to tell me with any

23  degree of certainty that the material that the Court had

24  excluded was not in these videos, then I would have said let's

25  just go ahead.  In fact, I initially -- that was going to be

1   my direction, is that we would just go forward.  But,

2   honestly, the back and forth between you and Ms. Matz about

3   what might be in there, what's not in there, your relying on

4   the plaintiff to tell you where the objectionable material is

5   for a video that you should know everything about doesn't lead

6   me to believe that you really know if it's in there or not and

7   that maybe you don't really care because if it comes in, then

8   the plaintiff is left trying to make a decision, do they want

9   a mistrial or do they want the case to go forward with an

10  instruction to the jury to disregard the bad stuff that they

11  wanted to keep out.  I say bad in quotes because it was such

12  that they didn't think it was admissible.

13          So it's basically, you know, allowing the jury to

14  hear what they're not supposed to hear and telling them they

15  have to disregard it.  And while juries have to do what

16  they're told to do, that doesn't mean that they do do what

17  they're told to do, particularly on something that's in their

18  brain that I can't remove.

19          So it's what, 3:35 today, 3:33 today.  Before y'all

20  leave today I want all of the material that you intend to play

21  with as much specificity as required given to the plaintiff so

22  that the plaintiff can view it tonight.  I would also like, if

23  there are any objections that the plaintiff has, to go ahead

24  and note -- because you're going to have to look at it

25  tonight, go ahead and get that information to the defendant,

1  and y'all appear at 10:30 tomorrow and be prepared to talk

2  about it.

3        If after reviewing everything, the plaintiff decides

4  that there was no objections that you're going to have to it,

5  then y'all otherwise appear at 11:30 both with emails back and

6  forth communicating that there are no objections and it's

7  going to move forward.  I say appear at 11:30 so that if there

8  is any other issues that come up, like we do every day when we

9  arrive 30 minutes early, then we can deal with that.

10        Any questions from the defendant?

11        MR. SABBAK:  Thank you, Judge.

12        THE COURT:  Any from the plaintiff?

13        MS. MATZ:  I just want to make sure.  So we're going

14  to have the list of the numbers and time codes by 5:00 p.m.

15  today?  That's the --

16        THE COURT:  You'll have them before they leave court

17  today.  They need to tell you everything that they're going

18  to -- that they hope to admit into evidence that involves

19  audio or video.  If it's photographs, then you can react to

20  those because you'll see that.  I presume y'all see them just

21  like the witness sees them, like I see them, before the jury

22  sees them so you know what that is.  But if there's video, you

23  need time to actually watch it.

24        MS. MATZ:  Absolutely, your Honor.  Photographs, I

25  agree we can see them.

1        MR. SABBAK:  And, your Honor, when would we get the

2   objections in order to make any redactions if they're actually

3   legitimate?

4        THE COURT:  I don't know.  I mean, it depends on how

5   long it takes them to review it all.

6        MS. IZMAYLOVA:  Just so the Court knows, we did

7   redact the videos.  Like the Starmarie Jones interview, there

8   was stuff redacted from there that was inadmissible.  So I

9   personally watched this video.  I do not believe that there's

10  anything in the video that we're planning on playing that

11  violates the pretrial order, which is the reason why

12  Mr. Sabbak is confused, because we did do the redactions of

13  the videos that did have, you know, language or whatever that

14  violated the pretrial order.

15       THE COURT:  Well, so the transcript of our bench

16  conference will be in the record of the court at some point,

17  but the best way I can put it is Mr. Sabbak was less than a

18  hundred percent sure that there was no objectionable material

19  included.  So given his -- if he had stood there and said,

20  Judge, absolutely we did it, just like you did, we did it,

21  there's nothing in there that violates the pretrial order, I

22  know there's not so their objection is meritless, then I would

23  have said, okay, then let's go forward.  We're ready to see

24  the video.  But that's not what he said.  He wanted the

25  plaintiff to tell him where the bad stuff was so that he could

1  go and take a look.

2          So I'm just -- I just don't want it to come in when

3  it's not supposed to.  I don't think it's fair to the

4  plaintiff to have to make a judgment call at the spur of the

5  moment about whether they want a mistrial if something comes

6  in that's not supposed to come in.

7          So this is what we're going to do:  So we'll see

8  y'all at 10:30.  If the plaintiff has any objections that

9  y'all can't work out tonight and if y'all work everything out

10 tonight and you don't need me at 10:30, then I'll see you at

11 11:30 tomorrow.  I'll be here notwithstanding because as fate

12 has it, I've got to take two dogs to the vet at 7:00 a.m. in

13 the morning, so I'm coming on in at 7:00 a.m. in the morning,

14 I suppose.  But I'll see y'all at 10:30 or 11:30.

15          MR. SABBAK:  Thank you, your Honor.

16          MS. MATZ:  Thank you, your Honor.

17          MS. IZMAYLOVA:  Thank you, your Honor.

18          COURTROOM SECURITY OFFICER:  All rise.  This court

19 stands in recess.

20          (Whereupon, the proceedings were adjourned at 3:35

21 p.m.)

22                      -  -  -

23

24

25

REPORTERS CERTIFICATE

I, Wynette C. Blathers, Official Court Reporter for the United States District Court for the Northern District of Georgia, with offices at Atlanta, do hereby certify:

That I reported on the Stenograph machine the proceedings held in open court on January 18, 2022, in the matter of BELCALIS MARLENIS ALMÁNZAR v. LATASHA TRANSRINA KEBE and KEBE STUDIOS LLC, Case No. 1:19-CV-01301-WMR; that said proceedings in connection with the hearing were reduced to typewritten form by me; and that the foregoing transcript (Volume V of X, Pages 1 through 141) is a true and accurate record of the proceedings.

This the 27th day of February, 2022.

_____
/s/ Wynette C. Blathers, RMR, CRR
    Official Court Reporter