```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
 2                      ATLANTA DIVISION

 3

 4  BELCALIS MARLENIS ALMÁNZAR,    )
                                   )
 5              Plaintiff,         )
           v.                      )  CIVIL ACTION
 6                                 )  FILE NO. 1:19-CV-01301-WMR
    LATASHA TRANSRINA KEBE and     )
 7  KEBE STUDIOS LLC,              )
                                   )  JURY TRIAL
 8              Defendants.        )
    _____)  VOLUME VI OF X
 9

10

11  ------------------------------------------------------------

12          BEFORE THE HONORABLE WILLIAM M. RAY, II

13              TRANSCRIPT OF PROCEEDINGS

14                  JANUARY 19, 2022

15  ------------------------------------------------------------

16

17

              Proceedings recorded by mechanical stenography
18          and computer-aided transcript produced by

19

                  WYNETTE C. BLATHERS, RMR, CRR
20                  Official Court Reporter
                   1714 U.S. Courthouse
21                 75 Ted Turner Drive, SW
                   Atlanta, Georgia  30303
22                     (404) 215-1547

23

24

25
```

2

```
1   APPEARANCES:

2   For the Plaintiff:          SARAH M. MATZ
                                Attorney at Law
3                               Adelman Matz, P.C.
                                1173A Second Avenue
4                               Suite 153
                                New York, New York  10065
5
                                LISA F. MOORE
6                               WILLIAM A. PEQUIGNOT
                                Attorney at Law
7                               Moore Pequignot, LLC
                                887 West Marietta Street
8                               Suite M-102
                                Atlanta, Georgia  30318
9
    For the Defendants:         OLGA IZMAYLOVA
10                              SADEER SABBAK
                                Attorneys at Law
11                              Sabbak & Izmaylova, LLP
                                1875 Old Alabama Road
12                              Suite 510
                                Roswell, Georgia  30076
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  Wednesday Morning Sessio

 2                    January 19, 2022

 3                      10:30 a.m.

 4                        -  -  -

 5                P R O C E E D I N G S

 6          COURTROOM SECURITY OFFICER:  All rise.  United States

 7   District Court for the Northern District of Georgia, Atlanta

 8   Division, is now in session, Judge William M. Ray II

 9   presiding.

10          THE COURT:  Good morning.

11          COURTROOM SECURITY OFFICER:  Please be seated and

12   come to order.

13          THE COURT:  All right.  So let's talk before we start

14   talking about the videos.  Overnight we've had a related or

15   additional, depending on how you talk about it, Covid issue.

16   Juror No. 15, Ms. Richardson, who's the same juror who had --

17   it is Ms. Richardson; right?  It is the same juror; right?

18          COURTROOM DEPUTY:  Yes.

19          THE COURT:  The same juror who had expressed concerns

20   because her son had Covid has overnight indicated that she has

21   developed Covid symptoms, chills, coughing -- let's see what

22   else -- sore throat, so three of the main Covid indications.

23   I guess the only thing she really doesn't talk about is fever,

24   probably has a fever, but she has chills and then headache.

25   So she called this morning or texted this morning about what
```

1  to do, and we have instructed her not to report today.

2       The question becomes what do we do going forward.  We

3  can stop the case and wait for Ms. Richardson and wait to make

4  sure that everyone else tests, you know, or that time

5  indicates that they're okay.  We've had no communication from

6  anyone else that they're feeling sick.  We could move forward

7  with the trial and just let Ms. Richardson go.  We, in fact,

8  instructed her that a decision would be made this morning as

9  to whether or not we'd stop the trial or that we'd proceed.  I

10 don't know if we explained to her that that meant that she

11 would no longer participate.

12      I think if we consider going forward with the trial,

13 I would probably need to alert the other jurors about her

14 symptoms and ensure that they're going to feel as comfortable

15 going forward.  If everyone doesn't feel comfortable going

16 forward, then I think probably at that point our option is

17 really just to take a break on the trial and come back.

18      I certainly don't know how long this trial will take

19 from this point forward.  I'm guessing a couple of days of

20 defendant's testimony.  Does the defendant expect other

21 witnesses other than their own representatives?

22      MS. IZMAYLOVA:  We don't expect any at this time,

23 your Honor.

24      THE COURT:  Okay.  I would think at the very -- it

25 would seem to me it would be logical that we would finish with

1   Ms. Kebe today -- well, maybe not given that we're starting a

2   little bit later but within a day of testimony.  It would also

3   seem to me to be likely that Mr. Kebe's testimony would not be

4   that long given that he is not accused of individually making

5   any of the slanderous or alleged slanderous statements about

6   the plaintiff.  His role more seems to be from the business

7   side of things.

8           So that might mean that unless there is rebuttal

9   testimony to be offered, that we finish with testimony at

10  least by the end of the day tomorrow.  Today is Wednesday, so

11  that would mean that we would be arguing on Thursday and the

12  case may be over by the end of the week.  Of course, there's

13  certainly a possibility of a second phase of the trial, but as

14  I indicated when we started, my experience has been that a

15  punitive damages phase does not last very long.  It should be

16  very quick.  And I do give the right for both an opening

17  statement and closing argument, and, of course, you can call

18  whatever testimony is relevant to the issue.

19          So the end of the week might be a good barometer of

20  when we would be finished with the case or it could stretch

21  into Monday, but, you know, I haven't made -- I have not made

22  a decision about what to do.  I wanted to hear what y'all

23  thought we should do.  I will say this, that I am concerned

24  about a pause if the jurors are comfortable going forward

25  because that just leaves more time for more people to be

1    impacted.  And, you know, a pause would probably mean a pause

2    of at least two weeks.  I'm not really sure what my schedule

3    is.  I have lots of trials on my agenda.  I mean, I can adjust

4    simply by not having a trial and then starting this case back

5    up.  It's not like we have to pick a jury.  So we can just

6    start back up whenever it fits.

7            But, in any event, what's the plaintiff's view on

8    what we should do with the information we have?

9            MS. MATZ:  Could I just have one moment, your Honor?

10           MS. IZMAYLOVA:  Your Honor, may we have like 5

11   minutes to discuss before we tell your Honor what --

12           THE COURT:  Sure.

13           MS. IZMAYLOVA:  Thank you.

14           MR. SABBAK:  Thank you, Judge.

15           THE COURT:  We'll just take 5 minutes.

16           MS. MATZ:  Thank you, your Honor.

17           MS. MOORE:  Thank you, your Honor.

18           THE COURT:  All right.  When you come back in, we'll

19   start.

20           (Brief recess.)

21           THE COURT:  All right.  So everybody is back into the

22   courtroom, so back to the plaintiff.  Ms. Matz, what is your

23   suggestion or your client's suggestion?

24           MS. MOORE:  Your Honor --

25           THE COURT:  Ms. Moore.  I'm sorry.

1          MS. MOORE:  Thank you, your Honor.  So when you had
2   advised us about your prior case where a juror reported
3   Covid-like symptoms and you requested that he test, we feel
4   like the best solution is to have this juror test immediately,
5   get a PCR test because if she's negative, we don't want to
6   lose another juror unnecessarily.  But if she's positive, for
7   the safety and health of all the other jurors, we know that
8   they would all need to be tested probably immediately.
9          If this juror tests negative this morning -- and
10  there are places that could go to her home and do a concierge
11  PCR test, within minutes results -- then we would recommend
12  that we simply argue the evidence today, allow this juror to
13  recuperate overnight, and resume in the morning.
14         We agree with your Honor.  We don't want a two-week
15  break, but we also don't want to lose a juror unnecessarily if
16  she doesn't have Covid.  I mean, two days ago, your Honor, I
17  woke up coughing, and I didn't feel well.  And I obviously did
18  not want to put anybody at risk.  So I did a test at home, and
19  I was negative.  And then I felt better within 24 hours.
20  There are lots of bugs going around.
21         So I feel like the primary question is does this
22  juror have Covid.  She needs to get tested, and I think after
23  we know the answer to that, that would dictate whether the
24  other jurors need to get tested.
25         THE COURT:  So if she tests negative, you suggest

```
 1   what?
 2          MS. MOORE:  If she tests negative, your Honor, if she
 3   not feeling well, I think that we would argue the evidence,
 4   the issues today, and resume testimony before the jury
 5   tomorrow morning.
 6          THE COURT:  That's not -- your suggestion is not
 7   consistent with CDC recommendations.
 8          MS. MOORE:  If she tests negative?
 9          THE COURT:  Even if she tests negative.  The CDC does
10   not recommend that they resume normal activities when they're
11   still feeling bad because of the fact that tests are not a
12   hundred percent positive.  So if she tests negative, then
13   we've got to pause no matter what as long as she's got
14   symptoms, and the symptoms she's described are not de minimis.
15   I mean, it's not just a cough.  It is chills, and that's not
16   normal with a cold, not that I'm -- not a cold as we knew it
17   before Covid, but it is certainly consistent with Covid.
18          MS. MOORE:  One question, your Honor, too.  Has there
19   been -- and I don't know if this has happened yet.  Has there
20   been a situation where a juror was ill, not Covid, and they
21   were put in a separate room watching on a camera?  Has that
22   ever happened in the courthouse since the pandemic started?
23          THE COURT:  I mean, it's possible.  I suppose that we
24   could do that.  I mean, from a technology standpoint we had
25   originally made plans that there could be an overflow
```

1    courtroom.  But that would be broadcasting -- let me ask

2    Jennifer.  What would -- if we had done that with the general

3    public, would there have been a separate camera where they

4    would have seen everything from a birdseye view kind of thing?

5              COURTROOM DEPUTY:  Yeah, that camera.  And that is

6    capturing the room, the audio, and then she would be in

7    another courtroom or another room.

8              THE COURT:  And it would just be the camera's view of

9    everything; right?

10             COURTROOM DEPUTY:  (Nods head.)

11             THE COURT:  So, for example, if there were documents

12   that were placed into evidence and shown on a screen, that

13   would not show up for that juror unless that camera happened

14   to pick up another monitor somewhere.

15             COURTROOM DEPUTY:  Right.  There would not be a way

16   to project.

17             THE COURT:  So that's not a perfect substitute for

18   being in court.  Can't tell you -- I don't think any of us

19   really know that if anybody objects to that, whether or not or

20   how the -- yeah, nobody knows exactly what the Eleventh

21   Circuit will say about that procedure.  We're kind of

22   operating blindly, you know, and I recognize there are courts

23   around the country that have had trials remotely.  There may

24   be one in Georgia that's done it, in state court in Fulton

25   County, that I think I may have read something recently about.

```
1              I don't know that that's where I want to go.  I
2    certainly can't do that unless y'all agree.  I'm not
3    willing -- I'm more likely -- well, I'm more comfortable with
4    a pause than I am in having normal procedure and then having
5    somebody who doesn't like the jury verdict arguing that the
6    delay was inherently prejudicial in some way because I feel
7    pretty certain that the appellate courts will say, no, we have
8    long trials all the time, and there's evidence that's
9    presented months before we get to closing.  And as long as the
10   lawyers are given adequate time to have closing argument to
11   remind the jurors of all the evidence they've received, that's
12   good enough.  So to me that's more tried and true than putting
13   the juror in another room.
14             Anything else you want to say, Ms. Moore?
15             MS. MOORE:  No, your Honor.
16             THE COURT:  Okay.  All right.  What about the
17   defendant?
18             MS. IZMAYLOVA:  Your Honor, I think that we would be
19   most comfortable with a pause only because if the juror does
20   have Covid and they've been all in close contact with one
21   another, even if today nobody reports symptoms, what if
22   someone has symptoms tomorrow?  Then we would inevitably have
23   to pause at that point in time.  So that would be our
24   preference in order to not lose any jurors at this point, to
25   take a pause and make sure that, you know -- because if we let
```

1  her go today and then tomorrow someone else reports that they

2  have Covid symptoms, then we're going to have to inevitably

3  pause the trial tomorrow.  So since we don't know whether

4  someone will or won't feel symptoms because they were in close

5  contact with this juror, that would be our preference so as to

6  not lose any of the jury members.

7          THE COURT:  All right.  Well, I'm not going to decide

8  right now.  I want to talk about the videos, and I want to

9  think about it.  I might be leaning towards letting the juror

10  go and going forward because I do have nine at this point, and

11  I only need six.  I make my decision independent of who the

12  juror is.  Y'all may have certain -- I don't know anything

13  about this juror other than she lives in Gwinnett County.

14          So y'all may have fixated or determined -- y'all I

15  mean plaintiff and defendant from a plurality standpoint or

16  plural, that this would be a good juror for you.  That's not

17  my concern, whether she's a good juror for you or not.  My

18  concern is making sure we get through with the trial and that

19  we have sufficient jurors in the pool to make a decision.  So

20  let me think about it, and the jurors won't report for another

21  hour.  And we can -- I'll have an answer to you when we get

22  through with our discussions about the video.

23          All right.  So all I know is that plaintiff thinks

24  that there's some issues, and the defendant disagrees.  That

25  was the last communication I had, I guess, the emails that

1   y'all exchanged with Ms. Lee last night.  So let's talk

2   about -- so I guess we'll just take items one by one.  Let's

3   talk about the first issue that you have, and then I'm going

4   to want to see it on the screen.  Someone is going to have to

5   have it ready to play.  And I'll hear from plaintiff and hear

6   from the defendant about why this is appropriate or not

7   appropriate, and then I'll make a decision after I see the

8   video.

9           MS. MATZ:  Sure, your Honor.  Is it okay if I go

10  ahead and start?

11          THE COURT:  Sure, since you're objecting.  They want

12  everything in.

13          MS. MATZ:  Yes, your Honor.  And just so you know, we

14  appreciate that your Honor gave us the opportunity to look at

15  everything again last night.  Some of the videos that were on

16  the list previously had been edited by them, and we had gotten

17  those yesterday morning.  But there were still many issues

18  with them, so we appreciate that as an initial matter.

19          So the first thing is -- the first video is D-11,

20  which is the one we were talking about where we ended

21  yesterday.  So when we rereviewed the video, there are still

22  references to this alleged assault in New York in there.  If

23  your Honor will recall, at the prior pretrial conference this

24  had been the specific subject of one of our motions in limine.

25  And just so you know, the relevant portions of the transcript

1   are somewhere around pages 38 through 48 of the prior pretrial

2   conference and, you know, the -- I'm just saying this to

3   refresh your Honor to the extent that it's helpful.

4           But we'd obviously argue that any mention of alleged

5   criminal activity is both not relevant and highly prejudicial

6   here, which your Honor had agreed with.  You had actually said

7   there's, you know, almost nothing more prejudicial than

8   alleged criminal conduct, and this doesn't have anything to do

9   with the case.  So your Honor had ruled it out.

10          The argument that the other side had made at the time

11  was that this somehow showed that Ms. Kebe made positive

12  videos about our client because they allege that she had made

13  a prior video about these criminal charges, and she was saying

14  she didn't believe them.  And that was what your Honor had

15  specifically ruled out at the conference.  This video, the

16  clip is still there, the clip discussing this prior video.

17          At the last hearing the discussion that was had was

18  they were trying to make that this was somehow relevant to the

19  issue of rebutting that Ms. Kebe has -- rebutting an argument

20  they thought we were making.  They thought we were going to

21  argue that Ms. Kebe has never said anything positive about our

22  client.  That's not something we've argued.  That's not

23  something anyone has ever articulated, and what the Court said

24  was even if that was an argument, that, you know, you still

25  thought this would be very prejudicial.

