```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
2                       ATLANTA DIVISION


3


4   BELCALIS MARLENIS ALMÁNZAR,     )
                                    )
5               Plaintiff,          )
            v.                      )  CIVIL ACTION
6                                   )  FILE NO. 1:19-CV-01301-WMR
    LATASHA TRANSRINA KEBE and      )
7   KEBE STUDIOS LLC,               )
                                    )  JURY TRIAL
8               Defendants.         )
    _____)  VOLUME VII OF X
9


10


11  ------------------------------------------------------------


12         BEFORE THE HONORABLE WILLIAM M. RAY, II


13              TRANSCRIPT OF PROCEEDINGS


14                  JANUARY 20, 2022


15  ------------------------------------------------------------

16


17

             Proceedings recorded by mechanical stenography
18            and computer-aided transcript produced by


19

                 WYNETTE C. BLATHERS, RMR, CRR
20                  Official Court Reporter
                     1714 U.S. Courthouse
21                  75 Ted Turner Drive, SW
                    Atlanta, Georgia  30303
22                     (404) 215-1547


23


24


25
```

```
 1   APPEARANCES:

 2   For the Plaintiff:          SARAH M. MATZ
                                 Attorney at Law
 3                               Adelman Matz, P.C.
                                 1173A Second Avenue
 4                               Suite 153
                                 New York, New York  10065
 5
                                 LISA F. MOORE
 6                               WILLIAM A. PEQUIGNOT
                                 Attorney at Law
 7                               Moore Pequignot, LLC
                                 887 West Marietta Street
 8                               Suite M-102
                                 Atlanta, Georgia  30318
 9
     For the Defendants:         OLGA IZMAYLOVA
10                               SADEER SABBAK
                                 Attorneys at Law
11                               Sabbak & Izmaylova, LLP
                                 1875 Old Alabama Road
12                               Suite 510
                                 Roswell, Georgia  30076
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    **INDEX TO EXAMINATIONS**

2

3    <u>WITNESS</u>                                                      <u>PAGE</u>

4    LATASHA TRANSRINA KEBE

5       Direct Examination (Cont'd) By Mr. Sabbak          12

6       Further Cross-Examination By Ms. Matz              47

7

8                    **INDEX TO EXHIBITS**

9              **P L A I N T I F F ' S   E X H I B I T S**

10                                      IDENTIFIED    ADMITTED

11   524A    Edited Version of YouTube          18           18
             Video Entitled "Exclusive
12           Tasha K Leaks Private Call
             Proving Lovelyti Tasha K
13           Planned Starmarie Interview...

14

15                    **INDEX TO EXHIBITS**

16             **D E F E N D A N T ' S   E X H I B I T S**

17                                      IDENTIFIED    ADMITTED

18   3       Picture of Cardi with Cold        36           36
             Sore on Her Lip
19
     8       Kebe 12/18/18 YouTube Video       31           31
20           Where Kebe Addresses Cardi's
             Intent to Sue Kebe...
21
     11      Kebe 9/21/18 YouTube Video re:    14           14
22           Proof that Starmarie Wasn't
             Lying in her Interview
23
     34      Cardi Strip Club Beer Bottle      31           31
24           Video

25

| | | | IDENTIFIED | ADMITTED |
|---|---|---|---|---|

**INDEX TO EXHIBITS** (Cont'd)

**D E F E N D A N T ' S   E X H I B I T S**

| | | | IDENTIFIED | ADMITTED |
|---|---|---|---|---|
| 68 | Kebe IG Post from 9/19/18 re: Picture of Offset with Cold Sore... | | 39 | 39 |
| 77 | Screenshot of Name of Kebe 12/18/18 YouTube Video re: Responding to Defamation Lawsuit | | 27 | 27 |

1              Thursday Morning Session

2                January 20, 2022

3                  9:20 a.m.

4                  -  -  -

5           COURTROOM SECURITY OFFICER:  All rise.  United States

6   District Court for the Northern District of Georgia, Atlanta

7   Division, is now in session, the Judge William M. Ray II

8   presiding.

9           THE COURT:  Thank you.  You can have a seat, please.

10           COURTROOM SECURITY OFFICER:  Please come to order.

11           THE COURT:  All right.  I wanted to come in this

12   morning to talk a minute about the end of the case because

13   some questions were raised about closing and requests -- a

14   charge conference.  So we've been actively working on the

15   charges in this case, and I'm going to spend some more time at

16   lunch today trying to finalize the charges.  I don't really

17   anticipate a long charge conference.  I mean, for the most

18   part on the major things y'all have agreed, I think, in your

19   requests to charges.  I've got a few things I'm going to

20   change.

21           As a general example, I'm going to use like the

22   discussion of the elements of the charges either from cases or

23   from the statutes themselves.  One objection was made, I

24   think, by the defendant objecting to certain language in the

25   statute as being awkward.  That may be true.

1            MS. IZMAYLOVA:  That wasn't our objection.

2            THE COURT:  In the consolidated version of everything

3    that I had there was one thing where it had objected and said

4    it was awkward or confusing.  Maybe I got that wrong, but if I

5    didn't get I wrong, it may be true.  And having been in the

6    legislature in Georgia, the process lends itself to awkwardly

7    written statutes.  I mean, you spend hours and days sometimes

8    trying to perfect bills in committee, and then when they hit

9    the floor, at least in Georgia, any senator or representative

10   can make an amendment that might be voted on minutes later.

11   And oftentimes, you know, most of the time those amendments

12   are not from lawyers because lawyers don't predominate in any

13   legislature, much less Georgia's legislature.  So sometimes

14   things do get confusing.

15           So but, you know, the most tried and true method of

16   developing jury instructions is always to rely on the statutes

17   and/or the case law that applies to statutes, particularly the

18   case law of the courts that are the reviewing court for that

19   particular trial court.

20           So I'm going to -- I think we'll have a very

21   streamlined discussion and if there -- I may very well give

22   you the instructions that I'm proposing from what y'all have

23   submitted and what we have supplemented, you know, maybe

24   overnight tonight and let you take a look at them tonight and

25   then discuss them in the morning.

1          I'm not sure if we will close tomorrow.  Obviously,

2   that depends on what happens today.  I do have a plea at 4:00

3   o'clock today; right?

4          COURTROOM DEPUTY:  Yes.

5          THE COURT:  So I'll have to end court today an hour

6   early to deal with a criminal matter that's time sensitive.

7   That may impact things today, but plan on a full day tomorrow

8   either because we're still going or because you have closed

9   and the jury has been charged.  And I'm going to give them the

10  full day to -- you know, before we break over the weekend if

11  we're not finished.  I will not invite the jury to come back

12  on the weekend to deliberate and will instead direct them to

13  come back on Monday if they haven't reached a verdict, if we

14  get to that point.

15         As it relates to closing, though, as far as the time

16  for closing, I will generally allow 30 minutes, but I also

17  defer to counsel for the most part.  Does plaintiff have any

18  specific requests about how long you need to close?

19         MS. MATZ:  Yeah.  I believe that we had -- in the

20  pretrial conference order we had, both sides, requested at

21  least an hour and we had -- I know defense had raised it as

22  well, and we're in agreement with that.  I think we

23  probably -- I definitely think everyone needs more than a half

24  an hour.  I think an hour would be at the least.

25         THE COURT:  All right.  That's fine with me.  I can't

1  remember if I've talked about it in this case or not.  I do

2  believe I mentioned this, that my practice is to require that

3  in the first round for the plaintiff, given that the plaintiff

4  has the right to open and close the closing arguments, is that

5  your ask has to be made.  In other words, if you're going to

6  ask for specific damages or suggest to the jury a certain

7  amount of damages be awarded should the jury find in your

8  favor on the issue of liability, you've got to make the ask in

9  the first round so that the defendant has an opportunity to

10  respond to the amount.

11         You don't have to necessarily put all your logic in

12  the first round, but you've got to throw the number out there

13  if you're going to suggest a number.  Even if it's not

14  concrete, even if it's a range, I'm going to require that you

15  do that and would note that, you know, some federal courts

16  require you really to only use your rebuttal for rebutting,

17  kind of like the procedure for direct examination and

18  cross-examination where you can only ask about things or talk

19  about things that were brought up by the other side when you

20  get to go second or a second time.

21         I'm not requiring you to throw all your work product

22  out in the first round, but I am requiring that the numbers

23  are put forth so that the defendant can address that in their

24  closing because they will not have an opportunity to come

25  back.

1          You will be able to use any of the evidence that's

2     been admitted, including any of the videos that have been

3     admitted.  Just have it ready to go.  Your hour is still your

4     hour, so make sure your technology is squared up in that

5     regard.

6          We may take a break during closing, probably will at

7     least after the defendant goes.  If the plaintiff spends a

8     large amount of time in their initial round of their opening

9     statement, then maybe even sooner than after the defendant

10    goes.  But that's probably the more likely time that we will

11    take a break.  And then we may take a break before I charge

12    the jury again.  I just don't consciously like to keep people

13    in the courtroom more than an hour and a half before we break,

14    even though I recognize yesterday we were in the courtroom two

15    and a half hours, I think, before we broke at least.  And I'm

16    sorry about that, just lost track of time yesterday.

17         Before the jury retires to deliberate the lawyers

18    will need to make sure that the clerk has a copy of all the

19    documents that you've admitted in sequential numbered order.

20    I doubt the jurors have kept up with your numbers, but it's

21    still helpful, I think, to have them in the order at least as

22    you review to make sure that they're all there.  And we can go

23    over our list at that time to make sure that we're not

24    including things that shouldn't be included or that we have

25    included everything that should be.

1          As far as the videos are concerned, if jurors want to

2   watch those again, I will let them do that, but they have to

3   do it in the courtroom.  We don't send out videos.  I don't

4   send out videos to jurors.

5          Ms. Matz, did you have a question or a comment?

6          MS. MATZ:  I actually had one -- two questions.  One

7   is since there is a lot of media in this case if -- and I

8   haven't asked Ms. Izmaylova this, but if we were to agree that

9   we needed slightly longer than an hour, would the Court have

10  any objection to that?

11         THE COURT:  I don't really have any objection.  I'd

12  just ask you to put yourself in the shoes of the jury, you

13  know.

14         MS. MATZ:  Of course.

15         THE COURT:  But, heck, there hasn't been any

16  reluctance to participate in this case by any juror at this

17  point.  Speaking of which, let me just tell you that as it

18  related to the whole discussion about the juror that was

19  excused yesterday, she was positive.  So, you know, excusing

20  her would have ended up being our only option anyway absent a

21  couple of week delay.

22         The second question you had?

23         MS. MATZ:  Yes.  The only other question I have is

24  just to make sure I'm understanding the procedure.  So if we

25  close today, I don't know how long they have --

```
 1                 THE COURT:  I don't expect to close today.
 2                 MS. MATZ:  I didn't mean closing arguments.  I meant
 3      closing testimony.  I apologize.  That was actually going to
 4      be my question.  I just want to make sure I'm understanding it
 5      right.  No matter what time testimony closes today, we're
 6      going to have until the morning to figure out our videos and
 7      everything for closing?
 8                 THE COURT:  Right.  We're not going to close today.
 9                 MS. MATZ:  Okay.  Wonderful.
10                 THE COURT:  I want you to be -- as you're sitting
11      here right now, I want you to be ready to close tomorrow.
12                 MS. MATZ:  Yes.
13                 THE COURT:  We've got to get there, obviously, but I
14      want you to be ready for that.  Anything else?
15                 MS. MATZ:  No.  That was it.  I appreciate that, your
16      Honor.  Thank you.
17                 THE COURT:  Anything else from the defendant?
18                 MS. IZMAYLOVA:  No, your Honor.  Thank you.
19                 THE COURT:  So I want to start out after our
20      discussion and apologize to Ms. Izmaylova for a statement that
21      I made yesterday that bothered me overnight.  I think it was a
22      low blow for me.  I don't think I was wrong about the whole
23      issue of trying to use the video of the step father-in-law to
24      prove the truth of the matter asserted.  I think I'm right
25      about that, but the comment made about law school was really
```

1   unnecessary and mean.  And I'm sorry I said that, and, you

2   know, I shouldn't have.

3           MS. IZMAYLOVA:  That's no problem.  Thank you, your

4   Honor.

5           THE COURT:  I apologize for that.  All right.  All

6   jurors are present?  All right.  Let's begin.  Thank you.

7           MR. SABBAK:  Your Honor, should Ms. Kebe go to the

8   stand now or --

9           THE COURT:  I'm sorry?

10          MR. SABBAK:  Should I recall Ms. Kebe to the stand or

11  would you like her --

12          THE COURT:  Yeah.  She's still up, so she can come on

13  up.

14          MR. SABBAK:  Sure.  Thank you.

15          COURTROOM SECURITY OFFICER:  All rise.

16          (Whereupon, the jurors entered the courtroom.)

17          COURTROOM SECURITY OFFICER:  Please be seated and

18  come to order.

19                   LATASHA TRANSRINA KEBE,

20          herein, having been previously duly sworn, was

21  examined and testified as follows:

22          THE COURT:  You can proceed.  Thank you.

23          MR. SABBAK:  Thank you, your Honor.

24                   DIRECT EXAMINATION  (Cont'd)

25  BY MR. SABBAK:

1  Q   Ms. Kebe, if you would do us a favor -- there you go.

2  Let's get that figured out.  All right.  Good morning.

3  A   Good morning.

4  Q   We're going to pick up where we left off the other day.

5  A   Okay.

6  Q   All right.  I showed you what's been already admitted into

7  evidence as Defendant's Exhibit 76?

8  A   Yes, sir.

9  Q   All right.  If you would, ma'am, just read the title for

10  the jury, please.

11  A   Yes, sir.  Actual Proof Cardi B Knew Her Ex-Roommate,

12  Drake, Funky Dineva vs Tamar, Beyonce Black Majic.

13  Q   Are those all part of the same story or separate stories

14  in this video?

15  A   Those are separate stories, a variety of stories together.

16  Q   And, Ms. Kebe, since I know it's a little blurry, can you

17  tell us when this video was made.

18  A   Yes, sir, September 21st, 2018.

19  Q   Do you recall how long after the Starmarie Jones interview

20  was published did you publish this video?

21  A   Yes, sir, two days.

22  Q   I'm showing you what's been marked as Defendant's Exhibit

23  11 for identification.  All right.  Let me show you something,

24  Ms. Kebe.  Ms. Kebe, do you recognize this?

25  A   Yes, sir.

1  Q    Without testifying to the contents, what is it?

2  A    This is a rebuttal video that I made.

3  Q    All right.  And is this the same video that was in the

4  previous exhibit?

5  A    Yes, sir.

6          MR. SABBAK:  Okay.  Your Honor, defendant -- defense

7  moves Defendant's Exhibit 11 into evidence.

8          THE COURT:  Any objection to 11?

9          MS. MATZ:  Subject to the conversation yesterday, no.

10         THE COURT:  All right.  Defendant's 11 is admitted

11  with the limitations as previously ordered by the Court.

12         (Whereupon, Defendant's Exhibit 11 was marked for

13  purposes of identification and admitted into evidence.)

14         MR. SABBAK:  Thank you, sir, and we intend to play

15  the -- this is probably an hour 20, 30 minute video.  We

16  intend to only play the first 46 minutes or so for the Court's

17  knowledge.

18         THE COURT:  So I'm not going to remember as we're

19  discussing any specific exhibit, but I'm going to rely on

20  counsel, I guess primarily the plaintiff, to alert me if this

21  is a video that required a limiting instruction.  This is not,

22  is it?

23         MS. MATZ:  No, I don't believe so, but the

24  designation was through 46:08, which may have been shortened a

25  little --

```
1              MS. IZMAYLOVA:  It's a little bit shorter.

