```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
 2                      ATLANTA DIVISION


 3


 4   BELCALIS MARLENIS ALMÁNZAR,      )
                                      )
 5                 Plaintiff,         )
            v.                        )  CIVIL ACTION
 6                                    )  FILE NO. 1:19-CV-01301-WMR
     LATASHA TRANSRINA KEBE and       )
 7   KEBE STUDIOS LLC,                 )
                                      )  JURY TRIAL
 8                 Defendants.        )
     _____)  VOLUME VIII OF X
 9


10


11   -------------------------------------------------------

12          BEFORE THE HONORABLE WILLIAM M. RAY, II

13              TRANSCRIPT OF PROCEEDINGS

14                  JANUARY 21, 2022

15   -------------------------------------------------------

16


17


            Proceedings recorded by mechanical stenography
18           and computer-aided transcript produced by

19

                 WYNETTE C. BLATHERS, RMR, CRR
20                  Official Court Reporter
                    1714 U.S. Courthouse
21                 75 Ted Turner Drive, SW
                   Atlanta, Georgia  30303
22                     (404) 215-1547

23


24


25
```

```
 1   APPEARANCES:

 2   For the Plaintiff:         SARAH M. MATZ
                                Attorney at Law
 3                              Adelman Matz, P.C.
                                1173A Second Avenue
 4                              Suite 153
                                New York, New York  10065
 5
                                LISA F. MOORE
 6                              WILLIAM A. PEQUIGNOT
                                Attorney at Law
 7                              Moore Pequignot, LLC
                                887 West Marietta Street
 8                              Suite M-102
                                Atlanta, Georgia  30318
 9
     For the Defendants:        OLGA IZMAYLOVA
10                              SADEER SABBAK
                                Attorneys at Law
11                              Sabbak & Izmaylova, LLP
                                1875 Old Alabama Road
12                              Suite 510
                                Roswell, Georgia  30076
13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | | | |
|---|---|---|---|
1 | **INDEX TO EXAMINATIONS**
2 |
3 | **WITNESS** | | | **PAGE**
4 | LATASHA TRANSRINA KEBE
5 | Further Cross-Examination (Cont'd) By Ms. Matz | | | 69
6 |
7 | **INDEX TO EXHIBITS**
8 | **P L A I N T I F F ' S   E X H I B I T S**
9 | | | IDENTIFIED | ADMITTED
10 | 506 | Comment from HeadChampion to | 187 | 187
11 | | YouTube Video Entitled 'Tasha
| | K Responds to Cardi B's
12 | | Diffimation Suit & ...
| 507 | Comment from Yung Rapunxel to | 186 | 186
13 | | YouTube Video Entitled 'Tasha
| | K Responds to Cardi B's
14 | | Diffimation Suit &...
15 | 514 | Email from | 72 | 72
| | tashakbusiness@gmail.com to
16 | | dgranderson@davisshapiro.com..
17 | 863 | Email Containing Cease and | 76 | 76
| | Desist Letter Sent from Jamie
18 | | Baratta to tashakbusiness...
19 |
20 |
21 |
22 |
23 |
24 |
25 |

```
 1                    Friday Morning Session

 2                    January 21, 2022

 3                    9:00 a.m.

 4                    -  -  -

 5              P R O C E E D I N G S

 6          COURTROOM SECURITY OFFICER:  All rise.  United States

 7  District Court for the Northern District of Georgia, Atlanta

 8  Division, is now in session, Judge William M. Ray II

 9  presiding.

10          THE COURT:  All right.  Thank you, sir.

11          COURTROOM SECURITY OFFICER:  Please be seated and

12  come to order.

13          THE COURT:  All right.  So you should have a copy of

14  what we have proposed, which is based in part on what y'all

15  have proposed.  And so let me just start, as I indicated

16  yesterday, start with the plaintiff and talk about -- let's

17  first talk about what I didn't give that you requested and you

18  believe should be in there.

19          MR. PEQUIGNOT:  Thank you, your Honor.  First of all,

20  I just wanted to thank you and the Court staff for the time

21  you've put into it.  Obviously, you know, with these jury

22  instructions it's a big endeavor, and it's obvious that you

23  guys put a lot of work into it so we appreciate that.

24          As far as the categories that we feel like have been

25  excluded or would, I guess, accurately fit into that bucket,
```

1   we had proposed, I guess a couple of days ago, in addition to

2   the alter ego charge just adding one additional sentence that

3   was directly from basically the same case citation just making

4   clear that the president of a company is presumed to be its

5   alter ego, but no such presumption exists in favor of any

6   other official of the company.

7           THE COURT:  Hold on just a minute.  In the actual --

8   in the Court's version of the instructions where is alter ego?

9           MR. PEQUIGNOT:  It is, your Honor, on page 9.  The

10  case citation there is *Sims v. Miller's*.

11          THE COURT:  I'm just comparing right now.  So what is

12  the testimony as to Ms. Kebe's position with Kebe Studios?  I

13  know she's the face of it, and I'm sure she testified about

14  what her position was.

15          MR. PEQUIGNOT:  Your Honor, Ms. Kebe testified when

16  she was on the stand, that her husband was the president, and

17  then when Mr. Kebe was on the stand, we asked him about that.

18  And his testimony was that both he and his wife are the

19  president of the company.

20          THE COURT:  Is that a legal possibility?  I mean, for

21  two people to share the role as president in an LLC under

22  Georgia law?

23          MR. PEQUIGNOT:  Well, I mean, your Honor, it's hard

24  to argue about what is legally possible in this situation

25  because we don't have really any meaningful distinction

1 between the individuals and the company.  So --

2          THE COURT:  What do you mean?

3          MR. PEQUIGNOT:  Meaning that there's no operating

4 agreement.  There's no corporate resolution.  There's nothing

5 that establishes they have some formal title in the sense that

6 your Honor's -- as I understand your Honor's question.  It

7 really boils down to how they testified and what their own

8 subjective belief is about their role within the company.  And

9 they both testified or she testified that he's the president,

10 and he testified that the two of them are the president.

11          THE COURT:  Yeah, but my question is more focused on

12 what Georgia law permits.  Does the record reflect that this

13 is a Georgia LLC?

14          MR. PEQUIGNOT:  It is a Georgia LLC, your Honor.

15          THE COURT:  Does Georgia law have any requirements

16 that would negate the possibility that two people could serve

17 as president at the same time?

18          MR. PEQUIGNOT:  I'm certainly not aware of any, your

19 Honor.

20          THE COURT:  Do you know what the code section is

21 under Georgia law for LLCs?

22          MR. PEQUIGNOT:  Let me see if I can find it.

23          THE COURT:  14-2-840 dealing with corporations,

24 partnerships, and associations.  So maybe that's it.  840 is

25 required officers.  Anything else that you want to say about

1  this particular charge?

2          MR. PEQUIGNOT:  No, your Honor.  We believe that the

3  addition that we've requested is consistent with the law, and

4  so to the extent the facts support that, then we believe it

5  was --

6          THE COURT:  I kind of want to -- I guess what I'd ask

7  is whoever is going to speak for the defendant when we're --

8  to pull the microphone close to you because I don't want y'all

9  switching back and forth.  That would be too time consuming.

10 What is the defendant's response to the request that

11 (inaudible due to microphone noise) be added to this

12 instruction?

13         MS. IZMAYLOVA:  Your Honor, I didn't hear what the

14 sentence was.  I'm sorry.

15         THE COURT:  I'm sorry?

16         MS. IZMAYLOVA:  I couldn't hear what the sentence --

17         THE COURT:  If you go to page 9 of our instructions,

18 of my instructions, the alter ego instruction is the first

19 instruction at the top of the page.  And the addition that the

20 plaintiff asked for is this:  Quote, the president of a

21 company is presumed to be its alter ego, but no such

22 presumption exists in favor of any other official of the

23 company.

24         So I guess it really -- you know, it's a rebuttable

25 presumption, I suppose.  It doesn't say otherwise.  Maybe you

1  checked that statement is in the case cited.

2          MS. IZMAYLOVA:  I don't really have any objection to

3  it.  I don't really think it's necessary per se because I

4  believe that the Court's charge already covers that.  I mean,

5  basically the sentence before then to me sounds like it's

6  saying the same thing.  But I don't really -- I don't

7  necessarily have an objection to that additional sentence --

8          THE COURT:  The sentence before?  I'm going to add

9  the statement then as requested.  I mean, the honest truth, I

10  think, ultimately is it's not really going to matter.  If the

11  jury decides that the plaintiff was defamed and damaged, I

12  can't imagine that the company is not going to be held

13  responsible because it was the company's business that

14  Ms. Kebe was engaged in.

15          When she was questioned about finances, she stated

16  she didn't even know, that was her husband's responsibility

17  and his role on behalf of the company, whether the profits

18  made, the ad revenues derived inured to the benefit of the

19  company, maybe ultimately to the members of the LLC.  But, you

20  know, the LLC is a legal being just like a corporation is.

21          So I don't think the addition of the instruction is

22  going to necessarily make the case any stronger for the

23  plaintiff because it's going to, in my mind, depend on whether

24  or not the plaintiff wins her defamation claim in the

25  abstract, not necessarily as to whom.

```
 1              I mean, Mr. Kebe has no liability here.  There's no
 2    allegations against him specifically, so his liability would
 3    only be derivative of his ownership interest in the LLC.  So
 4    I'm going to add that request to charge.
 5              All right.  Your next issue, sir?
 6              MR. PEQUIGNOT:  Yeah, so, your Honor, our Plaintiff's
 7    Request to Charge No. 22 was an additional charge related to
 8    actual malice.
 9              THE COURT:  Hold on a second.  Let me catch up with
10    you.
11              MR. PEQUIGNOT:  If you have the joint proposed
12    charges, it is on page 32, Request to Charge No. 22.
13              THE COURT:  All right.  Go ahead, sir.
14              MR. PEQUIGNOT:  So, your Honor, you know, it's our
15    position obviously that this is a fair statement of the law.
16    If your Honor has not included it simply because you believe
17    that the actual malice charge that is included is sufficient
18    and this additional charge is unnecessary, we're fine with
19    that and simply arguing this is a relevant factor for purposes
20    of finding actual malice when we argue to the jury.  But I
21    just wanted to clarify that to make it clear that this wasn't
22    included as any indication the Court believes this is not a
23    fair statement of the law.
24              THE COURT:  Give me a second to look at that case.
25              MR. PEQUIGNOT:  I'm sorry?
```

1          THE COURT:  Give me just a second to look at that

2    case.  All right.  So hold on a second.

3          (Brief Pause.)

4          THE COURT:  And this comment might apply to other

5    charges of either party that I did not include.  It is not an

6    incorrect statement of the law, but it's also not necessarily

7    a jury instruction.  And this is a pretty old case, 1931 case.

8    Opinions were written differently then than they are today, so

9    they're a little less clear because they're almost dating back

10   to that period of time.  Put on my reading glasses.  At that

11   time cases were written in very abstract kind of formation

12   where basically principles of law were just sort of laid out.

13         I think the issue in that case is whether there was

14   sufficient evidence in the record to establish malice, and the

15   Court points to something that could be actual malice.  And

16   that is you were told that it was incorrect.  I suppose there

17   was no evidence that whatever statements were made were

18   correct, and then you refused to retract what you had said.

19   And, you know, having served on an appellate court, I

20   certainly understand that oftentimes appellate courts comment

21   about the evidence as it happens to appear in the record to

22   say that certain elements of whatever the charge was, tort,

23   contract, whatever, are met and point to the evidence that

24   could have satisfied that.

25         But I don't think it's necessary to give that charge

1  that you've requested.  To me that's really just more of a

2  function of argument.  And should the jury find in your favor

3  as to malice, then certainly the fact that there were demands

4  made to retract or cease and desist, the defamation that went

5  unheeded would provide sufficient evidence for the appellate

6  court to affirm the decision that the jury makes.

7          And I recognize that, you know, we spent a good bit

8  of time yesterday -- and we may not yet be finished with

9  that -- arguing about whether or not retractions were

10  received, demand for retractions or cease -- cessation of

11  defaming conduct was received by the defendant.  But assuming

12  that the jury has sufficient evidence, which I think they do,

13  to conclude that these demands were made, then the continued

14  defaming statements that the defendant allegedly made would

15  provide that necessary -- so I'm not going to give that

16  instruction, but that's my explanation.

17          MR. PEQUIGNOT:  Thank you, your Honor.

18          THE COURT:  All right.

19          MR. PEQUIGNOT:  Our Plaintiff's Request to Charge

20  No. 29 on page 40.

21          THE COURT:  29?  All right.

22          MR. PEQUIGNOT:  And this, your Honor, we have a

23  similar view about this.  Obviously our position is this is a

24  correct statement of the law, but to the extent this was not

25  included simply because your Honor believes that the prior

1    instructions are sufficient, then, you know, we're comfortable

2    with that.  But certainly the totality of the conduct and, you

3    know, for example, there's many cases that deal with

4    intentional infliction of emotional distress and how a factor

5    that you would consider in determining whether something is

6    extreme and outrageous is whether, you know, it's repetitive

7    and continues over a period of time.

8         So that's all we were trying address with this

9    instruction, but, you know, again similar to the previous one,

10   we're comfortable making that sort of argument to the jury.

11        THE COURT:  Yeah, I think it's a similar analysis for

12   me that this principle of law can be used by the appellate

13   court to affirm the decision that a jury might make that there

14   was intentional infliction of emotional distress, but I don't

15   think it's necessary as an instruction.  And I'm very wary of

16   how any instructions that seem to direct jurors in one

17   direction or the other, so I'm not going to give that

18   instruction.

19        I do want to just make this basic comment about the

20   intentional infliction claim.  I'm really conflicted about

21   that claim anyway, and I don't really think it's necessary in

22   the case because I can't imagine that the jury would make a

23   decision that there was an intentional infliction of emotional

24   distress and that the plaintiff was damaged but not find that

25   there was defamation or invasion of privacy.

1          And so, you know, it's an additional charge but

2    probably the hardest charge to sustain on appeal in Georgia

3    courts.  There's just not that many cases you can look to

4    where Georgia appellate courts have found behavior to satisfy

5    this tort.  It almost seems to me under Georgia law that it is

6    a tort that was created in common law when nothing else quite

7    worked, but the behavior, of course, was just so bad that it

8    could not go unpunished.

9          And the Georgia courts have been really reluctant to

10   appellate decisions to allow the intentional infliction claim

11   to apply to normal ordinary situations that might occur

12   because they expect it to be rare, but that's sort of an aside

13   from this analysis generally.  I think the instruction that's

14   in the record or in the proposed charges is sufficient on this

15   charge or on this principle, this tort principle, and so I'm

16   not going to add this.  Thank you, though.

17          MR. PEQUIGNOT:  Thank you, your Honor.  The next one

18   was our Plaintiff's Request to Charge No. 39 on page 50.  And

19   this charge dealing with damages that are inferred for

20   defamation per se overlaps with some of the issues we have

21   with certain language in that particular charge.  But the big

22   issue here, as we see it, is that the type of damages that are

23   potentially recoverable for defamation per se are broader than

24   the other categories that we've specifically enumerated.  So

25   we have mental pain and suffering.  We have medical expenses

1   and -- but in a defamation case harmed reputation is often

2   considered sort of a primary harm caused by defamation.

3          So we've never alleged that there are special damages

4   with respect to harmed reputation but we have always

5   maintained --

6          THE COURT:  What about the special damages associated

7   with --

8          MR. PEQUIGNOT:  Meaning like we haven't tried to put

9   a number on any specific harm related to reputational harm,

10  but we've always contended in this case that the jury is

11  entitled for damages for defamation per se to find that there

12  are certain damages to the --

13         THE COURT:  General damages.  I mean, special damages

14  by nature are damages that are provable as to the amount like

15  Dr. Sherry's expenses that she charged.  There could be other

16  expenses I'm missing in my mind right now.  General damages

17  are everything else.  I guess my problem is that I don't quite

18  understand what the standard for calculating those damages

19  would be for the jury other than enlightened conscience of the

20  jury.

21         And there's no way to -- let me put it this way:

22  There's certainly no evidence of reputational harm to any type

23  of mathematical calculation.  For example, there's no

24  economist that has come in or record music expert who's come

25  in and has testified -- and whether or not they could testify

1    under *Daubert* would be another question -- but that testified

2    that the plaintiff's career has been harmed in some measurable

3    degree.

4         I have seen that happen before.  There was a case

5    before the Georgia Court of Appeals where an athlete at Auburn

6    University who was involved in a wreck and was an Olympic

7    world class athlete brought -- who was hurt in a car wreck

8    and, not his fault, and there was evidence brought in about

9    what earnings he had lost the opportunity for and likely would

10   have achieved had he not been injured.

11        We don't have anything like that here.  And that case

12   got reversed but for a different reason, not because of the

13   expert's testimony but because the trial judge did not allow

14   the defendant an opportunity to bring in its own economic

15   analysis based on some strict adherence to a pretrial order

16   that didn't include that.  And I won't bore you with the

17   details, but, in any event, we don't have any economic

18   evidence here.  And so really what we're left with is

19   enlightened conscience, I guess; right?

20        MR. PEQUIGNOT:  Right.  That's right, your Honor.

21   And the issue that we have -- so maybe it's just helpful for

22   me to explain what we had in mind with this charge.  So the

23   idea was we have medical expenses.  We have medical pain and

24   suffering, which is -- you know, there are separate

25   instructions for that.  And then we had sort of this catchall

1    category that would include reputational harm that the jury

2    could award with respect to defamation per se, and we made

3    clear in this instruction that the jury should not award

4    duplicative damages.

5          So, in other words, if you've already ordered --

6    awarded damages in these other categories, don't also award it

7    in this category.  And so we're not necessarily wedded to this

8    charge per se, but the issue is that the way that the current

9    instructions are framed and the verdict form that goes with

10   it, there's no category that would allow for the jury to award

11   those other types of damages.

12         The verdict form as proposed only has a line item for

13   medical pain and suffering and for medical expenses.  It

14   doesn't allow for the -- it doesn't allow the jury to award

15   these additional damages that are plainly recoverable for

16   defamation per se.

17         THE COURT:  That can be, on the verdict form, can be

18   taken care of by just more generalizing the pain and suffering

19   category into general damages parentheses, i.e., pain and

20   suffering, reputational harm, et cetera, and make that a very

21   broad category.  I understand your point about the verdict

22   form because reputational damage would not be pain and

23   suffering necessarily.

24         MR. PEQUIGNOT:  I mean, I guess, your Honor, I would

25   still say that --

```
1              THE COURT:  Let me do this.  Give me just a second to
2    read.  I'm reading page 12 of the proposed instructions, and I
3    want to just read what I've got here about them.
4              (Brief Pause.)
5              THE COURT:  So what if this?  I know you like what
6    you wrote, but what if on page 13 of the proposed
7    instructions -- in the middle of the page it says the
8    plaintiff seeks damages for mental pain and suffering -- that
9    was edited to say for mental pain and suffering and
10   reputational damage and damage to her reputation, and then
11   everything else is left the same?  In making such award your
12   standard should be your enlightened conscience as impartial
13   jurors.  Questions of whether, how much, and how long the
14   plaintiff has suffered or will suffer -- because reputational
15   damage the plaintiff suffers from that, and so I think that's
16   still generic -- are for you to decide.
17             We're talking about an enlightened conscience for
18   this type of damage anyway.
19             MR. PEQUIGNOT:  Yeah, I guess, your Honor, I would
20   respectfully submit that some of the language that follows
21   that paragraph is not really directly applicable to the
22   reputational harm, so I think that, you know, maybe the easier
23   course of action would just be to add a separate sentence
24   after the pain and suffering in the future or just making
25   clear that they can also award for this reputational harm.
```

1  And then we just include a line item for that in the verdict

2  form.

3          THE COURT:  That's on the next page?

4          MR. PEQUIGNOT:  Yeah, so the very first paragraph of

5  the next page it talks about pain and suffering in the future.

6  And just after that paragraph, have a sentence that would be

7  to the effect of, you know, you may also award --

8          THE COURT:  Well, would it be your position that the

9  plaintiff is not only entitled to recover for any damage to

10 her reputation that has occurred today but also damage that

11 continues to occur to her as a result of the statements

12 previously made?

13         MR. PEQUIGNOT:  Yes, your Honor.  That's a fair

14 point.

15         THE COURT:  I mean, the internet stuff never goes

16 away, does it?  People can take down what they put up, but

17 they can't take down what other people have shared or put --

18 maybe the sharing links back to the original listing, and I'm

19 not sure that we really have evidence of that here.  But I've

20 always told my kids when they were younger -- and they're all

21 grown now but, you know -- assume that what you put on the

22 internet is going to be there forever because it seems like it

23 always is.

24         I know this and this was -- some of this is

25 predigital age, but when I was going through the confirmation

1   process for this job, the Department of Justice attorneys that

2   were vetting me and preparing me for confirmation -- they

3   refer to this generically as the way back machine -- but they

4   went back and found articles written about me when I was a

5   legislator, things that I had said in debates that I couldn't

6   find.  And then I had to explain them, you know, because I had

7   to disclose them to the senate judiciary committee.  And this

8   was the predigital age, but everything had been scanned and

9   placed on record and available.

10          So I would think that to the extent that the jury

11  were to determine that the plaintiff has been defamed and that

12  she has been harmed, her reputation has been harmed, the jury

13  may also find that there is going to continue to be that type

14  of harm.  And so they're not simply compensating her for the

15  harm she has suffered today but the harm that might continue

16  to occur.  But granted nobody has really given me a case that

17  says that, but it just seems intuitive to me that that can

18  happen.

19          MR. PEQUIGNOT:  Yes, your Honor.  I think that your

20  proposal -- I think your proposal will work, you know,

21  obviously provided we modify the verdict form accordingly.

22          I guess the only thing I'm still maybe a little hung

23  up on is just these factors at the bottom of page 13 that

24  don't necessarily seem to apply, but I think that's just a

25  semantics issue.

```
 1            THE COURT:  Let me ask defendant.  What's the
 2   defendant's position about this discussion on the damages?
 3            MS. IZMAYLOVA:  Yes, sir.  Thank you.  We would
 4   object to the Plaintiff's Request No. 39.  We believe that the
 5   Court's charge is sufficient to explain the general damages
 6   and the type of damages the jury can award.  And,
 7   additionally, I don't believe that there was any evidence
 8   about damage to the plaintiff's reputation.
 9            So I'm not really sure why that would be highlighted
10   all throughout the jury charge when there was no evidence as
11   far as like what the Court already said.  There's no, like,
12   evidence of monetary damage or damage to, you know, business
13   contracts or, you know, lost revenue or anything like that.
14   So I feel like putting -- including that in the jury charge
15   would just be confusing.
16            THE COURT:  Isn't that what is presumed, though, when
17   you make statements that are libel per se, is that there is
18   that kind of damage too?
19            MS. IZMAYLOVA:  Right.  And I believe that the
20   Court's charge does cover the general damages, you know,
21   sufficiently.
22            THE COURT:  Point to where your point is covered.
23            MS. IZMAYLOVA:  Yes, sir.
24            THE COURT:  We're on 13?
25            MS. IZMAYLOVA:  Starting at the bottom of page 12
```

1   where you just say damages are given as compensation for an

2   injury done, and generally the injury is the measure when the

3   damages are of a character to be estimated in money.  And then

4   going to page 13, if the injury is small or mitigating

5   circumstances are strong, only nominal damages are given.  And

6   then the next paragraph is, you know, proper amount of nominal

7   damages is a question to decide under all the facts and

8   circumstances of the case.

9          I believe that covers any potential -- because if

10  there is any damaged reputation, it would be nominal, so we do

11  not have any evidence of specific monetary damages.

12         THE COURT:  All right.  So let me use a really bad

13  example here because it might be that the harm that occurred

14  to his career was justified based on the alleged conduct.  But

15  take Kevin Spacey, for example.  Allegations came out about

16  him and sexual misconduct.  I don't think it would be fair to

17  say that if those allegations were untrue -- and I have no

18  evidence to suggest and I'm not suggesting that they were

19  untrue -- but that the harm that was suffered to his career

20  was nominal.  I mean, it was probably fatal.

21         And that may very well be the case for many actors

22  who are accused of that kind of behavior.  It's really hard to

23  know, I suppose.  But we do know what -- we do know what the

24  current tide is, and the current tide in the whole, quote,

25  cancel culture, closed quote, terminology that exists in that

1  industry specifically -- and it may be broader in that

2  industry -- is that that type of reputational harm may be long

3  lasting and more than mere nominal.

4      I agree that we don't really have any testimony from

5  any industry individuals that would say that the plaintiff's

6  employability is harmed.  In fact, you know, the plaintiff's

7  career is probably, based on her own testimony about all the

8  things that she is currently engaged in, including the fact

9  that she just recently hosted a major music award show, is

10 that it's now as robust as it's ever been.  But, you know, the

11 jury might conclude, based on the statements that have been

12 said, is that there has been some damage, that maybe her

13 career could have even been at a higher level at this point

14 had this not occurred.

15     I mean, it's one of the reasons I asked about why --

16 you know, whether videos were going to be played of her

17 performances generally because I thought, you know, to the

18 extent that she has some very provocative songs and videos,

19 that one might make the argument that these allegations, even

20 if untrue, really doesn't harm her because, you know, the

21 subject matter of a lot of her music, you know, is so edgy.

22 I'm trying to pick my words really carefully here, as you

23 might imagine.  But to me that's more of a strategic decision,

24 I suppose, that you make.

25     I don't know that I can say that the jury would be

1   unauthorized based on simply their decision that these remarks

2   that were made about her were slanderous.  That means that the

3   jury is making a decision that they were also bad.  I mean,

4   it's not like she was being accused of being a good person in

5   it.  And, generally speaking, taking the plaintiff out of it,

6   these kinds of remarks would be very damaging to someone.

7            Defendant can certainly argue that, well, not

8   damaging to this person but maybe damaging to each individual

9   juror if it was about them, but that's not who they were

10  about.  So that, again, goes back to what you can argue.  But

11  in the abstract it's hard for me to say that there's not some

12  evidence to the jury.  I mean, the jury might disagree.  They

13  may say, yeah, this is going to harm anybody.

14           One of the things that jury instructions often do --

15  and I don't know that there's a pattern instruction in federal

16  court.  I haven't seen it if there is.  State court of Georgia

17  there is.  You know, you tell jurors that they can -- they're

18  able to use their common sense.  Some people might argue that

19  common sense is when you say things like this about anyone,

20  that it would harm them.

21           So I guess ultimately here's where I'm going to go.

22  I want a little bit of time to think about this and talk with

23  Mr. Roberts about it.  And if I supplement the instructions, I

24  will probably supplement them in the context of what I've

25  already done as opposed to the plaintiff's request as a

1  standalone instruction because I think it should be

2  incorporated generally and the discussion of the damages as

3  they are.  So I've written a star beside this area of the

4  proposed instructions, and I'll come back to it after we're

5  finished today, after we're finished this morning.

6          MS. IZMAYLOVA:  Thank you, your Honor.

7          MR. PEQUIGNOT:  Thank you, your Honor.

8          THE COURT:  All right.  Anything else from the

9  plaintiff?

10          MR. PEQUIGNOT:  I think that's all I have in terms of

11  things we're taking out.  Obviously, we have some

12  additional --

13          THE COURT:  Well, go ahead and talk about things that

14  you don't like that are in there too, and then we'll swap off.

15          MR. PEQUIGNOT:  Okay.  So, your Honor, starting on

16  page 6 --

17          THE COURT:  Okay.

18          MR. PEQUIGNOT:  -- just in the second paragraph where

19  it refers to infidelity, we'd just propose changing that to

20  adultery simply because, your Honor -- and I will get to this

21  in a second.  But since your Honor is putting the per se

22  categories to the jury, adultery is actually the crime in

23  Georgia.  So we're just proposing to change that to match the

24  crime.

25          THE COURT:  Any objection from the defendant?

1   Infidelity to adultery?

2          MS. IZMAYLOVA:  No, not really.  I don't think it

3   matters.

4          MR. PEQUIGNOT:  Really it's just to make it

5   consistent.

6          THE COURT:  It's also a law in a state, and I don't

7   remember what state it was.  Let me just make sure I know how

8   to spell adultery.  Does it have an E in it or not?  I think

9   it doesn't.  Okay.  So it does have an E.  Okay.

10          Which this was the case when I was in law school.  I

11   took a class on legislation from a fairly famous, for

12   University of Georgia Law School, professor named Sentell who

13   died a few years ago.  He was our version of John Houseman of

14   the *Paper Chase*.  He was a very Socratic, very no-nonsense

15   professor.  But there were a couple of classes that -- he

16   taught torts, but there were a couple of classes he taught for

17   upper level students that were a lot of fun, and legislation

18   was one of those classes.

19          I was lucky enough not to have him for torts, but I

20   took him for this class.  And he would highlight every day

21   crazy statutes that still existed on the books.  And I think

22   he said this was Louisiana, that in Louisiana that it was

23   illegal to do anything to disturb or bother a squirrel.  I

24   doubt anybody has been prosecuted for that, and I know that no

25   one has been prosecuted for adultery in Georgia for years and

1    years.  And it probably would be deemed to be an

2    unconstitutional statute today.  But y'all agree on the use of

3    the term, so I'll put that in there.

4         I personally think infidelity is probably a more

5    offensive term because while that's not illegal either, it's

6    just kind of how we think of it generally.  But I'll use

7    adultery if that's what you want.  All right.  Anything else,

8    sir?

9         MR. PEQUIGNOT:  Yes.  So on page 7, your Honor, the

10   section that's based off of the *Jaillett* decision dealing with

11   rhetorical hyperbole and opinion --

12        MS. IZMAYLOVA:  I'm sorry.  What page?

13        MR. PEQUIGNOT:  Page 7.

14        MS. IZMAYLOVA:  Okay.

15        THE COURT:  Yes.  I'm with you.

16        MR. PEQUIGNOT:  Okay.  So the first issue, your

17   Honor, so if you read the first sentence there, it refers --

18   there's the clause, because their factual premises are

19   revealed, is not -- well, the part because their factual

20   premises are revealed, that subclause really only refers to

21   the pure opinion part of this.  And really the rest of this

22   paragraph only refers to this discussion about opinion.

23        So if you actually look at the decisions, while it

24   sort of -- in the decision written in this order, the

25   rhetorical hyperbole is actually an entirely separate issue.

1   Your Honor, I --

2           THE COURT:  How would you define rhetorical

3   hyperbole?

4           MR. PEQUIGNOT:  So I don't know if there's a great

5   definition for it, but, your Honor, an example would be, for

6   example, the case that the defendants actually cited in

7   support of their charge, which was the statement was made that

8   an attorney had torpedoed his client's case.  And so the issue

9   with rhetorical hyperbole is that, obviously, it can't be

10  taken literally.

11          He wasn't saying he actually torpedoed his case, but

12  when you interpret it as it would reasonably be understood by

13  anybody reading that statement, you know, that just becomes

14  the statement that you evaluate for purposes of defamation, in

15  other words, something equivalent to like he, you know,

16  severely harmed his client's case would be sort of the literal

17  interpretation of that hyperbole.  You know, that statement

18  then becomes, you know, the statement that's evaluated for

19  purposes of defamation.

20          I don't know that -- I can't think of any scenario

21  where we actually have that at issue in this case, but even if

22  it were at issue, defendants are still capable of arguing that

23  statement is -- you know, wasn't intended as a statement of

24  fact, that it's merely hyperbole.  I just don't believe that

25  including it as part of this section as it's worded is

1  accurate or helpful to the jury in resolving that issue.

2           THE COURT:  Are you arguing that there is no -- there

3  is nothing that was said by the defendant that could be

4  considered to be rhetorical?  I mean, I'm not sure if the --

5  if this is hyperbole but -- and I'm just looking up that term

6  on the internet.  But are you saying that nothing that she

7  said could be construed as that?

8           MR. PEQUIGNOT:  I'm saying I don't interpret any of

9  the statements that are at issue to be hyperbole, at least by

10 my recollection, but actually the more fundamental issue is

11 that even if rhetorical hyperbole was squarely at issue, what

12 I'm suggesting is that this is not the way to address that

13 issue.  This paragraph dealing with, you know, when facts are

14 disclosed as part of the overall communication really has

15 nothing to do with rhetorical hyperbole.  So if that were a

16 charge that we were really dealing with or the need for, it

17 would need to be worded in an entirely different way in a

18 different context.

19          THE COURT:  I'm really not following your objection.

20 This is, I think, a correct statement of the law generally,

21 isn't it?

22          MR. PEQUIGNOT:  No, actually.  So, your Honor, maybe

23 it would be --

24          THE COURT:  It's a pretty recent case.

25          MR. PEQUIGNOT:  Right.  This quote actually is not a

1   fair representation of what's in the case is what I'm saying.

2   So it may be easier to talk about the opinion issue first and

3   then circle back to rhetorical hyperbole but --

4           THE COURT:  Okay.  Let's talk about -- in fact, let's

5   just set aside the rhetorical hyperbole -- hyperbole, however

6   you say that, sorry -- and just talk about it from the opinion

7   standpoint.  So it is certainly the defendant's position

8   that -- I mean, she's got multiple defenses, but one of them

9   is that some of the stuff she said was just her opinion.

10          I can think of an example probably.  At one point she

11  says the plaintiff is a nasty B, you know.  Of course, she

12  says the whole word.  But there is no thing in fact of someone

13  being nasty because nasty is an opinion-based word in the

14  abstract, you know.  Depends on the context that it's used.

15  And what I would think would be nasty generally, not in this

16  context, my college-aged kids would think would be normal.

17          So, you know, I think that is opinion based, that

18  word.  I don't know that that word itself, that that phrase

19  used by the defendant could be found to be defamatory.  Now,

20  the facts that she relies upon to make that conclusion -- and

21  I think she, through some of the videos that she put out, she

22  discusses those facts.  And to the extent that those facts are

23  not true, then she probably can be found to defame the

24  plaintiff in that regard.

25          But given the defendant's position that much of what

1  she said was simply opinion, I would have to tell the jury

2  that things are just based on opinions.  Statements made that

3  are just opinions aren't actionable; right?

4        MR. PEQUIGNOT:  So the way that the law distinguishes

5  between a fact and opinion is actually addressed in the very

6  next charge, which is what we had included, which is, you

7  know, stated differently an opinion can constitute actionable

8  defamation if the opinion can reasonably be interpreted

9  according to the context of the entire statement in which the

10  opinion appears to state or imply facts about the plaintiff

11  that are capable of being proved false.

12        So whenever this discussion comes up in the

13  decisions, you know, the Courts are very clear.  Like, there's

14  no exception for anything that might be labeled an opinion or

15  might be labeled hyperbole.  The pivotal question, in fact,

16  Courts' decisions even use that language, is what is already

17  addressed in the charge that I just read to you.  So, you

18  know, obviously the parties may have differences of opinion as

19  to how the facts line up with that standard, but that is the

20  standard.

21        And so this other paragraph above from the *Jaillett*

22  decision is sort of like a subcategory within that opinion

23  issue.  Like, we don't believe that charge is necessary at

24  all, but if we're going to include it, there are things that,

25  you know, we believe need to be corrected to make it --

