```
1                 IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF GEORGIA
2                          ATLANTA DIVISION


3

4   BELCALIS MARLENIS ALMÁNZAR,      )
                                     )
5                 Plaintiff,         )
          v.                         )  CIVIL ACTION
6                                    )  FILE NO. 1:19-CV-01301-WMR
    LATASHA TRANSRINA KEBE and       )
7   KEBE STUDIOS LLC,                )
                                     )  JURY TRIAL
8                 Defendants.        )
    _____)  VOLUME IX OF X
9

10

11  ----------------------------------------------------------

12         BEFORE THE HONORABLE WILLIAM M. RAY, II

13              TRANSCRIPT OF PROCEEDINGS

14                  JANUARY 24, 2022

15  ----------------------------------------------------------

16

17

            Proceedings recorded by mechanical stenography
18          and computer-aided transcript produced by

19

                 WYNETTE C. BLATHERS, RMR, CRR
20                  Official Court Reporter
                    1714 U.S. Courthouse
21                  75 Ted Turner Drive, SW
                    Atlanta, Georgia  30303
22                     (404) 215-1547

23

24

25
```

```
1   APPEARANCES:

2   For the Plaintiff:          SARAH M. MATZ
                                Attorney at Law
3                               Adelman Matz, P.C.
                                1173A Second Avenue
4                               Suite 153
                                New York, New York  10065
5
                                LISA F. MOORE
6                               WILLIAM A. PEQUIGNOT
                                Attorney at Law
7                               Moore Pequignot, LLC
                                887 West Marietta Street
8                               Suite M-102
                                Atlanta, Georgia  30318
9
    For the Defendants:         OLGA IZMAYLOVA
10                              SADEER SABBAK
                                Attorneys at Law
11                              Sabbak & Izmaylova, LLP
                                1875 Old Alabama Road
12                              Suite 510
                                Roswell, Georgia  30076
13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | **I N D E X** |
| 2 | |
| 3 | **PAGE** |

PLAINTIFF'S CLOSING ARGUMENT By Ms. Moore....................4

DEFENDANTS' CLOSING ARGUMENT By Ms. Izmaylova...............37

JURY CHARGE.................................................74

VERDICT...................................................115

```
 1                    Monday Morning Session

 2                     January 24, 2022

 3                        9:30 a.m.

 4                         -  -  -

 5                P R O C E E D I N G S

 6          COURTROOM SECURITY OFFICER:  All rise.  United States

 7   District Court for the Northern District of Georgia, Atlanta

 8   Division, is now in session, the Honorable Judge William M.

 9   Ray II presiding.

10          THE COURT:  Thank you.  Y'all can be seated, please.

11   All right.  Good morning.  Is the plaintiff ready to proceed

12   with closing?

13          MS. MOORE:  Yes, your Honor.

14          THE COURT:  All right.  Defendant ready?

15          MS. IZMAYLOVA:  Yes, your Honor.

16          THE COURT:  All jurors are here?  Okay.  You can

17   bring them in.  Thank you.

18          COURTROOM SECURITY OFFICER:  All rise.

19          (Whereupon, the jurors entered the courtroom.)

20          THE COURT:  All right.  Y'all can have a seat,

21   please.  Thank you.  You may proceed.

