**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| BELCALIS MARLENIS ALMÁNZAR,<br><br>                    Plaintiff,<br><br>          v.<br><br>LATASHA TRANSRINA KEBE and KEBE<br>STUDIOS LLC,<br><br>                    Defendants. | Case No. 1:19-cv-01301-WMR |

## PLAINTIFF'S BRIEF IN SUPPORT OF PERMANENT INJUNCTION

Plaintiff Belcalis Marlenis Almánzar ("Plaintiff") respectfully submits this

brief in support of her request for a permanent injunction against Defendants

Latasha Transrina Kebe ("Kebe") and Kebe Studios LLC ("Kebe Studios")

following the jury trial and verdict in this action (collectively, "Defendants").

### I.        BACKGROUND

Plaintiff filed this action because Defendants refused to stop targeting her

with harmful and disgusting lies. For over three years, Defendants repeatedly and

knowingly published false and defamatory statements that Plaintiff engaged in

prostitution; that Plaintiff has herpes and HPV; that Plaintiff uses or has used

cocaine; that Plaintiff appears in a particular video engaging in a debasing act with

a beer bottle; and that Plaintiff committed adultery (the "Defamatory Statements").

The verbatim Defamatory Statements published by Defendants and admitted at the recent jury trial in this case included the following:

*Defamatory Statements that Plaintiff Engaged in Prostitution*

- Kebe: **"There's a lot that you spilled, you said that Cardi is a prostitute, she was a drug user, cocaine and Molly to be specific, she has herpes."** Jones: **"Yes."** (P-534 at 0:35.)

- Kebe: **"You said that Cardi B prostituted."** Jones: **"Yes"** (P-534 at 0:40."

- Kebe: **"(Kebe) Was this [Cardi's] first time prostituting that you knew of?"** Jones: **"This was her first time prostituting that I knew of, yes."** (P-534 at 22:00.)

- **"[Plaintiff] prostituted for a living"** (P-532 at 5:50.)

- **"I cosigned everything that [Jones] said, that she's a whole prostitute."** (P-592 at 1:07:50.)

- **"She's mad because I called her a prostitute – b\*\*ch you sold p\*\*\*y!"** (P-581 at 7:15.)

- **"I do know this, for her to come out here and say that she's never sold p\*\*\*y, that's a lie. That's a motherf\*\*\*ing lie."** (P-576 at 58:45.)

*Defamatory Statements that Plaintiff has Herpes and HPV*

- Kebe: **"She has herpes?"** Jones: **"Yes."** (P-534 at 0:48.)

- Kebe: **"There's a lot that you spilled, you said that Cardi is a prostitute, she was a drug user, cocaine and Molly to be specific, she has herpes."** Jones: **"Yes."** (P-534 at 0:35.)

- **"I thought we left you and your confirmed irritated p\*\*\*y in 2018. . . . #HerpesB."** (P-276.)

- **"I know you got HPV."** (P-592 at 1:16:11.)

- **"What's the hashtag? Cold Sore B! We're going to be talking about Cold Sore B tonight b\*\*ch. Since y'all should have had a motherf\*\*\*ing gag order, we'll see b\*\*ch."** (P-549 at 3:05.)

- **"Cardi- Cold Sore B, I'm sorry Cold Sore B, that's her name."** (P-549 at 38:00.)

- **"We had a certain rapper, Cold Sore B, tweeting about us all night."** (P-576 at 2:30.)

- **"Cold Sore B is done."** (P-576 at 51:50.)

- **"Cold sore B is done."** (P-264.)

- **"Herpes B"** (P-999.)

*Defamatory Statements that Plaintiff Used Cocaine*

- Kebe: **"Was she a drug user?"** Jones: **"Yes"** Kebe: **"Cocaine . . . to be specific?"** Jones: **"Yes"** (P-534 at 0:40.)

- Kebe: **"There's a lot that you spilled, you said that Cardi is a prostitute, she was a drug user, cocaine and Molly to be specific, she has herpes."** Jones: **"Yes."** (P-534 at 0:35.)

- **"Now if the bitch is lying, by saying that you're a cokehead, okay, by saying that you were addicted to Molly pills, by saying that you were a prostitute, why in the f\*\*k are you coming at the blogs for some s\*\*t that already went viral, sue the b\*\*ch."** (P-519 at 2:59.)