1           So from our perspective, having this clip in there is

2    still continuously prejudicial, and Ms. Izmaylova at that

3    conference had even offered, because you had asked her if they

4    had other examples of positive coverage to make this point,

5    and she said they did and yet they're still trying to

6    introduce videos with this conduct discussed in it.

7           So I'd like to go ahead -- the specific clips begin

8    at 27 -- well, the clip about the criminal conduct is at

9    29:56.

10          (Whereupon, a video recording was played.)

11          THE COURT:  I can hardly hear it.

12          MS. MATZ:  Sorry, your Honor.  Technical glitches.

13          (Whereupon, there was a pause in the proceedings.)

14          MS. MATZ:  That wasn't the right time code, your

15   Honor.  He was just testing the sound.

16          (Whereupon, a video recording was played.)

17          THE COURT:  All right.  Thank you.  Ms. Izmaylova.

18          MS. IZMAYLOVA:  Thank you, your Honor.  First of all,

19   the criminal indictment, whatever -- the criminal case that

20   Ms. Matz is alleging or talking about didn't come down until

21   October of 2019.  This video was made in September of 2018 so

22   a whole year before any criminal anything was going on.  The

23   reason why this is relevant is because this was discussed

24   already in the Starmarie Jones interview, first of all, that

25   the jury has already heard, that there was no objections to.

1    And it goes to my client's state of mind and whether

2  she does or does not have actual malice.  She's not saying

3  anything about criminal charges or indictments or any of those

4  things.  In fact, what she's saying is that somebody said

5  something about the plaintiff that was not true.

6    THE COURT:  What difference does it make whether

7  there were criminal charges or not?  It's the conduct that

8  matters; right?

9    MS. IZMAYLOVA:  And she doesn't discuss the conduct.

10 She's saying the conduct is false, that whatever --

11    THE COURT:  I understand, but the conduct itself is

12 the issue.  I understand your client said on the tape that she

13 didn't believe it, but the prejudicial information from the

14 jury's perspective would be the allegations that the plaintiff

15 engaged in some type of assault, not whether or not the

16 prosecutor agreed and decided to bring charges, just whether

17 or not the allegation was there.  And so she is discussing the

18 allegation, which was that the plaintiff struck somebody

19 somewhere, at a bar or club or something.

20    MS. IZMAYLOVA:  As I recall, specifically we

21 discussed that we were not to mention anything about any

22 criminal charges or criminal history or anything related to

23 gang activity, which we have not done and she does not do in

24 this video.

25    THE COURT:  I would say your interpretation of what

1 | we talked about is very generous to the defendant's view about
2 | what she can get in.  You're obviously trying get into
3 | evidence the allegation that the plaintiff struck somebody.
4 | Now, you're saying that, well, the reason we're trying to get
5 | it into evidence is to demonstrate that the defendant has no
6 | ill will towards the plaintiff because she defended the
7 | plaintiff.

8 | MS. IZMAYLOVA:  Correct, but it's not --

9 | THE COURT:  But the allegation is still coming in,
10 | and the allegation is that the plaintiff struck someone.  And
11 | this jury isn't going to be charged with deciding whether or
12 | not the allegation is true or not true.  And so, you know,
13 | they won't have an appreciation about whether or not the
14 | plaintiff ever did strike someone or not because that case
15 | isn't being tried.  There would be no evidence of that one way
16 | or the other, but there's still going to be an allegation in
17 | here that she did.

18 | Whether your client believed or disbelieved, doesn't
19 | matter whether it's true or not, right, because Ms. Kebe
20 | doesn't get to decide whether or not the allegation is true.
21 | But you're throwing -- it's being thrown in there, and at the
22 | end of the day I still have to consider Rule 403 of the
23 | federal rules.

24 | The probative value that you submit is that it backs
25 | up the defendant's claim that she has no ill will towards the

```
 1   plaintiff, and of course I would argue this point:  That
 2   whether or not she has general ill will isn't the issue for
 3   the jury.  The issue before the jury is going to be if when
 4   she said what she said that she has sued about, whether she
 5   had ill will and malice about those things, not about
 6   something else that's unrelated to those things alleged in the
 7   complaint.  But under Rule 403 the Court may exclude relevant
 8   evidence if its probative value -- here you would say this
 9   video, this part of the video supports the defendant's claim
10   that she doesn't hate or have malice towards the plaintiff --
11   is substantially outweighed by a danger of one or more of the
12   following:  Unfair prejudice, confusing the issues.  Those are
13   probably the two factors that are most implicated.  There are
14   some others.
15         And the plaintiff's argument is that it would be
16   unfairly prejudicial to the plaintiff to introduce the
17   allegation made by somebody that she struck someone on a
18   different occasion and that it would confuse the issues before
19   this Court and before this jury.  So --
20         MS. IZMAYLOVA:  Your Honor, no one is going to get
21   over there and argue about this, you know, this allegation.
22   It is in the video.  She says it in passing.  I mean, it ties
23   in what Ms. Jones was saying.  And the reason why she even
24   made the -- her initial viral video was because she stated in
25   her interview which was already -- the jury already heard that
```

1   the plaintiff had an altercation with another singer, and then

2   they talked about how she also had an altercation with these

3   other two females.  That was the whole reason why Ms. Jones

4   got on the internet to begin with, to discuss the plaintiff

5   and her past with the plaintiff --

6           MR. SABBAK:  She --

7           THE COURT:  One person needs to talk at a time.  Did

8   you forget that rule?  Did you forget the instruction I gave

9   you that if you want to say something, you write it down?  You

10  do it again, sir, I'm going to hold you in contempt.  I'm just

11  telling you right now.  I'm tired of it.  You act like you

12  never tried a case that have judges that have rules that you

13  have to follow.  They're not optional.

14          All right.  So anything else you want to say, ma'am?

15          MS. IZMAYLOVA:  I mean, I would like for us to be

16  able to present our defense.  That's what I would like to do

17  and so it's feeling like --

18          THE COURT:  Well, your client can testify that, hey,

19  I've defended Cardi on other occasions when there have been

20  allegations made that I didn't think were proved; right?  She

21  can say that.

22          MS. IZMAYLOVA:  Sure she can say that, but what if

23  the jury thinks that she's just saying that now because it's

24  in her benefit because she's testifying and not -- and she

25  didn't -- but when we have evidence that she said it two or

1   three years ago?  I feel like it's a different weight, you

2   know, to the jury because her credibility is ultimately at

3   issue the whole time.

4          THE COURT:  Ms. Matz said that you said at our

5   previous pretrial conference that you had other ways that you

6   could introduce the same point, that your client had been

7   supportive of Cardi on some occasions; is that right?

8          MS. IZMAYLOVA:  When we were discussing not talking

9   about criminal indictments, yes, because there was other

10  videos that we had that we're obviously not introducing now

11  because of the pretrial, you know, ruling.  So --

12         THE COURT:  Well, that was the point of our

13  discussion.  So you're saying this is the one and only video

14  you've got where she's ever said something supportive of

15  Cardi?

16         MS. IZMAYLOVA:  I mean, I don't know -- out of all

17  the videos she's ever made, I don't know, but this is the one

18  that we were planning on using --

19         THE COURT:  I understand, but you may not be able to

20  use it.  So are you telling me you don't have others videos

21  where your client said something supportive of the plaintiff?

22         MS. IZMAYLOVA:  The other video that we were

23  initially talking about was -- the video that Ms. Kebe

24  references in this video where she said do you remember two

25  weeks ago when I made a video clearing -- the clip we just

1   heard Ms. Kebe references a video she made two weeks prior to

2   that video, that's the video that we were talking about, and

3   that's the video that got excluded at the pretrial conference.

4   So that's the video we are not showing.

5       This video is relevant because she goes through the,

6   you know, all the documentation or whatever that she received

7   regards to Starmarie Jones' story and in passing says this as

8   she's talking about all the people that she spoke with, you

9   know, to corroborate Starmarie Jones' story.

10      THE COURT:  Relevance isn't the only factor.

11  Prejudice is also important.  So you're saying that this video

12  that I just looked at and the one that is referenced in this

13  video from two weeks before this video was made are the only

14  two videos you have of the plaintiff saying -- of the

15  defendant saying positive things about the plaintiff?

16      MS. IZMAYLOVA:  I mean, I think she said positive

17  things about her in the MLK video that they've already heard

18  or at least she said that she was -- she came to her defense

19  in that video.

20      THE COURT:  Right, about the skit that the plaintiff

21  played --

22      MS. IZMAYLOVA:  Correct.

23      THE COURT:  -- Coretta Scott King.  Okay.  Anything

24  else?  Is that all?  Those three then?

25      MS. IZMAYLOVA:  Yes.  To my knowledge those are the

1  three videos that we were focusing on.

2         THE COURT:  Okay.  Anything else you want to say

3  before I go back to the plaintiff?

4         MS. IZMAYLOVA:  I'm sorry?

5         THE COURT:  Anything else you want to say before I go

6  back to the plaintiff?

7         MS. IZMAYLOVA:  Not about this, no.

8         THE COURT:  All right.  Ms. Matz.

9         MS. MATZ:  Yeah, so I was going to point out that

10 they already did introduce one other video, the MLK video that

11 they tendered at least with the defense of my client in some

12 way, shape or form.  You know, this was the exact conference

13 about the motion in limine.  So we already excluded the video

14 where she goes through it at length.  I don't think that it is

15 fair to let them just throw in another video that contains

16 highly prejudicial allegations.

17         And, you know, Ms. Izmaylova represented at the last

18 conference that Ms. Kebe has made positive statements about my

19 client's music and other things.  So to the extent they've

20 prepared their case to try to introduce evidence that are

21 extremely prejudicial to my client, I don't think that that's

22 fair.  If they have other evidence, they can use it.  And I

23 agree with your Honor.  She can testify and say without

24 talking about what those allegations were that she has

25 defended my client in other videos.

```
 1          THE COURT:  What about Ms. Izmaylova's statement that
 2   Ms. Jones's interview references this exact same -- that's
 3   already been admitted and played for the jury references the
 4   exact same incident?
 5          MS. MATZ:  That's not actually my understanding of
 6   what the Jones video referenced.  What the Jones video
 7   referenced and what Ms. Kebe's testimony yesterday actually
 8   was, that Ms. Jones made the video because there had been some
 9   sort of a fight at Fashion Week with Nicki Minaj.  That has
10   nothing to do with the alleged assault that took place with
11   these bartenders.  That has nothing to do with it and there
12   aren't -- to my knowledge there's not any type of, you know,
13   criminal indictment that stemmed from it or anything along
14   those lines.  I don't actually even know what happened.  But
15   to the extent that it was highly relevant to that one issue,
16   the Nicki Minaj thing, that's -- first of all, I'm not really
17   sure that that --
18          THE COURT:  Nicki Minaj is another performer; right?
19          MS. MATZ:  Yes.  And I'm not sure that should have
20   come in yesterday, but either way that doesn't open the door
21   for them to continue to bring in other prejudicial allegations
22   concerning criminal conduct where there's very specific ugly
23   allegations made and just leave it hanging for the jury.  It's
24   extremely confusing.
25          THE COURT:  Right.
```

```
 1              MS. MATZ:  It's extremely prejudicial.
 2              THE COURT:  Let me see the conversations.  Let's cue
 3   up Ms. Jones's interview with the defendant, and show me the
 4   part of it where they talk about this incident.
 5              MS. MATZ:  Your Honor, I'd also -- to the extent that
 6   it's helpful from yesterday's rough, this is Ms. Kebe's
 7   testimony:  All right.  Can you tell me how you first heard
 8   about Starmarie Jones?  I believe it was New York Fashion
 9   Week.  Cardi B had attacked Nicki Minaj at an event.  Who's
10   Nicki Minaj?  She's another artist such as Cardi B.  Is she on
11   the same level of Cardi B such as fame and popularity?
12              That had nothing to do with any of this.
13              THE COURT:  Well, I'm just trying to see if what
14   Ms. Izmaylova just said, whether she's got any fact in what
15   she said or whether or not she's mistaken.  So let's --
16              MS. IZMAYLOVA:  Do you want us to --
17              THE COURT:  I want you to play the part where they're
18   talking about -- and I guess it's going to be probably pretty
19   close to the beginning.
20              MR. SABBAK:  I've got it.  Don't worry about it.
21              (Whereupon, a video recording was played.)
22              MS. IZMAYLOVA:  That was the -- she said the two
23   bartenders, which is the same two people that Ms. Kebe is
24   talking about in the video we just watched previous to this
25   and Nicki Minaj, which is a separate person.
```

```
 1              THE COURT:  Play that again for me.  This is the only
 2   part of the tape where she talked about it?
 3              MS. MATZ:  No, your Honor.
 4              MS. IZMAYLOVA:  I think she talks about the Nicki
 5   Minaj fight at the beginning as well.
 6              THE COURT:  Seems like maybe she's talking about two
 7   different things there at the same time.  Let me hear it
 8   again.
 9              MS. IZMAYLOVA:  Yes, sir.
10              (Whereupon, a video recording was played.)
11              THE COURT:  So is that the allegation in the New York
12   incident --
13              MS. IZMAYLOVA:  That's the New York incident that
14   she's --
15              THE COURT:  -- about a shoe being thrown?
16              MS. IZMAYLOVA:  Yes, sir.
17              MS. MATZ:  I don't think that that's actually true.
18   I think the allegation, I believe, is -- yeah, the shoe has to
19   do with Nicki Minaj.  The allegations in the New York criminal
20   matter are that --
21              THE COURT:  There's been an accusation or an
22   indictment there?
23              MS. MATZ:  For Nicki Minaj?
24              THE COURT:  No, for your client.  Was she accused or
25   indicted of --
```

```
 1          MS. MATZ:  There's pending criminal charges, your
 2   Honor.
 3          MS. IZMAYLOVA:  Not from New York Fashion Week,
 4   though.
 5          MS. MATZ:  No, not from the Nicki Minaj incident.
 6          THE COURT:  Right.
 7          MS. MATZ:  So the allegations in the criminal
 8   indictment stem from an alleged beer bottle being thrown and
 9   two other people, not my client, getting into a physical
10   altercation.  And there's been an allegation that my client
11   was somehow involved.
12          THE COURT:  There's been an allegation that your
13   client what?
14          MS. MATZ:  Was somehow involved.
15          THE COURT:  Okay.  Let's go back to earlier.  You
16   said this was talked about by Ms. Jones earlier in her --
17          MS. IZMAYLOVA:  I believe that the time she mentioned
18   the two other people was right here, what we just heard, about
19   the two bartenders, I believe that she spoke about the Nicki
20   Minaj incident earlier in the video, which are two separate
21   incidents, your Honor.
22          THE COURT:  Okay.  Well, that's consistent with what
23   the plaintiff is saying.  So was Nicki Minaj involved in the
24   incident at the bar?
25          MS. IZMAYLOVA:  I don't believe so.
```

1          MS. MATZ:  No.  No, your Honor.

2          THE COURT:  I can't make heads or tails out of what

3    she just said.  It sounds like to me she's merging two

4    different incidences into one because she references Nicki

5    Minaj when she talks about those two bartenders.

6          MS. MATZ:  Your Honor, she also just to -- just so

7    you know, I don't necessarily think that clip should have been

8    included in what they showed, but what she also says here when

9    she's referencing the bartender alleged situation, she says

10   "them."  What she said was most likely entirely innocuous, and

11   I don't really think the jury is going to pick it up.

12         THE COURT:  Well, I can't understand it.  That's why

13   I'm asking questions about it.  I don't know what happened

14   there.  But I also know this, and that is that to the extent

15   that the defendant even wanted to -- excuse me.  To the extent

16   that the plaintiff, if this comes in, even wanted to address

17   it -- and I guess if it came in, she would have that right to.