2              MS. MATZ:  But it shouldn't be or so.

3              THE COURT:  Okay.  Well, I'm just going to rely on

4    the plaintiff to let me know when you request that limiting

5    instruction.

6              MS. MATZ:  Thank you, your Honor.

7              MR. SABBAK:  Permission to publish to the jury, your

8    Honor?

9              THE COURT:  Yes, sir.

10             MR. SABBAK:  Thank you, sir.

11             (Whereupon, a video recording was played.)

12   BY MR. SABBAK:

13   Q   In the video we just watched you said Lovelyti was waiting

14   for the interview to drop because of her receipts.  What did

15   you mean by that?

16   A   Well, Lovelyti and I, another blogger that was covering a

17   different angle of the story, had been contacting me over the

18   weekend, and basically she had receipts.  She didn't discuss

19   what those receipts are, and she wanted to make sure that her

20   receipts weren't fake.  So she was waiting on me to drop

21   Starmarie's initial interview before it was safe for her to

22   drop her receipts, which ended up being fake anyway.  And

23   that's one of the receipts that I pulled up in this video to

24   say that it was photoshopped because Cardi B did not have a

25   record deal in 2013.
```

1  Q    Were you in contact with Lovelyti or Lovely TI throughout

2  the time you were putting the story together?

3  A    Yes, sir.

4  Q    At some point did you release a recording of a phone call

5  between you and Lovelyti or Lovely TI?

6  A    Yes, sir.

7  Q    And to your recollection when did you release the call or

8  publish the call on YouTube?

9  A    Publish the call?  Probably six months after I did it.

10 Like, it was maybe a month after the lawsuit was filed in

11 April of 2019.

12 Q    Okay.  And if you're saying that you filed or you released

13 the recording April 2019, when did you record it?

14 A    Probably towards the end of September, a couple of weeks

15 after the interview and going into October because I started

16 to see that she was, you know, taking the side of Cardi B so,

17 you know, betrayed me per se, yeah, is what I mean.

18 Q    I am showing you what's been already admitted into

19 evidence as Plaintiff's 524.

20         And, your Honor, this call should take about an hour

21 50 minutes or so.  However your Honor wants to proceed.

22         THE COURT:  Let me see if there's any objection to

23 524.

24         MS. MATZ:  So could we just side bar, your Honor,

25 really quickly?

1          THE COURT:  Let me just say I don't have a -- I don't

2   have an Exhibit No. 524.  Is there a different exhibit number?

3          MR. SABBAK:  Plaintiff's Exhibit, sir.

4          THE COURT:  I'm sorry?

5          MR. SABBAK:  Plaintiff's exhibit.

6          THE COURT:  Plaintiff's 524.

7          (Whereupon, a bench conference was held between the

8   Court and counsel.)

9          THE COURT:  524 has been admitted.

10          MS. MATZ:  No, it hasn't.  This is the only thing.

11   Sorry.  We played excerpts from it, and so you said you

12   edited --

13          MR. SABBAK:  One section?

14          MS. MATZ:  Right, so it's not -- I'm not making a big

15   deal out of this, but it's not technically Plaintiff's 524

16   anymore because you guys had -- or let's admit it as another

17   number so it's added.  I just want to keep the record straight

18   because --

19          MR. SABBAK:  That's fine.

20          MS. MATZ:  -- we hadn't edited and --

21          THE COURT:  Why don't we --

22          (Papers on microphone.)

23          THE COURT:  We'll just point to -- well, 524, we'll

24   go with A.  Okay?

25          MS. MATZ:  That's fine.  I just wanted to perfect the

```
 1  record.

 2          MR. SABBAK:  That's no problem.

 3          MS. MATZ:  Oh, your Honor, I believe it's an hour and

 4  40 minutes.  Did you want to --

 5          THE COURT:  We'll probably go about 40 minutes, and

 6  then we'll take a break.  Okay.  I'll let you know.

 7          MR. SABBAK:  Thank you, Judge.

 8          (Whereupon, the following proceedings continued in

 9  open court.)

10          THE COURT:  All right.  Plaintiff's 524 has been

11  admitted.  This is a -- this particular exhibit is an edited

12  portion of Plaintiff's 524, so the Court will denote it as

13  Plaintiff's 524A, which is likewise admitted without

14  objection.

15          (Whereupon, Plaintiff's Exhibit 524A was marked for

16  purposes of identification and admitted into evidence.)

17          MR. SABBAK:  Permission to publish, sir?

18          THE COURT:  Yes.  So, ladies and gentlemen, this is a

19  long video.  It's about an hour and 40 minutes.  So we're

20  going to go about 30, 40 minutes.  Then we'll take a break and

21  then come back.  Okay.  Thank you.

22          MR. SABBAK:  Thank you, Judge.

23          (Whereupon, an audio recording was played.)

24  BY MR. SABBAK:

25  Q   I'm sorry.  Ms. Kebe, who answered the phone?
```

1   A    Lovely TI, the other creator that sided with Cardi B,

2   answered the phone.

3   Q    And who said, hey, do you have a second?

4   A    That was me.

5   Q    Okay.

6         (Whereupon, an audio recording was played.)

7   BY MR. SABBAK:

8   Q    That's you just now?

9   A    Yes, sir, that's me.  That's my voice.

10  Q    Okay.  All right.  Thank you.

11        (Whereupon, an audio recording was played.)

12        THE COURT:  Let's halt the video.  We'll take a

13  10-minute recess.  Thank you.

14        COURTROOM SECURITY OFFICER:  All rise.  Court stands

15  recess for 10 minutes.

16        (Whereupon, the jurors exited the courtroom.)

17        THE COURT:  All right.  So just before we break this

18  is -- y'all can have a seat.  This is the limiting instruction

19  that I've written that I will give when y'all indicate for me

20  it's appropriate, and it's as follows:  Hearsay is an

21  out-of-court statement offered to prove whatever it asserts.

22  Ordinarily hearsay is not admissible in court to prove the

23  alleged facts contained within.  However, in some instances

24  hearsay may be admitted for another purpose.  In this case

25  Ms. Kebe seeks to admit certain out-of-court statements made

1  by third parties from which she claims she was aware of and

2  relied upon when she made statements about the plaintiff.

3          The Court has admitted these out-of-court statements

4  only for that purpose.  That is, that Ms. Kebe allegedly

5  relied on these statements when she said what she said.  You

6  should not consider these out-of-court hearsay statements in

7  any way as support for any claim that the allegations included

8  within these out-of-court statements are true.

9          Does that work for the plaintiff?

10          MS. MATZ:  Your Honor, I think that that works for

11  the Facebook post.  I don't think that quite covers the

12  medical internet source or that Ms. Kebe --

13          THE COURT:  Okay.  I'll come up with something else

14  for that.

15          MS. MATZ:  Okay.

16          THE COURT:  It may have some similar connotations,

17  but I'll write a different one for that one.

18          MS. MATZ:  Yeah, just making it clear that like

19  photos with -- yeah, you understand.  And then the only other

20  thing I might say is that you said, like, statements and that

21  you might want to clarify that that also could include

22  someone, Ms. Kebe, either showing or repeating what someone

23  else said because she does both in the video.  She both shows

24  the post and then repeats things that she's been told about

25  it.

1          THE COURT:  Yeah, that's getting too much into the

2     weeds.  I mean, the things that she's repeating are the things

3     that were in the statements that she received.  So --

4          MS. MATZ:  Fair enough.

5          THE COURT:  These terms are second nature to us, but,

6     I mean, I've even tried to simplify some of the language as it

7     is.  First was looking in *Black's* and then I went to -- which

8     may be the better source of ordinary thinking, ordinary

9     language, just general internet definitions.  But I'll come up

10    with a different somewhat similar instruction as it relates to

11    the medical information.  All right.  So I'll see y'all in 10

12    minutes.

13         MS. MATZ:  Thank you, your Honor.

14         COURTROOM SECURITY OFFICER:  All rise.  Court stands

15    in recess for 10 minutes.

16         (Brief recess.)

17         COURTROOM SECURITY OFFICER:  All rise.

18         (Whereupon, the jurors entered the courtroom.)

19         COURTROOM SECURITY OFFICER:  Please be seated and

20    come to order.

21         THE COURT:  All right.  You can resume.  Thank you.

22         MR. SABBAK:  Thank you, Judge.  Resuming at minute

23    36:14 seconds.

24         (Whereupon, an audio recording was played.)

25    BY MR. SABBAK:

1  Q    Ms. Kebe, what was Starmarie Jones lying about?

2  A    Oh.  One thing for sure is she communicated to other

3  platforms that I offered her a radio job, and I could not do

4  that.  I basically offered her a recommendation because the

5  station that we recorded at wanted health and wellness shows,

6  and I said I would put in a recommendation for you.  So she

7  took that as if I had the power to give her a job.

8           The second thing she, I feel, that she lied about I

9  can't say for sure was, you know, the prostitution claims.

10 You know, you're going to a hotel with Ms. Almánzar.  And you

11 know that Ms. Almánzar is going there to possibly trick off,

12 which is prostitute, and you get in a bed with Ms. Almánzar

13 and this supposed John.  I thought that was a little bit

14 embellished because if I'm not into prostitution, I'm not

15 going to go and assist in prostitution activities.

16          So her saying that she woke up, and the guy was

17 eating her out and she didn't want to do anything, I just

18 thought that was a little farfetched.  So those were the two

19 lies that I thought that she was telling.

20 Q    Are you saying that Starmarie Jones was a willing

21 participant --

22          MS. MATZ:  Objection, your Honor.  Leading.

23          THE COURT:  Sorry.  So, first of all, you need to be

24 in front of a microphone because it helps the transcription.

25 And what's your objection?

```
 1              MS. MATZ:  He's leading the witness.
 2              THE COURT:  Sustained.
 3   BY MR. SABBAK:
 4   Q   And what was your impression of Starmarie Jones, her
 5   willingness to participate?  Did you believe that she was a
 6   willing participant?
 7   A   Absolutely, yes.  Yes, sir, in the prostitution.
 8   Q   Yes.
 9   A   Yes, sir.
10              MR. SABBAK:  We can stop here, Judge.
11              THE COURT:  Sorry?
12              MR. SABBAK:  We can stop here.
13              THE COURT:  Are you finished with your questions?
14              MR. SABBAK:  For this set of questions, but we have
15   another video.
16              THE COURT:  All right.  Thank you.
17              Ladies and gentlemen, we'll break for lunch.  We'll
18   see you at 1:30.  Take your notes with you.  Thank you.
19              COURTROOM SECURITY OFFICER:  All rise.
20              (Whereupon, the jurors exited the courtroom.)
21              COURTROOM SECURITY OFFICER:  Please be seated.
22              THE COURT:  So just quickly, the other statement as
23   it relates to the interview where the medical, pseudo medical,
24   definition was provided, this is what I've written:  In this
25   next video there will appear on the screen certain information
```

1   or text which purportedly defines herpes or the symptoms of

2   herpes.  This information is not evidence of what herpes is or

3   what some or all of the symptoms of herpes includes, rather,

4   it is merely information which Ms. Kebe obtained from some

5   source in which she alleges that she relied upon when she made

6   certain statements about the plaintiff.

7           MS. MATZ:  Yeah.  I think that works, your Honor.

8   Thank you very much.  We appreciate that.

9           MS. IZMAYLOVA:  That's fine with us, your Honor.

10          THE COURT:  Okay.  We'll see y'all in an hour.  Thank

11  you.

12          MS. MATZ:  Thank you.

13          MS. IZMAYLOVA:  Thank you, your Honor.

14          COURTROOM SECURITY OFFICER:  All rise.

15          (Whereupon, a recess was taken from 12:30 p.m. until

16  1:30 p.m.)

17          COURTROOM SECURITY OFFICER:  All rise.  This Court is

18  again in session.

19          THE COURT:  All right.  Thank you.

20          COURTROOM SECURITY OFFICER:  Please be seated and

21  come to order.

22          THE COURT:  All right.  You can bring the jury in,

23  please.

24          COURTROOM SECURITY OFFICER:  All rise.

25          (Whereupon, the jurors entered the courtroom.)