```
 1              THE COURT:  Was there another charge which would
 2    imply or state that simple opinions are not actionable?  You
 3    do agree that that's true; right?  That simple opinions are --
 4              MR. PEQUIGNOT:  Well, but simple opinion just --
 5              THE COURT:  No, no.  Answer my question.  If I said
 6    this, if I said, to put it in the sports context -- I'm sorry.
 7    Ms. Matz, are you a Yankees or Mets fan?
 8              MS. MATZ:  I am actually a Red Sox fan, your Honor.
 9              THE COURT:  Okay.  Great, because I am too.  I like
10    the Red Sox.  I'm a Red Sox and Braves fan, so you won't care.
11    I only asked you because you're the only person from New York.
12    Anyone is -- are you a Yankees fan?
13              MS. IZMAYLOVA:  I'm a Red Sox fan.
14              THE COURT:  Good.  Okay.  So I'm not going to offend
15    you either.  Anybody else from New York here?  What fan are
16    you of?  Mets or Yankees?
17              UNIDENTIFIED MAN:  Yankees.
18              THE COURT:  Okay.  So you're going to love this.  I
19    said the Mets suck.  And certainly there's a lot that you can
20    point to to say that they -- like this past season they were
21    in first for 80 percent of the season.  They didn't win.  I
22    mean, that's opinion; right?  I mean, that's not actionable.
23    So I couldn't be sued for that because it's my opinion based
24    on their performance.
25              MR. PEQUIGNOT:  Right, but it doesn't state a fact
```

1   that's capable of being proved false.  That's the point.

2   That's how we distinguish between an opinion and a fact.

3           THE COURT:  Okay.  How about this.  I'm a Georgia

4   fan.  You know that.  If I said Sabin sucks, you could

5   probably prove that that's not true because he's won seven

6   national championships.  I might base it just on the fact that

7   I don't like him with my team most times.  That's capable of

8   being proven false but yet its opinion.  That's not

9   actionable.

10          But if he -- if the -- so, you know, go back and

11  let's pull the example out of this case.  The defendant said

12  that the plaintiff was a nasty B.  I mean, I don't know that

13  you can prove that false; right?  I mean, that's her opinion

14  based on what she knows, you know, based on maybe more than

15  this certainly but based on the fact that the plaintiff has

16  even testified that sometimes she doesn't wear, you know,

17  certain clothing.  I mean, that's not --

18          MR. PEQUIGNOT:  Right, but we're not alleging that

19  statement is defamatory.

20          THE COURT:  I don't know that you're not.  I mean,

21  you've played the videos where she said that.

22          MR. PEQUIGNOT:  I think the instructions make clear,

23  your Honor, what we have alleged as defamatory.

24          THE COURT:  And that was what?

25          MR. PEQUIGNOT:  On page 6.

```
 1          THE COURT:  That she -- but it's related to that at
 2    the very least, you know, because that was the whole
 3    discussion, remember, is that, I think, that she may have
 4    caught some type of disease, that her body might be irritated
 5    because of her, you know, dress codes or dressing practices.
 6    I just don't think that her statement of what she believes and
 7    how she interprets -- I'm sorry.  When I say she, I'm
 8    referring to the defendant.  How she interprets those fact
 9    situations can be actionable.
10          Now, statements that the plaintiff has some type of
11    disease based on it, if untrue, could be actionable, somebody
12    proves it's untrue.  And there's certainly evidence here that
13    it's not true and that it's not somehow privileged because it
14    was without malice and was not reckless.  But I do think there
15    were some opinions in this case because there's a lot that the
16    defendant said, which, you know, I sort of indirectly referred
17    to it, I mean, that I thought that maybe her friends and
18    family in Panama City would be shocked by some of that stuff.
19          But a lot of it is -- you know, a lot of it is just
20    her giving her own view of the plaintiff, which isn't
21    positive, but also not actionable necessarily.  So I do think
22    that there's opinion here that has to be separated by the
23    jury.  They have to decide these very points, what was
24    opinion -- and certainly it's their defense.
25          Here's the thing.  You don't interpret it as such,
```

1    but the defendant does.  They say it's opinion, and I don't

2    get to side with you on whether it is or it isn't opinion

3    because that's a jury decision.  And I can give you a good

4    example in criminal law.  Defendants sometimes have the worst

5    theories of why they're not liable, why they're not criminally

6    responsible, but it would be error for me not to charge the

7    jury on those defenses and let the jury decide if the facts as

8    they find them to be support the defense that the jury or that

9    the defendant puts forth, even if I think it's not likely that

10   it would be successful.

11          If there's any evidence, I have to charge it, and in

12   this case there's these statements that the defendant made

13   here that y'all debate as to whether or not they're opinion or

14   not.  I've got to give the instruction, don't I, that lets the

15   jury know that if you find it to be opinion, that it's not

16   actionable.  But if you find it to be fact-based or as you say

17   the facts on which the opinion -- that the defendant relies in

18   making the opinion are simply not true and that the defendant

19   was wrong to state them as facts, then maybe you can.  So

20   that's why this instruction is in there.

21          MR. PEQUIGNOT:  So, your Honor, we're not disagreeing

22   with the general principle that you just articulated.  I think

23   the issue is how we're communicating this to the jury, and

24   what Courts have made crystal clear is that whatever statement

25   is labeled is not material to the question.  So if somebody

 1   simply says it's an opinion, that's not -- that doesn't make

 2   it an opinion.

 3          THE COURT:  Sure.  But if it is opinion, it is an

 4   opinion.  And if it is an opinion, it's not actionable.

 5          MR. PEQUIGNOT:  Right.  And the standard for that is

 6   whether the statement could reasonably be interpreted as

 7   stating or implying facts that are capable of being proved

 8   false.  So --

 9          THE COURT:  Let's just use my example of she's a

10   nasty B.

11          MR. PEQUIGNOT:  And the defendants can say that that

12   statement -- they can make clear that these statements that

13   they were making about them and their view are simply opinions

14   about her in the sense that they don't communicate a fact

15   about her that's capable of being proved false.

16          THE COURT:  Go to the main paragraph that you were

17   talking about, second sentence.  If an opinion is based upon

18   facts already disclosed in the communication, the expression

19   of opinion applies nothing other than the defendant's

20   subjective interpretation of the facts.  So we go to the

21   underwear situation, cab.  And I won't go beyond that into

22   some of the -- I won't go into, like, the photographs that I'm

23   sure that y'all cannot agree to that demonstrate anything

24   else.  I'm talking about the herpes stuff.

25          But if the jury thought that the nasty B comments

1  were based upon, say, the underwear situation, clothing

2  choices or lack of clothing, then a person saying -- calling

3  someone a name like nasty B based on that, would that not be

4  opinion?

5          MR. PEQUIGNOT:  Well, it's non-actionable in the

6  sense that if they've stated facts that are not defamatory --

7  and it's clear that the expression of an opinion is based off

8  of those facts that are non-defamatory -- then that's not

9  actionable.

10          THE COURT:  But I've got to tell the jury that, don't

11  I?  And that's what this instruction tells them, is that very

12  fact.  If an opinion is based upon facts already disclosed in

13  the communication, the jury would have to decide does that

14  statement "she's a nasty B" apply to that allegation or some

15  other allegation.  The expression of opinion implies nothing

16  other than a defendant's subjective -- a defendant's

17  subjective interpretation of the facts.

18          MR. PEQUIGNOT:  Well, circling back to this specific

19  charge -- and I think our biggest issue with this, your Honor,

20  is that if you actually read the *Jaillett* decision --

21          THE COURT:  I've got it on my phone right here.

22          MR. PEQUIGNOT:  Okay.  So if you look at the language

23  that -- this is language from the Court's decision.  But if

24  you look at the language they actually cite as support for

25  that proposition that comes from the restatement --

1          THE COURT:  I've got to find it, though,

2   unfortunately because I've got it on my phone and not on my

3   computer.  I don't have head notes.  I'm there, but let me

4   read it.

5          (Brief Pause.)

6          THE COURT:  Okay.  So I've read the part in the

7   opinion.  So --

8          MR. PEQUIGNOT:  Right.  So I think the issue that we

9   have is that the language that we have here does not make

10  clear, in our view, that this would not apply in situations

11  where the communication relies on defamatory facts.  So like

12  if you --

13         THE COURT:  Say that again now.  Say it one more

14  time.

15         MR. PEQUIGNOT:  So, for example, in the second

16  sentence where it says if an opinion is based upon facts.  So

17  the issue here is that it can still be defamation if it's

18  relying on defamatory facts in the communication.  It can

19  still be defamatory if it's implying there are other

20  defamatory facts that are not in the communication.  It's only

21  pure opinion if it's relying on truthful facts, and it doesn't

22  imply that there are other facts that it's relying on to make

23  that opinion.

24         THE COURT:  Isn't that what the -- I mean, so we're

25  quoting -- by the way, when these instructions are finalized,

1  any citations to the cases and stuff will be taken out.  We

2  just left those in there now so you'll know where they're

3  coming from.

4        So the *Georgia Television Company* case, as you know,

5  it is stating the restatement, and the restatement, I think,

6  is quoted accurately where it says in the last sentence, thus,

7  a defendant is only liable for a statement of opinion if the

8  opinion implies the allegation of undisclosed defamatory facts

9  as the basis for the opinion.  That's in --

10        MR. PEQUIGNOT:  But that's -- I'm sorry, your Honor.

11        THE COURT:  You don't think that's right?  You don't

12  think the restatement is --

13        MR. PEQUIGNOT:  It's not only.  If there are

14  defamatory facts that are in the communication, our issue is

15  that suggesting that if you --

16        THE COURT:  I'm sorry.  Defamatory facts in the

17  communication.

18        MR. PEQUIGNOT:  In the communication.  So this only

19  refers to -- the last sentence only says only liable if it

20  implies the allegation of undisclosed defamatory facts.  The

21  point is that you can't also include defamatory facts in the

22  communication.  So, for example, if you just -- I can suggest

23  some revisions, your Honor, that I think are consistent with

24  the case law --

25        THE COURT:  So is your dispute with the word

1  "undisclosed" then?

2        MR. PEQUIGNOT:  No, your Honor.  So the sentence --

3  what we would suggest is the sentence that starts with if an

4  opinion.  We would suggest if an opinion is based upon facts,

5  insert that are not defamatory and are already disclosed in

6  the communication, the expression of the opinion implies

7  nothing other than a defendant's subjective interpretation of

8  the facts.  And the next sentence, thus, a defendant is only

9  liable for a statement of opinion if the opinion, insert does

10 not rely on defamatory facts or imply the allegation of

11 undisclosed defamatory facts as the basis of the opinion.

12        Your Honor, I think it's also consistent with the

13 *Milkovich* Supreme Court decision that we cited in support of

14 our charge in which the Supreme Court says even if the speaker

15 states the facts upon which he bases his opinion, if those

16 facts are either incorrect or incomplete or if his assessment

17 of them is erroneous, the statement may still imply a false

18 assertion of fact.

19        THE COURT:  Let me make sure I understand how far

20 you're interpreting or the breadth of your interpretation.

21 Are you saying that if the defendant gives her opinion about

22 what someone else has said, that she can be -- and says, look,

23 I think that she is whatever because of these facts stated by

24 Starmarie Jones, that she could be liable for that?  I'm

25 talking about the opinion that she gives of the facts that

1   Starmarie Jones states, that she could be liable for that if

2   she doesn't have malice and isn't reckless in her relying on

3   those facts?

4        I mean, I don't think you can say yes to that because

5   that -- if she's not reckless and she's not -- doesn't have

6   malice, then she can't by the very nature, because your client

7   is a public figure, be legally liable; right?

8        MR. PEQUIGNOT:  Well, we can't recover for any

9   statement if we haven't shown actual malice.

10       THE COURT:  Right.  But you're arguing that sort of

11  because you're saying that she could be liable for defamation

12  if she gives her opinion about facts that are out there or

13  facts that she discloses that aren't true.  And that's not

14  true because if she doesn't have malice and she's not reckless

15  and relying on those facts, she's not liable.  And it could be

16  that all of this is sort of caught up in some degree because

17  we have a different standard for public personalities, public

18  officials, you know, under the New York Times standard.

19       As a private individual if someone says something

20  about someone else, you don't have to show malice and

21  recklessness if it's untrue.  I guess if you go to a PTA

22  meeting and you said that lady next door has had an affair,

23  since that's one of the allegations here, in the meeting --

24  and I think that's horrible -- I guess you could be liable for

25  that.  But in the context of a public official or a public

1   person -- that's not the right term.  I'm not sure what the

2   New York Times term is, but we all agree that it applies here.

3   That's not going to be actionable unless you have malice or

4   recklessness and relied on those facts.

5           So it seems like the suggestions that you seek for me

6   to put -- I'm not saying this is all correct the way it is.

7   I'm not trying to really defend it necessarily, but I can't

8   put something in there that negates one of the elements;

9   right?  I mean, it implies that malice and recklessness is

10  still not a part of this.

11          MR. PEQUIGNOT:  Right.  And that's -- I don't believe

12  that our suggestions would do that or that -- I mean, I guess

13  to come at it from the other side --

14          THE COURT:  Let's take this sentence by sentence.

15  Okay.  So we'll start with this paragraph of a defendant who

16  makes statements.  You don't -- you don't disagree with the

17  first sentence; right?  A defendant who makes statements of

18  rhetorical hyperbole, that sentence is okay for you; right?

19          MR. PEQUIGNOT:  Other than the rhetorical hyperbole

20  which I don't --

21          THE COURT:  Other than what?

22          MR. PEQUIGNOT:  Other than the rhetorical

23  hyperbole --

24          THE COURT:  I'm not going to agree with you on that.

25  If it's not rhetorical hyperbole, then we don't have to worry

1   about it.  I think arguably some of it is.  If you look at the

2   definition of that term, I mean, it's using exaggerated

3   language to make your point, is essentially what I interpret

4   it to be.

5            MR. PEQUIGNOT:  Just to be clear, your Honor, that

6   wasn't my point.

7            THE COURT:  Okay.  So other than that, though, but --

8   all right.  And then your problem with the second sentence is

9   that -- is that it seems to be limited to already disclosed in

10  the communication and that it's not broader.  If the opinion

11  is based upon facts already disclosed in the communication.

12           MR. PEQUIGNOT:  I think, just to try to succinctly

13  summarize our issue, is that it refers to all facts and the

14  restatement that --

15           THE COURT:  It doesn't.  It doesn't.  It says based

16  upon facts already disclosed in the communication.

17           MR. PEQUIGNOT:  Right.  And it doesn't distinguish

18  between defamatory facts or truthful facts, which is the issue

19  that we find problematic.  It's inconsistent with what is said

20  in the restatement.  It's inconsistent with *Milkovich*.  Your

21  Honor --

22           THE COURT:  But if it's -- okay.  If they're not

23  truthful facts and you don't know it to be untruthful or

24  you're not reckless in not knowing that it's untruthful, then

25  that can't be defamation in this context; right?

```
1              MR. PEQUIGNOT:  We're not trying to avoid the actual
2    malice standard.  I think the issue we have here is --
3              THE COURT:  But, look, that's the case we have.
4              MR. PEQUIGNOT:  No, I understand that.
5              THE COURT:  So the language needs to be tailored to
6    this case, and in this case just being untruthful is not
7    enough; right?  So you want me to add the word "not truthful."
8    Why can't I just say facts?  I mean, opinion is based upon
9    facts.
10             MR. PEQUIGNOT:  Your Honor, we didn't propose this
11   charge.  We don't think it's necessary at all, and the issue
12   is that the way that this reads is it's almost like a safe
13   harbor, like the jury could read this to say if she has cited
14   facts in her communication and it doesn't imply the assertion
15   of any other facts, whether those facts are true or not, then
16   it can't constitute actionable defamation.  And that is not
17   the law.
18             MS. IZMAYLOVA:  That is the law.
19             MR. PEQUIGNOT:  The statement makes clear --
20             THE COURT:  But it's modifying an opinion.  It's not
21   the facts.  Your claim for defamation is twofold.  One is that
22   she states facts that aren't truthful.  This instruction is
23   not talking about facts.  It's talking about opinions and says
24   that if opinions are based on facts, that the opinions aren't
25   actionable as opposed to -- I mean, the facts are still
```

1   actionable; right?  If, for example, the defendant says and

2   reveals that the plaintiff is a prostitute, that's not an

3   opinion.  That's a fact.  That's an allegation of a fact.  I

4   mean, it's not necessarily true or untrue, you know, in the

5   abstract, but that's not an opinion.

6        This instruction is all about opinions; right?  And

7   so when you argue your closing, you argue that there's malice

8   because of the facts that she has stated.  Is there anything

9   in this opinion -- I mean in this instruction that would say

10  that someone who reveals alleged facts that are untruthful,

11  they're somehow not liable for that?  Doesn't it all come back

12  to, in this instruction, whether it's an opinion or not?

13       MR. PEQUIGNOT:  I think the issue, your Honor, is we

14  believe there's a chance that the jury could read this

15  instruction to mean that a statement that includes facts,

16  whether those facts are true or not as part of the

17  communication, that that statement and that communication or

18  that communication could not be actionable for defamation.

19       I mean, if your Honor, what you just said, if you

20  feel like that's the simple interpretation of how a jury would

21  interpret it, then I would just submit we should just make it

22  clearer.

23       THE COURT:  We should make it clear what?

24       MR. PEQUIGNOT:  I mean, for example, if you want to

25  say, you know, it doesn't mean that the -- you know, if the

1   same communication also discloses defamatory facts, that those

2   defamatory facts are not actionable or we could quote directly

3   from *Milkovich*, the U.S. Supreme Court.

4          THE COURT:  Well, the U.S. Supreme Court doesn't

5   provide the context of defamation from Georgia; right?

6          MR. PEQUIGNOT:  It establishes the actual malice

7   standard.

8          THE COURT:  Yeah, but that's all.  It doesn't -- the

9   state of Georgia decides what its elements generally are.  The

10  actual malice requirement under the *New York Times* case is

11  just simply the federal courts stating that you can't have a

12  defamation claim against a public person because of the First

13  Amendment unless you can show actual malice.

14         MR. PEQUIGNOT:  But the First Amendment is also

15  encompassed within the distinction between statements of fact

16  and statements of opinion.  And if you look at the Georgia

17  cases --

18         THE COURT:  Yeah, but I don't think you look at the

19  *New York Times* decision to say that this is -- it's really --

20  I'm not going to argue with you about that.  I mean, you know,

21  states have the rights to make their own laws subject only to

22  their consistency with the United States Constitution, and I

23  think that case simply dealt with the First Amendment stating

24  that you can say anything about a public official you want to

25  say as long as you don't have malice or reckless disregard for

1   the truth.

2          So states are still free to add additional elements.

3   Like, for example, the states can say and to sue someone for

4   defamation it has to be said five times.  States could say

5   that, it's got to have a five-time limit threshold or they can

6   limit the amount of damages.  I mean, there's a lot of things

7   that states can do because it's their claim.  It's not a

8   federal common law claim.  We're not in federal court because

9   of substantive federal law.  We're in federal court because of

10  diversity and applying state law in that regard.

11          MR. PEQUIGNOT:  I just would --

12          THE COURT:  So, I mean, I'll have to think about it.

13  I can't take up anymore time right now but I will talk -- I

14  will talk -- Mr. Roberts and I, Andrew and I, will get

15  together and talk about it.  Let me, though, ask defendant for

16  any supplement that you want to make to all of this whole

17  discussion.

18          MS. IZMAYLOVA:  Thank you, your Honor.  We object to

19  the plaintiff's proposed changes.  We believe that the Court's

20  instruction is consistent with Georgia law.  We cited this

21  instruction in Defendant's Request to Charge No. 23.  We

22  absolutely object to editing or adding any additional

23  language.  This is the law in Georgia.  It's cited in many

24  different cases that I've read that are still good law, and we

25  would request that the Court keep it as is because the

1    Courts -- the paragraph after this paragraph that the

2    plaintiff has taken issue with does, in fact, state that if it

3    is -- you know, if the opinion is made on facts that could be

4    proven false, you know, then that is defamation.  So their

5    concern is addressed in the Court's charge.

6          THE COURT:  All right.  We're going to move on right

7    now and I'll let you, obviously, let you know before you argue

8    exactly how I'm going to finalize this.

9          Anything else from the plaintiff?

10         MR. PEQUIGNOT:  Yes, your Honor, on page 8 this

11   charge on the per se categories.

12         THE COURT:  Sorry.  The top of the page?  Bottom of

13   the page?

14         MR. PEQUIGNOT:  So the first full paragraph, if you

15   find.

16         THE COURT:  All right.

17         MR. PEQUIGNOT:  So, your Honor, I mean, this is an

18   issue of law, and it's been our position that, you know,

19   there's not really a reasonable dispute about the categories

20   that we're talking about here.  But I understand your Honor's

21   potential concerns about that.  So I would just say that if

22   we're going to put these categories to the jury and we say

23   crime punishable by law, that we have to actually specifically

24   define.  If we are going to include this, we have to

25   specifically define the crimes that we have that are at issue

 1 | in the defamatory allegations.
 2 |         THE COURT:  Can't you argue that?  We've already
 3 | mentioned the adultery thing.
 4 |         MR. PEQUIGNOT:  Sure.  We can read the criminal
 5 | tort --
 6 |         THE COURT:  So you're saying the jury won't know that
 7 | adultery is illegal?
 8 |         MR. PEQUIGNOT:  I don't know if they will or they
 9 | won't.
10 |         THE COURT:  Is that your point?
11 |         MR. PEQUIGNOT:  I don't know if they will or will not
12 | know if that's a crime in Georgia.  If your Honor would prefer
13 | we just read the statute to the jury, we can do that, but that
14 | was only our suggestion.
15 |         THE COURT:  So your point is that, okay, we mentioned
16 | adultery over on previous pages about --
17 |         MR. PEQUIGNOT:  Adultery and prostitution.  It's just
18 | the question becomes will a juror know that those two things
19 | are a crime in Georgia.
20 |         THE COURT:  I flipped over several pages, so I lost
21 | where you were.
22 |         MR. PEQUIGNOT:  Page 8, your Honor.
23 |         THE COURT:  What page?
24 |         MR. PEQUIGNOT:  Page 8.  It asks the jury to
25 | determine whether the statement is a crime punishable by law.

1    I don't know if we can assume the jury would know that.

2         THE COURT:  All right.  So what if I added such as

3    adultery?

4         MR. PEQUIGNOT:  And prostitution?

5         THE COURT:  Crime punishable and prosecution.

6         MR. PEQUIGNOT:  Prostitution?  Those are the two.

7         THE COURT:  Okay.  I see.  All right.  Does the

8    defendant have any objection to that?

9         MS. IZMAYLOVA:  No, your Honor.

10        THE COURT:  I'm going to -- what I'm going to do is

11   I'm going to put it in parentheses, but I'll read it, such as

12   adultery or prostitution.  Okay.

13        MR. PEQUIGNOT:  The very last sentence is just a

14   small semantic suggestion on the bottom of page 8 where the

15   sentence ends order to recover.  We'd just propose adding for

16   that statement just to make clear that the limitation only

17   applies to whatever statement they found does not meet one of

18   those categories.

19        THE COURT:  I don't understand.  If you find that one

20   of the defendants -- I'm reading it now, quote, if you find

21   that one of the defendant's statements is defamatory, does not

22   fit into one of the categories just listed, the plaintiff must

23   prove by a preponderance of the evidence that she suffered

24   damages actually flowing from the defamation in order to

25   recover.

1          MR. PEQUIGNOT:  And I'm just proposing adding for

2    that statement just to make clear of that.

3          THE COURT:  All right.  Any objection to that?

4          MS. IZMAYLOVA:  No.

5          THE COURT:  That's added then.  Anything else?

6          MR. PEQUIGNOT:  I think just one more, your Honor, on

7    the attorney's fee charge, which was on page 16.

8          THE COURT:  Can I ask y'all, did we agree in the

9    pretrial conference that the amount of attorneys' fees would

10   be left to the second phase of the trial or did y'all just

11   assume that?

12         MR. PEQUIGNOT:  It was jointly requested in --

13         THE COURT:  Okay.  Because I just didn't remember

14   discussing it.  I don't know if we discussed it or not.

15         MR. PEQUIGNOT:  I don't think there was a specific

16   discussion about it, your Honor --

17         THE COURT:  There was?

18         MR. PEQUIGNOT:  I don't believe there was.  We

19   included in --

20         THE COURT:  The last case I had we did do it that

21   way, but it's not normal that it's done that way.  It's

22   normally done as a part of the first phase of trial but it

23   doesn't -- I mean, it makes sense to do it in the second phase

24   given that it's a punitive damages phase.  So what's your

25   point about the --

1          MR. PEQUIGNOT:  Just, you know, the language that

2   says where the plaintiff has specially pleaded and has made

3   prayer therefore.  Obviously, that's from the statute.  I

4   guess our only issue is it just suggests an additional element

5   that's not really in dispute that, you know, the jury might

6   feel like they have to resolve.

7          THE COURT:  You're just asking that I strike the

8   first where the plaintiff --

9          MR. PEQUIGNOT:  Yes.

10          THE COURT:  -- has specially pleaded and has made a

11   prayer therefore and -- so it would say but where the

12   plaintiff has acted in bad faith --

13          MR. PEQUIGNOT:  Exactly.

14          THE COURT:  Any objection to that?

15          MS. IZMAYLOVA:  I'm sorry.  I'm not -- what are we

16   trying to strike?

17          THE COURT:  So the first sentence ends in semicolon

18   but -- strike but all the way until the and on the next line.

19   So strike but where the plaintiff has specially pleaded and

20   has made a prayer therefore and.  Strike all that.  And so it

21   would say but where the plaintiff has acted in bad faith, is

22   what it would read.

23          MS. IZMAYLOVA:  Where the defendant has acted?

24          THE COURT:  I'm sorry?

25          MS. IZMAYLOVA:  You mean where the defendant has

1   acted?

2          THE COURT:  Yeah.

3          MS. IZMAYLOVA:  Yeah, that's fine.

4          THE COURT:  All right.  I'll do that.

5          MR. PEQUIGNOT:  That's all I have, your Honor.

6          THE COURT:  Okay.  All right.  Thank you.

7          Ms. Izmaylova, anything you want to talk about

8   related to the instructions that we haven't already talked

9   about?

10          MS. IZMAYLOVA:  Yes, your Honor, just briefly.  When

11  we were on page 8, in that same paragraph it says or was

12  otherwise injurious to the plaintiff on its face without aid

13  of -- and it says intrinsic proof, but I believe that should

14  be extrinsic.

15          THE COURT:  Makes sense.

16          MS. IZMAYLOVA:  But I'm not sure.

17          THE COURT:  It makes sense that it's extrinsic.

18          MS. IZMAYLOVA:  I just wanted to point that out to

19  the Court.

20          THE COURT:  Well, the great thing about the Georgia

21  code system is that it is the only system that uses three sets

22  of numbers divided by hyphens, and so y'all haven't ever

23  realized that.  Whenever you put in, like, Georgia Code

24  Section it's going to come up, and no other states will come

25  up because no other state uses the system.  I'm sure that our

1   codifiers were not that smart to know that that's the way it

2   would impact the internet years later.

3        Okay.  Let's see.  I can't find it in this code

4   section.  So I'm not looking at the cases, but it does make

5   sense that this is extrinsic, doesn't it?

6        MS. IZMAYLOVA:  It does.  I don't know for sure, but

7   I just wanted to point that out to the Court.

8        THE COURT:  Okay.  We'll take a look at that and see

9   if we can figure that out.  Okay?

10       MS. IZMAYLOVA:  Thank you, your Honor.  And I just

11  have two points to bring up.  With regard to Defense Request

12  to Charge No. 20, the actual malice definition -- and in the

13  Court's charge this is on page 6.

14       THE COURT:  All right.

15       MS. IZMAYLOVA:  We would request that the language

16  that actual malice is not merely spite or ill will or even

17  outright hatred be included into the Court's charge because I

18  do believe that there is at least some evidence that, you

19  know, my client may not like the plaintiff.  But I don't want

20  the jury to misconstrue her dislike for the plaintiff to be

21  sufficient to prove actual malice.

22       And then --

23       THE COURT:  Hold on a second.  Hold on a second.  I'm

24  reading through what's in here already.

25       MS. IZMAYLOVA:  My apologies.

```
 1              THE COURT:  All right.  What's the plaintiff's

 2   response to that?

 3              MR. PEQUIGNOT:  Your Honor, if the concern is that

 4   they are afraid that the jury would confuse actual malice with

 5   ill will, you know, we don't have an objection to clarifying

 6   that those two things are different.  I think our concern with

 7   what the language they had proposed is that it suggests that

 8   we have to prove ill will in addition to the standard for

 9   actual malice because it says not merely.

10              THE COURT:  So you don't like the word "merely."

11              MR. PEQUIGNOT:  Yeah.  We don't like the fact that it

12   suggests we have to prove both.  We don't object or disagree

13   with the notion that those two things are different.

14              MS. IZMAYLOVA:  And I'm fine with taking out the word

15   "merely," your Honor.

16              THE COURT:  We have to use the word constitutional?

17              MS. IZMAYLOVA:  I was only quoting from the case so I

18   mean --

19              THE COURT:  Quoting from the case, from the --

20              MS. IZMAYLOVA:  From the Cottrell v. Smith.

21              THE COURT:  Well, yeah, trying to interpret what the

22   Supreme Court said was constitutionally required, but I don't

23   think we need to tell the jury that it's constitutional.