22          MS. MOORE:  Members of the jury, I want to thank you

23   for your service.  My client and our legal team are sincerely

24   appreciative of your careful attention to all the testimony

25   you've heard, the videos you've seen, the documents that have
```

1  been introduced, much of which is admittedly hard to see and

2  hear.

3         Being a juror is the most important job in modern

4  society, but I'm cognizant that it is highly disruptive of

5  your life.  Being away from your families and jobs and lives

6  is very difficult even under the best of circumstances but

7  particularly during a pandemic.

8         Last Monday Judge Ray told you that the parties had

9  decided you were the best jury to decide the case.  Based on

10  your diligence, your patience, and your dedication to this

11  process, we now know that our collective instincts were right.

12         So let's talk about why we're here.  My co-counsel,

13  Ms. Matz, told you during opening statements this is not a

14  case where defendant said merely hurtful and untrue things or

15  criticized my client or her music.  Ms. Matz told you this was

16  not an isolated event, and true to her word the evidence has

17  shown you that for years the defendants have knowingly and

18  intentionally published defamatory statements that are both

19  vile and provably false about my client for profit and to

20  torture her out of spite and have refused to stop, all out of

21  avarice and hate.

22         Ms. Kebe and Kebe Studios under her control

23  purposefully and relentlessly defamed my client by publishing

24  highly offensive despicable falsehoods in videos and written

25  posts that are on social media for the whole world to see.

1          Defendants have repeatedly defamed my client saying

2  that she was or is a prostitute, which is a crime.

3          (Whereupon, a video recording was played.)

4          MS. MOORE:  My client testified that she is not nor

5  has she ever been a prostitute.  Defendants admitted that they

6  have no evidence to prove that my client is or was a

7  prostitute, and they published this defamatory statement as a

8  statement of fact.  They admitted that they made these

9  statements with actual malice, meaning the defendants had

10  actual knowledge of the falsity of the statement or had a

11  reckless disregard for the truth or falsity of the statement.

12          Defendants have also published false and defamatory

13  statements that Cardi uses or has used cocaine, which is a

14  crime.  My client has testified that she's never done cocaine.

15  In addition to being a crime punishable by law, my client

16  testified why this false and highly offensive statement that

17  has been repeated by the defendants is so objectionable to

18  her.  Cocaine decimated the community that she came from.  It

19  is looked down upon in her community.  It is very beneath the

20  people from her community.  It's not acceptable under any

21  circumstances because of what that drug has done to that

22  community.

23          Defendants admitted they have no evidence to prove my

24  client has ever used cocaine.  They've also admitted that they

25  made these statements with actual malice.

1    Defendants also published false and defamatory
2  statements that my client has engaged in adultery, which is a
3  crime.
4    (Whereupon, a video recording was played.)
5    MS. MOORE:  My client testified that she's never
6  cheated on her husband.  The defendants admitted that they
7  have no evidence to prove my client has ever committed
8  adultery.  They also admitted that they've published these
9  statements with actual malice.
10    Defendants have knowingly published false statements
11  that my client appears in a video where a woman is seen
12  committing a debasing act with a beer bottle.
13    (Whereupon, a video recording was played.)
14    MS. MOORE:  My client testified that it is not her
15  and the beer bottle.  The defendants admitted that they know
16  this is not my client in the video, and they made these
17  statements with actual malice.
18    Defendants have published knowingly false statements
19  that my client has two contagious disorders, namely herpes and
20  HPV, which are sexually transmitted diseases.
21    (Whereupon, a video recording was played.)
22    MS. MOORE:  My client testified that she does not
23  have herpes or HPV, and we have introduced negative herpes and
24  HPV test results administered by her doctor at UCLA that you
25  see in front of you.

1          In his opening defense counsel said that this was

2   only an allegation about cold sores said in passing during the

3   Starmarie Jones interview.  As the mountain of evidence

4   presented by the plaintiff has shown, this is patently false.

5   We introduced enumerable examples where defendants published

6   statements calling my client herpes B, even though they knew

7   my client had put them on notice the very same day at the

8   Starmarie Jones promo to let them know she did not have

9   herpes.  Even though they received three demand letters from

10  three different law firms, even though they know my client's

11  negative test results, they continue to knowingly publish

12  these lies.  This is actual malice.

13          All of the defamatory statements made by the

14  defendants about my client are statements of fact, and each

15  one has been proven false.  Tasha K testified what she relays

16  to her viewers on a regular basis is that she is publishing

17  facts.

18          (Whereupon, a video recording was played.)

19          MS. MOORE:  In his opening statement defense counsel

20  said that everyone is familiar with opinion, but Tasha

21  admitted that she publishes each of the defamatory statements

22  as a statement of fact.  She admitted that she did not use the

23  word "opinion."  And even if she had, which she did not, that

24  still would not insulate the defendants from liability because

25  these are clearly statements of fact that can be proven false.

1   They are not subjective opinions that cannot be proven false.

2          Mr. Sabbak also said in his opening that Tasha

3   typically investigates all stories before publishing them as

4   either fake news or real news.  As you heard Tasha admit, she

5   never published any of the defamatory statements about my

6   client as fake news.  She presented them all as facts.  He

7   also said that like all good journalists and reporters do,

8   defendants wanted the story, and the reason we are all here is

9   because defendants got the story.  We all know that is not the

10  reason we are here.

11         While Tasha calls herself a journalist and says her

12  stories are true in her videos and social media posts, she

13  admitted that she is not a journalist and that she frequently

14  tells viewers lies about various issues, including about

15  whether she has receipts to back up her stories.  A good

16  journalist would immediately correct a well-researched but

17  inadvertent mistake and issue a retraction, not knowingly

18  engage in a campaign of defamatory lies for years and years

19  and refuse to retract.  This isn't journalism.

20         Defense counsel also said in his opening that you

21  would hear direct evidence that each of the allegations are

22  true.  That was also patently false.  My client has credibly

23  denied that she is a prostitute, that she's ever done cocaine,

24  that she has herpes or HPV, that she cheated on her husband or

25  that she's engaged in a debasing act with a beer bottle.

1          The defendants admitted that they have no evidence to

2    prove any of the defamatory statements.  They have not

3    tendered a single piece of evidence or a single witness to

4    corroborate any of these defamatory statements.  They admitted

5    they knew these statements were false when they were published

6    or they had a reckless disregard for the truth of the

7    statements.  The defendants did not publish these statements

8    in good faith, these horrible and provably false statements.

9    They did so solely to profit off the lies and to intentionally

10   upset my client.

11          Tasha admitted she was making statements of fact

12   about my client.  When asked in 2021 if conveying to viewers

13   that everything she did on Cardi was true, she testified that

14   is correct.  In September 2019, one year after Cardi's public

15   denial and receipt of the first demand letter for retraction,

16   seven months after the second demand letter, six months after

17   the lawsuit was filed, the defendants published a video where

18   Tasha repeated that everything she said, everything that

19   Starmarie Jones said was accurate.

20          We have proven by clear and convincing evidence that

21   defendant's act was actual malice when publishing these

22   statements.  Tasha testified multiple times that she knew

23   these statements were false before they published them or that

24   she had a reckless disregard for the truth.  They were not

25   published in good faith.

1              The defendants had no evidence to corroborate them.

2     She did not investigate them before she published them, and

3     there were clear indications present that brought into

4     question the truth or falsity of the statements.  There were

5     obvious reasons for Tasha to doubt the source of the

6     statement, to doubt the statement was reliable or trustworthy.

7     Tasha even knew that several of the statements were false

8     before she published them.

9              Let me walk you through some of the evidence and

10    testimony you've heard over the past two weeks that

11    conclusively demonstrate defendants have acted with actual

12    malice.

13              (Whereupon, a video recording was played.)

14              MS. MOORE:  Tasha admitted that she knew Lovelyti had

15    receipts debunking what Starmarie Jones was saying, but as you

16    heard her say during the Lovelyti call that she

17    surreptitiously recorded, she didn't want to know what the

18    receipts were.  She wanted to push the interview out before it

19    was debunked so she could make it trend and draw viewers and

20    increase ad revenue.

21              In addition to knowing that Lovelyti had evidence to

22    prove Starmarie Jones wasn't telling the truth, Tasha K, prior

23    to publishing the interview, knew that Starmarie Jones was

24    mentally ill, that she had, in her words, quite an impressive

25    criminal past, that she had not been able to pass a background

1 check, that she'd lied to the club owner, and had been

2 suspended from her job and subsequently lost her job.  She

3 lied to Tasha about multiple things and had violated the terms

4 of her probation.

5          There are many obvious reasons to doubt the veracity

6 of Starmarie Jones.  The defendants didn't care.  They only

7 cared about their profit.  Publishing the Starmarie Jones

8 interview when Starmarie Jones said my client had herpes, was

9 a prostitute, and had done cocaine despite actual knowledge of

10 the probable falsity proves actual malice on the part of

11 defendants.  This is not a situation where the source was

12 reliable or credible.  Even Tasha K herself thought Starmarie

13 Jones was a liar, a mentally ill liar.

14          Tasha admitted that she knew it was not Cardi and the

15 beer bottle.  As she testified -- and this was her words --

16 there were obviously no tattoos on the woman in the video.

17 She knows my client has several large and very prominent

18 tattoos on both her arms, her abdomen, her back, her thigh, in

19 addition to others.  She even admitted that she did a

20 google -- she saw a Google result before she published the

21 video entitled, "No, that Disturbing Video of a Stripper with

22 a Beer Bottle is not Cardi B," but she published the

23 defamatory statement anyway that Cardi was, excuse my

24 language, fucking herself with a beer bottle.  This is actual

25 malice.

1    And even though she knew it was not my client in the

2    video and was aware of the news article saying it was not my

3    client and later saw tweets from my client denying that it was

4    her, the defendants have refused to take down the videos

5    saying that my client is fucking herself with a beer bottle.

6    This is actual malice.

7    Tasha previously posted that she will expose

8    everything, especially if it's a lie.  She admitted she posts

9    photos on the internet even when she doesn't know where they

10   came from or if they've been edited revealing a reckless

11   disregard for the truth.  This is actual malice.

12   She admitted that she does not have any corroborating

13   evidence that my client cheated on her husband, but she

14   continues to publish videos saying that.  This is actual

15   malice.

16   She testified that she thinks it's okay for

17   defendants to publish statements about other people, including

18   my client, even if somebody else made it up or they're

19   defamatory.  She testified in the video where she says my

20   client committed adultery and has HPV that she thought the

21   information given to her before defendants published the video

22   was false.  She further admitted that it wasn't even just that

23   she had doubt about the alleged source to the story, that she

24   knew, in her words, it was fake before she published it.  That

25   is actual malice.

1          Tasha admitted that she told Kyle she thought the

2    story she published saying my client had HPV and had cheated

3    on her husband was fake, but she was going to put it out

4    anyway.  That is actual malice.

5          Tasha said if she is sent fake stories, she's going

6    to air them.  She also said that every story she gets on a

7    celebrity that she could put out that is not damaging to her,

8    she is going to fucking put it out.  She said every story that

9    she could put out that is good for her platform she's going to

10   put it out.  She admitted that she relies on anonymous

11   sources, even though she knows her sources are not credible.

12   For example, she put out a video even though she knew the

13   source had refused to give her a copy of the recording.

14          She admitted in a different video that she didn't

15   care if the things she posts are fake because she sells drama

16   and didn't think it would affect her credibility.

17          While she changed her testimony under oath last

18   Friday, she previously admitted in the Lovelyti recorded phone

19   call and in her deposition under oath and in direct

20   examination last Tuesday under oath, that Starmarie Jones did

21   not actually show her any documents or anything that

22   corroborated her story.

23          Tasha said in the video if someone called her a

24   cokehead, said she had herpes or prostituted, it would be

25   straight fucking defamation.  And you know what, Tasha is

1  right.  Excuse my language.  It is straight fucking

2  defamation.

3        Tasha testified my client posted in the comments and

4  DM'd her that the statements were not true before the

5  defendants published the Starmarie Jones interview and yet the

6  defendants published it anyway.  That is actual malice.

7        Tasha said about the Starmarie Jones interview that

8  it was just kind of something, I was like, well, shit, shit is

9  the shit.  It's funny.  Let me put it on my platform so

10 Lovelyti will come in with a rebuttal.  So it was like a whole

11 motherfucking set up.  I'm going to put the picture up.  You

12 tell her she's lying.  It's perfect.

13        Tasha also said, as far as the herpes and shit, I

14 don't know.  And she didn't have any personal knowledge about

15 whether my client had herpes before defendants published these

16 statements.  This is actual malice.

17        Tasha admitted that her attorneys told her about the

18 medical records that were produced by my client, and even

19 though she knows my client's herpes test result like her HPV

20 result are negative, defendants have knowingly continued

21 publishing defamatory statements that my client has herpes.

22 This is actual malice.

23        Tasha testified that before she published the

24 statements that it was my client in the beer bottle video and

25 even though she had actual knowledge that it was not my client

1  in the video, that she knew Pornhub was a free forum where

2  literally anyone can set up an account, and she had not

3  attempted to see if Pornhub does any verification.  That is

4  actual malice.

5          Tasha said to Lovelyti, well, I'm, like, shit, drop

6  it, I don't give a fuck about this bitch, drop it, in a

7  statement where she's talking about my client.  And even

8  though Lovelyti told her that she had information that was

9  going to contradict the Starmarie Jones interview that she was

10  putting out, her attitude was drop it, I don't give a fuck

11  about Cardi.  Drop it.  That is actual malice.

12          Tasha admitted that if she thought my client sent her

13  information saying she had an STD, she would publish it.  Even

14  if she didn't know whether my client was actually behind it,

15  she'd go ahead and publish it.  That demonstrates actual

16  malice.

17          Tasha admitted in a video that defendants published a

18  male voice said you don't know that in reference to a

19  statement that my client had slept with another man during her

20  marriage.  Mr. Kebe, her husband, admitted in his testimony

21  here during trial, as the corporate representative, that the

22  male voice was his.  And the defendants published the video

23  anyway.  This is evidence of actual malice on the part of the

24  defendants.

25          Mr. Kebe testified, as the corporate representative,

1   that he is aware everything his wife publishes could be false.

2   This shows actual malice on the part of Kebe Studios.

3   Mr. Kebe testified in his deposition that it doesn't matter to

4   him whether or not the content being published is actually

5   true because it's entertainment gossip, and it's based on

6   rumor.  And he knows there's a chance it's not true, and he's

7   sure his wife is aware of that.  But then at trial he changed

8   his testimony saying that he did care.

9           Regardless of which time he was telling the truth

10  under oath, as the corporate representative, he's never done

11  anything about these videos despite having his own actual

12  knowledge that there is a chance the statements are not true,

13  as well as the fact that he knows his wife knows that she has

14  no proof to support the things that she is saying.  This is

15  evidence of actual malice on the part of the defendants.

16          Tasha testified in her deposition it is okay for

17  people to defame my client, meaning Cardi, and it's my

18  client's job to get people to take that stuff down.

19          Tasha also stated in a video, unless Cardi sends me

20  court papers making me show up in court, videos are not coming

21  down.  Well, as you know, my client did send her court papers

22  making her show up in court, but the videos are still not

23  down.  I suppose this is just another lie that Tasha told her

24  viewers.

25          Last Thursday Tasha told the jury that my client has

1  herpes.  It is herpes were her exact words on Thursday, even

2  though she knows my client has a negative herpes test result

3  that proves she doesn't have herpes.  Notwithstanding the

4  defendants knowing that my client does not have herpes, does

5  not have HPV, notwithstanding knowing that my client is not

6  the woman in the beer bottle video, notwithstanding the

7  defendants have zero evidence that my client has ever cheated

8  on her husband, done cocaine or been a prostitute, all of the

9  posts and videos that we've watched are still up.  That is the

10 epitome of actual malice.

11        Defendants have refused to retract these statements,

12 notwithstanding that my client stated publicly and privately

13 to Tasha that none of these things are true, notwithstanding

14 multiple demand letters from three law firms, notwithstanding

15 the filing of this lawsuit in March of 2019.  Defendants have

16 republished these statements over and over and over knowing

17 that they are false or with a reckless disregard for the

18 truth.  Tasha has testified she doesn't care, and unless

19 someone actually forces them to stop, they will never stop

20 publishing these defamatory and disgusting lies about my

21 client.

22        (Whereupon, a video recording was played.)

23        MS. MOORE:  Tasha testified that if my client wants

24 this shit down, she would have to pay her.  And then even if

25 she takes it down, the defendants will continue publishing

1  these statements about my client, but instead of using her

2  name they will say this rapper and everyone viewing her

3  platforms will know that she is talking about my client.

4        Neither of the defendants have ever apologized to my

5  client or publicly retracted any of the statements.  The

6  defamatory statements remain up for the whole world to see.

7  Tasha has been very clear that it will require an injunction

8  from this Court for the defendants to stop.  She even blamed

9  my client for increasing views by going into her comments to

10  publicly deny the things that Starmarie Jones had said.  She

11  thinks my client should have left it alone.  Until when?

12  Until Cardi killed herself?  Until she left her children

13  motherless?

14        Defendants have admitted repeatedly that their

15  motives are profit and separately spite.  And of those two,

16  they admitted in this courtroom that their primary motive is

17  profit, to monetize the defamatory lies they've published

18  about my client.  Tasha testified that defendants saw a

19  340 percent increase in traffic between July, August, and

20  September of 2018.

21        (Whereupon, a video recording was played.)

22        MS. MOORE:  Tasha testified that even though she knew

23  the video where she said my client had HPV was fake, she

24  published it intending to bring traffic to her platform.  She

25  was trying to drive traffic and viewers to the revenue -- to

1  increase ad revenue.  She admitted that she was promoting the

2  sale of goods in the link where she promoted a video about our

3  client.

4       She testified that she hashtagged my client so when

5  people searching Instagram specifically looked for my client,

6  this would come up, which would help drive people to the

7  defendant's Instagram, YouTube, and platforms in general.  She

8  admitted that one of the reasons she wanted to drop the

9  Starmarie Jones interview first was to get ratings.  She

10  admitted that sometimes she uses hashtags like cold sore B or

11  herpes B or Cardi B even if she's not talking about my client

12  to drive traffic to her cite.

13       She said in the video that she wanted the money, and

14  she had an agency that's watching.  And they want to see

15  certain numbers, and they are in a business to generate

16  ratings, views, as well as money, and that she wasn't going to

17  pull the videos down, at least in part, because she wanted to

18  leave them up so she could continue getting views and ratings

19  and ad revenue.

20       She advertised feminine wash while talking about my

21  client with her image displayed on the screen and said that

22  while she typically does not place advertisements in these

23  types of videos, she did for this one concerning our client.

24       Tasha stated if Cardi wants her to delete the videos,

25  well, bitch, you need to give me a check.  So in order for the

1  defendants to take down the defamatory statements about my

2  client, my client either has to pay her or this Court will

3  have to force her to.  You will have to force her to.

4       Tasha testified when she posted the fake story about

5  my client having HPV, she expected Cardi to go live and say

6  something and if she had, it would have been good for her

7  platform and driven traffic there and would have increased

8  viewership and ad revenue.  She has repeatedly testified that

9  she does this to provoke a response so it will drive more

10  traffic to her site.

11       In addition to greed, Tasha admitted that she also

12  publishes the statements for spite.  She testified that she

13  knowingly publishes these statements and continues to publish

14  these statements to get back at my client for filing the

15  lawsuit.  She testified that she --

16       (Whereupon, a video recording was played.)

17       MS. MOORE:  Go ahead, Tom.  Sorry.

18       As you just heard Tasha say, she tags my client

19  because it's entertaining and it irritates my client, and she

20  has an admitted personal vendetta against her.  She knows it

21  upsets my client when she tags her @iamcardib and when she

22  tags -- hashtags her as herpes B or cold sore B.  She

23  testified that she does it intentionally to upset her.

24       Kebe Studios is liable for defamation because Tasha

25  published the defamatory statements as co-president and an

1  alter ego of the company.  She and her husband admitted that

2  they and Kebe Studios are all one and the same.  While denying

3  she was president of the company, Mr. Kebe testified that

4  Tasha is co-president of Kebe Studios and admitted that his

5  wife was not telling the truth when she testified under oath.

6  Tasha acts as the face of Kebe Studios when she's speaking to

7  the public.

8       Defendants have acted in concert to cause my client

9  damages, and that fault is indivisible.  Defendants should be

10  held jointly and severally liable.  Tasha admitted that she

11  owns the domain name unWinewithTashaK.com and a federal

12  trademark registration for unWinewithTashaK.

13      Mr. Kebe admitted that there are no operating

14  agreements for Kebe Studios.  There are not any corporate

15  resolutions.  There are no other written agreements or

16  documents between Ms. Kebe and Kebe Studios.  He admitted that

17  while his wife owns the trademark for unWinewithTashaK,

18  there's actually no agreement between her and the company for

19  the use of the trademark.

20      Mr. Kebe also admitted that there are no written

21  agreements that convey any rights or other assets that his

22  wife may have developed or owned prior to forming Kebe

23  Studios.  He testified there was no agreement between Kebe

24  Studios and Ms. Kebe for the use of Ms. Kebe's videos.

25  Suffice it to say, the defendants do not mind their corporate

1  formalities.

2          Neither Mr. or Mrs. Kebe are credible.  They have

3  each repeatedly admitted that they testified to things during

4  this trial that were untrue when impeached with their prior

5  deposition testimony.  They've given contradictory and

6  mutually exclusive testimony.  That's just one example.

7          Mr. Kebe testified there are other businesses besides

8  the unWinewithTashaK brand operating under the auspices of

9  Kebe Studios LLC.  Directly contradicting his wife, Mr. Kebe

10 testified there are no other businesses operating under Kebe

11 Studios.  When asked if his wife's testimony made under oath

12 was untrue, he said, yes.  When asked if her husband's

13 testimony was untrue when he testified under oath that she was

14 the co-president, she said, yes, that her husband had given

15 false testimony.

16         Defendants have invaded my client's privacy, and

17 they've placed her before the public in a false light.  These

18 disgusting statements have created a false impression by

19 depicting my client to the public as someone that she is not.

20 She does not have herpes.  She's not a prostitute.  She does

21 not have HPV.  She's never inserted a beer bottle into her