*Defamatory Statements About Debasing Act with a Beer Bottle*

- **"[Plaintiff] stuck beer bottles up her vagina, she actually took beer bottles from pedestrians. This is on video, she took the beer bottle from the pedestrian . . . stuck it in her cooch, drank the beer bottle and gave it back to him."** (P-583 at 22:40.)

*Defamatory Statements that Plaintiff Committed Adultery*

- **"[Plaintiff is] f***ing someone else too."** (P-592 at 1:15:37.)

  - **"She also said that you f***ing somebody too high profile and that's the reason you are done"** (P-592 at 1:16:29.)

- **"Enjoy your transition d**k, that's the only thing that gave her balls, somebody is licking her p***y."** (P-592 at 1:21:31.)

- **"Now [Plaintiff]'s f***ing somebody else."** (P-581 at 8:00.)

- **"Who is Cardi's side peen? He works for Atlantic, he's high up on the Richter scale."** (P-579 at 5:57.)

- L. Kebe: **"Cardi's sleeping with somebody else."** C. Kebe: **"You don't know that."** L. Kebe: **"But I do, my source told me that, when have my sources lied to me? When, I'm waiting."** (P-579 at 24:30.)

Each of these categories of statements was supported at trial with overwhelming and unrebutted evidence establishing that the statements were patently false and defamatory and that Defendants published them with actual malice and with the intention of causing Plaintiff emotional distress. The jury unanimously found both Defendants liable on each of Plaintiff's claims and awarded compensatory damages, punitive damages, and her costs of litigation.

Even though Defendants were told on multiple occasions that the abhorrent things they were publishing about Plaintiff were untrue, and even though they admitted that they knew they were untrue, Defendants refused to discontinue, remove, or retract the Defamatory Statements. Indeed, despite the filing of this action and the receipt of multiple cease-and-desist letters, Defendants' harassment continued throughout this years-long litigation as Defendants purposefully persisted in repeating the Defamatory Statements in order to upset Plaintiff and drive traffic to Defendants' platforms. (*See, e.g.*, 1/12/22 Tr. at 22:10-22 (Kebe acknowledging that she tagged Plaintiff and used the hashtag #HerpesB in her posts in part to irritate Plaintiff); P-549 (10/7/19 Video) at 39:15 ("I just happen to have a personal vendetta against you b**ch, so I take pride in this s**t.").)

Defendants also have made clear on multiple occasions that they will not stop repeating the Defamatory Statements unless compelled to by this Court. For example, during a September 21, 2020 video (a year and a half after this case was filed), Kebe clearly explained her intentions:

> "I don't care if they put a gag order on me, the reason the b**ch is mad - I know y'all going to put a gag order on me, I don't give a f**k, it's going to be an injunction, I don't give a f**k."

(P-581 at 4:10; *see also, e.g.*, P-549 (10/7/19 Video) at 3:05 ("What's the hashtag? Cold Sore B! We're going to be talking about Cold Sore B tonight b**ch. Since

y'all should have had a motherf***ing gag order, we'll see b**ch."), at 27:00

(""Now, on to Cold Sore B. Y'all should have had a gag order on me, I was just

waiting for the right time, and the right motherf***ing receipts to strike again,

b**ch."); P-550 (11/11/19 Video) at 4:15 ("She wants me to delete videos. Well

b**ch you need to give me a check. You want me to delete these videos you better

give me the money that I was supposed to make off of the videos. Or more.

Because it's residual income. . . . You want s**t down on my platform, you got to

pay for that."); P-583 (4/23/19 Video) at 18:25 ("You want to shut me up? Let me

tell you how to shut me up. Pay me b**ch.").

And when asked about her statements during the trial, her testimony could

not have been more unequivocal:

> Q:   "[U]nless someone actually forces you to, you are never going
>       to stop repeating these statements about my client?"
>
> A:    "That is correct."

(1/12/22 Tr. at 101:13-16.)

> Q:   "So the only way at this point these videos are ever going to
>       come down is if this Court forces you to; is that right?"
>
> A:    "That is correct."

(*Id*. at 108:7-9.)