18   Well, I'm not sure her lawyers in New York are going to be

19   happy with that.  I mean, she's got a Fifth Amendment right

20   not to testify but yet if she feels like she's got to testify

21   about it in the civil case so that she can say, assuming that

22   she would, that she didn't do anything wrong in the bar in New

23   York, then whatever she says here would be likely admissible

24   in the case in New York.

25         And it's not fair for the plaintiff to have to make a

1  decision in the civil case in dealing with a collateral issue

2  at best that could compromise her rights under the United

3  States Constitution and pending charges in New York, which is

4  one of the reasons why when a criminal -- an allegation of

5  criminal activity against any person has been filed and then

6  there is also a civil action pending, that the civil action is

7  stayed until the criminal action is dealt with to allow the

8  person who's alleged to have done the bad thing to have no

9  risk of their freedoms associated with the criminal

10  prosecution affected by their ability to testify in their own

11  case or the case brought against them in the civil case.

12          So I understand the defendant's argument that it's

13  relevant.  I don't think what was said in this Jones interview

14  would make what would be revealed in the video today harmless.

15  I think it would be harmful to the plaintiff if the video was

16  played, which was why the original decision was made by me

17  that it wouldn't come into evidence.

18          Whether we're talking about criminal charges or not,

19  criminal charges are just one part of the incident.  That's

20  what a prosecutor is considering or has filed based on the

21  facts of the incident.  It's the incident itself that raises

22  negative implications about the plaintiff that are unrelated

23  to the allegations in this lawsuit and are only collaterally

24  involved because the defendant says, well, I defended the

25  plaintiff against those allegations in New York that she

1 engaged in some wrongful behavior.  I'm not dismissing that it

2 might be relevant, but it's more prejudicial to the plaintiff

3 than relevant and necessary for the defendant.

4      The defendant can certainly testify that she said

5 positive things about the plaintiff.  Should the plaintiff

6 argue or intimate that that's not true, then maybe it opens

7 the door for the video then to come in.  In any event, it's

8 really irrelevant to the issues about whether or not when she

9 said, the defendant, said what she said that constituted

10 malice because malice comes from the event itself.

11      Yes, you can prove I generally hate someone, and that

12 aids a juror in being able to determine when you do something

13 that is slanderous, whether or not you had malice when you did

14 it, but just because you may not generally hate someone

15 doesn't mean when you engage in slander, that you didn't have

16 malice at that moment.

17      I also think based on the evidence I've seen so far,

18 that it would be a stretch to argue that the defendant

19 generally likes the plaintiff.  If so, then you need to be --

20 you need to question who your friends are because the

21 allegations here that have been embodied in the videos I have

22 been shown, in my mind demonstrate the opposite of that.

23      So I'm not letting that video come in as it relates

24 to the discussion of the allegations in the New York bar

25 incident.  It certainly would in my mind be excludable under

1  Rule 403, and that is the Court's order.

2          All right.  Let's talk about the next one.

3          MS. IZMAYLOVA:  I just want to be clear.  You're just

4  not letting that portion of the video come in; correct?

5          THE COURT:  I'm just saying any discussion in any

6  video about any allegation that the plaintiff was involved in

7  any way in an assault or attempted assault in New York is

8  prohibited, cannot be discussed.  Other than that, I haven't

9  seen the whole video.  We're just talking about the portions.

10          What's next from the plaintiff?

11          MS. MATZ:  Thank you, your Honor.  The next two time

12  codes -- and I'm trying to deal with these in grouping, so

13  there was one before that we can go back to in a moment.  But

14  the next two time codes deal with this same issue at 37:09

15  through 20.  Ms. Kebe makes a comment about this same

16  situation and the same at 39:38 through seconds 42.

17          THE COURT:  I don't need to see anymore about any

18  discussions related to the New York incident.  Anything in

19  reference to the New York incident cannot come into evidence

20  in this video period.

21          MS. MATZ:  Okay.  Thank you, your Honor.  So then the

22  other two clips from this video that we objected to relate to

23  a different issue.

24          THE COURT:  Okay.

25          MS. MATZ:  And these relate to the ruling on the

1  motion in limine that the defendants would not be allowed to

2  try to put in evidence related to their counterclaims that

3  Ms. Kebe was being stalked or harassed or bullied by my client

4  related to her counterclaims of assault and intentional

5  infliction of emotional distress, which, as the Court is fully

6  aware, were dismissed on summary judgment and, you know,

7  because there was absolutely no evidence to support them.

8         So the first --

9         THE COURT:  That's a little broader.  There's

10  evidence to support -- I mean, I have to take the allegations

11  as being true.  There's evidence to support that maybe she was

12  stalked or bullied, but the Court's ruling was there was no

13  evidence that it was linked to the plaintiff, that it was

14  speculation as to that.  Okay.  But be that as it may, you

15  want to play these parts of the video for me?

16         MS. IZMAYLOVA:  Your Honor, if I may just -- again,

17  this video was made in 2018 before this lawsuit was filed.

18  There's nothing --

19         THE COURT:  So then what would it be relevant to

20  then?  What would the allegations of being stalked and

21  bullied --

22         MS. IZMAYLOVA:  She didn't say that.  All she said

23  was Cardi B tried to bully me --

24         THE COURT:  Before the lawsuit was filed.

25         MS. IZMAYLOVA:  Correct.

1              THE COURT:  Okay.  But what does that matter?  I
2    mean --
3              MS. IZMAYLOVA:  There was no counterclaims or any of
4    that.  That's what I'm saying.
5              THE COURT:  Okay.  All right.  What evidence does --
6    okay.  What is her contention, her being Kebe's contention
7    that she was stalked or bullied?  What does that go to?
8              MS. IZMAYLOVA:  She didn't contend that she was
9    stalked.  I believe at the end she just says Cardi B tried to
10   bully me to take the video down, but I'm not going to be
11   bullied.  That's all she says.  I mean, you can hear it,
12   obviously.  I'm not saying not to hear it, but that doesn't
13   have anything to do with her counterclaims.  That's just a
14   general statement.
15             THE COURT:  All right.  And it's relevant to what?
16             MS. IZMAYLOVA:  I'm sorry?
17             THE COURT:  It's relevant to what?  What is it
18   relevant to?
19             MS. IZMAYLOVA:  To them going back and forth with one
20   another before this lawsuit was even filed.  She got some kind
21   of, you know, a demand for a redaction or retraction.  That's
22   what Ms. Kebe was talking about.  She was addressing it, you
23   know, as it relates to that.
24             THE COURT:  All right.  Well, let me see it.
25             MS. MATZ:  Your Honor, I will just say that's all she

1  says.  She actually talks about physical threat.  She says,

2  ain't going to be no security when that, excuse me, bitch sees

3  me.  She can throw shoes, and she'll throw fists and something

4  and then I'm a cross fitter or something.  So I don't think

5  that that's the entirety --

6         THE COURT:  Let me just see what it says.  Thank you.

7         MS. MATZ:  Sure.  It's at 45, second mark 25 through

8  44.

9         (Whereupon, a video recording was played.)

10         THE COURT:  All right.  So I guess -- is there

11  another part too?  Two parts to it?

12         MS. MATZ:  Yeah, the other part was earlier.  It's a

13  related thing, and it's at 27:16 through 20.  There's a very

14  short comment about fans issuing death threats.

15         (Whereupon, a video recording was played.)

16         MS. MATZ:  That was actually a little longer than I

17  originally designated.

18         THE COURT:  I'm sorry.  I thought you were playing

19  another one.  I heard you say something.

20         MS. MATZ:  No, that was it.

21         THE COURT:  That was it.

22         MS. MATZ:  Do you want us to replay?

23         THE COURT:  Help me understand -- and I'm talking to

24  Ms. Izmaylova.  Help me understand what is -- okay.  Granted

25  that's in a video that your client did where she's talking

1   about the plaintiff.  Why is any of that important?

2         MS. IZMAYLOVA:  She's talking about why did Starmarie

3   Jones do the interview.  She said that -- she didn't say

4   anything about Cardi B threatening her.  She said that her

5   fans were issuing threats.  How does that have anything to do

6   with her?

7         THE COURT:  Well, who is it she was talking about

8   when she, being your client, was saying that, well, I'm in

9   shape, I'm fit, I do CrossFit?

10        MS. IZMAYLOVA:  I mean, that was directed toward the

11   plaintiff, but I'm saying, like, so there's all this -- like,

12   so there's all this evidence that the plaintiff has -- you

13   know, goes online and communicates, you know, tries to post

14   stuff.  And she's saying this in -- like as a response to the

15   plaintiff reaching out online and posting stuff online, like,

16   she's going to testify to these things, like, this all is --

17   you know, they were going back and forth online with each

18   other.  My client was not the only one talking.  She wasn't

19   talking to herself.  The plaintiff was reaching out and

20   sending messages and responding and all of that.

21        THE COURT:  Okay.  And your evidence that your

22   plaintiff was -- that the plaintiff was sending messages to

23   your client is your client talking about that and saying the

24   plaintiff DM'd me or emailed me or went online and said

25   something to me directly, and so your client talks about that.

1              But that's not what I'm asking about.  I'm asking

2       about why is it important that the jury hear your client in

3       this video talk about that somebody was trying scare her and

4       that don't mess with me, I'm participating in CrossFit and/or

5       that Cardi B's fans are making death threats against me.  I

6       guess I don't understand your argument about -- or don't

7       clearly appreciate why that's important for her defense, that

8       the jury hear her say those things in the video.

9              MS. IZMAYLOVA:  The ending comments that's -- I don't

10      think it's -- it's not like it's important for her defense.  I

11      don't think that they're prejudicial toward the plaintiff.

12      She's not really saying anything.  But the part about the fans

13      threatening, she's not talking about herself.  She's talking

14      about that Starmarie Jones was getting the threats.  She's

15      explaining.  You know, you only heard a little bit of a clip.

16      But in the video she's explaining why did Starmarie Jones

17      decide to do the interview, because they're going to get up

18      and say in closing, like, you know, Starmarie Jones wanted to

19      get clout, that's why she did the interview so she made all

20      this shit up.

21             Well, this is -- you know, this is explaining, like,

22      what my client knew at the time of why -- you know, what was

23      going on with Ms. Jones at the time she did the interview with

24      her.  How is that not important?

25             THE COURT:  What difference does it make why

1  Ms. Jones said what she said at all?  I mean, the question is

2  did your client have reason to believe that what Ms. Jones was

3  saying about the plaintiff was not true so that when your

4  client repeated and emphasized and provided a forum for

5  Ms. Jones to say the things again, that your client is

6  responsible for any slanderous material.

7          MS. IZMAYLOVA:  It goes towards Ms. Jones'

8  credibility.  That's why.

9          THE COURT:  Jones' credibility as perceived by your

10 client?

11         MS. IZMAYLOVA:  Yes.

12         THE COURT:  Okay.

13         MS. IZMAYLOVA:  It's going to be one of the issues.

14         THE COURT:  So play the part again about the death

15 threats.  I'm not sure -- I think it was the second of those

16 clips.

17         MS. MATZ:  It's 27:16, your Honor.  And stop it

18 around 20, please.  It's very short.

19         (Whereupon, a video recording was played.)

20         THE COURT:  Anything else the plaintiff wanted to

21 say?  Because I talked to you before I talked to

22 Ms. Izmaylova.

23         MS. MATZ:  I think the only other thing I would say

24 is that I also -- if that is the argument here, I'm also not

25 sure that Ms. Kebe has competency to even testify about it.

1   It's not even what Ms. Jones said.  And I would just --

2         THE COURT:  She's got competency to testify about why

3   she believed what she believed or why she said what she said;

4   right?  I mean, she can talk about why I did what I did.  I

5   did what I did because of what I was told was happening or --

6         MS. MATZ:  Yeah, I guess she could say that.  I

7   also -- I do not want it to then launch into the other

8   situation and --

9         THE COURT:  The bar situation?

10        MS. MATZ:  The other alleged situation where I don't

11  want this to become where when Ms. Kebe is asked about this

12  comment, if she is asked about it, that she talks about the

13  other things that were dismissed as a matter of counterclaims.

14  So I think the death threat is mainly the issue because that

15  has been very clearly -- those allegations have been very

16  clearly ruled out by the Court and are not relevant to this.

17        THE COURT:  The ones against -- the death threats

18  that the defendant perceived she received, I guess; right?

19        MS. MATZ:  Alleges, yes.

20        THE COURT:  All right.  I don't have a problem with

21  either of these two clips.  I don't think that they're

22  prejudicial to the plaintiff at all.  And to the extent that

23  they explain why the defendant believed Ms. Jones, then that's

24  what they show, I guess, albeit for the jury to decide that.

25  I don't think they're harmful to the plaintiff.

1          MS. IZMAYLOVA:  Your Honor, one more question about

2    this particular video while we're still on it.  There is a

3    clip where -- it's at 39 minutes 34 seconds -- where Ms. Kebe

4    does not say anything about the New York assault.  What she

5    says is -- of course your Honor can hear it -- ain't nobody

6    biased toward Cardi.  I just cleared her last week, but she

7    didn't give me credit for that.  She's just trying to keep

8    that Monistat stuff off this channel.

9          Now just that clip, is that -- she doesn't mention

10   anything about, you know, what she cleared her for or what --

11   you know, the assault or anything like that.  If we take out

12   the other parts that you have already heard about, is that --

13          THE COURT:  That doesn't seem really any different

14   than her taking the stand and saying I've defended Cardi B

15   from other things that were said about her that I didn't think

16   were true.  I mean, it sounds pretty generic.  What's the

17   plaintiff's position about that?  Maybe we need to hear it.

18          MS. IZMAYLOVA:  Sure.  It's time stamped 39 minutes

19   and 34 seconds.  They're going to do it.

20          MR. SABBAK:  Okay.

21          MS. MATZ:  Oh, do you want us to cue it up?  I'm

22   sorry.

23          THE COURT:  I want somebody to.

24          MS. IZMAYLOVA:  We'll do it.

25          MS. MATZ:  You said 39:42?

1          MR. SABBAK:  I've got it.  It's all right.

2          THE COURT:  We're talking about in a video that has

3   not yet been published, so we shouldn't be looking at this one

4   or is this one just on --

5          MR. SABBAK:  They're just switched to my laptop,

6   Judge.

7          (Whereupon, a video recording was played.)

8          THE COURT:  Has that not been played for the jury

9   already?

10          MS. IZMAYLOVA:  No, sir.  This is the video.

11          THE COURT:  That part.  So I guess because I've seen

12   it, it just seemed -- it's familiar.

13          MS. IZMAYLOVA:  Well, actually, the plaintiff did

14   introduce a clip of this video during their case in chief but

15   not the whole video.  So maybe --

16          THE COURT:  But that part --

17          MS. IZMAYLOVA:  I don't know about that particular

18   part.