```
 1              COURTROOM SECURITY OFFICER:  Please be seated and
 2   come to order.
 3              THE COURT:  All right.  Good afternoon.  So it's my
 4   understanding that a juror or jurors anonymously have
 5   requested that things be warmed up a little bit.  So we have
 6   placed a call for that to happen, which probably means before
 7   we leave today it's going to be really hot.  Unfortunately,
 8   there doesn't seem to be a lot of middle ground.  I don't
 9   normally recognize it being very cold because I like it cold
10   generally.  The court reporter doesn't because she's got a
11   space heater right down here that I was told about, so she's
12   not complaining either.  So, in any event, we'll continue with
13   the defendant's examination.  Go ahead.
14              MR. SABBAK:  Thank you, your Honor.
15              Ms. Kebe, good afternoon.
16              THE WITNESS:  Good afternoon.
17   BY MR. SABBAK:
18   Q   What happened after you published the video we saw before
19   lunch?
20   A   A few months went past, and I got word of a video with
21   Ms. Almánzar in a towel.  And she basically made a video to
22   her followers stating that she was going sue me for defamation
23   of character.
24   Q   Was that the video you said with the towel on her head we
25   watched last week?
```

1   A    Yes, sir.

2   Q    What did you do after you saw the video?

3   A    I made a response to the video, to the allegations that

4   was made in her video that she made on Instagram.

5   Q    I'm showing you what's been marked as Defendant's Exhibit

6   77.  Ms. Kebe, do you recognize that?

7   A    There's nothing on the screen.

8   Q    Okay.  Without testifying to the substance, how do you

9   recognize that?

10  A    No, I don't see anything on the screen.

11          THE COURT:  It's not up yet.

12          MR. SABBAK:  Oh, it's not up?

13          THE COURT:  It shouldn't go there.  It should just

14  be --

15  BY MR. SABBAK:

16  Q    My apologies.  Ms. Kebe, I'm showing you what's been

17  premarked as Defendant's Exhibit 77.  Do you recognize that?

18  A    Yes, sir.

19  Q    All right.  How do you recognize that?

20  A    That's a screenshot from my YouTube channel.

21          MR. SABBAK:  Your Honor, we would move Defendant's

22  Exhibit 77 into evidence.

23          THE COURT:  Any objection to 77?

24          MS. MATZ:  No, your Honor.

25          THE COURT:  All right.  77 is admitted.

1            MR. SABBAK:  Thank you, sir.

2            (Whereupon, Defendant's Exhibit 77 was marked for

3   purposes of identification and admitted into evidence.)

4   BY MR. SABBAK:

5   Q   All right.  Ms. Kebe, if you would, for the jurors please

6   read out the name and the title.

7   A   Yes, sir.  Tasha K Responds to Cardi B's Diffimation Suit

8   and Offset's Dad Calling Cardi B Out and More.

9   Q   And, if you would, for the jury the date this video was

10  published on YouTube.

11  A   December 18th, 2018.

12  Q   I'm showing you now what's been marked as Defendant's

13  Exhibit 8.  Ms. Kebe, do you recognize that?

14  A   Yes, sir.

15  Q   How do you recognize that?

16  A   That's the actual video that I made in response to Cardi

17  B's announcement that she was going to sue me.

18            MR. SABBAK:  Okay.  Your Honor, we move Defense

19  Exhibit 8 into evidence.

20            THE COURT:  I'm sorry.  What's the number?

21            MR. SABBAK:  8.

22            THE COURT:  8?

23            MR. SABBAK:  Yes, sir.

24            THE COURT:  Any objection to 8?

25            MS. MATZ:  Just a small issue if we could have a

 1  short side bar.

 2          (Whereupon, a bench conference was held between the

 3  Court and counsel.)

 4          MS. MATZ:  Thank you.  So this is the video that we

 5  need the limiting instruction for so I just wanted to --

 6          THE COURT:  With the father?

 7          MS. MATZ:  Yes, your Honor, and the medical thing.

 8          THE COURT:  Oh, it's in the same video?

 9          MS. MATZ:  It's in the same video.  And one more

10  thing.  The other thing that is in this is the translation

11  issue that we discussed yesterday.  Ms. Izmaylova told me that

12  they would stipulate to -- we sent a proposed translation last

13  night, and we were told they would stipulate to it.  I'd just

14  like to put it on the record formally before the video is

15  shown because that was how -- one of the ways the Court

16  suggested we resolve the issue.

17          THE COURT:  Okay.

18          MR. SABBAK:  I'm happy to read it.

19          THE COURT:  All right.

20          MS. MATZ:  Okay.

21          (Whereupon, the following proceedings continued in

22  open court.)

23          THE COURT:  All right.  Ladies and gentlemen, so

24  there's a couple of limiting instructions that I need to give

25  the Court about -- I mean give the jury about the video that

1  you're about to watch, as well as a stipulation that the

2  parties have reached regarding certain phrases used in the

3  video by the plaintiff that was in Spanish, in other words,

4  providing you with the Spanish interpretation of what was

5  said.

6          Hearsay is legal term, and it is an out-of-court

7  statement offered to prove whatever it asserts.  Ordinarily

8  hearsay is not admissible in court to prove the alleged facts

9  contained within it.  However, in some instances hearsay may

10 be admitted for another purpose.  In this case Ms. Kebe seeks

11 to admit certain out-of-court statements made by third parties

12 in which she claims that she was aware of and relied upon when

13 Ms. Kebe made certain statements about the plaintiff.

14         The Court has admitted the out-of-court statements

15 only for that purpose.  That is, that Ms. Kebe allegedly

16 relied on these statements when she said what she said.  You

17 should not consider these out-of-court hearsay statements in

18 any other way or for support for any claim that the

19 allegations included within the out-of-court statements are

20 true.

21         Further, in the video there will appear on the screen

22 certain information or text which purportedly defines herpes

23 or the symptoms of herpes.  This information is not evidence

24 of what herpes is or what some or all of the symptoms of

25 herpes includes.  Rather, it is merely information which

1    Ms. Kebe obtained from some source and which she alleges that

2    she relied upon when she made certain statements about the

3    plaintiff.

4         Counsel, if you would now read the stipulation that

5    the parties have reached about the Spanish words spoken.

6         MR. SABBAK:  Your Honor, I have it right here.  All

7    right, ladies and gentlemen.  The stipulation you will see as

8    Spanish language in the video, this will be the interpretation

9    that both parties have agreed to:  They don't have a life.

10   Like, it's just annoying.  It's frustrating.  Like, it's just,

11   like, everything, my "N" word, everything.  They say I had a

12   coldsore.  Diablo, damn (laughing).  These people are crazy.

13   They say whatever.  They say any fucking dumb shit, but I bet

14   they won't take the time to go to YouTube and look up Cardi B

15   videos and see that my shit has always been looking the same

16   forever.  I bet they won't go on Google and see that this -- I

17   have a birthmark here all my life and how my lip always been

18   brown around here like a lot of bitches my skin complexion.

19        MS. MATZ:  Yes.  And then, your Honor, we'd just like

20   to add that to the stipulated facts that are officially part

21   of the record.  We'll follow up with a writing.

22        THE COURT:  All right.  Thank you.

23        MR. SABBAK:  Your Honor, I move Defendant's Exhibit

24   34 into evidence or 8, rather, into evidence.

25        THE COURT:  So Defendant's Exhibit 8 has been

1   admitted.  Thank you.

2           (Whereupon, Defendant's Exhibit 8 was marked for

3   purposes of identification and admitted into evidence.)

4           MR. SABBAK:  Thank you, Judge.  All right.

5           (Whereupon, a video recording was played.)

6   BY MR. SABBAK:

7   Q   Ms. Kebe, in the video that we just watched you referenced

8   another video about the plaintiff putting a beer bottle in her

9   vagina.  Do you recall that?

10  A   Yes, sir.

11  Q   I'm showing you what's been marked as Defendant's Exhibit

12  34.  Do you recognize this video?

13  A   Yes, sir.

14  Q   Without testifying to the contents, how do you recognize

15  the video?

16  A   It's a video that I've seen on various porn sites.

17          MR. SABBAK:  Your Honor, we move Defense Exhibit 3

18  into evidence -- I'm sorry.  34.

19          THE COURT:  34.  Any objection?

20          MS. MATZ:  No, your Honor.

21          THE COURT:  34 is admitted.

22          (Whereupon, Defendant's Exhibit 34 was marked for

23  purposes of identification and admitted into evidence.)

24          MR. SABBAK:  Thank you.

25          (Whereupon, a video recording was played.)

1   BY MR. SABBAK:

2   Q   Ms. Kebe, where did you see that video?

3   A   I believe Pornhub at the time.

4   Q   Have you seen it anywhere else?

5   A   Yes.  It's on various top porn sites monetizable.

6   Q   Is this video still available on those websites?

7   A   Oh, yes, sir.

8   Q   What are the title of those videos?

9   A   Cardi B Puts Beer Bottle in her Pussy.

10  Q   I'm showing you what's been marked as Defendant's Exhibit

11  3 for identification purposes.

12  A   Yes, sir.

13  Q   Do you recognize this?

14  A   Yes, sir.

15  Q   Without testifying to the contents, how do you recognize

16  it?

17  A   It's a video -- I'm sorry.  It's a picture on the internet

18  of Cardi B.

19  Q   Ms. Almánzar?

20  A   I'm so sorry.  Ms. Almánzar.

21          MR. SABBAK:  Thank you.  Your Honor, we move

22  Defendant's Exhibit 3 into evidence.

23          THE COURT:  Any objection?

24          MS. MATZ:  I'm sorry, your Honor.  Can you give me

25  one moment?

```
1              (Brief Pause.)

2              MS. MATZ:  Yes, your Honor.  We do object to this.

3              THE COURT:  All right.  Side bar, please.

4              (Whereupon, a bench conference was held between the

5  Court and counsel.)

6              THE COURT:  Before we even start, what's the purpose

7  of this photograph?

8              MR. SABBAK:  It's one of the photographs she relied

9  on as far as cold sores.

10             MS. MATZ:  Okay.  So when she testified at her

11 deposition, she was unable to authenticate the photo and lay a

12 foundation for it because she couldn't tell whether it had

13 been edited or whether anything else had happened to it.  I am

14 going to say this:  The version of -- I don't know if this is

15 the same one, but a version of this was introduced as part of

16 one of her posts.  And I don't have a problem with her using

17 that, but she was unable to authenticate this at her

18 deposition.

19             THE COURT:  Why does she have to authenticate it if

20 she says it's a photo that she saw before she made comments

21 and relied on it?  She doesn't have to be right.  She just has

22 to say that's what I relied on, and then you certainly can

23 cross-examine her about how does she know that it's your

24 client and make arguments whether or not it was reasonable to

25 rely on it.  But, I mean, there is no authentication necessary
```

1   to say I relied on it.  Maybe there is to say it's the

2   plaintiff.  And, honestly, that's a decision that's up to the

3   jury to make, you know.

4            MS. MATZ:  I hear you.  I just -- the way it sounded

5   like he was authenticating it saying -- she's, like, saying

6   this is a photograph of the plaintiff.  I don't think that

7   that's how it should be authenticated in this instance because

8   I actually think it misleads the jury.  If they want to say

9   that it's a copy of a photo you found and you saw this and

10  relied upon it and you want to let it in for that purpose,

11  then I completely understand that.

12           MR. SABBAK:  By saying that's not your client?  I

13  don't understand.

14           MS. MATZ:  I am saying that I have no idea where the

15  photo came from.  I have no idea if it's been edited.  I have

16  no idea what your client did to it or where she found it.

17           THE COURT:  None of that really matters -- hold on a

18  second.  None of that really matters.  None of that really

19  matters if she says she relied on it, and it's up to the jury

20  to decide who it is.  I mean, honestly, people generally,

21  maybe this case isn't, but you're not generally able to

22  testify as to who's who.  That's usually a question that's

23  left up to the jury.  It's admissible for the purposes that I

24  outlined it is, if she's going to say she relied on that

25  believing it to be the plaintiff and making the comment that

1   she made it up, herpes.

2          MS. MATZ:  I just didn't want it admitted.  The way

3   she phrased it, it sounded like she was doing this is a true

4   and correct copy of -- she said this is the plaintiff.  I

5   understand the jury is going to see it, the jury is going to

6   decide.  I completely hear you.  I'm just saying if they want

7   to admit it as something they relied on, authenticate it that

8   way.

9          THE COURT:  Well, why don't you follow up with those

10  questions.  Okay?

11         MS. MATZ:  Thank you, your Honor.

12         (Whereupon, the following proceedings continued in

13  open court.)

14         MR. SABBAK:  Thank you, sir.

15         Your Honor, we move Defendant's Exhibit 3 into

16  evidence.

17         THE COURT:  Well, so follow up with the questions

18  that we talked about first.

19         MR. SABBAK:  I will, sir.

20         Ms. Kebe, when you stated that Ms. Almánzar has cold

21  sores, you relied on certain things?

22         THE WITNESS:  Yes, sir.

23  BY MR. SABBAK:

24  Q   Okay.  I'm showing you what's been marked as Defendant's

25  Exhibit 3.

1  A    Yes, sir.

2  Q    Do you recognize that?

3  A    Yes, sir.

4  Q    Is it one of the things you relied on?

5  A    Yes, sir, one of them.

6          MR. SABBAK:  Okay.  Your Honor, we now move

7  Defendant's Exhibit 3 into evidence.

8          THE COURT:  Any objection?

9          MS. MATZ:  No, your Honor.

10          THE COURT:  All right.  Defendant's 3 is admitted.

11          MR. SABBAK:  Thank you.

12          (Whereupon, Defendant's Exhibit 3 was marked for

13  purposes of identification and admitted into evidence.)

14  BY MR. SABBAK:

15  Q    Ms. Kebe, who do you believe this to be a photograph of?

16  A    Ms. Almánzar.

17  Q    Okay.  All right.  And if we look closer here, is this

18  what you're referring to?

19  A    Yes, sir.

20  Q    Are you referring to her birthmark?

21  A    No, sir.

22  Q    Okay.  You're referring to the bumps on --

23          MS. MATZ:  Objection, your Honor.  He's leading the

24  witness.

25          THE COURT:  Overruled in this instance.