24              MS. IZMAYLOVA:  That's fine.

25              THE COURT:  Hold on a second.
```

 1            (Brief Pause.)

 2            THE COURT:  So what I'm going to do is I'm going to

 3    add this on page 6 of the proposed instructions, first,

 4    second, and third.  And then right where it starts to define

 5    actual malice, I'm going to say actual malice is not spite or

 6    ill will or even outright hatred.  Rather, actual malice is a

 7    defendant's actual knowledge that a statement is false or a

 8    defendant's reckless disregard as to the statement's truth or

 9    falsity.

10            MS. IZMAYLOVA:  Thank you.

11            THE COURT:  Okay.  Is plaintiff okay with that?

12            MR. PEQUIGNOT:  That's fine, your Honor.

13            THE COURT:  Okay.  What else, ma'am?

14            MS. IZMAYLOVA:  And then from the same charge at

15    the -- from the defendant's proposed charge, the third

16    paragraph, where I wrote it is not sufficient to measure

17    reckless disregard by what a reasonably prudent man would have

18    done under similar circumstances, I would like that language

19    added because I believe even in the opening the plaintiff

20    stated that, you know, some of the things that my client was

21    doing is not -- no reasonable person would have done this.

22    They said something along those lines.

23            And I would like that language added in because I do

24    not want the jury to be confused about what the standard is,

25    that it's not a reasonable person standard.  It is the -- they

1  have to look to what the defendant actually did.

2          THE COURT:  What's the plaintiff's response to that?

3          MR. PEQUIGNOT:  Your Honor, I just -- I think that

4  that language just is confusing as it relates to the rest of

5  the actual malice charge, and it's unnecessary in light of

6  what the Court already has.

7          THE COURT:  Explain to me how it's confusing.  What

8  would it mix up?

9          MR. PEQUIGNOT:  So the language that they're asking

10 to include is what a reasonable prudent man would have done

11 under similar circumstances, not whether a reasonably prudent

12 man would have conducted further investigation.  I think the

13 issue with actual malice and reckless disregard standard is

14 that we're looking at sort of subjective things related to the

15 defendant.  And so --

16         THE COURT:  Which is what -- I guess the way I

17 interpret what she's asking for is she wants to make the jury

18 understand that it's not an objective standard.

19         MS. IZMAYLOVA:  That's correct.

20         THE COURT:  It really is kind of weird that it's not,

21 honestly, because, I mean, this may be one of the -- I mean,

22 reckless disregard normally is an objective standard.

23         MS. IZMAYLOVA:  And that's why I would like that in,

24 so that they know that -- the difference.

25         THE COURT:  Take, for example, the Georgia crime of

1  theft by receiving.  Theft by receiving is if you receive

2  something that you know is stolen or you reasonably should

3  have known that it was stolen, and that's a reasonable man

4  standard or woman standard.

5       MS. IZMAYLOVA:  I think all the criminal ones are

6  reasonable because, like, even the drug -- like, when you're

7  carrying something, you say it's not my bag.  Well, if you

8  thought that it was, you should have known there might have

9  been drugs in it, also a reasonable person standard.

10      THE COURT:  There's something else in here -- and I

11 ask this to the plaintiff, Mr. Pequignot.  Is there something

12 else in here that would make it clear to the jury that it's a

13 subjective standard and not an objective standard?

14      MR. PEQUIGNOT:  I guess my concern, your Honor, is

15 just that there's some tension between that statement and what

16 I think is a clear statement of the law in the following

17 paragraph.

18      THE COURT:  I mean you agree, though, it is a

19 subjective standard; right?

20      MR. PEQUIGNOT:  Subjective in the sense that the

21 facts that are supporting the reckless disregard have to be

22 related to the defendants.  They can't just be -- so just

23 using, you know, using the example we have here like if the

24 source of a statement there's evidence that the defendant was

25 aware that this person was unreliable, then that's evidence of

1  actual malice.  So I guess the problem I have with the

2  language is just that it could be read to suggest something

3  different and I don't --

4              THE COURT:  Okay.  So let's take Starmarie as an

5  example since that's probably the biggest one in this case.

6  There's certainly some evidence here that she might not be

7  reliable, and the defendant would admit that as to some

8  things.  I don't specifically remember every situation in the

9  room with the third gentleman was there.  Might be one of the

10 things that the defendant pointed to as being something that

11 she didn't really trust.

12             That got published anyway originally, and so but

13 Starmarie said it happened.  And there was, you know, some

14 general reasons for the defendant not to have trusted

15 Starmarie, her criminal convictions, without delving more into

16 what they were about, the fact that she lied about some

17 things.  She admitted that she had lied about some stuff and

18 even in the interview.  I don't remember what it was, but she

19 discussed why she did.  And so how would a jury determine

20 whether or not it was proper for the defendant to rely on

21 anything that Ms. Jones said?

22             Now, an objective standard would be you don't rely on

23 anything that she says until you probably perhaps have a

24 second corroborating source, which is why, you know,

25 traditional news media use that as a standard, particularly

1   when you are alerted to the facts that her background was a

2   little sketchy.  But if it's not -- if this statement of the

3   law is right that it's not a sufficient measure of reckless

4   disregard by what a reasonable prudent person would have done

5   under similar circumstances, like get a second source, then I

6   guess I don't know how the jury does that.

7           I mean, honestly, this whole parsing of subjectivity

8   and objectivity seems real difficult for anyone.  I guess this

9   comes out of the *New York Times* case.  I'm not sure.  I mean,

10  know this is not the case that's quoted.  It's a Georgia case.

11  But because the New York times set up the reckless standard

12  too but I don't know.  So help me.  How would we tell the jury

13  that it's not what anyone else would have done with the

14  knowledge that -- which Ms. Kebe had and distinguish that from

15  your argument that she should have done more based on what she

16  knew.  I mean, I don't guess I understand it, quite honestly.

17          MR. PEQUIGNOT:  Your Honor, I think that there's some

18  tension there because I think that the quote that is coming

19  from the *Cottrell* decision is sort of one of these broad

20  statements that's not really being applied to these specific

21  facts.  And then the following paragraph which is, I think,

22  undoubtedly a fair characterization of the law under the

23  *St. Amant* decision is addressing the actual situation we have

24  that we're addressing.

25          So, you know, your Honor is, I guess, recognizing the

1  tension, which is our concern, is that the statement that

2  they're pulling from a decision is not really addressing a

3  situation --

4          THE COURT:  Okay.  So I'm just trying to think.  I

5  like to deal in analogies, so I'm thinking up one we all would

6  know.  If a certain former mayor of New York were to come to

7  me and tell me that there was voting irregularities, that

8  might be perceived by me differently than if someone from the

9  FBI or the GBI were to come to me and tell me that there were

10 voting irregularities.

11         I would think if I relied on what the mayor told me

12 and I went out and I said certain things, given everything

13 that we know about what -- you know, the body of statements

14 that he made, then maybe that might fit the definition where

15 on the -- in the next paragraphs you refer to where it says a

16 defendant cannot profess good faith when the statements are so

17 inherently and probable that only a reckless person would have

18 put them into circulation.

19         You know, if the FBI came to me and said something,

20 that might be totally different.  Gosh, that seems still to be

21 an objective standard, though.  I don't know where the

22 subjective -- it's an objective statement based on what I know

23 about speakers, you know, what's been publicly disclosed about

24 the speakers.  I mean, to the extent this case turns on this

25 issue, what's going to happen is the jury is going to come

1 back, and they're going to ask me, well, how do they do this,

2 how do they decide, you know.  And I don't really know what to

3 tell them if it's not a reasonable man, and we know that it's

4 not that, I think, I guess based on the *Cottrell* decision.

5 Since Georgia law gets to control that part of it -- in what

6 context did *Cottrell* use that statement?

7         MS. IZMAYLOVA:  Your Honor, I don't remember because

8 I wrote this a while ago, but I can go grab that opinion.

9         THE COURT:  All right.  So I'm just going to make a

10 note.  I'm just going to make a note that Andrew and I need to

11 talk about this a little bit more, and I'll let you know what

12 I decide about that.

13         So let me -- okay.  Anything else from the defendant?

14         MS. IZMAYLOVA:  No.  I think that was it.

15         THE COURT:  Okay.  All right.  So we'll take a

16 10-minute recess.  We'll come back.  I guess Ms. Kebe will

17 still be on the stand.

18         MS. IZMAYLOVA:  Your Honor, I do have -- I'm sorry.

19 Not in regards to this, but I do have something else to bring

20 up.  I thought you were talking about the jury charges.

21         THE COURT:  Okay.

22         MS. IZMAYLOVA:  We do have a motion for your Honor.

23 Based on the cross-examination that already occurred

24 yesterday, Ms. Matz, you know, seemed to suggest that my

25 client was lying about the, you know, all the other tweets

1  that she had seen from -- dating back from 2015 to before the

2  Starmarie Jones interview that was referring to, you know,

3  talking about plaintiff having herpes and even tagging her in

4  some of those tweets.

5       We do have copies of those tweets, and we would ask

6  to be able to present that on redirect given the fact that

7  Ms. Matz suggested that my client was basically lying about

8  the existence of those tweets.

9       THE COURT:  Are these the tweets from --

10      MS. IZMAYLOVA:  I mean, from random users, just like

11 my client testified, from Twitter, dating back to 2015,

12 between 2015 and 2018, before the Starmarie Jones interview,

13 you know, posting about the fact that, you know, plaintiff and

14 herpes and even tagging the plaintiff in some of those tweets.

15 And specifically yesterday when Ms. Matz was questioning my

16 client, she said, well, where are those tweets?  Are we just

17 supposed to trust your word that they exist?

18      And so I believe that because of the way that she --

19 because of the questions that were said to my client, I

20 believe that we should be able to now present into evidence

21 those tweets so that the jury does not think that my client

22 was lying about that.

23      THE COURT:  And these dealt with the herpes issue?

24      MS. IZMAYLOVA:  Your Honor, I have copies of them if

25 you would like.

```
 1              THE COURT:  Well, I mean, just tell me.  They deal
 2   with the herpes?
 3              MS. IZMAYLOVA:  Correct.  Yes, your Honor.
 4              THE COURT:  And your statement is that your client
 5   not only testified about it yesterday, I suppose, but that
 6   she -- these were things that she relied on when she made the
 7   statements?
 8              MS. IZMAYLOVA:  Correct.  And that's --
 9              THE COURT:  Have I ever ruled these out?
10              MS. IZMAYLOVA:  So --
11              THE COURT:  Are they on your witness list?
12              MS. IZMAYLOVA:  They were not on our witness list
13   initially because I did not anticipate the plaintiff ever
14   getting up and saying that my client was the first person to
15   ever say this about her because that's just not true.  So I
16   didn't think that it would be necessary.  But the way that
17   Ms. Matz made it seem yesterday was that my client was making
18   that up, and so I believe that at this point we should be
19   allowed to present that in her redirect as rebuttal.
20              THE COURT:  Okay.  In her rebuttal.
21              MS. IZMAYLOVA:  Not rebuttal, but in her redirect,
22   your Honor.
23              THE COURT:  Okay.  Anything else you want to talk
24   about?  Is that it?
25              MS. IZMAYLOVA:  That was it.
```

1          THE COURT:  All right.  Ms. Matz.

2          MS. MATZ:  So, first of all, I'd like to know if

3   these were ever produced in discovery, and the second thing is

4   I did not bring this up.  Mr. Sabbak asked her what the basis

5   was for her statements.  This is part of their main defense.

6   They had an obligation whatever evidence they wanted to

7   produce to the jury to show that she has a reasonable basis to

8   rely on whatever she's saying she relied on.  That's the main

9   piece of their defense.

10          They absolutely had an obligation to not only produce

11  that in discovery but have it on their pretrial order list,

12  and if they wanted to put it in, put it in on their direct

13  case.  It's perfectly within my rights to cross-examine their

14  client about statements she's making about evidence that she's

15  talking about that she saw that's not being produced to the

16  jury.

17          THE COURT:  Have you seen what it is she wants to put

18  in now?

19          MS. MATZ:  I don't know.  This is the first time

20  hearing it.

21          THE COURT:  So, Ms. Izmaylova, has this ever been

22  produced by the defendant to the plaintiff?

23          MS. IZMAYLOVA:  No, your Honor, because, again, I did

24  not believe that the plaintiff was going to lie about that my

25  client was the first person to ever say anything about her

1   having herpes on the stand.

2           THE COURT:  But that's not the standard about whether

3   you produce it in discovery.  The standard if you produce it

4   in discovery is was there a question -- was there a request to

5   produce that would have included evidence that the defendant

6   relied on when she said that the plaintiff had herpes.  I'm

7   going to guess there's probably such a question.

8           MS. MATZ:  There was also requests for any evidence

9   they intended to introduce at trial or rely upon in this case.

10          THE COURT:  You can't ask that.

11          MS. IZMAYLOVA:  I didn't intend to --

12          THE COURT:  Wait, wait, wait.  You can't ask somebody

13  to produce what they were going to introduce at trial; right?

14  I mean, that's work product.

15          MS. MATZ:  I'm sorry.  You can ask them to produce

16  anything that they're intending to rely upon in their defense

17  of the case or that supports any of their defenses.

18          THE COURT:  You can ask it generally that way but not

19  like trial because that's attorney decisions, and that's work

20  product, I think.  But I'm going to guess that there was a

21  request that would have covered this.  The plaintiff -- the

22  defendant may not have thought that they needed to produce it

23  because it would not be necessary since it was well known

24  allegedly that the plaintiff had this condition or that other

25  people had said that she did.  But that doesn't excuse not

1    producing it; right?  I mean, you do still have to produce it.

2              MS. MATZ:  Your --

3              THE COURT:  Wait a minute.  Wait a minute.

4              MS. MATZ:  Sorry.

5              MS. IZMAYLOVA:  I agree with your Honor.  I don't --

6              THE COURT:  So just follow my logic here.  So then

7    when Ms. Matz gets up and she asks her questions about her,

8    your client, or questions about what the proof is having not

9    had any of those documents given to her, it would seem natural

10   that the plaintiff would want to point out that she's just

11   saying this, and there's nothing to support it.  And then now

12   you're telling me there is something to support it, and that

13   kind of affects the plaintiff's case.  They may not have gone

14   down the road of asking those kinds of questions had you

15   produced it.  I mean, you can't just simply say it's out in

16   the stratosphere, everybody knew, everybody knew that, I mean,

17   particularly when it was requested in discovery.

18             MS. IZMAYLOVA:  I don't recall if it was specifically

19   requested in the question that your Honor -- how your Honor

20   has formed the question.  I do not remember.  I'm not going to

21   say it wasn't.

22             THE COURT:  Well, let's wait a minute.  Let's wait.

23   Ms. Matz, can you find a request to produce that --

24             MS. MATZ:  I'm looking, but I have two more points

25   while I'm looking, your Honor.  First of all, no one has said

1    that this was the first time.  My client actually admitted on

2    the stand that -- excuse me -- Ms. Azealia Banks had made some

3    prior allegation.  And the other thing is I, frankly, think

4    that this should have been a category of documents that's

5    subject to the automatic disclosures under Rule 26.  Anything

6    that you're intending on to support your claims or defenses

7    has to be a category, and it has to either be produced with

8    your initial disclosures or later in the case.

9            THE COURT:  That is true; right?

10           MS. IZMAYLOVA:  Yes.

11           THE COURT:  I mean, Rule 26 doesn't apply under

12   Georgia procedure, but it does apply in federal court and --

13           MS. MATZ:  Yes.

14           THE COURT:  That's a pretty big point because, in

15   fact, as it relates to herpes, it's about as big as they get,

16   you know, because she says there were all these statements of

17   people saying she had herpes.  And so when I heard Starmarie

18   Jones say she had herpes and particularly when I saw the

19   photographs that showed that she might have some cold sore and

20   knowing that that is an element of herpes, that kind of

21   provides a fairly tight defense for the defendants.  But it

22   starts with all this other stuff having been out there.

23           So I guess my ruling is this:  If you didn't produce

24   it in discovery, it can't be used because at this point in

25   time the plaintiff has gone down a road to ask questions and

1   build their case on the assumption that there was nothing.

2   And it would be unfair for you to use that now when you didn't

3   disclose it to them when the plaintiff may not have asked the

4   questions the way they did.  It would create an impression to

5   the jury that counsel for the plaintiff was being misleading

6   when if the information was not disclosed, the documents were

7   not produced.  Then the questions would not have been posed

8   the way they were.

9          So I'm not going to allow you to use that.  Anything

10  else?  That's why you've got to disclose everything.  You're

11  supposed to disclose everything.  Anything else?

12          MS. IZMAYLOVA:  None.  No, thank you.

13          THE COURT:  All right.  So we'll tell the jury we'll

14  call them in at 11:00.  We'll take a break until 11:00, and

15  we'll go until 12:30.  And then we'll take a lunch break.  All

16  right.

17          COURTROOM SECURITY OFFICER:  All rise.  Court is in

18  recess until 11:00.

19          (Brief recess.)

20          THE COURT:  All right.  Thank you.  Okay.  As soon as

21  the jury gets in, if you'll come on up.

22          COURTROOM SECURITY OFFICER:  All rise.

23          (Whereupon, the jurors entered the courtroom.)

24          COURTROOM SECURITY OFFICER:  Please be seated and

25  come to order.

```
 1                    LATASHA TRANSRINA KEBE,

 2           herein, having been previously duly sworn, was

 3  examined and testified as follows:

 4           THE COURT:  All right.  You can proceed.  Thank you.

 5           MS. MATZ:  Thank you your Honor.

 6               FURTHER CROSS-EXAMINATION (Cont'd)

 7  BY MS. MATZ:

 8  Q   Good morning.

 9  A   Good morning, Ms. Matz.

10  Q   So yesterday when we left off, we were talking about the

11  email that you testified came -- you believe, testified came

12  from my client's business manager.  Do you recall that?

13  A   Yeah.  Could you bring it back up on the screen for me,

14  please.

15  Q   Yeah.  We'll do that in one second.

16  A   Okay.

17  Q   And before we do that, you had also testified that the

18  tashakbusiness@gmail.com is one of your business email

19  addresses; correct?

20  A   I believe so, yes.

21  Q   Okay.  That was one of the addresses we saw on the

22  advertising portion of the Starmarie Jones video where you

23  were soliciting advertisements; correct?

24  A   Yes, ma'am.

25  Q   I'm sorry.  I didn't hear the answer.
```

1   A   Yes, ma'am.

2   Q   Thank you.  I appreciate that.  All right.  Do you know

3   who my client's business managers are?

4   A   Right now?

5   Q   No, at the time we were talking about, this email

6   September 19th of 2018.

7   A   I believe the same lawyers that her husband is suing were

8   doing business for her because she was in a lawsuit with the

9   current managers at the time.

10  Q   Your testimony -- okay.  So your testimony is that you

11  believe the business managers that sent you the email were

12  also my client's lawyers at the time?

13  A   I believe -- I don't think they were her lawyers.  I

14  believe they were doing business for her, like just kind of

15  looking at contracts.

16  Q   Okay.  And you have personal knowledge of this?

17  A   No.  That's just my idea of how the media was kind of

18  printing things at the time because she was in a lawsuit with

19  her, like, prior management firm.  So she didn't actually

20  have, like, a dedicated team at the time is what I read.

21  Q   Okay.  So when you said you thought that one of the

22  reasons why you didn't think the cease and desist letter was

23  real is because it came from business managers; you actually

24  understood that the people you thought were business managers

25  were also a law firm.  Is that what you're saying now?

```
1   A    No, ma'am.

2   Q    So you're saying the people who you thought were business

3   managers were not a law firm?

4   A    No, ma'am.

5   Q    Well, which is it?  You just answered no to both

6   questions.  Did you think that they were also a law firm or

7   not?

8   A    No, ma'am.  They were just doing business on her behalf.

9   Q    I'm asking if you understood whether or not they were a

10  law firm, not whether they were acting as her lawyers, ma'am.

11  A    No, ma'am.

12  Q    No, ma'am, you didn't understand they were a law firm at

13  all?

14  A    No, ma'am -- that is correct.  No, ma'am.

15  Q    Thank you.

16  A    Okay.

17           MS. MATZ:  All right.  If we can please pull up

18  P-514.  And, your Honor, just for the record, this is a

19  duplicate of what we were looking at yesterday.  There was

20  just a duplicate issued on that exhibit list, and if you'd

21  like me to show both, I can.

22           THE COURT:  So just to be clear, the duplicate

23  document has already been admitted?

24           MS. MATZ:  No, this is the -- the duplicate document

25  is the one we were talking about yesterday.
```

```
1              THE COURT:  514 has not been tendered either, has it?
2              MS. MATZ:  No, it's not in yet.  We were talking
3      about 515.  514 and 515 are the same document.
4              THE COURT:  Okay.
5              MS. MATZ:  I just wanted to make that clear.
6              All right.  So, ma'am, do you see this document?
7              THE WITNESS:  Yes, ma'am, I see it.
8      BY MS. MATZ:
9      Q   And you see at the top of the document it says from Tasha
10     K, tashakbusiness@gmail.com?  Do you see that?
11     A   That is correct.
12     Q   And that is the email address that we were just talking
13     about that is associated with your business; correct?
14     A   That is correct.
15             MS. MATZ:  Okay.  Your Honor, I'd offer this into
16     evidence.
17             THE COURT:  Any objection?
18             MR. SABBAK:  No objection.
19             THE COURT:  No objection.  It's admitted.
20             (Whereupon, Plaintiff's Exhibit 514 was marked for
21     purposes of identification and admitted into evidence.)
22     BY MS. MATZ:
23     Q   Okay.  If we could go down to the bottom or kind of split,
24     I'd like to -- there's two emails on this chain.  Can we
25     straddle all the pages, Tom?  I think it should be a
```

1    continuous scroll.  Just show it in the middle, please.

2    Perfect.  Thank you.

3            All right.  So looking towards the cutoff of the fist

4    page right before it says Confidential Cardi 313, you see it

5    says on Wednesday September 19th, 2018, at 11:19 p.m.?  Do you

6    see that?

7    A    Yes, ma'am.  At the bottom?

8    Q    Yes, at the bottom.

9    A    That is correct, yes, ma'am.

10   Q    So I'm talking about the Wednesday, September 19th email

11   that's from Jamie Baratta.  Do you see that?

12   A    That is correct.

13   Q    Okay.  And that email addresses is

14   jbaratta@davisshapiro.com?

15   A    That is correct.

16   Q    And below that where the message starts it says, please

17   see the attached time-sensitive cease and desist letter, on

18   behalf of Damien Granderson.  You see that?

19   A    Yes, ma'am.

20   Q    And then it says, this letter should be directed as soon

21   as possible to Tasha K or to the appropriate person who makes

22   decisions for Tasha K concerning legal matters.  Do you see

23   that?

24   A    Yes.  That is correct.

25   Q    And then at the bottom it has her signature block.  You

1   see that also?

2   A   Yes.  That is correct.

3   Q   It says Jamie M Baratta and then, slash, Davis Shapiro

4   Lewit Grabel Leven Granderson & Blake LLP.  You see that?

5   A   Yes, ma'am.

6   Q   Is this the email with the cease and desist letter that

7   you said you showed to your lawyer in Washington, D.C.?

8   A   Which cease and desist is attached?

9   Q   I can bring up the cease and desist again.

10  A   Okay.

11  Q   There wasn't more than one cease and desist that you got

12  on September 19th; correct?

13  A   Not that I believe so, no, ma'am.

14  Q   Okay.  So, Tom, do you want to bring up the video that we

15  were looking at?  It was D-11, and I believe the time code was

16  around 11:55, real quick just to refresh Ms. Kebe.  Right

17  there.  Maybe so it's a little clearer if you could just move

18  it forward a couple seconds.  Great.  That's good.

19          Do you recall looking at that yesterday?

20  A   Yes, ma'am.

21  Q   Okay.  And this was the -- do you need us to replay you

22  the clip where you said I sent this to my lawyer in D.C. who

23  looked at it and determined it was a fake cease and desist

24  letter?

25  A   You said -- what was the question again?

1  Q   I said do you need me to replay you that clip or do you

2  recall saying that?

3  A   Oh, no, I recall saying that.

4  Q   Okay.  And this was the cease and desist letter that you

5  were talking about?

6  A   Yes, at that time.  It's on the screen.

7  Q   Okay.  And so the email that we were just looking at,

8  Plaintiff's 514, was the email that came with this; correct?

9  A   I can't say because it's blacked out.  Why is it blacked

10  out?

11  Q   You're telling me you think you got more than one cease

12  and desist letter?

13  A   That's not what I'm saying.  I can't agree to something,

14  and you have an email up there.

15          THE COURT:  All right.  Hold on.  So I'm sure there's

16  a copy of an unredacted version of the letter; right?  Y'all

17  have that with you?

18          MS. MATZ:  Sure.  Well, we could look at -- why don't

19  we look at Plaintiff's -- excuse me.  Why don't we look at

20  Plaintiff's 863.  Have you ever seen this before?

21          THE WITNESS:  Yes.  I believe this was forwarded from

22  my Tasha K business email from my husband to me, so yes.

23  BY MS. MATZ:

24  Q   Well, hold on.  Let's just talk about the document.  It's

25  printed from tashakbusiness@gmail.com.  Do you see that in the

1   top right-hand corner?

2   A   Yes, ma'am.

3   Q   Okay.  And at the bottom right-hand corner it says Kebe

4   552.  You see that?

5   A   Yes.  I see that.

6   Q   Okay.  And this was a document you produced in discovery;

7   correct?

8   A   I produced?

9   Q   Defendants produced in discovery.

10  A   Okay.  If my attorneys gave it to you, then yes.

11          MS. MATZ:  Okay.  Your Honor, I'd offer this into

12  evidence.

13          THE COURT:  Any objection?

14          MR. SABBAK:  No, sir.

15          THE COURT:  So I'm sorry.  It was 8 -- what's the

16  number again?

17          MS. MATZ:  I'm sorry.  It's 863, your Honor.

18          THE COURT:  863 is admitted.

19          (Whereupon, Plaintiff's Exhibit 863 was marked for

20  purposes of identification and admitted into evidence.)

21  BY MS. MATZ:

22  Q   Okay.  So this was the email that the defendants actually

23  received; correct?

24  A   Yes, ma'am.

25  Q   Okay.  So this is what you showed with the attachment you

1  see halfway down the page there.  This is what you showed to

2  your attorney in D.C.; correct?

3  A    It wasn't my attorney.  It was my attorney friend but yes.

4  Q    All right.  Okay.  And did you google Jamie Baratta?

5  A    Did I google Jamie Baratta?

6  Q    Did you google her to find out who she was?

7  A    No, because she's all over the news.  You don't need to

8  google her.

9  Q    She's all over the news --

10  A    In the lawsuit that she has with plaintiff's husband, this

11  law firm.

12  Q    You're saying that that was pending in -- you're sure that

13  that was pending in 2018?

14  A    I'm just saying that's how I know --

15  Q    No, no, no.  I'm asking you what you understood at this

16  time, ma'am.

17  A    Oh, at this time?  No.  She was representing them doing

18  business contracts and such.

19  Q    Okay.  And I'm asking if you googled her to find out

20  whether or not it was a law firm.

21  A    No.  I didn't google her because I knew who she was.

22  She's in the news.  No, I did not google her.

23  Q    At the time you're saying she was in the news because you

24  just told me that that came later.

25  A    Yes.  That particular portion came later.

1    Q    I'm asking you about your knowledge at the time you

2    received this letter.  Okay.  Can we agree to talk about that

3    for a minute?

4    A    Yes, and I'm talking about that with you.

5    Q    I'm asking you if you goggled her to find out whether or

6    not she was an attorney.

7    A    I didn't need to google her because she was representing

8    the plaintiff's husband.  She was in the news.  I didn't need

9    to google her.

10   Q    So you knew she was an attorney?

11   A    I didn't know she was an attorney.  I knew she was doing

12   business for her husband.

13   Q    Okay.  So you knew she was doing business, and you didn't

14   google her?

15   A    Yes.  That's correct.

16   Q    All right.  And did you google the name of the business,

17   Davis Shapiro?  I'm not going to read the whole thing.  Did

18   you google that?

19   A    No, ma'am.  No, ma'am.

20        THE COURT:  So let me ask both of you, if you would,

21   to allow the other person to finish.  Oftentimes, Ms. Kebe,

22   you start answering before she's finished with her question,

23   and sometimes you start with your next question when she's

24   answering or attempting to answer some question that you've

25   asked.  So if y'all both would just wait until the other

1  person is done, that way the court reporter can have

2  everything in sequence in the transcript.  Otherwise, it's

3  words on top of words.

4          THE WITNESS:  Yes, sir.

5          THE COURT:  All right.  Thank you.

6          MS. MATZ:  Thank you, your Honor.  I'm sorry,

7  Wynette.  Okay.

8          All right.  So you felt like you knew who she was;

9  you didn't need to google her?

10          THE WITNESS:  That is correct.

11  BY MS. MATZ:

12  Q   All right.  And who's your friend in D.C. that you said is

13  the attorney that you sent this to?

14  A   I would rather leave her out of this because she's not a

15  part of this case.

16  Q   I'd like an answer to my question.

17          THE COURT:  Answer the question, please.  You need to

18  answer the question.

19          THE WITNESS:  But she's not a part of the case.

20          THE COURT:  Answer the question that was asked of

21  you.

22          THE WITNESS:  Can I google her name?  Because I was

23  friends with her at the time.

24          THE COURT:  Answer the question.

25          THE WITNESS:  I do not remember her name.  I can

1  google it in my email.

2         MS. MATZ:  Okay.

3         THE COURT:  You can google it?

4         THE WITNESS:  Yes.  If I get my phone, yes, I can get

5  her name.

6         THE COURT:  If you'll bring her her phone.

7         THE WITNESS:  I don't have my phone with me.  It's in

8  a car.

9         THE COURT:  Okay.  Bring her a phone.  Bring her

10 something with internet capabilities so she can google the

11 name.

12        THE WITNESS:  Can my husband sign into my email?

13        THE COURT:  Sure.

14        THE WITNESS:  Tashatkebe@gmail.com.  Thank you.

15 Cheick, google -- sign in to unwinewithtashak@gmail.com as

16 well because that's when I was doing the corresponding at the

17 time.

18        MR. SABBAK:  Your Honor?

19        THE COURT:  Yes.

20        MR. SABBAK:  The gmail requires two-step

21 verification, so if you know what that means, it requires

22 Mr. Kebe to have his actual phone, which is downstairs.  May

23 he be excused in the meantime to go retrieve it?

24        THE COURT:  Sure.  I mean, he's not required to be

25 here.

```
 1              MR. SABBAK:  Okay.

 2              THE WITNESS:  And two-step, that means my phone as

 3  well, so he has to sign in to both phones to get into the

 4  email.

 5              THE COURT:  And he's not going to be able to bring

 6  his phone in --

 7              MR. SABBAK:  He'll forward it to me or screenshot it.

 8              THE WITNESS:  Well, I don't think he knows what he's

 9  looking for, so I've got to look for it.

10              THE COURT:  Tell you what we'll do, is at

11  lunchtime -- we'll come back to this issue after lunch, so you

12  can find everything during lunch.

13              THE WITNESS:  Yes, sir.

14              THE COURT:  But I'm going to guess you can't bring

15  your phone in, so you're going to have go out and find it and

16  then maybe figure out --

17              THE WITNESS:  I'll screenshot everything to the

18  plaintiff.

19              MR. SABBAK:  I'll take care of it.

20              THE WITNESS:  Okay.

21  BY MS. MATZ:

22  Q   Okay.  Do you know whether or not your attorney friend

23  looked up the person sending this or the firm name to see if

24  they were lawyers?