22 vagina, and she's never done cocaine.  And she's never cheated

23 on her husband.

24         These statements are highly offensive, and both Tasha

25 and her husband, as the corporate representative of Kebe

1   Studios, admitted that the defendants acted with actual malice

2   when publishing these statements.  These false statements can

3   be seen all over social media across the world and have been

4   shared and retweeted hundreds, if not thousands, of times.

5        The defendants have caused my client to suffer

6   extreme emotional distress.  We've also conclusively proven

7   that defendants acted with reckless disregard to whether their

8   conduct would cause my client to suffer emotional distress.

9        (Whereupon, a video recording was played.)

10        MS. MOORE:  As my client testified, the emotional

11  distress she suffered was severe.  She wanted to kill herself.

12  In her words she was extremely suicidal.  She was a first time

13  mother with a beautiful baby girl, and she couldn't even put a

14  picture on the internet of her kissing her daughter because

15  she was flooded with vicious comments that she was giving

16  Kulture herpes.  She didn't want to have sex with her husband.

17  She was suicidal when her newborn son was just a few months

18  old all due to the defendant's unabated campaign of malicious

19  lies.

20        She developed anxiety.  She became depressed.  She

21  felt hopeless.  She felt defeated.  She lost a significant

22  amount of weight.  She started having migraines.  She was

23  fatigued and sleeping all of the time because she just wanted

24  to escape this nightmare.  This has not only affected my

25  client.  This has affected her entire family.  No reasonable

1   person could be expected to endure this.

2          Tasha admitted that some of her posts were being
3   taken down by Instagram for bullying, and she also stated that
4   she doesn't like the bitch and knows it upsets our client when
5   she hashtags her calling her herpes B saying that she has
6   herpes.  And she admitted in this courtroom that she does it
7   intentionally to upset her.

8          She admitted that she was using hashtags herpes B to
9   say our client had herpes, and when she was questioned about
10  using the @iamcardib to tag her, to intentionally notify our
11  client about these vile statements and videos, that she
12  thought it was entertaining, and she enjoyed it because it
13  irritates our client.  She admitted that she uses hashtags to
14  provoke a reaction from my client.

15         Tasha testified that she didn't know whether my
16  client had HPV, and when asked if she knew it would upset my
17  client, she admitted that was part of the reason she did it.
18  She testified that she knows it upsets our client when she
19  hashtags her calling her herpes B, and she does it
20  intentionally to upset her.

21         Dr. Sherry Blake, my client's therapist and a
22  nationally renowned expert on mental health with impeccable
23  credentials, said that Cardi was extremely suicidal and that
24  her suffering was severe.  We heard Dr. Blake testify the
25  first time she saw Cardi in New York in November of 2018, that

1  Cardi was very anxious and lethargic, that she had very little

2  energy, a lot of fear, that she had a lot of depressive

3  symptoms, such as she was very tearful, and she had just lost

4  interest in doing anything.  She was sleeping a lot, had lost

5  her appetite, she wasn't eating, and she was doing anything to

6  make this go away, which meant she was in bed sleeping all the

7  time just to get away from it.

8       She described the level of Cardi's mental distress

9  that weekend in New York.  Dr. Blake was quite concerned.  She

10 said that on a scale with 1 being the best and 10 being the

11 worst, Cardi was definitely a 10.  Dr. Blake testified

12 concerning her opinion of my client's mental health.  She said

13 that she was depressed and had a lot of anxiety, that she was

14 in a mental health crisis, that she was not very well at all,

15 and that she'd made a working diagnosis of depression and

16 anxiety and that the cause of all of this was and is the

17 defamatory lies being published by the defendants.

18      Dr. Blake testified that she believes Cardi's

19 emotional pain will continue into the future.  She discussed

20 the permanent trauma, depression, and anxiety that my client

21 will forever have to deal with due to the defendant's

22 outrageous conduct.

23      Dr. Blake testified that Cardi was suicidal in 2020.

24 She was quite concerned about my client's mental health.  She

25 testified that Cardi reported having feelings of suicide.  She

1   talked about not wanting to live, that she was bringing so

2   much shame to her family that she just couldn't go on, and she

3   just couldn't even get any reprieve, not from the social media

4   platforms.  And although she'd followed Dr. Blake's suggestion

5   to turn it over to her legal team, that wasn't working.

6          Dr. Blake testified that she was quite concerned

7   about the possibility of suicide.  She did a risk analysis.

8   My client did not have a prior history, and while she had some

9   protective factors, Dr. Blake created a safety plan for Cardi

10  to call her day or night at any time if she ever decided to

11  act on her suicidal ideations.

12         Dr. Blake testified based on her extensive

13  experience, training, education, that Cardi had a major

14  depressive disorder and an anxiety disorder and that during

15  her therapy sessions with Cardi in 2021, she continued to

16  struggle and suffer from anxiety and depression.  She was

17  extremely sad that nothing had changed, and she felt extremely

18  helpless.  In Dr. Blake's words she was continuing to bleed

19  internally.

20         Cardi testified that before the defendants began

21  spreading these false an vile lies about her that she'd never

22  suffered from any suicidal ideations or any other extreme

23  mental health disorders.  As you heard her testify, she's been

24  through rough times.  She's been homeless.  She grew up very

25  poor.  She's been beat up by men that she was in a

1  relationship with and yet she never experienced extreme

2  emotional distress or wanted to kill herself until defendants

3  began this campaign.  She felt like for a very long time that

4  she'd rather be dead than alive.

5       My client testified about her concerns that Kulture

6  and her son, when they get older, will see these disgusting

7  statements on social media or these videos or these

8  accusations of their mother doing these things.  She's

9  testified that it's been very difficult being in court this

10  week and that she's been having panic attacks in the morning

11  because it still continues.

12       Cardi testified that she's still suffering from

13  extreme emotional distress.  She gets anxiety because she

14  feels like it's going to continue.  She gets very scared

15  because it continues.  You've heard her testify that she felt

16  humiliated, and she continues to feel humiliated by these

17  posts and videos.  She feels this way because to this day

18  people still call her herpes B.  People to this day think it's

19  her putting a beer bottle up her vagina.  She feels like

20  forever she will have to defend herself and say that it's not

21  true.  Cardi is continuing to work with a therapist.

22       Tasha admitted several times during this trial that

23  the statements were intentionally directed to my client.  She

24  repeatedly hashtagged her.  She repeatedly used her @iamcardib

25  handle so it would tag my client, so it would notify her and

1  force her to see it, to upset her, to irritate her, to provoke

2  a reaction.

3        Cardi testified that by using the hashtag and by

4  using her username, it would tag her, and everybody else on

5  social media could see those same vile statements.  She

6  explained that on YouTube if you have a hashtag, the artist's

7  name, those videos will come out under the artist's video.  So

8  it could be a Cardi B video, an official video, and then the

9  next video underneath it might be one of Tasha K's disgusting

10  videos.

11        Defendant's conduct is reprehensible.  It is so

12  extreme in degree, and it goes beyond all possible bounds of

13  decency.  It is atrocious, and it is utterly intolerable in a

14  civilized society.  It's not merely vulgar or tasteless or

15  rude or insulting, this unrelenting campaign by the defendants

16  of intentionally publishing all of these knowingly false and

17  disgusting lies for years when they know these things are

18  false solely for clicks and views and money and spite, is so

19  abusive and obscene that, of course, it caused my client to

20  experience intense feelings of humiliation, embarrassment,

21  shame, outrage.

22        And I use the word "campaign" purposely.  On Day 3 of

23  this trial Tasha testified that September 18th, 2018, was when

24  this campaign started.  That was her word.  She said campaign.

25  The cumulative effect of defendant's conduct and all the

1  trauma intentionally inflicted on my client for the past three

2  and a half years is permanent.  She will never get back this

3  time with Kulture and her young son.  She will never

4  experience her baby's early months and years while not in

5  severe emotional distress.

6       And even if these defamatory videos come down, some

7  people will always believe that my client has herpes, has HPV,

8  was a prostitute, did cocaine, cheated on her husband, and was

9  the woman in the beer bottle video.  These lies will follow

10 her forever.  They will follow her children.

11      The defendants should be held jointly and severally

12 liable for the damages, for the reprehensible and outrageous

13 conduct.  You should award my client such sums as you believe

14 are reasonable and just in this case.  You've seen the videos.

15 They're horrifying.  You've seen the documents.  You've heard

16 all the testimony.

17      My client is entitled to damages for mental pain and

18 suffering.  Her pain and suffering understandably has

19 significantly interfered with her normal living.  It has

20 impaired her enjoyment of life.  It has had a debilitating

21 impact on her physical and mental health.  Her suffering over

22 the past three and a half years has been unspeakable.

23 Defendant's conduct shocks the conscience.  And while my

24 client may no longer be suicidal, as she and Dr. Blake

25 testified, she continues to suffer every day.

1        While justice demands that the defendants be enjoined

2   from ever publishing any of these disgusting lies again as

3   well as an order requiring all of these defamatory posts and

4   videos to come down immediately and permanently, because my

5   client's pain and suffering will continue into the future, you

6   should award damages for the pain and suffering that she will

7   continue to endure.

8        It is heartbreaking, heartbreaking to think about

9   Kulture and Cardi's young son having to read one day that

10  the -- about these vile and false statements that have

11  previously been published about their mother.

12       Defendants are undeniably and admittedly liable for

13  defamation because each of the defamatory statements are

14  considered per se.  They are so offensive and so egregious

15  that the law infers that my client has suffered damages, which

16  includes damages to her reputation, standing in the community,

17  damages for her extreme personal humiliation, for her severe

18  mental anguish, and for her suffering.  You should award

19  damages in an amount that you believe is reasonable to

20  compensate my client for these harms.

21       Importantly, my client is not required to prove

22  actual harm or financial loss to recover these damages.  The

23  defendants are also undeniably and admittedly liable for

24  intentional infliction of emotional distress.  Tasha and her

25  company have made abundantly clear of their intent to hurt my

1  client, the intent to harm my client through acts, through

2  conduct, through their separate and admitted motives of greed

3  and spite, and most certainly by the defendant's demeanor in

4  this courtroom.

5      We have conclusively proven that defendants had

6  specific intent to cause harm.  Tasha admitted to purposely

7  targeting and upsetting my client.  She specifically intended

8  to cause my client mental anguish.  In fact, she's admitted

9  that she enjoys it.  She gets pleasure from torturing my

10  client.

11      My client seeks to recover attorneys' fees and

12  expenses incurred by her in this action.  The infuriating

13  thing is that none of the enormous expense that my client has

14  had to incur, hundreds and hundreds and hundreds of thousands

15  of dollars, none of it would have been necessary had the

16  defendant simply stopped when my client posted in the comments

17  for the promo of the Starmarie Jones interview that these

18  things were not true -- my client immediately put them on

19  notice that the defamatory statements Ms. Kebe intended to

20  publish in the Starmarie Jones interview were false -- or if

21  the defendants had stopped the following day when they got

22  their first demand for retraction on September 19, 2018, or if

23  the defendants had stopped after they got the second demand

24  for retraction on February 28th, 2019, or if the defendants

25  had stopped when they received a third demand for retraction

1  from my law firm on October 2nd, 2020.  But as you know, the

2  defendants have refused to stop.  And they have stated that

3  they will never stop until this Court makes them, until you,

4  the jury, make them.

5          My client is entitled to her attorneys' fees and

6  expenses as the defendants have plainly acted in bad faith,

7  have been stubbornly litigious, and have caused her

8  unnecessary trouble and expense.  My client is entitled to be

9  compensated for her out-of-pocket expenses incurred from her

10  injuries inflicted by the defendants, including, but not

11  limited to, the $10,000 that both she and Dr. Blake testified

12  that she has paid for the 16 therapy sessions with Dr. Blake.

13          You have seen an overwhelming amount of evidence

14  concerning the nature and egregiousness of the defendants'

15  conduct.  It is truly reprehensible.  It goes beyond the

16  bounds of any civilized society.  And in terms of the extent

17  and duration of the defendants' wrongdoing, it has been an

18  unrelenting and intentional campaign to break my client all

19  because of greed and spite, post after post after post, dozens

20  and dozens of videos.

21          And with respect to the likelihood of recurrence, the

22  defendants have made it clear they will keep doing this until

23  they're forced to stop.  They've made it clear that they think

24  defaming my client is a very profitable business, and they

25  will never stop unless you make them.  Tasha admitted that she

1  did all of these things, published all of these knowingly

2  false and defamatory statements about my client with malicious

3  intent, with malice in fact, which is different than malice in

4  law with respect to actual malice that we've also proven

5  conclusively.  The defendants have been greatly enriched by

6  their unlawful and outrageous conduct.

7       As everyone in this courtroom has witnessed, there

8  are aggravating circumstances that warrant the imposition of

9  additional damages called punitive damages.  We have

10  conclusively proven that the defendant's actions have shown

11  willful misconduct, wantonness, and an entire lack of care

12  that would raise the presumption of conscious indifference to

13  the consequences.  The defendants do not care that their

14  intentional and knowing three and a half year campaign of

15  defamatory lies brought a young mother to her breaking point.

16       They do not care that she wanted to kill herself.

17  They refuse to issue a retraction.  They refuse to take down

18  the posts.  They refuse to take down the videos, and they sit

19  here today as defiant as ever that they will not stop until

20  this Court makes them.

21       They are completely indifferent to the consequences

22  of their conduct, the harm that their conduct has caused, and

23  the harm that their conduct will continue to cause.  They are

24  completely indifferent to all of the harms and the severe

25  emotional distress that my client has experienced, that her

1  family has experienced, that her parents have experienced.

2  They are so callous and without any moral parameters that they

3  do not even care about the harm that they've caused and will

4  continue to cause to my client's two young children.

5      Punitive damages are not awarded as compensation to

6  my client but solely to punish, to penalize or to deter the

7  defendants.  We respectfully urge you to impose punitive

8  damages on the defendants, to punish them for this atrocious

9  conduct, and equally importantly to deter them from ever doing

10  it again.

11      Given how strident they are about their intent to

12  keep spreading malicious and false lies about my client, I

13  submit to you that it will require a very significant punitive

14  damages award to make them cease this unlawful and outrageous

15  conduct.

16      The defendants have shown a complete and total

17  indifference and an utter reckless disregard for the health

18  and safety of others.  When you consider the degree of

19  reprehensibility of defendants' wrongdoing, remember that they

20  caused defendant (sic) physical harm, not just emotional harm,

21  not just to Cardi but also to her family, her husband, and her

22  children.

23      This is not an isolated event.  It has been an

24  unrelenting campaign for three and a half years, and it

25  continues today.  All of these false and defamatory statements

1  are still up for the whole world to see, for the whole world

2  to repeat.  I urge you to please make today the day it stops.

3           (Whereupon, a video recording was played.)

4           MS. MOORE:  If this isn't defamation, it doesn't

5  exist.  If this isn't intentional infliction of emotional

6  distress, it doesn't exist.  If this isn't false light, it

7  doesn't exist.  I urge you please bring this campaign to an

8  end today.

9           Your Honor, I'm going to reserve the last 17 or 18

10  minutes until after the defendants close.

11           THE COURT:  Yes, ma'am.  I'm assuming that the charts

12  up are the plaintiff's charts?

13           MS. MOORE:  Yes, your Honor.

14           THE COURT:  If you would take those down, we'll take

15  a break.  I know we've only been going for about an hour, but

16  I would rather the defendant have an opportunity to present

17  her entire closing arguments without having to have a break in

18  between, so we'll take a ten-minute recess.  Thank you.

19           COURTROOM SECURITY OFFICER:  All rise.

20           (Whereupon, the jurors exited the courtroom.)

21           THE COURT:  All right.  We'll stand in recess until

22  10:35.  Thank you.

23           (Brief recess.)

24           COURTROOM SECURITY OFFICER:  All rise.

25           (Whereupon, the jurors entered the courtroom.)

1           THE COURT:  All right.  Thank you.  Y'all can be

2   seated, please.  Defendant can begin when she's ready.

3           MS. IZMAYLOVA:  Thank you, your Honor.  Good morning,

4   ladies and gentlemen.  Before I begin my closing argument I

5   would like to thank you all on behalf of myself, Mr. Sabbak,

6   and Mr. and Ms. Kebe.  We know that you all have given up a

7   lot of time to be here, and we wanted to let you know that we

8   truly appreciate your sacrifice.  I know that this case may

9   not seem like a big deal to some, but it is a huge deal to

10  Mr. and Mrs. Kebe who are here fighting for their business and

11  their livelihood.

12          Now, this is the last time that you will hear from

13  the defense, and believe me it's not because I don't have

14  anything else to say.  It is because the law does not allow

15  the defense to make a rebuttal closing argument.  Only the

16  party with the burden of proof, in this case is the plaintiff,

17  gets to have a rebuttal closing.  So I ask you that you please

18  not hold the fact that I cannot come back up here against my

19  clients.

20          At the beginning of this trial Mr. Sabbak asked that

21  you keep an open mind until all of the evidence has been

22  presented.  Now you know exactly why Mr. Sabbak has made that

23  request.  I don't think that I've ever seen a more

24  disingenuous presentation of evidence than what the plaintiff

25  has showed you in this case.

1              In a little while Judge Ray is going to charge you on

2     the law that applies to this case.  One of the things Judge

3     Ray will tell you is that in considering the evidence, you may

4     use reasoning and common sense to make deductions and reach

5     conclusions.  You are the judges of the facts, and your only

6     interest is to seek the truth from the evidence in this case.

7              Let's talk about that for a moment.  The plaintiff

8     claims that this whole controversy began when Ms. Kebe

9     published the Starmarie Jones interview, but if that interview

10    was as horrible and defamatory as the plaintiff alleges, then

11    why didn't the plaintiff play the entire Starmarie Jones

12    interview for you during her case in chief?  Please recall

13    that plaintiff only played the first 30 seconds of a 46-minute

14    interview and then abruptly cut it off.  It wasn't until

15    Mr. Sabbak was questioning Ms. Kebe that you all got to see

16    the entire interview.

17             Remember when Ms. Matz told you in her opening

18    statement that my client said the plaintiff engaged in a

19    debasing act with a beer bottle based on a video that she had

20    watched, and Ms. Matz went on to say that no reasonable person

21    who saw that video could ever believe that plaintiff was the

22    person in the video.  Well, ladies and gentlemen, ask

23    yourselves this:  If no reasonable person could have ever

24    believed that plaintiff was in that video, why didn't the

25    plaintiff play the video for you during her case in chief?

1   Why did you have to wait until Mr. Sabbak was questioning

2   Ms. Kebe to watch that beer bottle video?  That makes

3   absolutely no sense.

4          And you all do not have to check common sense at the

5   door of the deliberation room.  You're allowed to use

6   reasoning and common sense during your deliberations.  In

7   fact, I encourage you to do so.

8          Throughout her case in chief the plaintiff only

9   played little bits and pieces from Ms. Kebe's videos.  The

10  plaintiff literally plucked out statements and often paused in

11  the middle of sentences in order to prove that my client made

12  allegedly defamatory statements about her.  The plaintiff

13  never presented the context in which my client made any of

14  those statements.  The plaintiff barely allowed you to hear my

15  client's full sentences.

16         There's a world of difference between if you saw a

17  clip of me saying I hate my husband and then you saw a clip of

18  me saying I hate my husband for always spoiling me.  Those are

19  two completely different statements, and yet the plaintiff

20  chose to present all of their evidence out of context.  That

21  choice is entirely inconsistent with a search for the truth,

22  which is what you all are here to do.

23         Judge Ray will instruct you that in this case the

24  plaintiff has the burden of proof.  In other words, it is the

25  responsibility of the plaintiff to prove every essential part

1   of her claims.  My clients do not have any obligation to

2   present evidence or to prove that they are not liable.  So if

3   the plaintiff gets back up here and says things like why

4   didn't the defense call this person or why didn't they present

5   this piece of evidence, that's impermissible burden shifting,

6   and I ask that you please disregard any such statements.

7          Now I would like to go through plaintiff's claims one

8   by one.  Let's start with defamation.  In order for plaintiff

9   to succeed on this claim, first she must prove by a

10  preponderance of the evidence that Ms. Kebe made a false and

11  defamatory statement about her.  A preponderance of the

12  evidence means enough evidence to persuade you that

13  plaintiff's claim is more likely true than not true.

14         Plaintiff alleges that Ms. Kebe defamed her when she

15  stated that plaintiff has herpes.  Plaintiff has already

16  argued that Ms. Kebe has reported that plaintiff has genital

17  herpes, but that is not true.  Ms. Kebe has never said

18  anything about plaintiff having genital herpes.  Everyone

19  knows that cold sores are a type of herpes, and you heard both

20  Starmarie Jones and Ms. Kebe use cold sores and herpes

21  interchangeably.  But Ms. Kebe made it a point to clarify that

22  they were discussing cold sores around the plaintiff's mouth

23  and not genital herpes in the Starmarie Jones interview.

24         (Whereupon, a video recording was played.)

25         MS. IZMAYLOVA:  Take plaintiff's alleged medical test

1  results, for example.  First of all, plaintiff testified that

2  she took the test for this lawsuit, and yet her name is

3  nowhere on these results.  I urge you to compare these test

4  results with Dr. Blake's summaries, which were also made after

5  this lawsuit was filed, but still they have plaintiff's real

6  name on them.

7         Secondly, plaintiff's alleged test results show that

8  a genital swab and not a blood test was conducted.  What you

9  have not seen are any test results where a swab of plaintiff's

10 mouth was conducted.  Again, Ms. Kebe has never stated that

11 plaintiff has genital herpes, so these test results are not

12 relevant for the issues in this case.  And the reason these

13 results state not detected instead of negative is because

14 there was no blood test conducted.

15        During this trial you have seen pictures of the

16 plaintiff with cold sores on her lips, and when the plaintiff

17 testified, she also didn't say anything about genital herpes.

18 If you recall, she talked about kissing her daughter or other

19 potential actors.  In fact, I don't think plaintiff has ever

20 said anything about genital herpes.

21        (Whereupon, a video recording was played.)

22        MS. IZMAYLOVA:  When her attorney was asking

23 questions, plaintiff testified that Ms. Kebe was the first

24 person to ever say that plaintiff had cold sores.  But when I

25 got up to question plaintiff, I exposed that lie and got

1  plaintiff to admit that other people were talking about her

2  cold sores way before Ms. Kebe.  You also heard Ms. Kebe --

3          (Whereupon, a video recording was played.)

4          MS. IZMAYLOVA:  The "they" in that clip references

5  other social media users, and Ms. Kebe had testified that many

6  users on social media have been saying that plaintiff has cold

7  sores for years prior to the Starmarie Jones interview.

8  Ms. Kebe also testified that those social media posts are

9  still available to this day.

10          You heard Ms. Kebe testify that Joseline Hernandez,

11  another Love & Hip Hop star, said that plaintiff had herpe

12  bumpy lips, and she even made a song about it back in 2017.

13  Ms. Kebe also told you that Joseline Hernandez's statements

14  and song are still publicly available to this day.

15          Ms. Kebe testified that Azealia Banks has stated that

16  plaintiff has herpes.  When I was questioning the plaintiff,

17  she did admit that Azealia Banks called plaintiff a, quote,