> Q:   "Are you essentially saying that to stop you from calling my
>       client cold sore B my client needs to get a gag order?"

6

A:     "Yes, ma'am."

Q:     "Okay. And when you say gag order, you're talking about an injunction in court; correct?"

A:     "That is correct."

(*Id*. at 128:20-25.)

## II.     ARGUMENT

### A.    Plaintiff Is Entitled to a Permanent Injunction.

#### 1.     The Traditional Factors Favor a Permanent Injunction.

"Under traditional equitable principles, a plaintiff seeking a permanent injunction must demonstrate (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction." *Angel Flight of Ga. v. Angel Flight Am.*, 522 F.3d 1200, 1208 (11th Cir. 2008) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). Each of these factors point decidedly in favor of a permanent injunction in this case.

Evidence entered at trial proved that Defendants were unrelenting in their campaign of defamation against Plaintiff both before and during the pendency of this case. Defendants also made clear that they would not stop publishing the

7

Defamatory Statements about Plaintiff absent an order from this Court. If Defendants carry through with these promises to keep harassing Plaintiff absent an injunction, Plaintiff will be required to file repeated (if not perpetual) subsequent litigation to redress the threatened future defamation.

This is particularly true if Defendants are judgement proof and thus incapable of compensating Plaintiff for the harm they have caused, or if the Defendants have fraudulently moved assets during the pendency of this litigation to make it more difficult to collect the judgment, because then the damages award cannot serve its intended deterrent effect. ***Defendants have already boasted as much***:

Kebe:       "What, I'm like 600 thousand in? But let me tell you how this was a blessing though. Cause can't nobody else sue me, and even if they do, I ain't got no money. We've got estate lawyers, we've got every motherf***ing thing. I ain't got s**t in my name b**ch."

Guest:      "Trust."

Kebe:       "Exactly. Good luck with that, you know what I'm saying? People will back away. Oh she's got a trust? Oh let me just you know, okay let me leave her alone. And you can research it like you know, that is the biggest blessing."

(P-651 (8/25/21 Video) at 12:30.)

Kebe:       "Even if they did sue b**ch I ain't got but a dollar to my name b**ch, what are you going to get? And there's

8

always bankruptcy b\*\*ch. To everybody who was like 'Well what are you going to do if she wins?' What do you mean what am I going to do? What do you do, I'm going to pull a 50 Cent on that b\*\*ch, what are you talking about?"

(*Id.* at 14:10; *see also* https://allblk.tv/socialsociety/season2/no-cap/ at 3:03 (Kebe referring to the verdict: "I ain't got it. Don't ask me for no money. I ain't got it. . . . We have business things in place that takes care of things like this.").)

Even assuming Defendants satisfy the jury's substantial damages award, damages alone are inadequate to address the constant ongoing threat of Defendants repeating the Defamatory Statements. *See Balboa Island Village Inn, Inc. v. Lemen*, 57 Cal. Rptr. 3d 320, 333 (Cal. 2007) (explaining that damages are not sufficient to address a continuing pattern of defamation because the plaintiff would be required to bring a succession of lawsuits); *see also Baker v. Kuritzky*, 95 F. Supp. 3d 52, 58 (D. Mass. 2015) (granting injunction where "[t]he frequency of the libelous statements suggests that the libel will continue absent injunctive relief"). As noted above, Defendants have explicitly said that they will continue publishing the Defamatory Statements unless an injunction is issued.

In addition, the ongoing harm to Plaintiff if the Defamatory Statements are permitted to subsist and be repeated is irreparable. Courts have routinely recognized damage to reputation, the archetype form of harm that is caused by