19          THE COURT:  I thought that was played personally

20   but --

21          MS. MATZ:  I don't believe we -- I think we played

22   the first part of that clip without the second part.  We cut

23   it off.  I think that's why it sounded familiar.

24          THE COURT:  The wipe her rear end part, you stopped

25   after that?

1          MS. MATZ:  Yes, your Honor.

2          THE COURT:  Okay.  So does the plaintiff have any

3    concern about her saying generally I cleared her on another

4    occasion?

5          MS. MATZ:  No, I think as long as it's not connected

6    up and they can't play those other two incidents, then I think

7    it's pretty much the same as her getting on the stand and

8    saying I've said positive things about her.

9          THE COURT:  Yeah, I do too.  I don't have a problem

10   with that.

11         MS. IZMAYLOVA:  I just wanted to make sure because it

12   technically talks about -- I mean, it technically references

13   the --

14         MS. MATZ:  I think we -- I apologize.  I think with

15   the other two that it was on the list because it's continued

16   repetition, but without the other two I think it's probably

17   fine.

18         THE COURT:  Without the other two, you're talking

19   about referencing the bar thing in New York?

20         MS. MATZ:  Right, because that is the reference.

21   When she says I cleared her last week, she's saying again,

22   referencing her earlier, so that's why I'm saying that one by

23   itself I don't think mentions anything that is different than

24   what we were talking about she could probably say on the stand

25   anyways.

```
1          THE COURT:  Do you have anymore clips to look at or
2    that you want to talk about?
3          MS. MATZ:  Not in this video.
4          THE COURT:  Okay.  Another video?
5          MS. MATZ:  Yes.  Okay.  And Plaintiff's 524, this is
6    a two-hour call with Lovelyti.  We did play clips from this
7    video.  There's really only one part of this that's
8    objectionable, your Honor, and it's at 38:02 through 38:26, I
9    believe, the time codes that I put in my email.
10          And this is -- I apologize.  I don't recall which of
11   the women speaking on the phone said this -- I think it was
12   Lovelyti -- said something about -- or it might have been
13   Ms. Kebe -- Cardi is starting to fight another woman for
14   liking a picture on IG.  They both cleared her name the week
15   before -- this is referencing the same incident.  They both
16   cleared her name of -- Ms. Kebe and Lovelyti are talking about
17   how they both cleared her name the week before.  People were
18   saying that Cardi beat those girls up and put a hit out on
19   those girls.  You know, those girls didn't even get touched.
20   We cleared the story.
21          This is the same -- it's a short clip about the same
22   incident that we've just been talking about in New York.
23          THE COURT:  Ms. Izmaylova, do we even need to look at
24   that?
25          MS. IZMAYLOVA:  No.  I'll just take their time stamp.
```

1          THE COURT:  That's out.  I'm going to rule that out.

2  Okay.

3          MS. MATZ:  Thank you, your Honor.  That's the only

4  one in that video.  The next one is D-8.  There are several

5  problematic issues in this video.  To be -- so two things.

6  I'm sorry.  Yeah, so this relates to a separate issue on the

7  motion in limine, and I'm just going to back up for one

8  moment, your Honor.  This video, the title of this video, just

9  so you know, is -- I'm sorry, your Honor.  Give me one moment.

10  I want to make sure I have my notes correct here.  Okay.  I'm

11  sorry, your Honor.  I had two videos mixed up.  Okay.  So D-8,

12  the first issue is that parts of this video talk about Nicki

13  Minaj allegedly saying my client had herpes.  This isn't --

14  this is Tasha K saying that Nicki Minaj said it, and then they

15  play a small clip of an alleged IG Live from my client.

16          There's a couple of different issues happening in

17  this clip.  One is that the defendant puts up internet

18  evidence defining what herpes is in the middle of the video,

19  and this is the exact type of explanatory testimonial evidence

20  that your Honor ruled should not be in these videos where we

21  had looked at some clips at the pretrial conference where they

22  had definition of stripper ho and all these things up on the

23  screen.  And so --

24          THE COURT:  That was a little different.  That was

25  the defendant's attorneys adding definitions to things versus

1  your saying that the defendant herself put that up in the

2  video when it was playing for the audience?

3       MS. MATZ:  So it actually wasn't different.  Those

4  were just in whatever clips that they found wherever they took

5  them from.

6       THE COURT:  So you object to a definition of what

7  herpes is?  You're suing saying that they said she had herpes.

8  Is it harmful that the jury knows what herpes is?  Is it not a

9  fair definition?

10       MS. MATZ:  I have no idea where it came from, and I

11  think it would be trying to bootstrap in some type of medical

12  evidence that was taken off the internet from an unknown

13  source.  The other piece of this is that they are trying to

14  play a video clip from my client where my client is partially

15  speaking in Spanish, and they're not putting in a translation.

16  So there's very clearly -- you know, I think that piece was

17  not authenticated.  But even if they showed it, I think that

18  there would have to be some of --

19       THE COURT:  I don't understand that piece is not

20  authenticated.

21       MS. MATZ:  It hasn't been otherwise authenticated,

22  but the issue is they didn't show it to my client in

23  deposition or on the stand.  But the issue is I don't think

24  that they can just put it in without having some sort of a

25  translation.

1          THE COURT:  Based on what law?  I mean, what is it

2    harmful to anyway?  Those are two different issues.

3          MS. MATZ:  Yeah, sure.

4          THE COURT:  You don't know whether or not this video

5    is what your client said or you don't know what -- are you

6    arguing that, well, the jury is not going to know what it

7    means unless they speak Spanish?

8          MS. MATZ:  Yeah, I think it's the latter, that the

9    jury is not going to necessarily know what it means unless

10   they understand the language that's being used because --

11         THE COURT:  Which means it won't be harmful because

12   they don't know what it means anyway.

13         MS. MATZ:  Well, no, because it's partially in

14   Spanish and partially in English.  So what's essentially said

15   in this video is my client says dique cold sore, which means

16   they say I have a cold sore.  Then she goes on to say but

17   nobody takes the time to look to see that it's a birthmark, et

18   cetera, et cetera, and she says some other things in Spanish.

19   So it's partially in Spanish, partially in English.  And to

20   the extent that they're going to use it to misrepresent that

21   it was some sort of an admission that my client was saying I

22   have a cold sore, I do think it's prejudicial without the jury

23   knowing what that says.

24         THE COURT:  Let's see the clip.  Is that the full

25   explanation of it?

1            MS. MATZ:  That's that particular clip.  So I think
2    that this starts at 3:45 through 4:39.  And I'm sorry.  It's
3    pronounced "deekay," your Honor.  I actually don't speak
4    Spanish, which although I wish I did.
5            (Whereupon, a video recording was played.)
6            THE COURT:  I mean, I wasn't -- to the extent that
7    she was speaking Spanish there, I wasn't picking it up.  I
8    don't speak much Spanish, and I wasn't paying a lot of
9    attention to that.  I'm sorry.  If y'all would hold on just
10   one second, please.
11           MS. MATZ:  Yes, your Honor.
12           THE COURT:  Sorry.  I've got to take this call.  I've
13   got a dog that's at the vet.
14           (Whereupon, there was a pause in the proceedings.)
15           THE COURT:  I'm sorry.  I wouldn't normally take a
16   call, but I had two animals that went under anesthesia this
17   morning for teeth cleaning, and one of them, they were
18   concerned that she might have a heart issue but she didn't.
19           All right.  So I want to get back.  I mean, as I was
20   saying, you know, the Spanish that was used I didn't
21   understand, and I didn't pick up anything from it one way or
22   the other.  Like I said, I don't know how -- putting aside
23   this chart issue, I'm not sure how -- I'm not sure how
24   anything that's in there is harmful for the plaintiff, though,
25   I guess.  When you say, well, they don't know the Spanish, and

1   so it kind of leaves all that out there for them to figure

2   out, of course there's ways for that to be dealt with.

3         Your client speaks Spanish, and I'm going to presume

4   that there's nothing bad there.  If there's something bad

5   there, you should tell me.  But if there's not, then she

6   certainly can get on the stand if she wants and interpret it

7   for the jury and say this is what I said in Spanish, which was

8   innocuous.  So that doesn't seem to me to be that big of an

9   issue.

10        And then I guess the other issue is the chart; right?

11   Those are the only two issues, the Spanish -- you didn't have

12   any problems -- I'm speaking to plaintiff's counsel.  You

13   didn't have any problems with what was said in English; right?

14        MS. MATZ:  No.  I guess because the mix is she says

15   dique cold sore, and then Ms. Kebe says she's admitting she

16   has a cold sore.  But what dique means is they say I have a

17   cold sore.  So my problem is the mix without a translation.

18   And we do have a case on the translation issue, *Ruiz v. United*

19   *States*, that, you know, party tendering evidence is supposed

20   to do it in English or provide a translation.  So I just think

21   that you're right.  We can put our client on the stand on

22   rebuttal and have her explain it, but I think it's also, you

23   know -- it is a requirement usually that when you're

24   introducing evidence in another language, that there also be

25   evidence of what that means.  And --

1          THE COURT:  They can call your client to interpret it
2     for them if they want.
3          MS. MATZ:  They could.  I agree with that, but I
4     think that that's not -- and they didn't do that.
5          THE COURT:  They're not finished.  I mean, y'all can
6     either stipulate what it means or they can call your client
7     and testify it to.  I'm not going to get hung up on a
8     technical rule of evidence where there are workarounds that
9     are legitimate, which is like calling someone who speaks
10    Spanish to the stand who happens to be in the courtroom.
11    You're trying to basically hang ribbons on technicalities that
12    can be resolved.  It's not even bad.
13         MS. MATZ:  I'm fine with that resolution if they had
14    called my client to do this, but my understanding is they just
15    said they're not going to call anybody but Kebe and that
16    they're planning on doing this with Ms. Kebe without any type
17    of translation.
18         THE COURT:  Well, if you're going to object to this,
19    then probably what they're going to do is call your client and
20    have your client interpret it for them.  I mean, if you don't
21    object to it, they're probably not going to do that.  This is
22    a red herring.  I mean, you're saying that it's not bad, but
23    you're objecting because they haven't interpreted it.  But
24    they can provide an interpretation by calling the plaintiff to
25    the stand and asking her what it means or you can by rebuttal

1  do so.  There's nothing harmful in it other than a situation

2  that can easily be cleared up by you if you wanted to, if you

3  really want to.  You just want to keep out the video.

4        MS. MATZ:  No, I'd actually be fine if it came in

5  with -- if they had shown it to my client the first time.  I

6  wouldn't be objecting to that.

7        THE COURT:  They don't have to do it the way you want

8  them to do it.  They can do it however they can do it, which

9  is they can call your client to the stand.  I can call your

10  client to the stand and ask her to interpret it.  Do you want

11  me to do that or do y'all just want to stipulate what it

12  means, what she said.

13        MS. MATZ:  I'd be fine with stipulating.

14        THE COURT:  How about that?

15        MS. IZMAYLOVA:  Your Honor, that's fine, the

16  stipulation thing.  The reason why we're playing this video is

17  not really so much for -- it's just for what Ms. Kebe thought

18  that was said.  That's what she had, you know -- that's why

19  she played that video, is because she interpreted that video

20  to mean that.  She's not trying to --

21        THE COURT:  She interpreted the video to mean?

22        MS. IZMAYLOVA:  She doesn't speak Spanish, so I think

23  she interpreted the video to mean that the plaintiff was

24  admitting to having a cold sore.  That's why she's playing

25  that video within her video, is to show where she was coming

1   from.  So it shows for her state of mind.  We're not trying

2   to -- I'm not going to talk about what the -- we're not

3   introducing any --

4           THE COURT:  Well, how about this:  Y'all either agree

5   to a stipulation --

6           MS. IZMAYLOVA:  We can agree to a stipulation.

7           THE COURT:  Either agree to a stipulation about what

8   it is that the plaintiff said in Spanish or if you're going to

9   use that video, call the plaintiff to the stand and ask her

10  what she said.

11          MS. IZMAYLOVA:  Sure.

12          THE COURT:  All right.  So let's talk about the chart

13  part of it, though.  Put that back up there.  Let me see that

14  again.

15          MS. MATZ:  That portion of it starts at --

16          THE COURT:  It doesn't matter -- it was up there for

17  a while.

18          MS. MATZ:  Yeah, I believe it starts at around 4:40.

19  I think that that's where that starts.  Yeah, 4:40.  It's up

20  there from 4:40 to somewhere in the 6-minute mark.

21          THE COURT:  So what would your client say about this

22  chart?

23          MS. IZMAYLOVA:  I mean, she's just saying that --

24          THE COURT:  Not as to what the video said.  She

25  didn't talk about the chart in the video, but if your client

1   was asked about this chart, what would she say?

2         MS. IZMAYLOVA:  That this is the definition of cold

3   sores that she relied on.

4         THE COURT:  That what?

5         MS. IZMAYLOVA:  That she re -- like, that it says

6   that cold sores are herpes because the whole thing is that

7   they're saying that she is, you know, alleging that the

8   plaintiff has, you know, genital herpes, which she does not

9   allege.  She always talks about the cold sores.

10        THE COURT:  Well, I mean, I'm not going to require

11  the defendant to take this out of the video.  This is what

12  they had in the video.  This video in part, I suppose, is part

13  of the slander that the plaintiff knocks the defendant for.

14  The defendant is able to say this is what I relied on.  Maybe

15  it was reasonable to rely on this.  Maybe it wasn't reasonable

16  to rely on this, but this is what she relied on.  So I'm not

17  going to require that that be taken out.

18        Any other parts of this video or is that it?

19        MS. MATZ:  No.  There are a couple of other parts.

20        THE COURT:  Of this video?

21        MS. MATZ:  Yes.  I will go ahead and skip 7:49

22  through 8:16 because it's honestly just a repetition of kind

23  of what we just saw, essentially.  So I don't think there's

24  anything new for the Court to rule on there.

25        Okay.  From 11:10 through 18:58 there is a long --

1  Ms. Kebe posts or depicts on the screen a Facebook post that

2  was allegedly posted by my client's husband's father and --

3        THE COURT:  By the father, the father of her husband?

4        MS. MATZ:  Yes, my client's father-in-law.

5        THE COURT:  All right.

6        MS. MATZ:  Where he is talking about drugs in the

7  household, feds kicking in his door regarding some type of

8  criminal allegation that was made against my client's husband,

9  and then talking about how --

10        THE COURT:  Was the criminal allegation drug-related?

11        MS. IZMAYLOVA:  He doesn't go into it.

12        THE COURT:  Okay.

13        MS. MATZ:  And I honestly don't think --

14        THE COURT:  What's the stage name or legal name of

15  the plaintiff's husband?

16        MS. IZMAYLOVA:  Offset.

17        THE COURT:  Offset.  Okay.  I've got Kulture down,

18  which is a pretty cool name I've got to admit.

19        MS. MATZ:  And then there's some commentary about

20  how -- she talks about how my client released pictures of

21  their daughter on Instagram out of spite and how my client is

22  racist and --

23        THE COURT:  I'm sorry.  What's this?  She put

24  pictures of her daughter on the internet or she released them.

25  What's the problem with that?

1          MS. MATZ:  Because she says she did it out of spite

2     and essentially because my client is racist.

3          THE COURT:  She, being the defendant, says your

4     client is racist because she released photos of the

5     plaintiff's daughter or of the defendant's daughter?

6          MS. MATZ:  Of my client's own daughter.

7          THE COURT:  She released pictures of her daughter and

8     that that made her racist?