```
1              MR. SABBAK:  Thank you.

2              THE COURT:  I'm sorry.  She's got to answer.

3              MR. SABBAK:  I'm sorry?

4              THE COURT:  She's got to answer.

5              MR. SABBAK:  Oh, she didn't answer?  My apologies.

6              THE WITNESS:  Can you put the picture back up and

7     repeat the question?  I'm sorry.

8              MR. SABBAK:  Sure.  Madam court reporter, would you

9     mind repeating the question for us.

10             (Whereupon, the record was read.)

11             MR. SABBAK:  Thank you, ma'am.

12             Are you referring to the birthmark?

13             THE WITNESS:  No, sir.

14             MR. SABBAK:  Thank you.  Thank you, madam.

15             Did you -- I'm going to show you now what's been

16    premarked as Defendant's Exhibit 68.  Ms. Kebe, without

17    testifying to the contents, do you recognize this?

18             THE WITNESS:  Yes, sir.

19    BY MR. SABBAK:

20    Q    Okay.  Is this something that you relied on?

21    A    Yes, sir.

22    Q    Okay.  Did you rely on it when you reported about

23    Ms. Almánzar's cold sores?

24    A    Yes, sir.  This was a viral photo.

25             MR. SABBAK:  Your Honor, we now move Defendant's
```

1    Exhibit 68 into evidence.

2            THE COURT:  Any objection to 68?

3            MS. MATZ:  Yes, your Honor.

4            THE COURT:  I'm sorry.  Yes?

5            MS. MATZ:  Yes, your Honor.

6            THE COURT:  All right.  Y'all can approach, please.

7            (Whereupon, a bench conference was held between the

8    Court and counsel.)

9            THE COURT:  Thank you.

10           MS. MATZ:  This isn't even a photograph of the

11   plaintiff.

12           THE COURT:  She said she relied on it.  We haven't --

13   I mean, I guess the argument is going to be that because she

14   believed that the plaintiff's husband had cold sores, then it

15   fit into her mind that the plaintiff would have cold sores too

16   if they're engaged sexually or otherwise.  So it's their

17   argument.

18           MS. MATZ:  All right.

19           (Whereupon, the following proceedings continued in

20   open court.)

21           THE COURT:  All right.  68?

22           MR. SABBAK:  68, your Honor.

23           THE COURT:  68 is admitted over the objection of the

24   plaintiff.

25           MR. SABBAK:  Thank you, your Honor.

1           (Whereupon, Defendant's Exhibit 68 was marked for

2    purposes of identification and admitted into evidence.)

3    BY MR. SABBAK:

4    Q   All right.  Ms. Kebe, who is this?

5    A   This is Mrs. Almánzar's husband, Kiari Cephus.

6    Q   What is his professional name?

7    A   Offset.

8    Q   Okay.  And is this also another photo that you relied on?

9    A   Yes, sir.

10   Q   And what about this photo did you rely on?

11   A   The visible sores.  I know it's kind of blurry but the

12   sores on his lips.

13   Q   Now, were you the first person to say anything about

14   Ms. Almánzar's cold sores?

15   A   Absolutely not.

16   Q   Where did you hear that before?

17   A   Well, after the Starmarie interview, before I did my

18   receipts video when I said actual proof that Cardi B knew her

19   ex-roommate, I did some extensive research on where the herpes

20   allegations came from because I was like, you know, of course,

21   those photos were on the internet, of course, and that's what

22   Azealia Banks relied on.

23           But since 2015, there have been tons of tweets with

24   hashtag Cardi B, hashtag herpes.  2017 Love & Hip Hop star,

25   Joseline Hernandez, she was a Love & Hip Hop star of Atlanta;

1   Cardi B was with the New York franchise.  Joseline Hernandez

2   was jealous of Cardi B's fame and made a diss track and the

3   actual -- one of the lines in the diss track said why don't

4   you, like, worry about your herpe bumpy mouth or bloody mouth

5   or something like that.  And so it was really viral because

6   two Love & Hip Hop franchises are going at it.  Cardi B

7   actually responds.  Joseline does a press run about it.

8   Azealia Banks was next.  And so this been following her pretty

9   much her whole career.

10          So when Starmarie came out, you know, with her, you

11  know, account of dealing and living and working with Cardi B,

12  she did mention visible cold sores on the mouth.  There have

13  been pictures, and so I just kind of compiled everything

14  before I made that video.  But I didn't focus on the herpes

15  because, I mean, it's herpes.  It's not a big deal to me so,

16  you know, but -- I'm sorry.  Did I answer the question?  I

17  don't want to ramble.  I'm so sorry.

18  Q   You didn't.  To your knowledge, do you know if

19  Ms. Almánzar has ever sued Joseline Hernandez?

20  A   Oh, no, no.  No, sir.

21  Q   Has she ever sued Azealia Banks?

22  A   No, sir.

23  Q   Any of the social media users that make comments?

24  A   No, sir.

25  Q   Ms. Kebe, I'm going to show you what's already been

```
 1  admitted into evidence as Plaintiff's Exhibit 592, and I just
 2  want to play a portion starting at what's 1 hour 16 minutes --
 3  A   I think the jury can see it.
 4  Q   It's already in evidence.
 5  A   I'm so sorry.  Okay.
 6           MR. SABBAK:  I intend to play this from 16 minutes to
 7  about 1 minute -- 1 hour 16 minutes 29 seconds, so about 29
 8  seconds of this.
 9           (Whereupon, a video recording was played.)
10  BY MR. SABBAK:
11  Q   Did you report that as fact?
12  A   Absolutely not.
13  Q   And how long was that video?
14  A   This video is, I believe, almost like an hour and a half,
15  if I'm not mistaken.
16  Q   Do you mention HPV anywhere else in that video?
17  A   No, sir.
18  Q   Have you mentioned HPV and Ms. Almánzar in any other
19  video?
20  A   No, sir.
21  Q   And was this video before or after the lawsuit?
22  A   This was after the lawsuit.
23  Q   Last week Ms. Matz was questioning you.  She played a
24  video with you wearing a red shirt.  Do you recall the video?
25  A   Yes, sir.
```

1  Q   And do you recall the date of that video?

2  A   I think it was towards the end of 2020, probably shortly

3  after this video here, the end of 2020, if I'm not mistaken.

4  I don't know the exact date.

5  Q   And at that point you released the video, about how long

6  had this lawsuit been pending?

7  A   Almost a year and a half -- I'm sorry.  Give me a second

8  (coughing)  Almost a year and a half, two years.  Sorry.  It

9  went down the wrong pipe.  Give me a second.

10          (Brief Pause.)

11          THE WITNESS:  Okay.

12  BY MR. SABBAK:

13  Q   Ms. Kebe, how would you describe your mood at the time you

14  made that video?

15  A   I was extremely angry, frustrated, and fed up with

16  everything.

17  Q   Why?

18  A   I mean, Ms. Almánzar and I had been going back and forth

19  for about three years.  Of course, the lawsuit was filed in

20  2019, and over the course of the lawsuit, you know, our

21  lawyers are going back and forth with evidence and things like

22  that.  And her and I had been going back and forth on social

23  media heavy the entire time.  And so she's calling me names;

24  I'm calling her names.

25          And so, you know, after, you know, she said something

1  on her Twitter and Instagram, she was in my comments, I just

2  said, you know what, after everything that I found out

3  regarding this conspiracy lawsuit, I just said, you know what,

4  that's it.  And so I just made a video and I just -- I went in

5  on her.  I just dragged her.

6  Q   Is that video still available for the public?

7  A   No.  I took that down a few hours after I made it.

8  Q   Did you take it down because it was defamatory?

9  A   Oh, no.  It wasn't defamatory at all.

10  Q   Why did you take it down?

11  A   I just wasn't proud of my actions.  That's not how I am as

12  a person.  I don't like to be -- I don't like to get angry

13  like that and take it to the internet, so I took it down.

14  Q   Ms. Kebe, approximately how many followers do you have on

15  Instagram?

16  A   Almost 300,000.

17  Q   What about Twitter?

18  A   Around like 35-, 36,000.

19  Q   And YouTube?

20  A   Over 1 million.

21  Q   Why did you call plaintiff a prostitute?

22  A   Ms. Almánzar has made various videos over the course of

23  her career bragging about being a prostitute and having

24  tricks.

25  Q   When you said the plaintiff used to be a prostitute, did

1  you believe that to be a true statement?

2  A   Absolutely, yes.

3  Q   Why did you say plaintiff was a drug user?

4  A   She's -- one thing that really stood out about the drug

5  use -- of course, I can never confirm, you know, all the

6  drugs.  But a Rolling Stone article came out at the beginning

7  of her career when *Bodak Yellow* went viral, and so Rolling

8  Stone corresponded, followed her for a day.  And so this was

9  the same article that I talked about earlier in my testimony

10 about her talking about her yeast infection and that her

11 vagina was screaming like a raging taco.

12          She also talked about molly, and she told the writer

13 and the writer quoted her, I used molly to boost my confidence

14 to strip.  So that was part of the research that I did to back

15 up Starmarie's story because Starmarie did mention molly and

16 cocaine, but I could confirm the molly.

17 Q   When you said plaintiff was a drug user, did you believe

18 that was a true statement?

19 A   Yes.  She has videos where she's bragged about popping,

20 you know, whatever she gotta pop to make her feel good.  She

21 calls it a little something, something.  So there's a lot of

22 content out there with her talking about it.

23 Q   Why did you say plaintiff has cold sores?

24 A   I mean, of course, the pictures.  This has been something

25 that people have been using or saying since the beginning and

1   the rise of her career at Love & Hip Hop.  You know, the cold

2   sores are, you know, are visible.  They've been viral on every

3   media news site so, yeah, I didn't think -- I mean, if it

4   wasn't true for me, I would have deaded it at the beginning,

5   you know.

6   Q   When you said plaintiff has cold sores, did you believe

7   that was a true statement?

8   A   Yes, sir.

9   Q   Why do you believe plaintiff put a beer bottle up her

10  vagina?

11  A   I mean, strippers, that's what they do.  They do things,

12  you know.  It was -- I saw the video.  The video was -- it's

13  all over the internet -- you can Google it -- and big porn

14  sites.  They monetize these videos, so users get paid or they

15  pay users when they upload these videos.  And so the title

16  reads "Cardi B Puts Beer Bottle in her Vagina."  And so it's

17  something that I had seen, and it's crossed my desk but, you

18  know.

19  Q   Okay.

20  A   And it looks just like her.

21  Q   So when you said that plaintiff put a beer bottle in her

22  vagina, did you believe that to be a true statement?

23  A   Absolutely, yes, sir.

24  Q   When you stated that plaintiff had HPV, did you state that

25  as a fact?

1  A    Oh, no.

2  Q    Did you build your YouTube channel for the purpose of

3  harassing Ms. Almánzar?

4  A    Absolutely not.

5  Q    Since September 19th, 2018, have you been engaged in a

6  malicious campaign to defame Ms. Almánzar?

7  A    Absolutely not.

8  Q    Have you ever made up any stories about Ms. Almánzar?

9  A    No, sir.

10  Q    So tell us, what is the main source of all your

11  information regarding Ms. Almánzar?

12  A    Her mouth, honestly.

13            MR. SABBAK:  No further questions.

14            THE COURT:  All right.  Any cross-examination?

15            MS. MATZ:  Yes, your Honor.  Is there any chance we

16  can take a quick comfort break?

17            THE COURT:  We'll go ahead and take an afternoon

18  break, a 10-minute break, and we'll see y'all as soon as

19  you're ready.

20            MS. MATZ:  Thank you, your Honor.

21            COURTROOM SECURITY OFFICER:  All rise.

22            (Whereupon, the jurors exited the courtroom.)

23            THE COURT:  All right.  See y'all in 10 minutes.

24            MS. MATZ:  Thank you.

25            (Brief recess.)

```
1              COURTROOM SECURITY OFFICER:  All rise.  This

2    honorable court is again in session.

3              THE COURT:  Thank you.  Ms. Matz, you're ready?

4              MS. MATZ:  Yes, your Honor.  Do I need to change this

5    bag?

6              THE COURT:  I'm sorry?  So we don't change the bags

7    for the lawyers.  We do for the witnesses because they often

8    have to get their faces real close to them.  If you want us

9    to, we can.

10             MS. MATZ:  Would you mind if I just did it?

11             THE COURT:  Sure.  Just go ahead.  We've had trials

12   where it was changed out every time somebody came up.

13             COURTROOM SECURITY OFFICER:  All rise.

14             (Whereupon, the jurors entered the courtroom.)

15             COURTROOM SECURITY OFFICER:  Please be seated and

16   come to order.