25  A   No.
```

1 Q    Okay.  Did you ask her if she did?

2 A    No, ma'am.

3 Q    All right.  So without either of you looking at this, she

4 told you to wipe your ass with it, and you were fine with that

5 conclusion?

6 A    Well, I was -- that was inflammatory.  She just basically

7 said ignore it, so I said wipe my ass with it.

8 Q    No, you said and -- you said I talked to an attorney and

9 they told you to wipe your ass with it.

10 A    Yes, meaning --

11 Q    Correct?  You said that yesterday in the video; correct?

12 A    But that's hypothetically speaking.

13 Q    Ma'am, please answer my question.

14 A    Yes, that's what I said in the video.

15        THE COURT:  Hold on.  Hold on.  All right.  So if

16 counsel doesn't like the answer you're getting, just look at

17 me and object for responsiveness to the answer.  Then when I

18 start talking, the court reporter will make what I say

19 primary, I hope.  I'm not sure.  But that's the way it should

20 work, I think.  So, otherwise, let her finish what she's

21 saying and then object.  Okay?

22        THE WITNESS:  Thank you.

23        MS. MATZ:  Sure, your Honor.

24        So you said in the video yesterday that after looking

25 at this, your attorney friend told you to wipe your ass with

1   it; correct?

2          THE WITNESS:  Correct.

3   BY MS. MATZ:

4   Q   All right.  And you felt like that determination was good

5   enough for you to go online and tell all of your followers

6   that your lawyer had determined that it was fake; correct?

7   A   Yes, ma'am.

8          THE COURT:  Let me ask a question.  So as you

9   understood it, what did it mean to say that the letter was

10  fake?

11         THE WITNESS:  Okay.  Can we bring the letter up and I

12  can describe it?  There were certain elements of the letter

13  because I've gotten cease and --

14         THE COURT:  I just want to know what you interpreted

15  that to mean.  That there wasn't a real letter or it wasn't

16  really from the plaintiff?  Or wasn't from a lawyer or what?

17         THE WITNESS:  It wasn't -- I guess because my name,

18  my address wasn't on it, it wasn't addressed to me.  It was

19  addressed to gentlepersons.  It wasn't signed.  So basically

20  don't take it serious.  Now, the second cease and desist, yes.

21  But the first one, it was just kind of drafted in a hurry to

22  just get over to me to take the video down, so that's how I

23  took it.

24  BY MS. MATZ:

25  Q   But it did have your business email address on it; right?

1  A    Whose business email address?

2  Q    Kebe Studios business email address; correct?  On

3  tashakbusiness@gmail.com.

4  A    Can you repeat that question.  I'm sorry.

5  Q    The letter that we were looking at did have your business

6  email address, tashakbusiness@gmail.com; correct?

7  A    That is correct, yes, ma'am.

8  Q    Thank you.  So despite going online and telling your

9  viewers that it was fake, you responded; correct?

10  A    I'm sorry.  Could you repeat that question.

11  Q    I said despite going online and telling all of your

12  viewers it was fake, you responded; correct?

13  A    I responded to what?

14  Q    The email dated September 19th, 2018, at 11:18 p.m. that

15  we're looking at at the top.

16  A    Yes.  I believe my husband responded to this, if I'm not

17  mistaken.

18  Q    Your testimony is that he responded to it?

19  A    I believe so.

20  Q    All right.

21  A    His name is at the bottom as well.

22  Q    All right.  I'd like to read a portion of his deposition

23  testimony into the record, and I'd like to pull up Plaintiff's

24  314.

25  A    Okay.

1    Q    I'm going to line -- I'm going to page 90, line 4 through

2    91, line 11.  No, that's not the right exhibit.  I'm sorry.

3    Did I say -- I'm sorry.  P-514.  I'm sorry.  I think I said

4    the Bates number, too many numbers.  All right.  If you can,

5    just show the middle view.

6            Okay.  So this is a copy of -- another copy of what

7    we were just looking at, part of it; right?

8    A    I believe so, yes, ma'am.

9    Q    Okay.  So when your husband was deposed in this case, you

10   understand that he was testifying under penalties of perjury

11   just like you were; correct?

12   A    Yes, ma'am.

13   Q    Okay.  And beginning on page 90, line 4 --

14   A    Of his deposition?

15   Q    Yeah.  I'm just going to read it into the record.

16   A    Oh, okay.

17   Q    It said, all right, I'm going to show you what I've marked

18   for production as Exhibit -- premarked as Exhibit 5, which is

19   Cardi 313 through 314, referring to the Bates numbers at the

20   bottom of this page.  Do you see that number?

21   A    Okay.  Cardi underscore 000313?

22   Q    Yes.

23   A    That is correct.

24   Q    I said, Exhibit 5 marked for identification.  Question,

25   now, do you see there are two email strings here?  Answer,

1  yes.  The first one meaning -- question, the first one meaning
2  the one on the lower portion of the page that's split between
3  313 and 314 is from Jamie Baratta at Davis Shapiro.  Do you
4  see that?  Answer, yes.  It says -- question, it says please
5  see the attached time-sensitive cease and desist letter on
6  behalf of Damien Granderson.  Answer, yes.  Question, okay.
7  And then you see above that on September 20th there's a
8  response from tashakbusiness@gmail.com.  Do you see that?
9  Answer, yes.  Question, did you send that email?  Answer, no.
10  Question, the one on September 20th at 6:34 a.m.?  Answer, no.
11  Question, okay, who did send that email?  It could have been
12  Tasha.  It had to be.  But, no, I don't respond to any, any
13  emails.
14  A   Oh, well, I mean, I can't --
15  Q   Are you aware that that's the deposition testimony your
16  husband gave?
17  A   Say that again.
18  Q   Are you aware that that's the deposition testimony your
19  husband gave?
20  A   Yes, ma'am.
21  Q   So if he gave that testimony, you're saying that he's
22  lying?
23  A   Yes, ma'am, because we were both receiving emails.
24  Q   Okay.  Thank you.  All right.  Can we go back to
25  Plaintiff's 683 -- I'm sorry.  863.  All right.  So your

1  testimony is that your husband wrote this response on Thursday

2  September 20th.  Do you see that?

3  A   Yes, ma'am.

4  Q   And then if you can go down, please, to the next page.

5  Okay.  And then after that, you received another

6  communication; correct?

7  A   You mean after that email?

8  Q   Yeah, where it says from Damien Granderson to

9  tashakbusiness@gmail.com?

10  A   I've never seen this one before.

11  Q   But you don't deny that that is your business email

12  address?

13  A   That's my business email, but I've never seen this email

14  before.

15  Q   Okay.  You don't --

16  A   That's not my email.  My husband runs that email.

17  Q   But it's the business email, ma'am?

18  A   That is correct.

19  Q   Okay.  And you're a co-owner of the business; correct?

20  A   That is correct.

21  Q   All right.  So the business received this email; correct?

22  A   My husband received this email who manages all advertising

23  and stuff like this, yes, ma'am.  I don't have access to this

24  email.

25  Q   So if your husband testified that you did have access to

1  the email, that would also be untrue?

2  A   That is correct.  I only have access when I have his

3  phone.

4  Q   So you do sometimes have access to this email address?

5  A   On his phone, but I do not have the passcode or anything

6  to get into it.

7  Q   When I asked you if you had access, do you understand the

8  word "access?"

9  A   Yes, ma'am, I do.

10 Q   Okay.  So when you said no, that wasn't true.  You do

11 sometimes have access to this email?

12 A   When it's open on his phone, yes, ma'am.

13 Q   Okay.  All right.  In this email this was a response to

14 the email you had sent that said your email indicates a lack

15 of understanding of the nature of defamation per se and your

16 legal exposure as a publisher of that defamation.  Do you see

17 that?

18 A   I see that, yes, ma'am.

19 Q   Okay.  And it says whether -- well, why don't we look at

20 the response that was sent first.  Can you go up a little bit?

21 So the response that was sent responded to Damien Granderson?

22 A   You mean the please see attached portion?

23 Q   The response that is sent on the second part of the page.

24 A   Dear Granderson?

25 Q   Damien Granderson.

1    A    Okay.  Can you pull it up some, please.  Thanks.  Okay.

2    So you want me to read it?

3    Q    I just want to know if you -- you can see it now; correct?

4    A    Yes.  I can see that.

5    Q    Okay.  So the response that was drafted on your behalf,

6    you're saying, is that unWinewithTashaK is a celebrity gossip

7    platform, and all stated opinions are alleged.  You see that?

8    A    Yes, ma'am.

9    Q    And you are talking about the Starmarie Jones video;

10   correct?

11   A    It says that in the email.

12   Q    I'm asking -- okay.  And then it says, the URL in the

13   letter is an interview video conducted by Tasha K with

14   Starmarie Jones giving her account while she allegedly lived

15   with your artist, Cardi B.  You see that?

16   A    I do see that, yes, ma'am.

17   Q    Okay.  And then it says a little bit further down, Tasha K

18   didn't make any statement in the interview, she asked

19   questions and listened, as any blogger, journalist, or gossip

20   personality would.  You see that?

21   A    Yes, ma'am.  I see that.

22   Q    And it says, you should forward your cease and desist

23   letter to the appropriate party.  The video is not coming

24   down.

25   A    That is correct.

1   Q   Okay.  And if your husband sent this, he was authorized to

2  do that on your behalf and on behalf of the business; correct?

3  A   Oh, yes.  That is correct.

4  Q   All right.  So essentially what you're conveying is that

5  you didn't think the business did anything wrong because you

6  published somebody else's statements; is that right?

7  A   I'm sorry.  Can you repeat that question.

8  Q   Was your position at the time that the business didn't do

9  anything wrong or you didn't do anything wrong by posting the

10  interview because you were publishing Ms. Jones's statements?

11  A   That is correct, yes, ma'am.

12  Q   But you do understand that as the publisher, you're also

13  responsible for the content that you publish; correct?

14  A   That is correct.

15  Q   You understand that now; right?

16  A   That is correct.  I understand it.

17  Q   All right.  So there was a response drafted to this, but

18  you still went online and in an attempt to discredit the cease

19  and desist to your viewers, said that it was fake; right?

20  A   Yes, ma'am.

21  Q   All right.  Let's go down to the response to this.  Okay.

22  And so then this was -- this next portion of the email that

23  we're looking at was in response to what you're saying your

24  husband sent.  Do you see that?

25  A   Yes.  I see it.

1    Q    Okay.  All right.  And you're saying your husband never

2    informed you that you received this email?

3    A    I'm sorry?  Can you repeat that?  My husband never

4    informed me that I sent this email?

5    Q    That you received this next part of the email.

6    A    No.  I've never seen this part, no.

7    Q    But he never informed you about it either?

8    A    I guess not, no.  I've never seen it.  Is there a reply to

9    it?

10   Q    I'm just asking you if he informed you of it.

11   A    Okay.  No.  No, ma'am.

12   Q    And he didn't forward it to you?

13   A    No, ma'am.

14   Q    All right.  Are you aware that your husband testified on

15   page 94 of his deposition, line 18 through 24, question, okay,

16   so you said -- I believe you said whenever you receive a cease

17   and desist or something like that, that you forward it to her.

18   Is that your usual custom and practice?  Answer, yes.  I would

19   either forward it to her or I would let her know depending on

20   where it is at the time.

21   A    So what's your question?  I'm sorry.

22   Q    You are saying that what your husband testified to is his

23   usual custom and practice he did not do.  That's your

24   testimony; correct?

25   A    Yeah, I did not see this part.  That is correct.

1  Q    Is it your testimony that the Starmarie Jones video is an

2  opinion piece?

3  A    Not really, no, ma'am.  It was her account.

4  Q    Okay.  So we can agree that you published that as what you

5  classified as a factual story; correct?

6  A    In some parts.

7  Q    All right.  So the part of the response that said it's an

8  opinion, you disagree with that; correct?

9  A    I'm sorry.  Say that again.

10 Q    The part of the earlier response we were looking at that

11 said it was an opinion, you disagree with that; correct?

12 A    My statements are opinions, yes, ma'am.

13 Q    Well, I just asked you if it was an opinion piece, and you

14 said no.

15 A    No, because it was her personal account, but my statements

16 in the interview were opinions based off of her account with

17 Ms. Almánzar.  So there are many different points in that

18 interview.

19 Q    But you don't think that Starmarie's statements -- you're

20 not contending that that is an opinion piece; correct?

21 A    Oh, that is correct, yes, ma'am.

22 Q    All right.  If we could just scroll back up to the middle

23 part of the response again.  I just want to look at that.

24 Okay.  That first sentence, it says, unWinewithTashaK is a

25 celebrity gossip platform and all stated opinions are alleged.

1           And we've just established that you are talking about

2   the Starmarie Jones video in this email and that this email is

3   discussing that; correct?

4   A   Well, it says all so we're talking about -- it's a gossip

5   platform, so everything that we do that unWinewithTashaK says

6   is based on opinion.  I get third party information, so I

7   can't state it as a fact because I'm not there.  So we

8   basically just -- in this email it looks like it was forwarded

9   as our disclaimer that we put on all of our videos.

10  Q   Okay.  But when your attorney questioned you earlier about

11  the type of content you put out, you didn't talk about that.

12  You said, well, I take stories from sources or they're already

13  on the internet, and of course I investigate the stories.  And

14  I publish them as either fake news or real news.

15          Do you recall giving that testimony, ma'am?

16  A   That is correct, yes, ma'am.

17  Q   All right.  So when your attorney was asking you about

18  your business, you did not give the testimony you just gave

19  about everything being opinion.  You classified it as real

20  news or fake news; right?

21  A   I'm confused.  Could you reword that question?

22  Q   Sure.

23  A   Thank you.

24  Q   Earlier when your attorney asked you to classify your

25  stories, you did not give the testimony you just gave me.  You

1 told him that you investigate stories and you publish

2 everything as real news or fake news; correct?

3 A    That is correct, yes, ma'am.

4 Q    All right.  So you're changing your testimony a little bit

5 again; correct?

6 A    No, ma'am.

7 Q    All right.  So after responding -- after the business

8 responded to this and said that all stated opinions are

9 alleged, you created another video saying that -- where you

10 told viewers that everything we said, everything that Star

11 said was accurate.  Do you recall that?

12 A    That is correct, yes, ma'am.

13 Q    All right.  So you didn't tell viewers what you said in

14 this letter; correct?

15 A    I'm sorry?

16 Q    You did not tell your viewers what you said in this

17 letter; correct?

18 A    It's on the bottom of every video.

19 Q    It's on the bottom of every video?

20 A    Yes.  If you look in the comment section at the bottom,

21 this or something similar to this is in the bottom of every

22 video.

23 Q    All right.  We'll look at that in a minute.

24 A    Okay.

25 Q    But I want to know what you said in the video.  Well, let

1   me ask you this:  When you go to the YouTube page, if I hit

2   the landing page of this video right now, would I be able to

3   see that?

4   A    Yes.  It's in the bottom in the description --

5   Q    Will I be able to see it on the first page?

6   A    On the first page?

7   Q    Yes.

8   A    Yes, it's on the first page, on the landing page.  So when

9   you click the description box, all of that comes up.

10  Q    No, no, no.  I asked you if I just went to a video, would

11  I be able to see it without clicking anything else.

12  A    I'm confused.

13  Q    What's confusing about that?  You just said --

14  A    Because you just asked --

15  Q    I'm sorry.  Can I please finish my question.

16  A    Okay.  I'm sorry.  I'm sorry.  You're right.

17  Q    You just said you click, and then it's in the description.

18  And I want to know -- I'm clarifying.  So what your testimony

19  is, is that this disclaimer you're talking about, I want to

20  know if I go to the page and the video just comes up, can I

21  see that without clicking on anything else.

22  A    No, because it's a written description.  So when you

23  click -- when you come to the page, you click a video, and

24  then all written text is in the bottom.  It's two parts to

25  complete the entire video.  Sorry about that.

1  Q   Right, because if I just click play on the video and I

2  don't click read more in the description, I will never see

3  that disclaimer; correct?

4  A   That is correct, if you don't click that.

5  Q   All right.  And before the disclaimer in the text box you

6  have the hashtags we looked at last week; correct?

7  A   That is correct.

8  Q   And you have the marketing material asking people to go to

9  your Teespring page; correct?

10  A   Not anymore but in that video, yes, that is correct.

11  Q   Okay.  And you have plugs for other equipment that you use

12  and your advertisers; correct?

13  A   That is correct, yes, ma'am.

14  Q   All right.  And the part of the text box that you are

15  saying contains this disclaimer, the part that is shown

16  without clicking anything else only contains the hashtags and

17  some of your marketing material and plugs for your other

18  products; correct?

19  A   Once you click it, it brings up the whole box.

20  Q   And please answer my question.

21  A   Yes.  That is correct.  Once you click it, it drops down

22  the whole box.  So you don't click it twice.  You click it

23  once.

24  Q   That isn't the question I asked.  Could I have the

25  question read back.

```
 1              (Whereupon, the record was read.)

 2              THE WITNESS:  Read the first part again -- I'm so

 3   sorry -- because it was a long question.  Could you read the

 4   first part for me again, Sarah, the top half?

 5   BY MS. MATZ:

 6   Q   The question I'm asking is if I go to the page to look at

 7   a video --

 8   A   Okay.

 9   Q   -- there is a description box where without clicking

10   anything else you can see part of the description.  You

11   understand that; right?

12   A   Yes.  That is correct.

13   Q   Okay.  So without clicking anything else, the only thing I

14   will see is the part of the description that has the title of

15   the video, your hashtags, and your promotions for your other

16   products; correct?

17   A   That is correct, yes, ma'am.

18   Q   Okay.  Thank you.  But going back to my question, so if I

19   went to this video, Starmarie Jones video -- and let me ask

20   you this:  Are you sure you were doing disclaimers at the time

21   you published this Starmarie Jones video?

22   A   That would be a question for my husband because he takes

23   care of all that marketing material, so that would be a

24   question for him.  But this has always been our disclaimer

25   since we started the channel.
```

```
 1  Q   But you're not actually sure it was on there?

 2  A   I'm not sure of the exact date, no, ma'am.

 3  Q   Okay.  Sorry.  If you don't mind, just let me finish my

 4  question.

 5  A   I'm sorry.

 6  Q   Thank you.  So if I went to look at this video as a

 7  consumer and I clicked play on the video and I did not click

 8  read more, then in the next video you made what I would have

 9  heard is you saying, everything that we said, everything that

10  Star said was accurate; correct?

11  A   That is correct, yes, ma'am.

12  Q   All right.  And you've made many other statements in the

13  videos that we saw last week, in the videos themselves, when

14  you are speaking, implying that what you say is real news;

15  right?

16  A   That is correct.

17  Q   Okay.  And one of the videos that your attorney showed

18  you, the Lovely TI call -- you know what I'm talking about

19  when I reference that; correct?

20  A   That is correct, yes, ma'am.

21  Q   And just for the jury, it's that two-hour, almost two-hour

22  call that we listened to --

23  A   Yes, ma'am.

24  Q   -- that was not a video.  It just had a photo displayed?

25  A   Yes, ma'am.
```

1  Q   And in that -- you published that, and in that you had

2  said, quote, my shit is real fucking news.  You remember

3  saying that?

4  A   Yes, ma'am.  That is correct.

5  Q   Okay.  And you also recall testifying that you do tell

6  your viewers that it's your job to report the news; correct?

7  A   Yes, ma'am.

8  Q   All right.  So when you convey to viewers that what you're

9  doing is real news and that it's your job to report the news,

10 you are not conveying to them in those oral statements what

11 you've said in this letter, that these are your opinions;

12 correct?

13 A   It depends on the video.

14 Q   You've admitted in your deposition, though, that when

15 you're giving opinion you don't always -- when you're giving

16 what you think is opinion, you don't always even tell your

17 viewers that; correct?

18 A   Could I go to my deposition to read that, to see what the

19 question was?

20 Q   I'm just asking if you recall for now.

21 A   Something like that, but I don't remember the question in

22 which I was answering.

23 Q   Why don't I just ask you.  When you are giving what you

24 are saying is opinion, do you always tell your viewers it's my

25 opinion?

1   A    Not always, no, ma'am.

2   Q    Okay.  Thank you.  All right.  You also admit that you've

3   made statements that are not true to your viewers about you

4   being a journalist; correct?

5   A    That is correct, yes, ma'am.

6   Q    Meaning that you've referred to yourself as a journalist

7   in statements to your viewers, but you acknowledge that is not

8   true; correct?

9   A    That is correct.

10  Q    All right.  In the video that we were talking about a

11  couple minutes ago that was published on September 21st, about

12  two days after the Starmarie Jones video, do you recall that

13  video?

14  A    Yes, ma'am.

15  Q    Okay.  And do you recall last week when you originally

16  testified, I played you a clip where you had said -- in the

17  video you had said that the interview was highly requested.

18  Do you remember that?

19  A    That is correct.

20  Q    And I had asked you a question about your deposition

21  transcript, and I asked you if you recalled testifying, did

22  you have people reaching out to you at that point asking if

23  you would do an interview of her, were your fans asking for

24  that, and you had testified, no, nobody asked me to.  Do you

25  recall that?

1    A    That is correct.

2    Q    All right.  And then when you testified here in court, you

3    said, well, they weren't talking to me directly on Instagram

4    or online.  People will tag you and say, hey,

5    unWinewithTashaK.  It happens all the time because I'm a news

6    reporter, and they want me to follow up on the story.  Do you

7    recall saying that?

8    A    Yes, ma'am.

9    Q    Okay.  And you also went on to say, but if you say

10   personally, no, no one called me or anything, no, ma'am?

11   A    That is correct.

12   Q    All right.  You also made a separate statement, though, in

13   that same video dated September 21st that you actually got

14   direct messages from all the Winos asking you to reach out and

15   talk to Starmarie.  Do you recall saying that?

16   A    That is correct.

17   Q    So you are admitting that you got direct messages?

18   A    I mean, I got tagged so when you -- may I explain?  I'm

19   sorry.

20   Q    You can just say no if it's not true.

21   A    I'm not understanding because in the deposition you asked

22   me a different question and so --

23   Q    No, no, no.  I'm asking you now about this other

24   statement.

25   A    I'm sorry.  Say that again.

1  Q   I'm asking you about this other statement.  You said in

2  the video you told your viewers I got DMs, which --

3  A   Yes.

4  Q   -- are direct messages; right?

5  A   That is correct.

6  Q   You said I got those from all the Winos -- and Winos

7  refers to your fan base; correct?

8  A   That is correct.

9  Q   You said, I got direct messages from all the Winos asking

10  you to reach out and talk to her.  Do you remember saying

11  that?

12  A   That is correct, yes, ma'am.

13  Q   Okay.  So you are actually saying that when you said that

14  in the video, you didn't actually get DMs; you were

15  maintaining that you got tagged?

16  A   That is correct, yes, ma'am, because you can tag in the

17  DM.

18  Q   Did you get DMs or not, ma'am?

19  A   Yes, and you can tag in the DMs.  So that's the same

20  thing.  So you're trying to make it two separate issues, but

21  it's the same exact thing.  So when someone DMs you or tags

22  you, they can tag you in the DM.  So just because I didn't

23  relay it in the video the entire way in my deposition, I'm not

24  saying two different things.  I'm actually saying the same

25  thing.

1          THE COURT:  Let's talk about that.

2          THE WITNESS:  Yes, sir.

3          THE COURT:  I just want to make sure the jury has got

4  all the vernacular right.  A direct message is a message from

5  whoever sends it to the person they send it to; correct?

6          THE WITNESS:  That is correct, yes, sir.

7          THE COURT:  And does it appear publicly available to

8  other people?

9          THE WITNESS:  No, sir.

10          THE COURT:  So when you say they tag you in the

11  direct message that they send you, what does that mean?

12          THE WITNESS:  It means, like, they can share a photo

13  to their story, right, and so they can say @unWinewithTashaK.

14  They don't necessarily have to say unWinewithTashaK do this

15  story.  They can let me know it's here.  So there's many

16  different ways that they can tag you in the DM besides saying,

17  hey, Tasha, and we have a conversation, can you do this

18  interview.

19          THE COURT:  If they sent you a message and they told

20  you something directly in the message, it's not available to

21  other people?

22          THE WITNESS:  That is correct, yes, sir.

23          THE COURT:  So tagging doesn't have the same effect

24  that generally tagging would have on social media where it's

25  available for everyone to see, and it could come to you

1   indirectly.  It's all directly to you?

2           THE WITNESS:  No, because if they tag me a picture

3   that they post to their story, everybody can see it.  So just

4   because it's coming to me individually, people can still see

5   it on their story.

6           THE COURT:  They can see the message they sent you?

7           THE WITNESS:  They can see my @.  They can see them,

8   hey, Tasha, I want to alert you about this story, so yes.  So,

9   yes, it's coming to me privately, but it's still publicly

10  available on their page.

11          THE COURT:  All right.  Thank you.

12          THE WITNESS:  Okay.  No problem.

13  BY MS. MATZ:

14  Q   Okay.  You also acknowledge that you have said things in

15  recorded phone calls that are not true; is that correct?

16  A   I'm sorry?

17  Q   Did you say anything in that recorded phone call with

18  Lovelyti that was not true?

19  A   Not to my recollection, no.

20  Q   All right.  So in that video we heard you say, but I

21  didn't know that you had receipts debunking it.  Do you recall

22  making that statement in the Lovelyti recording?

23  A   Yes, ma'am.

24  Q   All right.  And just to refresh the jury, the Lovelyti

25  recording was recorded after the phone call that you had with

1  Lovelyti the weekend that you -- between when you recorded the
2  Starmarie Jones video and when you published it; correct?
3  A   Yes, ma'am.  That's correct.
4  Q   All right.  So when you made that statement in the
5  Lovelyti call "but I didn't know that you had receipts
6  debunking it," you were referring to that weekend between the
7  time when you recorded it and published it; correct?
8  A   That is correct.
9  Q   All right.  But you have admitted since then that you did
10  know that she had information that Starmarie Jones was lying
11  or that would counteract Starmarie Jones's statement; correct?
12  A   Yes, ma'am, that is correct.
13  Q   And you also recall giving testimony that you did know
14  that she had those receipts, you just didn't ask for them or
15  didn't want them; correct?
16  A   That is correct, yes, ma'am.
17  Q   So the statement you made in the Starmarie -- excuse me.
18  Withdrawn.  Let me start that over.  The statement you made to
19  Lovelyti on that call when you said, but I didn't know you had
20  receipts debunking it, that was not entirely true; correct?
21  A   That wasn't the entire point.
22  Q   I'm just asking if that statement wasn't entirely true,
23  ma'am.  I'd appreciate it if you would answer my question.
24  A   How do you say it's not entirely true?  Could you
25  elaborate on that question some more?

```
1           THE COURT:  At the time you made the statement to

2    Lovelyti that, I didn't know you had receipts, did you know

3    when you made that statement, that she had receipts or did you

4    not know that she had receipts?

5           THE WITNESS:  No.  I knew that she had information

6    given to her basically counteracting that Star was a lie, so

7    yes.  Thank you.

8    BY MS. MATZ:

9    Q   Okay.  All right.  And talking about the Lovelyti call for

10   a few more -- for a couple more minutes, you said I believe --

11   well, do you recall the first day that you testified I asked

12   you how far -- excuse me -- from the time you released it in

13   April, how far back it had been recorded?  Do you recall that?

14   A   Yes.  I recall that question, yes, ma'am.

15   Q   Okay.  And do you recall telling me that even though you

16   had said it was six months, you weren't sure, that you felt

17   like you had just given that answer at your deposition to get

18   me to move on?

19   A   Yes, ma'am.  That is correct.

20   Q   But when your attorney stood up yesterday and asked you

21   about your recollection, when you recorded that call, you said

22   probably six months after I did it.

23   A   I'm sorry?

24   Q   Do you recall giving that testimony to your attorney?

25   A   No, he didn't ask me that.  That's not what he asked me.
```

1   Q   All right.

2   A   He asked me when I published the call, and that was six

3   months after, which is a month after Ms. Almánzar had filed

4   the lawsuit.  But I recorded it sometime towards the end of

5   September and October, which if you do the math, from that

6   time that's about six months.  So I remember that question

7   very clearly.  That's not what he asked me.

8   Q   Okay.  So your testimony is that when I asked you from the

9   time you published it how far back it had been recorded, you

10  couldn't recall that, but when he asked you when you released

11  the call or published it, you could recall that it was six

12  months after you recorded it?

13  A   I'm sorry.  What is your question?  What are you trying to

14  say?  I'm so sorry.  I'm not trying to be, like, disrespectful

15  or combative.  I just want to understand what you're saying.

16  Q   I think the point has been made.  I'm going to move on.

17  A   You're sure?

18  Q   Yeah.  I'm good.

19  A   Okay.

20  Q   All right.  During that call we heard a lot of

21  conversation between you and Lovely TI about your friendship.

22  Do you remember that?

23  A   Yes, ma'am.  That's correct.

24          THE COURT:  It's not Lovely TI, is it?  It's

25  Lovelyti?

```
 1            THE WITNESS:  Yes, sir.  That's correct.  It's
 2   Lovelyti.
 3            MS. MATZ:  Oh, I'm sorry.
 4            THE COURT:  Not TI.  We don't want to bring him into
 5   this.
 6            MS. MATZ:  No.  Fair enough.  Fair enough.  Lovelyti?
 7            THE WITNESS:  Yes, ma'am.
 8   BY MS. MATZ:
 9   Q    Okay.  So we heard a lot of conversation between you and
10   Lovelyti about your friendship; correct?
11   A    That is correct, yes, sir -- I mean, yes, ma'am.
12   Q    Okay.  And do you also -- do you recall testifying, when
13   your attorney was asking you questions, that you testified the
14   reason you recorded the call was because you started to see
15   that she, Lovelyti, was, you know, taking the side of Cardi B
16   so, you know, betrayed me?  Do you remember giving that
17   testimony?
18   A    Yes, ma'am.  That's correct.
19   Q    So you recorded the call because you thought that your
20   friend was betraying you?
21   A    Yes, ma'am.
22   Q    All right.  Did Lovelyti know that this call was being
23   recorded?
24   A    No, ma'am.
25   Q    So you didn't tell her?
```

1   A    No, ma'am.

2   Q    Do you have any idea if her permission was required to

3   record this call?

4   A    It was not.  Georgia is a one-party state.

5   Q    But she's not in Georgia; right?

6   A    No.  I am.  I was in Georgia when I recorded the call.

7           THE COURT:  Let's not argue about what law applies.

8   Just talk about the facts.

9           MS. MATZ:  Sure.  She's in Minnesota; correct?

10          THE WITNESS:  I believe so, yes, ma'am.

11  BY MS. MATZ:

12  Q    Okay.  And during that call you were recording it for

13  preservation purposes because you thought at some point you

14  might need to use it; is that right?

15  A    That is correct, yes, ma'am.

16  Q    And so you thought at the time you were recording it, that

17  at some point you might publish it; correct?

18  A    That is correct, yes, ma'am.

19  Q    All right.  And during that call with this person who you

20  have -- well, let me ask you this:  Were the two of you

21  actually friends?

22  A    Yes.  Yes, we were.

23  Q    Okay.  And did you consider her a friend at that time?

24  A    At the time that I recorded the call?

25  Q    Yeah.

1   A   I started to see, you know, behavior that didn't resemble

2   what a friend was.

3   Q   Okay.  But you didn't tell her that, that piece of it;

4   correct?

5   A   That is correct, yes, ma'am.

6   Q   All right.  And on the call, knowing that you were

7   potentially going to use this at some point and publish it,

8   you brought up her personal medical information?  We heard

9   that yesterday; correct?

10   A   Yes, ma'am.  That is correct.

11   Q   And when you published this entire call -- you did publish

12   the entire call on the internet; correct?

13   A   Yes.  Yes, ma'am.

14   Q   Is it still up today?

15   A   I believe so.  I believe it's privated on my channel, if

16   I'm not mistaken.  I can't remember because we go through and

17   private and unprivate stuff on my back-up channel.

18   Q   All right.  And when you published the entire call, you

19   decided to leave in the parts where she was crying and talking

20   about your friendship and where you talked about her personal

21   medical information?

22   A   Yes, ma'am.

23   Q   All right.  You also admitted yesterday on the stand that

24   you have given testimony -- you were giving testimony

25   yesterday that was different than your deposition and what you

1  had said earlier in this trial; correct?

2  A   Could you repeat that question because you keep coming in

3  and out of the mike.  I'm sorry.

4  Q   Sure.

5  A   Thank you.  That's why I'm, like, leaning into you, so I

6  can hear you.

7  Q   Is this better?

8  A   Yes, yes.  Much better.  Thank you.

9  Q   Okay.  I said, and you recall giving testimony yesterday

10  that -- you gave answers yesterday in court that were

11  different than the answers you gave in either or both at your

12  deposition or earlier in this trial; correct?

13  A   I can't -- not that I know of, no, ma'am.

14  Q   You don't recall the Court asking you is your answer today

15  in court different than the answer you gave either or both at

16  your deposition or earlier in this trial?  The witness, yes,

17  sir.

18  A   Okay.  Yes, that particular question, yes, ma'am.

19  Q   Okay.

20  A   Okay.

21  Q   So you recall saying that?

22  A   I do.  I do.

23  Q   And admitting that?

24  A   Yes, ma'am.

25  Q   Thank you.  You also changed some of your testimony during

1  the deposition at various points.  Do you recall that?

2  A    I'm sorry?

3  Q    You also changed some of your testimony during your

4  deposition at various points; correct?

5  A    I elaborated on it because you wouldn't allow me to speak

6  during my deposition.

7  Q    You don't recall changing your answers?

8  A    To some questions to elaborate, yes, ma'am.

9  Q    Okay.  So you didn't change your answer to anything other

10 than to elaborate.  Is that your testimony today?

11 A    It depends on what we're talking about.  So what questions

12 are you referencing so I -- I can't speak for all questions.

13        THE COURT:  Well, so the question, you either answer

14 yes or no, if you can, unless you say you don't remember.

15        THE WITNESS:  Yeah, I don't remember.  So I don't

16 want her to feel like I'm not trying to answer.  So I'm trying

17 to recall.  So I don't recall.  And so if you give me

18 specifics, I'll be able to recall and be able to talk about

19 that certain issue because there were so many things we went

20 over during our direct as well as my direct with my lawyer and

21 two days worth of depositions.  And on the first day it didn't

22 go well for either of us, but the second day I was very

23 cooperative.

24        MS. MATZ:  There isn't even a question pending.  I

25 move to strike.

1          THE COURT:  Yeah, I'm not going to do it because she

2   did it in response to the Court's question, and it's not

3   unrelated to the question that was asked.  But you can

4   certainly continue your questioning.

5   BY MS. MATZ:

6   Q   Sure.  All right.  Why don't we look at your deposition

7   transcript.  Let's look at November 19th.

8   A   Okay.

9   Q   Let's look at lines 112 --

10  A   What page?

11  Q   Excuse me.  Page 112, line 22.

12  A   Page 112, line 22?

13  Q   Sure.

14  A   Okay.

15  Q   Question, have you -- do you recall publishing comments or

16  hashtags using the hashtag herpes B?  Answer, yeah, yeah, I've

17  used that before.  Question, isn't it supposed to reference my

18  client, whether -- whatever tweet you are using in connection

19  with is actually about my client or not?  Answer, no, because

20  I don't know if your client has herpes or anything.  Question,

21  okay.  And what about herpes B?  You are saying that has no

22  connection to my client?  Answer, no, not at all.

23          Is that the testimony you gave that I just read?

24  A   That is correct, yes, ma'am.

25  Q   All right.  And in -- on page 117 -- I'm sorry.  The quote