18  mediocre cold sore having bird, end quote, and that the two of

19  them got into an online feud as a result of that.  All this

20  happened before Ms. Kebe ever published the Starmarie Jones

21  interview, and plaintiff admitted that she has never sued

22  Azealia Banks or anyone else other than my clients for

23  defamation stemming from the herpes allegations.

24          (Whereupon, a video recording was played.)

25          MS. IZMAYLOVA:  The plaintiff claims that she did not

1  sue Azealia Banks because Azealia Banks allegedly apologized

2  to the plaintiff, but you did not see any evidence of that

3  apology.  And the plaintiff admitted and Ms. Kebe confirmed

4  that Azealia Banks's statements, interviews, and social media

5  posts are still available online to this day.

6        During this trial you have also seen a picture of

7  plaintiff's husband, professionally known as Offset, with a

8  cold sore on his lips.  Plaintiff's husband did not come to

9  testify in this trial.  You also have not seen or heard any

10  evidence that plaintiff's husband denied having cold sores,

11  and you most certainly have not heard or seen any evidence

12  that plaintiff's husband sent Ms. Kebe a demand for retraction

13  or that he sued Ms. Kebe for defamation.

14        The reason you have not seen or heard any evidence

15  about that is because plaintiff's husband has never sent

16  Ms. Kebe any demands and has never filed suit against

17  Ms. Kebe.  Ask yourselves why that is.

18        Judge Ray will charge you that truth is a complete

19  defense to defamation.  After considering all the evidence

20  regarding plaintiff's cold sores, it is abundantly clear that

21  plaintiff has failed to prove by a preponderance of the

22  evidence that she does not have cold sores, which is a type of

23  herpes.  Therefore, plaintiff's claim that Ms. Kebe made a

24  false and defamatory statement when she said that plaintiff

25  had cold sores fails, and my clients cannot be found liable

1  for that statement.

2         Plaintiff also alleges that Ms. Kebe defamed her when

3  she stated that plaintiff has HPV.  Now, Ms. Kebe testified

4  that she never reported that plaintiff has HPV as a fact.  If

5  you recall, there's only one clip where Ms. Kebe even mentions

6  anything about HPV, and Ms. Kebe clearly said that she could

7  not confirm the HPV diagnosis.

8         (Whereupon, a video recording was played.)

9         MS. IZMAYLOVA:  Remember at the beginning of this

10 trial when my client was being questioned about this exact

11 video, and Ms. Matz played that clip once.  But then she

12 refused to play it again, even though she continued to

13 question my client about it.  Ms. Matz knew that my client

14 never reported plaintiff having HPV as a fact, and that's why

15 she refused to play the video again.  You have not seen or

16 heard any other evidence where Ms. Kebe says anything about

17 the plaintiff having HPV.  That evidence does not exist

18 because Ms. Kebe has never reported that plaintiff has HPV as

19 a fact.

20        Judge Ray will charge you that a defamation action

21 will lie only for a statement of fact.  Therefore, plaintiff's

22 claim that Ms. Kebe made a false and defamatory statement when

23 she said plaintiff has HPV fails, and my clients cannot be

24 found liable for that statement.

25        Plaintiff also alleges that Ms. Kebe defamed her when

1 she stated that plaintiff was a prostitute.  You saw

2 throughout the trial many different clips where the plaintiff

3 refers to herself as a stripper ho or a ho, all of which are

4 other words for prostitute.

5          (Whereupon, a video recording was played.)

6          MS. IZMAYLOVA:  You have also seen a video where the

7 plaintiff admits that she's lived everything she raps about

8 and you've --

9          (Whereupon, a video recording was played.)

10          MS. IZMAYLOVA:  And you've heard a clip from her song

11 titled *Everything* where she clearly raps about prostitution

12 and drug use.

13          (Whereupon, a video recording was played.)

14          MS. IZMAYLOVA:  And you also heard plaintiff yelling

15 about selling pussy.

16          (Whereupon, a video recording was played.)

17          MS. IZMAYLOVA:  But perhaps the most telling is

18 plaintiff's video about the three rules of tricking.

19          (Whereupon, a video recording was played.)

20          MS. IZMAYLOVA:  Plaintiff is clearly talking about

21 exchanging sex for money in that clip that we just saw, yet

22 when she testified, she lied and said that the word "trick"

23 means boyfriend.  However, Ms. Kebe testified that a trick is

24 the same thing as a John, both terms refer to a client of a

25 prostitute.  Even Starmarie Jones said, quote, he was Ebony's

1 trick in her interview when she was describing the time that

2 plaintiff was prostituting.

3          (Whereupon, a video recording was played.)

4          MS. IZMAYLOVA:  Again, Judge Ray will charge you that

5 truth is a complete defense to defamation.  After considering

6 all the evidence, it is abundantly clear that plaintiff has

7 failed to prove by a preponderance of the evidence that she

8 never prostituted.  Therefore, plaintiff's claim that Ms. Kebe

9 made a false and defamatory statement when she said that

10 plaintiff was a prostitute fails, and my clients cannot be

11 found liable for that statement.

12          Plaintiff also alleges that Ms. Kebe defamed her when

13 she stated that plaintiff used drugs.  You heard plaintiff

14 admit that she has smoked weed and taken molly and Percocets

15 and other pills.  Plaintiff got on the stand and claimed that

16 she's only done molly one time.  However, back in 2017 she

17 told the Rolling Stone Magazine that, quote, she had taken

18 molly as a confidence booster before stripping but doesn't

19 need it anymore, end quote.

20          Plaintiff did not introduce any evidence that

21 contradicted what she told the Rolling Stone Magazine nor did

22 plaintiff testify in rebuttal that she never made that

23 statement.

24          Smoking weed is a crime.  Taking molly is a crime.

25 Taking Percocets and other pills is a crime.  The plaintiff

1   has admitted to doing all of those drugs, and now she's making

2   the argument that because she's never publicly admitted to

3   using cocaine, that she has somehow been defamed.  Ladies and

4   gentlemen, does it make any sense that an admitted drug user

5   can be defamed by a suggestion that she uses different types

6   of drugs?  That is the most absurd argument that I have ever

7   heard.  If the plaintiff wants to get really technical, she

8   never denied using cocaine on the stand.  She was talking

9   about -- she was denying using crack.

10          So once again the plaintiff has failed to prove by a

11   preponderance of the evidence that she never used cocaine.

12   Therefore, plaintiff's claim that Ms. Kebe made a false and

13   defamatory statement when she said plaintiff was a drug user

14   fails, and my clients cannot be found liable for that

15   statement.

16          Plaintiff alleges that Ms. Kebe defamed her when she

17   stated that plaintiff engaged in a debasing act with a beer

18   bottle.  Plaintiff's position is that no reasonable person

19   could ever think that it was her in the video, and again I

20   ask, why didn't plaintiff play this video during her case in

21   chief?  Why did the plaintiff turn her whole body away from

22   you when Mr. Sabbak played that video during Ms. Kebe's

23   testimony?

24          You heard Ms. Kebe testify that she saw the beer

25   bottle video on Pornhub, and the title had Cardi B's name in

1   it.  You also heard that this video is still available today

2   not only on Pornhub but a lot of other popular porn sites, and

3   the title still has Cardi B's name in it.

4         You did not hear any testimony or see any evidence

5   that plaintiff sent Pornhub or any other porn sites a cease

6   and desist letter nor that plaintiff has filed suit against

7   Pornhub or any of the other porn sites for defamation, even

8   though all those sites are making money off of that video

9   which still has Cardi B's name in the title.  In fact, the

10   only evidence you heard was plaintiff denying that it's her.

11   The tweets and the article that they showed you were all

12   quoting the plaintiff's denial.

13         During her testimony the plaintiff lied about being

14   very religious.  She lied that Ms. Kebe was the first person

15   to say that she had cold sores.  She lied about using molly

16   only one time and told many other lies.  So why should you

17   believe her when she says it's not her in that video?  You did

18   not see any evidence from any other source that proves

19   plaintiff is not the person in the beer bottle video, and if

20   you ask me personally, the person in the video looks a lot

21   like the plaintiff.

22         THE COURT:  All right.  So the Court is going to

23   strike the last comment made by counsel.  As counsel knows, a

24   lawyer should never express their own opinion about anything

25   in the course of trial, and the statement was improper and

1  should be disregarded by the jury.

2         MS. IZMAYLOVA:  The only evidence plaintiff presented

3  in an attempt to prove that she isn't the person in the video

4  are a couple of pictures of her tattoos.  However, plaintiff

5  wasn't born with those tattoos, and she has presented

6  absolutely no evidence to prove the fact that the beer bottle

7  video was made after she got her tattoos.

8         Please keep in mind that plaintiff has the burden of

9  proof in this case, and my clients don't have to prove or

10  disprove anything.  Again, plaintiff has failed to prove by a

11  preponderance of the evidence that she did not engage in a

12  debasing act with a beer bottle.  Therefore, plaintiff's claim

13  that Ms. Kebe made a false and defamatory statement when she

14  said that plaintiff engaged in a debasing act with a beer

15  bottle fails, and my clients cannot be found liable for that

16  statement.

17         Plaintiff alleges that Ms. Kebe defamed her when she

18  stated that plaintiff committed adultery.  Throughout this

19  trial you have learned that plaintiff's husband has committed

20  adultery on numerous occasions.  You have heard that at one

21  point plaintiff even filed for divorce from her husband.  You

22  have also seen evidence of couples therapeutic coaching, and,

23  most importantly, you've heard plaintiff's position about

24  cheating in relationships.

25         (Whereupon, a video recording was played.)

1          MS. IZMAYLOVA:  Plaintiff's husband did not come to

2    testify at this trial.  You have not heard or seen any

3    evidence that plaintiff's husband denied committing adultly,

4    and you most certainly have not heard or seen any evidence

5    that plaintiff's husband sent Ms. Kebe a demand for retraction

6    or that he sued Ms. Kebe.  And the reason you haven't seen or

7    heard any evidence about that is because plaintiff's husband

8    has never sent Ms. Kebe any demands and has not filed suit

9    against Ms. Kebe for defamation.

10          Again, it is the plaintiff's burden to prove that she

11   did not commit adultery, yet all you've heard from plaintiff

12   is her denying that she cheated on her husband when her

13   attorney asked.  Can you really trust a person who encourages

14   others to, quote, cheat, cheat, cheat, but she didn't follow

15   her own advice?  You didn't even hear any testimony from

16   plaintiff regarding the impact this adultery allegation has

17   had on her marriage.  What impact could it possibly have on a

18   marriage where the husband is constantly being caught for his

19   infidelity?

20          Plaintiff has failed to prove by a preponderance of

21   the evidence that she did not commit adultery.  Therefore,

22   plaintiff's claim that Ms. Kebe made a false and defamatory

23   statement when she said plaintiff cheated on her husband

24   fails, and my clients cannot be found liable for that

25   statement.

1    The plaintiff has failed to prove by a preponderance

2  of the evidence that Ms. Kebe made any false and defamatory

3  statements about plaintiff.  Therefore, Ms. Kebe cannot be

4  found liable for plaintiff's defamation claim or any of

5  plaintiff's other claims.

6    You should select not liable on the verdict form, and

7  your job would be done.  However, if you believe that

8  plaintiff proved by a preponderance of the evidence that

9  Ms. Kebe made a false and defamatory statement about the

10  plaintiff, then you have to move on to the next step of your

11  inquiry, which is actual malice.

12    The plaintiff must prove by clear and convincing

13  evidence that Ms. Kebe acted with actual malice.  Judge Ray

14  will charge you that clear and convincing evidence is a higher

15  standard of proof than proof by a preponderance of the

16  evidence.  It means the evidence must persuade you that the

17  claim or fact is highly probable or reasonably certain.

18  Again, the burden of proof is on the plaintiff.

19    Judge Ray will also instruct you that actual malice

20  is not spite or ill will or even outright hatred.  Actual

21  malice is a defendant's actual knowledge that a statement is

22  false or a defendant's reckless disregard as to a statement's

23  truth or falsity.  Reckless conduct is not measured by whether

24  a reasonably prudent person would have published a statement

25  or would have investigated before publishing.  Rather, the

1 evidence must show in a clear and convincing manner that

2 Ms. Kebe, in fact, entertained serious doubts as to the truth

3 of the statements.

4       So if the plaintiff gets up here and argues that a

5 reasonable person would have done -- wouldn't have done what

6 Ms. Kebe did, that is not an acceptable argument for actual

7 malice.  Instead, the plaintiff must prove by clear and

8 convincing evidence that Ms. Kebe had actual knowledge that

9 her statements were false or that Ms. Kebe entertained serious

10 doubts about the truth of the statements.

11       Consider all the information that we just discussed

12 about each alleged defamatory statement and how plaintiff has

13 failed to prove that those statements are false.  That means

14 the plaintiff has automatically failed to prove actual malice.

15 However, I do want to highlight some additional evidence that

16 you've already heard during the trial which shows that

17 Ms. Kebe had no malice when she published stories about the

18 plaintiff.  In fact, this evidence shows that Ms. Kebe

19 investigated the stories and believed them to be true.

20       (Whereupon, a video recording was played.)

21       MS. IZMAYLOVA:  In those clips Ms. Kebe makes it very

22 clear that she is not publishing false stories about the

23 plaintiff, that she, in fact, investigates her stories and

24 that she has absolutely no malice toward the plaintiff.  You

25 also heard Ms. Kebe testify that she did not build her YouTube

1   channel for the purpose of harassing plaintiff.  Ms. Kebe

2   testified that she has not engaged in a malicious campaign to

3   defame the plaintiff.  Ms. Kebe testified that she has never

4   made up a story about the plaintiff which she knew was false

5   and reported it as the truth.  And, most importantly, Ms. Kebe

6   testified that the main source of all of her information about

7   the plaintiff has been the plaintiff's own statements and

8   admissions.

9           The plaintiff did not call any of her stripper

10  friends to come testify in this trial.  The plaintiff did not

11  call Lovelyti to come testify, and despite Ms. Matz making a

12  spectacle about all the alleged Lovelyti receipts, the

13  plaintiff did not present even one receipt from Lovelyti which

14  would have proven that Starmarie Jones was lying.  In fact,

15  the only Lovelyti receipts you all saw were in Ms. Kebe's

16  September 21st, 2018, video, and they were photoshopped so

17  they couldn't be used to prove anything.

18          (Whereupon, a video recording was played.)

19          MS. IZMAYLOVA:  The plaintiff has presented no

20  credible evidence of actual malice and has failed to prove by

21  clear and convincing evidence that Ms. Kebe published any

22  stories about plaintiff with actual malice.  Therefore,

23  plaintiff's defamation claim fails, and my clients cannot be

24  found liable for defamation.

25          Plaintiff's next claim is for invasion of privacy

1  false light.  Judge Ray will instruct you that in order to win

2  on this claim with respect to a statement, first the plaintiff

3  must prove by a preponderance of the evidence that the

4  statement created a false impression by depicting her to the

5  public as something or someone she's not.  Second, the

6  plaintiff must prove by a preponderance of the evidence that

7  the false impression created by the statement would be highly

8  offensive to a reasonable person.  And, finally, the plaintiff

9  must prove by clear and convincing evidence that Ms. Kebe

10 acted with actual malice when publishing the statement.

11        The plaintiff has built her entire career using the

12 persona of an extremely promiscuous woman who promotes

13 prostitution, drug use, fighting, sleeping around, and getting

14 money in any way possible.  Even if any of the statements

15 Ms. Kebe made about the plaintiff were false, which they are

16 not, plaintiff would never be able to prove that these

17 statements depicted her as someone she is not.  In fact, these

18 statements describe exactly who the plaintiff has always told

19 us that she is.

20        Because the plaintiff cannot prove the first

21 requirement of her invasion of privacy claim, the entire claim

22 fails.  Also, as we've already discussed, plaintiff has

23 presented no credible evidence of actual malice and has failed

24 to prove by clear and convincing evidence that Ms. Kebe made

25 any statements about plaintiff with actual malice.  Therefore,

1 plaintiff's invasion of privacy false light claim fails, and

2 my clients cannot be found liable for invasion of privacy.

3          Plaintiff's next claim is for intentional infliction

4 of emotional distress.  Given that plaintiff has failed to

5 prove her defamation claim and her invasion of privacy claim,

6 the law prohibits plaintiff from recovering for intentional

7 infliction of emotional distress, which I'm going to call IIED

8 for short in this argument.

9          Judge Ray will instruct you that defamatory remarks

10 made to the public in general are classic examples of conduct

11 that, though harmful to plaintiff, was directed toward the

12 hearer of the statements, not to the plaintiff and, thus, is

13 not actionable as IIED.  In this case every statement Ms. Kebe

14 made was to her viewers AKA the public.  Therefore, plaintiff

15 cannot use any of those statements as a basis for an IIED

16 claim.  Even if Ms. Kebe's statements weren't made to the

17 public, plaintiff's IIED claim would still fail because

18 plaintiff has not presented any evidence to prove the four

19 essential elements of an IIED claim.

20          Judge Ray will instruct you that to establish an IIED

21 claim, the plaintiff must prove by a preponderance of the

22 evidence that, first, Ms. Kebe engaged in conduct that caused

23 the plaintiff to suffer emotional distress; second, Ms. Kebe's

24 conduct was extreme and outrageous.  Conduct that can be

25 characterized as merely vulgar, tasteless, rude or insulting

1   is not sufficient for this claim; third, Ms. Kebe intended to

2   cause the plaintiff emotional distress; and, fourth, that the

3   emotional distress plaintiff suffered was severe.  The law

4   intervenes only where the distress inflicted is so severe that

5   no reasonable person could be expected to endure it.

6          When I was questioning the plaintiff, she testified

7   that in 2019 she won a Grammy.  She won Top Female Rap Artist

8   at Billboard Music Awards.  She purchased her dream house in

9   Atlanta.  She testified that in 2020 she collaborated with

10  Megan Thee Stallion, which is another rap artist, and they

11  released a song called *WAP*, which was a huge hit.  She also

12  became the first female rapper to be named Woman of the Year

13  at the Billboard Women in Music Awards.

14         The plaintiff testified that in 2021 she flew to

15  Paris for Fashion Week.  She hosted the American Music Awards

16  and even won an award for her song called *Up*.  She signed with

17  Warner Chappell Music.  She purchased a home in New York.  She

18  released a vodka whipped cream called Whipshots.  She

19  collaborated with Halle Berry on a soundtrack for a movie

20  called "Bruised."  She became the first female rapper to earn

21  three diamond singles.  She was named the Creative Director

22  for Playboy, and at the end of 2021 she gifted her husband

23  $2 million for his birthday.  Those were just some of the

24  plaintiff's personal and professional accomplishments from the

25  last three years.

1          The plaintiff also testified on direct examination

2    that since the end of 2018, she has been feeling depressed,

3    sleeping constantly, and was even having suicidal thoughts as

4    a result of Ms. Kebe's alleged conduct.  Ladies and gentlemen,

5    how can a person who is depressed and constantly sleeping

6    accomplish all of these things that plaintiff has accomplished

7    and more?

8          Also, please remember that Dr. Blake, who testified

9    to having over 30 years of clinical psychology experience, did

10   not note anything about the plaintiff being suicidal in her

11   therapeutic coaching summary from the November 2020 sessions.

12   Dr. Blake did specifically note that plaintiff denied any

13   suicidal or homicidal ideations in her coaching summary from

14   the November 2018 sessions.

15         Obviously, suicide is very serious, which is why I

16   find it extremely hard to believe that a clinical psychologist

17   with over 30 years of experience would have forgotten to write

18   down that her patient reported suicidal thoughts.

19         THE COURT:  All right.  So the same problem is that

20   counsel cannot vouch for testimony and offer personal opinion.

21   You can certainly argue to the jury what makes sense, but you

22   can't put yourself in the place of the jurors.

23         MS. IZMAYLOVA:  Yes, sir.

24         THE COURT:  So that statement likewise is improper,

25   and the Court instructs the jury to disregard it.

1          MS. IZMAYLOVA:  Ask yourself whether it makes sense

2    that a clinical psychologist with over 30 years of experience

3    would have forgotten to write down or note anywhere in the

4    coaching summary that her patient reported suicidal thoughts.

5    In fact, it's shocking that Dr. Blake would have classified

6    her sessions with the plaintiff as, quote, great if the

7    plaintiff did report having suicidal thoughts during those

8    sessions.

9          Also, the plaintiff did not call her husband, any of

10   her family members or anyone from her management team to the

11   stand.  These people could have testified to plaintiff's mood

12   and behavior as they observed it, but plaintiff chose not to

13   present any such evidence.  Ask yourselves why you didn't hear

14   from her family members or her management team who were

15   allegedly worried about her at that time.

16         Plaintiff has failed to prove by a preponderance of

17   the evidence the four essential elements of an IIED claim.

18   Furthermore, plaintiff has failed to prove by a preponderance

19   of the evidence that Ms. Kebe's statements were directed at

20   the plaintiff and not at the public in general.  Therefore,

21   plaintiff's claim for intentional infliction of emotional

22   distress fails, and my clients cannot be found liable for this

23   claim.

24         Since we're on the topic of plaintiff's therapy,

25   let's talk about it in a little bit more detail.  Dr. Blake

1  testified that she offers a variety of services for her

2  patients.  Specifically, she said that she offers traditional

3  therapeutic services, which Dr. Blake described as traditional

4  therapy, but she also offers therapeutic coaching, which

5  Dr. Blake described as coaching for individuals or couples who

6  may not need therapy but need some therapeutic guidance.

7        Dr. Blake traveled to New York in the beginning of

8  November 2018 to conduct 8 hours of therapeutic coaching.  If

9  you look at Dr. Blake's invoices from 2020, it shows that she

10  charges $250 per hour for individual therapeutic coaching.

11  Now, if you look at Dr. Blake's invoice from 2018, it shows

12  that she charged plaintiff $3200 for 8 hours of therapeutic

13  coaching.  If she was only seeing plaintiff alone in New York,

14  that charge should have been $2,000 for 8 hours, not 3200.

15  It's more likely that Dr. Sherry was seeing both the plaintiff

16  and her husband for couples coaching.

17        We also have the text messages from Johnny Lester

18  sent on Dr. Blake's behalf.  I know that Dr. Blake tried to

19  distance herself from Johnny Lester when I was questioning

20  her, but his name and his signature are on Dr. Blake's

21  November 2018 invoice.  So there's no doubt that he worked

22  with Dr. Blake.

23        On November 5th of 2018 Johnny Lester wrote that

24  Dr. Blake's second session with plaintiff went very well.  The

25  plaintiff was heading to the DR, and Dr. Blake was hoping this

1  could be a time for plaintiff and her husband to have some

2  down time.  Dr. Blake also did not want any other people to

3  come on the trip, and if issues arose while they were on

4  vacation, Dr. Blake would make herself available.

5         Then on February 11th, 2019, Johnny Lester again

6  texted that plaintiff told Dr. Blake she would not be

7  continuing services.  If you recall, plaintiff testified that

8  on December 5th, 2018, she announced that she was splitting

9  from her husband.  That is only one month after Dr. Blake's

10 visit to New York and only one month after Dr. Blake expressed

11 the hope that plaintiff and her husband have some down time on

12 their vacation.  Plaintiff also testified that on

13 January 31st, 2019, she announced that she had reconciled with

14 her husband, and not even two weeks later plaintiff tells

15 Dr. Blake that she won't be continuing with her services.

16        The evidence is clear, and it shows that plaintiff

17 and her husband were having problems and they sought

18 therapeutic coaching from Dr. Blake.  And once they

19 reconciled, plaintiff fired Dr. Blake.  Please remember that

20 Dr. Blake did not write the summary from the 2018 session

21 until October 26, 2020, specifically for this lawsuit, which

22 is why that summary mirrors a lot of the plaintiff's claims.

23 Dr. Blake admitted that all the information in the summary

24 about my client was self-reported by the plaintiff.  Dr. Blake

25 also admitted that the plaintiff paid her to come to court and

1   testify.

2          Judge Ray will charge you that you should decide

3   whether you believe what each witness had to say and how

4   important that testimony was.  You may believe or disbelieve

5   any witness, including experts, in whole or in part.

6          Dr. Blake and the plaintiff both testified that she

7   had seen the plaintiff in 2021 and 2022.  However, the

8   plaintiff did not present any evidence to corroborate those

9   sessions.  We have Dr. Blake's invoice from 2018.  We have two

10  invoices from 2020.  Why don't we have any invoices from 2021

11  and 2022?  Plaintiff is at this trial in this moment

12  attempting to recover for monetary damages, so why wouldn't