defamation, as irreparable. *See, e.g.*, *White Cap, L.P. v. Mowers*, No. 1:19-cv-02750-SDG, at 28 (N.D. Ga. Aug. 11, 2021) ("While White Cap is entitled to certain monetary damages as well, there is no adequate remedy at law to restore its tarnished reputation or to prevent continuing harm from Defendants' actions - damage to White Cap continues as long as Defendants continue their wrongful conduct.") (granting permanent injunction for defamation); *see also Transcon. Gas Pipe Line Co. v. 6.04 Acres*, 910 F.3d 1130, 1164-66 (11th Cir. 2018) (affirming finding that harm to reputation was irreparable); *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1310 (11th Cir. 1998) (same); *Reinalt-Thomas Corp. v. Mavis Tire Supply, LLC*, 391 F. Supp. 3d 1261, 1281 (N.D. Ga. 2019) (finding harm to the plaintiff's reputation was irreparable); *Express Franchise Servs., L.P. v. Impact Outsourcing Solutions, Inc.*, 244 F. Supp. 3d 1368, 1384 (N.D. Ga. 2017) (same); *EWE Grp. v. Bread Store, LLC*, 54 F. Supp. 3d 1343, 1352 (N.D. Ga. 2014) (same); *Dunkin' Donuts Inc. v. Kashi Enters., Inc.*, 106 F. Supp. 2d 1325, 1327 (N.D. Ga. 2000) (same).[1]

Likewise, the emotional harm to Plaintiff that was intentionally caused by Defendants, which Plaintiff proved at trial, would also be irreparable if permitted

---

[1] Many of these cases arise in the context of trademark infringement where the reputation of the company's brand is at issue. This is highly analogous to a celebrity such as Plaintiff whose personal reputation is her brand.

to continue. *Coyotl v. Kelly*, 261 F. Supp. 3d 1328, 1343 (N.D. Ga. 2017) (recognizing emotional harm as irreparable); *see also Chalk v. U.S. Dist. Court Cent. Dist. of Ca.*, 840 F.2d 701, 709-10 (9th Cir. 1988) (same); *E.E.O.C. v. Chrysler Corp.*, 733 F.2d 1183, 1186 (6th Cir. 1984) (same); *Conradis v. Buonocore*, No. 6:18-cv-1486-EJK (M.D. Fla. Sept. 17, 2021) (same); *Porter v. Clarke*, 290 F. Supp. 3d 518, 533 (E.D. Va. 2018) (same); *Lavielle  v. Acosta*, 281 F. Supp. 3d 1133, 1135 (W.D. Okla. 2017) ("[T]he harm Plaintiffs seek to avoid is their continued emotional degradation, which is undoubtedly irreparable."); *U.S. v. Matusoff Rental Co.*, 494 F. Supp. 2d 740 (S.D. Ohio 2007) (finding irreparable harm and noting that "emotional distress [is] difficult, if not impossible, to calculate with mathematical precision").

As to the third factor, the harm to Plaintiff outweighs any potential harm to Defendants if they are enjoined from continuing to publish the Defamatory Statements because the First Amendment does not protect false and defamatory speech. *See Beauharnais v. Illinois*, 343 U.S. 250, 266 (1952); *see also Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 245-46 (2002) ("The freedom of speech has its limits; it does not embrace certain categories of speech, including defamation . . . ."). Defendants therefore have no legitimate interest that would be affected by an injunction that prevents them from continuing to publish (and republish) the

Defamatory Statements.

Defendants may argue that Plaintiff will not suffer harm without an injunction because they already have removed certain videos and posts. As an initial matter, not all of the videos and posts containing the Defamatory Statements have been removed from Defendants' social media accounts. (*See, e.g.*, P-552 at 2:18, 35:22, 48:15, 49:14, 52:19 ("Cold Sore B"); P-565 at 0:54, 3:27, 12:00 ("Cold Sore B"), at 4:00 ("You've got cold sores on your lip, the picture's on live, everyone can see that s**t. Who's got a gag order now?"); Decl. of W. Andrew Pequignot ("Pequignot Decl.") ¶ 2, Ex. A.) Regardless, even with respect to videos and posts that have been taken down, Defendants have made it abundantly clear that an injunction is necessary to prevent them from repeating and republishing the Defamatory Statements.

Indeed, without an injunction, Defendants could simply republish the same videos and written posts at any time, and Plaintiff's only recourse would be to file another lawsuit. This is not a hypothetical concern; Defendants previously removed the Starmarie Jones interview and the video she posted a couple days later from their social media channels upon receiving a cease-and-desist letter only to republish them the very next day. (Pl.'s Second Am. Compl. (ECF No. 69) ¶¶ 67-68; Kebe's Answer and Affirmative Defenses, ECF No. 79 ¶¶ 67-68.) And despite

the overwhelming evidence entered at trial and a unanimous jury verdict against both Defendants on all of Plaintiff's claims, they continue to insinuate that the Defamatory Statements are true: "No LIES were told on anyone." (Kebe referring to this action). (Pequignot Decl. ¶ 3, Ex. B.)