9          MS. MATZ:  That's the implication that the defendant

10    makes.  She goes into a long tirade about how, you know -- I'm

11    sorry, your Honor.  Some of this language makes me a little

12    uncomfortable -- talking about how, you know, she doesn't like

13    chocolate people, and she doesn't like black people.  That's a

14    little later in the video.  These are kind of connected up.

15    And then there's -- in between there are also posts, other

16    social media posts, that we had specifically moved to exclude

17    that she puts up on the screen.  They're totally irrelevant.

18    There are other social media posts that have nothing to do

19    with the allegations in the case, the interactions between the

20    parties.  They're just -- in our motion in limine we

21    specifically moved to exclude these because they're --

22         THE COURT:  Social media posts where the plaintiff

23    and the defendant are communicating with each other or about

24    each other?

25         MS. MATZ:  No, not at all.  Social media posts where

1  my client is allegedly commenting on some other person's page,

2  and Ms. Kebe is essentially just ranting about how disgusting

3  it is that my client is calling a black child a monkey.  And

4  these were specifically mentioned in our motion in limine, and

5  they were specifically ruled out because they have nothing to

6  do with this.  This was part of the irrelevant social media

7  evidence that we had a long conversation about.

8          And so essentially they had put those posts in

9  physical form on their exhibit list, and they are in this

10  video being discussed.  So those are the kind of next three

11  issues.

12          THE COURT:  This is all included in a six-minute,

13  seven-minute clip?

14          MS. MATZ:  No, I'm sorry.  I just summarized the next

15  three issues because some of them were related and went back

16  to the three issues.  I can give your Honor the exact time

17  codes for which issues if you'd like.

18          THE COURT:  All right.  So let's isolate them if we

19  can.  So what is said about -- what is it that the defendant

20  says about -- well, let's see the social media post of the

21  father-in-law that you had problems with.

22          MS. MATZ:  Sure.  That starts at 11:10 and goes

23  through about 18:58, your Honor.

24          MS. IZMAYLOVA:  It's a long post.

25          THE COURT:  Is she talking about it while she's got

1    it up on the screen?

2            MS. MATZ:  Yes.  She's reading the whole thing.

3            THE COURT:  Okay.  Let's just see it.  I can read it.

4            (Whereupon, a video recording was played.)

5            THE COURT:  All right.  So, Ms. Izmaylova, this whole

6    part of this video, what would it be offered to support?

7            MS. IZMAYLOVA:  To support the -- corroborate the

8    allegation that plaintiff does drugs because she's got on the

9    stand already and denied that.  This is clearly coming from,

10   you know, a source who knows the plaintiff.  Also, it talks

11   about the fact that -- I mean, he mentions that they have

12   professionals that they don't use, like therapists and such,

13   even though there was testimony that, you know, that she goes

14   to therapy.

15           THE COURT:  I'm sorry.  I didn't understand that.  It

16   says they don't go to therapists?

17           MS. IZMAYLOVA:  That's what the post said.  They have

18   professionals at their disposal that they do not use.

19           THE COURT:  So you're questioning Dr. Sherry's

20   statements that she counseled the plaintiff over these

21   allegations?

22           MS. IZMAYLOVA:  I know -- based on the evidence that

23   we have, I know that she counseled her four times.  I don't

24   have any other document --

25           THE COURT:  Well, whatever she said, I mean, how many

1  times she said, she being Dr. Sherry, said that she had

2  provided counseling to the defendant both in New York and, I

3  guess, here in Atlanta, I'm not clear about whether that was

4  virtual or in person.  But whatever she said, she said.

5  You're questioning whether Dr. Sherry is telling the truth

6  about that?

7       MS. IZMAYLOVA:  No.  I'm not saying she's not telling

8  the truth about those four times.  I'm saying because

9  plaintiff has an IIED claim, you know --

10       THE COURT:  Because?

11       MS. IZMAYLOVA:  I'm sorry.  Intentional infliction of

12  emotional distress claim.  And, you know, for -- you know, for

13  me our argument is going to be that that's not -- four times

14  or however many, the little isolated times that she saw, I

15  don't think it's enough to prove, you know, intentional

16  infliction of emotional distress coupled with the fact that

17  now her father-in-law is saying that they don't really use the

18  professional help that they have around them.

19       THE COURT:  I mean, that's some weird logic there.  I

20  mean, the plaintiff has testified that she got some counseling

21  from Dr. Sherry.  Dr. Sherry has testified that she provided

22  some counseling to the plaintiff.  I understand your argument

23  that that's not enough to really show that she had the extreme

24  outrageous emotional distress that that tort supports, but I'm

25  not real sure how this post does anything with regard to that

1   in saying that they have other, they being Offset and Cardi B,

2   have other counselors, I guess, available to them that they

3   don't utilize.  That doesn't seem to be in dispute because the

4   plaintiff has testified to what she received and nothing more

5   than that.

6          The drug part, okay, maybe but probably that's a

7   stretch to say that the father is definitely saying that Cardi

8   B uses drugs.  The words "drugs" are used in a very generic

9   term or way, and he seems to be mainly talking about his son.

10  But to the extent that you would say, okay, but that's what my

11  client relied on to say that the plaintiff had a drug problem,

12  okay, I don't know that I agree with the logic of her

13  decision.  But I see your point there.

14         What else would this post -- would this -- I guess it

15  was Facebook -- this post or text or whatever from the

16  father-in-law support?

17         MS. IZMAYLOVA:  Yes, sir.  Just to -- this video was

18  made in December of 2018, so it also goes to basically

19  explain.  Like, these things were going on in plaintiff's

20  personal life, and he mentions in there, you know, things

21  about depression and stuff like that.  She said that she's

22  depressed because of my client, my client only, you know, my

23  client was the first person to do all these things or say all

24  these things, but clearly she's having marital problems.

25  There's --

1          THE COURT:  Yeah, okay.  That is so legally wrong for

2     you to make that argument that you can provide a hearsay

3     statement from someone to support your claim that she was

4     obviously having mental distress from other purposes.  You

5     would be using hearsay to try to negate the plaintiff's own

6     testimony that she was having problems.  That is classically

7     illegally wrong under the Federal Rules of Evidence.

8          MS. IZMAYLOVA:  How is it not impeachment testimony

9     when she said that the only reason she's depressed is because

10    of my client?

11         THE COURT:  Because it's not admissible for that

12    purpose is why.  If you brought the father in and he was on

13    the stand testifying to what he personally knew and could be

14    cross-examined, then maybe, but you're not doing that.  You're

15    trying to use a hearsay statement written by someone who's not

16    in court to try to counteract and counterargue the plaintiff's

17    argument that was provided through testimony in court, that

18    she suffered mental, you know, mental anguish based on what

19    your client has said.

20         You want to say, no, it's not because of what my

21    client said, it's because of all this other stuff going on in

22    your life.  Well, how do we know about this other stuff that's

23    going on in your life?  Because it was written about in a post

24    by someone who doesn't come into court and testify.  It's not

25    admissible for that purpose.  You should have learned that in

1  evidence class your first year in law school.  I mean, come

2  on.

3          I understand your argument as it relates to your

4  client's state of mind when she said what she said.  Cardi B

5  uses drugs because -- and how do you -- what did you rely on?

6  Well, I relied on this post that I saw.  But you can't use

7  that post to prove the truth of the matter which was asserted

8  in the post.  I mean, that's classic hearsay.  Look up the

9  definition.  Anything else?

10         MS. IZMAYLOVA:  No.

11         THE COURT:  Okay.  Yes, ma'am.

12         MS. MATZ:  I just wanted to clarify, your Honor.

13  That post is actually my client's stepdad-in-law.  I misspoke.

14  So I just wanted to clarify that.

15         THE COURT:  Stepdad-in-law.

16         MS. MATZ:  Yes, my client's husband's stepfather.

17         THE COURT:  Your client's husband's stepfather

18  married to your client's mother?  Your client's husband's

19  mother?

20         MS. MATZ:  I believe so.

21         THE COURT:  I don't know that that really changes

22  anything.

23         MS. MATZ:  No, it doesn't really matter.  My point

24  was that post was actually -- it wasn't even authored before

25  the Starmarie Jones video.  The Starmarie Jones video was in

1   September.  We're talking about something that occurred in

2   December so it couldn't have been --

3           THE COURT:  Continued to say all these things even

4   after the post was issued; right?

5           MS. MATZ:  Most of them, yes.

6           THE COURT:  I mean, I can't cut the legs out from

7   under the defendant.  The defendant says when I said some of

8   the time that the plaintiff was using drugs, I was relying on

9   this post.  Is that a reasonable interpretation of what was

10  there?  I don't know.  I mean, I wouldn't say it based on

11  reading something from somebody I had never met that may or

12  may not even have a relationship with the person for whom I'm

13  going to say something about.

14          I probably wouldn't be very sympathetic to that

15  defense if I was on the jury, but I can't say that a juror

16  might not be sympathetic to it and believe it.  So I can't

17  rule it out.  But I am not going to allow the defendant to

18  argue that the things that the plaintiff -- the things that

19  the writer, the stepfather-in-law, said is true because he

20  wrote it.  If you argue that before the jury, I am going to

21  correct you in front of the jury in harsh tones.  Look up the

22  definition of hearsay.  It's not admissible for that purpose.

23          The only purpose it would be admissible for would be

24  for at least some of the time when your client said what she

25  said about drug use, this provided me with the reason why I

1  might have said it.  But then, of course, that gets debunked

2  if, in fact, she had already said that the plaintiff used

3  drugs before.  Then did she really rely on this?  From a

4  timing perspective maybe she did on some of them, but the jury

5  will have to make that decision.  So I can't rule this post

6  out.

7          I think it's -- I think it truly shows the character

8  of the defendant generally, I mean, I'll say whatever I want

9  to say whenever I want to say it for whatever reason I want to

10 say it if it makes me money.  So but I guess my point is from

11 that perspective, I think the whole video is arguably more

12 supportive of the plaintiff's overall theme, which is that the

13 defendant engages in slanderous conduct, than it is a defense

14 of defendant.

15         MS. MATZ:  Your Honor, could it be -- could the

16 ruling be -- I mean, she does say the part about the drugs

17 early on.  Could it be split so that the second screens where

18 they're talking about feds kicking in doors and guns in

19 children's faces not come in?

20         THE COURT:  She never says that about -- there's

21 nothing about that that implicates your client in any way.

22 I'm not going to make them chop it up for no reason.  I mean,

23 it's only very -- it's only with a very liberal interpretation

24 of it that it even attributes drugs to your client.  But I

25 certainly didn't see anything else about that that would be

1  attributable to your client.  I mean, like the feds thing was

2  totally related to the son -- the stepson, I guess.

3          MS. MATZ:  I guess the only thing I'd ask is that

4  your Honor just give a limiting instruction to the jury

5  regarding hearsay similar to what you did with some of the

6  comments when they were with our client's -- excuse me -- when

7  they were with defendant's posts, that there just be some sort

8  of an instruction that it's not being admitted for the truth

9  of the things that are in the post.

10         THE COURT:  What about that, Ms. Izmaylova?

11         MS. IZMAYLOVA:  That's fine.

12         THE COURT:  All right.  So alert me before you play

13  this video.

14         MS. IZMAYLOVA:  Yes, sir.

15         THE COURT:  And I will give a limiting instruction on

16  hearsay.

17         MS. MATZ:  Thank you, your Honor.  We appreciate

18  that.

19         THE COURT:  Anything else?

20         MS. MATZ:  Yes.  There are three more.  I'd like to

21  deal with the last few first because those were the ones I

22  kind of described.  This is completely unrelated and

23  irrelevant social media comments where Ms. Kebe is accusing my

24  client of being racist where the comments themselves were

25  actually already ruled out by the Court.  We can start that at

```
1   22:24.

2          THE COURT:  How long is it?

3          MS. MATZ:  This one is 4 minutes, and then the next

4   one is approximately 2 and a half minutes.

5          THE COURT:  Okay.  Let's just watch both of them, and

6   then we'll talk about them.

7          (Whereupon, a video recording was played.)

8          THE COURT:  All right.  So, Ms. Izmaylova, what

9   relevance does this video have to your claims in this case?

10         MS. MATZ:  Did you want to see both, your Honor?  I'm

11  sorry.  I don't want to interrupt you --

12         THE COURT:  No, I want to talk about this before I

13  forget it all.

14         MS. MATZ:  Okay.  Go ahead.

15         MS. IZMAYLOVA:  Well, there's been allegations made

16  that my client talks negatively or reports negatively about

17  the plaintiff's child, and she specifically here, you know,

18  only says positive things about the child, that --

19         THE COURT:  Talks about positive things about whose

20  child?  About her --

21         MS. IZMAYLOVA:  About the plaintiff's child.

22         THE COURT:  What did she say that was positive about

23  the plaintiff's child?

24         MS. IZMAYLOVA:  That she's beautiful, that she's, you

25  know, a pretty baby, you know, that type of thing.  But
```

1  overall also -- I mean, it also explains why Ms. Kebe does

2  make, you know, in general, like, still a report on the

3  plaintiff.  I mean, she gives an explanation.  She's a public

4  figure.  This is what she's doing.  This is the behavior that

5  she's, you know, teaching to her fans who are young and kids,

6  and so she explains all of that.  And so --

7       THE COURT:  Explained her logic for why she can say

8  what she wants to say, because Cardi B, the plaintiff, is a

9  public figure?

10      MS. IZMAYLOVA:  Not say what she wants to say, but

11  she's saying that people -- you know, there's people saying

12  I'm harassing her, which is also what plaintiff testified to,

13  that, you know, that my client was harassing her.  She was

14  harassing her friends --

15      THE COURT:  Comments that she was making about her,

16  right, that she was sued for.

17      MS. IZMAYLOVA:  Right.  But this is also explaining

18  her state of mind and what -- you know, why she's doing what

19  she's doing like --

20      THE COURT:  You think this video is good for your

21  client as to your client's state of mind?  Really?

22      MS. IZMAYLOVA:  Yes, I do, because she is genuinely

23  saying what it is that -- like, what she's reporting on and

24  why she thinks whatever she thinks about the plaintiff.  Yes,

25  I do, and I think that the jury should see it because it goes

1  to her defense.

2         THE COURT:  It goes to her defense how?

3         MS. IZMAYLOVA:  Because it explains her state of mind

4  at the time that all these things was -- this is from 2018,

5  like I said.

6         THE COURT:  This video explains your client's state

7  of mind about what?

8         MS. IZMAYLOVA:  About the plaintiff.

9         THE COURT:  In what way?

10         MS. IZMAYLOVA:  I'm not sure what the question is.

11         THE COURT:  You said that it explains your client's

12  state of mind about the plaintiff.  In what way does it do

13  that?

14         MS. IZMAYLOVA:  I mean, she just like -- this is part

15  of what she thinks about the plaintiff and why she thinks

16  those things.

17         THE COURT:  She thinks the plaintiff is bad.  She

18  thinks the plaintiff is bad because she engages with a fan and

19  said mean stuff to a fan.  That provides a defense to your

20  client's -- to the claims that your client defamed the

21  plaintiff?  That your client believes that the plaintiff is

22  bad because she engages with fans at times in a negative way?