17             THE COURT:  All right.  You can proceed.

18             MS. MATZ:  May I inquire, your Honor?

19             THE COURT:  Yes.

20             MS. MATZ:  Thank you.

21                      FURTHER CROSS-EXAMINATION

22   BY MS. MATZ:

23   Q    Good afternoon, Ms. Kebe.

24   A    Good afternoon.

25   Q    When you were testifying earlier this week, I believe you
```

```
 1  testified that the spike in your viewership in September of
 2  2018 was due to the R. Kelly videos.  Do you recall giving
 3  that testimony?
 4  A   Yes, ma'am.
 5          MS. MATZ:  Okay.  Can we please pull up Plaintiff's
 6  834, which was previously admitted into evidence.
 7          And this is the document you were looking at when you
 8  were giving that testimony; correct?
 9          THE WITNESS:  I believe so, yes, ma'am.
10  BY MS. MATZ:
11  Q   And where did this document come from?
12  A   Either my website or YouTube.
13  Q   Okay.  Either your website or YouTube meaning you're not
14  actually familiar with the source of this document?
15  A   I'm familiar.  Both YouTube and my website, they look
16  exactly the same.
17  Q   I'm asking you if you're familiar with the source of this
18  document.
19  A   Yes, it's most likely my website.
20  Q   Most likely?
21  A   Yes, ma'am.
22  Q   Okay.  And do you -- are you heavily involved with
23  tracking the analytics and the financials of the
24  unWinewithTashaK platform?
25  A   No, ma'am.
```

1  Q    That's your husband's part of the job; right?

2  A    Yes, ma'am.

3  Q    Okay.  And so you also gave some testimony about what

4  caused the spike in viewership, I believe, when we were

5  looking at a post.  Was that testimony based upon your own

6  review of analytics?

7  A    Yes, ma'am.

8  Q    Okay.  So you actually reviewed those analytics?

9  A    Yes.  That was a pretty big few months for us, yes, ma'am.

10 Q    All right.  And if we could please pull up Plaintiff's

11 813.  You also recall giving testimony that the Starmarie

12 Jones interview -- well, I believe you said it had almost 5

13 million views or more; is that correct?

14 A    I believe it's like under 5 million.

15 Q    You don't recall testifying when I originally asked you

16 questions during your direct examination that it was more than

17 5 million?

18 A    Probably.  I mean, it fluctuates daily, so it goes up.

19 Q    It fluctuates daily, so it goes up.  But it couldn't go

20 down; right?

21 A    No.  That's impossible.

22 Q    So you're kind of speculating right now; correct?

23 A    No, ma'am.

24 Q    Well, you said over 5 million when I first questioned you,

25 but now you're saying it might be under 5 million.  So which

```
 1  is it?
 2  A    It was a give or take.  I don't have the exact number in
 3  front of me.
 4  Q    Okay.  So you don't recall the exact number now, but you
 5  did a day or two ago?
 6  A    No, ma'am.  They probably have gone up by now, the cases
 7  causing it to spike.
 8  Q    Okay.  Just a minute ago you just said it might be under 5
 9  million, but when I asked you last week, you said it was over
10  5 million.  So how is that a spike?
11  A    Because the case is trending.  Cardi B's name is
12  everywhere, so if her name is searchable, everybody is
13  watching the interview.  So it's going up.  I can't tell you
14  the number now, but we can google it.
15  Q    But it wouldn't go down is my point; correct?
16  A    No.  Absolutely not.
17  Q    Okay.  Thank you.  All right.  And in Plaintiff's 813
18  we're looking at, at the time this was provided, which was
19  during discovery, do you remember that?
20          THE COURT:  Hold on a second.  Do you need to do
21  something?
22          COURT REPORTER:  Yes.
23          THE COURT:  All right.  Let's just pause for a
24  moment.
25          MS. MATZ:  Sure.  No problem, your Honor.
```

```
1              (Brief Pause.)
2              THE COURT:  All right.  You can proceed.
3    BY MS. MATZ:
4    Q   Okay.  You've seen this document before; correct?
5    A   Yes, ma'am.
6    Q   Okay.  And this is a list of videos published on your
7    YouTube account with the number of views in the column all the
8    way to the left?  Do you see that?
9    A   Yes, ma'am.
10   Q   Okay.  And at the time that this list was produced during
11   discovery, the top video on this list, the Exclusive:  Cardi
12   B's Ex-Friend Alleges Cardi B Kept a Huge Box filled with
13   Monistat and Reveals More, that's the Starmarie Jones video;
14   correct?
15   A   Yes, ma'am.
16   Q   Okay.  And at the time that this was produced, it had over
17   4.2 million views; is that correct?
18   A   That is correct.
19   Q   And is it your understanding that this list is organized
20   in a fashion so that, at least at the time that this was
21   published, the videos with the most views are at the top?
22   A   Yes, ma'am.
23   Q   Okay.  So at the time that this was produced, during this
24   lawsuit, this -- the Starmarie Jones video was the top viewed
25   video on your YouTube channel; correct?
```

1   A    That is correct.

2   Q    And yet it is still your testimony that the spike in

3   views, in subscribers and views, between August and September

4   and October of 2019, you're saying that was all R. Kelly?

5   A    Yes, ma'am.  I actually lost around --

6   Q    Thank you.

7   A    -- 13,000 followers --

8   Q    It was a yes or no question, ma'am.

9   A    -- from the Cardi B interview.

10          THE COURT:  She did say yes, but she was giving her

11   explanation.  So go ahead with your explanation.

12          THE WITNESS:  Thank you, your Honor.

13          So right around the time when I published the

14   Starmarie interview and the R. Kelly videos, of course you can

15   see the various dates, they were going viral because *Surviving*

16   *R. Kelly* came out.  I actually lost around 13,000 subscribers

17   from the interview because of the controversy of it.  But in

18   January, as the R. Kelly videos rolled, I gained about

19   anywhere from 20- to 60,000 per se over the course of the

20   months.

21   BY MS. MATZ:

22   Q    Okay.  So you're saying that this video had nothing to do

23   with it.  That's your testimony?

24   A    I mean, I'm sure it had some, you know, spike but not

25   much.  I mean, it really did drastic damage on my channel.

1  Q   So when I asked you if it was your testimony that it was

2  solely due to the R. Kelly video and you said yes, that wasn't

3  true; correct?

4  A   You asked me -- your question was, was it just R. Kelly or

5  Cardi B.  It was a collective.  So around that time, from

6  August to January, the *Surviving R. Kelly* videos caused a

7  spike.  Of course, that interview with me and Cardi B going

8  back and forth became viral, but that one video really did

9  nothing for my channel.

10 Q   Okay.  All right.  You also testified about a video that

11 you did.  I believe you said you were defending my client for

12 taking a part in a prior acting job.  Do you recall giving

13 testimony about that?

14 A   Yes, ma'am.

15 Q   Okay.  And in that video when you said you were defending

16 my client, you also said she prostituted for a living;

17 correct?

18 A   That is correct.

19 Q   All right.  Let's talk about the Starmarie Jones video

20 interview for a moment.  Being familiar with the analytics

21 from your YouTube channel, do you know how long most people

22 watch your videos?

23 A   It's different for every video.  That's hard to say.

24 Q   But is it generally true that more people watch the

25 beginning of videos and fewer people finish the full length of

1  longer videos?

2  A    Yeah.  That's, of course, for everything, yes, ma'am,

3  every video.

4  Q    That's generally true on YouTube probably in general;

5  correct?

6  A    Movies as well.

7  Q    Okay.  So it -- actually, withdrawn.  Let me ask you

8  another question.  All right.  Now, you have given some

9  testimony today about your interview with Starmarie Jones.

10  And is it your testimony that you believe she was credible?

11  A    Yes, ma'am.

12  Q    All right.  Let's look at the video for a moment.  We can

13  pull it up.  I believe it's D-5.

14          This was moved in, I believe.  Did you move this in?

15          MR. SABBAK:  Of course we did.

16          MS. MATZ:  Yeah.  All right.  If you can, just play

17  the first maybe 30 seconds of it.  We're not going to rewatch

18  the whole thing.

19          (Whereupon, a video recording was played.)

20  BY MS. MATZ:

21  Q    Please pause there for a moment.  All right.  You've

22  previously admitted under oath that the reason you asked those

23  three questions first is because those are the things that

24  Starmarie had stated in her prior interview that went viral?

25  A    It wasn't an interview.  It was a live stream of hers that

1    went viral.

2    Q    But you did testify that you asked those three things

3    first because that's what she stated that went viral?

4    A    That's correct.

5    Q    Okay.  And in the video, in this interview Ms. Jones gave

6    multiple statements about her criminal history; correct?

7    A    That is correct.

8    Q    She said that during the time she was claiming that she

9    was living with Cardi B, she was going to Georgia to check in

10   with her probation officer?

11   A    That is correct.

12   Q    You also heard her tell you that she couldn't pass a

13   background check?

14   A    That is correct.

15   Q    And that's because she had criminal felony convictions?

16   A    I'm not sure of the conviction.  I just know that she had

17   some stuff in process.

18   Q    But you described it in your deposition as quite the

19   criminal past; correct?

20   A    It was one incident, I believe.

21   Q    I asked you if that's how you described it in your

22   deposition.

23   A    May I see my deposition, please?

24   Q    Sure.  All right.  You should have it up there.

25   A    Oh.  Hold on.  So which day?

1    Q    The 11-19 deposition.

2    A    Okay.  What page?

3    Q    Page 200.

4    A    200 and what line?

5    Q    Actually, I think it's on the next page.  Hold on one

6    moment.  All right.  Page 201, line 9, she told me she had

7    quite a criminal past so yeah.  All right.  So she told you

8    she had quite a criminal past?  Answer, yes.  Is that the

9    testimony you gave?

10   A    Yes, ma'am.

11   Q    All right.  You also heard Starmarie tell you that she

12   allegedly lied to the owner of the strip club and told him

13   that Cardi was her cousin; right?

14   A    That is correct.

15   Q    All right.  You also recall saying in the interview that,

16   when you were talking about the herpes allegation, saying that

17   it was quite a serious allegation?

18   A    Yes, ma'am.

19   Q    Okay.  So you understood at the time that it was serious?

20   A    Yes, ma'am.

21   Q    All right.  You also recall Ms. Jones saying that she was

22   mandated to the state of Georgia, and she was in New York

23   illegally?

24   A    Yes, ma'am.

25   Q    At one point during the video also you talked about

```
 1   getting receipts from someone named Ebony.  Do you recall
 2   that?
 3   A   Yes, ma'am.  I believe Starmarie said that.
 4   Q   Right.  Starmarie was talking about wanting to be able to
 5   give you proof for certain other things she was saying; right?
 6   A   I believe so.
 7   Q   Because she hadn't actually provided you with any
 8   corroborative documents to substantiate what she was saying in
 9   the interview; correct?
10   A   She showed me Instagram comments between her and the
11   strippers as well as her and Cardi B's current make-up artist
12   at the time.
13   Q   And did you keep those?
14   A   Yes, ma'am.  They're in the receipts video.
15   Q   So Starmarie showed you those or you had those
16   conversations with the strippers?
17   A   I don't understand your question.
18   Q   Well, you just said that Starmarie showed you both
19   Instagram comments and conversations with the people you
20   referred to as strippers.
21   A   Correct --
22   Q   But in the video --
23   A   -- and make-up artist.
24   Q   And the make-up -- Shawn Taloran; correct?
25   A   Yes.
```

1   Q    And I asked you if you kept them.

2   A    Yes, ma'am.

3   Q    Okay.  And so when we were looking at -- and we'll get

4   there in a minute.  But when we were looking at your video

5   where you showed conversations with Shawn Taloran, are those

6   Starmarie's conversations with Shawn Taloran or yours?

7   A    Those are mine.

8   Q    Okay.  So there were separate documents that you're now

9   saying that Starmarie showed you?

10  A    They weren't documents.  They were messages on her phone

11  between her and those girls.

12  Q    But I asked you if you kept them, and you said yes.

13  A    No, I kept the receipts.  That's why I asked you to repeat

14  your question.

15  Q    So she showed you messages that you didn't keep?

16  A    No, ma'am.  She showed me messages in order to solidify

17  the interview that there was some sort of connection between

18  her and Cardi B.

19  Q    All right.  But during your deposition when I asked you if

20  Jones actually showed you any documents or anything that --

21  anything that corroborated her story, you said no.

22  A    I think I took that question as documents because you just

23  used it here.

24  Q    I said documents or anything that corroborated her story.

25  A    Was this on the first day of the deposition or the second

1  day?

2  Q   I'm asking you if that's the testimony you gave.

3  A   Okay.  And I'm trying to corroborate the testimony.  So

4  which day was this testimony given?

5         THE COURT:  I'll tell you what, just go to the point

6  in the transcript, if you would, where it was discussed.

7         MS. MATZ:  Sure.  Let's look at the November 19th

8  deposition, line 203, 13.

9         THE WITNESS:  Okay.

10 BY MS. MATZ:

11 Q   All right.  So at the deposition I asked you -- we'll look

12 at the video in a minute.  Did Ms. Jones actually show you any

13 documents or anything that corroborated her story?  Answer,

14 no, not that I can recall, no, she didn't.  Is that the

15 testimony you gave?

16 A   Yes, ma'am.

17 Q   And when I asked you on the first day -- I questioned you

18 here -- do you also recall that I asked you and you also

19 admitted that Ms. Jones, Starmarie Jones, did not actually

20 show you any documents or anything that corroborated her

21 story; correct?  And you said, yes, ma'am.

22 A   Okay.  I took that as --

23 Q   Do you recall giving that testimony?

24 A   Yes, ma'am, I do.

25 Q   Okay.  So now you're changing your story; is that correct?

```
1   A    I'm not changing my story.  I misunderstood your question.
2   Q    Okay.  So when I asked you if you had anything that
3   corroborated it, you didn't understand that.  That's your
4   testimony now?
5   A    Yes, ma'am.  I was very -- we were very combative on this
6   day.  You remember?  It was a very hard day for both of us.
7   So your questions were coming, and I'm talking about coming
8   fast, sort of like how you're doing here so --
9              MS. MATZ:  Your Honor, move to strike.
10             THE COURT:  Any response to that?  No response.  So
11  the witness's last statements will be stricken from the
12  record.  And ask your question again, please.
13  BY MS. MATZ:
14  Q    My question is, so you are now changing the testimony you
15  gave at both your deposition and the first day of this trial;
16  correct?
17  A    No, ma'am.
18  Q    Except now you are saying that you did look at other
19  things that you didn't testify to?
20  A    Yes, ma'am.
21             MR. SABBAK:  Objection, your Honor.  Asked and
22  answered.
23             THE COURT:  Overruled.
24  BY MS. MATZ:
25  Q    Which is a change to the prior answer; correct?
```

```
1   A    I mean --

2   Q    Yes or no, ma'am?

3   A    Can you repeat the question?

4   Q    I'd like to know --

5          THE COURT:  Is your answer today in court different

6   than the answer you gave, either or both, at your deposition

7   or earlier in this trial?