```
 1   I just read you was from your November 19th, 2020, deposition;
 2   correct?
 3   A   That is correct, yes, ma'am.
 4   Q   Okay.  So we're going to go to page 117 of that same
 5   transcript.
 6   A   Okay.
 7   Q   Approximately five pages later, line 10.  Question, okay.
 8   So, why is the "B" in herpes B not referencing my client,
 9   because you said that one isn't referencing my client; right?
10   Answer, because, does your client have herpes?  I don't know.
11   Does your client have herpes?
12            Is that the testimony you gave?
13   A   That is correct, yes, ma'am.
14   Q   All right.  And then approximately 20 pages later in the
15   transcript --
16   A   Which page?
17   Q   Page 140.
18   A   Okay.  Which line?  I'm sorry.
19   Q   Line 25.  And I was showing you what's been admitted here
20   as Plaintiff's 943, and we can go ahead and pull that up.
21   A   Okay.  I see it.
22   Q   I don't see it yet.  Okay.  I asked you, can you tell me
23   what this is?  Answer, this is a photo I shared, I believe, on
24   Facebook if I'm not mistaken.  And I said, "Done herpes B.
25   See you in court."  So, yes, that was in reference to Cardi B.
```

1   Question, and then the photo that you shared is a photo of my

2   client; right?  Answer, it is, it really -- yes, it is.

3   Question, okay.  So the reference to herpes, the use of

4   "herpes B" was a reference to our client?  Answer, yes, in

5   this particular case it was.

6   A    That is correct.  That's my testimony.

7   Q    Okay.  So the first time I asked you if it had no -- I

8   asked you if it had any connection to my client, you said, no,

9   not at all.  And then a few minutes later you testified that,

10  yes, this did reference my client; correct?

11  A    That is correct.

12  Q    All right.  And you also gave testimony on the next page,

13  page 141, line 14 through 20, question, and you've also used

14  that as a hashtag to reference our client in other posts;

15  right?  Answer --

16  A    That's correct.  Sorry about that.  I thought you were

17  asking me that question.  I'm so sorry.  Go ahead.

18  Q    Answer, yes, it depends on the post.  I probably was

19  talking about somebody else and just used herpes B to get a

20  reaction, but, yes, herpes B does reference Cardi B.

21          Is that the testimony you gave?

22  A    Yes, ma'am.

23          MS. MATZ:  All right.  Your Honor, I realize it's a

24  little early.  I'm about to move into a new line that will

25  probably be a little long.  I can keep going if you'd like,

1 but this would be a natural breaking point depending on what

2 the Court would like to do today.

3          THE COURT:  We'll break then.  All right.

4          Ladies and gentlemen, I need to tell you that my

5 optimism that we would be finished with testimony and have

6 closing today was not correct.  I don't believe that we'll

7 have the closing today.  We spent the morning working on the

8 jury instructions, and so when we get to that point, we'll be

9 ready.  But if you would go ahead and prepare to be with us on

10 Monday.  And beyond that I really can't say because at this

11 point it really depends on how long deliberations take but

12 wanted to make that announcement to you.  And we'll see you

13 back at 1:15.

14          COURTROOM SECURITY OFFICER:  All rise.

15          (Whereupon, the jurors exited the courtroom.)

16          COURTROOM SECURITY OFFICER:  Please be seated and

17 come to order.

18          THE COURT:  Anything else we need to talk about

19 before we break?

20          MS. MATZ:  No.  I think the only other thing I was

21 going to raise, your Honor, is just that -- and I think you

22 probably just alluded to this, that closing is not going to

23 happen today.  But based on not having the instructions and

24 everything finalized, I think that even if -- I'm going to be

25 a little bit longer, but even if I were to wrap up, I would

1  request that we go ahead and do closing Monday.

2        THE COURT:  Yeah, that's what I meant.  That's what I

3  meant when I was talking to the jury, is that we're not going

4  to be closing today.

5        MS. MATZ:  Great.

6        THE COURT:  As far as time of the closing, we

7  exploded from 30 minutes to an hour and a half since sometime

8  yesterday.  And an hour and a half, did we have that wrong?

9        COURTROOM DEPUTY:  That's what they told me.

10        MS. IZMAYLOVA:  It was an hour.

11        THE COURT:  It was communicated to me that y'all had

12  agreed to an hour and a half each, and that seems awful long

13  to me.

14        MS. MOORE:  Your Honor had said an hour and a half.

15        THE COURT:  Did I?

16        MR. SABBAK:  Your Honor said half an hour, and you

17  granted our hour.

18        THE COURT:  Say that again.

19        MR. SABBAK:  Your Honor said half an hour, and then

20  you granted our hour.

21        MS. MOORE:  And after that your Honor said an hour

22  and a half, which Jennifer, I think, just confirmed.  But it

23  doesn't matter.  Our agreement was we would give each other

24  whatever time we needed, which we will certainly respect

25  subject to your Honor's --

```
 1              THE COURT:  Well, I'm a party to this too.

 2              MS. MOORE:  Subject to your Honor's restrictions,

 3    obviously.

 4              THE COURT:  An hour and a half is an awful long time

 5    for a closing statement on a simple case.  This case has a lot

 6    of evidence, but it's pretty simple.  The legal issues are

 7    simple.  I don't want to do an hour and a half.  I think it's

 8    too long, and I have no doubt that whatever time I give y'all,

 9    y'all can fill it up by replaying every video but that's

10    not -- look.  We've been here two weeks today, not all of the

11    time, but a lot of the time, and the jury has had their life

12    upended for two weeks.

13              We're going to go into our third week next week.  So

14    I want to keep it as succinct for them as possible, and the

15    longer we make opening, the less likely they can get their job

16    done the day that we give it to them.  I don't know that they

17    will or they won't.  I mean, sometimes jurors are quick.

18    Sometimes they're not.  I kind of think it may be Tuesday

19    anyway, but an hour and a half just seems awful long.  I've

20    had complicated multi-defendant murder cases that I've tried

21    that the lawyers did it in less time than that.

22              MS. MATZ:  I think the thinking was that -- I don't

23    think anybody is planning on playing all the videos again.  I

24    mean, obviously, we couldn't, and we've tried to keep the

25    clips to what we need to play.  I do think that there will be
```

1  some media, and just because you can't speed media up or you

2  can't make the clips faster than what they are, I think the

3  thought was just that it would be nice to have a little longer

4  than an hour.

5          But whatever the Court is willing to give us, I think

6  we'd appreciate maybe an hour and 10, and hour and 15, and

7  maybe we won't use it.  I mean, we ended up coming in under

8  the opening statements as well, and we're certainly trying to

9  be respectful of everybody's time.

10          THE COURT:  Well, you were.  But, look, lawyers were

11  once in law school, and when you think back to law school,

12  whatever time you had available between now and when the test

13  was, you studied and you used.  I have no doubt that if I give

14  you an hour and a half, you'll use it.  If I give you two

15  hours, you'll use it because there's a lot you can use.  At

16  some point you just have to be selective and say this is what

17  I need to use.  Right now I'm thinking an hour, and that's

18  probably what our closing is going to be, is an hour.

19          And you can talk about things, remind the jury about

20  things without playing them again.  In fact, a lot of the

21  videos we've already seen multiple times, at least in part, so

22  plan on an hour but plan on Monday for closing.  Okay.  All

23  right.  We'll take a break for lunch.

24          COURTROOM SECURITY OFFICER:  All rise.  This Court is

25  in recess until 1:15.

```
 1              (Whereupon, a recess was taken from 12:15 p.m. until
 2    1:20 p.m.)
 3              COURTROOM SECURITY OFFICER:  All rise.
 4              (Whereupon, the jurors entered the courtroom.)
 5              COURTROOM SECURITY OFFICER:  Please be seated and
 6    come to order.
 7              MS. MATZ:  All right, Ms. Kebe -- I'm sorry, your
 8    Honor.  May I inquire?
 9              THE COURT:  Go ahead, yes.
10    BY MS. MATZ:
11    Q    Thank you.  Ms. Kebe, during your lunch break did you have
12    a chance to find the name of the attorney friend in
13    Washington, D.C.?
14    A    Yes, ma'am.
15    Q    And what was that person's name?
16    A    Her name is Mimi.
17    Q    Mimi?
18    A    Yes, ma'am.
19    Q    And what's her last name?
20    A    I don't remember her last name.
21    Q    How were you able to locate her first name on your lunch
22    break but not her last name?
23    A    We had email exchanges throughout the course of the cease
24    and desist, so my attorneys have her phone number as well as
25    her email available to put up on the screen if need be.
```

1  Q   But you don't have her -- you have her email but not her
2  last name?
3  A   I do not remember her last name, no, ma'am.
4  Q   And is it available on these emails?
5  A   It's not, no, ma'am.
6  Q   Okay.  And these emails were never produced in litigation;
7  is that correct?
8  A   No, ma'am.
9  Q   Even though you're not claiming that she was an attorney
10 and they're subject to any privilege?
11 A   That is correct, yes, ma'am.
12 Q   Okay.  So even though we asked for all communications
13 related to the defamatory statements and the communications
14 related to the letters, you didn't produce these; is that
15 correct?
16 A   That is correct, yes, ma'am.
17 Q   All right.  Earlier when we were talking about the
18 response email that you testified your husband sent to
19 Mr. Granderson -- do you recall talking about that?
20 A   Yes, ma'am.
21 Q   And then we saw a response to that that you said you never
22 saw?
23 A   That is correct.
24 Q   And did I hear you say that the email comes to both of
25 you?

1    A    Well, when I said it comes to both of us -- yes, you did

2    hear me say that -- he forwards me emails from that email

3    because I don't have access to that email.

4    Q    Okay.  And it's your testimony you didn't have access to

5    that in 2018 around this time; correct?

6    A    That is correct, yes, ma'am.

7    Q    Except through his phone?

8    A    That is correct, yes, ma'am.

9    Q    Okay.  But isn't it true that at your deposition you also

10   testified that at this time you have access to that email

11   through the desktop that you use to upload all of your videos?

12   A    That is correct, yes, ma'am.

13   Q    So when I asked you if you had access to it and you said,

14   no, except through my phone, that wasn't true; correct?

15   A    You didn't ask me to expand.  You just asked for a yes or

16   a no --

17   Q    I asked you --

18   A    -- for that particular question.

19   Q    I asked you if you had access to it, and you explained

20   that you did not access to it except through your husband's

21   phone.  Do you recall that?

22   A    That's correct, yes, ma'am.

23   Q    So that wasn't a complete statement?

24   A    It wasn't a complete statement, no, ma'am.

25   Q    Okay.  So the truth is that you had access to it except

1  through your husband's phone and through the desktop computer

2  in your home that you regularly use to upload your videos?

3  A   I don't regularly use the desktop.  We have two different

4  desktops.  So I have one assigned to me.  He has one assigned

5  to him, and on my desktop I do not have access to the

6  tashakbusiness@gmail email.  On his desktop, yes, but I don't

7  use that desktop because he doesn't like anyone to touch his

8  desktop because it's very expensive.

9  Q   All right.  I think we should read your deposition

10 testimony.

11 A   Okay.

12 Q   All right.  Have you ever heard of the term "a lie by

13 omission?"

14 A   No, ma'am.

15 Q   Okay.  Do you understand that when you said except for

16 this one thing, you were telling all of us sitting here today

17 that except for the one thing you named what I said was true.

18 Did understand that?

19 A   No, ma'am.

20 Q   So in your mind it was except for many other things?

21 A   No, ma'am.

22 Q   Except for two other things?

23 A   I don't understand what you're trying to say right now.

24 Q   I'm trying to understand why you didn't truthfully answer

25 the question I asked you earlier.  When I asked you if you had

124

1   access to it and you said no, and then you qualified that

2   answer and said I do have access to it if I have his phone.

3   But the truth is you also had access to it through a computer

4   that you do sometimes use.

5   A    That is correct, yes, ma'am.

6   Q    And do you recall testifying that in September of 2018,

7   you also used that email address sometimes?

8   A    That is correct, yes, ma'am.

9   Q    Because it was before he asked you not to use it; correct?

10  A    I don't remember saying that.  May I look at the

11  deposition and the question that was asked at that time?

12  Q    Sure.  Let's look at your 11-30 deposition, line 64.

13  A    Which day?

14  Q    November 30th.  Let me get you the page and line number.

15  A    Okay.  And what page again?  I'm sorry.

16  Q    Okay.  Page 65, starting at line 24.  Question, but you do

17  go into that email sometimes?  Answer, it's been a -- it's

18  been a minute.  It's been a long time.

19       And this is when you're being deposed November of

20  2020; correct?

21  A    Correct.

22  Q    Okay.  And then I said, all right.  And you said, I can't

23  remember.  But not recent.  No, ma'am.

24  A    That is correct.

25  Q    And I said, question, well, your husband testified that

1  you sometimes would go in and respond using that email.  Is

2  that true?

3  A   That is correct.

4  Q   You said, back, back -- yes.  When I did receive things.

5  That was before he instructed me not to reply to anything, and

6  that's been a long time.  Question, when did he instruct you

7  not to reply to anything?  Answer, I can't remember the

8  specific date, but it was like a long time ago, maybe like a

9  year and a half ago or so.  But I can't remember the specific

10 date.  Question, okay.  But if we're talking about September

11 of 2018, which is more than two years ago, you think that you

12 may have used that email sometimes, in that time period?

13 Answer, yes, ma'am.

14 A   That is correct.

15 Q   Okay.  So the truth is you did use that email --

16 A   Sometimes, yes, ma'am.

17 Q   -- during that time period.  Sorry.  Please let me finish.

18 A   I'm sorry.

19 Q   The truth is you did use that email during that time

20 period sometimes; correct?

21 A   That is correct, yes, ma'am.

22 Q   All right.  Let's talk about the additional information

23 that you claimed you received after you published the --

24 excuse me.  After you published the teaser video but before

25 you published -- excuse me.  Let me start that over.  I want

1  to talk about the information you claim you received after the

2  published the Starmarie Jones video but before the

3  September 21st video that we've watched some of.  Okay?

4  A    Okay.

5  Q    All right.  Can we pull up D-11.  Your testimony is that

6  after the Starmarie Jones video was published, you

7  communicated with my client, and she told you to go talk to

8  some of the strippers that she used to work with; is that

9  correct?

10 A    That is correct, yes, ma'am.

11 Q    And in the video we watched, you claimed that your

12 communications with three women corroborated all of Starmarie

13 Jones's interview and the factual statement she made in her

14 interview; is that correct?

15 A    I'm sorry.  Can you repeat that question.

16 Q    Sure.  Your testimony is that after your conversations

17 with these three women, you're saying that that corroborated

18 to you what Starmarie Jones had said in her interview;

19 correct?

20 A    Yes, some of the things, yes, ma'am.

21 Q    But as we talked about last week, those conversations did

22 not corroborate the allegation my client has herpes, that she

23 was a prostitute or that she used cocaine; correct?

24 A    What are the three things again that you just said?  The

25 herpes, prostitution, and what was the other thing?

1  Q   Cocaine.

2  A   Oh, that is correct, yes, ma'am.

3  Q   Your conversations with them did not corroborate that;

4  correct?

5  A   Oh, no.  Of course.  I put it in the video.  Yes, ma'am.

6  Q   And what you are essentially saying they corroborated was

7  that my client knew Starmarie Jones?

8  A   Yes.  That is correct.

9  Q   All right.  And that you believe that they corroborated

10 that my client lived with Starmarie Jones?

11 A   That is correct, yes, ma'am.

12 Q   All right.  My client had already at this point, when you

13 made this September 21st video, my client had already

14 acknowledged that she worked with Starmarie Jones; correct?

15 A   That is correct, yes, ma'am.

16 Q   All right.  So you knew before that that my client worked

17 with Starmarie Jones?

18 A   That is correct, yes, ma'am.

19 Q   All right.  If we can pull this up and go to approximately

20 8:37, maybe a little further.

21      This is Defendant's 11, your Honor.  It's already

22 admitted into evidence.

23      All right.  Let's play a little bit before that for a

24 moment.

25      (Whereupon, a video recording was played.)

1  BY MS. MATZ:

2  Q   Let's pause.  So this is -- my client shared this on her

3  live; correct?

4  A   That is correct, yes, ma'am.

5  Q   All right.  And it said, when I was a dancer, these are

6  the only girls I rolled with and shared anything with,

7  exclamation point.  You see that?

8  A   Yes, ma'am.

9  Q   Okay.  And did you understand that to mean that these were

10  the women that my client was close with?

11  A   No, ma'am, because she made a post under my post when I

12  posted the trailer and said we worked in the same building,

13  but that's about it.  So she denied everything that Starmarie

14  had said.  And I actually put that post up in this video.

15          MS. MATZ:  Objection, your Honor.  This is

16  nonresponsive.  I'm asking you --

17          THE COURT:  The answer is just yes or no.

18          THE WITNESS:  Okay.

19          THE COURT:  So the answer is stricken.  What's the

20  answer to the question then?

21          THE WITNESS:  Okay.  Can you repeat the question.

22          THE COURT:  I'll do it for you.

23          THE WITNESS:  Thank you.

24          THE COURT:  Did you understand that to mean that

25  these were the women that my client was close with?

1            THE WITNESS:  Oh, yes.  Yes, ma'am.  That is what I

2  understood.

3  BY MS. MATZ:

4  Q    Thank you.

5  A    No problem.

6  Q    And then my client also said, about a sentence down,

7  people all of a sudden want to attach my -- want to attach my

8  name with mines?  You see that?

9  A    That is correct.

10 Q    And did you understand that to mean that now that my

11 client was becoming famous, people wanted to associate

12 themselves with her?

13 A    That is correct.

14 Q    All right.  So in this post my client was not denying

15 having ever met anyone else at her prior place of employment;

16 correct?

17 A    That is correct, yes, ma'am.

18 Q    All right.  Let's go to minute mark 10 approximately, may

19 be a little further.  It's the next post.  All right.  I think

20 that was it.

21            (Whereupon, a video recording was played.)

22 BY MS. MATZ:

23 Q    All right.  Let's pause there.  Okay.  So what we're

24 looking at here -- and the top is a little hidden.  Actually,

25 Tom, if you could back up just to get the whole post, please.

1  This is a screenshot of an Instagram post that you posted on

2  your Instagram; correct?

3  A    That is correct, yes, ma'am.

4  Q    And was this, the top part of this picture, the post

5  itself, was the promotion, the teaser for the Starmarie Jones

6  interview; correct?

7  A    Yes, ma'am.  That's correct.

8  Q    All right.  And below that -- we went over some of this

9  last week.  But just as a refresher, under the

10 unWinewithTashaK in bold, that's the part of the post, the

11 caption that you wrote; correct?

12 A    That is correct, yes, ma'am.

13 Q    And then under that there's comments; correct?

14 A    Yes, ma'am.

15 Q    And that's when other people look at your post and comment

16 on it?

17 A    Yes, ma'am.

18 Q    And the top one is a comment from my client; correct?

19 A    Yes, ma'am.

20 Q    All right.  And my client said, fake as fuck.  I worked in

21 the same club as her, and that's about it.  Good-bye?

22 A    That is correct.

23 Q    All right.  And did you understand that to mean that my

24 client was saying that -- what your post was and the teaser

25 for the video was fake and that she had worked with Starmarie

1  Jones; correct?

2  A    That is correct.

3  Q    Okay.  And my client's -- you do acknowledge that my

4  client's post here saying that -- what Starmarie Jones was

5  saying was fake was posted before you actually published the

6  interview?

7  A    That is correct.

8  Q    And my client had also already, before you published the

9  interview, direct messaged you telling you that what Starmarie

10  Jones was saying was false; correct?

11  A    That is correct.

12  Q    All right.  When my client was testifying, you heard her

13  testify that she did know Starmarie Jones and that she worked

14  at the same club with her; correct?

15  A    Yes, ma'am.

16  Q    And you also heard my client testify that one evening she

17  had helped Starmarie Jones out when some of the other girls

18  were looking to get into some sort of physical altercation

19  with Starmarie.  Do you recall that?

20  A    That is correct, yes, ma'am.

21  Q    All right.  All right.  So after you saw those two posts

22  from my client, you also had conversations with someone who

23  goes by the screen name Ash Cash Legit; is that right?

24  A    That is correct.

25          MS. MATZ:  All right.  If we can -- actually, let

1  this play for a moment.

2            (Whereupon, a video recording was played.)

3  BY MS. MATZ:

4  Q   All right.  Let's pause there.  So a couple of minutes ago

5  on the stand when we were looking at the other message you

6  were just referencing in this video, you said that you

7  understood that my client was saying that those were the women

8  she was close with; correct?

9  A   That is correct, yes, ma'am.

10  Q   But what you said to your viewers is that Cardi was saying

11  that those were the only women she worked with?

12  A   Play that again because that's not what I was conveying.

13  Q   Let's back up a few seconds.

14  A   Thank you.

15            (Whereupon, a video recording was played.)

16  BY MS. MATZ:

17  Q   All right.  Let's pause.  You said these are the only

18  ones?

19  A   Yes, ma'am.

20  Q   All right.  So were you trying to convey to your listeners

21  that Cardi was saying those were the only women she worked

22  with or not?

23  A   Yes, ma'am, because at first she did make a video denying

24  Starmarie and ever knowing her.  But that's when Starmarie

25  corrected me in the initial interview, and I forgot about

1  that.  So this post, fake as fuck, I worked in the same club,

2  came after she initially said that she didn't even know

3  Starmarie.

4  Q   Right.  But at this point you had both of those pieces of

5  information?

6  A   That is correct, yes, ma'am.

7  Q   And yet you were still telling your viewers that Cardi was

8  saying these are the only women?

9  A   Pointing out the lies that she had told, yes, ma'am.

10 Q   All right.  And the other post where you say Cardi said

11 she didn't know her, that's not on this video; correct?

12 A   No, ma'am.

13 Q   All right.  So we don't have that to look at.

14 A   We can enter it if you need it.  We have it.

15 Q   All right.  Let's look at Ash Cash Legit.

16 A   Okay.

17         MS. MATZ:  It's about 13:34.  Just go back a little.

18         (Whereupon, a video recording was played.)

19 BY MS. MATZ:

20 Q   All right.  Let's pause.  Ash Cash Legit was in the

21 comments of the Starmarie Jones video; is that right?

22 A   Oh, yes, ma'am.  Of the Starmarie Jones interview?  I'm

23 sorry.  I shouldn't have answered that fast.

24 Q   Of the promotions for it; correct?

25 A   That is correct.

1  Q   But she was in the comments after the video had come out;
2  correct?
3  A   This post was, I believe, from my trailer, and she had a
4  post on Starmarie's post as well.
5  Q   But you said earlier that the three women you spoke with,
6  Ash Cash Legit, Spotlight, and Shawn Taloran, you spoke with
7  after you published the Starmarie Jones video and before you
8  published this video; right?
9  A   That is correct because that was in the comment section as
10 well.
11 Q   So the comment we're about to look at occurred after the
12 Starmarie Jones video was published; correct?
13 A   That is correct, yes, ma'am.
14 Q   Okay.  So even though she was in the comments for the
15 trailer, she could have viewed the Starmarie Jones interview;
16 correct?
17 A   She could have used Starmarie Jones interview?
18 Q   She could have viewed it, viewed.
19 A   Oh, yes.  She viewed it, yes, ma'am.
20 Q   She viewed it.  Okay.  Thank you.  Let's keep going.
21        (Whereupon, a video recording was played.)
22 BY MS. MATZ:
23 Q   All right.  Let's pause here.  So this is the comment that
24 Ash Cash Legit left after the Starmarie Jones video was
25 published; correct?

1   A   I believe so.  Either it was on the trailer or -- because

2   I didn't post the interview on my Instagram, so this is an

3   Instagram post.  So this had to be up under the trailer of

4   that teaser for the interview.  So I don't know if she viewed

5   it and left this.  I can't remember exactly when she left this

6   actual comment, but it was under the trailer, the teaser.

7   Q   Okay.  But at this point the interview was out; correct?

8   A   I can't say for sure, but, yes, because I grabbed this

9   from the teaser.

10  Q   All right.  Well, you did testify a couple of times

11  already that all of this happened after the interview was out

12  and before you published this video.

13  A   Yes.  That is correct.

14  Q   So are you now changing your testimony again?

15  A   That is correct.  That's exactly what I said.  So I

16  grabbed this after the interview was out because I was in that

17  comment section and spoke with her more in the DM as well, as

18  well as Spotlight and the other girls.  And even Red Barz

19  Mediator, I believe, was one of the girls that rode with them

20  as well.  So I was basically telling you that I was compiling

21  all the information after the interview to basically say that

22  Cardi B was lying as well about the extension of the

23  relationship.

24          MS. MATZ:  Move to strike, your Honor.

25          THE COURT:  Let me look back at the question.  All

1    right.  So I don't think the answer called for an explanation.

2    The question was, now you're changing your testimony again.

3           The Court strikes the answer that you gave.  Please

4    answer the question.  Are you changing your testimony again?

5           THE WITNESS:  No, I'm not changing my testimony.

6           MS. MATZ:  Thank you.

7           THE WITNESS:  You're welcome.

8           THE COURT:  I want to remind the jury -- because

9    we've done this a couple of times in the last few minutes

10   particularly -- whenever the Court strikes testimony, the jury

11   should disregard the testimony that was given.  Thank you.

12   BY MS. MATZ:

13   Q   All right.  And so in this you see that Ash Cash Legit

14   wrote to @redbarzmediator Cardi never even did any of this

15   shit with her.  You see that?

16   A   That is correct.

17   Q   And when she said Cardi never did any of this shit with

18   her, you understood that to mean Cardi never did any of this

19   shit with Starmarie Jones; correct?

20   A   That is correct.

21   Q   All right.  So Ash Cash Legit was conveying to you that

22   Cardi didn't do the things that Starmarie Jones was saying

23   they did together; correct?

24   A   That is correct.

25   Q   All right.  And then -- all right.  The next sentence of