13  she want to be reimbursed for her therapy sessions in 2021 and

14  2022?  Does that make any sense?

15         Mr. Sabbak told you in his opening statement that the

16  real reason plaintiff filed this lawsuit is because plaintiff

17  could not put her hands on Ms. Kebe.

18         (Whereupon, a video recording was played.)

19         MS. IZMAYLOVA:  Plaintiff even told one of her

20  friends that she wanted to kill Ms. Kebe, and throughout this

21  trial plaintiff has balled up her fists, mouthed words to

22  Ms. Kebe while she was on the stand.  Plaintiff would be

23  visibly aggressive -- and I asked her about it -- to the point

24  where her attorney had to push her back down in her seat.

25         Plaintiff has stated from the very beginning that she

1  was going to make an example of Ms. Kebe and, quote, take all

2  her fucking bread, end quote, which plaintiff admitted means

3  that she wanted to take all of Ms. Kebe's money.

4          (Whereupon, a video recording was played.)

5          MS. IZMAYLOVA:  This lawsuit is not a gain for

6  Ms. Kebe and her family.  They're leaving their business and

7  livelihood in your hands, and we trust that after you review

8  all the evidence and consider all the evidence that was not

9  presented, you will undoubtedly find that my clients are not

10  liable for defamation, my clients are not liable for invasion

11  of privacy false light, and my clients are not liable for

12  intentional infliction of emotional distress.  Thank you.

13          THE COURT:  All right.  Thank you.  We're ready to

14  hear the rest of the plaintiff's presentation.

15          MS. MOORE:  Your Honor, I thought you said we'd have

16  a break before rebuttal.

17          THE COURT:  Well, that depended on when we took the

18  other break, which we did, so we're ready to go forward at

19  this point.

20          MS. MOORE:  Okay.  Thank you, your Honor.  Just one

21  second, your Honor.

22          (Brief Pause.)

23          MS. MOORE:  Juries are the backstop in our society

24  that prevent us from going into the abyss, that prevent us

25  from becoming a place where anybody can say literally anything

1   about anyone no matter how provably false, how offensive, how

2   vile, for profit.  You all are smart people.  You know that

3   it's important to tell the truth.  It's important for children

4   to tell the truth.  It's important for parents to tell the

5   truth.  It's important for witnesses to tell the truth.  It's

6   important for parties to tell the truth, and it's certainly

7   important for lawyers to tell the truth.

8          It is absolutely unacceptable that defense counsel

9   just sat here and made up things out of whole cloth, just

10  completely made up things.  She and her partner knew exactly

11  what their client does.  They literally think they can say

12  whatever they want with no proof, and it's okay, that she can

13  look at you in the face and say my client has cold sores, even

14  though we have a test from one of most prestigious medical

15  institutions in the United States proving that she does not

16  have herpes, that she could say, oh, obviously Dr. Blake

17  worked with Offset in New York because there's a discrepancy

18  about the price of her services.

19         Dr. Blake charges more for traveling to New York.

20  Offset was not in New York, and defense counsel just made this

21  up.  I'm not even sure how she's able to do that.

22         But as we're going through the things she talked

23  about, I want you to remember two things.  Judge Ray will

24  instruct you that what the lawyers are saying is not evidence.

25  I want you to think about what the evidence has shown you over

1   the past two weeks.

2         Defense counsel said that the Kebes are fighting for

3   their business, their livelihood.  Well, I hate to tell them

4   that this is not a lawful business.  The law does not allow

5   you to run a business and profit off somebody else's emotional

6   distress.  That's the entire reason we have defamation law.

7         She said that it was disingenuous, the case that we

8   presented.  What is disingenuous is Mr. Sabbak in his opening

9   statement telling you that you are going to see proof that

10  Cardi lived with Starmarie Jones.  He said that in his opening

11  statement.  Where's the proof?  Cardi testified credibly that

12  she never lived with Starmarie Jones.  Ash Cash, Spotlight,

13  Shawn Taloran, all the people that knew Cardi at that time

14  directly messaged in the comments to Tasha K that everything

15  Starmarie Jones was saying was a load of shit.  Excuse my

16  language.

17        And you heard Tasha K admit on the witness stand that

18  notwithstanding that those comments when read clearly say that

19  what Starmarie Jones was saying was false, that she was

20  telling her viewers that it supported what Starmarie Jones was

21  saying.  And then defense counsel got up here and played you

22  the same clip and spouted the same lie that their client did

23  in that video.  See these receipts.  Their evidence that

24  Starmarie Jones lived with Cardi.  That's ridiculous.

25        They have not shown you anything.  The only thing

1   they've done is tell you, like a child, that we haven't proven

2   our case when, in fact, you know we have established every

3   single element of each cause of action with clear and

4   convincing evidence just like Ms. Matz told you we would.

5   They literally think they get to come into court and tell you

6   that my client cheated on her husband with no proof.  They

7   think they can just stand up here and say that my client's

8   husband cheated on her.  Where's the proof of that?

9           As Ms. Izmaylova said, you can use reasoning and

10  common sense.  Does it make sense that these people should be

11  able to say whatever they want about whoever they want

12  whenever they want no matter what it is, no matter how vile

13  and disgusting and profit off of it?  Does that make sense?

14          And then she says -- she points to the fact that we

15  didn't play the whole beer bottle video or the Starmarie Jones

16  interview.  Why did we abruptly cut it off like we were hiding

17  something from you.  We didn't play it because I am trying to

18  avoid my client being anymore triggered than she already has

19  been in the past three and a half years.

20          Why should my client be forced to watch the entirety

21  of that video where that woman says knowing lies or the

22  defendants repeat those same knowing lies?  Where she has to

23  watch a woman taking a beer bottle from a patron, putting it

24  up her vagina, pleasuring herself, giving it back to the

25  patron and drinking it before she gave it back?  Why do I have

1  to put that into evidence?  It's obvious that's not my client.

2  Tasha K admitted that that was not my client.  She said -- we

3  went through all the tattoos.  Remember?  There are obviously

4  no tattoos on that woman.

5          She knew it was not my client before she published

6  those statements.  She knew that there were news articles

7  saying it was not my client.  She later knew that my client

8  denied it was her.  She knows it was not my client, but yet

9  all those videos saying that my client is fucking herself with

10  a beer bottle are still up.  If that is not actual malice, I

11  don't know what is.

12          And I want to say something about this whole genital

13  herpes thing.  Tom, if you could please put up P-542.

14          THE COURT:  So I'm sorry.  What's the number again?

15          MS. MOORE:  P-542, your Honor.

16          THE COURT:  I don't have P-542 as admitted into

17  evidence.

18          MS. MATZ:  It's 276.

19          MS. MOORE:  Oh, it's 276?  We have a duplicate.  I'm

20  sorry, your Honor.  Plaintiff's Exhibit 276.  Apologies.  It's

21  a duplicate.

22          What has happened over the entirety of this case as

23  the defendants realize they are trapped and they've said

24  herpes and herpes and herpes over and over and over again,

25  then they started to say, oh, no, we were only talking about

1   cold sores, we were only talking about her mouth. But you've

2   heard testimony and videos where you've seen Tasha K talking

3   about Cardi's vagina. I mean, look at this post. Awwh

4   @iamatcardib. I thought we left you and your confirmed

5   irritated pussy in 2018. What does an irritated pussy have to

6   do with a cold sore on somebody's mouth?

7           The other reason we didn't play every second of every

8   video is that we have respect for the jury. We have 500 hours

9   of video in this case. Why didn't we bring in all of Cardi's

10  friends and family and her management team to testify about

11  how emotionally distraught she was? Because we didn't want

12  you to be here for three months. My client credibly testified

13  that she was suffering extreme emotional distress.

14          Dr. Blake, with more than a hundred thousand hours of

15  clinical experience, told you that my client was suicidal,

16  that she was in severe mental distress, and yet the defense

17  counsel gets up and says Dr. Blake must be lying. She's lying

18  to you. She was really seeing Offset and my client for

19  marital therapy. You just made that up. You don't get to

20  just make up stuff in the courtroom. People don't just get to

21  make up stuff and say it because they want to with no

22  evidence. What would it matter if we played the whole video?

23  Would the context change? No.

24          Mr. Sabbak also said in his opening statements,

25  speaking of disingenuous, that they would prove that every

1   allegation, every defamatory statement, was true.  Think about

2   that.  There is not a single shred, not one atom of evidence

3   that proves my client cheated on her husband or did cocaine or

4   was in the beer bottle video or has herpes or HPV or was a

5   prostitute, and they think they just get to say that with no

6   proof, when we've proven to you conclusively that those things

7   are false and that the defendants published them as statement

8   of facts.

9            I mean, it's like Alice in wonderland.  She admitted

10  on the stand that she published these as statement of facts,

11  and then defense counsel gets up here and says she didn't

12  publish them as statement of facts.  You heard her testimony.

13           She also talks about the test results, the alleged

14  test results, the alleged test results from UCLA.  This is

15  absurd.  My client clearly testified that those are her

16  aliases.  For privacy and security and safety reasons she uses

17  aliases, like every celebrity on the planet.  And they somehow

18  want to suggest that those aren't legitimate test results?

19  Does that make any sense to you?  My client does not have cold

20  sores.  My client's husband does not have cold sores.

21           The defendants are not doctors.  They didn't call an

22  expert witness.  Their lawyers are not doctors, and they sit

23  here and tell you that my client has cold sores, even though

24  my client does not have cold sores, and we have negative

25  herpes test results.

1          And going back to the genital herpes for one moment,

2     in Plaintiff's Exhibit 542, which was admitted, Starmarie

3     said -- she was referencing Cardi -- Cardi has herpes.  I've

4     never fucking said it.  Why?  Because I don't give a shit what

5     she's got on her goddamned mouth or what she has on her

6     vagina, whether it's herpes 1 or herpes 2.  But she's already

7     admitted to having cold sores, which is a form of the fucking

8     herpes virus.

9          What does a vagina have to do with a cold sore on a

10    mouth?  Nothing.  Obviously, they're referencing genital

11    herpes.  In her deposition -- and you heard this on the

12    witness stand -- Tasha K admitted that she didn't know if our

13    client had herpes, and she admitted that she's known about the

14    test results since we gave them to her lawyers.  The herpes

15    test result came to us September 22nd.  We gave it to them

16    September 22nd.  The HPV result came to us September 28th.  We

17    gave it to them September 29th, within 24 hours, and yet she

18    has the audacity and her lawyers have the audacity to stand up

19    before you and say that she has herpes and cold sores.

20         She then references Azealia Banks, and she said,

21    Cardi testified that she's never sued anybody else except for

22    my client.  Again that's a complete falsehood.  You heard my

23    client say that apart from the defendants, she's also sued

24    Starmarie Jones for these same set of defamatory lies.  You

25    heard me say that, and yet you got up here and completely

1 twisted and misrepresented my client's testimony.

2          You then talk about Offset.  You think that -- you

3 just said without any basis that he has cold sores because you

4 point to a photo, even though Tasha has admitted that she

5 posts photos that may be doctored, she doesn't know where they

6 came from.  And you suggest that because Offset has not filed

7 suit against your clients, it must be true, that it's some

8 admission of the fact that he has a cold sore.

9          But in this same breath Tasha already told us, she

10 testified, that if somebody says something about a celebrity

11 that's false and defamatory, they should leave it alone,

12 especially if it's not true.  So maybe Offset just took your

13 advice.

14          When she said in that video -- you saw it -- I know

15 you have HPV, she said it as a statement of fact, and she has

16 admitted repeatedly on the stand that when she says those

17 things, she says them as statements of fact.  Over and over

18 and over again she's admitted that she didn't say opinion,

19 that she never said allegedly, that she never said fake news,

20 that what she was presenting to her viewers was fact.

21          And then the whole video.  This is -- they have no

22 proof that my client has ever committed prostitution.  Not a

23 single person has come into this courtroom to say that they

24 engaged in prostitution with my client.  It's not somebody

25 else that allegedly tricked with her, not any man that she was

1  ever paid by for sex.  They have absolutely no evidence, and

2  my client credibly testified that she's never been a

3  prostitute.

4       But what they use as their evidence is a video of

5  Cardi calling herself a ho, which, as Cardi testified, means

6  bitch in slang.  I mean, that's a -- their argument is a joke,

7  and it's even more of a joke because you heard Tasha K on the

8  stand refer to another woman as a ho, and my co-counsel

9  specifically asked Tasha K, were you referring to her as

10  prostitute?  No.  I was just like calling her a bitch.  I use

11  the word "ho" all the time.

12       And then, and then the next piece of evidence is that

13  Cardi lives everything she raps.  As my client testified on

14  rebuttal last week, she's never rapped nor have they produced

15  any rap lyric that she cheated on Offset, that she has herpes,

16  that she has HPV, that she's been a prostitute, that she put a

17  beer bottle up her vagina.  Rap songs are forms of artistic

18  expression.  So even if Cardi had said those things in her

19  lyric, which she testified that she did not do and which they

20  have no evidence of, do people believe that lyrics are always

21  true?  I mean, that's ridiculous, talk about taking something

22  out of context.

23       When Charlie Daniels released *Devil Came Down to*

24  *Georgia* in 1979, do people think that Charlie Daniels

25  witnessed little Johnny and the devil actually having a battle

1  of fiddles?  That's absurd.  I can't even believe they're

2  saying these things.  Taking some piece of a lyric or what she

3  said in the video completely out of context when there's no

4  evidence to support it?

5        And even if you believe that the genre of rap is

6  different and you have implicit bias and you assume that

7  rappers have done everything they rap about, Cardi has been

8  very clear she's never rapped about any of those things.  She

9  testified that she said tricks, not tricked, in one of those

10  videos, and she was referencing a consensual relationship, her

11  boyfriend.

12        And then they want to call Cardi a drug user, but

13  you'll remember that I put a very long list of drugs before

14  Cardi to see if she'd done it.  Here's the list.  These are my

15  notes.  Do you remember the first one I asked her?  Have you

16  done cocaine?  No.  Have you done crack cocaine?  But yet

17  Ms. Izmaylova got up here and told you that my client did not

18  testify that she has never done cocaine.

19        They make the statement that my client is not

20  religious with no basis.  That's highly offensive.  My client

21  is a person of strong faith, and she repeatedly testified

22  about the importance of her faith to her.  She prays multiple

23  times a day.  You don't just get to stand up here and say my

24  client isn't religious.

25        And let's talk about Starmarie Jones for a minute.

1   Tasha admitted that she knew Starmarie Jones was a liar, that

2   she says in these videos no less than 12 times that Starmarie

3   Jones is mentally ill, that she thought she was mentally ill,

4   she subjectively thought Starmarie Jones was mentally ill, and

5   everybody else did too and that she lied about her -- she had

6   a long criminal history, was a violator of probation.

7           Even if you assume for a moment that she

8   fantastically believed Starmarie Jones to be credible, that is

9   irrelevant.  As the judge will instruct you, a defendant

10  cannot overcome a finding of actual malice by testifying that

11  she believed the statements were true.  You must determine

12  whether the statement was indeed published in good faith.  A

13  defendant cannot profess good faith when her statements are so

14  inherently improbable that only a reckless person would have

15  put these into circulation.

16          Likewise -- and this is very important --

17  recklessness can be found where there are obvious reasons to

18  doubt the veracity of the source for the statement.  What are

19  more obvious reasons than somebody is mentally ill, has a

20  lengthy criminal record, violated probation, and has already

21  lied to you, and you know she lied to you?

22          THE COURT:  All right.  Ms. Moore, I'm sorry.  You're

23  out of time.  You're going to need to stop.

24          MS. MOORE:  Thank you, your Honor.

25          THE COURT:  Thank you.  I'm going to -- ladies and

1  gentlemen, I'm going to read you the jury instructions.

2  They're not too long.  They're about 18 pages.  If anyone

3  wants to leave the courtroom before I do that, you should do

4  it now because it's not going to allow anyone to come and go

5  during the time that I'm reading the instructions.  So I'm not

6  going to have self-esteem problems that so many people are

7  leaving before I read you the law.

8          Ladies and gentlemen, I'm going to read you the law.

9  I want you to understand you're not going to have to memorize

10 it because I will send out written instructions with you to

11 have to look at, to refer to.  You certainly can take notes on

12 what I tell you if you want to, but I just want you to know

13 you will have the written instructions with you.

14         Ladies and gentlemen, it's my duty to instruct you on

15 the rules of law that you must use in deciding this case, and

16 when I finish, you'll go to the jury room to begin your

17 deliberations, sometimes called deliberations -- I'm sorry --

18 your discussions sometimes called deliberations.

19         Your decision must be based only on the evidence

20 which has been presented in this courtroom over the last few

21 weeks.  You must not be influenced in any way by either

22 sympathy for or prejudice against anyone.

23         You must follow the law as I explain it -- even if

24 you don't agree with the law -- and you must follow all of my

25 instructions as a whole.  You must not single out or disregard

1  any of the instructions on the law.

2       The fact that a limited liability company or LLC is

3  involved as a party must not affect your decision in any way.

4  An LLC and all other persons stand equal before the law and

5  must be dealt with as equals in a court of justice.  When an

6  LLC is involved, of course, it may act only through people as

7  its employees; and, in general, an LLC is responsible under

8  the law for the acts and statements of its employees that are

9  made within the scope of their duties as employees of the

10  company.

11       As I said before, you must only consider the evidence

12  that I have admitted in the case.  Evidence includes the

13  testimony of the witnesses and the exhibits that have been

14  admitted, and the videos that you've seen are exhibits and

15  other photocopies of things.  But anything that the lawyers

16  have said is not evidence and isn't binding on you.

17       And you shouldn't assume from anything that I've said

18  that I have an opinion about any factual issue in this case.

19  Except for my instructions to you on the law, you should

20  disregard anything I may have said during the trial in

21  arriving at your own decision about the facts.

22       Your own recollection and interpretation of the

23  evidence is what matters.

24       In considering the evidence, you may use reasoning

25  and common sense to make deductions and reach conclusions.

1  You shouldn't be considered (sic) about whether the evidence

2  is direct or circumstantial.

3       Direct evidence is the testimony of a witness who

4  asserts that he or she has actual knowledge of a fact, such as

5  an eyewitness.

6       And circumstantial evidence is the proof of a chain

7  of facts and circumstances that tend to prove or disprove a

8  fact.  There's no legal difference in the weight you may give

9  to either direct or circumstantial evidence.

10      When I say you must consider all the evidence, I

11 don't mean that you must accept all the evidence as true or

12 accurate.  You should decide for yourselves whether you

13 believe what each witness had to say and how important that

14 testimony was.  And in making your decision, you may believe

15 or disbelieve any witness, in whole or in part.  The number of

16 witnesses testifying concerning a particular point doesn't

17 necessarily matter.

18      To decide whether you believe any witness, I suggest

19 that you ask yourself a few questions:  Did the witness

20 impress you as someone who was telling the truth?  Did the

21 witness have any particular reason not to tell the truth?  Did

22 the witness have a personal interest in the outcome of the

23 case?  Did the witness seem to have a good memory?  Did the

24 witness have the opportunity and ability to accurately observe

25 the things about which he or she testified?  Did the witness

appear to understand the questions clearly and answer them
directly?  Did the witness's testimony differ from other
testimony or other evidence?

You should ask yourselves whether there was evidence
that a witness testified falsely about an important fact.  And
ask whether there was evidence that at some other time a
witness said or did something, or didn't say or do something,
that was different from the testimony the witness gave during
the trial.

But keep in mind that a simple mistake doesn't mean a
witness wasn't telling the truth as he or she remembers it.
People naturally tend to forget some things or remember them
inaccurately.  So if a witness misstated something, you must
decide whether it was because of an innocent lapse in memory
or due to an intentional deception.  The significance of your
decision may depend on whatever the misstatement is about an
important fact or an unimportant detail.

When scientific, technical, or other specialized
knowledge might be helpful, a person who has special training
or experience in that field is allowed to state his or her
opinion about a matter.

But that doesn't mean that you must accept that
witness's testimony or opinion.  As with other witness's
testimony, you must decide for yourself whether to rely upon
the opinion stated.

1          In this case it is the responsibility of the

2    plaintiff to prove every material part of her claims by what

3    we call a preponderance of the evidence.  This is sometimes

4    called the burden of proof or the burden of persuasion.

5          A preponderance of the evidence simply means an

6    amount of evidence that is enough to persuade you that the

7    plaintiff's claim is more likely true than not true.

8          If the proof fails to establish any essential part of

9    a claim or contention by a preponderance of the evidence, then

10   you should find against the plaintiff as to that claim.

11         When one or more claim is involved, you should

12   consider each claim separately.

13         In deciding whether any fact has been proven by a

14   preponderance of the evidence, you may consider testimony of

15   all the witnesses, regardless of who may have called them, and

16   all of the exhibits received into evidence regardless of who

17   may have produced them.

18         If the proof fails to establish any part of a

19   plaintiff's claim by a preponderance of the evidence, then you

20   should find for the defendants as to that claim.

21         Sometimes a party has the burden of proving a claim

22   by a different standard that we call clear and convincing

23   evidence.  This is a higher standard of proof than proof by a

24   preponderance of the evidence, but less than what we call

25   beyond a reasonable doubt.  It means that the evidence must

1 persuade you that that claim or fact is highly probable or

2 reasonably certain.  I will tell you when to apply this

3 standard as it relates to the plaintiff's claims.

4        Now let me talk a little bit about the plaintiff's

5 claims.

6        The plaintiff first claims that the defendants

7 defamed her.  To establish this claim, the plaintiff must

8 prove the following:

9        First, the plaintiff must prove by a preponderance of

10 the evidence that the defendant made a false and defamatory

11 statement concerning the plaintiff.  The plaintiff claims that

12 the defendants made the following statements:  That the

13 plaintiff has herpes and HPV, that she was a prostitute, that

14 she used cocaine, that she engaged in a debasing act with a

15 beer bottle, and that she committed adultery.

16        Second, the plaintiff must prove by a preponderance

17 of the evidence that the statement was published, which means

18 that the statement was communicated to anyone other than the

19 plaintiff.

20        And, third, the plaintiff must prove by clear and

21 convincing evidence that the defendant acted with actual

22 malice.

23        Actual malice is not spite or ill will, or even

24 outright hatred.  Rather, actual malice is a defendant's

25 actual knowledge that a statement is false or a defendant's

1  reckless disregard as to a statement's truth or falsity.  The

2  knowledge of falsity or reckless disregard of the truth may

3  not be presumed nor derived solely from the language of the

4  publication itself.  Reckless disregard requires clear and

5  convincing proof that a defendant was aware of the likelihood

6  she was circulating false information.  Reckless conduct is

7  not measured by whether a prudent person would have published

8  a statement or would have investigated before publishing.

9  Rather, the evidence must show in a clear and convincing

10 manner that a defendant, in fact, entertained serious doubts

11 as to the truth of the statements.  Publishing with such

12 doubts shows reckless disregard for truth or falsity and