Notably, "the court's power to grant injunctive relief survives discontinuance of the illegal conduct." *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953); *accord Ky. Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 390 n.29 (5th Cir. 1977) ("In numerous cases courts have enjoined future violations though the transgressor has purged itself and come to court saying it will never again transgress and become a sinner."). This is the case because "the purpose of an injunction is to prevent future violations and the defendant would otherwise be free to return to his old ways." *Pullum v. Greene*, 396 F.2d 251, 256 (5th Cir. 1968). Given Defendants' refusal to remove the Defamatory Statements from their social media channels for more than three years even though they knew the statements were untrue, and given their promises to continue publishing the Defamatory Statements unless this Court orders them to stop, there can be no doubt that Defendants will "return to their old ways" unless an injunction is issued.

Finally, the public's interest in truthful information will be well-served by prohibiting Defendants from continuing to publish and republish the Defamatory

Statements. *White Cap*, No. 1:19-cv-02750-SDG, at 29. It also is in the public's interest not to burden the courts with multiple damages actions to address Defendants' continuing course of misconduct.

### 2. A Permanent Injunction Is Consistent with the First Amendment and Georgia Law.

In addition to the above factors, the Court must address whether an injunction would constitute an unconstitutional prior restraint on speech. Importantly, the Supreme Court "***has never held that all injunctions [against speech] are impermissible***." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 390 (1973) (emphasis added). Rather, "[t]he special vice of a prior restraint is that communication will be suppressed, either directly or by inducing excessive caution in the speaker, ***before*** an adequate determination that it is unprotected by the First Amendment." *Id.* (emphasis added). On the other hand, a permanent injunction on speech is permissible where "the order is based on a continuing course of repetitive conduct" and "the order will not have gone into effect before [a] final determination that the [speech is] unprotected." *Id.*; *see also Auburn Police Union v. Carpenter*, 8 F.3d 886, 903 (1st Cir. 1993) ("An injunction that is narrowly tailored, based upon a continuing course of repetitive speech, and granted only after a final adjudication on the merits that the speech is unprotected does not constitute an unlawful prior

restraint."); *Balboa Island*, 57 Cal. Rptr. 3d at 333 (distinguishing between "requests for preventive relief prior to trial and post-trial remedies to prevent repetition of statements judicially determined to be defamatory"); *Holmes v. Dominique*, No. 1:13- cv-04270-HLM, at 27-30 (N.D. Ga. Jan. 20, 2015) (entering permanent injunction after having denied a preliminary injunction on First Amendment grounds). Defendants' targeted defamation of Plaintiff has been a continuing course of repetitive conduct, and there was a determination made at trial that the Defamatory Statements are unprotected speech.

For injunctive relief to be allowable in a diversity case like this one, the relief also must be consistent with state law. That is not an impediment to issuing an injunction in this case. In *Retail Credit Co. v. Russell*, 218 S.E.2d 54 (1975), the Georgia Supreme Court adopted and applied the reasoning of *Pittsburgh Press* to uphold a permanent injunction for defamation under Georgia law. The trial court's injunction restrained the defendant there from publishing that the plaintiff was "dismissed for dishonesty and would not be eligible for rehire" and that "he admitted to taking money over a period of time" from his former employer. *Id.* at 62. The Georgia Supreme Court explained:

> Under the Court's reasoning in *Pittsburgh Press*, the injunction before us is not a prior restraint offending the Federal or State Constitutions. The jury verdict necessarily found the statements of Retail Credit to have been false and defamatory, and the evidence authorized a

conclusion that the libel had been repetitive. Moreover, the injunction does not interfere with Retail Credit's business activities in general, or even with its publication of further reports on Russell, provided there is no repetition of the exact allegations found to have been libelous.

*Id.* at 62-63.