23         MS. IZMAYLOVA:  I mean, I think that the jury should

24  know that this is what -- like, if they don't see all of the

25  interactions or the full story, then how are they supposed to

1  determine whether or not my client had actual malice toward

2  the plaintiff or not?  That's what I'm not understanding.

3         THE COURT:  Your client is charged with saying things

4  that are untrue about the plaintiff.  We don't even get to

5  malice unless and until there's a decision made that your

6  client did say things that were untrue about the plaintiff.

7  Then we get to did she have malice when she said those things.

8         MS. IZMAYLOVA:  Right.

9         THE COURT:  And this video we just watched would

10 negate the plaintiff's contention that your client had malice

11 how?  How would this video, in other words, negate that your

12 client had malice towards the plaintiff when she said the

13 things that were slanderous if we assume that they were for

14 discussion purposes against the plaintiff?  Would argue that

15 it shows that your client does have malice because your client

16 has just ranted and raved about how she believes that the

17 plaintiff engages wrongfully with her fans and says really

18 mean things to her fans.

19        Now, that might be the reason that your client said

20 the things that she said that a jury may determine to be

21 slanderous, but it doesn't negate malice.  It actually

22 supports that there was malice.  I don't like Cardi B because

23 she says racist things, and she says mean things to other

24 people, it sounds like.  And I'm not personally saying that.

25 I'm just trying to summarize the way I interpret what you're

1  saying.  And that to me is almost the definition of malice.  I

2  don't like her because this is the stuff that she does, and so

3  I'm going to go out and say stuff that is not true about her.

4       Now, I understand your client says that the things I

5  said weren't true, but if the jury assumes that they're true

6  or decides that they're true, then they move on to malice and

7  they look at did she have maliciousness of her heart when she

8  said what she said?  The video kind of shows that.  It doesn't

9  show otherwise, I don't believe, and it -- and then another

10 question, I guess, is, well, if they don't decide the malice

11 issue, is whether she recklessly disregarded and reasonably

12 relied upon the information she received.

13      But you stand by your position that this video

14 undercuts the malice decision that the jury may have to make?

15      MS. IZMAYLOVA:  I mean --

16      THE COURT:  You've got to argue to a jury somehow

17 someday.

18      MS. IZMAYLOVA:  I know that.  And specifically --

19 maybe not specifically to those statements that we're talking

20 about, but I think that it goes -- I think that it will

21 provide the jury, like, a fuller picture of what's going on at

22 this time.

23      THE COURT:  Well, it certainly provides the complete

24 picture of what's going on, but it's got to be both relevant

25 and not prejudicial.  And there is prejudicial stuff in it

1    because the comments that were made by the plaintiff to the

2    fan are not good.  They're pretty abhorrent.  You know, I

3    think the jury could reach that conclusion, and so the

4    question then becomes is, well, if those statements would put

5    the plaintiff in a bad light, then does that outweigh the

6    relevance.

7            I'm not even sure I even see the relevance because

8    you wanted to introduce it, I guess, to try to negate the

9    malice component of a defamation claim, and I don't see how

10   arguably they do anything but support the malice component.

11   And the plaintiff doesn't want it in because it's prejudicial

12   to how the jury may view her as an individual.  And, thus, if

13   they don't like her, like your client obviously doesn't per

14   the discussion here on this video -- I recognize she could be

15   performing, and it may not be her personal views -- but it is

16   what it is.

17           I don't know that any relevancy it has outweighs the

18   prejudicial harm that would occur to the jury deciding they

19   don't like the plaintiff because she may have said these

20   things to this fan.  That's why -- I mean, you seem to be

21   incredulous that I'm asking you how is it relevant.  Well, I'm

22   asking you how is it relevant because that's part of the test,

23   and it's certainly not relevant to show a lack of malice

24   because I don't think a reasonable juror could look at that

25   and say, oh, that shows that it wasn't malicious.  That shows

1   that what the defendant said wasn't malicious because it's not

2   supportive of the plaintiff.  It's actually very critical of

3   the plaintiff.

4           So I'll give you another opportunity.  If I'm missing

5   something, tell me about how it's relevant to the issues that

6   the jury has to decide because that's part of the -- that's

7   part of the 403 analysis, is that inherently that it's got to

8   be somehow helpful for the decisions the jury has to make.

9           I'm going to read 403 again.  The Court may exclude

10  relevant evidence -- I assume that it's relevant for the

11  analysis that I'm doing right this second -- if its probative

12  value is substantially outweighed by a danger of one or more

13  of the following:  Unfair prejudice, confusing the issues,

14  misleading the jury, undue delay, wasting time or needlessly

15  presenting cumulative evidence.

16          And I think, again, that the issues here are unfair

17  prejudice and confusing the issue.  Maybe misleading the jury,

18  but I'm not sure that that's really implicated.

19          So anything else you'd like to say?

20          MS. IZMAYLOVA:  Well, the jury is also going to have

21  to decide, you know, damages and the intentional infliction of

22  emotional distress claim.  And for them to not know at all

23  that this is like -- this is the -- they should know the kind

24  of person that the plaintiff is when they are determining

25  whether or not she's been damaged.  She's claimed that my

1   client -- one of the things she said was that my client got

2   online and, you know, talked negatively about her daughter and

3   her family, but this is the kind of things that she does.  So

4   how could she then turn around and say she's been damaged by

5   this video or any of the videos that my client made when this

6   is the kind of person that she is?  That's the relevance for

7   the jury, in my mind.

8          I feel like they should see the fuller picture

9   because now it seems like only my client is just reaching out

10  to the plaintiff and just harassing her.  That's kind of the,

11  you know, the story the plaintiff has told.  Now it's our turn

12  to tell our side of the story, and I feel like the jury

13  deserves to know the full picture.

14         I understand that, you know, the criminal activity,

15  the gang stuff that's not mentioned.  We redacted this video.

16  About half of the video has been redacted even before

17  yesterday to take all that stuff out, but some of these things

18  are still relevant for the jury's decision.  They cannot just

19  decide based on what they saw on the stand because that was

20  not the person who plaintiff really is.  I think that's not

21  fair.

22         THE COURT:  All right.  Thank you.  Yes, ma'am.

23         MS. MATZ:  So essentially what Ms. Izmaylova is

24  arguing is that they are trying to prove up other bad acts to

25  honestly, quite frankly, to prejudice the jury and to poison

1   the jury.  I mean, we're talking about -- first of all, this
2   is her interpretation of what's going on.  She says a lot of
3   things that aren't even necessarily on screen, and then she's
4   talking about my client, you know, being racist and
5   congratulating people on dead babies.  I mean, it is so highly
6   inflammatory and has nothing do with this case.
7          We're talking about defamation, defamation
8   allegations that Ms. Kebe made false statements that my client
9   has herpes, has HPV, engaged in lewd acts with a beer bottle,
10  cheated on her husband.  I mean, this is what we're talking
11  about -- and was a prostitute.  Excuse me.  I don't want to
12  leave off the last one.  We are not talking about this other
13  stuff.  This is totally irrelevant and for them to be allowed
14  to introduce everything my client has ever said on social
15  media when they are literally picking the most highly
16  prejudicial examples and to intentionally poison the jury is
17  completely and fundamentally unfair.
18         THE COURT:  So what is the other part, the other
19  video going to show?  Similar kind of stuff?
20         MS. MATZ:  Yeah, it is.  If you want -- if this is
21  a --
22         THE COURT:  I'm going to want to look at it, so let's
23  go ahead and look at it now.
24         MS. MATZ:  Sure.  It's 27:45 through approximately
25  29:38.

1          (Whereupon, a video recording was played.)

2          THE COURT:  Hold on just a second.  If we can let the

3   jury -- it's 12:30 now.  We've got this clip, and there's one

4   more to look at; is that right?

5          MS. MATZ:  There's a very short one in this video,

6   but then there is another longer video that is -- has a lot of

7   other information in it.

8          THE COURT:  How long is it?

9          MS. MATZ:  I believe that one -- that one, honestly,

10  we're objecting to the entire video, and it's 18 minutes long.

11         THE COURT:  18 minutes long?

12         MS. MATZ:  Yeah, 18 minutes long.

13         THE COURT:  Let's excuse the jury till 1:30, and I'll

14  apologize to them when I see them.  Won't make them feel any

15  better but all right.  Let's go ahead.  I'm sorry.

16         (Whereupon, a video recording was played.)

17         THE COURT:  All right.  So, Ms. Izmaylova, what does

18  this go to, this whole discussion?  It seems like the

19  overriding theme is that plaintiff doesn't like black people.

20         MS. IZMAYLOVA:  Right.  So it also goes to the motive

21  of why she sued Ms. Kebe.  We already talked about this.

22         THE COURT:  Motive of why she what?

23         MS. IZMAYLOVA:  Why she, you know, sued Ms. Kebe.

24  This was before this lawsuit was filed.

25         THE COURT:  That she sued Ms. Kebe --

```
 1              MS. IZMAYLOVA:  She doesn't like her.  I mean, that's
 2    what she said.
 3              THE COURT:  Because she's black?
 4              MS. IZMAYLOVA:  Because she doesn't like her.
 5              THE COURT:  Because this video came out?
 6              MS. IZMAYLOVA:  Well, not just this video, obviously.
 7    There's been other videos.
 8              THE COURT:  I'm sorry.  I don't follow.  So your
 9    argument is that she really is not slandered or damaged but
10    that she just doesn't like her because of the fact that your
11    client put out the videos or because she doesn't, she being
12    the plaintiff, doesn't like black/African American people?
13              MS. IZMAYLOVA:  That she doesn't like black people
14    and also that -- because she can't put her hands on her.  That
15    was the whole -- you know, the other videos we've already
16    discussed.
17              THE COURT:  Well, that wasn't in this video; right?
18              MS. IZMAYLOVA:  Not by video.  That was a different
19    video.
20              THE COURT:  She doesn't like black people because
21    your client says in your client's video that she doesn't like
22    black people?
23              MS. IZMAYLOVA:  I mean, she --
24              THE COURT:  So this is proof, this video is proof,
25    that the plaintiff doesn't like black people because your
```

1   client said it.

2          MS. IZMAYLOVA:  She's not just saying it out of

3   nowhere.  I mean, she's basing it off stuff that the plaintiff

4   has posted previously and other interactions she's had.  You

5   know, this is not the first time that my client says it

6   because it's not --

7          THE COURT:  Okay.  All right.  If we assume for a

8   minute that your client is entitled to prove that plaintiff

9   doesn't like black people, that that's somehow an element of

10  the case, can we agree that your client doing a video and

11  saying that the plaintiff doesn't like black people would not

12  be admissible for the proposition that the plaintiff doesn't

13  like black people?

14          I remember when I was in law school, I was not on law

15  review.  I did moot court and mock trial instead.  But my

16  roommate did law review, and I can remember him bringing me a

17  note his first year in law review where there was a certain

18  professor that we didn't like.  And he was reviewing a law

19  review article that the professor had written where the

20  professor was making a statement, and he was citing his

21  proposition for why the statement was true, a letter to the

22  editor that he himself wrote.  And it was published in the New

23  York Times.

24          And we thought what a joke that is that you can say

25  something is true, and then you can quote yourself for it

1  being true.  I mean, this is very similar to that.  Your

2  client is not the authority on whether or not the plaintiff is

3  a racist or not, if we assume that that's relevant anyway.

4          MS. IZMAYLOVA:  But if she believes that, if my

5  client believes that and this is, you know, this is where --

6          THE COURT:  So does your client believing that the

7  plaintiff is a racist provide her with a defense to go out and

8  say something that's not true against the plaintiff?

9          MS. IZMAYLOVA:  No, but it explains maybe potentially

10  some -- we're not saying that she's saying anything untrue,

11  okay, just for the record.  What I'm saying is --

12          THE COURT:  I know that but -- I know that's what

13  your contention is.  But if we get to where it matters,

14  there's been a determination by the jury that what your client

15  has said is not true and then they try to determine, well, are

16  there any defenses to that, well, if the plaintiff is a

17  racist, that doesn't provide a defense to go out and say

18  something untrue about anyone; right?  Under Georgia law?

19          MS. IZMAYLOVA:  Correct.

20          THE COURT:  And so this video is your client

21  providing commentary that -- and maybe using some examples

22  about why she's providing commentary to her belief that the

23  plaintiff is a racist.  That's not relevant to the claim of

24  slander, intentional infliction of emotional distress,

25  invasion of privacy, false light.  It's not an element of any

1  of those things, is it?

2          MS. IZMAYLOVA:  No.

3          THE COURT:  It's inadmissible.  It doesn't come in.

4  It's got to serve a purpose.  But I'll tell you what, if it

5  were me, this particular clip, if I'm the plaintiff, I let it

6  come in because I think it supports everything about the

7  malice that the plaintiff is alleging.  The other one I can

8  understand the plaintiff not wanting to come in because it

9  includes the mean stuff that the plaintiff said about someone

10 else that she engaged with online.  But this is just your

11 client talking and demonstrating her maliciousness throughout.

12 So it's not coming in.  The plaintiff has objected, and their

13 objection is valid.  It's out.

14         All right.  So we have another video to look at

15 completely; right?  Oh, I didn't rule on the first one.  The

16 first one -- let me go back and read my notes.

17         (Brief Pause.)

18         THE COURT:  The first video we looked at in this

19 sequence is also ruled out by the Court.  It's not admissible

20 for any purpose.  It's prejudicial and really has no relevance

21 to the issues in this lawsuit.  So both of the last two clips

22 we've seen are not admissible.  All right.  Let's look at the

23 next one.

24         MS. MATZ:  The next one is -- there is one other clip

25 in this video.  It's very short, and I'll just explain the

1  reference to your Honor.  When Ms. Izmaylova showed the video

2  of my client with a towel on her head -- she was getting

3  ready -- to my client, there was a limitation on what could be

4  played from that video, to keep out gang references and things

5  like that.  Part of that video is also in here, and I believe

6  it's been edited to not include anything that the Court said

7  couldn't be in.

8         But Ms. Kebe does make a comment about that video

9  later in this video about something like -- and I'm

10 paraphrasing from my notes and I will play it in a moment --

11 something about plaintiff is going to lose her life, how are

12 you going to raise your kids if you're out there jumping on

13 people.  We just want to make sure -- I'm not sure it needs to

14 be in here, but we just want to make sure also that this isn't

15 parlayed into some ability for them to try to elicit any

16 testimony about gang references or anything else from their

17 client on the stand if this is played.  21:08 through 22

18 seconds.  So it's approximately -- I'm not going to try to

19 subtract.

20         (Whereupon, a video recording was played.)

21         THE COURT:  So your concern is that you don't want

22 them to use that to open the door for arguments about gang

23 or -- it's not even really how I interpret that clip.  I

24 interpret jumping on other people to be figuratively, you

25 know, by saying that stuff about people when they criticize

1   you.

2         MS. MATZ:  Yeah, I hear you, your Honor.  My concern

3   is that, you know, at every turn in this case with their

4   counterclaims they were trying to use that video as a gang

5   reference.  And, yes, my concern is that I do not want them

6   trying to open the door and saying, oh, they opened the door

7   by letting her say that and trying to elicit some kind of

8   testimony that went further than that.  That is my concern.

9         THE COURT:  We're not talking about any contention

10  that the defendant has that the plaintiff is in a gang.  That

11  is at best -- and I put best in quotes -- speculation on the

12  part of the defendant.  It's not provable in any sense, but

13  it's based on the evidence.  And we're not talking about gang

14  in any way.