8          THE WITNESS:  Yes, sir.  Yes, ma'am.

9   BY MS. MATZ:

10  Q    All right.  So when we were talking about the receipts

11  that Ms. Jones was talking about in the interview from Ebony,

12  you understood that Ms. Jones was telling you she thought that

13  there might be additional documents that she couldn't get;

14  correct?

15  A    Yes, ma'am.

16  Q    If we could go to -- and we're still on Defendant's 5.  If

17  we could go to line 26, 18.  I'm sorry.  Not line.  Minute 26

18  and 18 seconds.  All right.  We can just look at that -- at

19  this for a moment.  You don't have to play it.  You can just

20  leave it up on the screen.

21          Do you recall this airing in the middle of the video?

22  A    Yes, ma'am.

23  Q    And it aired again towards the end; is that right?

24  A    Yes, ma'am.

25  Q    And this is -- the reason you put this in the video is to
```

1  make sure that people who are watching it know how to follow

2  you on both YouTube and Instagram, Facebook, and Twitter;

3  correct?

4  A   Yes, ma'am.

5  Q   Okay.  And at the bottom it says subscribe to the channel;

6  right?

7  A   Yes, ma'am.

8  Q   Okay.  If we can actually watch for a moment.  So you do

9  this to encourage people to up subscribership?

10 A   Yes, ma'am.

11 Q   And so, as we just looked at, the chart of subscribership,

12 the 4.2 million people who had seen this as of this date would

13 have seen your plug to subscribe to your channel; correct?

14 A   Yes, ma'am.

15 Q   Okay.

16         (Whereupon, an audio recording was played.)

17 BY MS. MATZ:

18 Q   Okay.  Can you pause.  Okay.  And these are both email

19 addresses associated with your unWinewithTashaK platform;

20 correct?

21 A   Yes, ma'am.

22 Q   And the first one here -- it says forward tips and stories

23 to unwinewithtashak@gmail.com -- you put that here to solicit

24 people to send you information; right?

25 A   Yes, ma'am.

1  Q   And the second one is for people who want to advertise

2  with you; right?

3  A   Yes, ma'am.

4  Q   All right.  Do you recall also during the video there

5  being a discussion about -- by my client responding she looks

6  guilty?  Do you recall that?

7  A   No, ma'am.  Can you replay it for me?

8  Q   Sure.

9  A   Thank you.

10 Q   Could we just go to 29:23.

11         (Whereupon, a video recording was played.)

12 BY MS. MATZ:

13 Q   All right.  Pause here.  Do you recall this discussion?

14 A   Yes, ma'am.

15 Q   Okay.  And do you share Ms. Jones's view that by

16 responding and saying this isn't true, that somehow makes my

17 client look guilty?

18 A   Yes, ma'am.

19 Q   Okay.  So it's your view that if people say untrue things

20 about my client, she should just keep her mouth shut?

21 A   Sometimes, yes, ma'am.

22 Q   And by voicing that they're not true, that somehow makes

23 her look guilty.  That's what you believe?

24 A   Yes, ma'am.

25 Q   At the time this video was published, not when it was

1  recorded, but at the time it was published, had you already

2  had the conversations with Ash Cash Legit and Spotlight and

3  Shawn Taloran that we looked at in a following video?

4  A   No, ma'am.

5  Q   So you had those conversations afterwards?

6  A   Yes, ma'am.

7  Q   All right.  So at the time you hadn't actually spoken to

8  any of the people that you were saying you later spoke with

9  about Ms. Jones and my client working together; correct?

10 A   I believe so, yes, ma'am.

11 Q   All right.  In this interview there was also a discussion

12 where Ms. Jones said that Offset also had a herpes blister.

13 Do you recall hearing that?

14 A   Yes, ma'am.

15 Q   Is that what prompted you to go looking on the internet

16 for photos?

17 A   I'm sorry?

18 Q   Is that what prompted you to go looking on the internet

19 for the photos that we looked at earlier?

20 A   Of Offset?

21 Q   Yes.

22 A   Oh.  No, ma'am.

23 Q   You looked at those before?

24 A   No, ma'am.

25 Q   You looked at those after this video was published?

1    A    Yes, ma'am.

2    Q    All right.  You also recall that Ms. Jones in this video

3    told you on a couple of different occasions that she was

4    saying that my client, Cardi, told people at this club that

5    she had herpes.  Do you recall that?

6    A    Yes, ma'am.

7    Q    And she characterized that allegation as trying to kill

8    her career.  Do you recall that?

9    A    Yes, ma'am.

10   Q    Okay.  So when you published this video with her

11   statements in it, you understood that she at least thought

12   that those would be damaging to someone; correct?

13   A    I'm sorry.  Can you repeat your question.

14   Q    Sure.  I said when you published this video with those

15   statements in it, you understood that she believed that such

16   allegations would be damaging to someone; correct?

17   A    I can't speak for her.

18   Q    You can't speak for her on this?

19   A    No, that's -- because we didn't talk about that.

20   Q    She didn't say to you that Cardi by -- allegedly saying

21   that was trying to kill her career?

22   A    At the time.  We're talking about something that happened

23   years prior, around 2010.

24   Q    So at least at the time when she was working then, you

25   think that she believed it would have been damaging?

1  A   I can't speak on that.  I wasn't working in that club at

2  the time.  That was around 2010.  We recorded this interview

3  in 2018.

4  Q   Okay.  So you can't speak to her state of mind about the

5  time period in question?

6  A   No, ma'am.

7           MR. SABBAK:  Objection.  Speculation, your Honor.

8           THE COURT:  Well, I don't think it's speculation as

9  to whether or not the witness can answer a question about

10  whether she could speak to someone's state of mind.  I think

11  if she tried to do that, the objection would probably fit.

12  Also, the question has been answered.

13           MS. MATZ:  Thank you.

14           Okay.  You also heard Ms. Jones talk about, towards

15  the end of the interview, how she had recently reached out to

16  my client; correct?  At the time this was recorded, of course.

17           THE WITNESS:  I don't believe it was recently.  She

18  said when Cardi B had first became, like, famous, like on Love

19  & Hip Hop.  So that wasn't recent.

20  BY MS. MATZ:

21  Q   Okay.  But she had reached out to my client at that time,

22  the time my client was starting to become famous?

23  A   Yes, ma'am, she said that.

24  Q   And my client -- she said my client didn't get back to

25  her; right?

1  A   I believe she said, if I'm not mistaken, that she was on a

2  live stream, Cardi B's live stream, and said, hey, Caramel, or

3  something like that.  And then Cardi B then brought up someone

4  that they mutually knew and started to diss her then.

5  Q   All right.  And at least -- why don't we go to the section

6  of the interview.  Let's go to a minute 40.

7            (Whereupon, a video recording was played.)

8            MS. MATZ:  A minute 40.

9            (Whereupon, a video recording was played.)

10 BY MS. MATZ:

11 Q   All right.  We can stop there.  Okay.  So after she said

12 that Cardi went live with someone else, she was like fuck

13 this.  You heard that; right?

14 A   Yes, ma'am.  We heard it.

15 Q   Yeah, indicating that she was unhappy with that; correct?

16 A   Yes, ma'am.

17 Q   All right.

18 A   Okay.  Sorry.

19 Q   All right.  So you hadn't looked at the photos that we

20 looked at, that your counsel showed you earlier of my client

21 or Offset, before you published this video; correct?

22 A   I believe I looked at Cardi B's photo.  That photo was

23 out.  But Offset, that came out much, much later.

24 Q   Well, when did it come out?

25 A   I'm not sure.  It was after the interview, though.  I

1  can't give you a date.  I mean, it's on the post because it

2  was an Instagram post, so we can put it up.

3  Q   And you believe you looked at the Cardi -- at the photo

4  that you're saying is of my client before?

5  A   Yes, ma'am.  That photo is pretty viral.

6  Q   I asked -- are you sure whether you looked at it or not?

7  A   Yes, ma'am.

8  Q   So you're sure now that you looked at it before this?

9  A   I can't -- I mean, that's kind of hard but the -- as far

10 as the songs and people commenting --

11 Q   I'm not asking you about the songs.  I'm asking about the

12 photo.

13 A   The photo I can't say for sure, but they are on the

14 internet, yes, ma'am.

15 Q   I'm asking if you saw them.  I'd appreciate it if you'd

16 answer my question.

17 A   Yes, ma'am.  I've seen those photos before.

18 Q   I'm asking if you saw them before the interview, and I

19 understand your testimony to be you're not sure.

20 A   I can't say for sure.

21 Q   All right.  So after this interview was published, is that

22 when you're saying you reached out to certain people that my

23 client used to work with?

24 A   Yes, ma'am.

25 Q   Okay.  And so after this interview was published, that's

1   when you're saying that you took a comment off the internet

2   from Ash Cash Legit; is that correct?

3   A   Yes, ma'am.  I believe that was in Starmarie's comment

4   section.

5   Q   You believe it was in Starmarie's comment section?

6   A   If I'm not mistaken, yes, ma'am.

7   Q   Okay.  And after that is also when you're saying you had

8   direct messages, DMs, with Spotlight and Shawn Taloran; is

9   that correct?

10  A   That is correct.

11  Q   All right.  And were those the basis of the next video

12  that you made talking about this subject?

13  A   That plus more but, yes, ma'am.

14  Q   All right.  And in the next video you came out and said

15  that everything that you had said in this interview was

16  accurate; correct?

17  A   That is correct.

18  Q   Even though none of those individuals confirmed any of the

19  statements regarding herpes or prostitution or cocaine use by

20  my client; correct?

21  A   That is correct.

22  Q   All right.  And earlier when your attorney was questioning

23  you, I believe that you talked about getting DMs from the

24  Winos saying Tasha was reaching out to you?

25  A   I'm sorry.  Can you repeat that question?

1    Q    Yeah.  I'm sorry.  You know what, I'm sorry.  Let's look

2    at this video for a moment.

3    A    Okay.

4            MS. MATZ:  I'm sorry.  Let's go to the next video,

5    which is D-11.  Hold on.  I'm sorry, your Honor.  One moment.

6    I just want to make sure this is the right exhibit.

7            (Brief Pause.)

8            MS. MATZ:  All right.  We're actually going to start

9    at 5:13.  We'll come back to that when I get the time code.

10            (Whereupon, a video recording was played.)

11    BY MS. MATZ:

12    Q    All right.  Let's pause this for a minute.  Okay.  So on

13    the screen here, is this a receipt that, or what you call a

14    receipt, that you saved confirming some portion of Starmarie's

15    criminal history?

16    A    Yes, ma'am.

17    Q    Okay.  And you felt that that was an important receipt to

18    have?

19    A    Yes, ma'am, to prove that she was on probation.

20    Q    All right.  And do you save these receipts anywhere?

21    A    I'm sorry?

22    Q    Do you save these what you call receipts anywhere?

23    A    To my desktop, but then they get deleted.  They used to

24    get deleted.  Now we save everything.

25    Q    Okay.  And some of the other receipts or documents that

1   you were referring to earlier when you were talking about lots

2   of people on the internet commenting about my client, did you

3   keep any of those?

4   A   I'm sorry.  Say that again.

5   Q   Yeah.  Earlier when you were talking about there being

6   lots of documents on the internet where other people have said

7   my client had cold sores, did you keep all of those?

8   A   Oh, yes, ma'am.

9   Q   You kept all of those?

10  A   Yes, ma'am.

11  Q   And you produced them in discovery in this case?

12  A   No, ma'am.

13  Q   No, you didn't produce them in discovery in this case?

14          MR. SABBAK:  Your Honor, I object.  Can we have a

15  side bar?

16          THE COURT:  I'm sorry.  What's your objection?

17          MR. SABBAK:  It's impermissible.  Can we have a side

18  bar?

19          THE COURT:  Sure.

20          (Whereupon, a bench conference was held between the

21  Court and counsel.)

22          THE COURT:  What's impermissible?

23          MR. SABBAK:  I believe the question is why didn't you

24  provide hearsay statements.  That's all hearsay.  Why would we

25  provide that?

1           THE COURT:  Because the discovery standard is that

2     you produce evidence which will lead to discovery of

3     admissible evidence not that --

4           MS. MATZ:  Everything else you've produced in this

5     case is hearsay.  Are you telling me you didn't understand --

6           MR. SABBAK:  These are comments.

7           MS. MATZ:  I'm sorry.  What?

8           MR. SABBAK:  Their comments are throughout the -- all

9     the discovery is like 2,000 exhibits.  There's comments

10    throughout.

11          THE COURT:  The comments are what?

12          MR. SABBAK:  There are comments about that throughout

13    the whole thing.

14          THE COURT:  The point is your objection is she

15    asked -- Ms. Matz asked why didn't you produce the documents,

16    and you objected and said it's impermissible.

17          MR. SABBAK:  Right.

18          THE COURT:  And it's impermissible why?  She didn't

19    ask her what the comments were.  That's what the hearsay would

20    be.

21          MR. SABBAK:  Withdrawn.

22          THE COURT:  Okay.  Do it on the record.

23          MR. SABBAK:  Sure.

24          (Whereupon, the following proceedings continued in

25    open court.)

1           THE COURT:  All right.  So an objection was lodged to

2    the question by defense counsel.  The objection has been

3    withdrawn.

4           MS. MATZ:  Was the question answered?

5           THE COURT:  And the question was.  You produced them?

6    Referring to these documents or receipts in discovery in the

7    case.  And the answer was, no, ma'am.  And then the question

8    right before the objection was, you didn't produce them?  I'm

9    sorry.  This is a rough draft.  So let's just ask your

10   question again because I'm a little confused with some of the

11   text in this rough draft of the transcript.  So go ahead.

12           (Whereupon, the record was read.)

13           THE COURT:  So the question is you didn't produce

14   them, question mark.

15           THE WITNESS:  No, ma'am.

16   BY MS. MATZ:

17   Q   Did you understand that they had been requested?

18   A   No, ma'am.

19   Q   All right.  And is that also the reason we're not looking

20   at them here today?

21   A   That is correct.

22           MS. MATZ:  Your Honor, I apologize.  Can I just

23   confer for one moment?

24           THE COURT:  Sure.

25           (Brief Pause.)

1  BY MS. MATZ:

2  Q   All right.  So in terms of those other comments that

3  you're testifying about that you didn't produce, we just have

4  to take your word for it; right?

5  A   Yes, ma'am, but they are --

6  Q   Okay.  Thank you.  We were looking at -- I believe we were

7  looking at D-11 still.  And you recall talking a little bit

8  about the cease and desist letter you received; correct?

9  A   Yes, ma'am.

10  Q   And D-11 was a video that you released on what date?  Do

11  you recall?

12  A   D-11?  What's D-11?

13  Q   The video we're looking at right now.

14  A   Oh.  What date was this video released?

15  Q   Yeah.

16  A   I believe the 21st, if I'm not mistaken.

17  Q   Right.  And that was after you received the cease and

18  desist letter; right?

19  A   That is correct, yes, ma'am.

20  Q   Okay.  And we know that because you show the cease and

21  desist letter in the video; right?

22  A   Yes, ma'am.

23         MS. MATZ:  Okay.  All right.  If we can look, please,

24  at 11:55 approximately, please.  You can start here.  Okay.

25         (Whereupon, a video recording was played.)

BY MS. MATZ:

Q   All right.  Let's pause for a moment.  All right.  So here you said in this video to all your viewers that your lawyer in D.C. looked at this and determined it was a fake cease and desist; correct?

A   That is correct.

Q   All right.  And you were saying that to imply to your viewers that this cease and desist letter wasn't real, to discredit it; right?

A   That is correct.

Q   Okay.  During your deposition, however, you admitted that around this time you didn't have legal counsel; correct?

A   That is correct.

Q   Okay.  So when you said that to your viewers in your video, that your lawyer looked at it and determined that it was fake to get them to discredit it, you were lying to them; correct?

A   No, ma'am.

Q   So you had legal counsel at this time?

A   No, ma'am.

Q   So I'm sorry.  You said your lawyer in D.C. looked at it and determined it's a fake cease and desist?

A   Yes, ma'am.

Q   Did you have a lawyer or not in September of 2018 between September 19th and September 21st?

1  A    No, ma'am.

2  Q    So when you told your viewers that your lawyer looked at

3  it and determined it was fake, you were lying; correct?

4  A    No, ma'am.

5        THE COURT:  I think there's another question you

6  should ask.

7  BY MS. MATZ:

8  Q    Are you lying now or were you lying during your

9  deposition?

10  A    I wasn't lying, no, ma'am.

11  Q    So you had an attorney?

12  A    No, ma'am.

13  Q    Who was that attorney?

14  A    My friend.

15  Q    But you referred to it as your lawyer.

16  A    My lawyer and I forgot to say friend.

17  Q    So when you said lawyer, you meant friend?

18  A    Yes, ma'am.  My lawyer friend, who is my friend who's a

19  lawyer, who looked at the cease and desist and saw that it was

20  not a correct cease and desist because it says gentlepersons.

21  My name is not on the cease and desist.  And when she looked

22  at the email, she saw that the lawyers at the time were cc'd,

23  so it came from Cardi B's management team.  So they copied and

24  pasted to send me that.  So I didn't take it serious because

25  the actual lawyer did not sign it.  So my lawyer friend at the

1  time -- I did not retain counsel -- looked at it and said wipe

2  your ass with it.

3  Q   Okay.  But you conveyed to your viewers that that was your

4  lawyer; correct?

5  A   Yes, ma'am, I did say lawyer.

6  Q   Okay.  So you were misrepresenting the situation to them?

7  A   I mean, you could say that, yes, ma'am, but fine.

8  Q   So you asked a friend for legal advice, and they gave you

9  some counsel about this; correct?

10 A   Yes, ma'am.

11        MR. SABBAK:  Your Honor, objection.  Asked and

12 answered.  I think the jury understands.

13        THE COURT:  Overruled.

14 BY MS. MATZ:

15 Q   But you do recall also that at your deposition when you

16 were being asked about your efforts to preserve certain

17 information that you claimed was deleted, that your excuse for

18 not having preserved that was that you didn't have legal

19 counsel at this time?

20 A   That is correct.

21 Q   All right.  And you mentioned this again at minute mark

22 12:33; correct?

23 A   I believe so.  Can you play it.

24        (Whereupon, a video recording was played.)

25        MS. MATZ:  Can you back that up a little bit.