```
 1   it says, she was a weirdo ass dancer that only Cardi fucked
 2   with.  You see that?
 3   A   That is correct.
 4   Q   And did you understand that to refer to what Shawn Taloran
 5   told you, that Cardi had defended her in the club one night?
 6   A   That is correct, yes, ma'am.
 7   Q   All right.  And that's also consistent with what my client
 8   testified to; correct?
 9   A   I believe so.
10           MS. MATZ:  All right.  Let's keep playing for a
11   moment.
12           (Whereupon, a video recording was played.)
13   BY MS. MATZ:
14   Q   All right.  Let's pause just for a minute.  Before we move
15   on to Spotlight, nothing in that message that Ash Cash Legit,
16   that was just on the screen -- and if you could back up so we
17   can view it -- nothing in that message, nowhere in that
18   message did Ash Cash Legit use any words that said that
19   Starmarie Jones lived with Cardi; correct?
20   A   That is correct.
21           MS. MATZ:  All right.  Let's go to -- yeah, let's
22   keep going with Spotlight.
23           (Whereupon, a video recording was played.)
24   BY MS. MATZ:
25   Q   All right.  Let's pause there for a minute.  All right.
```

1  So what we're looking at on the left-hand side of the screen

2  here are your DMs with Spotlight; is that correct?

3  A   Yes, some of them.

4  Q   Some of them.  Okay.  And your direct messages; correct?

5  A   That is correct.

6  Q   And then on the other side of the screen we are looking at

7  a screen grab of Spotlight's Instagram home page at the time?

8  A   That is correct.

9  Q   All right.  And the purpose of showing that is so that the

10 viewers could see that the image of Spotlight and the DM

11 matched what was on her Instagram at the time?

12 A   That is correct.

13 Q   All right.  And so in the DMs here -- we can't see the top

14 of this one; right?  But it starts at Sue's was fired because

15 the majority of the dancers felt like she was just plain

16 drama.  Do you see that?

17 A   That is correct.

18 Q   And you understood her to be referring to Starmarie Jones;

19 correct?

20 A   That is correct.

21 Q   And so Spotlight was telling you that Starmarie Jones was

22 fired because she was -- the majority of the dancers felt like

23 she was drama; right?

24 A   From her understanding, yes, ma'am.

25 Q   Okay.  And then she also, down a couple of messages,

1  said -- well, I guess the middle message -- reads into it.

2  She said, I don't need an interview, and I'm about a thousand

3  Gs percent sure that there are other dancers that would say

4  the same thing.  You see that?

5  A   Yes, ma'am.

6  Q   And --

7           THE COURT:  It's a hundred but --

8           MS. MATZ:  You're right.  A hundred G percent.  Do

9  you know what that means, a hundred G?

10          THE WITNESS:  No, ma'am.

11 BY MS. MATZ:

12 Q   Okay.  Did you understand her to mean a hundred percent

13 sure?

14 A   No, ma'am.

15 Q   Okay.  And then she was saying that other dancers would

16 say the same thing, not because of Cardi but simply because

17 what Star is saying is a, quote, fucking load of shit.

18          Do you see that?

19 A   That is correct.

20 Q   Okay.  So she was also conveying to you that she didn't

21 believe what Star was saying in the interview was true;

22 correct?

23 A   That is correct.

24 Q   And this is another person that you understood was

25 physically present or a personal witness to the time when my

1  client was allegedly working with Starmarie Jones; correct?

2  A   That is correct.  However --

3  Q   Thank you.  Move to strike, your Honor.

4  A   May I answer the question?

5          THE COURT:  Answer the question that's asked.

6          THE WITNESS:  Okay.  That is correct.

7          THE COURT:  Everything after that is correct is

8  stricken.

9          THE WITNESS:  Okay.

10  BY MS. MATZ:

11  Q   Okay.  You also asked her, this Spotlight woman, if she

12  punched star in the face, and she said yes; correct?

13  A   That is correct.

14          MS. MATZ:  All right.  Let's look at the next text

15  message.

16          (Whereupon, a video recording was played.)

17  BY MS. MATZ:

18  Q   All right.  Let's pause for a moment.  So here you tell

19  your viewers that the strippers are backing up her story.  And

20  are you referring to Starmarie Jones's story?

21  A   That is correct.

22  Q   So even though this woman is saying to you that what Star

23  is saying is a fucking load of shit, you are saying to your

24  viewers that she is backing up Starmarie's story; correct?

25  A   That is correct.

1          MS. MATZ:  All right.  Let's keep going.

2          (Whereupon, a video recording was played.)

3   BY MS. MATZ:

4   Q   All right.  Let's pause here.  Now, this isn't an exact

5   transition into the next direct message; correct?

6   A   No, ma'am.

7   Q   Okay.  You were selective about what you screenshotted and

8   showed to your viewers; right?

9   A   Sometimes, yes, ma'am.

10  Q   In this instance you were; correct?

11  A   No, ma'am, not in this instance.

12  Q   But you didn't know the messages in between?

13  A   No, ma'am, because I forgot to upload that message in

14  between, and I stated that in the video.

15  Q   Okay.  All right.  But you said in the video also that you

16  had asked her why she punched her in the face; right?

17  A   That is correct.

18  Q   And told her -- and this is where you can start to see

19  that she -- you had said I'm going to release your side;

20  right?

21  A   That is correct.

22  Q   Okay.  And she told you that she never liked her, and she,

23  she being Jones, rubbed Spotlight the wrong way.  You see

24  that?

25  A   That is correct.

1  Q    All right.  And then -- okay.  Further down in this she

2  says, I only commented because in one of her interviews -- and

3  in this when she said her interviews, you're understanding her

4  to refer to Starmarie Jones; correct?

5  A    That is correct.

6  Q    Okay.  So she said, I only commented because in one of

7  Jones's interviews Jones said that she told -- Cardi told me

8  to do it, and that's not true.  You see that?

9  A    That is correct, yes, ma'am.

10  Q    So you understood that Spotlight was also saying that part

11  of Jones's story about alleging that my client had asked her

12  to do this was not true; correct?

13  A    That is correct.

14  Q    Okay.  And then do you see anywhere in this text message

15  where Spotlight confirms that Starmarie Jones ever lived with

16  my client?  That's not anywhere in here; correct?

17  A    That is correct, yes, ma'am.

18  Q    Even though Spotlight has now conveyed to you that she

19  thinks that what Star was saying was false and contradicted

20  part of what Starmarie Jones's story is, though, you continued

21  to convey this to your viewers as if it validated Star's

22  story; correct?

23  A    That is correct.

24  Q    And nowhere in the messages we've seen so far has anybody

25  said anything about prostitution, herpes or cocaine use;

1  correct?

2  A    That is correct.

3           MS. MATZ:  All right.  Let's go to 21:19.

4           (Whereupon, a video recording was played.)

5  BY MS. MATZ:

6  Q    All right.  Let's pause here.  So what you're showing on

7  the right-hand side of the screen here is Shawn Taloran's

8  Instagram page; correct?

9  A    That is correct.

10  Q    And there's photos of my client on it.  You see that?

11  A    That is correct.

12  Q    Okay.  And you're showing that to prove that she knows my

13  client; right?

14  A    That is correct.

15           MS. MATZ:  All right.  Let's keep going.

16           (Whereupon, a video recording was played.)

17  BY MS. MATZ:

18  Q    All right.  Let's pause right there.  So here you're

19  telling your viewers -- and this is the video where you

20  started by saying everything you said about Star was accurate;

21  right?

22  A    That is correct.

23  Q    And here you're telling your viewers that Star only lived

24  with Cardi a couple weeks, and that's why there's no pictures;

25  right?

1  A   That is correct.

2  Q   But in Starmarie Jones's interview Starmarie Jones

3  actually told you that there weren't any pictures because she

4  was illegally in New York, and she was on probation and so she

5  didn't take pictures because she didn't want there to be

6  evidence that she was breaking the law?

7  A   That was correct.

8  Q   All right.  So you've just misrepresented to your viewers

9  what Starmarie had actually told you about the reason why she

10 didn't have any proof; correct?

11 A   No, ma'am.

12 Q   You didn't misrepresent that to your viewers?

13 A   No, ma'am.

14 Q   So you didn't say something to your viewers that was other

15 than what Starmarie Jones had said?

16 A   No, ma'am.

17 Q   Do you think that those two things are the same, that she

18 didn't have pictures because she only lived with her for two

19 weeks and that she didn't have pictures because she was

20 essentially breaking the law being in New York?

21 A   Yes, ma'am.

22        THE COURT:  So you think they are the same or they

23 aren't the same?

24        THE WITNESS:  They are the same.  May I expand?

25        THE COURT:  They're either the same or they're not.

1   If your lawyer wants to follow up --

2          THE WITNESS:  Okay.  That's fine.  They are the same.

3   BY MS. MATZ:

4   Q   All right.  Let's keep going on this for a minute.

5   Actually, no, pause for a second.  That's not even true,

6   though, right, that Starmarie Jones told you she only lived

7   with her for a couple weeks?

8   A   Well, that was half the truth, and I corrected that in the

9   Lovelyti call.

10  Q   So it's not true; right?  What you just said in this video

11  is not actually what you later said Starmarie Jones told you;

12  correct?

13  A   That is correct.

14  Q   All right.  Do you think there's a difference between half

15  truth and not true?  Yes or no, please.

16  A   Yes, I do.

17  Q   Okay.

18          (Whereupon, a video recording was played.)

19  BY MS. MATZ:

20  Q   All right.  Let's pause here.  Okay.  So this is again

21  part of your DMs with Shawn Taloran; correct?

22  A   That is correct.

23  Q   All right.  And in this first one Shawn Taloran was

24  telling you that she was there when Spotlight punched her,

25  being Jones, in the face, but she didn't think it had anything

1  to do with Cardi; right?

2  A   That is correct.

3        MS. MATZ:  Okay.  Let's keep going to the next text

4  message.

5        (Whereupon, a video recording was played.)

6  BY MS. MATZ:

7  Q   All right.  Let's pause there.  So Shawn Taloran also, who

8  you understood -- you understood Shawn Taloran did make-up for

9  various women who worked at this club?

10  A   That is correct.

11  Q   Okay.  And so she is also a person who you at least

12  believed at this time knew all of these people back when they

13  worked together at that club; correct?

14  A   That is correct.

15  Q   All right.  And Shawn Taloran is also telling you in this

16  first message at the top of the screen it was because Star was

17  always lying on people, I believe.  You see that?

18  A   Yes, ma'am.

19  Q   So this is a third woman telling you that she believed

20  that Star was lying; correct?

21  A   That is correct.

22  Q   All right.

23        (Whereupon, a video recording was played.)

24        MS. MATZ:  All right.  Let's go to the next message.

25  Trying to -- we watched a lot of these videos in full earlier

1  in the week.

2          (Whereupon, a video recording was played.)

3  BY MS. MATZ:

4  Q   All right.  Let's pause and back up so we can see that

5  full screenshot.  All right.  So you have said here's where

6  she put Cardi in the same house.  Do you see that?

7  A   That is correct.

8  Q   All right.  And part of this first message is cut off.  Do

9  you see that?

10 A   That is correct, yes, ma'am.

11 Q   But it looks like it says, people knowing where I stay,

12 exactly which apartment.  Do you see that?

13 A   That is correct.

14 Q   Is that your understanding of what it said?

15 A   Yes, ma'am.

16 Q   Okay.  And Shawn Taloran was saying something about where

17 I stay, I referring to Shawn Taloran; correct?

18 A   That is correct.

19 Q   All right.  Okay.  And then she also refers here, she says

20 that she, being Cardi.  I'm assuming you thought she was

21 referring to Cardi?

22 A   Yes, ma'am.  That's correct.

23 Q   Cardi is not embarrassed that Star has a mental illness.

24 I'll be ashamed to affiliate myself with someone crazy after

25 trying to help them out.  You see that?

1  A    That is correct.

2  Q    Okay.  So you understand Cardi to be telling you that

3  Cardi didn't necessarily want to affiliate her with someone

4  who Cardi thought was crazy after helping them out?

5  A    That is correct.

6  Q    Okay.  And that's perfectly consistent with what my client

7  testified to about defending Star in the club and what Shawn

8  Taloran tells you a little later in this conversation;

9  correct?

10  A    No, ma'am.

11  Q    No, it's not.  Shawn Taloran doesn't tell you later in

12  this conversation that --

13  A    You said later in the conversation?  I thought you said in

14  this conversation.  Sorry about that.

15  Q    No, I'm talking about in your DMs that you show over the

16  next couple of minutes in this screen --

17  A    Okay, yeah, so basically --

18  Q    Well, then why don't I ask the question again.

19  A    Okay.

20  Q    Okay.  So the question was that's perfectly -- I'll ask it

21  in two parts.  That's perfectly consistent with what my client

22  testified to about helping defend Starmarie one night;

23  correct?

24  A    No, ma'am.

25  Q    Okay.  But you do admit that Shawn Taloran also told you

1  that she -- that my client defended Star in the club?

2  A   Later in the conversations, yes, ma'am.

3  Q   Isn't that what I just said, later in the conversation,

4  and you said no?

5  A   Then you came back to this.

6  Q   Isn't that what you just said?

7  A   I don't follow.

8  Q   I asked you a question, and I said later in the

9  conversation.  And then you said, no, not later in the

10  conversation --

11  A   Right.

12  Q   -- and then I just asked you if she said that, and you

13  said, yes, later in the conversation.

14  A   I'm confused, Sarah.  I'm sorry -- Ms. Matz.  I'm so

15  sorry.

16  Q   Let's move on.

17  A   Thank you.

18  Q   All right.  Let's go to -- can you just skip to the

19  next -- oh.  Here she also is saying if she put that much

20  effort back into getting her son back instead of Cardi, she

21  would have him.  Do you see that?

22  A   Yes, ma'am.

23  Q   Okay.  And is that because she was essentially conveying

24  to you that Starmarie Jones was spending a lot of time dealing

25  with Cardi when maybe her efforts would be better spent

1  elsewhere?  Is that how you understood it?

2  A    Repeat your question, please.

3  Q    Sure.  Did you understand this part of the message to mean

4  that Shawn Taloran was telling you that she thought that

5  Starmarie Jones was putting a lot of effort into these stories

6  about my client instead of maybe what she should be putting

7  effort into related to her family; correct?

8  A    That is correct, yes, ma'am.

9  Q    Okay.  Let's go to the next one.  No, it's further

10  forward, actually.  You're going backwards.

11        You also understood Shawn Taloran to be conveying to

12  you that she also, being someone who knew Star, thought Star

13  had a mental illness; correct?

14  A    That is correct, yes, ma'am.

15  Q    All right.  Let's keep going forward.  All right.

16  Perfect.  Actually, back up a little so we can just see the

17  whole screenshot, please.  All right.  In the first message

18  here Shawn Taloran -- these are Shawn Taloran's messages to

19  you; right?

20  A    Yes, ma'am.

21  Q    And she says, if she claiming she lived with Cardi, that

22  says a lot about her.  You see that?

23  A    Yes, ma'am.

24  Q    And she's referring to Starmarie Jones there?

25  A    That is correct.

1    Q   So we could read that as if Starmarie Jones is claiming

2    she lived with Cardi, that says a lot about Starmarie Jones;

3    right?

4    A   Yes, ma'am.

5    Q   Okay.  And then she goes on to say, just because you know

6    a person does not mean you live with that person; correct?

7    A   That is correct.

8    Q   All right.  And she also says, and I got proof I lived

9    with Cardi.  You see that?

10   A   Yes.  That is correct.

11   Q   She said, I got proof I lived with Cardi before.  Why

12   don't Star have proof?  You see that?

13   A   That is correct.

14   Q   And you understood that as her questioning why Star didn't

15   have proof that she lived with Cardi?

16   A   That is correct.

17   Q   If Star was making that claim; correct?

18   A   That is correct.

19   Q   Okay.  And you also see at the bottom here that Shawn

20   Taloran is telling you that Cardi defended Star if people used

21   to pick on her and bully her.  You see that?

22   A   Yes, ma'am.

23   Q   Okay.  And that's consistent with what my client testified

24   to essentially; correct?

25   A   Yes, ma'am.

1   Q   Okay.  So nowhere in this message does she actually say

2   that she was confirming that Starmarie Jones lived with my

3   client; correct?

4   A   That is correct, yes, ma'am.

5   Q   All right.  So despite the fact that this does not --

6   these messages that we've seen do not confirm that Starmarie

7   Jones lived with my client, you continued to tell viewers that

8   she was putting them in the same, quote, fucking house?

9   A   That is correct.

10  Q   You also said in this video that these show that Cardi

11  admitted to having lived with Star; correct?

12  A   Yes, ma'am, that is correct.

13  Q   Even though you've just admitted they don't; correct?

14  A   Yes, ma'am, that is correct.

15          MS. MATZ:  Okay.  A little bit later in this video at

16  around the 25:40 minute mark.

17          (Whereupon, a video recording was played.)

18  BY MS. MATZ:

19  Q   All right.  Let's pause.  Okay.  So this video, again, was

20  published two days after the Starmarie Jones video; correct?

21  A   Yes, ma'am.

22  Q   And you're again making reference to a lawyer in this.

23  You said you get a cease and desist every week, and your

24  lawyer says good job?

25  A   That is correct.

1  Q   Okay.  And this was two days after the last time you made

2  a reference to your lawyer in a video; correct -- oh, wait.

3  This is the same video.  That happened earlier in this video;

4  right?

5  A   Yes.

6  Q   Okay.  So you're making another reference to your friend

7  who's not actually your lawyer; correct?

8  A   That is correct, yes, ma'am.

9  Q   So this is another what you described in yesterday's

10 testimony as misrepresenting that this person was your lawyer;

11 right?

12 A   That is correct.

13 Q   Okay.  And then you also heard yourself say and your

14 agency is telling you good job; right?

15 A   That is correct.

16 Q   And to keep your foot on their neck?

17 A   Yes.  That's correct.

18 Q   And that is a euphemism for to keep doing what you're

19 doing; right?

20 A   That is correct.

21 Q   All right.  And that's because the Starmarie Jones video

22 had gotten high engagement; correct?

23 A   That is correct.

24 Q   And it was making you revenue; correct?

25 A   That is correct.

1  Q   All right.  So even though you were getting cease and

2  desist letters, you and your agency you did not care.  You

3  wanted to just keep getting the ratings; correct?

4  A   That is correct.

5  Q   You also said in this that you get cease and desist

6  letters every week.  Is that true?

7  A   Yeah.

8  Q   Was it true at this time?

9  A   It was.

10  Q   All right.  A little bit further into this video we also

11  heard you say that you got the receipts, everyone asked you to

12  get the receipts, and you did and it's true that Cardi lived

13  with that girl?

14  A   That is correct.

15  Q   All right.  And when you said that to your viewers, you

16  were referring to the things we've just looked at on your

17  video; correct?

18  A   That is correct.

19  Q   Even though those -- you've admitted -- those do not

20  confirm or tell you that my client ever lived with Starmarie

21  Jones; correct?

22  A   That is correct.

23  Q   So you were making another misrepresentation to your

24  viewers about what these receipts said; correct?

25  A   No, ma'am.

1  Q   Well, you just said that -- you just admitted that they

2  didn't say what you said they said; right?

3  A   That is correct.

4  Q   In your mind there's some difference between that and a

5  misrepresentation?  Yes or no, please.

6  A   No, ma'am.

7  Q   So you did make a misrepresentation?

8  A   No, ma'am.

9          THE COURT:  I mean, there's really nothing I can

10  respond to.  You can either ask more questions or move on to

11  other issues.

12  BY MS. MATZ:

13  Q   So you admit that saying something is not true is a

14  misrepresentation, and even though you just did that you're

15  saying you didn't make a misrepresentation?

16  A   Okay.  I got confused at your question.  Can you repeat

17  the question please slowly.

18  Q   Which question do you need repeated?

19  A   The question you just asked.

20  Q   All right.  Could we read back the question asked --

21  actually, could I take a moment, your Honor?

22          THE COURT:  Well, you can go back several.  Well, you

23  just said that -- you just admitted that they didn't say what

24  you said they said; right?  And the answer is, that is

25  correct.  Question, in your mind there's some difference

1 between that and a misrepresentation?  Yes or no.  And the
2 answer is, no, ma'am.
3         So I guess that means -- well, whatever, no, ma'am,
4 means.
5         So did you make a misrepresentation?  No, ma'am.
6         So which one of those questions are we talking about?
7         MS. MATZ:  I think it was the first two but --
8         THE WITNESS:  But I answered them.
9         MS. MATZ:  I think the record says what it says.
10        THE WITNESS:  Okay.  Thank you.
11 BY MS. MATZ:
12 Q   All right.  You also mentioned in this video that Jones
13 had -- excuse me.  Withdrawn.  You mentioned in this video
14 that Jones was trying to pay off her legal bills; right?
15 A   Yes.  That is correct.
16 Q   And that you had receipts on that?  Do you recall saying
17 that?
18 A   Yes.  That is correct.
19 Q   Okay.  So you were saying that you actually had proof that
20 Jones was paying off her legal bills?
21 A   No.  No, ma'am.
22 Q   Well, receipts, as you testified last week, was a form of
23 corroboration or proof; correct?
24 A   That is correct, yes, ma'am.
25 Q   Okay.  So, again, you're saying that you had some kind of

1  proof that Jones was actually trying to pay off her legal

2  bills; right?

3  A    That is correct, on probation to be exact.

4  Q    Okay.  But you also testified that Jones didn't actually

5  give you anything; correct?

6  A    That is correct.

7  Q    Okay.  So when you said you had the receipts on it in your

8  video, again that was not a true statement; correct?

9  A    That is not correct.  It was in the video.

10  Q    Jones's legal bills were in the video?

11  A    No, her probation.  And when you're on probation, you have

12  probation fees.  So that was a screenshot of her probation

13  from the time that she was on.

14  Q    Okay.  So when you said that you had the receipts but you

15  weren't going to put them out -- because that's what you said

16  in the video; right?  You said I have the receipts, but I'm

17  not going to put them out.  But then you did put what you had

18  out?

19  A    That screenshot.  I didn't want to put her personal

20  information out.

21  Q    Did you have her personal information?

22  A    I did, yes, ma'am.

23  Q    So that's what I'm trying to understand.  I asked you if

24  Jones had given you anything, and you said no.

25  A    Yes.  She gave me her information regarding her probation

1  to show that she was on probation paying legal fees to the

2  system.  So it's like you're trying to, like, ask this and say

3  I didn't say that, and I put it in the video.  And it's right

4  there.  So, no, she didn't give me, like, any paperwork.

5          But I've been on probation before, so I know when

6  you're on probation, you have to pay fees to the state or

7  county in which you're in until you get off probation.  So

8  that was the paperwork right there that she gave me.  She put

9  it on her Instagram.

10 Q   So there's nothing else other than what you've showed that

11 she gave you; correct?

12 A   That is correct, but she did show me some stuff.

13 Q   Okay.  Thank you.

14 A   Okay.

15 Q   All right.  You also said in this video that -- you made a

16 statement, everyone says defamation of character.  I ain't

17 defamed shit.  That girl defamed Cardi.  Do you remember

18 saying that?

19 A   That is correct.

20 Q   Okay.  And when you said that girl defamed Cardi, you're

21 talking about Jones; right?

22 A   That is correct.

23 Q   All right.  So in this video, which you're referring to

24 the Jones interview, you are saying that Starmarie Jones

25 defamed Cardi?

1    A    Hypothetically, yes.

2    Q    That's not what you said in here, is it?  You didn't say

3    hypothetically.  Let's watch the clip.

4    A    Okay.

5              MS. MATZ:  39:29.

6              (Whereupon, a video recording was played.)

7    BY MS. MATZ:

8    Q    Let's pause.  All right.  So you said, I ain't defamed

9    shit.  That girl defamed Cardi.  That's what you said;

10   correct?

11   A    Yeah, but --

12   Q    Is that what you said?

13   A    -- you stopped the --

14   Q    Yes or no?

15   A    You didn't complete the sentence.  You stopped it off in

16   the middle of the sentence.

17   Q    I'd like to know --

18   A    I was speaking hypothetically.  You can't put words in my

19   mouth, no.  I'm trying to be as respectful and calm as I can,

20   but you stopped it right in the middle of the statement.

21             THE COURT:  Did you say the word "hypothetical?"

22             THE WITNESS:  Yes, I gave a hypothetical -- I didn't

23   say the word "hypothetical."  I gave a hypothetical answer

24   when they asked me in the comments.

25   BY MS. MATZ:

```
1    Q    Yes or no.  Did you say the words, "everyone says
2    defamation of character, I ain't defamed shit, that girl
3    defamed Cardi?"
4    A    That is correct, yes, ma'am.
5    Q    All right.  And if I play the rest of this clip, the word
6    "hypothetical" is not going to come out of your mouth;
7    correct?
8    A    No.  I gave a hypothetical statement.
9    Q    You've said the same things as Starmarie Jones did in that
10   interview; correct?
11   A    I'm sorry?  Could you speak up.  I'm sorry.
12   Q    I said, you have said the same thing as Starmarie Jones
13   said in that interview about my client having herpes, being a
14   prostitute, and using cocaine; correct?
15   A    I haven't said cocaine so, no, ma'am.  I'm going to say no
16   to the whole statement.
17   Q    So you have said the same things as Starmarie Jones said
18   in that video, that my client is a prostitute and has herpes;
19   correct?
20   A    That is correct, yes, ma'am.
21   Q    Thank you.  And this isn't the only video that you
22   released around this time where you acknowledged that this was
23   defamation; correct?  We watched that other one last week?
24   A    That is correct, yes, ma'am.
25   Q    Thank you.  Let's go to D-8.  All right.  Just hang on one
```

1   moment.  I've just got to grab something.  When you were being

2   questioned by your attorney, you testified that after the

3   Starmarie Jones video came out, you did some extensive

4   research on where the herpes allegations came from; right?

5   A    That is correct.

6   Q    Okay.  And you also testified about a rebuttal video that

7   you made in December of 2018; correct?

8   A    That is correct, yes, ma'am.

9   Q    And we watched some of that rebuttal video yesterday;

10  right?

11  A    Yes, ma'am.  We watched it all.

12  Q    Okay.  So why don't we pull that up, D-8.  Hold on one

13  second.  Okay.  Let's start this at about 3:45, I think.

14  Yeah, that's okay.

15          (Whereupon, a video recording was played.)

16  BY MS. MATZ:

17  Q    All right.  Let's pause.  So yesterday you testified about

18  some research you did and some things that you claimed to have

19  found.  And that occurred right after the Starmarie Jones

20  video; correct?

21  A    Yes, ma'am.

22  Q    Okay.  But a couple months later when you made this video,

23  you said there's only two, quote, bitches on the internet who

24  claim to know that Cardi has herpes.  You see that?

25  A    Yes, ma'am.

1   Q    Okay.  And then you identify them as Azealia Banks?

2   A    Yes, ma'am.

3   Q    And Starmarie Jones; correct?

4   A    That is correct.

5   Q    Okay.  And you heard my client testify last week that

6   Azealia Banks has since apologized for saying that my client

7   had cold sores; correct?

8   A    Yes.  That is correct.

9   Q    All right.  And then here you're also saying that there's

10  a third person who's confirmed it; right?

11  A    Yes.  That is correct.

12  Q    And you're saying to your viewers that that third person

13  who confirmed that she had herpes was my client; correct?

14  A    That is correct.

15  Q    All right.  Let's take a look at this.

16          (Whereupon, a video recording was played.)

17  BY MS. MATZ:

18  Q    All right.  Let's go back.  Let's take this one step at a

19  time.  You heard my client speaking another language in parts

20  of that video; correct?

21  A    Yes.  That is correct.

22  Q    And do you know what language that is?

23  A    Spanish.

24  Q    Do you speak Spanish?

25  A    No, ma'am.

1  Q   Okay.  So you heard my client speaking Spanish in this

2  video, for parts of it.  Did you make any effort to find out

3  what any of those terms meant?

4  A   Yes, ma'am.

5  Q   You did?

6  A   Uh-huh.

7  Q   Okay.  So let's take this from the beginning, and we're

8  going to do some pausing.

9          (Whereupon, a video recording was played.)

10 BY MS. MATZ:

11 Q   All right.  Let's pause.  Okay.  And just back up a tiny

12 bit from when you start again.  All right.  So you just heard

13 my client say -- and this was stipulated to; correct?

14 A   Uh-huh.

15 Q   -- they don't have a life, like, it's just annoying.  It's

16 frustrating.  Like, it's just, like, everything, my "N",

17 everything.  You heard her say that?

18 A   That is correct.

19 Q   Okay.  And just start a hair before where you paused.

20          (Whereupon, a video recording was played.)

21 BY MS. MATZ:

22 Q   Let's stop.  Okay.  And there she just said, dique I had a

23 cold sore.  You heard that?

24 A   Yes.

25 Q   Okay.  And the parties have stipulated that dique means

1    they say?

2    A    That is correct.

3    Q    Okay.  So that sentence says they say I had a cold sore;

4    correct?

5    A    That is correct.

6    Q    All right.  Let's keep going.

7              (Whereupon, a video recording was played.)

8    BY MS. MATZ:

9    Q    All right.  Let's pause.  And then there's another voice

10   in the background that says, diablo damn.  You heard that?

11   A    That is correct.

12   Q    Okay.  Let's keep going.

13             (Whereupon, a video recording was played.)

14   BY MS. MATZ:

15   Q    Let's pause.  And you heard my client just say a sentence

16   in Spanish; correct?

17   A    That is correct.

18   Q    Okay.  And the parties have stipulated that that means

19   these people are crazy, they say whatever?

20   A    That is correct.

21   Q    All right.  Let's back up a tiny bit just so we can hear

22   the beginning of the next sentence.

23             (Whereupon, a video recording was played.)

24   BY MS. MATZ:

25   Q    All right.  Let's pause.  And there you just heard my

1  client say in English, they say any fucking dumb shit, but I

2  bet they won't take the time to go to YouTube and look up

3  Cardi B videos and see that my shit has been looking the same

4  forever?

5  A   Yes.  That's correct.

6  Q   All right.  Next sentence, please.

7          (Whereupon, a video recording was played.)

8  BY MS. MATZ:

9  Q   All right.  Let's pause.  And this next sentence you heard

10  my client say, I bet they won't go on Google and see that

11  this -- and she points to her face -- I have a birthmark here

12  all my life and how my lip always been brown around here.  You

13  heard that?

14  A   Yes.  I heard that.

15  Q   All right.  Let's play the last sentence.

16          (Whereupon, a video recording was played.)

17  BY MS. MATZ:

18  Q   All right.  Let's pause.  Then she says, like a lot of

19  bitches my skin complexion; right?

20  A   That is correct.

21  Q   And she's referring to her mouth being brown in certain

22  places like a lot of people of her skin complexion?

23  A   That is correct.

24  Q   Okay.  Let's take that video down for a second.  Later in

25  this video, though, within a matter of minutes, though, you

1   say to your viewers that that was -- that -- you say to your

2   viewers, you just heard Cardi B admit that she has a cold

3   sore; correct?

4   A   That is correct.

5   Q   But that's not actually what my client said; correct?

6   A   I found out later, no.

7   Q   Found out later.  Okay.  So you at the time made -- you

8   said you made some effort to find out what this meant?

9   A   Yes, ma'am.

10  Q   And what did you do?

11  A   I put in the Spanish part into the Google translator, and

12  then the English part came with it.  And so it couldn't pick

13  up the "D" word, and so since she says nigger a lot, I took

14  that as, nigger, I had a cold sore.  And the person in the

15  video said damn.

16  Q   All right.  So at the time, though, people commented on

17  this video, right, telling you that dique meant supposedly or

18  they say?

19  A   Commented on the video how?  You mean in the chat box?

20  Q   I mean this video was published on a YouTube; correct?

21  A   That is correct.

22  Q   And YouTube has a comment section; correct?

23  A   That is correct.

24  Q   And there were comments left saying that that is not what

25  my client was saying, and that's not what dique means;

1    correct?

2    A    I believe so.  I went back and checked later, yes.

3    Q    Okay.  Let's look at P-506, please, and don't publish this

4    to the jury yet.

5            This video is still up, though; right?

6    A    Which one?

7    Q    This video.

8    A    There's nothing on my careen.

9    Q    The video we were just looking at.

10   A    Oh, yes.  It's absolutely still up.

11   Q    Okay.  So it's still up, and you're still telling

12   people -- people are still viewing that you're saying Cardi B

13   admitted she had a cold sore?

14   A    That is correct.

15   Q    All right.  Have you ever seen this before?

16   A    No.  I don't remember this, huh-uh.

17   Q    This isn't one of the comments that you saw saying what

18   dique meant?

19           MR. SABBAK:  Objection, your Honor.  She's testifying

20   to the contents of a document that's not even in evidence.

21           THE COURT:  She's having her identify it as of right

22   this minute.

23           MR. SABBAK:  Speaking to the content in her question.

24           THE COURT:  Okay.  Have you ever seen this?

25           THE WITNESS:  No, I get thousands of comments, no.

```
 1          THE COURT:  You do have to lay a foundation.

 2   BY MS. MATZ:

 3   Q    Okay.  Why don't we look at P-507.  Make it a little

 4   bigger, please.

 5          Have you ever seen this before?

 6   A    No.  It doesn't look familiar, no.

 7   Q    Okay.  So these are not the comments you testified about

 8   seeing?  You saw other comments; correct?

 9          MR. SABBAK:  Your Honor, objection.  She keeps

10   testifying to what the document is.  It's not in evidence.

11          THE COURT:  I don't think testifying for what it is.

12   She's asking a question about your client who said she didn't

13   know what it was.  She's allowed to ask a question to

14   establish if your client's testimony about that is correct or

15   not.

16          MR. SABBAK:  Right.

17          THE COURT:  The document hasn't been admitted into

18   evidence.  It has not been demonstrated to the jury, so I'm

19   not sure how we even do that unless you propose that we do

20   that outside the presence of the jury.  But the jury can't see

21   the document anyway.  So let the plaintiff ask questions to

22   determine whether or not this is a document that your client

23   is familiar with and whether or not it was a document --

24   whether it was a comment that was included on her YouTube

25   channel.  The only way to do that is to ask questions about
```

 1   it.

 2           MR. SABBAK:  Correct.  But if we could not comment on

 3   the substance of the comments.  That's all I'm saying.

 4           MS. MATZ:  I didn't.

 5           THE COURT:  Nobody has commented about the substance

 6   of the question.  So your objection is out of order if that's

 7   what it is.  Go ahead.

 8   BY MS. MATZ:

 9   Q   So you didn't see this comment.  You saw other comments on

10   this subject; correct?

11   A   That is correct, yes, ma'am.

12   Q   All right.  Let's move on.

13           THE COURT:  Let me ask a question about comments.

14   Have you deleted any comments from your YouTube channel?

15           THE WITNESS:  No.  I don't delete comments.

16           THE COURT:  So if we assume without deciding that

17   this was a comment that was on your YouTube channel, if you

18   haven't deleted any of them, would it still be there?

19           THE WITNESS:  If this comment is still there, yes, it

20   would be there unless maybe somebody reported it or YouTube

21   does spam, and they take users off so -- and delete, you know,

22   accounts so all their comments disappear because the account

23   is no longer.  So it's kind of hard to say.  If she would have

24   had a screenshot with my channel and the comments underneath,

25   I could have easily said, yes, that's where I got it from.

1  And I did testify and say, yes, there were people in the

2  comments that said dique means supposedly or used in sarcasm,

3  so I wasn't denying it.

4          THE COURT:  All right.  So if need be, you could log

5  in to your YouTube channel and scan and see if this is there?

6          THE WITNESS:  Yes, I could, and look for it.  But

7  it's thousands of comments, so it may take me a minute, now.

8          MS. MATZ:  Can I have one moment, your Honor?

9          THE COURT:  Sure.

10          MS. MATZ:  Thank you.  I appreciate that.

11          THE COURT:  Why don't we just take a break since

12  we're about five minutes away from an hour and a half.  So

13  we'll take a break, and we'll see the jury in 10 minutes or

14  so.  Thank you.

15          MS. MATZ:  Thank you.

16          COURTROOM SECURITY OFFICER:  All rise.

17          (Whereupon, the jurors exited the courtroom.)

18          THE COURT:  Let me ask a question.  Whoever knows

19  this can answer this.  I guess all the lawyers can see what's

20  up; right?  Okay.  So there's a date in the upper right-hand

21  corner below two lines of 9-10-2020.  Would that normally be a

22  date that something was published or was uploaded?

23          MS. MATZ:  No, your Honor.  That date is the -- and

24  my office captured this so -- or maybe co-counsel.  This was

25  on our side.  This is one of our documents.  That is the date

1   that this PDF was printed, so, like, essentially when you take

2   a screenshot, it puts the date that this was accessed on it.

3   So that's the last access date.  The right-hand side is the

4   URL that it was found on, which would match the video.  And

5   the post date of the comment, if you look, like, it has a

6   circle, and then says Yung Rapunxel -- I'm not sure I'm

7   pronouncing it right.  It says one year ago --

8           THE COURT:  That one year is not very helpful because

9   it could be -- I don't know if that's one year -- it's

10  certainly not exactly one year from the date you downloaded

11  it.

12          MS. MATZ:  Yeah.

13          THE COURT:  Is there a way for the plaintiff to lay a

14  foundation for this document?

15          MS. MATZ:  I mean, I think that to the extent that

16  she's admitted -- I think that we could do it by the URL being

17  the URL of the video.

18          THE COURT:  Do you have internet access with your

19  computer?

20          MS. MATZ:  Yeah, I can try it.

21          THE COURT:  Why don't you log in and see if it comes

22  up.

23          MS. MATZ:  Yeah.  I'm sorry.  Give me a minute, your

24  Honor.

25          THE COURT:  Manually type that in?