13 demonstrates actual malice.

14       A defendant cannot overcome a finding of actual

15 malice by testifying that she believed that the statements

16 were true.  You must determine whether the statement was

17 indeed published in good faith.  A defendant cannot possess

18 good faith when her statements are so inherently improbable

19 that only a reckless person would have put them into

20 circulation.  Likewise, recklessness may be found where there

21 are obvious reasons to doubt the veracity of the source for

22 the statement or the accuracies of the source's report.

23       Truth is a complete defense to defamation.  And a

24 defamation action will lie only for a statement of fact.  This

25 is because a statement that reflects an opinion or a

1  subjective assessment, as to which reasonable minds could

2  differ, cannot be proved false.  As a result, a plaintiff who

3  claims that a published opinion defamed her would generally be

4  unable to carry her burden of proving the essential element of

5  falsity.  Still there is no wholesale defamation exception for

6  anything that might be labeled an opinion.  An opinion can

7  constitute actionable defamation if the opinion can reasonably

8  be interpreted, according to the context of the statement in

9  which the opinion appears, to state or imply defamatory facts

10  about which -- about the plaintiff that are capable of being

11  proven false.

12         If you find that one of the defendant's statements is

13  defamatory and that the statement imputed to the plaintiff a

14  crime punishable by law, such as adultery, prostitution, or

15  cocaine use, charged the plaintiff with having some contagious

16  disorder, charged the plaintiff of being guilty of some

17  debasing act which may exclude her from society, or is

18  otherwise injurious to the plaintiff on its face without the

19  aid of extrinsic proof, the law infers that the plaintiff has

20  suffered damages.  In awarding such damages, your measure or

21  criterion is your enlightened conscience as impartial jurors.

22         If you find that one of the defendants' statements is

23  defamatory, but does not fit into one of the categories that

24  I've just talked about, then the plaintiff must prove, by a

25  preponderance of the evidence, that she suffered damages

1   actually flowing from the defamation in order to recover for

2   that statement.  I'll talk a little bit more about damages in

3   just a moment.

4           If you determine with respect to one or more

5   statements that the plaintiff has proven defamation against

6   Defendant Kebe, but not against Defendant Kebe Studios, you

7   may still find that Kebe Studios is liable under this claim if

8   you find by a preponderance of the evidence that Defendant

9   Kebe published the statements as an alter ego of the company

10  or LLC.  This means that Defendant Kebe holds a position with

11  the company such as president where she acts as the face of

12  the company when speaking to the public.  The president of a

13  company is presumed to be its alter ego, but no such

14  presumption exists in favor of any other official of the

15  company.

16          The plaintiff next claims that the defendants invaded

17  her privacy and placed her before the public in a false light.

18          A single statement cannot form the basis of both a

19  defamation claim and a false light claim.  So if you find that

20  the plaintiff has proven defamation with respect to a

21  statement, you do not need to consider whether that statement

22  also satisfies the elements of false light.

23          For either or both of the defendants to be liable for

24  false light with respect to a statement, the plaintiff must

25  prove the following:

First, the plaintiff must prove by a preponderance of the evidence that the statement created a false impression by depicting her to the public as something or someone she is not.

Second, the plaintiff must prove by a preponderance of the evidence that the false impression created by the statement would be highly offensive to a reasonable person, not a hypersensitive individual.

Third, and finally, the plaintiff must prove by clear and convincing evidence that the defendant acted with actual malice when publishing the statement.

Third -- or, lastly, the plaintiff's claim -- the plaintiff claims that the defendants caused her to suffer extreme emotional distress.  To establish this claim, the plaintiff must prove the following:

First, the plaintiff must prove by a preponderance of the evidence that the defendant engaged in conduct that caused the plaintiff to suffer emotional distress.

Second, the plaintiff must prove by a preponderance of the evidence that the defendant's conduct was extreme and outrageous.

And, third, the plaintiff must prove by a preponderance of the evidence that the defendant intended to cause plaintiff emotional distress or acted with reckless disregard to whether the defendant's conduct would cause the

1   plaintiff to suffer emotional distress.

2         And, finally, fourth, the plaintiff must prove by a

3   preponderance of the evidence that the emotional distress she

4   suffered was severe.

5         To qualify as sufficiently extreme and outrageous to

6   sustain a claim for intentional infliction of emotional

7   distress, the conduct at issue must be so extreme in degree as

8   to go beyond all possible bounds of decency and to be regarded

9   as atrocious and utterly intolerable in a civilized society.

10        Conduct that can be characterized as merely vulgar,

11   tasteless, rude, or insulting is insufficient.  Rather, the

12   conduct must be so abusive or obscene that reasonable people

13   would naturally assume that the target of such conduct would

14   experience intense feelings of humiliation, embarrassment,

15   fright or extreme outrage.  The rule of thumb in determining

16   whether the conduct complained of was sufficiently extreme and

17   outrageous is whether the recitation of the facts to an

18   average member of the community would arouse her resentment

19   against the defendant so that she would exclaim "outrageous."

20        Emotional distress includes all highly unpleasant

21   mental reactions such as fright, horror, grief, shame,

22   humiliation, embarrassment, anger, chagrin, disappointment,

23   worry, and nausea.

24        It is only where it is extreme that liability arises.

25        The law intervenes only where the distress inflicted

1  is so severe that no reasonable person could be expected to

2  endure it.

3       Even malicious, willful or wanton conduct will not

4  warrant a recovery for infliction of emotional distress if the

5  conduct was not directed toward the plaintiff.

6       Defamatory remarks made to the public in general are

7  classic examples of conduct which, though harmful to the

8  plaintiff, was directed toward the hearer of the statements,

9  not to the plaintiff, and thus is not actionable as

10  intentional infliction of emotional distress.

11       All right.  Now I'm going to talk and explain the law

12  on damages.  Damages are given as pay or compensation for

13  injury done.

14       When one party is required to pay damages to another,

15  the law seeks to ensure that the damages awarded are fair to

16  both parties.

17       If you believe from a preponderance of the evidence

18  that the plaintiff is entitled to recover -- and keep in mind

19  that certain aspects of the claims require proof by clear and

20  convincing evidence -- you should award to the plaintiff such

21  sums as you believe are reasonable and just in the case.

22       Damages are given as compensation for an injury done,

23  and generally the injury is the measure when the damages are

24  of a character to be estimated in money.  If the injury is

25  small or mitigating circumstances are strong, only nominal

1   damages are given and what would be a proper amount of nominal

2   damage, if that is what you decide, is a question for you to

3   decide under all the facts and circumstances of the case.

4          In all cases, necessary expenses resulting from the

5   injury are a legitimate item of damages.

6          As to medical expenses, such as hospital, doctor, and

7   medicine bills, the amount of the damages would be the

8   reasonable value of such expense as was reasonably necessary.

9          The plaintiff seeks damages for mental pain and

10  suffering.  In making such award, if any, your standard should

11  be your enlightened conscience as impartial jurors.  Questions

12  of whether, how much, and how long the plaintiff has suffered

13  or will suffer are for you to decide.

14          In evaluating the plaintiff's alleged pain and

15  suffering, you may consider the following factors, if proven:

16  Interference with normal living; interference with the

17  enjoyment of life; loss of capacity to labor and earn money;

18  impairment of bodily health and vigor; fear of extent of

19  injury; shock of impact; actual pain and suffering, past and

20  future; mental anguish, past and future; and the extent to

21  which the plaintiff must limit her activities.

22          If you find that the plaintiff's pain and suffering

23  will continue into the future, then you should award damages

24  for such future pain and suffering as you believe the

25  plaintiff will endure.  In making such award, your standard

1  should be your enlightened conscience as impartial jurors.

2  You would be entitled to take into consideration the fact that

3  the plaintiff is receiving a present cash award for damages

4  not yet suffered.

5       The plaintiff seeks damages for injury to her

6  reputation, including possible future injury.  In making such

7  award, your standard should be your enlightened conscience as

8  impartial jurors.

9       If you find that the defendants, plural, have acted

10  in concert to cause the plaintiff damages and that that fault

11  is indivisible, then you should find the defendants jointly

12  and severally liable for the full amount of damages, if any.

13       If you believe that the fault of the defendants is

14  divisible, meaning they did not act in concert to cause the

15  plaintiff damages, but instead separately contributed to the

16  harm, then you should apportion your award of damages

17  according to the percentage of fault of each of the

18  defendants.

19       In tort actions -- and the claims that are asserted

20  are what we call torts -- there may be aggravating

21  circumstances that warrant the awarding or imposing of

22  additional damages called punitive damages.

23       Before you may award punitive damages, the plaintiff

24  must prove that the defendant's actions showed willful

25  misconduct, malice, fraud, wantonness, oppression, or that

1  entire want of care that would raise the presumption of

2  conscious indifference to the consequences.  The plaintiff

3  must prove that the defendants are liable for punitive damages

4  by a higher standard of proof than that which is required for

5  the proof of other damages; and that standard is by clear and

6  convincing evidence, as the Court has previously defined.

7           If the plaintiff fails to prove, by clear and

8  convincing evidence, that the defendant was guilty of willful

9  misconduct, malice, fraud, wantonness, oppression, or the

10  entire want of care that would raise the presumption of

11  conscious indifference to the consequences, then you would not

12  be authorized to award punitive damages.

13          Mere negligence, although amounting to gross

14  negligence, will not alone authorize an award of punitive

15  damages.

16          Punitive damages, when authorized, are awarded not as

17  compensation to the plaintiff, but solely to punish, penalize,

18  or deter a defendant.  In your verdict you should specify

19  whether you do or do not decide that the plaintiff should

20  receive punitive damages.

21          If you decide to award punitive damages, you should

22  further specify whether you find that the defendant acted with

23  specific intent to cause harm.  A party must -- a party

24  possesses specific intent to cause harm when the party desires

25  to cause the consequences of her act or believes that the

1  consequences are substantially certain to result from it.

2  Intent is always a question for the jury to decide, and it may

3  be shown by direct or circumstantial evidence.

4        Intent is ordinarily ascertained from acts and

5  conduct.  You may not presume that defendant acted with

6  specific intent to harm, but intent may be shown in many ways,

7  provided that you, the jury, find that it existed from the

8  evidence produced.  The jury may find such intent, or the

9  absence of it, upon the consideration of the words, conduct,

10 demeanor, motive, and all the other circumstances connected

11 with the alleged act.

12        The expenses of litigation generally should not be

13 allowed as part of damages; but where a defendant has acted in

14 bad faith, has been stubbornly litigious, or has caused the

15 plaintiff unnecessary trouble and expense, the jury may allow

16 them.

17        Of course, the fact that I've given you instructions

18 concerning the issue of the plaintiff's damages should not be

19 interpreted in any way as an indication that I believe that

20 the plaintiff should, or should not, prevail in this case.

21        Ladies and gentlemen, your verdict must be unanimous.

22 In other words, all of you must agree.  Your deliberations are

23 secret, and you'll never have to explain your verdict to

24 anyone.

25        Each of you must decide the case for yourself, but

1  only after fully considering the evidence with your fellow

2  jurors.  So you must discuss the case with one another and try

3  to reach an agreement.  While discussing the case, don't

4  hesitate to reexamine your own opinion and change your mind if

5  you become convinced that you were wrong.  But don't give up

6  your honest beliefs just because others think differently or

7  because you simply want to get the case over with.

8         And remember that, in a very real way, you're the

9  judges in this case, the judges of the facts.  And your only

10  interest is to seek the truth from the evidence in this case.

11         So the first thing you should do when you go to the

12  jury room in a moment is to elect one of you as the

13  foreperson.  It is the foreperson's responsibility to direct

14  your deliberations and speak for you when you return to court.

15  I have prepared a verdict form that will also go out with you,

16  and I will have a copy of the verdict form for each of you.

17  If and when the jury reaches a verdict, then you would only

18  fill out one of the forms and return that to court.

19         The verdict form is fairly long, partly because there

20  are two defendants and partly because there are three claims,

21  and then there's some subsidiary issues that you might reach

22  depending on your verdict, like attorneys' fees, expenses of

23  litigation, another way to say that, and/or punitive damages.

24         So the first question that the jury should decide --

25  and, you know, by the way, you can decide these in any order

1  you want.  The first one on the list is this:  We, the jury,

2  make the following findings regarding the defendants'

3  liability for the defamation claim.  There's two separate

4  lines.  As to Defendant Latasha Kebe, there's a blank for

5  liable and a blank for not liable.  Whichever of those you

6  find, you would check that blank.  And the same thing as to

7  Defendant Kebe Studios LLC, there's a blank for liable and a

8  blank for not liable, and you'd check whichever of those

9  applies.

10        The next question is we, the jury, make the following

11  findings of fact regarding the defendants' liability for the

12  plaintiff's invasion of false light.  Same thing.  There's a

13  section for Defendant Latasha Kebe and a separate line for

14  Defendant Kebe Studios, and then there's also a similar

15  category for the plaintiff's claim of intentional infliction

16  of emotional distress.

17        Then there's another section.  Of course, if you find

18  that no -- if you do not find any liability of any defendant,

19  you can skip the rest of the verdict form.  But if you do find

20  that one or more defendant has been liable for one or more

21  claims, then you would need to address the damages section of

22  the verdict form.  That section says we, the jury, find that

23  the plaintiff has or has not proven by a preponderance of the

24  evidence, that she is entitled to recover damages.

25        If you find that she has, then there's three possible

1    category of damages.  There's a line for general damages

2    defined as pain and suffering and/or reputational injury.

3    There's another section for medical expenses, and then there's

4    a total.  So if you have anything in either of the first two

5    categories, then you would bring that total amount down to the

6    bottom.

7            There's a section of the verdict form under damages

8    that deals with whether or not you believe that the damages,

9    if any is awarded, should you find that a defendant is liable

10   for either of the three claims, has been proven to be

11   divisible or indivisible.  And I'll give you an instruction

12   about how to make a decision as to whether or not any damages

13   are divisible or not divisible.  If you find that any damages

14   are divisible, then you would write into that particular

15   section the percentage that would apply to the responsible

16   party.

17           As to defendant or Tasha Kebe, there's a section for

18   percent and the same thing as to Kebe Studios.  Of course, if

19   you only found and should you only -- should you find any

20   defendant liable for anything and it's only one defendant,

21   then there's not -- and you decide that the corporation, for

22   example, or the LLC is not the alter ego or that the

23   individual is not an alter ego for the corporation or LLC,

24   rather -- excuse me -- then you would skip that percentage.

25   But all of that is defined in the instructions that I've

1   previously given you.

2          There's also a section for punitive damages set up

3   much like the rest of it.  As to Defendant Latasha Kebe, you

4   must find, if you reach this section, that plaintiff has or

5   has not proven by clear and convincing evidence that Defendant

6   Latasha Kebe's actions showed willful misconduct, malice,

7   fraud, wantonness, oppression, or the entire want of care

8   which would raise the presumption of conscious indifference to

9   consequences.

10          If you find that the evidence has so shown that under

11   the standard of proof required, that punitive damages would be

12   appropriate against Latasha Kebe, then you would also have to

13   answer the question that says, the plaintiff has or has not

14   proven by clear and convincing evidence that Defendant Latasha

15   Kebe acted with specific intent to cause harm to the

16   plaintiff.  And there's an exact similar section that would

17   apply to Kebe Studios LLC, same two questions.

18          And then, finally -- I'm sorry.  I know this is a

19   long verdict form -- the last issue put to the jury would be

20   on the issue of litigation expenses.  And there's a question

21   for each defendant that says, the defendant has or has not

22   acted in bad faith, been stubbornly litigious, or caused the

23   plaintiff unnecessary trouble and expense.  So you would

24   answer that question as you would find to be appropriate under

25   the evidence in this case.

1          If at any time during your deliberations or

2    discussions you need to talk to me, then what I would ask you

3    to do is to write down a message or question, get the

4    attention of the court security officer who will bring it to

5    me.  I'll respond as promptly as I can.  That might be with a

6    written response.  It possibly could be bringing you back into

7    the courtroom and giving you an answer in the courtroom if

8    that's necessary.

9          Please understand that I'll have to talk with the

10   lawyers and confer with them to allow them to have input on

11   the proper response to the question that you seek, and so it

12   may not be a really quick turn around but we'll -- the lawyers

13   are instructed to be close by so that it shouldn't take us too

14   long to get them together.

15         Let me caution you that if you do send me a note,

16   please do not indicate any of your preliminary voting, if

17   you've taken any, as to any of the claims or decisions you

18   have to make unless I specifically ask for that.  And I likely

19   would not ask for that, at least preliminarily, early in your

20   deliberations.  That type of information should remain with

21   you in the jury room and not shared with anyone, including me,

22   unless I request.

23         As I indicated yesterday, obviously you need to eat,

24   and so what we'll do is if you'll decide after you elect your

25   foreperson whether you want to eat in the room or whether you

1  want to eat downstairs as a group, it needs to be the same

2  decision, I suppose, because you need to stay together.  If

3  you decide to eat downstairs, you'll be segregated from

4  everyone else, and you cannot talk about the case there.  You

5  can only talk about the case while you're in the jury

6  deliberation room behind us.  So if you want to deliberate,

7  then you go downstairs, get your lunch -- we'll escort you

8  down so that we can take care of the expense -- and bring it

9  with you back to your room.

10       Let me also tell you this:  So, you know, obviously

11  you take your mask off to eat but you may choose -- I mean,

12  you should, I think, keep your mask on while you're

13  deliberating but, you know, I'm not the CDC police.  I'm not

14  going to be controlling what happens in the jury deliberation

15  room.

16       If you want a little bigger area than we have in one

17  of the two deliberation rooms behind us, I can make this

18  courtroom available for you for your deliberation.  We can

19  just clear everyone out of it.  And if you notice, the windows

20  in the back are opaque so that no one can see through.  We'll

21  lock the doors, and you can, you know, sit around the room and

22  talk more freely if you would like to do that.  But,

23  otherwise, choose one of the deliberation rooms.  I think one

24  is bigger than the other.  And so until that new judge gets in

25  that other room and/or she's not using it, then it's available

1  for my juries as well.

2          So the lawyers will have to gather the evidence and

3  bring it to you.  We'll have it to you probably by the time

4  you finish lunch.

5          The final thing I want to mention is the videos and

6  digital evidence that have been introduced will not go with

7  you to the jury deliberation room.  It's just hard to manage

8  that.  That would mean you would have to have a computer or

9  some way to display it.  That doesn't mean that you can't

10 review it if you want.  If you want to review any of that,

11 then you should let me know that.

12         We will bring you back to the courtroom, and then

13 we'll have one or the other side of the case to cue it up for

14 you at the appropriate point that you want to watch, and you

15 can watch it again.  Not suggesting that you will need to

16 watch anything again, but, obviously, you'll have written

17 documentation with you, exhibits, and you won't have that.

18 And so I'm just explaining to you what the procedure will be

19 if you decide that you wish to see something again.

20         All right.  Thank you, ladies and gentlemen.  If

21 you'll go to jury room, elect your foreperson, and then enjoy

22 lunch however you decide that should go.

23         COURTROOM SECURITY OFFICER:  All rise.

24         (Whereupon, the jurors exited the courtroom.)

25         THE COURT:  All right.  Thank you.  Y'all can be

1  seated for just a moment.  We'll take lunch in just a second.

2  But let me ask, does the plaintiff wish to put any exceptions

3  to the jury instructions on the record?

4          MR. PEQUIGNOT:  No, your Honor.

5          MS. MOORE:  No, your Honor.

6          THE COURT:  Does defendant wish to put any exceptions

7  to the jury instructions on the record?

8          MS. IZMAYLOVA:  No, your Honor.

9          THE COURT:  I need y'all to make sure that all the

10  documents that you've tendered are put together.  There were

11  two that Ms. Lee was asking about during the closing

12  arguments.  Have you told them about those?

13          COURTROOM DEPUTY:  They confirmed.

14          THE COURT:  Okay.  All right.  So I don't really know

15  what to expect as far as doing videos.  Since all of you

16  played what you thought, I guess, was the most important

17  videos during your closing, then that may not happen.  But if

18  it does, then you need to be prepared to cue up whatever they

19  ask to be played.

20          I want to explain for the record the Court's

21  interruption of defense counsel.  General protocol does not

22  allow lawyers to vouch for the evidence.  It's a subtle

23  difference between arguing that the evidence has shown

24  something or hasn't shown something versus saying this is what

25  I believe.  And it is statements of counsel's personal belief

1  which is not appropriate, as I understand case law really

2  uniformly around the country.

3       I recognize the plaintiff didn't object, but there

4  are strategic reasons why counsel will not object from time to

5  time.  But I also think I have an independent duty to make

6  sure that improper argument is not made when it involves areas

7  that have been so clearly indicated are not appropriate.  So I

8  tried to do it as less intrusive as I could, but I had to

9  speak up.

10      All right.  Anything else we need to talk about

11  before lunch?  Yes, ma'am.

12      MS. IZMAYLOVA:  I just have a question.  In regards

13  to the paper exhibits, are we able to take them out of the

14  binders that we provided for the witness stand?

15      THE COURT:  However -- whatever you are -- I guess

16  I've got copies of everything either behind me of plaintiffs.

17  I've got the defendant's copies here.  I'm not going to keep

18  these after the trial.  So if y'all want to use those to put

19  together so there's a physical set to go with the jury, then

20  that's fine.  But the physical set that goes with the jury

21  will be kept by the clerk and placed into the record, at some

22  point will be scanned into the record to be held by the clerk

23  when this case is transmitted to the Court of Appeals.

24      Any other questions?  All right.  So I'm going to ask

25  if y'all will be back available around 1:40.  Take about 5 or

1  10 minutes to get your documents together, I suppose.  Make

2  sure that Ms. Lee knows where you're going to be, both your

3  phone numbers and/or what rooms you're in -- she may already

4  know all of that -- so that if we have a question or if we

5  have a verdict, that we can get you back into the courtroom.

6         You do need to be prepared that if the jury finds for

7  the plaintiff on any of the claims and finds that attorneys'

8  fees or and punitive damages are appropriate, that we will

9  begin another section of the case.  I will give each side 15

10 minutes to make an opening statement about that.  I don't

11 really think you'll need that, but I'll give you that so that

12 you can kind of frame everything as it exists then.

13        And then we will follow in the new trial the same way

14 we have.  The plaintiff will be able to introduce any evidence