Numerous other federal and state courts have upheld the propriety of a permanent injunction for repetitive defamatory statements after a final determination that the statements were defamatory. *See, e.g.*, *Auburn Police Union*, 8 F.3d at 903-04; *Lothschuetz v. Carpenter*, 898 F.2d 1200, 1209 (6th Cir.1990); *Hill v. Petrotech Res. Corp.*, 325 S.W.3d 302, 309 (Ky. 2010); *Balboa Island*, 57 Cal. Rptr. 3d at 331; *Advanced Training Sys., Inc. v. Caswell Equip. Co., Inc.*, 352 N.W.2d 1, 11 (Minn. 1984); *O'Brien v. Univ. Cmty. Tenants Union, Inc.*, 327 N.E.2d 753, 755 (Ohio 1975).

The California Supreme Court's opinion in *Balboa Island* succinctly encapsulates the rationale of these decisions:

> [P]reventing a person from speaking or publishing something that, allegedly, would constitute a libel if spoken or published is far different from issuing a posttrial injunction ***after*** a statement that already has been uttered has been found to constitute defamation. Prohibiting a person from making a statement or publishing a writing ***before*** that statement is spoken or the writing is published is far different from prohibiting a defendant from ***repeating*** a statement or ***republishing*** a writing that has been determined at trial to be defamatory and, thus, unlawful.

*Balboa Island*, 57 Cal. Rptr. 3d at 326 (emphasis added) (summarizing the history

16

of injunctions in defamation cases).

The jury in this case has already made a final determination that the statements published by Defendants are defamatory, and thus unlawful. And as discussed above, Defendants' publishing of these statements has been repetitive and unrelenting. A permanent injunction is both constitutionally permissible and required to afford Plaintiff a complete remedy on her meritorious claims.

**B.      Plaintiff Seeks a Narrowly Tailored Injunction.**

Plaintiff seeks a permanent injunction that is not worded more broadly than is necessary to address the Defamatory Statements that were the subject of this action and that were found defamatory by the jury in this case.[2] Specifically, Plaintiff is only seeking to require Defendants to remove any videos and posts that contain the Defamatory Statements from their social media accounts and to enjoin Defendants from republishing those same statements. In other words, the proposed injunction will only affect speech that has been found defamatory and thus is not subject to First Amendment protection, which is consistent with the Federal and State constitutions and the weight of authority on this issue. *See supra*.

---

[2] A proposed injunction will be submitted before the hearing on this issue in accordance with the Court's instructions.

## III.   CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests this Court grant the requested permanent injunction.

Dated: March 3, 2022              Respectfully submitted,

                                  /s/ W. Andrew Pequignot
                                  Lisa F. Moore (Bar No. 419633)
                                  W. Andrew Pequignot (Bar No. 424546)
                                  MOORE PEQUIGNOT LLC
                                  887 West Marietta Street, Suite M-102
                                  Atlanta, Georgia 30318
                                  Telephone: (404) 748-9596
                                  Email: lisa@themoorefirm.com
                                  Email: andrew@themoorefirm.com

                                  Sarah M. Matz (admitted *pro hac vice*)
                                  Gary P. Adelman (admitted *pro hac vice*)
                                  ADELMAN MATZ P.C.
                                  1173A Second Avenue, Suite 153
                                  New York, New York 10065
                                  Telephone: (646) 650-2207
                                  Email: sarah@adelmanmatz.com
                                  Email: g@adelmanmatz.com

                                  *Attorneys for Plaintiff*

18

## <u>CERTIFICATION AS TO FONT</u>

In accordance with Local Rule 7.1(D), the undersigned certifies that the foregoing document was prepared with Times New Roman 14, a font and point selection approved by the Court in Local Rule 5.1(C).

Dated: March 3, 2022

/s/ W. Andrew Pequignot
W. Andrew Pequignot

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

BELCALIS MARLENIS ALMÁNZAR,

                 Plaintiff,

    v.                                  Case No. 1:19-cv-01301-WMR

LATASHA TRANSRINA KEBE and KEBE
STUDIOS LLC,

                 Defendants.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 3, 2022, I electronically filed the foregoing

PLAINTIFF'S BRIEF IN SUPPORT OF PERMANENT INJUNCTION with the

Clerk of the Court using the CM/ECF system, which will automatically send email

notification of such filing to all of the attorneys of record

                               /s/ W. Andrew Pequignot
                               W. Andrew Pequignot