15        All right.  Go on to the next one.

16        MS. MATZ:  All right.  So the next one is the longer

17  video.  So just for the record the -- for D-34, provided it's

18  authenticated, we're not going to have any objections to any

19  specific time clips for that one.  And then --

20        MS. IZMAYLOVA:  Could I briefly object to that, your

21  Honor?  That D-34 is the video of the beer bottle that I

22  thought --

23        THE COURT:  It's coming in?

24        MS. IZMAYLOVA:  I thought the plaintiff has already

25  said it's coming in, so I don't know what this provided it's

1  authenticated thing is.

2           THE COURT:  She's not objecting to it.

3           MS. MATZ:  So I'm assuming they're going to show it

4  to their client and say is this the video you saw on the

5  internet, and then she's going to authenticate it.  So if she

6  authenticates --

7           THE COURT:  By authenticate it, then this is the

8  video I saw, that I relied on when I said what I said?

9           MS. MATZ:  Yeah.  It was on their pretrial order list

10 but it was not --

11          THE COURT:  I'm not sure that we're arguing about

12 anything.  Is the defendant going to play that video?

13          MS. IZMAYLOVA:  Yeah, we are.  I just want to make

14 sure that they remember what they said at the pretrial

15 conference about this video.

16          THE COURT:  That what?

17          MS. IZMAYLOVA:  That they're not going to object to

18 it coming in because they know --

19          THE COURT:  I don't think they are objecting to it.

20          MS. IZMAYLOVA:  Okay.

21          THE COURT:  Is plaintiff objecting to the Porn hub

22 video coming in?

23          MS. MATZ:  No, as long as she authenticates it and

24 says it's a video she saw.

25          THE COURT:  I'm sure she's going to.

1          MS. IZMAYLOVA:  Obviously --

2          MS. MATZ:  I'm just saying we didn't have it when we

3   deposed her, so that's all.  Assuming that happens, we don't

4   have an issue.

5          THE COURT:  I don't think we're really arguing about

6   anything here.

7          MS. MATZ:  No.  And then just to get it out of the

8   way for P-592, for the specific 28-second clip that they're

9   playing, we didn't have an issue with that.  I actually think

10  I already played it for the jury, so that's not an issue.

11         So the last one is P-531, and so this was not

12  actually on their pretrial order.  This was on ours.  We did

13  not introduce it, however.  Obviously, at the time we made

14  exhibit lists we didn't know what was coming in and what

15  wasn't coming in and there was a -- I'm not going to explain

16  the purpose that we were potentially going to use this, but it

17  has a lot of highly prejudicial stuff throughout the

18  beginning.

19         And it's essentially -- it's Ms. Kebe talking

20  about -- at the very beginning she makes a comment about

21  Azealia Banks saying that my client has cold sores and that

22  Azealia Banks called my client ugly without make-up on and

23  looks like a big toe.  But the issue is that beyond that, then

24  she goes on to essentially read -- and I don't know what she's

25  reading from -- but read some back and forth online between,

1  allegedly, between Azealia Banks and my client and again

2  brings up all of this, you know, racial undertones and

3  essentially calling my client -- she's kind of calling my

4  client racist and reading what Azealia Banks is saying.  So

5  the entire piece in the middle, it just doesn't have any

6  relevance to this case.

7       I don't know what it could possibly be relevant to

8  other than them trying, well, that's not relevant.  I don't

9  know why they're trying to play it other than to just

10  prejudice the jury and introduce other online -- you know,

11  other incidents with completely unrelated parties that have

12  nothing to do with this.

13       THE COURT:  So you talked the beginning, and you

14  talked about the middle.  What's on the end?

15       MS. MATZ:  Oh.  At the end there's a small trailer

16  where she's plugging wine and using it as an advertising

17  platform.

18       THE COURT:  All right.  So let's start it then from

19  after the Azealia Banks discussion about the cold sores or the

20  make-up.  You've already said that's been played.  Start it

21  from the point that has not been played.

22       MS. MATZ:  I don't think it's been played.  It's been

23  mentioned.  That was not played.

24       THE COURT:  Let's just start it from the beginning

25  then.  How long is it?

1          MS. MATZ:  It's 18 minutes long.  We get to the part
2     at the end at about the 15-minute mark and the part at the
3     beginning where --
4          THE COURT:  I'm sorry.  You get to what at the
5     15-minute mark?
6          MS. MATZ:  The part about the advertising.
7          THE COURT:  Okay.
8          MS. MATZ:  Really the only non-objectionable piece.
9          THE COURT:  Okay.  Well, the stuff about the cold
10    sores, or whatever, are you saying that's not -- are you
11    saying that's objectionable?
12         MS. MATZ:  This video was not on their list, so we've
13    objected on that ground.  However --
14         THE COURT:  It was on your list.
15         MS. MATZ:  No, I understand that, but that's very
16    short at the beginning.  It's like around the 28-second mark.
17    So if that was all they were playing, maybe it would be
18    relevant.  Why don't we just play it.
19         THE COURT:  Other than the part about the plaintiff's
20    appearance that arguably would be supportive of a claim that
21    she had herpes, what is the reason for the rest of the video,
22    Ms. Izmaylova?
23         MS. IZMAYLOVA:  Your Honor, I don't know if you
24    recall.  I had asked the plaintiff when she was on the stand,
25    about her online feud with Azealia Banks and that is -- this

1  video just is proof of that feud.  It's like them going back

2  and forth with one another and then the plaintiff --

3         THE COURT:  And they're going back and forth about

4  what?

5         MS. IZMAYLOVA:  About -- I mean, about, like, they're

6  just going back and forth to -- it's, like, long, very long

7  messages.

8         THE COURT:  But what's that relevant to?

9         MS. IZMAYLOVA:  Well, because in some of the messages

10  Azealia Banks does state, you know, that the plaintiff has

11  cold sores allegedly --

12        THE COURT:  But beyond that what's it relevant to?

13        MS. IZMAYLOVA:  I mean, nothing really just except --

14  again, the fuller version of their online feud and then after

15  that --

16        THE COURT:  Their online feud.  Who's their?

17        MS. IZMAYLOVA:  The plaintiff and Azealia Banks.

18        THE COURT:  But what is that relevant to?  I mean,

19  that's my point.  What does any feud that the plaintiff has

20  with Azealia Banks, what is that relevant to with the issues

21  in this lawsuit?

22        MS. IZMAYLOVA:  I'm sorry?

23        THE COURT:  What is it relevant -- the plaintiff's

24  so-called feud with -- Amelia?  Azealia Banks --

25        MS. IZMAYLOVA:  Azealia.

1          THE COURT:  -- Azealia Banks, what could that dispute

2    have relevance to that's in this lawsuit?  Slander?

3    Intentional infliction?  Invasion of privacy?

4          MS. IZMAYLOVA:  The slander because the testimony

5    that came out was that my client was the first person that,

6    you know, had said these things about plaintiff, and that's

7    not the case, as shown by this -- because this happened before

8    the Starmarie Jones interview had come out.

9          THE COURT:  Okay.  As it relates to whether or not

10   she has herpes --

11         MS. IZMAYLOVA:  Yeah.

12         THE COURT:  -- at the beginning of the video, but the

13   rest of the video, does that have anything to do with the

14   issues in this lawsuit?

15         MS. IZMAYLOVA:  Well, I mean, it shows the interview

16   that Azealia Banks did with Breakfast Club, and the plaintiff,

17   I believe, stated that Azealia Banks apologized to her.  But

18   that video does not -- disproves that testimony basically.

19         THE COURT:  Still trying to understand the relevance.

20   What's it relevant to as far as the plaintiff's claims against

21   your client?  Not about the cold sores but the other stuff

22   talked about.  How is it relevant to whether or not your

23   client committed slander, invaded her privacy or intentional

24   infliction of emotional distress?

25         MS. IZMAYLOVA:  I mean, I think that the part that's

1   relevant is about the cold sores.

2          THE COURT:  Then let's see that first.  Let's play

3   that.

4          MS. MATZ:  Sure.  That's -- I believe it's like a

5   two- or three-second clip starting around second mark 28, your

6   Honor.  And, your Honor, just one quick thing.  This does not

7   show the interview Ms. Izmaylova just mentioned, and that's

8   actually not the testimony my client gave about Azealia Banks.

9   But we can get to it if we have to.  Go ahead.

10          (Whereupon, a video recording was played.)

11          THE COURT:  All right.  So that's the end of that?

12          MS. MATZ:  Pretty much, your Honor.  And, I mean, my

13   client already admitted that that happened on the stand but --

14          THE COURT:  Well, that can't pretermit its

15   introduction necessarily, so that part I don't have a problem

16   with if the defense wants to play that.  Just go ahead and

17   play the rest of it.

18          (Whereupon, a video recording was played.)

19          THE COURT:  How much longer is it?

20          MS. MATZ:  We're at 10 minutes.  It's about 5 minutes

21   longer.

22          THE COURT:  Okay.  Anything more?  I mean, is it the

23   same --

24          MS. MATZ:  It's more of the same talk, but she goes

25   into talking about more of the racism and more of her opinions

1  about being racist.

2       THE COURT:  All right.  Let me do this.  It just

3  dawned on me that we had not taken a break since we've been in

4  here, and I'm sure plenty of people need a break.  So we'll

5  take a break, and we'll come back in ten minutes.

6       MS. MATZ:  Your Honor, just one thing.  I just wanted

7  to correct one thing I said.  It did contain a clip from the

8  Breakfast Club interview.  It didn't contain a clip where she

9  said the part about cold sores, so I just wanted to make sure

10  it was clear with the Court.

11       THE COURT:  I'm sorry.  I don't understand.

12       MS. MATZ:  I said it did contain clips from the

13  Breakfast Club interview.  It just didn't contain the

14  statements from Azealia that she had cold sores.  I just

15  wanted to make that correction.

16       THE COURT:  All right.  Thank you.  So 10-minute

17  break.

18       COURTROOM SECURITY OFFICER:  All rise.  This Court is

19  in recess for 10 minutes.

20       (Brief recess.)

21       THE COURT:  Thank you.  You may be seated.

22       COURTROOM SECURITY OFFICER:  Please be seated and

23  come to order.

24       THE COURT:  So on a couple of matters.  We're going

25  to continue with the trial.  We're going to excuse

 1   Ms. Richardson, and we're going to continue with the eight

 2   jurors that we have, assuming that the jurors are all

 3   comfortable moving forward with the case.  If I have any

 4   jurors that are not, then we would take a time out of the

 5   trial and come back to it relatively soon, but I can't say

 6   exactly when that will be.  I'll have to look at my calendar

 7   and see when it would best fit.

 8           As it relates to what we've been talking about this

 9   morning, one thing that Ms. Izmaylova said sort of at the

10   beginning of our colloquy about the relevancy of some of these

11   videos -- and I'm going to be paraphrasing what she said.  But

12   that essentially it's important for the jury to understand who

13   the plaintiff is as it relates to the issue of damages.  You

14   know, I think that's probably right.  The plaintiff that

15   testified on the stand is not certainly the plaintiff in the

16   videos, not the same person in the videos that I've seen so

17   far, the snippets, not been a lot but there's been some.

18           And while I don't, you know, particularly listen to

19   hip hop or rap music, I do sometimes, and so I'm familiar with

20   her work generally.  And, you know, it's certainly edgy stuff.

21   I really do like the Bruno Mars video.  That's my favorite one

22   probably because I really like Bruno Mars.  I hope I get to

23   see him in person, see him one day.  I've never had that

24   chance.  He kind of reminds me of Michael Jackson just of a

25   different generation in a lot of ways.

1          So I guess my point ultimately is that the videos

2   I've seen that have been introduced, some of the stuff that is

3   out there in the music world that I'm privy to is different

4   from the plaintiff's demeanor here testifying.  I certainly

5   recognize that, I think as Ms. Matz had argued maybe once

6   before, that, you know, we're talking about art.  Music is

7   art, and a person's persona in the business world and the art

8   world can be different than who they are.  But it's really not

9   my decision as to who the real -- what the real persona of the

10  plaintiff is, can she be hurt the way someone else might be

11  hurt.  That is for the jury to decide.

12          Now, I could say similar things about the defendant.

13  The defendant that has testified in this case on the stand is

14  quite different from the defendant in the videos, really

15  markedly so.  I don't know where Ms. Kebe went to high school

16  in Panama City, but I have relatives that live there.  And I

17  suspect that, you know, some people in her hometown probably

18  do not recognize her when they see her in videos given how

19  they knew her when she grew up, knowing the generally

20  conservative make up of that place.

21          So here's my point ultimately, long way of getting to

22  it I know.  But what the defendant may have said about the

23  plaintiff, about whether she was racist or not, whether she

24  likes black people generally, whether she demeaned some other

25  person or client or customer or other person on the internet,

1  a fan of hers, isn't relevant and is not admissible.  And I'm

2  not going to admit those things, like that whole wide video we

3  just saw is not going to come in because it's the defendant

4  talking about the plaintiff, but I'm not going to exclude the

5  text.

6         The text I'm going to allow in because I think it's

7  important.  If the defendant can find out how to make them

8  admissible, then it does set the stage about who the defendant

9  might -- excuse me -- the plaintiff might be, and it does feed

10 into the defendant's argument about whether or not the

11 plaintiff was hurt when the things that were said about her

12 were said.

13        So, in other words, let me put it this way:  If the

14 text, including the one that talked about -- the first one we

15 looked at, the one that used the word "monkey" and such in it,

16 if those texts show a place where the defendant might live

17 quite different than the place that she appears -- the person

18 she appears to be in court and a jury might look at those

19 texts and say, well, okay, so really that stuff was said about

20 the plaintiff that wasn't true, that would be harmful to me as

21 an individual but maybe not harmful to the plaintiff given the

22 kind of persona that she projects out there.

23        The jury might say otherwise.  The jury might say to

24 the human being like anyone else and human beings have

25 feelings, and, you know, nasty negative things are said that

1  aren't opinion based but are fact based and, you know, such

2  that maybe the jury determines that they were liable per se

3  because that's an instruction that the plaintiff has asked

4  for, that, yes, she could be harmed like anyone else.  But I

5  can't cut the legs out of the defendant from making their

6  argument, and I'm not going do that.  So I'm going to let the

7  texts come in but not the videos talking about the text or the

8  plaintiff talking about the text.

9         Now, defendant has got to find a way to make them

10 admissible, and that's not my job there to help you make that

11 case.  Yes, ma'am.

12        MS. IZMAYLOVA:  Your Honor, when you say texts, would

13 you please --

14        THE COURT:  The text of the Instagrams, whatever they

15 were, where the plaintiff was responding to people and saying

16 things that you think cast her in a different light than the

17 image that she portrays in court.

18        MS. IZMAYLOVA:  Okay.  So from the Instagrams that

19 was in that one video that we just saw where my client was

20 wearing the yellow shirt?

21        THE COURT:  That's one, and you also had another one.

22 You also had the one earlier and I don't remember -- were

23 those texts?  What was that first one?  What was the one that

24 used the word "monkey" in it?  Instagram comments, things that

25 she may have said.  But you've got to find a way to make them

1  admissible to use them.  All right.  Yes, ma'am.

2          MS. MATZ:  Just those two Instagram comments?  I just

3  want to make sure I'm clear on what you're ruling.