```
 1              (Whereupon, a video recording was played.)
 2    BY MS. MATZ:
 3    Q    All right.  So here again you misrepresented this person
 4    who you were getting advice to -- or from as your lawyer;
 5    correct?
 6    A    Yes, ma'am.
 7    Q    Okay.  And that was so the people who were watching this
 8    would think that that person was your lawyer; correct?
 9    A    Yes, ma'am.
10    Q    But you're saying that's not true.  That person was not
11    your lawyer?
12    A    Wasn't my lawyer, no, ma'am.
13    Q    I believe you also testified a minute ago that this was
14    sent by my client's management team?
15    A    I believe so, yes, ma'am.
16    Q    Okay.  So you're saying it wasn't sent from a law firm
17    called Davis Shapiro Lewit Grabel Leven Granderson & Blake?
18    A    That is correct, yes, ma'am.
19    Q    Are you guessing when you answer that question?
20    A    Yes, ma'am, to my knowledge.
21    Q    So you're speculating again?
22    A    I mean, I can never be sure.  I'm just telling you how I
23    saw the email came in.
24    Q    But you understand you're under oath; correct?
25    A    That is correct.
```

```
 1   Q    So you're giving testimony under the penalties of perjury.

 2   A    Yes, ma'am.

 3   Q    And you're giving answers, saying yes to questions where

 4   you're really not sure; correct?

 5   A    I'm giving you answers to the best of my knowledge, yes,

 6   ma'am.  That is correct.

 7   Q    So when we pull this email up, it's not going to have come

 8   from a law firm?

 9   A    I'm not sure.  Can you just put it up and we can see?

10   Q    No, I'm asking you for your knowledge.  So either the

11   answer is yes or I'm not sure.

12   A    From my knowledge, that was sent to me from her management

13   team or someone and the lawyers were cc'd.

14   Q    Okay.

15   A    Yes, ma'am.

16   Q    Do you know if Damien Granderson is a lawyer?

17   A    No, ma'am.

18   Q    Did you google him?

19   A    I'm sorry?

20   Q    Did you google him?

21   A    No, ma'am.

22   Q    So you didn't make any effort to find out if this was

23   real?

24   A    No, ma'am.  I told you my lawyer friend looked at it.

25   Q    What kind of law does your friend practice?
```

```
 1              MR. SABBAK:  Objection.  Relevance, your Honor.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  Family law.

 4   BY MS. MATZ:

 5   Q    Okay.  And so this person doesn't really have any

 6   experience with defamation claims?

 7   A    I'm not sure.  I just called up a friend in D.C. and asked

 8   them to look at it at the time.

 9   Q    Okay.  So you called it up a friend, asked for advice, and

10   then told all your viewers what that person said without

11   having any knowledge if they had any idea what they were

12   talking about?

13   A    Yes, ma'am.

14              MS. MATZ:  All right.  Let's look at -- your Honor,

15   can I have just one second to do something with a document?  I

16   just need to find it before I move on.

17              THE COURT:  I just want to remind you that we're

18   breaking at 4:00 because I have another hearing at 4:00

19   o'clock.

20              MS. MATZ:  I understand.  Actually, it's on this line

21   of questioning so I'd like to do it now, if that's okay,

22   rather than coming back.

23              THE COURT:  Go ahead.

24              MS. MATZ:  Thank you.

25              (Whereupon, there was a pause in the proceedings.)
```

1   BY MS. MATZ:

2   Q    Thank you.  All right.  I'd like to show you what I've

3   just marked as Plaintiff's 515A.  This has not been admitted

4   into evidence yet.  Have you ever seen this before?

5   A    No, ma'am.  It looks familiar but, no, ma'am, no.

6   Q    You've never seen this email?

7   A    What's blacked out at the top?

8   Q    I'm asking if you've seen the email that is shown on the

9   screen.

10  A    I don't remember, no, ma'am.

11  Q    You don't remember?

12  A    No, ma'am.

13  Q    Okay.

14          MR. SABBAK:  Your Honor, can we approach?

15          (Whereupon, a bench conference was held between the

16  Court and counsel.)

17          MR. SABBAK:  Your Honor, it appears that Ms. Matz

18  just redacted a document that we've never seen the redactions

19  of, and she's trying to ask my client to identify it.

20          MS. MATZ:  Well, first of all --

21          THE COURT:  I'm sorry.  What's your point?  Go ahead

22  and finish.

23          MR. SABBAK:  This is a redacted copy.  We didn't

24  agree to the redaction so --

25          THE COURT:  Well --

1          MR. SABBAK:  In the email her name is completely

2    missing.

3          THE COURT:  Okay.  Tell me what is your objection.

4    She showed her a document which you had, right, because it's

5    515 on their list.

6          MR. SABBAK:  It has been heavily redacted, something

7    that we got or agreed to.

8          MS. MATZ:  So you actually objected to the part I

9    redacted because you said it was a settlement communication

10   and neither of your clients could authenticate it --

11         THE COURT:  You need to talk a little lower.

12         MS. MATZ:  I'm sorry.  And this is being offered

13   to -- excuse me.

14         MR. SABBAK:  I see what you're trying to do but --

15         THE COURT:  Okay.  So it's a document that you have.

16   So that's not true that -- you said you haven't seen it

17   before --

18         MR. SABBAK:  I didn't say I didn't see it, Judge.  I

19   said I didn't see the redactions.

20         THE COURT:  So you haven't seen the redactions.  You

21   see it now.  She's asking your client about it.  Your client

22   has said she doesn't know that she's seen it.

23         MR. SABBAK:  Right.

24         THE COURT:  So what's your objection at the point

25   where we're at right this second?

1          MR. SABBAK:  I want to see the redacted version

2   before she admits it into evidence.

3          THE COURT:  It's not been admitted yet.  You've got

4   it on the screen.  Do you want her to hand you the -- send you

5   the file of the redacted --

6          MR. SABBAK:  It's not the whole document.  I just see

7   a portion of it.

8          THE COURT:  It appears to be -- okay.  So here's the

9   thing.  You're upset because your client has backtracked on

10  what I think to be a fairly minor point, honestly, but she has

11  backtracked on her testimony or made statements that made no

12  sense.  But the document you have.  You know what it says.

13  You've got the document.  You can look on the screen and then

14  see what's been redacted and look at the document as it

15  exists.

16         I don't know where we go from here because she said

17  she hasn't seen it before.  Maybe there's some more questions

18  that can be asked, but I don't know what's inherently unfair

19  about redactions to a document that you have the complete

20  document.

21         MR. SABBAK:  Okay.

22         THE COURT:  Do you want me to admit the whole

23  document?

24         MR. SABBAK:  I'm going to pull up the -- I have to

25  recall my recollection being that -- that was an exhibit, so

1    I'm going to pull it up on my --

2            MS. MATZ:  Your Honor, it's impeachment of the juror

3    (sic).  She's saying that this email came from the business

4    managers, and it's clearly from a law firm.  I mean, like,

5    it's --

6            MR. SABBAK:  Okay.  But was that the original email

7    or is that a reply email?

8            MS. MATZ:  This is the original email.  I took out

9    the reply.

10           MR. SABBAK:  But is that the -- I have to look at

11   chain.  Is that the middle of the chain?  Is that the

12   beginning of the email?  Or what part of the email is that?

13   That's my question.  I just don't know.

14           MS. MATZ:  It's the original email that the cease and

15   desist was attached to.

16           MR. SABBAK:  When you say original, do you mean the

17   first sender?  Is that a reply?  Is that a response to one of

18   my client's responses?  Because it just doesn't look like the

19   beginning of the email.  This looks like the middle of it.

20           THE COURT:  All right.  So at this point do you have

21   a legal objection to her -- where we are, it hasn't been

22   identified, so it's not admitted.

23           MS. MATZ:  Your Honor, I can find a clean email

24   tonight if that's what they'd prefer.

25           MR. SABBAK:  I just want to look at the clean one