```
1              MS. MATZ:  I'm going to try to copy it.  I'm not sure
2    I did that quite right.  Yeah, the URL does work, your Honor.
3              THE COURT:  It does?
4              MS. MATZ:  Yeah, it does.
5              THE COURT:  All right.  So after our break -- so does
6    that comment come up?
7              MS. MATZ:  He's just loading it.  There's lots of
8    comments it has to load.  I think we just --
9              THE COURT:  It doesn't go right to that comment?  It
10   just goes generally to the comments?
11             MS. MATZ:  It goes to the video.  It goes to the
12   video, and then the comments are all underneath.  So we just
13   have to scroll through and find it.
14             THE COURT:  How many comments are there?
15             MS. IZMAYLOVA:  Thousands.
16             MS. MATZ:  Do a few screenshots and --
17             THE COURT:  Well, I guess my -- you've got to find it
18   first; right?  And if you find it --
19             MS. MATZ:  We found the first one.
20             THE COURT:  So here's what I would suggest, is that
21   when we come back, you just show your computer that has it
22   loaded, have her identify that it's her web page, take her to
23   that spot, and have her identify it and then follow up with
24   your specific questions at that time.  At that point you
25   probably will have laid enough foundation where you can admit
```

1   the exhibit, and it can be done with the computer, I suppose.

2   Okay.  All right.  We'll take a 10-minute break.

3            MS. MATZ:  Thank you, your Honor.

4            THE COURT:  Thank you.

5            COURTROOM SECURITY OFFICER:  All rise.  Court is in

6   recess for 10 minutes.

7            (Brief recess.)

8            THE COURT:  All right.  We're ready.  Thank you, sir.

9            COURTROOM SECURITY OFFICER:  All rise for the jury.

10            (Whereupon, the jurors entered the courtroom.)

11            COURTROOM SECURITY OFFICER:  You may be seated.

12   BY MS. MATZ:

13   Q   All right, Ms. Kebe.  We're going to come back to those in

14   a minute.  I'd like to go back to the video that we were just

15   looking at for a moment, though.  Do you recall also that

16   in -- and the video we were just looking at was your -- what

17   you called your rebuttal video that you posted in December of

18   2018; correct?

19   A   In the yellow sweatshirt?

20   Q   Yes.

21   A   Yes, ma'am.

22   Q   Okay.  And after you -- you played that clip of my client

23   two or three times in the video; correct?

24   A   That is correct.

25   Q   All right.  And even though you are saying you didn't get

1    the exact translation the first time you were watching it, you

2    did hear my client's other statements in English; correct?

3    A    That is correct.

4    Q    Okay.  Where she said they don't have a life, it's

5    annoying, it's frustrating.  You heard that?

6    A    That is correct.

7    Q    And then you also heard her say, they say any fucking dumb

8    shit, I bet they won't take the time to go to YouTube and look

9    up Cardi B videos and see that my shit has been looking the

10   same forever.  You heard that?

11   A    That is correct.

12   Q    Okay.  And then you also heard my client say in English, I

13   bet they won't go on Google and see that this, I have a birth

14   mark here all my life and how my lip always brown around here

15   like a lot of bitches my skin complexion.  You heard that?

16   A    That is correct.

17   Q    All right.  So despite hearing that, you still thought

18   that my client was admitting to having a cold sore?

19   A    Yes, ma'am.

20   Q    All right.  And a little further into the video you also

21   said that your attorney had a good time with that video?

22   A    That is correct.

23   Q    We're now in December of 2018; right?

24   A    That is correct.

25   Q    Okay.  And so when you were talking about -- you also

1 mentioned that you had full permission from your legal team to

2 go in --

3 A   That is correct.

4 Q   -- in this video?

5 A   Yes.  That is correct.

6 Q   Sorry.  Just let me finish my sentence.

7 A   Sorry about that.  I thought you were done.

8 Q   So in December of 2018 did you have lawyers?

9 A   No, ma'am.

10 Q   All right.  So you were again misrepresenting to your

11 viewers that your legal team had cleared what you were doing?

12 A   That is correct.

13         MS. MATZ:  All right.  I'm going to show you --

14 actually, your Honor, could we have one side bar really

15 quickly about the next thing I'm going to do?

16         THE COURT:  Sure.

17         (Whereupon, a bench conference was held between the

18 court and counsel.)

19         MS. MATZ:  So we're going to share the screen to do

20 this.  The one thing I wanted to know is if you'd like us to

21 screen record while we're doing it so that can be put into

22 some type of an exhibit for the record.

23         THE COURT:  To screen record.  Well, you're doing it

24 to lay a foundation.  I don't think we need it in the record

25 if she admits that it is -- if she says it's not -- well, I'm

1    not sure how she could deny it's her page, but if she says

2    it's her page, then what comes in is the actual screenshot

3    that you had before.

4           MS. MATZ:  Yes, exactly.

5           THE COURT:  I don't think we need to screen record

6    anything.

7           MR. SABBAK:  And I'm okay with it, Judge.  But can I

8    say you one thing?

9           THE COURT:  I don't know how it would be included in

10   the record, though.

11          MS. MATZ:  No, I'm not suggesting we do it.  I

12   actually just wanted to ask the question, and I didn't want to

13   say it in front of the jury.

14          MR. SABBAK:  What are you doing?

15          MS. MATZ:  What do you mean what am I doing?

16          MR. SABBAK:  I'm saying what are you trying to put up

17   there on the screen for?  Are you just going to show it to

18   her?  I'm not understanding.

19          THE COURT:  It's the actual web page, to have her

20   look at it and identify that it's her web page and the

21   comments.

22          MR. SABBAK:  Okay.  Sorry.  Of course.  That's no

23   problem.

24          THE COURT:  Okay.

25          MR. SABBAK:  But one thing.  If you're going to --

1  understand that we might make an argument that if you keep

2  asking her why she's not representing that she has attorneys

3  when she doesn't --

4            THE COURT:  She's not representing what?

5            MR. SABBAK:  Ms. Kebe in her videos told her audience

6  she didn't have an attorney before she had attorneys at the

7  time.

8            THE COURT:  She had what?

9            MR. SABBAK:  In the videos Ms. Kebe tells her

10 audience that she has attorneys, my attorneys told me to do

11 this, blah, blah, blah, blah.  But we weren't hired until

12 April 2019, and she admits that she didn't have an attorney at

13 the time.  But the reason why she's saying that is because of

14 her client's actions that they kept out.  And so if she keeps

15 harping on that point, why she had to --

16           MS. MATZ:  I didn't ask her why.  Okay.  I asked

17 her --

18           MR. SABBAK:  Well, you kept asking her --

19           MS. MATZ:  I know I asked her if she's now --

20           MR. SABBAK:  -- so I'm telling you now that you're

21 opening the door.

22           MS. MATZ:  I'd like to respond whenever you're ready

23 but I don't want to --

24           THE COURT:  I don't think there's any response

25 needed.  Right now we're talking about the misrepresentations

1  that she made to her viewers that she had attorneys when she

2  didn't have attorneys.  I'm not sure how that opens the door

3  to anything.

4          MR. SABBAK:  Because she was receiving the threats

5  from not just the plaintiff but from Mr. Dennis Byron, from

6  all these people.  They were having her videos taken down.

7  Her pages were being flagged.  And so to, you know, fight off

8  all this she -- I'm just telling you, Judge, to fight off all

9  this, she had to tell the thing, though, that she has lawyers.

10  And she was really speaking to Cardi B.  She wasn't really

11  speaking to her audience.  So I'm just telling you now that if

12  you keep harping on this, I feel like I'm going to have to

13  redirect on that.

14          THE COURT:  I'm not sure that there's been any door

15  opened for you to do anything other than ask her questions

16  about --

17          MR. SABBAK:  Why she lied to her viewers, and then

18  that's the answer.  I can ask her why she misrepresents, that

19  she didn't have attorneys, and the answer to that question

20  you're not going to like.  So keep harping on it.

21          MS. MATZ:  Your Honor, they've been trying back door

22  this in the entire time.  This is, frankly -- I'm sorry.  This

23  is ridiculous.  She has said why she misrepresented.  The two

24  questions I asked why, she said she did it so that they would

25  think that the cease and desist letter is fake --

1          MR. SABBAK:  No, she didn't say that.

2          MS. MATZ:  No, that is actually --

3          MR. SABBAK:  So who would think it was fake?

4          MS. MATZ:  She said -- I asked her -- no, I'm happy

5  to go back to my notes.

6          THE COURT:  Okay.  We'll talk about it if we get to

7  that point, but I doubt the defendant is going to be

8  successful in that endeavor.

9          (Whereupon, the following proceedings continued in

10  open court.)

11          MS. MATZ:  All right.  We're not going to publish

12  this to the jury just yet.

13          All right.  Have you ever seen this before?

14          THE WITNESS:  Yes, ma'am.

15  BY MS. MATZ:

16  Q   Okay.  Is this your YouTube page?

17  A   It looks like a screenshot from my YouTube page.  I don't

18  see my icon at the bottom.

19  Q   Wait.  Hold on.  I'm sorry.  One second.

20          (Brief Pause.)

21          MS. MATZ:  Sorry.  We're going to start that over.

22  Do you know what this blue mark is right here on my screen?

23          COURTROOM DEPUTY:  Huh-uh, trying to clear it.

24          MS. MATZ:  I don't know if I did something.  Sorry

25  about that.

1              MR. SABBAK:  Your Honor, could we approach briefly?

2              (Whereupon, a bench conference was held between the

3     court and counsel.)

4              MR. SABBAK:  Objection for the record.  We object to

5     the hearsay comments coming in.  If your Honor doesn't agree,

6     we would ask for a limiting instruction, the same one that was

7     given --

8              THE COURT:  Which hearsay are we talking about?

9              MR. SABBAK:  Comments.

10             THE COURT:  I don't know what the comments say.  What

11    do they say?

12             MS. MATZ:  Oh, it's just --

13             THE COURT:  About what the Spanish means?

14             MS. MATZ:  Yeah.  It's just saying that's not what

15    she's saying.  We're not admitting it for the truth of the

16    statement.  The parties have already stipulated to a

17    translation, and that's fine.  This is --

18             MR. SABBAK:  I'm asking for a limiting instruction.

19             THE COURT:  Didn't y'all stipulate to what it meant?

20             MR. SABBAK:  That's what I thought.  I don't know why

21    we're doing all this.  We stipulated to the translation.  We

22    didn't stipulate --

23             THE COURT:  Okay.  I understand why they're doing it

24    but it's not -- if y'all stipulated to what it means, then

25    there is -- it's not introducing it as hearsay; right?

1          MR. SABBAK:  No.

2          THE COURT:  So then what's your objection?

3          MR. SABBAK:  So I stipulated to what the translation

4    in the video means.  I did not stipulate to what the

5    commenter's opinions are about Ms. Kebe's work.

6          THE COURT:  Well, is that for the truth of the matter

7    asserted?  Does that have any relevance anyway?

8          MR. SABBAK:  It doesn't.  That's why I ask for a

9    limiting instruction.

10          MS. MATZ:  It's not being admitted for the truth of

11    the matter -- sorry.  If you don't mind, it's not being --

12          THE COURT:  So you want me to say to the jury that

13    the -- wait a minute.  Hold on.  You want me to highlight for

14    the jury the fact that the person had expressed some disgust

15    for the situation and to tell them that they're to disregard

16    that?

17          MR. SABBAK:  No, that's fine.

18          THE COURT:  Well, that's what I would be doing.  I

19    would be --

20          MR. SABBAK:  I didn't realize it was that specific.

21          THE COURT:  I mean, otherwise --

22          MR. SABBAK:  The whole statement, I mean, it's

23    inconsistent with the stipulation.  I do understand what the

24    Court is saying.

25          THE COURT:  I have to distinguish between what you

1  agree to, which is the Spanish translation and then the other

2  stuff.  So aside from the Spanish translation, the person's

3  comments are hearsay and irrelevant.  They only -- they don't

4  go to any of the issues in the case anyway other than the fact

5  that she thinks that your client is not being fair, none of

6  which would be necessary if your client had admitted the

7  obvious, that she was aware that it was comments --

8        MR. SABBAK:  She did say that, though.  That's my --

9  she said she's aware of the comments -- see that particular

10  one, but you see there's thousands of them so -- which she's

11  already admitted that she's aware of these comments.

12        THE COURT:  Well, why don't we redact because --

13        MR. SABBAK:  But I guess if we could not just halfway

14  with these comments coming in with saying dique and all this

15  extra stuff --

16        MS. MATZ:  It's just the screenshots --

17        THE COURT:  So do you want me to give a limiting

18  instruction or not?

19        MR. SABBAK:  I don't.  Well, abandoning the limiting,

20  but do not have cumulative presentation of the dique --

21        THE COURT:  Well, I don't think --

22        MR. SABBAK:  -- in order to back door, you know, all

23  the other stuff.

24        MS. MATZ:  I'm not back dooring -- there are

25  literally --

1          MR. SABBAK:  That's all I'm saying.  I'm making two

2     comments.

3          MS. MATZ:  Sorry.  Do you mind letting me finish my

4     sentence?  Thank you.  The two comments that you're going to

5     admit -- because we're not going to show the jury all the

6     comments.  We're going to scroll and have her authenticate it

7     was her web page.  We're going to show those two.  This won't

8     be published to the jury.  And then we're going to put in the

9     screenshots, which will only have those blue bars.  It's

10    essentially just the one comment, so I don't know what

11    we're -- I'm not introducing all the other comments.  I don't

12    know --

13         MR. SABBAK:  I'm saying all of the dique comments.

14    If there's 20 or 30 of them, that's cumulative and

15    unnecessary.

16         THE COURT:  We haven't even done one yet.

17         MS. MATZ:  We're doing two.  There's two on my list.

18    I'm doing two.

19         THE COURT:  So do you want me to give a limiting

20    instruction on it?

21         MR. SABBAK:  No, your Honor.  That's fine.  If

22    they're limiting it to two, that's fine, but I don't want to

23    sit here and watch 30 comments come in with all this extra

24    information.  That's all I'm saying.

25         MS. MATZ:  To be honest, your client has already

1  admitted that there were lots of comments.  And so to the

2  extent it is admissible for the purpose of there being

3  information out there that she consciously disregarded, I

4  don't know why it would matter if I did a cumulative

5  presentation.

6          MR. SABBAK:  She admitted to it.

7          MS. MATZ:  That doesn't mean you get to put on my

8  case for me.

9          MR. SABBAK:  Okay.  Well, you can't just back door

10  hearsay.

11          MS. MATZ:  I'm not back dooring anything.  What am I

12  back dooring?

13          THE COURT:  I'm taking it that there are --

14          MR. SABBAK:  I'll withdraw my objection.

15          THE COURT:  Okay.  All right.

16          (Whereupon, the following proceedings continued in

17  open court.)

18  BY MS. MATZ:

19  Q   All right.  Do you recognize this website?

20  A   Yes.  That is my YouTube chat.

21  Q   Okay.  And the -- before we scroll down this is your

22  YouTube channel, and the video we are looking at is the Tasha

23  K Responds to Cardi's Diffimation Suit.  Do you see that?

24  A   Yes.  Yes, ma'am.

25  Q   Okay.  And this was posted on December 18th, 2018;

1  correct?

2  A    That is correct, yes, ma'am.

3  Q    Okay.  And this is the web page where the video that we

4  were just looking that you referred to as your rebuttal video,

5  this is where it is currently on the internet; correct?

6  A    That is correct.

7  Q    Okay.  We're going to take you to -- and, actually, do you

8  see the URL at the top here?  You see that?

9  A    Yes, ma'am.

10 Q    Okay.  And that's the URL for this particular video?

11 A    I believe so, yes, ma'am.

12 Q    All right.  And we're going to take you down to two of the

13 comments.  Do you see this?

14 A    Yes, ma'am.

15          MS. MATZ:  And, Tom, could you just highlight it for

16 her.  All right.

17          Do you see that comment?

18          THE WITNESS:  Yes, ma'am.

19 BY MS. MATZ:

20 Q    Okay.  So this is a comment that is currently on your

21 YouTube channel connected to the video that we were just

22 looking at; correct?

23 A    That is correct, yes, ma'am.

24 Q    All right.  And this is the same comment that we just

25 looked at as -- one moment.  This is the same comment as what

1   we just looked at as P-507; is that correct?  Do you need us

2   to put that up on the screen for you?

3   A   Yes, please.

4   Q   Sure.  Put P-507 up, please.  Do you see this?

5   A   Yes, ma'am.

6   Q   That's the same comment that we just looked at that's

7   currently on your YouTube channel under that video; correct?

8   A   That is correct, yes, ma'am.

9           MS. MATZ:  Your Honor, I would offer P-506 into

10  evidence.

11          MR. SABBAK:  No objection.

12          THE COURT:  506 is admitted without objection.

13          MS. MOORE:  And then -- oh, I'm sorry, your Honor.

14  That was 507.  I apologize.  I just misspoke.

15          THE COURT:  I was just still turning to it.  So 507

16  not 506.  Thank you.

17          MS. MATZ:  Correct.  Okay.

18          (Whereupon, Plaintiff's Exhibit 507 was marked for

19  purposes of identification and admitted into evidence.)

20          MS. MATZ:  Now, before we publish it to the jury,

21  we're just going to do the other one.  Go ahead.

22          Okay.  And do you see this comment?

23          THE WITNESS:  Yes, ma'am.

24  BY MS. MATZ:

25  Q   Under HeadChampion?

1    A    Yes.

2    Q    That's the username.

3    A    Yes, ma'am.  I see it.

4    Q    Okay.  And that comment is currently on your comment

5    section connected to the rebuttal video that we just looked

6    at; correct?

7    A    Yes, ma'am.  That is correct.

8    Q    Okay.  And if you can, please look at P-506.  Okay.  And

9    that's the -- this is a copy of that same comment we just

10   looked at that's currently live; correct?

11   A    That is correct, yes, ma'am.

12           MS. MATZ:  Your Honor, I would offer P-506 into

13   evidence.

14           MR. SABBAK:  No objection, sir.

15           THE COURT:  506 is admitted without objection.

16           (Whereupon, Plaintiff's Exhibit 506 was marked for

17   purposes of identification and admitted into evidence.)

18   BY MS. MATZ:

19   Q    Okay.  All right.  Let's take a look at P-506, please, and

20   if we can publish to the jury.  And if you want to just take

21   a -- if you can make this a little bigger, Tom.

22           Okay.  So we're looking at a comment that was posted

23   on your YouTube channel; correct?

24   A    That is correct, yes, ma'am.

25   Q    All right.  And this screenshot was taken in October of

1  2020.  You see that up at the top left-hand corner?

2  A   That is correct.  I believe so, yes, ma'am.

3  Q   Okay.  And the comment says it was about a year ago, so

4  approximately sometime in 2019; correct?

5  A   Could we go back to the comment on the YouTube page so we

6  can see exactly when it was posted?

7  Q   Well, this one says one year ago.  Do you see that?

8  A   Yes, ma'am.

9  Q   Okay.  And if the screenshot was taken in October of 2020,

10  that would be sometime in 2019; correct?

11  A   I can't speak for that because I don't know when you

12  actually took it.

13  Q   All right.

14  A   Thank you.

15  Q   In this the user, HeadChampion, is commenting on the video

16  that we just looked at where you played a live stream of my

17  client talking about where you said she admitted she had a

18  cold sore; correct?

19  A   That is correct, yes, ma'am.

20  Q   Okay.  And you see this user notifying you that she's not

21  admitting to having a cold sore.  You see that?

22  A   That is correct, yes, ma'am.

23  Q   Okay.  Let's look at P-507.  Okay.  And this is another

24  comment that was left on your YouTube channel; correct?

25  A   That is correct, yes, ma'am.

1  Q   And this user is also telling you that dique means

2  supposedly or used in sarcasm.  You see that?

3  A   Yes, ma'am.

4  Q   Okay.  And you see where it also says, adding that clip in

5  your video didn't prove anything.  She was saying that people

6  are saying that she "dique has a cold sore".  That's really

7  annoying.  Do you see that?

8  A   Yes, ma'am.

9  Q   And these are the types of comments that you were just

10  talking about, correct, when you said you saw comments in your

11  YouTube channel where people were discussing and notifying you

12  that dique didn't mean that she had a cold sore?

13  A   That is correct, yes, ma'am.

14  Q   Great.  Thank you.

15  A   You're welcome.

16  Q   Okay.  I'd like to talk about one of the other videos that

17  we watched yesterday -- and we also watched parts of it when I

18  was questioning you on direct -- the video where you state

19  that my client has HPV and that she cheated on her husband.

20  Do you recall the video I'm talking about?

21  A   Yes, ma'am, that is correct.

22  Q   Okay.  And when your attorney questioned you, you

23  testified that -- your testimony was that you didn't say that

24  as a fact, you said it was fake news; is that right?

25  A   That is not correct.

1  Q   You didn't -- so you did say that my client has HPV as a

2  fact?

3  A   No, I did not.  No, ma'am.

4  Q   So you didn't.  Your testimony is that you did not say it

5  as a fact.  Is that your testimony?

6  A   I did not say it as a fact.  Yes, ma'am, that is correct.

7  Q   Okay.  And that -- is it your testimony that you posted

8  that as fake news?

9  A   No, ma'am.

10  Q   Okay.  So earlier when you said that you publish things as

11  either fake news or real news, you admit that that was not

12  published as fake news; correct?

13  A   I'm sorry.  Could you repeat that question again.

14  Q   Earlier when you testified, when your attorney was

15  questioning you, you said that you publish stories as either

16  fake news or real news.  Do you recall giving that testimony?

17  A   Yes, ma'am.

18  Q   Okay.  And your testimony sitting here today is that your

19  story where you said I know your client got HPV, you are

20  saying that is not fake news; correct?

21  A   That is not fake news?

22  Q   You're testimony --

23  A   I'm sorry?  You're saying that -- okay.  You're talking

24  about the comments --

25  Q   No, no.  I'm saying that you testified that you classify

1  stories as either real news or fake news.  Do you recall that?

2  A    That is correct, yes, ma'am.

3  Q    And so sitting here today, the video that we watched where

4  you said I know your client got HPV, your testimony is that

5  you do not classify that as fake news?

6  A    Oh, no.  That's not fake news, no, ma'am.

7  Q    Thank you.

8  A    You're welcome.

9  Q    And you have previously admitted that you made a statement

10  that my client has HPV; correct?

11  A    That is correct, yes, ma'am.

12  Q    Do you understand that whether or not someone has HPV is

13  provably true or false?  You understand that?

14  A    That is correct, yes, ma'am.

15  Q    So you understand that someone can take a test and prove

16  whether or not they have it?

17  A    That is correct, yes, ma'am.

18  Q    And the video that we watched where you said I know your

19  client got HPV and that you also said she was cheating on her

20  husband, you testified that that video also had this standard

21  disclaimer; correct?

22  A    That is correct, yes, ma'am.

23  Q    And when we talked about that last week, isn't it also

24  true that, like earlier, that standard disclaimer is not

25  immediately apparent to a viewer who's going to watch the

1  video without clicking more; correct?

2  A    That is correct.

3  Q    And you also testified that even the disclaimer that is

4  there doesn't say that it is false that my client has HPV or

5  that it's false that she cheated on her husband; correct?

6  A    That is correct.  However, the disclaimer is in the

7  statement.  So you're asking if it's on the screen.  Yes, it

8  was on the screen, and I said I cannot confirm that.  It's

9  allegedly.  I said that in the statement, so people didn't

10 need to go to the channel to read it because I said it out of

11 my mouth in passing.  And that wasn't a story.  That was just

12 a comment I made.

13 Q    So you said, I know you got HPV.  I can't confirm that.

14        And you're saying that that means that people would

15 know that you're not actually saying my client has HPV.

16 That's your testimony?

17 A    Correct, yes, ma'am.

18 Q    Okay.  But you don't say that anywhere else in the video;

19 correct?

20 A    That is correct, yes, ma'am.

21 Q    All right.  After you say that, though, you do go on to

22 say something about you know the doctor can do something about

23 it.  Do you recall that in the video?

24 A    I was talking about a holistic doctor, Dr. Sebi, yes,

25 ma'am.

1  Q    Okay.  So implying that the doctor can do something to
2  help my client's HPV condition; correct?
3  A    Yeah.
4  Q    Sorry.  What?
5  A    Yes, ma'am.
6  Q    Thank you.
7  A    You're welcome.
8  Q    All right.  And you also testified last week that you
9  didn't believe the source who allegedly gave you the
10 information to post for that video; correct?
11 A    That is correct, concerning the baby, yes, ma'am.
12 Q    And you knew that that source was giving you fake news
13 before you published it; correct?
14 A    Yes, ma'am.  That is correct.
15 Q    Okay.  Do you recall in the Lovelyti call making a
16 statement that -- you said a person that would take anything
17 and post it without vetting it, I'm sorry, you're discredited.
18 Do you remember saying that?
19 A    Yes, ma'am.
20 Q    Okay.  And you were attempting to convey to Lovelyti, who
21 you were talking to, that a person who would just take
22 information and post it without vetting it should not be given
23 credit by viewers; is that correct?
24 A    That is correct, yes, ma'am.
25 Q    Okay.  Do you also recall during that video after --

1  shortly after you made a comment about -- saying something

2  along the lines of they're like CNN and Fox, and you were

3  talking about you and Lovelyti?  Do you recall that?

4  A    That is correct, yes, ma'am.

5  Q    And you were saying, you know, that you both make money.

6  Do you remember that?

7  A    Yes, ma'am.

8  Q    Okay.  And you were comparing you and Lovelyti to CNN and

9  Fox who put out completely different versions of news;

10 correct?

11 A    That is correct, yes, ma'am.

12 Q    Okay.  And do you also recall around that time calling

13 someone a ho?  You were talking about someone else?

14 A    Can you replay that part in the video?  Because, I mean, I

15 remember the CNN Fox because I use that all the time.

16 Q    That's fine.

17 A    Okay.

18 Q    You do that all the time?

19 A    I'm sorry?  Do what all the time?

20 Q    Did I just hear you say I do that all the time?

21 A    No.

22 Q    Oh, okay.  I misheard you.  All right.  Let's pull it up.

23 It's 1:28:40, and we're going to look at 524-A.  While we're

24 pulling this up, your Honor, may I ask the court reporter a

25 quick question?

1              (Brief Pause.)

2    BY MS. MATZ:

3    Q   When I asked you just a second ago if you said you say

4    that all the time, is the reason you said no because you said

5    I use that all the time?

6    A   I was talking in reference to the Fox News CNN comment

7    because reporters take a side.  So that's what I was following

8    up on.  I thought you were talking about me saying I say ho

9    all the time, and I was like in reference to what.  So I was

10   confused, yes, ma'am.

11   Q   Okay.  You were confused.  Okay.  Even though that was the

12   question before?

13   A   I'm sorry?

14              MR. SABBAK:  Your Honor, this is badgering.

15              THE COURT:  I'm sorry.  You know, if a witness

16   answers the question directly, then I would certainly

17   understand the objection, but I'm not sure that the witness

18   has yet provided a clear answer to this question.  So the

19   plaintiff can continue with her.

20              THE WITNESS:  Did you ask a question?  Because I

21   thought you were just implying something.

22              MS. MATZ:  I'm saying you're -- I'm sorry, your

23   Honor.

24              THE COURT:  It is the questions that you're asked

25   that the objection would have to speak to.  So the objection

1  that was made by your lawyer would not be speaking to anything

2  that you've done.  So just ask your next question.

3  BY MS. MATZ:

4  Q   Sure.  The question I'm asking is you're saying you made

5  that comment "I use that all the time," and you're saying you

6  were referring to CNN Fox even though that was the question

7  before.  And when you said that, we were talking about the ho

8  comment; is that correct?

9  A   I'm sorry, Sarah.  I'm confused.  I basically answered

10  your question when you said -- when I was saying I say that

11  all the time, I was talking about CNN Fox.  That's all that I

12  was talking about, nothing else.

13  Q   Okay.  Let's pull up this time code at 1:28:40.  Is ho a

14  word that you do use on somewhat of a regular basis?

15  A   Yes, ma'am.

16  Q   Okay.  So it's fair to say you do use the word?

17  A   Oh, yeah.  I use ho.

18  Q   Great.

19       (Whereupon, an audio recording was played.)

20  BY MS. MATZ:

21  Q   All right.  Let's pause there.  Were you calling that

22  woman a prostitute?

23  A   No.  I was calling her an old ho, sort of like a bitch.

24  Q   So you were not trying to imply that she was a prostitute?

25  A   No.

```
 1   Q    Okay.

 2   A    I don't know her.

 3   Q    All right.  Yesterday you testified that you -- that you

 4   believe that my client hopping into the comments and

 5   responding to the Starmarie Jones video made her look guilty.

 6   Do you recall talking about that?

 7   A    Yes, ma'am.  That's correct.

 8   Q    All right.  And you made a similar statement actually in

 9   the Jones video; is that correct?

10   A    I don't remember.

11   Q    You don't remember saying that by responding, she's making

12   herself look guilty?

13   A    Yes.  That is correct.  That's exactly what I said.

14   Q    Okay.  And you said that to Starmarie Jones; correct?

15   A    That is correct.

16   Q    And do you also recall saying in that video that when

17   Starmarie Jones was talking about how Cardi had jumped into

18   comments, you saying, well, you were specific enough to get

19   Cardi to respond, so there obviously must be some truth to it?

20   Do you recall saying that?

21   A    That is correct, yes, ma'am.

22   Q    And what you were saying was that because my client

23   responded and said these things aren't true, that the mere act

24   of her responding made you think that there was some truth to

25   it?
```

1    A    That is correct, yes, ma'am.

2    Q    And, generally speaking, you think that celebrities, when

3    they are talked about and statements are made about them,

4    should just move on; right?

5    A    If it's not true, yes, ma'am.

6    Q    So if the statements that are being made about them are

7    not true, they should say nothing; correct?

8    A    Correct.

9    Q    And in the Lovelyti video you talked about this concept in

10   reference to Usher; is that right?

11   A    That is correct.

12   Q    Okay.  And you were saying that Usher, when women were

13   coming out and saying things about him, that he just moves on

14   because controversy is good for business; correct?

15   A    That is correct, yes, ma'am.

16   Q    All right.  And you said -- and then you went on to say to

17   Lovelyti this is controversy, this is good for business;

18   correct?

19   A    That is correct, yes, ma'am.

20   Q    All right.  And you were talking about your business;

21   correct?

22   A    A collective whole, the celebrities as well as the

23   entertainment news reporters.  So a lot of celebrities do give

24   us stories to put out so that they can create publicity to

25   sell albums or clothes or merchandise and things like that.

1  So Usher profited big.  He got a residency at Vegas even after

2  the controversy came out of two women accusing him of giving

3  them herpes.  So it didn't damage his career at all.  He just

4  ignored it.

5  Q    Okay.  Did you put that story out about him?

6  A    I was one of the reporters that did talk to one of the

7  women involved with him.

8  Q    Okay.  And so you believe that it was good for him.

9  That's your testimony?

10 A    Absolutely.  It didn't damage him because he did not

11 respond.

12 Q    Do you know that -- do you understand being good for him

13 and not damaging him are two different things?

14 A    It depends on the context in which you're using it.

15 Q    Well, I just asked you if your belief is that it's good

16 for him, and you said it didn't damage him.  So I'd like you

17 to answer my question.  Do you believe it was good for him?

18 A    Well, I can't speak in reference for him, being good for

19 him.

20 Q    I want you to answer my question about what you --

21 A    I'm talking about the business.

22       THE COURT:  Hold on a second.  I think she's

23 answered.  You said, do you believe it was good for him?  And

24 she was saying I can't speak in reference to him.  So that's

25 really the answer, isn't it?