15 or testimony that might be appropriate.  The defendant will be

16 able to cross-examine and challenge, and when the plaintiff

17 has rested as to those claims, the defendant can do likewise

18 and introduce any evidence, testimony.  And then when we're

19 finished, I will give you both an opportunity to have an

20 additional period of time to make closing arguments on it.

21        But understand the issue at that point in time is a

22 little different.  The jury has already determined that those

23 claims are warranted by the evidence.  Your argument is really

24 not that it's not warranted.  The question is whether it

25 should or should not nonetheless be awarded and, if so, what

1    the proper amounts would be.  Okay.  Obviously, attorneys'

2    fees have got to be proven in some regards and litigation

3    expenses.  All right.  We'll see y'all at 1:40 or thereafter.

4    Thank you.

5              COURTROOM SECURITY OFFICER:  All rise.  Court stands

6    in recess.

7              (Whereupon, a recess was taken from 12:33 p.m. until

8    2:25 p.m.)

9              COURTROOM SECURITY OFFICER:  All rise.  This

10   honorable court is again in session.

11             THE COURT:  All right.  So we have a note from the

12   jury.  I'm thinking this is Court's Exhibit 3, if I remember

13   correctly from earlier notes we had about jurors.  For the

14   record the note says, were the test results of herpes

15   authenticated as part of admission to evidence?

16             And the proposed response that I've written out is

17   this:  The medical tests were authenticated pursuant to the

18   Federal Rules of Evidence such that they were admitted by the

19   Court for you to consider as you decide the issues in this

20   case.

21             Plaintiff have any objection to that response?

22             MS. MATZ:  I think the only thing that I would

23   consider adding to that is that they were -- because they were

24   certified by Certificate of Authenticity from UCLA as a

25   business record so maybe just adding that in that that is how

1  they were authenticated.

2          THE COURT:  That's almost me commenting on how

3  reliable they are.  I mean, you could have argued that.  You,

4  you know, didn't do that.  I don't feel comfortable telling

5  them why I admitted them.  They were admitted.  They're in.

6          I don't know if the question is going to the legal

7  authentication or go to some other, like, how reliable are

8  they kind of inquiry that the jury could make.  But I haven't

9  seen them as an exhibit.  Was the certification attached to

10 them?

11         MS. MATZ:  No, because we argued it pretrial, and

12 your Honor actually told us that the certification wasn't

13 going to come in, it was only for authentication purposes,

14 which I'm just rereviewing the pretrial conference transcript

15 on this.  And the other side -- what happened was the other

16 side had raised a potential objection.  We read you the

17 business record certification.  Your Honor noted that --

18         THE COURT:  I'm sorry.  You're talking a little bit

19 too fast for me with your mask on.  So can you start that

20 over?

21         MS. MATZ:  I'm sorry, your Honor.  Do you want me to

22 take my mask down?

23         THE COURT:  Come to the podium, if you would.

24         MS. MATZ:  Okay.  So, your Honor, I was just

25 rereviewing the pretrial conference transcript, and what had

1  happened was this was specifically the subject of one of the

2  defendant's motions in limine.  We noted to the Court that we

3  had a Certificate of Authenticity.  Under rule -- excuse me --

4  it's 9-02-11, which your Honor asked to see at the pretrial

5  conference because you were ruling on the objection, and you

6  had me read it into the record.  And you noted that it

7  essentially tracked the statute verbatim.

8          Your Honor noted also that the certificate itself

9  wouldn't come in, but it was for the purpose of authenticating

10 the document.  And based off of that, the other -- your Honor

11 allowed the other side to address their challenge by having a

12 subpoena sent to UCLA -- the records were returned to this

13 Court -- and that if there had been anything in there that was

14 inconsistent, your Honor was going to turn them over to the

15 other side.  And following that happening, your Honor issued

16 an order that there was nothing in there that was helpful to

17 the defendants.

18         And I will note further when they were introduced at

19 trial, the other side allowed them in pursuant to, you know,

20 this entire discussion that we had.

21         THE COURT:  Yeah, but, I mean, I'm not really

22 following -- you're saying that I said that the Certificate of

23 Authenticity doesn't come in?

24         MS. MATZ:  Yeah.  That's my understanding of the

25 pretrial transcript.

1          THE COURT:  Do you actually have --

2          MS. MATZ:  Yeah, I'm looking at it.

3          THE COURT:  Can you read to me what I said?

4          MS. MATZ:  Yeah, just give me one moment, your Honor.

5   I was just rereviewing this.  Okay.  So I had started by

6   saying it's 28 U.S.C. 1746.  This is how declarations are

7   submitted.  Usually in federal court people submit

8   declarations and certifications without notarization.  You

9   said, yes, but declarations aren't admissible --

10          THE COURT:  Slow down a little bit.

11          MS. MATZ:  Sure.  Yes, but declarations aren't

12   admissible at trial.  Ms. Izmaylova said, right.  The Court

13   said, declarations are like affidavits.  They're not

14   admissible at trial, and I said, it's just a business records

15   certification.  The Court, okay, so you're going to

16   business -- you have -- have you got the document?  And I

17   said, yes, and Ms. Izmaylova said, it's not a certification of

18   a business record, your Honor.

19          Would you like me to just continue reading verbatim?

20   I'll get to it.

21          THE COURT:  You were going so fast when you were

22   reading over what I said, but I haven't yet, I don't think,

23   heard you say that I said it's not going to come in, the

24   record itself.  I know that's the argument she was making, and

25   I was asking questions about that argument.  Did I say that

1  the certificates don't come in?

2       MS. MATZ:  The quote I have from you, your Honor,

3  is -- and I'm just reading the transcript, and it wasn't a

4  question -- declarations are like affidavits.  They're not

5  admissible at trial.

6       THE COURT:  Say that -- read it one more time a

7  little slower.

8       MS. MATZ:  Declarations are like affidavits.  They're

9  not admissible at trial.  And I'm reading from page 113, lines

10  9 through 10 of the transcript from November 9th, your Honor,

11  to the extent that you would like to review it yourself.

12       THE COURT:  Okay.  Go ahead.  Was there anything else

13  important that I said?

14       MS. MATZ:  You did note also after I read you the

15  declaration -- because you had me read it into the record, and

16  you noted that it seemed to track the statute perfectly.  And

17  then I don't know if you want to hear the part about how you

18  dealt with the issue about the subpoena, but I'd be happy to

19  read that back to you as well, your Honor.

20       THE COURT:  No, I don't know that that's -- I mean, I

21  remember how we had them sent here and all that.  And as far

22  as what was actually presented as an exhibit in this case, it

23  was simply the results from both tests.  I think they were

24  both from UCLA, weren't they?

25       MS. MATZ:  Yes.  So what was admitted in this case

1  was actually the appendix to the business records

2  certification.

3         THE COURT:  Right.

4         MS. MATZ:  And I have it.  If the Court would like me

5  to email it to Ms. Lee, I do have it on my computer right now.

6         THE COURT:  Okay.  I think I've got everything I need

7  from you.  Anything else from the defendant that you want to

8  comment on?

9         MS. IZMAYLOVA:  No, your Honor.  We don't have any

10 objection to the Court's proposed answer, but we do have an

11 objection to the plaintiff's proposed answer.

12        THE COURT:  So as I sit here and consider the ruling

13 that I've apparently made at the pretrial hearing, I'm not

14 sure it was right, honestly, now.  And the reason I don't know

15 that it was right was because, I mean, normally when you want

16 to authenticate a document in court, you do it with a witness

17 who lays the foundation in front of the jury.  And the

18 affidavit is the substitute for that that the law specifically

19 allows.

20        But I do believe -- so I guess I'm saying I think

21 probably the certification should have been allowed in.  Now,

22 notwithstanding that, though, I certainly am aware what the

23 defendant's argument is relative to these tests and, you know,

24 at least how they argued it in the closing argument.  And I

25 don't think that argument really goes to that these documents

1  aren't genuine and real.

2          There are a lot of possibilities, you know, like, for

3  example, someone else presented themselves in place of the

4  plaintiff and took the test.  And so when the names with the

5  aliases were recorded, it might have been a real test of a

6  real person but not a test to the plaintiff.  I think that's

7  highly unlikely, honestly, under the scenario because the

8  subpoenas themselves were addressed to the plaintiff's name as

9  opposed to, at least the second one, and not the aliases.  I'm

10  not sure anybody would have known the aliases other than the

11  plaintiff who may have known them.

12          The question the jury, though, has asked me is have

13  they been authenticated, and the answer to that is yes.  And

14  that is what I think this says, the medical tests, my proposed

15  instruction, the medical tests were authenticated pursuant to

16  the Federal Rules of Evidence such that they were admitted by

17  the Court for you to consider as you decide the issues in this

18  case.

19          So while I recognize, I think in hindsight, that I

20  should have allowed the certificates to come in, I think I

21  answered the question.  The question is probably not as

22  nuanced as we might think it is as lawyers, but I do think

23  this answers it.  So I think I'm going to send out what I've

24  proposed as Court's Exhibit 4 to answer their question.

25          I'm not going to introduce anything -- even if I've

1  made a mistake in not allowing the certificates to go in, I

2  don't think I can really open the evidence at this point and

3  let it go forward.

4       MS. MATZ:  Is there any way, your Honor -- and I'm

5  sorry.  Would you mind if I just make one suggestion?

6       THE COURT:  Sure.

7       MS. MATZ:  Is there any way that you could at least

8  tell the jury that it was as a result of a pretrial ruling so

9  that they understand that this was something that happened

10  outside of their presence?

11       THE COURT:  Affidavits themselves don't really mean

12  anything to them more so than -- the affidavit is just a key

13  to get things introduced, and I don't think that their lack of

14  knowledge that it came with an affidavit really would mean

15  anything because, you know, we're not dealing with -- I mean,

16  there's not a lawyer in the bunch.

17       So I don't think this is as big of an issue as it

18  might seem sitting here right now, but I think I'm going to

19  leave -- I'm reluctant to open the -- look, from the

20  plaintiff's standpoint, probably the best thing is that I left

21  it out.  If something doesn't go quite right from the

22  plaintiff's perspective, you know, this is something that

23  plaintiff could talk about on appeal.  I just don't think I

24  can open the evidence after closing to put something new in.

25  So one lawyer.  I'm sorry.

1          MS. MATZ:  I think what Ms. Moore was going to say is

2     that I completely hear what you're saying.  I do think there

3     is at least one juror that does work for a law firm, and so

4     just to the extent that that was -- that was part of the

5     reason I suggested maybe you could say something about the

6     pretrial order.

7          THE COURT:  Okay.  All right.  Was that what you were

8     going to say, Ms. Moore?

9          MS. MOORE:  Yes, your Honor.  During --

10         THE COURT:  Okay.  Wow.  Y'all have got an

11    incredible --

12         MS. MATZ:  We share headphones.

13         THE COURT:  Oh, okay.

14         MS. MOORE:  We do.  Yes, your Honor, Juror No. 3 is

15    the juror that works at a law firm.

16         THE COURT:  Well, then this answer that I'm giving

17    her will then probably mean to her what it means to us then,

18    and she will undoubtedly share that with the jury.  And I

19    don't know if I commented earlier maybe at one of our

20    meetings, when y'all were sitting there with two headphones on

21    like teenagers, you know, both listening to some jam up

22    song -- I think I wrote that down to make that comment later.

23    That's what it reminds me of.  I've seen that plenty of times,

24    teenagers doing that.

25          In any event, I think this answer will work fine, so

1  this is what I'm going to send.

2          MS. MATZ:  So does it just get sent to them or does

3  it have a --

4          THE COURT:  We'll make a copy that we'll send them,

5  and we'll keep a copy for the clerk's record.

6          MS. MATZ:  Okay.  Thank you, your Honor.

7          THE COURT:  And we'll give a copy to you as well.

8          MS. MATZ:  Wonderful.

9          THE COURT:  Okay.  All right.  Thank you.  Y'all just

10  stay pretty close.

11          MS. MATZ:  Thank you, your Honor.

12          MS. IZMAYLOVA:  Thank you.

13          COURTROOM SECURITY OFFICER:  All rise.  Court stands

14  in recess.

15          (Whereupon, a recess was taken from 2:40 p.m. until

16  3:20 p.m.)

17          COURTROOM SECURITY OFFICER:  All rise.

18          THE COURT:  So is your client going to come or no?

19  Do you want me to wait for your client?

20          MS. MATZ:  No, not unless the -- if this is just

21  about the jury question, we don't need to.

22          THE COURT:  Yeah, that's all it is.

23          MS. MATZ:  Okay.  Thank you, your Honor.

24          MS. MOORE:  Oh, yes.  Thank you, your Honor.

25          THE COURT:  Okay.  So the new note that you should

1  have from the jury, which we'll mark as Court's Exhibit 5, is:

2  Does the Court have the authority to order the take, maybe

3  down, but take of the videos based on the outcome of this

4  case?

5       The proposed response that I would have for the jury

6  is this:  Decisions about whether or to what extent either

7  party should be ordered to do something or prohibited from

8  doing something are not issues for the jury but are reserved

9  solely to the judge to decide.

10      I can't really answer their question.  I don't think

11  my decision, the authority -- and obviously this is -- there's

12  an objectionable question in this case, but that's not really

13  an issue for them and it shouldn't be a consideration for them

14  as to whether or not there's liability or not.

15      In other words, I don't think it's my role to tell

16  the jury that this is what has to happen for me to take that

17  action or this is what I have to see to take that action or at

18  all what my thinking is in that regard.  So it's just not a

19  jury issue as far as I know.

20      MS. MATZ:  So, your Honor, I think I agree it's not

21  an issue that's necessarily in front of the jury, but at the

22  same time I think perhaps addressing it in a way that makes

23  clear that equitable relief, people doing something or not

24  doing something is a decision that gets made after liability

25  and is the Court's decision.  I mean, that is the truth, and

1  you're not necessarily saying what you would or wouldn't do

2  because that would be a decision for the Court to make.  But

3  there would have to be a finding on liability first.

4          THE COURT:  Yeah, but that's not their -- they should

5  not decide the issue of liability in hopes that an injunction

6  should issue.  They already have the means to find for the

7  plaintiff and not order damages of any significant amount.  I

8  mean, they've been charged on nominal damages.

9          The instruction, in fact, says that if you

10  find for -- I'm paraphrasing right now.  But that if you find

11  for liability, the plaintiff is at least entitled for nominal

12  damages.  As far as I know, that opens the door then for

13  punitive -- not punitive, but opens the door for injunctive

14  relief regardless of what amount of damages the plaintiffs

15  might recover and maybe in this case more than perhaps any

16  other case I've ever seen with the testimony that we have here

17  about the defendant's future intentions relative to her

18  activity.

19          So I don't think I need to tell them or should tell

20  them that it is the issue of punitives -- excuse me -- the

21  issue of injunctive relief is dependent upon their decision

22  because if their decision was otherwise, if there was no

23  liable but that we still want the videos taken down and I were

24  to tell them essentially that that it is dependent upon or

25  their decision factors into whether or not I have the

1  authority, that could result in a decision on liability that

2  is not warranted in how they were thinking but is tailored to

3  get to the injunctive relief.  That's why I don't think I can

4  do that.

5        MS. MATZ:  Okay.  I think that the instruction you

6  read, and in light of what you just said, I think that that

7  makes some sense.

8        THE COURT:  All right.

9        MS. MATZ:  Thank you, your Honor.

10        THE COURT:  Does the defendant agree with what I've

11  proposed?

12        MS. IZMAYLOVA:  The defendant does agree with the

13  Court.

14        THE COURT:  Okay.  So we'll send that out as Court's

15  Exhibit 6.

16        MS. IZMAYLOVA:  Thank you, your Honor.

17        MR. SABBAK:  Thank you, Judge.

18        MS. MATZ:  Thank you, your Honor.

19        MS. MOORE:  Thank you, your Honor.

20        COURTROOM SECURITY OFFICER:  All rise.  Court stands

21  in recess.

22        (Whereupon, a recess was taken from 3:25 p.m. until

23  4:15 p.m.)

24        COURTROOM SECURITY OFFICER:  All rise.  This

25  honorable court is again in session.  Please be seated and

1  come to order.

2        THE COURT:  All right.  So the court security

3  officers have told me that we have a verdict.  In federal

4  courts you don't normally get a lot of spectators because a

5  lot of what we do is just not that much of interest to people.

6  But in this case that hasn't been the case, and I know there's

7  at least a couple of folks blogging regularly about our

8  activities today and others of you that are here interested.

9        My judicial assistant was sitting in the back of the

10  courtroom this morning listening to closing arguments, and one

11  of the things that she told me was that there was quite a bit

12  of chatter in the back by spectators.  I couldn't hear it, but

13  that doesn't mean that the jury couldn't hear it or that

14  others couldn't hear it.

15        But it's important, whatever the jury's decision,

16  that there be no audible conversation or reaction from the

17  jury.  That is particularly true if the plaintiff were to

18  prevail because this jury is not yet completed with the case.

19  So they have more to do, which may very well disappoint them

20  given the time of the day.  I'm sure they are hopeful that

21  they're done, but that's why it's important that you not make

22  any comments or statements or have any type of reaction

23  because it's just like we're in the middle of the case.  There

24  will be more argument made by counsel and more testimony to be

25  offered, and the case would still be ongoing.

1          The same is true if it's for the defendant, not that

2    the case would be continuing, but it's just not appropriate.

3    This is not an appropriate place for people to either cheer or

4    jeer depending on their outcome of the result.  It would be

5    interpreted by me to be in direct contravention to the

6    instructions that I'm giving you.  And anybody who can't

7    follow those instructions would be subject to being held in

8    contempt, so I ask that y'all keep that in mind.

9          All right.  If we could ask the jury to come back,

10   please.

11          COURTROOM SECURITY OFFICER:  All rise.

12          (Whereupon, the jurors entered the courtroom.)

13          COURTROOM SECURITY OFFICER:  Please be seated and

14   come to order.

15          THE COURT:  All right.  Thank you.  Mr. Dorsey?  Are

16   you Mr. Dorsey?

17          THE JUROR:  Yes.

18          THE COURT:  Mr. Dorsey, are you the foreperson of the

19   jury?

20          THE JUROR:  Yes.

21          THE COURT:  Has the jury reached a unanimous verdict

22   as to all counts of the complaint against the defendant?

23          THE JUROR:  Yes.

24          THE COURT:  If you could hand the verdict form to the

25   court security officer, please.  Thank you.

1            All right.  So this is the jury's verdict in Case

2    No. 19-CV-1301:  We, the jury, make the following findings

3    regarding the defendants' liability for the plaintiff's

4    claim -- for the plaintiff's defamation claim:  As to

5    Defendant Latasha Kebe, liable.  As to Defendant Kebe Studios

6    LLC, liable.

7            We, the jury, make the following findings regarding

8    the defendants' liability for the plaintiff's invasion of

9    privacy - false light claim:  As to Defendant Latasha Kebe,

10   liable.  As to Defendant Kebe Studios LLC, liable.

11           We, the jury, make the following findings regarding

12   the defendants' liability for the plaintiff's intentional

13   infliction of emotional distress:  As to Defendant Latasha

14   Kebe, liable.  As to Defendant Kebe Studios LLC, liable.

15           We, the jury, under damages, we, the jury, find the

16   plaintiff has proven, by a preponderance of the evidence, that

17   she is entitled to recover damages.

18           We, the jury, award the plaintiff damages in the

19   following amounts:  $1,000,000 in general pain and suffering

20   and reputational injury.  $250,000 in medical expenses for a

21   total of $1,250,000.

22           We, the jury, make the following findings regarding

23   joint and several liability:  The plaintiff has proven, by a

24   preponderance of the evidence, that the defendants are jointly

25   and severally liable for the damages awarded, if any.

1          We, the jury, make the following findings regarding a

2    possible award of punitive damages:  As to Latasha Kebe, the

3    plaintiff has proven, by clear and convincing evidence, that

4    Defendant Latasha Kebe's actions showed willful misconduct,

5    malice, fraud, wantonness, oppression, or entire want of care

6    which would raise the presumption of conscious indifference to

7    the consequences.

8          The plaintiff has proven, by clear and convincing

9    evidence, that Defendant Latasha Kebe acted with specific

10   intent to cause harm.

11         As to Defendant Kebe Studios LLC, the plaintiff has

12   proven, by clear and convincing evidence, that Defendant Kebe

13   Studios LLC's actions showed willful misconduct, malice,

14   fraud, wantonness, oppression, or entire want of care which

15   would raise the presumption of conscious indifference to

16   consequences.

17         The plaintiff has proven, by clear and convincing

18   evidence, that Defendant Kebe Studios LLC acted with specific

19   intent to cause harm to the plaintiff.

20         As to litigation expenses, we, the jury, make the

21   following findings regarding a possible award of attorney's

22   fees and expenses:  Defendant Latasha Kebe has acted in bad

23   faith, been stubbornly litigious, or has caused the plaintiff

24   unnecessary trouble and expense.

25         Defendant Kebe Studios has acted in bad faith, been

1  stubbornly litigious, or caused the plaintiff unnecessary

2  trouble and expense.

3          So say we all, 24 January 2022.

4          Sir, if you would please publish or show the verdict

5  first to plaintiff's counsel and then to defendants' counsel.

6          (Complies.)

7          THE COURT:  Any objection to the form of the verdict

8  from the plaintiff?

9          MS. MATZ:  No, your Honor.

10          THE COURT:  Any objection to the form of the verdict

11  from the defendants?

12          MS. IZMAYLOVA:  No, your Honor.

13          THE COURT:  Any further inquiry of the jury needed?

14  And I ask this to defendants as to the verdict that's been

15  rendered at this point.

16          MS. MATZ:  No, your Honor, not from plaintiff.

17          MS. IZMAYLOVA:  We would poll the jury, your Honor.

18          THE COURT:  Ladies and gentlemen, I'm going to poll

19  each of you, meaning I'm going to ask you a series of three

20  questions, and the questions will be whether the verdict, as

21  announced in court, was the unanimous verdict of the jury in

22  the jury room, whether it was your verdict, and whether it

23  remains your verdict.  So I'll just call you out by number and

24  name and ask you those three questions.

25          Juror No. 2, Kiplyn Lewis, if you'll raise your hand.

1  Ms. Lewis, was the verdict as announced in court the unanimous

2  verdict of the jury in the jury room?

3           THE JUROR:  Yes, Judge.

4           THE COURT:  Was it your verdict?

5           THE JUROR:  Yes, Judge.

6           THE COURT:  Does it remain your verdict?

7           THE JUROR:  Yes, sir.

8           THE COURT:  Mr. Dorsey, sir, was the verdict as

9  announced in court the unanimous verdict of the jury in the

10  jury room?

11           THE JUROR:  Yes.

12           THE COURT:  Was it your verdict?

13           THE JUROR:  Yes.

14           THE COURT:  Does it remain your verdict?

15           THE JUROR:  Yes.

16           THE COURT:  Juror No. 14, Rose Kopanski.  I think I'm

17  pronouncing it --

18           THE JUROR:  Kopanski.

19           THE COURT:  Okay.  I was close then.  Ms. Kopanski,

20  is the jury verdict, as announced in court, was that the

21  unanimous verdict of the jury in the jury room?

22           THE JUROR:  Yes, sir.

23           THE COURT:  Was it your verdict?

24           THE JUROR:  Yes, sir.

25           THE COURT:  Does it remain your verdict?

1              THE JUROR:  Yes, sir.

2              THE COURT:  Ms. Richardson was excused; right?  Okay.

3    Ms. Rodriguez, Juror No. 16, was the verdict as announced in

4    court the unanimous verdict of the jury in the jury room?

5              THE JUROR:  Yes, sir.

6              THE COURT:  Was it your verdict?

7              THE JUROR:  Yes, sir.

8              THE COURT:  Does it remain your verdict?

9              THE JUROR:  Yes, sir.

10             THE COURT:  Ms. Garcia?

11             THE JUROR:  Yes.

12             THE COURT:  Ms. Garcia, was the verdict as announced

13   in court the unanimous verdict of the jury in the jury room?

14             THE JUROR:  Yes, sir.

15             THE COURT:  Was it your verdict?

16             THE JUROR:  Yes, sir.

17             THE COURT:  Does it remain your verdict?

18             THE JUROR:  Yes, sir.

19             THE COURT:  Ms. O Bearden?  Ms. O Bearden, was the

20   verdict as announced in court the unanimous verdict of the

21   jury in the jury room?

22             THE JUROR:  Yes, sir.

23             THE COURT:  Was it your verdict?

24             THE JUROR:  Yes, sir.

25             THE COURT:  Does it remain your verdict?