4          THE COURT:  Yeah, the things that can be directly

5  attributable to the plaintiff that haven't been said can be

6  admitted if you can lay the foundation to admit them under the

7  rules of evidence.  You have to do that.  You can't do that

8  with your client saying I saw these.  I mean, you have to -- I

9  guess really there's only two ways to do that.

10         MS. IZMAYLOVA:  Call the plaintiff.

11         THE COURT:  You can call the plaintiff or you can

12 call the people that received them from the plaintiff, which I

13 can guess is not going to happen.  The plaintiff denies that

14 those were hers, then they're not admissible.  I mean, I can't

15 make an independent determination that they're authentic

16 unless I have the evidence that they're authentic.

17         You also have -- I've been presuming that you're

18 going to play some of her music videos as well.  Maybe you're

19 not, but I had assumed that you are.  I think that does kind

20 of the same thing, but if you choose not to, that's not my,

21 you know -- that's none of my business.  All right.

22         MS. IZMAYLOVA:  I do have an another follow-up

23 question, your Honor.  Sorry.  Because initially we thought

24 that, the pretrial conference, those screenshots of those

25 texts was ruled out, and so they're not on the exhibit list

1  that your Honor has before you.  So how do you want us to --

2  if we do want to introduce them, do we just submit another

3  exhibit list or do we just --

4        THE COURT:  I'm going to let the -- I mean, these

5  are -- if you can lay a foundation, there's only one way you

6  can do it, and that's with the plaintiff admitting that

7  they're true.  But they're not a surprise to anybody.  It's

8  not like new information, so I'm going to let those in but

9  you've got to lay the foundation.

10        MS. IZMAYLOVA:  Okay.

11        THE COURT:  All right.  And so we're going to

12  continue with the trial.  I'm going to call the jurors out.

13  I'm going to, you know, apologize to them for the delay this

14  morning and then engage in a colloquy about the juror.  Okay.

15        MS. IZMAYLOVA:  Your Honor, I do have one more --

16        THE COURT:  All right.

17        MS. IZMAYLOVA:  -- question.  I'm sorry.  After you

18  do the colloquy, will we be resuming or --

19        THE COURT:  Resuming assuming that we can.

20        MS. IZMAYLOVA:  Well, our request, and if your Honor

21  would entertain this, would be to allow us to redact the rest

22  of the stuff that was ruled out today just because I know that

23  the narrative has been spun that we're trying to throw this

24  trial or we're trying to get a mistrial, but nothing could be

25  further from the truth.  We do not want to try this case

1  again.  We want to be done with it this time, and our concern

2  is even if we have the time stamps, if there's something, a

3  technology glitch or something happens and for some reason

4  that inadmissible stuff comes in, we're not trying to do that.

5          So we would request, if your Honor would entertain

6  that, to give us just -- the texts today will be ready

7  tomorrow.  It's not that many cuts.  We're able to do it but

8  we would --

9          THE COURT:  You have other -- I mean, it's 1:30 now.

10  By the time I finish questioning the jury it will be sometime

11  after 2:00.  How long -- other than those things, you don't

12  have other things you can ask your client and then come back

13  to the videos?

14          MS. IZMAYLOVA:  Really it's just the videos is the

15  majority of her testimony.

16          THE COURT:  What about her husband?  Are you going to

17  call him?

18          MS. IZMAYLOVA:  No.  I mean, not as of right now we

19  were not planning on doing that.

20          THE COURT:  So this would be your only witness then?

21          MS. IZMAYLOVA:  With the exception of what your Honor

22  just stated, we might recall the plaintiff for those specific

23  texts but that would be -- yes.

24          THE COURT:  All right.  Let's talk to the jurors.

25  Let's go ahead and get them out here and we'll figure out --

1    we'll figure out where we're going to go after that.

2              MS. IZMAYLOVA:  Thank you, your Honor.

3              MS. MATZ:  Your Honor, I was just going to say this

4    is obviously up to you, but I don't have an objection to that

5    because we obviously want to make sure that there aren't

6    anything that shouldn't be played played to the jury either.

7    So just putting it in your Honor's head.

8              THE COURT:  Yeah, I understand.  Thank you.

9              COURTROOM SECURITY OFFICER:  All rise.

10             (Whereupon, the jurors entered the courtroom.)

11             COURTROOM SECURITY OFFICER:  Please be seated and

12   come to order.

13             THE COURT:  All right.  Good afternoon, ladies and

14   gentlemen.  So we've got a good bit of things we need to talk

15   about procedurally.  The first thing I want to do is apologize

16   for not being ready for you when you got here.  I had

17   anticipated that we would be finished with our discussions on

18   some evidence by the time you got here, and that just wasn't

19   the case.  And, indeed, we're not really quite finished yet.

20   I've made some decisions on some things that is going to

21   require the lawyers to do what we call redaction.  Redaction

22   is going back and looking at some of their evidence and making

23   some changes.

24             Sometimes, if you think about it, a redaction might

25   be -- a letter might be introduced into evidence, and there

1    may be certain lines of the evidence -- lines of the letter

2    that are blacked out because it includes material that was not

3    properly admissible.  But there's other things in the letter

4    that was admissible, and so we black out what it is you

5    shouldn't see because it's not admissible and then will let

6    you see the remaining part of it.

7              It's kind of like, if you would think of it, it's

8    kind of like when we go over to the side bar and we talk about

9    stuff hoping that you don't hear us so that we can figure out

10   what it is that you should be able to hear so that you don't

11   hear things that you shouldn't.  And so I've made a series of

12   decisions today that I really can't go into any detail with

13   you about now.  I could certainly talk to you about it after

14   the case is over with just so you have a complete

15   understanding of it.

16             That's going to require that there be some additional

17   work by the lawyers to do some redactions to some of the

18   evidence so that we make sure that what you see is, you know,

19   what we intend for you to see and not the stuff that we think

20   you should not have put before you.  So that's one of the

21   things we need to talk about, and we've been talking about it

22   this morning.  And it's why we've been delayed, and it's why

23   we're not really yet ready for you now.

24             And so assuming we continue tomorrow, then you

25   would -- what I'm going to ask you to do is come back

1    tomorrow.  I recognize it's a hardship.  I know some of you

2    have driven a long distance, and I wish this was not the

3    situation that we've found ourselves in.  All I can do now is

4    apologize and tell you I mean it.  I had a witness yesterday

5    in another case who wrote me a long letter.  It was a doctor

6    who -- he wasn't happy that he came to testify in a trial I

7    had last year where he was put on the stand about 4:30.  He

8    didn't really answer the questions very forthrightly, which

9    meant that he and the lawyers kind of danced around with him

10   being evasive.

11        And so the next thing you know it's 5:10, and he's

12   not finished.  And I sent the jury home and told him he had

13   come back the next day, and he was not happy with it at all.

14   He pitched a fit in front of the jury, and the next day when

15   he came to court to finish his testimony, which only took

16   about 30 more minutes as it turned out, but he was much more

17   compliant when he answered the questions.  He's still

18   obviously not happy because he wrote me a letter over

19   Christmas.  He didn't cuss me out but he did without cussing.

20   You know what I mean?

21        So, you know, I just said, look, I don't control --

22   as the judge, I don't control what witnesses get called or

23   when they get called.  The things that I control is the times

24   we're in court and what's admissible and what's not.  So

25   that's not going to -- I sent him that letter yesterday in

1   response to his letter, and he's not going to be happy with

2   that either.

3          I'm not happy that we have essentially wasted your

4   time today by having you come in when we're not ready, but I

5   would rather send you home without hearing any testimony today

6   just so, again, that we're able to complete the trial and

7   minimize any mistakes.

8          The other thing, though, that I do need to talk to

9   you about is the fact that there's only eight of you here

10  today, and yesterday there was nine.  The juror who's not with

11  you is the juror.  I didn't identify her last time because I

12  didn't really need to, but she's the juror whose son had been

13  exposed to Covid and -- or it was Covid.  And she had had, she

14  thought, limited exposure to him, and it turns out this

15  morning or overnight she woke up and she had Covid symptoms.

16  She, you know, told us about those Covid symptoms, and so we

17  instructed her not to come in today.

18         Let me tell you what I'd like to do.  What I'd like

19  to do is continue with the case without her, and the reason I

20  would like to do that is that I can't predict the future.  And

21  I don't know, you know, when any of us will be exposed to

22  Covid and when we might have delays in the future.  But

23  that -- but I say that as a person who had Covid now two weeks

24  ago.  So I'm not really -- and I've been fully -- I've had

25  both shots and a booster, and now that I've had a mild case

1   that really was for me nothing more than a cold, which I'm 58.

2   So I attribute that fact to the part that I can control, which

3   is I've done the things that I can do to minimize it.  But,

4   you know, I don't know any of your personal situations, and

5   I'm sensitive to it.  And I want to be.

6        I can't say that any of us are going to get Covid

7   because we were exposed to someone who might have Covid.  We

8   don't know whether she does or she doesn't at this point.  She

9   has not yet been tested, but, you know, like I said, I would

10  like -- unless some of you were having Covid symptoms, I would

11  like to continue, but I want you to tell me what you want to

12  do.  And I don't want that to happen where you have to stand

13  up in court in front of everybody and say, Judge, I'm

14  comfortable or, Judge, I'm not comfortable.

15       So here's what I'm going to let you do:  I'm going to

16  let you go back to the jury room.  And everybody has got paper

17  and a pencil and a pen.  You can tear off a piece of paper,

18  write your name on it, and tell me, yes, you are good to

19  continue with the testimony tomorrow or, no, you believe that

20  we ought to take a break and allow the situation, you know, to

21  resolve itself with the other juror and also see if any of you

22  might test positive or have symptoms really.

23       I'm not going to share the names, your responses with

24  anyone on an individual basis.  If some of you write down that

25  you're not comfortable proceeding and you would rather take a

1   time out of the trial, I'm going to honor that.  So if even

2   one of you wants to take a time out, then we're going to do

3   that.  And I'm not going to tell anybody who -- you know,

4   which juror or which jurors decided they want to take a time

5   out.  If all of you are comfortable with continuing, then we

6   will continue in the morning.

7          So do any of you have any questions?  You write yes

8   if you are good with continuing with your name on it and no if

9   you're not good with continuing.  And understand we'll take a

10  break for about a week or two and come back and just pick up

11  where we left off.  I'm not sure if it will be a week or two

12  weeks.  It will be something between a week and two.  I have

13  to go check and make sure that we lasted a long enough time to

14  allow if there were any effects, if the other juror does have

15  Covid and if you've been exposed to it, that it's kind of run

16  its course if you were going to get it so that we could know

17  we wouldn't be right back where we were when you come back.

18         And I do recognize, you know, Covid is here, and it's

19  going to be here probably, you know, someone my age probably

20  for the rest of my life in some form or fashion.  And there's

21  no guarantees that when we come back, we won't have a similar

22  scenario.  But I do want to -- I want all of you to be

23  comfortable in the procedures that we're using to try to keep

24  you safe, and so I'm going to defer to any of you if you

25  decide you need to take a break.  And if you don't need to

1 take a break, feel like you're ready to go forward, then we'll

2 do that.

3         So accept my apology, please, and when the trial

4 is -- as far as the delay today and yesterday afternoon and if

5 you want to know about the particulars of it when the case all

6 over with, just ask me, and I'll tell you.  But until then I

7 really can't go into the detail or I'll be telling you stuff

8 that we're talking about that we don't, you know, we think

9 would be -- that I think at least, you know, there were some

10 modifications that needed to occur to some of the evidence

11 that might come in.

12         So I'll let you go back to the jury room.  You can

13 write your note.  I'll send word with you about whether or not

14 we're going to continue tomorrow or whether we're going to

15 take a break.  If we continue tomorrow, then you would return

16 tomorrow morning at 9:30.  Okay.  So write your note, fold it

17 over so nobody can see it.  Let the court security officer

18 know once you've done it.  They'll bring the notes directly to

19 me.  I'll read them, and then I'll tear them up and throw them

20 away.  Okay.  Thank you.

21         COURTROOM SECURITY OFFICER:  All rise.

22         (Whereupon, the jurors exited the courtroom.)

23         COURTROOM SECURITY OFFICER:  Please be seated and

24 come to order.

25         THE COURT:  Anything else we need to talk about in

1   the interim while they're doing this?

2         MS. MATZ:  I have two other -- I have one question

3   and I'll just -- two questions.  One is, with relation to the

4   ruling about the internet piece of the, you know, what is

5   herpes and the thing Ms. Kebe pulled off the internet that's

6   going to be shown to the jury, could we just get the same

7   limiting instruction about hearsay when that's played as the

8   Facebook post?

9         THE COURT:  Okay.  That was played when she was -- I

10  don't remember.  Now I can't remember the other stuff that was

11  on there.  We said the video was -- did I say the video was

12  admissible?

13        MS. IZMAYLOVA:  Yes.

14        MS. MATZ:  You did, and she pulled up, you know,

15  something -- I don't know what website she got it off of.

16        THE COURT:  Yes.  So you'll have to remind me of that

17  when that goes to be played.

18        MS. MATZ:  I will.  Absolutely, your Honor.  And then

19  the only other question I had is actually a weather question.

20  I've heard that there might be ice tonight.  Can we just know

21  if there is, how --

22        THE COURT:  So I haven't heard that tonight.  I've

23  heard that Friday -- maybe Thursday night overnight into

24  Friday there could be an issue but not tonight.  So I can

25  check and see what all --

```
 1              MS. MATZ:  I'm sorry, your Honor.  It is Thursday
 2   night.  Sorry.
 3              THE COURT:  Okay.  The last I heard on that, though,
 4   was actually that it was pushed until Saturday.
 5              MS. MATZ:  Okay.  Great.
 6              THE COURT:  And right then they really weren't
 7   expecting it to be anything, and if it was something, it may
 8   be middle Georgia and not north Georgia.
 9              MS. MATZ:  Okay.
10              THE COURT:  So let me see.  Okay.  All right.  All
11   the jurors have confirmed that they're ready to begin back
12   tomorrow morning, so we'll begin back at 9:30 in the morning.
13              MS. MATZ:  Thank you so much, your Honor.
14              THE COURT:  All right.  We'll see y'all then.
15              MS. IZMAYLOVA:  Thank you, your Honor.
16              MR. SABBAK:  Thank you, Judge.
17              COURTROOM SECURITY OFFICER:  All rise.  Court stands
18   in recess.
19              (Whereupon, the proceedings were adjourned at 1:55
20   p.m.)
21                          -  -  -
22
23
24
25
```

```
 1                       REPORTERS CERTIFICATE

 2

 3

 4          I, Wynette C. Blathers, Official Court Reporter for

 5   the United States District Court for the Northern District of

 6   Georgia, with offices at Atlanta, do hereby certify:

 7          That I reported on the Stenograph machine the

 8   proceedings held in open court on January 19, 2022, in the

 9   matter of BELCALIS MARLENIS ALMÁNZAR v. LATASHA TRANSRINA KEBE

10   and KEBE STUDIOS LLC, Case No. 1:19-CV-01301-WMR; that said

11   proceedings in connection with the hearing were reduced to

12   typewritten form by me; and that the foregoing transcript

13   (Volume VI of X, Pages 1 through 100) is a true and accurate

14   record of the proceedings.

15          This the 27th day of February, 2022.

16

17

18

19                                   _____
                                     /s/ Wynette C. Blathers, RMR, CRR
20                                       Official Court Reporter

21

22

23

24

25
```