```
 1  before --
 2          MS. MATZ:  I do have it.
 3          MR. SABBAK:  I don't doubt it, right, but I didn't
 4  know it was going to be redacted for her today.  That's all.
 5          MS. MATZ:  I understand your comment and your
 6  objections.
 7          THE COURT:  Do you want the whole email chain then?
 8          MR. SABBAK:  I want to see the whole email first.
 9          THE COURT:  You've got all of the documents; right?
10          MR. SABBAK:  I mean, I --
11          THE COURT:  Okay.  Go look at it.  Go look at it.
12          MR. SABBAK:  I will.
13          (Whereupon, the following proceedings continued in
14  open court.)
15          THE COURT:  All right.  So counsel expressed concerns
16  about Document 515A.  Do you still have an objection?
17          MR. SABBAK:  Yes.
18          (Whereupon, a bench conference was held between the
19  Court and counsel.)
20          MR. SABBAK:  If she plans on introducing it, we ask
21  that it be introduced in its entirety.
22          THE COURT:  You want the whole thing in?  Even the
23  stuff that was redacted?
24          MR. SABBAK:  That was a different email.  What she's
25  referring to is a different email.  The one at the top is from
```

1  Cheick, from her husband.  That's the stuff you redacted;

2  right?  The email response was from her husband, which is what

3  she testified to.  So what you redacted was evidence of what

4  she testified to.  That's why I'd like the whole thing in.

5          MS. MATZ:  What she responded was evidence that it

6  came from her business managers?

7          MR. SABBAK:  I'm not understanding what you're --

8          THE COURT:  Can I see a hard copy of it?

9          MS. MATZ:  Yeah, sure.  I'd be happy to show it to

10  your Honor.  Are our exhibit books up there?  I'm sorry.

11          THE COURT:  Exhibit 515?

12          MS. MATZ:  Yes, it is.  And let me just grab my --

13          THE COURT:  So you want what was there?

14          MS. MATZ:  Yeah, that was already redacted because

15  that's actually privilege forwarded.

16          MR. SABBAK:  Right.  Whatever you had on 316 --

17  there's a response from her husband.  There we go.  Let me

18  see.

19          THE COURT:  You want the whole thing?  This whole

20  document as it is right here now?

21          MR. SABBAK:  Just this page that we were talking

22  about because I think she's going to impeach her on whether or

23  not she responded to the email, but that's her husband right

24  there, which is what you redacted.

25          THE COURT:  I don't think that's -- I think you're

1  misinterpreting what the plaintiff is doing.  But you want

2  this whole thing in?  Do you have any problem with the whole

3  thing going in?

4          MS. MATZ:  I may not, but can I check one thing on my

5  iPad?  I apologize I didn't bring both.  Just give me one

6  second.

7          THE COURT:  Sure.

8          (Brief Pause.)

9          MS. MATZ:  Okay.  I'm okay with it under one

10  condition.  This is not the email that we talked about on the

11  fist day of trial that you guys contended opened the door to a

12  bunch of other stuff because your client -- I just want to put

13  it on the record because I don't want something else coming in

14  later about that.  And I want to make sure that they are

15  waiving their objection to the settlement communication

16  because they did put that objection on the record.  And I

17  don't know --

18          MR. SABBAK:  I am not waiving my objection to

19  settlement communications in general.

20          MS. MATZ:  No, just this, just this.

21          MR. SABBAK:  Obviously, if I'm asking to put it --

22  how broad are you asking me?  I'm not going to agree to

23  anything you said because --

24          MS. MATZ:  I'm putting it on the record because I

25  don't want an issue on appeal where they claim --

1          THE COURT:  Okay.  Y'all just step down.

2          (Whereupon, the following proceedings continued in

3   open court.)

4          THE COURT:  We're not going to be able to work this

5   out quick enough, and I've already passed the time I told you

6   that we were going to end.  So let me give you a little bit --

7   we're going to end now.  Let me give you a little bit of my

8   best guess about where we are.  I'm not sure that the

9   defendants are going to have another witness to testify.  They

10  might.  But I'm thinking that probably tomorrow the evidence

11  will be finished in the morning, thereabouts, and that we

12  would have closing arguments tomorrow and that I would also

13  charge you on the law.

14         Rather than have you come back at 9:30, I'm going to

15  ask you to come back at 10:30.  I'm going to ask that the

16  lawyers and the parties come back at 9:00 a.m. so that we can

17  finalize the jury instructions.  I've already got several

18  pages -- 20 something pages of jury instructions put together

19  that I'm going to give to counsel before they leave today so

20  that they have a chance to look at it over the evening.  And

21  they should be prepared when they arrive in the morning at

22  9:00 o'clock to talk about things that are in there that they

23  think shouldn't be in there and things that aren't in there

24  that they think should be in there.

25         And then that way we can make those decisions before

1  you arrive at 10:30.  At 10:30 we'll continue with the

2  questioning that is ongoing now, and then there could be some

3  more evidence.  Defendant could have some more.  The plaintiff

4  would also have an opportunity to have rebuttal testimony if

5  that's applicable in their opinion.  If you think about it,

6  the defendant already has the opportunity to rebut anything

7  that the plaintiff's evidence has shown because they go

8  second, and so the law allows the plaintiff, after the

9  defendant puts on their evidence, to then introduce any new

10  testimony, not the same stuff we've heard.  But if there's

11  something new they would need to rebut or attempt to rebut,

12  what the defendant has put forward, they could do so.

13         So I think sometime tomorrow afternoon we'll have

14  closing.  I'm not sure if there will be a lot of time that is

15  available for you to deliberate tomorrow.  I hope that there

16  is some, but there's no guarantee.  And there is also, you

17  know, a requirement that the jury reach a verdict in any

18  particular amount of time.

19         You would need to plan on being back probably on

20  Monday to continue jury deliberations or to begin them if we

21  don't get to that until Monday morning.  I'm relying on the

22  information I'm telling you because I'm beginning to plan my

23  week next week.  I've got Monday open for this trial, but I'm

24  beginning with other hearings on Tuesday for the rest of the

25  week.

1          Again, that doesn't mean that decisions have to be

2    made in this case by then, and I will adjust my schedule

3    accordingly to what's going on in this case.  This case will

4    have priority for all that I'm doing, but I'm trying to

5    maximize the efficient use of my time for other matters, if

6    possible, too.

7          Do you have any questions from the jury that you want

8    to ask?  Return in the morning at 10:30 so at least you won't

9    have to deal with rush hour on the way in.  You may have to on

10   the drive out.  But we'll see you tomorrow morning at 10:30.

11   Thank you.

12          COURTROOM SECURITY OFFICER:  All rise.

13          (Whereupon, the jurors exited the courtroom.)

14          THE COURT:  Y'all just go ahead to your tables, and

15   we'll finish the discussion in a minute.

16          MS. MATZ:  Thank you, your Honor.

17          THE COURT:  All right.  Y'all can be seated.  So we

18   were talking about Exhibit 515.

19          MS. MATZ:  Your Honor, I apologize.  May I ask that

20   Ms. Kebe be excused from the courtroom while we talk about

21   something that could affect her testimony?

22          THE COURT:  It's hard for me to -- I can't order a

23   party to step out of the courtroom ever.  I mean --

24          MR. SABBAK:  We would object to that, your Honor.

25          MS. MATZ:  Okay.

1           THE COURT:  So I can't do that.  But as it relates to

2    the document itself, the document itself is Exhibit 515, which

3    is on the plaintiff's list.  And some questions were being

4    asked of the witness of whether she could identify what the

5    document was.  There were some redactions that were made to

6    the document.  The defendant has objected.  We've had a lot of

7    discussions which, frankly, I'm confused about, but I think

8    we've solved it in the sense that the plaintiff is going to

9    introduce the document without the redaction from the original

10   515 and in doing so, though, wants to make clear that the door

11   is not being opened in some way.  And I think you referred to

12   settlement discussions.

13          The earlier pretrial there were certain objections

14   that the defendant had made about settlement, about settlement

15   offers when a letter was sent from the lawyers for the

16   plaintiff to the defendant, and then the defendant responded

17   to those letters.  And the defendant's position was that none

18   of it could come in because if it came in, then it would be

19   violative of the rule against apprising the trier of fact

20   about any settlement discussions.  And the Court -- you're

21   going to have to help me remember because it's been two weeks

22   now nearly.  The Court ruled that 515 could come in --

23          MS. MATZ:  A different email, your Honor.  I don't

24   mean to interrupt you, but this was actually a totally

25   different email.

1          THE COURT:  Totally different letter?

2          MS. MATZ:  Yeah, totally the -- and I apologize for

3     interrupting.  I just wanted to help you since it has been a

4     couple weeks.  515 was the first cease and desist letter.  The

5     conversation that was had -- there's two separate issues here.

6     The conversation that was had about allegedly opening the door

7     to certain things that had already been ruled out on motions

8     in limine was in reference to the second cease and desist

9     letter that was sent in 2019 from my firm.  This is a totally

10    different letter.

11         THE COURT:  All right.  So my assumption all along

12    has been what we're doing is the plaintiff is attempting to

13    prove that the witness's testimony about not thinking that the

14    cease and desist letter was valid because it didn't come from

15    a lawyer, it came from managers, isn't true by virtue of what

16    the letter itself says.

17         MS. MATZ:  Yeah.

18         THE COURT:  Who it says it was sent from.  So if 515

19    is admitted, what is it that you're afraid it would open the

20    door to?  Were you confused too?

21         MS. MATZ:  I was just clarifying because I didn't

22    want -- that was a very important issue about the second cease

23    and desist letter, and I was putting it on the record to

24    clarify because I didn't want any confusion.  I am okay with

25    the portion Mr. Sabbak wanted in from the original unredacted.

1    I'm okay with that coming in.  I just wanted to clearly put on

2    the record that they were withdrawing their objection because

3    this, the 515 -- I believe it's the Bates number.  Tom, could

4    you scroll so I can see the Bates number, please.  I'm sorry.

5    Yes, it's 515.  I wanted to make sure I wasn't saying the

6    wrong exhibit number.

7            Plaintiff's 515, the full document, they had

8    originally objected on the grounds that it also was a

9    settlement communication.  So if they would like us to put the

10   whole email in, I'm willing to do that, but I want to make

11   clear for the record that they're withdrawing that objection

12   because I don't want an issue where they requested it, and

13   then later on some appeal they take the opposite position.

14   That's all.

15           THE COURT:  Well, let me think about it just a

16   minute.

17           MR. SABBAK:  We never objected to this for the

18   record.

19           THE COURT:  Never objected to what?

20           MS. IZMAYLOVA:  If I may, your Honor --

21           MS. MATZ:  Your Honor, how many counsel?

22           THE COURT:  One counsel.

23           MS. MATZ:  Sorry.

24           MS. IZMAYLOVA:  No one is understanding this.

25           MR. SABBAK:  Your Honor, if I may?  Ms. Matz has

1  confused the Court.  She's referring to two separate emails

2  that have nothing to with each other.  I don't know why she

3  would piggyback the issue about opening the door with this

4  email, and that's why I'm sure it was the cause of the

5  confusion.  But they just have nothing to do with each other

6  at all.  We never objected to this email coming in without the

7  redactions, so there's no issue about opening the door.

8  There's no issue about waiving any objections.  We are just

9  fine.

10         MS. MATZ:  Your Honor, I don't have any problem with

11  that except --

12         MR. SABBAK:  Excuse me.  We do not waive our

13  objection to the other email that was -- that we've already

14  discussed, which will absolutely open the door.

15         MS. MATZ:  That's fine.  They don't need -- the

16  other -- the Court has already ruled on the other one.

17         THE COURT:  I think they've said what you need;

18  right?  I mean, he's basically said this doesn't open the door

19  to anything, the fact that it comes in.

20         MS. MATZ:  They have, and they're waiving their

21  objection based on it being a settlement communication.  And I

22  apologize.  This is very frustrating because if you look at

23  the list of objections they filed, they did file that this was

24  a settlement communication, and I don't appreciate being

25  accused of making things up when I'm literally looking at the

1  pretrial order.

2          MS. IZMAYLOVA:  Your Honor, it is on our exhibit

3  list.  This exact email is on the defense exhibit list as well

4  so --

5          THE COURT:  Well, 515 is coming in.  The plaintiff

6  wants it to come in.  The defendant has not objected to it

7  coming in.  I don't fully appreciate how it could open the

8  door to really anything other than what it is.

9          MS. MATZ:  Yeah, great.

10         THE COURT:  So that's where we are.

11         MS. MATZ:  Okay.  Fantastic.

12         THE COURT:  How much longer will -- and if you don't

13 know, just tell me.  But how much longer do you think your

14 cross will take?

15         MS. MATZ:  Don't hold me to it.  I was hoping to

16 finish up in three hours.  It might take me a little longer.

17 I'm getting a lot of --

18         THE COURT:  Four hours or three hours total?

19         MS. MATZ:  I was hoping for originally three hours,

20 but it's clearly taking me longer because I'm getting a lot of

21 inconsistent answers.

22         THE COURT:  All right.  So I may have been a little

23 overly optimistic then and when we argued -- I don't -- you've

24 got two hours for argument in total between you.  I really

25 don't like to have jurors receive -- have argument and then

1  not get to deliberate.  So it may be that we don't argue then

2  until Monday.  But as far as any rebuttal testimony, does the

3  plaintiff anticipate any of that?

4         MS. MATZ:  Maybe.  But if we did, it would be very

5  short, I think.

6         THE COURT:  Does the defendant still believe that

7  this is your only witness or do you think that there will be

8  the need to call anybody else?

9         MS. IZMAYLOVA:  We may call another witness, your

10  Honor.

11        THE COURT:  You may?

12        MS. IZMAYLOVA:  We may.

13        THE COURT:  Okay.  All right.  Well, y'all be ready

14  to argue tomorrow.  I still want you to come back at 9:00

15  o'clock.  I want to talk about the jury instructions.  Make

16  sure that, from Mr. Roberts today, that you get a copy of the

17  Court's draft of the instructions, and then we'll talk about

18  it in the morning.

19        So really the way I expect that to go is for you to

20  flag what's in there that you don't like, and we'll talk about

21  that.  I'll start with the plaintiff and go to the defendant.

22  But also flag what it is that's not in there that you've asked

23  for that you want me to put in there.  And, again, we'll do --

24  I'll hear totally from the plaintiff first, then the

25  defendant, and hopefully by 10:30 we'll be ready.  Okay.

1   We'll see y'all in the morning.  Thank you.

2          MS. MATZ:  Thank you, your Honor.

3          THE COURT:  I'll take a 5-minute recess while --

4   let's say 10-minute recess while we reassess.

5          COURTROOM SECURITY OFFICER:  All rise.  Court stands

6   in recess.

7          (Whereupon, the proceedings were adjourned at 4:15

8   p.m.)

9                              -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        REPORTERS CERTIFICATE

2

3

4          I, Wynette C. Blathers, Official Court Reporter for

5   the United States District Court for the Northern District of

6   Georgia, with offices at Atlanta, do hereby certify:

7          That I reported on the Stenograph machine the

8   proceedings held in open court on January 20, 2022, in the

9   matter of BELCALIS MARLENIS ALMÁNZAR v. LATASHA TRANSRINA KEBE

10  and KEBE STUDIOS LLC, Case No. 1:19-CV-01301-WMR; that said

11  proceedings in connection with the hearing were reduced to

12  typewritten form by me; and that the foregoing transcript

13  (Volume VII of X, Pages 1 through 97) is a true and accurate

14  record of the proceedings.

15         This the 27th day of February, 2022.

16

17

18

19                              _____

20                          /s/ Wynette C. Blathers, RMR, CRR
                                Official Court Reporter

21

22

23

24

25
```