```
1            MS. MATZ:  I was asking her what she thought because
2    she was just testifying about what she thinks is good for the
3    collective.  So now she's saying she can't answer, but I guess
4    I'll accept that.
5            THE COURT:  Just ask your next question.  Okay?
6    BY MS. MATZ:
7    Q    Sure.  All right.  You have also testified that you think
8    it's okay for people to defame my client and that it's my
9    client's job to get that stuff taken down?
10   A    That is correct.
11   Q    All right.  So you think that, with reference to my
12   client, that it's okay to defame her and that when you or
13   other people defame her, she should say nothing and just let
14   them defame her until the end of time; correct?
15   A    I'm sorry?  Say that question again.
16           MS. MATZ:  Can you read it back.  Is there any chance
17   you can read it back?
18           THE COURT:  So you think that, with reference to my
19   client, that it's okay to defame her and that when you or
20   other people defame her, she should say nothing and just let
21   them defame her until the end of time; correct?
22           THE WITNESS:  No, ma'am.
23   BY MS. MATZ:
24   Q    But you don't think she should respond because that makes
25   her look guilty; right?
```

1   A    That is correct, yes, in the comments.  She's a big star.

2   Q    All right.  Let's look at D-34.  So before we pull this

3   up -- I'm sorry.  Yesterday we looked at a video that has been

4   referred to in this trial as the beer bottle video.  Do you

5   know what I'm talking about?

6   A    Yes, ma'am.

7   Q    And this is the video of a woman on a stripper stage

8   putting beer bottles in her private parts; correct?

9   A    That is correct, yes, ma'am.

10  Q    Okay.  And when you were deposed in this action, you said

11  that you found this on Pornhub; correct?

12  A    That is correct at the time, yes, ma'am.

13  Q    Okay.  And yesterday you mentioned that it was on some

14  other top porn sites that are monetizable.  Do you remember

15  saying that?

16  A    Yes, ma'am, that is correct.

17  Q    Did you find that later?

18  A    Yes, ma'am.

19  Q    Okay.  So that was after you were deposed and after you

20  put out the statements about my client, quote, fucking herself

21  with a beer bottle; correct?

22  A    I'm sorry.  Did I find what later?  The video later?

23  Because I had already seen the video.

24  Q    No, the other sites you were talking about yesterday.

25  A    Oh, no.  It was already on sites, and I was just telling

1  you which site that I saw it on at the time.  You didn't ask

2  me to name all the sites, so I just told you which site that I

3  had viewed it on at the time, which I believe it's now taken

4  down from that.  And then it's reuploaded and still

5  monetizable on Pornhub.

6  Q   Yeah, that's what I'm asking.  I'm asking at the time you

7  found it on Pornhub, and you're saying since then, you've seen

8  it other places.  That's your testimony?

9  A   Well, I've seen it other places then, but you asked me

10 what was the main site.  So I only specifically gave you that

11 site, but it's everywhere.

12 Q   I asked you what the main site was?  That's what you're

13 saying?

14 A   Something like that, yes, ma'am.

15 Q   Okay.  So you didn't mention in your deposition any of

16 these other sites you're claiming you found it on?

17 A   No, ma'am, but it's googable.  You can find it right now

18 if you want to search.

19 Q   All right.  So when you were deposed almost a year ago,

20 which is closer in time than to when you published the

21 statements about this, you testified about Pornhub --

22 A   Yes.

23 Q   -- and the whole search process of getting there and

24 didn't mention any of these other sites.  But sitting here

25 today and yesterday, you're telling us later in time that you

1  found it on other sites too?

2  A   Yes, ma'am.  It's everywhere.

3  Q   Okay.  All right.  And you do recall also -- well,

4  yesterday you said --

5  A   Sarah, I'm so sorry.  The reason I'm straining and I have

6  a headache is because you look down when you ask a question.

7  Can you just look at me?  Because I'm trying to follow your

8  words because I don't want to answer something and get it

9  wrong.  So it's hard to see what you're saying when you're

10  looking down because I don't know if you're talking to me.

11  Q   I'm happy to get my face closer to the mike.  My notes are

12  down here, so I have to look down some.

13  A   Okay.  Thank you so much.

14  Q   But I will try to speak a little louder.

15  A   Thank you.

16  Q   Sure.  You testified yesterday, I believe, that you

17  thought you could see my client in the video; is that correct?

18  A   That is correct.

19  Q   All right.  And your testimony is that you can see her

20  face?

21  A   You can't see her face.  But it was labeled as her, and it

22  looks just like her.

23  Q   Well, okay.  Hold on.  I didn't ask you what it was

24  labeled as.  I asked you if you could see her face.  And

25  you're saying no; correct?

1   A    Oh, you can't clearly see, no.

2   Q    All right.  You can't clearly see a face in this video of

3   this woman; correct?

4   A    That is correct, yes, ma'am.

5   Q    Okay.  And, well, let's pull it up for a moment.

6   A    Okay.

7         MS. MATZ:  And if you to want play it until

8   five-second mark, please.

9         (Whereupon, a video recording was played.)

10  BY MS. MATZ:

11  Q    Okay.  Sorry to pause at this angle, but I have a few

12  questions.  So in this video you can see the underside of this

13  woman's arms; correct?

14  A    Barely.  It's kind of blurry, but, yeah, you can see her

15  arms.

16  Q    Yeah, you can see her arms; correct?

17  A    Yes, ma'am.

18  Q    Okay.  And do you see any tattoos on the underside of

19  those arms?

20  A    No, ma'am.  It's kind of blurry.

21  Q    Do you see any black or dark spots that look like tattoos

22  there?

23  A    Yes.  When she's giving the beer bottle back, there's a

24  black shadow on her arm.

25  Q    Okay.  Let's pull up Plaintiff's 1005.  Your testimony is

1  you think you see a tattoo in there?

2  A   I don't see a tattoo.  I see a black shadow.  I just

3  stated that.

4  Q   Does it look like a tattoo to you?

5  A   I can't tell what it is.  It's a black shadow.

6         MS. MATZ:  Is there any way to get these up side by

7  side?  Just put it on a separate desktop, Tom, so that there

8  isn't other stuff behind it.  Do you know how to do it?

9         (Brief Pause.)

10 BY MS. MATZ:

11 Q   Okay.  I have up in front of you the video that was marked

12 as D-34 and is in evidence paused at 5 seconds and the photo

13 of my client that is marked as P-1005 that was also previously

14 admitted into evidence.  Do you see those two things?

15 A   Yes.  I see both.

16 Q   Okay.  And do you see the tattoos on my client's arms?

17 A   Yes.  I see tattoos on your client's arms.

18 Q   Okay.  And do you see those same tattoos on this woman in

19 the video?

20 A   No, ma'am.

21 Q   Okay.  Not on either side; correct?

22 A   I can't tell for the other side, but this side where the

23 shadow is at the bottom of her hand when she's given the beer

24 bottle, there's obviously no tattoos right there.

25 Q   And we're talking about the left arm that's kind of going

1  down?

2  A    Yes, ma'am.  She's given the beer bottle.

3  Q    Okay.  All right.  Now, you can also kind of see the hips

4  on this woman a little bit; correct?

5  A    No, ma'am.

6  Q    You can't see any part of -- well, you can see her torso a

7  little?

8  A    She has a small frame just like Cardi.

9  Q    Ma'am, please answer the question.  I asked if you could

10  see her torso.

11  A    Yes.  I can see her stomach, yes, ma'am.

12  Q    Okay.  Do you think my client is the only woman with a

13  small frame?

14  A    No, ma'am.

15  Q    Thank you.  Okay.  Let's look at -- let's move the video

16  to the 45-second mark.  You don't have to play it if you want

17  to just move it.  Okay.  All right.  Great.  So here you can

18  see the woman's hips a little bit and her torso a little

19  better?  You see that?

20  A    That is correct, yes, ma'am.

21  Q    Okay.  And you can also see the other arm; correct?

22  A    That is correct, yes, ma'am.

23  Q    Okay.  And so let's look at the arm first.  Do you see the

24  tattoo that's on my client's -- actually, I'm going to talk

25  about the sides of the photos here.  So the tattoo that is

1  on -- if you look at the photo of my client, the tattoo that's

2  on the left-hand side that says Hennessy, do you see that?

3  A   Yes.  That is correct.

4  Q   Do you see that on this woman, on the arm of this woman

5  who's on the left-hand side?

6  A   No, ma'am.  I don't see anything.

7  Q   Okay.  And, if we could, keep the video up, but put up

8  Plaintiff's 1007.  You can just go down a little bit.  Okay.

9  And you heard my client testify about her cheetah tattoo;

10  correct?

11  A   Yes, ma'am.

12  Q   And you can see that on the hip in this photo.  Do you see

13  that?

14  A   That is correct, yes, ma'am.

15  Q   And you don't see that on the woman's hip area in this

16  video; correct?

17  A   It looks -- no.  It's kind of blurry right there, but, no,

18  ma'am.

19       MS. MATZ:  And, Tom, can you just scroll the video a

20  little to get a little bit of an angle on the other hip.

21  Yeah, right there.  All right.  If we can also -- so this is

22  now the video paused at the -- can you hover so I can see the

23  mark -- 46-second mark.  Can we pull up Plaintiff's 1011,

24  please.  Okay.

25       And you heard my client testify about this tattoo as

1  well; correct?

2          THE WITNESS:  Yes.  I heard her testify.

3  BY MS. MATZ:

4  Q   Okay.  And you saw this photo?

5  A   Yes.  This is a photo from her -- looks like her Love &

6  Hip Hop days.

7  Q   Well, you heard my client testify that she had this tattoo

8  when she was a stripper also; correct?

9  A   Yes.  That is correct.

10 Q   Okay.  And do you see this tattoo on the other side of the

11 woman's body in the video?

12 A   No, ma'am.  It's kind of blurry.  But, no, I don't see any

13 tattoo -- well, I can't tell if there's imprint there because

14 it's kind of blurry.  There's a black shadow.

15 Q   But this is a very large tattoo; correct?

16 A   Yes, ma'am.  She's had it filled in over the years.

17 Q   Right.  But you don't see it anywhere on the left-hand

18 side of that woman's body; correct?

19 A   No, ma'am.  It's --

20 Q   Okay.  Thank you.

21 A   Okay.

22 Q   In D-8 you also said -- do you recall making the statement

23 no one can defame a person who's defamed herself fucking

24 herself with beer bottles on stripper stages and dildos?

25 A   That is correct, yes, ma'am.

1  Q    All right.  And this was the video you were talking about?

2  A    Yeah.  That is correct, yes, ma'am.

3  Q    Okay.  Do you see any dildos in this video?

4  A    No, ma'am.

5  Q    Okay.  And did you play this video for your viewers?

6  A    Oh, no, ma'am.

7  Q    And any of these other porn sites that you've talked about

8  during your testimony yesterday and today, do you understand

9  their verification processes for videos?

10  A    Verification processes for videos for what exactly?

11  Q    Do you know if they verify the sources of their videos?

12  A    I have no idea.  I can't speak for the company.  I don't

13  know.

14  Q    Okay.  Thank you.

15  A    Okay.

16  Q    If we could please pull up Plaintiff's 943 again -- we can

17  take this down.  Okay.  You recall seeing a version of this

18  photo yesterday that your attorney showed you; right?

19  A    That is correct, yes, ma'am.

20  Q    Okay.  And you recall, though, looking at this photograph

21  when I was both deposing you and when I directed you last week

22  on the stand; correct?

23  A    Yes, ma'am, and others.

24  Q    Okay.  And so this is the photo that you were looking at

25  with your attorney yesterday; correct?

1    A    Yes, ma'am.

2    Q    And this version of it is just the version that you posted

3    online saying done herpes B, see you in court; correct?

4    A    That is correct, yes, ma'am.

5    Q    All right.  And you do recall testifying, though, that you

6    didn't know where this photo came from or if it had been

7    edited in any respect?

8    A    That is correct, yes, ma'am.

9    Q    All right.  And when your attorney blew this photo up and

10   circled it and you said that's a cold sore, you recall that

11   testimony?

12   A    That is correct, yes, ma'am.

13   Q    Okay.  But you don't know for a fact that that's what it

14   is; correct?  You're just looking at the photo and saying what

15   you think it is; right?

16   A    That is correct, and the other bumps around the top of her

17   mouth too.

18   Q    You don't know what those are either, though; correct?

19   You're just looking at it and saying what you think they are;

20   correct?

21   A    That is correct, yes, ma'am.

22   Q    Great.  So you looked at this photo, and you decided that

23   you thought my client had herpes; correct?

24   A    And other photos, yes, ma'am.

25   Q    All right.  You also testified that, yesterday, that you

1  thought -- excuse me.  Withdrawn.  Let me start that over.

2  You testified yesterday that when you were talking about

3  herpes in the Starmarie Jones video, that you understood that

4  they were serious allegations; correct?

5  A    That is correct, yes, ma'am.

6  Q    Thank you.  And you have also admitted that you knew even

7  before you posted the video if Starmarie was lying, it was

8  straight defamation; correct?

9  A    That is correct, yes, ma'am.

10  Q    And yesterday you testified that you believed that

11  Starmarie was credible; is that correct?

12  A    That is correct, yes, ma'am.

13  Q    Okay.  You've also given a lot of testimony and made a lot

14  of statements about her past and the fact that she had a

15  criminal past; correct?

16  A    That is correct.

17  Q    You admitted you knew she was on probation; correct?

18  A    At that time.  She wasn't on probation when I talked to

19  her.

20  Q    She was on probation at the time she alleged all these --

21  she knew all these things; correct?

22  A    Yes.  She was very honest about that.

23  Q    Okay.  And you admitted that at that time she had to go to

24  Georgia to check in with her probation officer because she had

25  pending charges; right?

1    A    That is correct, pending charges.

2    Q    That's what I said pending --

3    A    Yeah, so she wasn't convicted.

4    Q    I'm sorry.  Do you know that for a fact or are you

5    speculating now?

6    A    That's what she told me.

7    Q    She told you she wasn't convicted but she was on

8    probation?

9    A    That is correct.  She was fighting.

10    Q    All right.  Well, you also said that she couldn't pass a

11    background check; correct?

12    A    That is correct, yes, ma'am.

13    Q    Is it normal for people who have convictions that would

14    enable so they couldn't pass a background check to not have a

15    conviction on their record?

16    A    I mean, I can't speak on that.  I don't know the law in

17    that perspective, and I don't know what she had on her report

18    at the time.

19    Q    Do you recall when you were deposed, admitting that

20    because she was on probation, that, yes, you understood it to

21    mean that she'd been convicted of a crime?

22    A    Of something, but I didn't know what it was.

23    Q    I understand.  But you did admit during your deposition

24    that you understood she'd been convicted of a crime?

25    A    That is correct, yes, ma'am.

1    Q    Thank you.

2    A    Okay.

3    Q    You've also admitted throughout your testimony and your

4    deposition testimony that Starmarie said things that you found

5    to be strange; correct?

6    A    That is correct.

7    Q    Okay.  One of them being that she gave another woman her

8    dirty underwear, which you said threw you for a loop; correct?

9    A    That is correct, yes, ma'am.

10   Q    Okay.  And you also admitted that you thought that her

11   admitting that she was prostituting, despite the fact that she

12   didn't prostitute, didn't sound credible; correct?

13   A    That is correct.

14   Q    And you've admitted that Starmarie told you that the

15   reason she didn't have photos is because she was on probation

16   and shouldn't have been in New York at the time she claimed

17   she was living with my client; correct?

18   A    Yes, ma'am.

19   Q    And she also told you during that interview that the --

20   some of the receipts that she thought she'd be able to provide

21   she couldn't get from people; correct?

22   A    That is correct.

23   Q    And you also admitted that before the Starmarie Jones

24   interview was published you never saw any medical records;

25   correct?

```
 1  A    Of whose medical records?

 2  Q    My client's.

 3  A    Before the interview was published?

 4  Q    Correct.

 5  A    Correct.

 6  Q    You also admitted that you knew during the time the

 7  interview was being taped, which was before it was being

 8  published, that Starmarie felt offended that my client hadn't

 9  acknowledged her in the live on Instagram; correct?

10  A    Before the interview?

11  Q    Before it was published, during the interview before you

12  published it.

13  A    That is correct, yes, ma'am.

14  Q    And you also heard Ms. Jones during the interview

15  attempting to take credit for certain -- we'll call them

16  personality traits of my client, like her hair and sticking

17  her tongue out?

18  A    That is correct.

19  Q    And you've admitted very clearly on multiple occasions

20  that you believed Ms. Jones to have a mental illness; correct?

21  A    That is correct.

22  Q    In the Lovely TI video you said, even if she has a mental

23  illness, which I really think she does; correct?

24  A    That is correct.

25  Q    And you also said Star is crazy, and she will fuck shit
```

1  up.  Do you remember saying that?

2  A   Yes, ma'am.

3  Q   Okay.  And you also said she's not mentally stable;

4  correct?

5  A   That is correct.

6  Q   You said she's not all there; correct?

7  A   That is correct.

8  Q   You also said she's really mixed up; correct?

9  A   I'm sorry?

10  Q   You also said she's really mixed up; correct?

11  A   Messed up or mixed up?

12  Q   Mixed up.

13  A   Oh.  Was it in the Lovelyti call?

14  Q   Yes.

15  A   Then, yes, ma'am.

16  Q   And you also said that she and all the strippers you

17  thought were lying; correct?

18  A   That is correct, yes, ma'am.

19  Q   You also talked about in the Lovely TI call -- Lovelyti

20  call.  Excuse me.  You also talked about in the Lovelyti call

21  that Jones had an assault charge and was fragile and could

22  snap at any moment; correct?

23  A   That is correct.

24  Q   So at least at the time the Lovelyti call was published,

25  you knew that one of the things she was being charged with was

1   assault; correct?

2   A   Oh, that is correct.

3   Q   All right.  And you also knew that Lovelyti did not

4   believe Starmarie Jones; correct?

5   A   That is correct.

6   Q   She told you that on a couple different occasions; right?

7   A   That is correct based off of the receipts that she had

8   received.

9   Q   And she said I don't believe Star; correct?

10  A   Yes, ma'am.

11  Q   And she said she was inconsistent; correct?

12  A   In the call that I recorded?

13  Q   Lovelyti said that to you, that she thought Star was

14  inconsistent; correct?

15  A   In her -- in the recording she said that?

16  Q   Yes, in the recording.

17  A   Oh, okay.  Then yes.

18  Q   And you also heard Lovelyti say to you in the recording

19  that she thought Star had a mental illness; correct?

20  A   That is correct.

21  Q   And that she thought that Star had actually lied about you

22  and that Star had said that you offered her a job in exchange

23  for the interview; correct?

24  A   That is correct, yes, ma'am.

25  Q   And you also heard Lovelyti say that she thinks Starmarie

1   is crazy and a liar; correct?

2   A    That is correct, yes, ma'am.

3   Q    You also admit that in the Lovelyti call that you thought

4   that Star had told some lies and had exaggerated; correct?

5   A    That is correct, yes, ma'am.

6   Q    And you also admit that when you discussed -- excuse me.

7   You also admit that when you took screenshots from Ash Cash

8   Legit, Ash Cash Legit said Cardi never even did any of this

9   shit with her; correct?

10  A    I said that in the call?

11  Q    No.  You acknowledged that that's one of the things that

12  was in Ash Cash Legit's comments to you; correct?

13  A    Yes.  She also said Cardi fucked with her.

14  Q    I'm asking you if that was one of the things in her

15  comments?

16  A    That is correct, yes, ma'am.

17  Q    Thank you.  I appreciate that.  And you also acknowledge

18  that one of the things Spotlight told you was that what Star

19  is saying is a, quote, fucking load of shit; correct?

20  A    That is correct, yes, ma'am.

21  Q    Okay.  And you also admit that one of the other things

22  that Spotlight told you was -- I'm sorry.  It was the wrong

23  person.  Apologies.  You also admit that Shawn Taloran told

24  you that Spotlight punched her because Star was always lying

25  on people; correct?

1   A    That is correct.

2   Q    Okay.  And when your attorney asked you yesterday what

3   Starmarie Jones was lying about, the first part of your answer

4   you said, one thing for sure is that she communicated to other

5   platforms.  Do you recall giving that testimony?

6   A    That she communicated to other platforms?

7   Q    You said, one thing for sure is that she communicated to

8   other platforms that I offered her a radio job.  Do you

9   remember saying that?

10  A    Oh, yes.  That is correct, yes, ma'am.

11  Q    Okay.  And you also testified about at least one other

12  thing that you felt that Starmarie Jones was lying about?

13  A    That is correct, yes, ma'am.

14  Q    Okay.  So you knew Ms. Jones was an admitted liar?

15  A    To some things, yes, ma'am.

16  Q    And you knew that she had a criminal history?

17  A    Yes, ma'am.

18  Q    And you believe she had a mental illness and was not

19  stable?

20  A    Yes, ma'am.

21  Q    And other people who knew her and would have been present

22  or known the parties involved at the time Ms. Jones claimed

23  that these things occurred, were all telling you that she was

24  lying or was full of shit; correct?

25  A    That is correct, yes, ma'am.

1  Q   You recall testifying in your deposition that you didn't

2  know whether or not my client actually has herpes; correct?

3  A   Oh, that is correct, yes, ma'am.

4  Q   But despite all that, you also testified that you wanted

5  to drop the video before anyone debunked it.  Do you recall

6  giving that testimony?

7  A   That is correct, yes, ma'am.

8  Q   And you also recall giving the testimony that even though

9  Lovelyti told you that she had information that was going to

10  contradict the interview you were planning on putting out,

11  your attitude was drop it, I don't give a, quote, fuck about

12  Cardi, drop it; correct?

13  A   That is correct, yes, ma'am.

14  Q   And you also recall testifying that you didn't even want

15  the information that Lovelyti was referring to; correct?

16  A   That is correct, yes, ma'am.

17  Q   And you also recall testifying that you kind of planned

18  those drops with her; correct?

19  A   Yes, ma'am.  It was scheduled between the two of us.  She

20  wanted to wait to make sure her news wasn't fake, but it

21  turned out it was.

22  Q   Okay.  And so at the time you dropped the video, you knew

23  there might be information out there contradicting that

24  Starmarie was telling the truth; correct?

25  A   That is correct, yes, ma'am.

1  Q   And you dropped the video anyway because you wanted to

2  bring ratings; correct?

3  A   Yes, ma'am.  That was one of the things.

4  Q   Well, you admitted that it was your primary motive for

5  doing this interview in your deposition; correct?

6  A   That's my primary motive for every interview, yes, ma'am.

7          MS. MATZ:  Your Honor, could I just take a very short

8  break?  I just -- I'm not sure how much I have left.  I just

9  want to check my notes and --

10          THE COURT:  Well, let's take a break, and if

11  everybody can stay, other than the jury, if everybody can stay

12  in the courtroom for a moment so I can get a sense of where we

13  are too.  All right.  Ladies and gentlemen, we're not going to

14  stay later than 5:00.

15          COURTROOM SECURITY OFFICER:  All rise for the jury.

16          (Whereupon, the jurors exited the courtroom.)

17          THE COURT:  All right.  Thank you.  So I want to ask

18  plaintiff -- y'all can go ahead.  And, counsel, I would like

19  to know how much longer you think you have.  And, Mr. Sabbak,

20  do you have any idea how long your redirect will go?

21          MR. SABBAK:  We'll see how much more direct she has,

22  I guess.

23          THE COURT:  But as of right now, do you know how

24  long, how much time you need?

25          MR. SABBAK:  Not much.

1          THE COURT:  Okay.  All right.

2          MS. MATZ:  Your Honor, I'm sorry to interrupt.  My

3  client needs to use the restroom.  Could she go while we're

4  talking?

5          THE COURT:  Yeah, absolutely.

6          MS. MATZ:  Thank you.

7          THE COURT:  That's really all I was going to ask

8  anyway.  I would like to have some information.  I mean, at

9  some point you just kind of have to cut the cord.

10          MS. MATZ:  I think I'm pretty close to done.

11          THE COURT:  Okay.  All right.  Thank you.

12          (Brief recess.)

13          THE COURT:  All right.  Are y'all ready?

14          MR. SABBAK:  We are.

15          COURTROOM SECURITY OFFICER:  Ready?

16          THE COURT:  Yes, sir.

17          To the gentleman in the red shirt, you need to pull

18  your mask up, please.  Thank you.

19          COURTROOM SECURITY OFFICER:  All rise for the jury.

20          (Whereupon, the jurors entered the courtroom.)

21          COURTROOM SECURITY OFFICER:  You may be seated.

22  BY MS. MATZ:

23  Q   All right, Ms. Kebe.  Isn't it true that there's not one

24  person here testifying on your behalf who has personal

25  knowledge that my client has herpes, was doing cocaine or was

1  prostituting; correct?

2  A    That is correct.

3  Q    And there's not one person here in this trial who's

4  testifying on your behalf who has personal knowledge to

5  testify that my client has HPV; correct?

6  A    That is correct.

7  Q    And there's not one person here with personal knowledge

8  who's going to testify that it is my client in that beer

9  bottle video; correct?

10  A    That is correct.

11  Q    And there's also not one person here who's going to

12  testify with personal knowledge on your behalf that my client

13  cheated on her husband; correct?

14  A    That is correct.

15  Q    All right.  Now, you admitted at your deposition that you

16  didn't know whether or not my client had herpes; correct?

17  A    That is correct.

18  Q    Okay.  And since then, you have also admitted that you

19  have repeatedly published social media posts and videos that

20  contain that statement; correct?

21  A    That is correct.

22  Q    You also said my client has herpes yesterday on the stand;

23  right?

24  A    That is correct, cold sores to be exact.  It's a form of

25  herpes.  I don't want to --

```
1   Q   Hold on.  Hold on.  You answered the question.

2   A   Okay.  I did.  So, yes, ma'am.

3   Q   Okay.  Yesterday isn't it true that you testified -- you

4   said, I mean, it's herpes.  You said that; correct?

5   A   I'm sorry.  To what statement?

6   Q   You said -- all right.  We'll read it back to you.

7   A   What was the question I was answering?  I'm so sorry.

8   Q   You don't recall using the word "herpes" describing my

9   client?

10  A   Yeah, we were talking about herpes, but I want to know

11  what question I --

12  Q   I'm asking you what you recall.

13          THE COURT:  One at a time, please.

14          MS. MATZ:  One moment, your Honor.  Your Honor, it's

15  just taking me one moment to find this site.

16          Okay.  When you were testifying about where you heard

17  about my client's cold sores, do you recall saying there have

18  been pictures and so I just kind of compiled everything before

19  I made that video, but I didn't focus on the herpes because, I

20  mean, it's herpes?

21          THE WITNESS:  That's correct, yes, ma'am.

22  BY MS. MATZ:

23  Q   That's the testimony you gave; correct?

24  A   That is correct, yes, ma'am.

25  Q   Okay.  And you've also admitted, at least as of a year ago
```

1  approximately, in November of 2020 when you were deposed, that

2  you have known about my client's negative test results;

3  correct?

4  A   That is correct.

5  Q   Okay.  But yesterday you said, I mean, it's herpes;

6  correct?

7  A   That is correct.

8  Q   And you expect this jury to believe you; correct?

9  A   I can't speak for the jury.  I can only speak for myself.

10 Q   Okay.  So it's okay if they don't believe you; correct?

11 A   Whatever their opinion is from the exhibits and the

12 testimony in this case, that's what they're going to base

13 their opinion off of.  I can't speak for them.

14        MS. MATZ:  All right.  I don't have anymore

15 questions, your Honor.

16        THE COURT:  Thank you.  Mr. Sabbak.

17        MR. SABBAK:  No redirect, your Honor.  Thank you.

18        THE COURT:  All right.  Thank you, ma'am.

19        THE WITNESS:  Thank you.

20        THE COURT:  Any other witnesses or evidence from the

21 defendant?

22        MS. IZMAYLOVA:  The defense rests, your Honor.

23        THE COURT:  All right.  Thank you.  Any rebuttal

24 testimony from the plaintiff?

25        MS. MATZ:  Could we just have a moment to confer?  I

1 know we just took a break.  I apologize, your Honor.

2　　　　　THE COURT:  It's okay.

3　　　　　MS. MATZ:  No, your Honor.

4　　　　　THE COURT:  All right.  Thank you.

5　　　　　All right, ladies and gentlemen.  The evidence in

6 this case is now closed.  The plaintiff has offered no

7 rebuttal testimony, and so that ends our evidence

8 presentation.  We'll come back on Monday morning at 9:30, and

9 at that time the lawyers will be ready to make their closing

10 arguments to you.  I have in consultation with the lawyers

11 agreed to extend to each side an hour and 15 minutes to sum up

12 and make arguments to you about what they think the evidence

13 is and what they think you as the jury, when considering the

14 facts and the law, should do at the end of this case.

15　　　　　The plaintiff will have the option to both open and

16 close the closing arguments.  In other words, they get to

17 start, and they get to finish since they have the burden of

18 proof.  But they get no longer than the hour and 15 minutes,

19 so they can split their time between the two opportunities to

20 speak to you.  The defendants will have their opportunity to

21 speak to you for that amount of time in the middle of the

22 plaintiff's presentation.

23　　　　　We start at 9:30.  Then sometime shortly before lunch

24 I will charge you on the law that applies in the case.  I will

25 probably charge you before lunch even if that means not taking

1  a lunch till a little bit after 12:00, consistent with kind of

2  what we've done really throughout the case.  You will have the

3  option to begin your deliberations as soon as you go to the

4  jury room.

5         If you wish, we can have lunch brought to you.  We

6  will pay for your lunch on Monday regardless since you'll be

7  deliberating because we'll want you to stay together.  If you

8  go downstairs to eat downstairs, then -- I say brought to you.

9  We'll probably let you go get your food, and you can decide to

10 eat downstairs together, separate from everyone else, but not

11 discussing the case because that can only occur in the jury

12 room.  Or you can bring your lunch back with you and begin

13 your deliberations while you eat.  That's just totally up to

14 you however you wish to do that.

15        So just from a standpoint of planning, I certainly

16 have no idea how long it will take you to reach a conclusion

17 in this case.  You might, to the extent that you work for

18 other people, you might alert them that you might be

19 unavailable for work on Tuesday as well just so they know

20 that's a possibility so that they're not surprised to the

21 extent that you have to be replaced in whatever your job might

22 be.

23        The evidence may be over, but the case is not to you

24 yet.  It will be your duty to refrain from discussing the

25 case, to refrain from trying to read any media about the case,

1   and wait until after the case is over with to do any of those
2   things.  And does anybody have any questions for me?
3          Return at 9:30.  I'm not aware of any weather issues
4   for Monday, so we should be good to go.  We have completed our
5   discussions about what the jury charges are.  The lawyers will
6   receive those as they leave here today, so they'll know
7   exactly what I've decided.  They should be ready to go first
8   thing Monday morning.  So we'll see you on Monday.  Hope you
9   have a nice weekend.
10          COURTROOM SECURITY OFFICER:  All rise for the jury.
11          (Whereupon, the jurors exited the courtroom.)
12          THE COURT:  There was a statement made sometime
13   today, and I don't remember exactly what the wording was.  It
14   was this whole discussion about a lie or misrepresentation and
15   what is and is not that.  Y'all can have a seat for just a
16   second as we finish.
17          It just reminded me of a pretty funny story.  When I
18   was a teenager, I was friends with a lady -- a girl named
19   Marle Carter.  She was the daughter of Billy Carter, who was
20   the brother of the President, Jimmy Carter, because I grew up
21   in that part of the state.  And she took me a couple of times
22   to meet Lillian Carter, Ms. Lillian as she was referred, who
23   was the President's mother, who was quite a character, full of
24   personality.
25          And Ms. Lillian told me this story.  She said one

1  time she was interviewed when her son was running for

2  President in 1976 because the whole issue in that election was

3  Nixon and lying and being honest as President.  And Jimmy

4  Carter was saying he would never lie to the American public.

5  And a reporter, I think from the Today Show, said to her,

6  ma'am, you are his mom.  I mean, you know surely he has lied

7  every now and then.  I mean, you would know better than

8  anyone.  And she said, no, Jimmy is good boy.  He doesn't lie.

9           And, of course, the reporter wouldn't take that at

10  face value and said, well, come on, just every once in a

11  while?  She goes, well, maybe a little white lie every now and

12  then.  And the reporter said, well, Ms. Lillian, kind of like

13  the question that was asked here today, what's a white lie?

14  She said, well, remember when y'all got here this morning, I

15  said how good it was to see y'all?  That was a little white

16  lie.

17           So anything else we need to talk about this evening

18  from the plaintiff?

19           MS. MATZ:  No, your Honor.  Thank you.

20           THE COURT:  Okay.  From the defendant?

21           MS. IZMAYLOVA:  No, your Honor, just are we going to

22  get the charge via email?

23           THE COURT:  Yeah.  You'll get them -- well, we can do

24  both, I guess.

25           LAW CLERK:  We've got hard copies.

```
1            THE COURT:  We've got hard copies we'll hand you
2    right now.  Okay.
3            MS. IZMAYLOVA:  Thank you.
4            THE COURT:  All right.  So you'll see what I did.  I
5    did a little bit of what both of you wanted in regards to the
6    requests, but I primarily relied on the cases that you had
7    cited to me and we went back and read those cases.  And so the
8    way it is is the way it's going to be.  We'll see y'all Monday
9    morning.  Thank you.
10           MS. MATZ:  Thank you, your Honor.
11           MR. SABBAK:  Thank you, Judge.
12           MS. MATZ:  Have a nice weekend.
13           MS. MOORE:  Thank you, your Honor.
14           THE COURT:  You don't need to be here early.  Y'all
15   can be here at 9:30, please.
16           MS. IZMAYLOVA:  We'll just start right into closings?
17   Okay.  Thank you.
18           MR. SABBAK:  Thank you, Judge.  Have a good weekend.
19           COURTROOM SECURITY OFFICER:  Court stands adjourned.
20           (Whereupon, the proceedings were adjourned at 4:30
21   p.m.)
22                          -  -  -
23
24
25
```

1                      REPORTERS CERTIFICATE

2

3

4           I, Wynette C. Blathers, Official Court Reporter for

5    the United States District Court for the Northern District of

6    Georgia, with offices at Atlanta, do hereby certify:

7           That I reported on the Stenograph machine the

8    proceedings held in open court on January 21, 2022, in the

9    matter of BELCALIS MARLENIS ALMÁNZAR v. LATASHA TRANSRINA KEBE

10   and KEBE STUDIOS LLC, Case No. 1:19-CV-01301-WMR; that said

11   proceedings in connection with the hearing were reduced to

12   typewritten form by me; and that the foregoing transcript

13   (Volume VIII of X, Pages 1 through 229) is a true and accurate

14   record of the proceedings.

15          This the 27th day of February, 2022.

16

17

18

19                         _____
                           /s/ Wynette C. Blathers, RMR, CRR
20                             Official Court Reporter

21

22

23

24

25