```
1            THE JUROR:  Yes, sir.

2            THE COURT:  Mr. Sapp?  Was the verdict as announced

3    in court the unanimous verdict of the jury in the jury room?

4            THE JUROR:  Yes, sir.

5            THE COURT:  Was it your verdict?

6            THE JUROR:  Yes, sir.

7            THE COURT:  Does it remain your verdict?

8            THE JUROR:  Yes, sir.

9            THE COURT:  I believe that was everyone; right?

10           Now, sir, juror number again?

11           THE JUROR:  13.

12           THE COURT:  I'm sorry.  You were included among a

13   bunch of people that had been struck, so I overlooked you.

14   Mr. Dukes; right?

15           THE JUROR:  Yes.

16           THE COURT:  Mr. Dukes, was the verdict as announced

17   in court the unanimous verdict in the jury room?

18           THE JUROR:  Yes, sir.

19           THE COURT:  Was it your verdict?

20           THE JUROR:  Yes, sir.

21           THE COURT:  Does it remain your verdict?

22           THE JUROR:  Yes, sir.

23           THE COURT:  All right, ladies and gentlemen.  I wish

24   we were at a point where I could tell you that we were

25   finished with you, but we're not.  I'm not sure if you
```

1    suspected it or not, but there do remain two issues that are

2    open.  And those issues are what amount, if any, of punitive

3    damages might be awarded against either or both of the

4    defendants, as well as what amount of litigation expenses

5    might be awarded against either or both of the defendants.

6            Each side has the opportunity in this second phase of

7    the trial, which I promise you won't be two weeks and one day,

8    but they have an opportunity to make a short opening statement

9    to you.  They have an opportunity to present any evidence to

10   you that would be relevant to those two basic issues.  They

11   would also have the opportunity under the law to make a

12   shorter brief closing argument as well.

13           It's 4:30.  I don't believe we could do it today and

14   be finished by 5:00.  So if it was 3:30, I would probably ask

15   the lawyers outside of your presence how long they would

16   expect their presentation to last, but it's just really not

17   fair to them or to any of you that need to be on your way at

18   5:00-ish to even attempt to try to do that today.  So I do

19   regret that you'll have to come back tomorrow for that.

20           So we can certainly have an opportunity to talk more

21   when the case is over with about any questions you may have

22   had and to properly thank you for your service.  But it's not

23   quite over, and I do need you an additional day.  My

24   expectation is that we will be able to likely do this in the

25   morning and be done with it midday, but I'll ask if you will

1  take your notes with you, leave those in the jury deliberation

2  room, come back in the morning for this second phase of the

3  trial.

4      I feel certain that the parties will be as succinct

5  as possible.  Not a secret, I don't think, based on what you

6  would suspect, that there has been a lot written about this

7  case in the press, certainly in the new media that we live

8  with today.  And there will be a lot written tonight, and

9  there certainly will be a lot written after tomorrow as well.

10 But you are still subject to the restrictions that you not

11 read or discuss the case with anyone.  And you obviously have

12 made some decisions, but you haven't made all of them.  And

13 there's a few more that you need to make.

14     So I want that decision to be only based on what

15 you've heard in the courtroom.  Obviously, you've talked about

16 the case, and so that's a little different than perhaps any

17 other day.  But you should also not, outside of the

18 negotiations and deliberations you've already had, you should

19 not talk about the case any further until tomorrow when the

20 case is given back to you to make these final two decisions.

21     So I will see you in the morning.  I'm going to ask

22 if you'll be back at 9:30.  Thank you.

23     COURTROOM SECURITY OFFICER:  All rise.

24     (Whereupon, the jurors exited the courtroom.)

25     THE COURT:  Y'all have a seat, please.  So I don't

1  plan on making any preliminary instructions from the court

2  tomorrow morning.  What I would plan to do is start with your

3  opening argument on this -- or opening statement at this phase

4  of the trial at 9:30, give each of you 15 minutes.  Then we'll

5  immediately start with the -- whatever evidence that the

6  plaintiff wishes to introduce and followed by the defendant.

7            And then we'll go to closing arguments, which I

8  intend to give you 20 minutes, I think, on those two issues,

9  that 15 and 20 should be plenty of time for you to make your

10  arguments.  The bulk of the case has been decided at this

11  point anyway.

12            I would like some estimation about how long your side

13  of the evidence might take.  Anyone on the plaintiff want to

14  suggest how long you think your presentation of evidence might

15  be?

16            MS. MATZ:  Your Honor, I think we're probably talking

17  about an hour or two tops, and it may be potentially shorter

18  than that.

19            THE COURT:  I'm sorry.  An hour or two tops?

20            MS. MATZ:  Yeah, tops, and we'll try to make it as

21  brief as possible.

22            THE COURT:  Okay.  How about from the defendant?  Not

23  counting arguments but just evidence.

24            MS. IZMAYLOVA:  I don't know, probably same.

25            THE COURT:  Okay.  Well, yeah, just be prepared to

1  complete the case tomorrow.  I don't think that -- I mean, the
2  jury deliberated today, you know, three hours and a half or
3  so.  If we take the lunchtime out of it, maybe four and a half
4  hours.  The deliberation on attorneys' fees and punitive
5  damages will be rather quick, based on my experience.  You
6  know, obviously every case is different, and maybe that won't
7  be the case.  But that's what I expect.
8          I have a couple of pages of instructions that we've
9  prepared that I will give on punitive damages and attorney's
10  fees.  It's not a lot.  It's really basically the statute.
11  Don't leave until you have a copy of that today.
12          There are obviously going to be other issues to
13  discuss in this case post trial.  Two come to mind.
14  Obviously, one is going to be the plaintiff's request for
15  injunctive relief.  I don't expect that we'll that have that
16  discussion tomorrow.  I think it's something that both sides
17  will need to brief for me, and we would have a hearing at a
18  future date.  Not in the distant future but, you know,
19  probably late February about what any injunction might look
20  like if there is going to be one.
21          You know, just looking at the verdict, you know, I've
22  got some questions about the medical expenses, whether or not
23  there's evidence to support a $250,000 award, and so we'll
24  need to talk about that as well as part of any post trial
25  motions that are filed.  And y'all might be able to talk about

1  that one and agree as to what it might look like in the

2  judgment.  But you might not be able to, so we'll just deal

3  with that in the future.  But we don't need to deal with that

4  tonight or tomorrow.

5          Anything else we need to talk about this evening?

6          MS. MATZ:  Not that I'm aware of, your Honor.

7          THE COURT:  Anything else from the defendant?

8          MS. IZMAYLOVA:  No, your Honor.

9          THE COURT:  Okay.  All right.  Thank you.  We'll see

10  you tomorrow.

11          COURTROOM SECURITY OFFICER:  All rise.  This Court

12  stands in recess.

13          (Whereupon, the proceedings were adjourned at 4:40

14  p.m.)

15                          -  -  -

16

17

18

19

20

21

22

23

24

25

1                    REPORTERS CERTIFICATE

2

3

4           I, Wynette C. Blathers, Official Court Reporter for

5   the United States District Court for the Northern District of

6   Georgia, with offices at Atlanta, do hereby certify:

7           That I reported on the Stenograph machine the

8   proceedings held in open court on January 24, 2021, in the

9   matter of BELCALIS MARLENIS ALMÁNZAR v. LATASHA TRANSRINA KEBE

10  and KEBE STUDIOS LLC, Case No. 1:19-CV-01301-WMR; that said

11  proceedings in connection with the hearing were reduced to

12  typewritten form by me; and that the foregoing transcript

13  (Volume IX of X, Pages 1 through 125) is a true and accurate

14  record of the proceedings.

15          This the 27th day of February, 2022.

16

17

18

19                           _____
                             /s/ Wynette C. Blathers, RMR, CRR
20                               Official Court Reporter

21

22

23

24

25